IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

          v.

TAJ JERRY MAHABUB, GENAUDIO, INC., and
ASTOUND HOLDINGS, INC.,

                    Defendants.

---

## COMPLAINT

      Plaintiff Securities and Exchange Commission ("SEC") alleges as follows against Defendants Taj Jerry Mahabub ("Mahabub"), GenAudio, Inc. ("GenAudio"), and Astound Holdings, Inc. ("Astound Holdings") (collectively, "Defendants"):

### I.      SUMMARY OF THE ACTION

      1.      GenAudio and its chief executive officer ("CEO"), Mahabub, engaged in fraud during the sale of the company's securities by, among other things, falsely representing the likelihood that GenAudio was to be acquired by the multi-national technology company, Apple, Inc. ("Apple") that is headquartered in Cupertino, California. Defendants also engaged in a fraudulent scheme, including Mahabub falsifying documents, to further the fraud. In addition, the defendants sold securities without complying with the registration requirements of the federal securities laws. As a result, the defendants obtained approximately $6.8 million from investors through false and misleading statements and omissions of material facts.

2.      From approximately November 2009 through April 2012, GenAudio, a small, private company that claimed to be developing three-dimensional audio technology, and Mahabub, raised money from investors based in large part upon their repeated representations that the company was engaged in advanced negotiations with Apple to either acquire GenAudio or to license its technology for use in Apple's products worldwide.  Among other things, GenAudio and Mahabub told prospective investors that Apple's senior management, including its CEO, Chief Operating Officer, and Senior Vice President of Worldwide Marketing, advocated acquiring GenAudio's technology and that a third party had valued GenAudio's technology at more than $1 billion.

3.      Defendants' claims about the likelihood of Apple acquiring GenAudio or licensing its technology were false and misleading.  In reality, GenAudio had only demonstrated its technology and participated in technical discussions with a few, mid-level Apple personnel, none of whom indicated that Apple was interested in a transaction with GenAudio.

4.      Mahabub was responsible for the fraud.  He was GenAudio's primary representative in its dealings with Apple, and he drafted all of the company's related false and misleading public disclosures.  Mahabub also engaged in other conduct in furtherance of the scheme, including falsifying emails that he received from Apple personnel to exaggerate their interest in GenAudio, then forwarding the falsified emails to other GenAudio employees, members of its board of directors, and investors.

5.      In late 2014, at Mahabub's direction, GenAudio formed Astound Holdings to function as its successor in interest.  Astound Holdings is liable for GenAudio's fraudulent and

unregistered stock offerings because: (i) it expressly and impliedly agreed to assume GenAudio's

debt; and (ii) it is a mere continuation of GenAudio.

## II.    SUMMARY OF VIOLATIONS

6.    As a result of the conduct described herein, Mahabub and GenAudio offered and

sold unregistered securities, obtained money or property on the basis of misleading statements

and omissions of material fact, made misleading statements and omissions of material facts, and

engaged in a scheme to defraud.  Accordingly, Mahabub and GenAudio have violated, and

unless restrained and enjoined, will continue to violate, Sections 5(a), 5(c), and 17(a) of the

Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)]; Section 10(b)

of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5].

7.    In the alternative, as a result of the conduct described herein, Mahabub  aided and

abetted, and unless restrained and enjoined, will continue to aid and abet GenAudio's violations

of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.    In the alternative, as a result of the conduct described herein, Mahabub is liable as

a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t] for GenAudio's

violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder

[17 C.F.R. § 240.10b-5].

9.    As the corporate successor in interest to GenAudio, Astound Holdings is liable for

GenAudio's violations of, and unless restrained and enjoined, will continue to violate Sections

5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10.     The SEC requests that the Court enter permanent injunctions prohibiting GenAudio and Astound Holdings from further violations of these provisions and order them to disgorge, with pre-judgment and post-judgment interest thereon, their ill-gotten gains from the conduct alleged in the Complaint and to pay third-tier civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

11.     The SEC also requests that the Court enter a permanent injunction prohibiting Mahabub from further violations of these provisions, order him to disgorge, with pre-judgment and post-judgment interest thereon, his ill-gotten gains from the conduct alleged in the Complaint and to pay third-tier civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and permanently bar him from serving as an officer and director of a public company.  The SEC also requests the Court to order Mahabub to disgorge, jointly and severally with GenAudio and Astound Holdings, their ill-gotten gains from the conduct alleged in the Complaint.

### III.      JURISDICTION AND VENUE

12.     The SEC brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], to restrain and enjoin the Defendants from engaging in the acts, practices, and courses of business described in this Complaint and acts, practices, and courses of business of similar purport and object.

13.     This Court has jurisdiction under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and  27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

14.     In connection with the transactions, acts, practices, and courses of business described in this Complaint, Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the means and instruments of transportation or communication in interstate commerce.

15.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391(b)(1) and (2).  GenAudio and Astound Sound maintain their principal place of business in Centennial, Colorado, and GenAudio is a Colorado corporation.  Mahabub resides in Broomfield, Colorado. In addition, many of the acts and practices described in this Complaint occurred in the District of Colorado, including, but not limited to, the solicitation of Colorado investors.

16.     Mahabub entered into three separate tolling agreements to toll the running of any statute of limitations against him from March 1, 2015 through November 30, 2015.

17.     GenAudio entered into three separate tolling agreements to toll the running of any statute of limitations against it from March 1, 2015 through November 30, 2015.

## IV.     DEFENDANTS

18.     **Taj Jerry Mahabub**, age 44, is a resident of Broomfield, Colorado.  He is the founder, CEO, and a director of GenAudio.  Mahabub has retained proxy voting rights to a majority of the issued and outstanding stock of GenAudio.  Mahabub is also the CEO sole director of, and controls Astound Holdings.

19.     **GenAudio, Inc.** is a Colorado corporation with its principal place of business in Centennial, Colorado.  GenAudio purports to be engaged in the development and marketing of software that creates three-dimensional audio.  Mahabub formed GenAudio in 2004 and has held the voting rights to a majority of its shares since its inception.  Since approximately October 2014, GenAudio has been the sole owner of common stock of Astound Holdings, its successor corporation.  GenAudio has not registered an offering of securities under the Securities Act or a class of securities under the Exchange Act.

20.     **Astound Holdings, Inc.** is a Delaware corporation with its principal place of business in Centennial, Colorado.  Mahabub caused the formation of Astound Holdings in 2014 to act as a successor in interest to GenAudio.  Mahabub is Astound Holdings' sole director and the only holder of its preferred stock.  Astound Holdings has not registered an offering of securities under the Securities Act or a class of securities under the Exchange Act.

## V.      FACTS

**A.      Background:  GenAudio's Operations.**

21.     Mahabub founded GenAudio in approximately 2004.  Since the company's inception, he has served as its CEO and a member of the board of directors.  Mahabub also holds the proxy rights to a majority of GenAudio's shares.

22.     From 2004 to the present, Mahabub controlled all aspects of GenAudio's business, including, but not limited to, its operations, fundraising, product research and development, and sales efforts.

23.     At various times, GenAudio licensed its technology and sold software downloads of its audio technology on the Internet.  However, from the company's inception to the present,

these licenses and sales have only generated revenue of approximately $100,000.  GenAudio's revenue was insufficient to meet its operating expenses, and therefore the company operated at a loss every year.

24.     GenAudio financed its operations almost entirely through the sale of debt and equity securities in numerous private offerings.  For example, from 2004 through 2009, GenAudio raised approximately $13 million in multiple private placements.  The company spent the bulk of those funds to compensate Mahabub and other company personnel and contractors.

**B.     Mahabub Had Only Limited Communications With Mid-Level Apple Personnel.**

25.     Mahabub led GenAudio's corporate sales efforts, which focused on attempting to license its technology to numerous companies.  Mahabub attempted to garner interest in GenAudio by sending unsolicited communications to other companies' technical or engineering staff.

26.     Mahabub was the sole representative of GenAudio in the vast majority of its communications with Apple.

27.     Mahabub first sent an unsolicited email to Apple in approximately December 2006.  He was referred to an acoustic engineer, who became his primary contact.  From December 2006 through May 2009, Mahabub had very limited communications with Apple personnel.

28.     On or about June 18, 2009, Mahabub gave an informal demonstration of GenAudio's audio software to an Apple acoustic engineer, and provided them with devices upon which GenAudio had installed its software for further testing.

7

29.     Mahabub executed Apple's standard confidentiality agreement on behalf of GenAudio on or about July 1, 2009.

30.     From approximately July 2009 through February 2011, Mahabub attended meetings and had communications with mid-level Apple engineers and marketing personnel, some of whom were, on a very preliminary basis, testing GenAudio's software technology.

31.     In February 2011, the acoustic engineer that had been Mahabub's primary contact at Apple left the company.  The acoustic engineer instructed Mahabub to pick up the devices that Mahabub had loaned to the Apple engineering staff for demonstration purposes.

32.     In March 2011, an engineer in Apple's Mac computer division gave Mahabub the name of another possible contact at Apple, and indicated that if interested, this other contact would "sign all the necessary evaluation agreements."  However, no other Apple personnel ever requested a demonstration or requested that GenAudio execute additional software evaluation or confidentiality agreements.

33.     From March 2011 forward, nobody at Apple indicated that they were continuing to evaluate GenAudio's technology.

34.     Although Mahabub attended various meetings and communicated with a handful of mid-level Apple personnel, GenAudio's dealings with Apple were limited in certain key respects:

        a.   Apple did not express an interest in licensing GenAudio's technology for
             inclusion in any of Apple's products;

        b.   Apple did not express an interest in acquiring GenAudio;

c.  Apple did not engage in any negotiations to license GenAudio's technology or to acquire GenAudio;

d.  GenAudio's technology never got past the testing stage, and therefore Apple never communicated that it planned to incorporate GenAudio's technology in any of its products;

e.  Beyond its basic, initial confidentiality agreement, Apple did not request that GenAudio enter into any additional confidentiality or software evaluation agreements; and

f.  Apple's senior management at that time, including its CEO, COO, and Senior Vice President for Worldwide Marketing:

    i.  Did not participate in demonstrations of, or meetings concerning, GenAudio's technology;

    ii. Did not express interest in acquiring GenAudio or licensing its technology; and

    iii. Did not request, schedule, or attend meetings with Mahabub.

**C.    Mahabub and GenAudio Made Material Misrepresentations and Omissions in Connection With GenAudio's 2010 Stock Offering.**

35.    From March through August 2010, GenAudio offered and sold approximately 1.1 million shares of its common stock to more than seventy investors in Colorado and numerous other states raising approximately $3.5 million from the sales (the "2010 Offering").

36.    GenAudio solicited prospective investors for the 2010 Offering by, among other things, disseminating, via email, a private placement memorandum ("PPM") and letter signed by Mahabub dated March 15, 2010 (collectively, "GenAudio's 2010 Offering Materials").

37.     Mahabub prepared, reviewed, approved and had ultimate responsibility for GenAudio's 2010 Offering Materials, and directed their dissemination to prospective investors. In particular, Mahabub was responsible for drafting the disclosures in GenAudio's 2010 Offering Materials related to its purported dealings with Apple.

38.     Because Mahabub was the sole representative of GenAudio in virtually all of its communications and dealings with Apple, others at GenAudio were dependent upon him for information relating to Apple.

39.     Immediately preceding and throughout the course of GenAudio's 2010 Offering, Mahabub made repeated misrepresentations implying that Apple was on the verge of either acquiring GenAudio, or licensing its technology for use in substantially all of its products worldwide.

40.     Mahabub made materially false and misleading statements about GenAudio's prospects for a deal with Apple to shareholders and new investors who purchased GenAudio's securities because the information was significant to the investors' decisions to purchase or sell the securities of GenAudio.

41.     As the CEO and a director of GenAudio, Mahabub's knowledge related to the false and misleading statements is imputed to GenAudio.

September 2009 Board Meeting

42.     In or about September 2009, GenAudio was in debt of over $1 million and need to raise additional funds from investors to continue its operations.  On September 25, 2009, at GenAudio's Board of Directors meeting Mahabub summarized his discussions with Apple.  He

told the Board of Directors that a deal with Apple was highly probable based on the many meetings he attended and Apple's responses to date.

43.     While Mahabub had attended meetings with mid-level Apple engineers during the summer of 2009 and signed a nondisclosure agreement in July 2009, he knew that no discussions about a potential deal with Apple occurred during those meetings and that he had no reasonable basis for his statement to the Board of Directors that a deal with Apple was highly probable.

44.     Mahabub was also negligent in sending this information to GenAudio's Board of Directors and employees.

45.     In these statements, Mahabub introduced the idea that GenAudio would either be acquired by or enter into a licensing agreement with Apple, which he later repeated in his personal offer and sale of GenAudio shares and in the 2010 Offering Materials.

October 2, 2009 Shareholder Email

46.     Following a meeting on October 1, 2009, with an Apple acoustic engineer and a marketing person, Mahabub sent an email on October 2, 2009, to GenAudio's directors and employees, some of whom were also shareholders.  Mahabub claimed that, among other things, that he had met with Apple's Senior Vice President for Worldwide Marketing and demonstrated GenAudio's technology to him, that the he "was very impressed," and requested additional demonstrations from Mahabub.  Mahabub also stated:

> "[m]y confidence level is at 80% as of now that we will be doing a $weet deal
>
> with Apple…. I am supposed to meet with the big man [the CEO of Apple] in two
>
> to three weeks…."

47.     Mahabub expected GenAudio's directors and employees to share these developments with GenAudio's shareholders.

48.     Mahabub knew or was reckless in not knowing these material statements were false and misleading, because he had not met with Apple's Senior Vice President for Worldwide Marketing or demonstrated GenAudio's technology for him.  In addition, Mahabub had no reasonable basis upon which to claim an "80%" confidence level that GenAudio would engage in a transaction with Apple because nobody from Apple had expressed any interest in doing any type of deal with GenAudio, and no one had mentioned the possibility of a meeting with Apple's CEO.

49.     Mahabub was also negligent in sending this information to GenAudio's Board of Directors and employees.

50.     Mahabub knew, or was reckless in not knowing that some other GenAudio Board members and employees were also GenAudio investors, and that they would pass the information on to other GenAudio shareholders.

51.     In these statements, Mahabub continued to create the false expectation that GenAudio would either be acquired by or enter into a licensing agreement with Apple, which Mahabub repeated in his personal offers and sales of GenAudio shares and in GenAudio's 2010 Offering Materials.

November 9, 2009 Shareholder Letter

52.     On November 9, 2009, Mahabub and GenAudio sent a letter to all GenAudio shareholders by email.  Mahabub wrote and electronically signed the letter as GenAudio's CEO. In this letter, Mahabub wrote that "there is a strong possibility that the Company may be

acquired within the next 6 months in light of our extensive discussions with a global industry leader in consumer electronics." Mahabub's reference to "a global industry leader in consumer electronics" was to Apple.

53.     Mahabub knew or was reckless in not knowing that his description of GenAudio's discussions as having been "extensive" was materially misleading because by that point in time, he had only made a handful of basic demonstrations to mid-level Apple employees. Mahabub had no reasonable basis for his statement that there was "a strong possibility that the Company may be acquired within the next 6 months" because nobody at Apple had expressed *any* desire to acquire GenAudio, let alone within six months.

54.     Mahabub and GenAudio were negligent in sending this materially false and misleading information to GenAudio's Board of Directors and employees.

55.     In these statements, Mahabub continued to create the false expectation that GenAudio would either be acquired by or enter into a licensing agreement with Apple, which Mahabub and GenAudio repeated in his personal offers and sales of GenAudio shares and in the 2010 Offering Materials.

2010 Offering Materials

56.     On or about March 15, 2010, Mahabub and GenAudio sent the 2010 Offering Materials, consisting of Mahabub's letter to Shareholders, the Private Placement Memorandum, and third-party's valuation report (collectively the "2010 Offering Materials"), to all of GenAudio's shareholders by email and later sent it to other prospective investors. The 2010 Offering was intended to raise funds "to provide bridge capital until we can 'ink' a deal with a large consumer electronics company (referred to as the 'LCEC' throughout the PPM)."

57.     Mahabub used the term "LCEC" in the 2010 Offering Materials and other shareholder communications as a thinly-veiled reference to Apple.  In numerous instances, Mahabub and other GenAudio employees directly told or strongly implied to prospective investors that the "LCEC" was Apple.  In addition, the third-party's valuation report identified Apple as the company with which GenAudio was interested in negotiating a license or outright sale.

58.     Given his limited dealings with Apple technical personnel through March 2010, Mahabub knew, or was reckless in not knowing, that GenAudio was not close to "ink[ing]" any transaction with Apple.

59.     GenAudio and Mahabub were also negligent in in sending this materially false and misleading information about a potential deal with a LCEC to GenAudio's shareholders and other prospective investors.

60.     With respect to Apple, GenAudio and Mahabub wrote in the 2010 PPM that: "Although the Company is prohibited from disclosing any further information about the identity of the LCEC and the status of current negotiations with it, the Company is optimistic that the LCEC will eventually want access to our AstoundSound Technology for their products.  It is unclear what structure such access would take but the Company believes the LCEC would either (i) integrate a portion of our AstoundSound Technology…into multiple product lines through a licensing arrangement or (ii) acquire all of our AstoundSound Technology or, at the least, that portion the LCEC deems necessary for its integration plans."

61.     Mahabub knew, or was reckless in not knowing, from his participation in all the meetings with Apple that GenAudio had not entered into any "negotiations" with Apple. Mahabub had no reasonable basis for the stated belief that Apple sought to license or acquire GenAudio's technology.

62.     At Mahabub's direction, GenAudio included in the 2010 Offering Materials a third party's valuation report that purported to value GenAudio's technology at $1 billion.  The third party's valuation report made clear that this valuation was based upon the assumption that Apple would license or otherwise acquire rights to GenAudio's technology for integration into *all* of Apple's products worldwide.

63.     Mahabub hired the third-party valuation company and provided information to its principal regarding Apple's supposed interest in acquiring GenAudio's technology.  Among other things, Mahabub told the principal of the valuation firm to assume that Apple would use GenAudio's technology in all of its products.

64.     Because Mahabub knew, or was reckless in not knowing, that Apple had no such plans to include GenAudio's technology in all of its products, his and GenAudio's inclusion of the third party's valuation of GenAudio's technology at $1 billion was materially false and misleading.

65.     Mahabub and GenAudio were also negligent in including the $1 billion valuation in the 2010 Offering Materials.

Additional Statements Made to Investors During with the 2010 Offering

66.     As detailed below, throughout GenAudio's 2010 Offering, Mahabub repeatedly made materially false statements orally and in writing to prospective investors regarding his

purported meetings with, or the evaluation of GenAudio's technology by, senior Apple personnel, including its CEO.

67.     In April 2010, Mahabub sent an email to prospective investors at an investment conference that claimed in relevant part:

"I have been on the phone all morning with the large consumer electronics company (the 'LCEC') looking to acquire GenAudio's tech for integration into their entire lineup of product offerings, of which, embedded level integration testing for all product offerings of the LCEC have already been tested successfully, and we are now waiting to when we will initiate negotiations, pending the CEO of the LCEC to approve the integrated product rollout strategy and the technical implementation strategy that will be presented to the CEO next week!!!"

68.     Mahabub knew or was reckless in not knowing that this material representation was false and misleading because Apple had never indicated that it sought to acquire GenAudio's technology or that it planned to integrate the technology into all of its products. Nobody at Apple had told Mahabub that Apple's CEO was scheduled to evaluate a product rollout and technical implementation strategy relating to GenAudio's technology.

69.     Continuing to seek additional investments, on or about June 2, 2010, GenAudio sent an audio presentation narrated by Mahabub to its existing shareholders.  In the audio presentation, Mahabub stated in relevant part that:

"Perhaps the biggest part of the entire presentation is that we have attracted a very large consumer electronics company of which, as of a couple of days ago and

16

after building a two year relationship with my management team contacts, in

almost one year of technology integration, software optimization and marketing

strategy planning, the CEO of the LCEC finally met with senior marketing and

technical management and we have the green light to move forward."

70.     Mahabub knew or was reckless in not knowing that this material representation

was false and misleading because, among other things, nobody from Apple had told him that the

company's CEO had met with senior marketing and technical management regarding

GenAudio's technology, or that Apple's CEO had expressed an opinion on the acquisition of

GenAudio's technology.

71.     Mahabub orally repeated the false statements alleged in paragraph 69 above

during in-person "road show" presentations to prospective investors in ten cities across the

country.  In these presentations, Mahabub also disseminated the 2010 Offering Materials to

prospective investors.

72.     Continuing to seek additional investments from existing shareholders, on or about

August 1, 2010, Mahabub sent a letter to GenAudio shareholders in which he represented as

follows:

"In the very near future, it has been requested by the LCEC's CEO to have a

'hand-shake' meeting with myself alongside meeting with the LCEC's expert in

acoustic physics and others…It has been requested that we sign an even more

restrictive NDA with the LCEC."

73.     Mahabub knew, or was reckless in not knowing that these material representations

were false or misleading because nobody from Apple had told him that Apple's CEO had

requested to meet him, nor had Apple requested that GenAudio sign a more restrictive non-disclosure agreement.

74.     Mahabub was also negligent in making these false and misleading material statements that operated as a fraud on investors.

75.     On or about August 28, 2010, Mahabub again urged GenAudio shareholders to invest in the 2010 Offering, by representing in relevant part that:

> "The offering must close on August 31, 2010…we hope you understand that our
> position [with the LCEC] grows stronger with each passing day.  I can say that
> our anticipation of a buyout would be the most probable case when and if we ink
> a deal and come to terms with the LCEC."

76.     Mahabub knew, or was reckless in not knowing that these material representations were false or misleading because nobody from Apple had indicated that it sought to license GenAudio's technology or engaged in any negotiations with GenAudio as to a possible transaction.  Therefore, Mahabub had no reasonable basis for his statement that GenAudio's position with Apple was growing stronger each day.

77.     Mahabub was also negligent in making these false and misleading material statements that operated as a fraud on investors.

78.     From March through August 2010, GenAudio and Mahabub offered and sold approximately 1,171,000 common shares in the 2010 Offering obtaining approximately $3,513,000 by means of their false and misleading statements.

**D.      Mahabub and GenAudio Made Material Misrepresentations and Omissions in Connection with GenAudio's 2011-2012 Offering.**

79.      From approximately December 2010 through April 2011, in preparation for the 2011/2012 stock offering ("2011/2012 Offering"), Mahabub and GenAudio continued to stoke investor interest in purchasing GenAudio stock by preparing and sending letters to shareholders touting Apple's purported, ongoing interest in GenAudio's technology.

December 8, 2010 Letter to Shareholders

80.      On or about December 8, 2010, GenAudio and Mahabub as CEO of GenAudio disseminated a letter to all shareholders in which Mahabub falsely claimed that "I met with their CEO [the LCEC] and gave him a demo of our technology, and he stated, 'I really like your technology and look forward to seeing you again in the future.'"

81.      At the time he made these material statements, Mahabub knew or was reckless in not knowing that his statements were false because, in fact, he had never met with Apple's CEO.

82.      Also, in the December 8, 2010 letter to shareholders, GenAudio and Mahabub wrote, "our new valuation analysis as of today puts our net present value at 3.3 Billion USD."

83.      At that time, Mahabub knew or was reckless in not knowing that this material valuation was false and misleading because he knew that the valuation was based upon the false assumption that Apple and numerous other industry leaders sought to license GenAudio's technology for use in each of their most popular product lines worldwide.

84.      These statements continued to create the false expectation that GenAudio would either be acquired by, or enter into a licensing agreement with Apple.  This fraud was repeated in the 2011/2012 Offering which was to begin shortly after these statements were made.

February 26, 2011 Letter to Shareholders

85.     In a February 26, 2011 letter sent to all shareholders, GenAudio and Mahabub as CEO advised that the company had only enough cash to continue operations through April or May 2011.  They also advised that the company planned to raise a minimum of $1.5 million from investors to enable the company to continue operations until it became self-sustaining through revenue from licensing deals.

86.     In this February 26, 2011 letter to shareholders, GenAudio and Mahabub again assured investors that Apple remained interested in acquiring GenAudio's technology by stating in relevant part:

> "[o]ur discussions with the confidential LCEC that I have previously advised you about in prior communications are ongoing. . . .  [M]y primary point of contact has recently retired from the LCEC . . . .  [T]he LCEC . . . continue[s] to be very interested in integrating our technology across their entire line-up of product offerings."

87.     At the time he made these material statements, Mahabub knew or was reckless in not knowing that the statements about discussions with the LCEC were ongoing and they were interested in integrating our technology across their entire line-up of product offerings were false because after his primary contact had left Apple nobody from Apple had expressed an interest in integrating GenAudio's technology across their entire lineup of products.

88.     Mahabub's and GenAudio's statements made in the February 26, 2011 shareholder letter were made in connection with the offer and sale of GenAudio stock.

March 30, 2011 Email to Shareholders

89.     On or about March 30, 2011, in an email to all shareholders, Mahabub as the CEO of GenAudio mentioned the company's upcoming 2011/2012 Offering, and then provided the following update regarding Apple's purported interest in GenAudio:

"this email is to notify all existing shareholders that what we commonly refer to as the 'LCEC'… and GenAudio are going to be signing a new set of 'evaluation and development' agreements.  This will completely prohibit myself or any of GenAudio's team members to disclose any further information about the LCEC…. All references to the LCEC will be deleted from the business plan section of the new offering….  GenAudio's internal management team will be allowed to know about our dealings with the LCEC on a 'need to know basis'.  When the time comes that we can inform the shareholders of the status with the LCEC we will."

90.     By falsely claiming that an even more restrictive agreement with Apple prevented him from disclosing more information, Mahabub:  (i) falsely implied that Apple's interest in GenAudio was ongoing; and also (ii) relieved himself and GenAudio from the need to provide further updates as to the status of the purported negotiations.

91.     At the time he made these material statements, Mahabub knew or was reckless in not knowing that they were false because by this time Mahabub's primary contact had left Apple, and Mahabub had not met again with or engaged in any substantive communications with any other Apple personnel.  Mahabub therefore had no reasonable basis upon which to claim that

such new agreements were any more restrictive than the basic confidentiality agreement that had been in place since July 2009.

92.     GenAudio and Mahabub were also negligent in making these false and misleading material statements that operated as a fraud on investors.

93.     In these statements, Mahabub and GenAudio continued to create the false expectation that GenAudio would either be acquired by or enter into a licensing agreement with Apple, which Mahabub and GenAudio repeated in his personal offers and sales of GenAudio shares and in the 2011/2012 Offering Materials.

GenAudio's 2011/2012 Offering Materials

94.     From approximately April 2011 through April 2012, GenAudio and Mahabub offered $2,100,000 of common shares of GenAudio and sold approximately 330,000 shares in the 2011/2012 Offering to more than twenty investors in Colorado and numerous other states, and obtained approximately $990,000 from the sales by means of false and misleading material statements.

95.     From approximately April 2011 through April 2012, Mahabub and GenAudio offered and sold GenAudio's shares to existing shareholders and other investors.

96.     Mahabub prepared, reviewed, approved, had ultimate responsibility for GenAudio's 2011/2012 Offering Materials, which consisted of Mahabub's letter to shareholders and Private Placement Memorandum dated April 22, 2011, and directed dissemination of the 2011/2012 Offering Materials to prospective investors.

97.     Mahabub and GenAudio represented in the 2011/2012 Offering Materials that the Company had received a new valuation report and the "updated [ ] net present value of the Company's technology [is] approximately $3.3 Billion."

98.     Mahabub's and GenAudio's representation that the value of the Company's technology had increased to $3.3 billion was materially false and misleading because GenAudio and Mahabub did not disclose that the valuation was based upon the unsupported assumption that Apple and other industry leaders sought to license GenAudio's technology for use in their respective products worldwide.

99.     Mahabub knew, or was reckless in not knowing, that the valuation of GenAudio's technology at $3.3 billion was false and misleading because it was based on an unsupported assumption  that Apple and other industry leaders sought to license GenAudio's technology for use in their respective products worldwide.

100.    Mahabub and GenAudio were also negligent in including this $3.3 billion valuation in the 2011/2012 Offering Materials.

Mahabub and GenAudio Omissions

101.    In the 2010 Offering Materials, 2011-2012 Offering Materials, and shareholder communications, GenAudio and Mahabub also omitted material information regarding the status of their discussions with Apple, including that:

      a. Mahabub's communications with Apple personnel had been limited to a handful of mid-level engineering and marketing staff, none of whom had authority to license GenAudio's technology or acquire GenAudio;

b.   Apple and GenAudio had never begun negotiations to license GenAudio's technology or to acquire GenAudio;

c.   Apple's communications with GenAudio were at times sporadic, including periods where months elapsed between communications;

d.   In September 2010, Mahabub had conducted a demonstration to Apple personnel that went poorly, with an Apple engineer questioning the premise of GenAudio's technology;

e.   GenAudio's technology never got past the testing stage, and therefore Apple never communicated that it planned to incorporate GenAudio's technology in any of its new product roll-outs; and

f.    GenAudio had no substantive communications with Apple after March 2011.

102.   GenAudio and Mahabub each knew or were reckless in not knowing that the misrepresentations and omissions to investors alleged herein regarding GenAudio's dealings with Apple were materially false and misleading.

**E.    Mahabub Made Material Misrepresentations and Omissions in Connection with His Offer and Sale of His Personal GenAudio Stock.**

103.   From November 2009 through April 2012, Mahabub periodically solicited investors to buy his personal holdings of GenAudio stock.  During this time period, Mahabub sold approximately 3 million shares of his GenAudio stock to more than ninety investors, thereby generating approximately $2.3 million in proceeds.

104.     Mahabub provided a portion of his GenAudio stock sales proceeds back to GenAudio, which he characterized as loans to the company or the advancement of business expenses on the company's behalf.

105.     Mahabub made some of his personal stock sales to existing GenAudio shareholders, including investors in GenAudio's 2010 and 2011-2012 Offerings.  Therefore, many of the investors that purchased Mahabub's personal GenAudio stock received the false and misleading offering materials and shareholder letters as alleged herein.

106.     Mahabub made additional false and misleading material statements to prospective purchasers of his personal GenAudio stock.  On or about March 10, 2010 – just five days before the commencement of the 2010 Offering – Mahabub sent an email to prospective purchasers of his personal stock that "we are starting to discuss the business side with the LCEC and I expect to have a very substantial license deal in place for their Christmas Product Rollout…."

107.     Mahabub knew or was reckless in not knowing that the statements were false because at that time, nobody from Apple had indicated a desire to license GenAudio's technology, much less that such licensing would come before the 2010 holiday shopping season.

108.     Mahabub and GenAudio were also negligent in making the materially false and misleading statement is the March 10, 2010 email to shareholders.

109.     In these statements, Mahabub and GenAudio continued to create the false expectation that GenAudio would either be acquired by or enter into a licensing agreement with Apple, which Mahabub repeated in his personal offers and sales of GenAudio shares, and in GenAudio's 2010 Offering Materials.

**F.     Mahabub and GenAudio Engaged in a Scheme and Fraudulent
         Practices or Courses of Business to Defraud GenAudio Investors.**

110.    From approximately November 2009 through April 2012, Mahabub and

GenAudio also engaged in a scheme to defraud GenAudio investors by, among other things:

a.   Making the false and misleading oral statements alleged herein;

b.   Authoring, reviewing, and directing the dissemination of GenAudio's false
     and misleading 2010 and 2011-2012 Offering Materials to prospective
     investors as alleged herein;

c.   Authoring, reviewing, and directing the dissemination of GenAudio's false
     and misleading shareholder letters as alleged herein;

d.   Providing false and misleading information regarding Apple's purported
     interest in using GenAudio's technology across all of its products to the
     principal of the third party valuation firm;

e.   Falsely modifying emails received from Apple personnel, then circulating
     them to others; and

f.   Providing false information to GenAudio's board of directors regarding
     Apple's purported interest in licensing GenAudio's technology.

111.    Mahabub actively encouraged other GenAudio board members and employees to

solicit their friends and family to invest in the company, and to repeat his false and misleading

updates as to Apple's supposed interest in acquiring GenAudio's technology.  For example, in an

email to several GenAudio employees on or about March 18, 2010, Mahabub attached the 2010

Offering Materials and the cover letter and stated:

"it should be smooth sailing into a HUGE deal with the LCEC as we are within days of the LCEC actually starting to embed our tech into their devices and prepare for product integration level testing….  Time to go back into fund raising mode, and if any of you feel like helping out with this effort, I would certainly appreciate it.  It's not like you are doing your friends and family a bad thing by getting them into GenAudio at this stage in the game.  **We are all in the same boat, and now I need you all to keep me from drowning.**" (Emphasis is in original.)

112.     Based upon false and misleading information provided solely by Mahabub, other GenAudio board members and employees told prospective investors that Apple sought to acquire GenAudio's technology.

113.     In numerous instances from at least October 2009 through July 2010, Mahabub falsely modified portions of emails he received from Apple employees, then forwarded them to GenAudio board members, employees, and investors.  Mahabub falsely modified numerous emails that he received from Apple personnel, by among other things:

    a.   Changing the names of meeting attendees to make it appear that senior management at Apple was involved in meetings with Mahabub or attended internal meetings at Apple to discuss GenAudio's technology, that they had been impressed with GenAudio, or that they sought additional information;

    b.   Referencing meetings or calls that were never contemplated or never took place, including planned in-person meetings with Apple's CEO, telephone

calls with Apple's COO, and multiple meetings with Apple's Senior Vice President for Worldwide Marketing; and

c. Inserting details as to Apple's purported interest in and consideration of licensing GenAudio's technology and including it in new Apple product roll-outs.

114. On or about February 12, 2010, Mahabub modified an email from an Apple employee to make it appear that Apple's CEO and Senior Vice President for Worldwide Marketing were involved in evaluating GenAudio's technology, and that Mahabub had discussed with the Senior Vice President for Worldwide Marketing a "Christmas product rollout." Mahabub sent the email to GenAudio's employees and at least one member of the Board of Directors.

115. In another instance, Mahabub fabricated what he claimed was an *entire verbatim transcript* of a phone call that he claimed to have had with an Apple acoustic engineer on the evening of May 6, 2010, then forwarded it to several GenAudio employees and board members, as well as one significant shareholder. In dramatic flair, Mahabub warned recipients of his phony transcript to "DELETE THIS EMAIL AFTER YOU READ IT . . . If this ever got out, it could kill our deal." In the falsified "transcript," Mahabub claimed that an Apple acoustic engineer had said, among other things:

a. "the meeting could not have gone any better . . . The [GenAudio] demos were all very well accepted."

      b.   "Steve thought the [GenAudio] 'technology is too good to be rolled in to a giant pool of other features,' . . . [but instead that Apple's CEO wanted to consider how best] 'to explode this technology into the world.'"

116.    As the founder, CEO and a director of GenAudio, Mahabub's acts in furtherance of this scheme and knowledge are imputed to GenAudio.

117.    Mahabub's false, misleading and fabricated emails and other communications with GenAudio Directors, employees and shareholders were material because they gave the appearance that Mahabub's discussions and negotiations with Apple employees were ongoing and leading to a deal with Apple.

**G.    Mahabub Controlled GenAudio.**

118.    From GenAudio's inception, Mahabub was the CEO, a director of GenAudio, and a significant shareholder.

119.    On or about March 15, 2010, Mahabub reported that he owned 7,001,000 shares of GenAudio's common voting stock, which was 51.43% of the outstanding shares.

120.    Between 2008 and 2014, Mahabub held the proxy voting rights for approximately 6,308,000 shares of GenAudio or approximately 45% of all outstanding shares.

121.    Mahabub controlled all aspects of GenAudio's business, including, but not limited to, its operations, fundraising, product research and development, and sales efforts.

122.    Mahabub decided to which companies GenAudio would offer its technology.

123.    Mahabub participated in all the meetings with Apple, updated GenAudio's Board of Directors and employees on the status of his discussions with Apple, and drafted all the disclosures to shareholders.

124.     Mahabub controlled the dissemination of the information about GenAudio's dealings with Apple to GenAudio's Directors, employees, shareholders and prospective investors.

125.     Mahabub controlled the selection of the third party that performed two valuations of GenAudio, and provided the assumptions about GenAudio's purported future business transaction with Apple that became the basis for the report.

126.     Mahabub directly or indirectly induced GenAudio to make false and misleading statements and omissions of material facts in the 2010 Offering Materials, the 2011/2012 Offering Materials and the letters to shareholders discussed above.

**H.     Defendants Profited From their Fraudulent Conduct.**

127.     GenAudio and Mahabub unjustly profited by selling GenAudio stock in fraudulent, unregistered offerings.

128.     In the 2010 Offering and 2011-2012 Offering, GenAudio unjustly profited by obtaining approximately $4.5 million from its sale of stock to investors.  Mahabub also profited from GenAudio's fraudulent offering from 2010 through 2012 by, among other things, collecting various forms of compensation, and directing GenAudio to pay various personal expenses from the offering proceeds.

129.     Mahabub also unjustly profited from his fraudulent and unregistered offering of his personal stock in GenAudio, by retaining a portion of the $2.3 million in proceeds.

**I.     The Stock Offerings By GenAudio and Mahabub Were
         Not Registered With the SEC or Exempt From Registration.**

130.     From approximately March 2010 through August 2010, during GenAudio's 2010 Offering, GenAudio and Mahabub offered and sold the securities of GenAudio when no

registration statement was filed or in effect for the transactions.  GenAudio raised approximately $3.5 million from more than seventy investors in multiple states in the 2010 Offering.

131.    From approximately April 2011 through April 2012, during GenAudio's 2011-2012 Offering, GenAudio and Mahabub offered and sold the securities of GenAudio when no registration statement was filed or in effect for the transactions.  GenAudio raised approximately $990,000 from more than twenty investors in multiple states in the 2011-2012 Offering.

132.    Mahabub was a necessary and substantial participant in GenAudio's offers and sales.  Among other things, he, along with other members of the Board of Directors, made the decision to offer GenAudio's securities to public investors.  In addition, he drafted the offering materials, and provided information to investors about GenAudio's dealings with Apple.

133.    From approximately November 2009 through April 2012, Mahabub made offers and sales of his personal GenAudio stock when no registration statement was filed or in effect for the transactions.  Mahabub's offering of his personal stock of GenAudio raised approximately $2.3 million from more than ninety investors in multiple states.

134.    Mahabub acted as an underwriter in his personal sales of GenAudio's securities. He sold the securities in part to raise money to pay to the company to continue its operations.

135.    GenAudio and Mahabub offered and sold GenAudio stock to investors using the means or instruments of interstate commerce including but not limited to telephones, the Internet, and the mails.

136.    GenAudio and Mahabub offered and sold GenAudio stock to some unaccredited and unsophisticated investors.  Neither GenAudio nor Mahabub had a reasonable basis to believe that all GenAudio investors were accredited or sophisticated.

137.    In their respective offerings, GenAudio and Mahabub failed to provide investors with the information required under Rule 502(b) of Regulation D [17 C.F.R. § 230.502(b)], including an audited balance sheet.

**J.    Astound Holdings Is GenAudio's Successor in Interest.**

138.    As part of two separate private securities offerings in September 2008, GenAudio offered to its common stockholders a contractual put right to require GenAudio to repurchase the shares at cost plus approximately 10% - 15% interest within approximately four years of the offerings' closing.

139.    In approximately March 2013, some put right holders exercised their put rights and received promissory notes from GenAudio that were payable in September 2013.  The promissory note holders repeatedly demanded payment from GenAudio, which demands the company declined on the grounds that it lacked sufficient funds.

140.    In September 2014, GenAudio held a special meeting of stockholders to consider Mahabub's plan to reorganize the company through the formation of a corporate successor in interest that shed the obligations to the put note holders.  At this special meeting, GenAudio shareholders approved of:

a.   The incorporation of Astound Holdings, Inc.;

b.   Astound Holdings' proposed bylaws, including bylaws regarding capital structure and associated corporate governance; and

c.   GenAudio's transfer of all of its assets, including its intellectual property, and all liabilities, with the exception of funds owed to shareholders pursuant

to put rights, and amounts owed to certain bond holders, in exchange for 10 million shares of Astound Holdings' common stock.

141.    Mahabub controlled the vote by GenAudio shareholders alleged above because he had retained the proxies for all of the shares that he had sold privately and therefore held voting rights to a majority of GenAudio's shares of stock.

142.    Astound Holdings later issued preferred stock to Mahabub, purportedly in exchange for his agreement to transfer the technology held by GenAudio to Astound Holdings. Other than GenAudio and Mahabub, there are currently no other shareholders of Astound Holdings' stock.

143.    In approximately October 2014, GenAudio, through Mahabub, incorporated Astound Holdings in Delaware.

144.    From October 2014 through the present, Astound Holdings has continued the business operations of GenAudio, and it has nearly identical employees, contractors, and management.

145.    Under Astound Holdings' bylaws, GenAudio has one vote in matters submitted to a vote.  Mahabub, as the holder of the proxies for a majority of GenAudio's shares, has the right to determine that vote, as well as vote his preferred shares, which purportedly have one vote for each preferred share.  As a result, Mahabub has complete control of Astound Holdings. Mahabub is currently Astound Holdings' CEO and sole director.

146.    Astound Holdings expressly and impliedly agreed to assume GenAudio's debts, with the exception of funds owed to shareholders pursuant to certain put rights, and amounts owed to certain bond holders.

147.    Astound Holdings was formed to be merely a continuation of GenAudio's ownership.  GenAudio was owned by Mahabub and other shareholders.  Astound Holdings has the same ownership – Mahabub and, indirectly, GenAudio shareholders.

148.    Astound Holdings was formed to be merely a continuation of GenAudio's corporate structure.  Although GenAudio still exits as a separate corporate entity, it exists only as a shareholder of Astound Holdings.  GenAudio and Astound Holdings also share a commonality of officers and directors.  Mahabub, through his stock voting rights, controls both entities.

149.    As the corporate successor in interest to GenAudio, Astound Holdings is liable for GenAudio's violations of the federal securities laws alleged herein.

## VI.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Scheme to Defraud in the Offer or Sale of Securities**
**Violations of Securities Act Section 17(a)(1) [15 U.S.C. § 77q(a)(1)]**
**(Against Defendants Mahabub, GenAudio, and Astound Holdings)**

150.    Paragraphs 1 through 149 are re-alleged and incorporated herein by reference.

151.    Mahabub, GenAudio, and Astound Holdings, directly or indirectly, with scienter, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme, or artifice to defraud, in violation of Section 17(a)(1) of the Securities Act.

152.    By reason of the foregoing, Mahabub, GenAudio, and Astound Holdings violated, and unless enjoined will continue to violate, Section 17(a)(1) of the Securities Act.

**SECOND CLAIM FOR RELIEF**
**To Obtain Money or Property By False Statements in the Offer or Sale of Securities**
**Violations of Securities Act Sections 17(a)(2) and (3) [15 U.S.C. §§ 77q(a)(2) and (3)]**
**(Against Defendants Mahabub, GenAudio, and Astound Holdings)**

153.    Paragraphs 1 through 149 are re-alleged and incorporated herein by reference.

154.    Mahabub, GenAudio, and Astound Holdings, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or by omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 17(a)(2) of the Securities Act.

155.    Mahabub, GenAudio, and Astound Holdings, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of securities, in violation of Section 17(a)(3) of the Securities Act.

156.    By reason of the foregoing, Mahabub, GenAudio, and Astound Holdings violated, and unless enjoined will continue to violate, Sections 17(a)(2) and (3) of the Securities Act.

**THIRD CLAIM FOR RELIEF**
**Scheme to Defraud in the Purchase or Sale of Securities**
**Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c)**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 (a) and (c)]**
**(Against Defendants Mahabub, GenAudio, and Astound Holdings)**

157.    Paragraphs 1 through 149 are re-alleged and incorporated herein by reference.

158.    Mahabub, GenAudio, and Astound Holdings, directly or indirectly, acting with scienter, by use of the means or instruments of interstate commerce, or of the mails, or of a

facility of national securities exchange, in connection with the purchase or sale of a security: employed devices, schemes or artifices to defraud; or engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon any person.

159.    By reason of the foregoing, Mahabub, GenAudio, and Astound Holdings violated, and unless enjoined will continue to violate, Exchange Act Section 10(b) and Rule 10b-5(a) and (c).

### FOURTH CLAIM FOR RELIEF
**Fraudulent Statements in the Purchase or Sale of Securities**
**Violations of Exchange Act Section 10(b) and Rule 10b-5(b)**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b)]**
**(Against Defendants Mahabub, GenAudio, and Astound Holdings)**

160.    Paragraphs 1 through 149 are re-alleged and incorporated herein by reference.

161.    Mahabub, GenAudio, and Astound Holdings, directly or indirectly, acting with scienter, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of national securities exchange, in connection with the purchase or sale of a security made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

162.    By reason of the foregoing, Mahabub, GenAudio, and Astound Holdings violated, and unless enjoined will continue to violate, Exchange Act Section 10(b) and Rule 10b-5(b).

### FIFTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 10(b) and Rule 10b-5**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Against Defendant Mahabub, Alternatively)**

163.    Paragraphs 1 through 149 are re-alleged and incorporated herein by reference.

164.     GenAudio violated Exchange Act Section 10(b) and Rule 10b-5 by having,

directly or indirectly, with scienter, by use of the means or instruments of interstate commerce,

or of the mails, or of a facility of national securities exchange, in connection with the purchase or

sale of a security:  (a) employed devices, schemes or artifices to defraud; (b) made untrue

statements of material fact or omitted to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices or courses of business which operated or would have operated as a

fraud or deceit upon any person.

165.     Mahabub aided and abetted the violations of GenAudio by knowingly or

recklessly providing substantial assistance.

166.     By reason of the foregoing, Mahabub aided and abetted violations of, and unless

enjoined will continue to aid and abet violations of, Exchange Act Section 10(b) and Rule 10b-5.

### SIXTH CLAIM FOR RELIEF
#### Aiding and Abetting Violations of Section 17(a)
#### [15 U.S.C. § 77q(a)]
#### (Against Defendant Mahabub, Alternatively)

167.     The SEC incorporates the allegations of paragraphs 1 through 149 as if fully set

forth herein.

168.     GenAudio violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]

when, directly or indirectly, with scienter, in the offer or sale of securities, by use of the means or

instruments of transportation or communication in interstate commerce or by use of the mails, it

employed a device, scheme, or artifice to defraud.

169.     GenAudio violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]

when, directly or indirectly, in the offer or sale of securities, by use of the means or instruments

of transportation or communication in interstate commerce or by use of the mails, it obtained money or property by means of untrue statements of material fact or by omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

170.     GenAudio violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)] when, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, it engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of securities.

171.     Mahabub aided and abetted GenAudio's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].  Specifically, Mahabub knowingly or recklessly, provided substantial assistance to GenAudio in (a) employing devices, schemes, or artifices to defraud; (b) obtaining money or property by means of untrue statements of material fact or omissions of material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; or (c) engaging in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

172.     Mahabub aided and abetted GenAudio's violations of, and unless restrained and enjoined, will in the future aid and abet violations of Section 17(a) of the Securities Act thereunder.

**SEVENTH CLAIM FOR RELIEF**
**Control Person Liability**
**Violations of Exchange Act Section 20(a)**
**[15 U.S.C. § 78t(a)]**
**(Against Defendant Mahabub, Alternatively)**

173.     Paragraphs 1 through 149 are re-alleged and incorporated herein by reference.

174.     GenAudio violated Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5] by having, directly or indirectly, with scienter, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of national securities exchange, in connection with the purchase or sale of a security:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon any person.

175.     Mahabub, as GenAudio's CEO and controlling shareholder, exercised control over the management, general operations, and policies of GenAudio, as well as the specific activities upon which GenAudio's violations are based.

176.     Mahabub directly or indirectly induced or caused GenAudio to make false and misleading statements of material fact and omit material facts about its dealings with Apple. Mahabub also directly or indirectly induced or caused GenAudio to submit a misleading valuation report by providing unreasonable assumptions that Apple would use GenAudio's technology in all of its products worldwide.

177.     By reason of the foregoing, Mahabub violated, and unless enjoined will continue to violate, Exchange Act Section 20(a).

**EIGHTH CLAIM FOR RELIEF**
**Offer and Sale of Unregistered Securities**
**Violations of Securities Act Sections 5(a) and (c)**
**[15 U.S.C. §§ 77e(a), 77e(c)]**
**(Against Defendants Mahabub, GenAudio, and Astound Holdings)**

178.    Paragraphs 1 through 149 are re-alleged and incorporated herein by reference.

179.    Mahabub, GenAudio, and Astound Holdings, directly or indirectly, by use of the means or instrumentalities of interstate commerce or by use of the mails, offered and sold securities or carried or caused such securities to be carried through the mails or in interstate commerce, for the purpose of sale or delivery after sale, when no registration statement had been filed or was in effect as to such securities and without any valid exemption.

180.    By reason of the foregoing, Mahabub, GenAudio, and Astound Holdings violated, and unless enjoined will continue to violate, Sections 5(a) and (c) of the Securities Act.

**VII.  PRAYER FOR RELIEF**

**WHEREFORE**, the SEC respectfully requests that the Court:

**I.**

Find that Mahabub, GenAudio, and Astound Holdings each committed the violations alleged in this Complaint and unless restrained will continue to do so.

**II.**

Enter injunctions, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the Defendants and their officers, agents, servants, employees, attorneys, fictitious trade name entities, and those persons in active concert or participation with them who receive actual notice by personal service or otherwise, from violating the laws and rules alleged against them in this Complaint.

**III.**

Order that Mahabub, GenAudio, and Astound Holdings each disgorge any and all ill-gotten gains, together with pre-judgment and post-judgment interest, derived from the activities set forth in this Complaint.

**IV.**

Order that Mahabub, GenAudio, and Astound Holdings each pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)].

**V.**

Enter an Order, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibiting Mahabub from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**VI.**

Grant such other relief as this Court may deem just or appropriate.

**<u>JURY DEMAND</u>**

The Plaintiff Securities and Exchange Commission demands a jury trial in this matter.

DATED:  September 25, 2015

<div style="margin-left:40%">

s/ Leslie J. Hughes
Leslie J. Hughes (Colo. Bar No. 15043)
Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO  80294-1961

</div>

Telephone: (303) 844-1000
Fax: (303) 297-3529
Email: HughesLJ@sec.gov
Attorney for Plaintiff
Securities and Exchange Commission