**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-02118-WJM-CBS

SECURITIES AND EXCHANGE
COMMISSION,

                         Plaintiff,

                v.

TAJ JERRY MAHABUB, GENAUDIO, INC., and
ASTOUND HOLDINGS, INC.,

                  Defendants.

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR
SUMMARY JUDGMENT AGAINST DEFENDANTS TAJ JERRY MAHABUB AND
GENAUDIO, INC.**

---

**Table of Contents**

PRELIMINARY STATEMENT ......................................................................................... 1

II.  MOVANT'S STATEMENT OF MATERIAL FACTS ............................................... 2

    A.  Mahabub And GenAudio Background ....................................................... 2

    B.  GenAudio Was Constantly In A Precarious Financial Situation ................. 3

    C.  The Relevant Securities Offerings And Sales ........................................... 5

        i.  Mahabub's Sales Of His Personal Shares Of GenAudio Stock ....... 5

        ii.  GenAudio's 2010 And 2011-2012 Securities Offerings ................... 6

    D.  Mahabub Orchestrated And Controlled GenAudio's Dealings
        With Apple ................................................................................................ 8

    E.  Mahabub's And GenAudio's Fraudulent Conduct Regarding Apple
        Executives ............................................................................................. 11

        i.  Mahabub And GenAudio Had Contact With Apple Mid-Level
            Managers ...................................................................................... 11

        ii.  Mahabub And GenAudio Did Not Deal With Former Apple
            CEO Steve Jobs Or Apple Executives
            Phil Schiller And Tim Cook ............................................................ 11

        iii  Mahabub And GenAudio Claimed That Mahabub
            Communicated With Jobs, Schiller, And Cook
            About GenAudio ............................................................................ 13

    F.  Mahabub's And GenAudio's Fraudulent Conduct Regarding
        Negotiations And Potential Deals With Apple ......................................... 17

        i.  GenAudio And Apple Did Not Negotiate Any
            Potential Deal Terms ..................................................................... 17

        ii.  Mahabub And GenAudio Falsely Claimed That GenAudio
            Would Likely Be Entering Into A Deal With Apple ......................... 18

i

G.    GenAudio's Substantive Meetings With Apple Ended After September 2010 ....................................................................................... 20

    i.    A September 23, 2010 Demonstration At Apple Did Not Go Well ............................................................................ 20

    ii.    GenAudio And Mahabub Continued To Claim GenAudio Was Moving Forward With Jobs And Apple .................................. 21

H.    Mahabub And GenAudio Made Material Omissions ................................ 22

I.    Representations About GenAudio's Dealings With Apple Were Material To GenAudio Investor Investment Decisions ............................ 23

III.    ARGUMENT ....................................................................................................... 24

A.    Legal Standard – Summary Judgment ...................................................... 24

B.    Mahabub And GenAudio Made Material Untrue And Misleading Statements And Omissions ........................................................................ 25

    i.    Legal Standard – Fraudulent Statements And Omissions ............. 25

    ii.    The Undisputed Facts Establish That Mahabub And GenAudio Made Material Untrue And Misleading Statements And Omissions ............................................................ 26

        a.    Fraudulent Statements Regarding Apple Executives ......... 26

        b.    Fraudulent Statements About GenAudio's Alleged Negotiations And Dealings With Apple ............................... 27

        c.    Material Omissions ............................................................. 28

        d.    Mahabub, And Therefore GenAudio, Acted With Scienter ............................................................. 29

        e.    The Misleading And Untrue Statements And Omissions Were Material .................................................. 30

        f.    Mahabub And GenAudio Are Both "Makers" ..................... 31

g.    The Fraudulent Statements And Omissions Were "In Connection With" The Purchase Or Sale Of A Security And "In The Offer Or Sale" Of A Security ..... 33

h.    Both Mahabub And GenAudio Obtained Money................. 34

C.    Mahabub And GenAudio Engaged In A Fraudulent Scheme................... 35

i.    Legal Standard – Scheme Liability .................................................. 35

ii.    The Undisputed Facts Establish That Mahabub And GenAudio Engaged In A Fraudulent Scheme ......................... 36

D.    Mahabub And GenAudio Engaged In Unlawful, Unregistered Securities Offerings .................................................................... 38

i.    Legal Standard – Registration Provisions Of The Securities Act .................................................................... 38

ii.    The 2010 Offering And 2011-2012 Offering Were Unregistered And Not Exempt From Registration .......................... 39

iii.    The Mahabub Personal Sales Were Unregistered And Not Exempt From Registration ................................................ 40

IV.    CONCLUSION.................................................................... 40

## Table of Authorities

**Cases**

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003) .................................. 29

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 25

*Basic Inc. v. Levinson,* 485 U.S. 224 (1988) ............................................................... 30

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................ 24

*Coit v. Zavaras,* No. 16-1146, 2017 WL 104447 (10th Cir. Jan. 11, 2017) ................. 24

*Dennis J. Malouf, Secs. Act Release No. 10115, Exch. Act Release No. 4463,*
*Inv. Co. Release No. 32194*, 2016 WL 4035575 (July 27, 2016) .......................... 35, 37

*Ghiasy v. Kroger Co.,* No. 11-cv-01667-WJM-MJW, 2012 WL 6720650
    (D. Colo. Dec. 27, 2012) ..................................................................................... 24

*Janus Capital Grp., Inc. v. First Derivative Traders,* 131 S. Ct. 2296 (2011) ......... 31, 32

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    135 S. Ct. 1318 (2015) ......................................................................... 25, 28, 29

*Quinn & Co. v. SEC,* 452 F.2d 943 (10th Cir. 1971) .................................................... 38

*SEC v. Arcturus Corp.,* 171 F. Supp. 3d 512 (N.D. Tex. 2016) *reconsideration denied*,
    No. 3:13-CV-4861-K, 2016 WL 3654430 (N.D. Tex. July 8, 2016) ................... 38

*SEC v. Calvo*, 378 F.3d 1211 (11th Cir. 2004) ........................................................ 38, 39

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ......................................................... 40

*SEC v. Cooper,* 142 F. Supp. 3d 302 (D.N.J. 2015) .................................................... 37

*SEC v. Curshen,* 372 F. App'x 872 (10th Cir. 2010) ........................... 25, 26, 27, 28, 31

*SEC v. Daifotis,* 874 F. Supp. 2d 870 (N.D. Cal. 2012) ............................................... 32

*SEC v. DiMaria,* No. 1:15-CV-7035-GHW, 2016 WL 4926200
    (S.D.N.Y. Sept. 15, 2016) ................................................................................ 31

*SEC v. E-Smart Techs., Inc.,* 74 F. Supp. 3d 306 (D.D.C. 2014) ........................... 32-33

*SEC v. e-Smart Techs., Inc.*, 85 F. Supp. 3d 300 (D.D.C. 2015) ................................ 34

*SEC v. Gallagher,* No. 87-3904, 1989 WL 95252 (E.D. Pa. Aug. 15, 1989) ............... 30

*SEC v. Goldstone*, 952 F. Supp. 2d 1060 (D.N.M. 2013) ........................................... 33

*SEC v. Goldstone*, No. CIV 12-0257 JB/GBW, 2015 U.S. Dist. LEXIS 116847 (D.N.M.
    Aug. 22, 2015) ................................................................................................. 37

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) ..................................................... 39, 40

iv

*SEC v. Kearns,* 691 F. Supp. 2d 601 (D.N.J. 2010) ..................................................... 37

*SEC v. Levin*, No. 12-21917-CIV-ROSENBAUM/SNOW, 2013 WL 5588224
      (S.D. Fla. Oct. 10, 2013) .................................................................................. 32

*SEC v. McDuffie*, No. 12-cv-02939, 2014 WL 4548723 (D. Colo. Sept. 15, 2014)   25, 35

*SEC v. Monterosso*, 557 F. App'x 917 (11th Cir. 2014) ............................................... 37

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ............................................................. 31

*SEC v. Parrish*, No. 11-cv-00558-WJM-MJW, 2012 WL 4378114
      (D. Colo. Sept. 25, 2012) ................................................... 29, 36, 37, 38

*SEC v. Provident Royalties, L.L.C.,* No. 3:09-CV-01238-L, 2013 WL 5314354
      (N.D. Tex. Sept. 23, 2013) .............................................................................. 30

*SEC v. Ralston Purina Co.,* 346 U.S. 119 (1953) ................................................... 38, 39

*SEC v. Recile,* 10 F.3d 1093 (5th Cir. 1993) ............................................................... 31

*SEC v. Smart,* 678 F.3d 850 (10th Cir. 2012) ....................................................... 29, 33

*SEC v. St. Anselm Expl. Co.,* 936 F. Supp. 2d 1281 (D. Colo. 2013) ......................... 35

*SEC v. Sullivan,* 68 F. Supp. 3d 1367 (D. Colo. 2014) ......................................... 30, 35

*SEC v. Universal Express, Inc.*, No. 04 Civ. 2322 (GEL), 2007 WL 2469452
 (S.D.N.Y. Aug. 30, 2007) ............................................................................................. 30

*SEC v. USA Real Estate Fund 1, Inc.,* 30 F. Supp. 3d 1026 (E.D. Wash. 2014) ......... 34

*SEC v. Wolfson,* 539 F.3d 1249 (10th Cir. 2008) ....................................................... 33

*Tsc Indus. v. Northway*, 426 U.S. 438 (1976) ............................................................. 30

*United States v. Naftalin,* 441 U.S. 768 (1979) ..................................................... 33, 34

*United States v. Wolfson*, 405 F.2d 779 (2d Cir. 1968) ............................................. 40

**Statutes**

15 U.S.C. § 4(1) ......................................................................................................... 40

15 U.S.C. § 4(2) ......................................................................................................... 39

15 U.S.C. § 5 ........................................................................................................ 39, 40

15 U.S.C. § 5(a), (c) .............................................................................................. 38, 40

15 U.S.C. § 10(b) ...................................................................... 25, 33, 34, 35, 37

15 U.S.C. § 10(b) ....................................................................................................... 35

15 U.S.C. § 17(a) .................................................................................................. 34, 37

15 U.S.C. § 17(a)(1) ............................................................................................. 35, 37

15 U.S.C. § 17(a)(2) ........................................................................................ 25, 30, 33

15 U.S.C. § 17(a)(2) ................................................................................. 25

15 U.S.C. § 17(a)(3) ................................................................................. 36

15 U.S.C. § 77e(a)(1), (c) ........................................................................ 38

15 U.S.C. § 77e(a), (c) ............................................................................. 2

15 U.S.C. § 77q(a)(1), (3) ........................................................................ 35

17 C.F.R. § 230.502(b)(2)(B)(2) .............................................................. 39

17 C.F.R. § 240.10b-5 .............................................................................. 2

**Other**

Fed. R. Civ. P. 56(a) ................................................................................. 24

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Securities and Exchange Commission ("Commission") moves the Court for summary judgment determining liability on all claims against Defendant Taj Jerry Mahabub ("Mahabub") and Defendant GenAudio, Inc. ("GenAudio").[1]

## I.   **PRELIMINARY STATEMENT.**

The undisputed facts establish that between at least July 2009 and April 2012, Mahabub and GenAudio made material untrue and misleading statements and material omissions to investors regarding GenAudio's relationship and business prospects with Apple, Inc. ("Apple").  During the same time, Mahabub, as the CEO of GenAudio, also engaged in a fraudulent scheme through which Mahabub and GenAudio sought to raise funds for GenAudio while deceiving GenAudio's investors, employees, consultants, and Board of Directors ("Board").  Further, Mahabub personally conducted unlawful, unregistered sales of securities and GenAudio conducted two unlawful, unregistered securities offerings.

The undisputed facts demonstrate Mahabub's and GenAudio's egregious conduct and render it appropriate to determine their liability as a matter of law. Mahabub, as the Chief Executive Officer ("CEO") of GenAudio, repeatedly and knowingly lied to GenAudio's investors, Board, and employees about Apple's interest in engaging in business transactions with GenAudio.  Among other things, Mahabub falsely stated that he met Apple's former CEO, Steve Jobs, and engaged in extensive communications with other Apple executives.  Mahabub went so far as to falsify email

---

[1] The SEC requests that if it prevails on summary judgment, the Court provide the SEC with an opportunity to submit a separate motion and brief addressing remedies.

communications to and from Apple to make it appear that GenAudio's – and his – relationship with Apple had progressed far beyond reality.  After laying this fabricated foundation, Mahabub and GenAudio told investors that GenAudio had reason to believe that GenAudio's technology would be monetized through a "deal" with Apple.  Further, throughout their securities offerings and sales that occurred in 2009, 2010, 2011, and 2012, Mahabub and GenAudio failed to disclose to investors material information related to the extent and significance of their contacts with Apple.

Based on the undisputed facts, summary judgment is appropriate as a matter of law on the Commission's claims against both Mahabub and GenAudio for violations of Sections 5(a) and (c), and 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. §§ 77e(a) and (c), 77q, 78j(b), 17 C.F.R. § 240.10b-5].[2]

## II.   MOVANT'S STATEMENT OF MATERIAL FACTS.

### C.   Mahabub And GenAudio Background.

1.   GenAudio is a Colorado corporation with its principal place of business in Centennial, Colorado and it engages in the development and marketing of software that creates three-dimensional audio, which it calls "AstoundSound."  *See* Answers ¶ 19.[3]

2.   Mahabub is a resident of Broomfield, Colorado.  Answers ¶ 18.

3.   Mahabub is the founder of GenAudio and became its CEO in 2006.  He served as GenAudio's CEO and Chairman of the Board from 2009 to 2012.  Ex. 1,

---

[2] The SEC requests summary judgment on all claims against Mahabub and GenAudio.  The SEC is not moving for summary judgment as to its claims against Astound Holdings, Inc.

[3] Facts admitted in the Answers of Mahabub and GenAudio are cited as "Answers ¶ __."  GenAudio's Answer is ECF No. 14. Mahabub's Answer is ECF No. 15.

Mahabub Inv. 48:22 – 51:4 (Feb. 5 and 12, 2015); Ex. 2, Mahabub Dep. 459:24 – 460:5 (Jan. 19 and Feb. 8, 2017).[4]

4.      Between November 2009 and April 2012, Mahabub had the right to vote a majority of GenAudio's securities and controlled the GenAudio Board.  *See* Ex. 3 at 9 and GA000523; Ex. 4 at 9 and 43.

5.      Between 2009 and May 2012, Jim Wei-Kung Mattos was the Support Services Manager of GenAudio and his "primary functions [for GenAudio] were to continue to raise money for the company, reaching out through friends and family [and] to manage company records …."  Ex. 5, Mattos Inv. 19:8-10 (Feb. 9, 2015); Ex. 6, Mattos Dep. 24:15-22 (July 22, 2016).

6.      Mattos and Mahabub were primarily responsible for bringing in investors to GenAudio, including through the sales of Mahabub's personal stock.  Ex. 6, Mattos Dep. 69:18 - 70:3 (addressing Ex. 46), 155:24 – 156:19, and 159:17-25.

7.      Between 2009 and 2012, James T. Devine was GenAudio's Vice President of Finance and his job duties included accounting, issuing stock certificates, and maintaining GenAudio's stock transfer ledger.  Ex. 7, Devine Dep. 49:25 – 50:8 (July 19, 2016).

D.      **GenAudio Was Constantly In A Precarious Financial Situation.**

8.      Between 2009 and 2012, GenAudio financed its operations primarily through the sale of debt and equity securities in private offerings.  Answers ¶ 24.

---

[4] True and correct copies of transcripts from witnesses who gave sworn testimony during the SEC investigation are cited as "Ex. __, [Witness Last Name] Inv. ___". True and correct copies of witness deposition transcripts are cited as "Ex. __, [Witness Last Name] Dep. ___".  The date(s) of the testimony are cited in the first reference.

9.      During that time, GenAudio was consistently insufficiently funded.  <u>Ex. 2</u>, Mahabub Dep. at 155:12-15 ("So that -- that was problematic for this company, you know, pretty much since inception, is we just couldn't seem to raise enough money to -- to get where we need to go.").

10.      Mahabub encouraged GenAudio Board members and employees to assist with finding investors for GenAudio.  Answers ¶ 111.

11.      In doing so, Mahabub touted an investment in GenAudio as a good decision.  <u>Ex. 8</u> at 6 ("Do I believe that if someone does not invest at this point in time that they are foolish?  Yes.  Yes.  And YES!  We need investors, and we need them now."); <u>Ex. 9</u> at 1, 3 ("Time to get some $$$ …  And someone would not want to invest at this stage in the game, or increase there [sic] shareholder position because why?" and "if any of you feel like helping out with this effort, I would certainly appreciate it.  It's not like you are doing your friends and family a bad thing by getting them into GenAudio …"); <u>Ex. 10</u> at 1 ("Any help from all of you with this financing effort would be great.").

12.      GenAudio needed investor funds to continue to develop technology and to permit Mahabub to travel and attend conferences.  <u>Ex. 2</u>, Mahabub Dep. at 65:15-20 (addressing <u>Ex. 8</u>, "And in order to port code and hire on the right team and the right dev staff, and there were a couple other additional software engineering people that I needed to bring on board at the time, and you can't bring those people on unless you have money."); <i>id.</i> at 155:7-11 (addressing <u>Ex. 9</u>, "I was trying to keep the team pumped and get the money that we needed … half of our achilles heel that we always had was we never had enough money to cross the bridge to where we needed to go to.").

13.     In explaining why he made certain statements encouraging the GenAudio's employees, contractors, and Board (collectively, the "GenAudio Team") to assist in fundraising, Mahabub testified:

> I mean, it takes money to do business.  You can't -- certainly can't fly for free and stay in hotel rooms for free with team members, or attend Game Developer Conference or CES for free either.  Those all cost money.  And in order to have money, you usually have to either raise money or you're independently wealthy, and I burned through all my money already.

*Id.* at 172:25 – 173:12 (addressing Ex. 9) (emphasis added).

E.     **The Relevant Securities Offerings And Sales.**

i.     **Mahabub's Sales Of His Personal Shares Of GenAudio Stock.**

14.     GenAudio has not registered an offering of securities under the Securities Act.  Answers ¶¶ 19, 130, 131.

15.     Between November 2009 and April 2012, Mahabub sold approximately 3,316,300 shares of GenAudio stock to approximately 83 investors, raising approximately $2.3 million ("Mahabub Sales") when no registration statement was filed or in effect for the transactions.  Declaration of Tracy W. Bowen and Ex. 11.

16.     In connection with the Mahabub Sales, Mahabub and investors executed a Stock Sale and Purchase Agreement, and an Irrevocable Proxy Agreement; however, investors did not complete subscription agreements or investor questionnaires that addressed whether or not the investor was accredited and Mahabub did not maintain documentation regarding whether or not investors were accredited.  Ex. 2, Mahabub Dep. 476:11 – 477:20, 480:22 – 481:23 and 483:5-19.

17.     GenAudio mailed share certificates to Mahabub Sales investors.  Ex. 7, Devine Dep. 162:10-18.

18.     Mahabub used a substantial portion of the proceeds of the Mahabub Sales to loan money to GenAudio or to pay creditors on GenAudio's benefit.  In exchange for its debt to Mahabub, GenAudio provided Mahabub with additional shares. Ex. 12 at ¶ 8; Ex. 2, Mahabub Dep. 460:25 – 461:8 and 464:8-18.

**ii.     GenAudio's 2010 And 2011-2012 Securities Offerings.**

19.     From approximately March to August 2010, GenAudio offered and sold GenAudio stock when no registration statement was filed or in effect for the transactions (the "2010 Offering").  Answers ¶ 130.

20.     From approximately April 2011 to April 2012 GenAudio offered and sold GenAudio stock when no registration statement was filed or in effect for the transactions ("2011-2012 Offering").  Answers ¶ 131.

21.     During the 2010 Offering, GenAudio offered and sold approximately 1,171,000 common shares, raising approximately $3,513,000.  Answers ¶¶ 35; 78; 130; Ex. 13 at 1-4; Ex. 7, Devine Dep. 136:4-19 (Devine prepared Ex. 13).

22.     During the 2011-2012 Offering, GenAudio offered $2,100,000 of common shares of GenAudio and sold approximately 330,000 shares, raising approximately $990,000.  Answers ¶¶ 94; 131; Ex. 13 at 5-6.

23.     During the 2010 Offering, GenAudio sold shares to more than seventy investors in various states.  *See* Answers at ¶¶ 35; 130.

24.     During the 2011-2012 Offering, GenAudio sold shares to around twenty investors in various states.  *See* Answers ¶ 94.

25.     GenAudio solicited prospective investors for the 2010 Offering by, among other things, disseminating, via email, a private placement memorandum ("PPM") and

letter signed by Mahabub dated March 15, 2010 (collectively, "2010 Offering Materials").

Answers ¶ 36; Ex. 3; Ex. 14.

26.     GenAudio solicited prospective investors for the 2011-2012 Offering

through a letter to investors electronically signed by Mahabub, and a PPM dated April

22, 2011 ("2011-2012 Offering Materials").  *See* Answers ¶¶ 95-96; Ex. 4; Ex. 15.

27.     GenAudio is unable to provide information as to the number of investors it

solicited to invest in its 2010 and 2011-2012 Offerings.  Ex. 16 at GenAudio Resp. to

Request No. 1 (GenAudio unable to locate and produce emails, metadata, or numbered

PPMs evidencing investors solicited during the 2010 and 2011-2012 Offerings).

28.     Mahabub assisted with the preparation of the 2010 and 2011-2012

Offering Materials, reviewed those Offering Materials, and was a member of the Board

that approved those Offering Materials.  Answers ¶¶ 37, 96.

29.     During the 2010 and 2011-2012 Offerings, Mahabub solicited potential

investors at public presentations he called "road shows."  Ex. 17 at 1; Ex. 18 at 1, ¶ 6

(Mahabub emailed 20 PPMs and handed out 16 PPMs in connection with a road show);

Ex. 19 at 1 (Mahabub "gearing up" to make calls to "convert[] road show attendees into

actual investors"); Ex. 20 at 5 (investor writing, "at the SEA roadshow I was told

GenAudio was in great need of Cash or things could get ugly by May").

30.     GenAudio used telephones, the Internet, and the mails in connection with

the 2010 and 2011-2012 Offerings.  Answers ¶ 135.

31.     GenAudio did not provide an audited balance sheet to investors in the

2010 or 2011-2012 Offerings.  Answers ¶ 137.

32.     In connection with the 2010 Offering, at least one GenAudio investor wrote

"N/A" on the portion of the Confidential Subscriber Questionnaire ("Questionnaire") that addressed accreditation and investment experience.  Ex. 21 at 4-5.

33.     In connection with the 2010 Offering, other GenAudio investors failed to complete the portion of the Questionnaire that addressed accreditation.  *See* Ex. 22 at 4-5; Ex. 23 at 4-5; Ex. 24 at 4; Ex. 25 at 4.

34.     At least one investor who invested in the 2011-2012 Offering on multiple occasions repeatedly failed to complete the portion of the Questionnaire that addressed accreditation.  *See* Ex. 26 at 4, 9, 14, and 19.

35.     Beyond sending and receiving the Questionnaires, GenAudio did not do anything to determine investor accreditation.  *See* Ex. 2, Mahabub Dep. at 488:24 - 489:24 and 490:25 – 491:23; Ex. 6, Mattos Dep. 169:18 – 170:7 (addressing investor file documents included in Ex. 14) and 171:17-19; Ex. 7, Devine Dep. 127:25 – 128:3 and 178:14-19.

36.     Mattos admitted that he "overlooked" a few Questionnaires that were not completed.  Ex. 6, Mattos Dep. 169:18 – 170:20.

37.     Emails from Mattos during the 2010 Offering also reveal that GenAudio was willing to accept investments from non-accredited investors.  *See* Ex. 27 ("new investors are required to be accredited investors; however, those restrictions do not apply to current investors"); Ex. 28 ("any group investments on your family's behalf should be kept track [sic] internally.  GenAudio can not [sic] officially know anything about it due to SEC laws regulating unaccredited investors").

F.     **Mahabub Orchestrated And Controlled GenAudio's Dealings With Apple.**

38.     Mahabub was GenAudio's primary point of contact with Apple and controlled the dissemination of the information about dealings with Apple to GenAudio's

8

Board, employees, shareholders, and prospective investors.  Answers ¶¶ 38, 124.

39.     Mahabub and GenAudio used the term "LCEC" in some shareholder communications to refer to Apple.  Answers ¶ 57.

40.     Mahabub used body language and other "hints" to lead investors to understand that the LCEC was Apple.  *See* Ex. 29 at 3 ("the super sharp investors will pick up on my body language" and "[t]his may entice investors that take a peek at our offering wondering why we are all of a sudden being so quiet … (not blah blah blah-ing about Apple in any way shape or form) with strong confidence is a good thing"); Ex. 30, Skluzak Dep. at 46:15 – 25 (Feb. 7, 2017) (explaining Mahabub that would refer to "the fruit with a piece of – bite out of it" and "[i]t was also a big inference when [Mahabub] said he met with Steve Jobs"); Ex. 31, Powers Inv. 110:9 – 15 (Feb. 27, 2015) (Mahabub would "refer to [the LCEC] as the fruit company").

41.     Numerous investors knew that "the LCEC" was Apple.  *See, e.g.*, Ex. 31, Powers Inv. 110:2 – 111:14; Ex. 32, Skluzak Inv. 52:8 – 53:2 and 55:4 – 56:6 (Dec. 15, 2014); Ex. 33, Elliott Inv. 24:16-23 ("everybody just knew it was Apple").

42.     During the relevant time period, Mahabub provided email updates to the GenAudio Team, including Board members that were also GenAudio investors.  *See* Mahabub Answer ¶ 50; Ex. 2, Mahabub Dep. 61:10 – 19 and 72:1 – 7 (addressing Ex. 43, explaining he always blind carbon copied the Board); Ex. 3 at GA000523 (listing Directors who were also shareholders).

43.     Some of Mahabub's emails to the GenAudio Team (including Mattos) included "forwarded" emails that Mahabub had exchanged with Apple employees and sometimes Mahabub altered those "forwarded" emails to add or delete text.  *See* Ex. 2,

Mahabub Dep. 74:16 – 23 (addressing Ex. 43, "There were from time to time alterations that I had made, yes. But I can't tell you for sure if I did … I don't know. But apparently so. If there's alterations here, it means I did.").

44.    Mahabub testified that he altered the emails to "entice" or "inform" the GenAudio Team.  Ex. 2, Mahabub Dep. 148:1-23 (addressing Ex. 44).  *See also id.* at 80:14-24 (addressing Ex. 43 and explaining that forwarding the email from Apple, without alterations, would not have kept the GenAudio Team motivated because it "[d]idn't have the strength to it").

45.    For example, on March 21, 2010, Mahabub altered his email correspondence to Apple as set forth in the demonstrative below (alterations highlighted).  Demo. at 8;[5] comparing Ex. 10 at 1 to Ex. 34 at 1.



---

[5] Demonstrative 1 was created by the SEC to compare emails that Mahabub altered and sent to the GenAudio Team.  It is attached as and is cited as "Demo. at [page]."

G. **Mahabub's And GenAudio's Fraudulent Conduct Regarding Apple Executives.**

i. **Mahabub And GenAudio Had Contact With Apple Mid-Level Managers.**

46.     Victor Tiscareno was a senior audio and acoustic engineer at Apple until February 2011, and he was Mahabub's primary contact at Apple.  Ex. 35, Tiscareno Inv. 11:5-9, 11:15-23, and 12:20-25 (Dec. 3, 2014 and Apr. 29, 2015); Ex. 1, Mahabub Inv. 70:2-5.

47.     In 2009 and 2010, Mahabub also met and communicated with Michael Hailey, who was a product market manager with Apple for the iPod, iPhone, and iPad product lines, and Ronald Isaac, who was a signal processing engineer and acoustician technologist with Apple.  Ex. 36, Hailey Inv. 8:17-19, 10:24-12:9, 16:7-19, and 17:6-9 (Apr. 21, 2015); Ex. 37, Isaac Inv. 8:17-25 (Apr. 15, 2015); Ex. 1, Mahabub Inv. 69:23-70:5 (regarding Isaac) and 153:23-154:2 (regarding Hailey).

48.     On or about July 1, 2009, Mahabub executed Apple's standard non-disclosure agreement ("NDA") on behalf of GenAudio.  *See* Answers ¶ 29.

49.     During 2009 and 2010, Mahabub visited the Apple campus to meet with Tiscareno and other Apple employees, exchanged emails with Tiscareno, Hailey, and Isaac, and worked to create demonstrations of GenAudio's technology on Apple devices.  *See generally* Exs. 34, 48, 50, 53-56 cited and discussed below.

ii. **Mahabub And GenAudio Did Not Deal With Former Apple CEO Steve Jobs Or Apple Executives Phil Schiller And Tim Cook.**

50.     During 2009, 2010, and until August 24, 2011, Steve Jobs was the CEO of Apple.  *See* Ex. 38, Isaac Dep. 184:7-10 and 196:1-3 (Jan. 13, 2017).

51.     Mahabub never met with Jobs regarding GenAudio or its technology.  Ex. 1, Mahabub Inv. 144:8 – 12 ("Q:  Did you ever meet with Steve Jobs?  A:  No.  Q:

11

Ever?  A:  No."); Ex. 2, Mahabub Dep. 29:25 – 30:2 ("Q:  Mr. Mahabub, you never met

Steve Jobs, the former CEO of Apple; correct?  A:  That's correct.") and 417:6-7 (never

met with Jobs regarding AstoundSound).  *But see* Ex. 2, Mahabub Dep. at 417:3 –

432:5 (describing a chance encounter with Jobs in the Apple cafeteria, which did not

involve any substantive communication).

      52.     Jobs was not involved in Apple's dealings with GenAudio, and Apple

employees did not discuss GenAudio with Jobs.  *See* Ex. 35, Tiscareno Inv. 137:5-7,

139:23 – 140:5, 194:17-19, and 235:17-24; Ex. 39, Tiscareno Dep. 311:21-25 (Dec. 16,

2016); Ex. 36, Hailey Inv. 24:7 – 25:5; Ex. 37, Isaac Inv. 30:3 – 31:4; Ex. 40 at 1.

      53.     During 2009, 2010, and 2011, Philip Schiller was the Senior Vice

President of Worldwide Marketing at Apple.  *See* Ex. 39, Tiscareno Dep. 211:21-23.

      54.     Mahabub never met or communicated with Schiller regarding GenAudio or

its technology.  Ex. 2, Mahabub Dep. 432:20-433:2 (addressing Ex. 41); Ex. 39,

Tiscareno Dep. 311:1-14; Ex. 36 Hailey Inv. 22:25-24:6; Ex. 37, Isaac Inv. 29:14-17.

      55.     During 2009, 2010 and part of 2011, Timothy Cook was the Chief

Operating Officer of Apple; he became Apple's CEO in August 2011. *See* Ex. 35,

Tiscareno Inv. 189:20-190:2.

      56.     Mahabub never met or communicated with Cook regarding GenAudio or

its technology.  Ex. 2, Mahabub Dep. 31:2-11 (Mahabub does not believe he met Cook

and does not recall communicating with Cook about GenAudio or its technology); Ex.

35, Tiscareno Inv. 190:11-191:8; Ex. 39, Tiscareno Dep. 311:15-20; Ex. 36, Hailey Inv.

22:22-24:6; Ex. 37, Isaac Inv. 29:25-30:2.

### iii.    Mahabub And GenAudio Claimed That Mahabub Communicated With Jobs, Schiller, And Cook About GenAudio.

57.     In August and September 2009, Mahabub emailed the GenAudio Team and represented that GenAudio was close to entering into licensing negotiations and a "big licensing deal" with Apple, and he altered emails from Apple to make it appear as if Mahabub had been in contact with Schiller and other high-level Apple employees. *Compare* Ex. 42 at 2-3 to Ex. 43 at 1; *compare* Ex. 44 at 4 to Ex. 45 at 1; *see also* Demo. at 1-3.

58.     In October and November 2009, Mahabub emailed the GenAudio Team false and altered emails that made it appear that he had communicated with Schiller and Cook, GenAudio had received "the green light" on "the technical … side of the coin," and Mahabub would be meeting with Jobs.  Ex. 46 at 1; *compare* Ex. 47 at 3-4 to Ex. 48 at 1; *compare* Ex. 49 at 2 to Ex. 50 at 1; *see also* Demo. at 4-6.

59.     On February 12, 2010, Mahabub emailed the GenAudio Team false and altered emails that made it appear that he had met with Schiller who discussed a "project … for Christmas product roll-out"; that "Apple is still very interested in licensing Astound for their products"; and that Apple employees were working towards getting a deal "ok'd by the big man."  *Compare* Ex. 51 at 1-2 to Ex. 52 at 1; *see also* Demo. at 7.

60.     Following the issuance of the 2010 Offering, Mahabub emailed the GenAudio Team false and altered emails on March 21, 2010 that made it appear that he was communicating with Schiller; Schiller was "hoping for – a fall product rollout"; and Apple and Mahabub had discussed an "embedded level integration process".  *Compare* Ex. 10 at 1 to Ex. 34 at 1; *see also* Demo. at 8.

61.     In early April 2010, Mahabub became aware of the scheduling of an internal meeting at Apple regarding GenAudio's technology.  *See* Ex. 53 at 2 (Mahabub writing, "[i]n an effort to get 'two thumbs up' from your meeting so we can continue to move forward …").

62.     In correspondence between Mahabub and Tiscareno, neither indicated that the meeting would involve Jobs, Schiller, or Cook; instead, Mahabub referenced Tiscareno's upcoming meeting with an "exec."  *Id.* at 1; Ex. 54; Ex. 55; Ex. 56 at 2.

63.     On April 8, 2010, Mahabub sent a few members of the GenAudio Team false and altered emails that made it appear that Tiscareno stated "Phil let us know earlier that this might be postponed until early next week.  Apparently Steve is planning on going out of town with his family for the weekend" and that Mahabub stated "[t]oo bad … although, that might be better given that Steve will be relaxed from having a weekend getaway with his family.  Perhaps this is why Phil is rescheduling for next week."  *Compare* Ex. 57 at 1-2 to Ex. 58 at 1; *see also* Demo. at 9-11.

64.     On April 30, 2010, while he was attending a conference for investment bankers and broker-dealers, Mahabub sent prospective investors an email that falsely stated that the LCEC was "looking to acquire GenAudio's tech for integration into their entire lineup of product offerings" and "we are now waiting to when [sic] we will initiate negotiations, pending the CEO of the LCEC to approve the integrated product rollout strategy and the technical implementation strategy that will be presented to the CEO next week!!!"  Ex. 59 at 4.

65.     After receiving the email, an investor purchased 5,000 shares for $15,000.  *See id.* at 1; Ex. 13 at 2, row 4.

66.     On May 5, Mahabub sent Tiscareno materials that he suggested
Tiscareno use at the meeting with "the exec," and he offered to attend the meeting;
however, Tiscareno declined the offer, explaining "this is not that kind of demo.  [Hailey]
and I are pitching this as a concept …." and "[o]nce we get the go ahead that this is a
great idea, then the questions will be, 'well, what about the other technologies, have we
reviewed them? etc.'  Then we sort of start over internally.…  We have to get to first
base…."  Ex. 55; Ex. 56 at 1 (emphasis added).

67.     In the morning and early afternoon of May 6, 2010, Mahabub sent emails
to the GenAudio Team regarding the upcoming meeting at Apple which falsely
represented that Schiller and Jobs were involved.  Ex. 60 at 1-2.

68.     Late in the evening of May 6, 2010, Mahabub sent the GenAudio Team a
purported "transcription" of a phone call between him and Tiscareno.  After repeatedly
instructing that the email be deleted, Mahabub set forth his purported conversation with
Tiscareno, which included representations that Tiscareno stated that "Steve thought the
technology was so extraordinary ….  I believe he wants to explode this technology into
the world" and "[Steve] instructed all of us to be in a no radio period" and "I can say that
[Steve] is anxious to meet you in person when we have things figured out on our end."
Mahabub then concluded the email by stating "[a]t least we have some time to put our
strategy together and get our pawns in order for the asset acquisition or licensing
battle."  Ex. 40 at 2-5.

69.     Mahabub then forwarded the email that contained the false "transcription"
to an investor.  *Id.* at 1.

70.     Receipt of the false "transcription" "affirmed [the investor's] willingness to purchase 40,000 shares of stocks" in the 2010 Offering, because "[i]t just confirmed that the decision I had made to purchase the stocks was a good decision."  Ex. 30, Skluzak Dep. 134:9-14 (addressing Ex. 40).

71.     On October 30, 2013, Tiscareno received a copy of the May 6, 2010 "transcription" from a GenAudio investor and responded "OMG!" and went on to explain "I never discussed anything about Steve Jobs or any other board member at Apple.  I never discussed this with Steve Jobs.  Period!" and "This letter is pure fabrication."  Ex. 40 at 1.

72.     On May 25, 2010, Mahabub emailed the GenAudio Team and represented that Tiscareno was contacting him despite the "no radio period" and forwarded emails that he altered to make it appear as if Tiscareno wrote "Steve has us looking very deep into other audio technology so he can better understand why yours is so much better" and "I have forwarded your email on to Steve.  He said he will give it a listen in his home theater.  This just might be what you need to get him to support this from the Pixar angle."  *Compare* Ex. 61 at 2-5, 9 to Ex. 62; *see also* Demo. at 12-14.

73.     In May 2010, Mahabub and GenAudio created an investor presentation that was emailed to investors; during the presentation, Mahabub falsely stated that "the CEO of the LCEC finally met with senior marketing and technical management and we have the green light to move forward."  Ex. 63 at 54:8-10 (emphasis added).  *See also* Ex. 17 (email transmitting presentation).

74.     The presentation and email also discussed GenAudio's 2010 Offering and encouraged investors to review the PPM and attached valuation report.  *See* Ex. 63 at 54-55; Ex. 17 at 1.

75.     On July 2, 2010, Mahabub emailed the GenAudio Team false and altered emails that made it appear that Jobs wanted to meet with Mahabub and Jobs was involved in evaluating GenAudio's technology.  *Compare* Ex. 64 to Ex. 65; *see also* Demo. at 15-17.

76.     On or about August 1, 2010, GenAudio sent investors a letter that was electronically signed by Mahabub and stated, in part, that the LCEC's CEO had requested a "hand-shake" meeting, and "I can say that we are still moving forward with confidence and plan on carrying it through all the way to the end, which could result in a significant revenue generating license deal or the potential for acquisition of the technology or the company."  Ex. 66 at 2; Answers ¶ 72 (admitting Mahabub sent a letter to GenAudio shareholders on or about August 1, 2010).

77.     Mahabub also explained in this letter that the 2010 Offering would be closing at the end of August, "and it has been very successful thus far with the vast majority of investments coming from our existing shareholders.…  Many of you have continued to invest over and over again…."  Ex. 66 at 3.

H.     **Mahabub's And GenAudio's Fraudulent Conduct Regarding Negotiations And Potential Deals With Apple.**

i.     **GenAudio And Apple Did Not Negotiate Any Potential Deal Terms.**

78.     Apple never told Mahabub or GenAudio that it planned to incorporate GenAudio's technology in any of its new product roll-outs.  Ex. 39, Tiscareno Dep. at

313:4-11, 314:12 – 315:17; <u>Ex. 38</u>, Isaac Dep. 193:24 – 194:11; <u>Ex. 67</u>, Hailey Dep. 97:1 – 98:3, 151:19-22, and 154:11-17.

79.    Apple never indicated that it was interested in licensing GenAudio's technology or acquiring GenAudio or GenAudio's technology.  <u>Ex. 35</u>, Tiscareno Inv. 73:9 – 74:5; <u>Ex. 36</u>, Hailey Inv. 29:7 – 30:3; <u>Ex. 37</u>, Isaac Inv. 36:24 – 39:11.

80.    Apple and GenAudio had no negotiations about Apple licensing GenAudio's technology or acquiring GenAudio or its technology.  <u>Ex. 39</u>, Tiscareno Dep. 166:17-20, 173:3-6, 307:19-308:10, 312:4-313:21, and 317:5-318:8; <u>Ex. 35</u>, Tiscareno Inv. 73:9-74:5; <u>Ex. 38</u>, Isaac Dep. 184:11-21, 189:8-192:23, 195:15-25; <u>Ex. 67</u>, Hailey Dep. 90:8-20, 91:8-18, 93:7-19, 149:1-150:7, and 155:9-156:13.

81.    On December 16, 2009, Apple employee Hailey responded to the November 28, 2009 email from Mahabub referencing a potential "deal" between Apple and GenAudio, and stated, in part, "[w]e're making progress and building our story, but this is not something we can execute overnight.  The business side of things would come into play after we have exec buy-in on the product side."  <u>Ex. 50</u> at 2.

82.    On January 5, 2010, Hailey responded to an email from Mahabub and informed him that "[w]ith respect to timeframe, we are pretty serious about looking at audio quality across the board and this will take time – definitely more than a couple of months."  <u>Ex. 68</u> at 2.

**ii.    Mahabub And GenAudio Falsely Claimed That GenAudio Would Likely Be Entering Into A Deal With Apple.**

83.    On September 25, 2009, GenAudio held a telephonic meeting of the Board and during the meeting, Mahabub "noted that a deal with Apple is highly probable

18

based on the many meetings and Apple's responses to date."  <u>Ex. 69</u> at ¶ 7; <u>Ex. 2</u>, Mahabub Dep. 101:22-25 (addressing Ex. 69).

84.     On November 9, 2009, GenAudio and Mahabub, through Mattos, sent GenAudio's investors an email drafted and electronically signed by Mahabub, which stated, in part:  "It should be kept very confidential and nothing is assured yet, but as shareholders you should be aware that there is a strong possibility that the Company may be acquired within the next 6 months in light of our extensive discussions with a global industry leader in consumer electronics[]" and "[p]lease continue to tell people about our Company and directing [sic] them to our website[.]"  <u>Ex. 70</u> at 2.  *See also* Answers at ¶ 52.

85.     Following this November 9, 2009 email, Mahabub, with the assistance of Mattos, began selling Mahabub's personal shares of GenAudio to investors.  <u>Ex. 71</u> at 2 ("Mattos brought in 225k, and I have brought in over 750K USD from previous round investors and some new ones").

86.     GenAudio and Mahabub sent prospective investors a March 15, 2010 letter, in the 2010 Offering Materials, that represented, "[t]his offering is being conducted to provide bridge capital until we can 'ink' a deal with a large consumer electronics company (referred to as the 'LCEC' throughout the PPM)...."  <u>Ex. 14</u>.

87.     GenAudio and Mahabub represented in the 2010 Offering PPM that:

> [T]he Company is optimistic that the LCEC will eventually
> want access to our AstoundSound Technology for their
> products.  It is unclear what structure such access would
> take, but the Company believes the LCEC would either (i)
> integrate a portion of our AstoundSound Technology, namely
> ASE, into multiple product lines through a licensing
> arrangement or (ii) acquire all of our AstoundSound

Technology or, at least, that portion the LCEC deems
necessary for its integration plans.

Ex. 3 at 21.

88.     On or about August 28, 2010, GenAudio sent investors a letter that was

electronically signed by Mahabub and began by stating that the 2010 Offering had

raised $2.7 million "with the vast majority of investments coming from existing

shareholders.…  If any of you are considering the prospect of increasing your stake, you

only have a few days left to make that decision."  Ex. 72 at 1.

89.     The letter also stated, "[w]e are moving forward with confidence with the

LCEC.  However, due to the NDA we have signed with them, we cannot provide specific

details at this time.  Based on the aforementioned factors, we hope you understand that

our position grows stronger with each passing day. I can say that our anticipation of a

buyout would be the most probable case when and if we ink a deal and come to terms

with the LCEC."  *Id.* at 4.

90.     On September 6, 2010, Mahabub sent an email to two Board members,

representing that he was forwarding "my latest cattle prod to Vic and Apple" and

forwarding an email that Mahabub altered to make it appear as if he had strenuously

pushed Tiscareno to "ink" a deal with GenAudio.  *Compare* Ex. 73 to Ex. 74; *see also*

Demo. at 18-19.

I.     **GenAudio's Substantive Meetings With Apple Ended After September
2010.**

i.     **A September 23, 2010 Demonstration At Apple Did Not Go Well.**

91.     On or about September 23, 2010, Mahabub attended a demonstration at

Apple with Dr. Andrew Bright, who was an Apple employee with a Ph. D. in Acoustics,

Tiscareno, and Isaac.  *See* Ex. 75 at 1.

92.     The meeting did not go well due to an argument between Mahabub and Bright, and was Mahabub's last substantive meeting with Apple.  *See id.*; Ex. 35, Tiscareno Inv. 68:14-71:7; Ex. 39, Tiscareno Dep.  232:5-9; 255:10-21 (regarding Exs. 75 and 81); Ex. 38, Isaac Dep. 146:1-147:2; 158:10-159:18.

93.     In February 2011, Tiscareno left Apple.  *See* Answers ¶ 31.

### ii.     GenAudio And Mahabub Continued To Claim GenAudio Was Moving Forward With Jobs And Apple.

94.     On or about December 8, 2010, GenAudio sent investors a letter that was drafted and electronically signed by Mahabub and in a section entitled "The LCEC," stated, in part, "I met with their CEO and gave him a demo of our technology, and he stated, "I really like your technology and look forward to seeing you again in the future. Although they are moving very slow, we are still on their radar screen, and remain very optimistic for a deal in the second or third quarter of 2011."  Ex. 74 at 11.

95.     Mahabub has admitted the statement was false.  Ex. 1, Mahabub Inv. 507:9 -19 (addressing Ex. 74).  *See also* Ex. 39, Tiscareno Dep. 323:21 – 324:12.

96.     On or about February 26, 2011, GenAudio sent investors a letter that was drafted and electronically signed by Mahabub and claimed that GenAudio, "will continue to support the development efforts with the LCEC with the hope that it will lead to a major transaction for GenAudio and its shareholders in the not so distant future."  Ex. 82 at GA005331 – 32.

97.     GenAudio and Mahabub also stated in the February 26, 2011 letter that "If you are one of our accredited investors and would like to discuss a follow-on investment in the company, please feel free to contact me directly….  While we cannot make any guarantees, we are very confident this will be the last money raised before achieving

21

self-sustaining revenues given our inked revenue generating license deals, near-term licensing potential deals, and upcoming massive global branding."  *Id.* at GA005337.

98.     On March 29, 2011, GenAudio and Mahabub, through Mattos, sent GenAudio's investors a letter that stated that GenAudio would be signing a new set of "evaluation and development" agreements with the LCEC, which would "completely prohibit" Mahabub and GenAudio from disclosing any further information about the LCEC, or even using the term "LCEC."  The email concluded:  "Believe me when I tell all of you that I wish I could disclose what is going on, however, the fact of the matter is I cannot."  Ex. 76 at 5-6.

99.     Beyond the July 2009 NDA, GenAudio never entered into any agreements with Apple.  *See* Ex. 1, Mahabub Inv. 102:25-105:15 (the only agreement between Apple and GenAudio was the NDA).

J.     **Mahabub And GenAudio Made Material Omissions.**

100.    On April 22, 2011, GenAudio sent investors the 2011-2012 Offering materials, which omitted information about Apple or "the LCEC."  Ex. 15.

101.    Between November 2009 and April 2012, GenAudio and Mahabub did not inform investors that Mahabub's substantive communications with Apple personnel were almost always limited to mid-level engineering and marketing employees.  *See supra* §§ II.E.i and ii, ¶¶ 46 - 56.

102.    Between November 2009 and April 2012, GenAudio and Mahabub did not inform investors that Apple and GenAudio had no negotiations to license GenAudio's technology or to acquire GenAudio or its technology.  *See supra* at p. 17 § II.F.i., ¶¶ 78 - 80.

103.   Between November 2009 and April 2012, GenAudio and Mahabub did not inform investors that Apple never told Mahabub or GenAudio that it planned to incorporate GenAudio's technology in any of its new product roll-outs.  *See supra* § II.F.i., ¶ 78.

104.   Between September 2010 and April 2012, GenAudio and Mahabub did not inform investors that in September 2010, Mahabub conducted a demonstration to Apple personnel that went poorly.  *See supra* § II.G., ¶ 91-92.

K.   **Representations About GenAudio's Dealings With Apple Were Material To GenAudio Investor Investment Decisions.**

105.   Investors received and reviewed GenAudio's Offering Materials.  Ex. 77, Elliott Dep. 35:11-14 and 65:25-66:5 (Apr. 8, 2015) (discussing 2010 PPM); Ex. 32, Skluzak Inv. 50:21-52:7 (2010 Offering) and 162:9-163:7 (2011-2012 Offering).

106.   GenAudio's and Mahabub's shareholder updates were important to investors.  *See* Ex. 78, Eldridge Inv. 37:15 – 38:2 (explaining he purchased additional shares because of shareholder updates regarding Apple) (Apr. 6, 2015); Ex. 33, Elliott Inv. 26:5-27:2 (based on shareholder updates, understood Mahabub met Jobs and there were ongoing negotiations with Apple); Ex. 79, Bobak Inv. 31:16-22 and 74:6-24 (after updates came out, shareholders would ask Bobak if they should invest additional money) (Mar. 3, 2015).

107.   Investors purchased shares from Mahabub and GenAudio based on representations about Apple's alleged dealings with GenAudio, including Mahabub's oral representations.  *See* Ex. 78, Eldridge Inv. 16:24-19:9 and 30:11-31:18; Ex. 30, Skluzak Dep. at 29:12-30:4.  *See also* Ex. 80, Herdt Inv. 23:25-24:17 and 29:14-30:8 (Apr. 10, 2015).

23

###### III.   ARGUMENT.

Mahabub and GenAudio made untrue and misleading statements and omitted material information in statements to investors during their offerings and sales of GenAudio stock.  Mahabub and GenAudio also engaged in a fraudulent scheme to deceive investors and the GenAudio Team about GenAudio's relationship and potential transactions with Apple in order to obtain funds from investors that GenAudio needed to continue to operate.  The scheme permitted Mahabub to maintain a lifestyle that included travel to technology conferences and visits to the Apple campus.  Finally, GenAudio's and Mahabub's offerings and sales were not registered and were not exempt from registration.

###### A.   Legal Standard – Summary Judgment.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if it pertains to an element of a claim or defense; a factual dispute is 'genuine' if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party." *Ghiasy v. Kroger Co.*, No. 11-CV-01667-WJM-MJW, 2012 WL 6720650, at *1 (D. Colo. Dec. 27, 2012) (Martinez, J.).  The movant must "identify[ ] those portions of the [record], together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations marks omitted).  "Once the moving party meets its initial burden … the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial."  *Coit v. Zavaras*, No. 16-1146, 2017 WL 104447, at *2 (10th Cir. Jan. 11, 2017).  In order survive summary judgment; the non-moving party must

24

point to admissible evidence sufficient for a reasonable jury to return a verdict in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

B. **Mahabub And GenAudio Made Material Untrue And Misleading Statements And Omissions.**

    i. **Legal Standard – Fraudulent Statements And Omissions.**

To prove a misstatement or omission under Exchange Act Section 10(b) and Rule 10b–5(b), the SEC must prove that Mahabub and GenAudio directly or indirectly made an untrue statement of material fact or omitted to state a material fact, with scienter, in connection with the purchase or sale of a security, and using any means of interstate commerce or of the mails.  *SEC v. McDuffie*, No. 12-CV-02939, 2014 WL 4548723, at * 8 (D. Colo. Sept. 15, 2014).  To establish violations of Section 17(a)(2) of the Securities Act, the SEC must establish that GenAudio and Mahabub obtained money or property by means of an untrue statement of material fact or an omission to state a material fact, with negligence, in the offer or sale of securities, and using any means of interstate commerce or of the mails.  *Id.* at *9.  Statements of opinion may be actionable as fraudulent if the speaker does not actually hold the stated belief, if the statement contains embedded false statements of fact, or if the speaker omits material facts that conflict with what a reasonable investor would take from the statement itself.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326-27, 1329 (2015).

Omissions are actionable when the speaker has a duty to disclose the omitted information.  *SEC v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010).  A duty arises when a voluntary statement is made and it omits material information.  In other words, "where a party without a duty elects to disclose material facts, he must speak fully and

truthfully, and provide complete and non-misleading information with respect to the subjects on which he undertakes to speak." *Id.*

### ii. The Undisputed Facts Establish That Mahabub And GenAudio Made Material Untrue And Misleading Statements And Omissions.

Between at least November 2009, when Mahabub was selling his personal shares, and April 2012, when the 2011-2012 Offering concluded, Mahabub and GenAudio made untrue and misleading statements and omissions directly to numerous GenAudio investors through oral communications, emails, shareholder letters, and offering documents.  Additionally, through Mahabub's false and altered emails to the GenAudio Team, Mahabub and GenAudio made untrue and misleading statements and material omissions because the emails were sent to Board members who were also investors, as well as to Mattos, the GenAudio employee who was a principal fundraiser and investor communicator.

### a.  Fraudulent Statements Regarding Apple Executives.

In oral communications, Mahabub told investors that he met Jobs and discussed GenAudio.  SOF ¶ 40, 41, 73, and 107.  In his email communications, Mahabub lied about his contacts with Schiller, Cook, and Jobs, and he altered emails to and from Apple to make it appear as if those Apple executives were involved with GenAudio when they were not.  *Id.* ¶¶ 57-60, 63-64, 67-69, 72, 75, and 106.  Moreover, in investor update letters, Mahabub and GenAudio claimed that Jobs had requested a meeting with Mahabub, *id.* ¶ 76, and later claimed that a meeting had occurred, *id.* ¶ 94.

These statements were false.  Mahabub never met with Jobs regarding GenAudio, and Jobs, Schiller, and Cook were not involved in Apple's dealings with GenAudio.  *Id.* ¶¶ 50 - 56.

b.  Fraudulent Statements About GenAudio's Alleged Negotiations And Dealings With Apple.

As set forth above, Mahabub and GenAudio repeatedly asserted that GenAudio would likely be entering into a deal with Apple or "the LCEC," which was understood to be a thinly-veiled reference to Apple.  In investor communications, Mahabub and GenAudio falsely claimed that there was "a strong possibility that the Company may be acquired within the next 6 months," *id.* ¶ 84, and "[w]e are moving forward with confidence with the LCEC ....  I can say that our anticipation of a buyout would be the most probably case when and if we ink a deal and come to terms," *id.* ¶ 89.  Mahabub also wrote to potential investors that the LCEC was "looking to acquire GenAudio's tech for integration into their entire lineup of product offerings[.]"  *Id.* ¶ 64.  Also, in the false transcription of Mahabub's alleged May 6, 2010 call with Tiscareno, Mahabub claimed that "Steve" "wants to explode this technology into the world."  *Id.* ¶ 68.

Similarly, the 2010 Offering Materials misleadingly stated that:  (1) the offering was "being conducted to provide bridge capital until we can 'ink' a deal with [the LCEC]"; (2) GenAudio was "optimistic that the LCEC will eventually want access to our AstoundSound Technology for their products"; and (3) GenAudio believed the LCEC would either enter into a licensing arrangement with GenAudio or acquire GenAudio's technology.  *Id.* ¶ 86.

There was no basis for these statements.  Apple never indicated that it was interested in licensing the technology – much less including AstoundSound in any of its product rollouts  – and an acquisition was never raised.  *See id.* ¶¶ 78 - 80.  Moreover, just a few months prior to the 2010 Offering beginning, Mahabub had been told by Apple that "[t]he business side of things would come into play after we have exec buy-in

27

on the product side[,]" *id.* ¶ 81, and Apple's consideration of "audio quality across the board" would "take time – <u>definitely more than a couple of months</u>[,]" *id.* ¶ 82 (emphasis added).

Mahabub's knowledge of these facts, especially in light of his <u>months</u> of lying and altering emails to the GenAudio Team, *see id.* ¶¶ 57-60, 63-64, 67-68, 72, and 75, establish that he did not actually believe these statements; the statements are therefore fraudulent. *See Omnicare*, 135 S. Ct. at 1327. The statements are also fraudulent because they omitted crucial information about the true scope of GenAudio's dealings with Apple, including that Apple never indicated that it was interested in licensing the technology, and GenAudio and Apple never discussed an acquisition. SOF ¶¶ 78 – 80. Absent disclosure of these critical facts, the reasonable investor who obtained the 2010 Offering Materials would assume that GenAudio and "the LCEC" had engaged in at least some communications whereby Apple indicated that a deal would be "inked," or otherwise consummated, shortly. As the Supreme Court explained in *Omnicare*, the reasonable investor "expects not just that the issuer believes the opinion (however irrationally), <u>but that it fairly aligns with the information in the issuer's possession at the time</u>." 135 S. Ct. at 1329 (emphasis added).

      c.  <u>Material Omissions</u>.

In all of their communications with investors during the 2010 and 2011-2012 Offerings and Mahabub Sales, Mahabub and GenAudio failed to disclose that:

- Mahabub's and GenAudio's communications with Apple personnel had almost exclusively been limited to a handful of mid-level engineering and marketing staff, and never involved Jobs, Schiller, or Cook. SOF ¶ 101.

- Apple and GenAudio had no negotiations to license GenAudio's technology or to acquire GenAudio or its technology. *Id.* ¶ 102.

- Apple never communicated that it planned to incorporate GenAudio's technology in any of its new product roll-outs.  *Id.* ¶ 103.

- GenAudio had no substantive meetings with Apple after September 2010.  *Id.* ¶ 91-92 and 104.

    d.  <u>Mahabub, And Therefore GenAudio, Acted With Scienter</u>.

In the Tenth Circuit, scienter can be established by a showing of knowledge or recklessness.  *SEC v. Smart*, 678 F.3d 850, 856-57 (10th Cir. 2012).  Recklessness is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that it is either known to the defendant or is so obvious that the actor must have been aware of it."  *See SEC v. Parrish*, No. 11-CV-00558-WJM-MJW, 2012 WL 4378114, at * 3 (D. Colo. Sept. 25, 2012) (Martinez, J.) (quoting *Hackbart v. Holmes*, 675 F.2d 1114, 1117 (10th Cir. 1982)).  As the CEO of GenAudio, Mahabub's scienter is imputed to GenAudio.  *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003), *as amended on denial of reh' g* (Aug. 29, 2003).

Mahabub acted with scienter because he actually knew that he and GenAudio were making untrue statements and omissions.  He was also GenAudio's primary contact with Apple and the participant in the communications about which he and GenAudio lied; as a result, Mahabub had actual knowledge of the falsity of the statements about his interactions with Jobs, Schiller, and Cook, and Apple's alleged "negotiations" and likelihood of engaging in a deal with GenAudio.  *See* SOF ¶¶ 38, 42-45, 57- 64, 66-68, 71-73, and 75-76.  Mahabub also knew that he was altering his emails to the GenAudio Team because he was the recipient of the actual emails with Apple employees and he altered them.  *Id.* ¶ 38, 42-45, 57- 64, 66-68, 71-73, and 75-76.  Given that he was "unquestionably aware of the true facts, the false statements can

only have been intentional." *SEC v. Universal Express, Inc.*, No. 04 CIV. 2322 (GEL), 2007 WL 2469452, at *7 (S.D.N.Y. Aug. 31, 2007).

Mahabub was also reckless in making untrue statements and material omissions in shareholder communications, and in forwarding altered emails to the GenAudio Team. *See SEC v. Gallagher*, No. 87-3904, 1989 WL 95252, at *6 (E.D. Penn. 1989) (defendant's knowledge of altered and fake documents provided to auditors established at least gross recklessness).  At the <u>very</u> least, Mahabub's conduct was negligent, and therefore violated Section 17(a)(2), as it was far beyond the standard of care of a reasonable person – much less the CEO of a corporation – to consistently lie to GenAudio's investors and to alter documents that were sent to shareholders and the employee charged with soliciting investors.  *See SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1380 (D. Colo. 2014) (deceptive conduct over a period of months "was so obviously misleading to be an 'extreme departure from the standards of ordinary care'").[6]

e. <u>The Misleading And Untrue Statements And Omissions Were Material</u>.

Information is considered material when there is a substantial likelihood that a reasonable investor would consider it important in determining whether to buy or sell securities. *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976).  GenAudio's alleged relationship, negotiations and potential transactions with Apple were material to its investors and influenced their investment decisions.  SOF ¶ 39 -41, 94, and 105-107.  Here, materiality can be determined as a

_____

[6] If the Court finds that Mahabub acted with scienter, then the SEC has also met its burden with respect to its negligence-based fraud claims.  *See SEC v. Provident Royalties, LLC*, No. 3:09-CV-01238, 2013 WL 5314354, *6 (N.D. Tex. Sept. 23, 2013) (granting the SEC summary judgment and explaining, "by showing scienter, the SEC has met the lower burden of negligence for violations of sections 17(a)(2) and (a)(3)").

matter of law because GenAudio's alleged dealings with Apple were of utmost importance to the success of the company and, therefore, the risk and value of an investment into GenAudio.  *See SEC v. Recile*, 10 F.3d 1093, 1095, 1097-98 (5th Cir. 1993) (upholding grant of summary judgment when misrepresentations regarding financing and leasing status of a real estate venture "amply satisfy the materiality element"); *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) ("Surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge.").

Moreover, Mahabub's conduct demonstrates the materiality of the statements: he admitted that he altered his emails with Apple because the truth was not good enough. *See* SOF ¶ 44.  Given that Mahabub felt he had to lie to influence the GenAudio Team; it's only logical that the embellishments were also of great consequence to GenAudio's much-needed investors.[7]  *See SEC v. DiMaria*, No. 1:15-CV-7035-GHW, 2016 WL 4926200, at *7 (S.D.N.Y. Sept. 15, 2016) (addressing materiality on a motion to dismiss, "after all, if these two [financial] measures were so insignificant to the reasonable investor, why was [the defendant CFO] so focused on them?").

f.  <u>Mahabub And GenAudio Are Both "Makers".</u>

For a defendant to be primarily liable for a violation of Rule 10b-5(b), the defendant must be the "maker" of the misstatement or omissions.  *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296, 2302 (2011).  "For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Id*.  Both

---

[7] Because the omissions were material, Mahabub and GenAudio had a duty to speak.  *See Curshen*, 372 Fed. App'x at 880.

GenAudio and Mahabub are makers of the untrue and misleading statements and omissions in the Offering Materials and shareholder updates.  GenAudio was the maker of the Offering Materials and updates, which were issued in its name.  *See id.* at 2304 (entity issuing prospectus was "maker").

Mahabub was the "maker" of his emails and his oral untrue statements to investors.  He was also the "maker" of all of GenAudio's untrue statements and omissions, as he had "ultimate authority" over all statements regarding Apple, SOF ¶ 38, and he controlled GenAudio, *id.* ¶¶ 3-4.  He also reviewed and approved GenAudio's Offering Materials, *id.* ¶ 28, and the shareholder updates were electronically signed by Mahabub, and frequently referred to him as the author, *id.* ¶¶ 76, 86, 88-89, 94.  "[I]n the wake of *Janus,* an executive who undisputably exercised authority over his own non-casual statements with the intent and reasonable expectation that such statement would be relayed to the investing public, should be deemed to be the person who 'made' the statements …."  *SEC v. Daifotis*, 874 F. Supp. 2d 870, 881 (N.D. Cal. 2012).  *See also SEC v. Levin*, 2013 WL 5588224, at * 14 (S.D. Fla. Oct. 10, 2013) (managing member and owner was maker when he had ultimate control over the content of statements issued to potential investors).  Further, Mahabub's "own contemporaneous words and actions show that [he] endorsed the statements" as his altered emails and direct communications with investors also contained untrue and misleading information regarding Apple.  *SEC v. E-Smart Technologies, Inc.*, 74 F.

Supp. 3d 306, 319 (D.D.C. 2014) (holding CEO was a "maker"); *see also* SOF ¶¶ 42-45, 57-60, 63-64, 67-68, 72, and 75.[8]

    g.  <u>The Fraudulent Statements And Omissions Were "In Connection With" The Purchase Or Sale Of A Security And "In The Offer Or Sale" Of A Security</u>.

"The 'in connection with' requirement [of Section 10(b)] is broadly interpreted and covers any fraud that 'coincide[s] with a securities transaction.'" *Smart*, 678 F.3d at 857 (quoting *SEC v. Wolfson,* 539 F.3d 1249, 1256 (10th Cir.2008)).  "Indeed, [the Tenth Circuit has] held that misrepresentations made to induce a party to purchase a security <u>or to influence an investment decision</u> are made in connection with the purchase or sale of a security."  *Id.* (emphasis in original) (internal quotations and citation omitted).[9] Similarly, the terms "offer" and "sale" as used in 17(a) "are expansive enough to encompass the entire selling process" and "[do] not require that the fraud occur in any particular phrase of the selling transaction."  *United States v. Naftalin*, 441 U.S. 768, 773 (1979).

Throughout the relevant time period, GenAudio was desperate for funds and was fundraising – or about to begin fundraising – from investors either through Mahabub's

---

[8] In the alternative, Mahabub is liable for GenAudio's violations of Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder as an aider and abettor or, with respect to the Exchange Act, as a control person.  (Compl. at Fifth, Sixth, and Seventh Claims).  As set forth above, it is undisputed that GenAudio committed fraud by making numerous untrue and misleading statements and omissions.  Mahabub's substantial assistance to GenAudio is demonstrated by his control over the statements and his deceptive conduct and, as explained above, he acted with scienter or, at least, recklessly.  Mahabub also controlled GenAudio and is therefore liable as a control person for GenAudio's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b).  *See SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1208 (D.N.M. 2013) (setting forth legal standard for aiding and abetting and control person liability).

[9] The SEC does not have to prove reliance.  *Wolfson*, 539 F.3d 1249, 1260.

personal sales of stock or the 2010 and 2011-2012 Offerings.  *See* SOF ¶¶ 8-13.  The fraudulent statements and omissions occurred in the Offering Materials, shareholder updates issued during the offerings, many of which encouraged further investment, and road shows.  *Id.* ¶¶ 29, 64-65, 68-70, 73-74, 76-77, 84- 89, 100-104.

Mahabub's fraudulent, altered emails were also "in connection with" and "in the offer and sale" of securities because he repeatedly encouraged the GenAudio Team – the direct recipients – to assist him and GenAudio in raising additional funds.  *Id.* ¶¶ 10-13.  In fact, Mahabub's fraudulent, altered emails were sent to Mattos, whose primary duties included raising money for GenAudio from investors, as well as GenAudio Team members who were also investors.  *See id.* ¶¶ 5-6, 10-11, 43-44, 57-60, 68, 72, 75.[10] Mahabub also personally sent the May 6, 2010 false "transcript" to at least one investor, which validated the investor's decision to purchase a large number of shares.  *Id.* ¶¶ 68-70.  Given that "[t]he Supreme Court has held that the 'in connection with' element is a broad and flexible standard and that any activity 'touching [the] sale of securities' will suffice," *SEC v. e-Smart Techs., Inc.*, 85 F. Supp. 3d 300, 326 (D.D.C. 2015) (internal quotation marks and citations omitted), Mahabub's and GenAudio's fraudulent conduct, which surrounded and occurred throughout GenAudio's 2010 and 2011-2012 Offerings and the Mahabub's Sales, satisfies the required nexus.

> h.  <u>Both Mahabub And GenAudio Obtained Money</u>.

Both Mahabub and GenAudio "obtained money" through the fraudulent

---

[10] The fraudulent scheme involved the use of email and therefore satisfies the interstate commerce element of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act.  *See SEC v. USA Real Estate Fund 1, Inc.*, 30 F. Supp. 3d 1026, 1035 (E.D. Wash. 2014).

statements and omissions.  GenAudio raised $3,513,000 during the 2010 Offering and $990,000 during the 2011-2012 Offering and Mahabub made $2,338,900 through his personal stock sales between November 2009 and April 2012.  SOF ¶¶ 15, 21, and 22.

C.   **Mahabub And GenAudio Engaged In A Fraudulent Scheme.**

   i.   **Legal Standard – Scheme Liability.**

Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) make it unlawful to, in connection with the purchase or sale of securities, "employ any device, scheme, or artifice to fraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," with scienter.  *Id.*  To establish violations of Rules 10b-5(a) and (c), the SEC must prove that Mahabub and GenAudio directly or indirectly:  (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; and (3) with scienter.  *Sullivan*, 68 F. Supp. 3d at 1377; *McDuffie*, 2014 WL 4548723, at * 10.  "For conduct to be a 'manipulative or deceptive act,' it must be 'inherently deceptive when performed.'"  *Sullivan*, 68 F. Supp. 3d at 1377 (quoting *SEC v. St. Anselm Exploration Co.*, 936 F. Supp. 2d 1281, 1299 (D. Colo. 2013)).  Such conduct encompasses "a wide spectrum of conduct involving cheating or trading in falsehoods."  *Dennis J. Malouf*, Securities Act Release No. 10115, Exchange Act Release No. 4463, Investment Company Release No. 32194, 2016 WL 4035575, at *6 (July 27, 2016) (internal quotation omitted).

Sections 17(a)(1) and (3) of the Securities Act make it unlawful, in the offer or sale of any security, "to employ any device, scheme, or artifice to defraud" and "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a)(1) and (3).  To establish a violation of Section 17(a)(1), the SEC must prove that Mahabub and

GenAudio acted with scienter; however, scienter is not an element of Section 17(a)(3).

*Parrish*, 2012 WL 4378114, at *3.

### ii. The Undisputed Facts Establish That Mahabub And GenAudio Engaged In A Fraudulent Scheme.

Mahabub, as the CEO of GenAudio, <u>repeatedly</u> committed deceptive, fraudulent acts in furtherance of the scheme to deceive investors and the GenAudio Team in order to raise additional funds for GenAudio.  Mahabub materially altered his email communications with Apple employees before forwarding them to the GenAudio Team, which included significant investors and Mattos, the GenAudio employee who was a principal fundraiser and investor communicator.  SOF ¶¶ 5-6, 37, and 85.  Specifically, Mahabub's and GenAudio's conduct in furtherance of a fraudulent scheme included altering and sending emails claiming that:  (1) Mahabub met Jobs or was going to meet Jobs, and that Jobs was involved in Apple's consideration of GenAudio's technology when, in fact, Mahabub never met Jobs and Jobs was never involved in GenAudio, *id.* ¶¶ 50-52; 58, 59, 63, 64, 67-68, 73, 75-76, 94-95; (2) Schiller and/or Cook had communicated with Mahabub and were involved in Apple's consideration of GenAudio's technology when, in fact, neither Schiller nor Cook communicated with Mahabub about GenAudio's technology and were never involved in Apple's consideration of the technology, *id.* ¶¶ 53-56; 57-60, 63, 67; and (3) Apple employees had made positive – or even glowing – statements about GenAudio's technology and possible licensing or acquisitions transactions, *see id.* ¶¶ 58, 68, 72, 94.  Mahabub also engaged in

deceptive conduct by creating and emailing a fake "transcription" of a conversation that never occurred to the GenAudio Team and investor.  *Id.* ¶¶ 68-70.[11]

Mahabub's lies in, and alterations to, the emails he forwarded, as well as his falsification of the May 6, 2010 "transcription" of a conversation between him and Tiscareno were deceptive, fraudulent, and repeated such that they constituted a fraudulent "practice," "transaction," and "course of business" and violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, as well as Sections 17(a)(1) and (3) of the Securities Act.  *See SEC v. Monterosso*, 557 Fed. App'x 917, 926 (11th Cir. 2014) (upholding summary judgment on scheme liability when defendants "changed the names of customers and vendors and altered the amounts on invoices, and no reasonable person could have believed it was proper to report revenue from fabricated invoices"); *SEC v. Cooper*, 142 F. Supp. 3d 302, 316 (D.N.J. 2015) (granting SEC summary judgment on scheme claims when defendant "created and supplied fake account statements" and "forged an email and a letter from a representative of a brokerage firm"); *see also SEC v. Kearns*, 691 F. Supp. 2d 601, 618 (D.N.J. 2010) (misleading auditors was conduct in furtherance of scheme).

_____

[11] In *Dennis J. Malouf*, the Commission explained that the Securities Act's and Exchange Act's scheme liability provisions encompass fraud involving misstatements as well as other fraudulent conduct.  2016 WL 4035575, at *10-12.  The SEC believes that Mahabub's false and altered emails to the GenAudio Team violate all three subsections of Section 17(a) and Rule 10b-5 because they contain misstatements <u>and</u> his conduct in creating those misstatements, including altering the emails, constitute deceptive acts in furtherance of a scheme.  If, however, the Court determines that the misstatements within the emails are not actionable as misstatements, the SEC asserts that Mahabub's <u>alterations</u> to the emails constitutes separate, deceptive conduct in furtherance of a scheme.  *See SEC v. Goldstone*, 2015 US Dist. LEXIS 116847, at *976 (D.N.M. 2015) ("as long as inherently deceptive conduct is present, a claim for scheme liability does not fail, because the alleged scheme was in furtherance of a misrepresentation or omission").

As detailed above, Mahabub acted with scienter (or was at least reckless) and was negligent because he actually knew that he was lying to the GenAudio Team, whom he asked to solicit investors, and that he was altering emails.  *See supra* at p. 29 § III.B.ii.d.  Mahabub's and GenAudio's fraudulent and deceptive conduct was "in connection with" the purchase or sale of a security and "in the offer or sale" of a security because it surrounded and occurred throughout GenAudio's 2010 and 2011-2012 Offerings and the Mahabub's Sales.  *See supra* at p. 33 *§* III.B.ii.g.

D.    **Mahabub And GenAudio Engaged In Unlawful, Unregistered Securities Offerings.**

     i.    **Legal Standard – Registration Provisions Of The Securities Act.**

To establish a prima facie case for a violation of Sections 5(a) and (c) of the Securities Act, the SEC must demonstrate:  (1) that no registration statement with the SEC was in effect for the securities; (2) that the defendant directly or indirectly sold or offered to sell the securities; and (3) that interstate means were used in connection with the offer or sale.  15 U.S.C. § 77e(a)(1) and (c); s*ee also SEC v. Calvo*, 378 F.3d 1211, 1214 (11th Cir. 2004); *Parrish,* 2012 WL 4378114, at *3.  Section 5(a) and (c) impose strict liability on offerors and sellers of unregistered securities.  *Calvo*, 378 F.3d at 1215; *SEC v. Arcturus Corp.*, 171 F. Supp. 3d 512, 531 (N.D. Tex. 2016), *reconsideration denied*, No. 3:13-CV-4861-K, 2016 WL 3654430 (N.D. Tex. July 8, 2016).  Once the SEC establishes a prima facie violation, the burden shifts to the defendants to demonstrate that a claimed exemption from registration is available.  *SEC v. Ralston Purina Co.,* 346 U.S. 119, 126 (1953).  Because "public policy strongly supports registration," any exemption from registration "must be strictly construed against the person claiming its benefit."  *Quinn and Co. v. SEC*, 452 F.2d 943, 946 (10th Cir. 1971).

38

A defendant violates Section 5 "if [the SEC] can show that he was a 'necessary participant' or a 'substantial factor' in the offering or selling of the unregistered securities. *Calvo*, 378 F. 3d at 1215.

### ii.   The 2010 Offering And 2011-2012 Offering Were Unregistered And Not Exempt From Registration.

The facts that establish the SEC's *prima facie* case are not in dispute.  In their Answers, GenAudio and Mahabub admit that GenAudio made sales of securities, by means of interstate commerce, and when no registration statement was in effect.   SOF ¶¶ 14, 19-26, 30.  The burden shifts to the defendants to establish whether an exemption applies, *Ralston Purina Co.,* 346 U.S. at 126, and Defendants cannot meet this burden.

GenAudio and Mahabub claim that they can rely on Rule 506 of Regulation D, as well as Section 4(2) of the Securities Act.  *See* Answers at p. 28 (Third Affirmative Defenses).  However, during the GenAudio Offerings, Mahabub and GenAudio offered and sold securities to non-accredited, unsophisticated investors without providing an audited balance sheet, as required by Rule 502 of Regulation D.  SOF ¶¶ 31-37; 17 C.F.R. § 230.502(b)(2)(B)(2).  Further, there is no evidence that many of GenAudio's offerees had a relationship with GenAudio, or that the size and manner of the offering would render Section 4(2) of the Securities Act applicable.  SOF ¶¶ 27, 32-37.

Mahabub is liable for GenAudio's Section 5 violations: he was a "necessary participant" and "substantial factor" in the offers and sales.  *See SEC v. Holschuh*, 694 F.2d 130, 140 (7th Cir. 1982).  He controlled GenAudio during both offerings, SOF ¶ 3-4; reviewed the PPMs and signed – or electronically signed – the cover letters, *id*. ¶ 25-26, 28, and solicited investors and encouraged others to solicit, *id.* ¶¶ 29, 10-13.

Mahabub was intimately involved in both of GenAudio's offerings and is therefore liable for violations of Sections 5(a) and (c).  *See Holschuh*, 694 F.2d at 140.

### iii.    The Mahabub Personal Sales Were Unregistered And Not Exempt From Registration.

Between November 2009 and April 2012, Mahabub also violated Section 5 in connection with his personal sales.  The undisputed facts make out a *prima facie* violation of Section 5: (1) no registration statement was filed or in effect for GenAudio; (2) Mahabub sold and offered to sell shares of GenAudio stock; and (3) interstate commerce and the mails were used in connection with Mahabub's sales.  SOF ¶¶ 14-15, 17, 20.  Mahabub's sales also were not exempt from registration.  The exception most often cited for personal sales, Section 4(1) of the Securities Act, is unavailable to Mahabub because he controlled GenAudio and acted as an underwriter.  A control person, such as an officer, director, or majority shareholder, is "treated as an issuer when there is a distribution of securities" and therefore "ordinarily may not rely upon the Section 4(1) exemption."  *SEC v. Cavanagh*, 155 F.3d 129, 134 (2d Cir. 1998) (*citing United States v. Wolfson*, 405 F.2d 779, 782 (2d Cir.1968)).

## IV.    <u>CONCLUSION.</u>

Based on the foregoing, the SEC respectfully requests that the Court enter an Order granting summary judgment against Defendants Mahabub and GenAudio as to their liability for the First, Second, Third, Fourth, and Eighth Claims against them.  Alternatively, the Commission requests that summary judgment be entered against Mahabub as to his liability for the Fifth, Sixth, and Seventh Claims alleged against him.

DATED:  March 24, 2017


Respectfully Submitted,


*/s Danielle R. Voorhees*

Leslie J. Hughes (Colo. Bar No. 15043)
Danielle R. Voorhees (Colo. Bar No. 35929)
Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO  80294-1961
Telephone: (303) 844-1000
Fax: (303) 297-3529
Email: HughesLJ@sec.gov
        VoorheesD@sec.gov
*Attorneys for Plaintiff Securities and Exchange Commission*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2017, the document above was e-filed with the Court's ECF system and will be served on those listed below:

Andrew B. Holmes
Holmes, Taylor & Jones, LLP
617 South Olive Street, Suite 1200
Los Angeles, CA 90014
Telephone: 213-985-2265
Email: abholmes@htjlaw.com
*Attorney for Defendant Taj Jerry Mahabub*

Michael P. McCloskey
Wilson Elser Moskowitz Edelman & Dicker LLP
655 West Broadway, Suite 900
San Diego, CA 92101
Telephone: 619-321-6200
Email: Michael.McCloskey@wilsonelser.com
*Attorney for Defendant GenAudio, Inc.*

Jeffrey G. Benz
Benz Law
12021 Wilshire Boulevard, Suite 256
Los Angeles, CA 90025
Telephone: 310-570-2774
Email: JeffreyBenz@gmail.com
*Attorney for Defendant Astound Holdings, Inc.*

*s/ Elinor E. Blomgren*
Elinor E. Blomgren