EXCERPTED

# EXHIBIT 1

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                )
                                 ) File No. D-03450-A
GENAUDIO, INC.                   )

WITNESS: Taj Jerry Mahabub

PAGES:   1 through 358

PLACE:   Securities and Exchange Commission

         Byron G. Rogers Federal Building

         1961 Stout Street, 1st Floor

         Denver, Colorado 80294

DATE:    Thursday, February 5, 2015

     The above-entitled matter came on for hearing, pursuant to Notice, at 9:00 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

Page 2

1   APPEARANCES:
2
3   On behalf of the Securities and Exchange Commission:
4       JENNIFER OSTROM, Senior Counsel
5       KURT L. GOTTSCHALL, Staff Attorney
6       Securities and Exchange Commission
7       Denver Regional Office
8       Byron G. Rogers Federal Building
9       1961 Stout Street, Suite 1700
10      Denver, Colorado 80294
11      (303) 844-1049
12
13  On behalf of the Witness:
14      ANDREW B. HOLMES, ESQ.
15      Holmes, Taylor & Jones, LLP
16      801 South Figueroa Street, Suite 2170
17      Los Angeles, California 90017
18      (213) 985-2200
19
20      MICHAEL P. MCCLOSKEY, ESQ.
21      Wilson, Elser, Moskowitz,
22      Edelman & Dicker, LLP
23      655 West Broadway, Suite 900
24      San Diego, California 92101
25      (619) 321-3200

Page 3

1           CONTENTS
2
3   WITNESS:                EXAMINATION
4   Taj Jerry Mahabub            4
5
6   EXHIBITS    DESCRIPTION        IDENTIFIED:
7   56   Bates SEC-RPI-P1-3, certification    33
8   57   Bates numbered JM2096-2099, series   119
9        Of e-mails
10  58   Bates numbered JM555-558, e-mails    155
11  59   Bates numbered JM378-380, e-mail     182
12       Chain
13  60   Bates numbered JM1098-1102, e-mails  214
14  61   Bates numbered JM727-729, e-mails    267
15  62   Bates numbered JM2093-2095, e-mail   278
16  63   Bates numbered JM2022-2023, e-mail   296
17       Bates numbered JM2158-2167, e-mail
18  64   Chain                      341

Page 4

1           PROCEEDINGS
2       MS. OSTROM: Let's go on the record at
3   9:00 a.m., on February 5, 2015.
4       Would you please raise your right hand.
5       Do you swear to tell the truth, the whole
6   truth and nothing but the truth?
7       THE WITNESS: Yes.
8   Whereupon,
9           TAJ JERRY MAHABUB,
10  was called as a witness and, having been first duly
11  sworn, was examined and testified as follows:
12          EXAMINATION
13  BY MS. OSTROM:
14      Q   And would you please state and spell your
15  full name for the record.
16      A   Taj, T-A-J, Jerry, J-E-R-R-Y, Mahabub,
17  M-A-H-A, B, as in boy, U, B, as in boy.
18      Q   And my name is Jennifer Ostrom, and this is
19  Kurt Gottschall, and we are both officers of the
20  United States Securities and Exchange Commission
21  for purposes of this proceeding.
22      And this is an investigation by the
23  Commission in the matter of GenAudio Inc., to
24  determine whether there have been violations of
25  certain provisions of the federal securities law.

Page 5

1       However, the facts developed in this
2   investigation might constitute violations of other
3   federal or state, civil or criminal laws.
4       And prior to the opening of the record, you
5   were provided with a copy the Formal Order of
6   Investigation in this matter, and it will be
7   available for your examination during the course of
8   this proceeding.
9       And, Mr. Mahabub, have you had an opportunity
10  to review the formal order?
11      MR. HOLMES: It's Number 2.
12      BY MS. OSTROM:
13      Q   The one I just handed you you could look
14  at. It's at the bottom here.
15      A   Yes, I have seen this before.
16      Q   Okay. And prior to the opening of the
17  record you were provided with a copy of the
18  Commission's Supplemental Information Form, and a
19  copy of that notice has been marked Exhibit
20  Number 1, and that's right -- right there.
21      And, Mr. Mahabub, have you had the
22  opportunity to read Exhibit Number 1?
23      A   Yes.
24      Q   And do you have any questions concerning
25  this notice?

2 (Pages 2 to 5)

Page 6

1  A  No.
2  Q  Do you understand that the statutes set
3  forth in Exhibit Number 1 provide criminal
4  penalties for knowingly providing false testimony
5  or knowingly using false documents in connection
6  with this investigation?
7  A  Yes.
8  Q  And I also want to highlight for you
9  paragraph B2 of the Form 1662. It reads as
10 follows: You may be represented by counsel who
11 also represents other persons involved in the
12 Commission's investigation. This multiple
13 representation, however, presents a potential
14 conflict of interest if one client's interest are
15 or may be adverse to another's. If you are
16 represented by counsel who also represents other
17 persons involved in the investigation, the
18 Commission will assume that you and counsel have
19 discussed and resolved all issues concerning
20 possible conflicts of interest. The choice of
21 counsel and the responsibility for that choice is
22 yours.
23     Do you understand this?
24 A  Yes.
25 Q  And, Mr. Mahabub, are you represented by

Page 7

1  counsel today?
2  A  Yes.
3     MS. OSTROM:  And would counsel please
4  identify themselves for the record?
5     MR. HOLMES:  Andrew Holmes.
6     MR. MCCLOSKEY:  Michael McCloskey.
7     MS. OSTROM:  And, Mr. Holmes, could you
8  please give us your contact information?
9     MR. HOLMES:  801 South Figueroa Street,
10 Suite 2170, Los Angeles, California, 90017.
11 Telephone is (213) 985-2265.
12    MS. OSTROM:  And, Mr. Holmes, are you
13 appearing today as counsel for Mr. Mahabub?
14    MR. HOLMES:  I am.
15    MS. OSTROM:  And, Mr. McCloskey, would you
16 please give us your contact information?
17    MR. MCCLOSKEY:  655 West Broadway, Ninth
18 Floor, San Diego, California, 92101.
19    MS. OSTROM:  And, Mr. McCloskey, are you
20 appearing as counsel for Mr. Mahabub?
21    MR. MCCLOSKEY:  Yes.
22    MS. OSTROM:  Do you also represent GenAudio?
23    MR. MCCLOSKEY:  Yes.
24    BY MS. OSTROM:
25 Q  Mr. Mahabub, if you want to go off the

Page 8

1  record today, please advise me of your desire to do
2  so and I will decide at that time whether to ask
3  the reporter to do so.
4     She will not go off the record at your
5  request or counsel's request, only at our request.
6  So if you need to take a break or talk to your
7  counsel about anything, please tell me because I'm
8  almost always happy to accommodate you. Okay?
9  A  What does that mean, off the record?
10    MR. HOLMES:  It means taking a break so
11 that the court reporter doesn't take down any more
12 information off the record.
13    THE WITNESS:  Oh, okay. Not recording, off
14 the record. Okay.
15    MR. HOLMES:  Yeah. And we can, you know,
16 step out if we need to.
17    THE WITNESS:  Okay.
18    BY MS. OSTROM:
19 Q  But if you need to take a break, especially
20 considering you're feeling under the weather,
21 please tell me.
22 A  I brought my meds with me, so if I start
23 getting a little shaky and the fever spikes up,
24 I'll get it out.
25 Q  And that's one of the things I was going to

Page 9

1  ask you and I'll go ahead and do that before we go
2  any further.
3     You said earlier that you were suffering
4  from the flu today; is that correct? Is that a
5  yes?
6  A  Oh, yes.
7  Q  And that's another thing is we need you to
8  verbally respond to our questions, not nod your
9  head. Okay?
10 A  Sure.
11 Q  Okay. Now, what medications are you on?
12 A  DayQuil, NyQuil at night, and ibuprofen.
13 Q  Okay. Nothing else?
14 A  No.
15 Q  Are you on any medications, prescription
16 medications on a routine basis?
17 A  No.
18 Q  Okay. So other than those over-the-counter
19 medications, you're not on any other medication?
20 A  No.
21 Q  Okay.
22 A  I typically do things organically in a
23 healthy way before I resort to medication.
24 Q  And, again, a couple of other things that
25 we may need to make clear before we continue today.

3 (Pages 6 to 9)

Page 46

1  Marines actually, called Vehicle Automated
2  Diagnostic Systems, also know as VADS. So data
3  acquisition primarily, testing measurement.
4     Q  Did anybody work for you at Rapid Prototype
5  Technologies?
6     A  Consultants, 1099s primarily on an
7  as-needed basis.
8     Q  So was it you that provided the contract
9  services with the government?
10    A  Yes.
11    Q  And then what happened after -- what did
12 you do at Innovative Elektronik Systems?
13    A  Same exact sort of stuff we were doing with
14 RPT, but it specialized in data acquisition cards,
15 so data acquisition is used to acquire data, right?
16 And also GPID cards for connecting instrumentation
17 and devices.
18    Q  Did you have a title at Innovative
19 Elektronik Systems?
20    A  Senior systems engineer.
21    Q  Where were they located?
22    A  Englewood, Colorado, and Germany also, and
23 over in Cologne.
24    Q  Did you work for anybody directly?
25    A  For INES.

Page 47

1     Q  No. Was there a person?
2     A  Yes. His name was Chris Spyrka,
3  S-P-Y-R-K-A.
4     Q  Spell it again.
5     A  S-P-Y-R-K-A.
6     Q  Got you. Where were you located?
7     A  At the time I was living in Englewood.
8     Q  Did you do any work in Germany?
9     A  I did some work in Germany, and the
10 manufacturing facility was based in the UK, in
11 Fairmont, down by South Hampton. So I also worked
12 in the UK as well.
13    Q  And then after Innovative Elektronik
14 Systems, where did you work?
15    A  Well, that's pretty much when I moved up to
16 Summit County, skied a little bit and worked for
17 Vail for a while doing information systems at Vail
18 Associates. At the time it was Vail Associates,
19 now I think it's Vail Resorts.
20    Q  Was that in 1999 or 2000?
21    A  Yep. That was right around that time
22 frame.
23    Q  Okay. How long did you work for Vail
24 Associates?
25    A  Like one year, not very long at all.

Page 48

1     Q  And what did you say you worked at?
2     A  In their information systems department.
3     Q  Okay.
4     A  Which was based out of Avon.
5     Q  Do you have a title?
6     A  Network engineer, I guess, whatever, you
7  know.
8     Q  Did you have an immediate supervisor?
9     A  Yeah. His name was Mike Higgs, if I
10 remember correctly. It was a long time ago.
11    Q  And then after you worked for Vail
12 Associates, what did you do?
13    A  Skied for quite some time. And then in
14 2003, I formed GenAudio.
15    Q  So did you work for anyone between the time
16 you worked for a year at Vail Associates and formed
17 GenAudio?
18    A  No. That was sort of my off time there.
19 That was primarily focusing on -- on GenAudio's
20 technology. I'm the invention of the technology,
21 so filed the first patent in 2004.
22    Q  And do you recall when in -- was it 2003
23 you said that you founded GenAudio?
24    A  Yes, 2003.
25    Q  Okay. And what was your title at that

Page 49

1  time?
2     A  At the time it was CTO, founder and CTO. I
3  brought on -- I brought on a CEO.
4     Q  Okay. And who was that?
5     A  Bruce Ohman, O-H-M-A-N.
6     Q  And did your title ever change?
7     A  It did.
8     Q  When?
9     A  In 2006, we held a special shareholder
10 meeting, removed Bruce from the board, I terminated
11 the CEO. And in 2006 I took on the role of CEO.
12    Q  And when was Mr. Ohman terminated?
13    A  Our corporate counsel, securities counsel,
14 Ben Huber, let us know that he had been doing
15 things not correctly in accordance with the law.
16 So we tried to explain that to him, and he didn't
17 want to stop doing what he was doing. So in
18 protection of the company and our shareholders, I
19 held a shareholder meeting and removed him.
20    Q  And did you hold any other titles in
21 addition to CEO?
22    A  Chairman of the board.
23    Q  Had you always been a director?
24    A  Yes. Whole time there.
25    Q  Okay. And at any point in time were you no

Page 50

1  longer CEO for GenAudio?
2     A   Yes.  Between the time frame of
3  December 12th -- well, no, December 21st.  I'm
4  sorry.  And --
5     Q   Of what year?
6     A   Of 2013.
7     Q   Okay.
8     A   Through February 24th of 2014.
9     Q   Okay.  And at that time did you hold any
10 title at all with GenAudio?
11    A   Well, technically, I was still CEO.  But I
12 was a sort of a, what we believe, unlawfully
13 suspended CEO.  I don't know what you call those.
14 Pretty much pushed aside as this group of hostile
15 members came over and took over the company.
16    Q   Were you still a director?
17    A   I was, but I was sidelined.  I was unaware
18 of anything that -- that they were doing.  They
19 felt that because -- yeah.  So I was -- I was
20 director, but I was a non-informed director during
21 that time frame.
22    Q   Then after February 24th of 2014, did you
23 still remain -- have the title CEO and be a
24 director?
25    A   After what now?

Page 51

1     Q   After the time period you're referencing,
2  February 24th of 2014, were you then CEO and a
3  director of GenAudio?
4     A   February 24th of 2014, yes.
5     Q   And have you remained consistently through
6  this day from that time period?
7     A   I have.
8     Q   Okay.  How was the company initially
9  funded?
10    A   Partially through money that I put in, of
11 course, and technology that I transferred into the
12 company that I developed on my own up until that
13 point.  And then through various Reg D offerings we
14 were able to raise money, C capital.
15    Q   How much money did you put in initially?
16    A   Well, I don't even think I can answer that
17 question.  Probably if you look at the research
18 that was done to develop the technology, before
19 even forming the company, probably close to 2
20 million.
21    Q   And I'm not saying what you value your
22 technology at, I'm actually saying --
23    A   No.  Money I spent out of my pocket to
24 develop the technology.
25    Q   Right.

Page 52

1     A   And then I transferred the technology into
2  the company.
3     Q   Right.
4     A   So close to 2 million.
5     Q   You're putting the value of the technology.
6        How about money to fund the operation of
7  the company --
8     A   Well, initially, all -- I paid for the
9  legal bills, right?
10    Q   How much money?
11       MR. HOLMES:  She's looking for a dollar
12 amount, not -- not what the value is of the stuff
13 you say --
14       THE WITNESS:  I don't remember.
15       MR. HOLMES:  Hang on.  There's -- there's a
16 certain amount of time you spent preparing the
17 technology.  You then put that into what was
18 GenAudio.
19       THE WITNESS:  Right.
20       MR. HOLMES:  So she's asking from the time
21 GenAudio existed, how much money did you put in, if
22 you can quantify that?
23       THE WITNESS:  From that until now?
24       BY MS. OSTROM:
25    Q   No, initially?

Page 53

1        MR. MCCLOSKEY:  Just initial
2  capitalization.
3        THE WITNESS:  Just initial capitalization?
4        BY MS. OSTROM:
5     Q   Yeah.
6     A   I think close to probably, I don't know.
7  Out of my own bank account, probably 25K.
8     Q   Okay.  So $25,000?
9     A   Yeah.
10    Q   Okay.
11    A   Maybe a little more.
12    Q   When was the first Reg D offering?
13    A   I don't remember the exact date.  I think
14 you have the offering.  I'm pretty sure that they
15 would have -- no, no.  Because you only went back
16 to 2010.  2004 time frame.  I can't remember
17 exactly what the date was.
18    Q   Okay.  And prior to that first Reg D
19 offering in 2004, did you ever raise any money from
20 outside investors for GenAudio?
21    A   No.
22    Q   Okay.  And when was the next offering after
23 the one in 2004?
24    A   We had a few of them moving forward.  I
25 think we had one in 2005.  We didn't have one in

Page 66

1  shareholders.
2       You're on that, correct?
3    A  Yes.
4    Q  I'm not talking about that.
5    A  Okay.
6    Q  Are you personally cc'ed, not as a
7  shareholder essentially, but are you cc'ed on
8  everything that Mr. Mattos sends then to the
9  shareholders?
10   A  I am blind carbon-copied.
11   Q  Okay.  Okay.  And is that the case with all
12 of those supplements?
13   A  Yes.
14   Q  How about other shareholders communication?
15   A  Well, I'm not -- I'm not tracking.
16   Q  Anything that's not a supplement.  There's
17 things called shareholder updates.  Someone may
18 have sent you e-mails, those kinds of things.  Are
19 you also bcc'ed on those?
20   A  I think so.  I really can't tell you if
21 Jimmy blind carbon-copies me on everything that he
22 does.  He's our SVP of corporate communications so,
23 I mean, I'm sure he has some communications with
24 shareholders that I probably have nothing to do
25 with.

Page 67

1    Q  Okay.  Is Mr. Mattos authorized to send
2  communications to all shareholders that are not
3  reviewed by you?
4    A  That are not reviewed by the board?
5    Q  Reviewed by you?
6    A  It's the board, not me.
7    Q  My question is you?
8    A  No.
9    Q  Okay.  So you're not authorized to do it
10 unless you see it; is that correct?
11   A  Unless -- I'm confused.
12   Q  Is Mr. Mattos authorized to send a
13 communication to all shareholders of GenAudio
14 without you seeing the communication?
15   A  No.
16   Q  Okay.
17   A  Sorry about that.
18   Q  Okay.
19   A  I just misunderstand where you're going
20 with that.  But I just want to clarify that --
21   Q  Go ahead.
22   A  -- it's the board that has to approve the
23 communication, not me.
24   Q  Is that all communications with
25 shareholders?

Page 68

1    A  Yes.  The board has to for everything.
2  It's not just me as CEO.
3       MR. GOTTSCHALL:  So you're saying as a
4  member of the board, that's why you'd have to see
5  it?
6       THE WITNESS:  That's right.
7       MR. GOTTSCHALL:  Okay.
8       BY MS. OSTROM:
9    Q  And when Mr. Mattos bcc's you or copies you
10 on shareholder communications, is the board also
11 blind-copied?
12   A  Yes.
13   Q  Okay.  Now, we want to explore all of your
14 recollection that you have of GenAudio dealings
15 with Apple.
16   A  Yes.
17   Q  And we'll get down to specifics later, but
18 we want to get an overview from you first of all.
19   A  Sure, of course.
20   Q  And during the entire course of dealings,
21 who from GenAudio engaged directly in discussions
22 with representatives of Apple?
23   A  Myself, Gary Smith, Walter Horat.  Who else
24 did we have dealings with Apple?  Ian Esten, he no
25 longer works for the company.

Page 69

1    Q  Can you spell his last name?
2    A  E-S-T-E-N.  I think he went on one trip
3  with us to Apple.
4    Q  Is it T-I-N?
5    A  E-S-T-E-N.
6    Q  Got it.
7    A  So those would have been the primary people
8  working on porting our code to run on iOS devices.
9       MR. GOTTSCHALL:  We're not talking about
10 working on projects for Apple.  We're talking about
11 actually dealing directly with Apple, participating
12 in meetings, phone calls.
13      THE WITNESS:  Yeah, yeah, right.
14      MR. GOTTSCHALL:  That's the list?
15      THE WITNESS:  Yes.
16      MR. GOTTSCHALL:  Anybody else that's in
17 addition to who you just gave on that list?
18      THE WITNESS:  No.
19      MR. GOTTSCHALL:  Okay.
20      THE WITNESS:  I think -- I think, that's
21 everyone there, yeah.
22      BY MS. OSTROM:
23   Q  Okay.  And during the entire course of your
24 dealings, who from Apple was engaged directly in
25 discussions with representatives of GenAudio?

18 (Pages 66 to 69)

Page 70

1    A   Victor Tiscareno, Ronald Isaac, Jim
2   Tenneboe. He was our training engineer. Vic
3   Tiscareno is the main point of contact. The other
4   two are just sort of -- dealt with them on rare
5   occasions. Vic was the primary guy.
6       Q   Is there anyone else at Apple that was
7   engaged directly in discussions with
8   representatives of GenAudio other than
9   Mr. Tiscareno, Mr. Isaac and Mr. Tenneboe?
10      A   We met a few different people from time to
11  time, but I mean, Vic was the main guy.
12      Q   Who were the other people you met with?
13      A   I don't remember their names. There was
14  like maybe a one-off meeting with them, so nothing,
15  nothing of substantial nature there.
16      Q   And who did you say Mr. Tenneboe was?
17      A   He was a tuning engineer. Ronald Isaac was
18  with the Mac division and, of course, Vic was in
19  charge of audio.
20      Q   What do you mean in charge of audio?
21      A   Audio -- audio technology for iPod, audio
22  engineering in general. I mean, you know, he was
23  kind of the senior manager of audio technology for
24  Apple or was, he retired.
25      Q   What was his title?

Page 71

1    A   Senior manager of audio engineering I think
2   was his -- was his title, if I remember correctly.
3       Q   Did you ever talk to his supervisor?
4       A   I met him once, yes.
5       Q   Who was that?
6       A   I can't remember his name. I met him once
7   and one time only. I think his name was Steve, if
8   I remember correctly.
9       Q   When was it that you met him?
10      A   Who, Vic?
11      Q   No. The Steve you're referencing.
12      A   2010, maybe. I mean, it would have been --
13  I had so many meetings in Cupertino. I really
14  can't tell you exactly when it was. I mean, we --
15  I probably went to Cupertino the better part of 30
16  times a year.
17      Q   Mr. Tiscareno's boss that you met once,
18  what was his title?
19      A   I can't remember.
20      Q   Was he a senior vice president of Apple?
21      A   I -- I don't recall his title.
22      Q   Okay. Was Mr. Tiscareno ever a senior vice
23  president of Apple?
24      A   No, he was not. But he reported directly
25  to Steve Jobs and another guy, Tony Fedell who was

Page 72

1   -- who was a -- I met Vic through Tony Fedell who
2   was the SVP. He was the SVP of iPod.
3       So iPod got washed away when iPhone came
4   along and then -- so but that's how I met Vic was
5   through connections with one of the SVPs.
6       Q   And Mr. Fedell, was he ever engaged in
7   discussions with GenAudio?
8       A   No, he was not. I just -- I went to him
9   and he put me -- it was like, this is Vic, his
10  department. Victor, at that time, reported
11  directly to Tony Fedell.
12      Q   Mr. Fedell left at some time, correct?
13      A   He did.
14      Q   When was that?
15      A   I don't remember the exact date. I think
16  it would have been 2010 time frame, 2011, right
17  around there. Maybe 2009 even, I don't recall.
18      Q   You said Mr. Tiscareno reported directly to
19  Mr. Jobs?
20      A   He was hired by Mr. Jobs. I don't think he
21  reported directly to him, but I know he was hired
22  by Steve Jobs.
23      Q   Anyone else?
24          MR. GOTTSCHALL: I'm sorry. How do you
25  know Mr. Tiscareno was hired directly by Steve

Page 73

1   Jobs?
2           THE WITNESS: Because he told me.
3           MR. GOTTSCHALL: Okay.
4           BY MS. OSTROM:
5       Q   Other than Mr. Tiscareno, Mr. Isaac, and
6   Mr. Tenneboe, is there anyone else that you
7   personally dealt with at Apple?
8       A   No.
9       Q   And when were the first discussions with
10  Apple?
11      A   First discussions would have been in 2007.
12  There was another guy. I can't remember his name.
13  I can't recall his name. There was another guy in
14  2007, but it all went to Vic.
15      Vic -- Vic and I were the ones that
16  primarily worked together. But yeah, it was 2007.
17  And then -- or 2008 time frame. I think 2007,
18  because it was right after our second patent filing
19  got filed in the U.S., so yeah, 2007.
20      Q   Speaking of your patent filings, have any
21  of them been granted?
22      A   Many of them have been granted in the U.S.
23  and internationally, yeah.
24      Q   Okay. When? When was the first one and
25  when was the last one? Just the time frame. I

Page 102

1  shareholders in 2012. I didn't come out because I
2  thought it was a good idea to have someone from
3  Apple explain it to the shareholders. And he had
4  said that some of the people at Apple didn't see it
5  the way he saw it, and it was unfortunate.
6      Q  And at that time he was engaged as the
7  consultant for GenAudio, correct?
8      A  At that he was, yes.
9      Q  He wasn't working at Apple, right?
10     A  No.
11     Q  Okay.
12     A  Oh, no, he -- he could have never came out
13 to present, yeah.
14     Q  Did Apple representatives ever communicate
15 that they were interested in acquiring GenAudio?
16     A  No. Not to my recollection. That was an
17 assumption made by Paul Powers and Mark Bobak.
18     Q  And is there any reason for that assumption
19 other than what you've already told us about?
20     A  No. That's just what they thought. And I
21 was indifferent. I just said, you know, if they
22 license, they license. If they acquire, they
23 acquire, but right now we don't know what they're
24 doing.
25     Q  Okay. What agreements were actually

Page 103

1  entered into between Apple and GenAudio?
2      A  An NDA.
3      Q  When was that?
4      A  We signed that in 2009, I want to say.
5      MR. GOTTSCHALL: And for the record, by NDA
6  you mean nondisclosure agreement?
7      THE WITNESS: Yes.
8      BY MS. OSTROM:
9      Q  Did you sign that for GenAudio?
10     A  Yes.
11     Q  Okay. And did someone sign that for Apple?
12     A  Yes.
13     Q  And do you have a copy of the one that's
14 signed by someone from Apple?
15     A  I have looked everywhere for that. And I
16 can find the one that I signed. And I went back
17 through my e-mails, because I remember the guy had
18 sent it back to me. He was one of the VPs there
19 who signed it, obviously. But that e-mail was pre
20 my e-mail crash, so --
21     Q  So the NDA you are referring to came from
22 someone at Apple who is not Mr. Tiscareno?
23     A  That's right, yeah. It was someone that
24 Barry Corlett got to sign the NDA. I just can't
25 remember exactly who it was.

Page 104

1      Q  And he was -- what was his capacity, the
2  guy who actually signed it?
3      A  I believe he was VP --
4      Q  Okay.
5      A  -- of operations or something like that.
6      Q  Okay. Did Mr. Tiscareno ever have anything
7  to do with the NDA?
8      A  Well, yeah. He's the one that introduced
9  me to Barry, right? And Barry is kind of a nuts
10 and bolts guy there that got all the legalese stuff
11 sort of sorted out there. Because before we moved
12 forward, you know, have an NDA. Apple rarely signs
13 NDAs with companies, by the way.
14     Q  So but what I'm asking you is: Did
15 Mr. Tiscareno have anything to do with the physical
16 delivery or acceptance of the NDA with GenAudio and
17 Apple?
18     A  Other than helping to facilitate, making
19 sure it happened, no.
20     Q  Okay. And other than the NDA that was
21 signed by GenAudio and Apple in 2009, were there
22 any prior or subsequent NDAs with Apple and
23 GenAudio?
24     A  No, I don't think so. Unless we had one in
25 2007. I don't recall. I don't think we signed an

Page 105

1  NDA with them until 2009.
2      Q  Okay. And there wasn't one after?
3      A  No. It just expired in 2014, I think.
4      Q  And there are evaluation and development
5  agreements I've seen that GenAudio has with --
6      A  SEAs, yeah.
7      Q  Okay. Did -- what did you call it?
8      A  Software evaluation agreement, called SEA.
9      Q  Okay. And did you ever have one of those
10 with Apple?
11     A  We did not, no.
12     Q  Okay. Any other agreements of any kind
13 between Apple and GenAudio other than 2009?
14     A  Just NDA. Apple wouldn't sign anything
15 else.
16     Q  Did you attempt to have them sign a
17 software agreement?
18     A  I asked, yes.
19     Q  Who did you ask?
20     A  I think Vic and Ron both.
21     Q  When was it that you asked about a software
22 agreement with Mr. Tiscareno?
23     A  I don't remember.
24     Q  Was it in writing or in person?
25     A  I honestly don't remember. I just remember

27 (Pages 102 to 105)

Page 142

1   shareholders of GenAudio?
2        THE WITNESS:  There are board members that
3   might have been shareholders.  The only one on here
4   or senior managers, right, or members of the SVP
5   staff that are also shareholders would have been
6   Steve Bagwell, and Mark Bobak.  They were the only
7   two.
8        BY MS. OSTROM:
9   Q   Isn't Mark Bobak the largest shareholder?
10  A   No.  The largest -- well, from an economic
11  interest, he might be the largest shareholder right
12  now in GenAudio.  I think Dr. Morey and Dr. Gilson
13  are pretty far up there, too.  I'm not sure exactly
14  where --
15  Q   So he's one of the largest shareholders?
16  A   He's one of the largest ones, yes.
17  Q   Was he at this time?
18  A   He's also a board member.
19  Q   Was he one of the largest shareholders in
20  October of 2009?
21  A   No.  Not at that time he wasn't.  I don't
22  think.  I don't remember though.  I really can't
23  answer that.  I shouldn't say no because I don't
24  know.
25  Q   Was he a shareholder though at that time?

Page 143

1   A   That's the first -- the other investor in
2   '08 or '09, yes.
3   Q   Now, still on the second paragraph --
4   A   Okay.
5   Q   -- second full paragraph, fourth line down,
6   it says:  I am supposed to meet with the big man in
7   two to three weeks.
8        Who's the big man?
9   A   That was either -- I was either referring
10  to a meeting, because I think Vic was trying to get
11  me set up to meet with Steve Jobs, right, or
12  Victor's boss.  I don't recall what I meant by
13  that.
14       I think I was referring to Steve Jobs
15  though, because Vic said that he was trying to get
16  a meeting set up with Jobs for me to actually get a
17  demo on his head.
18  Q   What did Mr. Tiscareno tell you that?
19  A   That night, when I got back and I was
20  talking with him.
21  Q   And did he give you this time frame of two
22  to three weeks?
23  A   Yeah.  He said within the month, you know,
24  he's hoping, but it never happened.
25  Q   And what did he tell you exactly that --

Page 144

1   Mr. Tiscareno tell you that he wanted -- why he
2   wanted you to meet with Mr. Jobs?
3   A   So we -- so we could give him a demo, and I
4   could talk to him intelligently about the
5   technology.  Because, apparently, if Steve Jobs
6   made a decision to make a -- you know, to use the
7   technology that -- that's it.  It's done.
8   Q   Did you ever meet with Steve Jobs?
9   A   No.
10  Q   Ever?
11  A   No.
12  Q   Was it only communicated to you in that
13  same phone call with Mr. Tiscareno?
14  A   Yes.
15  Q   Okay.  Were there ever any follow-ups with
16  trying to get you together with Mr. Jobs by
17  Mr. Tiscareno --
18  A   Not that I recall.  I mean, it fell by the
19  wayside there.
20  Q   Did you --
21  A   I think he made some maneuvers to get, you
22  know, the demo into Mr. Jobs' head, but I don't
23  know when or how or why.
24  Q   You're referencing Mr. Tiscareno?
25  A   Yes.

Page 145

1   Q   Did you when -- when you didn't meet then
2   with Mr. Jobs, within a month after October 1st of
3   2009, did you ask him what had happened?
4   A   No.  We just kept working.
5   Q   So you never asked him about being able to
6   meet Steve Jobs, never requested a meeting?
7   A   I asked him a couple of times, yeah.
8   Q   What did you ask him?
9   A   I just said on the phone a couple times, I
10  said, how do we get this thing on -- on Steve's
11  head together.  And he goes, Well, things have
12  changed.  The corporate management's being shooken
13  up right now.  It's not the same anymore.  The
14  philosophy around have changed, Jerry.  Things have
15  changed.
16       In other words, he didn't have, like he
17  used to have, direct access to Steve.  Apparently
18  he had lost his ability to just march into Steve's
19  office and do a demo like he used to be able to.
20  Q   And had he told you he was able to do that?
21  A   At one point in time, yeah, he said he was
22  able to do that.  Yes.
23  Q   When did he say he lost that ability?
24  A   He just said things were changing, that
25  management was getting shaken up.

Page 150

1    A   Yeah.  I probably didn't word that as
2    eloquently as I should have.
3        Q   If you can turn to the second page of
4    Exhibit Number 57, the second full paragraph that
5    starts:  Also because Craig.
6            Do you see that?
7        A   Craig Hemingway, yes.
8        Q   Yes.  Do you see that paragraph?
9        A   Yes.
10       Q   Okay.  If you could go down, first of all,
11   to there's four -- five lines down, sorry, to the
12   left:  It says thanks to Jim Mattos.
13           Do you see that line?
14       A   No.
15       Q   One, two, three, four, five lines down.
16       A   Yeah.  Jim Mattos, yes.
17       Q   Okay.  It says:  Thanks to Jim Mattos, he
18   has been able to continue to reach out and help me
19   sell a portion of my personal shares to make this
20   happen.
21       A   Yeah.
22       Q   What was Mr. Mattos doing to help you sell
23   a portion of your personal shares at that time?
24       A   His friends and family, just, you know, his
25   close personal relatives, primarily just talking

Page 151

1    with them.  Trying to help me get enough money so
2    he could cover for some of these patents.
3            Now, I got Craig, I think what I was saying
4    here is Craig agreed to cover from Dorsi & Whitney
5    the fees, the international filing fees, provided I
6    get him paid back quickly, right?  So in order to
7    do that, that's what happened.
8        Q   Did you raise $30,000 from your share --
9    your shares being sold?
10       A   I did.
11       Q   And did you then pay those to Dorsi &
12   Whitney?
13       A   Yes, I did.
14       Q   Okay.  If you could go to the same
15   paragraph, the very bottom, the last sentence, it
16   starts:  Of course.
17           Do you see that?
18       A   Yes.
19       Q   It says:  Of course when the time comes, I
20   will bring in the legal team, that being Paul,
21   Mark, Ben and Craig to assist me in finalizing the
22   deal with Apple.
23           Do you see that?
24       A   I don't.  I'm looking right now.
25       Q   It's the second paragraph last line.

Page 152

1    A   Right here, yes.  Yeah.  Well, you know, if
2    we do a deal with Apple --
3        Q   Wait.  Wait.  Do you see the sentence?
4        A   Yeah.
5        Q   Are you there?
6        A   I'm there.
7        Q   Okay.  So first of all, who is Paul that
8    you're referring to?
9        A   Paul Powers.
10       Q   Okay.  And Mark?
11       A   Mark Bobak.
12       Q   Okay.  And Ben?
13       A   Ben Huber.
14       Q   And Craig?
15       A   Hemingway.
16       Q   Okay.  And what do you mean when the time
17   comes?  What were you referencing?
18       A   Well, when the time comes, when we actually
19   get down to it and we're doing a deal, then I'll
20   bring the legal team in.
21           You know, I mean, until you get to a point
22   we're actually negotiating a licensing transaction
23   or a licensing deal or a potential M&A or whatever
24   it is.  There's no point in dragging a legal team
25   in and spending money on legal fees because we're

Page 153

1    not there yet.
2            But once you get to that point, my point I
3    was making is, you know, we've got enough legal
4    background that I could then put the legal team in
5    place to go in and help draft the agreement.
6        Q   Were you expecting at this time then to be
7    doing a deal with Apple?
8        A   It was looking that way.  That was what
9    Victor was telling me, so --
10       Q   What did Mr. Tiscareno tell you about doing
11   a deal with Apple at this time?
12       A   He had said at one point in time -- I can't
13   tell you exactly verbatim.  I'm going to try to
14   tell you in quotes.  Something along the lines
15   that, Jerry, I will be shocked if we don't do a
16   deal.  I think those were his exact words.  I will
17   be shocked if this doesn't go through.
18       Q   And that was at this time period?
19       A   That was at this time period, yes.
20       Q   Was that in the phone call after the
21   demonstration?
22       A   Yes.
23       Q   Okay.  And who was the -- who was the most
24   senior person that saw that demonstration?
25       A   I think probably Mike Hailey.

Page 154

1    Q   Who was a marketing guy?
2    A   Senior marketing guy, yeah.
3    Q   Does Mr. Hailey have any authority to --
4    did he have any authority to enter into any deals
5    for Apple?
6    A   I believe so, yes.
7    Q   What makes you think that?
8    A   Because I remember a conversation with him,
9    and I asked him, I said, if we're going to do a
10   licensing deal -- and so did Ron Isaac, on the Mac
11   side. So I believe they had authority to be able
12   to do something. I can't say for sure, but I think
13   they said that. Because I asked him, who would I
14   negotiate this with? And I think I remember Vic
15   and him saying we negotiate with Mike Hailey.
16   Q   So you did at some point bring up the word,
17   negotiations, with Mr. Tiscareno and Mr. Hailey --
18   A   We talked about --
19   Q   Let me finish the question.
20   A   Oh, sorry.
21   Q   And Mr. Isaac?
22   A   Yes.
23   Q   Okay. Was that around this time period,
24   October 2009?
25   A   Yes.

Page 155

1    Q   Okay.
2    A   And afterwards as well. I've tried
3    everything I could.
4        MS. OSTROM: Okay. Why don't we go ahead
5    and let's go off the record and we'll take lunch.
6    Okay.
7        (Whereupon, a lunch recess was taken at
8    12:00 p.m.)
9        (Whereupon, the proceedings resumed at 1:15
10   p.m.)
11       (SEC Exhibit No. 58 was
12        marked for identification.)
13       BY MS. OSTROM:
14   Q   Let's go ahead and go back on the record.
15       And while we were off the record,
16   Mr. Mahabub, did we have any substantive
17   discussions about this investigation?
18   A   No.
19   Q   Let me hand you Exhibit Number 58, this is
20   Bates numbered JM555 through 558. And the first
21   two pages are e-mails between Mr. Mattos and
22   Mr. Mike Kane, K-A-N-E, in May of 2010. The last
23   two pages is an e-mall from Jim Mattos, dated
24   November 9, 2009, to Jerry Mahabub, Paul Powers,
25   and a cc to Jim Devine. The subject is GenAudio

Page 156

1    update and business summary.
2        Why don't you look at that, and then when
3    you've read it, tell me and I'll ask you some
4    questions.
5    A   Okay.
6    Q   I was just going to say this is -- let me
7    -- let me have that one, and that one was mine. I
8    apologize.
9    A   Oh, yeah, no problem.
10   Q   Let me change this for you.
11       MR. HOLMES: We'll take one with your marks
12   on it.
13       MS. OSTROM: Yeah. Well, it's going to be
14   the same thing. Do you have somewhere -- maybe I
15   can take this one off.
16       BY MS. OSTROM:
17   Q   I apologize for that, Mr. Mahabub. Let me
18   hand you Exhibit Number 58, the same document.
19   Just don't have my stars on the last page.
20   A   Okay. Yep.
21   Q   Starting on page JM557, continuing onto
22   558, did you draft this update and business summary
23   to shareholders?
24   A   I did.
25   Q   Okay. And if you could turn to the last

Page 157

1    page of the document which is JM558, at the very
2    top, very first sentence, the last page.
3    A   (The witness complies.)
4    Q   There you go, very top: It should be kept
5    very confidential and nothing is assured yet, but
6    as shareholders you should be aware that there is a
7    strong possibility that the company may be acquired
8    in the next six months in light of our extensive
9    discussions with a global industry leader in
10   consumer electronics.
11       Do you see that?
12   A   Yep.
13   Q   Okay. What basis did you have for stating
14   that there's a strong possibility that the company
15   may be acquired within the next six months?
16   A   There is a company that we were working
17   with that looked like there was a possibility. So
18   what I did, and I went and I hired on an
19   independent evaluation analysis expert.
20   Q   What basis did you have for saying that
21   there was a strong possibility?
22   A   Because the interest was stated to me.
23   Q   By whom?
24   A   By -- I'm trying to remember which -- which
25   company it was that we were working with at that

Page 354

1 turkey without some sort of strange withdrawal.
2   A   Yeah.
3   Q   Who was the senior team at Apple you had
4 worked with day and night for the past 11 months?
5   A   Ron Isaac, Vic Tiscareno and Michael
6 Hailey, they're all senior managers.
7   Q   Did you have any conversations with
8 Mr. Tiscareno about Steve Jobs looking at other
9 technology to compare with yours?
10  A   I don't remember having any talks with him
11 about it, but I remember e-mailing him about it
12 now, which was right here.
13  Q   And what was your take on it?
14  A   That they're trying to find a way to
15 devalue us.
16  Q   So were you under the impression at this
17 time that there was either a licensing or
18 acquisition that was going to what Apple?
19  A   I thought so, yeah. I mean, it looked like
20 it was going in that direction, because when a
21 company goes in and, you know, starts doing
22 maneuvers like that to try to devalue you like
23 that, like, oh, well, look at these three other
24 audio tech companies out there. That's usually so
25 they can come and throw a lowball at you.

Page 355

1   Q   But what had happened between May 6th and
2 now to lead you to believe that there was going to
3 be some type of offer?
4   A   So just this e-mail exchange here, about
5 how, you know, when you say Steve had them look
6 into other audio technologies as well, which sort
7 of tells me that they're trying to find something
8 so they can come to me and go, oh, look, we can get
9 this over here for this. So why would we pay you
10 just that?
11  Q   You started this e-mail exchange?
12  A   Yeah, but nothing to do with lowballing. I
13 started by offering a new processing implementation
14 to show to Steve. That then turned into Vic's
15 response to me, which then turned into my response
16 to him.
17  Q   So was there anything in between, before
18 you sent this e-mail, the initial e-mail to
19 Mr. Tiscareno, had there been any contact with
20 anyone at Apple after that May 6, 2010, date and
21 this date when you sent the first e-mail to
22 Mr. Tiscareno? Had there been any contact with
23 anyone at Apple?
24  A   No.
25  Q   Okay.

Page 356

1   A   No. No, not to my -- actually, not that I
2 recall. I can't say definitively, but not to my
3 recollection.
4     MS. OSTROM: And let's go ahead and let's
5 go off the record, and we will be reconvening
6 tomorrow at 9:00 a.m. on February 6th.
7     (Whereupon, at 5:19 p.m. the proceedings
8 adjourned.)
9       * * * * *

Page 357

1       PROOFREADER'S CERTIFICATE
2
3 In the Matter of:   GENAUDIO, INC.
4 Witness:      Taj Jerry Mahabub
5 File Number:   D-03450-A
6 Date:        February 5, 2015
7 Location:     Denver, CO
8
9
10    This is to certify that I, Nicholas Wagner,
11 (the undersigned), do hereby swear and affirm
12 that the attached proceedings before the U.S.
13 Securities and Exchange Commission were held
14 according to the record and that this is the
15 original, complete, true and accurate transcript
16 that has been compared to the reporting or recording
17 accomplished at the hearing.
18
19
20
21  _____    _____
22  (Proofreader's Name)    (Date)
23
24
25

90 (Pages 354 to 357)

Page 359

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:               )
                                ) File No. D-03450-A
GENAUDIO, INC.                  )

WITNESS:  Taj Jerry Mahabub

PAGES:    359 through 686

PLACE:    Securities and Exchange Commission

          Byron G. Rogers Federal Building

          1961 Stout Street, Suite 1700

          Denver, Colorado 80294

DATE:     Thursday, February 12, 2015

　　　　The above-entitled matter came on for hearing, pursuant to Notice, at 8:35 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

```
                                                    Page 360
 1       APPEARANCES:
 2
 3       On behalf of the Securities and Exchange Commission:
 4           JENNIFER OSTROM, Senior Counsel
 5           KURT L. GOTTSCHALL, Staff Attorney
 6           Securities and Exchange Commission
 7           Byron G. Rogers Federal Building
 8           1961 Stout Street, Suite 1700
 9           Denver, Colorado 80294
10           (303) 844-1094
11
12       On behalf of the Witness and GenAudio:
13           ANDREW B. HOLMES, ESQ.
14           Holmes, Taylor & Jones, LLP
15           801 South Figueroa Street, Suite 2170
16           Los Angeles, California 90017
17           (213) 985-2200
18
19           MICHAEL P. McCLOSKEY, ESQ.
20           Wilson Elser Moskowitz Edelman &
21           Dicker, LLP
22           655 West Broadway, Suite 900
23           San Diego, California 92101
24           (619) 321-3200
25
```

```
                                                    Page 361
 1                    C O N T E N T S
 2
 3       WITNESS:                         EXAMINATION
 4       Taj Jerry Mahabub                    362
 5
 6       EXHIBITS      DESCRIPTION          IDENTIFIED:
 7       89   Transcription of Investor Audio    381
 8       90   Bates numbered JM2515-2518, series  421
 9            Of e-mails
10       91   Bates numbered JM5121-5126, series  469
11            Of e-mails
12       92   Bates numbered JM7122-7125, series  533
13            Of e-mails
14       93   Bates numbered GA3895-3898, e-mail  592
15            To Shareholders
16       94   Letter                             657
17
18
19
20
21
22
23
24
25
```

```
                                                    Page 362
 1                    P R O C E E D I N G S
 2           MS. OSTROM:  Then let's go on the record
 3       at 8:35 a.m., on February 12, 2015.
 4           My name is Jennifer Ostrom, and with me is
 5       Kurt Gottschall; we are officers of the Commission
 6       for purposes of this proceeding, and we are today
 7       resuming the examination of Jerry Mahabub which was
 8       adjourned on February 5th of 2015.
 9           Would counsel please identify themselves.
10           MR. HOLMES:  Andrew Holmes on behalf of
11       Jerry Mahabub.
12           MR. McCLOSKEY:  Michael McCloskey on
13       behalf of Mr. Mahabub and GenAudio.
14           MS. OSTROM:  The testimony today is
15       pursuant to a Commission subpoena which has been
16       previously marked as Exhibit No. 54.
17       Whereupon,
18               TAJ JERRY MAHABUB,
19       was recalled as a witness and, having been previously
20       sworn, was examined and testified as follows:
21                    EXAMINATION
22       BY MS. OSTROM:
23       Q    And, Mr. Mahabub, do you understand that
24       you remain under oath?
25       A    Yes.
```

```
                                                    Page 363
 1           MS. OSTROM:  And let the record reflect
 2       that a copy of the formal order of investigation in
 3       this matter will be available for examination during
 4       the course of this proceeding.
 5           BY MS. OSTROM:
 6       Q    And, Mr. Mahabub, we rescheduled your
 7       testimony -- continuation of it because you were ill.
 8       Are you on any medications today?
 9       A    Not today.
10       Q    Okay.
11       A    I went through all of my antibiotics
12       already.
13       Q    Okay.
14           THE REPORTER:  I'm sorry.  I went
15       through --
16           THE WITNESS:  -- all of my antibiotics
17       already, a Z-pack.
18           THE REPORTER:  Do we need to re-swear --
19           MS. OSTROM:  No.
20           THE REPORTER:  I'm sorry.  I just wanted
21       to be sure.  Thanks.  Okay.
22           BY MR. GOTTSCHALL:
23       Q    And, Mr. Mahabub, because you were not
24       feeling well last Friday, are you feeling okay today?
25       A    Much, much better.
```

2 (Pages 360 to 363)

Page 504

1  Q  And when did you actually sign a license
2  with them for that?
3  A  I don't remember.  2011, I think.
4  Q  And -- and how much revenue have you had
5  from that -- GenAudio?  I'm sorry.  How much revenue
6  has GenAudio had from that?
7  A  From the headphone that released on the
8  market, that got pulled from the market because they
9  lost component?  Let's see.  That would have been
10  maybe -- I don't know.  Probably 50,000 maybe.  I
11  can't remember.
12  Q  Okay.
13  A  It wasn't much.
14  Q  Okay.  Have you had any additional
15  agreements with Monster since that time?
16  A  We're working on it right now, actually --
17  Q  Okay.
18  A  -- as -- I mean literally, it's....
19  Q  So, not talking about what you're working
20  on right now, have you had any signed license deals
21  with Monster since this -- this --
22  A  Headphone licenses?
23  Q  Yes.
24  A  No.
25  Q  Okay.  And if you could look at the second

Page 505

1  page of Exhibit No. 35, GA-4922.
2      The first full paragraph, it says, "With
3  all the good news, I'm sorry to inform you that we
4  will not --  and "not" is underlined -- "be on
5  'Chronicles of Narnia 3'."
6      Do you see that?
7  A  Yes.
8  Q  Is this the time that you were referencing
9  that you told shareholders about not being on
10  Chronicles of Narnia 3?
11  A  This was about when we found out, yes.
12  Q  Okay.  So did you -- had you found out
13  close to December 8th of 2010?
14  A  Yes.
15  Q  Okay.  If you could turn to Page 11, which
16  is GA-4931.
17  A  Okay.
18  Q  In the middle of Page GA-4931, and Page 11
19  of 18, it says, "The LCEC," there's a heading; do you
20  see that?
21  A  I do.
22  Q  It says, "We just recently updated the
23  software to enable compatibility with recent updates
24  from --
25      THE REPORTER: I'm sorry.  To enable the

Page 506

1  compatibility.
2      MS. OSTROM:  Let me start over.
3      BY MS. OSTROM:
4  Q  "We just recently updated the software to
5  enable compatibility with recent updates from the
6  LCEC for a few of their product offerings."
7      Do you see that?
8  A  Yes.
9  Q  What does that mean?
10  A  Let me re-read it again.
11      "We just recently...."
12      (Pause.)
13  A  This would have been the new kernel
14  extensions we had to receive from Ron, I believe.  I
15  don't -- I don't remember because it was -- it was a
16  while ago.
17      But if I was to take a guesstimate for
18  you, this is when the new OS released, and the kernel
19  extensions broke, and we had to update our software
20  to be compatible with the -- with the new kext for
21  the new OS.
22  Q  Okay.  And then it goes on to say, "We
23  have also recently sent them a new implementation of
24  our software process that they request we put
25  together for them to test."

Page 507

1      Taking these two sentences together with
2  what you've told me, is there anything that happened
3  with Apple between the meeting that Mr. Bright was at
4  and this date, December 8th of 2010?
5  A  No.
6  Q  Okay.  So that's a summation of really
7  what had gone on between Apple and GenAudio, correct?
8  A  Yes.
9  Q  Okay.  The third sentence says, "I met
10  with their CEO and gave him a demo of their
11  technology, and he stated, 'I really like your
12  technology and look forward to seeing you again in
13  the future.'"
14      Did you meet with Steve Jobs?
15  A  Not that I remember, no.  And I'm not sure
16  why -- I think I -- that's -- that's a
17  mistake in what I wrote there.  I don't think I meant
18  to say that.  Why I didn't catch it, I have no idea.
19  But no, I never met with their CEO.
20  Q  Did you tell your board of directors that
21  you had met with Steve Jobs?
22  A  I did not.
23  Q  Did you tell any shareholders that you had
24  met with Steve Jobs --
25  A  No.

```
                                                      Page 684
 1        MS. OSTROM:  And we'll go off the record
 2   at 3:50 p.m., on February 12th of 2015.
 3        (Whereupon, at 3:50 p.m. the examination
 4   adjourned.)
 5            * * * * *
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                      Page 685
 1          PROOFREADER'S CERTIFICATE
 2
 3   In the Matter of:   GENAUDIO, INC.
 4   Witness:       Taj Jerry Mahabub
 5   File Number:   D-03450-A
 6   Date:          February 12, 2015
 7   Location:      Denver, CO
 8
 9
10      This is to certify that I, Nicholas Wagner,
11   (the undersigned), do hereby swear and affirm
12   that the attached proceedings before the U.S.
13   Securities and Exchange Commission were held
14   according to the record and that this is the
15   original, complete, true and accurate transcript
16   that has been compared to the reporting or recording
17   accomplished at the hearing.
18
19
20
21   _____    _____
22   (Proofreader's Name)       (Date)
23
24
25
```

83 (Pages 684 to 685)