EXCERPTED

# EXHIBIT 2

# In The Matter Of:

*Securities and Exchange Commission v.*
*Taj Jerry Mahabub, et al.*

---

*Taj Jerry Mahabub*
*Vol. 1*
*January 19, 2017*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94103*
*(415) 597-5600*

Original File 30906Mahabub.txt

**Min-U-Script® with Word Index**

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF COLORADO
3
4        - - - - - - - - - - - - - -
5    SECURITIES AND EXCHANGE        )
6    COMMISSION,                    )
7              Plaintiff,           )
8                                   ) CASE NO.
9    v.                             ) 1:15-cv-02118-CBS-WJM
10                                  )
11   TAJ JERRY MAHABUB, GENAUDIO,   )
12   INC., and ASTOUND HOLDINGS,    )
13   INC.,                          )
14              Defendants.         )
15       - - - - - - - - - - - - - -
16
17       VIDEOTAPED DEPOSITION OF TAJ JERRY MAHABUB
18             THURSDAY, JANUARY 19, 2017
19             PAGES 1 - 256; VOLUME 1
20
21         BEHMKE REPORTING AND VIDEO SERVICES, INC.
22       BY: PAULA A. PYBURN, CSR NO. 7304, RPR, CLR
23              160 SPEAR STREET, SUITE 300
24           SAN FRANCISCO, CALIFORNIA 94105
25                     (415) 597-5600
```

Page 2

```
1
2
3
4
5
6
7
8       Videotaped deposition of TAJ JERRY MAHABUB,
9    VOLUME 1, taken by Plaintiff, at 444 South Flower
10   Street, Suite 900, Los Angeles, California,
11   commencing at 10:17 a.m., on THURSDAY, JANUARY 19,
12   2017, before Paula A. Pyburn, Certified Shorthand
13   Reporter No. 7304, RPR, CLR, pursuant to Notice.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1    APPEARANCES OF COUNSEL:
2    FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION:
3       SECURITIES AND EXCHANGE COMMISSION
4       BY:  DANIELLE R. VOORHEES, TRIAL COUNSEL
5            LESLIE HENDRICKSON HUGHES, TRIAL COUNSEL
6       1961 Stout Street, Suite 1700
7       Denver, Colorado 80294
8       Telephone: (303) 844-1000
9       Email:  voorheesd@sec.gov
10              hugheslj@sec.gov
11
12   FOR DEFENDANT TAJ JERRY MAHABUB:
13      HOLMES, TAYLOR & JONES LLP
14      BY:  ANDREW B. HOLMES, ATTORNEY AT LAW
15      617 South Olive Street, Suite 1200
16      Los Angeles, California 90014
17      Telephone:  (213) 985-2200
18      Email:  abholmes@htjlaw.com
19
20
21
22
23
24
25
```

Page 4

```
1    APPEARANCES OF COUNSEL - (CONTINUED):
2    FOR DEFENDANT GENAUDIO, INC.:
3       WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
4       BY:  MICHAEL P. MCCLOSKEY, ATTORNEY AT LAW
5       655 West Broadway, Suite 900
6       San Diego, California 92101
7       Telephone: (619) 881-3326
8       Email:  michael.mccloskey@wilsonelser.com
9
10   FOR DEFENDANT ASTOUND HOLDINGS, INC.
11   - (A.M. SESSION):
12      BENZ LAW GROUP
13      BY:  JEFFREY BENZ, ATTORNEY AT LAW
14      12021 Wilshire Boulevard, Suite 256
15      Los Angeles, California 90025
16      Telephone: (310) 570-2774
17      Email:  jeffreybenz@gmail.com
18
19   ALSO PRESENT:
20      CASEY HOWELL, VIDEOTAPE OPERATOR
21
22
23
24
25
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 5

1                     INDEX
2    THURSDAY, JANUARY 19, 2017
3    TAJ JERRY MAHABUB - VOLUME 1              PAGE
4        Examination by MS. VOORHEES            14
5    P.M. SESSION                              153
6        Examination resumed by MS. VOORHEES   153
7
8
9                     -oOo-
10
11
12    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
13              PAGE        LINE
14              NONE.
15
16
17
18
19
20
21
22
23
24
25

---

Page 7

1                EXHIBITS - (CONTINUED)
2           TAJ JERRY MAHABUB - VOLUME 1
3    Number         Description              Page
4    Exhibit 203   EMAIL CHAIN, BATES NOS.
5                  SEC-TISCARENOV-E-0000325
6                  THROUGH SEC-TISCARENOV-
7                  E-0000326 - 2 pages          68
8
9    Exhibit 204   8/10/09 EMAIL FROM JERRY
10                 MAHABUB TO GARY SMITH, ETC.,
11                 BATES NOS. SEC-MAHABUBJ-E-
12                 0022806 THROUGH
13                 SEC-MAHABUBJ-E-0022882
14                 - 78 pages                   69
15
16   Exhibit 205   EMAIL CHAIN, BATES NOS.
17                 347APL-00000608 THROUGH
18                 347APL-00000621 - 14 pages   81
19
20   Exhibit 206   EMAIL CHAIN, BATES NOS.
21                 SEC-MAHABUBJ-E-0023716
22                 THROUGH SEC-MAHABUBJ-
23                 E-0023729 - 14 pages         81
24
25

---

Page 6

1                  EXHIBITS
2           TAJ JERRY MAHABUB - VOLUME 1
3    Number         Description              Page
4    Exhibit 199   DECEMBER 11, 2008, CONFIDENTIAL
5                  PRIVATE PLACEMENT MEMORANDUM,
6                  GENAUDIO, INC., BATES NOS.
7                  GA006483 THROUGH GA006585
8                  - 103 pages                  35
9
10   Exhibit 200   March 25, 2009, Confiden
11                 CONFIDENTIAL PRIVATE
12                 PLACEMENT MEMORANDUM,
13                 GENAUDIO, INC., BATES NOS.
14                 GA007367 THROUGH GA007453
15                 - 87 pages                   40
16
17   Exhibit 201   EMAIL CHAIN, BATES NOS.
18                 SEC-ELLIOTT-E-0002589
19                 THROUGH SEC-ELLIOTT-E-000292
20                 - 4 pages                    40
21
22   Exhibit 202   EMAIL CHAIN, BATES NOS.
23                 SEC-MAHABUBJ-E-0007972
24                 THROUGH SEC-MAHABUBJ-
25                 E-0007979 - 8 pages          49

---

Page 8

1                EXHIBITS - (CONTINUED)
2           TAJ JERRY MAHABUB - VOLUME 1
3    Number         Description              Page
4    Exhibit 207   EMAIL CHAIN, BATES NOS.
5                  GA006846 THROUGH GA006850,
6                  - 5 pages                   111
7
8    Exhibit 208   EMAIL CHAIN, BATES NOS.
9                  SEC-TISCARENOV-E-0000946
10                 THROUGH SEC-TISCARENOV-
11                 E-0000954 - 9 pages         125
12
13   Exhibit 209   EMAIL CHAIN, BATES NOS.
14                 SEC-MAHABUBJ-E-0023474
15                 THROUGH SEC-MAHABUBJ-
16                 E-0023489 - 16 pages        126
17
18   Exhibit 210   EMAIL CHAIN, BATES NOS.
19                 JM000378 THROUGH JM000380
20                 - 3 pages                   138
21
22   Exhibit 211   EMAIL CHAIN, BATES NOS.
23                 JM000727 THROUGH JM000279
24                 - 3 pages                   173
25

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 9

```
 1              EXHIBITS - (CONTINUED)
 2          TAJ JERRY MAHABUB - VOLUME 1
 3   Number        Description           Page
 4   Exhibit 212   EMAIL CHAIN, BATES NOS.
 5               SEC-TISCARENOV-E-0001047
 6               THROUGH SEC-TISCARENOV-
 7               E-0001048 - 2 pages        183
 8
 9   Exhibit 213   EMAIL CHAIN, BATES NOS.
10               SEC-MAHABUBJ-E-0019545
11               THROUGH SEC-MAHABUBJ-
12               E-0019549 - 5 pages        183
13
14   Exhibit 214   EMAIL CHAIN, BATES NOS.
15               JM002048 THROUGH JM002052
16               - 5 pages                  197
17
18   Exhibit 215   EMAIL CHAIN, BATES NOS.
19               SEC-TISCARENOV-E-0001119
20               THROUGH SEC-TISCARENOV-
21               E-0001120 - 2 pages        209
22
23   Exhibit 216   EMAIL CHAIN, BATES NOS.
24               JM002045 THROUGH JM002046
25               - 2 pages                  218
```

Page 10

```
 1              EXHIBITS - (CONTINUED)
 2          TAJ JERRY MAHABUB - VOLUME 1
 3   Number        Description           Page
 4   Exhibit 217   5/6/10 EMAIL FROM JERRY
 5               MAHABUB TO BOB COOVER, ETC.,
 6               BATES NOS. JM002017 THROUGH
 7               JM002020 - 4 pages         223
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 11

```
 1          PREVIOUSLY MARKED EXHIBITS
 2          TAJ JERRY MAHABUB - VOLUME 1
 3   Number        Description           Page
 4   Exhibit 16    EMAIL CHAIN, BATES NOS.
 5               SEC0000001 THROUGH
 6               SEC0000005 - 5 pages       244
 7
 8   Exhibit 21    EMAIL CHAIN, BATES NOS.
 9               JM002096 THROUGH JM002099
10               - 4 pages                  105
11
12   Exhibit 23    10/19/09 EMAIL FROM JERRY
13               MAHABUB TO VICTOR TISCARENO,
14               ETC., BATES NOS.
15               SEC-TISCARENOV-E-0000635
16               THROUGH SEC-TISCARENOV-
17               E-0000636 - 2 pages        112
18
19   Exhibit 27    EMAIL CHAIN, BATES NOS.
20               SEC-TISCARENOV-E-0000992
21               THROUGH SEC-TISCARENOV-E
22               - 0000993 - 2 pages        138
23
24
25
```

Page 12

```
 1     PREVIOUSLY MARKED EXHIBITS - (CONTINUED)
 2          TAJ JERRY MAHABUB - VOLUME 1
 3   Number        Description           Page
 4   Exhibit 28    EMAIL CHAIN, BATES NOS.
 5               JM001041 THROUGH JM001046
 6               - 6 pages                  153
 7
 8   Exhibit 30    3/21/10 EMAIL FROM JERRY
 9               MAHABUB TO VICTOR TISCARENO,
10               ETC., BATES NOS.
11               347APL-00000315 THROUGH
12               347APL-00000316 - 2 pages  173
13
14   Exhibit 71    EMAIL CHAIN WITH ATTACHMENT,
15               BATES NOS.  SEC-
16               TISCARENOV-E-0000114 THROUGH
17               SEC-TISCARENOV-E-0000118
18               - 5 pages                  31
19
20   Exhibit 72    GENAUDIO, INC., BOARD OF
21               DIRECTORS TELEPHONIC MEETING
22               MINUTES FROM SEPTEMBER 25TH,
23               2009, BATES NO. GA006254
24               - 1 page                   100
25
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 13

1        THURSDAY, JANUARY 19, 2017; 10:17 A.M.
2
3        (All counsel stipulated to waive the
4    reporter read on and read off pursuant
5    to Federal Rule 30.)
6
7        THE VIDEOGRAPHER: Good morning. We're now on
8    the record. Here begins DVD No. 1, Volume 1, in
9    the deposition of Taj Jerry Mahabub in the matter
10   of "Securities and Exchange Commission v. Taj Jerry
11   Mahabub, et al.," being heard in the United States
12   District Court for the District of Colorado, Case
13   No. 1:15-cv-02118-CBS-WJM.
14       Today's date, January 19, 2017. The time
15   is 10:17 a.m.
16       The video operator today is Casey Howell,
17   contracted by Behmke Reporting & Video Services,
18   located at 160 Spear Street, Suite 300,
19   San Francisco, California.
20       This video deposition is taking place at
21   444 South Flower Street, Suite 900, Los Angeles,
22   California, and was noticed by Danielle Voorhees,
23   Esq., of the Securities and Exchange Commission.
24       Would counsel and all present please
25   identify themselves for the record.

---

Page 14

1        MS. VOORHEES: Danielle Voorhees and
2    Leslie Hughes on behalf of the Securities and
3    Exchange Commission.
4        MR. HOLMES: Andrew Holmes on behalf of the
5    witness.
6        MR. MCCLOSKEY: Michael McCloskey on behalf of
7    GenAudio.
8        MR. BENZ: Jeff Benz on behalf of Astound
9    Holdings.
10       THE VIDEOGRAPHER: Thank you.
11       Your court reporter is Paula Pyburn,
12   certified shorthand reporter contracted by Behmke
13   Reporting & Video Services. She will now
14   administer the oath.
15       THE REPORTER: Raise your right hand, please.
16                    * * *
17            TAJ JERRY MAHABUB,
18   having been duly sworn, testified as follows:
19                    * * *
20            EXAMINATION
21   BY MS. VOORHEES:
22   Q.  Mr. Mahabub, you can put your hand down.
23   Thank you.
24       I'm Danielle Voorhees on behalf of the
25   Securities and Exchange Commission, and I'm here

---

Page 15

1    with Leslie Hughes.
2        You've met both of us before; correct?
3        Is that a "yes"?
4    A.  Yes.
5    Q.  All right. We'll go over some ground
6    rules.
7        As your counsel noted, the court reporter
8    is trying to take down everything that's being said
9    in the room today, and so we need you to answer
10   verbally my questions. I need you to try to wait
11   till I finish with my question before you answer,
12   which I know is hard, because you will see where
13   I'm going sometimes, but she has to take down
14   everything.
15       If you could pause just briefly after I
16   ask my questions, it'll probably be helpful for
17   counsel, because they may make objections, and then
18   you can go ahead and answer the question.
19       All right?
20   A.  Yes.
21   Q.  If you need me to clarify anything, just
22   ask me to do it. Otherwise, I'm going to assume
23   that you understand the questions I ask.
24       Okay?
25   A.  Yes.

---

Page 16

1    Q.  We can take breaks today as you need them.
2    So just let us know. We won't take a break while a
3    question is pending, but otherwise, you know, we
4    want everybody to be concentrated on what's going
5    on; so let me know if you need to take a break.
6        Okay?
7    A.  Okay.
8    Q.  Do you understand that you're under oath
9    today?
10   A.  I do.
11   Q.  Okay. Mr. Mahabub, just to make this go a
12   little faster, I want to go over a few key terms.
13       When I use the word "GenAudio," is it fair
14   that I'm referring to GenAudio, Incorporated, the
15   entity that's a defendant in this case?
16   A.  Yes.
17   Q.  Okay. And if I refer to "Astound," I'm
18   referring to Astound Holdings, Inc., another entity
19   that is a defendant in this case.
20       Does that make sense?
21   A.  Yes.
22   Q.  If I refer to "Apple," I'm referring to
23   Apple, Incorporated.
24       Does that make sense?
25   A.  Yes.

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 29

1    A.  No.
2    Q.  Other than this case that you're being
3    deposed in, are you currently a named party in any
4    other litigation?
5    A.  Not to my recollection, I don't think so.
6    Q.  And other than this case, is GenAudio a
7    named party in any other litigation?
8    A.  I don't believe so.
9    Q.  And other than this case, is Astound a
10   named party in any other litigation?
11   A.  I don't think so.
12   Q.  To the best of your knowledge.
13   A.  No.
14   Q.  Mr. Mahabub, is there any reason that you
15   can't testify truthfully and accurately today?
16   A.  No.
17   Q.  All right.  Mr. Mahabub, we're going to
18   spend much of today talking about GenAudio and its
19   contacts with Apple.  All right?  So I'm going to
20   start diving into that.
21       Between 2009 and February of 2011,
22   Victor Tiscareno was your primary contact at Apple;
23   correct?
24   A.  That's correct.
25   Q.  Mr. Mahabub, you never met Steve Jobs, the

---

Page 30

1    former CEO of Apple; correct?
2    A.  That's correct.
3    Q.  Mr. Mahabub, you never attended a meeting
4    with Phil Schiller where you discussed GenAudio or
5    Astound Sound; correct?
6    A.  I don't recall.  I'm not sure of the
7    answer to that or not.
8    Q.  Okay.
9    A.  I met many people while I was there; so...
10   Q.  Do you have an actual memory of meeting
11   with Phil Schiller and discussing GenAudio or
12   Astound Sound?
13   A.  I -- I don't know the answer to it.  I
14   can't answer it, unfortunately, because, like I
15   said, I met many people while I was there.  So
16   it's -- it was a long time ago.
17   Q.  I understand that.  I'm just trying to
18   figure out if, sitting here today, you have a
19   memory of meeting Mr. Schiller and discussing
20   GenAudio or Astound?
21   A.  I don't have a distinct memory of it, no.
22   Q.  Mr. Mahabub, did you ever participate in
23   phone calls with Phil Schiller where you discussed
24   GenAudio or Astound Sound?
25   A.  I don't -- I don't remember.  It's a long

---

Page 31

1    time ago again.
2    Q.  Have you ever met Tim Cook?
3    A.  That's the current CEO; right?  Tim --
4    Q.  I honestly don't know.
5    A.  Yeah, I think Tim is the current C -- I
6    don't believe so.  I could have in a meeting, but I
7    don't believe so.
8    Q.  Have you ever communicated with Mr. Cook
9    regarding GenAudio or Astound Audio?
10   A.  I don't recall.  Again, I just -- this is
11   a long time ago.  I can't remember.
12   Q.  Apple never acquired GenAudio; correct?
13   A.  No.
14   Q.  And Apple never licensed anything from
15   GenAudio; correct?
16   A.  No.
17   Q.  Apple never entered into a license
18   agreement with GenAudio; correct?
19   A.  Correct.
20   Q.  Mr. Mahabub, I'm going to hand you what's
21   been previously marked as Deposition Exhibit 71.
22       (Whereupon, Exhibit 71 was previously
23       marked for identification by the Court
24       Reporter.)
25   ///

---

Page 32

1    BY MS. VOORHEES:
2    Q.  Deposition Exhibit 71 bears the Bates
3    label SEC-TiscarenoV-E-000114.
4       Mr. Mahabub, go ahead and take a minute to
5    look at the email and attachment and let me know if
6    you recognize it.
7    A.  Yeah.
8    MR. HOLMES:  Sorry.  Can we pause for a second?
9    MS. VOORHEES:  You want to go off the record?
10   MR. HOLMES:  Yeah.
11   MS. VOORHEES:  Yeah, sure.
12       Okay.  Let's go off the record.
13   THE VIDEOGRAPHER:  We're off the record.  The
14   time is 10:35.
15       (A recess was taken from 10:35 a.m. to
16       10:35 a.m.)
17   THE VIDEOGRAPHER:  We're back on the record.
18   The time is 10:35.
19   BY MS. VOORHEES:
20   Q.  All right.  Mr. Mahabub, do you recognize
21   Exhibit 71?
22   A.  I think this is the NDA that we signed
23   with them.  Right?  Yes.
24   Q.  Okay.  So you're referring to the
25   attachment to Exhibit 71?

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 61

1  the team is.
2     THE WITNESS: Oh.
3     MR. HOLMES: Make sure you listen to the
4  question.
5     THE WITNESS: I -- I can't even tell you.
6  Melissa Gonzales, Jim Mattos, Paul Powers,
7  Mark Bobak -- it would have been team members and
8  board members.
9  BY MS. VOORHEES:
10    Q.  When you say "team members," you mean
11  people who worked for GenAudio?
12    A.  Or on the board of GenAudio, yeah.
13    Q.  And that could include people who are
14  actually employed by GenAudio or who were
15  contracting --
16    A.  Or consultants, exactly, full-time
17  consultants.
18    Q.  Okay.
19    A.  Yeah, you bet.
20    Q.  All right.  So if you could go to the next
21  page, then, of Exhibit --
22    A.  But consultants were all under, you know,
23  heavy NDAs with us or had software -- developer
24  agreements executed with us that would have
25  prevented them from -- if I said, "Keep this

Page 62

1  internal and confidential," that meant keep it
2  internal and confidential.
3     Q.  All right.  If you could take a look at
4  the second page.  I'm starting in sort of the end
5  of what I think is the first paragraph --
6     A.  Yep.
7     Q.  -- where you see it says (as read):
8        Most likely I will have one or two
9        additional calls with Apple after
10       their review, and if I get the green
11       light, actual integration development
12       and testing will commence.
13    A.  Yeah.
14    Q.  Do you see that?
15    A.  I do.
16    Q.  All right.  "Actual integration
17  development and testing," was that work that was to
18  be done by Apple?
19    A.  No.  By us.
20    Q.  Okay.  If you go down to the next
21  sentence, it says (as read):
22        I believe this could realistically
23        happen within two to four weeks.
24        Do you see that?
25    A.  The integration test, yes.

Page 63

1     Q.  Okay.  What was your basis for saying
2  that?
3     A.  We had already ported the code to run
4  across about every platform -- or every operating
5  system that they had at that time.  So getting
6  handed a -- an API or a kext, as Ron Isaac handed
7  to us --
8     THE REPORTER: Or a what?
9     THE WITNESS: A kext, k-e-x-t.  It's called a
10  kernel extension, which is an embedded way to embed
11  into a Macintosh product line.
12    MR. HOLMES: Jerry -- Jerry, when she does
13  that, she just wants you to repeat exactly what you
14  said.  If you add more things, it's more than she
15  needed.
16    THE WITNESS: Okay.  Okay.
17       So I'm not sure exactly what your question
18  is.  I think -- I think my point that I'm making
19  here is that we're pretty much self-ported; so
20  to -- to tighten down the nuts and bolts into a
21  kernel extension or into any type of API that we
22  might receive for OSX or iOS would be a matter of
23  weeks, is the point I was making there.
24  BY MS. VOORHEES:
25    Q.  Okay.  If you could skip down, there's a

Page 64

1  series of sentences that say, "Do I believe."
2        If you could go down to the one that says
3  (as read):
4        Do I believe that Apple could be a
5        strong potential buyer of GenAudio in
6        its entirety?  Yes.
7     A.  Absolutely.
8     Q.  Do you see that?
9     A.  Yes.
10    Q.  Okay.  What was your basis for that?
11    A.  Discussions that I had had and, you know,
12  they seemed to be very interested in the
13  technology.  I had written several emails to Victor
14  and Ron and other contacts that I had.  And, you
15  know, they -- they certainly didn't go against
16  anything that I was saying to them; that's for
17  sure.
18    Q.  All right.  The next -- if you skip down
19  two, it says (as read):
20        Do I believe that if someone does
21        not invest at this point in time that
22        they are foolish?  Yes.
23        And what did you mean by that?
24    A.  That means that at the time, I honestly
25  believed that we were going to be doing a deal with

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 65

1  Apple based on the communications I had with my
2  points of contact that I was working with there.
3     Q.  Okay.  And that's as of July of 2009, you
4  thought that?
5     A.  Yep, exactly.  But, you know, like I said,
6  this was meant to go to internal team members; this
7  wasn't meant to be distributed to anyone external
8  to the team, or else it would have been.
9     Q.  If you go down to the next paragraph, it
10 says (as read):
11         We need investors and need them
12         now.
13    A.  Yep.
14    Q.  Why were you writing that?
15    A.  Because we were out of money.  And in
16 order to port code and hire on the right team and
17 the right dev staff, and there were a couple other
18 additional software engineering people that I
19 needed to bring on board at the time, and you can't
20 bring those people on unless you have money.
21    Q.  Okay.  If you could go to the next page.
22 So I'm now on the Bates page 7974.
23    A.  Yeah.
24    Q.  And go down to what I think is the first
25 full paragraph.  It says (as read):

Page 66

1         Everyone keep their eye on the
2         prize and, if possible, bring
3         potential investors to the table,
4         please, preferably through the common
5         stock offering.
6         Do you see that?
7    A.  Yes.
8    Q.  All right.  So you were asking your team
9  to help bring potential investors to the table;
10 correct?
11    A.  Through the common stock offering.  What
12 I'm saying is, don't bring them to the table
13 through anything here.  They have to read the
14 common stock offering, the risk factors associated
15 with the offering; that this is -- you know, this
16 is internal team member confidential stuff, but if
17 you know anyone that might be interested in
18 investing, you know, give them the common stock
19 or -- at the time, the logistics were, you know, go
20 to Jim Mattos, and Mattos would then forward them
21 the common stock offering.
22    Q.  Okay.  So when -- so your parenthetical
23 that says "preferably through the common stock
24 offering," you're referring to the process by which
25 the investors would be provided with the offering

Page 67

1  documents?
2    A.  With information to determine whether or
3  not it was an investment that they want to invest
4  in or not, because this obviously isn't surrounded
5  by the appropriate risk factors and disclaimers in
6  the language that are needed.
7    Q.  Okay.  You say "preferably."  Was there
8  another alternative?
9    A.  Yeah, a term share.  So if there's a
10 potential that someone knew someone that wanted to
11 invest something, a little larger amounts, you
12 know, maybe the company would look at what's called
13 a term sheet, if I remember, is what it's referred
14 to as.
15        So if -- if someone wanted to -- you know,
16 one of our employees said, "Hey, Jerry, here is my
17 Uncle Joe.  You know, he wants to invest
18 $10 million."  Right?  Which never happened.  But
19 if it ever happened, you know, we'd -- we'd
20 entertain a term sheet at that time.
21        So it would either be through a common
22 stock offering or through a potential for a term
23 sheet.  Again, you know, we never had any term
24 sheet offers to the table; it was all through the
25 offerings.

Page 68

1    Q.  Okay.  So you never had any term sheets?
2    A.  No.
3    Q.  Okay.  Were there any other alternatives
4  other than term sheet and common stock offering?
5    A.  No.  No.  There was a term sheet with a
6  group called GenAudio Term Sheet Investment Group,
7  which is a B.S. group set up by Mark Bobak and
8  Dell Skluzak in a -- way for them to start their
9  hostile takeover when they were -- but that's the
10 only term sheet group, as far as I remember.
11    Q.  Okay.
12       THE WITNESS:  Slow down?  Okay, yeah, sorry.
13       (Whereupon, Exhibit 203 was marked for
14       identification by the Court Reporter.)
15       THE WITNESS:  Oh, you guys dug these up, huh?
16 This is great.
17 BY MS. VOORHEES:
18    Q.  All right.  Mr. Mahabub, you've been
19 handed what's been marked as Exhibit 203.  It's
20 email correspondence.  The first page is Bates
21 labeled SEC-TiscarenoV-E-000325.
22       Do you recognize Exhibit 203?
23    A.  Yes.
24    Q.  Okay.  And this is email correspondence
25 between you and Victor Tiscareno; correct?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 69

1   A.  I believe so, yes.  If it was pulled from
2   my computer, it must have been.
3   **Q.  It was not pulled from your computer.**
4   **I'll represent to you that this was produced to us**
5   **by Mr. Tiscareno.**
6   A.  Oh, okay.  Well, then -- then, I suppose
7   it must be right, yeah.
8   **Q.  Okay.  And so, knowing that, do you have**
9   **any reason to doubt that you sent and received the**
10  **emails as indicated?**
11  A.  Yeah, no, sure.
12  **Q.  Okay.**
13  A.  Vic would have supplied you with the right
14  emails, you know.
15  **Q.  Okay.**
16  A.  At least I hope.
17      (Whereupon, Exhibit 204 was marked for
18      identification by the Court Reporter.)
19  BY MS. VOORHEES:
20  **Q.  All right.  Mr. Mahabub, you've been**
21  **handed what's been marked as Exhibit 204.**
22  **Exhibit 204 is Bates-labeled on the first page**
23  **SEC-MahabubJ-E-0022806.**
24      **Mr. Mahabub, the document is -- is very**
25  **long, but I'm only going to ask you questions about**

---

Page 70

1   the first, like, two or three pages.
2   A.  Okay.
3   **Q.  That's just how it printed and it was just**
4   **how it was produced to us.**
5   A.  This must have came from my computer,
6   obviously.
7   **Q.  Correct.**
8   A.  Yeah.
9   **Q.  This document was produced to us by you.**
10      **All right.  So, Mr. Mahabub, if you look**
11  **at the first page of Exhibit 204 -- well, let me**
12  **ask you this:  Do you recognize this document?**
13  A.  Not in its format, no.  I -- but I --
14  that -- that's a tough one to answer, because I'm
15  under oath.  If you say to me -- tell me, do I
16  recognize that?  My answer is no.
17  **Q.  Okay.  Do you have any reason to doubt**
18  **that you sent and received the emails as indicated**
19  **in Exhibit 204?**
20  A.  I don't know.  Sorry.  I just can't answer
21  that question.  I'm sorry.
22  **Q.  Let's start to go through the content --**
23  A.  Yeah.
24  **Q.  -- and see what happens there.**
25      **If you look at the "To" line that's on the**

---

Page 71

1   very first page of Exhibit 204, you see it includes
2   **Mr. Smith; Paul Powers; Jim Devine; Jim Mattos;**
3   **Steve Bagwell; Greg Morgenstein --**
4   A.  Morgenstein.
5   **Q.  -- M-o-r-g-e-n-s-t-e-i-n --**
6   A.  Morgenstein, yes.
7   **Q.  Yes, sorry.  I'm just spelling it for the**
8   **court reporter.**
9       Stephan with a p-h --
10  A.  Stephan.
11  **Q.  -- Stephan -- Bernsee?**
12  A.  Bernsee.
13  **Q.  -- Bernsee, B-e-r-n-s-e-e.**
14      Recy A. Pilloud?
15  A.  Pilloud.
16  **Q.  Pilloud, P-i-l-l-o-u-d.**
17      Ian Esten?
18  A.  Esten.
19  **Q.  Esten, E-s-t-e-n.**
20      Bob Coover, C-o-o-v-e-r.
21      A P. Savio, P. S-a-v-i-o.
22  A.  That would have been Paul Savio.
23  **Q.  Okay.  And Walt, and it just says**
24  "walt@genaudio."
25  A.  It's Walter Horat, H-o-r-a-t.

---

1   **Q.  Okay.  Mr. Mahabub, is -- is this roughly**
2   **the team that you referenced that we were**
3   **discussing in the previous exhibit?**
4   A.  Yeah.  I might have had the board members
5   blind carbon copied as well.  Oftentimes when I'd
6   send out things like this, the board would always
7   be bcc'd also.
8   **Q.  Okay.**
9   A.  Which would have been -- at this time
10  Mark -- let's see, what is the date here? --
11  Mark Bobak, Paul Powers, Ted Cohen, and
12  Elliot Mazer.
13  **Q.  Okay.  All right.**
14      **If you go to the second page of**
15  **Exhibit 204, you'll see that I've -- if I have**
16  **highlighted, hopefully on all of the copies, some**
17  **provisions that I want us to focus in on just**
18  **because these are so difficult read.**
19      **MR. HOLMES:** I have highlighting on the third
20  page.
21      **MS. VOORHEES:** Oh, sorry, yeah, you're probably
22  right.  It may start on the --
23      **MR. MCCLOSKEY:** Should be --
24      **MS. VOORHEES:** Yeah, sorry.  I'll read you the
25  ones I want you to look at.

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 73

1    MR. MCCLOSKEY: These should be highlighted.
2    Okay.
3    MS. VOORHEES: But I have just done that so
4    that we can focus.
5    Q.  All right.  Mr. Mahabub, I want you to
6    compare Exhibit 203 to the email that starts
7    towards the bottom of the second page of
8    Exhibit 204.  That says "Hi, Vic."
9    MR. HOLMES: This one.
10   THE WITNESS: Okay.
11   BY MS. VOORHEES:
12   Q.  And, again, in the interest of efficiency,
13   I will tell you that I have highlighted at least
14   some of the changes --
15   A.  Yeah.
16   Q.  -- that I have seen between the two
17   emails, and that's what I want to go over.
18   A.  Okay.
19   Q.  But I want you to have a minute to take a
20   look at them.
21       All right?
22   A.  Sure, of course.
23       Yeah, yeah.  You're just talking about --
24   MR. HOLMES: Jerry -- Jerry, don't -- review it
25   first; wait for a question --

---

Page 75

1    about that.  I'm under oath; so I can't say I
2    remember doing any of that, you know?
3    Q.  Okay.  I understand.  But -- so let's
4    break that down a little bit.
5        If there were alterations, I understand
6    your testimony to be you did them?
7    A.  Oh, it was either me, or maybe I had
8    someone else do them for me.  It depends.  Probably
9    most likely it would have been me, though.
10   Q.  It would have been something you knew
11   about; correct?
12   A.  I would hope so, yes.
13   Q.  Okay.  If you take a look at Exhibit 204
14   on the third page -- so Bates ending in -808.
15   A.  Okay.  Where am I at?  Yep.
16   Q.  And take a look at the second highlighted
17   paragraph.  The one that says, "See you in a couple
18   of days."
19   A.  Yes, I see it.
20   Q.  Okay.  So do you see that corresponding
21   paragraph over on Exhibit 203?
22   A.  I do.
23   Q.  It starts at the very bottom of the page?
24   A.  Uh-huh.
25   Q.  All right.  So it appears that the email

---

Page 74

1    THE WITNESS: Okay.
2    MR. HOLMES: -- and then -- then start talking.
3    THE WITNESS: This is really difficult to parse
4    through this.
5        Okay.
6    BY MS. VOORHEES:
7    Q.  All right.  You've had a chance to take a
8    look at both of them?
9    A.  Yes.
10   Q.  Okay.  You notice that there's some
11   differences?
12   A.  I did.
13   Q.  Why?
14   A.  I am not sure.  I don't know how to answer
15   that.
16   Q.  Okay.  Did you alter the email that is
17   included in Exhibit 204, which is the one that was
18   produced by you and forwarded to your team?
19   A.  There were from time to time alterations
20   that I had made, yes.  But I can't tell you for
21   sure if I did for the -- I -- I don't know.  But
22   apparently so.  If there's alterations here, it
23   means I did.
24   Q.  Okay.
25   A.  I just -- I just can't tell you for sure

---

Page 76

1    has been altered to add the text (as read):
2        Prior to meeting with the senior VP
3        marketing, Phillip Schiller --
4    A.  Yes.
5    Q.  (As read):
6        -- and other senior VP staff, please
7        let me know.
8    A.  Uh-huh.
9    Q.  Why did you add that to this email?
10   A.  I'm not sure.  I don't -- I don't
11   remember.  It might have been to emphasize to the
12   team and keep them motivated that things are moving
13   forward.  I -- I don't know.
14   Q.  Okay.  So you altered Exhibit 204 because
15   you wanted the recipients to believe you were
16   meeting with Phil Schiller; right?
17   A.  No, not necessarily.  I -- I don't
18   remember if -- I can't -- I can't honestly tell
19   you.  I don't recall, it was so long ago.  I can't
20   remember making any of these alterations.
21       But if they are done in this way, I would
22   have been doing that with the emphasis to keep the
23   team motivated, basically.
24   Q.  All right.  You were not --
25   A.  The internal team motivated.

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 77

1    Q.  But -- okay.  All right.  Fine.
2    A.  Which should have nothing to do with any
3  sale of any securities.
4    Q.  If you focus on that same clause that I
5  just read, "Prior to meeting with the senior VP
6  marketing, Phillip Schiller" --
7    A.  Yeah.
8    Q.  -- you were not meeting with Mr. Schiller,
9  were you?
10    A.  I -- if I said I did, then there's a good
11  chance that I did.  I just don't recall.  I don't
12  remember.
13        I met a lot of people.  I went to Apple
14  many, many times and had several meetings with many
15  people there; so I don't remember.
16    Q.  Let's talk about everybody you ever met at
17  Apple that you recall.  Tell me everybody you
18  recall meeting at Apple.
19    A.  I can't remember their names.  I just --
20  I -- it was a long time ago.  Vic and Ron were my
21  main two points of contact.  That's -- those are
22  the main guys I would interact with.
23    Q.  Okay.
24    A.  And then they would set up meetings.
25  There are times when I would have conferences with

---

Page 78

1  them and they would have, you know, five, six
2  people, sometimes more, around a table to give
3  demos to.
4    Q.  And was one of those people ever
5  Phil Schiller?
6    A.  I don't -- I don't recall.  I mean, if I'm
7  saying it was here, there's a good chance it was,
8  but I just don't remember.
9    Q.  But what's curious, Mr. Mahabub, is that
10  you say it in an email forwarded to a team that
11  would not know any better, but you did not say it
12  in the email that you wrote to Mr. Tiscareno;
13  correct?
14    A.  Yeah --
15    MR. HOLMES: Objection.  Objection.
16  Argumentative.
17  BY MS. VOORHEES:
18    Q.  Go ahead.  Is that correct?
19    A.  I don't know.  I don't know.  I can't
20  answer -- I'm sorry, I can't answer that under oath
21  because I just don't remember.  I don't know the
22  answer to that.
23    Q.  Okay.  Well, just taking a look at the
24  documents as you sit here today, that clause is not
25  included in Exhibit 203; correct?

---

Page 79

1    MR. HOLMES: Document speaks for itself.
2    MR. MCCLOSKEY: Join.
3    THE WITNESS: I'm not sure I understand the
4  question, what you're asking.
5  BY MS. VOORHEES:
6    Q.  The -- the phrase "prior to meeting with
7  the senior VP marketing, Phillip Schiller, and
8  other senior VP staff --
9    A.  Uh-huh.
10    Q.  -- please let me know," is not included in
11  Exhibit 203?
12    MR. HOLMES: Document speaks for itself.
13    THE WITNESS: Yeah.
14    MR. MCCLOSKEY: Join.
15  BY MS. VOORHEES:
16    Q.  And why did you not include that language
17  in the email that you sent to Mr. Tiscareno, but
18  you did include it in the email that you forwarded
19  to your internal team?
20    A.  I don't know.  I'm not sure what my
21  reasoning was for doing it at the time.  But I'm
22  sure I had something in mind, if I -- I just can't
23  answer it because I don't really recall.  I'm
24  sorry.  It's -- it's a long time ago.  I don't
25  remember that.

---

Page 80

1    Q.  Do you recall the reason why you made any
2  of the alterations to Exhibit 204?
3    A.  Yeah.  I think I stated before in my
4  previous testimony that there are some emails that
5  I made modifications to; I can't remember exactly
6  what the modifications were.  Most of the time it
7  was redacting information.
8        But if I did anything along these lines,
9  it might have been just to keep the team motivated.
10  Because maybe I was getting some loss of
11  motivation, maybe the team hadn't been paid in
12  several months, and I had to do something to keep
13  them motivated to stay on board.
14    Q.  Okay.  And you didn't think that
15  forwarding the email that you sent to Mr. Tiscareno
16  without alterations would have kept them motivated?
17    A.  No.
18    Q.  Why is that?
19    A.  Didn't have the strength to it.  You -- at
20  the time there was a lot of stuff going on, and we
21  were low on funds and -- and high on energy, with a
22  lot of stuff that we had to get done in terms of
23  porting, development engineering work, and things
24  like that.
25        So if I would have done something along

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

1    A.  I do.
2    Q.  All right.  So I take it you attended the
3    meeting; correct?
4    A.  Yes.
5    Q.  Okay.  If you take a look at paragraph 7,
6    the last sentence -- well, the first sentence reads
7    (as read):
8         Apple.  Mr. Mahabub provided a
9         summary of the discussions with
10        Apple --
11   A.  Uh-huh.
12   Q.  (As read):
13        -- and noted that the next meeting was
14        this upcoming Thursday.
15        It then goes on, the last sentence reads
16   (as read):
17        Mr. Mahabub noted that a deal with
18        Apple is highly probable based on the
19        many meetings and Apple's responses to
20        date.
21   A.  Uh-huh.
22   **Q.  Is that an accurate representation of what**
23   **you explained to the board on that date?**
24   **A.  Of course.  That was my opinion at the**
25   **time, yes.**

Page 102

1    Q.  Okay.  What -- what was the summary of
2    discussions with Apple?
3    A.  Just various meetings that we have had up
4    to that date, many meetings.  A lot of integration.
5    A lot of software engineering.  Like I said, there
6    are -- there are multiple people that we were
7    interacting with; I don't remember who they all
8    were.
9         There are times when I'd go in and have a
10   meeting and there would be multiple people sitting
11   around the table.  I didn't really know who they
12   all were.  All I did was know we were under an NDA
13   with them; so it shouldn't have been a problem at
14   the time.  And I would just give demos that I was
15   asked to produce.
16   Q.  Okay.
17   MR. HOLMES:  I'm doing this to slow you down a
18   little bit.
19   THE WITNESS:  Okay.
20   BY MS. VOORHEES:
21   Q.  All right.  And, Mr. Mahabub, am I correct
22   that the integration that you are discussing was
23   being done by GenAudio?
24   A.  Yes.
25   Q.  Okay.

Page 103

1    A.  Yes.
2    Q.  And the software engineering was also
3    being done by GenAudio?
4    A.  That's correct.
5    Q.  The -- the last sentence (as read):
6         Mr. Mahabub noted that a deal with
7         Apple is highly probable.
8         What did you mean by "a deal"?
9    A.  That meant that I thought that -- you
10   know, doing a deal.  'Cause we were being listed as
11   a vendor.  We were being given, you know,
12   information, confidential kernel extensions and
13   other things like that as a vendor of Apple.
14        So, I mean, you know, it's -- like I said,
15   what does a vendor do?  A vendor sells stuff to a
16   company.  So seemed like a deal was coming.
17   Q.  And I -- I'm just trying to focus in on
18   that last word, "deal."
19        What did you mean by "deal"?
20   A.  Whatever it meant.  I don't know.  It
21   could have been an acquisition.  It could have
22   meant a license.  It could have meant an up front
23   lump sum -- some kind of a deal, whether it's we're
24   going to promote your product, we're going to not
25   pay you a dime, but we're going to integrate you

Page 104

1    and brand the hell out of you.
2    THE REPORTER:  We're going to --
3    THE WITNESS:  We're going to promote your
4    product and integrate your technology in, but we're
5    not going to pay you a dime.  But we're going to,
6    you know, promote you.  We're going to put your
7    name out there.
8         Because oftentimes, as a new software
9    company that's just going, you have to kind of give
10   the sweetheart deals away just to get your brand
11   out there.
12   BY MS. VOORHEES:
13   Q.  Did --
14   MR. HOLMES:  I'm just going to caution you to
15   slow down.
16   THE WITNESS:  Okay.
17   MR. HOLMES:  Even what you were doing to try to
18   help the reporter there was very fast.
19   THE WITNESS:  Yeah.
20   MR. HOLMES:  So try to slow down.  I know it's
21   hard.
22   THE WITNESS:  All right.
23   BY MS. VOORHEES:
24   Q.  Mr. Mahabub, thinking back to this board
25   meeting, do you recall discussing the various types

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 145

1    A.  I don't remember.
2    Q.  Do you recall what their position was?
3    A.  No.
4    Q.  Do you recall anything about them?
5    A.  Not really, no.  As I said, my main two
6  point of contacts at Apple were Vic and Ron.  Those
7  would be who I primarily dealt with.  Vic and Ron
8  would bring people into the loop for me to meet
9  with from time to time.
10    Q.  Well, we're seeing a lot of correspondence
11  about somebody named Phil.
12    A.  Yeah.  I just don't remember who it might
13  have been.  You know, I just -- I can't recall.
14  I'm sorry, I don't.
15    Q.  What did Phil look like?
16    A.  A little heavier set.
17    Q.  How old was he?
18    A.  Maybe forties or fifties.
19    Q.  What was his race?
20    A.  White.  Caucasian.
21    Q.  Where did you meet him?
22    A.  At Apple.  When I would go in for
23  meetings, he would attend some of the meetings.
24    Q.  What time frame?
25    A.  I don't remember.  I can't remember that.

---

Page 146

1  It was -- it was so intermittent.  I don't
2  remember.  I honestly don't.  If I do, I'd tell
3  you, but I don't.
4    Q.  How many times did you meet him?
5    A.  I don't remember that neither.
6    Q.  How many times did you meet him on the
7  phone -- I mean -- sorry -- did you speak to him on
8  the phone?
9    A.  I don't remember.  I can't answer that
10  honestly, because I don't remember.
11    Q.  Do you have any recollection of his last
12  name?
13    A.  No.
14    Q.  What building did you meet him in at
15  Apple?
16    A.  Many.  Many different buildings that we
17  had meetings in.  We'd have meetings in the Mariana
18  building --
19    Q.  Wait, sorry.  I'm -- I'm going to stop you
20  for just a second.  Only with Phil.  I'm focused on
21  Phil.
22       How many -- what building were you in when
23  you met with Phil?
24    A.  I can't recall.  We met in so many
25  different buildings, I can't tell you when --

---

Page 147

1    Q.  You and Phil met in so many different
2  buildings?
3    A.  I -- I don't know.  I don't remember.
4  There's so many different people I met with, is
5  what I'm trying to tell you.  I don't remember.  I
6  don't -- I just -- I don't.  I'm sorry.  It was a
7  long time ago.
8       This is -- what? -- seven, eight years ago
9  now?  Seven years ago?  Yeah.
10    Q.  If you go to the first page of
11  Exhibit 210, please.
12    A.  Yeah.
13    Q.  You see that the first line says (as
14  read):
15       Hello, GenAudio Team.  Important:
16       Read entire email chain.  Walt, that
17       means scroll to the bottom after
18       reading this email.
19    A.  Yeah.
20    Q.  It says (as read):
21       The response to my email below from
22       Vic is promising.  Great meeting with
23       Phil Schiller yesterday.
24       Did you meet with Phil Schiller on
25  February 11th, 2010?

---

Page 148

1    A.  I don't recall.  But perhaps I might have,
2  if it -- if it's -- if I'm addressing the team
3  members here, it was either done by way to entice
4  them or it was done by way to inform them.  I don't
5  recall which way it was.
6       But apparently was -- I was relaying
7  something to the team about something.  And
8  whatever it was, it was what I was saying to the
9  team.
10    Q.  Okay.  What do you mean by "It was either
11  done to entice them or inform them"?
12       What do you mean by "entice"?
13    A.  Entice.  To keep them motivated to work.
14    Q.  Okay.  So does that mean that it was
15  either not true but being done to entice them?
16    A.  One of the two, yeah.  But if -- I'm
17  pretty sure that these meetings -- I just can't
18  remember.  It was so long ago.  Like I said, I do
19  not remember.
20       I think I've already admitted to you that
21  there's been -- there were times when I made
22  alterations to keep the team members motivated, but
23  that's all I can say.
24    Q.  Okay.  And I understand that.  I get that.
25       But what I'm trying to figure out is if

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 149

1    the alterations were true or not?
2        A.  I don't know.  I can't remember.
3        Q.  They may not have been?
4        A.  They may not have been, but I can't
5    recall --
6        Q.  Okay.
7        A.  -- yes.
8        Q.  So you can't recall on an alteration-by-
9    alteration basis --
10       A.  I can't, no.
11       Q.  But at least some of them were not true?
12       A.  I don't know.  I would have -- yeah.  I
13   think that there was one where I may have said
14   something that was done to keep them motivated, but
15   it was an untrue statement.  But, again, that was
16   to the team members, not to shareholders.
17       Q.  Which one are you referring to?
18       A.  I don't remember.  It was -- I just said,
19   there might have been one or two that I might have
20   done like that, just remembering back.
21       Q.  Okay.
22       A.  But it's a general -- if you put them all
23   into a pool, a -- you know, a giant pool, maybe so.
24   But that was not my standard M.O.  That was not my
25   standard practice.

Page 150

1        Q.  Okay.  I just want to make sure, though,
2    you're not -- you're not thinking in your head of a
3    specific one that you know was false?
4        A.  No.
5        Q.  Okay.  Did -- did you ever tell
6    Mr. Tiscareno that you were editing his emails
7    before you forwarded them to his team --
8        A.  No.
9        Q.  -- to your team?
10       A.  To my team?  No, no.  It was none of his
11   business.
12       Q.  Okay.  Did he ever give you permission to
13   alter his emails before you forwarded them to your
14   team?
15       A.  No, of course not.
16       Q.  What about Mr. Isaac?  Did you ever tell
17   him that you were altering his emails before
18   sending them to the team?
19       A.  Well, you know, the thing is, is it's a
20   matter of this.  Right?  Oftentimes I'd redact
21   information as well.  So, I mean, it just depended
22   on what was being stated.
23          So, I mean, you know, I think I have -- I
24   think keeping something that's internally team
25   member confidential that is not supposed to ever

Page 151

1    leave their eyes ever, you know, I mean --
2        MR. HOLMES:  Jerry, just make sure you're
3    listening to the question, because I don't think
4    you responded to the question she asked.
5        THE WITNESS:  Oh, okay.
6    BY MS. VOORHEES:
7        Q.  Yeah.  Did Mr. -- did you ever tell
8    Mr. Isaac that you were altering his emails before
9    you forwarded them to your team?
10       A.  No, no.  If I -- if I did any alterations
11   for -- with intent of those emails, no, he was
12   never informed of any of that.
13       Q.  Okay.  Was anyone at Apple informed that
14   you were altering emails before you sent them to
15   your team?
16       A.  Again, if there were any alterations done,
17   they were not informed.
18       Q.  Okay.  Did you ever notify your team that
19   you were altering emails before you sent them to
20   the team?
21       A.  No.  No.  Unless there were redactions or
22   something like that.  But usually not, no.  I would
23   just send it off to them, and that was that.
24          Again, these were meant to be team member
25   confidential emails and stay to the team members'

Page 152

1    eyeballs only.
2        Q.  Did you ever tell the board that you were
3    modifying the emails that were being forwarded to
4    your team?
5        A.  No.
6        MS. VOORHEES:  All right.  I think this would
7    be a good time to break --
8        MR. HOLMES:  Okay.
9        MS. VOORHEES:  -- if that's okay.
10       THE WITNESS:  Yeah.
11       MS. VOORHEES:  So go off the record.
12       THE WITNESS:  Sure thing.
13       MS. VOORHEES:  How long do you want to take for
14   lunch?
15       THE VIDEOGRAPHER:  We're off the record.  The
16   time is 12:49.
17          (At 12:49 p.m., a lunch recess
18          was taken until 1:35 p.m. of the
19          same day.)
20
21    (Nothing omitted nor deleted. See next page.)
22
23
24
25

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 153

1     THURSDAY, JANUARY 19, 2017; P.M. SESSION
2                    ***
3            (Mr. Benz is not present.)
4      THE VIDEOGRAPHER: We're back on the record.
5   The time is 1:35.
6          Please proceed.
7      MS. VOORHEES: All right.  Thank you.
8                    ***
9            EXAMINATION (RESUMED)
10  BY MS. VOORHEES:
11     Q.  Mr. Mahabub, do you understand that you
12  are still under oath?
13     A.  I do.
14     Q.  Okay.  All right.
15         I am going to hand you what has previously
16  been marked as Exhibit 28.
17         (Whereupon, Exhibit 28 was previously
18         marked for identification by the Court
19         Reporter.)
20     THE WITNESS: More emails?
21  BY MS. VOORHEES:
22     Q.  More emails.  All right.  Exhibit 28 is
23  email correspondence, and there is an attachment.
24  It is Bates-labeled JM001041.
25         Do you recognize Exhibit 28?

---

Page 154

1      A.  Same answer.
2      Q.  Okay.  So that means that you do not
3   recall this email and you do not have any reason to
4   doubt that you sent or received it; correct?
5      A.  Correct.
6      Q.  Mr. Mahabub, if you start on the first
7   page of Exhibit 28, and you see there's an email
8   from you to several people.  It says -- on March
9   19th, 2010, excuse me.
10         It says (as read):
11             Hello.  Attached is the cover
12         letter that will go out to all the
13         shareholders with the new PPM via
14         electronic delivery.  Time to get
15         some --
16         And then there's three dollar signs.
17     A.  That's money.
18     Q.  (As read):
19         -- and drive the business side of our
20         company through the roof.  Of course,
21         to do this the right way, we will need
22         to complete our financing requirement
23         or raise enough to get us into a big
24         deal which will generate substantial
25         revenues.

---

Page 155

1          What did you mean by "big deal"?
2      A.  Just any kind of licensing deal with
3   whoever.  You know, we had a bunch of different
4   things going on at that time, not just Apple.  So
5   whatever we could have, you know, rolled into at
6   the time.
7          I was trying to keep the team pumped and
8   get the money that we needed in order to -- that --
9   half of our achilles heel that we always had was we
10  never had enough money to cross the bridge to where
11  we needed to go.
12          So that -- that was problematic for this
13  company, you know, pretty much since inception, is
14  we just couldn't seem to raise enough money to --
15  to get where we need to go.
16     Q.  Okay.  If you go down to the next email --
17  so the one that says "On 3/18/10, 11:56 p.m."
18         Do you see where I'm at?
19     A.  Yes.
20     Q.  Okay.  And then it says (as read):
21             Hello, Team.  Please read this
22         email in full as it will affect all of
23         you with whom -- all of you with whom
24         have been paid for the past several
25         months by myself personally.

---

Page 156

1          You see that?
2      A.  Yes.
3      Q.  Okay.  It says (as read):
4             Please find attached the corrected
5          and final version of the PPM.
6          And it says (as read):
7              Because the PPM is now live, I can
8          no longer sell my personal shares at a
9          discounted rate --
10     A.  Uh-huh.
11     Q.  (As read):
12         -- and this means I will no longer be
13         loaning my personal money from the
14         sale of my personal shares to the
15         company.
16     A.  Yep.
17     Q.  How did you sell your personal shares?
18     A.  Just -- I think it all started with
19  Mark Bobak and another guy named Pedro Soares.
20  Paul Powers and Mark had come up with that I could
21  sell my shares at a discounted rate because they're
22  nonvoting.  There's an irrevocable proxy -- in
23  fact, I ended up fighting them on the same exact
24  proxy agreement that they had me -- that they
25  helped to draft that had me sign, and I had to sue

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 169

1    A.  It could have been -- it could have been
2  touching into 2011; I just don't remember.
3    Q.  And when you started to refer to Panasonic
4  as "the LCEC" --
5    A.  Yes.
6    Q.  -- did you stop referring to Apple as "the
7  LCEC"?
8    A.  Yeah.  Because I let the shareholders know
9  that -- that, you know, business with one of the
10  large consumer electronics companies that we're
11  dealing with, you know, had pretty much stopped.
12    Q.  Okay.  So you started referring to
13  Panasonic as "the LCEC" after you had notified the
14  shareholders that the Apple business was stopped?
15    A.  I believe so.  There might be a little
16  overlap there, where at one point in time "the
17  LCEC" could have meant, you know, one or two or
18  maybe even three different companies.  But, you
19  know, that's -- that's really vague in my mind as
20  far as how that all interacted.  It's gray.  It's a
21  gray area of time.
22        Because Apple was kind of coming to an
23  end; these other companies were -- had started
24  while we're still dealing with Apple and they were
25  coming into focus.

Page 170

1        So, you know, like I said, Apple was not
2  our only egg in the basket, of course.  You never
3  try and, you know, do that.  Because when you do,
4  you -- it's not good.  You have to -- you have to
5  broaden your horizons when you're trying to do
6  business.
7    Q.  Other than Apple and Panasonic, who else
8  did you ever refer to as "the LCEC"?
9    A.  I can't recall.  There might have been one
10  or two others, but I don't remember who they would
11  have been.  There's a few large companies we were
12  dealing with.
13        Phillips, if I remember correctly, we
14  dealt with them for a little bit.  There was
15  another company --
16    Q.  And again -- sorry, I don't want to
17  interrupt you, but just -- I want to know who you
18  called "the LCEC," not who you interacted with.
19    A.  I don't recall.  I mean, if -- you're
20  asking me things from such a long time ago.  If I
21  could give you specifics, I would, but I can't.
22    Q.  Okay.  Did you refer to any other
23  companies, anybody other than Apple, as "the LCEC"
24  in 2009?
25    A.  No, I don't believe so.

Page 171

1    Q.  Did you refer to any other companies as
2  "the LCEC" in 2010?
3    A.  I don't believe so.
4    Q.  Did you --
5    A.  I can't remember, but I don't -- I don't
6  think so.  I mean, it's hard.  It's hard for me to
7  recall back that far.  But I don't believe so.
8        If -- if -- when I testified two years
9  ago, which would have been two years closer to when
10  this happened, my memory would have probably been
11  better at that time.  But, you know, we're talking
12  two years afterwards.  So, yeah, time flies by you,
13  you forget things like that.  Especially when
14  you're dealing with a lot of other things.
15        But I do remember it means Apple in this
16  context.
17    Q.  Okay.  All right.
18        Can you go to the third page of
19  Exhibit 28, please.
20    A.  Sure.
21    Q.  And if you go down to the third full
22  paragraph.  So this is the one that says "Time to
23  go back."
24        Do you see that?
25    A.  Yes.

Page 172

1    Q.  Okay.  I'm just going to read that.  (As
2  read):
3        Time to go back into fund-raising
4        mode, and if any of you feel like
5        helping out with this effort, I would
6        certainly appreciate it.
7    A.  Sure.
8    Q.  (As read):
9        It's not like you are doing your
10        friends and family a bad thing by
11        getting them into GenAudio at this
12        stage in the game.
13    A.  Sure.
14    Q.  What did you mean by that?
15    A.  That meant if you had any friends or
16  family that were interested in investing, introduce
17  them to Jim Mattos or me, as they all knew that was
18  the protocol.  Not to try to solicit them other
19  than an introduction to me or Jim Mattos -- or
20  Paul Powers at the time as well -- and that we
21  would handle it from there.  So --
22    Q.  And what's --
23        Oh, go ahead.
24    A.  So, basically, it was more of a, you know,
25  I'm looking forward, I'm seeing we're going to need

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 173

1  additional development staff; I'm seeing we're
2  probably going to need to have money for business
3  travel; for marketing and promoting our product;
4  for continuing to do business.
5      I mean, it takes money to do business.
6  You can't -- certainly can't fly for free and stay
7  in hotel rooms for free with team members, or
8  attend Game Developer Conference or CES for free
9  either. Those all cost money.
10     And in order to have money, you usually
11 have to either raise money or you're independently
12 wealthy, and I burned through all my money already.
13     Q. All right. Mr. Mahabub, I'm going to hand
14 you what's previously been marked as Deposition
15 Exhibit 30 and Investigative --
16     A. Yeah.
17     Q. -- testimony Exhibit 121.
18         (Whereupon, Exhibit 30 was previously
19         marked for identification by the Court
20         Reporter.)
21     MS. VOORHEES: A new exhibit, yeah.
22         (Whereupon, Exhibit 211 was marked for
23         identification by the Court Reporter.)
24     MR. HOLMES: Oh, sorry. These were previously
25 marked as 29 and 30?

Page 174

1      MS. VOORHEES: They were previously marked as
2  29 and 30, but 29 is now also going to be 211.
3      MR. HOLMES: Okay.
4      THE WITNESS: Where are we going?
5  BY MS. VOORHEES:
6      Q. Do you recognize Exhibit -- I'm sorry.
7      Do you recognize Exhibit 30?
8      A. Same answer.
9      Q. Okay. Which means that you do not recall
10 the document, but you do not have any reason to
11 doubt that you sent or received the emails as
12 indicated?
13     A. That's correct.
14     Q. Do you recognize Exhibit -- what has now
15 been marked as Exhibit 211, which was previously
16 Deposition Exhibit 29 and Investigative Exhibit 61?
17     A. Okay.
18     Q. Do you recognize it?
19     A. Same answer.
20     Q. All right. Which means that you do not
21 recall the exhibit, but you do not have any reason
22 to doubt that you sent and received the emails as
23 indicated?
24     A. That's correct.
25     Q. Okay. All right.

Page 175

1      Mr. Mahabub, if you can compare the email
2  that begins on the first page of Exhibit 30 with
3  the second email on the first page of Exhibit 211,
4  it's the one that begins after "Forwarded Message."
5      A. Okay.
6      Q. So you'll see that on Exhibit 30 the email
7  is to Victor Tiscareno, Michael Hailey, and
8  Ronald Isaac.
9      A. Yeah.
10     Q. On Exhibit 211, it includes -- it adds the
11 words "Phil Schiller, Barry Corbet" -- "Corlet"?
12     A. "Corlett."
13     Q. "Corlett." And "Jim Tenneboe"; is that
14 correct?
15     A. Yes.
16     Q. All right. Did you add those names to the
17 email that we're looking at in Exhibit 211?
18     A. You know, I'm wondering if maybe they were
19 blind carbon copied over here on the other one.
20 That -- I was just thinking about that while I was
21 downstair -- I don't know. They could have been.
22 I don't remember. I can't recall. But -- yeah, I
23 just don't know.
24     Q. You would agree that in Exhibit 211, they
25 appear on a "To" line along with Mr. Tiscareno,

Page 176

1  Hailey, and Isaac; correct?
2      A. Yeah. I may have -- I may have just added
3  their names into the fields for the purposes of
4  forwarding to the team. But that would be the only
5  reason.
6      Q. Did you ever blind carbon -- blind carbon
7  copy Mr. Schiller on emails?
8      A. I don't remember.
9      Q. Did you ever blind carbon copy Mr. Corlett
10 on emails?
11     A. I don't remember.
12     Q. Did you ever blind carbon copy
13 Mr. Tenneboe on emails?
14     A. I don't remember that either. I do
15 remember having emails with -- with Barry and Jim
16 both on email chains. I don't remember. I just
17 can't -- I can't tell you. It's so long ago. I --
18 I don't remember.
19     Q. Okay. If you -- continuing to take a look
20 at both exhibits, you see that Exhibit 30 begins
21 with "Hi Michael, Ron, and Vic"?
22     A. Yes.
23     Q. Do you see that?
24         That is not included on Exhibit 211.
25     A. Uh-huh.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 253

1  deposition of Jerry Mahabub.  The time is 3:51.
2      Please proceed.
3      MS. VOORHEES: All right.
4      Q.  Mr. Mahabub, before -- I think after we
5  actually went off the record last time, you said
6  you thought you maybe had 30 minutes left to give
7  us in the deposition?
8      A.  Around there.
9      Q.  Okay.  So given that, and given that the
10 parties have agreed that we can reconvene this
11 deposition on February 8th, 2017, in Denver, we're
12 going to go ahead and conclude the deposition for
13 today.
14     A.  Okay.  That --
15     Q.  We will issue an amended notice that will
16 have you appear at our office in Denver on
17 February 8th, 2017.
18     A.  Okay.
19     Q.  Okay?
20     A.  That's great, yeah.
21     MS. VOORHEES: All right.  Thank you.
22     Counsel, anything else?
23     MR. MCCLOSKEY: So stipulated.  We'll see you
24 on the 8th.
25     MR. HOLMES: Yeah.

Page 254

1      MS. VOORHEES: Okay.  Sounds good.  Thank you.
2      THE WITNESS: Oh, wait.  And we just pick up
3  where we left off or --
4      MR. HOLMES: Yeah.  Yeah.
5      MS. HUGHES: We also wanted to stipulate that
6  the court reporter did not need to put on her
7  address, business address and those things at the
8  beginning and end of the deposition.
9      THE REPORTER: For the federal rule read on?
10     MS. HUGHES: Yes.
11     MR. HOLMES: So stipulated.
12     MR. MCCLOSKEY: So stipulated.
13     MS. VOORHEES: Agreed.
14     THE VIDEOGRAPHER: This concludes today's
15 deposition of Jerry Mahabub.  The number of DVDs
16 used was three.  The original media will be
17 retained at Behmke Reporting & Video Services,
18 Incorporated, located at 160 Spear Street,
19 Suite 300, San Francisco, California.
20     We're going off the record.  The time is
21 3:52.
22     (Off video record.)
23     THE REPORTER: Do you guys need certified
24 copies?
25     MR. HOLMES: No, I don't.

Page 255

1      Do you want -- are you getting a certified
2  copy?
3      MR. MCCLOSKEY: You guys get the original.
4      MS. VOORHEES: We noticed it.  We will get the
5  original.
6      MR. MCCLOSKEY: Yes, I want a certified copy.
7      THE REPORTER: Does anyone need a rough draft?
8      MS. VOORHEES: Whatever our order is.  We'll
9  have to get back to you on that.
10     (At 3:54 p.m., the deposition
11     proceedings adjourned to February 8,
12     2017.)
13
14
15
16     _____
17         TAJ JERRY MAHABUB
18
19
20
21
22
23
24
25

Page 256

1  STATE OF CALIFORNIA    )
2                         ) ss
3  COUNTY OF RIVERSIDE    )
4      I hereby certify that the witness in the
5  foregoing deposition, TAJ JERRY MAHABUB,, was by me
6  duly sworn to testify to the truth, the whole truth and
7  nothing but the truth, in the within-entitled cause;
8  that said deposition was taken at the time and place
9  herein named; and that the deposition is a true record
10 of the witness's testimony as reported by me, a duly
11 certified shorthand reporter and a disinterested
12 person, and was thereafter transcribed into typewriting
13 by computer.
14     I further certify that I am not interested in
15 the outcome of the said action, nor connected with nor
16 related to any of the parties in said action, nor to
17 their respective counsel.
18     IN WITNESS WHEREOF, I have hereunto set my
19 hand this 27th day of January, 2017.
20 Reading and Signing was:
21 _X_ requested ___ waived ___ not requested
22
23           _Paula A. Pyburn_
24
25     PAULA A. PYBURN, CSR NO. 7304, RPR, CLR

# In The Matter Of:

*Securities and Exchange Commission v.*
*Taj Jerry Mahabub, et al.*

*Taj Jerry Mahabub*
*Vol. 2*
*February 8, 2017*

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California  94105*
*(415) 597-5600*

Original File 31006MahabubV2.txt
Min-U-Script® with Word Index

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

Page 257

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3

4      - - - - - - - - - - - - - -

5      SECURITIES AND EXCHANGE      )

6      COMMISSION,                  )

7               Plaintiff,          )

8                                   ) CASE NO.

9      v.                           ) 1:15-cv-02118-CBS-WJM

10                                  )

11     TAJ JERRY MAHABUB, GENAUDIO, )

12     INC., and ASTOUND HOLDINGS,  )

13     INC.,                        )

14               Defendants.        )

15     - - - - - - - - - - - - - -

16

17        VIDEOTAPED DEPOSITION OF TAJ JERRY MAHABUB

18          WEDNESDAY, FEBRUARY 8, 2017

19          PAGES 257 - 541; VOLUME 2

20

21        BEHMKE REPORTING AND VIDEO SERVICES, INC.

22        BY:  BARBARA J. CASTILLO, RMR, CRR

23              160 SPEAR STREET, SUITE 300

24        SAN FRANCISCO, CALIFORNIA 94105

25                       (415) 597-5600

---

Page 258

8          Videotaped deposition of TAJ JERRY MAHABUB,

9      VOLUME 2, taken by Plaintiff, at 1691 Stout Street

10     Street, Suite 1700, Denver, Colorado, commencing

11     at 9:23 A.M., on WEDNESDAY, FEBRUARY 8, 2017,

12     before Barbara J. Castillo, Registered Merit Reporter,

13     Certified Realtime Reporter and Notary Public within

14     and for the State of Colorado, pursuant to Notice.

---

Page 259

1      APPEARANCES OF COUNSEL:

2      FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION:

3           SECURITIES AND EXCHANGE COMMISSION

4           BY:  DANIELLE R. VOORHEES, TRIAL COUNSEL

5                LESLIE HENDRICKSON HUGHES, TRIAL COUNSEL

6           1961 Stout Street, Suite 1700

7           Denver, Colorado 80294

8           Telephone: (303) 844-1000

9           Email:  voorheesd@sec.gov

10                  hugheslj@sec.gov

11

12     FOR DEFENDANT TAJ JERRY MAHABUB:

13          HOLMES, TAYLOR & JONES LLP

14          BY:  ANDREW B. HOLMES, ATTORNEY AT LAW

15          617 South Olive Street, Suite 1200

16          Los Angeles, California 90014

17          Telephone: (213) 985-2200

18          Email:  abholmes@htjlaw.com

---

Page 260

1      APPEARANCES OF COUNSEL - (CONTINUED):

2      FOR DEFENDANT GENAUDIO, INC.:

3           WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP

4           BY:  MICHAEL P. MCCLOSKEY, ATTORNEY AT LAW

5           655 West Broadway, Suite 900

6           San Diego, California 92101

7           Telephone: (619) 881-3326

8           Email:  michael.mccloskey@wilsonelser.com

9

10     ALSO PRESENT:

11          WALT MATHERN, VIDEOGRAPHER

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

Page 261

```
 1                    INDEX
 2   WEDNESDAY FEBRUARY 8, 2017
 3   TAJ JERRY MAHABUB - VOLUME 2           PAGE
 4      Examination By MS. VOORHEES          270
 5   P.M. SESSION                            386
 6      Examination resumed by MS. VOORHEES  386
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 263

```
 1              EXHIBITS - (CONTINUED)
 2            TAJ JERRY MAHABUB - VOLUME 2
 3   Number        Description               Page
 4   Exhibit 266   Email string, top message
 5                 from Jerry Mahabub to Paul
 6                 Powers and Mark Bobak,
 7                 9/7/10; Bates No.
 8                 SEC-MahabubJ-E-0005677
 9                 through 0005680 - 4 pages     376
10
11   Exhibit 267   GenAudio Shareholder
12                 Progress Report, February
13                 26, 2011; Bates Nos.
14                 GA005317 through 005339
15                 - 23 pages                    393
16
17   Exhibit 268   Email string, top message
18                 from Jerry Mahabub to Jay
19                 Rifkin and Phil Rodriguez,
20                 9/30/11; Bates No.
21                 SEC-MahabubJ-E-0020185
22                 through 0021086 - 2 pages     413
23
24
25
```

Page 262

```
 1                  EXHIBITS
 2            TAJ JERRY MAHABUB - VOLUME 2
 3   Number        Description               Page
 4   Exhibit 262   Email string, top message
 5                 from Jerry Mahabub to
 6                 littlebadass19@yahoo.com,
 7                 5/29/10; Bates Nos.
 8                 SEC-MahabubJ-E-0023379
 9                 through 0023389 - 11 pages    288
10
11   Exhibit 263   Audio Transcription, Pages 1
12                 through 56 - 56 pages         296
13
14   Exhibit 264   Letter from Jerry Mahabub to
15                 Shareholder, 8/28/10; Bates
16                 Nos.  SEC0000006 through
17                 0000009 - 4 pages             339
18
19   Exhibit 265   Email from Jerry Mahabub to
20                 Victor Tiscareno, 9/6/10;
21                 Bates No.
22                 SEC-TiscarenoV-E-0001264
23                 - 1 page                      376
24
25
```

Page 264

```
 1              EXHIBITS - (CONTINUED)
 2            TAJ JERRY MAHABUB - VOLUME 2
 3   Number        Description               Page
 4   Exhibit 269   Transcript of audio file
 5                 - 32 pages                    435
 6
 7   Exhibit 270   Printout of slides; Bates
 8                 Nos. SEC-Skluzak-E-0000392
 9                 through 0000425 - 34 pages    446
10
11   Exhibit 271   Affidavit of Jerry Mahabub
12                 in Support of Plaintiff's
13                 Response - 12 pages           458
14
15   Exhibit 272   Defendant Astound Holdings,
16                 Inc.'s Response to Plaintiff
17                 Securities and Exchange
18                 Commission's Second Request
19                 for Production of Documents
20                 and First Interrogatories
21                 Dated November 10, 2016
22                 - 7 pages                     494
23
24
25
```

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 265

```
1                  PREVIOUSLY MARKED EXHIBITS
2              TAJ JERRY MAHABUB - VOLUME 2
3      Number          Description              Page
4      Exhibit 31    Email string, top message
5                    from Gary Smith to
6                    psavio@genaudioinc.com;
7                    5/25/10; Bates No. JM002158
8                    through 002167 - 10 pages    273
9
10     Exhibit 32    Email string, top message
11                   from Jerry Mahabub to Victor
12                   Tiscareno, 5/25/10; Bates
13                   Nos.
14                   SEC-TiscarenoV-E-0001158
15                   though 0001162 - 5 pages     273
16
17     Exhibit 34    Email string, top message
18                   from Jim Mattos to Jerry
19                   Mahabub, 10/27/14; Bates
20                   Nos. JM002515 through 002518
21                   - 4 pages                    315
22
23
24
25
```

Page 266

```
1          PREVIOUSLY MARKED EXHIBITS - (CONTINUED)
2              TAJ JERRY MAHABUB - VOLUME 2
3      Number          Description              Page
4      Exhibit 35    Email string, top message
5                    from Jerry Mahabub to Victor
6                    Tiscareno, 7/2/10; Bates
7                    Numbers
8                    SEC-TiscarenoV-E-0001218
9                    through 0001221 - 4 pages    315
10
11     Exhibit 37    Letter from Jerry Mahabub to
12                   GenAudio Shareholders,
13                   8/1/10; Bates No. GA005351
14                   through 005353 - 3 pages     330
15
16     Exhibit 40    Email string, top message
17                   from Dell Skluzak to
18                   Jennifer Ostrom, 11/20/14;
19                   Bates Nos.
20                   SEC-Scluzak-E-0000905
21                   through 0000911 - 7 pages    404
22
23
24
25
```

Page 267

```
1          PREVIOUSLY MARKED EXHIBITS - (CONTINUED)
2              TAJ JERRY MAHABUB - VOLUME 2
3      Number          Description              Page
4      Exhibit 74    Compilation exhibit of a
5                    stock certificate and other
6                    documents; Bates Nos.
7                    Mahabub001659 through 001671
8                    - 13 pages                   468
9
10     Exhibit 138   Email string, top message
11                   from Jerry Mahabub to Victor
12                   Tiscareno, 9/1/10 - 9 pages   350
13
14     Exhibit 139   Email string, top message
15                   from Jerry Mahabub - 4 pages  361
16
17     Exhibit 170   Email string, top message
18                   from Richard DeVaul to Jerry
19                   Mahabub, 4/6/11; Bates Nos.
20                   347APL-00000066 through
21                   00000069 - 4 pages           397
22
23
24
25
```

Page 268

```
1          PREVIOUSLY MARKED EXHIBITS - (CONTINUED)
2              TAJ JERRY MAHABUB - VOLUME 2
3      Number          Description              Page
4      Exhibit 198   GenAudio Inc. Common Stock
5                    Transfer Ledger; Bates Nos.
6                    GA001816 through 001852 - 37
7                    - 37 pages                   462
8
9      Exhibit 242   Email string, top message
10                   from Jerry Mahabub, 7/3/09;
11                   Bates Nos.
12                   SEC-MahabubJ-E_0023817
13                   through 0023827 - 11 pages    436
14
15     Exhibit 257   Email string, top message
16                   from Jerry Mahabub to Dell
17                   Skluzak, 7/6/12; Bates No.
18                   SEC-ELLIOTT-E-0002702
19                   - 1 page                     502
20
21     Exhibit 258   Email from Jerry Mahabub to
22                   Dell Skluzak, 1/5/13; Bates
23                   No. SEC-ELLIOTT-E-0002703
24                   - 1 page                     513
25
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 269

1      WEDNESDAY, FEBRUARY 8, 2017; 9:23 A.M.
2
3           THE VIDEOGRAPHER: Good morning.  Here
4   begins DVD Number 1 of Volume 1 in the deposition of
5   Taj Jerry Mahabub in the matter of the United States
6   Securities and Exchange Commission v. Taj Jerry
7   Mahabub, et al., in the United States District Court
8   for the District of Colorado, Case Number
9   1:15-CV-02118.  Today's date is Wednesday,
10  February 8, 2017.  The time on the video monitor now
11  is 9:23 a.m.  The video -- video operator is Walt
12  Mathern, contracted by Behmke Reporting & Video
13  Services, Inc., 160 Spear Street, Suite 300, San
14  Francisco, California.  This video is taking place at
15  1961 Stout Street, Denver, Colorado and was noticed
16  by Danielle Voorhees.
17          Counsel, please voice identify yourself
18  and state whom you represent.
19          MS. VOORHEES: Danielle Voorhees and
20  Leslie Hughes on behalf of the Securities and
21  Exchange Commission.
22          MR. McCLOSKEY: Michael McCloskey on
23  behalf of GenAudio, Incorporated.
24          MR. HOLMES: Andrew Holmes on behalf of
25  Jerry Mahabub.

Page 270

1           THE VIDEOGRAPHER: The court reporter is
2   Barbara Castillo contracted by Behmke Reporting &
3   Video Services.  Will the reporter please swear in
4   the witness.
5               TAJ JERRY MAHABUB,
6   being first duly sworn in the above cause, was
7   examined and testified as follows:  Good
8               EXAMINATION
9   BY MS. VOORHEES:
10      Q    Good morning, Mr. Mahabub.  Thanks for
11  coming in again today.  Just to repeat a couple of
12  ground rules for the deposition, let's try not to
13  talk over each other.  The court reporter is trying
14  to take everything down.  If you don't understand the
15  question I'm asking, go ahead and stop me and ask me
16  to clarify.  Otherwise I'm going to assume that you
17  understood.  Is that fair?
18      A    Yes.
19      Q    Okay.  Verbal answers are important so
20  that the court reporter can actually note your
21  answer.  Let me know if you need to take a break.  As
22  long as there's not a question pending we can take
23  breaks as you need.  Is there any reason you cannot
24  testify fully and accurately today?
25      A    No.

Page 271

1      Q    Did you get enough sleep last night?
2      A    Some.
3      Q    All right.
4      A    Not much, but some.
5      Q    All right.  Did you do anything to prepare
6   for your deposition today?
7      A    Jumping jacks.  Not much, no.
8      Q    Okay.  Did you read any documents?
9      A    I did breeze through for the first time,
10  just kind of skimmed through the transcript from --
11     Q    Okay.
12     A    -- the initial.  Right.
13     Q    Okay.  So do you mean that you looked at
14  the investigative transcripts from the investigation?
15     A    I -- it was the transcript from when I was
16  deposed during that time, yes.
17     Q    Okay.  So the transcript of your testimony
18  from a couple years ago during the SEC investigation?
19     A    Correct.
20     Q    Okay.  Did you --
21          MS. VOORHEES: Sorry.
22          MR. HOLMES: Can we just take a 20 second
23  break?
24          MS. VOORHEES: Sure.
25          MR. HOLMES: Let's go off the record.

Page 272

1           THE VIDEOGRAPHER: The time now is 9:25.
2   We're off the record.
3           (Recess from 9:25 to 9:26 a.m.)
4           THE VIDEOGRAPHER: The time now is 9:26.
5   We're back on the record.
6      Q    (BY MS. VOORHEES)  Mr. Mahabub, you -- in
7   addition to reviewing your investigative testimony
8   transcript, did you do anything else to prepare for
9   today's deposition?  Did you look at anything else?
10     A    No, only that.  Hopefully I don't give as
11  long of answers as I did for that one because that
12  was big.
13     Q    Okay.  Did you review your deposition from
14  just a couple of weeks ago when we were out in Los
15  Angeles?
16     A    No.
17     Q    Did you review anybody else's testimony --
18     A    No.
19     Q    -- transcripts?  Did you look at any
20  documents?
21     A    No, nothing, just -- just that transcript.
22     Q    Just the transcript?
23     A    Yeah.
24     Q    Okay.  All right.  Mr. Mahabub, I'm going
25  to hand you what has previously been marked as

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

**Page 417**

1  passing by in the hallway type event and that was
2  that.
3      Q   Mr. Mahabub, you have testified several
4  times that you have never met Steve Jobs.  Are you
5  telling me that that's incorrect?
6      A   Not -- not in terms of a meeting for
7  AstoundSound I have never met Steve Jobs.
8      Q   Have you ever met Steve Jobs in your life?
9  Have you ever met Steve Jobs?
10     A   In passing in a hallway at Apple one time.
11  It was -- it wasn't even like a -- it wasn't a, hey,
12  how are you doing, I'm Jerry, let's go into a
13  conference room and have a meeting about
14  AstoundSound.  It was just a passing in the hallway
15  meeting, nothing at all, just that's it.
16     Q   So you are testifying that you met Steve
17  Jobs?
18     A   Not in the purpose of AstoundSound is what
19  I'm talking about.
20     MR. HOLMES:  Jerry -- Jerry, yes or no.
21     A   Yes.
22     Q   (BY MS. VOORHEES)  Okay.  You met Steve
23  Jobs?
24     A   Once at Apple in the hallway.
25     Q   When?

---

**Page 418**

1      A   I can't remember what date it was.
2      Q   How can you not remember that?
3      A   I just don't remember.  It was a long time
4  ago.  It was -- it was one of the trips that I had
5  over there and we were passing in the hallway and
6  that's it.  That was -- that was all it was.  It was
7  just a simple handshake meeting and -- and that was
8  it.  Nothing -- nothing bigger than that.
9      Q   Tell me everything you remember about that
10  meeting.
11     A   Walking down the hallway and he was
12  walking on the other side and --
13     Q   What hallway?
14     A   I don't remember which building.  Probably
15  the main Apple campus building, I would imagine, or
16  it might have been going toward the food court, if I
17  remember.  That's probably it.  I think it was -- I
18  don't really recall.  Like I said, it was just a
19  passerby meeting.  It wasn't anything, you know,
20  specifically related to Astound or anything like
21  that.
22         So stating that I met Steve Jobs here, it
23  could have been taken out of context, you know what I
24  mean, because it had nothing to do with AstoundSound,
25  per se, but --

---

**Page 419**

1      Q   I need you to tell me everything you
2  remember about the meeting with Steve Jobs.
3      A   There was nothing.  It was just a
4  handshake meeting.
5      Q   What -- who else was there?
6      A   I can't remember who else was there.  I
7  was walking to the food court.  Steve Jobs was at --
8  I think it was going to the food court or coming out
9  of the food court and Jobs was there and he was
10  coming out.  And I had a chance to shake the guy's
11  hand.  That's about it.
12     Q   Okay.  You shook his hand?
13     A   Yes.
14     Q   What were you wearing?
15     A   I don't remember.
16     Q   What was he wearing?
17     A   I was probably wearing my blue blazer or
18  something like that, you know.  Any time I go to a
19  meeting at Apple I usually wear a blue blazer or
20  something.
21     Q   What time of day was?
22     A   Lunchtime I'd say.
23     Q   Okay.  You think he would have been eating
24  at the food court?
25     A   Well, yeah.  It was lunchtime because

---

**Page 420**

1  that's where we were going.
2      Q   Were you with Mr. Tiscareno?
3      A   No.  I can't remember who I was with at
4  the time.  I don't think it was Vic.  It was one of
5  the other guys I just --
6      Q   Who else could it have been?
7      A   I don't remember.
8      Q   Who else did you -- who else escorted you
9  around the Apple cafeteria?
10     A   It may have been Vic's boss when I went in
11  for a meeting with him.  I really don't recall.  I
12  just remember going to the Apple -- I don't remember.
13     Q   Do you remember anything else about this
14  meeting?
15     A   No, because it wasn't a meeting about
16  AstoundSound, per se.  It was just like a -- you
17  know, I was wearing a -- a GenAudio name badge.  I
18  know that.
19     Q   Okay.  Why do you remember that?
20     A   Because any time you check in at the
21  campus they give you like a little name badge that
22  you wear.
23     Q   Do you recall why you were on the Apple
24  campus?
25     A   I don't remember what -- what the purpose

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 421

1  of the meeting was at that time, no, but that's -- my
2  only disclosure to you is it was a passersby like
3  hallway type meeting, you know.  It wasn't anything
4  -- when I say meeting I don't mean a meeting, per se,
5  that was set up for AstoundSound.  Does that make
6  sense?  It had nothing to do with that.  It was just
7  a meet and greet like, you know.
8      Q    Did somebody take you over to Mr. Jobs and
9  introduce you?
10     A    No.  No.  He was -- he was just walking by
11  and I shook his hand and said, I'm Jerry, you know.
12  And he was like, yeah, and kind of walked away.  That
13  was about it.
14     Q    So you just walked up to Mr. Jobs and
15  shook his hand?
16     A    Yeah, which apparently you're not supposed
17  to do at Apple.  Don't look Steve in the eyes kind of
18  a thing, you know.
19     Q    How did you come to learn that?
20     A    Ronald Isaac told that to me and I think a
21  couple of other people as well.
22     Q    And was that before or after you met
23  Mr. Jobs?
24     A    I think it was afterwards, if I remember.
25  I'm not sure.  The timelines are a little off on that

Page 422

1  one, but, yeah, it was one of the times I was there,
2  and he was sitting down eating lunch and we were
3  walking -- we were walking in.  I think I actually
4  sat down and ate.
5      Q    Who's we?
6      A    That's what I'm trying to remember who --
7  I can't remember who I was with.
8      Q    You certainly weren't alone?
9      A    No.
10     Q    Okay.
11     A    I just don't remember who I was with.
12     Q    Okay.
13     A    And I had gotten up to go get something
14  and he was walking out and I was walking in the other
15  direction and shook his hand, but that was it.  That
16  was the only time I actually ever had any type of
17  interaction with him.
18     Q    So you're in the cafeteria with someone
19  who you can't recall?
20     A    It was one of the guys that -- I don't
21  think it was Vic, though.
22     Q    Okay.  So it could have been Mr.
23  Tiscareno's boss?
24     A    I think it was after Vic had already
25  retired, yes.

Page 423

1      Q    Okay.  So that should limit our potential
2  players, right?
3      A    (Deponent nodded head.)
4      Q    So Mr. Tiscareno has retired.  It could
5  have been his boss, whose name you can't remember.
6      A    Right.
7      Q    You -- so you met with Mr. Tiscareno's
8  boss without Mr. Tiscareno present?
9      A    One time, yes.
10     Q    Okay.
11     A    But it could have been that time, but --
12  and then there were another couple of engineers I was
13  working with, and I can't remember their names
14  either.  I just don't remember.
15     Q    Okay.  But -- so I want to know though the
16  class of people it could have possibly been, because
17  I've got to run this down.
18     A    Yeah.
19     Q    So it could have been Mr. Tiscareno's
20  boss.  It could have been who else?  Who else are
21  possibilities?
22     A    I don't -- I don't remember, honestly.  I
23  -- it's -- I don't.
24     Q    I know you don't remember.  But who else
25  did you interact with at Apple after Mr. Tiscareno

Page 424

1  retired?
2      A    Primarily Ronald Isaacs.  Jim Tenneboe was
3  another guy I interacted with, Vic Tiscareno's boss.
4  And then there were two engineers, and I can't
5  remember what their names were, and they were in the
6  Mac division, but I don't remember what their names
7  were.
8      Q    Okay.  They were in the Mac division?
9      A    Yeah.
10     Q    Okay.
11     A    But that was it.
12     Q    Did you ever have lunch with those people?
13     A    I just -- I honestly do not recall.  If I
14  did I would tell you.
15     Q    Okay.  So you are walking out of the Apple
16  cafeteria, Mr. Jobs is walking in, you believe?
17     A    No.  I think he was sitting down eating
18  with someone else, and, you know, it was pretty
19  obvious that he was there.  And then I got up and
20  went to go -- I went to the bathroom, went back to
21  get a drink or something like that and I had -- we
22  were just sort of passing and, you know, I stuck out
23  my hand and said, hi, I'm Jerry, you know, or -- and
24  then he stuck out his hand and shook my hand and that
25  was about it.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 425

1    Q    Did you say anything to him beyond, I am
2    Jerry?
3    A    No.
4    Q    Did he say anything to you?
5    A    Not really, no.
6    Q    Did he say anything to you?  You said not
7    really.  What did he say to you?
8    A    He just looked at me and said let's --
9    something like -- it was more like -- what's the
10   easiest way to put it to you, like pushing me away
11   kind of an attitude more than anything, I think.
12   Q    Okay.  Did he shake your hand?
13   A    He did.
14   Q    And -- then what made you feel like he
15   was pushing you away?
16   A    Well, he didn't really say anything.  He
17   shook my hand, walked away, you know.
18   Q    Okay.  Was he with somebody?
19   A    I don't think -- I mean -- I think he was
20   with someone he was eating lunch, right, like two or
21   three people.  When he was walking by me, no.
22   Q    Okay.  So he was standing up --
23   A    Yeah.
24   Q    -- when you shook his hand?  Was anybody
25   with you?

Page 426

1    A    No, not -- the guy I was having lunch with
2    was sitting at the table.  I just don't remember who
3    it was.
4    Q    Who did you tell at -- did you tell
5    somebody at Apple that you had just met Steve Jobs?
6    A    No.  I remember mentioning something to
7    Ron about it, and Ron is like, oh, don't ever look
8    Steve Jobs in the eye, you know, he's kind of like --
9    gave me something like that.  And I'm like I shook
10   the guy's hand.  I don't know what to tell you, but
11   he --
12   Q    I'm sorry, I want to stop you right there.
13   So you told Mr. Isaac that you shook Steve Jobs's
14   hand?
15   A    I think that's why he made that -- that
16   thing up, like, you know, don't look Steve Jobs in
17   the eye when you're walking down the hallway kind of
18   thing.  That's what he told --
19   Q    I just need a yes or no to this question,
20   though.  Did you tell Ron Isaac, I just shook Steve
21   Jobs's hand?
22   A    No, not just shook.  It might have been
23   like after the fact or something.  I don't exactly
24   recall what the situation or the circumstances were,
25   but . . .

Page 427

1    Q    But you told Mr. Isaac that you had met
2    Steve Jobs?
3    A    I think -- I think I did, yeah, because
4    that's why he gave me the story, you know, don't look
5    Steve Jobs in the eye kind of thing, you know, when
6    you're walking around the hallways is what he said,
7    something along those lines.
8    Q    Did you tell Mr. Tiscareno that you had
9    met Steve Jobs?
10   A    Mr. Tiscareno wasn't there at the time.
11   Q    Well, no, ever.  Did you tell him ever
12   that you met Steve Jobs?
13   A    No.
14   Q    Why not?
15   A    It wasn't -- it had nothing to do with
16   what we were doing really.  I mean, it was
17   unimportant.
18   Q    Well, it ends up in this email that is
19   about Mr. Tiscareno and Mr. Franzi, right?
20   A    Yeah.  Yeah, it ends up in this email,
21   just -- you know, I'm just letting the board know
22   that, you know, if he were to ever remember me and we
23   were to do something, you know, that maybe it would
24   mean something.  It really -- it's -- it can be taken
25   out of context here, but like I said, it's email to

Page 428

1    the board members.
2    Q    Did you tell Mr. Jobs your last name?
3    A    No.
4    Q    Did you tell him where you worked?
5    A    No.
6    Q    Did you mention GenAudio?
7    A    No.
8    Q    Did you mention AstoundSound?
9    A    Nothing.
10   Q    You said nothing other than, hi, I'm
11   Jerry?
12   A    That's about it.
13   Q    Is that it it?
14   A    That's it.  Yeah.  I mean, really not much
15   more time to do anything but that.
16   Q    Okay.
17        MS. VOORHEES:  Let's go off the record.
18   A    But that's the only time ever, yeah.
19        THE VIDEOGRAPHER:  The time now is
20   17 minutes after 2:00.  We're off the record.
21        (Recess from 2:17 to 2:34 p.m.)
22        THE VIDEOGRAPHER:  The time now is 2:34
23   and we're back on the record.
24        Q    (BY MS. VOORHEES)  All right.  Mr.
25   Mahabub, do you understand you're still under oath?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 429

```
 1    A    Yes.
 2    Q    Okay.  Other than the encounter with
 3   Mr. Jobs that you have just testified to in the Apple
 4   cafeteria after Mr. Tiscareno had retired, did you
 5   ever otherwise meet Steve Jobs?
 6    A    First of all, I want to clarify, honestly,
 7   it could have been before, it could have been after.
 8   I don't recall.  So I just really don't.  It was an
 9   encounter, very brief and that was that.  So when it
10   happened I can't tell you.  I mean, I wish I could
11   but I can't.  And no, there are no other interactions
12   after that other than the email interaction that I
13   had.  That was about it.
14    Q    All right.  So let's -- let's talk about
15   the timing thing.  Do you think that you Mr. -- met
16   Mr. Jobs before you emailed him?
17    A    I can't -- I do not recall.  I'm sorry.  I
18   don't remember.
19    Q    You seemed fairly certain that Mr.
20   Tiscareno was not at Apple at the time.  Are you now
21   saying you're not sure about that?
22    A    I'm not sure, no.  I just don't -- I'm
23   putting out possibilities when I say that, and I
24   probably shouldn't do that.  I just don't -- don't
25   recall.
```

Page 430

```
 1    Q    Do you recall actually meeting him in the
 2   cafeteria?  Is that a thing that really happened?
 3    A    Yeah.  But it was -- it was just like --
 4   like I said, it was a handshake meeting.
 5    Q    I don't need you to re-testify if what
 6   you've previously said is true.
 7    A    Yes.
 8    Q    Okay.  So you know that that happened?
 9   You remember shaking Mr. Jobs' hand?
10    A    And that was it, yeah.
11    Q    Okay.  But you now are not sure whether or
12   not that happened before or after Mr. Tiscareno
13   retired?
14    A    I don't recall when, no.
15    Q    Was Mr. Tiscareno with you?
16    A    I don't think so.  I just don't remember
17   who was with me at the time.  I had so many meetings
18   at Apple.  I mean, many, many times I was on that
19   campus with meetings.  So I just don't know.
20    Q    But only one time did you encounter Steve
21   Jobs, right?
22    A    Yep, that's right.
23    Q    And you still can't remember?
24    A    Well, that's not -- I mean, encountering
25   him, he's all over.  He walks around the campus.  So
```

Page 431

```
 1   I mean, you could be somewhere and he'll be, you
 2   know, right over there talking with someone else.
 3   You know, it doesn't mean you go run up and interrupt
 4   the guy or anything like that.  But as far as actual,
 5   you know, handshake with him, that only happened
 6   once, yes.
 7         And I was like -- you know, I was pretty
 8   choked up by the whole thing.  It was even hard for
 9   me to speak.  It's like, you know, I'm not worthy
10   kind of thing, you know.
11    Q    Okay.  So -- so you -- did you ever shake
12   Mr. Jobs' hand other than what you just described?
13    A    No.
14    Q    Did you ever talk to him about GenAudio
15   ever?
16    A    Other than email, no.
17    Q    Okay.  Other than the email that we've
18   marked and looked at, right?
19    A    Yes.
20    Q    So other than that you never spoke to him
21   about GenAudio, correct?
22    A    No.
23    Q    Other than that, did you ever communicate
24   with him about AstoundSound?
25    A    No.
```

Page 432

```
 1    Q    Okay.  Other than the encounter in the
 2   cafeteria that you testified to and the email that we
 3   looked at in Exhibit 138 and 139, did you have any
 4   other communications with Mr. Jobs?
 5    A    No.
 6    Q    If you could take a look at Exhibit -- how
 7   many -- let me ask you this.  How many times did you
 8   eat lunch in the Apple cafeteria?
 9    A    God, I can't -- I mean, at least probably
10   maybe ten times, a dozen times, I would say.
11    Q    Okay.  How did you pay?
12    A    Did I pay or did Vic pay or the person I
13   was with, Ron.  Whoever I was with usually paid
14   because whoever you're with, they'll -- the Apple
15   employee, they will cover your lunch for you, you
16   know, so, yeah.
17    Q    Okay.  If you could take a look at
18   Exhibit 268 again.
19    A    Uh-huh.
20    Q    So back on that same sentence that says, I
21   have met Steve Jobs, Phil Schiller -- did you meet
22   Phil Schiller?
23    A    I think that's a mistake.  No.  Scott
24   Forstall --
25    Q    Hold on.  Let's -- let's stick with Phil
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 433

1    Schiller.  So you never met Phil Schiller?
2    A    No.
3    Q    Okay.  Who is Scott Forstall?
4    A    He used to be there.  There was a guy that
5    -- that put me in touch with Vic named -- I gave you
6    his name the other day, and I can't -- I can't
7    remember it now.  He was a senior vice president of
8    iPod division.  He's the guy that I initially
9    interacted with at Apple.  He's the guy that put me
10   in touch with Vic.
11   Q    Barry Corlett?
12   A    No.  No.  No.
13   Q    Okay.  All right.  So that's -- sorry.
14        MS. HUGHES:  Tony Videll (phonetic).
15   Q    (BY MS. VOORHEES)  Tony Videll?
16   A    Tony Videll, yes.  And Tony Videll also
17   put me in touch with this guy, Scott Forstall,
18   initially at the very beginning.  So I met with
19   Scott, and there was another guy who was a VP.  I
20   can't remember what his name was.  Victor brought him
21   into the first -- you know, when I brought speakers
22   up there and stuff like that and actually gave a
23   demo.  Ted Cohen was there.  Toby was there.  Jerry
24   Bentley, one of my sound engineers was there, and I
25   was there.  There was a VP there.  I just can't

Page 434

1    remember his name.
2    Q    And Scott Forstall was there?
3    A    Scott Forstall is one of the guys that
4    popped in, yes.
5    Q    Okay.  And then you write, And many other
6    executive team members at Apple.  Who's that in
7    reference to?
8    A    Just people who I had met whenever I had
9    gone up there.  I don't know necessarily if executive
10   team members is the right way to say that.  I think
11   that's probably not correct.  Management team members
12   is probably a better way to say it.
13   Q    Okay.  Were there any other executive team
14   members then?
15   A    No.  No, not that I can recall.  I mean,
16   I've been in rooms with a lot of people, you know,
17   giving demos, so who knows if one of them was an
18   executive.  I don't know.  I don't remember.  I think
19   they were mostly engineers though.
20   Q    All right.  Mr. Mahabub --
21        MS. VOORHEES:  Let's mark this, I guess.
22   A    Scott Forstall is no longer with the
23   company, I don't think, anymore.
24        (Exhibit Number 269 was marked.)
25        MR. HOLMES:  Is this different than --

Page 435

1        MS. VOORHEES:  Yes.
2    Q    (BY MS. VOORHEES)  All right.  Mr.
3    Mahabub, you have been handed -- this is the exhibit
4    we're on now.
5    A    Okay.
6    Q    You have been handed what's been marked as
7    Exhibit 269.  This is another transcript that the SEC
8    had made of an audio file.  I think it's actually an
9    audio and video file in this instance --
10   A    Uh-huh.
11   Q    -- that was produced to us.  I believe
12   that the name of the file was GenAudio, underscore,
13   investor, underscore, presentation, underscore,
14   111511.  And, again, I'm just going to play the very
15   beginning of the file and just ask you to tell me if
16   you recognize the voice.
17        (Audio recording of Exhibit 269 was
18        played.)
19   Q    (BY MS. VOORHEES)  Is that your voice, Mr.
20   Mahabub?
21   A    Yes.
22   Q    Okay.  And do you recall putting together
23   this presentation?
24   A    Well, not, you know -- for whatever I can
25   remember of it.  Yeah.  We put together quite a few

Page 436

1    presentations.  So if you ask me do I specifically
2    recall this, no, but I have no reason to doubt that
3    we did.
4    Q    Okay.
5        MR. HOLMES:  There was a video that went
6    with that.
7        MS. VOORHEES:  There is a video that comes
8    on my computer with this one.
9    Q    (BY MS. VOORHEES)  Okay.  Well, do you
10   recall whether or not this was a presentation that
11   was given around November of 2011?
12   A    I wouldn't remember the date.  I'm sorry.
13   Q    Okay.  Do you recall the purpose of the
14   presentation?
15   A    No.  I'd have to read through it to see
16   what it was about here.
17   Q    All right.  We'll not do that today.  All
18   right.  Mr. Mahabub, I'm going to hand you a document
19   that was recently marked as Exhibit 242, but I don't
20   have the stamped copy of it yet.
21        MS. VOORHEES:  So if we could just
22   indicate on the transcript that this is Exhibit 242
23   even though it's not stamped.
24   A    Do you have a cleaned up version of this
25   one, by any chance?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 457

1  A   Yeah.
2  Q   Okay.  Did he ask you orally, in writing?
3  A   It was on the phone, yeah.
4  Q   Okay.  And you're not sure whether or not
5  you've provided that information?
6  A   I can't remember, yeah.  I just -- I don't
7  think we did.
8  Q   Why not?
9  A   Because I was embarrassed by the financial
10  statements and I wanted to see if we couldn't clean
11  them up a little bit before sending them to Apple and
12  we look like a bunch of idiots.
13  Q   All right.  So it sounds like your best
14  recollection is you probably didn't provide that
15  information?
16  A   Right.
17  Q   Did you ever provide Apple with any
18  information about GenAudio's contracts or policies
19  and procedures, employment agreements, you know,
20  copies of any policies?
21  A   No.
22  Q   Shareholder information?
23  A   Maybe.  Maybe like number of shareholders
24  or something like that but never, you know, anything
25  specific.  It was just like very -- very generic

Page 458

1  information.
2  Q   Okay.  You said maybe number of
3  shareholders?
4  A   Yeah.
5  Q   Okay.  Do you actually recall providing
6  that to someone?
7  A   In a conversation I think, yes, but not
8  formally like in writing as a detailed document
9  approved by the board to send to them.
10  Q   Did -- did GenAudio and Apple ever
11  exchange any draft term sheets?
12  A   Not that I recall.  No, because we never
13  got that other set of agreements, so no.
14  Q   All right.  Mr. Mahabub, I'm going to
15  switch gears here for a second and ask you a couple
16  of questions about your personal stock sales.
17  A   Yeah.
18     (Exhibit Number 271 was marked.)
19  Q   (BY MS. VOORHEES)  Mr. Mahabub, you've
20  been handed what's been marked as Exhibit 271.  This
21  is an affidavit of Jerry Mahabub in support of
22  plaintiff's response in an action captioned Jim
23  Mattos versus GenAudio, Inc. in District Court,
24  Arapahoe County, Colorado.  The exhibit consists of
25  the affidavit, a verification and acknowledgment, a

Page 459

1  California jurat with affiant statement and then
2  Mahabub Exhibit D.  If you could just take a minute
3  and flip through this, let me know if you recognize
4  it.
5     MR. HOLMES: It's 271?
6     MS. VOORHEES: Yes, 271.
7  A   I'm not sure.  No, I don't recognize this.
8  I'm trying to figure out what this is in reference
9  to.
10  Q   (BY MS. VOORHEES)  Okay.
11  A   It's an affidavit.
12  Q   Yes.  If you go to the third page of the
13  document, so where your signature -- is that your
14  signature?
15  A   Yes.
16  Q   Okay.  Did you sign this affidavit?
17  A   I believe so, yes.  I think this is --
18  yeah.  Yes.
19  Q   Okay.  I just want to ask you about a
20  couple of statements in the affidavit just to confirm
21  them.  So Paragraph 3 on the first page of
22  Exhibit 271.
23  A   Okay.
24  Q   The first sentence reads, I served as
25  GenAudio's CEO from October 1st, 2008, to

Page 460

1  January 30th, 2014, and then it goes on.  Is that
2  accurate?  Were you the CEO from October 1st, 2008,
3  to January 30th 2014.
4  A   That is correct.  Actually, it was before
5  that date but for -- yes, but also before.
6  Q   Okay.  Okay.  But also before.  All right.
7  If you go to Paragraph 7, so that's on the next page.
8  A   All right.
9  Q   So Paragraph 7 says, Further, I have sold
10  num-- numerous shares of my stock over the years
11  with the initial sales of my personal shares
12  occurring in Q4 2008 and Q1 2009 when I sold my
13  shares to Mr. Bobak and Mr. Paul Powers, both
14  attorneys and at the time members of the board.  Is
15  that accurate?
16  A   That's accurate.
17  Q   Okay.  If you go down to Paragraph 8, it
18  says, I made similar sales of my personally indicated
19  stock at steep discount between the end of 2008
20  and 2013, including two transactions with
21  Mr. Skluzak, one of which was for 400,000 shares at
22  an extremely low price per share of 25 cents, in
23  parens, a hundred thousand dollars.  Is that correct?
24  A   That's correct.
25  Q   It goes on to say, And a substantial

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 461

1   portion of the proceeds from these stock sales was
2   invested in a studio facility in Los Angeles that
3   became the backbone of the GenAudio, Inc.'s
4   technology and business development efforts, and a
5   substantial portion went to fund GenAudio's business,
6   marketing, promotions and trade show events, software
7   development and operations.  Is all of that true?
8       A   Yes.
9       Q   Okay.  Paragraph 9 says, All totaled, I
10  sold seven million five hundred and -- five thousand
11  eight hundred shares to 129 investors between 2008
12  and 2013.  Is that accurate?
13      A   I believe so, yes.
14      Q   Okay.  And then later on in the paragraph
15  there's a reference to attached as Mahabub Exhibit D
16  is a chart summarizing the sale of my personal stock,
17  which includes any transfers of such stock.  Do you
18  see that?
19      A   Exhibit E, you mean, right?
20      Q   No.  I'm sorry, that's Exhibit D.
21      A   Oh, on the top one.  Yes.  Okay.
22      Q   Yeah.  So then if you flip to the last
23  couple pages of the document, which are Mahabub
24  Exhibit D.
25      A   Okay.

Page 462

1       Q   Do you recognize this chart?
2       A   I recognize it, yes.  I'm not sure if it's
3   accurate, but I recognize the chart, yes.
4       Q   Do you have any reason to doubt that it's
5   accurate if it's attached to your affidavit?
6       A   No.
7       Q   Okay.  How did -- how was this chart put
8   together?
9       A   I'm trying to remember.  I don't remember.
10  Probably Jim Devine, I would imagine, must have put
11  this together from the stock transfer ledger maybe.
12      Q   Did you review the chart before you
13  submitted this affidavit to the court?
14      A   I did.
15      Q   And at the time that you had it submitted
16  did you believe that it was accurate?
17      A   I believe so, yes.
18      Q   Mr. Mahabub, I'm going to hand you what's
19  been previously marked as Exhibit 198.  It's
20  GenAudio, Inc. common stock transfer ledger.
21      MS. VOORHEES: And, Counsel, this is one
22  of the documents that was used yesterday.
23      Q   (BY MS. VOORHEES) Do you recognize
24  Exhibit 198?
25      A   This is more Jim Devine's department than

Page 463

1   mine.
2       Q   Okay.
3       A   So yeah.  I mean, I recognize it, but it's
4   not my cup of tea.  I had him deal with this kind of
5   stuff.
6       Q   Okay.  And did you believe that Mr. Devine
7   was capable of handling -- you know, keeping track of
8   the transfer of GenAudio stock?
9       A   At the time he was doing it, yes.
10      Q   Okay.  I want to ask you a few questions
11  about just the first several entries on the very
12  first page of Exhibit 198.
13      Q   Okay.
14      Q   So you see that the first three entries
15  all relate to you.
16      A   Yes.
17      Q   So the first one says Mahabub, Jerry with
18  an issue date of May 21st of 2003, and it lists the
19  6.7 million shares.  Do you see that?
20      A   I do.
21      Q   And then if you go all the way over to the
22  -- well, it's the -- the column that says, Shares
23  surrendered.  Do you see that?
24      A   Yes.
25      Q   And it shows over 7 million shares and

Page 464

1   then it shows basically a deficit of about 392,000
2   shares.  Do you see that?
3       A   I do.
4       Q   Okay.  Excuse me.  Is -- is that accurate?
5       A   No.
6       Q   Okay.  What -- what is inaccurate about
7   that?
8       A   I was also -- there were shares that I
9   received in exchange for debt that the company owed
10  me.  In 2009 I think Paul Powers and the board all
11  voted for that.  Basically I was loaning sums of
12  money to the company from the sales of my stock
13  primarily, but I was putting it back in the company.
14  Then something where they -- we decided to reduce the
15  debt of the company and then give me -- so I sold the
16  shares at a much discounted rate and then exchanged
17  the debt in at a rate that was like two, three times
18  as high, I mean.
19      Q   Okay.
20      A   Does that make sense?
21      Q   Well --
22      A   It's hard to understand, I know.  But it's
23  like -- so that number is actually -- if this is done
24  by date in chronological order and that was the
25  formation of the company, that would probably be

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 473

1   understand, Mr. Mahabub, that the thought -- the idea
2   that you could sell your personal shares begins
3   sometime in 2009 with sales to Mr. Powers and Mr.
4   Bobak; is that accurate?
5       A    That's correct.
6       Q    And in connection with those sales you end
7   up using some of the money for the company so that
8   you can attend CES; is that correct?
9       A    I think it was all of the money --
10      Q    Okay.
11      A    -- at that time.
12      Q    All of the money.  So basically all of the
13  money was used on behalf of the company; is that
14  correct?
15      A    Yeah.
16      Q    Okay.  So without getting necessarily into
17  the specifics of any particular stock sale on a
18  moving forward basis then, what was the process for
19  you selling your personal shares?
20      A    Yeah.  Basically it was more of a -- like
21  I said, I tried to limit it to friends and family
22  only.
23      Q    Like your friends and family?
24      A    My friends and family, yes.
25      Q    So how did someone like Mr. Marvin end up

Page 474

1   investing?
2       A    He was either a friend, a family of mine
3   or a friend or family member of Jim Mattos's.  I
4   think it's on my side because it's St. Louis.  So it
5   would have been like, you know, one of my family
6   members or friends that introduced him most likely.
7       Q    Oh, I understand.  So by friends and
8   family you mean one of your friends or family would
9   introduce Mr. Marvin to you?
10      A    To me.
11      Q    Okay.  Have you met Mr. Marvin?
12      A    I have, yes.
13      Q    Okay.  When -- when have you met him?
14      A    In St. Louis at a shareholder presentation
15  once.
16      Q    And was that after he was already a
17  shareholder?
18      A    Yes.
19      Q    Okay.  Did you meet him before he
20  purchased shares from you?
21      A    I don't believe so, no.
22      Q    Okay.
23      A    I don't remember, but I don't think so.
24      Q    Do you know how he came to purchase shares
25  from you?

Page 475

1       A    I don't recall.
2       Q    Who drafted the stock sale and purchase
3   agreements that you used in connection with your
4   personal stock sales?
5       A    Paul Powers, Ben Huber and Mark Bobak.
6       Q    Okay.  And were the stock sale and
7   purchase agreements that you used for your personal
8   sales intended to be used for all of your personal
9   sales or just for the ones to Mr. Bobak and Powers?
10      A    I don't know the answer to that question.
11  I know that for the initial ones that we did it was
12  Pedro Sorrez (phonetic), Paul Powers, Mark Bobak, and
13  I think like Steve Bagwell was another guy on that
14  list.  They -- pretty much the board was encouraging
15  me more or less to do it.  So --
16          MR. HOLMES:  Jerry, pay attention to the
17  question.
18      A    Yeah.  No.  There was a board resolution
19  for it and that's -- yeah.
20      Q    (BY MS. VOORHEES)  Okay.  So -- so there's
21  definitely -- there's definitely a drafting of these
22  documents in connection with your sale to those
23  people; is that correct?
24      A    To those people and also for -- you know,
25  like I said, the board had encouraged me that if I

Page 476

1   wanted to do that because the studio that was
2   starting to get built out by the company, pretty much
3   owed all the board members agreed, you know, not to
4   continue to build it because of money, right.  So I
5   knew that the studio would be above critical
6   component for the company rolling forward.
7          So what I did was continued to sell my
8   personal shares to, A, continue to loan money to the
9   company to keep it operating and, B, build out the
10  studio.  And that's why I outright own the studio.
11      Q    Okay.  And so in connection with doing
12  that you continued to use the stock sale and purchase
13  agreements that had been drafted for the sale to
14  those four or five people that you named?
15      A    That's right.
16      Q    Okay.  So then how -- who actually would
17  edit the document, like, for example, the one that
18  we're looking at in Exhibit 74 so that it includes
19  Mr. Marvin's name as the purchaser, for example?  How
20  did that happen?
21      A    That was me.
22      Q    You would do that?
23      A    (Deponent nodded head.)
24      Q    Okay.  And did you do that for all of your
25  stock sales?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 477

1      A     Yes.
2      Q     Okay.  What about the irrevocable proxy
3  agreement that's also attached?  Is that the same
4  situation?
5      A     Same situation.
6      Q     Okay.  So that -- that was drafted in
7  connection with the initial -- in connection with the
8  stock sale to several people in 2009 and then you
9  continued to use it on a going forward basis?
10     A     That -- that's correct, yes, to build out
11  the studio and to continue to loan money to GenAudio,
12  and also during large gaps of the company when, you
13  know, I'd pay all the rest of the teach members
14  except myself.  So I mean, there are times when I'd
15  go three or four years without payroll, but everybody
16  else would get paid but me just to make sure that,
17  you know, if I'm loaning money to the company to pay
18  everyone, I'm certainly not going to loan money to
19  the company to pay myself again, you know.  So it
20  was --
21          MR. HOLMES:  Jerry, she asked whether, not
22  why.
23          THE DEPONENT:  Okay.  All right.
24          MR. HOLMES:  You answered it a long time
25  ago.

Page 478

1      Q     (BY MS. VOORHEES)  Mr. Mahabub, why did
2  you maintain the proxy rights?
3      A     I think that the purpose of that was
4  because they were my founder shares that, you know,
5  I'm the inventor of the technology and since I'm
6  doing that, then, you know, one of the main
7  objectives was to reduce the price per share, and the
8  reason for the reduction was because they were
9  non-voting -- one of the reasons of the reduction in
10  price per share is because they were non-voting
11  shares.
12     Q     Other than the documents we're looking at
13  in Exhibit 74, which are an example related to
14  Mr. Marvin, did investors who purchased your personal
15  shares get any other documents?
16     A     Well, of course, yes.  If they ever needed
17  -- if someone would come in, I would usually -- if
18  there was a previous offering that we had, you know,
19  done maybe, per se, I would send that to them just so
20  they'd have, you know, risk factors and things like
21  that they can review, that kind of stuff, and
22  understand, you know, speculative deal, that kind of
23  stuff.
24     Q     So you would provide investors with a copy
25  of the private placement memoranda?

Page 479

1      A     A previous one, or if there was one maybe
2  that -- I think at very rarely, very rarely did I do
3  this, but there are like a few times when I sold
4  stock during the time of an official company offering
5  that was open on the table, and I would have either
6  done that because, you know, build-out of the studio
7  was happening or because GenAudio needed more money.
8  It's the bottom line.  Because whatever reason the
9  offer wasn't working, so I'd go to my friends and
10  family and they'd say, well, you know, we -- we'd
11  rather invest in the discounted shares because we
12  don't care about the voting rights, you know.
13          MR. HOLMES:  Jerry, she's -- you're
14  answering something she didn't ask.
15          THE DEPONENT:  Oh, okay.  I'm sorry.
16          MR. HOLMES:  Listen to the question and
17  try to stick with it as best you can.
18          THE DEPONENT:  Yeah.  Okay.
19     Q     (BY MS. VOORHEES)  Let me just see if I
20  can summarize.  If the personal stock sales were
21  occurring after another offer -- offering had ended,
22  you would send the previous offering materials to the
23  investor, correct?
24     A     That's right, yes.
25     Q     If an offering was ongoing and you were

Page 480

1  still engaging in personal stock sales, you'd send
2  those current offerings?
3      A     The current offering, yeah.
4      Q     Did you keep any records or any documents
5  of any sort showing what copies of private placement
6  memoranda actually went to each investor?
7      A     I don't think so, no.  I mean, maybe
8  through -- through emails or something there might be
9  attachments.  I don't know.
10     Q     Okay.  But other than maybe it wound up
11  some somebody's email, you do not have like a log or
12  anything like that?
13     A     No.
14     Q     Okay.  When you sold your personal shares,
15  did you evaluate whether or not the investors were
16  accredited?
17     A     Yeah.  That was one of the stipulations,
18  was that we could only take on accredited investors
19  because at that time I think the Jobs act hadn't come
20  into place yet.  So I mean, we had to be a lot more
21  cautious about that.
22     Q     So how did you -- and, again, I want to
23  differentiate between the company's offerings and
24  your offerings because I know in connection with the
25  company's offerings there's subscription agreements

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 481

```
 1   that are completed by the investors.
 2      A    Yes.
 3      Q    I'm not seeing that in connection with
 4   your personal sales.
 5      A    No sub-agreements, yeah.
 6      Q    Okay.  So there's no subscription
 7   agreement with your personal sales; is that correct?
 8      A    I think most the people that invested in
 9   my --
10      Q    I'm sorry, can you just say yes or no.  Is
11   that correct, there was no subscription agreement
12   that went along with your personal sales?
13      A    A purchase agreement, not a subscription
14   agreement, yeah.
15      Q    Okay.  An investor questionnaire where
16   they fill out the information about their
17   accreditation sales?
18      A    No.
19      Q    That doesn't happen in your personal
20   sales?
21      A    To an extent it does, but not directly.
22      Q    Okay.  No actual physical document?
23      A    No.
24      Q    Okay.  All right.  So go ahead.  Now tell
25   me how you did evaluate accreditation.
```

Page 482

```
 1      A    So most of them that came and invested
 2   through my personal stock sale deal had either, A,
 3   invested in a company offering and filled out an
 4   investor questionnaire so we knew they were
 5   accredited, or, B if they didn't and I talked to
 6   them, you know, I'd just make sure that it was, you
 7   know -- if something went wrong it was money they
 8   could lose, this, that or the other, what's their net
 9   worth, was it over a million, do him -- him and their
10   spouse or whatever make 300,000 per year or him -- I
11   think it was like 200,000 per year or 300,000 per
12   year if I remember what the accreditation standards
13   were.  So I'd just ask the questions and make sure
14   they were.
15      Q    Did you do that with Mr. Marvin?
16      A    I believe so, yes.
17      Q    Was he accredit---
18      A    I think he was investing in the company
19   first.  I can't remember.
20      Q    Okay.  Was he accredited?
21      A    I think so, yeah, or else -- I believe so.
22      Q    How -- what did you do to keep track of
23   these oral conversations that you were having with
24   investors?
25      A    Not much.  I mean, they were friends and
```

Page 483

```
 1   family, so it was personal stock sale.  It didn't
 2   dilute the other shareholders, so, you know, it
 3   pretty much didn't affect the company.  It only
 4   affected me.
 5      Q    Okay.  And I'm trying to just focus on the
 6   accreditation point.  Is there something -- some
 7   document or something that we could go look at to see
 8   whether or not the investors who purchased your
 9   personal shares were accredited?
10      A    I think the document you have to look at
11   there would be in the corporation files if they
12   filled out a subscription agreement.
13      Q    Okay.  If they also invested in the
14   company?
15      A    Yes.
16      Q    But otherwise there would not be a
17   document?
18      A    There would not be a document, that's
19   right.
20      Q    What -- tell me about the transfer of
21   money.  When investors purchased your personal stock
22   what happened with the money?
23      A    They would wire transfer it to my account
24   or send a check.
25      Q    Okay.  To your personal account?
```

Page 484

```
 1      A    Yes.
 2      Q    Which account?
 3      A    I've had so many banks.  Back then I would
 4   have had -- let's see, U.S. Bank would have been back
 5   then and -- and also I think Wells Fargo, I believe.
 6   I can't remember who I moved to after U.S. Bank.  I
 7   think Wells Fargo.
 8      Q    Okay.  So if investors bought your
 9   personal shares, the money went into your personal
10   account?
11      A    That's right.
12      Q    Okay.  And then you would transfer it to
13   GenAudio?
14      A    Or Astound Studios.
15      Q    Or Astound Studios?
16      A    Yeah.
17      Q    Did you keep any of the money?
18      A    A little bit, yeah, obviously because I
19   wasn't paying -- getting paid.  So there was a small
20   portion that I kept, but the only reason why was
21   because of my understanding that I wasn't obligated
22   to have to loan money to the company or -- no
23   obligation to the company and the shareholders or the
24   board to have to loan my personal money to the
25   company, but that's what I chose to do with it.
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

Page 485

```
 1    Q    Did you do anything to -- to keep track of
 2  where the money went, you know, whether you kept it
 3  or whether it went to GenAudio or Astound Studios?
 4    A    I tried, yeah.  I tried my best.  I had an
 5  accountant through some point in time that would code
 6  things in on this went to GenAudio, this went to
 7  Astound Studios.  This went here.
 8    Q    Who's that accountant?
 9    A    Carl Hebeler.
10    Q    Can you spell his last name.
11    A    H-e-b-e-l-e-r.
12    Q    Okay.  Do you have any of the records that
13  Mr. Hebeler created that -- that showed the flow of
14  money?
15    A    He gave them to me.  They were a storage
16  unit in Marin Del Rey which got --
17    Q    I don't know what that means.
18    A    When you don't pay your storage unit and
19  then they auction the storage unit off.
20    Q    Oh, okay.  So do you no longer have those
21  records?
22    A    I may have some like on my computer and
23  stuff like various transactions but not, you know --
24  not in any really reconcilable way right now.
25    Q    Okay.  Do you know offhand how much money
```

Page 486

```
 1  you personally kept versus how much went to one of
 2  the businesses?
 3    A    It wasn't that much, I'll tell you that.
 4  It really wasn't because the businesses really sucked
 5  me dry pretty bad.  You know, when you're building
 6  out the studio plus loaning money to the company,
 7  yeah.
 8    Q    How much did you raise from your personal
 9  stock sales?
10    A    That's a good question.  I don't know.
11  Maybe all in all in sum total --
12    Q    Right.
13    A    -- maybe like 3 or 4 million, something
14  like that, I'd say.
15    Q    Okay.
16    A    The studio was about 2.5 million to build
17  out, if I remember.
18    Q    Okay.  So -- and did you spend -- did all
19  of the money to build out the studio come from these
20  personal stock sales?
21    A    Yes.
22    Q    Mr. Mahabub, just to try to clarify this,
23  did you ever make payments to GenAudio employees or
24  contractors or other people that GenAudio owed money
25  to from your personal stock sales?
```

Page 487

```
 1    A    I've given some of them personal loans,
 2  yes.
 3    Q    Okay.
 4    A    But that wasn't to be done in lieu of
 5  salary compensation.  Their salaries continued to
 6  accrue.  They were just more -- if the company ever
 7  hit like a tough spot, right, and, you know, someone
 8  needed some extra money, whatever, to pay a bill or,
 9  you know, whatever they might need it for, sure, I
10  would -- I would loan the money to them directly so
11  they could pay.
12         Because usually it was like emergency,
13  diehard straight situation where even taking the time
14  to get it to the company and having Jim Devine write
15  a check to them they would have been, you know,
16  evicted out of their house.  So it was pretty --
17    Q    Okay.
18    A    Yeah.
19         MR. HOLMES:  Jerry, yes and no question.
20         THE DEPONENT:  Okay.
21    Q    (BY MS. VOORHEES)  Setting aside those
22  loans I'm just trying to figure out the flow of
23  money.  So I understand the -- the money would come
24  into your personal bank account and then it could go
25  to the studio.  It sounds like a lot of the money
```

```
 1  went to the studio.  And then the money could go to
 2  GenAudio into GenAudio's bank account.  I'm trying to
 3  figure out if you also would make payments directly
 4  to third parties on behalf of GenAudio.
 5    A    I may have a couple of times in the
 6  interest of just, you know, getting -- I remember one
 7  time Paul and I went through this huge like creditor
 8  zero out thing and pretty much I zeroed out all the
 9  creditors.  It was over a million, $1.2 million in
10  creditors or something.  You know, Paul and I went on
11  the -- you know, calling them up and negotiating with
12  them to settle out with a lower amount and paying
13  them down.  So maybe like on one or two of them I did
14  that.  I just can't -- usually I'd try to give to
15  GenAudio to make the payment, but sometimes I would
16  just make it direct.
17    Q    Okay.
18    A    But it got chopped off as a loan, right,
19  or something.  Jim Devine tried to keep good records
20  on that, I think.
21    Q    All right.  I want to switch now to some
22  questions about the GenAudio offerings.
23    A    Yeah.
24    Q    So in connection with the offering that
25  began in March of 2010, did GenAudio evaluate whether
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

**Page 489**

1  or not its investors were accredited?
2      A    I think we did on -- on every offering
3  that we did, yes.
4      Q    Okay.
5      A    We had a suitability questionnaire.
6      Q    And what was your involvement in that
7  process?
8      A    I pretty much handed that skillet over to
9  Jim Mattos and Jim Devine.
10     Q    Okay.
11     A    They were sort of the ones taking care of
12  that.
13     Q    Were there any procedures in place over
14  the evaluation of investor questionnaires?
15     A    Well, yeah.  They -- they fill out the --
16  as far as I remember, my understanding was they fill
17  out the questionnaire and if they check they're
18  accredited, then, you know, there's no other further
19  due diligence we had to do on our part.  If they tell
20  yeah.  They're accredited, you know, we believe them.
21     Q    And what happened if they did not check
22  the box or indicated they were not accredited?
23     A    That I do not know.  I don't remember
24  encountering that until recently when this came up.
25  I guess there were like a few files that were missing

**Page 490**

1  the suitability questionnaire, they weren't actually
2  filled out or something like that.  I remember Jim
3  Mattos saying that, you know, they were missing some
4  of the documents there that got overlooked.
5      Q    So back during the 2010 offering did you
6  -- were you personally involved in reviewing these
7  documents --
8      A    No.
9      Q    -- to determine accreditation?  Okay.  How
10  did you confirm that Mr. Mattos and Mr. Devine were
11  reviewing the documents?  Did you do anything to
12  confirm that?
13     A    Well, they had the -- you know, they had
14  the documents.  So when they come in on a fax, their
15  -- their job was to -- to make sure that all the
16  documents were signed and filled out, you know, and
17  the I's were dotted and T's were crossed.  So that's
18  not that hard of a job to do, so . . .
19     Q    Do you have an understanding today as to
20  how some investors who either indicated they weren't
21  accredited or who didn't fill out the form ended up
22  becoming investors?
23     A    I do not know, no, because we -- we
24  limited the offerings to accredited investors only.
25     Q    In connection with the offering that began

**Page 491**

1  in April 2011, did GenAudio evaluate whether its
2  investors were accredited?
3      A    Same thing with a suitability --
4      Q    Okay.
5      A    -- questionnaire.
6      Q    And what was your involvement in that
7  process?
8      A    Same -- you know, not much.  Like I said,
9  it was primarily Jim Mattos and Jim Devine that were
10  handling that.
11     Q    Okay.  And so you were not involved in the
12  review of the investor accreditation?
13     A    No.
14     Q    Did you do anything to confirm that Mr.
15  Devine and Mr. Mattos were actually checking
16  accreditation?
17     A    I think I called them a couple of times,
18  you know, and just asked him, you know, are you
19  making sure that they're filling out the forms.  Oh,
20  yeah.  Yeah.  So if --
21     Q    Was it part of their job to -- to check
22  investor accreditation?
23     A    Yes.
24     Q    When investors invested through the
25  GenAudio offerings in 2010 and 2011, where did their

Page 492

1  money go?  What bank account?
2      A    That I think was Wells Fargo at the time.
3      Q    Who had authority over that bank account
4  or who had access to it?
5      A    At one point in time the board took my
6  access off of it because I didn't actually want, you
7  know.  So I think it would have been Jim Devine -- at
8  one point I had access to.  I was like -- I think it
9  was like me, Jim, Paul Powers, if I recall maybe.  I
10  think he was on it as well as a signer.  And then it
11  was just Jim Devine and Paul Powers for a bit.
12          And then Paul, Mark, Ted and Elliott all
13  resigned from the board in 2011.  So you need to have
14  two signers on the account, so I became a signer on
15  the account again, and I think that's kind of how
16  that went down.
17     Q    Okay.  So do you recall when you stopped
18  having access to the account for the first time?
19     A    I think it was in 2009, if I remember
20  correctly.
21     Q    Okay.  And then you regained access to the
22  account after Mr. Powers, Mr. Bobak, Mr. Elliott
23  resigned?
24     A    I can't remember if it was before they
25  resigned or after.  It was -- I don't recall.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 541

```
 1    STATE OF COLORADO )
 2                )  ss.
 3    COUNTY OF DENVER  )
 4           I hereby certify that the witness in the
 5    foregoing deposition, TAJ JERRY MAHABUB, was by me
 6    duly sworn to testify to the truth, the whole truth,
 7    and nothing but the truth, in the within-entitled
 8    cause; that said deposition was taken at the time and
 9    place herein named; that the deposition is a true
10    record of the witness's testimony as reported by me,
11    a duly certified shorthand reporter and a
12    disinterested person, and was thereafter transcribed
13    into typewriting by computer.
14           I further certify that I am not interested
15    in the outcome of the said action, nor connected
16    with, nor related to any of the parties in said
17    action, nor to their respective counsel.
18           IN WITNESS WHEREOF, I have hereunto set my
19    hand this 13th day of February, 2017.
20    Reading and Signing was:
21    Requested
22
23                    Barbara J. Castillo
24
25           BARBARA J. CASTILLO, RMR, CRR
```