EXCERPTED

# EXHIBIT 6

# In The Matter Of:

*Securities and Exchange Commission v.*
*Taj Jerry Mahabub, et al.*

---

*Jim Wei-Kung Mattos*
*July 22, 2016*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94105*
*(415) 597-5600*

Original File 29803Mattos.txt
**Min-U-Script® with Word Index**

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF COLORADO
 3
 4   - - - - - - - - - - - - - - -
 5   SECURITIES AND EXCHANGE      )
 6   COMMISSION,                  )
 7            Plaintiff,          )   CASE NO.
 8   v.                           )   1:15-cv-02118-CBS-WJM
 9   TAJ JERRY MAHABUB, GENAUDIO, )
10   INC., and ASTOUND HOLDINGS,  )
11   INC.,                        )
12            Defendants.         )
13   - - - - - - - - - - - - - - -
14
15
16        VIDEOTAPED DEPOSITION OF JIM WEI-KUNG MATTOS
17                    FRIDAY, JULY 22, 2016
18
19
20
21                  BEHMKE REPORTING AND VIDEO SERVICES, INC.
22          BY:  KIMBERLY J. WALDIE, CSR NO. 8696, NVCCR 720
23                              160 SPEAR STREET, SUITE 300
24                          SAN FRANCISCO, CALIFORNIA 94105
25                                             (415) 597-5600
```

Page 2

```
 8       Videotaped deposition of JIM WEI-KUNG MATTOS,
 9   taken on behalf of Plaintiffs, at the Courtyard by
10   Marriott, 6855 South Virginia Street, Reno, Nevada,
11   commencing at 9:07 A.M., FRIDAY, JULY 22, 2016, before
12   Kimberly J. Waldie, Certified Shorthand Reporter No.
13   8696, pursuant to Notice of Deposition.
```

Page 3

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFF:
 3       SECURITIES AND EXCHANGE COMMISSION
 4       BY: DANIELLE R. VOORHEES, ATTORNEY AT LAW
 5           LESLIE HENDRICKSON HUGHES, ATTORNEY AT LAW
 6       1961 Stout Street, Suite 1700
 7       Denver, Colorado 80294
 8       Telephone: (303)844-1000
 9       Email: voorheesd@sec.gov
10
11   FOR DEFENDANT, TAJ JERRY MAHABUB:
12       HOLMES, TAYLOR & JONES, LLP
13       BY: ANDREW B. HOLMES, ATTORNEY AT LAW
14       617 South Olive Street, Suite 1200
15       Los Angeles, California 90014
16       Telephone:  (213) 985-2200
17       Email:  abholmes@htjlaw.com
18
19   FOR DEFENDANT GENAUDIO, INC. AND JAMES T. DEVINE:
20       WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
21       BY: MICHAEL P. McCLOSKEY, ATTORNEY AT LAW
22       655 West Broadway, Suite 900
23       San Diego, California 92101
24       Telephone:  (619) 321-6200
25       Email: Michael.mccloskey@wilsonelser.com
```

Page 4

```
 1     APPEARANCES OF COUNSEL - (CONTINUED):
 2     FOR DEFENDANT ASTOUND HOLDINGS, INC.
 3     - (TELEPHONICALLY):
 4         BENZ LAW GROUP
 5         BY: JENNIFER YUEN, ATTORNEY AT LAW
 6         12021 Wilshire Boulevard, Suite 256
 7         Los Angeles, California 90025
 8         Telephone: (818) 371-8800
 9         Email:  jenniferk.yuen@gmail.com
10
11     ALSO PRESENT:
12         JEFF WALDIE, VIDEOGRAPHER, CCVS
```

Securities and Exchange Commission v.  
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos  
July 22, 2016

Page 5

```
 1                       INDEX
 2   FRIDAY, JULY 22, 2016
 3   JIM WEI-KUNG MATTOS                              PAGE
 4        Examination by MS. VOORHEES                  12
 5        Examination by MS. YUEN                     211
 6        Examination by MR. HOLMES                   215
 7        Examination by MR. McCLOSKEY                218
 8        Further examination by MS. VOORHEES         219
 9
10                       -oOo-
11
12           QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
13                    PAGE      LINE
14                       None.
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1                     EXHIBITS
 2                 JIM WEI-KUNG MATTOS
 3   Number             Description                   Page
 4   Exhibit 21   E-mail chain, top e-mail dated
 5                October 2, 2009, Bates JM002096 -
 6                JM002099 - 4 pages                    64
 7   Exhibit 22   E-mail chain, top e-mail dated
 8                October 19, 2009, Bates GA006846 -
 9                GA006850, - 5 pages                   71
10   Exhibit 23   E-mail dated 10/19/2009, Bates
11                SEC-TiscarenoV-E-0000635 -
12                SEC-TiscarenoV-E-0000636 - 2 pages    73
13   Exhibit 24   Forwarded e-mail originally
14                sent November 9, 2009, and
15                attachment, Bates GA006774 -
16                GA006814, - 41 pages                  76
17   Exhibit 25   GenAudio, Inc., Common Stock
18                Shareholder List, Bates GA006005 -
19                GA006012 - 8 pages                    81
20   Exhibit 26   E-mail chain, top e-mail dated
21                February 12, 2010, Bates JM000378 -
22                JM000380 - 3 pages                    84
23
24
25
```

Page 7

```
 1                EXHIBITS - (CONTINUED)
 2                 JIM WEI-KUNG MATTOS
 3   Number             Description                   Page
 4   Exhibit 27   E-mail dated 2/12/2010, Bates
 5                SEC-TiscarenoV-E-0000992 -
 6                SEC-TiscarenoV-E-0000993 - 2 pages    86
 7   Exhibit 28   E-mail chain, top e-mail dated
 8                March 19, 2010, Bates JM001041 -
 9                JM001046 - 6 pages                    88
10   Exhibit 29   E-mail chain, top e-mail dated
11                March 21, 2010, Bates JM000727 -
12                JM000729 - 3 pages                    97
13   Exhibit 30   E-mail dated Sun. 21 Mar 2010,
14                Bates 347APL-00000315 -
15                347APL-00000316 - 2 pages             98
16   Exhibit 31   E-mail chain dated May 25, 2010,
17                Bates JM002158 - JM002167 - 10 pages 104
18   Exhibit 32   E-mail chain, top e-mail dated
19                5/25/2010, Bates
20                SEC-TiscarenoV-E-0001158 -
21                SEC-TiscarenoV-E-0001162,
22                - 5 pages                            106
23
24
25
```

Page 8

```
 1                EXHIBITS - (CONTINUED)
 2                 JIM WEI-KUNG MATTOS
 3   Number             Description                   Page
 4   Exhibit 33   E-mail dated June 2, 2010, Bates
 5                GA004959 - GA004961 - 3 pages        109
 6   Exhibit 34   E-mail chain, top e-mail dated
 7                October 27, 2014, Bates JM002515 -
 8                JM002518 - 4 pages                   114
 9   Exhibit 35   E-mail chain, top e-mail dated
10                7/2/2010, Bates
11                SEC-TiscarenoV-E-0001218 -
12                SEC-TiscarenoV-E-0001221 -
13                - 4 pages                            117
14   Exhibit 36   E-mail chain, top e-mail dated
15                Thur 11/20/2014, Bates
16                SEC-ELLIOTT-E-0000241 -
17                SEC-ELLIOTT-E-0000242 - 2 pages      122
18   Exhibit 37   Letter dated August 1, 2010, Bates
19                GA005351 - GA005353,
20                - 3 pages                            124
21   Exhibit 38   E-mail dated September 6, 2010,
22                Bates JM005121 - JM005126 - 6 pages  126
23   Exhibit 39   E-mail dated November 6, 2010, Bates
24                JM006157 - JM006158 - 2 pages        136
25
```

Case 1:15-cv-02118-WJM-SKC   Document 53-6   Filed 03/24/17   USDC Colorado   Page 5 of 11

Securities and Exchange Commission v.  
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos  
July 22, 2016

Page 9

```
 1                EXHIBITS - (CONTINUED)
 2                   JIM WEI-KUNG MATTOS
 3     Number           Description              Page
 4     Exhibit 40   E-mail chain, top e-mail dated
 5                  Thur 11/20/2014, Bates
 6                  SEC-Skluzak-E-0000905 -
 7                  SEC-Skluzak-E-0000911,
 8                  - 7 pages                     149
 9     Exhibit 41   E-mail chain, top e-mail dated
10                  March 12, 2010, Bates JM001098 -
11                  JM001102 - 5 pages            153
12     Exhibit 42   Stock Certificate and attachment,
13                  Bates Mahabub000018 -
14                  Mahabub000029 - 12 pages      160
15     Exhibit 43   Stock Certificate and attachment,
16                  Bates GA007852 - GA007867 - 16 pages   166
17     Exhibit 44   E-mail chain, top e-mail dated April
18                  27, 2010, Bates JM003267 -
19                  JM003273 - 7 pages            173
20     Exhibit 45   E-mail chain, top e-mail dated June
21                  28, 2010, Bates JM002199 - 1 page   178
22     Exhibit 46   E-mail chain, top e-mail dated April
23                  22, 2011, Bates JM007887 -
24                  JM007889 - 3 pages            180
25
```

Page 11

1    FRIDAY, JULY 22, 2016; 9:07 A.M.
2    **THE VIDEOGRAPHER:** Here begins DVD No. 1 in the
3 deposition of Jim Wei-Kung Mattos in the Matter of
4 Securities and Exchange Commission versus Taj Jerry
5 Mahabub, et al., in the United States District Court for
6 the District of Colorado, case No.
7 1:15-CV-02118-CBS-WJM.
8    Today's date is July 22, 2016.  The time on the
9 video monitor is 9:07.
10    The video operator today is Jeff Waldie
11 contracted by Behmke Reporting & Video Services,
12 Incorporated, 160 Spear Street, Suite 300, San
13 Francisco, California.
14    This video deposition is taking place at 6855
15 South Virginia Street, Reno, Nevada, and was noticed by
16 Leslie Hughes, Esq., of the Securities and Exchange
17 Commission.
18    Counsel, please voice identify yourselves and
19 state whom you represent.
20    **MS. VOORHEES:** Danielle Voorhees and Leslie Hughes
21 on behalf of the Securities and Exchange Commission.
22    **MR. McCLOSKEY:** Michael McCloskey on behalf of
23 GenAudio.
24    **MR. HOLMES:** Andrew Holmes on behalf of Jerry
25 Mahabub.

Page 10

```
 1                EXHIBITS - (CONTINUED)
 2                   JIM WEI-KUNG MATTOS
 3     Number           Description              Page
 4     Exhibit 47   E-mail chain, top e-mail dated
 5                  August 30, 2010, Bates JM004734
 6                  - 1 page                      183
 7     Exhibit 48   E-mail chain, top e-mail dated
 8                  March 20, 2010, Bates JM000965
 9                  - 1 page                      185
10     Exhibit 49   E-mail chain dated March 19, 2010,
11                  Bates JM001202 - JM001203 - 2 pages   188
12     Exhibit 50   Letter dated August 6, 2015, Bates
13                  AST-0000035 - AST-0000036 - 2 pages   197
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 12

1    **MS. YUEN:** And Jennifer Yuen on behalf of Astound
2 Holdings.
3    **THE VIDEOGRAPHER:** Would the court reporter please
4 swear in the witness.
5        JIM WEI-KUNG MATTOS,
6    having been first duly sworn by the reporter,
7        was examined and testified as follows:
8    **THE VIDEOGRAPHER:** You may begin.
9           EXAMINATION
10 BY MS. VOORHEES:
11    Q.  Mr. Mattos, good morning.  Thank you for
12 appearing here today.  Could you please state and spell
13 your full name for the record.
14    A.  My name is Jim Wei-Kung Mattos, J-i-m,
15 W-e-i-K-u-n-g, M-a-t-t-o-s.
16    Q.  Thank you, Mr. Mattos.
17       Are you represented by counsel in this matter?
18    A.  No, I am not.
19    Q.  And you've testified before.  Correct?
20    A.  I have.
21    Q.  And have you testified other than in the SEC
22 investigation that preceded this matter?
23    A.  No.
24    Q.  All right.  The same ground rules apply here.
25 Do you understand that you are under oath?

**Securities and Exchange Commission v.**
**Taj Jerry Mahabub, et al.**

**Jim Wei-Kung Mattos**
**July 22, 2016**

Page 21

1   e-mail after my employment had concluded, and I did not
2   respond.
3       Q.  Do you recall when that was?
4       A.  Either late March or early April of 2015 or
5   '16, rather, this year.
6       Q.  Have you spoken to any other GenAudio employees
7   or former GenAudio employees since you left GenAudio?
8       A.  I have.
9       Q.  Who?
10      A.  Jim Devine.
11      Q.  And when did you speak to Mr. Devine?
12      A.  Most recently just two days ago.
13      Q.  Okay.  And what did you speak to Mr. Devine
14  about?
15      A.  I just asked him how -- I knew he was sitting
16  through testimony.  I just asked him how it went.
17      Q.  And what did he tell you?
18      A.  He just said it went well.  We didn't get into
19  any specifics.
20      Q.  Okay.  Did he tell you any of the questions
21  that the SEC counsel asked him?
22      A.  No.
23      Q.  Did he tell you any of the documents that the
24  SEC counsel showed him?
25      A.  No.

Page 22

1       Q.  How would you describe your relationship with
2   Mr. Devine?
3       A.  Friendly.
4       Q.  So do you communicate with him somewhat
5   regularly?
6       A.  I do, yeah.  I mean, over the course of our
7   roughly ten or so years of employment together, we
8   became friends.
9       Q.  Have you talked to him about the SEC litigation
10  other than what you just described regarding his
11  deposition?
12      A.  No.
13      Q.  Have you spoken to any other former GenAudio
14  employees since you left?
15      A.  No.
16      Q.  Are you currently employed?
17      A.  I am not.
18      Q.  When was your last employment?
19      A.  Would have been -- I believe my official exit
20  date was March 3rd of 2016.
21      Q.  Okay.  And who were you employed by as of
22  March 3rd, 2016?
23      A.  GenAudio.
24      Q.  When did you first become employed with
25  GenAudio?

Page 23

1       A.  I was first offered verbal terms of employment
2   in roughly October of 2004.
3       Q.  And who offered you that employment?
4       A.  Jerry Mahabub.
5       Q.  Okay.  And did you start working for GenAudio
6   at that time?
7       A.  It was on a contractor basis.  I didn't
8   technically have an employment contract until -- oh, it
9   might have been a year or two later.
10      Q.  Okay.  And what were you doing as a contractor
11  for that period of time?
12      A.  Essentially helping to raise seed capital for
13  the company.
14      Q.  All right.  And then you think you became an
15  actual employee sometime in 2006, thereabout?
16      A.  No.  It would have been 2005.
17      Q.  2005.  All right.
18      A.  Yeah.
19      Q.  And what was your title when you became an
20  employee?
21      A.  Well, the first title I was offered, although
22  it didn't really make much sense, was vice president of
23  sales.
24      Q.  Okay.  Why do you say that didn't make much
25  sense?

Page 24

1       A.  We didn't really have a product to sell --
2       Q.  Okay.
3       A.  -- at that time.
4       Q.  All right.  Did you actually use that title for
5   some period of time?
6       A.  I may have on certain documents.  I don't
7   recall.  The more appropriate title that I assumed, I
8   believe after I signed my employment contract, was --
9   oh, what was it?  I'd have to go look on my LinkedIn
10  account.  I want to say support services manager or
11  something along those lines.
12      Q.  Okay.  And, generally, today we're going to be
13  focused on the time period 2009 through 2012.
14      A.  Yeah.
15      Q.  So if you could just describe for us what you
16  were doing for GenAudio up until about 2009.
17      A.  Oh, at that point my primary functions were to
18  continue to raise money for the company, reaching out
19  through friends and family; to manage company records,
20  including the processing of -- of -- assisting in the
21  processing of stock certificates and -- and related
22  documents.
23      Q.  All right.  And then starting in 2009, what was
24  your title at that time?
25      A.  I'd -- I'd have to look it up on LinkedIn.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

**Page 69**

1  recall ever mentioning to any GenAudio shareholders that
2  Mr. Mahabub had met with Phil Schiller?
3     A.  I do not.
4     Q.  Did you mention to GenAudio shareholders,
5  again, outside of official documents, that Mr. Mahabub
6  was going to be meeting with Steve Jobs?
7     A.  I don't recall.
8     Q.  If you turn to the next page of Exhibit 21, the
9  second full paragraph down, it begins with "Also,
10 because Craig."
11        Do you see that?
12    A.  Yes.
13    Q.  And I'm not going to read all of this, but it
14 explains that Craig is going to be filing some
15 international patents and that 30K must be paid to
16 Dorsey and Whitney?
17    A.  Right.
18    Q.  Do you see the parens that says "(thanks to Jim
19 Mattos, he has been able to continue to reach out and
20 help me to sell a portion of my personal shares to make
21 this happen)"?
22        Do you see that?
23    A.  Yes.
24    Q.  Is that accurate?  Did you do that?
25    A.  That was an ongoing thing that I was doing at

**Page 70**

1  that time.
2     Q.  Okay.  You were helping Mr. Mahabub sell his
3  personal shares at that time?
4     A.  Correct.
5     Q.  Okay.  And -- and describe for us the process
6  for doing that.
7     A.  Well, I would have -- I mean, I would have a
8  conversation with somebody, and they may express an
9  interest in further investment in the company, and I
10 would generally say, "Okay.  Well, Jerry has his
11 personal shares that he is selling at a discounted
12 rate."  And that was pretty much the procedure.  If they
13 wanted to move forward, they did.  If they didn't, you
14 know, they didn't.
15    Q.  And what did you tell those investors about --
16 those potential investors about the company?
17    A.  Everything that would have been expressed in
18 the company documents would have been a reiteration of
19 the -- of those conversations.
20    Q.  Okay.  Would you provide those potential
21 shareholders with the information that Mr. Mahabub was
22 providing to you about Apple?
23    A.  Perhaps, but again, I don't recall any specific
24 conversations.
25    Q.  Did you ever see any communications between

**Page 71**

1  Mr. Mahabub and Phil Schiller?
2     A.  I don't recall.
3        (Exhibit 22 marked for Identification.)
4     Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
5  what's been marked as Exhibit 22.  It was previously
6  marked as Investigative Exhibit 120.  It's Bates labeled
7  GA006846 through GA006850.
8        Do you recognize Exhibit 22?
9     A.  I do.
10    Q.  And did you receive and read this e-mail?
11    A.  At that time I did.
12    Q.  Okay.  And it looks like from your e-mail to
13 Mr. Mahabub on October 19, 2009, you actually listened
14 to the demo that was linked.  Is that correct?
15    A.  I believe so, yes.
16    Q.  All right.  Do you see that Mr. Mahabub writes
17 in his October 19th, 2009, e-mail at 2:13 a.m.:  "Hello
18 team, Below is my latest e-mail to my contacts at Apple.
19 For those who do not know, Tim Cook is the COO of Apple
20 (second in the chain of command at Apple)."
21        And then the second paragraph reads:  "I am
22 happy to let you all know that it has been requested
23 that I carbon copy Tim and Phil on some of my e-mails
24 with Michael, Ron and Vic (depending on the content).  I
25 do hope that the big man likes the demos we have worked

**Page 72**

1  very hard to create and this will end up in a super
2  sweet licensing deal with us."
3        When you received this e-mail from Mr. Mahabub,
4  did you believe the statements that he made in it?
5     A.  I did.
6     Q.  Did you have any reason to doubt those
7  statements?
8     A.  I did not.
9     Q.  Did you ever meet Tim Cook?
10    A.  I did not.
11    Q.  Have you ever communicated with him in any way?
12    A.  I have not.
13    Q.  Outside of this e-mail, did you ever have
14 communications with Mr. Mahabub about Tim Cook?
15    A.  I don't recall.
16    Q.  Did you do anything to document your
17 communications with Mr. Mahabub?
18    A.  I did not.
19    Q.  If you flip to the third page of the exhibit
20 towards the bottom, do you see where it says "Forwarded
21 Message"?
22    A.  I do.
23    Q.  And there is an e-mail dated Sun 18 Oct, O-c-t,
24 2009, from Mr. Mahabub to Victor Tiscareno,
25 T-i-s-c-a-r-e-n-o, Michael Hailey, H-a-i-l-e-y, Ronald

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

Page 153

1  A. No.
2  Q. Did you ever talk to Mr. Mahabub about this
3  e-mail that Mr. Mahabub received from Mr. Allen?
4  A. I wasn't aware of this.
5  Q. Okay. Until right now?
6  A. Right.
7  Q. Have you had any communications with Mr. Allen
8  about his allegation that you made misrepresentations to
9  him?
10 A. I wasn't aware of them until today, and I
11 haven't spoken to Mr. Allen in several years.
12 Q. Did you ever have any communications with
13 anyone in the Eldridge family about Mr. Allen's
14 concerns?
15 A. I don't recall.
16    MR. VOORHEES: All right. Why don't we take a
17 lunch break. Go off the record.
18    THE VIDEOGRAPHER: This is the end of DVD No. 2 of
19 the deposition of Jim Mattos. The time is approximately
20 12:26 p.m.
21    (At 12:27 P.M. a lunch recess was taken until
22    1:24 P.M. of the same day.)
23    (Exhibit 41 marked for Identification.)
24    THE VIDEOGRAPHER: This is the beginning of disc No.
25 3 of the video-recorded deposition of Jim Mattos. The

Page 154

1  time is approximately 1:23 p.m.
2  Q. MS. VOORHEES: Mr. Mattos, do you understand
3  that you are still under oath?
4  A. Yes.
5  Q. And during the lunch break, did you talk to
6  anybody about this deposition?
7  A. No.
8  Q. All right. Mr. Mattos, you've been handed what
9  has been marked as Exhibit 41, which was previously
10 marked as Testimony Exhibit 60, and it is Bates labeled
11 JM001098 through -1102.
12    Do you recognize Exhibit 41?
13 A. Yes.
14 Q. And is this an e-mail that you received from
15 Mr. Mahabub?
16 A. I believe so. Although the "to" and "from" is
17 a little -- maybe he might have bcc'd me on that.
18 Q. All right. Yes. I mean, the -- the top e-mail
19 is from Jerry Mahabub to Jerry Mahabub on March 12th,
20 2010.
21    Is this a document that you produced to the
22 SEC?
23 A. I believe so, yes.
24 Q. All right. And so if you produced it to the
25 SEC, is it something that you would have had in your

Page 155

1  e-mail possession?
2  A. Yes.
3  Q. Okay. Do you recall reviewing this e-mail?
4  A. Not specifically, no.
5  Q. All right. In that March 12th, 2010, e-mail at
6  2:09 p.m., Mr. Mahabub writes: As a reminder, today is
7  the last day that I can offer my personal shares at
8  $0.50 per share (or for that matter at any price per
9  share) as the offer -- as the company offering goes live
10 on Monday.
11    Do you see that?
12 A. Yes.
13 Q. And if you go down to the third paragraph, it
14 reads: "Although I will not need the wire transfer by
15 today (according to corporate counsel), I will need to
16 send out the agreements (stock sale and irrevocable
17 proxy) and you will need to sign and fax back to Jim
18 Mattos by no later than Monday morning."
19    Do you see that?
20 A. Yes.
21 Q. Did you collect the paperwork related to
22 Mr. Mahabub's personal sales of his stock?
23 A. Yes. That was a function of my job.
24 Q. All right. Did you receive any instructions
25 from Mr. Mahabub related to his stock sales?

Page 156

1  A. In what regard?
2  Q. In -- in the way that people were solicited for
3  those stock sales?
4  A. No.
5  Q. Did you actually offer any of his personal
6  sales to people?
7  A. I may have passed along the offering.
8  Q. And what do you mean by "the offering"?
9  A. Well, just whatever he was selling at the time.
10 Q. Okay. And how would you do that?
11 A. There wasn't really any formal procedure. If
12 someone, again, was looking to reinvest or, you know,
13 invest more in the company, then I would just throw it
14 out there.
15 Q. Okay. So did you -- it sounds like if an
16 investor came to you and said that they were looking to
17 buy shares, you might put them in touch with
18 Mr. Mahabub?
19 A. Correct.
20 Q. Okay. Just like you did with Mr. Powers?
21 A. Right.
22 Q. Did you ever tell investors affirmatively that
23 Mr. Mahabub was looking to sell his shares?
24 A. Invariably at certain points I'm sure I did.
25 Q. Okay.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

Page 157

1   A.  Yeah.
2   Q.  And how would you make that communication?
3   A.  Typically, informal.  I mean, the phone call,
4   you know.  Again, it was more along the lines of people
5   were inquiring as opposed to cold calling people and
6   soliciting for their investment.
7   Q.  Okay.  In the instances where you were actually
8   reaching out to people to see if they might be
9   interested in buying some -- some of Mr. Mahabub's
10  shares, were there certain investors that you went to?
11  A.  Not specifically targeted.
12  Q.  Okay.
13  A.  I would tend to speak to my, you know, friends
14  more frequently than, you know, people that I was not
15  familiar with.
16  Q.  Did Mr. Mahabub ever direct you to contact
17  specific people to see if they wanted to buy his
18  personal shares?
19  A.  I don't recall.
20  Q.  Did Mr. Mahabub give you instructions about the
21  price that he was willing to accept for his shares?
22  A.  Yeah.  He would always state what the -- what
23  the price was, sure.
24  Q.  Were you involved in setting that price?
25  A.  No.

Page 158

1   Q.  Did you have any authority over the price that
2   he was selling shares at?
3   A.  No.
4   Q.  Did you have any involvement in how many shares
5   Mr. Mahabub was selling?
6   A.  No.
7   Q.  Once you put the investor in touch with
8   Mr. Mahabub, were you involved in their communications?
9   A.  Only indirectly insofar as I would help to
10  collect the necessary documents and that type of thing.
11  Q.  Okay. Were you ever -- and, again, let's
12  try -- because I know you were there for a long time.
13  Between 2009 and 2012, were you ever present when Mr.
14  Mahabub was providing investors information about the
15  company so that they could buy his personal shares?
16  A.  I may have on occasion been present in the room
17  when he would talk to people on the phone.  His tendency
18  was to use the speaker mode, so, you know, if you were
19  in his presence, you were, you know, present for the
20  conversation, so to speak.
21  Q.  All right.  Do you recall any specific calls
22  with investors in connection with his sale of personal
23  shares?
24  A.  No.
25  Q.  Did you ever hear Mr. Mahabub say anything to

Page 159

1   an investor that you thought was untrue at the time?
2   A.  Not that I was -- not that I was aware of, no.
3   Q.  Did Mr. Mahabub ever have any sort of standard
4   communication that he gave to investors who were
5   interested in buying his personal shares, a standard
6   e-mail or script of any sort?
7   A.  No.  Not standard.  I mean, you know, he --
8   like all people, he had his -- you know, his certain
9   wording that he would use, you know.
10  Q.  Give me an example of that wording.
11  A.  I mean, it was -- it was more of a tone as
12  opposed to specific words.  Obviously upbeat.  Obviously
13  "The company's doing well."  You know, a salesman pitch.
14  Q.  All right.  And are you aware of that because
15  you would actually hear him give that pitch to people
16  who were on the phone?
17  A.  Oh, I did on occasion, sure.  I mean, I think
18  one thing that needs to be understood is that over the
19  course of all of the years of, you know, raising money
20  for the company, the two people that were principals and
21  sort of bringing in a volume of people were Jerry and
22  myself.  When all was said and done, it was by and large
23  the, you know, friends and family investors as opposed
24  to some of the investors that were brought on from
25  several of the institutions that we dealt with, like

Page 160

1   Westminster Securities, et cetera.
2   Q.  All right.  After GenAudio moved out of their
3   offices in -- in Englewood or Centennial, Colorado, did
4   you ever actually work in the same space as Mr. Mahabub?
5   A.  Well, not -- we -- there was never a shared
6   office space.  I was a frequent visitor to their home or
7   his home up in Broomfield and -- and elsewhere.  One of
8   the -- my duties was also to provide ground
9   transportation.  So I was always taking him to the
10  airport, picking him up, dropping him off, and we would
11  conduct business out of his home.
12  Q.  Okay.
13      (Exhibit 42 marked for Identification.)
14  Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
15  what's been marked as Deposition Exhibit 42.  It's Bates
16  labeled Mahabub000018 through -29.
17      And if you look at the first page of
18  Exhibit 42, do you recognize this document?
19  A.  I do.
20  Q.  And what is this?
21  A.  This was our standard GenAudio stock
22  certificate.
23  Q.  And what was your involvement in creating these
24  stock certificates, if any?
25  A.  I would arrange the investment documents and

| Securities and Exchange Commission v.<br>Taj Jerry Mahabub, et al. | Jim Wei-Kung Mattos<br>July 22, 2016 |
|---|---|

Page 169

1   and back, and then would hand me back the file to sign.
2   Q.  Okay.  If you look at the next page, so now on
3   Bates page 7854, do you recognize the form of that
4   document?  And it actually goes over to 855.
5   A.  Yes.
6   Q.  And what is this?
7   A.  This is the subscriber questionnaire.
8   Q.  Okay.
9   A.  That was also part of the PPM.
10  Q.  And did you collect these documents in
11  connection with the PPM?
12  A.  I did.
13  Q.  And what did you do with them?
14  A.  They would go in -- we would receive both these
15  documents essentially at the same time, and I would,
16  again, create an investor file and forward that to Jim
17  Devine for processing.
18  Q.  All right.  You see the middle of Bates page
19  7854, right above the check boxes, it says:  "The
20  undersigned qualifies as an 'accredited investor'" and
21  then there's check boxes.
22  A.  Right.
23  Q.  Did you do anything to check if those were
24  marked off?
25  A.  That was also part of my job function.  I do

Page 170

1   understand in retrospect that there were a few that I
2   overlooked.
3   Q.  Okay.  Did you generally check them?
4   A.  I -- yes.
5   Q.  And what would you do to check them?
6   A.  Well, just to see if they were -- were checked
7   off.
8   Q.  All right.
9   A.  But obviously I slipped.
10  Q.  Okay.  So you've become aware that there are
11  some like the one we're looking at that were not checked
12  off?
13  A.  Yes, there was a small handful; yes, I am aware
14  of that.
15  Q.  Did you ever do anything to follow up with
16  anybody who had not checked off boxes?
17  A.  Well, normally, I would have indicated to the
18  investor that they needed to check one of the boxes, but
19  at times of high activity, I, you know, I -- I -- you
20  know, I missed it.
21  Q.  So -- but there were some instances where you
22  received questionnaires that did not have any boxes
23  checked and you actually did follow up?
24  A.  Perhaps once or twice --
25  Q.  Okay.

Page 171

1   A.  -- yeah.
2   Q.  And when that happened, what did you do?
3   A.  Oh, I would just contact the investor and let
4   them know they needed to resubmit the paperwork.
5   Q.  Did you ever tell them which box to check?
6   A.  No.
7   Q.  Did you ever fill out any of the boxes on
8   behalf of any investors?
9   A.  No.
10  Q.  What about the second page of the subscriber
11  questionnaire?  Did you do anything as far as reviewing
12  the information submitted by the investor?
13  A.  No.  Just to make sure that the -- the
14  signature was intact and legible.
15  Q.  Okay.  So you just made sure they'd signed it?
16  A.  Right.
17  Q.  Did you ever ask any investor in connection
18  with the PPM to submit additional information?
19  A.  No.
20  Q.  Did you ever provide any investors with
21  additional information?
22  A.  I don't understand the question.
23  Q.  Sure.
24      Did you ever send any investors anything
25  outside of the PPM, like additional financial

Page 172

1   statements?
2   A.  No.
3   Q.  Or additional information about the company?
4   A.  No.  That was -- I mean, anything that --
5   everything was -- was contained within the PPM including
6   risk factors, et cetera.  And any -- any financial
7   information that they submitted was taken at face value
8   for, you know, accuracy on behalf of the investor.
9   Q.  Would anyone other than you have been involved
10  in reviewing the subscriber questionnaires?
11  A.  After the fact, no.  I -- it was an assumption
12  that Jim Devine was looking it over, but what -- what I
13  understand now, he was not.
14  Q.  And what's the basis of that understanding?
15  A.  I just assumed we were double-checking each
16  other's work, but, clearly, there were a few that
17  slipped through the cracks.
18  Q.  I guess I'm -- what I'm asking is what's the
19  basis of your understanding that Mr. Devine was actually
20  not double-checking the work?
21  A.  Well, they -- we have a few that were un- --
22  unmarked.  So if he missed it and I missed it, I think
23  it's a fairly easy deduction that we both were not
24  paying attention.
25  Q.  When did you first learn that there were

Case 1:15-cv-02118-WJM-SKC   Document 53-6   Filed 03/24/17   USDC Colorado   Page 11 of 11

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.
Jim Wei-Kung Mattos
July 22, 2016

Page 221

1  300, San Francisco, California.  Going off the record.
2  The time is 2:58 p.m.
3      (Comments off the record by the reporter.)
4      MR. HOLMES: Wait.  Before we do that, we should
5  figure out the transcript so he knows what to do with
6  it.
7      Jim, normally this is something your attorney
8  would handle for you or talk about, but you are going to
9  get a chance to review the written booklet of the
10 testimony.  And typically there's a stipulation that
11 says that, you know -- if you don't do a stipulation,
12 then, you know a bunch of things happen that the court
13 reporter has to do.  But if we do a stipulation, then
14 what we do is relieve the court reporter of some of her
15 normal duties, and then we have the deposition
16 transcript sent to you so that you can review it, make
17 any changes that you think need to be made.  Sometimes
18 the response comes out opposite you thought it would be
19 or whatever the change might be.  Then you sign off on
20 changes, and you send it back to counsel for the SEC.
21     THE WITNESS: Okay.
22     MR. HOLMES: You have a certain amount of time to do
23 that in.  And I want to just sort of invite you to tell
24 us how much time you need and what process would work
25 for you.

Page 222

1      MR. McCLOSKEY: Typically it's 30 days.  Are you
2  all right with it being signed under penalty of perjury
3  as opposed to going out, getting the signature
4  notarized?
5      MS. VOORHEES: Yeah, yes, that's fine.  We can do it
6  under penalty of perjury.  We can provide you a copy of
7  the transcript.  If we give you 30 days, is that
8  sufficient to review?
9      THE WITNESS: That should be sufficient, yes.
10     (Discussion off the record.)
11     MR. HOLMES: So, Jim, what that means is you'll get
12 it, and then within 30 days of getting it, you are
13 expected to send back whatever changes you have to the
14 court reporter.
15     THE WITNESS: Okay.  That's fine.
16     MR. HOLMES: If you don't do that, then the
17 assumption is you're fine with it as is.
18     THE WITNESS: Okay.  So no changes, then just don't
19 send it back?
20     MR. HOLMES: Right.  But it's important to read it
21 because sometimes --
22     THE WITNESS: No.  I will.
23     MR. McCLOSKEY: I'd ask you if you have no changes,
24 say you have no changes.  That we way affirm --
25     THE WITNESS: Okay.  Thank you.

Page 223

1      THE REPORTER: Counsel, what would you like to
2  order?
3      MS. VOORHEES: Whatever is in our standard order.
4      THE REPORTER: Ms. Yuen, would you like a copy?
5      MS. YUEN: No.
6      THE REPORTER: Okay.  And, Mr. Holmes?
7      MR. McCLOSKEY: I'll get you one.
8      MR. HOLMES: No, not right now.
9      MR. McCLOSKEY: I'll get a copy.
10     (At 3:01 P.M., the deposition proceedings
11     concluded.)
12
13        -----------------------------
14          JIM WEI-KUNG MATTOS

Page 224

1    STATE OF CALIFORNIA     )
2                            )  ss.
3    COUNTY OF EL DORADO     )
4        I hereby certify that the witness in the
5  foregoing deposition, JIM WEI-KUNG MATTOS, was by me
6  duly sworn to testify to the truth, the whole truth, and
7  nothing but the truth, in the within-entitled cause;
8  that said deposition was taken at the time and place
9  herein named; that the deposition is a true record of
10 the witness's testimony as reported by me, a duly
11 certified shorthand reporter and a disinterested person,
12 and was thereafter transcribed into typewriting by
13 computer.
14     I further certify that I am not interested in
15 the outcome of the said action, nor connected with, nor
16 related to any of the parties in said action, nor to
17 their respective counsel.
18     IN WITNESS WHEREOF, I have hereunto set my hand
19 this 28th day of July, 2016.
20 Reading and Signing was:
21 _X_ requested   ___ waived   ___ not requested
22
23         *Kimberly J. Waldie* (signature)
24
25          KIMBERLY J. WALDIE, CSR 8696