**EXCERPTED**

# EXHIBIT 31

Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:            )
                             )  File No. D-03450-A
GENAUDIO, INC.               )

WITNESS:  Paul B. Powers

PAGES:    1 through 193

PLACE:    U.S. Attorney's Office

          400 West Washington Street, Suite 300

          Orlando, FL  32801

DATE:     Friday, February 27, 2015


     The above entitled matter came on for hearing, pursuant to notice, at 9:10 a.m.




Diversified Reporting Services, Inc.

(202) 467 9200

Page 2

1     APPEARANCES:
2
3     On behalf of the Securities and Exchange Commission:
4        JENNIFER OSTROM, ESQ.
5        Securities and Exchange Commission
6        1801 California Street
7        Suite 4800
8        Denver, Colorado
9
10    On behalf of the Witness:
11       PAUL B. POWERS, PRO SE
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              C O N T E N T S
2
3     WITNESS:                    EXAMINATION
4     Paul B. Powers                   4
5
6     EXHIBITS:    DESCRIPTION         IDENTIFIED
7       95     Copy of Subpoena            7
8       96     Completed Background
9              Questionnaire              12
10      97     GenAudio Board of Directors
11             February 12th, 2010       100
12      98     E-mails beginning on
13             May 6th, 2010 at 5:32 a.m.   129
14      99     GenAudio Board of Directors
15             Minutes for July 29        158
16     100     String of e-mails          170
17     101     Unanimous Written Consent of
18             the Board of Directors
19             of GenAudio, Inc.          181
20
21
22
23
24
25

Page 4

1              P R O C E E D I N G S
2        MS. OSTROM:  Let's go on the record at
3     9:10 a.m. on February 27th of 2015.
4        Would you please raise your right hand.
5     Do you swear to tell the truth, the whole truth and
6     nothing but the truth?
7        MR. POWERS:  I do.
8     Whereupon,
9              PAUL B. POWERS
10    was called as a witness and, having been first duly
11    sworn, was examined and testified as follows:
12                EXAMINATION
13    BY MS. OSTROM:
14    Q   Would you please state and spell your
15    full name, for the record?
16    A   Paul B. Powers, P-O-W-E-R-S.
17    Q   And does the B stand for anything?
18    A   Yeah, the B stands for Bannon,
19    B-A-N-N-O-N.
20    Q   Okay.  And my name is Jennifer Ostrom and
21    I'm an officer of the United States Securities and
22    Exchange Commission for purposes of this
23    proceeding.
24        And this is an investigation by the
25    Commission In The Matter of GenAudio, Inc., to

Page 5

1     determine whether there have been violations of
2     certain provisions of the Federal Securities laws;
3     however, the facts developed in this investigation
4     might constitute violations of other federal or
5     state civil or criminal laws.
6        And prior to the opening of the record,
7     you were provided with a copy of the Formal Order
8     of Investigation in this matter, and it will be
9     available for your examination during the course of
10    this proceeding.
11       Mr. Powers, have you had an opportunity
12    to review the Formal Order?  That's this.
13    A   Yes.  I just reviewed it moments ago.
14    Q   Okay.  Do you have any questions
15    concerning the formal order?
16    A   No, I do not.
17    Q   Okay.  And prior to the opening of the
18    record, you were provided with a copy of the
19    Commission Supplemental Information Form.  And a
20    copy of that notice is what is marked Exhibit
21    Number 1.
22       BY MS. OSTROM:
23    Q   And Mr. Powers, have you had the
24    opportunity to read Exhibit Number 1?
25    A   Yes, I have.

1  A   Only by Mr. Mahabub.
2      Q   Okay.  Did you ever tell anyone that the
3  LCEC referenced Apple?
4      A   I may have.
5      Q   Do you recall who?
6      A   Probably friends of mine that got
7  involved with, you know, investing in the original
8  PPM that I invested in back in 2008, I think.
9  Everybody knew who LCEC was.  It was kind of
10 ridiculous because, you know, when Jerry would meet
11 with potential investors, you know, he would have
12 separate discussions with them, or he would refer
13 to them as the fruit company, or he had an iPad or
14 an iPod and, you know, it was kind of, you know,
15 misleading.
16     Q   And that was with shareholders, correct?
17 When you're talking about these things.  It's not
18 just the e-mails that we saw that referred to the
19 fruit company and things like that.  He would say
20 that in front of shareholders?
21     A   Shareholders or, yeah, potential
22 shareholders when he was trying to, you know --
23 when he was, you know, having -- giving out the
24 PPMs and having a presentation.
25         So, you know, I always viewed LCEC as not

1  a very well-guarded secret.  So it wouldn't
2  surprise me that, you know, if I was speaking to
3  somebody that I knew well, that I would mention the
4  word Apple.
5      Q   When you had that conversation with Gary
6  Allen, and the other shareholders, was it clear
7  that they knew that the LCEC referenced Apple?
8      A   Yes, I believe so.
9      Q   Okay.  And do you know where they got
10 that belief?
11     A   Probably -- I don't.
12     Q   Okay.
13     A   But I don't think it would be hard for
14 them to figure out.
15     Q   Okay.  And do you know if GenAudio's
16 technology ever got beyond the demonstration stage
17 with Apple?
18     A   My guess is they probably got it from
19 Jerry.  He probably had conversations with them.
20 But I don't know for sure.
21     Q   When you had the discussions with them
22 about whether the LCEC transaction would actually
23 happen, did they actually talk about the LCEC or
24 did they talk about Apple, Gary Allen and the
25 others; do you recall?

1  A   I don't recall.
2      Q   Okay.  So -- sorry, go ahead.
3      A   Or they could have gotten it from Jim
4  Mattos, because he had conversations with them, as
5  well.  So I wouldn't be surprised if they
6  referenced it as Apple, but I don't have the
7  specific recollection.  I'm sorry.
8      Q   That's okay.  Let me ask you one more
9  question about this and then let's -- before we
10 quit, we'll cover the thing about Jim Mattos and
11 Gary Allen.
12     A   Okay.
13     Q   Did GenAudio's technology, to your
14 knowledge, ever get beyond the demonstration with
15 Apple; do you know?
16     A   I do not -- I don't believe Apple ever
17 sold a product that had the technology in it, if
18 that's what you're asking.
19     Q   Yeah, I'm actually asking if --
20     A   I think --
21     Q   Go ahead.
22     A   -- it was just strictly at the
23 demonstration stage, across a variety of Apple
24 products.
25     Q   Okay.  And my question is, do you know if

1  Apple, themselves, ever embedded the product in any
2  of their products, as opposed to Mr. Mahabub
3  demonstrating it on products?
4      A   Well, I don't know.  Because, again, I
5  wasn't there.  And I wasn't privy to the
6  discussion.  And, frankly, at this point, Jerry and
7  I were hardly talking to each other.
8          But, you know, who embedded it?  I was
9  under the impression that we embedded our
10 technology into their products, utilizing some sort
11 of, I think they called it an SDK, which is some
12 type of standard developer kit, I believe, that
13 would allow us to, you know, access their product
14 just to bypass their security.
15         So they would give kind of, you know, a
16 hardware product that didn't have the normal
17 security that would keep somebody from cracking
18 into it and messing around with it.
19     Q   Okay.  Now --
20     A   But that's a layman's description of the
21 process, as best I can.
22     Q   After you left GenAudio, and you were
23 working at SeaWorld, did you receive some
24 communication from some shareholders who were
25 complaining about representations that Mr. Mattos

Page 190

1  Q  Have you spoken with anyone else
2  regarding the fact that you're appearing here
3  today, other than Mr. Divine and the people that
4  you e-mailed?
5  A  My wife.
6  Q  Okay.  And do you know anyone else who's
7  been subpoenaed or testified in this investigation?
8  A  Yes.  Mr. Divine told me that Mr. Mattos
9  had been deposed.  And that Mr. Mahabub was going
10 to be deposed, and his lawyer got it pushed off or
11 something like that.
12 Q  Okay.
13 A  That's all I know.
14 Q  Okay.  And have you heard anything about
15 the substance of anyone else's testimony in this
16 investigation?
17 A  No.
18 Q  Have you spoken to anyone about the
19 substance of your testimony in this investigation,
20 what it was going to be?
21 A  No.  I didn't know what questions you
22 were going to ask.
23     MS. OSTROM:  Okay.  And Mr. Powers, we
24 have no further questions, at this time.  We may,
25 however, call you again to testify in this

Page 191

1  investigation.  And should this be necessary, we
2  will contact you.
3      Is there anything that you wish to
4  clarify or add to the statements you have made
5  today?
6      THE WITNESS:  No.  I don't think so.
7      MS. OSTROM:  And we are off the record at
8  3:30 p.m. on February 27th, 2015.
9      (Whereupon, at 3:30 p.m., the examination
10 was concluded.)
11          * * * * *

Page 192

1  PROOFREADER'S CERTIFICATE
2
3  In the Matter of:   GENAUDIO, INC.
4  Witness:       Paul B. Powers
5  File Number:    D-03450-A
6  Date:         Friday, February 27, 2015
7  Location:      Orlando, FL  32801
8
9      This is to certify that I, Donna S. Raya,
10 (the undersigned), do hereby swear and affirm that
11 the attached proceedings before the U.S. Securities
12 and Exchange Commission were held according to the
13 record and that this is the original, complete,
14 true and accurate transcript that has been compared
15 to the reporting or recording accomplished at the
16 hearing.
17
18 _____    _____
19 (Proofreader's Name)      (Date)