EXCERPTED

# EXHIBIT 35

Case 1:15-cv-02118-WJM-SKC   Document 53-35   Filed 03/24/17   USDC Colorado   Page 2 of 17

### Page 1

1  UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3  In the Matter of:        )
4                           ) File No. D-03450-A
5  GENAUDIO, INC.           )
6
7  WITNESS:  Victor Tiscareno
8  PAGES:    1 through 180
9  PLACE:    Securities and Exchange Commission
10           Byron G. Rogers Federal Building
11           1961 Stout Street
12           Denver, Colorado 80294
13 DATE:     Wednesday, December 3, 2014
14
15    The above-entitled matter came on for hearing,
16 pursuant to notice, at 9:10 a.m.
17
...
24    Diversified Reporting Services, Inc.
25         (202) 467-9200

### Page 2

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4      JENNIFER OSTROM, Senior Counsel
5      U.S. Securities and Exchange Commission
6      Denver Regional Office
7      Byron G. Rogers Federal Building
8      1961 Stout Street, Suite 1700
9      Denver, Colorado 80294
10     Telephone:  (303) 844-1049
11     E-mail:  ostromj@sec.gov
12
13     KURT L. GOTTSCHALL, Staff Attorney
14     U.S. Securities and Exchange Commission
15     Denver Regional Office
16     Byron G. Rogers Federal Building
17     1961 Stout Street, Suite 1700
18     Denver, Colorado 80294
19     Telephone:  (303) 844-1049
20     E-mail:  gottschallk@sec.gov

### Page 3

1  APPEARANCES (continued):
2
3  On behalf of the Witness:
4      JOHN R. ELTRINGHAM, ESQ
5      Martin, Davis, PLLC
6      1200 Westlake Avenue North
7      Suite 604
8      Seattle, Washington 98109
9      Telephone:  (206) 829-8619
10     E-mail:  jeltringham@martindavislaw.com

### Page 4

```
              C O N T E N T S
WITNESS:                                   PAGE
Victor Tiscareno                             5

EXHIBITS    DESCRIPTION                 IDENTIFIED
1      Commission Supplemental               7
       Information Form
2      Copy of the Subpoena                  7
3      Bates numbered GA3660-3662, Apple,   52
       Inc. Confidentiality Agreement,
       dated July 1, 2009
4      Bates numbered SEC1-SEC5, an        108
       e-mail dated August 30, 2013
5      Bates GA140, a letter dated March   151
       15, 2010
6      Bates numbered GA487-634, private   155
       placement memorandum for GenAudio,
       dated March 15, 2010
7      Bates GA5351-5353, letter to        163
       shareholders of GenAudio,
       August 1st of 2010, from
       Mr. Mahabub
8      Bates GA3572-3574, chain of         171
       e-mails to Mr. Mahabub to
       Ron Isaac
```

[12/3/2014] TISCARENO_VICTOR_20141203                              Pages 1 - 4

Page 5

```
1              PROCEEDINGS
2         MS. OSTROM: Let's go on the record at
3  9:10 a.m., on December 3, 2014. Would you
4  please raise your right hand? Do you swear to tell
5  the truth, the whole truth, and nothing but the
6  truth?
7         THE WITNESS: I do.
8  Whereupon,
9              VICTOR M. TISCARENO
10 was called as a witness and, having been first duly
11 sworn, was examined and testified as follows:
12              EXAMINATION
13       BY MS. OSTROM:
14    Q   And would you please state and spell your
15 full name for the record?
16    A   Victor Manuel Tiscareno, V-I-C-T-O-R,
17 M-A-N-U-E-L, Tiscareno, T-I-S-C-A-R-E-N-O.
18    Q   And my name is Jennifer Ostrom, and with me
19 today is Kurt Gottschall. We are officers of the
20 Commission for purposes of this proceeding. And
21 this is an investigation by the United States
22 Securities and Exchange Commission in GenAudio,
23 Inc., to determine whether there have been
24 violations of certain provisions of the federal
25 securities laws.
```

Page 6

```
1         However, the facts developed in
2  this investigation might constitute violations of
3  other federal or state civil or criminal laws.
4         And prior to the opening of the record, you
5  were provided with a copy of the formal order of
6  investigation in this matter and it will be
7  available for your examination during the course of
8  this proceeding.
9         And, Mr. Tiscareno, have you had an
10 opportunity to review the formal order?
11    A   This one here?
12    Q   Yes.
13    A   Briefly, yes.
14    Q   Do you want to read it again?
15    A   Well, we just went over -- I mean, this is
16 the first time I've seen it.
17    Q   Yes. Are you okay? You've seen it?
18    A   Yes.
19        MR. ELTRINGHAM: Yes.
20        BY MS. OSTROM:
21    Q   And then also prior to the opening of the
22 record you were provided with a copy of the
23 Commission Supplemental Information Form, and a
24 copy of that notice has now been marked as Exhibit
25 Number 1.
```

Page 7

```
1         (SEC Exhibit No. 1 was marked
2            for identification.)
3         MS. OSTROM:
4     Q   And, Mr. Tiscareno, have you had the
5  opportunity to read Exhibit Number 1?
6     A   Yes.
7     Q   And do you have any questions concerning
8  the notice?
9     A   No.
10    Q   And, Mr. Tiscareno, are you represented by
11 counsel today?
12    A   Yes, I am.
13        MS. OSTROM: And would counsel please
14 identify himself for the record?
15        MR. ELTRINGHAM: John Eltringham.
16        MS. OSTROM: Could you please spell your
17 last name for the record?
18        MR. ELTRINGHAM: Sure. E-L-T-R-I-N-G-H-A-M.
19        MS. OSTROM: And could you tell us what
20 firm you're with and an address?
21        MR. ELTRINGHAM: Of counsel at the firm
22 Martin Davis, 1200 Westlake Avenue North, Suite
23 604, Seattle, Washington 98109.
24        MS. OSTROM: Thank you. And Mr. Eltringham,
25 are you representing counsel for Mr. Tiscareno
```

Page 8

```
1  today?
2         MR. ELTRINGHAM: I am, yes.
3         MS. OSTROM: Thank you.
4         BY MS. OSTROM:
5     Q   And if you want to go off the record,
6  Mr. Tiscareno, please advise me that you want to,
7  and I'll decide at that time whether to ask the
8  reporter to do so. She won't go off the record at
9  your request or your counsel's, but only at our
10 request. So if you need to speak with your counsel
11 or take a break just make sure you tell me. Okay?
12    A   Sure.
13    Q   And then the other thing is I'm going to be
14 asking a lot of questions today. And if you don't
15 understand something or don't hear something that I
16 ask, please tell me. I'll rephrase it, repeat it,
17 whatever we need, to make sure we understand each
18 other.
19        And the other thing is, please allow me to
20 ask the question completely before you answer so we
21 don't talk over each other for the record, and then
22 also if you could please speak audibly when you
23 answer, saying yes or no with an answer, rather
24 than a nod of the head so that again it shows up on
25 the transcript. Okay?
```

Page 9

1   A   Yes.
2       (SEC Exhibit No. 2 was marked
3       for identification.)
4   BY MS. OSTROM:
5   Q   And, Mr. Tiscareno, in front of you is a
6 copy of Exhibit Number 2. Is this a copy of the
7 subpoena that you're appearing pursuant to here
8 today?
9   A   Yes.
10  Q   What's your date of birth?
11  A   January 15, 1958.
12  Q   And what is your social security number?
13  A   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.
14  Q   And can you please give me your home
15 address?
16  A   13119, 200 Seventh Avenue Southeast,
17 Issaquah -- that's spelled I-S-S-A-Q-U-A-H -- state
18 of Washington 98027.
19  Q   And do you have a work address?
20  A   I'm self-employed, and no.
21  Q   Do you work out of your home?
22  A   Yes.
23  Q   Okay. And what's the name of your business?
24  A   It's self-employed.
25  Q   So you don't have an actual company?

Page 10

1   A   No. No.
2   Q   Okay. And can you tell me what you do
3 currently?
4   A   I'm retired, and I do consulting on the
5 side.
6   Q   What kind of consulting do you do?
7   A   I do engineering consulting.
8   Q   And what does that entail?
9   A   Currently doing radio design.
10  Q   And what do you design?
11  A   Well, currently, it's an amateur radio
12 transceiver.
13  Q   Okay. Go ahead.
14  A   It just includes some of the bits and
15 pieces I do.
16  Q   And what is your educational background?
17  A   I went to Grossmont College. I did not
18 finish and so I'm self-taught, electrical engineer
19 and acoustics.
20  Q   When did you attend Grossmont College?
21  A   1975.
22  Q   How long did you attend?
23  A   I think a year and a half, yeah.
24  Q   Where is Grossmont College?
25  A   El Cajon, California.

Page 11

1   Q   And then where did you go to high school
2 and when did you graduate?
3   A   Mount Miguel High School, Spring Valley,
4 California, and I graduated in 1975.
5   Q   And before you became self-employed, where
6 did you work?
7   A   I worked at Apple, Incorporated.
8   Q   And what time period was that?
9   A   February 2004 to February 2011.
10  Q   And prior to Apple, where did you work?
11  A   Self-employed. I was a VP of engineering
12 at our firm corporation.
13  Q   What was the name of the company?
14  A   It was called Red Rose Music.
15  Q   What was your title at Apple?
16  A   I was senior manager of audio and acoustics.
17  Q   Was that the entire time period?
18  A   No. Well, yes, I was a manager at one
19 point, divisions changed, things changed.
20  Q   So are you saying that you were a manager
21 but not necessarily it wasn't called audio and
22 acoustics the entire time?
23  A   Yes, it was.
24  Q   Okay. So --
25  A   I wasn't a manager the whole time I was

Page 12

1 there. I didn't know if that's what the question
2 was.
3   Q   I got you. So when did you become senior
4 manager?
5   A   When I first started.
6   Q   And when did that end?
7   A   I'm going to say beginning of 2012,
8 maybe -- yeah.
9   Q   I thought that you left in 2011.
10  A   I'm sorry.
11  Q   That's okay.
12  A   2005. Yeah, year, year and a half after I
13 started there.
14  Q   I got you. And then what was your title
15 after that?
16  A   Well, it was acoustics engineer, audio and
17 acoustics engineer. I forgot what my card used to
18 say.
19      BY MR. GOTTSCHALL:
20  Q   So just to be clear.
21      During, let's say the last year, part of your
22 tenure at Apple, so from January 2010 through the
23 time you left, what was your title at Apple?
24  A   Senior engineer, Audio and
25 Acoustics, I think.

Page 65

1  paying for it.  Apple's an, you know, interesting
2  company when it comes to that stuff.
3       MR. GOTTSCHALL:  So let's talk about the
4  demonstration on the iDevice.
5       Did you communicate to the GenAudio folks
6  that you were pleased with their -- the software's
7  performance?
8       THE WITNESS:  I'm sorry.  I spaced for just
9  a split second.  If you would come back on that.
10      MR. GOTTSCHALL:  Yeah.  So I'm just
11 focusing on -- for a moment, on the demonstration
12 on the iDevice.
13      THE WITNESS:  Yes.
14      MR. GOTTSCHALL:  Did you communicate at the
15 end of that demonstration to the GenAudio folks
16 that you were pleased with the -- the sound
17 enhancement?
18      THE WITNESS:  Yes.
19      MR. GOTTSCHALL:  Okay.  And did you
20 communicate to them the next steps that would be
21 taken, if any?
22      THE WITNESS:  Well, that was about in the
23 middle of the point A to point B of the -- of the
24 life of our business relationship.  So I was giving
25 him -- we -- constructive criticism and how we

Page 66

1  would best succeed at both of what we were trying
2  to attempt to do.  Which is, he was supposed to
3  provide me with working software, and I was trying
4  to put together a demonstration that would
5  demonstrate the product in a favorable way so that
6  people could understand it.
7       And, you know, if it's going to work,
8  people would like this and they want to do
9  something like this, let's -- let's make sure we
10 give them everything.  We don't want to give him a
11 bunch of excuses along with the demo.  So he
12 provided everything.
13      It was -- it was -- it was nicely done, you
14 know.  He did a nice job and, you know, I --
15 anybody I was ever working with, I would say, hey,
16 this -- thank you very much for doing this.  It was
17 just a human thing to do.
18      MR. GOTTSCHALL:  But did you communicate to
19 GenAudio that at the end of those demonstrations
20 what Apple intended to do next with GenAudio's
21 technology or products?
22      THE WITNESS:  Well, I don't recall anything
23 that was very specific.  What -- what we were
24 trying to do was continue working together and
25 see -- because it could easily have died right

Page 67

1  then.  So also, I have to get permission from my
2  boss to spend any kind of time on it.  It was a
3  side project, a total side project.  It had nothing
4  to do with what I was working on.
5       Again, there was no project to put this
6  into.  So my boss said I could continue working on
7  this.  So because it could have been killed right
8  then and there.  So that's as simple as that.
9       MR. GOTTSCHALL:  But what did you tell
10 GenAudio you wanted to do to keep working with
11 them?
12      THE WITNESS:  Well, you know, I -- well, I
13 don't remember specifically.  But, in general -- in
14 general, it was what I said before.  It was
15 constructive criticism.  How do we make this work
16 the way we think it needs to work?  What feature
17 set?  Because the original product, the original
18 thing he had was very rudimentary.  And then.
19      I said, it -- look, it doesn't matter
20 whether it's Apple or anybody else.  I said the
21 engineers will like if they have a toolset to a
22 user interface that's easy to use.  Because if
23 you're doing acoustics, you could imagine dealing
24 with the acoustics itself, that part of it, and
25 then still having to work with the software which

Page 68

1  is arcane.
2       I said, look, if you could just give us the
3  user interface, that's easy to use and we can
4  adjust this thing very quickly and you'll make
5  friends with this.  And that's what I told him, and
6  he went back and did it.  And, you know, I said,
7  hey, thank you very much for doing that.  It's a
8  great project.
9       And then I think post that and later on in
10 the relationship, he -- he -- it came in -- it did
11 well for him.  He used that, all that work that he
12 did, it worked out for him in future demos with
13 other products, other people.
14      MR. GOTTSCHALL:  So similar questions with
15 respect to the demonstration that GenAudio did for
16 the Mac hardware.
17      THE WITNESS:  Uh-huh.
18      MR. GOTTSCHALL:  At the end of that
19 demonstration, did you communicate -- what did you
20 communicate to GenAudio that were the next steps in
21 the relationship?
22      THE WITNESS:  That meeting did not go well.
23 I told Jerry that meeting didn't go well.  It went
24 poorly.
25      MR. GOTTSCHALL:  How so?

[12/3/2014] TISCARENO_VICTOR_20141203                    Pages 65 - 68

Page 69

1  THE WITNESS: It went poorly because of --
2  because his behavior was over the top. There was a
3  -- there was a person that I invited to the
4  meeting, an audio guy that -- that had a Ph.D. in
5  acoustics.
6      And I said, "Jerry, don't mess with that
7  guy. He doesn't like this type of software."
8      So, you know, I just told him to -- to be
9  careful with this guy. As we entered the room, I
10 said, be careful. And it blew up.
11     MR. GOTTSCHALL: So first of all, who's the
12 Ph.D. in acoustics that was --
13     THE WITNESS: Andrew Bright.
14     MR. GOTTSCHALL: And --
15     THE WITNESS: So the meeting didn't go
16 well.
17     MR. GOTTSCHALL: So walk us through why the
18 meeting didn't go well. What happened at the
19 meeting?
20     THE WITNESS: Well, he got into a -- aside
21 from a disagreement, an argument. And instead of
22 taking it outside or to the side or, you know, for
23 friendly discussion, it got -- it got loud. It was
24 embarrassing. And I -- and I said that meeting
25 didn't go well.

Page 70

1      BY MS. OSTROM:
2   Q  Was this an argument with Mr. Bright and
3  Mr. Mahabub?
4   A  Yeah. Mr. Bright actually was very
5  reserved, actually, considering.
6      MR. GOTTSCHALL: Was it a technical
7  disagreement then between the two?
8      THE WITNESS: Yeah. Well, you know, this
9  is cycle acoustics, and it's kind of like 3D video.
10 It's -- it's -- and you know how well that works.
11 So some are good, some are bad. And -- and so he
12 -- he didn't believe it will ever work right.
13     And he tried it at his previous -- he'd
14 done a lot of research on it. He worked for Nokia
15 and other companies, and he had a lot of experience
16 with this stuff and he disagreed with it.
17     And he -- he just totally disagreed. I'm
18 not going to -- you know, he just disagreed with
19 Jerry. He thought Jerry didn't know what he was
20 talking about. So --
21     MR. ELTRINGHAM: Did Mr. Bright ask
22 questions of Jerry or how did this erupt?
23     THE WITNESS: Yes. I think Andrew Bright
24 sort of gave a challenging question about what
25 Jerry was doing on the whiteboard, and Jerry took

Page 71

1  offense to that. And instead of -- I don't know,
2  it just went bad.
3      It's just -- it's just not the kind of
4  meeting you want. It's just very embarrassing. I
5  mean, I -- that's the last meeting for me. I won't
6  get these guys back. That's the way it went down.
7  It was -- it was bad.
8      MR. GOTTSCHALL: And as you sit here today,
9  can you -- can you recall the timing of this
10 meeting, when it happened?
11     THE WITNESS: I don't know how you mean. I
12 mean --
13     MR. GOTTSCHALL: Well, I'm just trying to
14 put this -- put this meeting somewhere in time, so
15 you --
16     THE WITNESS: Well, it was towards the end.
17 It was either -- it was either this was the last
18 meeting or -- or the one after it with that -- I
19 showed it on the iPod Touch or whatever we had it
20 on. But one of these iDevices, and showed it to my
21 marketing friends.
22     MR. GOTTSCHALL: But did that meeting
23 happen in 2010, early 2011?
24     THE WITNESS: It would have been probably
25 2010, because I left early 2011, and I don't think

Page 72

1  I ran it right -- I didn't do that kind of meeting
2  right at the end. I was just trying to get my work
3  done.
4      BY MS. OSTROM:
5   Q  How -- how -- how are meetings scheduled at
6  Apple? Would there be some type of record of -- of
7  this meeting having occurred at Apple?
8   A  Oh, yeah.
9   Q  How -- what kind of records would we look
10 for?
11  A  Well, there's calendars, Meeting Makers was
12 what it was called probably at the time or
13 calendar, Apple's Calendar. They had created their
14 own.
15  Q  Okay. So these kind of meetings would have
16 been on there?
17  A  Oh, yeah.
18  Q  Okay.
19  A  Somehow.
20     MS. OSTROM: Why don't we take a short
21 break.
22     (Whereupon, a recess was taken at 10:48
23 a.m.)
24     (Whereupon, the proceedings resumed at
25 10:52 a.m.)

Page 73

1          BY MS. OSTROM:
2     Q   Let's go ahead and go back on the record.
3          And while we were off the record,
4  Mr. Tiscareno, did we have an substantive
5  discussions regarding this investigation?
6     A   No.
7     Q   And I'll ask you that every time when we
8  come back on the record, just so you know.
9          At any point in time, are you aware of
10 anyone from Apple indicating any interest in doing
11 any type of transaction with GenAudio?
12    A   No.
13    Q   Specifically, did Apple ever indicate that
14 they were interested in licensing GenAudio's
15 technology?
16    A   Specifically that question?
17    Q   Yes.
18    A   No.
19    Q   And did Apple ever indicate that they were
20 interested in acquiring GenAudio's intellectual
21 property?
22    A   No.
23    Q   Did Apple ever indicate that they were
24 interested in acquiring GenAudio?
25    A   No.

Page 74

1     Q   To your knowledge, did anyone from Apple
2  say anything that could reasonably have been
3  misconstrued by anyone at GenAudio as indicating
4  interest in a deal between the two companies?
5     A   No.
6     Q   Do you have any more specific recollections
7  about how the relationship ended between GenAudio
8  and Apple, at least with your involvement?
9     A   It -- it ended well in the sense that I'm
10 -- it ended well in that we just parted ways.
11    Q   Was there a -- I know you said earlier you
12 thought maybe you communicated by e-mail or phone
13 call.
14         Do you recall an actual communication with
15 Mr. Mahabub about your retirement?
16    A   Not a specific instance. I can't point to
17 it.
18    Q   And what about the relationship? I'm
19 sorry, I shouldn't say that. What about the
20 continuing evaluation of the software?
21    A   I don't recall. I'd say no.
22    Q   Okay. Did -- before you retired, do you
23 recall what the last communication was with
24 Mr. Mahabub?
25    A   I don't.

Page 75

1     Q   Did he ever come back to you and -- and
2  say, how did the -- any other testing go after that
3  meeting? Was there anything else? Did he ask you,
4  Can I do anything, is there anything, you know,
5  that kind of thing?
6     A   I don't recall.
7     Q   You don't recall that it happened?
8     A   I don't recall that it happened, no. I
9  guess no would be just as good.
10    Q   Okay. Now, at some point, after you left
11 Apple, you got in touch with either Mr. Mahabub or
12 GenAudio; is that correct?
13    A   That's correct.
14    Q   When was that?
15    A   Fall of 2011.
16    Q   And what was the purpose of that contact?
17    A   He either called me or I called him. And I
18 would -- I don't remember which way it went, but I
19 -- I would -- it could easily have been me. I
20 don't know if it matters.
21    Q   And what was the substance of the
22 conversation?
23    A   The subject was, is that I -- I don't know
24 how it developed, honestly. But what it did end up
25 with is that we had -- I had some ideas on how to

Page 76

1  do some business development for him through my
2  network.
3     Q   And what were those ideas?
4     A   I knew that there were -- again, business
5  development is doing the same thing he was doing,
6  walking into places and trying to get people to
7  sign up and licensed. And so one of my ideas was
8  to -- my first stop was I made arrangements to go
9  into Texas Instruments.
10    Q   Were you acting as a self-employed
11 consultant at that point?
12    A   Yes, yes.
13    Q   And so was this -- were you reaching out,
14 if that's the way it happened or vice versa,
15 reaching out to him to see if you could do some
16 consulting work for them?
17    A   Ask that again. I just want to make sure
18 I'm answering the question properly.
19    Q   Were you reaching out to Mr. Mahabub to see
20 if you could provide some consulting services to
21 GenAudio?
22    A   I'll say yes, but I'm not sure if -- what
23 -- if I went this way or he came that way. And it
24 wasn't going to be full-time employment, so
25 consulting was it --

[12/3/2014] TISCARENO_VICTOR_20141203                                   Pages 73 - 76

Page 137

1  Q  It says, "I can't wait to meet him for our
2  one-on-one meeting, which is according to Vic is
3  still on the radar screen for when we reopen
4  hailing frequencies with them."
5      Did you at any point have any discussions
6  with Mr. Mahabub about him meeting with Steve Jobs?
7  A  No.
8  Q  Okay. And then the very top of SEC 5, the
9  very first, it's the full sentence. This just
10 talks about something different. So I just want
11 you to -- well, I'll just ask this question, too.
12 It says, "Now, we are simply waiting at the end of
13 the tunnel."
14     Do you see that?
15 A  Yeah.
16 Q  Okay. " Now, we are simply waiting at the
17 end of tunnel for them to open up their doorway and
18 acquire the technology and bring it to life for the
19 world to enjoy."
20     At any point did you ever discuss with
21 Mr. Mahabub Apple wanting to acquire GenAudio's
22 technology?
23 A  No. And if I may add, that would rise to
24 somebody else at Apple anyway. That discussion
25 wouldn't even -- even if I -- just so you get the

Page 138

1  general sense. It's corporate America. Even if I
2  was championing the product, and I went to my boss
3  and my boss -- he'd have to take it, and it would
4  have to go elsewhere, and I would be left out.
5  It's just not my conversation.
6  Q  This was an earlier question, I figure I
7  should just ask you. What's WWDC in June?
8  A  Worldwide Developers Conference. That's an
9  Apple developers conference. It's famous now.
10 Q  And it's specific to Apple, right?
11 A  Yeah.
12 Q  That's when the releases and things are
13 made?
14 A  For software developers.
15 Q  Okay. And then if you could look at the
16 very first page again of Exhibit Number 4. So
17 where you're at.
18 A  Okay.
19 Q  Where you're at.
20 A  You said 4. I was thinking 4.
21 Q  I'm sorry. Exhibit Number 4, the very
22 first page at the top. Your e-mail to Mr. Skluzak
23 in response to having the Mahabub e-mail forwarded
24 to you.
25     What was your general reaction when you saw

Page 139

1  this?
2  A  I was stunned, literally stunned. I would
3  almost say I was probably shaking. My wife was
4  there, and she read it. She goes, you didn't write
5  this. I can tell your writing from his. You know,
6  when -- when Dell told me, I wouldn't even imagine
7  the letter was this kind of letter. I thought it
8  was maybe, you know, a little more professional
9  letter.
10     So, you know, again, I just tried to
11 quickly set the record straight. This just did not
12 happen.
13 Q  Did you ever consider confronting
14 Mr. Mahabub?
15 A  I was -- I was completely out of the loop
16 on this.
17 Q  I understand. I mean, after you got this.
18 So when you saw this forwarded to you in October of
19 2013, did you give any considerations talking to
20 Mr. Mahabub about it?
21 A  I -- I just shut it away. I mean, I just
22 shut it off. You know, I just --
23 Q  And just going through a few of the things
24 that you said at the top, the second paragraph, the
25 second sentence says, "However, I never discussed

Page 140

1  anything about Steve Jobs or any of the board
2  members at Apple. I never discussed with Steve
3  Jobs," period, exclamation mark.
4      Is that accurate?
5  A  Yes.
6  Q  And then the next sentence says, "Jerry's
7  demos were shown to midlevel management engineers"
8  And then in bold it says, "There was never any
9  discussion about buy-out. If it was mentioned it
10 only came out of Jerry's mouth, OMG," exclamation
11 mark, the end of the bold.
12     Is all of that accurate?
13 A  Yes.
14    MR. GOTTSCHALL:  OMG refers to what?
15    THE WITNESS:  Oh, my God.
16    MR. GOTTSCHALL:  Thank you.
17    BY MS. OSTROM:
18 Q  And we should go back because there was one
19 of those, the first LOL reference.
20 A  Laughing out loud. So I apologize for my
21 shorthand, but everybody gets it. Again, I was
22 stunned.
23 Q  Now, the next sentence says: Licensing
24 will only come about if we could get the product
25 working and get an approval. We never got out of

Page 165

1 never know. You might get into places --
2      MR. ELTRINGHAM: You're not done yet.
3      BY MS. OSTROM:
4   Q  So do you know who he's referencing when he
5 says expert in acoustics physics, if it's referring
6 to Apple?
7   A  We can make assumptions. I don't know who,
8 might be me.
9   Q  Is there anybody else who he was meeting
10 with that would be considered an expert in
11 acoustics physics other than yourself?
12   A  He could have been meeting with Jeff
13 Hammerstrom. But, you know, honestly, Jeff went
14 along for the ride. He wasn't pro or con on the
15 product.
16      MR. ELTRINGHAM: What about that Ph.D. that
17 he didn't get along with, would that be an expert?
18      THE WITNESS: Yeah, but he didn't come in
19 till the very end, the 2010 date, kind of takes him
20 out of the equation.
21      BY MS. OSTROM:
22   Q  And am I correct that you never passed
23 along any requests from Steve Jobs to meet with
24 Mr. Mahabub?
25   A  No.

Page 166

1   Q  The next sentence: "This meeting will take
2 place within the next couple of weeks." This is
3 dated August of 2010. To your knowledge, did
4 Mr. Mahabub ever meet with Steve Jobs or have a
5 meeting scheduled with Steve Jobs?
6   A  No, not that I'm aware of.
7   Q  I think I asked you about this earlier, but
8 now it's in writing about the fifth line up from
9 the bottom of that first paragraph. The sentence
10 begins: It has been requested. Do you see that
11 sentence?
12   A  Yeah.
13   Q  It says: It has been requested that we
14 sign an even more restricted NDA with the LCEC.
15 expect to receive this new NDA within the next
16 couple of weeks. Did you ever request that
17 GenAudio sign a more restrictive NDA with Apple?
18   A  Every -- I did not.
19   Q  And then go ahead. What were you going to
20 say?
21   A  So the answer is no. But he did work with
22 Ron Isaac across the street -- and I call it across
23 the street, it's the other department. And he may
24 have asked him to sign a very similar NDA that
25 we -- in tern, I'm sure it was the same one, but

Page 167

1 his department has to collect those too.
2   Q  Is there a step-up NDA? So is there
3 something what's referred to in here as a more
4 restrictive NDA? Was there such an animal at the
5 time in Apple in 2010?
6   A  Not that I'm aware -- not that I'm aware
7 of.
8   Q  Okay. And was there ever -- so thinking,
9 first of all, the normal NDA was just talking about
10 standards that Apple had in 2010. Was there any
11 negotiations allowed by people who signed that with
12 Apple, that they were just a vendor -- were they
13 allowed to negotiate the terms of that?
14   A  There probably were some cases. You know
15 that could have -- I don't know of any personally,
16 but I could see that happening. It just depends,
17 two titans coming together. Hey, I don't like your
18 NDA, but these are -- if you look at this NDA, it's
19 pretty standard.
20   Q  And would someone coming in off the street,
21 like GenAudio, Jerry Mahabub would have the
22 leverage to negotiate the NDA with Apple, would
23 that have been something that would have happened?
24   A  Probably not. I'm not saying it couldn't
25 be done and would he dare ask and get into that, I

Page 168

1 mean, he could have, but I don't think so. So I
2 would say the answer's no.
3   Q  And by the time we're hitting August of
4 2010, I ask you the same questions again. So we're
5 talking about a little later time period. In
6 August of 2010, was there any interest expressing
7 when Apple -- to license GenAudio's technology?
8   A  No.
9   Q  And was there any interest in acquiring
10 GenAudio by Apple?
11   A  No.
12   Q  I just have one more because we brought it
13 up.
14   A  Now, if you go back, just to be clear --
15   Q  Absolutely.
16   A  -- that -- when you come into Apple, just
17 to be sure. Come into Apple, a vendor comes into
18 Apple. They're there to sell the services, sell
19 components or parts or license something, a piece
20 of software. There's about -- those three things.
21      And so I guess you could -- I just want to
22 be sure, you know, if I'm inviting them in, at some
23 point, if it works out, yeah, we'll go ahead and
24 ask them, but we never got there. So I want to be
25 sure that's 110 captured that I don't know how that

[12/3/2014] TISCARENO_VICTOR_20141203                    Pages 165 - 168

Page 177

1  Q  And has he spoken to you since then about
2  the investigation at any point?
3  A  Absolutely not.
4  Q  And other than your wife and your counsel,
5  have you spoken with anyone regarding the fact that
6  you are appearing here today?
7  A  No.
8  Q  And have you -- do you know of anyone else
9  who has been subpoenaed or testified in this
10 investigation?
11 A  No.
12 Q  And, Mr. Tiscareno, we have no further
13 questions at this time. We may, however, call you
14 again to testify in this investigation and should
15 this be necessary we will contact you through your
16 counsel. And is there anything that you would wish
17 to clarify or add to the statements you have made
18 today?
19 A  Circle back to my e-mails, I gave you my
20 main e-mail. I have some very, very old accounts I
21 didn't think were important.
22 Q  You mean, your actual e-mail addresses?
23 A  Yeah.
24 Q  That's fine. If we need those, we'll
25 contact you.

Page 178

1  A  Okay.
2  Q  Don't worry about -- that's fine.
3  A  I can't think of anything else unless you
4  have other questions.
5     MS. OSTROM: No, I think that's it. So we
6  will go off the record at 2:40 p.m., on December 3rd
7  of 2014.
8     (Whereupon, at 2:40 p.m. the proceedings
9  concluded.)
10        * * * * *

Page 179

1  REPORTER'S CERTIFICATE
2
3
4  I, Theresa L. Mendez, reporter, hereby certify that the
5  foregoing transcript of 180 pages is a complete, true and
6  accurate transcript of the testimony indicated, held on
7  December 3, 2014, at Denver, Colorado. in the matter of:
8  Genaudio, Inc..
9
10
11 I further certify that this proceeding was recorded by me,
12 and that the foregoing transcript has been prepared under my
13 direction.
14
15
16
17             Date: _____
18             Official Reporter: _____
19             Diversified Reporting Services, Inc.

Page 180

1  PROOFREADER'S CERTIFICATE
2
3  In the Matter of:   GENAUDIO, INC.
4  Witness:            VICTOR TISCARENO
5  File Number:        D-03450-A
6  Date:               DECEMBER 3, 2014
7  Location:           DENVER, CO
8
9
10    This is to certify that I, Beth Roots,
11 (the undersigned), do hereby swear and affirm
12 that the attached proceedings before the U.S.
13 Securities and Exchange Commission were held
14 according to the record and that this is the
15 original, complete, true and accurate transcript
16 that has been compared to the reporting or recording
17 accomplished at the hearing.
18
19
20
21 _____    _____
22 (Proofreader's Name)        (Date)

Page 181

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:             )
                              )   File No. D-03450-A
GENAUDIO, INC.                )

WITNESS:   Victor Tiscareno

PAGES:     181 through 254

PLACE:     Martin Davis, PLLC

           1200 Westlake Avenue North, Suite 604

           Seattle, WA 98109

DATE:      Wednesday, April 29, 2015

    The above entitled matter came on for hearing, pursuant to notice, at 1:05 p.m.

Diversified Reporting Services, Inc.

(202) 467 9200

```
                                                        Page 182
 1      APPEARANCES:
 2
 3      On behalf of the Securities and Exchange Commission:
 4          JENNIFER OSTROM, ESQ. (Via telephone)
 5          Securities and Exchange Commission
 6          1801 California Street
 7          Suite 4800
 8          Denver, Colorado
 9          (303) 844-1047
10
11      On behalf of the Witness:
12          JOHN R. ELTRINGHAM, ESQ.
13          MartinDavis, PLLC
14          1200 Westlake Avenue North, Suite 604
15          Seattle, Washington 98109
16          (206) 829-8619
17
18
19
20
21
22
23
24
25
```

```
                                                        Page 183
 1              C O N T E N T S
 2
 3      WITNESS:                    EXAMINATION
 4      Victor Tiscareno                185
 5
 6      EXHIBITS:   DESCRIPTION         IDENTIFIED
 7       125        Email string            199
 8       126        Email string            219
 9       127        Email string            224
10       128        Email string            227
11       129        Email string            238
```

```
                                                        Page 184
 1              P R O C E E D I N G S
 2          MS. OSTROM: Let's go on the record at
 3  1:05 p.m. on April 29th of 2015. My name is
 4  Jennifer Ostrom. And I am an officer of the
 5  United States Securities and Exchange Commission
 6  for purposes of this proceeding. We are today
 7  resuming the examination of Victor Tiscareno
 8  which was adjourned on December 3rd of 2014.
 9          Would counsel please identify himself.
10          MR. ELTRINGHAM: Good afternoon.
11  John R. Eltringham, E-l-t-r-i-n-g-h-a-m, attorney
12  for Mr. Tiscareno.
13          MS. OSTROM: The testimony today is
14  pursuant to a Commission subpoena, which has been
15  previously marked as Exhibit Number 2.
16          And, Mr. Tiscareno, do you understand
17  that you remain under oath?
18          MR. TISCARENO: Yes.
19          MS. OSTROM: Let the record reflect
20  that a copy of the formal order of investigation
21  in this matter will be available for examination
22  during the course of this proceeding today.
23  Whereupon,
24              VICTOR TISCARENO
25  was recalled as a witness and, having been
```

```
                                                        Page 185
 1  previously duly sworn, was examined and testified
 2  further as follows:
 3              EXAMINATION
 4          BY MS. OSTROM:
 5      Q   And, Mr. Tiscareno, did provide to your
 6  counsel some documents to produce to us?
 7      A   Yes.
 8      Q   And could you please describe the
 9  documents that you produced to us, just in
10  general?
11      A   They were copies of my emails I
12  received while working for Apple.
13      Q   And where were these documents located?
14      A   They were on an archive hard disk that
15  I had, external archive.
16      Q   And did you withhold any documents from
17  us?
18      A   No.
19      Q   Jerry Mahabub testified that from 2009
20  through when you left Apple in February of 2011
21  you and he had almost daily phone calls; is that
22  accurate?
23      A   I don't know about daily. Often.
24      Q   Okay. More than weekly?
25      A   I would say weekly would be fair.
```

2 (Pages 182 to 185)

Page 186

1  Q  Okay.
2  A  Would be fair.
3  Q  Okay. If you could look at what has
4  already been marked as Exhibit Number 119.
5  A  Here it is right here.
6     MR. ELTRINGHAM: Yes. Mr. Tiscareno
7  has it in his hand.
8     BY MS. OSTROM:
9  Q  And, Mr. Tiscareno, did you produce
10 Exhibit 119 to the staff?
11 A  Yes.
12 Q  And did you receive this email from
13 Jerry Mahabub on or about October 19th of 2009?
14 A  Yes.
15 Q  And then keeping that Exhibit Number
16 119 in front of you. Could you please look at
17 Exhibit Number 120.
18    MR. ELTRINGHAM: Yes, he has it.
19    BY MS. OSTROM:
20 Q  And, Mr. Tiscareno, what I wanted to
21 tell you is that a different version of the email
22 in Exhibit Number 119 was produced to us by Jim
23 Mattos, a GenAudio employee.
24 A  Yes.
25 Q  I'm going to point out some of the

Page 187

1  differences in the email that you produced and
2  the one produced by Mr. Mattos and ask you some
3  questions about those differences. If you see
4  anything else in the emails that you want to
5  comment on, and that I don't ask you about,
6  please do so.
7     If you look at page three of Exhibit
8  Number 120.
9  A  I'm there.
10 Q  Did you receive this email beginning on
11 page three, which is Bates Number GA6848, of
12 Exhibit Number 120 from Jerry Mahabub?
13 A  No.
14 Q  Did you authorize Jerry Mahabub to
15 change the email that he sent you before
16 forwarding it on to his employees?
17 A  No.
18 Q  If you looked at Exhibit Number 120 and
19 in comparison to Exhibit Number 119. On Exhibit
20 Number 120 the to line shows that the email is to
21 Victor Tiscareno, Michael Hailey, Ronald Isaac,
22 Timothy Cook and Phillip Schiller. Is it
23 accurate that the email, the genuine email, that
24 you produced to us it was only sent to Victor
25 Tiscareno, Michael Hailey and Ronald Isaac?

Page 188

1  A  That's correct.
2  Q  And then on -- continuing on Exhibit
3  Number 120, there's a line that says, hi Michael,
4  Phil Ron, Tim and Vic. And the genuine email,
5  Exhibit Number 119, says hi Michael, Ron and Vic.
6  Is that accurate that it should hi Michael, Ron
7  and Vic?
8  A  That's correct.
9  Q  Okay. And then the next line shows --
10 it says, Tim, great to meet you on the phone the
11 other day. Glad you enjoyed the demo and we are
12 anxious to move forward to the next step. And
13 these are two sentences that are included in
14 Exhibit Number 120, but not in Exhibit Number
15 119.
16    Is it correct that you never saw those
17 lines in any email to you?
18 A  That is correct.
19 Q  Did you ever see any emails from Mr.
20 Jerry Mahabub to Tim Cook?
21 A  I never saw. No.
22 Q  Okay. And then if you go down two more
23 lines it says Vic, Phil, Michael, do you see that
24 on Exhibit 120?
25 A  Yes.

Page 189

1  Q  And then on Exhibit Number 119, which
2  you produced to us, it only says Vic. Is that
3  the accurate email?
4  A  Yes.
5  Q  And on Exhibit Number 119 that you
6  produced to us it says, Vic, will call you
7  tomorrow. Is that the extent of the email that
8  you received from Mr. Mahabub as to that line?
9  A  Yes.
10 Q  Okay. And on Exhibit Number 120 it
11 continues after will call you tomorrow, it says
12 morning at 9:00 a.m. PST for the conference call
13 with the three of you. Was there ever a
14 conference call with yourself, Phil Schiller and
15 Michael Hailey and Mr. Mahabub?
16 A  No.
17 Q  Did you ever see any emails from Mr.
18 Mahabub to Phil Schiller?
19 A  No.
20 Q  Who is Tim Cook?
21 A  Tim Cook then or now?
22 Q  Give me both if you don't mind.
23 A  He was chief operating officer of Apple
24 at that time.
25 Q  Yes.

Page 190

1   A   And currently he's the chief executive
2   officer of Apple.
3       Q   Okay. And can you give me the same for
4   Phil Schiller, his role at that time and what he
5   is currently.
6       A   I believe it's the same today as it was
7   at that time, senior vice-president of global
8   marketing, I think is his title --
9       Q   Okay.
10      A   -- for Apple.
11      Q   Was Mr. Cook ever present at any
12  discussions with Jerry Mahabub?
13      A   Not that I'm aware of, no.
14      Q   Okay. Was Mr. Cook present at any
15  internal discussions within Apple about
16  GenAudio's technology?
17      A   Not that I'm aware of and, no, not in
18  front of me.
19      Q   To your knowledge, was Tim Cook ever
20  present at any -- at any demonstration of
21  GenAudio's technology?
22      A   Not in front of me.
23      Q   I'm sorry, what did you say?
24      A   I'm going to say no, if this is
25  referring to my time at Apple, but I don't know

Page 191

1   of any --
2       Q   Yes.
3       A   I don't know of any time that GenAudio
4   was with Tim Cook.
5       Q   Okay. Did you ever hear that Tim Cook
6   was given a demonstration of GenAudio's
7   technology?
8       A   No.
9       Q   Were you present at any meeting with
10  Jerry Mahabub that Phil Schiller was also present
11  at?
12      A   No.
13      Q   Were you ever present at any meetings
14  in which Phil Schiller was present by phone with
15  Jerry Mahabub and yourself?
16      A   No.
17      Q   Were you present at any internal
18  discussions within Apple about GenAudio's
19  technology at which Mr. Phil Schiller was
20  present?
21      A   No.
22      Q   To your knowledge, was Phil Schiller
23  ever present at any demonstration of GenAudio's
24  technology?
25      A   He was not.

Page 192

1       Q   Did you ever hear that Phil Schiller
2   was given a demonstration of GenAudio's
3   technology?
4       A   I did not hear any.
5       Q   Did you ever tell Jerry Mahabub that
6   Phil Schiller had heard a demonstration of
7   GenAudio's technology?
8       A   I never heard any discussion of it.
9       Q   Okay. My -- but my question was did
10  you ever tell Jerry Mahabub that Phil Schiller
11  had heard a demonstration of GenAudio's
12  technology? Did you ever tell Jerry that?
13      A   No.
14      Q   Okay. Did Phil -- excuse me, did Phil
15  Schiller ever tell you that he wanted Jerry
16  Mahabub to put together more material for a
17  demonstration?
18      A   I never heard anything like that.
19      Q   Did Phil Schiller ever talk to you
20  about GenAudio's technology or Mr. Mahabub at
21  all?
22      A   No.
23      Q   Jerry Mahabub testified that you told
24  him that Phil Schiller requested that there be
25  more material for a demonstration. Did you ever

Page 193

1   tell that to Jerry Mahabub?
2       A   No.
3       Q   Jerry Mahabub testified that you might
4   have told him that Michael Hailey requested more
5   material for a demonstration. Do you recall
6   telling him that?
7       A   For Michael Hailey?
8       Q   Yes.
9       A   Yes.
10      Q   Okay. And what were the circumstances?
11      A   We had -- well, I was working very
12  closely with Michael Hailey. Michael Hailey is
13  in marketing. And we were simply putting
14  together a demonstration, and we were going to
15  present it to his boss.
16      Q   And who was his boss?
17      A   His boss is a VP of iPod marketing at
18  the time. It may have been also iPhone, but it
19  doesn't matter. It's -- it's a -- somebody with
20  the I device department.
21      Q   And what was his name?
22      A   Greg Joswiak.
23      Q   Okay.
24          COURT REPORTER: Can you spell it?
25          THE WITNESS: J-o-s-w-i-a-k.

Page 194

1   BY MS. OSTROM:
2   Q   Okay. And Jerry Mahabub testified that
3   you told him that he would negotiate with Michael
4   Hailey from licensing GenAudio's technology. Did
5   you ever tell him that?
6   A   No.
7   Q   Jerry Mahabub testified that you told
8   him, "I will be shocked if we don't do a deal."
9   Did you ever tell him that?
10   A   No.
11   Q   If you look at Exhibit Number 120. The
12   Vic, Phil, Michael paragraph. The next sentence
13   where I left off, the -- it's the very first line
14   still, the second sentence. Hopefully rev 6 will
15   get the big man to want to move forward and firm
16   up a time for our one-on-one in the near future.
17   Had you ever spoken with Mr. Mahabub
18   about a possible meeting with Steve Jobs?
19   A   No.
20   Q   And then it goes on the next sentence.
21   It says, Phil, I have not cc'd the other product
22   marketing division managers you introduced me to,
23   as I have primarily been working with Michael
24   Hailey on the iPod/iPhone side.
25   To your knowledge, did Mr. Phil

Page 195

1   Schiller ever introduce Mr. Mahabub to anyone?
2   A   No.
3   Q   The next sentence says I am happy that
4   you and Michael like my ideas on how to bring the
5   technology to market. To your knowledge, did Mr.
6   Mahabub have any discussions with Mr. Phil
7   Schiller on bringing the GenAudio technology to
8   market?
9   A   Not that I'm aware of. I'd say no.
10   Q   And do you know of any product
11   marketing that was discussed with Mr. Hailey?
12   A   I'm not aware of any -- of Mr. Mahabub
13   ever discussing how to market the products to
14   Michael Hailey. But, you know, I don't know what
15   he would consider marketing advice.
16   Q   And that's fine. I just want to know
17   from your standpoint.
18   A   No. Not -- not a purposeful discussion
19   on this is how we should market. I mean, again,
20   I guess it's a matter of opinion what his advice
21   is worth.
22   Q   And then if you could turn to page four
23   of Exhibit Number 120, and comparing that to
24   Exhibit Number 119. It is the next paragraph in
25   Exhibit Number 119. It says attached you will

Page 196

1   find a new AB demo.
2   Do you see that?
3   A   Yes.
4   Q   And the first sentence is the same, but
5   then there's another -- there's more language
6   added in Exhibit Number 120, in the email that
7   you did not receive that was modified. It says
8   Vic asked me to provide him something other than
9   Deprived, with more "action" and actual game
10   play. Warsow, W-a-r-s-o-w, an online game that
11   I found after searching, downloading, playing and
12   testing a variety of games, and it worked great.
13   Do you know what he's talking about
14   there, Mr. Mahabub?
15   A   What Mr. Mahabub is talking about
16   there? I -- I --
17   Q   Yes.
18   A   I know what the game is. I -- I see
19   that there is a difference between the two
20   emails, and I don't know why.
21   Q   Okay. Did you ever ask him for that?
22   A   I don't recall ever saying anything
23   quite like that, but it's --
24   Q   Okay.
25   A   I just see that alteration and -- or

Page 197

1   the differences between the two, and I stand by
2   what I sent.
3   Q   Okay. And if you look at Exhibit
4   Number 120 now. And now we're going to look at
5   the part of the email that was forwarded on to
6   the employees. So, if you'll just look at the
7   first page, page one of Exhibit 120.
8   A   Okay.
9   Q   Am I correct that you've never seen
10   this before either?
11   A   I've never seen this.
12   Q   Okay. And if you look at that first
13   page, the fourth line down on the first
14   paragraph. It says Vic has given me the green
15   light verbally on the technical "sign-off" side
16   of the coin; however, he wanted to give it one
17   more pass and has requested we both give it one
18   more round of critical listening test this
19   evening.
20   Do you know what Mr. Mahabub is
21   referencing there?
22   A   Well, this is October 19th, 2009. I'm
23   not certain where we were in the design cycle
24   or -- again, this is strictly an evaluation piece
25   of software to give a demonstration. So, going

Page 234

1    A   Yes. I see this now.
2    Q   And then he's -- he's added that you
3  forwarded it on to the rest of senior team. Is
4  there any reason for that to be in there?
5    A   I didn't -- there's no reason for it.
6    Q   Okay. And did you tell Jerry Mahabub
7  that you had forwarded it on to the senior team?
8    A   I have not -- I did not say that to
9  Jerry Mahabub.
10   Q   Okay. And then the next line says
11 that -- in the modified email, on Exhibit Number
12 64, it says we listened to this on a large
13 system. And you have particular in your actual
14 email, you said I did not have a chance to listen
15 to this on a large system. Is that correct?
16   A   That's correct.
17   Q   Okay. And then if you would go down on
18 the -- it's kind of in the middle of that email
19 that's on Exhibit 64, that Mr. Mahabub has
20 modified.
21   A   Okay.
22   Q   It -- it's basically your email end,
23 and says copious amount of EQ. Do you see that?
24   A   Yes.
25   Q   Okay.

Page 235

1    A   Okay. I know I said that somewhere
2  copious amounts. Where was that? Yes.
3    Q   So, that's really the end of your
4  email.
5    A   Yes. That's correct
6    Q   The add gain and copious amount of EQ.
7  Do you see that?
8    A   Yes.
9    Q   And then there is a continuation on the
10 modified email that says, first sentence after
11 that, it says Steve has us looking very deep into
12 other audio technology so we can better
13 understand why yours is so much better.
14      Is there any basis in fact for that
15 statement?
16   A   There is no basis.
17   **Q   Did you have any discussions with Steve**
18 **Jobs about this demo?**
19   **A   I did not have any conversation with**
20 **Steve Jobs about anything having to do with**
21 **GenAudio.**
22   **Q   Okay. Did you tell Jerry Mahabub that**
23 **you had?**
24   **A   No. I never did.**
25   Q   And then if you look down the -- so,

Page 236

1  I'll -- I'll go ahead and just finish reading it
2  from there. It says we already did all this work
3  with you, so I know it may same redundant. We
4  simply do what he tells us to do. I have forward
5  your email on to Steve. He said he will give it
6  a listen in his home theater. This just might be
7  what you need to get him to support this from the
8  Pixar angle. How are your meetings going with
9  Disney?
10      Is there any basis in fact for any of
11 these statements that were added to your email?
12   A   There is no basis.
13   Q   And, in particular, one of the things
14 that Mr. Mahabub testified to was that you told
15 him to email Mr. Jobs directly. Did you tell him
16 that?
17   A   I don't believe I ever said that to
18 Jerry Mahabub.
19   Q   Okay. Jerry Mahabub testified that you
20 gave him Steve Jobs' email address. Did you give
21 him Mr. Jobs' email address?
22   A   I don't recall ever giving Steve
23 Jobs -- I mean Jerry, Mr. Mahabub, Steve Jobs'
24 email, although it is public knowledge.
25   Q   Okay. And Jerry Mahabub testified that

Page 237

1  he emailed Steve Jobs and you were copied on the
2  email. Were you ever copied on an email from
3  Jerry Mahabub to Steve Jobs?
4    A   No. Not -- it's not in my email stuff.
5  I -- I don't know of any.
6    Q   Okay. And if you look on page two of
7  Exhibit Number 64, this is the email that was
8  sent to Mr. -- from Mr. Mahabub to his employees.
9  And if you look at that second page it says even
10 though they are supposed to be in a no-radio
11 period with us.
12      Do you see that?
13   A   I see that.
14   Q   It says Vic and I have still been
15 talking and emailing each other. Vic said he was
16 getting separation anxiety to me on the phone.
17      Is there any basis for any of this --
18 any of this narrative that Mr. Mahabub said to
19 his employees?
20   A   I -- I don't remember ever saying
21 anything like that.
22   Q   And there was no, as he's called it,
23 radio silence period that you ever talked to him
24 about; correct?
25   A   No. I don't know where that comes

Page 250

1   talk to Mr. Bobak?
2       A   I don't recall him ever being on an
3   email thread, but that -- that's -- I --
4       Q   And -- and -- and that's fine, because
5   that was going to be my next question.  But did
6   you -- did you ever talk to him in that 2010/2011
7   time period?
8       A   No.
9       Q   Okay.  And since we last spoke, Mr.
10  Tiscareno, have you spoken with anyone regarding
11  this investigation?
12      A   Yes.
13      Q   And who have you spoken with other than
14  your counsel, obviously?
15      A   I have reached out to Michael Franze to
16  see if he had any emails.  Because I was looking
17  for emails.  And that's -- and I've also chatted
18  with Michael Henein if he had any information.
19  But, you know, again I was scrambling for -- I --
20  I didn't have any emails, I didn't think.
21      Q   And did -- was Mr. Henein, did he talk
22  to you about?
23      A   Well, it was -- it really was just
24  that -- that he had heard from Jerry.  But
25  that -- that, you know there was some issues

Page 251

1   that had developed.
2       Q   Did he say in any detail what those
3   issues were?
4       A   Well, that -- that -- that, apparently,
5   there was some investigation of this -- on this?
6       Q   Okay.  And did Mr. Henein give you
7   anything?
8       A   No, he didn't actually.
9       Q   Okay.
10      A   I mean not that -- you know, that
11  wasn't -- you -- you might appreciate this,
12  that -- that, you know, at -- at -- when GenAudio
13  had gone -- apparently, had some issues with
14  their board, then Mr. Skluzak was reaching out to
15  all parties.  And then as far as this goes, you
16  know, this is before we -- anyone knew that --
17  you know, anyway we just - - the -- the -- the
18  discussion never went down to details, I'll say
19  it that way.
20      Q   Okay.  And prior to your seeing the
21  emails that Mr. Mattos produced to us from
22  GenAudio, did you know that Mr. Mahabub had
23  modified so many of your emails?
24      A   I had no idea.
25      Q   And, Mr. Tiscareno, at this time is

Page 252

1   there anything that you want to add to what
2   you've already said today or clarify?
3       A   Actually, you know, it's a
4   disappointment really.  That's -- that's all I can
5   add.
6       Q   What in particular are you referring
7   to?
8       A   Well, I'm disappointed that -- that
9   this - - this was done -- well, that -- that so
10  many people are involved in something that, you
11  know, that -- I don't know what to say.  There
12  was this undercurrent that was going on, and
13  unbeknownst to probably a lot of people and --
14  and here I am learning about this with -- with
15  these emails.  I had no idea.
16          MS. OSTROM:  And, Mr. Tiscareno we have
17  no further questions at this time.  We may,
18  however, call you again to testify in this
19  investigation.  And should this be necessary we
20  will contact you through your counsel.
21          And we will go off the record at
22  2:37 p.m. on April 29th of 2015.
23          (Whereupon, at 2:37 p.m., the
24  examination was concluded.)
25              * * * * *

Page 253

1              PROOFREADER'S CERTIFICATE
2
3   In the Matter of:   GENAUDIO, INC.
4   Witness:       Victor Tiscareno
5   File Number:    D-03450-A
6   Date:         Wednesday, April 29, 2015
7   Location:       Seattle, WA 98109
8
9       This is to certify that I, Donna S. Raya,
10  (the undersigned), do hereby swear and affirm that
11  the attached proceedings before the U.S. Securities
12  and Exchange Commission were held according to the
13  record and that this is the original, complete, true
14  and accurate transcript that has been compared to the
15  reporting or recording accomplished at the hearing.
16
17  _____    _____
18  (Proofreader's Name)      (Date)