EXCERPTED

# EXHIBIT 38

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLORADO
 3                       ---oOo---
 4
 5   SECURITIES AND EXCHANGE        )
 6   COMMISSION,                    )
 7           Plaintiff,             )
 8      vs.                         )   No. 1:15-CV-2118
 9                                  )        WJM-CBS
10   TAJ JERRY MAHABUB, GENAUDIO,   )
11   INC. and ASTOUND HOLDINGS,     )
12   INC.,                          )
13           Defendants.            )
14   _____)
15
16
17              DEPOSITION OF RONALD ISAAC
18                FRIDAY, JANUARY 13, 2017
19
20
21
22
23
24   PAGES 1 - 214
25
                                              Page 1
```

| | |
|---|---|
| 9  Deposition of RONALD ISAAC, taken on behalf of<br>10 Defendants, at 2765 Sand Hill Road, Menlo Park,<br>11 California, commencing at 10:25 a.m., Friday,<br>12 January 13, 2017, before Kelli Combs, CSR 7705. | 1 APPEARANCES OF COUNSEL CONTINUED:<br>2     WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP<br>3     BY: DAVID AVENI, ESQ.<br>4     655 West Broadway, Suite 900<br>5     San Diego, California 92101<br>6     619.321.6200<br>7     david.aveni@wilsonelser.com<br>8<br>9<br>10 FOR THE WITNESS:<br>11    O'MELVENY & MYERS<br>12    BY: CLAY MARQUEZ, ESQ.<br>13    Two Embarcadero Center, 28th Floor<br>14    San Francisco, California 94111<br>15    415.984.8700<br>16    cmarquez@omm.com |
| Page 2 | Page 4 |

| | |
|---|---|
| 1 APPEARANCE OF COUNSEL:<br>2 FOR PLAINTIFF:<br>3     SECURITIES AND EXCHANGE COMMISSION<br>4     BY: LESLIE J. HUGHES, ESQ.<br>5     1961 Stout Street, Suite 1700<br>6     Denver, Colorado 80294-1961<br>7     303.844.1000<br>8     hughes.j@sec.gov<br>9<br>10 FOR DEFENDANT ASTOUND HOLDINGS:<br>11    BENZ LAW<br>12    BY: JEFFREY G. BENZ, ESQ.<br>13    12021 Wilshire Blvd., Suite 256<br>14    Los Angeles, California 90025<br>15    310.570.2774<br>16    jeffreybenz@gmail.com<br>17<br>18 FOR DEFENDANT TAJ JERRY MAHABUB:<br>19    HOLMES TAYLOR & JONES, LLP<br>20    BY: ANDREW B. HOLMES, ESQ.<br>21    617 South Olive Street, Suite 1200<br>22    Los Angeles, California 90014<br>23    abholmes@htjlaw.com | 1            I N D E X<br>2 January 13, 2017<br>3<br>4 RONALD ISAAC<br>5 EXAMINATION                    PAGE<br>6<br>7      (BY MR. AVENI)       9, 207<br>8      (BY MR. HOLMES)      178, 208<br>9      (BY MS. HUGHES)         184<br>10<br>11           I N D E X<br>12      EXHIBITS FOR IDENTIFICATION<br>13 EXHIBIT NO.                   PAGE<br>14 Exhibit 157  Email chain Bates stamped   59<br>             347APL-00000608 through<br>15           -621<br>16 Exhibit 158  Email from Mr. Mahabub to   78<br>             Ronald Isaac and Vic<br>17           Tiscareno dated<br>             September 15, 2009, Bates<br>18           stamped<br>             SEC-Tiscaareno-V-E-0000526<br>19<br>   Exhibit 159  Email from Jerry Mahabub to   81<br>20           Victor Tiscareno and others<br>             dated October 19, 2009,<br>21           Bates stamped<br>             SEC-TiscarenoV-E-0000635<br>22           and -636<br>23 Exhibit 160  E-mail exchange between    82<br>             Mr. Tiscareno and Jerry<br>24           Mahabub dated October 22,<br>             2009, Bates stamped<br>25           SEC-TiscarenoV-E-0000645 |
| Page 3 | Page 5 |

2 (Pages 2 - 5)

```
                    I N D E X
              EXHIBITS FOR IDENTIFICATION
EXHIBIT NO.                                PAGE
Exhibit 161  Email string Bates stamped     85
             SEC-TiscarenoV-E-0000649
             and -650
Exhibit 162  Email chain Bates stamped      88
             347APL-00000537 through
             -541
Exhibit 163  Email chain dated             103
             October 30, 2009
Exhibit 164  Email string Bates stamped    116
             SEC-TiscarenoV-E-0000750
             and -751
Exhibit 165  Email chain dated             121
             January 4, 2010, Bates
             stamped
             SEC-TiscarenoV-E-0000956
Exhibit 166  Email from Jerry Mahabub to   137
             Ronald Isaac dated June 8,
             2010, Bates stamped
             SEC-TiscarenoV-E-0001184
Exhibit 167  Email string Bates stamped    160
             SEC-TiscarenoV-E-0001421
             and -1422
Exhibit 168  Email string Bates stamped    161
             SEC-TiscarenoV-E-0001742
             and -1743
Exhibit 169  Email string Bates stamped    169
             347APL-0000095 through -097
Exhibit 170  Email string Bates stamped    173
             347APL-00000066 through
             -069
Exhibit 171  Photocopy of stick-on         185
             badges from Apple
```

Page 6

```
                    I N D E X
              EXHIBITS FOR IDENTIFICATION
EXHIBIT NO.                                PAGE
Exhibit 172  Photograph of Steve Jobs       195
Exhibit 173  Photograph of Tim Cook         196
Exhibit 174  Photograph of Phil Schiller    196
Exhibit 175  Photograph of Greg Joswiak     197
Exhibit 176  Photograph of Victor           198
             Tiscareno

         PREVIOUSLY MARKED EXHIBITS
              EXHIBIT    PAGE
                96        50
                99        57
               105       107
               106       113
               112       129
               113       131
               119       141
               120       143
               121       144
               123       148
               125       149
               126       150
```

Page 7

```
         PREVIOUSLY MARKED EXHIBITS
              EXHIBIT    PAGE
               130       152
               131       153
               132       165
               133       168

                 * * * *
```

Page 8

RONALD ISAAC,
after having been duly sworn, testified as follows:
---oOo---

EXAMINATION
BY MR. AVENI:

Q   Good morning, Mr. Isaac. So my name is David Aveni, and I represent GenAudio, the company in this case.

    Thank you very much for taking time for this deposition today.

    MR. AVENI: Do we want to do appearances?
    THE REPORTER: (Shakes head.)
BY MR. AVENI:

Q   I know you testified during the administrative proceeding in this case.

    Have you -- other than that, have you ever had your deposition taken?

A   That was my first.

Q   The first time?

A   Yeah.

Q   And I'm sure your attorney has walked through how depositions work. Just to make it easy and make sure we're all on the same page, I'll run through kind of the standard instructions that everybody gives in

Page 9

**Page 146**

1  So then we looked at Exhibit 120, and you
2  mentioned the meeting with Barry Corlett and
3  Andrew Bright.
4  What was the purpose of that meeting?
5  A  If this is the one with everyone in, which I
6  don't know -- I don't recall if Barry -- Barry was part
7  of that meeting, you're referring to the one where I
8  have very good memories of the -- the -- there was an
9  exchange in that meeting, and that's why I remember
10  it --
11  Q  Yes.
12  A  -- where Andrew Bright accused Mr. Mahabub
13  that this technology was -- was not what he was making
14  it sound; that he was describing it as an MRI-based, you
15  know, brain scan technology and that this was nothing
16  more than an HRTF, which stands for head-related
17  transfer function.
18  And there was an exchange there where
19  Mr. Mahabub countered that he would send Mr. Bright some
20  books to read about this, which was, quite honestly, a
21  little bit offensive, because Mr. Bright was a -- was a
22  Ph.D. in acoustics from one of the most prestigious
23  schools in London.
24  So it was -- it was a very, very not usual
25  exchange between a third-party vendor or -- or an

**Page 147**

1  outsider with a very high-ranking Apple person who, by
2  the way, had a Senior Manager title at the time.
3  Q  Andrew Bright had the Senior Manager title?
4  A  Yeah.
5  Q  How senior is that?
6  A  Very senior at Apple. Especially the fact
7  that in the audio division at the time, if I'm not
8  mistaken, in the iPod, he was the highest ranking
9  person.
10  Q  Okay.
11  So my question, though, originally was: What
12  was the purpose of that meeting; do you remember?
13  A  It was to demo case -- to showcase in one
14  setting the -- the AstoundSound virtualization algorithm
15  on the iPad and on the Mac in one setting with -- with
16  various people from various divisions.
17  Q  Okay.
18  And were you involved in any way in that demo
19  on the iPad side?
20  A  No.
21  Q  That was Mr. Tiscareno's responsibility?
22  A  I believe so, but I would be speculating if I
23  said yes.
24  Q  And who was that demo for? Was it for
25  Andrew Bright and Barry Corlett?

**Page 148**

1  A  Considering the -- the seniority of the people
2  in the room, perhaps it was meant at them, because we
3  had that meeting in the Mariani building, which is the
4  iPod building.
5  Q  How senior is Barry Corlett?
6  A  I've only met Barry one time, but he -- he was
7  a fairly senior member of the team, potentially working
8  on audio architecture in the iPod division.
9  Q  Okay. You can put those aside.
10  I'm handing you what's been previously marked
11  as Exhibit 123, and you're not copied on this email.
12  Have you ever seen Exhibit 123 before?
13  A  No, I have not.
14  Q  Okay.
15  Near the end of that email, Mr. Mahabub
16  writes:
17  "I need that a new NDA to
18  review as well that we discussed."
19  Do you see that?
20  A  I do.
21  Q  Do you know anything about discussions in this
22  time period regarding a new NDA?
23  A  No, I do not.
24  Q  Did any discussions in this time period about
25  a new NDA have anything to do with the Mac side, as far

**Page 149**

1  as you know?
2  A  Not that I'm aware of.
3  MR. AVENI: You can put that aside.
4  BY MR. AVENI:
5  Q  Handing you what I just marked as Exhibit 167.
6  You don't appear to be copied on this email.
7  Do you recognize it?
8  A  I haven't seen it, but I'm reading it now.
9  Q  Okay.
10  So I appear to have a copy of this email that
11  doesn't have the sticker on it. It's actually already
12  been marked. This has already been marked as
13  Exhibit 125. So if it's okay, I'm going to take off the
14  sticker. My copy appears not to have the exhibit tab,
15  but this has been previously marked as Exhibit 125.
16  Apologize for the confusion.
17  So as I said, you are not copied on
18  Exhibit 125, but do you recognize the email chain?
19  A  No, I haven't seen this before.
20  Q  Okay.
21  And there's another reference on the top email
22  on the first page to an NDA. It's in the same time
23  period as the previous exhibit we looked at.
24  Do you recall any discussion in connection
25  with this email about a further NDA?

| | |
|---|---|
| 1  A  I do not know who that is.<br>2  Q  Okay. That's fine.<br>3      So after this email chain, do you know if<br>4  there was any further discussions about the heavier NDA<br>5  that Mr. Mahabub proposes --<br>6  A  No, I'm not aware.<br>7  Q  -- in the paragraph I just read?<br>8  A  I'm not aware of any NDA that's referenced.<br>9  Q  Okay.<br>10     Do you recall having any discussions with<br>11 Mr. Mahabub after the Andrew Bright meeting about what<br>12 the next steps would be on the Mac side?<br>13 A  I do not recall discussions after that meeting<br>14 with -- with Jerry, quite frankly.<br>15 Q  You just don't remember?<br>16 A  I don't remember.<br>17 Q  Okay.<br>18 A  I would say -- I would say the following:<br>19 Coming out of that meeting and watching the exchange was<br>20 a huge red flag that Jerry, Mr. Mahabub, had gone<br>21 head-on with a very senior member of the technical team,<br>22 and it's not something I would have been proud of and<br>23 would have retreated me quite a bit, quite honestly, to<br>24 the point even that I wouldn't have wanted Andrew seeing<br>25 me exchange or mention Jerry.<br>Page 158 | 1      Do you recall doing some additional work with<br>2  Mr. Mahabub on the Mac side following the Andrew Bright<br>3  meeting?<br>4  A  I don't recall, but there's one thing that is<br>5  vaguely in my -- in my memory, which is Jerry reaching<br>6  out and then me forwarding him to another group that was<br>7  conducting a broad evaluation across vendors, and that's<br>8  the -- that's one of the things I do remember trying<br>9  to -- trying to basically present Jerry with other<br>10 options at Apple, which was this broad demo that was<br>11 going on from within -- outside of the Mac division.<br>12 Q  Is that the interaction with Sasha Pance?<br>13 A  That is correct.<br>14 Q  So you mentioned during your administrative<br>15 testimony that any decision making about going forward<br>16 with GenAudio after the Andrew Bright meeting was above<br>17 your pay grade.<br>18     Do you remember that testimony?<br>19 A  Yes.<br>20 Q  Do you know who would have to make that<br>21 decision?<br>22 A  Like I mentioned before, it's not clear-cut at<br>23 Apple how this process happens. It's -- it's very --<br>24 very different for different cases, and -- and there<br>25 isn't a clear pathway; intentionally done so, to allow,<br>Page 160 |
| 1  Q  Did you ever express any of that to<br>2  Mr. Mahabub?<br>3  A  Not really. This is internal -- this is<br>4  seniority and my respect to Mr. Bright. I wouldn't have<br>5  expressed any of that to anyone that's external to<br>6  Apple.<br>7  Q  Okay.<br>8      You never said to Mr. Mahabub, Boy, that<br>9  meeting didn't go well, anything like that?<br>10 A  I'm not sure if I had seen Jerry after that,<br>11 but -- but it wouldn't have been unusual for me to<br>12 comment if I had -- if I had seen Jerry since -- since<br>13 he was there and I was there and it wasn't anything<br>14 private. I might have -- if I had seen him, I might<br>15 have said, That was not a very good exchange to be had<br>16 with a senior Apple engineer.<br>17 Q  You just don't remember, one way or the other?<br>18 A  I don't remember, no.<br>19 Q  Okay.<br>20     Do you remember, though, any discussion with<br>21 him about what's going to happen next with regard to the<br>22 work you had been doing in regard to GenAudio on the Mac<br>23 side; do you remember --<br>24 A  No, I do not recall any of that.<br>25 Q  Okay.<br>Page 159 | 1  quite honestly, the checks and balances to take effect,<br>2  so -- so one person or a division does not influence a<br>3  decision all by themselves.<br>4      So there isn't -- what I -- what I would have<br>5  meant by that is -- is making business decisions was way<br>6  above my pay grade, and that remains a very accurate<br>7  statement.<br>8  Q  Do you recall ever telling that to<br>9  Mr. Mahabub?<br>10 A  No, I do not.<br>11     MR. AVENI: You can put that aside. We may<br>12 come back to that, but you can put it aside for now.<br>13     (Defendants' Exhibit 167 marked<br>14     for identification.)<br>15 BY MR. AVENI:<br>16 Q  I'm going to mark this one as Exhibit 167.<br>17     I don't believe you're copied on this email.<br>18     Do you recognize it?<br>19 A  No, I do not.<br>20 Q  If you see at the top, the subject line is<br>21 "Re: iPad."<br>22     Do you see that?<br>23 A  Uh-huh. Yes, I do.<br>24 Q  I just want to know if you are familiar with<br>25 any of the work regarding the iPad that's reflected in<br>Page 161 |

**Page 182**

1 the current state of things, right, without realizing
2 dutifully that this an exploration or an evaluation
3 period; that we should wait to -- to garner the right
4 evidence -- not the right -- the right, you know,
5 opinions about what the technology sounds and -- and is
6 demonstrated by before initiating any kind of business
7 discussions, and, for that matter, with the audience
8 that's in the email.
9    So oftentimes when -- as I mentioned earlier
10 before, when I would see stuff like that, I would just
11 skip over, pretending that this is not addressed to me.
12    Q  Right.
13    MR. MARQUEZ: I was going -- can I help? I
14 might be able to help. I think what he's asking is,
15 without speculating, about what Mr. Mahabub might have
16 wanted to do, is there any of your interactions with
17 Mr. -- or with Jerry that were inconsistent with a
18 desire to eventually do business with Apple?
19    MR. HOLMES: Thank you.
20    THE WITNESS: You mean consistent with -- with
21 the interactions? Not that I -- not that I can recall
22 or -- or, you know, speculate on his behalf of what his
23 intentions are.
24    From my point of view, they were strictly an
25 interaction of investigating his technology and

**Page 183**

1 GenAudio's technology.
2 BY MR. HOLMES:
3    Q  And I appreciate that clarification. That was
4 helpful.
5    I guess at the beginning of the day, Mr. Aveni
6 gave you the difference between estimating the length of
7 the table and guessing at the size of his dining room
8 table.
9    And I think what I'm trying to understand is:
10 You keep saying "speculating" as to what Mr. Mahabub's
11 intentions were, and, of course, you're not in his head
12 and you don't really know.
13    A  Yeah.
14    Q  But I don't think that we're in the realm of
15 speculation right here because of the interactions you
16 had with him and because of the communications you had
17 with him.
18    So can you, without speculating and based on
19 your own understanding, do you have an understanding of
20 whether Mr. Mahabub was trying to do business with
21 Apple?
22    A  I believe he was trying to do business, as
23 with many others -- many other interactions that we had
24 with many other vendors. Yes.
25    MR. HOLMES: Okay. Thank you. I don't have

**Page 184**

1 any further questions.
2    MR. MARQUEZ: Can we go off the record for one
3 second?
4    (Discussion held off record.)
5         EXAMINATION
6 BY MS. HUGHES:
7    Q  So, Mr. Isaac, in your time with Apple, you
8 were there from roughly September 2008 until
9 December 2013, correct?
10    A  Yes, that's correct.
11    Q  During that time, did you ever have authority
12 to enter into a licensing agreement on behalf of Apple
13 to acquire someone else's software?
14    A  No, I did not.
15    Q  Did you ever have authority to enter into an
16 agreement to acquire another company like GenAudio?
17    A  No, I did not.
18    Q  Did Mr. Mahabub ever ask you if you had that
19 kind of authority to either enter into a software
20 license or acquire his company?
21    A  No, he did not.
22    Q  During the time that you were at Apple, you
23 talked about in your investigative testimony that from
24 roughly December '08 until 2011, you were a DSB [sic]
25 Engineer.

**Page 185**

1    What is a DSB engineer?
2    A  So a DSP, as in Paul --
3    Q  Ah.
4    A  -- is a digital signal processing engineer,
5 which is the art and science of engineering a signal to
6 alter its -- its, you know, characteristics for a
7 particular medium. A DSP engineer could be someone who
8 works with radio frequency waves as a signal as in an RF
9 wave.
10    In this case, I was an audio signal processing
11 engineer, which -- which the signals are for audio -- in
12 the audio realm.
13    Q  You had testified before, that in 2011 at some
14 point your job changed. How did it change?
15    A  In 2011 we -- we unified the audio divisions
16 at Apple, and mostly all audio engineers were on the one
17 umbrella.
18    Q  Can you give me a time frame roughly when that
19 happened during 2011? Beginning, end, middle?
20    A  I can't remember very -- very well now when
21 exactly that happened, but I would say by December,
22 perhaps 2011, it had already happened. So I'm assuming
23 this happened in the summer towards the fall of 2011.
24    Q  Can you place it in terms of the emails we saw
25 where Mr. Pance was doing an evaluation?

```
 1   A   The transition that we are referring to had
 2   not happened when these evaluations were carried -- were
 3   being carried on.
 4   Q   When someone comes to Apple's campus, do they
 5   have to obtain a badge or a name tag to be on the
 6   property?
 7   A   Absolutely.  They would have to go through the
 8   front lobby, they would have to sign in and designate
 9   who they're visiting, and then the receptionist will
10   have -- would need to basically call on someone and to
11   come and basically escort the -- the vendor or the
12   visiting person and stay in their custody throughout the
13   visit.
14   Q   So a visitor isn't allowed to just wander
15   around Apple on their own?
16   A   Absolutely not.
17       MS. HUGHES:  All right.  I'm going to have the
18   court reporter mark this as Exhibit 171.
19            (Plaintiff's Exhibit 171 marked
20             for identification.)
21   BY MS. HUGHES:
22   Q   Do you recognize what is depicted on
23   Exhibit 171?
24   A   Yes.  These seem to be stick-on badges that
25   the receptionist would hand over to visitors.  I do
```
Page 186

```
 1   recognize -- I'm not too quite sure what the numbers are
 2   on the very top.  I do recognize the building names.  MA
 3   is Mariani 01.  I seem to have forgotten what AC is.
 4   Let's see.  Yes.  But that's -- that's about -- and
 5   obviously the name of the person that's visiting and --
 6   and who they are with.
 7   Q   And when Mr. Mahabub came, did you ever --
 8   were you involved in the process of obtaining these
 9   badges for him?
10   A   These badges do not reflect -- I was in
11   building IL 5, which none of these badges here reflect a
12   visit to.
13       MR. HOLMES:  Intergalctic Level 5?
14       THE WITNESS:  Yes.
15       MR. HOLMES:  Okay.
16   BY MS. HUGHES:
17   Q   We spent some time today talking about the
18   process you were involved with with GenAudio attempting
19   to integrate their software with the kernel extension
20   that you had provided.
21   A   Correct.
22   Q   At the end of that process, after going
23   through the different iterations, was GenAudio software
24   at a stage it could have been plugged into all of Mac's
25   products and shipped to customers?
```
Page 187

```
 1   A   No, it wasn't.  The process for integrating
 2   software for evaluation purposes is a completely
 3   different process than the form it would have taken had
 4   it been part of a shipping product.
 5   Q   So there were several more steps or processes
 6   GenAudio needed to go through before it could be
 7   considered part of Apple's software that's included in
 8   its products?
 9   A   Most likely, yes.
10       MR. HOLMES:  Objection; assumes facts not in
11   evidence.
12       MR. AVENI:  Join.
13   BY MS. HUGHES:
14   Q   When Mr. Mahabub had demonstrated GenAudio's
15   software on the Mac, did you ever move it up to your
16   first line manager?
17       MR. AVENI:  Objection; vague, lacks
18   foundation.
19       THE WITNESS:  The first demo that we
20   encountered with Mr. Mahabub, which was a general public
21   demo which did not involve the work that we had engaged
22   in, my Manager was present, most likely, in that -- in
23   that room.  In any subsequent work that we had completed
24   with GenAudio, and the answer would have been that, yes,
25   it would have been demo'd to my Manager.
```
Page 188

```
 1   BY MS. HUGHES:
 2   Q   So when we talk about that first meeting, do
 3   you believe that occurred on or about August 19th, 2009,
 4   based on Exhibit 96 that you saw earlier today?
 5   A   That is correct.
 6   Q   And I'll take that back because it's my copy.
 7   Thank you.
 8            In the fall of 2009, did you ever tell
 9   Mr. Mahabub that Apple would enter into a deal to
10   license GenAudio's technology within the next six
11   months?
12   A   No, I did not.
13   Q   Did you ever tell Mr. Mahabub in the fall of
14   2009 that Apple would enter into an agreement to acquire
15   GenAudio?
16   A   No, I did not.
17   Q   In 2009, did you ever participate in any
18   meetings with Mr. Mahabub that were attended by
19   Steve Jobs?
20   A   No, I did not.
21   Q   In 2009, did you attend any meetings or
22   participate in any meetings with Mr. Mahabub that were
23   attended by Tim Cook?
24   A   No, I did not.
25   Q   In 2009, did you participate in any meetings
```
Page 189

**Page 190**

1  with Mr. Mahabub that were attended by Phil Schiller?
2  A  No, I did not.
3  Q  During 2009, did you participate in any
4  telephone calls with Mr. Mahabub in which Mr. Jobs,
5  Mr. Cook or Mr. Schiller also participated?
6  A  No, I did not.
7  Q  In 2009, did you receive any emails from
8  Mr. Mahabub that were also sent to Steve Jobs, Tim Cook
9  or Mr. Schiller?
10  A  No, I did not.
11  Q  In 2009, did you offer to introduce
12  Mr. Mahabub to Steve Jobs?
13  A  No, I did not.
14  Q  Did you offer to set up any meetings between
15  Mr. Mahabub, Steve Jobs, Tim Cook or Mr. Schiller?
16  A  No, I did not.
17  Q  So I've asked you a series of, in essence,
18  four questions about participating in meetings,
19  telephone calls, emails or setting up meetings between
20  Mr. Mahabub, Steve Jobs, Tim Cook or Phil Schiller.
21      I want to, in essence, ask that same question:
22  Did you do those things in 2010?
23  A  No, I did not
24  Q  And I'll ask you the same question: Did you
25  do those four things in 2011?

**Page 191**

1  A  No, I did not.
2  Q  Moving ahead from 2009 to 2010, did you ever
3  discuss with Mr. Mahabub terms for Apple to either
4  acquire a license for or acquire the company of
5  GenAudio?
6  A  No, I did not.
7  Q  Did you have any discussions with Mr. Mahabub
8  about that Apple would not agree to pay a per unit
9  royalty to use GenAudio's software?
10  A  No, I did not.
11  Q  During 2009, did you tell Mr. Mahabub that
12  Apple wanted an exclusive license to use GenAudio's
13  software in all of its products worldwide?
14  A  No, I did not.
15  Q  Did you ever hear anyone else at Apple tell
16  Mr. Mahabub that?
17  A  No, I did not.
18  Q  Did you make any statement like that in 2000
19  or 2011 that -- let me restate that.
20      In 2010 or 2011, did you tell Mr. Mahabub that
21  Apple wanted an exclusive license to use GenAudio's
22  software in all its products worldwide?
23  A  No, I did not.
24  Q  Did you ever hear anyone else tell Mr. Mahabub
25  that Apple wanted an exclusive license to use GenAudio's

**Page 192**

1  software in all of its products worldwide?
2  A  No, I did not.
3  Q  During the time frame when you were dealing
4  with Mr. Mahabub, so between 2009 and 2011, did you ever
5  see any emails in which someone from Apple told
6  Mr. Mahabub that Apple wanted an exclusive license to
7  use GenAudio's software in all of its products
8  worldwide?
9  A  No, I did not.
10  Q  Did you ever talk with Mr. Mahabub about
11  someone from Apple needing to look at GenAudio's
12  patents?
13  A  No, I did not.
14  Q  Did you ever ask to review GenAudio's patents?
15  A  No, I did not.
16  Q  Did you ever ask anyone within Apple's
17  organization to prepare a term sheet, letter of intent,
18  licensing agreement or acquisition agreement?
19  A  No, I did not.
20  Q  Did you hear of anyone else asking someone in
21  Apple to prepare those kinds of agreements with
22  GenAudio?
23  A  No, I did not.
24  Q  In November of 2009 -- so I know we had some
25  emails about you meeting with Mr. Mahabub around that

**Page 193**

1  time frame -- did Mr. Mahabub tell you he had hired a
2  valuation firm named, Innovis or Inavisis -- I say it
3  always poorly, I-N-A-V-I-S-I-S, and it's operated by a
4  man named Sam Khoury, K-H-O-U-R-Y?  Did Mr. Mahabub ever
5  tell you he had hired Inavisis and Dr. Khoury to set a
6  value on GenAudio's software?
7  A  No, I did not hear about this.
8  Q  Did Mr. Khoury or Dr. Khoury ever contact you
9  to talk about his valuation of GenAudio?
10  A  No, he did not.
11  Q  Did he ever contact you to ask about Apple's
12  dealings with GenAudio?
13  A  No.
14  Q  Did you ever request Mr. Mahabub sign a more
15  restrictive nondisclosure agreement?
16  A  No.
17  Q  Did you ask Mr. Mahabub to sign evaluation
18  agreements?
19  A  In the one email, we had discussed potentially
20  signing an evaluation agreement for that specific demo.
21  Q  And that related to the demo that was being
22  organized by Mr. Pance?
23  A  That is correct.
24  Q  Earlier today, there were a number of emails
25  in which Mr. Mahabub talked about GenAudio's technology

1  being included in Apple's products for a fall or
2  Christmas rollout.
3       Do you recall that?
4   A  I recall that.
5   Q  Did you ever talk with Mr. Mahabub about
6  timing for Apple to include GenAudio's software in its
7  products for a fall or Christmas rollout?
8   A  No, I did not.
9   Q  Did you ever push anyone in Apple to include
10 GenAudio's products for a fall or Christmas rollout?
11  A  No, I did not.
12  Q  You attended a meeting with Mr. Mahabub and
13 Andrew Bright in September of 2010, correct?
14  A  That is correct.
15  Q  In the scheduling of that meeting, it's my
16 understanding it was to be set earlier in the summer of
17 2010.
18      Did you have that understanding that it was
19 trying to be scheduled during the summer?
20  A  I do not recall that.
21  Q  Do you recall the meeting ever being set off
22 because Mr. Bright had a death in his family?
23  A  I do not recall that.
24  Q  Did you have a death in your family that
25 caused that meeting to be set off?

Page 194

1   A  No, I did not.
2   Q  Are you aware of Mr. Tiscareno having a death
3  in his family that would cause it to be set off?
4   A  I'm not aware of that.
5   Q  I believe earlier today or in your
6  investigative testimony, you said something to the
7  effect of your role at Apple revolved around integrating
8  vendors' technology and assisting with the evaluation.
9       Is that accurate?
10  A  That is correct.
11  Q  Once you had assisted GenAudio and the other
12 vendors by providing the Kext -- K-E-X-T -- was your
13 role, in essence, done?
14  A  Most likely, yes.
15  Q  Once GenAudio was able to integrate its
16 product into the Kext and have it operate on Mac, did
17 you ever participate in a meeting, an internal meeting,
18 at Apple at which it was discussed that the company
19 would either acquire GenAudio or license the technology?
20  A  No, I did not.
21  Q  So in March of 2011 -- this is roughly about
22 the time that those emails with Mr. Pance are
23 occurring -- what, if any, discussions did you have with
24 Mr. Mahabub about Apple licensing GenAudio's technology?
25  A  None.

Page 195

1   Q  During the time from when you started at Apple
2  through 2011, the CEO at Apple was who?
3   A  Steve Jobs.
4   Q  Did you ever meet Steve Jobs?
5   A  Only in the cafeteria, and I opened the door
6  for him a couple of times.
7   Q  Did you see him make presentations?
8   A  Absolutely.
9   Q  Right.
10  A  Twice.
11     MS. HUGHES: I'm having the court reporter
12 mark this as 172.
13          (Plaintiff's Exhibit 172 marked
14           for identification.)
15 BY MS. HUGHES:
16  Q  Do you recognize this photograph?
17  A  I do.
18  Q  Who is it a picture of?
19  A  Steve Jobs.
20  Q  And is this roughly how he looked in about
21 2009, 2010?
22  A  Yes, but a little bit thinner.
23  Q  At that point, 2009, 2010, Mr. Jobs had health
24 issues?
25  A  That's correct.

Page 196

1   Q  He had pancreatic cancer?
2   A  That's correct.
3   Q  Had you, in your work at Apple, had an
4  opportunity to meet Tim Cook?
5   A  Only in presentations.
6           (Plaintiff's Exhibit 173 marked
7            for identification.)
8  BY MS. HUGHES:
9   Q  I'm going to have the court reporter mark this
10 as Exhibit 173.
11     Do you recognize this photograph?
12  A  Yes, I do.
13  Q  Who is this a photograph of?
14  A  Timothy Cook.
15  Q  And this is an accurate depiction of how
16 Mr. Cook looked in or about 2009, 2010?
17  A  That is correct.
18  Q  Did you have interactions with Phil Schiller?
19  A  No, I did not.
20  Q  Did you ever see him at presentations?
21  A  Only in the cafeteria and in presentations.
22          (Plaintiff's Exhibit 174 marked
23           for identification.)
24     MS. HUGHES: I'm going to have the court
25 reporter mark this as 174.

Page 197

50 (Pages 194 - 197)

## Page 210

1   When we sell a Macintosh CPU, the -- the rule
2 of thumb is to never allow it to be consuming more than
3 3 percent from what the customer bought. So we -- we
4 make sure that 97 percent of the processing power is
5 what the customer is buying.
6   So if we were to integrate a technology and we
7 like the experience and it was consuming 25 percent, we
8 would not make a big deal about it because it's just an
9 evaluation. But had we -- had we were to decide to move
10 to the next level, we would ask the -- the partner or
11 the vendor to basically optimize their software to make
12 sure that it's not consuming as much power as -- as
13 would be.
14   Q   Okay.
15   Did you have any of that conversation with
16 Mr. Mahabub?
17   A   No, we would not have. And it's just
18 customary not to have that conversation until -- because
19 it exerts a ton of work on the -- on the vendor, and
20 that was never our intentions for the evaluation.
21   MR. HOLMES: I don't have any further
22 questions.
23   MS. HUGHES: I have no more questions.
24   Thank you so much for the time you spent with
25 us today.

## Page 211

1   THE WITNESS: Appreciate it. Thank you very
2 much.
3   MR. MARQUEZ: Before we close the deposition,
4 I'll just state for the record, earlier this morning the
5 witness expressed some concerns regarding his
6 confidentiality obligations as a former employee at
7 Apple.
8   During the break we spoke, and I understand
9 that there is not a protective order that has been
10 entered in this case, but the parties have agreed that
11 once the deposition transcript has been prepared, we
12 will have an opportunity to review that and identify any
13 potential confidential information that should not be
14 subject to public disclosure, at which point, if we
15 identify any such information, the parties agree that we
16 will confer to see if something can be done about that
17 in terms of a motion to seal or protective order or some
18 other means of protecting that confidential information.
19   MR. HOLMES: Sounds right.
20   MR. AVENI: So while we were off the record,
21 counsel for all parties discussed the manner for
22 handling the transcript, and we stipulated that the
23 court reporter would send the original transcript to the
24 witness' counsel, and from receipt, the witness will
25 have 30 days to review the testimony, the transcript,

## Page 212

1 rather, and provide an errata with any changes.
2   Anything else?
3   MR. HOLMES: If the original is lost or
4 stolen --
5   MR. AVENI: A copy can be used for all
6 purposes.
7   So stipulated?
8   MR. HOLMES: So stipulated.
9   MR. MARQUEZ: So stipulated.
10   MS. HUGHES: Yes.
11   MR. AVENI: We're off the record. Thank you.
12   (Time noted: 4:38 p.m.)

## Page 213

7 I, RONALD ISAAC, do hereby declare under penalty of
8 perjury that I have read the foregoing transcript; that
9 I have made any corrections as appear noted, in ink,
10 initialed by me; that my testimony as contained herein,
11 as corrected, is true and correct.
12   EXECUTED this_____day of_____, 2017, at
13 _____,_____.
14 (city)         (State)

17         _____
                 RONALD ISAAC

```
1        I, the undersigned, a Certified Shorthand
2   Reporter of the State of California, do hereby certify:
3        That the foregoing proceedings were taken
4   before me at the time and place herein set forth; that
5   any witnesses in the foregoing proceedings, prior to
6   testifying, were administered an oath; that a record of
7   the proceedings was made by me using machine shorthand
8   which was thereafter transcribed under my direction;
9   that the foregoing transcript is a true record of the
10  testimony given.
11       Further, that the foregoing pertains to the
12  original transcript of a deposition in a Federal Case,
13  before completion of the proceedings, a review of the
14  transcript [X] was [ ] was not requested.
15       I further certify I am neither financially
16  interested in the action nor a relative or employee of
17  any attorney or any party to this action.
18       IN WITNESS WHEREOF, I have this date
19  subscribed my name.
20
21  Dated: 1/19/2017
22
23
24       [signature]
             KELLI COMBS
25       CSR No. 7705
```

Page 214