Page 1

1  THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3  In the Matter of:           )
4                              ) File No. D-03450-A
5  GENAUDIO, INC.              )
6
7  WITNESS:   Dean Eldridge
8  PAGES:     1 through 61
9  PLACE:     635 All View Lane
10             Corvallis, Montana 59828
11 DATE:      Monday, April 6, 2015
12
13     The above entitled matter came on for hearing,
14 pursuant to notice, at 1:00 p.m.
15
16
17
18
19
20
21
22
23
24     Diversified Reporting Services, Inc.
25             (202) 467-9200

Page 2

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4      JENNIFER OSTROM, ESQ.
5      Securities and Exchange Commission
6      Division of Enforcement
7      1801 California Street, Suite 4800
8      Denver, Colorado 80202
9
10 On behalf of the Witness:
11     DEAN ELDRIDGE, PRO SE
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

C O N T E N T S

| WITNESS: | EXAMINATION |
|---|---|
| Dean Eldridge | 4 |

| EXHIBITS: | DESCRIPTION | IDENTIFIED: |
|---|---|---|
| 106 | Subpoena | 9 |
| 107 | Subpoena Duces Tecum | 9 |
| 108 | Background Questionnaire | 11 |
| 109 | 11/1/2013 Email from Jerry Mahabub to Rosalinda1 | 50 |

Page 4

PROCEEDINGS

MS. OSTROM:  Okay.  So we'll go on the record at 1 p.m. on April 6 of 2015 and would you please swear the witness in.

COURT REPORTER:  I'll have you raise your right hand.

Do you solemnly swear or affirm that the testimony you're about to give in this cause will be the truth, the whole truth and nothing but the truth, so help you God?

MR. ELDRIDGE:  I do.

Whereupon,

DEAN ELDRIDGE,

was called as a witness and, having been first duly sworn, was examined and testifies as follows:

EXAMINATION

MR. ELDRIDGE:  Go ahead and open this envelope now?

MS. OSTROM:  Yeah.

BY MS. OSTROM:

Q  Would you please spell your full name for the record.

A  Maurice Dean Eldridge.

Q  Can you spell it for the record, too.

COURT REPORTER:  She wants you to spell

Page 5

1  it.
2  A    M-a-u-r-i-c-e, D-e-a-n, E-l-d-r-i-d-g-e.
3        BY MS. OSTROM:
4  Q    Okay, thank you. And my
5  name is Jennifer Ostrom, and I am an officer with
6  the United States Securities and Exchange
7  Commission for purposes of this proceeding. And
8  this is an investigation by the Commission in the
9  matter of GenAudio, Inc., to determine whether
10 there have been violations of certain provisions of
11 federal securities laws. However, the facts
12 developed in this investigation might constitute
13 violations under federal or state civil or criminal
14 laws. And Mr. Eldridge, do you have the
15 documents that were sent to you?
16 A    I do.
17 Q    Okay. Go ahead and open those now, all
18 right?
19 A    Okay, I have.
20 Q    And on the top there should be something
21 called a Formal Order of Investigation.
22 A    Yes, private investigation designating
23 officers to take testimony.
24 Q    Exactly. And that's available for you to
25 look at during the course of this proceeding, and

Page 6

1  why don't you go ahead and look at that now because
2  I want to make sure that you've had an opportunity
3  to review it, okay?
4  A    Okay. Okay, I've read that.
5  Q    Okay. And do you have any questions
6  about Exhibit -- about, excuse me, the formal
7  order, Mr. Eldridge?
8  A    No.
9  Q    Okay. And then also there should be what
10 is marked as Exhibit No. 1, and I believe that
11 you've seen this before, it's the Form 1662.
12 A    Oh, 1662, yes.
13 Q    And have you seen that before?
14 A    Yes, I have.
15 Q    Okay. And do you have any questions
16 concerning Exhibit No. 1?
17 A    No.
18 Q    Okay. And Mr. Eldridge, are you
19 represented by counsel today?
20 A    No, I'm not.
21 Q    Okay. You are represented by counsel
22 with regards to this investigation, but you've
23 chosen not to be represented during your testimony;
24 is that correct?
25 A    That's correct.

Page 7

1  Q    Okay. And who is your counsel?
2  A    Aaron, I can't think of his last name.
3  Q    Is it Jensen?
4  A    Aaron from Denver.
5  Q    Yes. Is it Aaron Jensen?
6  A    Yes, yes, Aaron Jensen.
7  Q    Okay. And you do have the right to be
8  accompanied, represented and advised by counsel,
9  this means that you may have an attorney present
10 and that your attorney can advise you before,
11 during and after your examination here today, do
12 you understand this?
13 A    I do.
14 Q    Okay. Since you are not represented by
15 counsel today, there are certain matters discussed
16 in Exhibit No. 1 that I want to highlight for you.
17 Do you understand that upon your request, these
18 proceedings will be adjourned so that you may
19 request your counsel to be present during your
20 testimony?
21 A    Yes.
22 Q    Okay. And do you understand that the
23 statutes set forth in Exhibit No. 1 provide
24 criminal penalties for knowingly providing false
25 testimony or knowingly using false documents in

Page 8

1  connection with this investigation?
2  A    I do, except, you know --
3  Q    And do you understand that you may assert
4  your rights under the 5th Amendment under the
5  Constitution and refuse to answer any questions
6  which may tend to incriminate you?
7  A    Yes.
8  Q    Okay.
9  A    But my memory is not as good as it used
10 to be now.
11 Q    That's okay, we'll do our best, all
12 right?
13       MS. OSTROM: And if the court reporter
14 could please mark the subpoena, which is the one
15 that asks for his testimony today, if you could
16 mark that as Exhibit No. 106.
17       COURT REPORTER: Okay, just one moment.
18       MS. OSTROM: Thank you.
19       COURT REPORTER: Now, that's the order
20 directing private investigation?
21       MS. OSTROM: No, it's the actual
22 subpoena, on the top there's going to be a seal and
23 it's going to say Subpoena, it should be the third
24 document in the stack.
25       COURT REPORTER: Is it -- Oh, I see, one

Page 13

1  Q    And what were the circumstances of that
2  meeting or speaking with those people at that time?
3  A    That was to purchase shares in GenAudio.
4  Q    Okay. And who was it that you first
5  spoke to from GenAudio?
6  A    Well, I believe I spoke to Jimmy Mattos
7  first and then he referred me to their finance
8  officer.
9  Q    Is that Mr. Devine?
10 A    Yes.
11 Q    Okay. And when was your first investment
12 in GenAudio?
13 A    I'm not -- I don't have that information
14 right in front me, but it was in the documents that
15 we sent you, but --
16      MR. ELDRIDGE: Linda? Excuse me one
17 moment.
18      BY MS. OSTROM:
19 Q    Actually, I can ask
20 you -- because I have something that I didn't send
21 to you because it's got a lot of information in it
22 for a lot of different people.
23      I first show that you received 10,000
24 shares in September of 2008, does that sound about
25 right?

Page 14

1       (Whereupon Mrs. Eldridge enters the
2  interview.)
3  A    2008? Boy, yeah, that would be right,
4  because 2010 was when the big Apple deal blew up
5  so, yeah, probably 2008 is right.
6       BY MS. OSTROM:
7  Q    Okay. And it looks like
8  there were 5,000 shares in your name and 5,000
9  shares in Rosalinda's name, does that sound
10 correct?
11 A    That's correct.
12 Q    Okay. And previous to your investment in
13 2008 had Derek invested in GenAudio?
14 A    Yes, he did.
15 Q    Okay.
16 A    He invested in it ten years ago, almost.
17 Q    Like 2004?
18 A    Almost 11 years ago, yeah.
19 Q    Right, okay, okay.
20      And then it looks like you purchased
21 88,000 shares from Jerry Mahabub directly in
22 January of 2010, does that sound right?
23 A    Yes.
24 Q    Okay. And around that same time Derek
25 bought some more shares from Mr. Mahabub; is that

Page 15

1  right?
2  A    That's correct.
3  Q    Okay. And then it looks like you also
4  then bought 20,000 shares in that 2010 offering?
5  A    Correct.
6  Q    Okay. Does it sound like that's all the
7  shares that you bought?
8  A    Yes. We had sent in money to buy 20,000
9  more shares in 2013, but never received the shares
10 and never received the money back.
11 Q    Okay. And we'll cover that at the end,
12 because I think chronologically -- yep, that makes
13 sense, but you never got those shares; right?
14 A    No.
15 Q    So how much money did you end up -- let's
16 put aside the ones from 2013, but the ones that you
17 purchased in 2008, do you remember how much those
18 were per share?
19 A    The first -- the first bunch we bought
20 was $3 a share.
21 Q    Okay.
22 A    And then the other shares we bought was
23 50 cents a share.
24 Q    The ones you bought directly from
25 Mr. Mahabub?

Page 16

1  A    Yes.
2  Q    Okay. And the ones in the offering, were
3  those $3 per share?
4  A    Yes.
5  Q    Okay.
6  A    We bought 60, yeah.
7  Q    Okay. So for the shares that you
8  actually got you spent $134,000, does that sound
9  about right?
10 A    That's about right.
11 Q    Okay. Now, for the solicitation in 2008,
12 was that just -- was it conversations you had with
13 Derek, the first shares you bought?
14 A    Derek told us -- he commented that he
15 thought the company was going to go somewhere that he
16 tried to get us to buy in earlier, and I was
17 skeptical --
18 Q    Okay.
19 A    -- but then the further it went, it
20 sounded like it was turning out to be a pretty good
21 deal, so I thought, well, okay. So that's when we
22 called Jimmy and talked about buying it, and he
23 turned us over to Jim Devine.
24 Q    Okay. So then those shares that you
25 bought from Mr. Mahabub in early 2010, how did that

Page 17

1  come about?
2  A  Well, that came about when he came to
3  Seattle for a stockholder meeting and, you know,
4  told us how great things were going and all of the
5  above. And so several of us thought, wow, this is,
6  you know, really going someplace now, so we bought
7  in -- bought more because he was positive that,
8  supposedly I guess it was by the end of the year or
9  something that Apple was going to be buying us out and
10 we'd better get in now, so we bought more.
11     Q   And did he actually say Apple at that
12 time at the shareholders meeting?
13     A   Yes, he did.
14     Q   Okay.
15     A   He called it the -- what's the initials
16 of a -- a large LCEC, or something like that --
17     Q   Right.
18     A   -- and then he went, wink-wink, Apple --
19     Q   Uh-huh.
20     A   -- so there's a lot of people that will
21 testify to that.
22     Q   Okay. Now, he said the LCEC and then
23 did -- he said -- did he actually -- the quote was
24 "wink-wink, Apple"?
25     A   Yes.

Page 18

1      Q   Did he actually say those words?
2      A   I believe he did, from what I recall.
3      Q   Okay. And also with the -- at this
4  meeting, so was this early in 2010 or was it 2009?
5      A   When did we buy those shares? It had to
6  be right after that, I think.
7      Q   Yeah, it says that the shares were issued
8  to you January 12th of 2010.
9      A   Oh, well, the meeting must have been in
10 2009 then.
11     Q   Okay. And then how is it that you came
12 to buy shares from Mr. Mahabub as opposed to from
13 the company at that point in time?
14     A   He was selling them, his own shares,
15 cheaper.
16     Q   Was it -- but was it something he
17 mentioned at that shareholders meeting, or is it
18 something you got like in writing, or how did that
19 happen?
20     A   No, we got that from him just over the
21 telephone.
22     Q   Okay, okay. So was it after this meeting
23 you had indicated that you wanted to buy more
24 shares?
25     A   Right.

Page 19

1      Q   Okay. So then you ended up talking to
2  Jerry, Jerry Mahabub on the phone?
3      A   Yes.
4      Q   Okay. And then you set it up for 50
5  cents a share?
6      A   Yes.
7      Q   Okay. And you did get the certificate
8  for those shares; is that right?
9      A   Yes.
10     Q   Okay, okay. And then why don't we jump
11 ahead and then we'll go back through some more
12 specifics, but in terms of then your -- the 20,000
13 shares you actually bought in the 2010 offering,
14 did you receive the written offering materials
15 before you made that investment?
16     A   No, no, it was all over the phone.
17     Q   Okay. So you never -- did you get the
18 private placement memorandum in the mail as a
19 shareholder?
20     A   Was that to purchase, you mean?
21     Q   Yeah, the 2010 offering.
22     A   No, not that I recall anyway.
23     Q   Okay.
24     A   Oh, you know what, he may have sent out
25 a -- you know, he sends out statements of the

Page 20

1  financial -- or a letter out explaining what's
2  going on, and then at the end of it he says, well,
3  you know, more shares are available, I guess that
4  could be considered --
5      Q   Right.
6      A   -- an offering, not just a strictly -- a
7  letter sent out trying to raise money, it was a
8  newsletter, but then at the bottom --
9      Q   Right.
10     A   -- you can buy more shares.
11     Q   Right. Now, this is, though -- the March
12 2010 offering was an actual private placement
13 memorandum and it had that valuation on it from
14 Dr. Corey.
15     A   From who?
16     Q   Dr. Corey, Dr. Sam Corey who made that
17 valuation of a billion dollars that first time.
18     A   Oh, yes, uh-huh, now I remember that.
19     Q   Do you remember -- do you remember seeing
20 that?
21     A   Yes, I did.
22     Q   Okay. But what you're saying it sounds
23 like is, you didn't buy as soon as you saw that
24 private placement, you bought several months after
25 it; is that correct?

Page 29

1  Q  Okay. And if you could look on -- it's
2  the -- it's the last page at the very top, the very
3  first sentence says, It should be kept very
4  confidential and nothing is assured yet, but as
5  shareholders you should be aware that there is a
6  strong possibility that the company may be acquired
7  within the next six months; do you see that?
8  A  I do, yes, uh-huh.
9  Q  Do you recall hearing things about that
10  in writing or orally?
11  A  Yes, I heard about it, but I never
12  actually read it.
13  Q  Okay. So you don't know if you ever got
14  this update?
15  A  I know I didn't, no.
16  Q  Okay. Did you normally get the updates,
17  though?
18  A  Yes, we did.
19  Q  Okay. And is it your understanding that
20  the reference here is to Apple, the global industry
21  leader of consumer electronics?
22  A  That was it, yes.
23  Q  Okay. Was there any other company at
24  this time, other than Apple, that you understood
25  was a possibility of a sale to them?

Page 30

1  A  No --
2  Q  Okay.
3  A  -- Apple was the only one --
4  Q  Okay.
5  A  -- a lot of deals with other companies,
6  but nothing.
7  Q  Okay. So not the sale of the company?
8  A  Right.
9  Q  That was only Apple?
10  A  Yes.
11  Q  Okay. And then if you could look at the
12  next exhibit, which is Exhibit No. 5.
13  A  Uh-huh.
14  Q  And this is the letter that went with the
15  private placement in 2010.
16  A  Okay.
17  Q  And why don't you look at that and see if
18  you remember this.
19  A  I don't think we got that.
20  Q  And I think the main -- the main part is
21  those two top paragraphs are really what tell you
22  what happen -- what this is about.
23  A  Yeah, I'm pretty sure I got that --
24  Q  Okay.
25  A  -- because I remember the north of 1

Page 31

1  billion. I like north of 1 billion.
2  Q  Right. And that second paragraph refers
3  to -- in parentheses it talks about the LCEC; do
4  you see that?
5  A  The second paragraph? Yes, referred to
6  the LCEC throughout the --
7  Q  Yes. And who is the LCEC?
8  A  Well, that was Apple.
9  Q  Okay. Did these -- these -- the fact
10  that you understood there was going to be a deal
11  with Apple, did that influence your investment?
12  A  That increased our investing, yes.
13  Q  Okay. What do you mean by that?
14  A  Well, because of that we bought more
15  shares.
16  Q  Okay, gotcha.
17  A  And this says he had over 15 meetings
18  with marketing and technical management, wow.
19  Q  And is the person that you remember from
20  Apple, was that Victor Tiscareno, does that sound
21  right?
22  A  Yes --
23  Q  Okay.
24  A  -- that's Victor, yeah.
25  Q  Okay.

Page 32

1  A  Now, this deal here, after reading that
2  paragraph completely, that -- this deal here was
3  probably not Apple, this was after that.
4  Q  Well, it --
5  A  Well, maybe it -- no, it isn't, it
6  probably is because it's provided a bridge capital
7  deal with a large -- yeah, it's the same -- the
8  LCEC that he refers to in his talking and several
9  emails, we all assumed it was still Apple because
10  that's where it started.
11  Q  Right. And did you ever hear him talk
12  about -- say the LCEC and not -- and it was
13  referring to a different company?
14  A  No.
15  Q  Okay. And I do realize that at a certain
16  point he stopped talking about Apple, but he never
17  used the term LCEC for any other company; right?
18  A  That's right.
19  Q  Okay, okay. Now, am I correct that the
20  only places that you heard of that information with
21  regard to Apple and GenAudio was either from
22  Mr. Mahabub or Mr. Mattos, or Derek getting
23  information from Mr. Mattos; is that right?
24  A  That's correct.
25  Q  Okay. You didn't have any independent

Page 37

1   Q   Okay. And what was your understanding as
2   to why GenAudio was saying this was going to be the
3   last round of financing they would need?
4   A   Well, because they were going to have a
5   deal done and wouldn't need any more money.
6   Q   Okay. And was the deal going to be with
7   Apple?
8   A   That was our guesswork, anyway.
9   Q   Okay. And is that -- I mean, in this
10  it's referring to LCEC, as far as you know in June
11  of 2010 there wasn't any other --
12  A   No.
13  Q   -- entity -- Okay.
14  A   No, there was always --
15  Q   And the reason I'm asking about June of
16  2010 is because your additional shares were
17  purchased in like -- in the summer, August of 2010,
18  it looks like. Am I correct that those additional
19  shares that you purchased were because of these
20  updates with Apple?
21  A   Absolutely.
22  Q   Okay.
23  A   Yeah, we bought them on 9/16 -- or no,
24  8/9 -- 8/19 --
25  Q   Yep, of 2010.

Page 38

1   A   -- of 2010 we bought 20,000 shares at 3
2   bucks.
3   Q   Okay. And then if you look at Exhibit
4   No. 7, this would still be before that date, do you
5   remember getting this?
6   A   Major 3-D movie. Yeah, we did get this.
7       MRS. ELDRIDGE: Yeah.
8   A   Yes, we did.
9       BY MS. OSTROM:
10  Q   Okay. And if you look
11  at the second page, right in the middle there's a
12  heading that says Consumer Electronics Industry in
13  Bold --
14  A   Yes.
15  Q   -- do you see that?
16  A   Yes.
17  Q   Okay. And then right under that the very
18  first sentence says, In the very near future it has
19  been requested by the LCEC's CEO to have a
20  handshake meeting with myself, alongside meeting
21  with the LCEC expert in acoustics, physics and
22  others.
23  A   Yep.
24  Q   Did you understand that that meant Steve
25  Jobs had requested to have a meeting with Jerry

Page 39

1   Mahabub?
2   A   Yes.
3   Q   Okay.
4   A   See, and that was -- and it also says, As
5   you all may already know, due to our NDA with the
6   LCEC... See, he brought that up in a meeting, too,
7   you know, the nondisclosure agreement, but that was
8   kind of when the "wink-wink, Apple" came in.
9   Q   Gotcha. And it also -- about in the
10  middle it says, It has been requested that we sign
11  an even more restrictive NDA with the LCEC; do you
12  see that?
13  A   Yes.
14  Q   And did these -- these -- this movement
15  forward with Apple that was portrayed here in this
16  exhibit, did that have any influence on your
17  investment?
18  A   I'm sure it did.
19  Q   Okay. And am I correct that this entire
20  time your understanding was that the LCEC was Apple
21  and the LCEC CEO was referenced as Steve Jobs?
22  A   Yes.
23  Q   Okay. And if you can look at Exhibit
24  No. 73. And I realize that this is dated after
25  your investment, but there were still a couple

Page 40

1   things here that I wanted to make sure I went over
2   with you.
3   A   Yes.
4   Q   And if you could look at the second page,
5   which is SEC-7, at the bottom it talks about
6   Consumer Electronics again in bold; do you see
7   that?
8   A   Yes. (Laughter.) Yep.
9   Q   Okay. And the first paragraph says, I am
10  very pleased to report that the big fish is
11  Panasonic. Do you recall that things were being
12  told to you about Panasonic being interested in
13  GenAudio?
14  A   Yes, very much so.
15  Q   Okay. And what do you recall about
16  Panasonic?
17  A   They were -- they weren't -- they weren't
18  somebody that was going to buy the company, as I
19  recall they were just a company that was going to
20  put the GenAudio stuff in all of their products,
21  and so it was going to be a real big deal.
22  Q   And do you know what happened with
23  Panasonic?
24  A   Well, I only know rumors that I've heard
25  that he -- he went over there and that didn't make

Page 57

1  have spoken with your attorney about.
2  A   Well, I've talked to Mike Elliot and Tim
3  Hurt, and whatever, if they know -- you know, if
4  Mike knows anything that's happening, and he tells
5  me he doesn't know any more than I do, so...
6  Q   Okay.  And what were the subjects that
7  you guys have talked about?  Just about the
8  investigation in general or anything in particular?
9  A   Just in general of what the SEC's doing,
10 you know.  And I guess one thing that we did
11 discuss was not just about the investigation, but
12 with Jerry forming the new company in Delaware and
13 diluting all the shares, and kind of it looks like
14 to us with the way he did that, it looks likes he's
15 kind of throwing GenAudio out the door and possibly
16 making the company more favorable for him, if and
17 when he ever would make it work.
18     And so we had discussed, well, I wonder
19 if this is something that, during the
20 investigation, if the SEC will do something about
21 him trying to leave the original shareholders out
22 in the cold, or something.  And the question -- of
23 course the answer to that was, we don't know.
24 Q   And you're referring to a Astound
25 Holdings that he started; is that right?

Page 58

1  A   Yes.
2  Q   And other than your wife, Linda, have you
3  spoken with anyone regarding the fact that you were
4  going to talk to me today?
5  A   Mike Elliot, I told him I was talking to
6  you today.
7  Q   Okay.  Anything in particular or just
8  that you were going to --
9  A   No, just --
10 Q   -- talk to me?
11 A   -- just that I was going to have the
12 deposition with you today.
13 Q   Okay.  And do you know anyone else who
14 has been subpoenaed or testified in this
15 investigation?
16 A   No, I don't.
17     MS. OSTROM:  Okay.  And Mr. Eldridge, I
18 don't have any further questions at this time.  I
19 may, however, have to call you again to testify in
20 this investigation, should this be necessary I will
21 contact you through your counsel.
22     And is there anything you wish to clarify
23 or add to the statements you made today?
24     MR. ELDRIDGE:  No, I think that's about
25 it.

Page 59

1     MS. OSTROM:  Okay.  And why don't we go
2  off the record at 2:15 p.m. on April 6th of 2015.
3     (Whereupon at 2:15 p.m., the examination
4  was concluded.)
5         * * *

Page 60

1         PROOFREADER'S CERTIFICATE
2
3  In the Matter of:   GENAUDIO, INC.
4  Witness:       Dean Eldridge
5  File Number:   D-03450-A
6  Date:          April 6, 2015
7  Location:      Corvallis, MT
8
9
10    This is to certify that I, Nicholas Wagner,
11 (the undersigned), do hereby swear and affirm
12 that the attached proceedings before the U.S.
13 Securities and Exchange Commission were held
14 according to the record and that this is the
15 original, complete, true and accurate transcript
16 that has been compared to the reporting or recording
17 accomplished at the hearing.
18
19
20
21 _____    _____
22 (Proofreader's Name)      (Date)
23
24
25