**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No.:  1:15-cv-02118-WJM-CBS

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,


TAJ JERRY MAHABUB, GENAUDIO,
INC., and ASTOUND HOLDINGS, INC.,

      Defendants.

---

**DEFENDANT GENAUDIO INC.'S OPPOSITION TO PLAINTIFF SECURITIES
AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**

---

**Table of Contents**

INTRODUCTION...................................................................................................... 1

II.    RESPONSE TO MOVANT'S MATERIAL FACTS........................................ 2

III.   GENAUDIO'S STATEMENT OF ADDITIONAL MATERIAL FACTS................ 12

IV.    ARGUMENT............................................................................................. 24

    A.    Alleged Misleading Statements and Omissions.................................... 24

        1.    Alleged Fraudulent Statements Regarding Discussions with Apple........ 24

            a. Mahabub Reasonably Believed Steve Jobs Gave
            The Green Light.................................................................. 24

            b. Mahabub Reasonably Believed A Deal With Apple Was Likely........ 26

                i.    GenAudio's Extensive Discussions with Apple.............. 27

                ii.   Other Reasons To Be Optimistic About A Deal
                With Apple......................................................... 27

                iii.  Alleged Misrepresentations Regarding Discussions
                With Apple......................................................... 29

        2.    Alleged Fraudulent Statements Regarding Apple Executives............... 35

            a. Not "in connection with" the purchase or sale of a security.............. 35

            b. In light of Jobs' apparent approval, the statements
            are immaterial.................................................................. 35

        3.    Alleged Omissions.................................................................. 36

            a. No substantive meetings with Apple after September 2010............... 36

            b. Discussions were with mid-level Apple personnel.............................. 37

            c. Apple Negotiations and Plan To Integrate Technology........................ 38

    B.    Alleged Fraudulent Scheme Liability................................................. 38

    C.    Alleged Liability for Unlawful, Unregistered Securities Offerings .................... 39

V.    CONCLUSION.......................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Anastasi v. American Petroleum Inc.,* 579 F.Supp. 273, 275 (D.Colo.1984) .................................. 42

*Fitzpatrick v City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993) ............................................................ 41

*Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) ............................................. 31, 32

*Romero v. Union Pac. Railroad,* 615 F.3d 1303, 1309 (10th Cir. 1980) .......................................... 3

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801,

   811 (2d. Cir. 1996) ..................................................................................................................... 32

*SEC v. Nacchio*, 438 F.Supp.2d 1266, 1281 (D. Col. 2006) .......................................................... 31

*SEC v. St. Anselm Exploration Co.,* 936 F.Supp.2d 1281, 1298 (D.Colo.2013) ........................... 41

*SEC v. Sullivan,* F.Supp.3d 1367, 1377 (D. Colo. 2014) ............................................................... 41

**Other Authorities**

Rule 506 of Regulation D .......................................................................................................... 41, 42

Section 4(2) of the Securities Act of 1933 ..................................................................................... 41

Section 5 of the Securities Act ....................................................................................................... 42

**INTRODUCTION.**

In its motion for summary judgment, the Securities and Exchange Commission ("Plaintiff") attempts to repackage as securities fraud altered emails and arguably misleading statements sent principally to the management team of GenAudio, Inc. ("GenAudio"), not to investors.  While GenAudio concedes its CEO, Taj Jerry Mahabub ("Mahabub"), compromised his honesty in certain limited instances in emails to his *employees*, his flirtation with the truth does not give rise to liability under either Section 10(b) or 17(a) of the Securities Exchange Act.  Mahabub's conduct may prove objectionable for a variety of reasons, but Plaintiff fails to demonstrate he acted with the requisite state of mind or link his misgivings to the purchase of GenAudio shares by investors so as to give rise to securities fraud.

Nor has Plaintiff presented admissible evidence to demonstrate the absence of genuine issues of material fact.  The exhibits it offers to support its Statement of Material Fact largely are inadmissible for the reasons set forth in the accompanying Objections to Evidence.  Even if Plaintiff's evidence was admissible, it is confronted by other evidence offered by GenAudio and Mahabub calling into question its probative value.  For example, this competing evidence demonstrated genuine issues with respect to scienter.  Because it concerns a mental state, scienter needs to be determined by a trier of fact, thus is uniquely ill-suited for disposition by summary judgment.  *See Romero v. Union Pac. Railroad,* 615 F.3d 1303, 1309 (10th Cir. 1980).

The alleged Section 5 violations for unregistered securities fare no better.  As a threshold matter, the accredited investor questionnaires offered by Plaintiff are inadmissible.  *See* Objections to Evidence No. 7, 8.  But even if admissible, the failure of an investor to check a box on the questionnaire could be as much administrative inattention to detail as an affirmative indication the investor is not accredited.  Nor does annotating the questionnaire "NA" demonstrate self-evident investor disqualification.  At best the annotation is ambiguous and, without more, does not evaporate GenAudio's eligibility for exemption from securities

registration.  Given the existence of these genuine issues of material fact, Plaintiff has failed to sustain its burden that it is entitled to judgment as a matter of law.

## II.    RESPONSE TO MOVANT'S MATERIAL FACTS.

1 – 5:  Undisputed.

6.    Mattos and Mahabub were primarily responsible for bringing in investors to GenAudio, including through the sales of Mahabub's personal stock.  **Response:**  Disputed.  Only Mahabub was primarily responsible for capital raises.  <u>Ex. 217</u>, Mattos Dep. 19:16-23 ("Mr. Mahabub was solely responsible for all business development. … There was no other either executive or senior manager, to my knowledge, that had any measurable interactions with any business development partners.")

7 – 14:  Undisputed.

15.    Between November 2009 and April 2012, Mahabub sold approximately 3,316,300 shares of GenAudio stock to approximately 83 investors, raising approximately $2.3 million ("Mahabub Sales") when no registration statement was filed or in effect for the transactions. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #4).

16.    In connection with the Mahabub Sales, Mahabub and investors executed a Stock Sale and Purchase Agreement, and an Irrevocable Proxy Agreement; however, investors did not complete subscription agreements or investor questionnaires that addressed whether or not the investor was accredited and Mahabub did not maintain documentation regarding whether or not investors were accredited. **Response:** Disputed. See Mahabub's Response to SOF ¶ 16.

17 – 28:  Undisputed.

29.    During the 2010 and 2011-2012 Offerings, Mahabub solicited potential investors at public presentations he called "road shows." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #5).

30 - 31.  Undisputed.

32.    In connection with the 2010 Offering, at least one GenAudio investor wrote "N/A" on the portion of the Confidential Subscriber Questionnaire ("Questionnaire") that

addressed accreditation and investment experience.  **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #7).

33.     In connection with the 2010 Offering, other GenAudio investors failed to complete the portion of the Questionnaire that addressed accreditation. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #8).

34.     At least one investor who invested in the 2011-2012 Offering on multiple occasions repeatedly failed to complete the portion of the Questionnaire that addressed accreditation. **Response:**  Disputed on the basis the evidence is inadmissible. (See Objections #9).

35.     Beyond sending and receiving the Questionnaires, GenAudio did not do anything to determine investor accreditation. **Response:**  Disputed. Mattos reviewed the Questionnaires to ensure investor qualified as accredited and if Questionnaire incomplete, normally contact the investor to complete it.  Ex. 6, Mattos Dep. 169:23-171:4.

36.     Undisputed.

37.     Emails from Mattos during the 2010 Offering also reveal that GenAudio was willing to accept investments from non-accredited investors. **Response:**  Disputed on the basis the evidence is inadmissible. (See Objections #10). The cited evidence demonstrates GenAudio's allegiance to the accredited investor requirement. Ex. 27 (Rosenblatt was prior investor already known to be accredited, thus the reference to new investors required to be accredited); Ex. 28 (Mattos acknowledging SEC regulations in reference to aggregate investment by family pooling).

38 – 39:  Undisputed.

40.     Mahabub used body language and other "hints" to lead investors to understand that the LCEC was Apple. *See* Ex. 29 at 3 ("the super sharp investors will pick up on my body language" and "[t]his may entice investors that take a peek at our offering wondering why we are all of a sudden being so quiet… (not blah blah blah-ing about Apple in any way shape or form)

with strong confidence is a good thing"). **<u>Response:</u>**  Disputed on the basis the evidence is inadmissible. (See Objections ##1, 2, and 11).

41.   Numerous investors knew that "the LCEC" was Apple. **<u>Response:</u>** Disputed on the basis the evidence is inadmissible. (See Objections #1).

42 - 43:  Undisputed.

44.   Mahabub testified that he altered the emails to "entice" or "inform" the GenAudio Team. **<u>Response:</u>**  Disputed.  Mahabub altered the emails to keep employees motivated to work when low on funds and high on energy with much to accomplish.  Ex. 2, Mahabub Dep. 80: 14-24; 148:12-23 ("I think … there were times when I made alterations to keep the team members motivated…").

45.   For example, on March 21, 2010, Mahabub altered his email correspondence to Apple as set forth in the demonstrative below (alterations highlighted). **<u>Response:</u>**  Disputed on the basis the evidence is inadmissible. (See Objections ##3 and 12).

46.   Victor Tiscareno was a senior audio and acoustic engineer at Apple until February 2011, and he was Mahabub's primary contact at Apple. **<u>Response:</u>**  Disputed on the basis the evidence is inadmissible. (See Objections #1).

47.   In 2009 and 2010, Mahabub also met and communicated with Michael Hailey, who was a product market manager with Apple for the iPod, iPhone, and iPad product lines, and Ronald Isaac, who was a signal processing engineer and acoustician technologist with Apple. **<u>Response:</u>** Disputed on the basis the evidence is inadmissible. (See Objections #1).

48 – 51:  Undisputed.

52 – 60:  Disputed. **<u>Response:</u>** Each of the Statements of Fact in paragraphs 52 – 60 rely on inadmissible deposition and/or investigation testimony as well as unauthenticated emails and are thus disputed on the basis the evidence is inadmissible. (See Objections ##1 – 3 and 12 - 16).

61.   In early April 2010, Mahabub became aware of the scheduling of an internal meeting at Apple regarding GenAudio's technology. **<u>Response:</u>**  Disputed on the basis the evidence is inadmissible. (See Objections #17). Mahabub was aware of the internal meeting long

before April 2010.  Mahabub and Tiscareno worked on demos to be used at that meeting in late 2009.  Ex. 203 (Tiscareno and Mahabub discussing with Mahabub the preparation of demos to be shown to "the man", Ex. 152, Tiscareno Dep. 140:18-141:21 (Tiscareno confirming Ex. 203 relates to preparation of demos to be shown at the internal meeting).

62.     In correspondence between Mahabub and Tiscareno, neither indicated that the meeting would involve Jobs, Schiller, or Cook; instead, Mahabub referenced Tiscareno's upcoming meeting with an "exec." **Response:** Disputed on the basis the evidence is inadmissible. (See Objections #18). Mahabub and Tiscareno used several terms in their correspondence to describe the individual who would receive the presentation on May 6, 2010, including "the exec.", "the big exec.", and "the man."  *See* SOF ¶ 142.  Mahabub also testified Tiscareno and Hailey told him the meeting was with "Jobs."  SOF ¶ 144.  Tiscareno and Hailey may have intended to tell him the meeting was with "Joz."  SOF ¶ 143.

63.     On April 8, 2010, Mahabub sent a few members of the GenAudio Team false and altered emails that made it appear that Tiscareno stated "Phil let us know earlier that this might be postponed until early next week. Apparently Steve is planning on going out of town with his family for the weekend" and that Mahabub stated "[t]oo bad … although, that might be better given that Steve will be relaxed from having a weekend getaway with his family. Perhaps this is why Phil is rescheduling for next week." **Response:** Disputed on the basis the evidence is inadmissible. (See Objections #19).

64.     On April 30, 2010, while he was attending a conference for investment bankers and broker-dealers, Mahabub sent prospective investors an email that falsely stated that the LCEC was "looking to acquire GenAudio's tech for integration into their entire lineup of product offerings" and "we are now waiting to when [sic] we will initiate negotiations, pending the CEO of the LCEC to approve the integrated product rollout strategy and the technical implementation strategy that will be presented to the CEO next week!!!" **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #20).  The email was sent to one investor only.  Other than Cohen, Mahabub speculates who else may have received.  Ex. #150, Mahabub Dep.,

200:12-202:10.  Mahabub's email was not false as he believed the statements were reasonable under the circumstances. *Id.*, 205:2-19 (reasonable to believe Apple looking to acquire GenAudio technology for integration); 207:4-20 (reasonable to believe awaiting CEO approval of integrated product rollout strategy and technical implementation strategy). *See* SOF ¶ 131, 134, 136, 137, 138, 140-146.

65.    After receiving the email, an investor purchased 5,000 shares for $15,000.

**Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #21).

66.    On May 5, Mahabub sent Tiscareno materials that he suggested Tiscareno use at the meeting with "the exec," and he offered to attend the meeting; however, Tiscareno declined the offer, explaining "this is not that kind of demo. [Hailey] and I are pitching this as a concept ...." and "[o]nce we get the go ahead that this is a great idea, then the questions will be, 'well, what about the other technologies, have we reviewed them? etc.' Then we sort of start over internally.... We have to get to first_base...." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #22).

67.    In the morning and early afternoon of May 6, 2010, Mahabub sent emails to the GenAudio Team regarding the upcoming meeting at Apple which falsely represented that Schiller and Jobs were involved. **Response:**  Disputed on the basis the evidence is inadmissible. (See Objections #23).  Mahabub honestly and reasonably believed Schiller and Jobs were involved. Declaration of Jerry Mahabub ("Mahabub Decl."), ¶ 23-24; *See* SOF ¶ 131, 134, 136, 137, 138, 140-146.

68 - 69.    Late in the evening of May 6, 2010, Mahabub sent the GenAudio Team a purported "transcription" of a phone call between him and Tiscareno. After repeatedly instructing that the email be deleted, Mahabub set forth his purported conversation with Tiscareno, which included representations that Tiscareno stated that "Steve thought the technology was so extraordinary .... I believe he wants to explode this technology into the world" and "[Steve] instructed all of us to be in a no radio period" and "I can say that [Steve] is anxious to meet you in person when we have things figured out on our end." Mahabub then concluded

the email by stating "[a]t least we have some time to put our strategy together and get our pawns in order for the asset acquisition or licensing battle." Mahabub then forwarded the email that contained the false "transcription" to an investor. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #24).

70.    Receipt of the false "transcription" "affirmed [the investor's] willingness to purchase 40,000 shares of stocks" in the 2010 Offering, because "[i]t just confirmed that the decision I had made to purchase the stocks was a good decision." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #2).  Also, Skluzak did not rely on the "transcription" to purchase shares as he had purchased prior to receiving it.  Ex. #218, Skluzak Dep., 59:23-60:5 ("I had already made my determination ... prior to this date, sometime in April, that I was going to invest.")

71.    On October 30, 2013, Tiscareno received a copy of the May 6, 2010 "transcription" from a GenAudio investor and responded "OMG!" and went on to explain "I never discussed anything about Steve Jobs or any other board member at Apple. I never discussed this with Steve Jobs. Period!" and "This letter is pure fabrication." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #25).

72.    On May 25, 2010, Mahabub emailed the GenAudio Team and represented that Tiscareno was contacting him despite the "no radio period" and forwarded emails that he altered to make it appear as if Tiscareno wrote "Steve has us looking very deep into other audio technology so he can better understand why yours is so much better" and "I have forwarded your email on to Steve. He said he will give it a listen in his home theater. This just might be what you need to get him to support this from the Pixar angle." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections ##3 and 26).

73 - 74.        In May 2010, Mahabub and GenAudio created an investor presentation that was emailed to investors; during the presentation, Mahabub falsely stated that "the CEO of the LCEC finally met with senior marketing and technical management and we have the green light to move forward."; The presentation and email also discussed GenAudio's 2010 Offering

and encouraged investors to review the PPM and attached valuation report. **Response:** Disputed on the basis the evidence is inadmissible. (See Objections ##5 and 27). Mahabub reasonably believed his statement about the LCEC's CEO was true. *See* SOF ¶ 131, 134, 136-138, 140-146.

75.      On July 2, 2010, Mahabub emailed the GenAudio Team false and altered emails that made it appear that Jobs wanted to meet with Mahabub and Jobs was involved in evaluating GenAudio's technology. *Compare* <u>Ex. 64</u> to <u>Ex. 65</u>; *see also* <u>Demo.</u> at 15-17. **Response:** Disputed on the basis the evidence is inadmissible. (See Objections ##3 and 28).

76-77:  Undisputed.

78.      Apple never told Mahabub or GenAudio that it planned to incorporate GenAudio's technology in any of its new product roll-outs. **Response:** Disputed on the basis the evidence is inadmissible. (See Objections #2). Mahabub testified he spoke with Tiscareno regarding a Christmas product roll-out. <u>Ex. 150</u>, Mahabub Dep. 143:24-144:33, 310:21-311:11; *see also* SOF ¶ 124.

79.      Apple never indicated that it was interested in licensing GenAudio's technology or acquiring GenAudio or GenAudio's technology. **Response:** Disputed on the basis the evidence is inadmissible. (See Objections #1). Mahabub testified he had a conversation with Isaac about licensing. <u>Ex. 150</u>, Mahabub Dep. 95:9-97:16. Mahabub also reasonably believed for *many* reasons that Apple was interested in acquiring its technology. *See, e.g.,* SOF ¶¶ 109, 110, 111, 118, 124, 127, 128, 130, 131, 134-158.

80.      Apple and GenAudio had no negotiations about Apple licensing GenAudio's technology or acquiring GenAudio or its technology. **Response:** Disputed on the basis the evidence is inadmissible. (See Objections ##1 and 2). Mahabub testified he had conversations with Tiscareno and Isaac regarding licensing and product rollout. <u>Ex. 150</u>, Mahabub Dep. 95:9-97:16, 143:24-144:33, 310:21-311:11; *see also* SOF ¶ 124 (Mahabub sending negotiation emails to Apple); Tiscareno and Isaac never told Mahabub they would not be the ones to negotiate any deal with GenAudio. SOF ¶¶ 128, 129.

81.     On December 16, 2009, Apple employee Hailey responded to the November 28, 2009 email from Mahabub referencing a potential "deal" between Apple and GenAudio, and stated, in part, "[w]e're making progress and building our story, but this is not something we can execute overnight. The business side of things would come into play after we have exec buy-in on the product side." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #29).

82.     On January 5, 2010, Hailey responded to an email from Mahabub and informed him that "[w]ith respect to timeframe, we are pretty serious about looking at audio quality across the board and this will take time – definitely more than a couple of months." **Response:** Disputed on the basis the evidence is inadmissible.  (See Objections #30).

83.     On September 25, 2009, GenAudio held a telephonic meeting of the Board and during the meeting, Mahabub "noted that a deal with Apple is highly probable based on the many meetings and Apple's responses to date." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #31).

84.     Undisputed.

85.     Following this November 9, 2009 email, Mahabub, with the assistance of Mattos, began selling Mahabub's personal shares of GenAudio to investors. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #32).

86.     GenAudio and Mahabub sent prospective investors a March 15, 2010 letter, in the 2010 Offering Materials, that represented, "[t]his offering is being conducted to provide bridge capital until we can 'ink' a deal with a large consumer electronics company (referred to as the 'LCEC' throughout the PPM)...." **Response:**  Disputed that it was sent to prospective investors as the letter is addressed only to current shareholders to secure bridge capital.  Ex. 14.

87.     Undisputed.

88 - 89.     Each of the Statements of Fact in paragraphs 88 – 89 rely on an inadmissible unauthenticated letter and are thus disputed on the basis the evidence is inadmissible.  (See Objections #33).

90.     On September 6, 2010, Mahabub sent an email to two Board members, representing that he was forwarding "my latest cattle prod to Vic and Apple" and forwarding an email that Mahabub altered to make it appear as if he had strenuously pushed Tiscareno to "ink" a deal with GenAudio. **Response:** Disputed on the basis the evidence is inadmissible. (See Objections ##3 and 34).

91.     On or about September 23, 2010, Mahabub attended a demonstration at Apple with Dr. Andrew Bright, who was an Apple employee with a Ph. D. in Acoustics, Tiscareno, and Isaac. **Response:** Disputed on the basis the evidence is inadmissible. (See Objections #35).

92.     The meeting did not go well due to an argument between Mahabub and Bright, and was Mahabub's last substantive meeting with Apple. **Response:** Disputed on the basis the evidence is inadmissible. (See Objections ##1 and 2). Disputed that it was Mahabub's last substantive meeting with Apple. The meeting was not Mahabub's last substantive meeting with Apple. Mahabub continued to work substantively with both the iPhone/iPod/iPad division and the Mac division, and had many more substantive discussions with them in-person, by email, and by phone. SOF ¶¶ 110, 156, 157, 159-161.

93.     Undisputed.

94.     On or about December 8, 2010, GenAudio sent investors a letter that was drafted and electronically signed by Mahabub and in a section entitled "The LCEC," stated, in part, "I met with their CEO and gave him a demo of our technology, and he stated, "I really like your technology and look forward to seeing you again in the future. Although they are moving very slow, we are still on their radar screen, and remain very optimistic for a deal in the second or third quarter of 2011." **Response:** Disputed on the basis the evidence is inadmissible. (See Objections #36). Ex. 74 is not a December 8, 2010 letter sent to investors by GenAudio.

95.     Mahabub has admitted the statement was false. **Response:** Disputed on the basis the evidence is inadmissible. (See Objections #1 and 2). Ex. 74 is not a December 8, 2010 letter sent to investors by GenAudio. Misstates Mahabub's testimony on this document. Also, in the cited testimony, Mahabub was only addressing whether he ever met with Steve Jobs. He did not

testify as to whether anything else in the referenced statement was accurate, and in particular he did not admit the statement that GenAudio remains "very optimistic . . ." was false.

96.     On or about February 26, 2011, GenAudio sent investors a letter that was drafted and electronically signed by Mahabub and claimed that GenAudio, "will continue to support the development efforts with the LCEC with the hope that it will lead to a major transaction for GenAudio and its shareholders in the not so distant future." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #37).

97.     GenAudio and Mahabub also stated in the February 26, 2011 letter that "If you are one of our accredited investors and would like to discuss a follow-on investment in the company, please feel free to contact me directly.... While we cannot make any guarantees, we are very confident this will be the last money raised before achieving self-sustaining revenues given our inked revenue generating license deals, near-term licensing potential deals, and upcoming massive global branding." *Id*. at GA005337. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #37).

98.     On March 29, 2011, GenAudio and Mahabub, through Mattos, sent GenAudio's investors a letter that stated that GenAudio would be signing a new set of "evaluation and development" agreements with the LCEC, which would "completely prohibit" Mahabub and GenAudio from disclosing any further information about the LCEC, or even using the term "LCEC." The email concluded: "Believe me when I tell all of you that I wish I could disclose what is going on, however, the fact of the matter is I cannot." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #38).

99.     Beyond the July 2009 NDA, GenAudio never entered into any agreements with Apple. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #1).

100.    On April 22, 2011, GenAudio sent investors the 2011-2012 Offering materials, which omitted information about Apple or "the LCEC." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #39).  Ex. 15 is not 2011-2012 Offering materials.

101.     Between November 2009 and April 2012, GenAudio and Mahabub did not inform investors that Mahabub's substantive communications with Apple personnel were almost always limited to mid-level engineering and marketing employees. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections ##1-3 and 12-16).  Mahabub met with some senior Apple personnel.  Mahabub also reasonably believed Tiscareno was a senior Apple employee. SOF ¶¶ 153, 154.

102.     Between November 2009 and April 2012, GenAudio and Mahabub did not inform investors that Apple and GenAudio had no negotiations to license GenAudio's technology or to acquire GenAudio or its technology. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections ##1 and 2).  *See* response to SOF ¶¶ 78-80.

103.     Between November 2009 and April 2012, GenAudio and Mahabub did not inform investors that Apple never told Mahabub or GenAudio that it planned to incorporate GenAudio's technology in any of its new product roll-outs. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #2).  *See* response to SOF ¶ 78.

104.     Between September 2010 and April 2012, GenAudio and Mahabub did not inform investors that in September 2010, Mahabub conducted a demonstration to Apple personnel that went poorly. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections ##1 and 2).  Ex. 15 is not 2011-2012 Offering materials.

105.     Investors received and reviewed GenAudio's Offering Materials. **Response:** Disputed on the basis the evidence is inadmissible.  (See Objections ##1 and 2).

106.     GenAudio's and Mahabub's shareholder updates were important to investors. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #1).

107.     Investors purchased shares from Mahabub and GenAudio based on representations about Apple's alleged dealings with GenAudio, including Mahabub's oral representations. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #2).

### III.     GENAUDIO'S STATEMENT OF ADDITIONAL MATERIAL FACTS

108.    GenAudio's discussions with Apple regarding GenAudio's AstoundSound technology began in late 2006.  Ex. 151; Ex. 152, Tiscareno Dep. 46:21-47:1.[1]

109.    The discussions between GenAudio and Apple regarding GenAudio's technology were extensive.  Ex. 151, Tiscareno Dep. 152:2-154:14 (Tiscareno saying there were "a lot" of communications with GenAudio by November 2009), 267:20-23 (the discussions were "fairly extensive"), 269:2-6 (Tiscareno demonstrated GenAudio's technology to a lot of Apple employees); Ex. 150, Mahabub Dep. 206:13-16.

110.    Mahabub met in-person with Apple personnel at Apple's offices at least 15 times, the last of which was on December 1, 2010.  Ex. 153 (prepared during testimony of Victor Tiscareno to reflect the dates of at least 15 in-person meetings, based on emails, calendar entries, and deposition testimony),[2] Ex. 152, Tiscareno Dep. 56:4-20; *Meeting 15:* Ex. 168, Ex. 152, Tiscareno Dep. 259:13-25.

111.    Mahabub and Apple personnel had extensive other contacts, including many phone calls, and exchanged hundreds upon hundreds, if not thousands of emails regarding GenAudio's technology.  Ex. 152, Tiscareno Dep. 25:25-26:5; 29:17-30:3; Ex. 169, Isaac Dep. 46:1-2, 47:2-5; Ex. 150, Mahabub Dep. 92:11-15.

112.    GenAudio had separate discussions with both the iPhone/iPod/iPad division and the Macintosh (or "Mac") division at Apple.  Tiscareno served as GenAudio's primary point of contact for the iPhone/iPod/iPad division, and Isaac was the primary person working with GenAudio from the Mac division. Ex. 170, Isaac Inv. 13:17-14:2.

113.    Tiscareno was not substantively involved in the discussions between GenAudio and the Apple Mac" division or in the Mac division's evaluation of GenAudio's technology and integration of GenAudio's technology into Mac products.  Ex. 152, Tiscareno Dep. 110:5-14, 22-24, 150:6-8; Ex. 169, Isaac Dep. 49:5-16.

---

[1]      For the convenience of the Court, citations to and testimony from the SEC investigation and to deposition transcripts follow the same format as used by Plaintiff in its brief.

[2]      Exhibit 153 is referenced throughout the Tiscareno deposition transcript as Deposition Exhibit 82.

114.    When vendors contact Apple to engage in discussions of the vendors' technology, the ultimate goal of those discussions from the vendor's perspective is to reach an agreement with Apple to buy that technology, either through a licensing agreement, or a partnership/acquisition, and the purpose from Apple's perspective also is due to the potential for such an agreement.  Ex. 152, Tiscareno Dep. 30:14-23; 50:14-51:3; Ex. 171, Hailey Inv. 32:23-33:4.

115.    From the beginning of the discussions between GenAudio and Apple, Mahabub made clear to Apple that his goal was to reach a licensing agreement or acquisition of GenAudio's technology.  Ex. 172 at 2; Ex. 173, Ex. 152, Tiscareno Dep. 70:23-71-7.

116.    During its discussions and work with Apple, GenAudio successfully integrated its technology into Apple products.  Ex. 169, Isaac Dep. 44:1-11, 117:16-118-24 (Isaac acknowledging GenAudio accomplished full embedded level integration by November 2009), 136:3-9, 175:21-176:21 (integration of GenAudio's technology was completed on the most complicated line of Mac computers and minimal effort would be needed to integrate the technology onto other types of Mac computers).

117.    GenAudio and Apple executed a Non-Disclosure Agreement in July 2009. Mahabub Decl. ¶ 12.

118.    Apple discussed with GenAudio the potential need for GenAudio to sign additional non-disclosure agreements on multiple occasions in 2010 and 2011. Ex. 176 ("I need the new NDA to review as well that we discussed"); Ex. 177 at 1; Ex. 178 at 1; Ex. 179; Ex. 180 at 2; Ex. 181 at 1, 2 (Apple proposing further "evaluation agreements" with GenAudio); Ex. 169, Isaac Dep. 171:23-172:14, 173:12-24.

119.    Mahabub believed because GenAudio had already signed Apple's standard non-disclosure agreement, the fact Apple wanted GenAudio to execute further non-disclosure agreements meant those additional proposed agreements would be even more restrictive, and indicated Apple was interested in a licensing agreement or acquisition of GenAudio's technology.  Ex. 150, Mahabub Dep. 97:17-20, 98:18-21; Mahabub Decl. ¶ 25.

120.     Regarding GenAudio's March 15, 2010 letter to potential investors stating that GenAudio's 2010 stock offering "is being conducted to provide bridge capital until we can 'ink' a deal with a large consumer electronics company (referred to as the 'LCEC' throughout the PPM)," Tiscareno testified that there was nothing inaccurate regarding that statement. Ex. 152, Tiscareno Dep. 194:5-6, 195:4-21, 199:20-25 (discussing SEC Ex. 14).

121.     Regarding GenAudio's March 15, 2010 Private Placement Memorandum, which states as follows:

> [GenAudio] is optimistic that the LCEC will eventually want access to our AstoundSound technology for their products. It is unclear what structure such access would take, but the Company believes the LCEC would either (i) integrate a portion of our AstoundSound Technology, namely ASE, into multiple product lines through a licensing arrangement or (ii) acquire all of our AstoundSound Technology or, at least, that portion the LCEC deems necessary for its integration plans

Tiscareno testified the statements are accurate. Ex. 152, Tiscareno Dep. 203:11-13, 204:6-7, 205:2-207:22 (discussing SEC Ex. 3 at 21).

122.     By August 2009, Tiscareno and Mahabub were working closely together regarding GenAudio's technology and the two communicated frequently. Ex. 152, Tiscareno Dep. 118:14-16, 120:5-8; Ex. 185 ("I . . . feel that we have become friends . . . .")

123.     Mahabub repeatedly wrote to his contacts at Apple regarding his view that most of the work needed to implement GenAudio's technology into Apple products was completed and that GenAudio's technology could be included quickly into Apple products for sale to consumers. GenAudio's contacts at Apple did not tell Mahabub they disagreed with his view, which further encouraged Mahabub to believe his statements were correct. Ex. 189 ("[I]t is already for the most part done. . . . [I]t is in fact a very real and attainable goal for X-Mas product rollout if we work hard and fast[]!"); Ex. 152, Tiscareno Dep. 127:10-20, 128:20-24 ("Q: Did you talk to Mr. Mahabub about whether you agreed with that statement? . . . A. No, I never called him on those things."); 130:5-8; 134:10-16 (regarding Mahabub's frequent comments of this nature).

124.    Mahabub also repeatedly wrote to his contacts at Apple regarding his understanding that Apple's interest in GenAudio's technology, and its evaluation of GenAudio's technology was sufficiently advanced that a license agreement or acquisition would be completed between GenAudio and Apple in the near future, or that he was optimistic such a deal would take place soon.  Again, GenAudio's contacts at Apple did not tell Mahabub that they disagreed with his view, which further encouraged Mahabub to believe his statements were correct. Ex. 193 (Mahabub saying in November 2009, "Hopefully Mac Division signs off on this and we can get moving on to the next step, especially if there is any hope of having this done by Macworld from the Marketing side, it would only make sense that we start to figure out the deal structure between Apple and GenAudio sooner rather than later."); Ex. 152, Tiscareno Dep. 143:5-12, 144:10-11, 145:1-12 (Tiscareno did not tell Mahabub his statement about the timeline of a possible deal was unrealistic); Ex. 190; Ex. 191 at 3 (Mahabub stating the path forward is simple: "1. Ink a licensing deal . . . 2. Hand over the actual AstoundAPI . . . 3. Ready to Ship."); Ex. 194 ("This would be a phenomenal time for Apple to consider putting out an Astound integrated set of product offerings for their Christmas product rollout"); Ex. 195; Ex. 196; Ex. 152, Tiscareno Dep. 250:2-251:15 (Tiscareno agrees that in September 2010 Mahabub appeared to believe discussions between GenAudio and Apple were moving forward in a manner that was "optimistic" for GenAudio); Ex. 197; Ex. 152, Tiscareno Dep. 262:17-263:7 (discussing Ex. 197); Ex. 169, Isaac Dep. 169:16-170:19 (Isaac did not respond to Ex. 197); Ex. 192 at 13 (Mahabub writing in September 2009, "I hope we can get this done on the fast track – potentially for inclusion in Apple's X-Mas product rollout strategy?); Ex. 169, Isaac Dep. 71:13-72:11; Ex. 199 (Mahabub stating he hopes there will be "multiple products from Apple incorporating AstoundSound" by the time of the upcoming WWDC conference); Ex. 169, Isaac Dep. 122:2-8, 125:15-17, 127:17-129:2 (Isaac did not read Mahabub's email in Ex. 199 and did not respond to it), 134:23-25 (Isaac did not pay attention to many of Mahabub's emails); Ex. 169, Isaac Dep. 207:10-19 (Isaac confirming he never discussed with Mahabub how long it might take to incorporate GenAudio's technology into Apple products); Ex. 150, Mahabub Dep. 64:4-17,

143:24-144:33 (Mahabub had discussion with Tiscareno regarding a Christmas product rollout);

Ex. 219, Mahabub Dep. 310:21-311:11 (same).

125.    Mahabub believed GenAudio was going to reach a deal with Apple for GenAudio's technology.  Ex. 150, Mahabub Dep. 64:20-65:5, 94:24-95:1, 109:23-24, 110:2-4, 103:6-16, 181:9-20, 205:2-19.

126.    Mahabub testified he also had a conversation with Isaac in which Mahabub said "we need to figure out how we're going to license this to you; right?" and that Isaac responded "Well, we're not going to pay you a per unit royalty, you know that."  This conversation led Mahabub further to believe a licensing deal would be reached with Apple.  Ex. 150, Mahabub Dep. 95:9-97:16.

127.    On November 28, 2009, Mahabub sent his contacts at Apple a lengthy email in which he sought to negotiate the terms of a transaction with Apple for GenAudio's technology, including its architecture, price, patent ownership, and timing of its close.  Ex. 190; Ex. 152, Tiscareno Dep. 173:3-7 (discussing Ex. 190: "Q: So [Mahabub's] trying to negotiate with you. You're just not negotiating back. A: Yeah.")

128.    After Tiscareno received Mahabub's November 28, 2009 email, Tiscareno ignored it; he did not tell Mahabub that his attempt to negotiate a deal with Apple was premature or that his understanding of Apple' intent was misplaced.  Ex. 152, Tiscareno Dep. 164:13-165:8, 167:17, 25-168:6; 173:3-7.  Tiscareno also did not tell Mahabub that Tiscareno would not be responsible for any negotiation on behalf of Apple.  Ex. 152, Tiscareno Dep. 174:22-175:24; Mahabub Decl. ¶ 26.

129.    Isaac never told Mahabub that Isaac lacked the authority to make a decision about any business deal with GenAudio on the Mac side.  ).  Ex. 169, Isaac Dep. 160:22-161:10 ("[M]aking business decisions was way above my pay grade, and that remains a very accurate statement.  Q: Do you recall ever telling that to Mr. Mahabub?  A: No, I do not.").

130.    Hailey did respond to Mahabub's November 28, 2009 email.  In Hailey's response, he confirmed Apple is "interested in [GenAudio's] technology" and said "[w]e're

making progress and building our story, but this is not something we can execute overnight.  The business side of things would come into play after we have exec buy-in on the product side."  Ex. 190 at 2.

131.     Following Hailey's response to the November 28, 2009 email, Mahabub was focused on what Hailey had referred to as the "executive buy-in" as a "final milestone" to be reached before a deal with Apple could be reached for GenAudio's technology.  Ex. 201; Ex. 152, Tiscareno Dep. 178:18-179:9 ("final milestone"); Ex. 190 at 1 (Mahabub asking when "exec buy-in might take place" and asking for a "ball park figure" on timing).

132.     After Hailey's response, Mahabub still believed "executive buy-in" at Apple could be obtained within the next few months.  Ex. 188, Hailey Dep. 100:24-101:22 (Q: And you wrote that because it seems Mr. Mahabub thought the time frame would be faster than a couple of months, right? A: Correct.")； *see also* Ex. 164 at 2 (Mahabub thanking Hailey for disclosing "the more realistic timeframe" and suggesting he still thought it could occur within 3-6 months).

133.     In November 2009, Mahabub hired an intellectual property valuation specialist to value GenAudio's technology under several scenarios in anticipation of negotiations with Apple over a licensing agreement or acquisition. Ex. 198 at 39.

134.     On May 6, 2010, Tiscareno and Hailey gave a demonstration of GenAudio's technology to a senior executive at Apple named Greg Joswiak. Ex. 152, Tiscareno Dep. 214:10-215:20 (confirming the meeting occurred on May 6, 2010).

135.     Greg Joswiak, who was the Vice President of iPod/iPhone in the Marketing Department, is among the most senior executives at Apple. Ex. 216 (org. chart showing top Apple executives as of 2011, including Joswiak in the same role as in 2010); Ex. 152, Tiscareno Dep. 211:11-21, 212:3-214:2 (Tiscareno acknowledging "it doesn't get any higher than that").

136.     Greg Joswiak is known at Apple by the nickname "Joz", and both Tiscareno and Hailey refer to Joswiak using the "Joz" nickname.   Ex. 152, Tiscareno Dep. 180:4, 208:21, 210:9-21; Ex. 188, Hailey Dep. 15:20-21, 144:25-145:10; Ex. 171, Hailey Inv. 18:5-7.

137.     This May 6, 2010 meeting was when the "executive buy-in" at Apple would be determined.  Ex. 152, Tiscareno Dep. 179:3-180:8.

138.     As a result, the May 6, 2010 presentation to Greg Joswiak was a "make-or-break" meeting regarding Apple's interest in GenAudio's technology.  If Joswiak did not give a "green light" to continue with GenAudio, then discussions between GenAudio and Apple's iPhone/iPod/iPad division regarding potential use of GenAudio's technology in iPhone/iPod/iPad devices would end.  Ex. 152, Tiscareno Dep. 218:13-17, 219:6-14.

139.     Tiscareno also needed the May 6, 2010 meeting to result in a green light for Tiscareno to keep spending time related to GenAudio.  Ex. 152, Tiscareno Dep. 221:1-222:7.

140.     Mahabub's contacts at Apple told him how important this May 6, 2010 meeting was, and Mahabub understood discussions with the iPhone/iPod/iPad division would end if the meeting did not result in a green light for the project. Ex. 202 ("Trying to line you up with as much fire power as possible so we get a green light to continue to move forward!"), Ex. 152, Tiscareno Dep. 179:3-180:8, 219:6-14.

141.     Tiscareno testified if he used a term such as "the big man" Tiscareno probably meant it as a reference to Steve Jobs without expressly using Steve Jobs' name.  Ex. 152, Tiscareno Dep. 156:2-16. ("And, you know, if I – if I used them myself, it was probably – that's wink-wink – that's who it is.")

142.     Mahabub worked with Tiscareno to prepare for the May 6, 2010 presentation. During those discussions, Tiscareno and Mahabub referred to the executive who would receive the presentation as "the man", "the executive", "the exec.", and "the big exec." (as an abbreviation for the "big executive"). Ex. 203 (Tiscareno discussing with Mahabub the preparation of demos of GenAudio's technology for someone at Apple whom Tiscareno refers to as "the man"); Ex. 202 ("the executive"), Ex. 204 ("the exec."), Ex. 205 ("the exec at Apple"), Ex. 206 ("the big exec at Apple"), Ex. 152, Tiscareno Dep. 208:19-209:7; Ex. 150, Mahabub Dep. 188:22-189:1 ("the big man").

143.     Tiscareno and Hailey may also have told Mahabub that the meeting was with "Joz", without using Greg Joswiak's actual name.  Ex. 171, Hailey Inv. 33:11-17 ("We may have said that we – that we were going to pitch to Jaws."

144.     Mahabub testified that when he spoke with Tiscareno and Hailey by phone in advance of the May 6 meeting, he had understood they told him the meeting was with "Jobs", meaning Steve Jobs, and Mahabub believed the May 6 presentation was to Steve Jobs. Ex. 150, Mahabub Dep. 189:1-3, 190:7-21, 221:19-223:7, 227:14-228:2; Ex. 219, Mahabub Dep. 290:12-291:3, 323:2-22

145.     Mahabub has never heard the name Greg Joswiak, and was not told the May 6, 2010 meeting was with someone with that name.  Ex. 150, Mahabub Dep. 217:13-25, 252:12-15.

146.     Mahabub testified that around February 2010, he also had a conversation with Tiscareno in which Tiscareno said words to the effect that "Michael [Hailey] and I want to make sure we have no hang-ups when we push this to the top, and we both are confident that we can get this okayed by the big man if we play our cards right." Ex. 150, Mahabub Dep. 142:15-143:2.

147.     The only individuals present during the May 6, 2010 meeting were Tiscareno, Hailey, and Greg Joswiak.  Mahabub was not invited to attend and did not participate.  Ex. 152, Tiscareno Dep. 217:22-25.

148.     At the May 6 meeting, Joswiak "agreed that there was value in exploring ways to enhance the listening experience for people using iPods and iPhones" and thought there was value in continuing the exploration  Ex. 188, Hailey Dep. 114:20-115:4, 117:15-19.

149.     After the May 6, 2010 meeting, Tiscareno and Mahabub continued to engage in substantive work in connection with possible use of GenAudio's technology on products for Apple's iPod/iPhone/iPad division. Ex. 152, Tiscareno Dep. 223:23-224:18; Ex. 208; Ex. 166 (Mahabub email to Tiscareno in July 2010 regarding work on a revised demonstration application); Ex. 176; Ex. 209; Ex. 178 (discussing continued work on the app for the iPad; Ex. 195; Ex. 167; Ex. 152, Tiscareno Dep. 253:11-16 (discussing Ex. 167 and admitting it reflects

additional work being done in connection with GenAudio's technology in September 2010 related to the iPad); Ex. 168; Ex. 152, Tiscareno Dep. 258:18-259:9 ("Q: Does this reflect that there was still some more work being done on the iPad and iPod side? A: That's what it says here."); Ex. 197; Ex. 152, Tiscareno Dep. 260:1-18; Ex. 210; Ex. 152, Tiscareno Dep. 263:17-265:2 (Tiscareno admitting he was performing work connected to GenAudio technology in January 2011 and that it appears the work related to the iPad); Ex. 211; Ex. 169, Isaac Dep. 147:11-148:8 (Mahabub presentation given to Andrew Bright and Barry Corlett on September 23, 2010 was to demonstrate GenAudio's technology on both the iPad side and the Mac side; Corlett worked on audio architecture in the iPod division; the meeting was held in the iPod building);

150.   Any belief by Tiscareno that all of his post-May 6 work regarding GenAudio technology could have involved work for the Mac division rather than for the iPhone/iPod/iPad division is mistaken.  Ex. 169, Isaac Dep. 141:22-142:12 (Isaac does not believe Ex. 208 relates to work done in connection with the Mac division); 148:12-149:2 (The potential NDA discussed in Ex. 176 does not relate to work being done on the Mac side); 165:22-166:8; 161:16-162:6 (same for Ex. 211); 150:21-152:4 (same for Ex. 178); 152:6-153:20 (same for Ex. 167).

151.   Mahabub believed the May 6, 2010 meeting had resulted in the critical "green light" to continue toward a transaction regarding GenAudio's technology and that discussions with the iPhone/iPod/iPad division were still moving forward.  Ex. 219, Mahabub Dep. 300:22-301:15; Ex. 194 (Mahabub writing in July 2010 that "This would be a phenomenal time for Apple to consider putting out an Astound integrated set of product offerings for their Christmas product rollout"); Ex. 209; Ex. 197; Ex. 152, Tiscareno Dep. 262:17-263:7.

152.   Tiscareno does not recall ever telling Mahabub that based on the May 6, 2010 meeting, in Tiscareno's view, the discussions between GenAudio and the iPhone/iPod/iPad division at Apple had come to an end and would not continue.  Ex. 152, Tiscareno Dep. 225:3-226:4, 228:6-229:20.

153.    On September 23, 2010, Mahabub made a presentation to a number of Apple employees, including Andrew Bright, who was a very senior Apple employee, and Barry Corlett, who also was a senior Apple employee.  Ex. 169, Isaac Dep. 146:1-3, 147:3-16; Ex. 152, Tiscareno Dep. 255:10-21.

154.    Mahabub understood Tiscareno also was a senior employee at Apple.  Ex. 150, Mahabub Dep. 38:3-7; Ex.  152, Tiscareno Dep. 20:3-15 (Tiscareno's title was "Senior Engineer" for Audio and Acoustic).

155.    After the September 23, 2010 meeting, nobody at Apple ever said to Mahabub that the Mac division had decided to end discussions with GenAudio or end further evaluation of GenAudio's technology.  Ex. 169, Isaac Dep. 158:10-159:24.

156.    After the September 2010 meeting with Bright and Corlett, Apple and GenAudio continued to conduct work in connection with GenAudio's technology related to the Mac division.  Ex. 212; Ex. 169, Isaac Dep. 162:17-165:15; Ex. 168; Ex. 169, Isaac Dep. 166:10-21; Ex. 197 ("I can now update the iPad/iPod and Mac side apps with the new processing that solves many issues we had with the current implementations you have . . . .")

157.    After September 2010, work also continued between GenAudio and Tiscareno on the iPhone/iPod/iPad side.  Ex. 168; Ex. 152, Tiscareno Dep. 258:18-259:9; Ex. 169, Isaac Dep. 165:22-166:8; Ex. 197; Ex. 152, Tiscareno Dep. 260:1-18; Ex. 210; Ex. 152, Tiscareno Dep. 263:17-265:2.

158.    In early 2011, Apple's Advanced Technology Group conducted a further evaluation of audio technology in connection with Mac computers, including GenAudio's technology, and discussed that evaluation with GenAudio, including the possibility of signing an "evaluation agreement" with GenAudio.  Ex. 181; Ex.  169, Isaac Dep. 170:24-173:24.

159.    When Tiscareno left Apple in February 2011, he informed Mahabub that his supervisor, Jesse Dorogusker, was "fully aware and engaged with the project" relating to GenAudio. Ex. 214

160.     Mahabub testified he met with Dorogusker on two occasions regarding GenAudio's technology.  Ex. 219, Mahabub Dep. 394:25-396:24.

161.     Mahabub was scheduled to meet again with Isaac on March 14, 2011.  Although Mahabub went to Apple's campus for the meeting as scheduled, Isaac was unable to attend because he was delayed by car trouble.  Instead, Isaac and Mahabub scheduled a meeting to talk by phone.  Ex. 215.

162.     Apple's Mac division ultimately did not reach a deal with GenAudio for its technology because while some within Apple were supportive of that type of technology, others at Apple were not.  As a result, interest in GenAudio's technology slowly fizzled out over time. Ex. 169, Isaac Dep. 176:22-177:23.

163.     The Mac division never explained to Mahabub that interest in GenAudio's technology had fizzled out and that the Mac division would not be continuing to move forward with GenAudio.  Ex. 169, Isaac Dep. 177:20-178:16.

164.     GenAudio's March 15, 2010 Private Placement Memorandum, and the March 15, 2010 letter that accompanied it, included meaningful cautionary language regarding the risks facing GenAudio, including that GenAudio had not consummated any deal with Apple, and the specific fact there was no guarantee that such deal would be reached in the future.  Ex. 198 at 5, 21, 39 (discussing the valuation report prepared in anticipation of negotiations for a deal with the LCEC, and stating, "there is no guarantee or assurance that any actual transactions will occur or that consummated transactions will result in the revenues projected in the Valuation Report, and the Company and its management make no representations or warranties concerning the same"), 40-49; SEC Ex. 14 (March 15, 2010 letter accompanying the Private Placement Memorandum).

165.     GenAudio investors knew in 2011 that a deal with the LCEC, or Apple, had not been consummated.  Investors knew this because of the passage of time without an announcement a deal had been reached.  Investors' purchases of stock after that time were not based on any statements from GenAudio regarding discussions with, or a potential deal with Apple. That there would be no deal with Apple also was made clear during presentations to

investors in early 2012.  Declaration of George Marvin dated April 27, 2017, ¶ 3; Mahabub
Decl., ¶ 27.

166.    Some investors who purchased shares during 2010 to 2012 did not make their
purchase decisions based on statements from GenAudio regarding discussions with, or the
possibility of a deal with Apple.  Declaration of Julie Eastwood dated April 28, 2017, ¶ 4.

## IV.   ARGUMENT.

### A.  Alleged Misleading Statements and Omissions

The fraudulent misrepresentations alleged by Plaintiff essentially fall into two categories:
statements regarding the status of discussions with Apple, and statements regarding the
involvement of Steve Jobs and other Apple executives.[3]  Plaintiff also alleges Defendants
omitted material information about the same two categories.

#### 1.  Alleged Fraudulent Statements Regarding Discussions with Apple

Plaintiff's motion is fatally defective because genuine issues of material fact exist
regarding the most critical component of this entire case: Mahabub's reasonable belief GenAudio
would reach a deal with Apple.  Mahabub reasonably believed his contacts at Apple had
presented GenAudio's technology to Steve Jobs, and that Jobs personally signed off on
continuing Apple's project with GenAudio toward a deal.  In light of that fact, and the many
other facts that reasonably bolstered Mahabub's confidence regarding Apple's interest in
GenAudio's technology, Mahabub's statements to investors regarding GenAudio's optimism
over a deal with Apple were reasonable such that he did not act with scienter.

##### a.    Mahabub Reasonably Believed Steve Jobs Gave The Green Light

In December 2009, Hailey told Mahabub that before Apple could reach a business deal
with GenAudio, the Apple team needed "executive buy-in" to proceed with GenAudio.  SOF ¶
130.  Following that interaction, Mahabub became very focused on obtaining that executive buy-
in, which he understood to be a "final milestone" to be reached before a deal with Apple could

---

[3]        Plaintiff also alleges Mahabub's internal emails to the GenAudio Team contained fraudulent
misrepresentations.  Mahabub addresses those in his opposition to the SEC's motion for summary judgment, the
arguments which GenAudio adopts and incorporates by reference as if fully set forth below.

be obtained.  SOF ¶ 131.  According to Tiscareno, this critical "executive buy-in" was to be determined at a May 6, 2010 presentation to a very senior Apple executive named Greg Joswiak. SOF ¶¶ 134, 135, 137.

Mahabub understood how critical the May 6, 2010 internal Apple meeting was, and both Mahabub and Tiscareno treated the meeting as a "make-or-break" moment for the possibility of a deal between GenAudio and Apple.  SOF ¶ 140.  In fact, Tiscareno testified that if he did not receive the green light to continue with GenAudio, then he would not be permitted to spend additional time working on the project, and the iPhone/iPod/iPad division's work with GenAudio would need to end.   SOF ¶ 139.

Mahabub believed the May 6 meeting was with Apple's iconic CEO, Steve Jobs.  His understanding stemmed from two facts.  First, in his discussions with Tiscareno about the critical meeting, he and Tiscareno euphemistically discussed that the meeting would be with someone at Apple simply labeled as "the man," "the executive" or "the big exec."  SOF ¶ 142.  Given Steve Jobs' fame, his history as one of the founders of Apple, and his iconic status within the technology industry, it is more than reasonable that someone would understand a euphemistic reference to "the man" at Apple to mean Steve Jobs.  In fact, the reasonableness of that view is highlighted by Tiscareno's own testimony that if he ever used a term such as "the big man," he likely would intend it as a sort-of "wink-wink, nudge-nudge" reference to Steve Jobs without using Jobs' name.  SOF ¶ 141.  Thus, when Mahabub spoke with Tiscareno regarding a make-or-break" meeting with a senior Apple executive referred to as "the man" or "the big exec," Mahabub reasonably understood that to mean Steve Jobs.

Second, Mahabub's understanding that the May 6 meeting was with Steve Jobs was strongly reinforced by the fact that the actual executive who attended the May 6 meeting – Greg Joswiak – went by the nickname "Joz."  That nickname sounds remarkably similar to the last name "Jobs."  Tiscareno and Hailey may have expressly told Mahabub the May 6 meeting was with "Joz," and Mahabub testified that they did so, but that he understood they had said the meeting was with "Jobs."  Thus, Mahabub understood his Apple contacts were telling him they

were going to make a critical internal presentation to a very senior Apple executive Mahabub understood they alternately referred to as "the man" or "Jobs."  It is more than reasonable for Mahabub to have believed under those circumstances that the meeting was with Steve Jobs himself.  SOF ¶ 144.  This is particularly true since Mahabub had never heard of Greg Joswiak, SOF ¶ 145, and Mahabub was not present at the May 6 meeting.  SOF ¶ 147.  At the very least, a genuine issue of material fact exists as to whether Mahabub reasonably believed the internal meeting was with Jobs.

Not only did Mahabub reasonably believe the meeting was with Jobs, he also reasonably believed Jobs gave the critical green light to continue with GenAudio toward a deal.  Besides understanding the meeting was a "make-or-break" moment, Mahabub understood it was the moment in which the anticipated "executive buy-in" would, or would not, occur.  SOF ¶¶ 130, 131, 137, 138, 139, 140.  Hailey testified that at the May 6 meeting, Joswiak agreed there was value in continuing the work Tiscareno and Hailey had been doing, SOF ¶ 148, and thus the "green light" to continue had been given at the meeting.

Further, after the May 6 meeting, Tiscareno did in fact continue to work with GenAudio on a possible implementation of GenAudio's technology into products from Apple's iPhone/iPod/iPad division.  SOF ¶ 149.  Because Tiscareno testified he would need a green light to continue working on the GenAudio project, and since Tiscareno did keep working, Mahabub reasonably believed Tiscareno must have received the needed "green light" at the May 6 meeting.

As a result, Mahabub reasonably understood the internal May 6, 2010 presentation was to Steve Jobs, and that Jobs personally had given the green light to continue toward a deal with GenAudio.  These facts demonstrate Mahabub's optimism regarding a deal with Apple was reasonable with the result that his alleged misrepresentations and omissions lacked scienter.  They further demonstrate many of the other alleged misrepresentations and omissions were immaterial.

> **b.   Mahabub Reasonably Believed A Deal With Apple Was Likely**

### i.      GenAudio's Extensive Discussions with Apple

Putting aside Mahabub's critical understanding regarding the May 6 meeting, Mahabub's optimism regarding a transaction with Apple also was reasonable in light of the discussions with Apple and the progress made to integrate GenAudio's technology into Apple products.   Apple engaged in *extensive* discussions with GenAudio.  SOF ¶ 109.  Those discussions spanned a number of years – starting in late 2006 and continuing into 2011 (with a two-year hiatus from 2007 to 2009 as GenAudio further developed its technology).  SOF ¶¶ 108, 157-161. The work between the two companies involved *at least* fifteen in-person meetings at Apple's campus. SOF ¶ 110.  At least one additional meeting was scheduled but ultimately had to be conducted by phone, SOF ¶ 161, and there was testimony about other meetings with Apple personnel that may not have been reflected in email correspondence. SOF ¶ 160.  GenAudio also had very extensive discussions with Apple personnel by phone and email.  SOF ¶ 111.  These extensive discussions, and the time Apple invested, reasonably caused Mahabub to believe Apple was interested in GenAudio's technology and increased his confidence a deal would be reached.

### ii.      Other Reasons To Be Optimistic About A Deal With Apple

Throughout the discussions with Apple, Mahabub frequently told his contacts at Apple his belief that a deal between Apple and GenAudio would be reached in the short term, and that Apple could roll out products containing GenAudio's technology for sale within months.  SOF ¶¶ 123, 124.  For example, on November 28, 2009, Mahabub sent Tiscareno and Hailey a very lengthy email in which he discussed, among other things, the value to Apple of reaching a deal with GenAudio; told Apple he had hired an intellectual property valuation specialist in anticipation of negotiating price terms with Apple; discussed various considerations that could impact the price Apple would pay for GenAudio's technology; and expressed his certainty that a deal with Apple would be consummated.  SOF ¶ 127.  In short, Mahabub believed in November 2009 that GenAudio and Apple were at the stage where negotiations over a deal were underway.

With one limited exception,[4] Tiscareno, Isaac and Hailey never told Mahabub his optimism regarding a deal or his understanding regarding the timeline of a potential deal was misplaced. Instead, the Apple employees who served as Mahabub's contacts at Apple testified they routinely just ignored Mahabub's optimistic emails and wrote them off as salesmanship.  SOF ¶¶ 123, 124, 128, 129.

While Plaintiff alleges various optimistic statements Mahabub made to investors about a deal with Apple were misleading, it is significant that Mahabub was making the same kinds of statements directly to his Apple contacts without contradiction.  SOF ¶¶ 123, 124.  That Mahabub was saying to shareholders the same kinds of things he was saying to Apple raises a genuine issue of material fact whether Mahabub possessed the scienter required for liability.

Mahabub had many other reasons to be optimistic regarding his discussions with Apple, including the fact GenAudio was successful at conducting full embedded level integration into some Mac division products by as early as November 2009 (SOF ¶ 116); the execution of a non-disclosure agreement with Apple, and the fact Apple subsequently proposed multiple times throughout 2010 and 2011 that GenAudio sign additional (presumably even more restrictive) non-disclosure agreements (SOF ¶¶ 117, 118, 119); and Mahabub testified he had conversations with his Apple contacts regarding a possible licensing deal or product roll-out (SOF ¶¶ 124, 126.).  Based on this extensive history, Mahabub both actually and reasonably believed a deal with Apple would materialize.

Finally, Plaintiff challenges as misleading Mahabub's continued optimism about a deal with Apple to investors in late 2010 and early 2011.  However, Apple continued to work with GenAudio throughout that time period, SOF ¶ 149, 156, 157, 158, 160, 161, and nobody at

---

[4]     In December 2009, Hailey told Mahabub the vague statement that "this is not something we can execute overnight.  The business side of things would come into play after we have exec buy-in on the product side."  SOF ¶ 130.  In follow-up discussions, Hailey also told Mahabub that it would take more than a "couple" of months.  SOF ¶ 132.  This discussion led Mahabub to focus on the "executive buy-in" as the "final milestone" to be reached before a deal with Apple could be reached, and was part of the chain of events that caused Mahabub reasonably to believe Steve Jobs had given a green light to proceed with GenAudio on May 6, 2010.  SOF ¶¶ 130-132, 134-145, 147-151.  Thus, this one set of discussions in which Hailey did respond to Mahabub's optimistic statements ultimately was part of the chain of events that caused Mahabub's confidence in a deal with Apple to *increase*, not decrease.

Apple ever told GenAudio that the discussions with Apple were coming to an end.  SOF ¶ 152, 155, 162, 163.  On the contrary, when Tiscareno left Apple in February 2011, he told Mahabub that his supervisor was taking over the project, and that this new point of contact was "fully aware and engaged with the project" related to GenAudio.  SOF ¶¶ 159, 160.  Thus, Mahabub reasonably continued to believe his discussions with Apple remained ongoing, which continued to buoy his optimism.

### iii.    Alleged Misrepresentations Regarding Discussions With Apple

Plaintiff argues external statements GenAudio made to potential investors[5] regarding the status of discussions with Apple were false and misleading.  SOF ¶¶ 64, 84, 86, 87, 89, 94, 96-98.  But a genuine issue of material fact exists as to whether each of them was reasonable based on discussions with Apple to date, and whether Mahabub thus also had the requisite scienter.

Further, many of these challenged statements also are not actionable because they constitute nothing more than optimistic statements about a hoped-for transaction with Apple and thus constitute puffery.  "Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). Such "vague statements of corporate optimism are not materially misleading, as 'reasonable investors do not rely on them in making investment decisions.'" *SEC v. Nacchio*, 438 F.Supp.2d 1266, 1281 (D. Col. 2006) (quoting *Grossman*, 120 F.3d at 1119); *see, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d. Cir. 1996) (statement that company was "optimistic" about its earnings in 1993 and that it "should deliver income growth consistent with its historically superior performance" was non-actionable).

Here, many of the challenged representations are mere statements of optimism that a deal will be reached with Apple in the future.  Such statements are nothing more than forward-

---

[5]        The internal emails to GenAudio directors and employees that are challenged by Plaintiff are addressed separately below.

looking statements of corporate optimism, or puffery, that are not actionable as a matter of law. Mahabub, who believes quite passionately in the technology he invented, is entitled to profess his opinion, and that of the company, that he is "optimistic" Apple will want the technology for its products, and that at some uncertain time in the future, Apple will want to acquire that technology. These statements were expressed as opinions rather than guarantees, usually were indefinite as to time, and are sufficiently vague that they are "not capable of objective verification." *Grossman*, 120 F.3d at 1119.

Many of the statements also are not actionable under the separate "bespeaks caution" doctrine. Forward-looking statements are considered immaterial when the defendant has provided "sufficiently specific risk disclosures or other cautionary statements . . . to nullify any potential misleading effect." *Id.* at 1120. Here, many of the challenged statements to potential investors are forward-looking predictions about a possible deal, accompanied by meaningful cautionary language making it clear the company was not guaranteeing any particular outcome.

*November 9, 2009 Email to Investors.* Plaintiff alleges that on November 9, 2009, GenAudio sent its investors an email stating, "*nothing is assured yet*, but as shareholders you should be aware that there is a strong possibility that the Company may be acquired *within the next 6 months* in light of our extensive discussions with a global industry leader in consumer electronics[]." SOF ¶ 84 (emphasis added). First, the November 9 email commences with the admonition, "nothing is assured yet." Thus, this statement is simply an opinion expressing the company's optimism of an eventual deal, and with meaningful cautionary language that the deal might never occur. There is no dispute GenAudio was in genuine discussions to demo its product to Apple at that time, Mahabub and the company believed a deal would be done, and that the discussions, based on a product in which they believed, would yield a successful outcome. In short, the November 9, 2009 email is puffery and liability cannot attach under the bespeaks caution doctrine.

Second, this email provided an opinion that discussed what might occur in the next six months. But the email was sent almost six months before the 2010 stock offering began, and it

thus was outdated and irrelevant by the time the offering started.  It was nothing more than a statement about what the Company had expected to occur in the time period immediately *before* the 2010 offering began. By the time of the offering, investors knew the opinion expressed in the November 9 email had been proven wrong by the passage of time.  By the time the 2010 offering opened, and no deal with Apple had been consummated, no reasonable investor could have relied on the November 9 statement.[6]

  Third, this email expressly stated the basis of the company's view that a strong possibility existed that it would be acquired – namely, that it was "in light of the extensive discussions" that had occurred. *Id.*  That basis is true – or at the very least, a genuine issue of fact exists as to whether it was true.  By November 2009, extensive discussions had in fact occurred between GenAudio and Apple.  By that date, GenAudio had met in person with Apple at least ten times, in addition to extensive phone and email discussions.  SOF ¶¶ 109, 110, 122. By that date, GenAudio also already had accomplished full embedded level integration of its technology into certain Apple products.  SOF ¶ 116.  Around the same time period, Mahabub also made similar optimistic statements to his contacts at Apple, and began raising negotiating points with them regarding the terms of a possible transaction, demonstrating Mahabub genuinely believed his statements of optimism to investors and lacked the requisite scienter.  SOF ¶¶ 124, 125, 127.

  <u>*March 15, 2010 Offering Materials*</u>.  Plaintiff alleges the 2010 offering materials sent to investors on March 15, 2010 contained misrepresentations that GenAudio is "optimistic" the LCEC  will "eventually" want GenAudio's technology through either a licensing agreement or an acquisition, and that the offering is being conducted to provide bridge capital "until we can 'ink' a deal" with the LCEC.  SOF ¶¶ 86, 87.  But the statement that GenAudio is optimistic of a deal does not even provide a timeframe for that deal to happen.  It simply tells the investor GenAudio is <u>*optimistic*</u> such a deal might happen "<u>*eventually*</u>."  The statement about 'inking' a deal similarly does nothing more than express GenAudio's optimism such a deal might transpire

---

[6]  Consequently, this email in particular was not made in connection with the purchase or sale of the securities at issue in the case.

at some unknown time in the future. These statements are classic examples of the type of vague statements of corporate optimism that are non-actionable.

Moreover, the March 2010 Private Placement Memorandum ("PPM"), and the March 15, 2010 letter accompanying it, contain considerable meaningful cautionary language and thus are non-actionable under the bespeaks caution doctrine. The PPM contains an extensive discussion of the various risks associated with GenAudio's forward statements, and includes a specific warning that no transaction had been consummated with the LCEC and there was no guarantee any such deal would be consummated in the future. The portion of the PPM addressing discussions with Apple makes it clear that a transaction with Apple had not yet been completed, and that it was unclear what form any such deal might take if a deal is completed some day in the future. SOF ¶ 164.

Further, these statements of belief were true. As reflected in the communications with Apple, GenAudio was optimistic Apple eventually would want to obtain GenAudio's technology for use in its products. SOF ¶¶ 124, 125, 127, 139, 133. In fact, Tiscareno, who was intimately familiar with the status of discussions with GenAudio, testified there was nothing inaccurate about the specific portions of the 2010 Offering materials Plaintiff challenges as misleading. SOF ¶¶ 120, 121. Tiscareno's testimony reveals GenAudio's statements were reasonable based on the status of the Apple discussions. At the very least, his testimony shows there is a genuine issue of material fact as to whether the statements were false.

*April 30, 2010 Email*. Plaintiff alleges that on April 30, 2010, Mahabub sent an email to investors saying the LCEC is looking to acquire GenAudio's technology and that GenAudio is waiting to initiate negotiations pending approval by the CEO of the LCEC to be obtained in the following week. SOF ¶ 64. But as discussed above, Mahabub reasonably believed that, in the following week, the project would be presented to Steve Jobs for his approval as a "final milestone" toward a deal with GenAudio. SOF ¶ 131, 134, 136, 137, 138, 140-146. Based on this fact, and the other reasons Mahabub reasonably believed a deal with Apple was likely that

are discussed above, the statements in this April 30 email were reasonable, and Mahabub lacked the necessary scienter for this statement to be actionable.

Further, this email did not guarantee a deal would take place, but rather said Apple's interest in GenAudio's technology was subject to the CEO's – Steve Jobs' – approval, which the email expressly said had not yet occurred. Thus, all the email did was alert investors to a meeting scheduled for the following week for a senior Apple executive to green light the GenAudio project. This was true, it was just that Mahabub was mistaken as to which Apple executive would be attending that meeting.

*August 28, 2010 Letter*. Plaintiff alleges that, on August 28, 2010, GenAudio sent a letter to investors stating "GenAudio's moving forward with confidence with the LCEC", that GenAudio's "position grows stronger with each passing day," and GenAudio's "anticipation of a buyout would be the most probable case when and if we ink a deal and come to terms with the LCEC." SOF ¶ 89. Again, however, these statements are nothing more that statements of corporate optimism, thus non-actionable. For example, GenAudio's statements that it is "moving forward with confidence" and that its "position grows stronger with each passing day" are vague statements of optimism incapable of objective verification, and thus are puffery. *See Grossman*, 120 F.3d at 1119.

The letter also makes it clear no deal had yet been reached with Apple, and there was no guarantee a deal with the LCEC ever would be reached, by expressly stating "when and *if we ink a deal and come to terms* with the LCEC." SOF ¶ 89 (emphasis added). Thus, there is meaningful cautionary language, and Plaintiff has not demonstrated the statement is material or that it is a misrepresentation. Finally, based on the status of discussions with Apple to date, and particularly in light of Mahabub's reasonable belief by August 2010 that Steve Jobs had given the green light to proceed with GenAudio, Plaintiff has not demonstrated the statement is false or that Mahabub had the requisite scienter for the letter to be actionable.

*December 8, 2010 Letter*. Plaintiff alleges GenAudio sent investors a letter that said Mahabub met with the LCEC's CEO and gave him a demo, that the CEO told Mahabub that he

really liked the technology, and that although the LCEC is "moving very slow, we are still on their radar screen, and remain very optimistic for a deal" later in 2011.  SOF ¶ 94.  First, the statements about the CEO of the LCEC are not material because, as discussed above, Mahabub reasonably believed Steve Jobs had, in fact, received a demo of the technology and that he liked it and gave a green light to proceed.  A genuine issue of material fact exists whether a reasonable investor would care about whether Mahabub personally interacted with Steve Jobs as all that would matter is that Jobs received the demo and liked it sufficiently to green light the project.

In addition, GenAudio's statement that it is "optimistic" for a deal in 2011 is, again, a vague statement of corporate optimism that is non-actionable.  Finally, around the end of 2010, GenAudio continued to work with both the iPhone/iPod/iPad division and the Mac division, and it thus was reasonable for GenAudio to remain optimistic about a deal with Apple.  SOF ¶¶ 110 (Meeting 15), 153, 155, 156, 157.

_February 26, 2011 Letter_.  Plaintiff challenges additional statements in this letter to the effect that GenAudio "hope[s]" efforts with the LCEC will lead to a transaction "in the not so distant future" and that "[w]hile we cannot make any guarantees, we are very confident this will be the last money raised before achieving self-sustaining revenues given our inked revenue generating license deals, near-term licensing potential deals, and upcoming massive global branding."  None of these statements are actionable, as they are additional examples of vague corporate optimism, linked to a cautionary reminder that a deal with the LCEC has not yet been reached, and there is no "guarantee" a deal will be reached in the future.  Further, Plaintiff has not demonstrated the vague statement regarding other licensing deals that already have been signed, near-term licensing potential deals, and upcoming massive global branding have _anything_ to do with GenAudio's discussions with Apple (as opposed to the many other licensing deals GenAudio was pursuing), and thus those statements are irrelevant.

_March 29, 2011 Letter_.  Plaintiff challenges as misleading Mahabub's statement that GenAudio would be signing a new set of "evaluation and development" agreements with the LCEC.  SOF ¶ 98.  However, there is no dispute Apple did propose to Mahabub the execution of

evaluation agreements in early 2011.  SOF ¶ 118.  Because GenAudio had already signed Apple's standard non-disclosure agreement, there is a genuine issue of fact regarding whether Mahabub reasonably believed Apple's request for further agreements meant those new agreements would be more restrictive (otherwise they would be unnecessarily duplicative of the existing NDA), and thus indicated Apple's interest in GenAudio's technology was increasing.[7]  SOF ¶¶ 117, 119.

### 2.    Alleged Fraudulent Statements Regarding Apple Executives

#### a.    Not "in connection with" the purchase or sale of a security.

Mahabub addresses the "in connection with" argument in his separate Opposition.  GenAudio adopts and incorporates those arguments, and the additional statements of fact on which they are based, by reference as if fully set forth below.

#### b.    In light of Jobs' apparent approval, the statements are immaterial.

Because Mahabub reasonably believed GenAudio's technology was going to be presented to Steve Jobs, and subsequently, that Jobs gave the green light for Apple to continue with GenAudio, Mahabub's statements regarding other Apple executives such as Tim Cook and Phil Schiller, and Mahabub's statements regarding a meeting between himself and Steve Jobs are not material.  What would be material to a reasonable investor is that _Steve Jobs_ personally heard a demonstration of GenAudio's technology and gave a green light to continue with GenAudio, which Mahabub reasonably believed was the case.  Accordingly, in light of Jobs' apparent approval, the potential involvement of other _less senior_ Apple executives, such as Tim Cook and Phil Schiller, was not material.  Nor were Mahabub's anecdotes that he got to meet Steve Jobs and shake his hand.  In other words, if Steve Jobs signed off on proceeding with GenAudio, it

---

[7]    Plaintiff seeks disgorgement of all investments in GenAudio's 2011-2012 stock offering.  However, investors understood at some point in 2011 that there would be no transaction with Apple given the considerable passage of time with no announcement of a transaction.  Further, in early 2012, GenAudio gave presentations to investors at which it was made clear the discussions with Apple had ended.  SOF ¶ 165.  Further, even in 2010 and early 2011, some investors' decision to purchase GenAudio stock was not influenced by GenAudio's statements regarding discussions with, or a potential transaction with, Apple.  SOF ¶ 166.  Thus, even if Plaintiff prevails on its motion, a genuine issue of material fact exists as to the amount of disgorgement and fines that would result.

would not matter to an investor whether other Apple executives were involved as well, or whether Mahabub personally got to meet Jobs along the way.

### 3.      Alleged Omissions

In addition to the alleged misrepresentations, Plaintiff alleges GenAudio omitted to provide material information that Plaintiff alleges was necessary to prevent GenAudio's statements from being misleading.  However, in each instance of an alleged omission, a genuine issue of material fact exists as to whether such omissions of fact existed, and whether such omissions would be material to a reasonable investor.

### a.      No substantive meetings with Apple after September 2010.

Plaintiff alleges GenAudio failed to tell investors it "had no substantive meetings with Apple after September 2010."  However, there is considerable evidence regarding substantive discussions between GenAudio and Apple, and additional Apple work being performed regarding GenAudio's technology, after September 2010.  SOF ¶¶ 156-157.  For example, around November 2010, Mahabub and Isaac were working to improve integration of GenAudio's technology into Mac products.  During his testimony, Isaac confirmed this work occurred, as did the related substantive discussions with Mahabub reflected in those documents.  SOF ¶¶ 156.

Similarly, emails between Mahabub and Tiscareno reveal work continued on the iPhone/iPod/iPad side between GenAudio and Apple after September 2010.  During his testimony, Tiscareno also confirmed this work occurred, as did the substantive discussions between Tiscareno and Mahabub related to that work.  SOF ¶¶ 157.

In addition, there is evidence showing Mahabub met in-person with Apple personnel at Apple's campus after September 2010.  First, Mahabub met with Tiscareno on December 1, 2010.  SOF ¶ 110 (Meeting 15).  Mahabub also testified he met Tiscareno's boss, Jesse Dorogusker, on two occasions after Tiscareno announced his retirement in 2011.  SOF ¶¶ 159, 160.  Finally, Mahabub also was scheduled to meet with Ron Isaac on March 14, 2011.  Although Isaac was unexpectedly delayed and thus was unable to meet with Mahabub in person, they instead scheduled a meeting to talk by phone.  SOF ¶ 161.

In short, there is substantial evidence of continued substantive discussions between GenAudio and Apple after September 2010.  At the very least, there is a genuine issue of material fact regarding whether such substantive meetings occurred.  Consequently, Plaintiff is not entitled to summary judgment based on this alleged omission.

### b.   Discussions were with mid-level Apple personnel.

Plaintiff argues GenAudio failed to disclose that its communications had "almost exclusively been limited to a handful of mid-level engineering and marketing staff, and never involved Jobs, Schiller, or Cook."  As an initial matter, there is a genuine issue of fact as to the seniority of the individuals with whom GenAudio was communicating.  For example, Tiscareno, GenAudio's primary point of contact, had the title of "Senior Engineer."  SOF ¶ 154.

Moreover, Mahabub testified he thought Tiscareno was a senior Apple employee.  SOF ¶ 154. Because Mahabub thought Tiscareno was a senior employee, and because that belief was reasonable based on Tiscareno's title and role, Plaintiff cannot establish as a matter of law, that Mahabub had the duty to disclose Tiscareno was only a mid-level employee.

Further, Apple employees testified that both Andrew Bright and Barry Corlett, who met with GenAudio, and who were involved in evaluating GenAudio's technology, were senior apple employees.  SOF ¶ 153.  Thus, again, Plaintiff cannot show as a matter of law that GenAudio had a duty to disclose it was only meeting with mid-level employees, or that it had the requisite level of scienter in failing to disclose that disputed "fact."

Finally, even if Plaintiff could show it was true that GenAudio was almost exclusively meeting with mid-level Apple personnel, that is not a material fact that needed to be disclosed. As discussed above, Mahabub reasonably believed GenAudio's technology was presented to Steve Jobs, and that Jobs gave the green-light to continue.  As a result, it would not matter to a reasonable investor the level of seniority of the individuals at Apple that were carrying out Steve Jobs' orders.  What would matter to a reasonable investor is the fact *Steve Jobs gave the green light to continuing with GenAudio*.  Thus, the level of seniority of GenAudio's points of contact at Apple would not be a material fact that GenAudio had a duty to disclose.

### c.     Apple Negotiations and Plan To Integrate Technology

A genuine issue of material fact also exists regarding Plaintiff's allegation that GenAudio failed to disclose it never negotiated with Apple or that Apple never planned to incorporate GenAudio's technology into Apple products.  As an initial matter, Mahabub testified at one point he had a discussion with Tiscareno regarding a Christmas product rollout of Apple products containing GenAudio technology, SOF ¶ 124, and he also had a conversation with Isaac regarding possible terms of a licensing agreement.  SOF ¶ 126.  That testimony by itself is sufficient to create a genuine issue of material fact on this alleged omission.

In addition, for all the reasons discussed above, Mahabub reasonably believed Apple was very interested in GenAudio's technology, and Mahabub reasonably was optimistic a deal would be reached.  Further, from a vendor's perspective, the entire reason to engage in discussions with Apple is to try to sell the vendor's technology to Apple.  Thus, a vendor reasonably could view the entire discussions with Apple about the vendor's technology as a negotiation that hopefully culminates in a deal.  SOF ¶ 114.  And there is no doubt that from the beginning of discussions with Apple, Mahabub did treat the discussions as a negotiation.  He made it clear from the outset that his goal was to reach a deal with Apple, and he frequently raised negotiating points about the terms of a deal in his communications with Apple.  SOF ¶¶ 115, 124, 127.

Mahabub's principal contacts at Apple, Tiscareno and Hailey, also never told Mahabub they did not have the authority to negotiate with him on Apple's behalf.  SOF ¶¶ 128, 129.  In short, Mahabub was negotiating with Tiscareno and Hailey, he just did not understand they were not negotiating back.

### B.     <u>Alleged Fraudulent Scheme Liability</u>

Plaintiff fails to satisfy its burden establishing "scheme liability" pursuant to § 17(a)(1) and (3) of the Securities Act of 1933 and Rule 10(b)-5(a) and (c). "To succeed on [a scheme liability] theory, the SEC must prove that [Defendants] committed deceptive acts beyond making fraudulent statements to investors." *SEC v. Sullivan,* F.Supp.3d 1367, 1377 (D. Colo. 2014). The conduct of Defendants, however, must be the performance of a manipulative or deceptive act that

is inherently deceptive when performed. *Id.* The Tenth Circuit has "drawn a 'bright line' between the types of conduct that satisfy claims made under the scheme liability framework" and adopted holdings from the Second, Eighth, and Ninth Circuits that "scheme liability encompasses only actions which include deceptive conduct *beyond assistance with a material misstatement or omission.*" *Id.* (emphasis added, citations omitted) .

Plaintiff attempts to "repackage" alleged fraudulent misrepresentations and/or omissions as a scheme to defraud. *See SEC v. St. Anselm Exploration Co.,* 936 F.Supp.2d 1281, 1298 (D.Colo.2013). The alleged fraudulent misrepresentations or omissions, however, do not constitute deceptive conduct beyond the mere making of an alleged fraudulent statement. *See SEC v. Sullivan,* F.Supp.3d 1367, 1377 (D. Colo. 2014). Here, because Plaintiff has failed to identify any "manipulative or deceptive act" beyond the alleged fraudulent misrepresentations or omissions, Plaintiff cannot meet its burden. Simply put, Plaintiff alleges the altered emails sent to GenAudio employees were fraudulent misrepresentations, and cannot additionally assert the same altered emails constitute the *deceptive acts* that create fraudulent scheme liability.  Thus, Plaintiff cannot rely upon GenAudio Team Emails by themselves to support its scheme liability theory.

### C.      Alleged Liability for Unlawful, Unregistered Securities Offerings

Plaintiff is using summary judgment to test the legal sufficiency of Defendants affirmative defense on which Defendants bear the burden of proof at trial. *See* Answer at p. 35, Third Affirmative Defense.  For Plaintiff to satisfy its burden, Plaintiff must show an absence of evidence to support an essential element of Defendant's affirmative defense. *See Fitzpatrick v City of Atlanta,* 2 F.3d 1112 (11th Cir. 1993). Plaintiff must demonstrate the absence of evidence supporting applicability of the safe harbor provisions of Section 4(2) of the Securities Act of 1933 and Rule 506 of Regulation D for an issuer in a non-public offering of securities. Plaintiff has failed to carry this burden.

Plaintiff's only attempt at satisfying this burden is by way of ambiguous and inadmissible investor questionnaires and an out of context statement that actually bolster's Defendants

reasonable reliance on applicability of the Rule 506 exemption. See Responses to SOF ¶¶ 31-37. And importantly, it is only the reasonable belief of the issuer and not the actual status of the purchaser, the court must consider when determining whether the exemption applies. *Anastasi v. American Petroleum Inc.,* 579 F.Supp. 273, 275 (D.Colo.1984). "The suitability question turns on defendants' reasonable belief at the time of the transaction rather than [the investors'] actual financial condition and business sophistication." *Id.* Like scienter, that is a state of mind question uniquely ill-suited for determination on summary judgment.

## V.    CONCLUSION.

Plaintiff's motion for summary judgment should be denied because genuine issues of material fact abound.  Because Mahabub reasonably believed Jobs gave the green light to continue with GenAudio (and because of many other considerations that further boosted Mahabub's optimism), there is a genuine issue of fact regarding whether Mahabub and GenAudio had the requisite scienter in making statements to investors regarding discussions with Apple.  Further, many of the challenged statements are non-actionable as puffery or under the bespeaks caution doctrine.  In addition, Mahabub's emails to internal GenAudio employees and directors are not actionable because they are not "in connection with" the purchase or sale of a security, and because they are not material.

Plaintiff also has failed to establish scheme liability because Plaintiff has failed to identify any "manipulative or deceptive act" other than alleged altered emails that also are asserted to be alleged fraudulent misrepresentations.  Thus, Plaintiff improperly has repackaged its fraudulent misrepresentation claim as a claim for scheme liability.  Finally, Plaintiff has failed to satisfy its burden of proof on its claim under Section 5 of the Securities Act for unregistered securities offerings.  For these reasons, GenAudio respectfully requests that Plaintiff's motion be denied.

Dated:  April 28, 2017

Respectfully submitted,

Wilson Elser Moskowitz Edelman & Dicker, LLP

By:  s/ Michael P. McCloskey _____
       Michael P. McCloskey
       David J. Aveni
       Wilson Elser Moskowitz Edelman
       & Dicker, LLP
       655 W. Broadway, Suite 900
       San Diego, CA 92101
       (619) 321-6200
       (619) 321-6201 (fax)
       michael.mccloskey@wilsonelser.com
       david.aveni@wilsonelser.com
       *Attorneys for Defendant GenAudio, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 28, 2017 a true and correct copy of the foregoing was electronically served via CM/ECF to the following:

| |
|---|
| Leslie J. Hughes, Trial Counsel<br>Danielle R. Voorhees, Trial Counsel<br>Securities and Exchange Commission<br>1961 Stout Street, Suite 1700<br>Denver, CO 80294-1961<br>Ph: (303) 844-1000<br>Email: HughesLJ@sec.gov<br>Email: VoorheesD@sec.gov<br>*Attorneys for Plaintiff Securities and Exchange Commission* |
| Andrew B. Holmes<br>Holmes, Taylor & Jones, LLP<br>617 South Olive Street, Suite 1200<br>Los Angeles, CA 90014<br>Ph: (213) 985-2265<br>Email: abholmes@htjlaw.com<br>*Attorneys for Defendant Taj Jerry Mahabub* |
| Jeffrey G. Benz, Esq.<br>Benz Law<br>12021 Wilshire Blvd., Suite 256<br>Los Angeles, CA  90025<br>Ph.: (310) 570-2774<br>Email: jeffreybenz@gmail.com<br>*Attorney for Astound Holdings, Inc.* |

By:  s/ Michael P. McCloskey
        Michael P. McCloskey
        David J. Aveni
        Wilson Elser Moskowitz Edelman
        & Dicker, LLP
        655 W. Broadway, Suite 900
        San Diego, CA 92101
        (619) 321-6200
        (619) 321-6201 (fax)
        michael.mccloskey@wilsonelser.com
        david.aveni@wilsonelser.com
        *Attorneys for Defendant GenAudio, Inc.*