# EXCERPTED

# EXHIBIT 152

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2

 3       --------------------------------------------------

         SECURITIES AND EXCHANGE      )
 4       COMMISSION,                   )
                                       )
 5                        Plaintiff,   )
                                       )
 6               vs.                   )  No. 1:15-cv-02118-WJM-CBS
                                       )
 7       TAJ JERRY MAHABUB, GENAUDIO, )
         INC., and ASTOUND HOLDINGS,  )
 8       INC.,                         )
                                       )
 9                      Defendants.    )
10       --------------------------------------------------
11            DEPOSITION UPON ORAL EXAMINATION
12                            OF
13                    VICTOR TISCARENO
14       --------------------------------------------------
15                       Martin Davis PLLC
                1200 Westlake Avenue North, Suite 802
16                  Seattle, Washington 98109
17
18
19
20
21
22
23       DATE:   December 16, 2016
24           REPORTED BY:  Olivia Pennella
25                         Washington CCR 3337

                                                       Page 1
```

APPEARANCES

FOR PLAINTIFF:

LESLIE H. HUGHES
DANIELLE R. VOORHEES
United States Securities and Exchange
Commission
1961 Stout Street, Suite 1700
Denver, Colorado 80294
303-844-1066
303-844-1108
HughesLJ@sec.gov
voorhreesd@sec.gov

FOR DEFENDANT TAJ JERRY MAHABUB:

ANDREW B. HOLMES
Holmes, Taylor & Jones LLP
617 South Olive Street, Suite 1200
Los Angeles, California 90014
213-985-2200
abholmes@htjlaw.com

FOR DEFENDANT GENAUDIO, INC.:

DAVID J. AVENI
Wilson Elser Moskowitz Edelman &
Dicker, LLP
655 West Broadway, Suite 900
San Diego, California 92101
619-321-6200
david.aveni@wilsonelser.com

FOR WITNESS:

JOHN R. ELTRINGHAM
Martin Davis PLLC
1200 Westlake Avenue North, Suite 802
Seattle, Washington 98109
206-650-6560
jeltringham@martindavislaw.com

Page 2

EXAMINATION

| WITNESS | MR. AVENI | MR. HOLMES | MS. HUGHES |
|---|---|---|---|
| VICTOR TISCARENO | 8 | 280 | 307 |
|  | 340 | 329 | 345 |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| Exhibit 79 | Email Correspondence (SEC-TiscarenoV-E-0001883-1884) | 46 |
| Exhibit 80 | Email Correspondence (SEC-TiscarenoV-E-0001875-1876) | 48 |
| Exhibit 81 | Email Correspondence (SEC-TiscarenoV-E-0001842-1843) | 53 |
| Exhibit 82 | GenAudio In-Person Meetings | 55 |
| Exhibit 83 | Email Correspondence (SEC-TiscarenoV-E-0001840) | 57 |
| Exhibit 84 | Email Correspondence (SEC-TiscarenoV-E-0001812-1815) | 62 |
| Exhibit 85 | Email Correspondence (SEC-TiscarenoV-E-0000056-57) | 68 |
| Exhibit 86 | Email Correspondence (SEC-TiscarenoV-E-0000095-96) | 71 |
| Exhibit 87 | Email Correspondence (SEC-TiscarenoV-E-0000101) | 75 |
| Exhibit 88 | Email Correspondence (SEC-TiscarenoV-E-0000161-164) | 81 |
| Exhibit 89 | Email Correspondence (SEC-TiscarenoV-E-0000269-250) | 84 |
| Exhibit 90 | Email Correspondence (SEC-TiscarenoV-E-0000284) | 88 |

Page 3

EXHIBITS (Continued)

| No. | Description | Page |
|---|---|---|
| Exhibit 91 | Email Correspondence (SEC-TiscarenoV-E-000300-301) | 92 |
| Exhibit 92 | Email Correspondence (SEC-TiscarenoV-E-0001611-1612) | 99 |
| Exhibit 93 | Demo With MH (347APL-06000046) | 99 |
| Exhibit 94 | Email Correspondence (SEC-TiscarenoV-E-0000336-37) | 111 |
| Exhibit 95 | AstoundSound Demo (347APL-00000047) | 113 |
| Exhibit 96 | GenAudio Demo (Astound) (347APL-00000051) | 114 |
| Exhibit 97 | Email Correspondence (SEC-TiscarenoV-E-0000376) | 117 |
| Exhibit 98 | Email Correspondence (SEC-TiscarenoV-E-0001635) | 120 |
| Exhibit 99 | Email Correspondence (SEC-TiscarenoV-E-0000400) | 124 |
| Exhibit 100 | Email Correspondence (SEC-TiscarenoV-E-0000412-414) | 126 |
| Exhibit 101 | Email Correspondence (SEC-TiscarenoV-E-0000534) | 136 |
| Exhibit 102 | Email Correspondence (SEC-TiscarenoV-E-0000556) | 138 |
| Exhibit 103 | Email Correspondence (SEC-TiscarenoV-E-0000557) | 138 |
| Exhibit 104 | Email Correspondence (SEC-TiscarenoV-E-0000581) | 140 |
| Exhibit 105 | Email Correspondence (SEC-TiscarenoV-E-0001731) | 141 |

Page 4

EXHIBITS (Continued)

| No. | Description | Page |
|---|---|---|
| Exhibit 106 | Email Correspondence (347APL-00000526-527) | 148 |
| Exhibit 107 | Email Correspondence (SEC-TiscarenoV-E-0000756-757) | 154 |
| Exhibit 108 | Email Correspondence (SEC-TiscarenoV-E-0000770) | 157 |
| Exhibit 109 | Email Correspondence (SEC-TiscarenoV-E-0000946-954) | 159 |
| Exhibit 110 | Email Correspondence (SEC-TiscarenoV-E-0000984) | 178 |
| Exhibit 111 | Email Correspondence (347APL-00000333-336) | 180 |
| Exhibit 112 | Email Correspondence (SEC-TiscarenoV-E-0001560-1561) | 182 |
| Exhibit 113 | Email Correspondence (SEC-TiscarenoV-E-0001018-1020) | 187 |
| Exhibit 114 | Letter dated March 15, 2010 (GA000140) | 193 |
| Exhibit 2 | GenAudio, Inc., Confidential Private Placement Memorandum (GA000487-540) | 202 |
| Exhibit 115 | Email Correspondence (SEC-TiscarenoV-E-0001052-1053) | 208 |
| Exhibit 116 | Apple Organizational Chart | 212 |
| Exhibit 117 | Email Correspondence (SEC-TiscarenoV-E-0001114) | 214 |
| Exhibit 118 | Email Correspondence (SEC-TiscarenoV-E-0001129-1130) | 217 |
| Exhibit 119 | Email Correspondence (SEC-TiscarenoV-E-0001187-1188) | 223 |

Page 5

2 (Pages 2 - 5)

1 case goes to trial or during a deposition.
2  A.  I -- I mean, it -- it's basically covering
3 what I already was deposed for.
4  Q.  Okay.  I see.
5  A.  I mean, there's conversations -- all about
6 what was discussed.
7  Q.  Just running through the chronology of your
8 discussions with GenAudio --
9  A.  Yeah, it's -- it's -- it -- there wasn't
10 anything beyond that --
11  Q.  Okay.
12  A.  -- that I recall.  I mean, that's -- I would
13 have written notes.
14  Q.  Is that when they gave you the 50 to 100
15 documents, or is that later?
16  A.  No, I received those later.  Probably -- as a
17 matter of fact, it was that -- I -- I didn't -- I
18 couldn't receive them because of the size.  And so we
19 had to go through some logistics on that.  But I would
20 say it was probably three weeks ago.
21  Q.  Okay.  Any other communications you've had
22 with Ms. Hughes or Ms. Voorhees?
23  A.  Not directly.
24  Q.  Indirectly?
25  Again, I don't want any communications you've
Page 18

1 had with your attorney.
2  A.  It was indirectly.
3  Q.  Okay.  Through whom?
4  A.  Through my attorney, Mr. Eltringham.
5  MR. AVENI:  Do you mind if we close the
6 shades?
7  THE WITNESS:  It was done on purpose.
8  MR. AVENI:  Let's go off the record.
9  (Discussion held off the record.)
10  Q.  (By Mr. Aveni) Okay.  So was there anything
11 else that you did, other than what you've already
12 mentioned, to prepare for your testimony today?
13  A.  No.  I -- I -- you know, with all respect,
14 I -- I did what I needed to do to prepare today so that
15 I would be consistent with my answers; that I would
16 recall your questions -- answer your questions a bit
17 better.  That's all.
18  Q.  Have you reviewed the complaint that the SEC
19 has filed in this case?
20  A.  Two years ago.  No, it's not -- no, I've --
21 no.
22  Q.  Okay.  And did you review the testimony from
23 any other witnesses in the case?
24  A.  No.
25  Q.  Have you met with anybody, other than your
Page 19

1 attorney or the attorneys for the SEC, about this case?
2  A.  No.
3  Q.  Okay.  So, from approximately 2006 through
4 2011 --
5  A.  Okay.
6  Q.  -- you were at Apple?
7  A.  Correct.
8  Q.  What was your title?  Was it --
9  A.  At that time?
10  Q.  Yes.
11  A.  I can't remember what I was doing then.
12  Q.  I believe you testified it was Senior
13 Engineer, Audio and Acoustics.  Does that sound about
14 right?
15  A.  That sounds about right.
16  Q.  Okay.  And I don't want to rehash everything
17 you've already testified about.
18  A.  Mm-hmm.
19  Q.  We're not going to do that.  But if you can
20 just very quickly -- when did you start working at
21 Apple?
22  A.  I started February 9, 2004.
23  Q.  I'm impressed that you remember the exact
24 date.  Did you have a different title when you first
25 joined Apple --
Page 20

1  A.  Yes.
2  Q.  -- as compared to 2006?
3  What was your title in 2004 when you started?
4  A.  Well, I was -- I was working on a secret
5 project.  But I was a senior manager and -- and -- and
6 so was -- my -- my title was cryptic -- special
7 projects.
8  Q.  At that time, were your responsibilities
9 focused solely on that secret project?
10  A.  Yes.
11  Q.  Okay.  When did your responsibilities change?
12  A.  Responsibilities changed when iPod changed --
13 it created a new division for -- specifically for the
14 iPod.
15  Q.  Okay.  And so you were transferred to -- were
16 you transferred into that division?
17  A.  Yes.
18  Q.  What's the name of that division?
19  A.  IPod division.
20  Q.  IPod division.  Direct and to the point.
21  At some point, your responsibilities also
22 related to other similar products -- Apple products --
23 is that right?
24  A.  That's correct.
25  Q.  iPad, for example.  So, at that time did the
Page 21

6 (Pages 18 - 21)

1  name of the division change?
2     A.  Hmm.  I don't know.  There was a -- my manager
3  was the manager for the division.  And then there was
4  a -- a departure because he -- the guy I was working
5  for, before the division, was getting ready to retire.
6  My peer who started the iPod -- grandfathered the
7  iPod -- he became senior manager.
8     Q.  What was his name?
9     A.  Tony Faddell.  Anthony Faddell.
10    Q.  Okay.
11    A.  F-A-D-D-E-L-L, I think.
12    Q.  Okay.  During the time frame 2007 to 2011,
13  what were the -- at a high level -- what were the Apple
14  products that were being handled by that division?
15    A.  Only iPod.  Secret projects that had to do
16  with i-devices, including phone.
17    Q.  Okay.
18    A.  Now known as the iPhone.
19    Q.  And does it also include the iPad?
20    A.  The iPad -- it did.  Now, there's -- it's a
21  large company.
22    Q.  Right.
23    A.  Some cross-functionality.  But the iPad was
24  actually -- came in late -- I think that was 2009, '10.
25  IPod has been around since 2001.  So they may have, I
Page 22

1  think, some responsibilities for -- depending on what
2  intel were shared.
3     Q.  Okay.  So from 2007 to 2011, what were your
4  responsibilities within?
5     A.  I'm sorry, what's the beginning date?
6     Q.  2007.  Beginning of 2007 through 2011, what
7  were your responsibilities?
8     A.  Acoustics and audio, I'll just say it that
9  way -- general, broad.  I mean, it's just all kinds of
10  things.
11    Q.  Is there any way to characterize the kinds of
12  things you did?  Was it literally your manager telling
13  you, "Go do this next"?
14        That's a very general question.  I'm trying to
15  figure out -- can you characterize -- can you put into
16  buckets the different kinds of things you did within
17  acoustics and audio?
18    A.  Well, we sourced components.  I mean, you
19  start off with a concept.  Somebody comes in with a
20  concept -- whether the concepts developed in our area
21  and somehow migrates its way up or it comes down our
22  way -- and this is what -- we're taken into a room and
23  guess what we're going to do now.
24        Then you huddle with the team, and you figure
25  out who's best to take care of this.  And you go off.  I
Page 23

1  mean, you know, sometimes you need audio amplifiers.
2  Sometimes you need acoustic drivers, devices, speakers.
3  So, there's a lot of components to building something.
4  So, it -- it, you know -- and you have -- there's lots
5  of divisions and lots of responsibilities.
6        There's safety, reliability, packaging.  And
7  all those people come in at some point in the -- to
8  build this product.  The engineering part might be --
9  but to build the product, you have the investigation
10  phase.
11        They may say, "Here's a competitive product.
12  We kind of want to do something like that" -- which
13  is -- I'm pointing to the iPhone -- "but we want to do
14  something like that.  And -- but we want to do it this
15  way.  Go figure it out and come back and let me know."
16    Q.  During the 2009-2010 time frame, what was your
17  reporting chain up to the top of the company?
18    A.  At that time, I was working -- well, Tony
19  Faddell left the company.  He was a senior vice
20  president of iPod.  I worked for Jesse Dorogusker, and
21  he reported directly to Tony Faddell.  We had a power
22  vacuum when Tony left.
23    Q.  When did he leave?
24    A.  I'd have to look it up, but -- 2009, 2010.
25    Q.  Okay.
Page 24

1     A.  I'm going to say, 2009.  Semi-retired.  And we
2  had a power vacuum.  They hired somebody else and,
3  unfortunately, got into a lawsuit with IBM.  Mark
4  Papermaster -- after -- after they settled that --
5  competitive issues -- he finally came to work for -- for
6  the iPod division, to replace Tony -- Tony's leadership.
7        And, unfortunately, Mark Papermaster didn't
8  last very long.  So, you know, it was -- it was
9  basically on automatic pilot.  Everybody knew what they
10  were doing.  It was just -- there was this power vacuum.
11    Q.  And for whoever was in that position --
12  whether it was Mark or Tony or somebody else -- who did
13  that person report to?
14    A.  Senior VPs report -- reported to the CEO.
15    Q.  And at the time it was Steve Jobs?
16    A.  At the time it was probably Steve Jobs.
17    Q.  Okay.  So, let's start talking a little
18  specifically about GenAudio for a minute.
19        During the entire time you were at Apple --
20    A.  Mm-hmm, yes.
21    Q.  -- how many times approximately would you say
22  you met in person with GenAudio to discuss GenAudio's
23  technology?
24    A.  Eight to twelve times.
25    Q.  Okay.  And how often would you say you spoke
Page 25

7 (Pages 22 - 25)

Page 26

1  to Jerry Mahabub by telephone during that time frame?
2     A.  I'm going to just average it -- once a week.
3     Q.  Now, were there some times when you spoke
4  multiple times by phone a week?
5     A.  Yes --
6     Q.  Before big milestones, for example, or things
7  like that?
8     A.  I mean, I didn't call him out of the --
9  just -- just to chitchat.  It was specific to the
10  project.  So, that's why I averaged it, I, you know --
11  it might have been five calls in one day, and none for
12  three weeks.  I -- I don't remember that -- that kind of
13  detail.  But I -- yes, I communicate with him by phone.
14     Q.  Fair enough.  And I certainly understand.
15     A.  Yeah.
16     Q.  We're going back ten years as well.  As
17  lawyers, that's something that happens all the time to
18  us.  But I realize for witnesses that can be
19  frustrating.
20     A.  I wish I had a photographic memory.
21     Q.  We fully realize this is quite a long time
22  ago, and I don't mean to test your memory.  These
23  details can be important, so I apologize for the many
24  details I'm going to ask.
25     So how many times again, approximately, would

Page 27

1  you say you emailed with Jerry Mahabub or anybody else
2  at GenAudio during your time at Apple?
3     MS. HUGHES:  Objection.  Can you break that
4  into two questions -- who else at GenAudio he emailed
5  with.  Let's focus first on Mr. Mahabub, and then on
6  anyone else.
7     MR. AVENI:  I don't think that's an objection,
8  but I'm happy to do it that way.
9     A.  So, your question is --
10     Q.  (By Mr. Aveni)  So, how many times would you
11  say you emailed with Jerry Mahabub?
12     A.  I -- I'm going to just say, 100.  I -- I don't
13  know.  I don't -- I don't remember.
14     Q.  And that's fair enough.
15     A.  I mean, I -- I would say I responded to his
16  emails generally.
17     Q.  Right.  So, I'll represent to you I have a
18  binder over here --
19     A.  Okay.
20     Q.  -- that's full -- it's almost the entire
21  emails between you and him.  That has almost 200 in it.
22     A.  Okay.
23     Q.  And I'd say --
24     A.  Factor of 50.
25     Q.  -- this is only a portion of the emails that

Page 28

1  you or Apple produced to us.
2     A.  Okay.
3     Q.  You know, I'm only asking for your best
4  estimate and for what you remember.  But if I said it
5  could be -- you know, if you counted every email in an
6  exchange -- it could be 100 or maybe even 1,000, does
7  that sound possible to you?
8     A.  It's possible.  When I write an email,
9  it's about a paragraph long -- good or bad grammar.  But
10  it's bullet points.  When I got a letter from him, it
11  was -- it was pages, paragraphs.  So I'm not surprised
12  that you filled a binder.
13     Q.  Fair enough.
14     A.  I -- I -- look, I didn't spend time --
15     Q.  Yeah.
16     A.  -- going back and forth with him a lot.  It
17  was, "Can you make a meeting?  This is what we need to
18  do."  And I want you to understand that, quite often,
19  there were very leading proposals in the emails that at
20  that time I just glossed over.
21     You know, I ran down to the bottom --
22  what's -- what's -- what are we doing here -- and -- and
23  just moved on, you know.  I don't know if the word
24  "superfluous" works in that -- in his emails, but
25  there's a lot of content there.

Page 29

1     Q.  He was a very enthusiastic individual.
2     A.  He was -- he has -- he has a big personality.
3     Q.  And is it fair to say that he is very
4  optimistic about his --
5     A.  Yes.
6     Q.  -- technology, about AstoundSound?
7     A.  He was.
8     Q.  And he worked hard to share that optimism with
9  you and others at Apple, right?
10     A.  Oh, yeah.  It's -- look, I -- I really thought
11  that the software itself was something to look at, you
12  know.  All the other stuff that we're talking about
13  here -- as far as the emails, I mean, that was just
14  some -- I try to stay in business.
15     Q.  And I understand --
16     A.  Focused on.
17     Q.  And I understand your comment about the length
18  of some of his emails.  And I'm really, by the way, just
19  trying to focus on the sheer number of emails, just to
20  get a sense of the extent of the dialog.
21     And so, you know, when I show you a binder,
22  I'm not trying to talk about the length of his emails.
23  I'm just trying to say it seemed -- from where I sit --
24  that there were hundreds upon hundreds, if not over a
25  thousand, exchanges.  And I just want to know if you

8 (Pages 26 - 29)

1 think that's fair.

2    A. That's fair.

3    Q. And I'm not telling you I've counted every one

4 of them. I haven't. Have you ever had discussions --

5    So, in your role in the iPod division --

6    A. Uh-huh.

7    Q. -- you would at times have discussions with

8 other vendors, other than GenAudio, who were trying to

9 sell you something?

10    A. Come -- I think -- come back with the question

11 again, I'm sorry.

12    Q. Sure.

13    A. I was processing.

14    Q. There are other times when outside vendors,

15 like GenAudio, would come to you and would want to talk

16 to you about their technology?

17    A. Yes, there were other vendors that were --

18 that not only sold components, but actually competitors

19 to GenAudio.

20    Q. Okay. And they would meet with you because, I

21 mean, they're hoping to sell Apple on a component or a

22 technology for use in Apple products, right?

23    A. Sure. Correct.

24    Q. What was the typical process for evaluation of

25 an outside vendor's product? Could you walk me through

1 what that vetting process is like? At a high level,

2 what are the stages?

3    A. Sure. Well, I think there's two. One is, we

4 have a need. We made the call out. Or they come in and

5 make a cold call, so --

6    Q. In GenAudio's case, it was a cold call?

7    A. That's correct.

8    Q. Okay. So, let's talk about cold calls for a

9 second. Say, somebody comes in. They make a cold call

10 to you. Can you just walk me through the stages of the

11 process from, you know, your initial meeting all the way

12 through an eventual transaction with that company?

13    What are the different stages along the way?

14    A. Well, if -- we generally would not get a phone

15 call. Phone calls usually are well-filtered. And, you

16 know, you don't get -- unless somebody passes on your

17 number. It came in as an email. And they do the sales

18 through an email -- you know, try to engage -- "Hey, I

19 got something to show you."

20    Maybe it's somebody I already know that's got

21 something new to show me, okay. "Can we set up a

22 meeting?" "Okay, sure. How much time do you need?

23 Half an hour is usually as much as we can afford. Do

24 you really need an hour?" -- might be the question going

25 back, and --

1    And we give them all the respect that, you

2 know -- doesn't matter whether they're a Fortune 500

3 company. We had people walk in with a -- I'm not

4 kidding -- a garage operation, one person working out of

5 their house. Brings it in. And I jokingly say that

6 there's a Chiquita banana sticker on the box. And

7 you -- you see what they have. You never know when

8 somebody really has something.

9    And so we sit and listen to the demo or their

10 spiel. It's -- it's -- it's what you would think -- I

11 know I'm answering the question, but it's what anyone

12 would think would happen when somebody walks in the

13 door. You listen to what they have to sell.

14    Q. So, what happens from there? What are the

15 different stages of evaluation -- again, at a high

16 level -- that it goes all the way through to a possible

17 deal with them?

18    A. It depends. If we have a project and we have

19 a need, then we're going to engage at a different level.

20 And if it's an abstract -- I don't know if that's a

21 right word to use here -- but if it's coming in -- you

22 got this -- I mean, what -- what can I hold -- I'm

23 holding a business card here.

24    But what can we build out of this? I'll have

25 to use my imagination. They walk in. I generate a

1 concept. Maybe it's origami. I can fold this card into

2 something. I, you know -- in the case of a software

3 company, do we have a need for that, you know, how does

4 it fit into our program. Is it a coincidence that we

5 need something at that very moment --

6    Oh, if you walked in and you're -- you're here

7 at the right time and, look, it's -- it fits into our

8 program, you know. Those things -- I don't know what

9 the chances are, but probably pretty small. So, you

10 know, with a cold call, it's a cold call. It's --

11    Q. So, let's say there's a software company.

12 They cold-call you. You do an initial meeting with

13 them. You like what you see. Maybe there's a need for

14 it. You go into a demo stage with them, where they're

15 demoing the product for you.

16    Is that fair to say, is that what happens?

17    A. I -- I'm -- I don't know, because you've asked

18 a couple of different times, different ways.

19    Q. Right.

20    A. And maybe I need to -- to go through the steps

21 carefully here, to educate on what we do, so --

22    Q. Yeah, by all means.

23    A. You have basically four major groups here.

24 One is the -- three of them are engineering stages. And

25 the -- the one at the front end of this thing is called

9 (Pages 30 - 33)

1   brought in a full corporate presentation slide stack.
2       Q.  Okay.  Well, let's run through the chronology
3   with the documents --
4       A.  Okay.
5       Q.  -- so we understand the time frame --
6       A.  Yeah.
7       Q.  -- as you were describing.
8       A.  Sure.
9       MR. AVENI:  Let's mark this as Exhibit-79,
10  please.
11      (Exhibit-79 marked for identification.)
12      MS. HUGHES:  Can we take a short break?
13      MR. AVENI:  Absolutely.
14      (Recess taken from 9:52 a.m. to 9:56 a.m.)
15      MR. AVENI:  So, does everybody have a copy?
16      THE WITNESS:  Of this?
17      MS. HUGHES:  Yes.
18      MR. AVENI:  I'm sorry.  Let's go off the
19  record.
20      (Discussion held off the record.)
21      Q.  (By Mr. Aveni)  Okay.  So, you've been handed
22  Exhibit-79, which is an email chain dated December 27 --
23      A.  Mm-hmm.
24      Q.  -- 2006.  Is this the first email contact that
25  you mentioned from -- with regard to GenAudio?

Page 46

1       A.  Yes.
2       Q.  Okay.
3       A.  Yeah.
4       Q.  And I think that this was mentioned to you,
5   when you testified previously in this case, just so
6   we're on the same page.  You'll see on the lower
7   right-hand corner, there's what we call a Bates stamp.
8   It says SEC-TiscarenoV-E --
9       A.  Mm-hmm.
10      Q.  -- and a number.  You'll see that throughout
11  the day.  That indicates that that's a document that you
12  produced to the SEC --
13      A.  Okay.
14      Q.  -- in the underlying investigation.
15      A.  Sure.
16      Q.  At times, you'll see one that says APL rather
17  than Tiscareno.  I believe that reflects -- again, those
18  are numbers the SEC puts on there to reflect documents
19  Apple produced to the SEC.
20      A.  Right.
21      MR. AVENI:  If you have any questions at any
22  time about the source of a document, feel free to ask
23  me.  But I want to make that clear.  This is one of your
24  documents.  Okay.
25      So, let me mark this next one here as

Page 47

1   Exhibit-80, please.
2       (Exhibit-80 marked for identification.)
3       MS. HUGHES:  Thanks.
4       MR. AVENI:  Sure.
5       Q.  (By Mr. Aveni)  Do you recognize this
6   document?
7       A.  What would you like to know?
8       Q.  I'm going to show you a lot of documents.
9   I'll show you generally the things I want to ask you
10  about.
11      A.  Mm-hmm.
12      Q.  Obviously, you're welcome to look over each
13  document to make sure you recall it and you understand
14  its contents.  But I'm going to generally show you the
15  things --
16      A.  Yeah.
17      Q.  -- the emails that I'm talking about.
18      Do you remember -- do you recall this
19  document?
20      A.  Only because it's more recent, but not from --
21  I mean, I'm -- yeah.  It's not anything unusual.  I --
22      Q.  Okay.  So this is an email dated January 21,
23  2007, shortly after the previous --
24      A.  Right.
25      Q.  -- Exhibit-79.  So it's an email from Jerry

Page 48

1   Mahabub to you, discussing an upcoming presentation to
2   you on Apple, right?
3       A.  Mm-hmm, yes.
4       Q.  Do you recall the purpose of that
5   presentation?
6       A.  It's -- it -- it's one step removed from a
7   cold call.
8       Q.  How often would you say vendors reach out to
9   you with a cold call?
10      A.  I'll say, frequently.
11      Q.  Okay.  And how many of them would you say make
12  it to the point of getting to make a presentation?
13      A.  I would say, 90 percent, just -- if I said 100
14  percent, I don't think that'd be accurate.
15      Q.  Okay.  Fair enough.  Okay.  That's fine.
16      So this email sets out six different items
17  that Jerry was hoping to present to you, right?
18      A.  Yeah.
19      Q.  Okay.
20      A.  Yes.
21      Q.  I want to point you to the last one real
22  fast -- No. 6, Licensing and/or Partnership Agreement.
23      So, Jerry wanted to discuss a possible
24  licensing or partnership agreement with Apple for
25  incorporating GenAudio's technology to Apple products,

Page 49

13 (Pages 46 - 49)

1 right?

2 A. Mm-hmm.

3 Q. That's one of the things he wanted to present

4 to you?

5 A. I -- I didn't -- we weren't -- I -- I assume

6 so. It was a slide presentation, as I recall.

7 Q. Yeah.

8 A. Slide stuck, a set of headphones, some videos,

9 a little bit of audio. I mean, it was -- it was just

10 another vendor coming through the door. Thank you very

11 much for coming.

12 Q. Fair enough.

13 A. Okay.

14 Q. Is it fair to say that when vendors come in

15 and make these cold calls and then make presentations --

16 and the ones lucky enough to continue to have

17 discussions with you -- their ultimate goal is to reach

18 a licensing agreement or a partnership agreement with

19 Apple, right? That's their ultimate goal?

20 MS. HUGHES: Objection. Calls for

21 speculation.

22 Q. (By Mr. Aveni) As you understand it, that's

23 their goal, right?

24 A. They're -- they're trying to sell us

25 something.

Page 50

1 Q. Right.

2 A. So I would say, yes, that's the object of

3 their cold call.

4 Q. Okay. Fair enough. Do you recall if you

5 responded to Jerry's email?

6 A. I don't remember.

7 Q. And again --

8 A. I don't.

9 Q. -- I won't keep apologizing for this, but I

10 realize this is a very long time ago. I appreciate

11 that.

12 Do you know --

13 A. Well, you could see -- just even here -- this

14 is a significant bit of information.

15 Q. You mean, in his email?

16 A. In his email, yeah. I would just -- what do

17 we do -- I mean, "Okay. Bring in your demo, and we'll

18 talk about it then." I mean, you know, he drops some

19 names in here. "I'm -- I'm not going to bore you, Tony,

20 and/or Steve, question mark, with a keynote or

21 PowerPoint presentation. You most likely see those 100

22 times a day."

23 I -- I mean, it's just -- I -- I would gloss

24 over stuff like that. I'd just say, "Okay. When can we

25 meet?" Okay. He will tell me about it then.

Page 51

1 Q. Okay. Fair enough.

2 A. I try to be respectful to vendors.

3 Q. You testified before, you know, that you met

4 with Jerry maybe eight or twelve times. You've

5 exchanged hundreds, maybe more, emails with him; you

6 know, at least weekly phone calls.

7 Is there -- can you say what percentage of

8 vendors get to that stage, that level of communication

9 with you?

10 A. I don't have an answer for that one.

11 Q. Is it fair to say that it is a small

12 percentage?

13 MS. HUGHES: Objection. Relevance.

14 MR. ELTRINGHAM: Go off the record?

15 MR. AVENI: Just answer the question, and then

16 we'll go off the record.

17 (Mr. Holmes entered the room.)

18 A. I'd be guessing. I really don't know.

19 Q. (By Mr. Aveni) Okay.

20 A. I don't know how to answer your question,

21 honestly.

22 Q. I guess, I'm just trying to -- I mean, I

23 assume that most vendors that come in the door -- you

24 said a lot of vendors come in the door. I'm assuming

25 most of them don't get to that point, where they get to

Page 52

1 have that many communications over a period of years?

2 A. I don't recall any cold-call vendors that --

3 well, yeah, I don't have any cold-call vendors. He was

4 one of the few --

5 Q. Okay.

6 A. -- that took -- that went just a little bit

7 further along.

8 MR. AVENI: Okay. Thank you. Let's go off

9 the record.

10 (Recess taken from 10:04 a.m. to 10:12 a.m.)

11 MR. AVENI: I was about to mark Exhibit-81.

12 (Exhibit-81 marked for identification.)

13 Q. (By Mr. Aveni) You've been handed Exhibit-81,

14 which -- and just so you know, we're going to run today

15 through a variety of documents, a variety of emails, in

16 rough chronological order. I mean, just to be fair, I'm

17 not showing you every email just because -- obviously,

18 because of the time pressures, I don't have the time to

19 do that. So, I'm just trying to show you --

20 A. Mm-hmm.

21 Q. -- some significant things along the way. I

22 don't want you to think I'm showing you every email.

23 I'm not even close to doing that.

24 A. Okay.

25 Q. So, Exhibit-81 is an email from Jerry

Page 53

14 (Pages 50 - 53)

1  regarding a meeting he had with you that day,
2  February 14, 2007. And you see the first line says, "I
3  just wanted to thank you very much for having lunch and
4  meeting with me earlier today."
5      So, first, do --
6      A.  Mm-hmm.
7      Q.  -- you recognize this email as one of your
8  emails?
9      A.  Since I -- I don't see anything here unusual.
10     Q.  So, you see the first line there: "I just
11 wanted to thank you very much for having lunch and
12 meeting with me earlier today."
13     Is that the first meeting you think you had
14 with Jerry Mahabub in person?
15     A.  I'm not sure.
16     Q.  You're not sure. Okay. Do you recall that
17 meeting, from this email?
18     A.  I -- there was a meeting -- and I don't know
19 what date it was -- where we had kind of an introductory
20 meeting -- laptop, headphones. He brought a developer,
21 Walter Horat, who I later -- later got to know. And he
22 brought him and told me everything about the fact that
23 he worked for Apple. And I don't know if that was to
24 impress me or what.
25     But, you know, he said, "Hey, he used to work

Page 54

1  here. He's one of my developers." I said, "Okay.
2  Cool." So, I don't know if -- if it was this meeting
3  or -- I just recall, you know, we had -- we had two
4  meetings. One was at -- one was in the main hall, with
5  a laptop. And then we had a follow-up meeting.
6      I'm pretty sure it went kind of in that
7  order -- where we went into our building, in a public
8  meeting room, and got a slide presentation. We got a
9  video and some headphones to wear while we were watching
10 his video.
11     Q.  Okay. What I'd like to do is just kind of
12 keep track, on this piece of paper (indicating
13 Exhibit-82), whenever the emails showed you guys had an
14 in-person meeting. I just think that would be helpful
15 to do. I understand --
16     A.  Yeah.
17     Q.  -- given the passage of time, you may not
18 remember the date of each meeting. But if, you know --
19     You don't have any reason to think this
20 meeting didn't occur, as reflected in this email, right?
21     A.  Well, yeah, you know, without going and
22 checking anything that I have or Apple has -- you know,
23 I don't see anything objectionable on it. I mean,
24 there's a lot -- there's some name-dropping in here, of
25 course -- Tony Faddell, Eddie Cues. But that's stuff I

Page 55

1  would gloss over. You know, I'd -- okay.
2      Q.  So --
3      A.  Yeah.
4      MR. AVENI:  And if this is helpful -- let's
5  mark this as an exhibit as well. I just want to kind of
6  run -- we're just going to -- I just think it'd be
7  convenient and easy to keep track of the meetings that
8  you went through with him.
9      (Exhibit-82 marked for identification.)
10     MR. AVENI:  Thank you.
11     Q.  (By Mr. Aveni)  So what I've marked as
12 Exhibit-82, for the record, is just a piece of paper
13 that I marked, "GenAudio In-Person Meetings." And I
14 wrote, number one -- and I'm not trying to represent
15 that these are the only meetings.
16     I'm not trying to represent anything other
17 than, as we run through these, these are the ones
18 that from the emails appear to have taken place. Is
19 that fair?
20     A.  Yes.
21     Q.  Okay. So, then you see -- if you look at the
22 bottom of this email, it said: "Everything will come
23 into focus at the upcoming presentation on March 1,
24 2007."
25     And throughout this email he talks about

Page 56

1  meeting with you about what his presentation would be;
2  is that fair?
3      A.  Yes. That might be the one I referred to with
4  the slide deck.
5      MR. AVENI:  Right. Okay. You can put that
6  one aside. Okay.
7      Let's mark this as Exhibit-83.
8      (Exhibit 83 marked for identification.)
9      Q.  (By Mr. Aveni)  So, this is another email --
10 the Bates stamp indicates it was produced by you. It's
11 an email from Jerry to you.
12     Is it okay with you if I referred to Jerry
13 Mahabub sometimes as Jerry?
14     A.  That's fine.
15     Q.  Sometimes, I'll call him Jerry Mahabub;
16 sometimes, I'll call him Mr. Mahabub. But if I say
17 "Jerry," you'll know what I'm talking about, right?
18     A.  I prefer JM. If -- it doesn't matter.
19     Q.  I want the record to be clear. I'll try to
20 use --
21     A.  Okay.
22     Q.  -- Jerry Mahabub --
23     A.  Okay.
24     Q.  -- and may slip into Jerry at times --
25     A.  That's okay. I -- I -- okay.

Page 57

15 (Pages 54 - 57)

1  integration with minimal non-recurring engineering."
2      Do you see where it says that?
3  A.  Mm-hmm, yes.
4      Q.  Do you think that reflects the state of
5  GenAudio's state of technology at that stage?
6      MS. HUGHES:  Objection.  It calls for
7  speculation.
8      A.  I -- you know, I -- as I said, I read a lot of
9  this stuff and I -- I glossed -- I got down to the
10  bottom, okay.  What is it that you -- okay, you're going
11  to -- "Give me a license to open up the Expander."
12  "Okay.  I'll try it.  I'll bite."  I downloaded this
13  free software, and it haunts me to this day.  It
14  won't -- I can't find the hidden file, and it --
15      Every time I start a computer up, it comes
16  up -- it has no software attached.  I can't find the
17  hidden file.  I found it -- I found -- it's a big, long
18  numerical code.  And at some point I'm going to figure
19  it out.  But it -- whenever I restart the computer, that
20  stupid free -- say it here --
21      Q.  (By Mr. Aveni)  Okay.
22      A.  -- stupid free software.
23      Q.  If you look at the middle paragraph of that
24  page, the last sentence says:  "... I would like to take
25  the next steps with Apple and see if Apple is interested
*Page 70*

1  in having AstoundStereo integrated into iPod and iPhone
2  product offerings via licensing."  So, that's just to
3  say --
4      I mean, you understood Jerry was trying from
5  the outset to sell you AstoundSound through a licensing
6  agreement?
7      A.  Yes.
8      MR. AVENI:  Okay.  Okay.  Let's mark
9  Exhibit-86.
10      (Exhibit-86 marked for identification.)
11      Q.  (By Mr. Aveni)  Okay.  Do you recognize
12  Exhibit-86?
13      A.  Oh, here's -- here's the comment I made -- "It
14  doesn't sound like Matthew is really on your business
15  team.  I'm sorry, these are rules we have to live with
16  around here."
17      Q.  Right.  And you're referring to -- earlier,
18  you said one time he showed up and wanted to bring
19  another --
20      A.  Yeah.
21      Q.  -- non-GenAudio person to Apple?
22      A.  Yeah.
23      Q.  Okay.  So, you recognize this document?
24      A.  I'll take it for its word.
25      Q.  Okay.
*Page 71*

1      A.  Yeah.  If it came from me, it's probably cool.
2      Q.  Okay.  And so if you look at this, the bottom
3  email on Page 1 is dated June 18, 2009.  It's an email
4  from Jerry to you.
5      At the bottom of that page he says, "See you
6  in a couple of hours."  Do you see that on Page 1?
7      A.  Oh, okay.  I'm sorry, I was looking at the
8  top.
9      Q.  Yeah, look at --
10      A.  I see it -- June 18th.
11      Q.  June 18th.  And on the bottom of Page 1, it
12  says, "See you in a couple of hours."  Do you see that?
13      Here, mine's highlighted.  You can see it a
14  little better.
15      A.  Okay.  Yes.
16      Q.  So, does that reflect that Jerry was meeting
17  with you on June 18, 2009?
18      A.  It -- it says that.
19      Q.  It appears to reflect that meeting?
20      A.  I'll -- yeah.
21      Q.  Is there any reason to think that meeting
22  didn't take place?
23      A.  There's no reason for me to believe it didn't.
24      Q.  Okay.  So, I'm marking it on Exhibit-82.
25      A.  Even though this -- (mumbling) -- yeah.
*Page 72*

1      Q.  Do you recall what took place at that meeting?
2      A.  Just let me -- (mumbling) -- okay -- "a fly on
3  the wall" -- yeah, thanks.
4      Q.  Yeah, I know what you're --
5      A.  I'm sorry for the mumble.  I just kind of --
6  trying to read through this.
7      MR. HOLMES:  You know, the only caution I give
8  you is that if it is audible, the court reporter will
9  probably try to take it down.
10      THE WITNESS:  I understand, I understand.  I
11  just -- they couldn't hear, and I was mumbling into my
12  paper here.
13      MR. AVENI:  And I realize that someone in my
14  office attached an extra email to the back of this
15  (indicating Exhibit-86).
16      THE WITNESS:  This one?
17      MR. AVENI:  So, the last page.  Let's take
18  that page off and -- that email on the last page there
19  is not part of this document.
20      THE WITNESS:  Okay.
21      MR. AVENI:  But we'll talk about that one --
22  since it's here, we'll talk about that one as well.
23      THE WITNESS:  Okay.
24      MR. AVENI:  I'll mark that separately.  Okay.
25      Q.  (By Mr. Aveni)  So, at the top of this exhibit
*Page 73*

19 (Pages 70 - 73)

1　conversation even with GenAudio ended from my point of
2　view, where I worked at iPod and iPhone.
3　　　　After we had -- I guess, we'll go -- continue
4　with big meeting -- with Michael Hailey's manager, he
5　was still working -- GenAudio was still working with the
6　folks in the -- in the Mac hardware/DSP audio side of
7　the street, I'll call it, that I introduced -- the Ron
8　Isaacs of -- of the conversation.
9　　　　That's a separate thing. They're colleagues
10　of mine, friends. And -- and they had an -- they had a
11　somewhat general interest in it. And it's -- but they
12　had no program driving -- that they use this product.
13　　　Q. And you weren't involved in those discussions?
14　　　A. No. I went -- and sometimes I was invited to
15　their meetings -- maybe all of them -- I don't know how
16　many meetings they ever had with GenAudio. It wasn't
17　really -- at Apple, we don't -- everything is
18　confidential. And -- and even though we're all on the
19　same team, unless you're working on the project, you
20　don't know anything, so --
21　　　Q. Okay.
22　　　A. So, the guys across the street -- the Ron
23　Isaac of this conversation that we're -- they -- they
24　were on their own thing. And -- and since they're in
25　development and prototype and things -- things that --
　　　　　　　　　　　　　　　　　　　　　　　　　Page 110

1　there's no finished product there.
2　　　　It's just a lot of concepts. It's a -- little
3　projects going on all over. And they'd invite me at
4　times for projects -- they're looking -- they got a
5　vendor that came in and showing them -- I mean, I --
6　　　　Over that period of time, we had -- I don't
7　know -- 15 different vendors that probably had this kind
8　of software. Some were from -- came all the way from
9　England, Germany. I'm -- it was sporadic. They'd just
10　come in and show us what they have, to generate some
11　interest.
12　　　　"Hey, do you guys think you can do something
13　with this?" And so they'd invite me to their meetings,
14　you know, "A vendor coming in. You want to check it
15　out?" "Sure. I'll set out some time and come over and
16　check it out." So, just to fill you in with -- with
17　everything.
18　　　MR. AVENI: Let's mark this one here.
19　　　(Exhibit-94 marked for identification.)
20　　　Q. (By Mr. Aveni) Okay. You see on the lower
21　right-hand corner -- again, this is a document that you
22　produced. Does this look right?
23　　　A. Yeah.
24　　　Q. Okay. If you look at Jerry Mahabub's email to
25　you, the bottom of Page 1, it says -- oh, I'm sorry. I
　　　　　　　　　　　　　　　　　　　　　　　　　Page 111

1　take that back. This is an email from you to Jerry
2　Mahabub. And you say, "Hi Jerry, Nice to see you
3　today!!" Do you see that?
4　　　A. Yes.
5　　　Q. So do you recall having a meeting with
6　Mr. Mahabub on August 11, 2009?
7　　　A. Yes.
8　　　Q. Okay. I'm going mark that on Exhibit-82. Do
9　you recall what that meeting was about?
10　　　A. I'm taking it -- from here -- that he handed
11　me probably an i-touch, with the feature set that I
12　asked him to work on. There was some -- you know,
13　obviously there were some issues -- technical issues --
14　respond to a feedback, based on what I see here, and --
15　and also called him on -- on making sure that the levels
16　were matched.
17　　　　Again, it doesn't take but a little bit to
18　make people think that they're hearing better because
19　it's louder or quieter. So, he -- I want to make sure
20　this was a level playing field. The same thing happened
21　with SRS. I made sure that they -- "Hey, you guys got
22　to make sure that these are matched."
23　　　Q. So then at the bottom you say, "BTW" -- that
24　means by the way, right?
25　　　A. Yes.
　　　　　　　　　　　　　　　　　　　　　　　　　Page 112

1　　　Q. "By the way (sic), this is a great demo
2　device, congratulations!!" So, you're pleased with the
3　work that Mr. Mahabub gave --
4　　　A. Yeah --
5　　　Q. -- to you at this stage?
6　　　A. -- an edible way, if you will.
7　　　Q. Okay.
8　　　A. Well, I -- I tell you what -- off the record?
9　　　MR. AVENI: We can go off the record.
10　　　(Discussion held off the record.)
11　　　MR. AVENI: Okay. Let's mark the next one
12　Exhibit-95.
13　　　(Exhibit-95 marked for identification.)
14　　　Q. (By Mr. Aveni) Okay. This is another one
15　that's marked with an APL Bates label on the --
16　　　A. Okay.
17　　　Q. -- lower right-hand corner, reflecting that
18　Apple produced it. But this is a calender entry, it
19　looks like, from you for another internal meeting with
20　Michael Hailey. Do you see that?
21　　　A. Right, I see it.
22　　　Q. And it says at the top, "AstoundSound demo"?
23　　　A. Mm-hmm.
24　　　Q. This is about a week and a half after the last
25　calendar entry for an internal meeting with Michael
　　　　　　　　　　　　　　　　　　　　　　　　　Page 113

29 (Pages 110 - 113)

Page 118

1    A.  Yes.

2    Q.  Okay.  If you look at the -- so, this is an

3  email from Jerry Mahabub to you.  It's dated August 19,

4  2009.

5    A.  Mm-hmm.

6    Q.  And then at the bottom of that email, he says

7  to you, "Much appreciated your help.  Although I am

8  happy that you are my POC at Apple" -- I understand that

9  to mean point of contact at Apple?

10   A.  Mm-hmm, yes.

11   Q.  -- "and feel that we have become friends, I

12  wish that I had you or someone like you working on my

13  team!!!"

14        Do you feel like by August 19th, by this date,

15  that you and Jerry Mahabub have worked closely together?

16   A.  Yeah, I would say that.

17   Q.  Did you have the same feelings of friendship

18  back towards Mr. Mahabub at this stage?

19   A.  He -- we just had a good vendor/Apple working

20  relationship, I would say, you know.

21   Q.  But your collaboration was --

22   A.  Our collaboration was good.

23   Q.  And it was close at this point, right?  You

24  guys were working a lot together.  I mean, it seems like

25  it's a very -- it seems like it's an emotional comment

Page 119

1  from Mr. Mahabub, that reflects a lot of communications

2  with you over time on this project; is that fair?

3        MS. HUGHES:  Objection to the form of the

4  question.

5    A.  I -- I don't know how I felt at that point.

6  I -- you know, I -- I got along with him well.  I

7  respected, you know, the big effort that he put into

8  this.  It didn't go unnoticed with me, personally.  So

9  if you're asking about personal feeling, I -- I really

10  respected the fact that he -- he -- he did all the -- he

11  went through all this work.

12   Q.  (By Mr. Aveni)  And it was a close

13  collaboration by this stage, right?

14   A.  Based on the emails, that's -- that's about as

15  far as we went.  We swapped out gear.  We made a call.

16  "Hey, can you bump it up?"  I sent him graphs, things

17  that would help him understand what the issue was.

18        Again, he on his own -- had he walked in --

19  "Hey, I'm done with my amplification" -- working on the

20  outside with no other help -- and he comes in and

21  shows -- "Hey, it's not ready.  It's -- it's -- you got

22  to do some more work."

23   Q.  Right.  And I'm not trying to --

24   A.  So --

25   Q.  I'm not asking you, was the project ready?

Page 120

1        I guess, my question is:  At this point, did

2  you feel like you had a close collaborative relationship

3  with Mr. Mahabub?

4    A.  We had a good vendor/business relationship.

5    Q.  You guys talked frequently at this point?

6    A.  Based on the emails and the -- and probably

7  phone calls, yeah.

8    Q.  Okay.

9    A.  I mean, I -- I don't know what to say to that,

10  except -- yeah, it was -- yeah, based on the emails, it

11  looks like we had a decent communication --

12   Q.  Okay.

13   A.  -- on it.

14        (Exhibit-98 marked for identification.)

15   Q.  (By Mr. Aveni)  Okay.  From the Bates stamp,

16  again this looks like another document you produced; is

17  that right?

18   A.  Yes.

19   Q.  Do you recall this email?

20   A.  No.  But, I guess, I'm going to rip on it.

21  I --

22   Q.  This is an internal email, right, from you to

23  Michael Hailey?

24   A.  Yes.

25   Q.  And is it fair to say the email reflects that

Page 121

1  you were enthusiastic about GenAudio's technology,

2  right?

3        MS. HUGHES:  Objection to the form of the

4  question.

5    A.  Let me read this and see if I can --

6    Q.  (By Mr. Aveni)  Sure.

7    A.  -- gather -- I'm a slow reader, so trying to

8  digest what process -- what I was thinking about.

9        Okay.

10   Q.  Okay.  So, is it fair to say that the email

11  reflects that at this stage you were enthusiastic about

12  GenAudio's technology?

13        MS. HUGHES:  Object to the form.  Leading.

14   A.  Yes.  It doesn't say anything negative.

15   Q.  (By Mr. Aveni)  It seems pretty positive,

16  right?

17   A.  It seems -- it seems positive.

18   Q.  You say, at the top of the second paragraph,

19  "It works as advertised."  What was working as

20  advertised?

21   A.  Well, it's a figure of speech in this case.

22  But, you know, that he was able to take -- do you want

23  me to explain what -- what he means by fold -- I don't

24  know if I used the word "fold down" in here.  But movies

25  are created in six channels -- 5.1 -- five normal

31 (Pages 118 - 121)

1     A. It's a puzzle. I really don't know. I -- I
2 mean, I'm just -- based on -- 8/29 -- so I -- you know,
3 what is 8/29? I'm looking at --
4     Q. Well, we don't have to go back -- I will say
5 approximately --
6     MS. HUGHES: August 26, I believe.
7     MR. ELTRINGHAM: 26.
8     MR. AVENI: Okay. I'll say approximate --
9     THE WITNESS: Or maybe it wasn't.
10     MR. HOLMES: I'll represent that 8/19 and 8/26
11 were Wednesdays.
12     THE WITNESS: Okay.
13     MR. ELTRINGHAM: I have a calendar up here.
14     A. But, I mean, to be specific, I don't know.
15 You got something that ties this together, that I can --
16     MR. AVENI: Well, that -- I think they -- that
17 ties it as well as we can. So I've reflected on here,
18 exact date matters. So I've reflected on here,
19 approximate, 8/26. Okay. You can put that aside.
20     (Exhibit-100 marked for identification.)
21     Q. (By Mr. Aveni) Okay. Exhibit-100 is another
22 document, the Bates stamp reflects, that you produced
23 this one. Does that look right to you?
24     A. I got to read through --
25     Q. Sure.
    Page 126

1 product rollout if we work really (sic) hard and fast!"
2 You know, that just -- he just generated this.
3     Q. So, you disagreed with him about the status?
4     A. Yeah, absolutely. I mean, this isn't even my
5 call.
6     MR. AVENI: Okay. And we'll get to that. So,
7 let's talk about this one at a time.
8     MS. HUGHES: Could we stop for a moment?
9     You just read something about Christmas
10 rollout. Where is that on Exhibit --
11     THE WITNESS: The -- the final --
12     MS. HUGHES: Oh.
13     THE WITNESS: -- paragraph on this -- this one
14 right here -- of his email.
15     MS. HUGHES: Thank you so much.
16     Q. (By Mr. Aveni) Okay. So, let's talk about
17 Mr. Mahabub's comment about AstoundSound and realtime
18 during game play and it's already for the most part
19 done.
20     Did you talk to Mr. Mahabub about whether you
21 agreed with that statement? Did you tell him something
22 like -- that you didn't think it was as far along as he
23 did -- anything like that?
24     A. No, I never called him on those things. He --
25 you can look at all these emails, and they all have
    Page 128

1     A. -- try to get into context.
2     Q. Sure. Take a minute.
3     A. Okay. I mean, if I send it, it's -- I'm sure
4 it was in my email box.
5     Q. Okay. If you look at the second page --
6     A. Mm-hmm.
7     Q. -- there's a paragraph that starts, "The
8 solution for Apple ..." Do you see that?
9     A. Yes.
10     Q. Okay. The last sentence of that paragraph
11 says, "AstoundSound in real-time during game play, and
12 it is already for the most part done." Do you see that?
13     A. Yes.
14     Q. So when you read that, did you understand that
15 Jerry Mahabub was saying he thought most of the work he
16 needed to implement AstoundSound into Apple for gaming
17 was already completed? Is that what it seems like what
18 he was trying to say there?
19     A. Yeah, in his judgment. That's not our
20 judgment.
21     Q. That was --
22     A. No, he -- he constant -- I mean, you can go
23 right down -- he -- he -- I mean, I'm going to skip for
24 a second. I -- I read this. And I said -- "... however
25 it is in fact a very real and attainable goal for X-mas
    Page 127

1 conclusion and assumptions and -- and I think he was --
2 he just had a sales hat on -- salesman hat. So, I --
3 I -- I just glossed over that stuff and --
4     Q. You wouldn't respond back to him on --
5     A. Oh god --
6     Q. -- anything --
7     A. -- you can go through all these emails. And I
8 can probably highlight, you know, places I could have
9 said many, many, many, many times, you know. But I
10 wasn't -- I'm not going to sit there and cor -- all I
11 cared about was, did you adjust the thing the way I
12 asked you to do it or not.
13     Q. And so it's fair to --
14     A. And remaining friendly.
15     Q. So, it's fair to say -- I want to try to clear
16 up the record a little bit, just so that it's clear what
17 we're talking about later.
18     You're saying that Jerry Mahabub would
19 frequently make comments to you about his view, about
20 how far down the road the technology was in terms of
21 being ready to implement, right?
22     A. Right. He was --
23     Q. And --
24     A. -- trying to be -- he's trying to en -- show
25 me that he's confident, that he -- he -- that he saw the
    Page 129

33 (Pages 126 - 129)

1  end game; that, you know, we can do it right now.
2  That's the way I -- we're ready to roll --
3  Q.  Right.
4  A.  And, you know, that's --
5  Q.  And you don't recall ever telling him
6  something like, "Jerry, that's not the case or that's
7  not the stage" -- or anything like that?
8  A.  I don't know if we ever did.  I think there
9  were a couple of times where he asserted himself, like
10 "I know how to sell this stuff."  I said, "You're not
11 coming to this meeting.  It's not that kind of meeting."
12      It's -- it's -- it's superficial.  It's not
13 digging down into the nitty-gritty or -- or -- or we're
14 going to knock out term sheets here -- anything like --
15 it wasn't anything like that.
16      This was -- I'm presenting a concept.  You're
17 building the demo.  We're trying to fine-tune the demo
18 and putting our best foot forward.  And that's all I
19 cared about.  You know, as far as details, they're
20 high-level.
21      You know, hey, is it -- it's not working, you
22 know.  It's -- the button's in the wrong place, or it's
23 got a scratch on it.  It's making a ticking sound.  It
24 cuts out.  It's drawing too much power.
25 Q.  So, you were focusing on the specific tasks

Page 130

1  that needed to be done --
2  A.  Yeah.
3  Q.  -- rather than responding to each of his
4  comments regarding the status of implementation?
5  A.  Yeah, he -- you know, the -- the -- all these
6  documents --
7  Q.  Okay.
8  A.  -- have that sort of thing in there.
9  Q.  Okay.  So, let's talk about -- and we'll go
10 through a number of them.  Let's talk about this other
11 sentence that you read, which is in the middle of that
12 page --
13 A.  Yes, okay.
14 Q.  -- where he says, "... however it is in fact a
15 very real and attainable goal for X-Mas" -- meaning
16 Christmas, right?
17 A.  Right.
18 Q.  -- "X-Mas product rollout if we work hard and
19 fast."  I mean, Jerry's an optimist with regard to his
20 technology.  Is that fair to say he comes across that
21 way?
22 A.  He was enthusiastic.
23 Q.  He's enthusiastic.
24 A.  And he had a salesman hat on.
25 Q.  Sure.

Page 131

1  A.  Okay.
2  Q.  But, I mean, he really appeared to believe in
3  his prospect; right?
4  A.  Oh, yes.
5  Q.  And he really appeared to believe in the --
6  you know, in a possible transaction with Apple?
7  A.  Yes.
8  Q.  He's --
9  A.  I would assume -- I mean, that's the
10 assumption -- somebody walking in, they're going to
11 hopefully close something.  I mean, he's not doing it
12 for free, so --
13 Q.  And from your interactions with him, do you
14 understand he seems to think that that was likely --
15 that a deal was going to close with Apple?
16      MS. HUGHES:  Objection.  Lack of foundation.
17 Q.  (By Mr. Aveni)  I mean, he's making --
18 A.  I wasn't --
19 Q.  -- these statements --
20 A.  -- thinking that far in advance.
21 Q.  And I understand you weren't.  And we can talk
22 about that.  But, I guess, my question is:  Did it look
23 like Jerry was thinking that far in advance?
24 A.  Um --
25 Q.  You said that he makes these comments all the

Page 132

1  time.  And you said he's an enthusiastic guy.  He really
2  seemed to believe in the value of his technology.
3      Did it seem like he was convinced -- right or
4  wrong -- that he was further down the road with Apple
5  and that a transaction with Apple was likely?
6      MS. HUGHES:  Objection.  Calls for speculation
7  on what Mr. Mahabub thought.
8      MR. AVENI:  I'm asking based on the witness's
9  interactions with him.
10      You can answer.
11 A.  I didn't make specific note.  It -- it seemed
12 like it was just part of who he was.  You know, if it's
13 constantly coming out of him like that, you know, you
14 just accept it.  Oh, there's another one.  It was
15 harmless, I'll say it that way.
16 Q.  (By Mr. Aveni)  Did you have --
17 A.  I took it as being harmless.  I wasn't
18 thinking about this in any way, shape, or form because
19 it really -- it -- you know, if it was -- in romantic
20 parlance, we're -- we're -- "Let's go get some coffee."
21 What does that mean?  We're getting coffee.
22      It just -- it wasn't on my radar.  Look, it's
23 just -- I'm just focused on the technical -- a couple of
24 yuks once in a while.  You know, he -- he -- he --
25 obviously, he's very enthusiastic.  And on a personal

Page 133

34 (Pages 130 - 133)

Page 134

1   level, he's -- he's got a big personality. I mean,
2   there's no doubt about it, okay.
3          So, you know, beyond that -- and getting back
4   to this -- I mean, this -- the ques -- I have no way of
5   answering it. It's just -- it's -- it's throughout
6   everything we've got here. Which one do you want me to
7   pick from?
8      Q.   Yeah. And we'll talk about -- I realize --
9      A.   I mean, it's like --
10     Q.   -- he made a lot of these kinds of comments --
11     A.   Yes.
12     Q.   -- right?
13     A.   Peppered it throughout the conversation and
14   this. And it was never very specific. It was just
15   something that washed over me. I just did not -- didn't
16   think about it.
17     Q.   And do you have any reason to think
18   Mr. Mahabub did not genuinely believe in these
19   statements when he says here, "It is in fact a very real
20   and attainable goal for X-Mas product rollout" --
21          When he makes statements like that, did you
22   have any reason to believe that he didn't believe that?
23   I mean, he seemed genuinely to believe this --
24     A.   I'll tell you what I took that as, okay.
25   After reading some of these, I -- I just took it that --

Page 135

1   "Hey, it wouldn't take a whole lot to get this thing
2   ready to go. We're ready to go." He was -- that was a
3   constant. We're -- we're this -- you know, isn't -- you
4   tell me -- I think one of the comments --
5          But he says, "You tell me how high to jump,
6   I'll jump. I'll get this done." And -- and that's --
7   as I mentioned earlier, he did a lot of work and --
8   and -- and -- and, you know, I had to bring up the
9   software.
10         And all I cared about was creating a demo that
11  I could present to somebody. And I complimented him on
12  his ability to get it done, so --
13     Q.   So you testified you didn't respond to Jerry
14  on this X-Mas product rollout, and you generally didn't
15  respond when he made these comments.
16         Do you know if anybody else responded to him,
17  when he said, "it is in fact a real and attainable goal
18  for X-Mas product rollout?
19     A.   Well, yeah, I've --
20     Q.   Did anybody else --
21     A.   I -- I've --
22     Q.   -- respond to this and say, "Jerry, that's not
23  what we talked" --
24     A.   This one specifically?
25     Q.   Yes, this one.

Page 136

1      A.   I don't know. If you have an email that
2   shows -- but, you know, I recall -- again, he -- he --
3   it was a constant drive towards, you know, "Let's --
4   let's make the deal," okay. And, you know, I think
5   Michael Hailey at one point said something about that.
6   He said, "We'll -- we got you, you know. It's" -- you
7   know.
8      Q.   Okay.
9      A.   I -- I --
10     Q.   You can put that aside.
11     A.   Let's keep going.
12     Q.   I just thought --
13     A.   I don't know how to answer your question. I
14   mean, it's --
15     Q.   There's a lot of them.
16     A.   There's a lot of them.
17     Q.   There are a lot of those comments. I will
18   skip some of them for your sanity.
19     A.   Yeah.
20          MR. AVENI:  Okay. Let's mark that as
21   Exhibit-101.
22          (Exhibit-101 marked for identification.)
23     Q.   (By Mr. Aveni) Okay. This exhibit appears to
24   be another document that you produced. Does that seem
25   to be the case?

Page 137

1      A.   Yeah. Yeah, I see that.
2      Q.   Okay.
3      A.   But -- well, go ahead. Go ahead with your
4   question. I'm just -- never mind.
5      Q.   Okay. If you look at the first sentence --
6   so, this is an email from Jerry Mahabub to yourself and
7   to Michael Hailey --
8      A.   Mm-hmm.
9      Q.   -- to you --
10     A.   Yes.
11     Q.   -- dated September 16, 2009. And it says, "It
12   was great to meet with you both today." Do you see
13   that?
14     A.   Yes.
15     Q.   Do you recall a meeting with Jerry Mahabub and
16   Michael Hailey on or about this date?
17     A.   I'll take that this was official.
18     Q.   Okay. So, I will mark on Exhibit-82. By my
19   count, we're up to about, you know, eight --
20     A.   If you have a calendar that event ties with
21   this, I'll agree to it. I --
22     Q.   Do you need a calendar event? I mean --
23     A.   No, I mean, I -- I -- I recall this kind of
24   email.
25     Q.   Okay. And generally when he said to you, "It

35 (Pages 134 - 137)

1 was great meeting with you both today," is it fair to
2 say that you guys met that day?
3     A. Yes.
4     Q. Okay. Do you happen to recall the purpose of
5 this particular meeting?
6     A. I have to read this through here. But -- yes,
7 I -- I -- I'm updated with what I'm reading here. But I
8 don't -- I don't see what's important here.
9         MR. AVENI: Okay. That's fine. We can move
10 on.
11        THE WITNESS: Okay.
12        MR. AVENI: Mark that as Exhibit-102, and this
13 one as 103.
14        (Exhibits-102 and 103 marked for
15        identification.)
16     Q. (By Mr. Aveni) Okay. Exhibits-102 and 103
17 also appear to have been produced by you. Does that
18 look to be the case?
19     A. Yes, I -- I'll take that it came from me.
20     Q. Okay. And these two emails appear to reflect
21 another meeting between you and Mr. Mahabub on October
22 1, 2009. Do you see that?
23     A. Yes.
24     Q. Exhibit-103 says, "See you in about
25 2 hours!" at the bottom. Do you recall that meeting

Page 138

1 with Mr. Mahabub?
2     A. Not specifically.
3     Q. Okay.
4     A. Quite often what -- what would happen is -- is
5 that since the application was a developer copy, that he
6 had put in -- there's provisioning, meaning they say
7 that the -- the -- the application time bombs. You
8 know, it's only capable of operating for 30, 60, 90 days
9 or something like that. I'd -- I've forgotten what it
10 was.
11        And sometimes I'd have it bricked. In other
12 words, it just wouldn't operate anymore with that
13 application. He'd had to re-provision them, reset the
14 clock. Now, that's something he did. It was an option
15 that -- for him to do, that he -- you know, or -- or if
16 it was part of the developer package from Apple, that's
17 the way it worked. And he just enabled the function.
18     Q. Are you saying that was the purpose of this
19 meeting?
20     A. It might have been to swap them out. Hey, I
21 got an updated unit. I don't know. But, see, you can
22 see that it -- it -- in here, he had some button
23 settings and -- and he's telling me -- "An exact level
24 match and response matches bypass mode. More. 1db
25 hotter" -- meaning loudness -- "compared to the bypass

Page 139

1 mode. Less Active ... +3db ..."
2        In other words, bass is up by 3 dB or down by
3 3 dB. So -- "I'm anxious to see your ... entire system
4 ..." Okay. So what I would do is I gave him a test
5 file, a special test file, that -- that would -- I know
6 I used the term -- that would actually -- that he could
7 use.
8        He send it -- he'd run it through on a file on
9 his system, send it back to me, and I'd de-convolute it
10 in my system. And -- and it would show me where his
11 adjustments went with reference to a straight line
12 across the screen, on the graph. So, that's what this
13 was about.
14        MR. AVENI: Okay. I'm going to reflect that
15 meeting on Exhibit-82 as Meeting 9. And you can put
16 those two exhibits away. Okay.
17        Let's mark that as 104.
18        (Exhibit-104 marked for identification.)
19     Q. (By Mr. Aveni) It appears to be another email
20 that you produced; is that right?
21     A. That's what it says, yes.
22     Q. Okay. There's this one line here. It says --
23 this is an email from you to Jerry Mahabub October 8,
24 2009. It says, "Awesome! At least for me, this is the
25 best demo. As an aside anymore Dead videos available?

Page 140

1 I believe the man loves the Dead."
2        Do you see that?
3     A. Yeah.
4     Q. Do you know who "the man" is that you're
5 referring to there?
6     A. I don't. I'm trying to think who -- who the
7 man -- "Dead videos ... the man loves the Dead." Oh,
8 yes. It was -- it was -- Michael Hailey's boss liked
9 the Dead -- like the Grateful Dead.
10    Q. What was his name?
11    A. Greg -- Gregory Joz -- Jozwiak -- Jozwiak,
12 J-O-Z-W-I-A-K. Or it's actually an S. Sorry.
13 J-O-S-W --
14    Q. Joswiak?
15    A. Joswiak.
16    Q. Okay. He liked the Grateful Dead?
17    A. I think he liked the Grateful Dead.
18    Q. So, you were preparing demos for him?
19    A. Yeah, we are preparing demos. At some point,
20 we were preparing demos that we could -- Michael and I
21 could go in and say --
22        MR. AVENI: Okay.
23        (Exhibit-105 marked for identification.)
24    Q. (By Mr. Aveni) Okay. This appears to be
25 another document that you produced; is that right?

Page 141

36 (Pages 138 - 141)

Page 142

1   A. Yep.
2   Q. Okay. Okay. So in the bottom paragraph
3   there, in Mr. Mahabub's email, November 3, 2009 --
4   A. Mm-hmm.
5   Q. -- to you --
6   A. Yes.
7   Q. -- it says, "Hopefully Mac division signs off
8   on this and we can get moving on to the next step,
9   especially if there is any hope of having this done by
10  MacWorld from the marketing side, it would only make
11  sense that we start to figure out the deal structure
12  between Apple and GenAudio sooner rather then (sic)
13  later."
14      Do you remember seeing that?
15  A. No. But I'm reading it.
16  Q. And when you saw that, did it seem to you
17  Jerry believed there was a strong possibility the
18  transaction would be completed?
19  A. It could -- yeah. I could have ignored it
20  and -- you know, because it already starts off with the
21  -- "having this done by MacWorld" implies he's
22  already -- his end game is -- there's product to put
23  this into MacWorld's -- you know, a place that -- that
24  Apple launches products sometime, which they ended up
25  backing out of. And --

Page 143

1   Q. What time of year is MacWorld?
2   A. It is around January of -- right after CES or
3   during CES, I think, which is January -- first or second
4   week of January.
5   Q. So, Jerry Mahabub is telling you here that he
6   thinks a deal between GenAudio and Apple could be
7   imminent?
8   A. I -- I think he's suggesting -- the way I take
9   it and the way I -- that's why I say I just kind of
10  gloss over it. The way I take it is, if we can get this
11  thing done, you guys could have it in your product in
12  time for MacWorld.
13  Q. Right.
14  A. It isn't -- it isn't -- I mean, it's just
15  impossible to even -- knowing what I know, that isn't
16  the way it works. This is software. So, this would be
17  this application. GenAudio would be handed off to a
18  whole different team -- software team.
19      And they'd start over on the guy. That --
20  should run it through and make sure because, you can
21  imagine, every time somebody changes the code, it could
22  break the darned thing. It isn't simply just a "plug in
23  this -- "
24      So while we have it working on something like
25  this, in an application, that's totally separate from

Page 144

1   everything else. It's just a little third-party game.
2   This might as well be a game. That's a different
3   thing -- cup of tea -- versus something that's fully
4   integrated. It's got to run through hours of testing,
5   quality control testing.
6   Q. And Jerry Mahabub didn't seem to understand
7   that, right?
8   A. Well, he's -- he has a salesman hat on.
9   That's the way I took this, honestly.
10  Q. Did you respond to this comment?
11  A. I didn't, no. I mean, I totally glossed over
12  it. I mean, if you take a look at this and -- I -- I
13  just said, "Hey, it's" -- what time -- let's see -- 3:30
14  p.m. -- and then I wrote this at 11:56 at night, right
15  before I rolled into bed. I mean, I just -- I ignored
16  it. It's just another passing comment.
17  Q. As far as you know, did anybody else at Apple
18  respond to that comment?
19  A. Uh --
20  Q. I mean, nobody else was in this email chain.
21  But as far as you know --
22  A. Yeah, no. I -- again, it was just -- to me,
23  it was just a salesman hat. "By the way, we can have
24  this thing done." That's the way I -- I took a lot of
25  his comments, just like that. I --

Page 145

1   Q. Did you and he -- so, you -- Strike that.
2   You mentioned that having it done by MacWorld
3   was not realistic because once you got approval, a whole
4   bunch of other things had to --
5   A. Oh, yeah.
6   Q. -- happen, right?
7   Did --
8   A. Hit the reset button.
9   Q. Did you and Jerry ever talk -- Strike that.
10  Did you and Jerry Mahabub ever talk about all
11  those other steps that needed to happen?
12  A. No, I don't think so.
13  Q. As far as you know, did Jerry understand that
14  all those other steps needed to happen?
15  A. If I would've said something, it would've been
16  what I just told you; that, "Hey, look, you know, this
17  is -- this is -- we're just trying to get somebody to
18  sign off on the idea."
19      And then what would happen is that -- then,
20  they would start to go, "Well, is there anything else
21  out there that's competitive, might be better?" You
22  know, we get into these rooms with -- with white boards
23  and, you know, slide presentations. And we show why
24  this one's better.
25      Whether it's -- you know, when we took a group

37 (Pages 142 - 145)

Page 150

1    Q.  Sure.
2    A.  -- DSP.  And they're working over there.  But
3    he -- and -- and actually I may have not even -- I
4    shouldn't have been probably necessarily included on the
5    email thread because --
6    Q.  Yeah, I understand -- I understand you weren't
7    involved in the stuff with Ron Isaac.
8    A.  Right, I was not involved.  And I was kept in
9    the loop here.  And I don't know if I -- there may have
10   been a couple of times, somewhere along the road, they
11   said, "Hey, you know, you probably shouldn't include me
12   on this thread."  But the point is -- is I -- I -- I
13   don't know what -- this is out of context right now for
14   me, except it doesn't seem to be any issue.
15   Q.  Okay.
16   A.  Right.
17   Q.  And my question is simply -- I'm just
18   establishing the meeting, so I --
19   A.  I -- I may have --
20   Q.  Any --
21   A.  -- missed the meeting.
22   Q.  Well, but here he says, "Hi Ron/Vic, Great
23   seeing you both again earlier today."  So, he's saying
24   he saw you.  Do you have any reason to think --
25   A.  I --

Page 151

1    Q.  -- that didn't happen?
2    A.  I have no reason to think -- I -- yeah, I -- I
3    imag -- maybe we met for lunch, totally independent, no
4    meeting.  I -- I mean, there's any number of possibility
5    -- let's just say that I met with him.
6    Q.  Okay.  And I want to --
7    A.  I just want to clarify that -- make sure that
8    we --
9    Q.  I understand --
10   A.  -- clarify.
11   Q.  -- you don't remember the details of the
12   meeting.
13   A.  No --
14   Q.  Okay.
15   A.  -- I don't.
16   Q.  I'm going to put it on Exhibit-82, it's the
17   tenth time you met with him.  Okay.
18       In light of your testimony, I'm not going to
19   ask you the purpose of the meeting.
20   A.  Thank you.
21   Q.  Okay.  So, we've gone through -- I mean, so
22   far we've got, you know, at least ten in-person
23   meetings.  We've talked about a variety of emails.  As I
24   said, there's some we didn't -- certainly didn't talk
25   about all of them.  But there's a number of emails you

Page 152

1    guys exchanged.  We've talked about the phone calls,
2    I mean, is it fair to say that from this point
3    where we are now in the timeline -- November 2009 --
4    that the ongoing discussions were getting fairly
5    extensive with GenAudio?
6       MS. HUGHES:  Object to the form of the
7    question.
8    A.  I mean, based on these emails and what I know
9    about it, GenAudio was meeting as an outside vendor
10   trying to engage with Apple to demon -- to demonstrate
11   their product at its best.  That's --
12   Q.  (By Mr. Aveni)  Sure.
13   A.  So, they were doing what was -- would take to
14   make it viable, at least from a demo standpoint.
15   Q.  And from a vendor's perspective -- I mean, you
16   know, vendors come to you -- as we've talked about --
17   they want to sell you something.  I mean, it's Apple.
18   It's probably -- for many of these guys, like a company
19   like GenAudio, it's their dream to get to sit down with
20   you guys.
21       From a vendor's perspective, you know,
22   GenAudio's gotten to sit down with you ten times -- at
23   least, you know, that we can confirm in emails.  He's,
24   you know, having regular phone calls with you, you know,
25   regular email communications with you.  You know, at

Page 153

1    least from his perspective, he feels like he's working
2    closely with you.
3       So, I mean, is it fair to say a vendor in that
4    position is going to feel like the discussions are
5    fairly extensive?
6       MS. HUGHES:  Object to the form of the
7    question.  Calls for speculation about what a vendor
8    might think.
9    A.  I -- I don't know how to answer your question,
10   honestly.  I -- I -- he, you know -- based on the
11   emails --
12   Q.  (By Mr. Aveni)  Yeah.
13   A.  -- he connected with us a lot.
14   Q.  Yeah.
15   A.  And we went back and forth.  Here are the
16   things that we need to do.  My emails generally are very
17   short.  His are long and sometimes hard to read -- you
18   know, hard to read through and -- and -- you know, so
19   the extra communication -- honestly, I think he
20   over-communicated.  That's my opinion.  If you ask my
21   opinion, he over-communicated in the emails.
22   Q.  He communicated with you a lot?
23   A.  A lot.  And in many cases it looks -- appears
24   in emails, I -- I ignored everything in the content.
25   And I got -- I drilled down to what was necessary.  And

39 (Pages 150 - 153)

Page 154

```
 1   I can go back as an example to, you know, some of
 2   these -- I mean, this is just --
 3      Q.  Yeah.  And I understand what you're saying.
 4   You're saying that --
 5      A.  Yeah, he over-communicated.
 6      Q.  -- he would have --
 7      A.  I mean, I think that's what you're asking,
 8   He's over-communicated in emails.  That's what I want to
 9   say.
10      Q.  Yeah.  And I understand you're also -- you're
11   saying that he also had lengthy communications.  I'm
12   also talking about the number of communications, that
13   there were just a lot of them.
14      A.  There was a lot of them.
15      MR. AVENI:  Okay.  So, you can put that aside.
16      (Exhibit-107 marked for identification.)
17      Q.  (By Mr. Aveni)  Okay.  The Bates stamp on this
18   document reflects that you produced that.  Does that
19   look right to you?
20      A.  I'm -- yeah, I'm reading now that he's got
21   carets where he -- where I spoke -- or there's carets
22   where I spoke, and then he answered apparently in
23   between paragraphs.  So, let me -- let me read through
24   to see what --
25      Q.  Sure.
```

Page 155

```
 1      A.  -- where he's going.
 2      Q.  Just so you know, I'm -- you're welcome,
 3   obviously, to read through it.  I'm just going to ask
 4   you about the last paragraph.
 5      A.  Okay.  I just want to get the context.
 6      Q.  That's fine.
 7      A.  I'm reading what I said, and everything else
 8   is -- I mean, this has obviously become a lengthy --
 9   another one.
10      Q.  Yeah, I don't intend to ask you about the
11   entire document.  But you're welcome to read it.
12      A.  Yeah.  Okay.
13      Q.  Okay.  So looking at that last paragraph on
14   Page 2, Jerry writes -- Jerry Mahabub writes, "Let me
15   know if you know anyone directly I can speak with at
16   Apple to help us solve this nasty issue once and for all
17   ... that would be great ... especially before a demo to
18   the big man!"
19      Do you see that?
20      A.  Yeah.
21      Q.  Who do you understand, "demo to the big man"
22   to be?
23      A.  Well, it looks like a puzzle.  I -- I would
24   assume, since our demos were -- I only had one demo,
25   which was to -- to Greg Joswiak, which is Michael
```

Page 156

```
 1   Hailey's direct manager -- direct report manager.
 2      Q.  I'm wondering if, in the way that Jerry
 3   Mahabub writes, whether he's referring to Steve Jobs
 4   here when he's referring to the "big man"?
 5      MS. HUGHES:  Objection.  Speculation.
 6      Q.  (By Mr. Aveni)  Do you know --
 7      MS. HUGHES:  Lack of foundation.
 8      A.  I don't know.
 9      Q.  (By Mr. Aveni)  When you read this, when you
10   received it, did you have any understanding of who Jerry
11   was referring to when he said, "... especially before a
12   demo to the big man!"?
13      A.  I -- I don't know what he meant by that.
14   Look, you know, he -- he used to say -- use terms like
15   that.  And, you know, if I -- if I used them myself, it
16   was probably -- that's wink-wink -- that's who it is.
17   But I don't know -- I don't think he's referring to
18   Steve Jobs.
19      Q.  Okay.
20      A.  I don't know who he was referring to.  When
21   I'm talking about the demo, I'm -- I'm thinking this.
22   If he says that, I, you know -- if he's labeled my
23   meeting with somebody that way, I -- I just didn't
24   correct him on it, "Who do you mean?"  I just didn't do
25   that.  Now, when was this?  2009?
```

Page 157

```
 1      Q.  So, you don't know one way or the other who
 2   he's referring to?
 3      A.  I have no idea.  I don't know --
 4      Q.  Okay.
 5      A.  -- in this case.
 6      Q.  Do you recall ever talking to Jerry Mahabub
 7   about that comment after he made it?
 8      A.  No, I -- I don't remember.
 9      Q.  Okay.
10      A.  First of all, I don't remember.
11      MR. AVENI:  That's fine.
12      (Exhibit-108 marked for identification.)
13      Q.  (By Mr. Aveni)  Okay.  This is another email
14   with a Bates Label, reflecting that you produced it.  Is
15   there any reason to think that's inaccurate?
16      A.  I -- I was reading.  I'm sorry, what was it?
17      Q.  I'm sorry.  I said that the Bates number on
18   the right-hand corner reflects that this is a document
19   that you produced.  Is there any reason to think that
20   that's incorrect?
21      A.  No.
22      Q.  Okay.  If you look at the last paragraph of
23   this email -- now we're at November 13, 2009 -- Jerry
24   Mahabub writes to you:  "So now you/Apple have three
25   devices, all of which are completely up to date, and
```

40 (Pages 154 - 157)

1 Bates Stamp No. 951, he tells you there that he's hired
2 an IP valuation specialist --
3    A. Yes.
4    Q. -- to provide evaluations of the AstoundSound
5 so that GenAudio and Apple can be ready to sign a deal.
6 Do you see that?
7    A. Yes.
8    Q. That last one, that's my words; not a quote.
9      When you read this, did you view this as Jerry
10 Mahabub writing as if he believes a deal over
11 AstoundSound with Apple is imminent?
12      I mean, he's talking at getting a valuation
13 company, that's now hired, at least talking about
14 getting -- you know, looking at IP rights.
15      Did you view that as Jerry's thinking -- he
16 might be off-base in your mind -- but he's thinking that
17 a deal with Apple is something that should start taking
18 shape?
19    A. I don't know to whose benefit that was. I
20 don't even know if I read this. I used to have -- you
21 know, if I saw this, I -- it was -- to me, I'd look at
22 this and say this is another lengthy thing. What is --
23 it's just -- it's -- it's just --
24    Q. I mean, it's incredibly lengthy, right, and
25 very detailed; is that fair?

Page 162

1    A. Oh, yeah.
2    Q. I mean --
3    A. So -- so, to me, this is more sales stuff, you
4 know.
5    Q. I mean, is there any reason that you think he
6 didn't believe this; that he didn't --
7      MS. HUGHES: Objection --
8    Q. (By Mr. Aveni) -- believe a transaction with
9 Apple was --
10    A. I don't know --
11    Q. -- going to be inked soon?
12    A. I -- I didn't even -- it didn't even dawn on
13 me -- if I read this. But even reading it now, it's
14 just -- it's just --
15    Q. Well, reading it now, do you have that sense?
16    A. Well, I mean, it just goes on. It goes on
17 every tangent you can imagine. I mean, who's he writing
18 it for?
19    Q. Well, it's written to you and to Michael
20 Hailey.
21    A. I -- I understand. But I -- it didn't -- this
22 was like so many of the other emails. I mean, it --
23 it -- you know, I -- I don't even know if I responded to
24 it.
25    Q. Did you ever --

Page 163

1    A. I mean, is there an email that backs up what
2 -- that I respond to this?
3    Q. I have not seen an email response from you.
4    A. I -- I -- there were probably a few emails
5 that I missed. I mean, we miss -- I mean, my -- my
6 phone right now says I got a hundred messages. Some of
7 them are saved. Some of them --
8    Q. I will represent that I have not seen a
9 response from you to Jerry --
10    A. Yeah --
11    Q. -- Mahabub --
12    A. -- and the fact that --
13    Q. Go ahead. Do you recall ever calling him on
14 the phone in response to this and saying, "Jerry, we're
15 not talking about a deal yet" or anything like that?
16    A. I don't remember.
17    Q. Okay.
18    A. I don't recall anything.
19    Q. So you see on the bottom of Page 951, where he
20 says he's now hired an IP valuation specialist. Were
21 you aware that he'd done that? Do you remember that?
22    A. No.
23    Q. Do you recall ever telling Jerry Mahabub,
24 "Don't hire an IP specialist. It's too expensive. It's
25 too early to do that" -- anything like that?

Page 164

1    A. No.
2    Q. If you look at where -- we're looking now at
3 the bottom of 951, and then going on to 952. I mean,
4 Mr. Mahabub here is talking about the price that Apple
5 might pay GenAudio when a deal is done for AstoundSound.
6      And all the way through this email, Jerry is
7 pitching to you the value of a deal for Apple, right?
8    A. I don't think I read the email.
9    Q. But is that the way you read it, when you look
10 through it now?
11    A. I -- I -- I mean, at a glance, it looks like a
12 sales job to me. I mean, like so many -- we could write
13 a -- I mean, I can go back to previous emails where he's
14 constantly driving towards that end.
15    Q. Right.
16    A. And I just turned a blind eye to it.
17    Q. I think you said part of your frustration with
18 Mr. Mahabub, if I can call it that, was that he was
19 always trying to negotiate with you; right?
20      MS. HUGHES: Objection.
21    A. He never --
22      MS. HUGHES: It misstates the prior testimony.
23 The word "negotiate" has never came out of his mouth.
24      MR. AVENI: I didn't -- no, I didn't say
25 whether it has one way or the other. I'm raising -- he

Page 165

42 (Pages 162 - 165)

1 can -- that's a speaking objection. Okay. I'm not
2 misstating anybody's testimony. I'm not para -- I'm not
3 quoting what the witness said, one way or the other. He
4 can explain his testimony. So, you can raise your
5 objection.
6      MR. ELTRINGHAM: I object. He never said he's
7 negotiating anything. And the word "negotiation" has
8 not come up ever between the two.
9      MR. AVENI: Okay. Well, I used that phrase.
10      MR. ELTRINGHAM: Okay.
11      MR. AVENI: And again --
12      MR. ELTRINGHAM: That's fine.
13      MR. AVENI: -- these are speaking objections.
14 Again, I mean, I'm not trying to put words in anybody's
15 mouth. But he said he was frustrated with Jerry
16 constantly doing this.
17      Q. (By Mr. Aveni) My question for you is: Were
18 you frustrated that Mr. Mahabub was constantly trying to
19 negotiate with you?
20      A. He never negotiated with me. I never -- this
21 is the first time that I can recall reading this --
22      Q. Reading this email --
23      A. -- this email.
24      Q. But, I mean, you were saying before that you
25 were frustrated --
Page 166

1      A. Oh,
2      Q. -- because he's always trying to sell you.
3      A. Well, that's -- that's --
4      Q. And people are taking --
5      A. Well, no. He --
6      Q. I mean, that was --
7      A. I was frustrated with his -- his lengthy
8 emails, that went off on bird walks. You know, he --
9 he'd go -- I mean, there's an email back here, that we
10 didn't touch upon, that he's -- he over-communicated
11 things that he shouldn't be communicating. I never
12 called him on it.
13      For example, "I just left Disney Studios.
14 And, by the way, that's a -- something Steve Jobs owns
15 and" -- and, you know, it just kind of -- dropping names
16 and -- and all this other stuff that had nothing to do
17 with it. And I just kind of ignored it.
18      Q. Okay. Fair enough.
19      A. Okay.
20      Q. I guess, you did say that you were frustrated
21 because he was always being a salesman, right? I think
22 that was one of the words that you did use.
23      A. Well --
24      Q. And --
25      A. It's an email -- you know, obviously if we
Page 167

1      could turn the clock -- probably bash him over the head
2 for this, for -- for constantly doing this. But I
3 didn't think anything of it at the time. It was a guy
4 who over-communicated in his emails, peppering it with
5 all kinds of what-ifs. And I was just focused on --
6 could you bring me a new sample with this stuff on.
7      Q. Okay. And I understand that --
8      A. It's as simple --
9      Q. -- you're not --
10      A. -- as that.
11      Q. I know you're not focused on it. But you did
12 say, right, that you were frustrated that he was always
13 acting as a salesman?
14      I think that was the word you used,
15 "salesman."
16      A. I -- I did use the word "salesman." I don't
17 know if I used the word "frustrated" --
18      Q. That's my word.
19      A. -- until just -- until just now. Okay.
20      Q. People are complaining about my word choice.
21 I want to be clear. I think your word was "salesman."
22 Mine was --
23      A. I --
24      Q. -- "frustrated." But you were saying he
25 was --
Page 168

1      A. I said "salesman."
2      Q. -- always acting as a --
3      A. Yeah, I mean, I -- I mean, it was -- I think
4 between Michael Hailey and I -- and I don't know if he
5 would disag -- Michael Hailey would disagree with me on
6 this. But it was, you know, Jerry being Jerry. I --
7 I -- and what we meant by that was not necessarily --
8 hmm -- necessarily unkind.
9      But he -- he was enthusiastic. That's a word
10 that came up today. He's very enthusiastic. He's
11 enthusiastic about his company. He's enthusiastic about
12 his software. And that's the way I read the emails.
13 He's enthusiastic.
14      He wants -- he wants to -- "What is it going
15 to take for you guys to really like my software and
16 really shoot this to the moon?" I don't know if he used
17 those words. But, you know, I -- there isn't anything
18 to this.
19      Q. I guess, this email, though -- I want to know
20 if you would agree that this email goes a little bit
21 beyond that, from Jerry's perspective.
22      In terms of the email from Jerry, he's talking
23 now about things like price and, you know, IP rights
24 and, you know, structure. And not that you're engaging
25 in it with him on those things, but those are the things
Page 169

43 (Pages 166 - 169)

1 that he's talking about; right?
2 He's raising price issues with you, he's
3 raising IP rights with you; isn't that right?
4 MS. HUGHES: Object to the form of the
5 question.
6 A. I haven't even -- I have to read this in
7 detail, to find out what it says there. And, obviously,
8 we haven't had quite the time to digest --
9 Q. (By Mr. Aveni) Sure.
10 A. -- the thesis --
11 Q. Right.
12 A. -- that you got here. I -- it just seems
13 like -- unless you have an email that tracks this
14 back -- that says I answered him on this, then maybe I
15 could refresh how I worded it or whatever. But I just
16 don't have anything on it. And it might have been a
17 holiday. As a matter of fact, it was a holiday --
18 12/22 -- Thanksgiving. Probably didn't read it.
19 And then Michael Hailey didn't -- and so I
20 would have thought if he had written all this and if he
21 had been concerned about it, he would have written me
22 back or called me and said, "Hey, did you read my email?
23 I sent you a thing with all this kind of stuff."
24 Did I blow him off, did I -- I -- I don't
25 know. I -- you know, that -- we -- we weren't -- there
Page 170

1 wasn't anything to this. And I -- you know, I just
2 don't know.
3 Q. Sure. And I understand that you don't recall
4 ever responding back. And I understand your testimony
5 that you may never even have read this email. I'm
6 really trying to focus on what -- you know, where was
7 Mr. Mahabub's head, as best as you could tell, and --
8 MS. HUGHES: Objection. Calls for
9 speculation.
10 MR. AVENI: I haven't asked a question yet.
11 MS. HUGHES: You're not asking questions.
12 You're just making argumentative statements on the
13 record.
14 MR. AVENI: I haven't even finished my
15 statement, Leslie. Come on. I didn't do that during
16 your deposition. I'm not arguing with the witness. I
17 am trying to ask questions. And I think I've been doing
18 that.
19 Q. (By Mr. Aveni) Would you take a look at
20 Page 953, the paragraph at the top. About halfway --
21 about two-thirds of that paragraph -- do you see that he
22 says, "... as both Vic and I have worked very hard to
23 get the technology into a state that is for the most
24 part ready to integrate with minimal code/dev efforts
25 ..."
Page 171

1 Do you see that?
2 A. Mm-hmm. Stating his opinion.
3 Q. Okay. Do you agree that that's an accurate
4 statement of --
5 A. No, I don't agree with any of it.
6 Q. You don't agree with that?
7 A. No. I'm sure along the way I told him many,
8 many times, "Look, this is" -- you know, he's -- I read
9 this as a sale -- you know, if I read something like
10 this -- because we've read things like this, okay.
11 Q. Yeah.
12 A. If I were to have read this -- 'cause I -- I
13 really don't know if I actually read his email, as I
14 said before. But we've read other things that are like
15 it -- in here. He's trying to tell me in these
16 comments -- like this, that -- "We're ready to go. It
17 won't take much for you guys to just push it over the
18 top."
19 Q. You read this as a sale --
20 A. I read -- oh, yeah, totally. And a lengthy
21 one, I mean -- and it goes into all things that have
22 nothing to do with us. Reverse. Go to play. Stat. As
23 if we had -- as if we had any control over the guys on
24 the Mac side -- any control over the guy -- over the
25 guys in marketing, any control over the guys in our --
Page 172

1 in our iPod division. Heck, we're just trying to get
2 this thing into the concept.
3 Q. So, he's trying to negotiate with you. You're
4 just not negotiating back.
5 A. Yeah.
6 Q. Is that fair?
7 A. That's -- yes, that is a fair statement.
8 Q. If you look at the middle of that same page --
9 A. What was that? I had left it -- 950?
10 Q. 953.
11 A. 953.
12 Q. Almost smack dab in the middle of the page
13 there, it says, "On the iPod/iPhone side ..." Do you
14 see that?
15 A. Mm-hmm.
16 Q. He says -- this is Jerry Mahabub still
17 writing -- "... the stereo expansion implementation of
18 AstoundSound is ready to be completed/integrated,
19 however, the OpenAL/Gaming implementation still needs to
20 be worked on ..."
21 Do you see that?
22 A. Yeah, I see it.
23 Q. Did you agree with that statement?
24 MS. HUGHES: Are you speaking about now, or
25 are you speaking about at the time when Mr. Mahabub
Page 173

44 (Pages 170 - 173)

Page 174

1 wrote this letter?

2    Q. (By Mr. Aveni)  Is that an accurate statement?

3    A. He thinks that that's the case. I never

4 agreed to that. And -- and we had a demo. There is no

5 way -- I want to reiterate, there is no way this stuff

6 flies through just on his say-so. It has to go through

7 an entire process. Different engineering team works on

8 it. The -- the -- they qualify it, run it through

9 quality control. You know, this is just his

10 assumptions, so --

11    Q. Right.

12    A. That's just assumptions on his part. He's

13 putting a sales job on.

14    Q. But you don't recall responding to him on that

15 and said, "Hey, look, Jerry, that's not accurate to

16 where we are" or anything like that?

17    A. I think there's a good chance I didn't read

18 this. And I don't think I responded to it.

19    Q. Okay.

20    A. And if I read it, I still didn't respond to

21 it.

22    Q. Okay. If you look at Page 949, the first full

23 paragraph there -- near the bottom -- it says: "Just

24 waiting for the green light from the two of you to move

25 to the next level, and who I talk to about the business

Page 175

1 side (perhaps it's both of you?)"

2       Do you see that?

3    A. I mean -- let me see. I'm sorry, where are

4 you looking at?

5    Q. Here, you can see it on my page. I've got it

6 highlighted. Is that helpful?

7    A. Yes. So, we would be handling the business

8 side anyway.

9    Q. Right. Did you ever tell Jerry that, though,

10 in response to this email?

11    A. No.

12    Q. Did you ever say, "Jerry, I'm the wrong guy to

13 talk to?"

14    A. I don't think it ever came up.

15    Q. Well, he raised it here.

16    A. But -- okay. He raised it here, but I don't

17 think I -- I mean -- if you have an email and I

18 responded to it, I responded to it.

19    Q. Okay.

20    A. I'll agree to that.

21    Q. Do you remember any other time telling him,

22 "Jerry, I'm not the right guy to talk to about that?"

23 Anything like that?

24    A. I -- I don't remember.

25    Q. Okay.

Page 176

1    A. I mean, it was evident that -- hey, look, if

2 you're bringing in software -- Apple tends to license

3 things if they like it. And -- and that -- you know,

4 that's the only assumption you can make walking in. I

5 don't handle the business side of it. There's a whole

6 team from legal, business, maybe the software teams,

7 that come in and listen -- to see how it's going. But,

8 I mean -- no, I -- I probably would be out of the loop.

9    Q. And Jerry just didn't seem to understand that,

10 though, right?

11    A. He's just trying to figure out what -- how

12 the -- what the inner workings were and who -- who -- I

13 mean, based on this, he was just trying to figure out --

14 "What do I have to do, and who do I have to talk to" --

15 based on what I read here.

16    Q. Okay. If you look at Page 947 --

17    A. Mm-hmm.

18    Q. -- Michael Hailey did respond --

19    A. Yep.

20    Q. -- to this email. And he said that -- the

21 last sentence of this main paragraph -- "the business

22 side of things would come into play after we have exec

23 buy-in on the product side." Do you see that?

24    A. Yes.

25    Q. And then the next page -- I'm sorry -- the

Page 177

1 first page of this email, about the middle of Page 1 --

2 so it's Bates Label 946 -- Jerry Mahabub writes: "If

3 you have any idea as to when the exec buy-in might take

4 place, that would help me out." Do you see that?

5       And then he has some discussions of

6 specific --

7    A. I -- I -- where --

8       MR. ELTRINGHAM: It's about the middle of the

9 page.

10       MR. AVENI: Yeah, right here.

11       THE WITNESS: Okay.

12    Q. (By Mr. Aveni)  Do you see that?

13    A. Yeah.

14    Q. Did you respond to Jerry's question -- Jerry

15 Mahabub's question about that, as to when the exec

16 buy-in might take place?

17    A. Do you have an email to back it up? I don't

18 remember.

19    Q. Okay. And do you know if Michael Hailey or

20 anybody else at Apple responded to that?

21    A. I don't know.

22    Q. And what I'm asking you -- I'm not trying to

23 trick you. I'm really asking whether you remember --

24    A. I don't remember, no. This is 2009.

25       MR. AVENI: Okay. You can put that email

45 (Pages 174 - 177)

1   aside.
2       (Exhibit-110 marked for identification.)
3       Q.   (By Mr. Aveni)  Okay.  This has another Bates
4   label that reflects that you produced that.
5       A.   Uh-huh.
6       Q.   Is there any reason that is not the case?
7       A.   No.
8       Q.   Is there any reason to think that you didn't
9   produce this?
10      A.   No.
11      Q.   Okay.
12      A.   I'm sorry.  There is -- it's -- if I send it
13  to you, it's good.
14      Q.   Okay.  So, this is an email that's dated
15  February 3, 2010.  So, a couple of months after the one
16  that we just looked at.
17      A.   All right.
18      Q.   And if you look in the middle of that email,
19  Jerry Mahabub is asking you:  "Any news on what is going
20  on with AstoundSound and exec buy-in?"
21      So if you remember the email we just looked
22  at, he and Michael Hailey were exchanging emails about
23  when an exec buy-in might take place.  And now he's
24  asking you, "Any news on what is going on with
25  AstoundSound and exec buy-in?"

Page 178

1       Do you see that?
2       A.   Yes, I see that.
3       Q.   So after that email we just looked at --
4   Exhibit-109 -- did Jerry seem very focused to you on
5   exec buy-in as a final milestone that needed to be
6   reached?
7       A.   I believe that that's what he's driving at.
8   He knew that I had to have a demo and that eventually
9   this would -- this would, you know, culminate to that.
10  I mean --
11      Q.   And --
12      A.   -- all the demos and the songs and preparing
13  the right song list and -- and -- and that would have
14  been with Michael Hailey's manager.
15      Q.   Did you have any understanding what Jerry
16  Mahabub believed that exec buy-in timeline might look
17  like, when that might happen?
18      A.   I don't know what we told him then.  I do know
19  that at some point in the emails is -- pretty -- pretty
20  vivid on this one -- is that we told him we had a
21  demo -- it was the demo with Michael Hailey's manager --
22  that, you know, you're -- he wanted to invite himself to
23  the meeting, that he can -- that he can do the job.
24  He's done a lot of demos.  And we said, no, it's not
25  that kind of meeting.

Page 179

1       Q.   Are you saying that --
2       A.   It's an internal meeting only.  It was three
3   of us.  It was Michael Hailey, myself, and Michael
4   Hailey's boss Greg -- Joz.  And -- and that was it.  And
5   it turned out to be Michael Hailey's last day at Apple.
6       Q.   And are you saying that meeting was the time
7   when exec buy-in would be determined?
8       A.   Yeah.  And the buy-in might have been soft.
9   It might have been like, yes, let's race to get this
10  done.  We don't know.  It's -- we're springing the idea
11  for the first time -- for the first time.  This guy
12  doesn't know anything about it.  For the first time.
13      Michael Hailey worked hard.  He put together a
14  presentation -- you know, slide stack -- story to go
15  with it -- why we want to do it, why we think this kind
16  of product -- it didn't have to be GenAudio.  This kind
17  of product or this idea would benefit iPod or iPhone.
18      Q.   Okay.  Do you recall whether you responded to
19  Jerry's email in Exhibit-110?
20      A.   I don't remember whether or not.
21      MR. AVENI:  Okay.
22      (Exhibit-111 marked for identification.)
23      Q.   (By Mr. Aveni)  Okay.  This is another APL
24  marked -- Bates-labeled document.
25      A.   Okay.

Page 180

1       Q.   Is there any reason to think that you didn't
2   get the email?
3       A.   I probably got it.  I -- you know, I'm reading
4   this stuff and that -- we must have met with him or
5   something at some point.  I'm reading here.
6       Q.   Yep.  So, let's look at the second page -- the
7   middle of the second page.  It's an email dated
8   February 12, 2010.  And Jerry Mahabub wrote, "Hi Michael
9   and Vic, Great to see you both yesterday again ..."  Do
10  you see that?
11      A.   Yes, I'm reading it.
12      Q.   Okay.  So, he wrote that on February 12th.  So
13  does that reflect a meeting on February 11, 2010?
14      A.   I --
15      Q.   Is there any reason to think that's not the
16  case?
17      A.   It could be.  Your guess is as good as mine.
18  I'll take your word for this at this point.
19      Q.   Is there any reason to think that that email
20  is incorrect, that there wasn't a meeting in person on
21  February 11th?
22      A.   Right.  When did he write it -- so it would
23  have been the 11th, right.
24      Q.   Okay.
25      A.   Most likely.

Page 181

46 (Pages 178 - 181)

1 going to talk about is the Private Placement Memorandum
2 (indicating Exhibit-2). This has been marked as a prior
3 exhibit. I don't have a copy that has the prior stamp.
4     MS. HUGHES: Is this the March 15, 2010?
5     MR. AVENI: Yeah.
6     MS. HUGHES: I think we've marked it as
7 Deposition Exhibit --
8     MR. AVENI: -- 37?
9     MS. HUGHES: -- No. 2.
10     MR. AVENI: Oh, 2. You're right. I'm
11 sorry -- 2.
12     MS. HUGHES: I mean, there may have been an
13 Investigative Exhibit-37. But I believe we marked it
14 as --
15     MR. AVENI: No, no, you're right. I'm sorry,
16 I was mixing things up.
17     MS. HUGHES: -- Exhibit-2.
18     MR. AVENI: It's Exhibit-2. I just don't have
19 a stamped copy.
20     MS. HUGHES: And your Bates Stamp is GA004487?
21     MR. AVENI: Correct.
22     MS. HUGHES: Right. Then, that's already been
23 marked as Exhibit-2.
24     MR. AVENI: Right. So --
25     MS. HUGHES: I think we should refer to it as
Page 202

1 Deposition Exhibit-2.
2     MR. AVENI: 2. I agree. All I'm saying is,
3 maybe we should just swap this copy out at some point
4 down the road with the actual stamped copy. I just
5 wanted to make you aware. I know it's Exhibit-2. I'm
6 going to refer to it as Exhibit-2. I just wanted us to
7 be on the same page.
8     MS. HUGHES: Thank you.
9     MR. AVENI: Okay.
10     MR. HOLMES: Literally.
11     MR. AVENI: Literally on the same page. Okay.
12     Q. (By Mr. Aveni) So, this is -- I'm handing you
13 what's been marked previously as Exhibit-2, now that
14 we've established that. I've just given you the front
15 part. I have the rest of it here, which is all the
16 back --
17     A. Do you have this thing highlighted anywhere?
18 I mean, where do you want --
19     Q. I'm going to point you to one paragraph.
20     A. Okay.
21     Q. And, for convenience, I'm just giving you
22 that. I've got all the back-end attachments, if you
23 want it.
24     MR. ELTRINGHAM: Is the -- sorry. Just for
25 clarity, is the original Exhibit-2 this shortened
Page 203

1 version or is it the --
2     MR. AVENI: The whole thing. I'm happy to
3 hand that --
4     MR. ELTRINGHAM: Okay. No, that's fine. I
5 just wanted to clarify.
6     Q. (By Mr. Aveni) Okay. So if you go to
7 Page 21 --
8     MS. HUGHES: Does it have a different Bates
9 number on it?
10     MR. AVENI: No. It's GA487 -- is the first
11 page.
12     MS. HUGHES: But Page 21, you're --
13     MR. ELTRINGHAM: Yeah, which --
14     MS. HUGHES: -- using the numbers in the
15 center?
16     MR. ELTRINGHAM: -- Bates number?
17     MR. AVENI: Oh, I'm sorry. I'm using the
18 dockets in GA --
19     MR. HOLMES: 510.
20     MR. AVENI: -- 510, yes.
21     Q. (By Mr. Aveni) Okay. If you look at the
22 third and fourth paragraph on that page, that letter we
23 just read is of the same date and, I'll represent to
24 you, was distributed to shareholders with Exhibit-2 that
25 you're looking at.
Page 204

1     A. Mm-hmm.
2     Q. So, if you can just look at the third and
3 fourth paragraphs.
4     A. Pretty generous statements.
5     Q. Okay. So, I mean, if the LCEC is Apple, was
6 there anything in here that --
7     A. Well, it wasn't integrated. This little
8 expander was an app that you could download and you
9 can -- with a trial. And after the trial period, you
10 can buy it. So, it's a third-party application. It
11 wasn't fully integrated.
12     When I think of fully integrated, I'm thinking
13 that -- the way I take it -- I guess it could be --
14 depend on how -- how a large LCE comp -- LCEC -- what
15 were you saying -- LCEC company might call things. You
16 know, there's a -- there might be some common terms
17 they'd like to call third party as -- versus their own.
18     But, to me, that would be -- that Apple has
19 taken it on. And they're actually shipping it as part
20 of their product.
21     Q. Where do you see that?
22     A. They don't. I'm just saying -- well, it says,
23 "fully integrated" -- "... the LCE (sic) ... has now
24 fully (sic) successfully integrated the AstoundSound
25 Technology into several of the LCE's (sic) product to
Page 205

52 (Pages 202 - 205)

1  demonstrate ..." -- so, he's using the word
2  "demonstrate."
3  Q.  Right.
4  A.  Okay.  "Viability."
5  Q.  Well, that's accurate, right?
6  A.  That part is accurate, if it's a
7  demonstration.
8  Q.  Okay.  So --
9  A.  But --
10 Q.  -- assuming he's talking about a demonstration
11 here --
12 A.  Yeah, okay.
13 Q.  -- this is fair, right?  These two paragraphs
14 are fair and accurate, right?
15 A.  Yeah, I guess.
16 Q.  Okay.  You can put that aside.
17      Is there anything else in those paragraphs
18 that you have a problem with, that's --
19 A.  I --
20 Q.  -- inaccurate?
21 A.  -- I -- I could pick -- I don't know.  Maybe I
22 read it accurately more in detail.  But what -- what
23 should I be looking for?  Do you have a specific
24 question or area that you --
25 Q.  Well -- okay.  So if you look at the bottom

Page 206

1  paragraph, he says:  "It is unclear what structure such
2  access would take ..."  But he said -- so if there's a
3  deal ever done with the LCRC, he says:  "It is unclear
4  what structure such access would take ..."  But then he
5  sets out two possibilities -- if you read that,
6      I mean, those are the same two things he's
7  been saying to you throughout your discussions with him,
8  right?
9  A.  It's -- yeah.
10 Q.  Yes?
11 A.  Well, we never talked about acquisition.
12 Q.  I understand.
13 A.  So -- so, licensing arrangements -- automatic,
14 I mean, right?  And that doesn't even mean that somebody
15 is going to pay for it.
16 Q.  Sure.
17 A.  They might have a different business model for
18 that, but -- maybe it's advertising or marketing efforts
19 that they give away the software.
20 Q.  But the way it's written here isn't
21 inaccurate, is it?  It's accurate; is that fair?
22 A.  I'm going to say, yes, it's fine.
23 Q.  Okay.
24 A.  But I, you know -- to add that there's an
25 acquisition, they -- of course, it's not impossible.

Page 207

1  It's a -- it's a -- it's a small possibility, I guess.
2      MR. AVENI:  Okay.  You can put that aside.
3      THE WITNESS:  Okay.
4      (Exhibit-115 marked for identification.)
5  Q.  (By Mr. Aveni)  Okay.  So, again, the Bates
6  stamp on this document reflects that you produced this
7  to the SEC, right?
8  A.  I -- I'm going to take your word for it.
9  Q.  Okay.
10 A.  That's what it says there.  It probably did.
11 Q.  Okay.  So if you see at the bottom of Jerry
12 Mahabub's email to you, he says:  "I am sure the
13 executive will very much so enjoy hearing the attached
14 demo as well!!!  Trying to line you up with us much fire
15 power as possible so we get a green light to continue to
16 move forward!"
17      Do you see that?
18 A.  Yes.
19 Q.  So, we talked about this meeting.  First of
20 all, who's the "executive"?
21 A.  I would say, Joz -- Greg Joswiak.
22 Q.  Okay.  And Mr. Mahabub is using the term, "the
23 executive" here.  Is that a term that you told him?
24      I mean, do you know where the term, "the
25 executive" came from?

Page 208

1  A.  I -- I -- I -- I don't know.  But it's not an
2  unusual -- I'm -- I -- maybe he didn't know who it was.
3  I don't know.
4  Q.  And I'll represent to you, we'll go through a
5  series of emails talking -- using that term, "the
6  executive" or "the exec" --
7  A.  Yeah, I might have used it.
8  Q.  -- of Apple.  Do you remember using that term
9  with him?
10 A.  No, I don't remember.  I'm just saying, I may
11 have used it to not disclose who I was talking to.
12 Q.  Okay.  Okay.  So, at this time -- April 18,
13 2010 -- you have an upcoming meeting with the person you
14 refer to as the executive about AstoundSound?
15 A.  I'd have to look at a timeline.
16 Q.  I think we're going to see that the meeting
17 with Greg Joswiak was on May 6th.
18 A.  May 6.
19 Q.  During this time period, there seems to be a
20 series of emails where you talked about a big upcoming
21 meeting.
22 A.  That was it.
23 Q.  Okay.
24 A.  90 percent chance, that's probably the one.
25 Q.  So Jerry Mahabub here says, "Trying to line

Page 209

53 (Pages 206 - 209)

1 you up with as much fire power as possible so we get a
2 green light to continue to move forward!"
3     So, you guys talked about that meeting —
4   A. Right.
5   Q. -- with an executive, right?
6   A. Did I disclose who it was? I may have not.
7 I -- you know, why -- it's -- I don't need to tell him
8 that. It turns out it's probably a good idea.
9   Q. And you said the meeting was with Greg
10 Joswiak?
11   A. Yeah.
12   Q. And I think you referred to him as Joz?
13   A. Yeah.
14   Q. Is that how you called him?
15   A. Yeah, between friends.
16   Q. Joz?
17   A. Yeah.
18   Q. Was he known that way --
19   A. Yeah.
20   Q. -- around the company?
21   A. There was Woz, and there was Joz.
22   MR. HOLMES: Different -niaks.
23   THE WITNESS: Yeah, the ni -- that's correct.
24   MR. ELTRINGHAM: Easier reference.
25   Q. (By Mr. Aveni) So, you referred to here as
Page 210

1 the executive -- you're not sure if you told Jerry who
2 the executive was. Is it possible Jerry thought the
3 executive was Steve Jobs?
4   A. I --
5   MS. HUGHES: Objection.
6   A. That'd be a guess on my part.
7   Q. (By Mr. Aveni) Okay. You don't know one way
8 or the other?
9   A. No.
10   Q. So, who is Greg Joswiak -- at the time?
11   A. At the time he's vice president of iPod/iPhone
12 and -- that was probably it.
13   Q. In Marketing, right?
14   A. In Marketing, yeah.
15   Q. So, he's the VP of iPhone/iPod in Marketing?
16   A. Yeah.
17   Q. And he's a senior employee at Apple, right?
18   A. Right. But he's not -- he didn't report to
19 Steve Jobs.
20   Q. Who did he report to?
21   A. He reported to Phil Schiller, Senior VP Global
22 Worldwide Marketing -- or whatever intergalactic
23 marketing guru. I don't -- I don't know. He's been
24 there a long time.
25   Q. But, I mean, Greg Joswiak was a senior
Page 211

1 employee, right?
2   A. Yeah, he's been there forever.
3   Q. And he's not a mid-level engineer?
4   A. No.
5   MR. AVENI: Okay.
6   (Exhibit-116 marked for identification.)
7   THE WITNESS: Built out the org chart. Okay.
8   Where did you get this?
9   MR. AVENI: So, I got this from a -- I think I
10 got this from Fortune, as reflected on the bottom.
11   THE WITNESS: Oh, okay.
12   Q. (By Mr. Aveni) I assume you've never seen
13 this org chart before?
14   A. Not in this particular.
15   Q. Not in this form?
16   A. No.
17   Q. But my question to you is: This purports to
18 be an org chart around this time. Does it look accurate
19 to you generally?
20   A. Yeah, people come and gone. But let me -- let
21 me -- let me --
22   Q. You can find Greg Joswiak in the lower
23 left-hand quadrant.
24   A. Yeah.
25   MR. ELTRINGHAM: There we go.
Page 212

1   A. VP, iPhone Marketing. What's the date on it?
2   Okay. 2011. It might have been changed over -- yeah,
3   he might have dropped the iPod part of it.
4   Q. (By Mr. Aveni) Right.
5   A. Yeah, because it went -- the VP of iPad went
6 to somebody else.
7   Q. Is the reporting line that's reflected here
8 for Greg Joswiak, is that accurate?
9   A. Yeah, that's accurate.
10   Q. Okay.
11   A. As of 8 of 2011.
12   Q. Okay. Do you have any idea, around this time
13 frame, how many employees Apple had worldwide? Just a
14 broad estimate's fine.
15   MR. ELTRINGHAM: Which time?
16   A. At this time?
17   Q. (By Mr. Aveni) How about in May 2010?
18   A. I -- I'm going to take a guess -- 50,000.
19   Q. Wow. Okay.
20   A. I -- I -- I'm not sure. When I started at the
21   main -- at the main -- locally, I think we had like
22   7,000 employees.
23   Q. Okay.
24   A. 8,000. Mostly engineers.
25   Q. And the individuals on the org chart are the
Page 213

54 (Pages 210 - 213)

1   senior people?
2       A.   Yeah, it doesn't get any higher than that.
3           MR. AVENI:   Okay.   Fair enough.   Thank you.
4           MR. HOLMES:   Can we take five minutes?
5           MR. AVENI:   Okay.   Let's go off the record.
6       (Recess taken from 2:59 p.m. to 3:11 p.m.)
7           MR. AVENI:   We're back on the record.   And
8   let's mark this one.
9       (Exhibit-117 marked for identification.)
10      Q.   (By Mr. Aveni)   Okay.   So, we've looked at a
11  couple of emails.   I'll represent to you that there were
12  a number of emails -- I'm just skipping some of them,
13  for time's sake, to talk about the executive meeting or
14  the big meeting.   We've talked a bit about that.
15      A.   Mm-hmm.
16      Q.   I'm happy to show you more, if you need to see
17  them.   This email is dated -- Exhibit-117, it's dated
18  May 5, 2010.
19      A.   Mm-hmm, yes.
20      Q.   And you see Mr. Mahabub says, "Hi Vic, If you
21  would prefer, I can hop on a flight tomorrow night or
22  Thursday early morning and attend the presentation."
23  And you can see the subject is, "Re:  Thursday meeting."
24          Do you recall the big meeting, that we've been
25  talking about, with Greg Joswiak occurring on May 6,

Page 214

1   2010?   Does that fit within your recollection?
2       A.   That sounds about right.   Without getting any
3   other information in front of me, I don't --
4       Q.   And if you look at this email, Exhibit-117,
5   you see that Mr. Mahabub wrote it on May 5th.   But he
6   wrote it early in the morning.   So I think when he says
7   Thursday night, he's still in his head -- this is just a
8   guess on my part.
9       A.   Yeah.
10      Q.   I'm not trying to say this is the case.   But
11  I'm thinking maybe it was still May 4th in his mind?
12      A.   You know, out of all the emails you've asked
13  me, there's very few that I remember.   And I remember
14  getting this email and telling him it's not that kind of
15  meeting.
16      Q.   Okay.
17      A.   So, I'm assuming there's a follow-on --
18      Q.   No.   I just wanted to make sure that we were
19  in agreement that the meeting occurred on May 6th.
20      A.   Yes.
21      Q.   Okay.
22      A.   I -- you're going to show me in a minute.
23      Q.   Well, no.   I think I just wanted to know if
24  you agree with that.
25      A.   Yeah, for the time being, yes.   Unless I see

Page 215

1   something different that shows me differently --
2       Q.   Okay.
3       A.   -- I'll take your word for it.
4       Q.   You don't have any other reason to think it
5   was a different day, right?
6       A.   No.
7           MR. AVENI:   Okay.   Oops.
8           MR. HOLMES:   Glad it (indicating coffee cup)
9   was empty.
10          MR. AVENI:   It was empty.   We're good.
11          MS. HUGHES:   Let's take it off the table then,
12  if it's empty.   Thank you.
13          MR. AVENI:   You're welcome.
14      Q.   (By Mr. Aveni)   Okay.   So, what happened at
15  the meeting with Greg Joswiak?
16          Before we get to that, do you recall referring
17  to it with Mr. Mahabub as the big meeting?
18      A.   I do not recall that.
19      Q.   Okay.   But you thought it was a big meeting,
20  right?
21      A.   It was an important meeting.   Would I have
22  called it the big meeting?   Maybe.   I --
23      Q.   Okay.
24      A.   I --
25      Q.   We can go through it.

Page 216

1       A.   Yeah, I mean --
2           MR. AVENI:   I was trying to save us time,
3   but --
4       (Exhibit-118 marked for identification.)
5       Q.   (By Mr. Aveni)   Okay.   Exhibit-118 again has a
6   Bates stamp reflecting that you produced this, right?
7       A.   Mm-hmm.
8       Q.   Okay.
9       A.   Yes.
10      Q.   Is that a yes?   Okay.
11          And then you see the bottom line of your email
12  to Jerry Mahabub on that page, it says:  "We were able
13  to have our big meeting.   More soon."   Do you see that?
14          "Before Michael left, we were able to have our
15  big meeting."
16      A.   Oh, okay.   All right.   So --
17      Q.   Okay.   Does that refresh your recollection
18  that you refer to it as a big meeting with Mr. Mahabub?
19      A.   Okay.   I'll go with that.
20      Q.   Okay.   You can put that aside.   Now, what
21  happened at the big meeting?
22          So, first of all, who was there?   We know you
23  were there.   Greg Joswiak was there.   Michael Hailey was
24  there.   Was there anybody else?
25      A.   That's it.

Page 217

55 (Pages 214 - 217)

**Page 218**

1  Q.  Okay.  What happened at the meeting?
2  A.  We gave a slide presentation.  When I say
3  "slide presentation," it was probably on his computer --
4  laptop or desktop.  We had the devices, we had some
5  headphones, and we gave a demonstration -- meaning he --
6  A/B, the songs they liked, all scrolling back and forth
7  and --
8  Q.  Did he respond that he liked the technology?
9  A.  He -- he did respond.  And he generally
10  enjoyed the demonstration.  But that's not the hat he's
11  wearing.
12  Q.  Okay.  So, how did he respond?
13  The purpose of the meeting was to give a green
14  light to keep going forward; is that fair?
15  A.  Well, yeah, that's what we had -- we had
16  hoped.  But the -- you know, we could call it the green
17  light.  We're -- we're giving a presentation.  We're
18  springing this idea on him.  You know, does this person
19  make a quick decision, or does he take his time to make
20  that decision.
21  So, we're springing a brand new idea.  Greg
22  didn't know anything about it.  We just had to find some
23  time to set aside with him, find a hole in his -- in his
24  schedule.  It's Michael's last day.  And so that was --
25  It ended up that we tried to schedule a

**Page 219**

1  meeting.  And I think that we can only do it on the last
2  day.  And that was also kind of a parting -- you know,
3  farewell.
4  Q.  For Michael Hailey?
5  A.  For Michael Hailey.
6  Q.  Now, you said, "We've used the phrase 'green
7  light.'"  Jerry Mahabub was talking to you about this
8  meeting being a green light to keep moving forward,
9  right?
10  A.  Right.
11  Q.  And so it seemed like the two of you were
12  treating it kind of as a make-or-break meeting; is that
13  fair to say?
14  A.  That's fair to say.
15  Q.  Okay.  Now after the meeting took place on
16  May 6th, you guys did keep moving forward on the
17  project, right?
18  A.  No.
19  Q.  You didn't keep moving forward?
20  A.  No.
21  Q.  When you say no, what do you mean by that?
22  I mean, there was work that was still done
23  with Jerry Mahabub for a lengthy period of time after
24  May 6th, right?
25  A.  It may have been with Ron Isaac.

**Page 220**

1  Q.  Are you saying there was no work on the iPod
2  and iPhone side after May 6?
3  A.  I can't say 100 percent, but I believe at that
4  point we were dead in the water.
5  Q.  Did you ever tell that to Jerry Mahabub?
6  A.  I -- oh, he knew.
7  Q.  How did he know that?
8  A.  I think we called him up and said, "Hey,
9  we" -- I think one of -- maybe that's what he -- before
10  Michael left, we were able to have our meeting -- "more
11  soon."  Now, what I probably did -- and I'd have to find
12  an email or something like that.
13  But it -- it really -- the end result -- it
14  still ended in the same result, that we were not able to
15  convince his boss at the time that -- that this was a
16  viable option for -- let me give you the rundown, so
17  maybe we'll just get that out of the way.
18  Q.  Sure.
19  A.  The answer that we got was -- first of all,
20  software.  Is there going to be a royalty?  There's
21  certainly going to be a licensing arrangement,
22  regardless of whether or not somebody like Apple pays
23  for it or not.  Two -- so Greg is thinking on his level,
24  how do I sell this upstream, how -- because nothing
25  happens with one guy.

**Page 221**

1  Usually, it isn't one person making the
2  decision.  It's a committee.  At some point, it becomes
3  a committee decision.  And I don't know how many people
4  are in that committee.  I don't know who was involved in
5  a committee.  It's beyond my pay grade --
6  Q.  Okay.
7  A.  -- what happens behind closed doors.  But
8  they're trying to figure out -- does it expand the
9  market, does a customer -- when does a customer get out
10  of it.  And the other issue was -- that was discussed,
11  that's not thought of, is -- when you --
12  When you have the -- whatever kind of audio
13  file on your car stereo or wherever, you can adjust the
14  tone of the system by using the tone -- bass, treble,
15  whichever -- simple tone controls -- high/low.
16  What this software was doing is -- was
17  remixing the audio.  It's changing the presentation.  We
18  would have to go back to the labels and ask them for
19  permission to do that, even with a bypass mode, because
20  you're changing the -- the mix.
21  Q.  Okay.
22  A.  So, you have royalty -- who's paying for it,
23  it's going to expand the market, and any legal issues
24  that might be -- might happen.
25  Q.  So, I think you previously testified in your

56 (Pages 218 - 221)

1 prior testimony -- not today. I think you hit on it
2 today, but you previously testified that you needed
3 permission after this green light to keep spending
4 time --
5 A. Well --
6 Q. -- on this project?
7 A. Yeah, yes.
8 Q. And you did spend time after May 6th on this
9 project, right?
10 A. I -- I need proof to answer your question that
11 I did.
12 Q. Okay. We'll go through some of it.
13 A. I'm going to say -- I'm going to say that --
14 that I probably had to go back and tell -- and find
15 out -- let my -- let my boss know what happened at the
16 meeting, because I obviously -- I can't keep going,
17 so --
18 Q. Okay.
19 A. I -- I couldn't answer you. You know, as far
20 as I was concerned today, you're asking me a question,
21 that was the drop-dead date --
22 Q. Okay.
23 A. -- to get an --
24 Q. Well, let's go through some stuff. And we can
25 figure out if --

Page 222

1 A. But I helped the guys across the street.
2 Q. Okay.
3 A. I had no other place to go with it.
4 Q. Okay.
5 A. That I recall. Maybe you'll remind me.
6 MR. AVENI: I only have one copy of this.
7 MR. ELTRINGHAM: I can make copies real quick,
8 if you need.
9 MR. AVENI: You know, I'm just going to spend
10 a minute on it. If everybody's okay with that, I'll
11 just show it to you.
12 Are you okay with that, or do you want --
13 MS. HUGHES: What is it?
14 MR. AVENI: It's SEC-TiscarenoV-E-0001187.
15 MS. HUGHES: Does it have the date?
16 MR. AVENI: 6/30/2010.
17 MS. HUGHES: Would you mind making a copy?
18 MR. ELTRINGHAM: No.
19 MR. AVENI: Let's go off the record.
20 (Recess taken from 3:24 p.m. to 3:28 p.m.)
21 (Exhibit-119 marked for identification.)
22 MR. AVENI: We're back on the record.
23 Q. (By Mr. Aveni) So, Exhibit-119 -- so, the top
24 is an email from you to Jerry Mahubub dated June 30,
25 2010. And you say, "Hi Jerry, I have a meeting

Page 223

1 tomorrow. Is the the" -- I think you meant, "Is this
2 the latest and greatest prezo to date" -- by "prezo,"
3 you mean presentation, right?
4 A. Yeah.
5 Q. Okay. So you're telling him you have a
6 meeting the next day, which would be July 1st, and
7 you're asking if the presentation here is up-to-date?
8 A. Slide stack.
9 Q. Okay. So what was the meeting that you had on
10 July 1st, do you remember?
11 A. It -- it might have been with a colleague.
12 You know, the presentation was a slide stack of -- of
13 a -- graphics and --
14 Q. So, you're --
15 A. -- lots of --
16 Q. -- still spending lots of time on the project
17 after May 6th, right?
18 A. Well, that's what it says here. But, you
19 know, I don't know how much more technical time we spent
20 on it.
21 Q. Okay. But you're spending time on it, is my
22 point.
23 A. Yeah. Let's look further down the road.
24 Maybe that's -- maybe I'm helping out Ron Isaac. I
25 don't know.

Page 224

1 Q. You don't know?
2 A. I don't know.
3 Q. Okay. Now, when you -- so after the meeting
4 with Greg --
5 A. Joswiak, yeah.
6 Q. -- Joswiak -- I mean, I will represent to you
7 that we have not seen any email where you talked to him
8 about the result of that meeting.
9 A. Yeah, there wasn't any communication. It was
10 him to Michael, Michael to me, as far as I --
11 Q. I'm sorry, who to Michael?
12 A. Well, I -- I only got the verbal. Michael
13 Hailey.
14 Q. Okay.
15 A. Okay. Sorry.
16 Q. Are you saying that Michael Hailey told Jerry
17 the --
18 A. Yeah.
19 Q. -- results of the meeting?
20 A. No, no. Told me.
21 Q. Yep.
22 A. And I probably told Jerry.
23 Q. Okay. So, you say you probably told Jerry?
24 A. Yeah, probably. I don't know.
25 Q. Do you know?

Page 225

57 (Pages 222 - 225)

1      A.  I don't know.  I don't know.
2      Q.  Do you recall ever sending him an email about
3  the results of the meeting?
4      A.  I don't recall any of them.
5      Q.  So --
6      A.  Yeah.
7          MR. AVENI:  Okay.
8          MR. ELTRINGHAM:  I think he may have said
9  earlier a phone -- it might have been a phone call.
10         MR. AVENI:  Yeah.  But he's saying he doesn't
11 remember.
12     Q.  (By Mr. Aveni)  If you don't remember --
13     A.  I don't remember.  I mean, it could be any
14 number of things.  I do know internally myself that
15 what -- what our meeting was all about -- we had a
16 follow-up meeting with -- that had nothing to do with
17 this.  And I don't know if this has to do with that --
18 is --
19         There was a meeting, where Jerry was still
20 working with Ron Isaac across the way.  And -- and I
21 made the -- made a statement or suggested to him that --
22 and this is for an iMac.  So, you know what those look
23 like.  They're flat screen -- speakers are on -- coming
24 out -- blasting out the bottom -- stereo -- left
25 channel, right channel -- reflect off the table.

                                            Page 226

1          At the time -- adding that -- people were
2  starting to watch movie on their -- on their displays,
3  you know.  They were getting a lot better.  Some people
4  were using them as their TV.  So, it was not out of the
5  question to have that be your -- the -- the stereo
6  system or the sound, you know, instead of having a sound
7  bar that -- this would be -- a better sound could be
8  made on the iMac.
9          So I suggested, "Hey, Jerry, you know, you
10 can -- you know, you got the sound expander.  It's hard
11 to control that sound just out of two speakers.  You're
12 trying to create a full surround -- 5.1 system with --
13 with just two speakers."
14         He says it's -- and the voices walking all
15 over -- you know, for the center channel -- is walking
16 all over.  You've got this phantom center.  "It'd be
17 better if you come up with -- can you come up with
18 something that's a left channel, center channel, and
19 right channel?"
20         And so he worked on -- and he got this metal
21 box.  He got three little computer-type desktop speakers
22 about the size of this cup -- coffee cup.  And he
23 created an LCR -- left, center, right -- channel
24 system that would take the expanded signal and run it
25 through these --

                                            Page 227

1          And we would get a more immersive, more
2  accurate sound field.  And so he worked on that very
3  hard.  We had this meeting, and I had -- I invited some
4  colleagues, some friends -- people that might be
5  interested in -- in the -- in the product.
6      Q.  Okay.  But you don't remember what you told
7  Jerry, if anything, about the Greg Joswiak meeting,
8  right?
9      A.  I don't remember anything.  I don't have
10 anything to back it up with, the --
11         MR. AVENI:  Okay.  Let's mark that one as
12 Exhibit-120.
13         (Exhibit-120 marked for identification.)
14     A.  One of the things I want to mention to you --
15 if I may go back -- is that it's not always Apple policy
16 to talk about an internal discussion, tell them -- you
17 know, the most that we would say is, "Hey, it's been
18 great.  Thank you very much."
19         But to say that the executive didn't -- the
20 executive didn't like it or any of their gut feelings
21 -- we just wouldn't probably say that.
22     Q.  (By Mr. Aveni)  Okay.
23     A.  We'd say, "Hey, it's -- you know,
24 it's -- this is where we're going to have to stop.  And
25 thank you very much."  And if they ask -- you know, it

                                            Page 228

1  just depends -- but generally try not to discuss
2  internal business with an -- outside vendors.
3      Q.  So, as far as you know, you didn't discuss --
4      A.  I --
5      Q.  -- the meeting?
6      A.  -- I don't know.
7      Q.  Okay.
8      A.  I'm -- I'm just -- all I'm saying is, is
9  that --
10     Q.  That's a possibility?
11     A.  -- that may have -- that's a possibility, that
12 we -- but if you're asking what I did, which is what
13 I've told you, is that I -- I knew that for us -- that
14 was the end of the road for us.
15     Q.  So, in your head, you knew that was the end of
16 the road.  You just don't know --
17     A.  I don't know if I expressed that --
18     Q.  -- what you communicated to Jerry, if
19 anything?
20     A.  Right.
21     Q.  Okay.
22     A.  So, my -- I continued to expose my friends to
23 the product in other departments.  And that basically
24 was probably the -- and that may have been what I
25 said -- I mean, again, trying to reconstruct what

                                            Page 229

                                58 (Pages 226 - 229)

1    MR. AVENI: Okay. Okay. Let's mark this one.
2    (Exhibit-129 marked for identification.)
3    Q. (By Mr. Aveni) Okay. This is another email
4    chain from September 2010. And you produced this
5    document as well, right?
6    A. Yes.
7    Q. Okay. If you look at the second page of this
8    email -- it's real short -- Mr. Mahabub writes: "I can
9    really feel that 2011 will be a very transformational
10   year for my company."
11       Did you understand Mr. Mahabub to mean by
12   that, that he thought a deal with Apple would be
13   consummated in 2011 -- would be a successful year for
14   GenAudio -- do you know?
15       MS. HUGHES: Object to the form of the
16   question. It calls for speculation.
17   A. I don't know.
18   Q. (By Mr. Aveni) What did you understand him to
19   mean there?
20   A. Another sales promotional statement.
21   Q. Okay. Did it appear to you that Mr. Mahabub
22   believed that a possible deal with Apple was still very
23   much alive at this point?
24   A. If you're asking for my opinion on it, sure,
25   why not. But I -- we had no definite -- definitive

Page 250

1    statements that were ever made on that.
2    Q. Okay.
3    A. It was just another sales pitch. I mean,
4    there's lots of them.
5    Q. But, I mean, he still seemed to believe that
6    things were still moving forward in a way that was
7    optimistic for him, right?
8    A. Yes.
9        MS. HUGHES: Object to the form of the
10   question.
11   Q. (By Mr. Aveni) He was still optimistic, it
12   seemed from what he was writing to you, that a deal
13   could still be reached?
14   A. Well, we -- to answer your question, yes, I
15   think so.
16   Q. Okay.
17   A. We had run through the one process with the
18   i -- with the i-touch. We had that meeting. I started
19   a relationship, by introduction to Ron Isaac's team.
20   And that's basically the focus of -- of this. I -- I
21   mean, I don't think there's any more -- any more work on
22   what I had originally intended.
23   Q. Was the meeting that you were arranging with
24   Andrew Bright and Barry Corlett, did that relate to the
25   iPod/iPad side of Apple as well or was it just the Mac

Page 251

1    side?
2    A. Just the Mac side. But there's -- there's
3    people that would be interested in -- other audio groups
4    or marketing or whatever. Again, trying to raise
5    awareness, perhaps gain a little traction with --
6    somebody -- somebody says, "Wow, I can use that."
7        Again, trying to sell it internally. You
8    know, the fact that the people I tried to go to -- to
9    see if we could raise awareness on it and get them --
10   you know, was kind of shut down there. Nowhere to go
11   there. But maybe in Ron's division, they like it.
12   Q. Okay.
13   A. And it was actually a little bit different
14   software, so I could see where he might feel like
15   there's still a chance.
16       MR. AVENI: Okay. Let's mark this one.
17       (Exhibit-130 marked for identification.)
18   Q. (By Mr. Aveni) Okay. This is another
19   document that you produced, right?
20   A. Yeah, see everything is about the LCR.
21   Q. This is another document that you produced?
22   A. Yes.
23   Q. Okay. And so first -- so if you look at the
24   bottom of the first page, Mr. Mahabub is writing about
25   meeting with you on September 16th. And then at the top

Page 252

1    of that page, he says he's coming down to deliver an
2    iPad with the new app. Do you see that?
3    A. Yes.
4    Q. Okay. Did you meet with him on September
5    16th?
6    A. Uh --
7    Q. As far as you know?
8    A. As far as I know.
9        MR. AVENI: Okay. I'm going to reflect that
10   on Exhibit-82. Okay.
11   Q. (By Mr. Aveni) Now he's talking about an app
12   on the iPad. Does that reflect any work that's been
13   done on the iPad side, on this date?
14   A. I'll take an assumption that that's true.
15   Q. Okay. So, you think yes?
16   A. Yes.
17   Q. Okay.
18   A. Now, what I think we discussed on that is that
19   the app was not necessarily for demonstration; but it
20   was a working tool. Let me explain the difference.
21   Q. Okay.
22   A. When we started off our conversation earlier
23   this morning, we talked about an arcane user interface.
24   You had to key in all -- a numerical key to move the
25   volume up or down. If you wanted to go up in volume,

Page 253

64 (Pages 250 - 253)

1　you go from 5 to 10. And that's the way the original
2　app was, that GenAudio developed.
3　　A.　I -- I suggested to GenAudio that they create
4　a -- a tool set, meaning a user interface that got rid
5　of all that stuff, and use a graphical interface -- one
6　that literally moved -- whether it's a slide bar
7　and with a graphical representation. And -- and they
8　did. And that might be what that is.
9　　Q.　Okay. So why were you doing that work around
10　this time frame, September 2010?
11　　A.　It was a suggestion to GenAudio that they
12　would gain huge benefit for all teams -- whether it was
13　at Apple or even outside -- that he should work on this
14　because it makes it easier to sell the product.
15　　Q.　Okay.
16　　A.　To us, or to anybody else. Because you
17　could -- you can dynamically and graphically adjust the
18　volume --
19　　Q.　I --
20　　A.　-- or adjust -- adjust -- so, it was -- it was
21　just a suggestion to him. He did it. And that's -- and
22　he maybe wanted to show it to me.
23　　Q.　And just --
24　　A.　I mean, I -- I'd forgotten exactly all --
25　　Q.　Just to be clear, you're -- and I may have
Page 254

1　missed this. You're not sure, one way or the other, as
2　to what this email -- whether this email relates to what
3　you just explained, right?
4　　A.　I'm not 100 percent sure, but it sounds like
5　it.
6　　Q.　Okay.
7　　A.　Because it says, "new app." And I know we've
8　asked him about that before. So, I'm kind of jumping
9　into it with that one.
10　　Q.　Okay. Now, the bottom of Page 2, you're
11　writing to Jerry Mahabub. And you say, "I have
12　tentatively set up a meeting for Thursday, September
13　23rd." Do you see that?
14　　A.　Okay.
15　　Q.　And that's the meeting with Andrew Bright and
16　Barry Corlett; right?
17　　A.　Okay.
18　　Q.　Is that right?
19　　A.　Probably.
20　　Q.　Okay. And that meeting took place, right?
21　　A.　Yes.
22　　MR. AVENI:　Okay. So, I'm going to reflect
23　that on Exhibit-82 as well. Okay. You can put that
24　document away.
25　　(Exhibit-131 marked for identification.)
Page 255

1　　Q.　(By Mr. Aveni) And this is another document
2　that you produced, right?
3　　A.　Mm-hmm, yes.
4　　Q.　Okay. And you wrote this -- I'm sorry --
5　Mr. Mahabub wrote this email the day after the meeting
6　with Andrew Bright and Barry Corlett?
7　　A.　Yes.
8　　Q.　Okay. If you go to the bottom of Page 2,
9　there's a paragraph that starts, "Lastly ..." Do you
10　see that?
11　　A.　Yes.
12　　Q.　Okay. I'm just going to read a bit of that;
13　not the whole thing. It says: "Lastly, we will need to
14　either go under a more serious development agreement for
15　us to give Apple our real deployment level SDK (not the
16　test level SDK you have already received).
17　　"Given that Barry stated it would be easier
18　for us to give our SDK to Apple so Apple could then
19　integrate and point to the iTunes Music library, as
20　opposed to Apple giving us an API to do this on our end
21　(which would actually have been the easiest pathway), I
22　will put together an SDK license agreement for Apple to
23　review and sign as the current NDA between our companies
24　is not strong enough to cover both sides of the fence."
25　　Do you see that?
Page 256

1　　A.　Yes.
2　　Q.　So, do you recall a discussion about a heavier
3　NDA in this time period?
4　　A.　No. But I'm reading it.
5　　Q.　Okay. Do you recall what the -- if there was
6　any further discussion about another NDA after this
7　email?
8　　A.　No, I don't know.
9　　Q.　Now, I think you previously testified the
10　meeting with Andrew Bright did not go great because
11　there was a disagreement that occurred during the
12　meeting; is that --
13　　A.　That's correct.
14　　Q.　-- fair?
15　　A.　That's correct.
16　　Q.　Okay. Thank you.
17　　A.　Sorry.
18　　Q.　But after that meeting you still kept working
19　with Jerry on the project, right?
20　　A.　I -- I'm not sure. I don't know -- I mean,
21　we're going to -- I don't know the follow-ups --
22　follow-up emails are.
23　　Q.　You don't recall one way or the other?
24　　A.　No.
25　　Q.　Okay.
Page 257

65 (Pages 254 - 257)

Page 258

1    A.  I think I -- I think I -- I think I responded
2  to this general time -- because of all this.  I mean, he
3  was rather insulting on some of his -- suggesting books
4  that -- and trying to educate Mr. Andrew Bright on
5  something that Andrew Bright know very well --
6  well-versed in it.
7    Q.  But it appeared that Jerry Mahabub still
8  thought that a deal could be reached, right?
9    A.  I -- I -- I don't know what he was thinking.
10   Q.  Okay.  Is there any reason to think that he
11  didn't believe that?
12   A.  I don't know what he's -- I don't know what he
13  was thinking, I mean, you know.
14   Q.  You continued to act enthusiastic about the
15  possibility of the transaction with Apple, right?
16   A.  I -- I don't remember that far back.
17       MR. AVENI:  Okay.  You can put that aside.
18       (Exhibit-132 marked for identification.)
19   Q.  (By Mr. Aveni)  Okay.  This is another
20  document that you produced, right?
21   A.  Yes.
22   Q.  Okay.  So, the bottom part of this email,
23  you're writing to Jerry Mahabub.  And you say:  "Thanks
24  for updating the software.  By the way (sic), I
25  discovered a small bug in the iPod SW."

Page 259

1    Do you see that?
2    A.  Yes.
3    Q.  And then the next page, Jerry is saying to
4  you:  "We just wrapped up with debugging and have fixes
5  for both iPad and iPod apps for 4.2."  Do you see that?
6    A.  Yes.
7    Q.  Does this reflect that there was still some
8  more work being done on the iPad and iPod side?
9    A.  That's what it says here.
10   Q.  Okay.
11   A.  Not sure what I was using it for, other than
12  keeping it handy.
13   Q.  Okay.  Then, at the top, Mr. Mahabub writes to
14  you:  "Hi Vic, I am heading your way in about 30
15  minutes!"  Do you recall meeting with Mr. Mahabub on
16  December 1, 2010?
17   A.  I recall something about him -- one of his
18  guys having an issue that required med -- medical
19  attention, but I don't know if it was 12 -- December
20  1st.  I'll take it --
21   Q.  Okay.
22   A.  -- that that's what happened on that day, at
23  that time, at that hour.
24       MR. AVENI:  All right.  I will reflect the
25  meeting on Exhibit-82.  You can put that the aside,

Page 260

1    (Exhibit-133 marked for identification.)
2    Q.  (By Mr. Aveni)  Okay.  This is another
3  document produced by you, right?
4    A.  (No response.)
5    Q.  This is another document that you produced as
6  well, right?
7    A.  Yes, according to this.
8    Q.  Okay.  So, at the top, Jerry Mahabub writes to
9  you that they just finished filing some new patent
10  applications.  And he says:  "... as a direct result, I
11  can now update the iPad/iPod and Mac side apps with the
12  new processing that solves many issues that we had with
13  the current implementations you have."  And then he
14  talked about that a little further.
15   A.  Yes.
16   Q.  Does this reflect that there was additional
17  work being done on the iPod and iPad side?
18   A.  Yes.
19       MS. HUGHES:  Object to the form of the
20  question.
21       When you say, "more work being done," are you
22  referring to work that Mr. Tiscareno is doing and Apple
23  is doing, or are you referring to work that GenAudio is
24  doing?
25       MR. AVENI:  The i -- I'm referring to the

Page 261

1  iPod/iPad side of the project, which is what I think
2  we've generally been talking about.  Whether it's being
3  done --
4        MS. HUGHES:  Do you mean what is Apple doing
5  on that side of the project?
6        MR. AVENI:  Either one.  I think it's a -- I
7  think it was described as a collaboration.  And so are
8  they working together to do additional work on the
9  iPod/iPad side.  That's what I mean by that.
10       MS. HUGHES:  Mr. Tiscareno, have you
11  understood that in these questions?  When he's asked
12  you, is more work being done on the iPad/iPod project,
13  that he's meaning is Apple working on it?
14   A.  If I go back -- to answer your question, if I
15  go back three or four months in these emails, I don't
16  know what I was doing at that time with the iPad.
17  There's a point where things had stopped on what I was
18  trying to do.
19       Now, the fact that they are still being
20  updated, it might be that we kept them there in case
21  somebody came in -- I could show them.  We wanted to
22  keep a fresh unit.  But there was no -- I don't think
23  there was any further demonstration to any specific
24  team.
25   Q.  (By Mr. Aveni)  But you were still interacting

66 (Pages 258 - 261)

1  with Mr. Mahabub with regard to the iPod/iPad side of
2  the project?
3     A.  Based on the emails, yes, he was updating the
4  the software.  What we were doing with them after he was
5  updating them, that I couldn't tell you.
6     Q.  But you were still looking at them, right?
7     A.  Yeah.  Was it putting them on my desk up on a
8  cabinet?  I couldn't answer your question.  But,
9  obviously, from this -- he's updating the hardware we
10  had kicking around the office.
11    Q.  As far as you can tell, he still thought there
12  was work that --
13    A.  Well --
14    Q.  -- was valuable for him to do on the project,
15  right?
16    A.  I don't know what he was thinking.
17    Q.  Fair enough.  Okay.  So then, in the middle of
18  the page, he says: "I was hoping to have Apple products
19  with our tech inside by now ... perhaps with these
20  updates we will be working on for you, we can finally
21  cross the bridge and ink an actual license deal."
22       Did you understand him to be saying he's
23  hoping for an actual license deal in connection with
24  iPod and iPad, as well as the Mac side?
25    A.  He said that almost on every single email, so
                                                    Page 262

1  I -- it -- it probably was lost on me -- making that
2  statement.
3     Q.  But is it fair to say that he's --
4     A.  He's obviously trying.
5     Q.  -- he's trying to sell a deal and still thinks
6  there could be a deal on the iPod/iPad side, right?
7     A.  It's what it says there, yeah.
8     MR. AVENI:  Okay.
9     MS. HUGHES:  David, before you move on, just
10  where -- I guess, that's in the middle of the -- middle
11  paragraph, is that where that is?
12    MR. AVENI:  Yes, right smack-dab in the middle
13  of the paragraph.
14    MS. HUGHES:  Thank you.
15    MR. AVENI:  Sure.
16    (Ms. Voorhees exits the room.)
17    (Exhibit-134 marked for identification.)
18    Q.  (By Mr. Aveni)  Okay.  And you produced this
19  document as well, right?
20    A.  Hmm.  Yeah.
21    Q.  Okay.  Now, at the top of this document, you
22  write: "The demo has been switched to Monday.  What
23  should I do?  I'm still tweaking my demo with the unit I
24  have here."
25       This is dated January 26, 2011, right?
                                                    Page 263

1     A.  Yes.
2     Q.  Do you recall, does this reflect that you were
3  making a -- showing a demo to somebody within Apple,
4  around this time frame?
5     A.  That's what it says there.
6     Q.  Do you know who the demo was to there?
7     A.  I don't know who it was to.
8     Q.  Do you know whether the demo would have
9  related to the Mac side or the iPod/iPad side?
10    A.  I don't -- I don't have any idea.
11    Q.  You can't tell?
12    A.  I can't tell.
13    Q.  But you're still doing something connected to
14  the project in this time frame; is that right?
15    A.  I'm going to say, according to this, yes.
16    Q.  Okay.  And then if you look at the second half
17  of the email, Jerry Mahabub writes to you -- in the
18  paragraph that starts with, "Unfortunately not ..."
19       After that, it says: "Just send me your iPad
20  when the demo is over to the following address ..."  Do
21  you see that?
22    A.  Sure.
23    Q.  So, does that mean that the demo relates to
24  the iPad?
25    A.  I don't know.
                                                    Page 264

1     Q.  It seems that way, though, right?
2     A.  It seems that way.  Now, I only have another
3  week or so at Apple.  So what was I doing at that time,
4  that late?  I -- I have -- I've forgotten.
5     MR. AVENI:  Okay.
6     (Exhibit-135 marked for identification.)
7     Q.  (By Mr. Aveni)  Okay.  This is another email
8  you produced, right?
9     A.  Yes.
10    Q.  Okay.  Now, this is as you're leaving Apple;
11  is that right?
12    A.  Yes.
13    Q.  And you left Apple the next day, right --
14  February 2, 2011?
15    A.  Yes.
16    Q.  Okay.  So, you write here: "Hi Jerry.  I'd
17  like to introduce you to my manager, Jesse Dorogusker."
18  And then a little further down you say: "Jesse is fully
19  aware and engaged with the project that you and I worked
20  on for so long together using your GenAudio DSP software
21  and team."
22       Do you recall that?
23    A.  Yes.
24    Q.  Okay.  So you told Jerry, Mr. Dorogusker was
25  fully aware and engaged in the project?
                                                    Page 265

                                          67 (Pages 262 - 265)

1    A.  Right.  He gave me authorization to work on
2  this.
3    Q.  Okay.
4    A.  He didn't physically work on it.  He didn't --
5  he didn't get involved, but my boss knew I was working
6  on it and expending energy on it.
7    Q.  And you're telling Jerry Mahabub that he's now
8  taking it over, and he's fully aware and engaged in
9  connection with it, right?
10    A.  He knows that -- what the project is about --
11    Q.  Yep.
12    A.  -- what he's been doing, and that I'm leaving
13  the product with -- with my manager, which later on --
14  chase him down, but --
15    Q.  So, looking at this email, is it fair to say
16  that Mr. Mahabub would have believed that Apple remained
17  interested in continued work on this project?
18      MS. HUGHES:  Object to the form of the
19  question.
20    A.  I -- I don't know.  It was -- you know, I -- I
21  left.  And I don't know what they did after I left.
22    Q.  (By Mr. Aveni)  Okay.
23    A.  He's with Ron Isaac, you know.  He's still
24  engaged over there, you know.  He had introductions.  He
25  had lots of email addresses and --

Page 266

1    Q.  Was your intent, in writing this, to say,
2  "Jesse Dorogusker is taking over.  Don't worry.  He's
3  got the ball, and he's going to run with it"?  Is that
4  effectively what you're trying to say?
5    A.  I -- I think -- I mean, the way -- I know when
6  I wrote it, most likely -- "Hey, I left the three units
7  that are owned by GenAudio with my boss."  That's what I
8  was saying.  "And I'm leaving."
9    Q.  Okay.
10    A.  I mean, there wasn't anything -- it may have
11  left a little bit -- a little range in there, but that
12  was -- you know, I was not writing a poison pen.  He
13  may -- I was just saying, "Hey, been nice working with
14  you."
15    Q.  So, we've gone through a lot of emails.
16    A.  Yes.
17    Q.  We've talked about, I think, a decent number
18  of meetings.  You've already testified again about the
19  number of phone calls you have and so forth.
20      Is it fair to say that, ultimately, there were
21  fairly extensive discussions with GenAudio in connection
22  with this project?
23    A.  Yes.
24    Q.  And you invested a considerable amount of time
25  into it, right?

Page 267

1    A.  Well, I probably spent a lot of time writing
2  emails.  It wasn't that much time, honestly.
3    Q.  But, I mean, it was a significant investment,
4  right?
5    A.  My investment was -- was the emails in --
6  discussion on what to do next and -- and -- and
7  generate, you know, work with a slide deck with Michael
8  Hailey -- meet on that -- yeah.  But when I work on a
9  project -- we're talking about intensive, intensive
10  work.  You know -- slide-the-pizza-under-the-door kind
11  of stuff.
12    Q.  Okay.
13    A.  Day and night.
14    Q.  Ultimately, we've --
15    A.  So, this is not that.
16    Q.  Ultimately, we've seen a lot of emails about a
17  lot of different meetings.  Is it fair to say you showed
18  GenAudio to a lot of Apple employees by the end of this
19  time period, when you left Apple, right?
20      MS. HUGHES:  Object to the form of the
21  question.
22    A.  He was introduced --
23    Q.  (By Mr. Aveni)  I was referring --
24    A.  He was introduced to a significant number of
25  Apple employees during the course -- and -- and your

Page 268

1  question is?
2    Q.  I just wanted to ask whether it's fair to say
3  that you demonstrated GenAudio's technology to a lot of
4  Apple employees while you were at Apple?
5    A.  Yes.  And the email list kind of proves that
6  out.
7    Q.  Okay.  Now, in your previous testimony, during
8  the SEC investigation portion of the case, you mentioned
9  that the GenAudio software was loaded onto two different
10  kinds of devices -- an iPad and an iPod touch -- is that
11  right?
12    A.  That's correct.
13    Q.  And you said it was loaded on there while the
14  testing and the development was ongoing.  And you
15  mentioned that those devices belong to GenAudio rather
16  than Apple?
17    A.  That's correct.
18    Q.  Is there some significance, in your mind, as
19  to who owned the devices?  Does it matter who owns it?
20    A.  We didn't supply him with the software.  We --
21  I didn't have permission to cede devices to GenAudio.
22  Sometimes we do that.  We'll -- we'll cede a -- you
23  know, give equipment -- with a little contract that cede
24  the business.
25      And we didn't have that kind of

Page 269

68 (Pages 266 - 269)



1   MR. HOLMES: Do you agree?

2   MS. HUGHES: I do agree.

3   MR. AVENI: Okay. We're off the record.

4   (Deposition concluded at 6:46 p.m.)

5   (Signature reserved.)

6   -----

Page 346

---

CERTIFICATE

STATE OF WASHINGTON )
                     ) ss.
COUNTY OF KING       )

I, the undersigned Washington Certified Court Reporter, hereby certify that the foregoing deposition upon oral examination of VICTOR TISCARENO was taken stenographically before me on December 16, 2016, and transcribed under my direction;

That the witness was duly sworn by me pursuant to RCW 5.28.010 to testify truthfully; that the transcript of the deposition is a full, true, and correct transcript to the best of my ability; that I am neither attorney for nor a relative or employee of any of the parties to the action or any attorney or counsel employed by the parties hereto nor financially interested in its outcome.

I further certify that in accordance with Washington Court Rule 36(e), the witness is given the opportunity to examine, read, and sign the deposition within thirty days upon its completion and submission unless waiver of signature was indicated in the record.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of December, 2016.



_____
Washington Certified Court Reporter No. 3337
License expires June 4, 2017.

Page 348

---

SIGNATURE

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the CHANGE SHEET page hereof.

        Signed in _____,

Washington, on the _____ day of _____,

2016.



        _____
        VICTOR TISCARENO
        TAKEN: December 16, 2016

Page 347