# EXHIBIT 198

Memorandum No. _____     Name: _____

## Confidential Private Placement Memorandum

# GENAUDIO, INC.

### UP TO 1,000,000 SHARES OF COMMON STOCK
### $3.00 PER SHARE



## AGGREGATE OFFERING AMOUNT: $3,000,000

THESE SECURITIES HAVE NOT BEEN REGISTERED WITH OR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY SUCH STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PRIVATE PLACEMENT MEMORANDUM. THIS PRIVATE PLACEMENT MEMORANDUM DOES NOT CONSTITUTE AN OFFER IN ANY JURISDICTION IN WHICH AN OFFER IS NOT AUTHORIZED.

The Information Contained Herein is Confidential and Intended Only for the Entity or Person to Which or Whom It is Given to or Transmitted Electronically.

March 15, 2010

EXHIBIT _____2_____        PLTF. _____
                           DEFT. _____
WITNESS _Devine_
CONSISTING OF _148_ PAGES
DATE _7-19-16_
BEHMKE REPORTING AND VIDEO SERVICES, INC.



GA000487

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## 1,000,000 Shares of Common Stock

# GENAUDIO, INC.

GENAUDIO, INC. ("we", "us", "the "Company" or "Gen Audio") is offering up to one million (1,000,000) shares of its common stock at $3.00 per share (the "Shares" or "Common Stock") subject to the Company's over-allotment right to sell up to an additional 250,000 Shares in its sole discretion depending on demand. The minimum investment is 10,000 Shares, or $30,000; provided, however, such minimum investment may be waived by the Company on an investor-by-investor basis. *See* "SUMMARY OF THE OFFERING."

The Company shall have the right, in its sole discretion, to accept or reject any subscription and funds received, in whole or in part. Upon return of any rejected subscription (or portion thereof) to a prospective investor, without any deduction therefrom or interest thereon, the Company shall have no further obligation to such prospective investor with respect to the rejected subscription amount.

**INVESTMENT IN THE SHARES IS SPECULATIVE. THUS, PROSPECTIVE INVESTORS SHOULD CAREFULLY REVIEW AND CONSIDER THE MATTERS DESCRIBED UNDER "RISK FACTORS" AND SHOULD CONSIDER SUCH RISKS CAREFULLY BEFORE ACQUIRING THE COMPANY'S SECURITIES. INVESTORS MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME AND A TOTAL LOSS OF THEIR INVESTMENT.**

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION NOR ANY OTHER REGULATORY BODY HAS APPROVED OR DISAPPROVED THESE SECURITIES OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

## SUMMARY OF SUBSCRIPTION PROCEDURES

The prospective investor (the "Investor") who is the direct recipient of this Confidential Private Placement Memorandum ("Memorandum") has received herewith a subscription agreement ("Subscription Agreement") for subscribing to purchase Shares as set forth on Exhibit A hereto. To subscribe for Shares, an Investor must complete, execute and deliver to Company the following items: (i) one copy of the executed pages of the Subscription Agreement, including any exhibits thereto, by means of which the Investor shall subscribe to purchase Shares; (ii) to comply with the "Patriot Act," a copy of each Investor's driver license (front and back) or passport photo page; and (iii) a check or wire transfer payable to the Company for that number of Shares for which the investor wishes to subscribe, which amount will be deposited into a segregated account established for the Offering until the Company has accepted to rejected such subscription, in whole or in part.

Subscriptions for the purchase of Shares may be accepted by the Company as received, and there is no minimum number of Shares for which subscriptions must be received prior to the use of any offering proceeds by the Company and the subscription proceeds may be released to the Company at any time. Any subscriptions not received and accepted by the Company by May 31, 2010 (the "Termination Date"), shall be deemed refused and the Company shall return the full amount of the subject Investor's cash payment, without interest or deduction; however, the Company may elect to extend the Termination Date for a period not exceeding ninety days. The Company shall have the right to reject any subscriptions received, in whole or in part, at its sole discretion, whether or not the Offering is oversubscribed. *See* "*SUMMARY OF THE OFFERING*."

---

**GENAUDIO INC.**
**PRIVATE PLACEMENT MEMORANDUM**

**CONFIDENTIAL**
**DO NOT COPY**

**GA000488**

# TABLE OF CONTENTS

LEGENDS ............................................................................................................................1

JURISDICTIONAL STATEMENTS .....................................................................................2

FORWARD LOOKING STATEMENTS .................................................................................5

INVESTOR SUITABILITY STANDARDS ..............................................................................6

SUMMARY OF THE OFFERING .........................................................................................7

BUSINESS OF THE COMPANY .........................................................................................10

    OVERVIEW .....................................................................................................................10
    THE TECHNOLOGY ...........................................................................................................11
    PRODUCTS ......................................................................................................................14
    INDUSTRY ANALYSIS .......................................................................................................23
    MARKETING ....................................................................................................................25

MANAGEMENT ORGANIZATIONAL CHART .....................................................................27

MANAGEMENT OF THE COMPANY .................................................................................28

MANAGEMENT COMPENSATION ....................................................................................32

DESCRIPTION OF SECURITIES ........................................................................................35

    COMMON STOCK ............................................................................................................35
    PREFERRED STOCK .........................................................................................................35
    WARRANTS .....................................................................................................................36

PLAN OF DISTRIBUTION AND SUBSCRIPTION PROCEDURES ............................................37

EXIT STRATEGY ............................................................................................................38

INAVASIS REPORT .........................................................................................................39

RISK FACTORS ..............................................................................................................40

    RISKS RELATED TO THE BUSINESS OF THE COMPANY ........................................................40
    RISKS RELATED TO THE COMPANY ...................................................................................44
    RISKS RELATED TO THE OFFERING ...................................................................................45
    OTHER RISK FACTORS .....................................................................................................48

RELATED PARTY TRANSACTIONS ...................................................................................49

LEGAL PROCEEDINGS ....................................................................................................50

ADDITIONAL INFORMATION ..........................................................................................51

## EXHIBITS

Subscription Agreement ................................................................................ Exhibit A
Inavasis Valuation Report ............................................................................. Exhibit B
Financial Statements .................................................................................... Exhibit C

# LEGENDS

### *SUITABILITY AND OTHER MATTERS*

INVESTORS SHALL BE REQUIRED TO REPRESENT THAT THEY ARE FAMILIAR WITH AND UNDERSTAND THE TERMS, RISKS AND MERITS OF THE OFFERING DESCRIBED IN THIS MEMORANDUM, AND ALL THE ATTACHMENTS HERETO. THE UNITS ARE BEING OFFERED IN A PRIVATE OFFERING TO A LIMITED NUMBER OF INDIVIDUALS OR ENTITIES MEETING CERTAIN SUITABILITY STANDARDS (*SEE* "INVESTOR SUITABILITY STANDARDS"). THIS OFFERING INVOLVES A HIGH DEGREE OF RISK AND PROSPECTIVE INVESTORS SHOULD BE AWARE THAT THEY MAY SUSTAIN A LOSS OF THEIR ENTIRE INVESTMENT (*SEE* "RISK FACTORS").

### *EXCLUSIVE NATURE OF PRIVATE PLACEMENT MEMORANDUM*

NO ENTITY HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM. ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY. THE COMPANY DISCLAIMS ANY AND ALL LIABILITIES FOR REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONTAINED IN, OR OMISSIONS FROM, THIS MEMORANDUM, OR ANY OTHER WRITTEN OR ORAL COMMUNICATION TRANSMITTED OR MADE AVAILABLE TO THE RECIPIENT. THE DELIVERY OF THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER IN ANY JURISDICTION TO ANY PERSON TO WHOM SUCH OFFER WOULD BE UNLAWFUL IN SUCH JURISDICTION. THIS MEMORANDUM DOES NOT PURPORT TO BE ALL-INCLUSIVE OR TO CONTAIN ALL OF THE INFORMATION THAT A PROSPECTIVE INVESTOR MAY DESIRE IN EVALUATING AN INVESTMENT IN THE COMPANY. THIS MEMORANDUM DOES NOT CONTAIN ALL OF THE INFORMATION THAT WOULD NORMALLY APPEAR IN A PROSPECTUS FOR AN OFFERING REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. INVESTORS MUST CONDUCT AND RELY ON THEIR OWN EVALUATIONS OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION WITH RESPECT TO THE UNITS. *SEE* "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS WHICH SHOULD BE CONSIDERED IN CONNECTION WITH THE PURCHASE OF THE UNITS.

### *NASAA UNIFORM LEGEND*

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FUTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATIONS TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AND THE APPLICABLE STATE SECURITES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

---

## JURISDICTIONAL STATEMENTS

**FOR RESIDENTS OF ALL STATES:** IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATIONS OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

THIS MEMORANDUM HAS BEEN PREPARED FOR INFORMATIONAL PURPOSES ONLY IN ORDER TO ASSIST PROSPECTIVE INVESTORS IN EVALUATING AN INVESTMENT IN THE COMPANY. BY ACCEPTING DELIVERY OF THIS MEMORANDUM, OR ANY OTHER MATERIAL IN CONNECTION WITH THIS OFFERING, THE OFFEREE AGREES (a) TO KEEP STRICTLY CONFIDENTIAL THE CONTENTS OF THIS MEMORANDUM AND SUCH OTHER MATERIAL, AND TO NOT DISCLOSE SUCH CONTENTS TO ANY THIRD PARTY OR OTHERWISE USE THE CONTENTS FOR ANY PURPOSE OTHER THAN EVALUATION BY SUCH OFFEREE OF AN INVESTMENT IN THE UNITS, (b) NOT TO COPY ALL OR ANY PORTION OF THIS MEMORANDUM OR ANY SUCH OTHER MATERIAL, AND (c) TO RETURN THIS MEMORANDUM AND ALL SUCH OTHER MATERIAL TO THE COMPANY IF (i) THE OFFEREE DOES NOT SUBSCRIBE TO PURCHASE ANY UNITS, (ii) THE OFFEREE'S SUBSCRIPTION IS NOT ACCEPTED, OR (iii) THIS OFFERING IS TERMINATED OR WITHDRAWN.

THE OFFER AND SALE OF THE UNITS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM REGISTRATION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND RULE 506 OF REGULATION O PROMULGATED THEREUNDER, AND SIMILAR EXEMPTIONS FROM REGISTRATION PROVIDED BY CERTAIN STATE SECURITIES LAWS. THE UNITS ARE OFFERED ONLY TO ACCREDITED INVESTORS WHO HAVE THE QUALIFICATIONS NECESSARY TO PERMIT THE UNITS TO BE OFFERED AND SOLD IN RELIANCE UPON SUCH EXEMPTIONS, AND WHO MEET THE SUITABILITY STANDARDS SET FORTH BELOW IN "INVESTOR SUITABILITY STANDARDS."

THE COMPANY RESERVES THE RIGHT AT ITS SOLE DISCRETION AND FOR ANY REASON WHATSOEVER TO MODIFY, AMEND AND/OR WITHDRAW ALL OR A PORTION OF THE OFFERING, AND/OR ACCEPT OR REJECT IN WHOLE OR IN PART ANY PROSPECTIVE INVESTMENT IN THE UNITS, OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE NUMBER OF UNITS SUCH INVESTOR DESIRES TO PURCHASE. THE COMPANY SHALL HAVE NO LIABILITY WHATSOEVER TO ANY OFFEREE AND/OR INVESTOR IN THE EVENT THAT ANY OF THE FOREGOING SHALL OCCUR, EXCEPT FOR THE RETURN OF THE REJECTED PORTION OF SUCH INVESTOR'S SUBSCRIPTION FUNDS, WITHOUT INTEREST THEREON OR DEDUCTION THEREFROM.

CERTAIN PROVISIONS OF VARIOUS AGREEMENTS ARE SUMMARIZED IN THIS MEMORANDUM, BUT PROSPECTIVE INVESTORS SHOULD NOT ASSUME THAT THE SUMMARIES ARE COMPLETE. SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXT OF THE ORIGINAL DOCUMENTS WHICH SHALL BE MADE AVAILABLE TO PROSPECTIVE INVESTORS BY THE COMPANY UPON REQUEST.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM, OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM OR WITH THE COMPANY, OR ANY PROFESSIONAL ASSOCIATED WITH THE OFFERING, AS LEGAL OR PROFESSIONAL TAX ADVICE. THE OFFEREE AUTHORIZED TO RECEIVE THIS MEMORANDUM SHOULD CONSULT ITS OWN LEGAL COUNSEL, TAX ACCOUNTANT OR BUSINESS ADVISOR REGARDING LEGAL, TAX AND OTHER MATTERS CONCERNING PURCHASING THE UNITS.

NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME NOR ANY SALE OF SECURITIES HEREUNDER SHALL IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE. THE COMPANY SHALL MAKE AVAILABLE TO ANY PROSPECTIVE INVESTOR, PRIOR TO THE CLOSING FOR THE SALE OF UNITS TO SUCH INVESTOR, THE OPPORTUNITY TO ASK QUESTIONS OF, AND TO RECEIVE ANSWERS FROM, REPRESENTATIVES OF THE COMPANY CONCERNING THE COMPANY AND THE TERMS AND CONDITIONS OF THE OFFERING, AND TO OBTAIN ANY ADDITIONAL RELEVANT INFORMATION TO

2

GA000491

THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN OBTAIN IT WITHOUT UNREASONABLE EFFORT OR EXPENSE. EXCEPT FOR SUCH INFORMATION THAT IS PROVIDED BY THE COMPANY IN RESPONSE TO REQUESTS FROM PROSPECTIVE INVESTORS OR THEIR ADVISORS, NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THE OFFER OR SALE OF THE UNITS TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON. PROSPECTIVE INVESTORS SHOULD NOT RELY UPON INFORMATION NOT CONTAINED IN THIS MEMORANDUM UNLESS IT IS PROVIDED BY THE COMPANY IN WRITING AS INDICATED ABOVE.

THIS MEMORANDUM INCLUDES DATA OBTAINED OR DERIVED FROM INDUSTRY PUBLICATIONS AND REPORTS CONCERNING THE INDUSTRIES THE COMPANY SEEKS TO OPERATE IN. THE COMPANY BELIEVES SUCH SOURCES TO BE RELIABLE, HOWEVER, NEITHER THE ACCURACY NOR COMPLETENESS OF THE DATA IS GUARANTEED. THE COMPANY HAS NEITHER INDEPENDENTLY VERIFIED THIS DATA NOR SOUGHT THE CONSENT OF SUCH SOURCES TO REFER TO THEIR REPORTS IN THIS MEMORANDUM.

THE OFFERING PRICE OF UNITS HAS BEEN DETERMINED ARBITRARILY. THE PRICE OF THE UNITS (AND THE COMMON STOCK COMPRISING THE UNITS) DOES NOT NECESSARILY BEAR ANY RELATIONSHIP TO THE ASSETS, EARNINGS OR BOOK VALUE OF THE COMPANY, OR TO POTENTIAL ASSETS, EARNINGS, OR BOOK VALUE OF THE COMPANY. THERE IS NO ACTIVE TRADING MARKET IN THE COMPANY'S COMMON STOCK OR UNITS AND THERE CAN BE NO ASSURANCE THAT AN ACTIVE TRADING MARKET IN ANY OF THE COMPANY'S SECURITIES WILL EVER DEVELOP OR BE MAINTAINED.

NO REPRESENTATIONS, WARRANTIES OR ASSURANCES OF ANY KIND ARE MADE OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN, IF ANY, THAT MAY ACCRUE TO AN INVESTOR OR THE COMPANY.

THE SECURITIES OFFERED BY THIS MEMORANDUM ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**FOR FLORIDA RESIDENTS ONLY:** THE UNITS REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE HOLDER IN A TRANSACTION EXEMPT UNDER § 517.061 OF THE FLORIDA SECURITIES ACT. THE UNITS HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, ALL FLORIDA RESIDENTS SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE COMPANY, AN AGENT OF THE COMPANY, OR AN ESCROW AGENT OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**FOR GEORGIA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED AND SOLD IN RELIANCE ON PARAGRAPH (13) OF CODE SECTION 10-5-9 OF THE GEORGIA SECURITIES ACT OF 1973, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT. EACH GEORGIA RESIDENT WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 9(M) OF THE GEORGIA SECURITIES ACT, DIRECTLY FROM AN ISSUER OR AFFILIATE OF AN ISSUER, IS HEREBY NOTIFIED HE CANNOT SELL OR TRANSFER SUCH SECURITIES EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THIS ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THIS ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THIS ACT. ANY PERSON WHO PURCHASES THE SECURITIES OFFERED HEREBY SHALL HAVE THE UNQUALIFIED AND UNWAIVEABLE RIGHT TO RESCIND SUCH PURCHASE WITHIN 72 HOURS OF THE EXECUTION OF A WRITTEN AGREEMENT TO PURCHASE ANY SECURITIES OFFERED HEREBY.

3

GA000492

**FOR MISSOURI RESIDENTS ONLY:** THE UNDERSIGNED ACKNOWLEDGES THAT THE UNITS HAVE NOT BEEN REGISTERED UNDER THE MISSOURI UNIFORM SECURITIES ACT, AS AMENDED (THE "MISSOURI ACT"), AND ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND SALE OF SECURITIES AS SET FORTH HEREIN. THE UNDERSIGNED HEREBY ACKNOWLEDGES THAT SUCH UNITS MAY BE DISPOSED OF ONLY THROUGH A LICENSED BROKER-DEALER. IT IS A FELONY TO SELL SECURITIES IN VIOLATION OF THE MISSOURI ACT.

**FOR TEXAS RESIDENTS ONLY:** THE UNDERSIGNED HEREBY ACKNOWLEDGES THAT THE UNITS CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE TEXAS SECURITIES ACT, OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. THE UNDERSIGNED FURTHER ACKNOWLEDGES THAT BECAUSE THE UNITS ARE NOT READILY TRANSFERRABLE, THE INVESTOR MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

GA000493

## FORWARD LOOKING STATEMENTS

DISCUSSIONS OF CERTAIN MATTERS IN THIS MEMORANDUM AND OTHER RELATED DOCUMENTS MAY CONSTITUTE FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A OF THE SECURITIES ACT OF 1933, AS AMENDED, AND SECTION 21E OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "EXCHANGE ACT"), AND AS SUCH, MAY INVOLVE RISKS AND UNCERTAINTIES.    FORWARD-LOOKING STATEMENTS, WHICH ARE BASED ON CERTAIN ASSUMPTIONS AND DESCRIBE FUTURE PLANS, STRATEGIES, AND EXPECTATIONS, ARE GENERALLY IDENTIFIABLE BY THE USE OF WORDS OR PHRASES SUCH AS "BELIEVE", "PLAN", "EXPECT", "INTEND", "ANTICIPATE", "ESTIMATE", "PROJECT", "FORECAST", "MAY INCREASE", "MAY FLUCTUATE", "MAY IMPROVE" AND SIMILAR EXPRESSIONS OF FUTURE OR CONDITIONAL VERBS SUCH AS "SHOULD", "WOULD", AND "COULD." THESE FORWARD-LOOKING STATEMENTS RELATE TO, AMONG OTHER THINGS, EXPECTATIONS OF THE BUSINESS ENVIRONMENT IN WHICH GENAUDIO, INC. OPERATES, PROJECTIONS OF FUTURE PERFORMANCE, POTENTIAL FUTURE CREDIT EXPERIENCE, PERCEIVED OPPORTUNITIES IN THE MARKET AND STATEMENTS REGARDING THE COMPANY'S MISSION AND VISION.   GENAUDIO, INC.'S ACTUAL RESULTS, PERFORMANCE AND ACHIEVEMENTS MAY DIFFER MATERIALLY FROM THE RESULTS, PERFORMANCE, AND ACHIEVEMENTS EXPRESSED OR IMPLIED IN SUCH FORWARD-LOOKING STATEMENTS DUE TO A WIDE RANGE OF FACTORS. THESE FACTORS INCLUDE, BUT ARE NOT LIMITED TO, CHANGES IN INTEREST RATES, GENERAL ECONOMIC CONDITIONS, THE LOCAL ECONOMY, THE DEMAND FOR THE COMPANY'S PRODUCTS AND SERVICES, ACCOUNTING PRINCIPLES OR GUIDELINES, LEGISLATIVE AND REGULATORY CHANGES, MONETARY AND FISCAL POLICIES OF THE U.S. GOVERNMENT, U.S. TREASURY, AND FEDERAL RESERVE, REAL ESTATE MARKETS, COMPETITION IN THE AUDIO TECHNOLOGY INDUSTRY, ATTRACTING AND RETAINING KEY PERSONNEL, PERFORMANCE OF NEW EMPLOYEES, REGULATORY ACTIONS, CHANGES IN AND UTILIZATION OF NEW TECHNOLOGIES AND OTHER BUSINESS, ECONOMIC AND TECHNOLOGICAL RISKS.    THESE FACTORS SHOULD BE CONSIDERED IN EVALUATING THE FORWARD-LOOKING STATEMENTS, AND UNDUE RELIANCE SHOULD NOT BE PLACED ON SUCH STATEMENTS.   GENAUDIO, INC. DOES NOT UNDERTAKE, AND SPECIFICALLY DISCLAIMS ANY OBLIGATION, TO UPDATE ANY FORWARD-LOOKING STATEMENTS TO REFLECT OCCURRENCES OR UNANTICIPATED EVENTS OR CIRCUMSTANCES AFTER THE DATE OF SUCH STATEMENTS.

We urge you to review carefully the "RISK FACTORS' section of this Memorandum for a more complete discussion of the risks of purchasing the Shares. All subsequent written and oral forward-looking statements attributable to us, or persons acting on our behalf, are expressly qualified in their entirety by the cautionary statements in such section, this section and elsewhere in this Memorandum.

GA000494

## INVESTOR SUITABILITY STANDARDS

Each prospective Investor will be required to represent that he, she or it satisfies the following suitability standards and is:

(a)   a private business development Company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940;

(b)   an organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of Five Million Dollars ($5,000,000);

(c)   a Director or executive officer of the Company;

(d)   a natural person whose individual net worth, or joint net worth with that person's spouse, exceeds One Million Dollars ($1,000,000);

(e)   a natural person who has an individual income in excess of Two Hundred Thousand Dollars ($200,000) in each of the two (2) most recent years and has a reasonable expectation of reaching the same income level in the current year;

(f)   a natural person who has a joint income with that person's spouse in excess of Three Hundred Thousand Dollars ($300,000) in each of the two (2) most recent years and has a reasonable expectation of reaching the same income level in the current year;

(g)   a trust, with total assets in excess of Five Million Dollars ($5,000,000), not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as defined by Rule 506(b)(2)(ii) of the Securities Act of 1933, as amended; or

(h)   an entity in which all of the equity owners are accredited investors.

An investment in the Shares is suitable only for persons of adequate financial means who have no need for liquidity with respect to this investment. There is not currently any established public market for the Shares and no expectation that any such public market will develop. The minimum initial investment shall be for 10,000 Shares, for which the price has been arbitrarily established at $30,000, or $3.00 per Share; however, the Company may accept subscriptions for less than such amount.

This Memorandum contains essential information about the Company and the Shares being offered. Prospective Investors are advised to read this Memorandum carefully and obtain any documents referred to in this Memorandum prior to making a decision to purchase any Shares. This Memorandum contains all of the representations by the Company concerning this Offering, and no person is authorized to make different or broader statements than those contained herein. Investors are cautioned not to rely upon any information not expressly set forth in this Memorandum.

6

GA000495

## SUMMARY OF THE OFFERING

*Investors should read this Memorandum carefully before making any investment decisions regarding the Company and should pay particular attention to the information contained under the heading "RISK FACTORS." Additionally, Investors should consult their own legal, tax and financial advisors in order to fully comprehend the consequences of investing in the Company. The following summary does not purport to be complete and is qualified in its entirety by more detailed information appearing elsewhere in this Memorandum and the Exhibits hereto.*

| | |
|---|---|
| **The Company** | Formed in May 2003, GenAudio, Inc., a Colorado corporation (the "Company"), intends to revolutionize the audio listening experience by offering a sound solution called AstoundSound™ that produces sound uniquely processed which immerses the listener in a 360 degree sound field using only 2 channels (2 speakers or headphones). The sound solution offered by GenAudio does not require any specialized decoding or playback hardware or software, allowing users to experience AstoundSound™ on their existing equipment which makes the technology both mobile and cost-effective. No specialized decoding/encoding or multiple speakers is needed to create the surround sound listening experience. The Company has one consumer product currently available for computers and has several additional products with multiple features in development for the professional, prosumer and consumer markets. The Company envisions a hardware integration into one or more mobile hand held devices such as a smart phone or mp3 player in the near future. |
| **Securities Offered** | Up to One Million (1,000,000) shares of the Company's common stock, par value $.0001 ("Shares" or "Securities" ) at a price of $3.00 per Share. The Company also has an overallotment right to sell up to an additional Two Hundred Fifty Thousand (250,000) Shares in the event this Offering is over-subscribed. |
| **Price per Share** | $3.00 |
| **Minimum Investment** | The minimum investment amount for a single Investor is Ten Thousand (10,000) Shares, or $30,000; provided, however, the Company, at its sole discretion, may accept subscriptions for less than such amount. |
| **Best Efforts Offering** | This is a best efforts offering being conducted by the Company. There is no aggregate minimum number of Shares that must be sold prior to the initial closing of the Offering, and the Company may commence using proceeds as soon as subscriptions are accepted. *See "RISK FACTORS".* |
| **Offering Period** | The term of this Offering shall commence on the date hereof and terminate on May 31, 2010, unless extended for a period not exceeding 90 days in the sole discretion of the Company. |
| **Investor Suitability** | The Shares are being offered and sold solely to "accredited investors" as defined in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended (the "Securities Act"), pursuant to an exemption from registration under Rule 506 promulgated under Regulation D. Subscribers shall be required to submit a completed Subscription Agreement, together with all exhibits thereto, including a confidential subscriber questionnaire, so that the Company can determine whether investor suitability requirements are satisfied. Affiliates of the Company may acquire Shares. |
| **Risk Factors** | This Offering involves substantial risks to Investors. An investment in the Shares is speculative and should not be considered by persons who cannot afford the loss of their entire investment. An Investor must depend on their own |

7

GA000496

investigation of the Company. *See "RISK FACTORS".*

**Subscription Agreement**

Purchases of the Shares must be made pursuant to the Subscription Agreement in the form appended to this Memorandum as Exhibit A, which contains, among other provisions, representations and warranties by the Company, investment representations by the subscriber, and restrictions on transferability of the Shares.

**Capital Stock Authorized And Currently Outstanding**

The Company's authorized capitalization consists of 25,000,000 shares of Common Stock, par value $.0001 per share, and 5,000,000 shares of Preferred Stock, par value $.0001 per share, of which 1,000 have been designated as "Series C Preferred Stock" and 1,400,000 have been designated as "Series D 10% Convertible Preferred Stock." *See "DESCRIPTION OF SECURITIES."* 12,161,000 shares of Common Stock are currently issued and outstanding, warrants to purchase 7,834,885 shares of Common Stock have been granted and are outstanding. There are 1,000 shares of Series C Preferred Stock and 434,000 shares of Series D 10% Convertible Preferred Stock issued and outstanding (the anti-dilution rights of which will be triggered upon the consummation of this offering, resulting in the issuance of approximately 16,051 additional shares of Common Stock to holders of such preferred stock upon conversion thereof if this Offering is fully subscribed).

**Total Capital Stock And Warrants Outstanding After Completion Of The Offering Assuming It Is Fully Subscribed**

| | | |
|---|---|---|
| Existing Common Shares | 12,161,000 | Common Shares |
| Existing Warrant Shares | 7,834,885 | Common Shares |
| Compensatory Warrant Pool | 0 | Common Shares |
| Existing Series C Preferred Shares | 1,000 | Preferred Shares |
| Existing Series D Preferred Shares, as adjusted | 450,051 | Preferred Shares |
| Common Shares in this Offering | 1,000,000 | Common Shares |
| Fully Diluted (shares and warrants) | 21,446,936 | Total Shares |

*See "SECURITIES OWNERSHIP."*

**Use of Proceeds**

The Company intends to use the net proceeds from this Offering to pay approximately $250,000 in outstanding third party invoices and obligations, $500,000 in accrued employee payroll, and the balance for future expenses associated with completion of its RTAS plug-ins for ProTools equipment for third party processing of original content, and for additional research and development for commercial exploitation of its AstoundSound core technology for both operating system software integration and hardware integrated circuit chip integration. Initial integration is expected for hand held devices such as smart phones and mp3 players. Subsequent integration is expected for other consumer electronic products such as the development of a videogame adaptor for playing existing videogames, an AstoundTools audio engine videogame tool kit, prosumer products, including those compatible with such products as Garage Band and Final Cut, and embedded applications for slot machines and other gaming devices as well as car stereos. In addition, net proceeds of this Offering will be used for sales and marketing expenses to promote the Company's products, to make patent filings, and for general working capital purposes, all in accordance with the Company's general business plans and goals. The foregoing uses are illustrative only and management will have broad discretion in the allocation of the net proceeds of this Offering.

**Plan of Distribution**

All of the Shares are being offered to accredited investors only under the terms set forth in this Memorandum and the Subscription Agreement. The Shares are offered by the Company subject to receipt and acceptance by the Company of

8

GA000497

subscription documentation and funds, with the right to reject any subscription, in whole or in part. *See "PLAN OF DISTRIBUTION."*

**Limited Transferability**

The Shares being sold will not be registered with the Securities and Exchange Commission or qualified under the securities laws of any state, but will be offered and sold pursuant to an exemption therefrom. Therefore, the Shares will be "restricted securities" and may not be resold or otherwise distributed without registration or qualification under the Securities Act and/or any other applicable securities laws or the availability of an exemption therefrom. *See "RISK FACTORS".*

**Management**

The Board of Directors of the Company consists of five members. Jerry Mahabub (Chairman), Ted Cohen, Elliot Mazer, Mark Bobak, and Paul Powers. *See "BOARD OF DIRECTORS AND MANAGEMENT"* for additional information regarding the Board of Directors and other key personnel as well as certain of its third party contractors.

**Dividends**

The Company has not paid any dividends on its Common Stock and does not anticipate paying any dividends in the foreseeable future.

**Voting Rights**

Each share of Common Stock is entitled to one vote in all matters brought to a vote before shareholders. There are no cumulative voting rights and no decisions require more than a majority vote under the Company articles of incorporation or bylaws. Notwithstanding the foregoing, the Series C Preferred Stock held by Jerry Mahabub, the Company's founder, CEO and majority shareholder, is entitled to appoint two (2) of the Company's five (5) directors.

**Preemptive Rights**

None.

**Exit Strategy
And Put Right**

Each Investor shall have the right to require the Company to buy back his, her or its respective Shares in the event the Company does not consummate a Liquidity Event (as defined below) by September 18, 2014. The Investors shall have this right for a period of four (4) months following such date and the price at which the Company shall be required to repurchase such Shares shall be the amount paid for the Shares plus a 10% annualized return thereon (cumulative daily but not compounded). A "Liquidity Event" means (i) a sale of all or substantially all of the Company's assets, (ii) a merger, reorganization or similar business combination in which the shareholders of the Company immediately prior to such merger, reorganization or combination own less than a majority of the voting power of the surviving entity immediately following such merger, reorganization or other business combination, (iii) an underwritten initial public offering ("IPO"), (iv) the date the Company otherwise becomes a publicly reporting company and lists its Shares for sale on a national securities exchange, any of the Nasdaq markets, or the OTC Bulletin Board, or (v) any recapitalization, share repurchase program or other reorganization in which the Investors are entitled to receive an amount equal to their capital investment plus a 10% annualized return thereon. Notwithstanding the foregoing, if an Investor fails to exercise his, her or its put right within four (4) months of becoming entitled to do so, such right shall expire.

9

GA000498

# BUSINESS OF THE COMPANY

*"THE BEST WAY TO PREDICT THE FUTURE IS TO INVENT IT"*
-Alan Kay

### OVERVIEW

Formed in May 2003 as a Colorado corporation, GenAudio intends to revolutionize the way audio is heard throughout multiple industries by offering a software-based solution that immerses the listener in the center of a 360 degree spherical soundscape. The Company has coined its unique sound solution "AstoundSound". The AstoundSound software technology creates four-dimensional ("4D") audio (3 physical dimensions of space over time) with a high degree of positional accuracy based on an elaborate digital audio filter set created from the combination of physiological, physical and mathematical modeling of how the human brain processes and perceives sound.



This software based listening experience emulates sound occurring in the physical reality of 4 dimensions without the need for the multiple speakers utilized by current hardware driven technologies, thereby providing a mobile surround sound audio solution which may be incorporated into consumer devices such as mp3 players, smartphones, and computers, as well as a tool for professional audio engineers in the audio mixing process.

AstoundSound differs significantly from currently offered surround sound systems because it is software based and therefore does not require anything more than 2 speakers or a simple pair of headphones. In addition, while other purportedly competitive technologies at best provide 3D surround sound on a linear plane and require the use of 4 or more speakers, the AstoundSound technology provides enhanced depth and elevation auditory cues which provide a listening experience akin to being in the center of a globe where sound can emanate from both above and below the listener's position, as well as in front and behind the listener with a minimum of two speakers and no special hardware.



Without the requirement of any specialized decoding or playback hardware (like Dolby), this allows users to experience AstoundSound on their existing equipment. GenAudio believes that its software's cost-effectiveness, mobility, and processing technology gives it a much wider appeal than current hardware based surround sound systems in the market which require specialized hardware (multiple speakers) to effectuate a "surround sound" listening experience (e.g. Bose 3-2-1 system, Sound Bars, Surround Sound systems, etc.). Moreover, the Company

10

GA000499

believes that its technology is far superior to competing software technologies due to its unique technology core based on how the human brain actually processes audio information, and its ability to stay "in phase" with no compromise in center channel or low-end audio information.

AstoundSound creates an audio solution that may be utilized at the consumer, prosumer, and professional levels that truly changes the game.

## AstoundSound - An immersive and innovative 4D audio experience

- AstoundSound produces robust 4D sound which can distinguish multiple sound sources simultaneously.

- The so-called "sweet spot" is all around—not in a central location. Users can experience AstoundSound, irrespective of listening position, as long as there are two speakers and they are within the speaker boundaries.

- No special equipment or decoding devices are needed to enjoy the AstoundSound experience.

- CDs and DVDs processed with AstoundSound can be played on all consumer electronic equipment and speakers.

- AstoundSound is compatible with all existing multi-channel audio presentation formats such as Dolby Digital, DTS, and SDDS, making it easy to use for motion picture releases.

- Four-dimensional sound spatialization is applied during the mixing process. It is not decoded to send various sound elements to specific speakers like 3D surround-sound presentation formats.

We believe that AstoundSound is an extremely "disruptive" technology that represents the next major milestone in the history of audio.



### THE TECHNOLOGY

AstoundSound is extremely versatile, as it can be integrated into just about anything and everything that has an audio component. It requires no special equipment, and it can be played back on any type of media (both digital and analog) using consumers' existing hardware and equipment. The technology can be experienced while driving in your car, relaxing in your home theater, listening to music with your iPod or portable CD player, playing a video game, watching TV, attending live concert events, going to the movie theater, and in many other settings.

The technology is the result of over two decades of research and development commencing with the innovative brain research and development by our Company's founder and CEO, Jerry Mahabub. Mr. Mahabub modeled how the brain processes audio information using a 10 Tesla magnet by performing fMRI scans for over two years (from 1988 to 1991). This raw fMRI imaging data, coupled with advanced numerical analysis and computational physics based modeling enabled the creation of 7,337 points in space (for the left and right side each) to create the extremely accurate filter set emulating how the human brain processes spatial audio information. This "AstoundCore" is at the heart of all of the Company's product offerings as illustrated in the following diagram:

11

GA000500



After forming the Company in 2003, Mr. Mahabub filed the first utility patent application in 2004. In 2005, Mr. Mahabub hired a team of carefully selected top ranked software engineers with very diverse backgrounds ranging from audio digital signal processing ("DSP") to applied mathematics. Their primary purpose – to wrap various software applications around the AstoundCore to enable licensing and/or distribution of multiple product offerings in multiple industries, commencing with the entertainment and consumer electronics industry.

The Company's software development strategy is based on a modularized approach to technology segmentation. This methodology allows the Company to create separate product offerings on three levels – consumers, prosumers, and professional audio engineers – all based on the AstoundCore which represents the core technology where new features and the most advanced digital signal processing algorithms are utilized. The three technology tiers enable the Company to access multiple revenue streams from a wide range of end users. GenAudio plans to develop different products around the AstoundCore to license and distribute to various targeted vertical markets within the entertainment industry, such as the broadcast, video game, music, film, and consumer electronics markets.

12

GA000501

The Company has elected to focus on the following vertical markets and has prioritized its product offerings accordingly:

| Primary Targets: | Consumer Electronics | Film/Music | Video Games |
|---|---|---|---|
| Secondary Targets: | Broadcast | Live Concerts | Theme Parks |
| Future Targets: | Telecommunication | Medical | Aviation |

Just recently, the technology was optimized to work with handheld consumer electronic devices. We have already successfully integrated the technology into the mp3 player and smart phone devices of a well-known consumer electronics company (the "LCEC"), and hope to use these mobile devices as the vehicle of widespread commercial exploitation of the AstoundSound technology. Due to the extreme optimization, the AstoundSound technology has a negligible impact on portable electronics processors, and a negligible impact on a device's battery life - the two most important factors for such handheld consumer products integration.

*The technology is now in an "Integration ready" state and can be embedded into just about any consumer electronics product offering where audio plays an important role, with no change to the hardware. For this reason, we have shifted our focus to licensing to third parties for integration into consumer electronics. We believe such business development will have the strongest potential to generate substantial revenues for GenAudio in the near- to mid-term, thus maximizing shareholder return.*

The Company is not the only party that believes that AstoundSound is the next logical step in the evolution of audio. World-class sound engineers and artists, such as Neil Dorfsman, Steve Lillywhite, Robin Thicke, Gus Skinas, and many others, share this vision. Here are a few of many testimonials and industry reviews:

➤ Neil Dorfsman, a four-time Grammy award winner for both Best Producer and Best Engineer (Sting, Dire Straits, Paul McCartney, etc.), stated in his endorsement letter to Mr. Jerry Mahabub, the Company's CEO, *"You have begun an audio revolution, and started what I believe will be a new era in professional audio production---truly coherent, multi-dimensional audio reproduction for Music Recordings, Film, Television, and Video Games."* He also stated, *"I am sure it will become the industry's gold standard."*

➤ Steve Lillywhite, a Grammy award winning Producer for U2's "Beautiful Day" and "How to Dismantle an Atomic Bomb", and Producer for Matchbox Twenty, Peter Gabriel, The Rolling Stones and others, stated, *"I was amazed by the first audio demo I heard. AstoundSound significantly extends the sound field beyond the traditional stereo mix. The audio recording was so true-to-life that it actually sounds 'real'."*

➤ Robin Thicke, an award winning multiplatinum R&B and Pop star not only remixed several tracks on his 2008 album release of "Something Else" with the AstoundSound technology, but also stated, *"As an artist having this technology is a dream come true. My goal is to always have my audience hear my music on a deeper level, so I am thrilled about AstoundSound."*

➤ Gus Skinas, the President of Super Audio Center LLC, co-developer of the Super Audio CD Sonoma System and engineer for the 30th Anniversary re-master of Pink Floyd's Dark Side of the Moon stated, *"AstoundSound is the most effective, natural sounding four-dimensional audio positioning processor. Its ability to process audio at very high sample rates produces stunning results especially when coupled with the very high quality DSD program here at the Super Audio Center."*

➤ Applelinks "GenAudio's AstoundStereo Expander Software takes Position as Top Audio Download on Apple Site"
http://www.applelinks.com/index.php/more/genaudios_astoundstereo_expander_software_takes_position_a s_top_audio_downl/

➤ Stage Select's "GenAudio debuts 'Deprived' at E3 2009"

13

GA000502

http://www.stageselect.com/N4093-press-release-genaudio-debuts-deprived-at-e3-2009.aspx

➢ Electronic Musician "Soundfield Simulators Tech" By Scott Wilkinson
http://emusician.com/futuretech/soundfield-simulators-tech-page/

➢ About.com: Digital Music, "AstoundStereo Expander Review: Add Another Dimension to Your Computer's Sound" By Mark Harris
http://mp3.about.com/od/audiotools/fr/AstoundJ_Review.htm

**PRODUCTS**

The Company intends to continue its audio engineering services for new album and film title releases while following the following roadmap for development of AstoundSound products:



**AstoundSound Product Roadmap**

The Company plans to roll its product development forward as depicted in the diagram above with an initial emphasis on hardware integration into handheld media devices such as mp3 players and smartphones.

AstoundSound™ Pro – Professional Sound Engineer Application

The Company's AstoundSound Pro application encompasses all of our most advanced digital signal processing capability, and is intended for use solely by the world's top professional audio engineers, producers, and mixers, as it enables audio engineers to process any input "mono" audio file and construct any 4D path (3 dimensions of space over time), with a variety of different path drawing and audio processing modes. AstoundSound Pro enables an audio engineer to create pinpoint sound localization anywhere within a 360 degree sphere and, if desired, move such sound along any defined path over any time interval. The Company has developed two Audio Unit ("AU") plug-ins

14

GA000503

for Apple's "Logic" audio engineering software, and has recently completed the beta release of two RTAS plug-ins for use with DigiDesign's "ProTools." These first revision plug-ins are intended for selected third-party audio studios to both test and utilize for commercial exploitation via licensing.

The associated revenue model for each market application differs for each in terms of the fees to be paid on a per title basis. For example, for film trailers, we expect to charge a fee of $500 per trailer, and this will most likely increase as the technology generates awareness and increased demand. Similarly, for TV shows, we expect to charge around $1000 per episode, which fee may also increase as demand increases. For theatrical, we anticipate a $5000 per film title on the theatrical mix. However, because our process will hold when folded down to two-channels (stereo) for home theater DVD/Blu-Ray or digital distribution of the film title, we also expect to negotiate license fees of somewhere between $0.05 to $0.15 per unit for physical distribution $0.05 per downloaded film title for digital distribution.

These "plug-ins" enable professional engineers to give their original content mix stereo expansion and pin-point sound localization, including elevation +/- 90 degrees through the virtual panning of AstoundSound. Engineers can simply "map" any of the sliders or user interface controls within the plug-in to a mixing console and this is fully user definable, making it adaptable to a variety of audio mix engineers' personal taste.



*AstoundSound Professional RTAS Plug-in: Mono Input, Stereo or 5.1 output*

The screen shot above shows the localization settings tab. For surround sound mix sessions, there is an additional tab (not shown in the screen shot) that allows engineers to pan a localized sound source within the surround sound field, in real-time, during mixing. This allows the engineer to create extremely accurate 4D sound paths integrated directly into the surround sound mix with complete workflow compatibility in any type of mix session for any kind of media.

GA000504



*AstoundSound Professional RTAS Plug-in; Stereo Input, Stereo or 5.1 output*

The screen shot above is for widening stereo elements within a surround sound or stereo mix session. This, coupled with the mono in plug-in, is a powerful combination and together enable the mix engineer to create soundscapes and audio scenes that are so real that whether listening in a movie theater, in a home theater, or on a portable media player device with headphones, the listener will not be able to distinguish the difference between what is real and what is virtual. Our technology fills the entire room with sound sources that are perceived by the listener all around, regardless of listening position.

Since the plug-ins working with virtually every mixing console on the market today, audio engineers can move in all three spatial dimensions simultaneously over time, integrate post-production workflow, and reduce the post-production time and costs to construct complex 4D audio paths via automation within the host application. Our AstoundSound Pro technology has been used in several major film and audio studios and for artist CDs (Robin Thicke's *Somewhere Else*), DVDs (*The Orphanage, Hellboy II, Bangkok Dangerous*), and smaller independent motion pictures ("*Viko*").



The Company demonstrated its AstoundSound Professional audio products at the Mix Nashville Audio Engineers conference May 19-20, 2009, and was informed it was "the talk of the show" by several audio engineers interested in using the Company's ProTools RTAS plug-ins once they became finalized for third party use. As of February 15, 2010, this became a reality and we are actively pursuing licensing agreements and following up with several top ranked professional audio engineers that have been patiently waiting to use our pro-audio products.

*Theatrical Implementation of AstoundSurround™ and AstoundStereo™*

The Company is uniquely positioned to provide the needed sound solution for the recent 3D impact in the film industry. AstoundSound brings forth the 4D audio component that is needed to complement the 3D visuals by seamlessly integrating into the 5.1/Surround Sound mixes during audio post-production. We have created a new theatrical demonstration using our own 3D content mixed in AstoundSurround which enables us to demonstrate the

16

GA000505

superiority of AstoundSurround over standard 5.1 Surround Sound mix on the fly in any 3D screening room at any of the major studios. In addition, we also can easily demonstrate the difference between the two channel (stereo) normal LTRT fold-down, versus the AstoundSound processed LTRT fold-down.

We have been demonstrating the technology to major film studios, and we expect AstoundSound to be used in one or more major studio film title releases in 2010. We believe that once the world goes to the theater and hears AstoundSurround, or listens to the DVD of a major motion picture in their home, on their computer, or on their portable media device, that the technology will become widely accepted as the next "standard" to be utilized by audio engineers and incorporated as part of the print masters at the dub stage for film title releases.

Much like when Dolby introduced "surround sound" or "5.1" in 1991 in direct response to the advances in video graphics within the film industry, the new 3D films require a similar audio sound solution that can provide pinpoint sound placement beyond the linear plane by pushing audio information into the audience, much like when we wear 3D glasses at the theater and feel like we can reach out and touch the images, AstoundSound does exactly the same for the audio.

Iosono approached this need for the ability to push audio into the audience by coming up with a 600+ speaker system, however, after one of our recent presentations at one of the major film studios, the Sr. VP Post Production stood up and stated: "*I just came back from a demo with the new Iosono system. AstoundSound does the same thing, and is better in some ways because no matter where I sit in the theater it worked, and although Iosono was claiming this would be the same for their system, I found it hard to get the experience when I moved around the room, and we don't need to spend money on mixing for a 600+ speaker system, especially when the return would be negligible because only a handful of theatres exist with the system in place*". This told us that film studios are hungry for a significantly improved audio experience, just like they were back in 1991, and not just for 3D films, but also for non-3D film title releases, including their home theater releases through their home theater distribution channels.

It is important to note that AstoundSound is very different from THX, Dolby, DTS, and similar formats. THX is a standardization certification format that was created to ensure a room is set up correctly in terms of acoustics and speaker placement. Dolby, DTS, and SDDS are all considered "delivery" formats because these represent the audio formats that are delivered to theaters with a new film title release. In essence, these delivery formats do nothing but encode audio after mixing (during creation of the "print master" at the dub stage for theatrical release), and this encoded audio is then decoded on the other side (either for theatrical release in a cinema or for a home theater DVD). Neither THX nor any of the delivery formats have anything to do with __how__ the audio was mixed – this has been a big misconception for consumers for a long time. THX, Dolby, DTS, and SDDS are not mixing technologies. They do not make the original audio sound better nor do they provide for a new listening experience like AstoundSound.

AstoundSound, on the other hand, is applied __during the mixing process__. AstoundSound provides a new audio experience with intensive elevation (height information) and depth perception filling the entire room with sound above, below, and beyond the physical placement of the speakers. Since we enhance the sound during the mixing process rather than at the end user stage through a multiple speaker configuration, we are not a direct competitor of Dolby, DTS, or SDDS. Instead, we significantly enhance the audio experience and our technology is fully compatible with all surround sound encode/decode delivery formats (Dolby, DTS, SDDS). All three surround sound delivery formats are still being used today, and will continue to be used in the future.

The Company is currently using or has recently used its AstoundSound Pro technology to process the following:

- RealD trailer shown before RealD 3D movies, which released world-wide with the 20th Century Fox 3D movie "Ice Age 3: Dawn of the Dinosaurs" in theaters on July 1, 2009, and continues to be used before RealD 3D movies such as the recent "Avatar" movie.
- Walden Media's new logo that will appear before all future Walden Media film title releases.
- "Playing for Change" and "Ghetto Physics" movies.

The Company expects to use its AstoundSound Pro technology for processing many upcoming theatrical film title releases and is currently in discussions with film studios, post production supervisors, and mix engineers with respect to the following potential movies concerning the integration of AstoundSound into a surround sound multi-channel audio mix:

17

GA000506

- Warner Brothers - "Cats and Dogs 2: The revenge of Kitty Galore (in 3D)" July, 2010
- Walden Media - "The Chronicles of Narnia: The Voyage of the Dawn Treader" December, 2010
- Dundee Entertainment - movie "The Irishman" 2010

When AstoundSound is integrated into a standard surround sound mix prior to encoding in one of the various delivery formats, it turns surround sound into an enhanced "super surround sound" – we call this implementation of the technology "AstoundSurround". The Company's first AstoundSurround mix was encoded with Dolby Digital for the DVD and BluRay High-Definition release of *Hell Boy II: The Golden Army* in 2008 with Universal Pictures. You will notice our logo placement at the bottom right corner of the official Hell Boy II website at http://www.hellboymovie.com/. A screenshot of the official Hell Boy II website is set forth below.



We recently presented to Warner Brothers Studios in Burbank, CA. Shortly after, on December 18, 2009, we performed the first of two mix engineering tests at the Warner Brothers Post-Production Facility in Burbank, CA. We passed the initial tests and expect to complete the second portion of the mix engineering tests within the next 30 days. Warner Brothers Sr. VP Post Production was amazed by our technology, and said he believed Warner Brothers would be interested in both the theatrical and home theater (DVD/Blu-Ray and Digital) implementation of

18

GA000507

the technology for multiple film title releases. The branding associated with having AstoundSound on the big screens in theaters world-wide, with a 30 second to 1 minute trailer at the beginning of the film, coupled with integration of the consumer based AstoundSound technology into consumer electronics, all releasing contemporaneously, have been the vision and overall business and technical direction of the Company since its inception. The Company expects that by January 2011, both markets will have adopted the technology and product offerings incorporating the technology will be on the market via licensing.

Perhaps the most incredible aspect of "AstoundSurround" integration into theatrical film title releases is that the technology survives the "fold-down" process to a two channel (stereo) encoded audio mix, commonly referred to in the professional audio realm as the "LTRT", which is an acronym for "Left Total, Right Total". The LTRT fold-down is a Dolby encoding process for playback in theaters or home theaters that do not have Dolby Digital home receivers, or only have two speakers (e.g. TV speakers). Such two channel/speaker audio encompasses the vast majority of listening experiences and this is where the AstoundSound software driven sound solution accomplishes something unique – a surround sound listening experience with just two speakers or headphones.

In summary, when incorporated into the LTRT or stereo mix, AstoundSound creates a listening experience akin to a hardware based 6 channel surround sound audio experience with just two speakers or headphones which we refer to as "AstoundStereo". It enables the consumer to enjoy an audio experience that is virtually indistinguishable from the hardware driven 6 speaker surround sound listening experience without the need for such hardware or a decoding device.

The Company's strategy is to approach major film studios to license the use of our Astound software plug-ins by their audio engineers (with the guidance of a Company field support engineer on an as needed basis) so that the mixing work will be performed at the cost of the film studio using the studio's facilities and personnel. In exchange, the Company would receive certain branding exposure in the theatrical release (trailer, credit, etc.) and a royalty on the physical and digital distribution of the film title after its exhibition in theatres. We believe this strategic approach will provide an incredible market differentiator for film studios in their theatrical exhibition of the movies and enhance demand for the subsequent physical and digital distribution of the film title by enhancing the listening experience for consumers, particularly consumers who watch the film on two channel devices such as a normal TV, computer, or hand held device. It is the Company's hope that this approach will slowly create a new audio standard as people become aware of the difference in quality and consumer demand is created.

Our revenue model for theatrical releases is to recoup our expenses from the movie studio for having a certified AstoundSound Audio Engineer present during mixing to assist and train the mix engineers working on a specific film title project (similar to Dolby), and then to charge distribution royalties on the physical (DVD and BluRay) and digital distribution (Internet Download, Hotel Movie Rental, etc.) of the film after its theatrical run. We believe this is the fairest and most justifiable approach since it is these distribution channels where our technology provides a major impact and market differentiation as it essentially enables "Surround Sound on the Go" due to the need for only two speakers or headphones with no special hardware or decoding required. As a result, out Astound technology is a "value add" which will enable the film studios to increase their margins and share this increased margin with the Company.

### AstoundSound™ - Prosumer Application for Independent Studios and Garage Bands

The "prosumer" version of AstoundSound was created by removing many of the pro audio mixing and engineering features, using a lower resolution set of digital audio filters that are analogous to the high resolution filters found in the professional audio product offerings, and constructing a user interface specifically for audio expansion that requires a stereo input (rather than a mono input like AstoundSound Pro). This application is targeted at independent studios, "prosumers," and people who want to create expansive stereo mixes for their final product offerings. The Company anticipates worldwide release of the prosumer version of the plug-in via various distribution channels such as Guitar Center and Sweetwater. The Company has elected to delay this release in order to enable its "early adopter" strategic partners and licensees the right to use the software to differentiate their product offerings and to create branding and product awareness of the AstoundSound technology at the highest professional levels before offering it at the prosumer level.

The following is a snapshot of the Company's audio unit plug-in for Apple's Logic Pro and Logic Express audio production software. The prosumer plug-in also works with other audio software programs that use audio unit plug-ins, such as Garage Band and Final Cut Studio.

19

GA000508



AstoundSound Expander - Consumers Application and Consumer Electronic Integration

GenAudio unveiled its AstoundSound Technology during the month of January 2009 at the Consumer Electronics Show ("CES"), MacWorld, and Sundance Film Festival. The consumer version of the Company's technology, AstoundSound Expander and previously named AstoundStereo Expander ("ASE"), delivers an application that any consumer can use with extreme ease of use with the simple push of a button. All one has to do is turn the processing on and the computer's two channel stereo audio becomes surround sound "on-the-go".

This is our initial consumer product offering and is available at www.astoundsound.net. ASE enables consumers to create their own expanded and enhanced listening experience on their desktop and laptop computers with any stereo audio file. Consumers can download a free trial of the ASE product and then purchase the software through our digital distribution partner, who we expect to change from Digital River to Avangate soon. Currently, the software is available only via digital download distribution channels, but eventually the Company may sell this software via physical distribution directly to consumers through consumer electronics stores (e.g. Fry's Electronics, Ultimate Electronics, Best Buy, etc.).

The ASE is currently being offered with a MSRP of $39.95 USD and consumers can "try before they buy" with a 30-day free trial period. Our current promotion allows for a sliding scale discount depending on what time throughout the 30-day trial period the consumer decides to purchase the software. This incentivizes the consumer to purchase our product sooner rather than later. We are currently creating updates to the ASE to make it compatible for the latest versions of the Microsoft Windows 7 and Apple Snow Leopard operating systems. We expect these compatibility updates to be released within the next 30 to 60 days.

GA000509



**Screen shot of our ASE consumer product**

In March, 2009, Apple placed ASE on the front page of their downloads section as well as under the more specific "audio downloads" section as the "featured download" for being the "top" audio download amongst all audio software downloads world-wide. We maintained the position as "Top Audio Download" and "Featured Product" from March 2009 to the end of May 2009 – ranked #1 of all audio downloads on Apple's world wide web based portals, and such visibility came at no cost to the Company. This also created a noticeable spike in our downloads and sales. See screen shot on following page.

After completing the ASE, the Company shifted its principal focus to compressing and optimizing the AstoundSound Technology to enable ASE to be embedded into popular handheld devices such as smartphones and mp3 players without a material drain on their battery life. This strategy is designed to achieve marketing savings and to create an upfront royalty payment rather than trying to achieve revenues through direct marketing and downloads.

In furtherance of this strategic objective, the Company has had various discussions with several companies that make electronic devices for consumers, which eventually resulted in a non-disclosure agreement ("NDA") with the LCEC. Working with the LCEC, the Company has now successfully integrated the AstoundSound Technology into several of the LCEC's products to demonstrate the viability and enhanced audio experience for music, movies, and videogames played on several of their consumer electronic devices.

Although the Company is prohibited from disclosing any further information about the identity of the LCEC and the status of current negotiations with it, the Company is optimistic that the LCEC will eventually want access to our AstoundSound Technology for their products. It is unclear what structure such access would take but the Company believes the LCEC would either (i) integrate a portion of our AstoundSound Technology, namely ASE, into multiple product lines through a licensing arrangement or (ii) acquire all of our AstoundSound Technology or, at least, that portion the LCEC deems necessary for its integration plans.

21

GA000510



**Screen shot of Apple audio downloads page**

AstoundSound Real-Time Interface - Video Game Environment

In addition to the AstoundSound Expander consumer product for computers, the Company has developed a "first level" video game demonstration game entitled *"Deprived"* which premiered at the E3 (Entertainment Electronics Expo) in Los Angeles in June, 2009. The *"Deprived"* game environment demo is designed to demonstrate the real time pinpoint sound placement of the AstoundSound RTI (real time interface) technology in a video game environment. In addition, we have commenced work on an audio engine videogame tool kit for third party game developers ("AstoundTools") to use the AstoundSound RTI technology during development of upcoming video game title releases. The Company anticipates a per-title use royalty plus a back end distribution royalty for each game title in accordance with industry standards for game audio engine licensing.

AstoundTools will enable game developers worldwide to simply use our toolset during development of a video game (for any video game console) in the hope that the AstoundSound technology will become the dominant audio engine toolkit over competing audio engines such as WWISE and FMOD, neither of which provide any sound localization or spatial audio processing.

With only two channels or headphones, AstoundSound Real Time Interface will enable video game players to experience a full 360 degree listening experience with depth and precise sound localization to the source of the sound in real time as they play the game. For example, a game player will be able to hear the exact location of their adversary in a warfare game, even if the adversary is directly behind the game player and not depicted in the visual

22

GA000511

screen yet. Successful video gamers depend heavily on quickly reacting to visual and audio cues and the AstoundSound Real Time Interface will enable them to completely immerse themselves in the game with a "virtual reality" listening experience without the need for multiple speakers.



**Screen shot from "Deprived video demonstration game**

From a revenue potential standpoint, DCF Intelligence and Nielsen data indicates that:

- There are over 260 million PC based video gamers worldwide, and estimated to grow to 350 million by 2012.
- The PC gaming market is the largest single game segment on a revenue basis and it is expected to grow 80% over the next 5 years.
- Of the 10 million World of WarCraft subscribers, 2 million were added just in 2007, many coming from emerging markets such as Asia.
- When segmenting by video game genre, we can see the amount of time, dedication and loyalty to not only the game, but also the gaming accessories, gaming community and gaming experience.
- Gamers are also watching movies and streaming music, treating the PC as their home theater system

INDUSTRY ANALYSIS

*There is a need for definitive sound quality enhancement within the entertainment industry.*

From the latest in first-person shooter video games to Hollywood's current blockbusters, audio plays a critically important role in the entertainment industry. The continuously improving visual component of motion pictures and

23

GA000512

video games is simply not being sufficiently complemented by a superior audio experience. George Lucas summed it up when he stated that "Sound is 50% of the motion picture experience".

We believe that there is a marked need across the entire entertainment industry spectrum for providing a superlative and immersive 4D sound solution, particularly in light of the new wave of 3D movies. Companies like Dolby, DTS, and Sony have provided product offerings that are commonly referred to as "surround sound" technologies, but they are all hardware driven which increases cost and limits mobility.   AstoundSound expects to provide the entertainment industry with the next dimension in the evolution of audio with its virtual 360° degree sound field which extends beyond the linear plane of existing surround sound technologies.  We believe that the listening public is demanding it, large companies are actively seeking to differentiate their product offerings with new and innovative technologies, and producers and engineers are constantly competing to create the best listening experience possible.

Current 3D product offerings from competitors can be classified into 3 separate categories as shown the following diagram.



Of the three categories in the diagram (from left to right), the first category is the trend of the industry (surround sound), the second is the easiest to use for the consumer but offers no significant "WOW" factor, and, while the third has the highest "WOW" factor, this category's products are very expensive and do not allow for seamless production workflow integration due to the highly specialized software and scientific training that is required for their use – such technology is simply not a viable commercial or consumer product offering for widespread use within the entertainment industry.

AstoundSound encompasses the best characteristics of all three categories and none of the bad.  AstoundSound can be integrated into all formats in the first category, it has the ease of use associated with the second category, and it surpasses the "WOW" quality factor of the third category.

*AstoundSound is not just a new product offering, it enables a complete paradigm shift for audio in everything – everywhere.*

24

GA000513

## MARKETING

The marketing component of the Company's business strategy has been constantly evolving. The recent optimization breakthrough for the technology has enabled the Company to pursue new business opportunities for integration into hand held devices, which in turn allows the Company to significantly reduce direct marketing costs. With the ability to license the technology to industry leaders within various vertical markets, the Company expects to be able to license its AstoundSound Technology to these larger corporations for their product offerings, thereby minimizing Company funded direct marketing expenditures. Although we will continue to incur direct marketing expenses for certain promotions, particularly with our ASE distribution partners, these marketing costs are minimal compared to that of a full-blown product launch. The larger consumer electronics companies will market their improved products which incorporate our AstoundSound Technology to differentiate their product offerings and achieve a significant competitive advantage while simultaneously providing us with significant brand exposure and corporate recognition.

We commenced this marketing strategy with Universal Pictures and MiCasa Multimedia for use of the AstoundSound Technology into the DVD movie titles "*The Orphanage*", "*Hellboy II: The Golden Army*," and "*Bangkok Dangerous*". We coordinated the release of our ASE product with the release of the *Hellboy II* DVD by entering into a marketing and promotion agreement with Universal Studios to place the following ASE insert cards in the standard definition (widescreen) DVD cases of *Hellboy II*, which promotion included a home theater giveaway and other award items sponsored and provided by Philips and Universal Pictures.



In sum, the Company's current marketing strategy is focused on the following three initiatives:

- Internet

  Marketing of ASE for Mac and PC through both direct marketing efforts and through shared revenue arrangements with promotional partnerships and our digital distribution partner's affiliates. We are focusing on media or music centric websites such as Wolfgang's Vault and Pandora to promote our software. The expected promotion price for the software will be $19.95, where 6.9% will go to our distribution partner and up to 40% will go to our promotional partners, leaving us with approximately $10 per download.

25

GA000514

- Professional Audio

    Marketing of the professional audio mixing plug-ins to mixing studios, movie studios, and other parties engaged in audio post-production work for use in the mixing of compact disks, DVDs, film trailers, television commercials, television programming, and motion pictures. As noted above, the Company's AstoundSound Technology has already been incorporated into CDs such as Robin Thicke's *Something Else*, DVDs such as *HellBoy II: The Golden Army*, trailers such as RealD's proprietary trailer utilized by RealD before its 3D movies, including *Avatar*, and independent theatrical releases such as *Viko* and *Playing For Change*. These early successes with these early adopters of the Company's technology utilized the Company's plug-ins while such plug-ins were in their test "beta" state and therefore required substantial involvement by the Company's internal audio engineers. The plug-ins are now much further advanced such that licensing the plug-ins to third parties in exchange for a per project royalty is achievable. This will enable the Company to utilize third party personnel and resources since very limited time will be expended by the Company's audio engineering staff.

- Consumer Electronics Companies

    Marketing of our optimized ASE product to be embedded into consumer electronics devices has commenced. Now that our ASE software can be embedded into just about any consumer electronics device via a special software programming "library," we are well positioned to exploit this market segment. To assist us in that endeavor, we recently retained a valuation expert to help us determine the fair market value for all current implementations of the technology, including the price per unit for specific types of consumer electronics devices that we have targeted for embedding our AstoundSound Technology. *See "Invasis Report."* Now that this report is complete, we have entered into the next stage of our consumer electronics marketing and licensing initiative, i.e. actively seeking consumer electronics companies interested in licensing the technology for inclusion in their product offerings. We have already successfully integrated the technology into several of the LCEC's products which represent only a small portion of the total product integrations that are available to us as shown in the Inavasis report. We believe companies like Toshiba, Philips, Samsung, Panasonic, Sony, among many others, are all strong potential candidates for licensing our technology for their product offerings. Portable media players, computers, home theater receivers, car stereos and TVs are just some of the devices that can benefit from having our AstoundSound Technology integrated into them.

BALANCE OF PAGE LEFT INTENTIONALLY BLANK

26

GA000515

# MANAGEMENT ORGANIZATIONAL CHART

The following chart depicts the Company's organizational structure:



GA000516

## MANAGEMENT OF THE COMPANY

The Company's Board of Directors and management team are comprised of a team of dedicated professionals with extensive experience in technology, software development, marketing, the entertainment industry, finance, licensing and business development. Management is augmented by an advisory committee, consisting of honorary members extensively involved in the field of acoustics, professionals in the audio industry, marketing experts, and seasoned individuals with experience in the commercialization and sale of digital audio technology. The executive officers, directors, and senior management of the Company and the positions held by each are as follows:

| Name | Age | Position |
|------|-----|----------|
| Jerry Mahabub | 38 | Founder, Chairman, CEO, President, CTO |
| Paul Powers | 51 | Board Member, COO |
| Ted Cohen | 57 | Board Member |
| Elliot Mazer | 68 | Board Member |
| Mark Bobak | 51 | Board Member |
| James Devine | 54 | Secretary, Sr. Vice President - Finance |
| Brent Kaviar | 50 | Sr. Vice President - Post Production |
| Greg Morgenstein | 38 | Sr. Vice President - Audio Engineering |
| Gary Smith | 42 | Sr. Manager Software Engineering |

### BIOGRAPHIES

#### Jerry Mahabub: Founder, Chairman, Chief Executive Officer, and Chief Technical Officer

Mr. Mahabub founded GenAudio in 2003 and is the inventor of the core technology, AstoundSound™ with over 20 years of continuous R&D as of present. His activities include strategic planning with respect to the overall integrated business and technical direction, patent filing, capital formation, licensing, forming partnerships/strategic alliances, and works directly with the software development team when necessary.

Prior to founding GenAudio, he was owner and Executive Manager of Rapid Prototype Technologies, LLC from 1998 to 2003, where he designed and developed new and innovative technologies for a large variety of government contracts and mainstream commercial markets. His responsibilities there included design engineering, business development, technology commercialization, and licensing. In addition, Mr. Mahabub was often asked to assess technologies for large investment firms and assist with IP based independent valuation analysis. Mr. Mahabub has negotiated many world-wide licensing deals, channel partnerships and strategic alliances with multiple divisions of Hewlett Packard and many other companies in an effort to create marketable, state of the art, disruptive and cost-effective products, and has also consulted for both hardware and software engineering projects. Prior to his position at Rapid Prototype Technologies, Mr. Mahabub was Director of Engineering at Ines Inc./SPYR Technologies Inc. from 1995 to 1998, where he established that company as a GSA/8A provider for government contracts. The work involved research and analysis of market trends for commercialization efforts, competition and market analysis, product marketing strategy, print and digital advertisements, ISD 9001 compliance, and negotiation of several deals in accordance with the Federal Acquisition Regulations and Government Procurement Policies for numerous branches of the armed forces. A cursory list of entities for which he has designed, developed and/or transferred, including through licensing, technologies are Hewlett Packard, Intel, Motorola, Siemens, Philips, Boeing, the Jet Propulsion Laboratory, the US Naval Warfare Center and the US Army Missile Research and Development Engineering Center (MRDEC).

Mr. Mahabub started attending Rensselaer Polytechnic Institute ("RPI") in Troy, NY doing coursework and lab work from the age of 13 and entering as a full time student at the age of 16. In 1988, at 16, he was hired to work part-time at a Superconducting Research Laboratory while attending RPI full-time and also worked, from the age of 13, in Dr. Charles P. Bean and Ivar Gaiver's lab (Nobel Prize winner for the discovery of Superconducting Tunneling in 1971). He double-majored in Physics (B.S) and Electrical and Computer Systems Engineering – ECSE (B.E.) with a Minor in Philosophy/Symbolic Logic.

#### Paul Powers: Board Member and Chief Operating Officer

Paul Powers joined the Company's Board of Directors in November, 2008 and joined the Company as an officer on May 1, 2009. Mr. Powers spent the previous 17 years as the Associate General Counsel for Anheuser-Busch

28

GA000517

Companies, Inc., a subsidiary of Anheuser-Busch, where he specialized in mergers, acquisitions, real estate, aviation, and entertainment law. Mr. Powers has served as lead counsel for numerous acquisitions and divestitures aggregating billions of dollars. Mr. Powers was one of the lead attorneys for the recent merger between Anheuser-Busch Companies, Inc. and a subsidiary of InBev N.V./S.A which represented the largest all cash merger in the history of the United States. Prior to joining the Company, Mr. Powers was also a member of the Board of Directors of Grupo Modelo S.A.B. de C.V., the largest beer manufacturer in Mexico which makes Corona, Negra Modelo, Especial, and many other brands. Before joining Anheuser-Busch Companies, Inc. in 1992, Mr. Powers practiced law with Armstrong, Teasdale, Schafly & Davis and Thompson Coburn, two of the largest law firms in St. Louis, Missouri, where his practice focused on institutional lending, corporate finance, and real estate. Mr. Powers graduated cum laude from Marquette University, and received his juris doctorate cum laude from St. Louis University Law School where he received the Order of the Woolsack for top academic honors.

### Ted Cohen: Board Member

Ted Cohen joined the Company's Board of Directors in 2007, and brings his widespread digital expertise in music, mobile, IPTV and product & service development. He is also the Managing Partner of TAG Strategic, a digital media and entertainment advisory company.

In his previous role as Senior Vice President of Digital Development & Distribution for EMI Music, Mr. Cohen led next-generation digital business development worldwide for this "big four" record Company, which includes labels such as Capitol, Virgin, Angel/Blue Note, Parlophone and Chrysalis. During that time, EMI embraced and exploited new technologies and business models such as digital downloads and online music subscriptions, custom compilations, wireless services, high-definition audio and Internet radio, and anti-piracy efforts, for which Mr. Cohen was a key strategist. He was also instrumental in crafting the licensing agreements upon which the Rhapsody subscription service and the iTunes Music Store were built. Prior to his role at EMI, Mr. Cohen served as Executive Vice President of Digital Music Network Inc., which he co-founded and served as Chairman of the groundbreaking Webnoize conferences. He also led two new media consulting operations, DMN Consulting and Consulting Adults, attracting clients such as Amazon.com, Microsoft, Universal Studios and DreamWorks Records. Mr. Cohen has previously held senior management positions at both Warner Bros. Records and Philips Media.

A 30-year industry veteran, Mr. Cohen is Chairman of the Mobile Entertainment Forum Americas board, and of MidemNet, an international music/technology conference. He also serves on the NARAS (Grammy) Los Angeles Chapter Board of Governors as well as the national Trustee Board, the Board of Directors for the Neil Bogart Memorial Fund, co-chairs the new media arm of the T.J. Martell Foundation, and lends his time to music & technology education efforts such as Grammy In The Schools.

### Elliot Mazer: Board Member

Elliot Mazer joined the Company's Board of Directors in 2007, and brings his experience as a world-renowned record producer, studio owner, engineer, entertainment technology executive and audio consultant. Primarily known for his 30-year association with Neil Young, Mazer has produced multi-platinum albums for Linda Ronstadt and Janis Joplin. He worked on The Band - The Last Waltz film and album. Mr. Mazer has produced DVD-Audio and SA-CD projects with sound recordings by Neil Young, Janis Joplin, Frank Sinatra, The Who, P!NK, Switchfoot and Santana. He also designed, built, owned and operated audio recording facilities, and developed the AirCheck monitoring system, which automates the recovery of publishers' royalties from radio stations.

Mr. Mazer is a member of the following organizations: Audio Board Consumer Electronics Association (CEA) 2005, TAG (Technical Advisory Group) ANSI, British Academy of Film and Television Artists, Audio Engineering Society, National Academy Recording Arts & Sciences (former Governor) Country Music Association. He received a Bachelor's degree from New York University and Fairleigh Dickinson University in New Jersey.

### Mark Bobak: Board Member

Mark Bobak joined the Company's Board of Directors in November, 2008. Mark Bobak is of counsel to the St. Louis law firm of Williams Venker & Sanders, L.L.C. He specializes in a number of areas including legal strategy development, political affairs, crisis management, communications and labor issues.

From July of 2004 until December 31, 2007 Mark Bobak served as Group Vice President and Chief Legal Officer of Anheuser-Busch Companies, Inc ("Anheuser-Busch". In that role, Mr. Bobak was responsible for all Labor, Legal and Industry and Government Affairs matters for Anheuser-Busch, including all of its subsidiaries. He also served

GA000518

on Anheuser-Busch's strategy committee, which was comprised of Anheuser-Busch's senior-most executives and determined the strategic direction and policies for Anheuser-Busch. Mr. Bobak further served on the Board of Directors for Mexican brewer Grupo Modelo, Anheuser-Busch Inc., Busch Entertainment Corp. and the Anheuser-Busch Packaging Group. Mr. Bobak has also served on the Board of Directors for the U. S. Chamber of Commerce and as the Regional Vice Chair for the South Central area. He is also a member of the Board of Directors for the Missouri Historical Society.

Previously, Mr. Bobak served as Vice President, Corporate Human Resources for Anheuser-Busch, beginning in 2000. His responsibilities included labor relations and negotiating the Anheuser-Busch's contracts with its union workforce. From 1996 to 2000, Mr. Bobak served as Vice President and Deputy General Counsel of Anheuser-Busch where he was responsible for Anheuser-Busch's legal affairs in Litigation, Intellectual Property, International and Employment Law. He joined Anheuser-Busch's Legal Department in 1992 as Associate General Counsel responsible for the Litigation Section.

Prior to joining Anheuser-Busch, Mr. Bobak was a partner with the St. Louis-based law firm of Armstrong, Teasdale, Schafly & Davis where he was engaged in trial work. He graduated with a bachelor's degree in marketing from Marquette University and graduated cum laude with a law degree from St. Louis University Law School.

### James Devine: Corporate Secretary and Sr. VP Finance

Mr. Devine joined the Company first as a consultant in early 2006 and became Vice President of Finance in late 2006, responsible for accounting, reporting and general Company administration. From 2003 to 2006, he worked for Quinella Corp., a Certified Public Accounting firm whose practice includes tax, accounting and consulting services to public and private companies in various industries. From 2000 to 2003, he worked for US Escrow & Financial Services, where his duties included credit, due diligence and analysis of finance clients. Mr. Devine received a B.A. degree in Accounting, Business Administration from Concordia College, Morehead, MN. He is a Certified Public Accountant, Minnesota 1982.

Mr. Devine started his career with Automatic Data Processing as a systems analyst in accounting and reporting systems for major accounts. After 3 years he entered the field of public accounting, where he gained exposure to a number of industries. Mr. Devine left public accounting in 1983 and formed a high-tech company for the production of high-end liquid crystal displays. Subsequent to the sale of this business, from 1985 to 1989 he joined an investment-banking firm where he became a securities principal and worked in the underwriting of debt and equity. Mr. Devine subsequently took a position as CFD for a national real estate management firm. He then accepted a political appointment in 1991 from the Governor of North Dakota as Deputy Director of Finance for the state's Department of Economic Development. In addition, he was appointed President of the North Dakota Future Fund, a venture capital fund financed by the state's legislature to provide capital to businesses and high-tech ventures within the state. After serving his term, Mr. Devine worked from 1995 to 1998 for an investment firm where he specialized in locating financing for companies based upon economic incentives from taxing authorities among other criteria. Mr. Devine works directly with the Company's CPA firm, Quinella Corporation, located in Denver, CO.

### Gary Smith: Sr. Manager Software Engineering

Mr. Smith was formerly the Senior Vice President of Software Engineering and Co-Chief Technology Officer of the Company with primary responsibility for intellectual property management, software architecture and project management. Mr. Smith is currently acting as a consultant to the Company and performing similar roles on a part time basis. Mr. Smith brings to the Company over 18 years of software engineering leadership, management, and development experience. He has been integrally involved in nearly all of the Company's software engineering activities, including systems engineering, software design and development, quality assurance, and information systems administration. From 2001 to 2006, he was lead systems engineer and development manager for an enterprise mission control research and development team for Raytheon Company – Space Systems. Mr. Smith has a Bachelor of Science degree in Computer Science and a Master of Science degree in Applied Mathematics from the University of Colorado. Mr. Smith spent over 15 years in the aerospace industry as an Integrated Product Team Manager, Software Architect, Principal Software Engineer, Systems Engineering Lead, and Principal Investigator for research and development. He spent an additional 4 years in the supply chain management and telecommunications industries, as a Senior Software Engineer and Technical Manager, respectively. He has extensive experience in ISD 9001 and CMMI Level 3 processes and procedures, as well as project management

GA000519

practices. His areas of expertise include software team leadership, large-scale software architecture and development, and mathematical optimization algorithms. Mr. Smith has a deep knowledge of, and experience with, the Company's technology.

**Brent Kaviar: Sr. VP Post Production**

Mr. Kaviar was the Senior Vice President of Post Production for New Line Cinema and Picturehouse with over 22 years of experience in all aspects of theatrical post production. He had a key role in the domestic and international releases of hundreds of New Line, Fine Line and Picturehouse films including The Lord of The Rings trilogy, Austin Powers, and Rush Hour films. Mr. Kaviar was the technical studio liaison with all of the filmmakers (directors and producers) ensuring their creative vision and high quality standards, while meeting all the studio requirements and supervising all post production facilities and vendors. In addition, Mr. Kaviar was the New Line post production executive on Journey to the Center of the Earth 3D, launched digital cinema and the film preservation departments, and helped negotiate major post production contracts while at New Line.

Brent Kaviar graduated from SUNY at Binghamton. He is a member of the Inter Society for the Enhancement of Cinema Presentations, Inc. and SMPTE (Society of Motion Picture and Television Engineering). He has participated in two studio audio committees recognized and awarded by the Motion Picture Academy with an Academy Award for Science and Technical Merit (Theatrical Audio Standards Association committee and Cyan Track committee).

Mr. Kaviar has veteran experience as a film post-production executive and has extensive knowledge of audio technology. Within a few months, he has opened doorways to the major motion picture studios and has helped to define the revenue models for licensing the AstoundSound technology for film (both Theatrical and Home Theater Distribution). This combination, coupled with his prior experience, gives him unique insight and opportunities into audio licensing specific to theatrical film releases and theatrical marketing. Mr. Kaviar's passion to incorporate the AstoundSound technology into upcoming 3D film titles and trailers (as well as conventional non 3D film titles) is an incredible value to the Company.

**Greg Morgenstein: Sr. VP Audio Engineering**

Greg Morgenstein is a multi-talented engineer, producer, composer, sound designer and editor. He's built an all star client roster by being reliable, innovative and always ready to jump into any audio project thrown his way. Determined not to silo himself, Mr. Morgenstein has worked with hip hop's beat and brightest stars such as Ludacris and Missy Elliot, teamed up with pop star greats Jennifer Lopez and Janet Jackson and partnered with several legends along the way, including Guns & Roses and Aretha Franklin. Outside of the music realm, Mr. Morgenstein was the sound designer for four of the DVD re-mastered James Bond films. Additionally, Mr. Morgenstein has composed music for "Moulin Rouge" and "The Break Up" movies.

Mr. Morgenstein is responsible for mixing, and managing all professional audio engineering services for the Company. Mr. Morgenstein's solid track record and extensive entertainment industry contacts provide business opportunities for licensing of the AstoundSound technology, including new film titles for theatrical release, new album projects from multi-platinum artists, and television broadcasts and advertisements. Mr. Morgenstein received his Bachelor of Science in Music from Berklee College of Music in 1997.

31

GA000520

## MANAGEMENT COMPENSATION

### Salaries

Employee compensation is approximately $92,416 per month and contractor compensation varies from month to month. In order to conserve financial resources and due to changes in the Company's business plan, the Company has endeavored to utilize consultants rather than employees for discrete project tasks. Three former employees, Gary Smith, Recy Pilloud, and Steve Bagwell are now engaged as part time consultants rather than full time employees. The following table sets forth information concerning the compensation of the most-highly compensated members of management.

| | |
|---|---|
| Jerry Mahabub, Founder, Chairman, CEO, President, and CTO[1] | $250,000 |
| Paul Powers, Chief Operating Officer & General Counsel | $225,000 |
| James T. Devine, Corporate Secretary & Sr. VP Finance | $135,000 |
| Brent Kovar, Sr. VP Theatrical Production | $120,000 |
| Greg Morgenstein, Sr. VP Audio Production | $120,000 |

[1] Mr. Mahabub is also entitled to a gross up bonus sufficient to pay all taxes due on his salary.

### Benefits

Employees also are entitled to standard benefits such as vacation and sick leave and to participate in the Company's standard benefit plans, which currently only consist of group medical and dental.

### Equity Incentive Plan

The Company awards warrants to purchase shares of the Company's Common Stock to its directors, officers, employees, and key contractors for purposes of incentivizing and retaining them, especially in light of the recent salary deferrals discussed above; however, the Company has no formal equity incentive plan and there are no formal plan documents governing such awards. Instead, the Board of Directors periodically sets aside a certain number of shares of Common Stock to be available for incentive compensation and then, based upon the recommendations of the Company's CEO, the Board of Directors approves grants of warrants out of this "pool" to particular individuals or consulting businesses on such terms as the Board of Directors deems appropriate. Although there is no formal set of plan terms or documents, the warrants are typically issued with an exercise price equal to fair market value (as determined by the Board of Directors) for a 5 year term with a cashless exercise feature pursuant to a standard form of Company warrant agreement. The primary variable that changes is whether any given warrants contain vesting conditions. Currently, no shares of Common Stock remain in the "pool" for issuance under this informal plan but the Board of Directors has the authority to make them available at any time without any stockholder action, although it has no current plans to do so.

### Cash Bonus Plan

The Company has also adopted a cash bonus plan for its directors, officers, employees, and key contractors upon the consummation of a significant transaction which creates value for all stockholders. In particular, in the event the Company sells substantially all of its assets or there is a change of control of the Company (a "Disposition") with a gross transaction price as set forth below, the Company will retain the following sum from the gross transaction price of such disposition transaction for the purpose of awarding cash bonuses to directors, officers, employees, and key contractors after the closing of such Disposition, subject to a maximum bonus pool of $10,000,000:

| Gross Transaction Price | Bonus % | Cash Range |
|---|---|---|
| >150MM - 200MM | 1% | 1.5MM – 2MM |
| >200MM - 250MM | 1.5% | 3MM – 3.75MM |
| >250MM - 300MM | 2.0% | 5MM – 6MM |
| >300MM | 2.5% | 7.5MM -10MM |

The allocation of this cash pool shall be made by recommendation of the CEO, and approved by the Company's Budget Committee except that the CEO's bonus shall be determined by the independent directors of the Board of

GA000521

Directors in the exercise of their sole discretion. Any bonuses allocable to directors shall be determined by the Budget Committee after obtaining the advice of an independent compensation advisor. No bonus pool shall be created unless the gross transaction price in the Disposition is more than One Hundred Fifty Million Dollars ($150,000,000) and the total cash bonus pool shall not exceed Ten Million Dollars ($10,000,000). For purposes of this bonus program, a Disposition expressly does not include any license arrangement.

<u>Legal Counsel</u>

The Company's primary law firms are Dorsey and Whitney, LLP for patent and trademark legal services and Greenberg and Traurig, LLP for general representation, particularly corporate and securities legal services.

BALANCE OF PAGE LEFT INTENTIONALLY BLANK

GA000522

## SECURITIES OWNERSHIP

The following table sets forth information regarding the ownership of the Company's securities as of the date of this Memorandum assuming the full amount of Shares offered pursuant to this Memorandum is subscribed for (without exercise of any overallotment right).

| GenAudio, Inc. | | | | | | |
|---|---|---|---|---|---|---|
| Shareholder Name | Position(s) | Common Voting Stock | % of Common Stock | Warrant Shares | Fully Diluted Shares | Fully Diluted Ownership |
| Jerry Mahabub (1) | Chairman, President, and CEO | 7,001,000 | 51.43% | 2,202,685 | 9,203,685 | 42.91% |
| Paul Powers(1) | Director, COO | 85,000 | 0.62% | 669,000 | 754,000 | 3.52% |
| Mark Bobak (1) | Director | 310,000 | 2.28% | 485,000 | 717,500 | 3.71% |
| Elliot Mazer | Director | 0 | 0.00% | 175,000 | 175,000 | 0.82% |
| Ted Cohen | Director | 0 | 0.00% | 175,000 | 175,000 | 0.82% |
| All directors as a group | | 7,396,000 | 54.33% | 3,629,185 | 11,025,185 | 51.77% |
| All other officers and employees as a group | | 0 | 0.00% | 3,113,800 | 3,113,800 | 14.52% |
| All other common stockholders as a group | | 4,766,000 | 35.01% | 1,014,400 | 5,857,900 | 26.95% |
| All Series D preferred stockholders as a group (2) | | 450,051 | 3.31% | 0 | 450,051 | 2.10% |
| Maximum number of shares reserved for this Offering | | 1,000,000 | 7.35% | 0 | 1,000,000 | 4.66% |
| Totals | | 13,612,051 | 100.00% | 7,834,885 | 21,446,936 | 100.00% |

(1) 1,000 of these shares are Series C Preferred Shares which are identical to common in all respects except that they carry the right to elect two board positions. Additionally, 3,464,750 of these shares represent shares that Mr. Mahabub no longer owns but for which he has retained all voting rights, including 200,000 shares to Mr. Powers and 750,000 shares to Mr. Bobak. Accordingly, they are reflected as still belonging to Mr. Mahabub in this table to reflect his full voting rights. *See "RELATED PARTY TRANSACTIONS."*

(2) Reflects the total number of shares of Common Stock into which the outstanding Series D Preferred Shares can be converted after applying their weighted average anti-dilution rights assuming this Offering is fully subscribed but excluding the 10% annual dividend which may be paid in cash or stock at the Company's election.

GA000523

## DESCRIPTION OF SECURITIES

The Company's authorized capitalization consists of 25,000,000 shares of Common Stock, par value $.0001 per share, and 5,000,000 shares of Preferred Stock, par value $.0001 per share, of which 1,000 have been designated as "Series C Preferred Stock" and 1,400,000 have been designated as "Series D 10% Convertible Preferred Stock." See *"DESCRIPTION OF SECURITIES."* 12,161,000 shares of Common Stock are currently issued and outstanding, warrants to purchase 7,834,885 shares of Common Stock have been granted and are outstanding. In addition, there are 1,000 shares of Series C Preferred Stock and 434,000 shares of Series D 10% Convertible Preferred Stock issued and outstanding (convertible into 450,051 shares of Common Stock if this Offering is fully subscribed as a result of such preferred stock's anti-dilution rights).

There are also 1,000 shares of Series C Preferred issued and outstanding, which were issued to Jerry Mahabub, the Company's President and Chief Executive Officer, in August of 2006, together with certain other consideration, in exchange for all of his rights in and to the intellectual property related to the AstoundSound brand and technology. See *"RELATED PARTY TRANSACTIONS."*

The following is a brief summary of certain terms and provisions of the capital stock of the Company. Such summary does not purport to be complete and is qualified in all respects by reference to the actual text of the Company's Articles of Incorporation (the "Articles"), its Bylaws, and to applicable law.

### COMMON STOCK

The holders of shares of Common Stock are entitled to one vote for each share on all matters on which the holders of Common Stock are entitled to vote. There is no cumulative voting for the election of directors. Subject to the rights of any outstanding shares of Preferred Stock, the holders of the Common Stock are entitled to receive ratably such dividends as may be declared by the Board out of funds legally available therefor. Holders of Common Stock are entitled to share ratably in the net assets of the Company upon liquidation or dissolution after payment or provision is made for all liabilities and the preferential liquidation rights of any shares of Preferred Stock then outstanding. The holders of Common Stock have no pre-emptive rights to purchase any shares of any class of stock. Additionally, all outstanding shares of Common Stock are, and the shares of Common Stock to be issued by the Company upon exercise of outstanding warrants shall be upon payment therefore, fully paid and non-assessable.

### PREFERRED STOCK

The Board currently has two series of Preferred Stock authorized - Series C Preferred Stock and Series D Preferred Stock - and may create and issue additional shares of Preferred Stock in one or more series and fix the rights, preferences and privileges thereof, including voting rights, dividends, terms of redemption, redemption prices, liquidation preferences, number of shares constituting any series or the designation of such series without further vote or action by the stockholders. Although the Company presently has no intention to do so, the Board may issue Preferred Stock with voting and conversion rights that could adversely affect the voting power of the holders of Common Stock or the Preferred Stock.

#### Series A and B Preferred Stock

The Company previously authorized Series A Preferred Stock and Series B Preferred Stock but each such series has been cancelled.

#### Series C Preferred Stock

The holders of Series C Preferred are entitled to one vote for each share of Series C Preferred held by such holder and have voting rights and powers equal to the voting rights and powers of the holders of Common Stock and any other series of Preferred Stock possessing voting rights as a single group. In addition, the holders of Series C Preferred, voting as a separate class, are entitled to nominate and elect two directors to the Company's Board of Directors, and possess the right to remove or replace such directors.

Currently, the Series C Preferred are all held by Jerry Mahabub who received such shares contemporaneously with his transfer of the core technology to the Company. The right to elect a second director was added to the Series C

35

GA000524

Preferred Stock by an amendment to the Articles of Incorporation due to the expansion of the Board of Directors from three (3) members to five (5) members. See "RELATED PARTY TRANSACTIONS."

Holders of the Series C Preferred are entitled to participate in any dividends declared by the Board of Directors in equal standing with the holders of the Common Stock. Upon the liquidation, dissolution or winding up of the Company, after payment or provision for payment of the debts and other liabilities of the Company and subject to any preferential rights that may be subsequently granted to holders of other series of preferred stock, the holders of the Series C Preferred share ratably in the distribution of the assets of the Company legally available for distribution among the holders of the Common Stock and the Series C Preferred.

### Series D Preferred Stock

The holders of the Series D Preferred vote on an as-converted basis and, except as otherwise set forth in the Articles, shall be entitled to vote, as a single class with the Common Stock, on all matters upon which shares of the Company's Common Stock are entitled to vote. In addition, the Company may not, without the affirmative vote of the holders of a majority of the Series D Preferred: (i) alter or change adversely the powers, preferences, or rights given to the Series D Preferred, (ii) increase the authorized number of Series D Preferred or (iii) enter into any agreement with respect to any of the foregoing.

Holders of the Series D Preferred accrue cumulative dividends at a rate of ten percent (10%) per annum on a daily basis (360 days per year) which are payable, at the election of the Company, in either cash or additional shares of Common Stock upon conversion or at such earlier dividend payment date(s) as may be declared by the Company. Holders of the Series D Preferred are also entitled to participate in any dividends declared by the Board of Directors in equal standing with the holders of the Common Stock.

Upon the liquidation, dissolution or winding up of the Company, after payment or provision for payment of the debts and other liabilities of the Company and subject to any preferential rights that may be subsequently granted to holders of other series of preferred stock, the holders of the Series D Preferred are entitled to receive, on a pro rata basis among all holders of Series D Preferred, an amount equal to the amount paid for the Series D Preferred plus all accrued and unpaid dividends, in preference to all other classes of capital stock currently existing. The Series D Preferred are, subject to weighted average anti-dilution rights with standard carve outs therefrom, convertible into shares of the Company's Common Stock.

If a Liquidity Event (as defined in the Section entitled SUMMARY OF THE OFFERING) does not occur by September 18, 2012, each holder of Series D Preferred shall have the right to either (i) increase the dividend rate to fifteen percent (15%) per annum until such time as the Liquidity Event occurs, or (ii) demand that the Company redeem such holder's Series D Preferred for cash at a redemption value of one hundred fifty percent (150%) of the purchase price, or $7.50 per share, plus all accrued and unpaid dividends.

### WARRANTS

The Company has issued warrants at various strike prices over the past several years to purchase up to 7,834,885 shares of Common Stock to investors, directors, officers, employees and consultants Of these warrants, (i) approximately 1,339,400 have been issued to investors in connection with their investments and (ii) approximately 6,495,485 have been issued to directors, officers, employees and consultants as compensation for their services.

The exercise prices of our outstanding warrants range from $0.50 for approximately 1,495,000 shares, to $1.00 for approximately 110,000 shares, to $3.00 for approximately 1,780,300 shares, to $4.00 for approximately 717,500 shares, and to $5.00 for approximately 2,392,685 shares.

Generally speaking, three different warrant forms have been used to evidence all of these warrants - one for compensatory grants which have various vesting conditions and few protections, one for earlier investors with a call provision (all of which have now been called), and one for later investors with no call provision and some subsequently negotiated protections for investors. None of our warrants expire prior to August 1, 2011, when approximately 1,605,000 compensatory warrants with exercise prices of $0.50 and $1.00 per share shall expire. Included in the number of outstanding Company warrants is the Company's recent issuance of warrants to its CEO, Jerry Mahabub, to purchase up to 2,052,685 shares of the Company Common Stock at $5.00 per share in

36

GA000525

consideration of his lending funds to the Company for continued operations, forgiveness of interest on certain debt owed to Mr. Mahabub by the Company and his purchase of studio Improvements and equipment from the Company at the Company's cost basis without depreciation for age or obsolescence. *See "RELATED PARTY TRANSACTIONS."*

The Company has an informal plan pursuant to which it issues shares of Common Stock from a "pool" of reserved shares to its directors, officers, employees and key contractors for purpose of incentivizing and retaining them. There are currently no shares available for issuance in such pool and no current plan to authorize additional warrants. *See "MANAGEMENT COMPENSATION."*

## PLAN OF DISTRIBUTION AND SUBSCRIPTION PROCEDURES

All of the Shares are being offered to selected persons qualifying as accredited investors pursuant to exemptions from registration pursuant to Section 4(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder and pursuant to the terms set forth in this Memorandum. The Shares are offered by the Company subject to receipt and acceptance by the Company, and the right to reject, any subscription in whole or in part.

The Offering hereunder will terminate upon the earlier of (i) the Company's sale of 1,000,000 Shares, subject to the Company's over allotment right to sell an additional 250,000 Shares depending on demand, or (ii) May 31, 2010, unless extended by the Company for an additional ninety (90) days at the discretion of the Board of Directors (the "Termination Date"). The Company shall not be required to provide any notice of earlier termination or extension of a termination date, including exercise of the Company's over-allotment right; provided, however the Company shall not extend the Offering beyond August 30, 2010, in any event

All expenses incident to the offer and sale of the Shares, including all filing fees, legal, accounting, and printing expenses, will be paid by the Company. The Company does not intend to pay any commissions; however, it reserves the right to pay up to a 10% commission to a licensed broker-dealer or other qualified finder.

The Shares may be purchased by selected offerees who verify that they are bona fide accredited investors. The minimum purchase amount is 10,000 Shares at $3.00 per share, or an aggregate of $30,000. The Company reserves the option to accept a lesser purchase amount at its discretion. The Company reserves the right to withdraw all or any part of the offering and, as stated above, to reject any subscription in whole or in part. The Company also reserves the right to offer additional incentives or "volume" discounts to any investor who invests more than $1,000,000.

All proceeds from subscriptions for the Shares shall be deposited into a segregated bank account established by the Company for purposes of this Offering in accordance with the instructions set forth in the Subscription Agreement. If the Offering is withdrawn or otherwise terminated or if any subscriptions are rejected, funds paid by subscribers whose funds are not closed upon will be returned without interest or deduction.

Subscriptions for the purchase of the Shares may be accepted by the Company as received, and there is no minimum number of Shares for which subscriptions must be received prior to the use of any Offering proceeds by the Company. Any subscriptions not received and accepted by the Company by the Termination Date shall be deemed refused and the Company shall return the full amount of the subject Investor's cash payment, without interest or deduction.

37

GA000526

At the time of investment, Investors will be required to execute and deliver a (i) Subscription Agreement in the form attached hereto as Exhibit A, including the confidential subscriber questionnaire attached thereto, and (ii) payment for the full purchase price of the Shares desired to be purchased. The Subscription Agreement should be provided to the Company at the following contact information:

      If by mail:      GenAudio, Inc.
                           8200 South Quebec Street, Suite A3250
                           Centennial, CO 80112
                           Attn: James T. Devine, VP of Finance

      If by fax:       (303) 865-8834

      If by email:    jdevine@genaudioinc.com

Payment for the Shares may be made by check payable to the Company and delivered to the Company or via wire transfer directly to the Company's segregated account, all pursuant to the instructions set forth in the Subscription Agreement.

## EXIT STRATEGY

We expect to develop a value proposition for AstoundSound within the next two years. We believe that the most likely event is a sale of the Company of substantially all of its assets to an established consumer products company, or alternatively, a license arrangement with one or more consumer electronics companies for exclusive use of the AstoundSound technology within certain defined markets. If a major acquisition is not consummated, the Company may conduct an IPO or alternative method of entering the public markets once the AstoundSound brand is further established and assuming we have reached a stage of generating substantial revenues and/or profits.

If GenAudio has not consummated a Liquidity Event (as defined in the Summary of the Offering) before September 18, 2014, each investor in the Offering shall have the right, exercisable in its sole discretion for the period beginning on such date and continuing for four (4) months thereafter, to require the Company to buy back his, her or its respective shares of Common Stock purchased in the Offering at the original purchase price, plus a 10% per annum (cumulative daily but not compounded) return thereon.

BALANCE OF PAGE LEFT INTENTIONALLY BLANK

38

## INAVASIS REPORT

Due to the recent success in optimizing the AstoundSound Technology for integration into consumer electronic devices, particularly hand held devices, as well as the extensive discussions conducted with the LCEC, the Company hired Inavasis, Inc. ("Inavasis") on November 5, 2009 to prepare two valuation reports to determine the fair market value of the AstoundSound technology across various market applications. The first valuation report specifically identifies the potential licensing revenues to the Company on both an exclusive and a non-exclusive basis with the LCEC we are working with, and contains an in-depth analysis of the value for the Company's AstoundSound technology within the specific product offerings of the LCEC. Due to the Company's nondisclosure obligations with the LCEC, this first report is for internal guidance for the Company's management and future negotiations with the LCEC only, and may not be shared with any third party.

A more abbreviated and generic valuation report has been prepared by Inavasis for the purpose of identifying the fair market value of the AstoundSound technology across various market applications, including both current and future licensing targets, without disclosing the identity of the LCEC. A copy of this second valuation report is attached hereto as Exhibit B (the "Valuation Report"). The Valuation Report contains the qualifications of Inavasis and its Chairman, Dr. Sam Khoury, as well as the valuation assumptions and limiting conditions of the Valuation Report. Attention is directed to the Valuation Report for more specific information concerning such matters.

The Valuation Report is intended to provide Company management with a certified third party valuation analysis of the fair market value of the Company's AstoundSound Technology and intellectual property rights, but there is no guaranty or assurance that any actual transactions will occur or that consummated transactions will result in the revenues projected in the Valuation Report, and the Company and its management make no representations or warranties concerning the same. The Valuation Report is not intended as a valuation of the Company itself or its Shares. See the "STATEMENT REGARDING FORWARD LOOKING PROJECTIONS" near the beginning of this Memorandum concerning any projections contained in the Valuation Report, and see also the "RISK FACTORS" section below for further discussion of the engagement of Inavasis and the nature of the Valuation Report.

The Valuation Report concludes that the Company's AstoundSound Technology has the potential to create gross licensing based revenues of over One Billion Dollars ($1,000,000,000) on a net present value basis as of the valuation date of the Valuation Report assuming the accuracy of the various assumptions set forth therein, including the entering of licenses in each of the markets at the assumed royalty rates within the time periods identified in the Valuation Report. Company management intends to use the Valuation Report solely as an evaluation and benchmarking tool to prioritize Company technology initiatives and to evaluate proposed licensing arrangements since the evaluation of the Company's technology is a very complicated and speculative process requiring specialized expertise from a qualified and experienced third party appraiser.

The "value" of the technology in various market applications does not necessarily mean that would be the "price" that is negotiated for specific anticipated license based transactions. Any prospective purchaser or licensee of all or any portion of the AstoundSound Technology will need to determine what price it is willing to pay for such technology use within its specific fields of use based on numerous factors, but the Valuation Report serves as one basis for the Company's management to evaluate third party offers and will enable the Company to engage Inavasis to assist Company management in such sale or licensing negotiations.

BALANCE OF PAGE LEFT INTENTIONALLY BLANK

GA000528

# RISK FACTORS

*The purchase of the Shares involves a high degree of risk including, but not limited to, the risks described below. Before subscribing for the Shares, each Investor should consider carefully the general investment risks enumerated elsewhere in this Memorandum and the following risk factors, as well as the other information contained in this Memorandum.*

RISKS RELATED TO THE BUSINESS OF THE COMPANY

### *Our products may have technical difficulties or undetected design errors which we may not be able to correct or that may otherwise cause us to incur additional costs*

Because our products have not been fully developed and deployed, they could have substantial defects, technical difficulties or undetected design errors. Our products have just recently been commercially deployed and, in fact, GenAudio has already encountered certain compatibility problems with certain versions of ASE with the latest versions of Apple and Microsoft operating systems that are being remedied but have delayed full deployment. We cannot assure you that our products will perform the desired functions, offer sufficient performance benefits or meet the technical or other requirements of customers. Further, if errors and defects are discovered, we cannot assure you that we will be able to correct such errors and defects. Also, technical difficulties or design errors could result in unanticipated costs, including costs related to product liability litigation. The discovery of any design defect or any ensuing litigation could damage our reputation and our relationships with our partners could be adversely affected and could materially and adversely affect our results of operations.

### *Our failure to reach an agreement to embed our ASE consumer product into consumer electronic products could have a material adverse affect on our business plan*

We are relying on our efforts to successfully integrate our technology as an embedded sound solution into consumer electronics for purposes of initial revenue generation and, potentially, brand development. If these efforts are not successful, we expect we will continue to struggle financially and that we will have difficulty establishing our brand. Factors that could contribute to our inability to successfully integrate our technology into consumer electronics include product errors, technical difficulties related to the integration process as well as a failure to reach acceptable business terms with the manufacturers of consumer electronics into which our technology may be embedded.

### *We anticipate having an initial long sales cycle for certain of our products*

We believe that potential customers of certain of our products, namely AstoundSound Pro and our video game RTI application, initially will need to go through an internal process to decide whether our products fit their needs. We will have to educate and inform prospective customers regarding the use and benefits of our products. For these and other reasons, our initial sales cycle for these products will be a lengthy process. During this process, we will have to expend substantial time, effort and funds demonstrating our products, preparing contract proposals and negotiating agreements. Our failure to achieve signed contracts after expending such time, effort and funds could have a material adverse affect on our business, operating results and financial condition, especially since we are applying a "top down" approach where we focus on the professional audio engineers to be first adopters of our technology, thus driving our brand in the market place.

### *We initiated limited marketing efforts and we will be reliant on strategic partners*

We formally launched our initial product, ASE, at the Mac World Expo on January 6th to the 10th, 2009, the Consumer Electronics Association International Show on January 8th to the 11th, 2009, and the Sundance Film Festival on January 15th to the 25th, 2009. In addition, a few months prior to this product launch we commenced marketing and public relations efforts to potential customers, including an Amazon promotion for 6 tracks off of Robin Thicke's *Something Else* album that were mixed in our technology and a sweepstakes promotion with Universal Home Theater in connection with the recent release of the *Hellboy II* DVD. These marketing efforts, and others that largely consist of establishing strategic alliances and non-revenue branding opportunities, continue. Notwithstanding, product awareness does not appear to be robust and, despite a substantial investment in these marketing activities, sales are expected to be nominal until we are able to become fully compatible with Microsoft 7 and Apple Snow Leopard operating systems and gain better promotional exposure such as being advertised on music centric websites such as Wolfgang's Vault and Pandora.

40

GA000529

Our success in promoting, marketing and licensing our technology, products and services will depend on enhancing awareness and may depend in large part on our ability to enter into a number of additional agreements with strategic partners. There is no guarantee that we will be able to enhance such awareness or enter into such agreements on favorable terms and therefore our ability to generate revenue could suffer. Should we fail to do any of these things, our business will likely be materially adversely affected.

Furthermore, there can be no assurances that any strategic partners will actively market our technology, products and services, or that if they do so, their efforts will be successful or generate significant revenues for the Company. Although we intend to develop on in-house marketing and sales infrastructure to focus on direct sales to potential customers, there can be no assurance that the Company will have the necessary resources to do so, or that any such efforts undertaken will be successful.

### *We may not successfully develop our brand*

Establishing and maintaining our brand name will be a crucial aspect of our effort to attract business. In addition, we believe that the importance of brand recognition will increase in the future due to the growing number of competitors. Promotion and enhancement of our brand name will depend largely on our ability to provide consistent high-quality products and services, which cannot be assured. As noted above, two of our strategies in this regard is to embed certain or our products into consumer electronics manufactured by leading companies in the industry and to cause professional audio engineers to adopt certain of our other products as the audio mixing "gold" standard. If we are unsuccessful in these endeavors, we will have difficulty developing our brand. And, if and when we do develop any significant brand recognition, if our customers do not perceive our products to be of a high quality, or if we introduce new products and services or enter into new business ventures that are not favorably received by identified users, the value of our reputation and brand name will be diminished.

### *We will be dependent on third-party relationships*

We expect to be dependent on a number of third-party relationships. These relationships are intended to include arrangements, including non-exclusive contracts and partnerships with providers of key services, and the resulting generation of revenue, including third party promotional arrangements with such parties as Wolfgang's Vault or the Avangate promotional affiliates. The failure of us to enter into and thereafter continue such relationships on reasonable terms could have a material adverse affect on our business, results of operations and financial condition.

### *Rapid technological changes may have a potential adverse effect on our business*

Our future growth and our ability to remain competitive may depend in part upon our ability to develop new and enhanced products or services and to introduce these products or services at competitive prices in a timely and cost-effective manner. The markets for our products and services are characterized by rapid technological change, frequent new introductions, changes in customers' demands and evolving industry standards. In addition, product and service introductions or enhancements by our competitors or the use of other technologies could cause a decline in sales or loss of market acceptance of our existing products and services. Our success in developing, introducing, selling and supporting new and enhanced products or services depends upon a variety of factors, including timely and efficient completion of service and product design and development, and timely and efficient implementation of product and service offerings. Because new product and service commitments may be made well in advance of sales, new product or service decisions must anticipate changes in the industries served. Such a failure on our behalf to react to changing market conditions could create an opportunity for other market participants to capture a critical share of the market within a short period of time.

### *We are a technology-based company, which may affect our market value for reasons beyond our control*

We are a technology-based company, and as such may be susceptible to wide shifts in our market value due to a variety of factors. These factors include, among others, the rapidly changing and very competitive market for technology-based products and the large expense and lengthy time period involved in researching and developing such products. These market attributes require companies to have strong technical support systems, track records and financial stability to maintain and attract new clients. Companies in these markets also experience serious competition in hiring sales, consulting and technical personnel. There can be no assurance that we will be able to overcome these obstacles and compete successfully in our market. Our future success will depend, in large part, on

41

GA000530

our ability to penetrate the market in accordance with our current plans and then maintain a competitive position in such market.

### *We face competition*

The market for products and services similar to ours is competitive and we expect competition to intensify in the future. Numerous well-established and well-financed companies and smaller entrepreneurial companies are focusing significant resources on developing and marketing products and services that may compete with us. There can be no assurance that we will be able to compete successfully or that competitive pressure, including possible downward pressure on the prices we charge for our products and services, will not affect our business, results of operations and financial condition. Several existing companies may, in part or in whole, compete directly with us. Many of our competitors may be significantly larger than us, have established operating histories and procedures, have access to significantly greater capital and other resources, have management personnel with more experience than our management and may have other advantages over us in conducting certain businesses and providing certain services. There can be no assurance that we can compete successfully.

### *There may be fluctuations in our operating results*

If we are unsuccessful in embedding our technology into consumer electronics or cannot reach acceptable business terms in connection with same, we may have difficulty generating revenues in the near term since we have experienced low levels of downloads of our stand-alone ASE consumer product, expect longer sales cycles with our professional applications and initially expect that we will license our products at the outset primarily for marketing exposure as opposed to revenue.

Once operations are more consistent and revenues are more reliable, significant annual and quarterly fluctuations in our results of operations may be caused by, among other factors, the volume of revenues generated by the Company, the timing of new product or service announcements, releases by the Company and its competitors in the marketplace of new products or services, and general economic conditions.

There can be no assurances that the level of revenues and profits, if any, achieved by us in any particular fiscal period will not be significantly lower than in other comparable fiscal periods. The Company's expense levels are based, in part, on its expectations as to future revenues. As a result, if future revenues are below expectations, net income or loss may be disproportionately affected by a reduction in revenues, as any corresponding reduction in expenses may not be proportionate to the reduction in revenues.

### *We may be unable to manage growth effectively*

We expect to expand our operations by embedding our technology in consumer electronics, targeting professional audio engineers for the adoption of our technology in the mixing process, mixing audio projects in our technology through an affiliated studio, increasing our sales and marketing efforts, building additional strategic relationships with third parties, expanding our product offerings and research and development activities, and escalating our infrastructural and personnel capabilities. The anticipated growth could place a significant strain on our management, and operational and financial resources. Effective management of the anticipated growth will require expanding our sales, administrative, development and management personnel, implementing appropriate financial controls, and developing additional expertise by existing management personnel. However, there can be no assurances that these or other measures implemented by us will effectively increase the Company's capabilities to manage such anticipated growth or to do so in a timely and cost-effective manner. Moreover, management of growth is especially challenging for a Company with a short operating history and limited financial resources, and the failure to effectively manage growth could have a material adverse affect on our operations.

### *We will be required to invest in facilities and equipment on a continuing basis*

We have invested, and intend to continue to invest, in facilities and state-of-the-art equipment in order to increase, expand or update our capabilities and facilities. In light of anticipated business opportunities, a significant investment in audio processing equipment and facilities is contemplated. Changes in technology or sales growth beyond currently established production capabilities will require further investment. However, there can be no assurances that we will generate sufficient funds from operations to finance any required investment or that other

42

GA000531

sources of funding will be available. Additionally, there can be no guarantees that any future expansion will not negatively affect earnings.

### *We may be unable to protect and enforce our proprietary rights*

Our ability to compete effectively with other companies will depend, in part, on our ability to maintain the proprietary nature of our intellectual properties, e.g., patents, trademarks, copyrights and trade secrets. Our success will also depend, in part, on our ability to obtain and/or enforce intellectual property protection for these assets in the United States and other countries. The Company, in such circumstances, may file applications for patents, copyrights and trademarks, and enter into confidentiality and non-compete agreements, all as management deems appropriate. However, there can be no assurances as to the degree of protection offered by any intellectual property ·rights issued to, licensed by or otherwise negotiated for by, the Company.

There can be no assurances that competitors, many of whom have substantial resources and substantial investments in competing technologies, will not seek to apply for and obtain patents and other intellectual property protection that would prevent, limit or interfere with our ability to make and sell our products and or services. In addition, the laws of certain countries do not protect our proprietary rights to the same extent as do the laws of the United States

The defense and prosecution of patent, trademark, copyright and trade secret infringement and misappropriate suits may be both costly and time consuming even if the outcome is favorable to the Company. An adverse outcome could subject us to significant liabilities to third parties, require disputed rights to be licensed from third parties, or require us to cease selling some or all of our products. We will also rely on proprietary technology in the form of trade secrets and know-how and there can be no assurances that others may not independently develop the same or similar technology, or otherwise obtain access to our proprietary technology. There can be no assurances that confidentiality agreements entered into by the Company's employees, consultants, advisors and collaborators will provide meaningful protection for our trade secrets, know-how or other proprietary information in the event of any unauthorized use or disclosure of such trade secrets, know-how or other proprietary information.

### *We are dependent upon computer infrastructure*

We rely heavily on our computer hardware operations, the computer facilities and related services of our digital distribution partner, and the Internet. Accordingly, a system failure could materially adversely affect the performance of the Company. We presently have limited redundancy systems, no back up facilities and only a limited disaster recovery plan. Despite the implementation of network security measures by us, computer servers are vulnerable to computer viruses, physical or electronic break-ins and similar disruptive problems. Computer viruses, break-ins or other problems caused by third parties could lead to interruptions, delays or stoppages in service to users of our services and products. The occurrence of any of these events could have a material adverse affect on our business, operations and financial condition.

### *Loss of key members of our management could adversely affect our business*

We are highly dependent on the services of Jerry Mahabub, the Company's President and Chief Executive Officer, and the loss of his services could have an adverse affect on the future operations of the Company. We do not currently maintain a key-man life insurance policy insuring the life of Mr. Mahabub, although the Company may secure such a key man insurance policy on Mr. Mahabub in the future.

### *We may not be able to attract and retain professional and qualified personnel*

Our ability to realize our objectives will be dependent on our ability to attract and retain additional, qualified personnel. Competition for such personnel can be intense, and there can be no assurance that our results will not be adversely affected by difficulty in attracting and/or retaining qualified personnel. We require all personnel to enter into confidentiality agreements as a condition of employment. However, there can be no assurance that such agreements will fully protect us from competitive injury if any of these individuals leave the Company and disclose proprietary or otherwise sensitive information.

43

GA000532

*We might be unable to employ a sufficient number of technical personnel.*

We believe that our success depends upon our ability to employ and retain technical personnel with the ability to design, utilize, enhance service and maintain our technology and products. In addition, our ability to expand our operations depends in part on our ability to increase our personnel having the expertise to expand the capabilities of our existing products and to develop new products. The demand for such personnel is high and the supply of qualified technical personnel is limited. A significant increase in the wages paid by competing employers could result in a reduction of our technical work force and increases in the wage rates that we must pay or both. If either of these events were to occur, our cost structure could increase and our growth potential could be impaired.

RISKS RELATED TO THE COMPANY

*We have a limited operating history and limited capital and should be considered a start-up company*

The Company was formed in 2003 and it has just recently established revenues, though they are immaterial at this point. Our current operations consist of developing our proprietary technology to provide audio processing products and services to consumers and the entertainment industry. As a result, GenAudio has limited historical financial and revenue information upon which you can judge our business. There can be no assurance that we can realize our plans on the timetables projected in this Memorandum in order to reach sustainable or profitable operations. There is no assurance that we will not seek additional capital or that such capital shall be available at reasonable cost, or that it would not materially dilute your investment in this Offering if it is obtained.

Investment in a start-up company such as the Company is inherently subject to many risks. The Company only has a limited operating history upon which you may base an evaluation of our performance; therefore, we are still subject to all of the risks incident to the creation and development of a new business including, among other items, competition from other companies, the lack of long-term operating history, and the need for additional working capital.

*Our existing shareholders will have controlling ownership*

Assuming the maximum amount of Shares offered hereunder are sold in this Offering, the directors, executive officers and principal stockholders of the Company will still own a majority of the Company's voting capital stock. In fact, Mr. Mahabub, the Company's Chairman and CEO, will hold the right to vote a majority of the Company's capital stock on his own. The voting rights represented by these share holdings provide our management, namely Mr. Mahabub, with a sufficient number of voting rights to control the election of our directors, cause us to engage in transactions with affiliated entities, cause or restrict the sale or merger of the Company, and effect such other matters as may be presented for a vote of our shareholders. Such concentration of ownership and control could have the effect of delaying, deferring or preventing a change in control of the Company even when such a change of control would be in the best interests of the Company's other stockholders. Accordingly, Investors will have little voice in our management decisions and will exercise very little control over us. In addition, the Colorado Business Corporation Act provides that certain actions must be approved by a specified percentage of shareholders. In the event that the requisite approval of shareholders is obtained, dissenting shareholders would be bound by such vote. Accordingly, no persons should purchase Shares unless they are willing to entrust all aspects of control to our management. In addition to the foregoing, the Company created a class of Series C Preferred Stock (the "Series C Preferred") which is virtually identical to the Common Stock, but entitles the holders thereof to appoint two members to the Company's Board of Directors. All of the authorized shares of Series C Preferred were issued to Mr. Mahabub, our founder, Chairman of the Board, and CEO, as partial consideration for the Company's proprietary technology. As a result, for as long as he owns such shares of Series C Preferred, he will be entitled to appoint at least two members to the Board. See *"BOARD OF DIRECTORS AND MANAGEMENT,"* and *"DESCRIPTION OF SECURITIES."*

*We may be subject to claims from previous offerings*

Although we are not a party to any pending legal actions or proceedings and are not aware that any such actions or proceedings are likely to be initiated in the near future, since we commenced operations in 2003, we conducted three securities offerings in the early years of the Company in which we sold securities to accredited and non-accredited "friends and family" Investors. Although we have not conducted an in-depth investigation of those offerings, we believe that we may not have fully complied with all applicable securities rules to qualify such offerings as exempt

44

GA000533

from registration. Accordingly, we may have sold unregistered securities in violation of the Securities Act, and any counterpart state securities laws in those states where such securities were sold. Until the various federal and state statutes of limitations have expired with respect to any such violations, some or all of the investors in such offerings may have a right to rescind their respective investments, entitling them to a return of their investment capital with statutory interest. In addition, the Securities and Exchange Commission and any state securities agencies with jurisdiction could potentially seek to enforce the securities laws and penalize us for any such violations. There is also a risk that the current Offering could be integrated with the prior offerings so that our failure to comply with applicable securities laws and regulations would be deemed a failure of this Offering to so comply. Notwithstanding the foregoing, given the likely scope of any potential securities violations, the context in which they may have occurred and the nature of the Company's investors, we do not believe that the risk of a rescission or enforcement action being threatened or brought against us is significant.

### *We have not filed all tax returns since the commencement of our operations*

The Company has recently retained tax counsel to assist it with filing past due tax returns and recently filed tax returns for calendar year 2004. Because the Company has not generated any revenue until late 2008 and has never had net income, the Company does not believe that this failure will result in any material adverse consequences (though it may result in the imposition of some nominal penalties), and the Company expects some beneficial tax loss carry forwards.

### *We have historically characterized all of our service providers as independent contractors*

In its early years, the Company characterized all of the individuals who provided it with services as independent contractors. The Company, with the assistance of outside tax counsel, is currently evaluating whether any of these individuals were improperly characterized as such and, if so, the best approach for rectifying the situation. The Company believes it is likely that at least a few of these individuals should have been characterized as employees and that the Company will be responsible for any withholdings and related tax payments that it may not have made as a result of the mischaracterization. Once the Company's evaluation is complete, the Company intends to make corrective tax filings and to pay any amounts required thereby to the Internal Revenue Service, the Colorado Department of Revenue and any other applicable tax authority.

### *GenAudio has not paid any dividends and have no current plans to pay any dividends on our Common Stock*

GenAudio has never paid cash dividends on our Common Stock and has no current plans to pay cash dividends with respect to our Common Stock in the foreseeable future. We intend to retain any earnings for use in the operation of our business. Our Board shall determine dividend policy in the future based upon, among other things, our results of operations, financial condition, contractual restrictions and other factors deemed relevant at the time. We intend to retain appropriate levels of our earnings, if any, to support the Company's business activities.

### RISKS RELATED TO THE OFFERING

### *There is no minimum number of Shares which must be sold in the Offering; this is a best efforts Offering*

There is no minimum number of Shares that must be sold by us in this Offering prior to the initial closing, and we expect to accept subscriptions for Shares as they are received. As a result, there can be no assurance that we will raise sufficient funds in this Offering to carry out our business plan as currently proposed, or that the net proceeds from the initial subscriptions for the Shares will be in an amount sufficient to enable us to continue operations in any meaningful manner. In the event sufficient subscriptions for the Shares are not received and accepted by us, we may be forced to curtail or cease our activities, which would likely result in the loss to Investors of all or a substantial portion of their investment.

The Shares are being offered by the Company on a "best efforts" basis. No individual, firm or corporation has agreed in advance to purchase any of the offered Shares. No assurance can be given that any or all of the Shares will be sold.

45

GA000534

### *The offering price of the Shares is not based on any objective criteria*

The offering price for the Shares was determined arbitrarily by the Company based upon a number of factors. Such price is based primarily on the amount of funds sought from this financing, the number of shares of Common Stock the Board is willing to issue in order to raise such funds, the prices at which the Company has historically sold equity, the recent accomplishment of certain milestones and the Company's other business prospects. Accordingly, there is no direct relationship between the price of the Shares and the assets, earnings, net worth or book value of the Company, the market value of the Common Stock, or any other recognized criteria of value. As such, the price does not necessarily indicate the current value of the Shares and should not be regarded as an indication of any future market price of the Company's capital stock.

### *There is no public market for the Shares*

The Shares offered hereby are being offered in a private offering based upon available exemptions from federal and state securities laws. There is no public market in which the shares of Common Stock may be sold, and it is not anticipated that any such market will develop in the foreseeable future. Therefore, purchasers of the Shares should be prepared to hold their Shares for an indefinite period of time.

### *The Company may not be able to honor the Investors' put rights*

If a Liquidity Event (as defined in the Section entitled *"SUMMARY OF OFFERING TERMS"*) does not occur by September 18, 2014, the Investors have the right to require the Company to buy back their shares at a price equal to the amount paid for them plus a return at the rate of 10% per annum. There can be no assurance, however, that the Company will have sufficient funds to honor this put right at such time. Accordingly, investors should not rely on such right as a contingent exit strategy, especially since the factors that may result in the Company's ability to achieve a Liquidity Event by September 18, 2014 (e.g., failure to gain market acceptance or to generate significant revenue), may be the same factors that would prevent the Company from being able to repurchase the Investors' Shares pursuant to their put rights.

### *There are restrictions on transfer of the Shares*

The Shares offered hereby will be restricted securities as such term is defined in Rule 144 under the Securities Act. None of such Shares may be resold unless registered under the Securities Act and applicable state securities laws or unless exemptions from such registration requirements are available. Any such exemption must be established to our satisfaction.

Because of potential restrictions on transferability of the Shares, and the fact that no trading market exists or is expected to develop for the Shares, holders of the Shares are not likely to be able to liquidate their investments or pledge the Shares as security on a loan in the event of an emergency. Thus, the Shares should be considered only as a long-term investment.

### *There will be no merit review of the Offering*

Investors are cautioned that the Shares have not been registered under the Securities Act or any state securities laws. No federal or state authority has reviewed the accuracy or adequacy of the information contained herein nor has any regulatory authority made a merit review of the pricing of this Offering, the percentage of capital stock offered to Investors, or any dilutive factors therefrom. Therefore, Investors must recognize that they do not have all the protections afforded by securities laws to register or qualify offerings with the Federal government or in states with merit reviews, and must therefore judge for themselves the adequacies of the disclosures, the pricing, dilution and fairness of the terms of this Offering without benefit of prior merit review by any authorities.

### *We may require additional financing*

Assuming the maximum amount of Shares offered hereunder are sold in this Offering, we believe that the net proceeds from this Offering, together with our projected cash flow from operations, will be sufficient to fund the Company's operations as currently conducted until the end of 2010, by which time we expect to be generating self-sustaining revenues, assuming the Company's business plan and earnings projections and their underlying assumptions are materially accurate. Such belief, however, cannot give rise to an assumption that our cost estimates

46

GA000535

are accurate or that unforeseen events or changes in our business plan or earnings projections would not occur that would require us to seek additional funding to meet our operational needs. In addition, there can be no assurance that the cash flow generated from operations will be sufficient to implement our business objectives. As a result, we may require substantial additional financing in order to implement our business objectives.

There can be no assurances that we will be able to obtain additional funding when needed, or that such funding, if available, will be available on terms acceptable to us. In the event that our operations do not generate sufficient cash flow, or we cannot acquire additional funds if and when needed, we may be forced to curtail or cease our activities, which would likely result in the loss to Investors of all or a substantial portion of their investment.

### _Dilution effect of the Offering_

After completion of this Offering and assuming the maximum amount of Shares offered hereunder are sold in this Offering, existing shareholders will own 13,612,051 shares of the Company's capital stock representing approximately 92.54% of the Company's issued and outstanding capital stock (including outstanding Series C Preferred and Series D Preferred on an as-converted basis), whereas the investors under this Offering will own 1,000,000 shares of Common Stock, representing approximately 4.66% of the Company's issued and outstanding capital stock , for which they shall have paid $3.00 per share, well in excess of the average price per share paid for the outstanding shares of Common Stock, thus representing an immediate dilution in their investment. *See* "SECURITIES OWNERSHIP" and "DESCRIPTION OF SECURITIES".

Finally, in the event we require additional equity financing subsequent to the completion of this Offering, purchasers of the Shares in this Offering may experience further dilution to the extent that such new shares may be issued for a value less than the price paid for the Shares offered hereunder. We may issue or sell additional securities of the Company in the future, upon such terms and at such price as we may determine in our sole discretion.

### _GenAudio has the right to create and issue additional series of Preferred Stock, which may have preferential rights over the holders of Common Stock_

We are authorized to issue up to 5,000,000 shares of Preferred Stock, of which 1,000 shares have been designated as "Series C Preferred Stock" and 1,400,000 shares have been designated as "Series D 10% Convertible Preferred Stock," the rights, preferences and limitations of which are described elsewhere in this Memorandum. *See* "DESCRIPTION OF SECURITIES." Additional preferred stock may be issued in any series from time to time with such designations, rights, preferences and limitations, including stock with rights senior and in preference to the Common Stock, and may be sold at such price, as the Board may in its sole discretion.

### _We may need to raise additional capital in the form of debt, which would be senior to our capital stock_

From time to time, we may need to raise additional capital to fund the Company's operations and product development, and these funds may be raised in the form of debt. We can issue any type of debt for any purpose without your consent. In the event that we incur any indebtedness, our Common Stock and Preferred Stock will be junior and subordinate to such debt. In the event of a liquidation, the holders of our debt would be entitled to repayment before any distribution of our assets, if any, to holders of Common Stock and Preferred Stock. Although the Company has no outstanding long-term debt or loan facilities at this time, as of March 1, 2010 it does owe various vendors $141,111 in trade payables, and third party contractors approximately $73,333, current employees approximately $544,126 in deferred compensation (of which $204,230 is owed to Mr. Mahabub), and Mr. Mahabub approximately $459,378 for loans made by him to the Company over the past year to fund operations. *See* "RELATED PARTY TRANSACTIONS."

### _Management will have broad discretion in the allocation of the proceeds from the Offering_

We intend to use the net proceeds of this Offering as set forth in the Summary of Offering. In the event less than all of the Shares are sold in this Offering, or other unforeseen events or circumstances arise, the Board of Directors will have broad discretion in allocating the proceeds of the Offering by reallocating, eliminating and/or reducing funds to be expended on the categories set forth in such Summary.

47

GA000536

*There are risks associated with dependence on our projections*

The plans and projections discussed by the Company in this Memorandum are based upon assumptions that we
believe to be reasonable. Among other things, our plans are based on the premise that existing and future consumer
demand for the intellectual property, products, goods and services offered by the Company will continue or
materialize.   Such assumptions may, however, be incomplete or inaccurate, and unanticipated events and
circumstances may occur. For these reasons, actual results achieved during the periods covered may be materially
and adversely different than the projections and plans GenAudio has developed. Moreover, even if the assumptions
underlying the Company's plans prove to be correct, there can be no assurances that we will not incur substantial
operating losses in attaining our goals.

*There are risks associated with dependence on the Valuation Report*

The Valuation Report attached to this Memorandum was not prepared by the Company and represents only potential
licensing valuations in various markets based on the numerous assumptions set forth in the Valuation Report.
Accordingly, the Company is not in a position to determine the accuracy of such projections. Such assumptions may
be incomplete or inaccurate, and unanticipated events and circumstances may occur.   For these reasons, actual
results achieved may be materially and adversely different than the projections set forth in the Valuation Report.
Even if the assumptions underlying the Valuation Report prove to be correct, the Valuation Report is not intended as
a valuation of the Company or its Shares. Moreover, a substantial portion of Inavsis' remuneration for the report
was paid in part with warrants to purchase 270,000 shares of the Company's Common Stock at $5.00 per share so
Inavsis has an economic interest in the Company. This is noted in the Valuation Report by Inavsis as follows: "
*The fee is not based, in any way, on any values arrived at in the valuation. The fees for this report were established
prior to the commencement of any work. Inavsis agreed to accept fixed fee compensation for conducting the
valuation with cash and warrants to acquire common stock of GenAudio. Despite this form of compensation the
Inavsis report was designed to remain independent to help GenAudio management negotiate arms length and fairly
valued licensing deals with potential licensees, or on outright sale of the AstoundSound Technology to one or more
buyers.*"

*Unaudited Financial Information*

All financial information and financial statements provided as part of this Memorandum or otherwise provided to
Investors in connection with a potential investment in the Shares, have been prepared internally by the Company
based on numerous assumptions.  No independent party has in any manner verified, audited or confirmed the
reasonableness of the assumptions or the data that form the basis of such financial information and our financial
statements were not prepared in accordance with generally accepted accounting principles.

*Investors are not independently represented*

Prospective investors in the Company are encouraged to engage independent counsel and financial advisors in its
organization or in connection with the preparation of Offering materials. Attorneys assisting in the formation of the
Company and the preparation of the Offering materials have represented only the Company.  Any decision by an
Investor to invest in the Offering should be based on an independent review of the merits and risks of any
investment in the Company undertaken by the Investor, together with its advisors, if any.

**OTHER RISK FACTORS**

The United States is currently in a recession. Business activity across a wide range of industries and regions is
greatly reduced and local governments and many businesses are experiencing serious difficulty due to the lack of
consumer spending, reductions in the value of real estate and the lack of liquidity in the credit markets.
Unemployment has increased significantly. Since mid-2007, and particularly during the second half of 2008 and first
quarter of 2009, the securities markets generally were materially and adversely affected by significant declines in the
values of nearly all asset classes and by a serious lack of liquidity and a lack of financing for many investors.

Market conditions have also led to the failure or merger of a number of prominent financial institutions. In addition,
declining asset values, defaults on mortgages and consumer loans, and the lack of market and investor confidence,
as well as other factors, have all combined to cause rating agencies to lower credit ratings, and to otherwise increase

48

GA000537

the cost and decrease the availability of capital, despite very significant declines in Federal Reserve borrowing rates and other government actions.

Some banks and other lenders have suffered significant losses and have become reluctant to lend, even on a secured basis, due to the increased risk of default and the impact of declining asset values on the value of collateral. The foregoing has significantly weakened the strength and liquidity of some financial institutions. In 2008 and 2009, the U.S. government, the Federal Reserve and other regulators have taken numerous steps to increase liquidity and to restore investor confidence, but asset values have continued to decline and access to capital continues to be very limited.

The Company's performance will be dependent upon the business environment in the markets where the Company operates and consumer confidence, which is relatively low at this time. It is expected that the business environment and consumer confidence globally and in the United States will continue to deteriorate for the foreseeable future. There can be no assurance that these conditions will improve in the near term and such conditions could adversely affect the Company's overall results of operations and financial condition.

In addition to the above risks, businesses are often subject to risks not foreseen or fully appreciated by management.

## RELATED PARTY TRANSACTIONS

### Transfer of Intellectual Property by Mr. Mahabub to the Company

In August of 2006, the Company issued 1,000 shares of Series C Preferred Stock to Mr. Mahabub. The Series C Preferred was issued, among other consideration, in exchange for all rights to the intellectual property for the Company's core technology and its related applications. Such additional consideration included forgiveness of any loans advanced to Mr. Mahabub prior to August, 2006, and inventor royalties payable to Mr. Mahabub once Net Revenues (defined below) from the licensing and/or sale of such intellectual property exceed fifty million dollars ($50,000,000), in accordance with the following schedule:

| NET REVENUES | PERCENT OF NET REVENUES |
|---|---|
| Over $50,000,000 | 3.5% |
| Over $100,000,000 | 2.5% |
| Over $150,000,000 | 1.5% |
| Over $200,000,000 | 0.5% |

"Net Revenues" are deemed to be the aggregate amount of (i) annual revenue received by the Company from the licensing of the Company's intellectual property to other parties or from the sale of products and services incorporating or otherwise relying upon the intellectual property, less discounts and allowances, returns, refunds and promotional sales, the amount of any shipping or insurance billed, sales or use taxes, and support obligations or (ii) the consideration received by the Company from the sale of the Company's intellectual property or any portion thereof, less any transaction costs incurred by the Company.

### Financing of Company Operations by Mr. Mahabub

As of March 1, 2010, Mr. Mahabub has sold 3,464,750 of his personal shares of Company Common Stock to investors at varying prices (though Mr. Mahabub has retained all voting rights to these shares pursuant to irrevocable proxies). The purpose of these sales has been, among other things, for Mr. Mahabub to raise funds to loan to the Company for purposes of financing the Company's operations, which have been scaled back over the past year due to a shortage of funds. These transactions resulted in the Company owing to Mr. Mahabub the aggregate principal amount of approximately $1,536,622 as of February 12, 2010. In lieu of payment of the accrued interest on such loaned monies and in recognition of Mr. Mahabub's sale of his personal shares (at what Mr. Mahabub and the Company believe to have been below their fair market value at the time of sale) to provide loans to the Company for Company operations, Mr. Mahabub received warrants to purchase 1,536,622 shares of the Company's Common Stock (i.e., one share of Common Stock for each dollar loaned to the Company) for a period of five years at a strike price of $5.00 per share.

49

GA000538

### Sale of Studio Improvements and Equipment to Mr. Mahabub

The Company previously entered into a month-to-month lease for its primary studio facility in the Los Angeles area so that it could mix projects more efficiently using its technology. The purpose of these projects is to generate revenue and build brand recognition within the industry. Under the lease, the Company was responsible for the build-out of the studio space, which the Company diligently undertook. Last summer, however, the landlord demanded that the Company enter into a lease with a three year term; however, given the Company's financial situation, it was not in a position to responsibly make such a commitment. As a result, on July 1, 2009, Mr. Mahabub agreed to lease the studio from the landlord instead.

Mr. Mahabub has subsequently assigned the lease to a newly-formed company named Astound Studios, LLC that is owned wholly by him ("ASL"). With the studio build out substantially complete, the Company, ASL and Mr. Mahabub have entered into a Studio Agreement dated as of March 1, 2010 for the Company's use of the studio space on a first priority and rent free basis. In addition, as part of the arrangement, the Company and Mr. Mahabub agreed to transfer the ownership of the improvements to the studio space and various studio equipment from the Company to Mr. Mahabub (who will then contribute such property to ASL) for $860,848, an amount equal to the Company's cost basis in the improvements and studio equipment. In lieu of cash payment from Mr. Mahabub for the purchase price, the parties agreed to offset such amount in full against the amount of the Company's indebtedness to Mr. Mahabub. In consideration for the Company's free use of the studio and studio equipment for the entire period of ASL's lease and Mr. Mahabub's purchase of the studio improvements and sound equipment at the Company's full cost basis without deduction for depreciation or obsolescence, the Company also issued to Mr. Mahabub warrants to purchase 516,063 shares of the Company's Common Stock for a period of five years at a strike price of $5.00 per share.

Because the principal purpose of ASL is to use the studio to mix projects that promote the Company and its technology, the Company has granted ASL the perpetual, non-exclusive right to use the name "Astound" as part of the Studio Agreement. Under the Studio Agreement, the Company will be paid no less than the fair market value far any use of the Company's technology and any use of the Company's personnel (consistent with transactions between the Company and independent third parties), but ASL shall be entitled to retain all revenues generated by it from non-Company related business.

### Current Amount Owed to Mr. Mahabub

As a result of the various related party transactions between the Company and Mr. Mahabub as described above, the current indebtedness of the Company to Mr. Mahabub as of March 1, 2010 is $459,378, which amount accrues interest at the rate of five percent (5%) per annum. It is evidenced by a Consolidated Promissory Note that provides for payments of $5,000 per month to begin only after the Company has net operating income of at least $100,000, which payments shall continue on the first of each month until all principal and interest due hereunder is paid in full provided Maker continues to have a net operating income of at least $100,000 at the time of each such payment date; and provided further that for each $100,000 incremental increase in net operating income of Company that exists on a payment date, then Company shall increase its payment amount by Five Thousand Dollars ($5,000.00) until all principal and interest due thereunder is paid in full

## LEGAL PROCEEDINGS

To our knowledge, we are not a party to any material legal proceedings or litigation and we are not aware of any contemplated or threatened legal proceedings or litigation as of the date of this Memorandum. However, Investors should review "RISK FACTORS".

50

GA000539

## ADDITIONAL INFORMATION

Each Investor, or the Investor's professional advisor, if any, is invited to ask questions of the Company's management concerning the terms and conditions of the Offering and to obtain any additional information that the Company possesses or can acquire without unreasonable effort or expense as may be necessary to verify the accuracy of the information furnished in this Memorandum. For additional information, please contact:

GenAudio, Inc.
8200 South Quebec Street, Suite A3250
Centennial, CO 80112
Attn: James T. Devine, VP of Finance
jdevine@genaudioinc.com
(303) 588-877

51

GA000540

# EXHIBIT A

## SUBSCRIPTION AGREEMENT

THIS SUBSCRIPTION AGREEMENT (this "Agreement") is by and between the undersigned Subscriber identified on the signature page attached hereto (the "Subscriber") and GenAudio, Inc., a Colorado corporation located at 8200 South Quebec Street, Suite A3250, Centennial, CO 80112 (the "Company").

The Company is conducting a private placement (the "Offering") pursuant to a Confidential Private Placement Memorandum dated March 15, 2010, (together with its exhibits and as the same may be supplemented and amended from time to time, the "Memorandum"). The Offering is a "best efforts" offering of up to 1,000,000 shares of the Company's common stock, par value $0.0001 (the "Common Stock" or "Shares"), at a price of $3.00 per share (the "Purchase Price") for an aggregate maximum offering price of $3,000,000. Upon the Company's receipt of immediately available funds and acceptance of Subscriber' subscription (a "Closing"), the Company shall promptly thereafter deliver to Subscriber the Shares subscribed for by Subscriber. The date of the Closing in which the purchase and sale of Shares pursuant to this Agreement is effected is the "Closing Date". The Shares are sometimes referred to herein as the "Securities".

NOW THEREFORE, in consideration of the foregoing recitals, the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**Section 1.        Subscription and Purchase.**

Section 1.1.        Subscription.  Subject to the conditions set forth in Section 2 hereof, the Subscriber hereby subscribes for and agrees to purchase the number of Shares indicated on the signature page hereto on the terms and conditions described herein.

Section 1.2.        Purchase of Shares.  The Subscriber understands and acknowledges that the purchase price to be remitted to the Company in exchange for the Shares shall be $3.00 per Share, for an aggregate purchase price as set forth on the signature page hereof (the "Aggregate Purchase Price"). The Subscriber's delivery of this Agreement shall be accompanied by the completed Confidential Subscriber Questionnaire attached hereto as Exhibit A and by payment for the Shares subscribed for hereunder, payable in United States Dollars, by check or by wire transfer pursuant to the instructions set forth in Exhibit B hereto and delivered contemporaneously with delivery of this Agreement as instructed in the Memorandum. The Subscriber understands and agrees that, subject to Section 2 and applicable laws, by executing this Agreement, it is entering into a binding agreement.

**Section 2.        Closing Procedures**

Section 2.1.        Closings.  Closings under the Offering may be held at the discretion of the Company at any time. Sales of the Securities may continue following the initial Closing and any Closing thereafter until the Offering terminates on May 31, 2010, subject to one extension of up to 90 days in the discretion of the Company. Notwithstanding the foregoing, the Company shall have the right to accept or reject any subscription amounts, in whole or in part. In the event of a rejection, this subscription shall be void with respect to such rejected amount, and all funds paid by the Subscriber with respect to such rejected amount shall be promptly returned without interest or deduction to the Subscriber.

Section 2.2.        Delivery of Certificates.  The Subscriber hereby authorizes and directs the Company to deliver any certificates or other written instruments representing the Shares to be issued to such Subscriber pursuant to this Agreement to the address indicated on the signature page hereof. Certificates representing the Shares purchased by Subscriber shall be delivered promptly following the Closing Date.

Section 2.3.        Foreign Subscribers.  If the Subscriber is not a United States resident or domiciled individual, corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability

GA000541

company, joint stock company, government entity (or agency or subdivision thereof) or other entity of any kind (each, a "Person"), such Subscriber shall immediately notify the Company, and the Subscriber hereby represents that the Subscriber is satisfied as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Securities, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities. Such Subscriber further represents and warrants that Subscriber's subscription and payment for, and continued beneficial ownership of, the Securities will not violate any applicable securities or other laws of the Subscriber's jurisdiction.

Section 3.       Representations and Warranties of the Subscriber.

The Subscriber hereby represents and warrants to the Company as follows:

Section 3.1.       Power and Authority.  The Subscriber has full power and authority to enter into this Agreement, the execution and delivery of which has been duly authorized, if applicable, and this Agreement constitutes a valid and legally binding obligation of the Subscriber.  The Subscriber is either an individual or an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with full right, corporate or partnership power and authority to enter into and to consummate the transactions contemplated by this Agreement and otherwise to carry out its obligations hereunder.

Section 3.2.       Exempt Offering.  The Subscriber acknowledges that the Offering and sale of the Securities is intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), by virtue of Section 4(2) of the Securities Act and the provisions of Regulation D promulgated thereunder ("Regulation D").

Section 3.3.       Acquisition for Own Account.  The Subscriber is acquiring the Securities solely for the Subscriber's own beneficial account, for investment purposes, and not with a view towards, or resale in connection with, any distribution of the Securities (this representation and warranty shall in no way limit Subscriber's right to sell the Securities in compliance with applicable federal and state securities laws).

Section 3.4.       Financial Condition.  The Subscriber's financial condition is such that the Subscriber is able to bear the risk of holding the Securities for an indefinite period of time, the Subscriber has adequate means to provide for the Subscriber's current financial needs and contingencies, the Subscriber has no need for liquidity in this investment and the Subscriber is able to risk the loss of the Subscriber's entire investment in the Securities.  The Subscriber's overall commitment to investments that are not readily marketable such as an investment in the Securities is not disproportionate to the Subscriber's net worth and the Subscriber's investment in the Securities will not cause such overall commitments to become excessive.

Section 3.5.       Accredited Investor.  The Subscriber has completed the applicable Confidential Subscriber Questionnaire attached hereto and is an "accredited investor" as that term is defined in Rule 501 of Regulation D of the Securities Act.

Section 3.6.       Sophistication.  The Subscriber and the Subscriber's attorney, accountant, purchaser representative and/or tax advisor, if any (collectively, the "Advisors") has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of a prospective investment in the Securities.  The Subscriber, either alone or together with its Advisors, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the Offering, and has so evaluated the merits and risks of such investment. The Subscriber has not authorized any Person to act as its Purchaser Representative (as that term is defined in Regulation D of the General Rules and Regulations under the Securities Act) in connection with the Offering.

Section 3.7.       Review of Information.  The Subscriber acknowledges receipt and careful review of the Memorandum, including all exhibits thereto, and has been furnished by the Company during the course of this transaction with all information regarding the Company, the Offering and the Securities which the Subscriber has

GA000542

requested or desires to know; and the Subscriber and its Advisors, if any, have been afforded the opportunity to ask questions and receive answers from duly authorized officers or other representatives of the Company concerning the terms and conditions of the Offering, the business, financial condition, results of operation and prospects of the Company, and any additional information which the Subscriber has requested, and all such questions have been answered to the full satisfaction of the Subscriber and its Advisors, if any.

Section 3.8.   Evaluation of Risks.  The Subscriber has carefully considered the potential risks relating to the Company and a purchase of the Securities, including but not limited to a thorough review of the "Risk Factors" section of the Memorandum, and fully understands that the Securities are a speculative investment that involve a high degree of risk of loss of the Subscriber's entire investment.

Section 3.9.   No Oral Representations.  The Subscriber confirms that no oral or written representations or warranties have been made to the Subscriber by the Company or any of its officers, employees, agents, sub-agents, affiliates or advisors, other than any representations of the Company contained herein, and in subscribing for the Securities, the Subscriber is not relying upon any representations other than those contained herein.

Section 3.10.   No Reliance.  The Subscriber is not relying on the Company or any of its employees, agents, sub-agents or advisors with respect to the legal, tax, economic and related considerations involved in this investment. The Subscriber has relied on the advice of, or has consulted with, only its Advisors. Each Advisor, if any, is capable of evaluating the merits and risks of an investment in the Securities.

Section 3.11.   Restrictions on Transfer.  The Subscriber will not sell or otherwise transfer any Securities without registration under the Securities Act or an exemption therefrom, and fully understands and agrees that the Subscriber must bear the economic risk of its purchase because, among other reasons, the Securities have not been registered under the Securities Act or under the securities laws of any state and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless they are subsequently registered under the Securities Act and under the applicable securities laws of such states, or an exemption from such registration is available.  In particular, the Subscriber is aware that the Securities are "restricted securities," as such term is defined in Rule 144 promulgated under the Securities Act (as such rule may be amended or superseded by a similar rule or regulation having substantially the same effect, "Rule 144"), and they may not be sold pursuant to Rule 144 unless all of the conditions of Rule 144 are met. The Subscriber also understands that the Company is under no obligation to register the Securities on behalf of the Subscriber or to assist the Subscriber in complying with any exemption from registration under the Securities Act or applicable state securities laws. The Subscriber understands that any sales or transfers of the Securities are further restricted by state securities laws and the provisions of this Agreement. Upon Company's request, Subscriber shall deliver to Company a legal opinion reasonably acceptable to Company contemporaneously with the request for any transfer of the Securities confirming that such proposed transfer complies with all requirements of the Securities Act, including Rule 144, and applicable state securities laws.

Section 3.12.   Restrictive Legends.  The Subscriber understands and agrees that the certificates for the Shares shall bear substantially the following legend until (i) such Shares shall have been registered under the Securities Act and effectively disposed of in accordance with a registration statement that has been declared effective or (ii) in the opinion of counsel reasonably acceptable to the Company, such Shares may be sold without registration under the Securities Act, as well as any applicable "blue sky" or state securities laws:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAWS, AND NEITHER SUCH SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR OTHERWISE TRANSFERRED UNLESS (1) A REGISTRATION STATEMENT WITH  RESPECT THERETO IS EFFECTIVE UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR (2) AN EXEMPTION FROM SUCH REGISTRATION EXISTS AND THE COMPANY RECEIVES AN OPINION OF COUNSEL TO THE HOLDER OF SUCH SECURITIES, WHICH COUNSEL AND OPINION ARE REASONABLY SATISFACTORY TO THE COMPANY, THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR TRANSFERRED IN THE MANNER CONTEMPLATED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR APPLICABLE STATE SECURITIES LAWS.

GA000543

**Section 3.13.**   **No SEC Review.**  The Subscriber understands that neither the Securities and Exchange Commission (the "SEC") nor any state securities commission has approved the Securities or passed upon or endorsed the merits of the Offering. There is no government or other insurance covering any of the Securities.

**Section 3.14.**   **Address.**  The Subscriber hereby represents that the address of the Subscriber furnished at the end of this Agreement is the undersigned's principal residence, if the Subscriber is an individual, or its principal business address if it is a corporation or other entity.

**Section 3.15.**   **Prohibited Party to Transaction.**  Neither Subscriber nor any Person who owns an interest in Subscriber (a "Purchaser Party") is now, or shall be at any time prior to or at the Closing Date, a Person with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories, or a United States Financial Institution as defined in 31 U.S.C. Section 5312, as amended, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("OFAC").

**Section 3.16.**   **Payment of Purchase Price.**  Subscriber has taken, and shall continue to take until the Closing Date, such measures as are required by law to assure that the funds used to pay to the purchase price for the Shares are derived: (i) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

**Section 3.17.**   **Money Laundering.**  To the best of Subscriber's knowledge, neither Subscriber nor any Purchaser Party, nor any Person providing funds to Subscriber: (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as defined below); (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws. For purposes of this Section 3(cc), the term "Anti-Money Laundering Laws" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that:  (i) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (ii) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (iii) require identification and documentation of the parties with whom a Financial Institution conducts business; or (iv) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq. (the "Bank Secrecy Act"), the Trading with the Enemy Act, 50 U.S.C. Appendix, the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

**Section 3.18.**   **Survival.**  Subscriber represents and warrants that the representations and warranties contained in this Section 3 are true and accurate as of the date hereof and shall survive the delivery of the Purchase Price and this completed Agreement.

**Section 4.**      **Representations and Warranties of the Company.**

The Company hereby represents and warrants to the Subscriber as follows:

**Section 4.1.**   **Organization and Qualification.**  The Company is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization (as applicable), with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted. **Section 4.2.**   **Authorization; Enforcement.**  The Company has the corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement has been duly authorized, executed and delivered by the Company and is valid, binding and enforceable against the Company in accordance with its terms.

Section 4.3.   Issuance of Securities.   The Shares to be issued to the Subscriber pursuant to this Agreement, when issued and delivered in accordance with the terms of this Agreement, will be duly authorized and validly issued and will be fully paid and non-assessable, free and clear of all liens, charges, security interests, encumbrances, rights of first refusal, preemptive rights or other restrictions (collectively, "Liens") imposed by the Company other than restrictions on transfer provided for in this Agreement. The Company has reserved from its duly authorized capital stock the maximum number of shares of common stock issuable pursuant to this Agreement.

Section 4.4.   No Conflicts with Organizational Instruments.   The execution and delivery and the performance of this Agreement by the Company does not and will not conflict with the Company's articles of incorporation or bylaws, as amended to date.

Section 4.5.   Capitalization.   After giving effect to the transactions contemplated by this Agreement and the Memorandum, the Company will have the outstanding capital stock as set forth in the Memorandum. All of the outstanding shares of capital stock of the Company are validly issued, fully paid and nonassessable, and no further approval or authorization of any stockholder, the Company's Board of Directors or others is required for the issuance and sale of the Securities.

Section 4.6.   Financial Statements.   The financial statements attached as Exhibit C to the Memorandum (the "Financial Statements") present fairly and accurately the financial condition of the Company and the results of operations of the Company for the periods covered thereby, are correct and complete, and are consistent with the books and records of the Company.

Section 4.7.   Material Changes; Undisclosed Events, Liabilities or Developments.   Since the date of the latest Financial Statements, except as disclosed in the Memorandum, (i) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a material adverse impact (i) on the Company's operations, assets, or business condition, taken as a whole (other than an event whose impact would reasonably be expected to aggregate less than $250,000), or (ii) on the enforceability of this Agreement or the Company's ability to perform in any material respect on a timely basis hereunder (any of (i) or (ii) a "Material Adverse Effect"), (ii) the Company has not incurred any liabilities (contingent or otherwise) other than trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice, (iii) the Company has not altered its method of accounting, and (iv) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock.

Section 4.8.   Litigation.   There is no action, suit, inquiry, or proceeding pending or, to the knowledge of the Company, threatened against or affecting the Company, or any of its properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action") which could, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect.

Section 4.9.   Employees.   To the Company's knowledge, no employee, officer or director of the Company, nor any consultant with whom the Company has contracted, is in violation of any proprietary information agreement or non-competition agreement.

Section 4.10.   Patents and Trademarks.   The Company has not received any notice (written or otherwise) that any of the Intellectual Property Rights used by the Company violates or infringes upon the rights of any Person. To the knowledge of the Company, all such Intellectual Property Rights are enforceable and there is no existing infringement by another Person of any of the Intellectual Property Rights.

Section 4.11.   Survival.   The foregoing representations, warranties and agreements shall survive the Closing Date.

GA000545

**Section 5.        Indemnification.**

·Section 5.1.        Company Indemnification of Subscriber.  The Company hereby agrees to indemnify and hold harmless the Subscriber and, where applicable, its directors, officers, and employees ("Subscriber Party"), from and against any and all loss, damage, liability, claim or expense (including, but not limited to, fees, costs and expenses incurred in investigating, preparing or defending such matter, whether commenced or threatened) due to or arising out of a material breach of any representation, warranty or covenant of the Company contained in this Agreement.  Section 5.2.  Subscriber Indemnification of Company.   The Subscriber acknowledges that the Subscriber understands the meaning and legal consequences of the representations and warranties and certifications contained in Section 3, and the Subscriber hereby agrees to indemnify and hold harmless each of the Company, its directors, officers, and employees ("Company Party") from and against any and all loss, damage and liability due to or arising out of a material breach of any representation, warranty or covenant of the Subscriber contained in this Agreement.

Section 5.3        Indemnification Procedures.        If any action shall be brought against any indemnified party in respect of which indemnity may be sought hereunder, such indemnified party shall promptly notify the indemnifying party in writing, and the indemnifying party shall have the right to assume the defense thereof with counsel of its own choosing reasonably acceptable to the indemnified party.  Any indemnified party shall have the right to employ separate counsel and participate in the defense thereof, but the fees and expenses of such counsel shall be at such indemnified party's expense except to the extent that (i) the employment thereof has been authorized by the indemnifying party in writing, (ii) the indemnifying party has failed after a reasonable period of time to assume such defense and to employ counsel or (iii) in such action there is, in the reasonable opinion of such separate counsel, a material conflict on any material issue between the position of the indemnifying party and the position of such indemnified party, in which case the indemnifying party shall be responsible for the reasonable fees and expenses of no more than one such separate counsel.  The indemnifying party will not be liable to any indemnified party under this Agreement (i) for any settlement by a indemnified party effected without the indemnifying party's prior written consent, which shall not be unreasonably withheld or delayed; or (ii) to the extent, but only to the extent that a loss, claim, damage or liability is attributable to any indemnified party's breach of any of the representations, warranties, or agreements made by such indemnified party in this Agreement.

**Section 6.        Legend Removal; Replacement of Securities.**  To the extent that the restrictive legends on any certificates representing the Shares are no longer required under the Securities Act, Subscriber may submit such certificates to the Company or its designated transfer agent for cancellation and re-issuance of new certificates without such legends, which certificates shall be delivered to Subscriber promptly following of receipt of the original certificates (and any other requisite documentation to effect legend removal, including an opinion of counsel reasonably acceptable to Company).  In the event of the loss, theft, destruction or mutilation of a stock certificate representing the Shares, upon the Company's receipt of evidence reasonably satisfactory to it of such event, and in the case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it, or in the case of mutilation upon surrender of such mutilated certificate, the Company shall issue and deliver to Subscriber a replacement certificate of like tenor.

**Section 7.        Securities Act Information.**  If the Company subsequently becomes a publicly traded entity, the Company thereafter covenants to use its best efforts to timely file all reports required to be filed by it after such date pursuant to the Securities Exchange Act of 1934, as amended, or, if not so required, to prepare and furnish to the Subscribers and make publicly available in accordance with Rule 144(c) such information as is required for the Subscribers to sell the Securities under Rule 144.

**Section 8.        Blue Sky Filings.**  The Company shall take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Securities for, sale to the Subscribers at each Closing under applicable securities or "Blue Sky" laws of the states of the United States.

**Section 9.        Listing of Securities.**  If at any time hereafter the Common Stock shall become publicly registered or traded, the Company shall, not later than the initial such date, and continuing at least until all the Shares have been sold, provide a transfer agent and registrar for its Common Stock.  Once traded on an over-the-counter market or listed on a national exchange or marketplace, the Company shall use its reasonable best efforts to comply with the continued trading or listing requirements, as applicable.

**GA000546**

**Section 10.      Put Right.**

Section 10.1.      General.  Subscriber shall have the right to require the Company to buy back all, but not less than all (unless otherwise agreed to by the Company), of the Shares then held by Subscriber in the event the Company does not consummate a Liquidity Event (as defined below) by September 18, 2014 ("Put Right").  The Put Right shall be exercisable during the period beginning on September 18, 2014 and expiring on the date that is four (4) months thereafter (the "Put Right Period").  "Liquidity Event", as used herein, means (a) a sale of all or substantially all of the Company's assets, (b) a merger, reorganization or similar business combination in which the shareholders of the Company immediately prior to such merger, reorganization or combination own less than a majority of the voting power of the surviving entity immediately following such merger, reorganization or other business combination, (c) an underwritten initial public offering, (d) the date the Company otherwise becomes a publicly reporting company and lists its Common Stock on a national securities exchange or includes its Common Stock for quotation on an over-the-counter market, or (e) any recapitalization, share repurchase program or other reorganization duly authorized in which the Subscribers are entitled to receive an amount equal to the Repurchase Amount (as defined below).

Section 10.2.      Price.  The price at which the Company shall be required to repurchase Shares pursuant to an exercised Put Right shall be the Purchase Price paid for such Shares (subject to applicable adjustments for stock splits, recapitalizations and the like) plus an additional amount equal to 10% per annum of such Purchase Price from the date of the final Closing of the Offering until the beginning of the Put Right Period (cumulative daily, but non-compounded) (such total amount, the "Repurchase Amount").

Section 10.3.      Exercise Procedure.  In order to exercise its Put Right, Subscriber must deliver a written notice to the Company during the Put Right Period confirming the number of Shares for which it has elected to exercise its Put Right ("Put Right Notice").  Subscriber shall have the right to rescind, modify and/or resubmit its Put Right Notice in writing at any time until the conclusion of the Put Right Period, and the Company shall be entitled to rely upon whatever is the last written instruction it received from Subscriber with respect to its Put Right prior to the conclusion of the Put Right Period.  Within ten days following the earlier of (a) the conclusion of the Put Right Period or (b) the date that Put Right Notices have been received which represent all of the Shares then held by Subscribers, the Company shall pay to each Subscriber the applicable Repurchase Amount, in cash, payable by check or wire transfer.  If the Company's cash reserves or deposits are insufficient to pay the aggregate of all Repurchase Amounts due, the Company shall pay to each applicable Subscriber the maximum payment amount possible, applied pro rata in accordance with the Repurchase Amount due to each Subscriber, and shall issue promissory notes to each Subscriber representing the balance of the Repurchase Amount due, bearing interest at an annual rate of 10%, deemed issued as of the date of the conclusion of the Put Right Period and due on the date that is four (4) months thereafter.  Concurrently with the payment of any Repurchase Amount (and the issuance of any promissory notes, if applicable), Subscriber shall deliver to the Company for cancellation the certificate or certificates representing the applicable repurchased Shares and, if such certificate(s) represent any additional Shares not repurchased or for which the Repurchase Amount has not been paid in full, the Company shall deliver back to Subscriber a new certificate representing the balance of such Shares.  During the Put Right Period, the Company shall not incur any liabilities or expend any funds other than in the ordinary course of business without the approval of Subscribers holding a majority of the Shares purchased in the Offering.

**Section 11.      Expenses.**  Each of the Subscriber and the Company shall be responsible for their respective fees and expenses incurred in connection with the consummation of the transactions contemplated by this Agreement.

**Section 12.      Confidentiality.**  Subscriber shall hold confidential, and will cause the Subscriber's partners, officers, employees, directors, equity owners, agents, and representatives, if any, (collectively, "Representatives") to hold confidential (and not to use except in connection with the investment in the Company), all non-public information concerning the Company, its subsidiaries and its affiliates that is provided to Subscriber or Subscriber's Representatives in connection with its investment.  Except as required by law, regulation or legal process or regulatory authority, without the prior written consent of the Company, Subscriber will not, and will use Subscriber's best efforts to cause Subscriber's Representatives to not, disclose or use any such confidential information for any purpose other than in connection with the investment contemplated hereby.

GA000547

**Section 13.      Miscellaneous.**

Section 13.1.      Execution.   This Agreement may be executed in one or more counterparts, which together shall constitute one and the same agreement.  Facsimile and electronically imaged signatures shall have the same force and effect as originals.  This Agreement shall be binding upon and inure to the benefit of the heirs, executors, successors and permitted assigns of the parties.  The Company may not assign this Agreement without the written consent of Subscriber (other than by merger).  Subscriber may assign any or all of its rights under this Agreement to an assignee or transferee of its Securities, provided such assignee or transferee agrees in writing to be bound to the provisions of this Agreement that apply to "Subscriber" with respect to such Securities.  This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters.

Section 13.2.      Modifications.  No provision of this Agreement may be amended or waived except in a writing signed by both parties (in the case of an amendment) or signed by the party against whom enforcement of any such waived provision is sought (in the case of a waiver).  If any term, provision or covenant of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of this Agreement shall remain in full force and effect and the parties shall use their commercially reasonable best efforts to find and employ an alternative means to achieve substantially the same result as that contemplated by such term, provision or covenant.

Section 13.3.      Notices.  All notices required or permitted hereunder shall be in writing and shall be deemed effectively given to the other party: (i) upon personal delivery; (ii) when sent by confirmed electronic mail (e-mail) or facsimile if sent during normal business hours of the recipient, if not, then on the next business day; (iii) three (3) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent to the Company at its principal address or to Subscriber at Subscriber's last address in the Company's records or such other address as the Company or Subscriber may designate by ten (10) days advance written notice to the other party.  If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a business day, then such action may be taken or such right may be exercised on the next succeeding business day.

Section 13.4.      Governing Law; Venue.  This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado, without reference to the conflicts of law provisions thereof.  Venue for any proceeding or dispute arising between the parties hereto in any manner pertaining or related to this Agreement shall, to the extent permitted by law, be the City and County of Denver, Colorado.  The parties hereby consent to the exclusive jurisdiction of the state courts of the State of Colorado sitting within the City and County of Denver, Colorado, and waive any contention that any such court is an improper venue for enforcement of this Agreement.

Section 13.5.      **WAIVER OF JURY TRIAL**:  THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY DISPUTE OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

**GA000548**

## SIGNATURE PAGE TO GENAUDIO, INC. SUBSCRIPTION AGREEMENT

The undersigned Subscriber hereby certifies that he, she or it (i) has received and relied solely upon the Memorandum, this Subscription Agreement and their respective exhibits and schedules, (ii) agrees to all the terms and makes all the representations set forth in this Subscription Agreement and (iii) meets the suitability standards set forth therein and herein.

Subscription Amount:  $_____

# of Shares: _____

_____          _____
Name of Subscriber (Print)                                  Name of Joint Subscriber (if any) (Print)

_____          _____
Signature of Subscriber                                       Signature of Joint Subscriber (if any)

_____
Capacity of Signatory (for entities)

_____          _____
Social Security or Taxpayer Identification Number      Country of Residence (if a non-U.S. Subscriber)

Subscriber Contact Information:

_____          _____
Street Address                                                  Telephone                            Fax

_____          _____
City                    State         Zip Code            Email

Instructions for Delivery of Securities:

   Deliver to the address above                               Deliver to an alternate address:

                                                                     _____

                                                                     _____

The Subscriber certifies under penalty of perjury that (1) the Social Security Number or Taxpayer ID and address provided above is correct, (2) the Subscriber is not subject to backup withholding (unless otherwise noted above) either because he has not been notified that he is subject to backup withholding or because the Internal Revenue Service has notified him that he is no longer subject to backup withholding and (3) the Subscriber (unless a non-U.S. Subscriber) is not a nonresident alien, foreign partnership, foreign trust or foreign estate.

THE SUBSCRIPTION FOR SECURITIES OF GENAUDIO, INC. BY THE ABOVE NAMED SUBSCRIBER(S) IS ACCEPTED THIS _____ DAY OF _____, 2010.

GENAUDIO, INC.

By:_____
Name:
Title:

GA000549

## EXHIBIT A - CONFIDENTIAL SUBSCRIBER QUESTIONNAIRE

This Questionnaire is provided to a prospective Subscriber who has expressed interest in purchasing securities of GenAudio, Inc. (the "Company"). The purpose of this Questionnaire is to determine whether Subscribers meet applicable suitability standards to invest in the offering of securities by the Company ("Offering"), and to comply with certain "know your customer" requirements. This material does not constitute an offer to sell nor is it a solicitation of an offer to buy securities, which offer may be made only pursuant to the terms and conditions of the Subscription Agreement to which this Questionnaire is an exhibit. Completion of this Questionnaire does not guarantee a Subscriber's participation in the Offering.

Answers to this Questionnaire will be kept confidential, provided they may be provided to such parties as required to provide assurance that the Offering will not result or has not resulted in violations of securities laws which are being relied upon by the Company in connection with the offer and sale thereof.

Please type or clearly print answers. If securities are to be purchased by more than one individual or entity, a separate Questionnaire should be completed for each.

Name of Subscriber: _____

1. The undersigned qualifies as an "accredited investor" pursuant to the following definition (please check one or more of the following which apply to Subscriber; if none apply, do not check any items):

☐ **The undersigned is an individual who is a director or executive officer of the Company.** An "executive officer" is the president, a vice president in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the Company.

☐ **The undersigned is an individual that (1) had individual income of more than $200,000 in each of the two most recent fiscal years and reasonably expects to have individual income in excess of $200,000 in the current year, or (2) had joint income together with the undersigned's spouse in excess of $300,000 in each of the two most recent fiscal years and reasonably expects to have joint income in excess of $300,000 in the current year.** "Income" means adjusted gross income, as reported for federal income tax purposes, increased by the following amounts: (i) any tax exempt interest income under Section 103 of the Internal Revenue Code (the "Code") received, (ii) any losses claimed as a limited partner in a limited partnership as reported on Schedule E of Form 1040, (iii) any deduction claimed for depletion under Section 611 of the Code or (iv) any amount by which income has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Code. In determining personal income, however, unrealized capital gains should not be included.

☐ **The undersigned is an individual with individual net worth, or combined net worth together with the undersigned's spouse, in excess of $1,000,000.** "Net worth" means the excess of total assets at fair market value, including home, home furnishings and automobiles, over total liabilities.

☐ **The undersigned is a Trust with total assets in excess of $5,000,000,** was not formed for the specific purpose of acquiring securities of the Company, and the purchase of the securities is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the risks and merits of the prospective investment in such securities.

☐ **The undersigned is a corporation, partnership, limited liability company or limited liability partnership that has total assets in excess of $5,000,000** and was not formed for the specific purpose of acquiring securities of the Company.

☐ **The undersigned is an entity in which all of its equity owners are "accredited investors".**

GA000550

2. The Subscriber's principal residence, if different than the address provided on the signature page to the Subscription Agreement, is as follows:

_____

_____

3. The Subscriber's current employment or business activity is as follows:

Company Name: _____

Address: _____

Telephone Number: _____

Principal Business: _____

Position and Title: _____

4. The Subscriber has _____ years of investment experience.

5. The Subscriber invests or trades in marketable securities:

        ☐ More than 20 times per year
        ☐ 6-20 times per year
        ☐ 1-5 times per year
        ☐ Never

6. The Subscriber invests in non-marketable securities such as private placements:

        ☐ More than 10 times per year
        ☐ 6-10 times per year
        ☐ 1-5 times per year
        ☐ Never

7. The Subscriber has provided the following identification information:

        ☐ A copy of Subscriber's driver's license (front and back) or passport or, in the case of an entity, such identification for its principal individual shareholders and signatories, accompanies this Questionnaire.

The Subscriber by signing below represents that the information provided in this Questionnaire is true and complete in all material respects.

_____    _____
Name of Subscriber (Print)              Name of Joint Subscriber (if any) (Print)

_____    _____
Signature of Subscriber                 Signature of Joint Subscriber (if any)

_____    _____
Capacity of Signatory (for entities)          Date

**GA000551**

## EXHIBIT B - PAYMENT INSTRUCTIONS

Date: _____

To: _____
[Your Financial Institution]

Dear _____:

Please wire $_____ from my account # _____
according to the following instructions:

Wells Fargo Bank:
ABA #: 121000248
Account Name:   GenAudio, Inc. Account
Account #: 7529210952

Ref: _____
[Your Name]

Funds are for purposes of investment in a private placement.

Thank you,


_____          _____
Signature                          Joint Signature (if any)


_____          _____
Printed Name                       Printed Name

*For payments by check instead of wire transfer, please make payable to:*
*"GenAudio, Inc." and deliver to*

GenAudio Inc.
8200 South Quebec Street
Suite A3250
Centennial, CO  80112
Attn: Jim Devine, VP of Finance

GA000552

## EXHIBIT B

### INAVASIS REPORT

#### STATEMENT REGARDING FORWARD LOOKING PROJECTIONS

THE STATEMENTS, PROJECTIONS AND ESTIMATES OF FUTURE PERFORMANCE OF THE COMPANY OR VARIOUS ELEMENTS OF THE COMPANY'S BUSINESS CONTAINED IN THE FOLLOWING FINANCIAL PROJECTIONS ARE FORWARD-LOOKING STATEMENTS. INVESTORS SHOULD EXPECT THAT ANTICIPATED EVENTS AND CIRCUMSTANCES SHALL NOT OCCUR, THAT UNANTICIPATED EVENTS AND CIRCUMSTANCES SHALL OCCUR, AND THAT ACTUAL RESULTS SHALL LIKELY VARY FROM THE FORWARD-LOOKING CIRCUMSTANCES. INVESTORS SHOULD BE AWARE THAT A NUMBER OF FACTORS COULD CAUSE THE FORWARD-LOOKING STATEMENTS OR PROJECTIONS CONTAINED IN THIS MEMORANDUM OR OTHERWISE MADE BY OR ON BEHALF OF THE COMPANY TO BE INCORRECT OR TO DIFFER MATERIALLY FROM ACTUAL RESULTS. SUCH FACTORS MAY INCLUDE, WITHOUT LIMITATION, (i) THE ABILITY OF THE COMPANY TO PROVIDE SERVICES AND TO COMPLETE THE DEVELOPMENT OF ITS PRODUCTS IN A TIMELY MANNER, (ii) THE DEMAND FOR AND TIMING OF DEMAND FOR SUCH SERVICES AND PRODUCTS, (Iii) COMPETITION FROM OTHER PRODUCTS AND COMPANIES, (iv) THE COMPANY'S SALES AND MARKETING CAPABILITIES, (v) THE COMPANY'S ABILITY TO SELL ITS SERVICES AND PRODUCTS PROFITABLY, (vi) AVAILABILITY OF ADEQUATE DEBT AND EQUITY FINANCING, AND (vii) GENERAL BUSINESS AND ECONOMIC CONDITIONS. THESE IMPORTANT FACTORS AND CERTAIN OTHER FACTORS THAT MIGHT AFFECT THE COMPANY'S FINANCIAL AND BUSINESS RESULTS ARE DISCUSSED IN THIS MEMORANDUM UNDER "RISK FACTORS." THERE CAN BE NO ASSURANCE THAT THE COMPANY SHALL BE ABLE TO ANTICIPATE, RESPOND TO OR ADAPT TO CHANGES IN ANY FACTORS AFFECTING THE COMPANY'S BUSINESS AND FINANCIAL RESULTS.

GA000553

# Audio AstoundSound® Technology

## AstoundSound® Technology Valuation

By

### Inavisis, Inc.



Prepared For

### GenAudio, Inc.



March 1, 2010

GA000554

*Inavisis, Inc.*

# GenAudio, Inc. AstoundSound® Audio Technology

## Table of Contents

Executive Summary ................................................................................. 4

Valuation Assignment & Inavisis Qualification ................................................ 8

AstoundSound Technology Description ........................................................ 9

Patent Description ................................................................................. 14

Market Applications ............................................................................... 15
    A -- Large Consumer Electonics Company .......................................... 15
    B -- Rest of the World ("ROW") ........................................................ 15
    C -- Broadcast and Live Concerts & Streaming Media .......................... 15

Competitors with Commercial Products ...................................................... 16

Competitive Patents ................................................................................ 19

Economic Impact .................................................................................. 21

General Technology Valuation Methods ..................................................... 22
    Market Approach ......................................................................... 22
    Cost Approach ............................................................................ 23
    Income Approach ........................................................................ 23
    Relief From Royalty Approach ........................................................ 24
    Conclusion ................................................................................. 25

Chapter One: Large Consumer Electronics Company ("LCEC") ...................... 26
    Valuation Period  (Timing) .............................................................. 26
    Market Potential .......................................................................... 26
    Discount Rate ............................................................................. 28
    Income Approach Estimation of Value ............................................... 29

Conclusion .......................................................................................... 30

Chapter Two:  Rest of the World ("ROW") ................................................... 30
    Valuation Period  (Timing) .............................................................. 30
    Market Potential .......................................................................... 30
    Target Company Share .................................................................. 35
    Revenue per Unit ........................................................................ 36
    Discount Rate ............................................................................. 37
    Royalty Rate .............................................................................. 38

Income Approach Estimation of Value ....................................................... 39

Conclusion .......................................................................................... 39

*Inavisis, Inc.*

Chapter Three:  Broadcast and Live Concerts ................................................................. 40
    Valuation Period  (Timing) ....................................................................................................... 40
    Market Potential ....................................................................................................................... 40
    Target Company Share ............................................................................................................ 40
    Revenue from Broadcast & Live Concerts ............................................................................. 41
    Discount Rate ........................................................................................................................... 41

Income Approach .......................................................................................................... 42

Conclusion .................................................................................................................... 42

Valuation Summary ....................................................................................................... 43

*Inavisis, Inc.*

## Executive Summary

GenAudio, Inc. a Colorado corporation (hereafter referred to as "GenAudio") is the developer and owner of a bundle of intellectual properties consisting of sound localization cue based software processes and algorithms generally known as "AstoundSound®" (which together with its associated patents, know-how and trade secrets is collectively referred to herein as the "AstoundSound Technology"). GenAudio has retained Inavasis to determine the fair market value of the AstoundSound Technology for the purpose of negotiating licensing deals with either one large consumer electronics company which will be identified only as "LCEC" in order to ensure that GenAudio does not violate any nondisclosure duties, or several consumer electronics companies interested in enhancing their respective products through the integration of the AstoundSound Technology.

The AstoundSound Technology is a four dimensional audio processing technology based on innovative acoustical physical modeling utilizing mathematical algorithms to create an impulse response filter design emulating how a listener would perceive sound in three dimensional space, over time (the "AstoundCore"). The AstoundCore utilizes advanced digital signal processing to create an audio platform technology that is applicable to many different products and applications and therefore various commercial markets. We divided this report into three separate sections that cover (a) the market applications for a large consumer electronics company (hereinafter "LCEC") GenAudio is currently working with which has expressed an interest in licensing the AstoundSound technology, (b) market applications for competitive products to LCEC, and (c) other applications which do not involve integration into consumer electronics devices such as professional broadcasting and live concerts. The markets that GenAudio's AstoundSound Technology could be applied to at LCEC and in the rest of the world ("ROW") include the following products:

A – LCEC: Data Centric smart phones, computers, all types of portable media players (e.g. mp3 players), and other consumer electronics products.

B – Competitive Products: smart phones, portable media players, PC, Gaming (Hardware & Software), DVD and DVR players, Theatrical, CD, Car Audio, Hearing Aids.

C – Broadcasting and Live Concerts.

*Inavisis, Inc.*

Inavisis reviewed the published and filed patents in order to become familiar with the scope of the AstoundSound Technology, and conducted several days of interviews with Mr. Jerry Mahabub, Founder and CEO of GenAudio, to develop a deep understanding of the AstoundSound Technology, the market applications, and various revenue models specific to each market application. The Inavisis team researched each market application based on the potential commercial application of the AstoundSound Technology to such markets. For each market application, Inavisis relied on market data from different resources as a starting point to gauge the size of the market. This data included actual historical values as well as forecast values. Inavisis then extrapolated the market data for five years into the future for almost all market applications, except the hearing aid application where the life of the AstoundSound Technology was carried out to 10 years into the future since this is the customary valuation approach in the medical device area. Technology valuation in the consumer electronics industry is usually forecast for the useful life of the technology rather than the life of the patent, typically five years from the launch of the consumer electronics technology. Reference sources include, but are not limited to, the Consumer Electronics Association ("CEA") market data, GenAudio internal research data, Internet sources, SEC filings, and Multexinvestor (Marketguide) data.

GenAudio is interested in negotiating an exclusive license or outright sale of the AstoundSound Technology to one or more companies with its current focus on LCEC. For an outright sale, GenAudio is interested in determining the market value of the AstoundSound Technology to LCEC (on an exclusive and non-exclusive basis) and then determine the market value of the AstoundSound Technology to the rest of the world. Those calculations facilitate GenAudio's ability to structure separate transactions with multiple parties in markets where LCEC does not desire exclusivity, and in markets where LCEC has no current or contemplated product offerings. We analyzed the revenue stream for each market application based on the market data mentioned above. We determined the net present value ("NPV") of the product markets that the AstoundSound Technology enhances, and then we determined the portion of the NPV that is attributable to the AstoundSound Technology.

We also analyzed the competitive technologies and concluded that GenAudio would face limited competition from existing technologies, but that such competition would not be substantial due to the unique processing approach and unique attributes of the AstoundSound Technology.

For all market applications we used a per unit/device income valuation methodology. The per unit/device income valuation is similar to the Relief from Royalty Approach but the fixed charge per unit/device is applied instead of a percentage of the revenue stream. The table below describes the various valuation contexts and the resulting value of the AstoundSound Technology.

*Inavisis, Inc.*

Table 1

Summary of Valuation Results for All Market Applications

| Market Application (LCEC/ROW/Other) | LCEC Exclusive (CE) | LCEC Non-exclusive (CE) | Rest of the world (CE) | Other Markets (non-CE) |
|---|---|---|---|---|
| **Computers** | $169,241,000 | $60,834,000 | $86,015,000 | |
| **Smart Phones** | $226,433,000 | $113,963,000 | $67,494,000 | |
| **Enhanced Portable Media Players** | $293,499,000 | $147,204,000 | $3,735,000 | |
| **Traditional Portable Media Players** | $149,131,000 | $40,480,000 | LCEC Only | |
| **Internet Media TV Devices** | $16,520,000 | 8,260,000 | LCEC Only | |
| **Tablet Computers** | $27,081,000 | $13,541,000 | LCEC Only | |
| **Theatrical, DVD, CD** | | | $147,579,000 | |
| **DVD, DVR Hardware** | | | $142,806,000 | |
| **Gaming Hardware** | | | $89,054,000 | |
| **Gaming Software** | | | $66,008,000 | |
| **Car Audio** | | | $2,438,000 | |
| **Hearing Aids** | | | $8,405,000 | |
| **Broadcasting** | | | | $1,080,000 |
| **Live Concerts** | | | | $7,495,000 |
| **Total** | **$881,905,000** | **$384,480,000** | **$613,933,000** | **$8,575,000** |

*Inavisis, Inc.*

## Total AstoundSound Technology Value

Inavisis conducted the valuation from two points of view. The first analysis was for the market value of the AstoundSound Technology assuming an exclusive license to LCEC for the products in the first column above. The grand total value of the AstoundSound Technology was calculated to be:

**Grand Total for Exclusive License to LCEC = $881,905,000**

The second analysis was for the market value of the AstoundSound Technology for the rest of the world assuming non-exclusive license(s) to LCEC for the technology for the products in the first column above. A non-exclusive license with LCEC opens up the AstoundSound Technology licensing to other companies in the same product markets in which LCEC sells its products, as well as other markets where LCEC does not have product offerings. Inavisis determined that the total AstoundSound Technology value is the aggregate total of (1) the non-exclusive license to LCEC for its existing products, (2) the licensing revenue from the rest of the world for consumer electronics integration, and (3) the broadcast and live concert market applications (non-integration applications). Therefore we assign a grand total value of:

| | | |
|---|---|---|
| 1. | Non- Exclusive License to LCEC | =$ 384,480,000 |
| 2. | Non-Exclusive License to the ROW | =$ 613,933,000 |
| 3. | Non – Exclusive License to Broadcasting and Live Concerts | =$   8,575,000 |
| | **Grand Total** | = $1,006,988,000 |

*Inavisis, Inc.*

## Valuation Assignment & Inavasis Qualifications

Due to the recent commercialization and software optimization of the AstoundSound Technology, GenAudio is interested in the segmented valuation of the AstoundSound Technology for the purpose of negotiating license deals or the outright sale of the AstoundSound Technology to one or more interested buyers within specific fields of use or product market segments.

The "Fair Market Value" of an asset is defined as the amount at which an asset would change hands between a willing buyer and a willing seller, each having reasonable knowledge of the relevant facts and neither being under compulsion to act. In this report we value the AstoundSound Technology as of January 30, 2010.

Inavisis specializes in valuation of technology driven businesses and their intangible assets. We take a marketplace approach to setting arm's length values. In addition, we apply the latest tools in the valuation of intellectual properties such as the Technology Factor method and the Technology Valuation Management System (TVMS™) that are designed for the sole purpose of valuing technology.

The Inavisis licensing team works with all aspects of technology licensing. We are often hired to identify and value intangible assets, technologies, and intellectual properties such as trademarks so that value projections can be substantiated. We also assist with licensing discussions with potential licensing partners.

Inavisis clients include Fortune 500 companies that are interested in the effective management of their intellectual properties and in determining their potential value. Inavisis consults with such clients on all aspects of intellectual property asset management and helps them derive value from their patents, trademarks, trade secrets and know-how. The fee that Inavisis charges for services rendered is a fixed fee negotiated between Inavisis and the client prior to the start of any valuation analyses. The fee is not based, in any way, on any values arrived at in the valuation. The fees for this report were established prior to the commencement of any work. Inavisis agreed to accept fixed fee compensation for conducting the valuation with cash and warrants to acquire common stock of GenAudio. Despite this form of compensation Inavisis report was designed to remain independent to help GenAudio management negotiate arms length and fairly valued licensing deals with potential licensees, or an outright sale of the AstoundSound Technology to one or more buyers.

The author of this report is Dr. Sam Khoury. Dr. Khoury, Chairman of Inavisis, is a leading expert on the subject of valuation of intellectual properties. Dr. Khoury has presented on the topic of valuation of intellectual properties at numerous meetings, conferences, and seminars, including the Licensing Executive Society ("LES"), Institute for International Research ("IIR"), Industrial Research Institute ("IRI"), American Intellectual Property Lawyers Association ("AIPLA"), and the American Society of Appraisers ("ASA"). Professionals from NASA, the Navy, and U.S. government laboratories and agencies have attended Dr. Khoury's valuation courses, as well as personnel from Du Pont, Ford, Eastman Chemical, Allied Signal, Delphi, and many other Fortune 100 companies.

*Inavisis, Inc.*

## AstoundSound Technology Description

GenAudio's AstoundSound Technology creates the impression of a virtual sound source appearing at an arbitrary position in space by processing an audio signal and playing back the results through speakers or headphones. It does this by splitting the audio signal into a left and right ear channel and applying a separate filter to each of the two channels ("binaural filtering"). Three-dimensional sound localization is achieved by filtering the input audio data with a set of filters derived from a pre-determined head-related transfer function ("HRTF") or head related impulse response ("HRIR"), which describe the variance in phase and amplitude over frequency for each ear based on the relative position of the simulated sound source with respect to the listener.

The sound source can be localized at any discrete position on a 3 dimensional unit sphere for which a set of such binaural filters is available. Other points in space can be simulated by appropriately interpolating the filter coefficients for that position. To simplify implementation, only points on the unit sphere (spherical coordinate system with azimuth and elevation measured in degrees at the closest distance to the head) are considered and distance is modeled using a different process[1].

The AstoundSound Technology and software products were developed over a period of more than 20 years of research and software development. The trade secret and know how of the AstoundSound Technology Core deals with a mapping of the brain response to spatial auditory stimuli from fMRI images of the brain as sound is delivered to the listener from a 360 degree environment along both elevation and azimuth in a spherical coordinate system. The listener perceives total immersion into the audio experience because the sound signal is manipulated to the mapping of the brain's response to sound coming from different directions. The know-how is in developing a mathematical equation modeling the exact location of the sound so the brain perceives the sound as emanating from such virtual location.

Prior to GenAudio's formation, Founder and CEO Jerry Mahabub conducted the brain R&D from 1988 to 1991, in his spare time, while attending Rennselaer Polytechnic Institute in Troy, NY for Physics and Electrical and Computer Systems Engineering. Coupled with intensive numerical analysis and physical modeling from 1991 to 2002, his research yielded an extremely accurate set of brain response filters known in the field of psychoacoustics as Head Related Transfer Functions ("HRTFs"). These were determined by generating a monaural audio source of white and pink noise with 1 degree increments in azimuth at zero elevation with respect to the listener while performing fMRI scans of the human brain, using a 10 Tesla Superconducting Magnet. Once the elevation of the monaural sound source reaches the azimuth of 45 degrees, fMRI scans were measured at every 5 degrees of elevation and 2 degree increments of azimuth. Anything greater than or equal to an elevation cue of 60 degrees had an azimuth increment of 5 degrees. The end result is a representation of the HRTFs called "Impulse

---

[1] GenAudio notes on technology description.

*Inavisis, Inc.*

Response Filters", totaling 7,337 discrete and unique filters mapped on the unit sphere. Once the impulse response filter set was created, GenAudio, Inc. was formed in 2003, and the AstoundSound Technology Core was transferred into GenAudio. GenAudio has been developing custom digital signal processing based software around the core technology for over 7 years, with various applications in many industries, and three filed patents (both in the US along with international filings), and anticipate one or more patent filings within the next 3 to 6 months.

The AstoundSound Core Technology did not use dummy heads as in other competing technology, but mapped the brain to find the points within the brain that respond to the different auditory stimuli. Existing technologies are based on head related transfer functions (HRTF) computed using so-called "Dummy-Heads". These are dependent on various physiological properties, including body/head dimensions, which vary from one person to another, thus causing dummy head measurements to be far less accurate, alongside many other issues. The AstoundSound Technology Core uses the actual brain response to particular spatial auditory stimuli and this method of determining a set of HRTFs has never been replicated and is very unique. This approach eliminated the variability of perceived sound based on the head size and the ear shape among other physiological properties. In addition to the auditory cortex, there are other points in the brain that were responding to sound that were measured and compensated for the differences so that two people can hear the sound from the same location. Independent Component Analysis combined with Functional Connectivity Analysis enabled this to be determined. GenAudio's AstoundSound technology essentially fools the brain into hearing 4-dimensional sound (3 dimensions of space over time) from a minimum of any two speakers or headphones.

The strength of the AstoundSound technology is the ability to accomplish this enhanced surround sound listening experience using two speakers and without any modification to the hardware of the device delivering the audio experience. For example, LCEC does not have to retool its portable media players or smart phones to deliver this 4-dimensional sound experience. A simple software update to the devices will seamlessly integrate the AstoundSound Technology. AstoundSound Technology creates this true 4-D listening experience through software rather than hardware and using only two channels (stereo) due to the AstoundSound Technology's ability to virtually localize sound in a particular location without the need for placing speakers in multiple locations as in the Iosono technology or other typical surround sound hardware set-ups. Iosono-Sound can deliver a similar effect using 600+ speakers[2]. This makes Iosono technology implementation prohibitively expensive and immobile.

The AstoundSound Technology is completely compatible with all surround sound delivery formats. All the sound technologies used by Dolby, THX, Digital Theatre System (DTS) and Special Data Dissemination Standard ("SDDS") are considered delivery formats that encode audio after mixing and the encoded audio is then decoded on the receiving device as movies or DVDs are played on such receiving devices. On the other hand, AstoundSound Technology is applied during the mixing process and no encoding or decoding is needed, and the AstoundSound Technology is simply played on the existing hardware device.

---

[2] GenAudio Confidential Information -- Business Summary

*Inavisis, Inc.*

Another benefit of the AstoundSound technology is the limited drain on the power consumption of the device. This is particularly important for hand held devices such as smart phones and portable media players. The AstoundSound Technology has been optimized and can be implemented on hand held devices without draining battery life to any significant degree since the AstoundSound technology has a negligible impact on the power consumption of such devices.

The AstoundSound Technology may be classified into two general implementations:

1. Stereo in and Stereo out: (Consumer, Prosumer, ProAudio)

This implementation is best exemplified by consumer electronics applications (computers, portable media players, smart phones).

2. Mono in and Stereo out: (Prosumer, ProAudio, Real-time gaming)

This implementation is best exemplified by professional audio mixing (Plug-ins for Logic, ProTools, etc.), video games (Microsoft XBOX360, Sony PS3, Nintendo Wii, PC/Mac), hearing aids and telecommunications (iChat, Skype, telephony).

AstoundSound Expander ("Expander") is the trade name for the computer version of the AstoundSound Technology that processes any two-channel/stereo input and outputs a final product, which delivers a four-dimensional sound experience through any two speakers or headphones. In addition, GenAudio has developed a real-time process that utilizes the Mono in, Stereo out implementation of the AstoundSound Technology to be used in the video gaming industry. This enables game developers to create a true-to-life audio experience during game play such that each player controlling the movements of characters will enjoy a completely unique and immersive audio experience in "real time" with negligible latency.

The breadth and depth of the AstoundSound Technology and its flexibility to be implemented in both hardware and software applications with no significant redesign provides a licensing platform where the AstoundSound Technology may be implemented into multiple industries and multiple products within each industry.

Figure – 1 highlights some of the major potential industries and markets and their relationship to the particular types of implementations of the AstoundSound Core technology.

*Inavisis, Inc.*

Figure -1

AstoundSound® Technology Platform

Multiple product offerings for multiple industries



The AstoundSound Technology can be integrated in any device where high quality audio is important. Figure – 2 outlines the major possible industries, horizontal and vertical markets for the AstoundSound Technology.

12
GA000565

*Inavisis, Inc.*

## Figure - 2

## Horizontal and Vertical Market Applications for AstoundSound Technology



*Inavisis, Inc.*

## Patent Description

     The filed patents are described briefly below. The titles of the filed patents is reproduced in Appendix (E). The valuation was conducted based on global markets because GenAudio is filing PCT applications for all their filed patents and also filing in China and Japan. This means that the valuation calculation has to include global markets.

### 1. US Filed Patent # 10,802,319

### "METHOD AND APPARATUS FOR CREATING SPATIALIZED SOUND"

     This filed patent has 46 claims that cover the "Method", and the "Apparatus" for the AstoundSound Technology. This patent has 6 independent claims and forty dependent claims. The patent describes the method of creating the 4-D sound, and the apparatus for the delivery of the AstoundSound Technology (memory, processor and storage elements). It also describes the different mathematical ways to manipulate the sound thus creating the appropriate hearing perception directly associated with the representation of the brain response to discrete spatial locations.

### 2. US Filed Patent # 12,041,191

### "AUDIO SPATIALIZATION AND ENVIRONMENT SIMULATION"

     This invention relates generally to sound engineering, and more specifically to digital signal processing methods and apparatus for calculating and creating an audio waveform, which, when played through headphones, speakers or another playback device, emulates at least one sound emanating from at least one spatial coordinate in 4-dimensional space.

     The filed patent has 44 claims with 7 independent claims and 37 dependent claims. The patent has six computer method claims and one system processing claim.

### 3. US Filed Patent # 12582449

### "AUDIO SPATIALIZATION AND ENVIRONMENT SIMULATION"

The patent has one independent method claim to improve the localization of sound.

     All the above patents includes mathematical calculations to create perception of sound in a three dimensional spatial environment over time. These patents are classified under the utility patent as the need to translate the concept using a machine (computers or other devices) that will manipulate a mono or stereo digital sound source into a final four-dimensional environment. The PTO is currently reviewing these patents.

     Inavisis in their analysis assumed that the patents would issue and will be valid. If the patents do not issue, then GenAudio has only trade secrets and know-how and the final value of the technology would be reduced accordingly.

*Inavisis, Inc.*

## Market Applications

### A – LCEC

LCEC is an international corporation that designs and manufactures consumer electronics and computer software products. LCEC has established a unique reputation in the consumer electronics industry. This includes a customer base that is devoted to LCEC and its brand. LCEC has the product offerings, the financial and management resources to fully commercialize AstoundSound Technology across multiple product lines with little or no hardware or software redesign.

### B – Rest of the World ("ROW") Applications

LCEC is a major player in the consumer electronics market but it is not the only player. GenAudio's AstoundSound Technology is independent of the various consumer electronic devices operating systems, so the AstoundSound Technology is capable of working on its existing products, including computers, smart phones, and portable media players.

Various home theater product offerings, such as DVD and Blu-Ray players, TVs, and home theater receivers are also strong potential candidates for integration of the AstoundSound Technology. Companies operating in these fields include but are not limited to Apple, HP, Dell, Samsung Electronics, LG Electronics, Sony, Toshiba, Panasonic, Siemens, Philips Electronics and many other companies all over the world.

In additions to the consumer electronics markets the AstoundSound Technology also applies to areas outside the current markets such as automotive audio, hearing aids, the video game industry and theatrical production such as movies and DVDs.

Inavisis conducted the valuation for all those markets so that GenAudio's management can develop an appropriate valuation system as it monetizes the AstoundSound Technology, and the valuation report envisions both an outright sale as well as a long-term exclusive/non-exclusive licensing arrangement for such market applications.

### C – Broadcast, Live Concerts and Streaming Media.

In addition to the market applications outlined above, there is a host of applications in the areas of digital music broadcasts, live concerts, and the Internet streaming and satellite radio. The ability to transmit these events in a 4-D acoustic environment using only two speakers or headphones is a revolutionary step beyond the current audio experience.

*Inavisis, Inc.*

The AstoundSound Technology has the potential to be the next "audio standard" due to its compatibility with existing equipment and the elimination of the need for additional speakers to achieve a surround sound listening experience, thereby decreasing cost and increasing portability. The unique commercial advantages that the AstoundSound Technology provides make it a viably competitive technology that could change the way consumers interact with the audio portion of many devices, as well as the way audio is mixed at the professional level. The 4-D AstoundSound Technology does not require any encoding for delivery over any electronic hardware device or to play any DVD or CD so it represents a significant change in the way a surround sound listening experience can be delivered to consumer electronics. The large majority of consumers listening to audio do not have 5+ surround sound speaker setups so the AstoundSound Technology is able to give these consumers a comparable listening experience with only two speakers or headphones and no special decoding devices, unlike competing technology such as Dolby Digital.

AstoundSound could become the next audio industry standard due to its compatibility with existing equipment and the elimination of the need for additional speakers to achieve a surround sound listening experience, thereby decreasing cost and increasing mobility for "surround sound on the go".

## Competitors With Commercial Products

There are several companies that mention they create a 3-D audio experience. These companies achieve similar results as AstoundSound Technology by adding several speakers to their delivery, or use software plug-ins to manipulate the signal delivered to the listener. The following is a list of the primary companies that are providing commercial products to deliver a 3-D audio signal to the listener.

### Iosono

IOSONO technology[3] combines the use of a large number of loudspeakers (600+) with the principle of wave field synthesis to recreate, or synthesize, the complex acoustic wave field of sound emanating from actual objects. Conventional audio systems, by contrast, merely amplify audio signals, which can be compared to displaying images on a TV screen fixed to the wall (or several screens in the case of multi-channel audio). With IOSONO, you're no longer looking at a picture on the wall, so to speak, but at an "acoustic hologram". The disadvantage of the IOSONO system is it has to be delivered through a large number of speakers, so it mainly finds applications at theme parks and large theatres, and there is a substantial expense and space requirement for the numerous speakers. It cannot be adapted to consumer electronic products with 2 speakers or headphones.

### SRS Labs, Inc. [4]

SRS Labs, Inc. is a Santa Ana, California-based audio technology engineering company that specializes in audio enhancement solutions for a wide variety of consumer electronic devices. Originally a part of Hughes Aircraft Company, the audio division developed the Sound Retrieval System technology, and in 1993 was separated off to form SRS Labs, Inc. In 1996 SRS Labs became a publicly traded company on NASDAQ, SRSL.

---

[3] http://iosono-sound.com/

[4] Wikipedia SRS

*Inavisis, Inc.*

SRS develops audio enhancement solutions and licenses those products to companies including Microsoft, Samsung Group, LG Group, Toshiba, Vizio, Dell, Hewlett-Packard, Sony and ViewSonic.

In 2008, approximately 36 million SRS-equipped flat-panel TVs were shipped, representing a 30-percent estimated market share.

SRS Labs has more than three hundred consumer electronics manufacturing partners, and holds more than 150 patents for its technologies. SRS has also recently begun to manufacture its own products, including, MyVolume - Volume Leveling Adaptor, SRS iWOW for iTunes, SRS Audio Sandbox for PC, and SRS iWOW Adaptor for portable media players. The technology delivers a software based audio experience but can actually degrade the audio and create phase problems that inhibit its ability to be used in a commercial broadcast medium.

### X-spat Box

The X-spat Series of 3D audio workstations is a full line of products dedicated to 3D audio soundscape[5] creation for live surround sound, opera sound reinforcement, theatre sound automation, corporate event sound engineering, ambient audio design and DVD post-production enhancement.

When equipped with its optional fire wire card and used in conjunction with X-Spat Controller II, the workstation can be used also as a multi-channel audio processor and playback system for theatrical productions and events. Alternatively, the X-spat player hardware represents an economical and powerful solution for any kind of installation.

The three X-spat bo$X^2$ models available are compatible with See'n'Sound and can support and enhance DVD post-production workstations like Symphony, Pro Tools and Nuendo.

### Holistik

The main core of Holistik's products is based on the so-called, Amphiotik Technology, which has been developed and implemented by Holistik. Amphiotik Technology is based on binaural technology, which in turn is based on the way the human hearing process perceives sounds.

Amphiotik Technology incorporates several algorithms that have been designed by Holistik. The general motivation for working on these algorithms is the desire for better audio.

Amphiotik technology is based on Multi-Channel Systems (Surround Sound) using two speakers. A separate channel is used for every sound originating from a desired direction, including even above and below, if desired. Although multi-channel systems produce impressive spatial effects, the drawback of these systems is that they are expensive and inconvenient.

---

[5] http://www.aegweb.it/homenglish.html

*Inavisis, Inc.*

### Emersys

Emersys was founded by senior researchers from ETRI (Korea's Electronics & Telecommunications Research Institute) in March 2000. Emersys develops virtual reality and three dimensional audio editing solutions for the personal computer environment.

Emersys has the following flagship products, the Maven3D[6] series of 3D audio editing studios. This product is making inroads into the fiercely competitive audio editing software market.

Emersys continues to expand in the audio industry with high-end audio products and services including multi-channel audio players, music video and movie soundtrack post-production & mastering, DVD audio development, AAC and AC-3 audio codecs for 3D audio and multi- channel DTV broadcasts and HDTVs, game 3D audio engines, as well as Voice Recognition (VR).

With the technology on the digital contents, 3d sounds, digital contents creation tools, game, and VR, Emersys is targeting the world markets in the movie, DVD, DTV, HDTV, and other forms of media. The Maven 3D series is already marketed on a worldwide basis.

Emersys Corporation was established in 2000 has 6-10 employees with revenues of less than $1.0 million.

### Sensaura

Sensaura is a division of Creative Technology, which provides sophisticated 3D audio technology for the interactive entertainment industry.

Following its origin as a research project at THORN EMI Central Research Laboratories ("CRL", based in Hayes, United Kingdom) in 1991, Sensaura evolved to become a leading worldwide supplier of 3D audio technology. By 1998 Sensaura had licensed its technology to the three major audio chip manufacturers (ESS Technology, Crystal Semiconductor/Cirrus Logic and Yamaha), who at that time supplied 70% of the PC audio market. Subsequent major licensees included NVIDIA, Analog Devices, VIA Technologies (expired, replaced by QSound) and C-Media Electronics (expired, replacement not yet available).

Sensaura technology has shipped on more than 24 million game consoles and 150 million PCs (on soundcards, motherboards and external USB audio devices). As well as being licensed directly for the Microsoft Xbox hardware, the technology is also available as a middleware product, GameCODA, for the Xbox, Sony PlayStation 2 and Nintendo GameCube.

In December 2003 the Sensaura business and IP portfolio was bought by Creative Technologies. Sensaura continues to operate as an R&D division within Creative Technologies; however following a major reduction in staff numbers in March 2007, it is no longer supplying advanced audio technologies for PC sound cards, game consoles but now focusing on other

---

[6] http://www.Maven3D.com/en/index.asp

*Inavisis, Inc.*

product areas, including involvement with the OpenSL ES standard. Sensaura is no longer an R&D division of Creative Technologies and the employees were absorbed into the organization.

**Wolfson Microelectronics**

Wolfson has two products specifically designed for enhancing the audio experience of listeners.

1. Sonaptic SoundStage™

Wolfson has developed a suite of products to enhance the quality of sound for consumer audio and entertainment devices. Wolfson also developed software solutions that are specifically suited for 3-D positioning for hand held devices and video gaming industry under the trademark Sonaptic Sound Engine™.

- Soundfield expansion
- Surround sound virtualization
- Psycho-acoustic bass boost
- Dynamic ambient processing
- Multi-band EQ with presets
- Automatic gain control
- Audio mixing

2. Sonaptic Sound Engine™

Sonaptic Sound Engine technology is designed to bring 3D Positional Audio software solutions to the console gaming and to mobile phones and handheld gaming devices. The elements of the technology include the following:

- Real time, highly accurate 3D positioning
- Doppler effects
- Sound cones
- Reverb with environmental presets
- User and object orientation
- Obstruction and occlusion

## Competitive patents

Inavisis, Inc. reviewed all the patents referenced in the filed patents. In addition to the referenced patents, Inavisis searched other databases to review patents that would accomplish similar results as the AstoundSound Technology. Inavisis' research indicated only one patent that was similar and it was based on the use of hardware speakers.

US Patent 5,764,777: "FOUR DIMENSIONAL ACOUSTICAL AUDIO SYSTEM"

This patent has 38 claims and deals with placement of specific speakers in the right configuration to generate a four dimensional total immersion experience.

*Inavisis, Inc.*

WO/2003/015471 "DEVICE AND METHOD TO SIMULATE THE PRESENCE OF ONE OR MORE SOUND SOURCES VIRTUALLY POSITIONED IN A THREE-DIMENSIONAL ACOUSTIC SPACE"

This patent has six claims that cover the method and apparatus. The claims describe the method to calculate the position of sound emitting from a source relative to a listener. This invention relates to a method designed to simulate the presence of one or more sound sources in virtual positions in three-dimensional acoustic space, in the perception of a listener occupying a real physical space, by means of suitably driven loudspeakers whose position is not perceived by the said listener, and a device for the implementation of the said method.

Such simulation generates the sensation that the listener is in a space with a different shape and size from the real physical space, possibly bounded by one or more walls, in which the listener is actually located.

#### Conclusion

Inavisis considered the different companies and technologies that would compete directly with the AstoundSound Technology developed by GenAudio, Inc. Although alternatives exist, none preclude the commercialization of GenAudio's 4-dimensional AstoundSound Technology. In all three separate areas that we looked at, the AstoundSound Technology was superior, cheaper and easier to implement. The AstoundSound Technology is a new and leading edge technology with many unique attributes that no other technology can claim.

The following is a summary list of unique properties associated with the AstoundSound Technology. This list highlights the strength of the AstoundSound Technology and the deficiencies of the competitive products:

- High quality audio filters with 7,337 discrete positions that were measured on the tightest sphere that can be placed around the head. Numerous magnetic resonance imaging (MRI) measurements were taken of the auditory cortex, which has a tonotopic relationship to the cochlea of the inner ear. Other competing technologies use binaural dummy heads, thus yielding inferior research results.
- Provides a true-to-life multi-dimensional 2-channel (stereo) audio experience.
- Audio remains in phase.
- Improves hearing safety with little or no gain increase, yet provides a perceived "louder" audio experience avoiding unwanted "clipping".
- Enhances audio clarity and tone regardless of genre or audio file format.
- Revitalizes compressed formats (e.g. portable media players) with an immersive audio experience.
- No compromise to center channel imaging and low-end audio information.
- Listening with any set of headphones creates a stereo speaker field audio experience just as the mix engineers intended for the audio to be listened to and eliminates the annoying "center of your head" listening sensation.

*Inavisis, Inc.*

- Listening with any two speakers creates a realistic surround sound field for music, video games, and movies.

Below is a list of problematic issues present in competing technologies:

- Low quality digital audio filters (in critical audible range) act as broad Q factor equalization, not as localization cues.

- Additional gain added to signal contributing to distortion and clipping, +5db to +15db depending on preset chosen by the end-user.

- Impulse response measurements conclude filtering asymmetrically, leading to unbalanced sound panning left and right.

- Audio is out of phase, therefore not suitable for commercial broadcast.

- High noise floor and excessive audio phase, often times causing the end-user to feel nausea when listening.

- Extensive use of phase inversion.

- Center channel attenuation and smearing of center channel imaging.

- Impulse response measurements conducted concluded that competing product filtering is positionally static (no localization or spatial audio processing).

- Signal compression to create a denser and unnatural sound.

- Output quality is compromised due to use of additional reflections In the signal.

- Some competing technologies are based on binaural dummy head measurements.

From consumer electronics to professional audio and video editing software applications, the AstoundSound technology can be licensed with various fields of use restrictions within multiple industries, and may provide for a strong market differentiator for the consumer product company.

## Economic Impact

Industries and businesses operate within the larger economic environment. As the globe diminishes in size due to the Internet and the on-location, round-the-clock, news reporting, and as communications travel around the world at the speed of light, any economic event that takes place anywhere in the world would have some effect on the industries and businesses elsewhere in a short time frame.

Similarly, technologies also operate within the same economic environment; technologies do not exist in a vacuum. Their ultimate value is determined by the economic factors that allow technologies to flourish or die independent of their technical merit. A brief description of the economic environment would be helpful in our valuation of the AstoundSound Technology.

*Inavisis, Inc.*

The global economy is struggling. Europe is suffering from unemployment and sluggish economies such as Greece. China is impacted by the slow economy in the US and is now focusing on selling their products in Asia. The US narrowly avoided a depression and is struggling to recover from one of its worst recessions. The financial markets recovered but the stock market is showing signs of weakness. Lending is constrained, and the deficit is making it difficult to be optimistic about the long-range recovery of the U.S. economy.

The consumer electronics industry is impacted by the global economic downturn. The AstoundSound Technology is affordable to OEM's and at the same time would give the OEM's a strong competitive edge in selling their consumer electronics products.

## General Technology Valuation Methods

The following is a brief discussion of the most popular approaches used in the valuation of businesses and intangible assets. Of these, the Income Approach and the Relief From Royalty are the basic approaches that can be used to extract the value of the technology from the value of the business as a whole. However it is important to understand all valuation approaches in order to clarify the importance of the methods used for the valuation of the AstoundSound Technology.

### Market Approach

Intangible assets can sometimes be valued by comparing the technology under consideration to purchase or license transactions involving similar assets that have occurred recently in similar markets.

The Market Approach is applicable to all forms of intangible assets when there are reliable transactions that reflect value patterns or trends in the market. When data on transactions is available, the Market Approach is considered the most direct and systematic approach to the estimation of value. This approach is best if an active market exists with recent examples of arm's length transactions for comparable intangible assets, and adequate information on their terms and conditions.

The conditions of the market will influence the expected sales or license price for an intangible asset. When using this method, one needs to consider contributing factors such as historical transactions and the participants' influences on them. With the use of Market Approach valuation, data analysis is the most critical element. Empirical sales and license data must be selected, analyzed, and adjusted before it can be applied to the valuation of the intangible asset. Then this data must be further analyzed in the context of:

- The economic income generated by the transaction
- The risks associated with achieving that economic income
- The remaining useful life of the asset involved
- The transaction date
- The type of arrangement (exclusivity, lump sum, running royalties, milestone payments, paid-up value, etc.).

Most intangible assets are not sold frequently enough to rely on for a comparable market value. Moreover, it is very difficult to get enough detail on comparable transactions to be certain that you have all the elements of value that make a good comparison. In this assignment we did not find a direct comparable that we could use to value the AstoundSound technology.

*Inavisis, Inc.*

### Cost Approach

The Cost Approach borrows from the economic principle of substitution and competitive equilibrium price, i.e., an investor will pay no more for an investment than the cost to obtain another investment of equal utility. Put another way, an efficient market will adjust the value of an investment so that its market price always reflects its utility compared to available substitutes, and thus remain in equilibrium.

The price of an intangible asset is not necessarily set by the historical cost of creating the asset, nor is it necessarily set by the sum of the costs for which a willing seller would like to be compensated. Economic value is seldom related to cost. Cost, in an economic sense, is more equal to an accounting measure of cost that has been increased or decreased by existing market conditions.

The Cost Approach to intangible asset valuation involves different analytical methods. Two of the most common methods are the "reproduction cost method" and the "replacement cost method." The reproduction cost method uses the cost to construct an exact replica of the intangible asset being valued. The cost of the reproduction however does not consider the actual demand for the asset in the marketplace.

The replacement cost method, on the other hand, focuses on the cost to recreate the function or utility of the intangible asset. This replica may not perform or appear exactly the same as the intangible asset being imitated, which consequently makes it difficult to appraise.

In the Cost Approach, the original cost to develop the technology is sometimes used to determine its value. This approach does not directly consider the quantity or duration of economic benefits that may be achieved. Therefore this usually is not an accurate approach because the cost to develop the technology and its market value are not the same.

This approach is useful for certain intellectual properties when:

- The flow of income or other economic benefits related to the asset cannot be reasonably and/or accurately quantified.
- The intangible asset is only a small part of a larger collection of assets.
- Another valuation approach is inappropriate or cannot be used.

For a few technologies in the earliest stages of development, and where equivalent functional, non-infringing alternatives may be easily designed, the Cost Approach might be appropriate since it reflects the cost a company could avoid by purchasing, rather than duplicating, a similar R&D effort.

### Income Approach

The Income Approach, based on discounted cash flow ("DCF"), focuses on the income-producing capability of the property. The theory of this approach is that the value of property can be measured by the present value of the anticipated net economic benefit to be received over the property's life. While the Market and Cost approaches have particular applications in certain situations and with certain types of intangibles, the Income Approach is generally applicable to all situations and types of intangible assets and intellectual properties.

The Income Approach is based on determining the future income or cash flow streams expected from the business (or business segment) under consideration. The Income Approach focuses on the main parameters that determine value. These parameters include the following elements:

GA000576

*Inavisis, Inc.*

- The expected size and duration of future income or cash flows
- The size and nature of the potential market, factors affecting demand, recent and expected future trends, etc.
- The risk factors associated with the generation of the income or cash flow stream such as competitive actions, ability to attract customers, etc.

The most common error in applying this approach is the lack of differentiation between the business enterprise value and the value of the Intellectual property that supports the business. In the valuation of the intellectual property, it is very critical to be able to separate this value from the value of the business as a whole.

Inavisis calculated the value of the AstoundSound Technology by capturing the dollar amount per unit sale that is charged for the value of the technology. It is not the value of the whole product. So the income approach calculation is capturing the value of the technology only and not the value of the business.

**Relief from Royalty Approach**

In the Relief from Royalty Approach, the value of intangible assets is equal to the present value of the after-tax royalties that the company is relieved from paying by owning the assets. This approach quantifies the royalties a licensee would be willing to pay for the use of the technology and typically is based on a percentage of revenues. It is a function of the rights being granted by the licensee and the royalty payments that would be necessary to acquire those rights.

Prospective royalty payments are projected and then present valued at a suitable discount rate. Royalties are generally derived from a percentage of revenue. Since this is so, the process of forecasting avoided royalties requires a reasonable forecast of revenues from the sale of products or services associated with the intangible asset and the determination of a fair royalty rate for that asset in the market.

In most cases, the discount rate applied to avoided royalties is derived from the risk of receiving the forecast royalties. Generally a licensing transaction is a process of passing risk from the licensee to the licensor. Hence, the rate of the royalty usually reflects only a segment of the risk related to the intangible asset.

The relief from royalty method generally uses royalty rates that are market driven and applied to the projection of revenue as determined by the Income Approach. However some practitioners also may apply the 25 Percent Rule, which has become a commonly cited guideline. The fact is that the phrase "25 Percent Rule", and the idea behind it, is widely recognized in the licensing community. It appears in many articles about valuation and it has been cited in court cases.[7]

---

[7] Smith, Gordon V., "Valuation of Intellectual Property and Intangible Assets", Gordon V. Smith, Russell L. Parr—3rd Edition, John Wiley & Sons, 2000, pp.366-368.

*Inavisis, Inc.*

The 25 Percent Rule[8] assumes a royalty equal to 25% of the pre-tax operating profits of the enterprise in which the licensed intellectual property is used. It is a simple rule of thumb based on equitably dividing the economic profits between the licensor and licensee according to their relative contributions. It gives an approximate estimate of the value of intellectual property that would be paid in a reasonable arm's length negotiation.

Although it is known as the 25 Percent Rule, in practice experienced appraisers of intellectual property recognize that the percentage may vary from 10-50%. Selecting a number within this range is based on many factors that add to or detract from the contribution of the intellectual property.

Some positive aspects of this approach that make it popular and worth using is that:

1. It gives a feeling of fairness. Because it is based on apportioning anticipated gain, it creates a basis for considering the respective contributions of the seller and the buyer.

2. It is based directly on resulting benefits. The 25 Percent Rule is focused on the earnings-before-income-tax ("EBT") line in the income statement. This is an appropriate measure of the direct benefit of the subject license.

3. It can be the basis of an early agreement. Parties beginning a negotiation will sometimes agree that their negotiations will be governed by some split of expected profits based on applying the 25 Percent Rule. This can be helpful in determining mutual expectations at an early stage and in reaching closure.

**Conclusion**

Several approaches to valuation were considered: the Market Approach, Cost Approach, Income Approach (DCF), and Relief From Royalty. The Market Approach derives value directly from current market transactions for identical or substantially equivalent properties. Since no sufficiently identical properties or transactions exist for this AstoundSound Technology, this approach is rejected.

The Cost Approach derives value based on the cost to create the property or re-create one of similar utility. However, since economic value is actually determined by customer demand for the product and its competitive advantages in the marketplace, it is almost never related to cost. Therefore, the Cost Approach is not appropriate here either.

The Income Approach will be selected for this valuation since we have a good handle on the risk of the AstoundSound Technology and business, the duration that the AstoundSound Technology will be viable and the revenue expected from all the market applications. Inavisis, Inc. will rely on the Income approach with revenue based on the AstoundSound Technology's contribution to the products within various markets being calculated.

---

[8] Goldscheider, R., 1993, "Measuring Damage in U.S. Patent Litigation", 5 No. 5 J. Proprietary Rights.

*Inavisis, Inc.*

In the Relief From Royalty Approach, the value of intangible assets is equal to the present value of the after-tax royalties that the company is relieved from paying by owning the assets. Prospective royalty payments are projected and then present valued at a suitable discount rate. The hearing aid application will be the only application that we apply the Relief From Royalty method because it is the most accepted valuation method used in the medical device area.

## Chapter One: LCEC , Consumer Electronics Applications

### Valuation Period (Timing)

The patents that embody the AstoundSound Technology consist of three filed patents. The earliest patent was filed March 16, 2004. The latest patent was filed on October 20, 2009. The patent life is 20 years from filing so the patents will expire in 2024 to 2029.

In determining the valuation period, the appraiser has to consider both the legal life of the patent and the economic life of the patent. The legal life is 20 years from filing the patent. The economic life of the patent is an estimate based on industry practices and the strength of the claims in the patent. Inavisis, Inc. based their calculation on the economic life principle and did the calculation for 5 years from the anticipated launch date of the AstoundSound Technology. We believe this is both conservative and consistent with technology valuations in the consumer electronics industry.

GenAudio is contemplating a license deal with LCEC and/or with other consumer electronics manufacturers; this report is specifically prepared in contemplation of a transaction with LCEC. It is assumed in all the market applications that it will take LCEC six months to implement the AstoundSound Technology in all of its current products that encompass stereo audio output either through speakers or headphones. Based on this assumption, the start date for the cash flow for each new product application is assumed to start August 1st, 2010 and end on July 30, 2015. The retrofit of product upgrade market was assumed to start on August 1st, 2010 and end December 31, 2014.

### Market Potential

The market potential and the target company share are assumed to be the same, since LCEC is expected to launch the AstoundSound Technology in all their relevant product offerings. Inavisis assigned a payment per device so that when the payment per device is multiplied by the total number of devices, the income attributed to the AstoundSound Technology can be calculated.

*Inavisis, Inc.*

Inavisis derived the price per device by starting with the current commercial price of AstoundSound Expander to the consumer, although this is the least sophisticated implementation of the AstoundSound Core technology. GenAudio sells the product after discount at $19.95 (MSRP $39.95). Inavisis assumed that original equipment manufacturers ("OEM") would be willing to pay $10 for the technology to be placed on their devices. However, the GenAudio, Inc. business model is different; they want to have their technology incorporated into all of LCEC's product lines rather than purchased separately by the consumer as an enhancement. Therefore the GenAudio revenue model envisions LCEC's implementation of the technology in all of their new product sales and offering the enhanced products to new customers and to current customers as an opportunity to upgrade. Inavisis assumed that since the GenAudio revenue model requires LCEC to implement the technology into its products, then LCEC could demand from GenAudio a lower licensing fee than the $10 base assumption due to the existing sales base of LCEC's products, its exclusive responsibility for marketing, etc.

Based on its experience in the technology licensing field and the difference between the LCEC and GenAudio business models described above, Inavisis assumed a substantial discount and incorporated in its valuation model the revised assumption that the GenAudio royalty would be reduced from $10.00 to $1.00 per device for an exclusive license and $0.50 for a non-exclusive license. This low revenue allocation would allow LCEC to include the AstoundSound Technology in its products without having to pass any material additional cost to the consumer since the hand held devices' price ranges from $199-499. Inavisis doubled the $1.00 fee per unit for the non-exclusive license to LCEC in the computer market applications only because the average computer price point is in excess of $1000. Inavisis assigned a $3.00 fee per unit for an exclusive license for computers because computers are more expensive than the rest of LCEC's products. Also, LCEC does not have a dominant position in the computer market and an exclusive license with LCEC will result in significant loss of revenue to GenAudio by restricting its right to license the AstoundSound Technology to other computer manufacturers.

The financial analysis in this report assumes that LCEC would use the AstoundSound Technology in both new devices as well as in upgrades to existing devices in conjunction with an LCEC operating system upgrade. Historically those upgrades were either free or were about $10 for a significant upgrade. Inavisis assumed that LCEC would include the AstoundSound Technology upgrade into one of its payment required upgrades. Inavisis assigned a value of $0.15 for each upgrade except for the computers where $0.30 was used due to the higher price point of the computer.

As a verification check for reasonableness, Inavisis estimated the average price for LCEC products to be approximately $399. A $1 license fee for an exclusive arrangement is equivalent to a 0.25% royalty rate (one quarter of one percent). Similarly, for a non-exclusive license the $0.50 license fee is equivalent to about a 0.12% royalty rate(twelve hundreds of one percent). This is a very low royalty rate and confirms that the price per unit for the AstoundSound Technology is reasonable.

Table - 2 outlines the fees per unit assigned to all of LCEC current products that would use the AstoundSound Technology.

*Inavisis, Inc.*

### Table - 2

### Summary of Royalty per Unit for Each Consumer Electronics Product Category

| Product | New Sale (Exclusive/Nonexclusive) | Upgrade/After Market |
|---|---|---|
| Computers | $3.00/$1.00 | $0.30 |
| Data Centric Smart Phone | $1.00/$0.50 | $0.15 |
| Portable Media Players | $1.00/$0.50 | $0.15 |
| Internet Media TV Device | $1.00/$0.50 | N/A |

Inavisis used the fee per device from Table 2 for the AstoundSound Technology along with assumption on the number of units of LCEC's different products to calculate the revenue to GenAudio.

### Discount Rate

Inavisis applied the Capital Asset Pricing Model ("CAPM") to calculate the discount rate used in determining the value of the AstoundSound Technology under the income approach. The discount rate is also known as the cost of equity or the annual return that an investor expects to earn when investing in shares of a company. The return expected of any common stock should be composed of at least three different return components[9]: 1) a return commensurate with a risk-free security ($R_f$); 2) a return that incorporates the market risk associated with common stocks as a whole (Rm); and 3) a return that incorporates the business and financial risks specific to the stock of the company itself, known as the company's Beta ($\beta$). There is also another element of product development risk that is relevant to the size of the company that is commercializing the technology. Small companies have product development risk as high as 3.5% and large companies over $1-2 billion will have zero risk due to their size and commensurate resources.

The CAPM can be calculated using the following equation:

### DR (CAPM) = Risk free rate + $\beta$ (Market Risk Premium) + Company Size Risk

- Risk Free Rate = 4.32% (30 Year Treasury Bond Yield for Jan 2010, CBOE, 11/24/09)
- $\beta$ is the equity risk of business versus the stock market
- $\beta$: 1.52 for LCEC
- Long-Term Market Risk Premium: 7.7% because LCEC is likely to have resources necessary to manufacture and market its products.
- Size Adjustment is 0 because of LCEC's annual gross revenue .

---

[9] http://www.valuepro.net/approach/equity/equity.shtml "The cost of Equity"

*Inavisis, Inc.*

### DR: 4.32 + (1.52 X 7.7) + 0 = 16.02%

Inavisis used 16% as the discount rate to measure the risk or the return that an investor would expect from investing in LCEC.

### The Income Approach Estimation of Value

The Income approach estimation of value was carried out using a conservative projection period of five years. The market revenue for each market application was described above. The future revenues were discounted to January 30, 2010 using a discount rate of 16%. The Net Present Value ("NPV") for each market application is calculated assuming an exclusive license or a non-exclusive license with LCEC (See Appendix C for detailed calculation). Table – 3 outlines the NPV for the value of LCEC's use of the AstoundSound Technology in all the LCEC market applications.

### Table 3

### Market Value AstoundSound Technology

|  | Exclusive | Non-Exclusive |
|---|---|---|
| Computers | $115,037,000 | $60,834,000 |
| Smart Phones | $226,433,000 | $113,963,000 |
| Enhanced Portable Media Players | $293,499,000 | $147,204,000 |
| Traditional Portable Media Players | $149,131,000 | $40,480,000 |
| Internet Media TV Devices | $16,520,000 | $8,260,000 |
| Computer Tablets | $27,081,000 | $13,541,000 |
| Total | $827,701,000 | $384,480,000 |

GA000582

*Inavisis, Inc.*

### Conclusion

The Income Approach calculates the revenue to GenAudio from the implementation of its AstoundSound Technology in LCEC's major product segments. The indication of value shows that the AstoundSound Technology is worth $827,701,000 when LCEC secures an exclusive license and a value of $384,480,000 when LCEC secures a non-exclusive license.

### Chapter Two:  Rest of the World ("ROW")

### Valuation Period (Timing)

The patents that embody GenAudio's AstoundSound Technology are three filed patents. The earliest patent was filed March 16, 2004. The latest patent was filed on October 20, 2009. The patent life is 20 years from filing so the patents will expire in 2024 to 2029. Those patents are filed in China, Japan and under the Patent Cooperation Treaty ("PCT") to secure international protection.

In determining the valuation period the appraiser has to consider the legal life of the patent and the economic life of the patent. The legal life is 20 years from filing the patent. The economic life of the patent is an estimate based on industry practices and strength of the claims in the patent. Inavisis, Inc. did the calculation for 5 years from the date of the valuation report as the economic life of the technology.

The calculation for the consumer electronics market as well as most of the other applications Inavisis assumed that GenAudio would be able to enter into a non-exclusive license agreement within one year. The technology for the hearing aid application is not as developed as the rest of the other applications. Inavisis used a 2-year delay in the beginning of the commencement of revenues for the hearing aid market application.

The cash flow for most market applications will start January 30, 2011 and end on January 30, 2015. The cash flow for the hearing aid application will start January 30, 2012 and the valuation was carried for ten years because of the medical device market application technology is not replaced as quickly as in the consumer market application.

### Market Potential

In order to determine the market for the AstoundSound Technology, Inavisis reviewed the consumer electronics applications in which the technology would be implemented. In addition Inavisis reviewed the current trends within the audio industry. Most of the information was gathered from internet sources as well as information from Digital America 2008[10], and various reports from Consumer Electronic Association, including the report titled "The Evolution of Audio: Is Anyone Listening".

---

[10] Digital America 2008 at WWW.CE.org

*Inavisis, Inc.*

In the consumer electronics market the trend is shifting from a home listening experience to an "anywhere" listening experience. The portability of electronic devices is becoming very important to consumers. In addition, the growth of electronic gadgets in vehicles with radios, CDs and DVDs to entertain the passengers is becoming an essential element of the driving experience.

Consumers, in the US, listen to music from several electronic devices. It is estimated that 77% of consumers listen to music from TV, 55% from computers, 48% from the internet and 33% from portable electronic devices.

### Hardware TV, 3D-TV, HT, DVD, DVR

Display Bank in their report published Q3 of 2009 forecasts the global units of TV being sold. They estimate that in 2009 the global market represent 194.4 million[11] units. These TVs include all types of TVs (LCD, PDP, RPT, CRT and others). In that report Display Bank estimates that the TV market will grow to 209.6 million units in 2010, 220.3 million units in 2011, and 230.8 million units in 2012. The report also suggests a growth rate of 7.8% for TVs. Inavisis used this growth rate to estimate TV sales to 2015.

The 3D-TV is new technology that several companies are introducing. LG mentioned in one of their press releases that they want to sell 400,000 3D-TVs in 2010 and 3.4 million in 2011. Techrader.com reported that all future DreamWorks and Disney titles will be available in 3D formats and Bskyb and Virgin are looking into 3D television channel offerings. Based on the trends in the industry, Techrader.com and GigaOM Pro estimated that the total global market would be 46 million units of 3D – TVs by 2013. Screen Digest forecast that the growth of worldwide 3D-capable TVs would be 25 million units by 2013. Inavisis assumed that the new technology will receive some resistance in the market assuming the price point was too high so Inavisis used the 25 million units for the global market as appropriate for this analysis. Inavisis started the market in 2010 to be 2.5 million and grew the market so that the total market will be 25 million in 2013.

The home theatre is becoming increasingly popular as the center of home entertainment. It provides the viewer with an experience of placing them in the middle of the action. With large picture and large sound, the consumer experiences movies and TV shows similar to the commercial theatre experience without leaving home. The prices for home theatres are also not as expensive as they used to be, as many companies introduced the "Home Theatre in a Box" concept for under $1,000. The consumer can install that system and connect it to their TV so that they can enjoy movies and TV shows in theatre-like fashion. Approximately 936,000 units of home theatre units were sold in 2009. With the onset of the digital transmission of TV signals and the hardware for digital DVD using Blu-Ray players, it is expected that the home theatre market will grow at a rate of 20% for the next five years. The total number of home theatres will reach 2.4 million units in 2015.

---

[11] GenAudio "Hear it Believe it" Presentation. Global TV shipments and Forecast Report Q3 09, Displaybank.

*Inavisis, Inc.*

The Digital Entertainment Group cited in a press release on January 8, 2009 that the US sale of DVD players is 25.2 million[12] units. Inavisis assumed that there is no growth in 2009 because of the economic recession. Inavisis also assumed that the global market for the DVD players is double the US markets. So in 2009 the global DVD player sale is 50.4 million units. Forecasting into the future Inavisis used a growth rate of 5%.

The electronics industry is making it more convenient for consumers to watch TV. During the past few years there has been increased interest in hard drive video recorders, sometimes called digital video recorders ("DVRs"). According to the market research firm In-Stat, the leading distributors of DVRs include TiVo, EchoStar (Dish Network), and Comcast. ISuppli Corp., published in 2008 that in 2009 the world wide sale of DVR shipments would be 70.2 million units with sales growing at an annual rate of twenty-nine and two-tenths percent (29.2%).

### Theatrical DVD & CD

The theatrical market was calculated using the number of movies, and the average number of tickets per movie. Movie production companies made 590 movies[13] in 2009. Inavisis assumed that the number of movies that are being made will remain constant for the next five years. Ticket sales for movies are estimated to be 2.5 million tickets per movie. The financial analysis in this report assumes that LCEC would use the AstoundSound Technology in both new devices as well as in upgrades to existing devices in conjunction with an LCEC operating system upgrade

3D-Movies are becoming popular and there were 19 3D movies produced in 2009. It is expected that by 2015 there will be 35 3D-movies produced per year. Ticket sales for 3D-movies average about 5 million tickets per movie.

The movies are then stamped into DVDs and sold globally. The total 2009 market for DVDs is 1,783.85 million. The growth rate for DVD sales is estimated at 2.8% resulting in a total market of 2,105.32 million in 2015.

The CD market is divided into two segments, the digital download of single songs and albums and the physical sale of CDs. The digital download of single songs is growing at a healthy rate of 45% and the digital download of albums is growing at a rate of 54%[14]. This increase in the digital downloads led to the decline in the sale of the physical stamping of CDs. The decline in market share for physical CDs is estimated to be -20%[15].

---

[12] GenAudio "Hear It Believe It" Presentation.  www.emarketer.com presents DVD player sales from 1997 - 2008

[13] Motion Picture Association of America (MPAA 2007) Entertainment Industry Market Statistics

[14] www.CE.org; Digital America 2008 page 23.

[15] http://www.myce.com/news/  "Music Sales Fall But Digital Download Climbed in 2008.

*Inavisis, Inc.*

## Gaming Industry Hardware

Video game industry is becoming a mainstream industry with growth rates that do not seem to be affected by a recession. In 2008 the gaming industry reached $21.33 billion according to NPD sales figures. The hardware sales were about $7.81 billion and the software sales were about $10.96 billion[16].

There are three major players in the hardware business: (1) Nintendo, (2) Sony Playstations 2&3, and (3) Microsoft X-box. The total number of units sold in 2007[17] was 17.44 million units of consoles and 12.32 million units of portable gaming hardware. AstoundSound Technology could be downloaded on to existing consoles in order to upgrade the system. It also can be packaged in new consoles and portable gaming hardware. The total number of gaming hardware consoles that exist on the market is estimated to be around $118 million[18] units. The new game consoles sales were $33.527 million for 2009. The growth rate of the new game console is expected to be 75%. The portable game hardware starts at 28.6 million units with a growth rate of 85%.

## Digital Gaming Industry Software

CEA predicts that hardware sales will remain steady while the software sales are expected to grow to $11.5 billion. The total number of software unit sales for the top games was 27.180 million[19] units. The software is developed for consoles that are specific for playing games, but there is additional software that is sold so that the consumer can play games on their computer. Although it is not as large of a market, it is big enough that software developers produce games that operate on computers.

Companies try to tie the software game to specific hardware to help push the sale of the products. Xbox was successful in increasing the sale of their hardware when the game Halo was not produced for competing consoles.

## Personal Computers (PCs)

AstoundSound Technology could be used on existing PC's as well as new personal computers. There are about 840 million[20] PCs in the world. GenAudio should be able to incorporate its technology into the existing pool of computers that are sold to the consumer.

New computer sales in 2009 were 323.456[21] million computers. The growth rate for the new computers is expected to be 1%. Therefore the total market in 2015 would rise to 343.355 million units.

---

[16] NPD 2008 sales figures-Video Game Sales Wiki http://vgsales.wikia.com/wiki/NPD_2008_in_review

[17] www.CE.org Digital America 2008 page 41

[18] http://en.wikipedia.org/wiki/Wii page 5

[19] www.CE.org Digital America 2008 page 42

[20] GenAudio "Hear it Believe it" Presentation. Computer industry Almanac, Jan.2009.

[21] Ibid; Quarterly sales of computers is cited as 80,864 multiplied by 4 gives the yearly units of computers.

GA000586

*Inavisis, Inc.*

### Smart Phones (Data Centric)

GenAudio's AstoundSound Technology could be implemented in existing smart phones as well as new smart phones. There are 191.420 million smart phones in the world. The global smart phones market of 33,780,000 units was multiplied by 85/15 ratio to derive the global existing market. The market for new smart phones sales in 2009 is estimated to be 142.100 million units. Industry experts estimate that smart phone market will be 214.7 million in 2010 and grow to 321.8 million smart phones in 2011 and 421.8 million smart phones in 2012[22]. After this fast growth as estimated by industry experts, Inavisis grew the market at a 5% rate.

### Portable Media Players

Headphone portable media players account for the bulk of portable audio sales. Sales of portable media players however are stabilizing. Although the sales growth in units grew by 2.9%, the dollar value of those sales increased by only 0.1 %.

To avoid double counting, the sales of LCEC products were deducted from the total market of the portable media player unit sales. This gave an existing market for portable media players of 117.778 million units. Those units could be upgraded with GenAudio technology. New portable media player unit sales for 2009 are estimated at 25.474 million units. Inavisis used a growth rate of 1%.

### Car Audio

AstoundSound Technology could be implemented in new car sales and in the aftermarket of in-vehicle electronics. Total new vehicle sales were 12.359 million[23] cars in 2009. The current recession is impacting the sale of new vehicles. Inavisis grew the market for the new vehicle sale at a modest rate of 1%. The total sales of new vehicles in 2015 are 13.119 million vehicles.

The aftermarket for auto sound increased by 4%, to $2.43 billion, in 2005[24]. Inavisis estimated the average price for an aftermarket audio sound product to be $300. This gives a total sale of 8.1 million auto-sound units in 2005. Inavisis used the aftermarket growth rate of 4% to calculate the number of units sold in 2009. The calculation resulted in a total after market unit sales figure of 9.476 million. Similar calculations resulted in total sales of 11.99 million units for 2015.

---

[22] GenAudio presentation Nov. 2009

[23] http://online.wsj.com/mdc/public/page/2_3022-autosales.html

[24] http://www.twice.com/article/print/262912-portable_audio_sales_top_home_units.

*Inavisis, Inc.*

### Hearing Aids

Executives in the hearing aid industry were pleasantly surprised in 2009 that the sales were not as bad as they expected. The sales to the general public grew at 1.7%; however the first half of 2009 the VA purchases of hearing aids was up by 5%[25]. This resulted in unexpected growth in the industry sales. Hearing aids can be analog or digital. Digital is much more popular than analog and represents about 90% of the total hearing aid market. The AstoundSound technology applies only to the digital segment of the market. Although the price to the consumer[26] for hearing aids is $3,000-$4000, the manufacturer – wholesaler commercial sale price of the hearing aid is close to $500. Inavisis used this $500 wholesale price and the number of units to calculate the total revenue. In the calculation of the value of the technology in this market Inavisis used a royalty rate of 5% of revenue as the indication of value.

### Target Company Share

The market analysis described above outlines the principal segments/markets available to the AstoundSound technology. This total market will be subject to the competition from other 3D audio system manufacturers. For each market application, Inavisis assumed a fraction of the total market will adopt the GenAudio technology. Also the market was split into two parts: upgrading of existing products previously sold to consumers and new sales. The pricing of the technology would be different for upgrades versus new products.

**Table 4**

**GenAudio Market Share Ranges**

| Product | New Sale | Upgrade/After Market |
|---|---|---|
| TV, HT, DVD, DVR | 5% (2011)---Max 15% | |
| 3D-TV | 10% (2011) --- Max 50% | |
| Gaming Industry Hardware Console | 3% (2011) --- Max 10% | 3%(2011) ---Max 6% |
| Gaming Industry Software New Game Titles | 5% (2011) --- Max 30% | |
| Gaming Industry Software Video Games | 3% (2011) --- Max 10% | |
| Gaming Industry Hardware Portable | 3% (2011) --- Max 20% | |
| PC | 3% (2011) --- Max 10% | 3% (2011) --- Max 6% |

---

[25] Greg Thompson, *Hearing Review* "Hear and Now and Then" 2009

[26] ibid

*Inavisis, Inc.*

| Smart Phones (Data Centric) | 5% (2011) --- Max 15% | 5% (2011) --- Max 15% |
|---|---|---|
| Portable Media Players | 3% (2011) --- Max 15% | 2% (2011) --- Max 10% |
| Theatrical | 10 movies/590 (2011) --- 80 movies/590 (2015) | |
| 3D Movies Theatrical | 5 movies/16 (2011)---- 35 movies/35 (2015) | |
| DVDs, CDs | 5% (2011) --- 20% (2015) | |
| Digital Downloads | 5% (2011) --- 25% (2015) | |
| Car Audio | 2% (2011) --- Max 10% | 1% (2011) --- Max 5% |
| Hearing Aids | 2% (2012) --- Max 10% | |

The market share allocation of the AstoundSound Technology is determined by the number of competitors, the price charged for the technology and the fit of the technology with the specific market application.

**Revenue per Unit**

Inavisis calculated the income for the technology based on the allocation of a charge per unit sold. The charge per unit analysis is described in detail in Chapter 1. The charge per unit was discussed with management and confirmed by the general practice within the industry. When there were no industry standards, such as the theatrical market application, the price per unit is used as a proxy to determine the market value of the technology.

**Table – 5**

**Price per Unit for Each Product**

| Product | New Sale | Upgrade/After Market |
|---|---|---|
| TV, HT, DVD, DVR | $1.00 | |
| 3D-TV | $1.00 | |
| Gaming Industry Hardware Console | $1.00 | $0.15 |
| Gaming Industry Software New Game Titles | $10,000 per Game Title | |

GA000589

*Inavisis, Inc.*

| Gaming Industry Software Video Games | $0.50 | |
|---|---|---|
| Gaming Industry Hardware Portable | $0.30 | |
| PC | $1.00 | $0.30 |
| Smart Phones (Data Centric) | $0.50 | $0.15 |
| Portable Media Players | $0.50 | $0.15 |
| Theatrical | $0.05 per movie ticket | |
| 3D Movies Theatrical | $0.25 per 3D movie ticket | |
| DVDs, CDs | $0.10 per DVD $0.05 per CD | |
| Digital Downloads | $0.01 per song $0.05 per album | |
| Car Audio | $1.00 | $1.00 |
| Hearing Aids | $500 per Hearing Aid | 5% of revenue |

**Discount Rate**

Inavisis applied the Capital Asset Pricing Model ("CAPM") to calculate the discount rate used in determining the value of the technology using the income approach. The discount rate is also known as cost of equity or the annual return that an investor expects to earn when investing in shares of a company. The return expected of any common stock should be composed of at least three different return components: 1) a return commensurate with a risk-free security ($R_f$); 2) a retune that incorporates the market risk associated with common stocks as a whole (Rm); and 3) a return that incorporates the business and financial risks specific to the stock of the company itself, known as the company's Beta ($\beta$). There is also another element of risk that is relevant to the size of the company that is commercializing the technology. Small companies have values as high as 3.5% and large companies over $2 billion will have zero risk due to size.

The CAPM can be calculated using the following equation:

**DR (CAPM) = Risk free rate + $\beta$ (Market Risk Premium) + Company Size Risk**

- Risk Free Rate = 4.32% (30 Year Treasury Bond Yield for Jan 2010, CBOE, 11/24/09)
- $\beta$ is the equity risk of business versus the stock market
- $\beta$: 1.19 for the industry average as reported by Reuters

GA000590

- Long-Term Market Risk Premium: 7.7% company most likely to have resources necessary to manufacture and market batteries with built-in control device.

- Size Adjustment is 0 because most companies that are interested in AstoundSound Technology are the large corporation with revenues exceeding $2billion in revenue such as Samsung, LG, Sony, and Siemens as well as other large global organizations.

$$\textbf{DR: } 4.32 + (1.19 \text{ X } 7.7) + 0 = \textbf{13.48\%}$$

Inavisis used 13.5% as the discount rate to measure the risk or the return that an investor would expect from investing in the consumer electronic device markets using the AstoundSound Technology.

This discount rate is lower than the discount rate for LCEC. LCEC had a Beta of 1.52 while the industry had a Beta of 1.19. LCEC being a technology leader has a higher company risk, while most other companies are followers in the industry resulting in lower company risk than LCEC's.

Inavisis will use the lower discount rate for the ROW market application.

### Royalty Rate

The hearing aid market application is the only product market where Inavisis used the royalty income method. Hearing aids are considered medical devices and are considered part of a completely different industry than the consumer electronics industry. Inavisis applied a completely different method in determining the value of AstoundSound Technology in this specific market application.

The royalty rate could be determined from comparable agreements, when available, or using the 25% rule. Inavisis searched its own internal database of royalty rate agreements and did not find a comparable technology that had a royalty rate attached to it. Inavisis also searched the literature for any public record that outlines the royalty rate that is acceptable in the hearing aid industry.

Inavisis then relied on the 25% rule. This rule was developed by Mr. GoldScheider, a leading expert in negotiating license agreements. The Mr. Goldscheider rule or the "25% rule" is essentially a profit split method between the licensor and the licensee. Over many years of experience Mr. Goldscheider recognized that a win-win license deal was acceptable to all parties if the royalty rate charged by the licensor was about 25% of the operating profit of the company attributable to the sale of the products utilizing the licensed technology.

Inavisis reviewed the operating profit for companies in this industry and determined that the profit margin is 20.8%[27]. A royalty rate of 5.2% was calculated when Inavisis applied the 25% rule to this profit margin. Inavisis will use 5% as the royalty rate that GenAudio would charge for implementing its technology in a hearing aid device.

---

[27] Hearing Loss News and Articles: phonic acquisition makes it number one. http://wwwl4hearingloss.com

*Inavisis, Inc.*

## Income Approach Estimation of Value

The Income approach estimation of value was carried out using the projection period of five years. The market revenue for each market application was described above. The future revenues were discounted to January 30, 2010 using a discount rate of 13.5%. The Net Present Value ("NPV") for each market application is calculated assuming a non-exclusive license with potential licensees in the consumer electronics industry (See Appendix C for detailed calculation). Table 6 outlines the NPV for GenAudio technology in all the market applications.

### Table 6

### Market Value GenAudio Technology in ROW

| Markets | Non-Exclusive Values |
|---|---|
| **Theatrical DVD CD Digital** | $ 147,579,000 |
| **Hardware DVD/DVR** | $ 142,806,000 |
| **Gaming Software** | $ 66,008,000 |
| **Gaming Hardware** | $ 89,054,000 |
| **Car Audio** | $ 2,438,000 |
| **Computers** | $ 86,015,000 |
| **Smart Phones** | $ 67,494,000 |
| **Portable Media Players** | $ 3,735,000 |
| **Hearing Aids** | $ 8,405,000 |
| **Total** | $ 613,933,000 |

## Conclusion

The analysis for each market application described in detail the total market application. Inavisis then allocated a portion of the total market to GenAudio since there are other competing technologies in the market place. The total number of units that will apply the AstoundSound Technology was then multiplied by the revenue per unit. The valuation was carried out for 5 years except for the hearing aid application. The discount rate for the consumer electronics industry was then applied.

The total non-exclusive market value for the technology is $613,933,000.

*Inavisis, Inc.*

## Chapter Three:  Broadcasting and Live Concerts

### Valuation Period (Timing)

The patents that embody the AstoundSound Technology are three filed patents.  The earliest patent was filed March 16, 2004.  The latest patent was filed on October 20, 2009.  The patent life is 20 years from filing so the patents will expire in 2024 to 2029.  PCT applications were filed for all the US filed patents

In determining the valuation period the appraiser has to consider the legal life of the patent and the economic life of the patent.  The legal life is 20 years from filing the patent.  The economic life of the patent is an estimate based on industry practices and strength of the claims in the patent.  Inavisis, Inc. did the calculation for 5 years from the date of the valuation report based on the economic life of the technology.

Inavisis assumed that GenAudio would be able to enter into a non-exclusive license agreement within one year for the consumer broadcast and live entertainment markets.  With five years for the life of the technology, the calculation was carried out to January 30, 2015.

### Market Potential

#### Broadcast:

There are 10,000 commercial radio stations and 2,500 non-commercial stations in the United States[28].  Most of those stations are broadcasting in digital signals so the GenAudio technology could be adapted so that the listener can benefit from the 4D audio experience.

#### Live Concerts:

Live Nation is the largest live-events company in the world.  Annually Live Nation promotes or produces 16,000 to 22,000 live events.[29,30]  Live Nation operates 117 venues, consisting of 75 US and 42 international venues.  Inavisis will consider 20,000 as the average total market for live concerts.

### Target Company Share

#### Broadcast:

Inavisis assumed that the total number of radio stations would remain constant for the next five years.  As more stations transform their transmission to digital more stations will be added since digital stations do not require as much space as the analog signal.  However, Inavisis assumed that the number of stations will remain constant.    In 2011 Inavisis assumed that AstoundSound technology will capture 1% of the market growing to 15% in 2015.  AstoundSound Technology will be implemented in 4,250 radio stations that represent a total of 34% of the radio station market within 5 years.

---

[28] Bryan Farrish, Music Biz Academy, "The Number of Radio Stations in the U.S."

[29] http://www.linkedin.com/companies/live-nation.

[30] Live Nation – Wikipedia, the free encyclopedia http://en.wikipedia.org/wiki/Mojo_Concerts

*Inavisis, Inc.*

### Live Concerts:

The total number of live events is about 20,000 events globally. AstoundSound Technology could be used in the top booking events such as Madonna, U2, Jay-Z and other top artists. Inavisis started with a market share of 5% in 2011 growing to 30% in 2015.

### Revenue from Broadcast and per Live Concert

### Broadcast:

Hybrid Digital or "HD" Radio is one of the largest providers of technology to digital broadcasting. They published on their website their licensing model. HD Radio gives a perpetual license to their broadcaster for a one time fee of $25,000. Digital broadcasting also allows broadcasters to include two other stations within the same space. These additional stations will pay 3% of incremental revenue with a minimum annual fee of $1,000[31].

Inavisis used this agreement as a general guideline for the enhancement the AstoundSound Technology would add to the digital audio broadcast system. As an enhancement, Inavisis assigned a one time license fee of $1,000 per station. This represents 4% of the revenue that HD Radio charges for its significant enhancement to the sound experience.

### Live Concerts:

Attendance at each concert averages between 2,500 for the small venues to as large as 10,000 for the large venues. Most venues are on the low end of the range. Inavisis assumed an average of 3000 concert goers per event. The average price of a ticket is $45 resulting in total revenue per event of $135,000. Inavisis used a license fee of $1,350 per event, which corresponds to 1.0% royalty income. This is reasonable considering that the technology significantly enhances listener experience of the music.

### Discount Rate

Inavisis applied the Capital Asset Pricing Model (CAPM) to calculate the discount rate used in determining the value of the technology using the income approach. The discount rate is also known as cost of equity or the annual return that an investor expects to earn when investing in shares of a company. The return expected of any common stock should be composed of at least three different return components: 1) a return commensurate with a risk-free security ($R_f$); 2) a return that incorporates the market risk associated with common stocks as a whole ($Rm$); and 3) a return that incorporates the business and financial risks specific to the stock of the company itself, known as the company's Beta ($\beta$). There is also another element of risk that is relevant to the size of the company that is commercializing the technology. Small companies have additional risk values as high as 3.5% and large companies over $1-2 billion will have zero risk due to size.

The CAPM can be calculated using the following equation:

### DR (CAPM) = Risk free rate + β (Market Risk Premium) + Company Size Risk

- Risk Free Rate = 4.32% (30 Year Treasury Bond Yield for Jan 2010, CBOE, 11/24/09)

---

[31] www.ibiquity.com HD Radio™ Broadcaster Licensing Fact Sheet, January 2009.

*Inavisis, Inc.*

- β is the equity risk of business versus the stock market. Inavisis will use the beta for Live Nation as a proxy for the risk associated with the broadcasting and live concert industry.

- $\beta = 2.34$[32] for Live Nation Entertainment.

- Long-Term Market Risk Premium: 7.7% company most likely to have resources necessary to manufacture and market batteries with built-in control device.

- Size Adjustment is 0 because most Live Nation Entertainment has a market cap over $1.0 billion.

**DR: 4.32 + (2.34X 7.7) + 0 = 22.34%**

Inavisis used 22.3% as the discount rate to measure the risk or the return that an investor would expect from investing in the broadcasting and live concert markets using the GenAudio technology.

### Income Approach

The Income approach estimation of value was carried out using the projection period of five years. The market revenue for each market application was described above. The future revenues were discounted to January 30, 2010 using a discount rate of 22.34%. The Net Present Value (NPV) for each market application is calculated assuming a non-exclusive license with potential licensees in the broadcasting and live concert industry. Table – 7 outlines the NPV for GenAudio technology in all the market applications.

Table – 7

Broadcast and Live Concert Calculation

| Markets | Non-Exclusive Values |
|---|---|
| **Broadcast** | $1,080,000 |
| **Live Concerts** | $7,495,000 |
| **Total** | $8,575,000 |

### Conclusion

The analysis for the two market applications described the total market application. Then Inavisis gave a portion of the total market to GenAudio since there are other competing technologies in the market place. The total number of digital radio stations or live concerts that will apply the AstoundSound technology was then multiplied by the revenue per unit. The discount rate for the live concert industry was then applied.

The total market value for the AstoundSound Technology for broadcast and live concert market applications is $8,575,000.

[32] http://moneycentral.msn.com/detail/stock_quote?Symbo=LYV

*Inavisis, Inc.*

## Valuation Summary

**Total AstoundSound Technology Value**

Inavisis conducted the valuation from two points of view. The first analysis was for the market value for the technology assuming an <u>exclusive</u> license to LCEC. The grand total value of the technology was calculated to be:

### LCEC Exclusive Value = $881,905,000

The second analysis was for market value for the technology assuming <u>non-exclusive</u> licenses for the technology. This opens up the technology licensing to other companies in all types of industries where sound is an essential element of the product. Inavisis determined that the total technology value is the grand total of the non-exclusive license to LCEC, the non-exclusive licensing revenue from the rest of the world and the broadcast and live concert market applications. Therefore we assign a grand total value of:

| | | |
|---|---|---|
| 1. | Non- Exclusive License to LCEC = | $ 384,480,000 |
| 2. | Non-Exclusive License to the ROW = | $ 613,933,000 |
| 3. | Non – Exclusive License to Broadcasting & Concerts = | $    8,575,000 |
| | Grand Total= | $1,006,988,000 |

*Sam Khoury*

Sam Khoury
Chairman
Inavisis, Inc.

*March 1, 2010*

Date

43

GA000596

*Inavisis, Inc.*

# Appendices

A - Inavisis, Inc. .................................................................................................. A

B - Biography ...................................................................................................... B

C - Income Approach ......................................................................................... C

D - Relief From Royalty Approach ......................................................... D

E - Patents Valued .............................................................................................. E

F - Statement of Limiting Conditions.......................................................... F

*Inavisis, Inc.*

## A - Inavisis, Inc.

### Inavisis, Inc.

Inavisis, Inc. specializes in the management and valuation of technology driven businesses and their intangible assets. We take a marketplace business approach to setting arm's length values and imputed royalty rates. In addition, we apply the latest tools in the valuation of intellectual properties such as the Technology Factor method and the Technology Valuation Management System (TVMS™) that are designed for the sole purpose of valuing technology. The technology factor approach simulates the willing-buyer-willing-seller evaluation of those attributes that affect value. This approach captures the true fair market value as defined by the American Society of Appraisers.

The Inavisis licensing team works with all aspects of licensing. Companies hire us to do parts or all of this process. We are often hired to identify the most marketable technologies or trademarks so that internal corporate discussions and projections can be resolved or substantiated. If the assets identified have strong licensing potential, we then may be asked to create the deal memo and enter into licensing discussions with potential licensees. When this takes place we team with the client (the licensor) to pick the most appropriate licensing partners and get the agreement signed.

It is the Inavisis objective to help corporations generate additional revenue utilizing their intellectual assets. We give our clients the tools necessary to succeed throughout the licensing process, and help them form new partnerships.

Inavisis Inc. is contacted frequently to determine the damages that result from infringement of a patent, theft of a trade secret, or confusion in a trademark or trade dress. As expert witnesses, we stand ready to support attorneys, arbitrators, and mediators in the demanding task of litigation and dispute resolution. In addition, our experienced staff is consulted regularly about the customs and practices that are acceptable in business, licensing, and other approaches to the leveraging of intellectual properties.

Inavisis, Inc.'s clients are Fortune 500 companies that are interested in the effective management of their intellectual properties and in determining their potential value. Inavisis, Inc. consults with their clients on all aspects of intellectual asset management and helps them to derive significant value from their patents, trademarks, trade secrets and know-how.

GA000598

*Inavisis, Inc.*

## B - Biography

### Sam Khoury Ph.D., MBA
### Chairman

**Current Status**

Dr. Khoury is the Chairman of Inavisis, Inc., a national consulting firm headquartered in San Diego, California. The company is dedicated to leveraging intellectual properties and valuing intangible assets.

**Previous Professional Experience**

Dr. Khoury served as the president of CONSOR[SM] for about two years. He is an educator on the principles of valuation of intellectual property and prolific writer on the topic of intellectual asset management. Dr. Khoury is a trustee of the Licensing Executive Society (LES) and coordinates the operations of four committees. He is a regular invited international speaker at the LES, American Institute of Patent Lawyers Association (AIPLA) and American Society of Appraisers. Dr. Khoury has developed the curriculum and training courses for the National Technology Transfer Center in Wheeling, West Virginia, on technology assessment and technology valuation. Those courses are offered to educate industry, university and government professionals.

Dr. Khoury was one of the main architects of the Intellectual Asset Management Model that helped The Dow Chemical Company generate significant revenue from proper management of intellectual properties. Dr. Khoury served for two years as Dow's Intellectual Asset Manager for Chemicals and Metals. In that capacity, he implemented the intellectual asset management model and the processes for the proper management of intellectual properties in the Chemicals and Metals business. The implementation of this process reduced the costs of maintaining the patents by over $10 million and led to a more focused effort on business relevant research.

Dr. Khoury was the Sr. Intangible Asset Appraiser for The Dow Chemical Company. He worked in the Licensing & Catalyst Business and as an Intangible Asset Appraiser for five years. Over this period Dr. Khoury valued many technologies with a wide range of values. As the Senior Intangible Asset Appraiser for Dow, Dr. Khoury took all the course work necessary to value businesses from the American Society of Appraisers. Working with several consultants in the area of intangible asset appraisal, he developed basic understanding of the underlying principles. Dr. Khoury developed, with the help of Arthur D. Little, the Technology Factor and ValuGrid™ methods to value technology. These methods are currently used throughout The Dow Chemical Company. These methods have been tested and proven to work in over 300 different technologies. The Technology Factor was captured in a software package that makes the facilitation and the valuation from one business to the other consistent and relevant.

Dr. Khoury has presented on the topic of valuation of intellectual properties at numerous meetings, conferences, and seminars. These include the Licensing Executive Society, Institute for International Research (IIR), Industrial Research Institute (IRI), AIPLA and the American Society of Appraisers. Professionals from NASA, Navy, and U.S. government laboratories and agencies have attended his valuation courses, as well as personnel from Du Pont, Ford, Eastman Chemical, Allied Signal, Delphi, and many other Fortune 100 companies.

GA000599

*Inavisis, Inc.*

Dr. Khoury recently authored a chapter in the book entitled Profiting from Intellectual Capital (1998).

**Other Professional Experience**

Prior to the above, Dr. Khoury worked over eight years at the Wayland, Massachusetts's laboratories of the Dow Chemical Company in its research and technical development program. Dr. Khoury has eight issued patents and many inventions that remained as a trade secret. He developed technologies from research to pilot plant for the Dow Chemical Company. Dr. Khoury has first hand experience with the attributes necessary to take technology from research to production and commercial success.

**Education**

Dr. Khoury received his Ph.D. in polymer chemistry from the University of Wisconsin in Milwaukee. He has two master degrees; an MBA in Marketing/Finance from Worcester Polytechnic Institute in Massachusetts and a Masters of Science in organic chemistry from Fort Hays State University in Kansas.

**Professional Involvement**

Dr. Khoury, who is currently a trustee of LES, the Licensing Executive Society, has served as the chairman of its valuation committee for three years. LES is the largest society that is dedicated to the management and leveraging of intellectual properties. The society has thousands of members and representatives from almost every country in the world. This global reach has allowed LES to raise the importance and value of intellectual properties worldwide. Dr. Khoury is a candidate member of the American Society of Appraisers.

GA000600

*Inavisis, Inc.*

## C - Income Approach

GA000601

*Inavisis, Inc.*

# Chapter – 1
# LCEC
# Consumer Electronics Products Calculation

**Technology Valuation for the LCEC Global Computer Market**
**Exclusive Agreement**

| | |
|---|---|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 6 months |
| Launch Date | 31-Jul-10 |
| Technology Obsolescence | 5 Years |
| Patent Expiration Date | 2024 & 2028 |
| Real Peak Sales | 3 Years (July 2012) |
| Return on Equity | 25% |
| Discount Rate | 18% |
| Growth Rate | 17% |
| GenAudio Revenue Per new device | $ 3.00 |
| Gen Audio Revenue Upgrade Existing Product | $ 0.30 |

($thousand)

| Year | | 2009 | | 2010 | | 2011 | | 2012 | | 2013 | | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Existing LCEC Computers | | | | 75,000 | | 75,000 | | 75,000 | | 75,000 | | 75,000 | |
| OS Upgrade 50% Over Five Years | | | | 5% | | 10% | | 15% | | 10% | | 10% | |
| Existing Units with Astound Sound | | | | 3,750 | | 7,500 | | 11,250 | | 7,500 | | 7,500 | |
| Revenue from Upgrade | | | $ | 1,125 | $ | 2,250 | $ | 3,375 | $ | 2,250 | $ | 2,250 | |
| New Computer Sales | | 10,394 | | 12151 | | 14228 | | 16647 | | 19477 | | 22786 | 26682 |
| Revenue from New computer Sales | $ | 31,182 | $ | 36,463 | $ | 42,685 | $ | 49,941 | $ | 58,432 | $ | 68,365 | $ 79,887 |
| | | | | | | | | | | | | | |
| Total Revenue | | | $ | 37,608 | $ | 44,935 | $ | 53,316 | $ | 60,682 | $ | 70,615 | $ 79,987 |
| Partial Year Revenue | | | | 0.42 | | | | | | | | | 0.58 |
| | | | | | | | | | | | | | |
| Present Value Factor | | | | 0.873 | | 0.752 | | 0.646 | | 0.558 | | 0.482 | 0.415 |
| Present value of GenAudio Cash Flow | | | | 13,677 | | 33,783 | | 34,566 | | 33,914 | | 34,022 | 18,269 |
| | | | | | | | | | | | | | |
| NPV GenAudio | $ | 168,241 | | | | | | | | | | | |

GA000603

**Technology Valuation for the LCEC Global Computer Market**
**Non-Exclusive Agreement**

| | |
|---|---|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 8 months |
| Launch Date | 31-Jul-10 |
| Patent Expiration Date | 2024 & 2028 |
| Technology Obsolescence | 5 years |
| Real Peak Sales | 3 Years (July 2012) |
| Return on Equity | 25% |
| Discount Rate | 16% |
| Growth Rate (first three years) | 17% |
| GenAudio Revenue per New Computer | $ 1.00 |
| Gen Audio Revenue per Existing Computer | $ 0.30 |

($thousand)

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2018 |
|---|---|---|---|---|---|---|---|
| Existing LCEC Computers | | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | |
| DB Upgrade 50% Over Five Years | | 5% | 10% | 15% | 10% | 10% | |
| Existing Units with GenAudio Technology | | 3,750 | 7,500 | 11,250 | 7,500 | 7,500 | |
| Revenue from Upgrade | | $ 1,125 | $ 2,250 | $ 3,375 | $ 2,250 | $ 2,250 | |
| | | | | | | | |
| New Computer Sales | 10,394 | 12,161 | 14,228 | 16,647 | 19,477 | 22,788 | 28,662 |
| Revenue from New Computer Sales | $ 10,394 | $ 12,161 | $ 14,228 | $ 16,647 | $ 19,477 | $ 22,788 | $ 28,662 |
| | | | | | | | |
| Total Revenue | | $ 13,286 | $ 16,478 | $ 20,022 | $ 21,727 | $ 25,038 | $ 28,662 |
| Partial Year | | 0.42 | 1 | 1 | 1 | 1 | 0.58 |
| | | | | | | | |
| Present Value Factor | | 0.873 | 0.752 | 0.648 | 0.559 | 0.482 | 0.415 |
| Present Value of GenAudio Cash Flow | | 4,832 | 12,392 | 12,981 | 12,143 | 12,083 | 6,423 |
| | | | | | | | |
| NPV GenAudio | $ 60,834 | | | | | | |

GA000604

**Technology Valuation for the LCEC Smart Phone Market**
**Exclusive Agreement**

| | |
|---|---|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 6 months |
| Launch Date | 31-Jul-10 |
| Technology Obsolescence | 5 Years |
| Patent Expiration Date | 2024 & 2028 |
| Real Peak Sales | 3 Years (July 2012) |
| Return on Equity | 25% |
| Discount Rate | 16% |
| Growth Rate (first three years) | Actual Estimates by Industry Experts |
| Growth Rate (remaining years) | 5% |
| GenAudio Revenue per New Smart Phone | $ 1.00 |
| GenAudio Revenue per existing Smart Phone | $ 0.15 |

($thousands)

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Existing Smart Phones | | 33,780 | 33,780 | 33,780 | 33,780 | 33,780 | |
| OS Upgrade 50% Over Five Years | | 5% | 10% | 15% | 10% | 10% | |
| Existing Units with AstoundSound | | 1,688 | 3,378 | 5,067 | 3,378 | 3,378 | |
| Revenue from Existing Smart Phones | | $ 253 | $ 507 | $ 780 | $ 507 | $ 507 | |
| New Smart Phone Sales | 20,764 | 43,700 | 54,700 | 82,100 | 86,205 | 90,515 | 95,041 |
| Revenue from New Smart Phones | $ 20,764 | $ 43,700 | $ 54,700 | $ 82,100 | $ 86,205 | $ 90,515 | $ 95,041 |
| Total Revenue | | $ 43,963 | $ 55,207 | $ 82,880 | $ 86,712 | $ 91,022 | $ 95,041 |
| Partial Year | | 0.42 | 1 | 1 | 1 | 1 | 0.58 |
| GenAudio Revenue | | $ 18,314 | $ 55,207 | $ 82,880 | $ 86,712 | $ 91,022 | $ 65,124 |
| Present Value Factor | | 0.873 | 0.752 | 0.648 | 0.559 | 0.482 | 0.415 |
| Present Value of GenAudio Cash Flow | | 16,984 | 41,516 | 53,718 | 48,462 | 43,854 | 22,895 |
| NPV Gen Audio | $ 226,433 | | | | | | |

GA000605

**Technology Valuation for the LCEC Smart Phone Market**
**Nonexclusive Agreement**

| | |
|---|---|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 6 months |
| Launch Date | 31-Jul-10 |
| Technology Obsolescence | 5 Years |
| Patent Expiration Date | 2024 & 2028 |
| Real Peak Sales | 3 Years (July 2012) |
| Return on Equity | 25% |
| Discount Rate | 15% |
| Growth Rate (first three years) | Actual Estimates by Industry Experts |
| Growth Rate (remaining years) | 6% |
| GenAudio Revenue per New Smart Phone | $   0.50 |
| GenAudio Revenue per Existing Smart Phone | $   0.15 |

**($thousands)**

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Existing Smart Phones | | 33,780 | 33,780 | 33,780 | 33,780 | 33,780 | |
| OS Upgrade 50% Over Five Years | | 5% | 10% | 15% | 10% | 10% | |
| Existing Units with AstoundSound | | 1,689 | 3,378 | 5,067 | 3,378 | 3,378 | |
| Revenue from Existing Smart Phones | | $   253 | $   507 | $   760 | $   507 | $   507 | |
| | | | | | | | |
| New Smart Phones Sales | 20,764 | 43,700 | 54,700 | 82,100 | 86,205 | 90,515 | 96,041 |
| Revenue from New Smart Phones | $  10,382 | $  21,850 | $ 27,350 | $ 41,050 | $  43,103 | $ 45,258 | $ 47,521 |
| | | | | | | | |
| Total Revenue | | $  22,103 | $ 27,857 | $ 41,810 | $  43,609 | $ 45,764 | $ 47,521 |
| Partial Year | | 0.42 | 1 | 1 | 1 | 1 | 0.56 |
| GenAudio Revenue | | $   9,210 | $ 27,857 | $ 41,810 | $  43,609 | $ 45,764 | $ 27,882 |
| | | | | | | | |
| Present Value Factor | | 0.873 | 0.752 | 0.648 | 0.559 | 0.482 | 0.415 |
| Present Value of GenAudio Cash Flow | | 8,038 | 20,949 | 27,106 | 24,373 | 22,048 | 11,448 |
| | | | | | | | |
| NPV Gen Audio | $ 113,983 | | | | | | |

GA000606

**Technology Valuation for LCEC mp3 Portable Devices**
**Exclusive**

| | | |
|---|---|---|
| NPV Date | | 31-Jan-10 |
| Time for Implementation | | 8 months |
| Launch Date | | 31-Jul-10 |
| Technology Obsolescence | | 5 Years |
| Patent Expiration Date | | 2024 & 2029 |
| Real Peak Sales | | 3 Years (2012) |
| Return on Equity | | 26% |
| Discount Rate | | 16% |
| Growth Rate | (3yrs) | LCEC mp3 | 100% |
| Growth Rate | (4-5 Yrs) | LCEC mp3 | 50% |
| GenAudio Revenue Per New mp3 | | $ 1.00 |
| Gen Audio Revenue per Existing mp3 | | $ 0.15 |

**($thousands)**

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Existing mp3 | | 20,679 | 20,578 | 20,579 | 20,679 | 20,679 | |
| OS upgrade 50% over five years | | 5% | 10% | 15% | 10% | 10% | |
| Existing Units with Astound Sound | | 1,029 | 2,058 | 3,087 | 2,058 | 2,058 | |
| Revenue from Upgrade | | $ 154 | $ 309 | $ 463 | $ 309 | $ 309 | |
| | | | | | | | |
| New LCEC mp3 Unit Sales | 9,498 | 18,996 | 37,992 | 75,984 | 113,976 | 170,964 | 256,448 |
| Revenue from New mp3 | $ 9,498 | $ 18,996 | $ 37,992 | $ 75,994 | $ 113,976 | $ 170,964 | $ 256,448 |
| | | | | | | | |
| Total Revenue | | 18,160 | 38,301 | 78,447 | 114,286 | 171,273 | 256,448 |
| Partial Year Revenue | | 0.42 | 1 | 1 | 1 | 1 | 0.58 |
| Gen Audio Revenue | | $ 7,979 | $ 38,301 | $ 78,447 | $ 114,285 | $ 171,273 | $ 148,739 |
| Present Value Factor | | 0.873 | 0.752 | 0.648 | 0.559 | 0.482 | 0.416 |
| | | | | | | | |
| Present Value of GenAudio Cash Flow | | 6,964 | 28,804 | 49,681 | 63,872 | 82,519 | 61,778 |

| | | |
|---|---|---|
| NPV GenAudio | $ | 283,499 |

GA000607

**Technology Valuation for LCEC mp3 Portable Devices**
**Non-Exclusive**

| | | | |
|---|---|---|---|
| NPV Date | | | 31-Jan-10 |
| Time for Implementation | | | 6 months |
| Launch Date | | | 31-Jul-10 |
| Technology Obsolescence | | | 5 Years |
| Patent Expiration Date | | | 2024 & 2026 |
| Real Peak Sales | | | 3 Years (2012) |
| Return on Equity | | | 25% |
| Discount Rate | | | 15% |
| Growth Rate | (3yrs) | LCEC mp3 | 100% |
| Growth Rate | (4-5 Yrs) | LCEC mp3 | 50% |
| GenAudio Revenue Per New mp3 Device | | | $    0.50 |
| Gen Audio Revenue Per Existing mp3 | | | $    0.15 |

($thousands)

| Year | 2008 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Existing mp3 | | 20,579 | 20,579 | 20,579 | 20,579 | 20,579 | |
| O9 Upgrade 50% Over Five Years | | 5% | 10% | 15% | 10% | 10% | |
| Existing Units with GenAudio Technology | | 1,029 | 2,058 | 3,087 | 2,058 | 2,058 | |
| Revenue From Upgrade | | $    154 | $    306 | $    463 | $    309 | $    309 | |
| | | | | | | | |
| New mp3 Unit Sales | 9,498 | 18,995 | 37,992 | 75,984 | 113,876 | 170,964 | 256,446 |
| Revenue From New mp3 | $    4,748 | $    9,498 | $    18,995 | $    37,992 | $    66,988 | $    85,482 | $    128,223 |
| | | | | | | | |
| Total Revenue | | 9,652 | 19,305 | 38,455 | 57,287 | 85,791 | 128,223 |
| Partial Year Revenue | | 0.42 | 1 | 1 | 1 | 1 | 0.58 |
| GenAudio Revenue | | $    4,022 | $    19,305 | $    38,455 | $    57,287 | $    85,791 | $    74,359 |
| Present Value Factor | | 0.873 | 0.752 | 0.648 | 0.559 | 0.482 | 0.415 |
| | | | | | | | |
| Present Value of GenAudio Cash Flow | | 3,510 | 14,518 | 24,931 | 32,022 | 41,334 | 30,689 |

| | | |
|---|---|---|
| NPV GenAudio | $ | 147,204 |

GA000608

**Technology Valuation Variables for the Standard mp3 Music Devices**
**Exclusive**

| | |
|---|---:|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 6 months |
| Launch Date | 31-Jul-10 |
| Patent Expiration Date | 2024 & 2026 |
| Reel Peak Sales | 3 Years (2012) |
| Return on Equity | 25% |
| Discount Rate | 16% |
| Growth Rate | 3% |
| GenAudio Revenue Per New standard mp3 | $ 1.00 |
| Gen Audio Revenue Per Existing mp3 | $ 0.15 |

**($thousands)**

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Existing Standard mp3 | | 250,278 | 250,278 | 250,278 | 250,278 | 250,278 | |
| OS Upgrade 20% over five years | | 1% | 4% | 10% | 4% | 1% | |
| Total Existing Units with AstoundSound | | 2,503 | 10,011 | 25,028 | 10,011 | 2,503 | |
| Gen Audio Revenue (Existing) | $ | 376 | $ 1,502 | $ 3,754 | $ 1,502 | $ 375 | |
| New Standard mp3 Unit Sales | 54,132 | 55,756 | 57,429 | 59,151 | 60,926 | 62,754 | 64,636 |
| Revenue from New Standard Sales | | $ 55,756 | $ 57,429 | $ 59,151 | $ 60,926 | $ 62,754 | 64,636 |
| Partial Year | | 0.42 | 1 | 1 | 1 | 1 | 0.58 |
| GenAudio Revenue (New) | | $ 23,232 | $ 57,429 | $ 59,151 | $ 60,926 | $ 62,754 | $ 37,489 |
| Total Revenue | | $ 23,607 | $ 58,930 | $ 62,905 | $ 62,428 | $ 63,129 | $ 37,489 |
| Present Value Factor | | 0.873 | 0.652 | 0.521 | 0.417 | 0.334 | 0.267 |
| Present Value for Gen Audio Cash Flow | | 20,604 | 38,365 | 32,788 | 26,031 | 21,059 | 10,005 |
| NPV GenAudio | $ 148,861 | | | | | | |

GA000609

**Technology Valuation Variables for standard mp3 Music Devices**
**Non-Exclusive**

| NPV Date | 31-Jan-10 |
|---|---|
| Time for Implementation | 8 months |
| Launch Date | 31-Jul-10 |
| Technology Obsolescence | 5 Years |
| Patent Expiration Date | 2024 & 2028 |
| Real Peak Sales | 3 Years (2012) |
| Return on Equity | 25% |
| Discount Rate | 16% |
| Growth Rate | 3% |
| GenAudio Technology Revenue from New Standard mp3 | $ 0.60 |
| GenAudio Revenue From Existing Standard mp3 | $ 0.15 |

($thousand)

| Year | 2008 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Existing Standard mp3 | | 250,278 | 250,278 | 250,278 | 250,278 | 250,278 | |
| OS Upgrade 20% over five years | | 1% | 4% | 10% | 4% | 3% | |
| Total Existing Units with AstoundSound | | 2,503 | 10,011 | 25,028 | 10,011 | 7,508 | |
| Gen Audio Revenue (Existing) | | $ 375 | $ 1,502 | $ 3,754 | $ 1,502 | $ 1,128 | |
| New Standard mp3 Unit Sales | 54,132 | 55,758 | 57,428 | 58,151 | 60,926 | 82,754 | 54,636 |
| Revenue From New Standard mp3 Sales | | $ 27,878 | $ 28,714 | $ 29,576 | $ 30,463 | $ 31,377 | $ 32,318 |
| Partial Year | | 0.42 | 1 | 1 | 1 | 1 | 0.58 |
| GenAudio Revenue (New) | | $ 5,808 | $ 14,357 | $ 14,788 | $ 15,232 | $ 15,688 | $ 9,372 |
| Total Revenue | | $ 6,183 | $ 15,859 | $ 18,542 | $ 16,733 | $ 16,815 | $ 9,372 |
| Present Value Factor | | 0.873 | 0.652 | 0.521 | 0.417 | 0.334 | 0.287 |
| Present Value for GenAudio Cash Flow | | 5,397 | 10,332 | 9,855 | 6,977 | 5,809 | 2,501 |

NPV GenAudio          $      40,481

GA000610

Technology Valuation Variables for the Internet Media TV Device
Exclusive

| | |
|---|---|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 6 months |
| Launch Date | 31-Jul-10 |
| Patent Expiration Date | 2024 & 2026 |
| Real Peak Sales | 3 Years (2012) |
| Return on Equity | 25% |
| Discount Rate | 16% |
| Growth Rate | 5% |
| GenAudio Revenue Per New Internet Media TV Device | $  1.00 |

($thousands)

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| New Internet Media TV Device Unit Sales | | 6,100 | 6,405 | 6,725 | 7,062 | 7,415 | 7,765 |
| Revenue from new Internet Media TV Device Sales | | $    6,100  $ | 6,405  $ | 6,725  $ | 7,062  $ | 7,415  $ | 7,765 |
| Partial Year | | 0.42 | 1 | 1 | 1 | 1 | 0.56 |
| Gen Audio Revenue (new) | | $    2,542  $ | 6,405  $ | 6,725  $ | 7,062  $ | 7,415  $ | 4,515 |
| Total Revenue | | $    2,542  $ | 6,405  $ | 6,725  $ | 7,062  $ | 7,415  $ | 4,515 |
| Present Value Factor | | 0.673 | 0.652 | 0.521 | 0.417 | 0.334 | 0.267 |
| Present value for GenAudio Cash Flow | | 2,216 | 4,173 | 3,505 | 2,944 | 2,473 | 1,205 |
| NPV GenAudio | $    16,520 | | | | | | |

GA000611

**Technology Valuation Variables for the Internet Media TV Device**
**Non-Exclusive**

| | |
|---|---|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 6 months |
| Launch Date | 31-Jul-10 |
| Patent Expiration Date | 2024 & 2028 |
| Real Peak Sales | 3 Years (2012) |
| Return on Equity | 26% |
| Discount Rate | 16% |
| Growth Rate | 5% |
| GenAudio Revenue Per New Internet Media TV Device | $0.50 |

($thousands)

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| New Internet Media TV Device Unit Sales | | 6,100 | 6,405 | 6,725 | 7,062 | 7,415 | 7,785 |
| Revenue from New Internet Media TV Device Sales | | $ 3,050 $ | 3,203 $ | 3,363 $ | 3,631 $ | 3,707 $ | 3,893 |
| Partial Year | | 0.42 | 1 | 1 | 1 | 1 | 0.58 |
| GenAudio Revenue (New) | | $ 1,271 $ | 3,203 $ | 3,363 $ | 3,531 $ | 3,707 $ | 2,258 |
| Total Revenue | | $ 1,271 $ | 3,203 $ | 3,363 $ | 3,531 $ | 3,707 $ | 2,258 |
| Present Value Factor | | 0.873 | 0.652 | 0.521 | 0.417 | 0.334 | 0.287 |
| Present Value for GenAudio Cash Flow | | 1,109 | 2,087 | 1,753 | 1,472 | 1,237 | 603 |
| NPV GenAudio | $ 8,260 | | | | | | |

GA000612

**Technology Valuation Variables for the Computer Tablet**
**Exclusive**

| | |
|---|---:|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 6 months |
| Launch Date | 31-Jul-10 |
| Patent Expiration Date | 2024 & 2028 |
| Real Peak Sales | 3 Years (2012) |
| Return on Equity | 26% |
| Discount Rate | 18% |
| Growth Rate | 5% |
| GenAudio Revenue Per New Computer Tablet | $      1.00 |

**($thousands)**

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| New Computer Tablet Unit Sales | | 10,000 | 10,500 | 11,025 | 11,576 | 12,155 | 12,763 |
| Revenue from New Computer Tablet Sales | | $  10,000  $ | 10,500  $ | 11,025  $ | 11,576  $ | 12,155  $ | 12,763 |
| Partial Year | | 0.42 | 1 | 1 | 1 | 1 | 0.58 |
| Gen Audio Revenue (new) | | $   4,167  $ | 10,500  $ | 11,025  $ | 11,576  $ | 12,155  $ | 7,402 |
| Total Revenue | | $   4,167  $ | 10,500  $ | 11,025  $ | 11,576  $ | 12,155  $ | 7,402 |
| Present Value Factor | | 0.873 | 0.652 | 0.521 | 0.417 | 0.334 | 0.267 |
| Present Value for GenAudio Cash Flow | | 3,637 | 6,841 | 5,746 | 4,827 | 4,055 | 1,975 |
| NPV GenAudio | $ | 27,081 | | | | | |

GA000613

**Technology Valuation Variables for the Computer Tablet**
**Non-Exclusive**

| | |
|---|---|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 6 months |
| Launch Date | 31-Jul-10 |
| Patent Expiration Date | 2024 & 2028 |
| Real Peak Sales | 3 Years (2012) |
| Return on Equity | 25% |
| Discount Rate | 16% |
| Growth Rate | 5% |
| GenAudio Revenue Per New Computer Tablet | $0.50 |

($thousands)

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| New Computer Tablet Unit Sales | | 10,000 | 10,500 | 11,026 | 11,576 | 12,165 | 12,763 |
| Revenue from new Computer Tablet Sales | | $ 5,000 | $ 5,250 | $ 5,513 | $ 5,788 | $ 6,078 | $ 6,381 |
| Partial Year | | 0.42 | 1 | 1 | 1 | 1 | 0.56 |
| Gen Audio Revenue (new) | | $ 2,083 | $ 5,250 | $ 5,513 | $ 5,788 | $ 6,078 | $ 3,701 |
| Total Revenue | | $ 2,083 | $ 5,250 | $ 5,513 | $ 5,788 | $ 6,078 | $ 3,701 |
| Present Value Factor | | 0.873 | 0.852 | 0.521 | 0.417 | 0.334 | 0.267 |
| Present Value for GenAudio Cash Flow | | 1,816 | 3,421 | 2,873 | 2,414 | 2,027 | 986 |
| NPV GenAudio | $ | 13,541 | | | | | |

GA000814

*Inavisis, Inc.*

# Chapter – 2
# Rest of the World
# Consumer Electronics Products
# Calculation

Technology Valuation Theatrical DVD CD Software Industry
Non-Exclusive Agreement

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| NPV Date | | | | | | | 31-Jan-10 |
| Time for Implementation | | | | | | | 1 Year |
| Launch Date | | | | | | | 31-Jan-11 |
| Patent Expiration Date | | | | | | | 2024 & 2028 |
| Technology Obsolescence | | | | | | | 5 years |
| Return on Equity | | | | | | | 25% |
| Discount Rate | | | | | | | 125% |
| Growth Rate for DVD Blu-Ray Digital | | | | | | | 20% |
| Growth Rate for Digital CD (Single Track/Full Album Respectively) | | | | | | 45% | -54% |
| Growth Rate for Physical CD Album | | | | | | | -20% |
| GenAudio Technology Revenue per Movie Ticket Sale | | | | | | $ | 0.05 |
| GenAudio Technology Revenue per 3D Movie Ticket Sale | | | | | | $ | 0.25 |
| Gen Audio Technology Revenue per DVD | | | | | | $ | 0.10 |
| Gen Audio Technology Revenue per CD | | | | | | $ | 0.05 |
| GenAudio Technology Revenue per Digital Download (single track/full albums) | | | | $ | 0.01 | | $0.06 |

(1000s/units)

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Total Number of Movies (units) | 590 | 590 | 590 | 590 | 590 | 590 | 590 |
| Total Number of Movies Implementing AstoundSound | | 0 | 10 | 20 | 40 | 60 | 80 |
| Average Number of Tickets Per Movie | 2,500 | | 25,000 | 50,000 | 100,000 | 150,000 | 200,000 |
| Revenue from Movies with AstoundSound | | 0 | $ 1,250 $ | 2,500 $ | 5,000 $ | 7,500 $ | 10,000 |
| | | | | | | | |
| Total Number of 3D Movies | 10 | 25 | 18 | 20 | 26 | 30 | 35 |
| Number of 3D Movies Implementing AstoundSound | | 0 | 5 | 10 | 20 | 30 | 35 |
| Average Number of Tickets Per Movie | 5,000 | | 25,000 | 50,000 | 100,000 | 150,000 | 175,000 |
| Revenue from 3D Movies with AstoundSound | | $ | 0 250 $ | 12,500 $ | 25,000 $ | 37,500 $ | 43,750 |
| | | | | | | | |
| Total Number of DVD/Blu-Ray/Digital Download | 1,703,851 | 1,933,799 | 1,895,148 | 1,937,900 | 1,902,192 | 2,047,973 | 2,105,310 |
| DVD Blu-Ray Digital Units with GenAudio | | 0 | 6% | 10% | 20% | 20% | 20% |
| Revenue from DVD Sales | $ | - $ | 0,426 $ | 19,379 $ | 30,844 $ | 40,959 $ | 42,196 |
| | | | | | | | |
| Total Number of CD | 290,080 | 232,064 | 185,651 | 149,321 | 118,617 | 95,053 | 76,041 |
| CD Units with AstoundSound Technology | | | 5% | 10% | 20% | 20% | 20% |
| Revenue from CD Sales | $ | - $ | 464 $ | 743 $ | 1,186 $ | 951 $ | 780 |
| | | | | | | | |
| Total Number of Digital Download Single Track | 844,200 | 1,224,090 | 1,774,930 | 2,573,640 | 3,731,781 | 5,411,087 | 7,846,091 |
| Digital Downloads with AstoundSound Technology | | | 5% | 10% | 15% | 20% | 25% |
| Revenue from Digital Music | $ | - $ | 887 $ | 2,574 $ | 5,598 $ | 10,822 $ | 19,615 |
| | | | | | | | |
| Total Number of Digital Download Full Album | 50,000 | 77,000 | 118,580 | 182,613 | 281,224 | 433,085 | 666,852 |
| Digital Downloads with AstoundSound Technology | | | 5% | 10% | 15% | 20% | 25% |
| Revenue from Digital Music | $ | - $ | 296 $ | 913 $ | 2,109 $ | 4,331 $ | 8,337 |
| | | | | | | | |
| Total Revenue | | $ | - $ | 10,576 $ | 38,609 $ | 76,728 $ | 102,063 $ | 124,569 |
| Partial Year | | | 0.00 | 0.9167 | 1 | 1 | 1 | 0.08 |
| | | | | | | | |
| Present Value Factor | | | 0.888 | 0.784 | 0.801 | 0.600 | 0.538 | 0.473 |
| Present Value of GenAudio Cash Flow | | | - | 13,372 | 28,975 | 42,930 | 64,718 | 4,586 |

| NPV GenAudio | $ | 147,579 |
|---|---|---|

GA000616

Technology Valuation for the Hardware DVD TV and HT Markets
Non-Exclusive Agreement

| | |
|---|---|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 1 Year |
| Launch Date | 31-Jan-11 |
| Patent Expiration Date | 2024 & 2028 |
| Technology Obsolescence | 5 years |
| Return on Equity | 25% |
| Discount Rate | 13.5% |
| DVD Player Growth Rate | 5% |
| TV Growth Rate | 7.6% |
| 3D TV Growth Rate | 76.0% |
| Home Theater Growth Rate | 20% |
| DVR Growth Rate | 17% |
| GenAudio Technology Revenue per DVD Player, TV HT, DVR | $ 1.00 |

($thousands)

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| DVD Player Total US Market | 25200 | 26,460 | 27,783 | 29,172 | 30,631 | 32,162 | 33,770 |
| DVD Player Total ROW Market | 25200 | 27,168 | 29,285 | 31,589 | 34,031 | 36,685 | 39,547 |
| DVD Global Unit Sales | 50,400 | 53,628 | 57,068 | 60,741 | 64,662 | 68,849 | 73,317 |
| Market Share | | 0% | 5% | 10% | 15% | 15% | 15% |
| Existing Units with AslaundSound Technology | | - | 2,853 | 6,074 | 9,699 | 10,327 | 10,998 |
| Revenue from Upgrade | $ - | $ - | $ 2,853 | $ 6,074 | $ 9,699 | $ 10,327 | $ 10,998 |
| | | | | | | | |
| TV Total Market | 194,480 | 209,600 | 220,300 | 230,800 | 249,802 | 266,200 | 298,120 |
| Percent Market Penetration | | 0% | 5% | 10% | 15% | 15% | 15% |
| Revenue from New TV Sales | $ - | $ - | $ (1,015 | $ 23,080 | $ 37,920 | $ 40,231 | $ 43,369 |
| | | | | | | | |
| 3D TV Total Market | | 2,500 | 5,200 | 12,500 | 25,000 | 43,750 | 70,663 |
| Percent Market Penetration | | 0% | 10% | 20% | 30% | 40% | 50% |
| Revenue from New 3D TV Sales | $ - | $ - | $ 520 | $ 2,500 | $ 7,500 | $ 17,500 | $ 35,281 |
| | | | | | | | |
| Home Theatre Total Market | 936 | 1,123 | 1,348 | 1,617 | 1,941 | 2,329 | 2,795 |
| Percent Market Penetration | | 0% | 5% | 10% | 15% | 15% | 15% |
| Revenue from New Home Theatre Sales | $ - | $ - | $ 67 | $ 162 | $ 291 | $ 349 | $ 419 |
| | | | | | | | |
| DVR Total Market | 70,200 | 82,134 | 96,097 | 112,433 | 131,547 | 153,910 | 180,075 |
| Percent Market Penetration | | 0% | 5% | 10% | 15% | 15% | 15% |
| Revenue from New DVR Sales | $ - | $ - | $ 4,805 | $ 11,243 | $ 19,732 | $ 23,086 | $ 27,011 |
| Total Revenue | | $ - | $ 19,231 | $ 43,059 | $ 74,643 | $ 91,494 | $ 120,079 |
| Partial Year | | 0.00 | 0.9167 | 1 | 1 | 1 | 0.08 |
| | | | | | | | |
| Present Value Factor | | 0.880 | 0.764 | 0.691 | 0.609 | 0.536 | 0.473 |
| Present Value of GenAudio Cash Flow | | - | 13,845 | 29,749 | 45,378 | 49,070 | 4,708 |

NPV GenAudio            $ 142,750

GA000617

**Technology Valuation for the Video Game Software Industry**
**Non-Exclusive Agreement**

| | |
|---|---|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 1 Year |
| Launch Date | 31-Jan-11 |
| Patent Expiration Date | 2024 & 2028 |
| Technology Obsolescence | 5 years |
| Return on Equity | 25% |
| Discount Rate | 13.5% |
| Growth Rate for New Game Development | 10% |
| Growth Rate for Video Game Software | 11% |
| GenAudio Technology Revenue per SKU development | $ 10,000 |
| Gen Audio Technology Revenue per one Video Game Sales | $ 0.50 |

**($thousands)**

| Year | 2008 | 2010 | 2011 | 2012 | 2013 | 2014 | 2016 |
|---|---|---|---|---|---|---|---|
| New Game Console Titles | 4.95 | 6.45 | 6.69 | 6.59 | 7.25 | 7.97 | 8.77 |
| Market share | | 0% | 5% | 10% | 20% | 26% | 30% |
| Existing Units with Astound Sound | | - | 0.30 | 0.66 | 1.45 | 1.99 | 2.63 |
| Revenue from AstoundSound | | $ - | $ 2,995 | $ 6,589 | $ 14,466 | $ 19,930 | $ 26,308 |
| | | | | | | | |
| New Video Game Software  Sale | 293,708 | 328,016 | 361,878 | 401,694 | 445,869 | 494,915 | 549,356 |
| Percent Market Penetration | | 0% | 3% | 5% | 10% | 10% | 10% |
| Revenue from New Software Game Console Sale | $ - | $ - | $ 5,428 | $ 10,042 | $ 22,293 | $ 24,746 | $ 27,468 |
| | | | | | | | |
| Total Revenue | | $ - | $ 9,423 | $ 16,631 | $ 36,786 | $ 44,576 | $ 63,776 |
| Partial Year | | 0.00 | 0.9167 | 1 | 1 | 1 | 0.06 |
| | | | | | | | |
| Present Value Factor | | 0.890 | 0.764 | 0.691 | 0.609 | 0.538 | 0.473 |
| Present Value of GenAudio Cash Flow | | - | 8,055 | 11,490 | 22,394 | 23,980 | 2,109 |

| | |
|---|---|
| NPV GenAudio | $ 68,008 |

GA000618

**Technology Valuation for the Hardware in the Gaming Industry**
**Non-Exclusive Agreement**

| | |
|---|---:|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 1 Year |
| Launch Date | 31-Jan-11 |
| Patent Expiration Date | 2024 & 2029 |
| Technology Obsolescence | 5 years |
| Real Peak Sales | 3 Years (July 2012) |
| Return on Equity | 25% |
| Discount Rate | 13.5% |
| Main Console (Xbox, PS 2-3, Wii) Growth Rate | 75% |
| Portable Console (PSP, DS) Growth Rate | 65% |
| GenAudio Technology Revenue Console | $ 1.00 |
| Gen Audio Technology Revenue for Portable | $ 0.30 |
| GenAudio Technology Revenue Upgrade | $0.15 |

**($thousands)**

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---:|---:|---:|---:|---:|---:|---:|
| Existing Hardware Console Internet Update Capable | | 118,078 | 119,079 | 118,079 | 118,079 | 118,079 | 118,079 |
| Market share of 20% Over Five Years | | 0% | 3% | 4% | 9% | 4% | 3% |
| Existing Units with GenAudio Technology | | - | 3,542 | 4,723 | 7,095 | 4,723 | 3,542 |
| Revenue From Upgrade | | $ - | $ 531 | $ 708 | $ 1,063 | $ 708 | $ 531 |
| | | | | | | | |
| New Hardware Game Console Sale | 33,527 | 56,572 | 102,579 | 179,994 | 314,447 | 550,282 | 952,993 |
| Percent Market Penetration | | 0% | 3% | 5% | 10% | 10% | 10% |
| Revenue from New Hardware Game Console Sales | $ 33,527 | $ - | $ 3,080 | $ 8,984 | $ 31,445 | $ 55,028 | $ 99,299 |
| | | | | | | | |
| New Hardware Portable Game Sale | 29,600 | 52,910 | 87,884 | 161,994 | 335,009 | 918,792 | 1,149,559 |
| Percent Market Penetration | | 0% | 3% | 5% | 10% | 15% | 20% |
| Revenue from New Portable Hardware Game Sales | $ 8,580 | $ - | $ 991 | $ 2,719 | $ 10,050 | $ 27,889 | $ 66,794 |
| Total Revenue | | $ - | $ 4,403 | $ 12,406 | $ 42,556 | $ 83,829 | $ 196,624 |
| Partial Year | | 0.00 | 0.9167 | 1 | 1 | 1 | 0.06 |
| | | | | | | | |
| Present Value Factor | | 0.890 | 0.784 | 0.691 | 0.609 | 0.536 | 0.473 |
| Present Value of GenAudio Cash Flow | | - | 3,229 | 9,673 | 25,906 | 44,950 | 6,496 |

| | |
|---|---:|
| NPV GenAudio | $ 69,054 |

GA000619

Technology Valuation for the PC Global Computer Market
Non-Exclusive Agreement

| | | |
|---|---|---|
| NPV Date | | 31-Jan-10 |
| Time for Implementation | | 1 Year |
| Launch Date | | 31-Jan-11 |
| Patent Expiration Date | | 2024 & 2028 |
| Technology Obsolescence | | 5 years |
| Return on Equity | | 25% |
| Discount Rate | | 13.5% |
| Growth Rate (first three years) | | 1% |
| Gen Audio Revenue From Per New Computer | $ | 1.00 |
| Gen Audio Revenue per Existing Computer | $ | 0.30 |

($thousands)

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Existing PC Computers | | 840,450 | 840,450 | 840,450 | 840,450 | 840,450 | 840,450 |
| OS Upgrade 20% Over Five Years | | 0% | 3% | 4% | 8% | 4% | 3% |
| Existing Units with AstoundSound Technology | | - | 25,214 | 33,618 | 50,427 | 33,618 | 25,214 |
| Revenue from Upgrade | | $ - | $ 7,564 | $ 10,085 | $ 15,128 | $ 10,085 | $ 7,564 |
| New Computer Sales | 323,456 | 326,691 | 328,957 | 333,257 | 336,590 | 339,956 | 343,355 |
| Percent Market Penetration | | 0% | 3% | 5% | 10% | 10% | 10% |
| Revenue from New Computer Sales | $ 323,456 | $ - | $ 9,899 | $ 16,663 | $ 33,659 | $ 33,996 | $ 34,336 |
| Total Revenue | | $ - | $ 17,463 | $ 26,748 | $ 48,787 | $ 44,081 | $ 41,900 |
| Partial Year | | 0.00 | 0.9167 | 1 | 1 | 1 | 0.08 |
| Present Value Factor | | 0.890 | 0.784 | 0.691 | 0.609 | 0.536 | 0.473 |
| Present Value of GenAudio Cash Flow | | - | 12,553 | 18,480 | 29,698 | 23,641 | 1,643 |

| | | |
|---|---|---|
| NPV GenAudio | $ | 88,019 |

GA000620

**Technology Valuation for the Smart Phones (Data Centric) Market**
**Nonexclusive Agreement**

| | |
|---|---|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 1 Year |
| Launch Date | 31-Jan-11 |
| Technology Obsolescence | 5 Years |
| Patent Expiration Date | 2024 & 2026 |
| Return on Equity | 25% |
| Discount Rate | 13.5% |
| Growth Rate (first three years) | Actual Estimates by Industry Experts |
| Growth Rate (remaining years) | 5% |
| GenAudio Revenue per New Smart Phone | $   0.60 |
| Gen Audio Revenue Per Existing Smart Phone | $   0.16 |

($thousands)

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2016 |
|---|---|---|---|---|---|---|---|
| Existing Smart Phones | | 191,420 | 191,420 | 191,420 | 191,420 | 191,420 | 191,420 |
| OS upgrade 20% Over Five Years | | 0% | 5% | 10% | 15% | 10% | 5% |
| Existing Units with Astound Sound | | - | 9,571 | 19,142 | 28,713 | 19,142 | 9,571 |
| Revenue From Existing Smart Phones | $    - | $    - | $   1,436 | $   2,871 | $   4,307 | $   2,871 | $   1,436 |
| | | | | | | | |
| New Smart Phone Sale | 142,100 | 214,700 | 321,800 | 421,800 | 442,890 | 465,036 | 488,286 |
| Percent Market Penetration | 0% | 0% | 5% | 10% | 15% | 15% | 15% |
| Revenue from New Smart Phones | $    - | $    - | $   8,045 | $  21,090 | $  33,217 | $  34,878 | $  36,621 |
| | | | | | | | |
| Total Revenue | $    - | $    - | $   9,481 | $  23,961 | $  37,524 | $  37,749 | $  38,057 |
| Partial Year | | 0.00 | 0.9187 | 1 | 1 | 1 | 0.083 |
| GenAudio Revenue | $    - | $    - | $   8,691 | $  23,961 | $  37,624 | $  37,749 | $   3,159 |
| | | | | | | | |
| Present Value Factor | | 0.890 | 0.784 | 0.691 | 0.609 | 0.536 | 0.473 |
| Present Value of GenAudio Cash Flow | | - | 6,815 | 16,555 | 22,841 | 20,245 | 1,493 |

| | |
|---|---|
| NPV Gen Audio | $   67,948 |

GA000621

**Technology Valuation Variables for the MP3 Portable Music Devices**
**Non- Exclusive Agreement**

| | |
|---|---:|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 1year |
| Launch Date | 31-Jan-10 |
| Technology Obsolescence | 5 Years |
| Patent Expiration Date | 2024 & 2026 |
| Real Peak Sales | 3 Years (2012) |
| Return on Equity | 25% |
| Discount Rate | 13.5% |
| Growth Rate | 1.0% |
| Gen Audio Revenue Per New MP3 Players | $ 0.60 |
| Gen Audio Revenue Per Existing MP3 players | $ 0.15 |

($thousands)

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Existing MP3 Players | | 117,778 | 117,778 | 117,778 | 117,778 | 117,778 | 117,778 |
| OS Upgrade 20% Over Five Years | | 0% | 2% | 4% | 10% | 4% | 2% |
| Total Existing Units with AstoundSound | | - | 2,356 | 4,711 | 11,778 | 4,711 | 2,356 |
| GenAudio Revenue (Existing) | | $ - | $ 363 | $ 707 | $ 1,767 | $ 707 | $ 353 |
| | | | | | | | |
| New MP3 Unit Sales | 25,474 | 25,729 | 25,986 | 26,246 | 26,508 | 26,773 | 27,041 |
| GenAudio Market Penetration | | - | 3% | 5% | 10% | 15% | 15% |
| Revenue from New MP3 Sales | | $ - | $ 390 | $ 858 | $ 1,325 | $ 2,008 | $ 2,028 |
| Partial Year | | 0.00 | 0.9167 | 1 | 1 | 1 | 0.083 |
| GenAudio Revenue (New) | | $ - | $ 179 | $ 328 | $ 663 | $ 1,004 | $ 84 |
| | | | | | | | |
| Total Revenue | | $ - | $ 632 | $ 1,035 | $ 2,429 | $ 1,711 | $ 437 |
| | | | | | | | |
| Present Value Factor | | 0.890 | 0.784 | 0.691 | 0.609 | 0.536 | 0.473 |
| | | | | | | | |
| Present Value for Gen Audio Cash Flow | | - | 417 | 716 | 1,479 | 917 | 207 |
| | | | | | | | |
| NPV GenAudio | $ 3,735 | | | | | | |

GA000622

**Technology Valuation for the In-Vehicle Electronics Market**
**Non-Exclusive Agreement**

| | |
|---|---:|
| NPV Date | 31-Jan-10 |
| Time for Implementation | I Year |
| Launch Date | 31-Jan-11 |
| Patent Expiration Date | 2024 & 2028 |
| Technology Obsolescence | 5 years |
| Return on Equity | 25% |
| Discount Rate | 13.5% |
| Growth Rate (first three years) | 1% |
| GenAudio Revenue From Each Vehicle Sale | $   1.00 |
| Gen Audio Revenue From After Market Electronics | $   1.00 |

($thousand)

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Total New Vehicle Sales | 12,359 | 12,483 | 12,607 | 12,733 | 12,861 | 12,989 | 13,119 |
| Market Share Using AstoundSound Technology | | 0% | 2% | 4% | 6% | 8% | 10% |
| Existing Units with AstoundSound Technology | | - | 252 | 509 | 772 | 1,039 | 1,312 |
| Revenue from New Car Sales | $   - | $   - | $   252 | $   509 | $   772 | $   1,039 | $   1,312 |
| New after Market in Car Electronic Audio Sales | 9,478 | 9,855 | 10,249 | 10,658 | 11,086 | 11,629 | 11,990 |
| Percent Market Penetration | | 0% | 1% | 2% | 3% | 4% | 5% |
| Revenue from New Computer Sales | $   - | $   - | $   102 | $   213 | $   333 | $   461 | $   600 |
| Total Revenue | | $   - | $   355 | $   723 | $   1,104 | $   1,500 | $   1,911 |
| Partial Year | | 0.00 | 0.9187 | 1 | 1 | 1 | 0.08 |
| Present Value Factor | | 0.890 | 0.784 | 0.691 | 0.609 | 0.538 | 0.473 |
| Present Value of GenAudio Cash Flow | | - | 255 | 499 | 672 | 805 | 75 |

| | |
|---|---:|
| NPV GenAudio | $   2,306 |

GA000623

*Inavisis, Inc.*

# Chapter – 3
# Broadcast and Live Concerts
# Calculation

GA000624

**Technology Valuation for the Radio Broadcasting Industry**
**Non-Exclusive Agreement**

| | |
|---|---|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 1 Year |
| Launch Date | 31-Jan-11 |
| Patent Expiration Date | 2024 & 2028 |
| Technology Obsolescence | 5 years |
| Return on Equity | 25% |
| Discount Rate | 22.3% |
| Growth Rate for New Radio Stations | 0% |
| GenAudio Technology Revenue per Radio Station | $   1,000 |

(\$thousands)

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Total Number of Radio Stations | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| GenAudio market share | | 0% | 1% | 3% | 5% | 10% | 15% |
| Existing Radio Stations with AstoundSound | | - | 125 | 375 | 625 | 1,250 | 1,875 |
| Revenue from Radio Station Revenue | $   - | $   125 | $   375 | $   625 | $   1,250 | $   1,875 |
| | | | | | | | |
| Partial Year | | 0.00 | 0.9167 | 1 | 1 | 1 | 0.08 |
| | | | | | | | |
| Present Value Factor | | 0.831 | 0.679 | 0.555 | 0.454 | 0.371 | 0.303 |
| Present Value of GenAudio Cash Flow | | - | 78 | 208 | 284 | 464 | 47 |

| NPV GenAudio | $   1,080 |
|---|---|

GA000825

Technology Valuation for Live Concert Industry
Non-Exclusive Agreement

| | |
|---|---:|
| NPV Date | 31-Jan-10 |
| Time for Implementation | I Year |
| Launch Date | 31-Jan-11 |
| Patent Expiration Date | 2024 & 2028 |
| Technology Obsolescence | 6 years |
| Return on Equity | 25% |
| Discount Rate | 22.3% |
| Growth Rate for Live Concerts | 0% |
| GenAudio Technology Revenue per Live Concert | $    1,350 |

($thousands)

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Total Number of Live Concerts | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| GenAudio Market Share | | 0% | 5% | 10% | 20% | 25% | 30% |
| Existing Live Concerts with AstoundSound | | - | 1,000 | 2,000 | 4,000 | 5,000 | 6,000 |
| Revenue from Live Concerts Revenue | $    - | $    - | $    1,350 | $    2,700 | $    5,400 | $    6,750 | $    8,100 |
| | | | | | | | |
| Partial Year | | 0.00 | 0.9167 | 1 | 1 | 1 | 0.08 |
| | | | | | | | |
| Present Value Factor | | 0.831 | 0.679 | 0.555 | 0.454 | 0.371 | 0.303 |
| Present Value of GenAudio Cash Flow | | - | 840 | 1,499 | 2,450 | 2,503 | 204 |
| | | | | | | | |
| NPV GenAudio | $    7,495 | | | | | | |

_GA000626

*Inavisis, Inc.*

## D – Relief from Royalty Approach

**Technology Valuation for the Hearing Aid Market**
**Non-Exclusive Agreement**

| | |
|---|---|
| NPV Date | 31-Jan-10 |
| Time for Implementation | 2 years |
| Launch Date | 31-Jan-12 |
| Patent Expiration Date | 2024 & 2028 |
| Technology Obsolescence | 10 years |
| Return on Equity | 25% |
| Discount Rate | 13.5% |
| Growth Rate | 2% |
| Royalty Rate | 6% |
| Sale Price Per Hearing Aid | $ 500 |

**($thousands)**

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New Hearing Aid units | 2,500 | 2,550 | 2,601 | 2,653 | 2,706 | 2,760 | 2,815 | 2,872 | 2,929 | 2,988 | 3,047 | 3,108 |
| Market that Technology Could be Applied | 90% | 2,295 | 2,341 | 2,388 | 2,435 | 2,484 | 2,534 | 2,585 | 2,636 | 2,689 | 2,743 | 2,798 |
| Percent Market Penetration | 0 | - | - | 2% | 4% | 6% | 8% | 10% | 10% | 10% | 10% | 10% |
| Total Number of Units | 0 | 0 | 0 | 48 | 97 | 149 | 203 | 259 | 264 | 269 | 274 | 280 |
| | | | | | | | | | | | | |
| Total Revenue From Sales of Hearing Aids | - | - | - | 23,877 | 48,700 | 74,525 | 101,355 | 129,227 | 131,812 | 134,448 | 137,137 | 139,880 |
| Royalty Payment | - | - | - | 1,194 | 2,435 | 3,726 | 5,068 | 6,461 | 6,591 | 6,722 | 6,857 | 6,994 |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Partial Year | | 0.00 | 0.00 | 0.9167 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0.08 |
| Total Revenue | $ | - $ | - $ | 1,094 $ | 2,435 $ | 3,726 $ | 5,068 $ | 6,461 $ | 6,591 $ | 6,722 $ | 6,857 $ | 581 |
| Present Value Factor | | 0.815 | 0.652 | 0.521 | 0.417 | 0.334 | 0.267 | 0.213 | 0.171 | 0.137 | 0.109 | 0.087 |
| Present Value of GenAudio Cash Flow | | - | - | 570 | 1,018 | 1,243 | 1,352 | 1,379 | 1,126 | 919 | 750 | 51 |

| | |
|---|---|
| NPV GenAudio | $ 6,405 |

GA000828

*Inavisis, Inc.*

## E – Patents Valued

1. US Filed Patent # 10,802,319

"METHOD AND APPARATUS FOR CREATING SPATIALIZED SOUND"

2. US Filed Patent # 12,041,191

"AUDIO SPATIALIZATION AND ENVIRONMENT SIMULATION"

3. US Filed Patent # 12582449

"AUDIO SPATIALIZATION AND ENVIRONMENT SIMULATION"

GA000629

*Inavisis, Inc.*

## F – Statement of Limiting Conditions

**The appraisal report is subject to the following general assumptions and limiting conditions:**

1.  No investigation has been made of, and no responsibility is assumed for, the legal description of the property being valued or legal matters, including title or encumbrances. Title to the property is assumed to be good and marketable unless otherwise stated. The property is assumed to be free and clear of any liens, easements, or encumbrances unless otherwise stated.

2.  Information furnished by others, upon which all or portions of this appraisal are based, is believed to be reliable but has not been verified except as set forth in this report. No warranty is given as to the accuracy of such information.

3.  This report has been made only for the purpose stated herein and shall not be used for any other purpose. The context of the report is solely for management due diligence to aid in negotiating license deals with electronic companies.

4.  Neither Inavisis nor any individual signing or associated with this report shall be required by reason of this report to give further consultation, provide testimony, or appear in court or at other legal proceedings unless specific arrangements therefore have been made.

5.  This appraisal has been made in conformance with the Uniform Standards of Professional Appraisal Practice of The Appraisal Foundation.

6.  No responsibility is taken for changes in market conditions, and no obligation is assumed to revise this report to reflect events or conditions that occur subsequent to the date hereof.

7.  The date of value to which the opinion expressed in this report applies is set forth in the opinion letter at the beginning of this report. Inavisis' value opinion is based on the purchasing power of the U.S. dollar as of that date.

8.  It is assumed that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can readily be obtained or renewed for any use on which the value estimate contained in this report is based.

9.  Full compliance with all applicable federal, state, and local zoning, use, environmental, and similar laws and regulations is assumed unless otherwise stated.

10. Responsible ownership and competent management are assumed.

11. The opinion of value is predicted on the financial structure prevailing as of the date of the appraisal.

GA000630

*Inavisis, Inc.*

12. Other than matters involving (i) negligence, misconduct or omission, (ii) violation of any law, regulation or ruling, (iii) any act outside the scope of any assignment authorized by the client or (iv) failure to perform or breach of any term or condition of an assignment, Inavisis' maximum liability relating to services rendered under this report (regardless of form of action, whether in contract, negligence, or otherwise) shall be limited to the charges paid to Inavisis for the portion of its services or work products giving rise to liability and Inavisis shall not be liable for consequential, special, incidental, or punitive losses, damages or expenses (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

**EXHIBIT C**

**HISTORICAL FINANCIALS**

*DEN 07160808*

**GA000632**

## GenAudio, Inc.
## Profit & Loss
### January - December 2009

| | | Total |
|---|---|---|
| **Income** | | |
| 410000 Sales of ASE | | 52,192.98 |
| 418000 Commission paid to Affiliates | | (30.57) |
| 421000 Editorial | | 5,915.00 |
| 422000 Stage | | 17,760.00 |
| 423000 Operations | | 300.00 |
| 426000 Mix | | 8,070.00 |
| **Total Income** | **$** | **82,197.41** |
| | **Cost of Goods Sold** | |
| 510000 Server Bandwith | | 191.87 |
| 518000 Application Hosting Fees | | 1,188.00 |
| 51800 Commission | | 10.00 |
| 521000 Cost Movie Editing | | 32,674.00 |
| 530000 Production Costs | | 446,065.37 |
| **Total Cost of Goods Sold** | **$** | **481,129.24** |
| | **Gross Profit $** | **(398,931.83)** |
| | **Expenses** | |
| 607000 Artwork & Design | | 7,050.00 |
| 610000 Auto | | 7,484.13 |
| 615000 Bank Charges | | 10,304.30 |
| 618000 Colocation Expense | | 14,868.00 |
| 624000 Communication | | 14,377.89 |
| 625000 Conferences & Trade Shows | | 664,597.21 |
| 626000 Administrative | | 516.00 |
| 627000 Consultants Outside | | 74,969.20 |
| 627500 Development Costs | | 1,111,019.19 |
| 628000 Marketing & Sales | | 712,248.53 |
| 628000 Consulting Other | | 30,000.00 |
| 628500 Donations | | 10,000.00 |
| 630000 Dues & Subscriptions | | 822.65 |
| 635000 Equipment & Tools | | 20,952.48 |
| 638000 Insurance | | 33,815.08 |
| 640000 Internal | | 1,270.35 |
| 643000 Legal & Professional | | 513,895.13 |
| 644000 License Fees | | 371.50 |
| 645000 Meals and Entertainment | | 4,460.60 |
| 647000 Meetings Expense | | 7,485.80 |
| 648000 Miscellaneous | | 3,277.82 |
| 651000 Office Expenses | | 4,781.21 |
| 653000 Payroll Tax Expense | | 56,254.98 |
| 653800 Payroll Fees | | 2,957.75 |
| 654000 Printing & Replicating | | 31,436.83 |
| 654500 Postage & Shipping | | 18,362.01 |
| 655000 Promotional | | 1,528.00 |
| 658000 Rent or Lease | | 52,130.00 |
| 660000 Salaries & Wages | | 718,036.38 |
| 664000 Software | | 11,863.53 |
| 670000 Travel | | 192,660.80 |
| **Total Expenses** | **$** | **4,285,398.68** |
| | **Net Operating Income $** | **(4,684,328.52)** |
| | **Other Expenses** | |
| 720000 Interest Expense (income) | | 129.87 |
| 810000 Depreciation | | 75,000.00 |
| **Total Other Expenses** | **$** | **75,129.87** |
| | **Net Other Income $** | **(75,129.87)** |
| | **Net Income $** | **(4,739,458.49)** |

DEN 97150806

GA000633

## GenAudio, Inc.
## Balance Sheet
### As of December 31, 2009

|  |  | Total |
|---|---|---:|
| **ASSETS** |  |  |
| **Current Assets** |  |  |
| **Bank Accounts** |  |  |
| 108000 Wells Fargo 0378 |  | 28,376.32 |
| **Total Bank Accounts** | $ | 28,376.32 |
|  | **Other Current Assets** |  |
| 122000 Employee Advances |  | 15,772.83 |
| 132000 Suspense - Other |  | 525.00 |
| 137100 Prepaid Rent |  | 3,800.00 |
| **Total Other Current Assets** | $ | 20,097.83 |
|  | **Total Current Assets** $ | 48,473.15 |
|  | **Fixed Assets** |  |
| 150000 Computers & Sound Equip. |  | 428,804.78 |
| 152000 Tenant Improvements |  | 11,056.68 |
| 154000 Furniture & Fixtures Office |  | 4,875.43 |
| 165000 Furn. & Fixtures Venice House |  | 32,737.30 |
| 156500 Tenant Improvements Venice |  | 15,238.37 |
| 168000 Tenant Finish AIX Studio |  | 239,740.27 |
| 168500 AIX Studio Equipment |  | 36,268.74 |
| **Total Fixed Assets** | $ | 768,821.58 |
|  | **Other Assets** |  |
| 180000 Loans to Shareholder |  | 3,564.84 |
| 188000 Deposits |  | 17,500.00 |
| 180000 Organizational & Offering Costs |  | 812,888.34 |
| 186000 License & Technology Transfer |  | 323,435.06 |
| **Total Other Assets** | $ | 937,188.53 |
|  | **TOTAL ASSETS** $ | 1,774,493.24 |
|  |  |  |
|  | **LIABILITIES AND EQUITY** |  |
| **Liabilities** |  |  |
| **Current Liabilities** |  |  |
| **Accounts Payable** |  |  |
| 200000 Accounts Payable |  | 218,036.34 |
| **Total Accounts Payable** | $ | 218,036.34 |
|  | **Other Current Liabilities** |  |
| 212000 Accrued Payroll |  | 489,490.14 |
| 216000 N/P Short Term |  | 10,000.00 |
| 216000 Payable Stock Subscri |  | 100.00 |
| **Total Other Current Liabilities** | $ | 509,590.14 |
|  | **Total Current Liabilities** $ | 728,626.48 |
|  | **Long Term Liabilities** |  |
| 286000 N/P J Mahabub |  | 1,178,691.82 |
| **Total Long Term Liabilities** | $ | 1,178,691.82 |
|  | **Total Liabilities** $ | 1,907,318.30 |
|  | **Equity** |  |
| 201000 Preferred Stock Series C |  | 0.10 |
| 202000 Preferred Stock Series D |  | 43.40 |
| 306000 Common Stock |  | 1,218.10 |
| 310000 Additional Paid-in-Capital |  | 11,487,940.50 |
| 312000 Purchased Warrants |  | (23,800.00) |
| 320000 Retained Earnings |  | (8,858,768.87) |
| Net Income |  | (4,736,456.48) |
| **Total Equity** | $ | (132,825.95) |
|  | **TOTAL LIABILITIES AND EQUITY** $ | 1,774,493.24 |

DEN 97150605

GA000634