**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No.:  1:15-cv-02118

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

TAJ JERRY MAHABUB, GENAUDIO,
INC., and ASTOUND HOLDINGS, INC.,

      Defendants.

---

**DEFENDANT TAJ JERRY MAHABUB'S OPPOSITION TO PLAINTIFF'S MOTION FOR**

**SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

PAGE(S)

I.    INTRODUCTION ..................................................................................................1

II.   DEFENDANTS' RESPONSES TO SEC'S STATEMENT OF MATERIAL
      FACTS .................................................................................................................1

III.  GENAUDIO'S STATEMENT OF ADDITIONAL DISPUTED FACTS ......................14

IV.   MAHABUB'S STATEMENT OF ADDITIONAL DISPUTED FACTS .........................14

V.    ARGUMENT .......................................................................................................19

      A.    MAHABUB INCORPORATES THE ARGUMENTS CONTAINED IN
            GENAUDIO'S OPPOSITION................................................................................19

      B.    THE MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED
            BECAUSE THE SEC FAILS TO MEET THEIR BURDEN OF
            PRODUCING ADMISSIBLE EVIDENCE ........................................................20

      C.    MAHABUB'S INTERNAL GENAUDIO TEAM EMAILS DID NOT
            VIOLATE § 10(B) OF THE EXCHANGE ACT OR RULE 10B-5 ....................21

            1.    The GenAudio Team Emails were not in connection with
                  the purchase or sale of securities because they were not
                  communicated to potential investors and they did not
                  cause any securities transactions.............................................................22

                  a.    The internal GenAudio Team Emails were not
                        communicated to potential investors ..........................................22

                  b.    There is no causal connection between the
                        misrepresentation and any purchase or sale of
                        securities ...................................................................................25

            2.    The GenAudio Team Emails did not contain any material
                  misrepresentations or omissions ............................................................27

                  a.    The optimistic statements in Exhibits 8, 9, and 10
                        are nonactionable puffery ..........................................................28

            3.    Any misrepresentations in the GenAudio Team Emails
                  were not made with scienter ..................................................................29

      D.    THE GENAUDIO TEAM EMAILS DO NOT VIOLATE § 17(A)(2) OF
            THE SECURITIES ACT ...................................................................................31

      E.    DEFENDANTS DID NOT ENGAGE IN A FRAUDULENT SCHEME ...........31

      F.    MAHABUB DID NOT VIOLATE § 5 .................................................................34

i

VI.     CONCLUSION.................................................................................................................35

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Anastasi v. American Petroleum Inc.*, 579 F.Supp. 273 (D.Colo.1984) ........................................ 34

*Anixter v. Home-Stake Prod. Co*, 77 F.3d 1215 (10th Cir. 1996) ........................................... 23, 24

*Arst v. Stifel, Nicolaus & Co.*, 86 F.3d 973 (10th Cir. 1996) .................................................. 25, 26

*Broadband Mgmt. Solutions, LLC v. Dish Network Serv., L.L.C.*, No. 04-cv-01489-EWN-BNB, 2006 U.S.Dist. LEXIS 8695, at *10 (D. Colo. Feb. 16, 2006) .............................................. 20

*Burman v. Phoenix Worldwide Indus.*, 384 F.Supp.2d 316 (D.D.C. 2005) ................................. 30

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................... 20, 21

*Fitzpatrick v City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993) ......................................................... 34

*Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997) ..................................................... 28, 29

*Hackbart v. Holmes*, 675 F.2d 1114 (10th Cir. 1982) ............................................................ 29, 30

*James v. Wadas*, 724 F.3d 1312 (10th Cir. 2013) ....................................................................... 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S.Ct. 1318 (2015) 28

*Republic W. Ins. Co. v. Fireman's Fund Ins. Co.*, 241 F.Supp.2d 1090 (N.D. Cal. 2003) ........... 20

*Romero v. Union P. Railroad*, 615 F.2d 1303 (10th Cir. 1980) .................................................. 30

*Seattle-First Nat'l Bank v. Carlstedt*, 678 F. Supp. 1543 (W.D.Okla. 1987) .............................. 26

*SEC v. C. Jones & Co.*, 312 F.Supp.2d 1375 (D.Colo. 2004) ..................................................... 27

*SEC v. Delphi Corp.*, No. 06-14891, 2008 U.S.Dist. LEXIS 78671, at *22–23 (E.D.Mich. Oct. 8, 2008) ....................................................................................................................................... 23

*SEC v. DiMaria*, No. 1:15-CV-7035-GHW, 2016 U.S.Dist. LEXIS 125694, at *20 (S.D.N.Y. Sept. 15, 2016) ......................................................................................................................... 27

*SEC v. Goldstone*, 2015 U.S.Dist. LEXIS 116847, *976 (D.N.M. Aug. 22, 2015) .................... 33

*SEC v. Lucent Techs., Inc.*, 610 F.Supp.2d 342 (D.N.J. 2009) .............................................. 31, 32

*SEC v. Nacchio*, 438 F. Supp. 2d 1266 (D.C.Col. 2006) ...................................................... 23, 28

*SEC v. Smart*, 678 F.3d 850 (10th Cir. 2012) ...................................................................... 22, 31

*SEC v. Sullivan*, 68 F.Supp.3d 1367 (D. Colo. 2014)................................................... 31, 32, 33, 34

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ............................................................ 22, 23, 25

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434 (9th Cir. 1984).................... 30

## **STATUTES**

15 USC § 78j(b) .................................................................................................................... 21

17 C.F.R. § 240 .................................................................................................................... 21

## **RULES**

Federal Rule of Civil Procedure 56 .......................................................................... 20, 21, 34, 35

## I.        INTRODUCTION

In this case, Taj Jerry Mahabub ("Mahabub"), as the CEO of GenAudio, created a novel 3-D spatial audio technology that Mahabub and GenAudio tried to license and/or sell to various technology companies, including Apple. There is no dispute that the technology is real and that it works. The SEC's case arose because – despite extended efforts by Mahabub to get Apple to go into business with GenAudio – in the end, they did not.

This is really a case about a big hopes and ambitions, and a seemingly tireless attempt by an ever-optimistic Mahabub to close a deal with Apple. Due to the nature of his interactions with Apple personnel, Mahabub subjectively and reasonably believed that he was always on the verge of a deal, but – like Tantalus himself – was never quite able to get there. And not only does the deal with Apple not occur, but Mahabub's indomitable optimism and dogged efforts are rewarded with an SEC investigation and litigation.

Ironically, the SEC's Motion For Summary Judgment ("MSJ") suffers the same fate as Tantalus, as it tries for far too much, and ends up getting nowhere. First, the SEC fails to present sufficient admissible evidence to provide a prima facie case that it will prevail on any of its causes of action. Second, the SEC can't surpass the numerous issues of material fact (especially those regarding Mahabub's state of mind) to establish the requisite scienter for their fraud claims. And third, the SEC's claims for violation of the registration provisions fail, as they are not backed-up by admissible evidence of investments actually made, and are not dispositive of whether any exemptions to registration apply.

The SEC's MSJ must be denied, and this case should proceed to trial.

## II.       DEFENDANTS' RESPONSES TO SEC'S STATEMENT OF MATERIAL FACTS

1 – 5:  Undisputed.

6.        Mattos and Mahabub were primarily responsible for bringing in investors to

GenAudio, including through the sales of Mahabub's personal stock. **Response:** Disputed. Only Mahabub was primarily responsible for capital raises. Ex. 217, Mattos Dep. 19:16-23 ("Mr. Mahabub was solely responsible for all business development. … There was no other either executive or senior manager, to my knowledge, that had any measurable interactions with any business development partners.")

7 – 14:  Undisputed.

15.     Between November 2009 and April 2012, Mahabub sold approximately 3,316,300 shares of GenAudio stock to approximately 83 investors, raising approximately $2.3 million ("Mahabub Sales") when no registration statement was filed or in effect for the transactions. **Response:** Disputed on the basis the evidence is inadmissible.  (See Objections #4).[1]

16.     In connection with the Mahabub Sales, Mahabub and investors executed a Stock Sale and Purchase Agreement, and an Irrevocable Proxy Agreement; however, investors did not complete subscription agreements or investor questionnaires that addressed whether or not the investor was accredited and Mahabub did not maintain documentation regarding whether or not investors were accredited. **Response:** Disputed. Some, possibly all, investors that executed an agreement with Mahabub previously invested with GenAudio through a company offering and filled out an investor questionnaire. Mahabub relied upon that to determine whether the investors were accredited. Ex. 87 (Mahabub Depo. Vol. 2) 481:24–482:5. Further, Mahabub can only speculate as to whether some investors had not previously filled out an investor questionnaire. *Id.* 482:5–14. Mahabub also had personal relationships with many investors, and knew them to be accredited.  (Mahabub Decl., ¶¶ 4-5.)

17 – 28:  Undisputed.

///

---

[1] By way of its concurrently filed Joinder, Mahabub adopts GenAudio's concurrently filed Evidentiary Objections (Dkt. No. 58-71).

29.     During the 2010 and 2011-2012 Offerings, Mahabub solicited potential investors at public presentations he called "road shows." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #5).

30 - 31.  Undisputed.

32.     In connection with the 2010 Offering, at least one GenAudio investor wrote "N/A" on the portion of the Confidential Subscriber Questionnaire ("Questionnaire") that addressed accreditation and investment experience.   **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #7).

33.     In connection with the 2010 Offering, other GenAudio investors failed to complete the portion of the Questionnaire that addressed accreditation. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #8).

34.     At least one investor who invested in the 2011-2012 Offering on multiple occasions repeatedly failed to complete the portion of the Questionnaire that addressed accreditation. **Response:**  Disputed on the basis the evidence is inadmissible. (See Objections #9).

35.     Beyond sending and receiving the Questionnaires, GenAudio did not do anything to determine investor accreditation. **Response:**  Disputed. Mattos reviewed the Questionnaires to ensure investor qualified as accredited and if Questionnaire incomplete, normally contact the investor to complete it.  Ex. 6, Mattos Dep. 169:23-171:4.

36.     Undisputed.

37.     Emails from Mattos during the 2010 Offering also reveal that GenAudio was willing to accept investments from non-accredited investors. **Response:**  Disputed on the basis the evidence is inadmissible. (See Objections #10). The cited evidence demonstrates GenAudio's allegiance to the accredited investor requirement. Ex. 27 (Rosenblatt was prior investor already known to be accredited, thus the reference to new investors required to be accredited); Ex. 28 (Mattos acknowledging SEC regulations in reference to aggregate investment by family pooling).

38 – 39:  Undisputed.

40.     Mahabub used body language and other "hints" to lead investors to understand that the LCEC was Apple. *See* Ex. 29 at 3 ("the super sharp investors will pick up on my body language" and "[t]his may entice investors that take a peek at our offering wondering why we are all of a sudden being so quiet… (not blah blah blah-ing about Apple in any way shape or form) with strong confidence is a good thing"). **Response:**  Disputed on the basis the evidence is inadmissible. (See Objections ##1, 2, and 11).

41.     Numerous investors knew that "the LCEC" was Apple. **Response:** Disputed on the basis the evidence is inadmissible. (See Objections #1).

42 - 43:  Undisputed.

44.     Mahabub testified that he altered the emails to "entice" or "inform" the GenAudio Team. **Response:**  Disputed.  Mahabub altered the emails to keep employees motivated to work when low on funds and high on energy with much to accomplish.  Ex. 2, Mahabub Dep. 80: 14-24; 148:12-23 ("I think … there were times when I made alterations to keep the team members motivated…"); Mahabub Decl., ¶¶ 9-11.)

45.     For example, on March 21, 2010, Mahabub altered his email correspondence to Apple as set forth in the demonstrative below (alterations highlighted). **Response:**  Disputed on the basis the evidence is inadmissible. (See Objections ##3 and 12).

46.     Victor Tiscareno was a senior audio and acoustic engineer at Apple until February 2011, and he was Mahabub's primary contact at Apple. **Response:**  Disputed on the basis the evidence is inadmissible. (See Objections #1).

47.     In 2009 and 2010, Mahabub also met and communicated with Michael Hailey, who was a product market manager with Apple for the iPod, iPhone, and iPad product lines, and Ronald Isaac, who was a signal processing engineer and acoustician technologist with Apple. **Response:** Disputed on the basis the evidence is inadmissible. (See Objections #1).

48 – 51:  Undisputed.

52 – 60:  Disputed. **Response:** Each of the Statements of Fact in paragraphs 52 – 60 rely on inadmissible deposition and/or investigation testimony as well as unauthenticated emails and are thus disputed on the basis the evidence is inadmissible. (See Objections ##1 – 3 and 12 - 16).

61.     In early April 2010, Mahabub became aware of the scheduling of an internal meeting at Apple regarding GenAudio's technology. **Response:**  Disputed on the basis the evidence is inadmissible. (See Objections #17). Mahabub was aware of the internal meeting long before April 2010.  Mahabub and Tiscareno worked on demos to be used at that meeting in late 2009.  Ex. 203 (Tiscareno and Mahabub discussing with Mahabub the preparation of demos to be shown to "the man", Ex. 152, Tiscareno Dep. 140:18-141:21 (Tiscareno confirming Ex. 203 relates to preparation of demos to be shown at the internal meeting).

62.     In correspondence between Mahabub and Tiscareno, neither indicated that the meeting would involve Jobs, Schiller, or Cook; instead, Mahabub referenced Tiscareno's upcoming meeting with an "exec." **Response:** Disputed on the basis the evidence is inadmissible. (See Objections #18). Mahabub and Tiscareno used several terms in their correspondence to describe the individual who would receive the presentation on May 6, 2010, including "the exec.", "the big exec.", and "the man."  *See* SOF ¶ 142.[2]  Mahabub also testified Tiscareno and Hailey told him the meeting was with "Jobs."  SOF ¶ 144. Tiscareno and Hailey may have intended to tell him the meeting was with "Joz."  SOF ¶ 143.Prior to this litigation, Mahabub did not know anyone named "Jozwiak" or "Joz" worked at Apple. Mahabub Decl., ¶ 24.

63.     On April 8, 2010, Mahabub sent a few members of the GenAudio Team false and altered emails that made it appear that Tiscareno stated "Phil let us know earlier that this might be postponed until early next week. Apparently Steve is planning on going out of town with his family

---

[2] Facts 108 through 166 appear in GenAudio's concurrently filed Opposition and are incorporated herein by reference.

for the weekend" and that Mahabub stated "[t]oo bad … although, that might be better given that Steve will be relaxed from having a weekend getaway with his family. Perhaps this is why Phil is rescheduling for next week." **Response:** Disputed on the basis the evidence is inadmissible. (See Objections #19).

64.    On April 30, 2010, while he was attending a conference for investment bankers and broker-dealers, Mahabub sent prospective investors an email that falsely stated that the LCEC was "looking to acquire GenAudio's tech for integration into their entire lineup of product offerings" and "we are now waiting to when [sic] we will initiate negotiations, pending the CEO of the LCEC to approve the integrated product rollout strategy and the technical implementation strategy that will be presented to the CEO next week!!!" **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #20).  The email was sent to one investor only.  Other than Cohen, Mahabub speculates who else may have received.  Ex. 150, Mahabub Dep., 200:12-202:10. Mahabub's email was not false as he believed the statements were reasonable under the circumstances. *Id.*, 205:2-19 (reasonable to believe Apple looking to acquire GenAudio technology for integration); 207:4-20 (reasonable to believe awaiting CEO approval of integrated product rollout strategy and technical implementation strategy). *See* SOF ¶ 131, 134, 136, 137, 138, 140-146.

65.    After receiving the email, an investor purchased 5,000 shares for $15,000. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #21).

66.    On May 5, Mahabub sent Tiscareno materials that he suggested Tiscareno use at the meeting with "the exec," and he offered to attend the meeting; however, Tiscareno declined the offer, explaining "this is not that kind of demo. [Hailey] and I are pitching this as a concept ...." and "[o]nce we get the go ahead that this is a great idea, then the questions will be, 'well, what about the other technologies, have we reviewed them? etc.' Then we sort of start over internally....

We have to get to first base....” **Response:**  Disputed on the basis the evidence is inadmissible. (See Objections #22).

67.     In the morning and early afternoon of May 6, 2010, Mahabub sent emails to the GenAudio Team regarding the upcoming meeting at Apple which falsely represented that Schiller and Jobs were involved. **Response:**  Disputed on the basis the evidence is inadmissible. (See Objections #23).  Mahabub honestly and reasonably believed Schiller and Jobs were involved. Mahabub Decl., ¶¶ 23–24; *See* SOF ¶ 131, 134, 136, 137, 138, 140-146.

68 - 69.     Late in the evening of May 6, 2010, Mahabub sent the GenAudio Team a purported “transcription” of a phone call between him and Tiscareno. After repeatedly instructing that the email be deleted, Mahabub set forth his purported conversation with Tiscareno, which included representations that Tiscareno stated that “Steve thought the technology was so extraordinary .... I believe he wants to explode this technology into the world” and “[Steve] instructed all of us to be in a no radio period” and “I can say that [Steve] is anxious to meet you in person when we have things figured out on our end.” Mahabub then concluded the email by stating “[a]t least we have some time to put our strategy together and get our pawns in order for the asset acquisition or licensing battle.” Mahabub then forwarded the email that contained the false “transcription” to an investor. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #24).

70.     Receipt of the false “transcription” “affirmed [the investor’s] willingness to purchase 40,000 shares of stocks” in the 2010 Offering, because “[i]t just confirmed that the decision I had made to purchase the stocks was a good decision.” **Response:**  Disputed on the basis the evidence is inadmissible.   (See Objections #2).   Also, Skluzak did not rely on the “transcription” to purchase shares as he had purchased prior to receiving it.  Ex. 218, Skluzak Dep., 59:23-60:5 (“I had already made my determination ... prior to this date, sometime in April, that I was going to invest.”)

71.    On October 30, 2013, Tiscareno received a copy of the May 6, 2010 "transcription" from a GenAudio investor and responded "OMG!" and went on to explain "I never discussed anything about Steve Jobs or any other board member at Apple. I never discussed this with Steve Jobs. Period!" and "This letter is pure fabrication." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #25).

72.    On May 25, 2010, Mahabub emailed the GenAudio Team and represented that Tiscareno was contacting him despite the "no radio period" and forwarded emails that he altered to make it appear as if Tiscareno wrote "Steve has us looking very deep into other audio technology so he can better understand why yours is so much better" and "I have forwarded your email on to Steve. He said he will give it a listen in his home theater. This just might be what you need to get him to support this from the Pixar angle." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections ##3 and 26).

73 - 74.    In May 2010, Mahabub and GenAudio created an investor presentation that was emailed to investors; during the presentation, Mahabub falsely stated that "the CEO of the LCEC finally met with senior marketing and technical management and we have the green light to move forward."; The presentation and email also discussed GenAudio's 2010 Offering and encouraged investors to review the PPM and attached valuation report. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections ##5 and 27).  Mahabub reasonably believed his statement about the LCEC's CEO was true. *See* SOF ¶ 131, 134, 136-138, 140-146.

75.    On July 2, 2010, Mahabub emailed the GenAudio Team false and altered emails that made it appear that Jobs wanted to meet with Mahabub and Jobs was involved in evaluating GenAudio's technology. *Compare* Ex. 64 to Ex. 65; *see also* Demo. at 15-17. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections ##3 and 28).

76-77:  Undisputed.

78.     Apple never told Mahabub or GenAudio that it planned to incorporate GenAudio's technology in any of its new product roll-outs. **Response:** Disputed on the basis the evidence is inadmissible.  (See Objections #2).  Mahabub testified he spoke with Tiscareno regarding a Christmas product roll-out. Ex. 150, Mahabub Dep. 143:24-144:33, 310:21-311:11; *see also* SOF ¶ 124.

79.     Apple never indicated that it was interested in licensing GenAudio's technology or acquiring GenAudio or GenAudio's technology. **Response:** Disputed on the basis the evidence is inadmissible.  (See Objections #1).  Mahabub testified he had a conversation with Isaac about licensing.  Ex. 150, Mahabub Dep. 95:9-97:16.  Mahabub also reasonably believed for *many* reasons that Apple was interested in acquiring its technology.  *See, e.g.,* SOF ¶¶ 109, 110, 111, 118, 124, 127, 128, 130, 131, 134-158.

80.     Apple and GenAudio had no negotiations about Apple licensing GenAudio's technology or acquiring GenAudio or its technology. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections ##1 and 2).  Mahabub testified he had conversations with Tiscareno and Isaac regarding licensing and product rollout.  Ex. 150, Mahabub Dep. 95:9-97:16, 143:24-144:33, 310:21-311:11; *see also* SOF ¶ 124 (Mahabub sending negotiation emails to Apple); Tiscareno and Isaac never told Mahabub they would not be the ones to negotiate any deal with GenAudio.  SOF ¶¶ 128, 129.

81.     On December 16, 2009, Apple employee Hailey responded to the November 28, 2009 email from Mahabub referencing a potential "deal" between Apple and GenAudio, and stated, in part, "[w]e're making progress and building our story, but this is not something we can execute overnight. The business side of things would come into play after we have exec buy-in on the product side." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #29).

82.     On January 5, 2010, Hailey responded to an email from Mahabub and informed him that "[w]ith respect to timeframe, we are pretty serious about looking at audio quality across the board and this will take time – definitely more than a couple of months." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #30).

83.     On September 25, 2009, GenAudio held a telephonic meeting of the Board and during the meeting, Mahabub "noted that a deal with Apple is highly probable based on the many meetings and Apple's responses to date." **Response:**   Disputed on the basis the evidence is inadmissible.  (See Objections #31).

84.     Undisputed.

85.     Following this November 9, 2009 email, Mahabub, with the assistance of Mattos, began selling Mahabub's personal shares of GenAudio to investors. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #32).

86.     GenAudio and Mahabub sent prospective investors a March 15, 2010 letter, in the 2010 Offering Materials, that represented, "[t]his offering is being conducted to provide bridge capital until we can 'ink' a deal with a large consumer electronics company (referred to as the 'LCEC' throughout the PPM)...." **Response:**  Disputed that it was sent to prospective investors as the letter is addressed only to current shareholders to secure bridge capital.  Ex. 14.

87.     Undisputed.

88 - 89.      Each of the Statements of Fact in paragraphs 88 – 89 rely on an inadmissible unauthenticated letter and are thus disputed on the basis the evidence is inadmissible.  (See Objections #33).

90.     On September 6, 2010, Mahabub sent an email to two Board members, representing that he was forwarding "my latest cattle prod to Vic and Apple" and forwarding an email that Mahabub altered to make it appear as if he had strenuously pushed Tiscareno to "ink" a deal with

Case 1:15-cv-02118-WJM-SKC   Document 60   Filed 04/28/17   USDC Colorado   Page 16 of 41

GenAudio.  **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections ##3 and 34).

91.     On or about September 23, 2010, Mahabub attended a demonstration at Apple with Dr. Andrew Bright, who was an Apple employee with a Ph. D. in Acoustics, Tiscareno, and Isaac. **Response:** Disputed on the basis the evidence is inadmissible.  (See Objections #35).

92.     The meeting did not go well due to an argument between Mahabub and Bright, and was Mahabub's last substantive meeting with Apple.  **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections ##1 and 2).  Disputed that it was Mahabub's last substantive meeting with Apple.  The meeting was not Mahabub's last substantive meeting with Apple.  Mahabub continued to work substantively with both the iPhone/iPod/iPad division and the Mac division, and had many more substantive discussions with them in-person, by email, and by phone.  SOF ¶¶ 110, 156, 157, 159-161.

93.     Undisputed.

94.     On or about December 8, 2010, GenAudio sent investors a letter that was drafted and electronically signed by Mahabub and in a section entitled "The LCEC," stated, in part, "I met with their CEO and gave him a demo of our technology, and he stated, "I really like your technology and look forward to seeing you again in the future. Although they are moving very slow, we are still on their radar screen, and remain very optimistic for a deal in the second or third quarter of 2011." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #36).  Ex. 74 is not a December 8, 2010 letter sent to investors by GenAudio.

95.     Mahabub has admitted the statement was false. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #1 and 2).  Ex. 74 is not a December 8, 2010 letter sent to investors by GenAudio.  Misstates Mahabub's testimony on this document.  Also, in the cited testimony, Mahabub was only addressing whether he ever met with Steve Jobs.  He did not

testify as to whether anything else in the referenced statement was accurate, and in particular he did not admit the statement that GenAudio remains "very optimistic . . ." was false.

96.     On or about February 26, 2011, GenAudio sent investors a letter that was drafted and electronically signed by Mahabub and claimed that GenAudio, "will continue to support the development efforts with the LCEC with the hope that it will lead to a major transaction for GenAudio and its shareholders in the not so distant future." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #37).

97.     GenAudio and Mahabub also stated in the February 26, 2011 letter that "If you are one of our accredited investors and would like to discuss a follow-on investment in the company, please feel free to contact me directly.... While we cannot make any guarantees, we are very confident this will be the last money raised before achieving self-sustaining revenues given our inked revenue generating license deals, near-term licensing potential deals, and upcoming massive global branding." *Id*. at GA005337. **Response:**  Disputed on the basis the evidence is inadmissible. (See Objections #37).

98.     On March 29, 2011, GenAudio and Mahabub, through Mattos, sent GenAudio's investors a letter that stated that GenAudio would be signing a new set of "evaluation and development" agreements with the LCEC, which would "completely prohibit" Mahabub and GenAudio from disclosing any further information about the LCEC, or even using the term "LCEC." The email concluded: "Believe me when I tell all of you that I wish I could disclose what is going on, however, the fact of the matter is I cannot." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #38).

99.     Beyond the July 2009 NDA, GenAudio never entered into any agreements with Apple. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #1).

///

///

100.    On April 22, 2011, GenAudio sent investors the 2011-2012 Offering materials, which omitted information about Apple or "the LCEC." **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #39).  Ex. 15 is not 2011-2012 Offering materials.

101.    Between November 2009 and April 2012, GenAudio and Mahabub did not inform investors that Mahabub's substantive communications with Apple personnel were almost always limited to mid-level engineering and marketing employees. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections ##1-3 and 12-16).  Mahabub met with some senior Apple personnel.  Mahabub also reasonably believed Tiscareno was a senior Apple employee. SOF ¶¶ 153, 154.

102.    Between November 2009 and April 2012, GenAudio and Mahabub did not inform investors that Apple and GenAudio had no negotiations to license GenAudio's technology or to acquire GenAudio or its technology. **Response:**   Disputed on the basis the evidence is inadmissible.  (See Objections ##1 and 2).  *See* response to SOF ¶¶ 78-80.

103.    Between November 2009 and April 2012, GenAudio and Mahabub did not inform investors that Apple never told Mahabub or GenAudio that it planned to incorporate GenAudio's technology in any of its new product roll-outs. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #2).  *See* response to SOF ¶ 78.

104.    Between September 2010 and April 2012, GenAudio and Mahabub did not inform investors that in September 2010, Mahabub conducted a demonstration to Apple personnel that went poorly. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections ##1 and 2). Ex. 15 is not 2011-2012 Offering materials.

105.    Investors received and reviewed GenAudio's Offering Materials. **Response:** Disputed on the basis the evidence is inadmissible.  (See Objections ##1 and 2).

106.    GenAudio's and Mahabub's shareholder updates were important to investors. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #1).

107.    Investors purchased shares from Mahabub and GenAudio based on representations about Apple's alleged dealings with GenAudio, including Mahabub's oral representations. **Response:**  Disputed on the basis the evidence is inadmissible.  (See Objections #2).

### III.    GENAUDIO'S STATEMENT OF ADDITIONAL DISPUTED FACTS

108–166: Mahabub adopts and incorporates GenAudio's additional disputed facts by reference herein. Paragraphs 167 through 180 are intentionally omitted by Defendants.

### IV.    MAHABUB'S STATEMENT OF ADDITIONAL DISPUTED FACTS

181.    With one possible exception, the "GenAudio Team Emails,"[3] the emails that Mahabub sent out detailing his communications and interactions with Apple, were sent only to GenAudio Team members. The exceptions were sent to people "who [Mahabub] was interested in soliciting to join the board of directors." "GenAudio Team" members, as used in this context, means GenAudio employees, full-time consultants, and board members. SOF ¶¶ 57–60, 63, 67–68, 72, 75 (referring to recipients of these emails as the "GenAudio Team Mahabub Decl. ¶¶ 7–8; Ex. 87 (Mahabub Depo. Vol. 1) 60:17–24, 61:5–17.

182.    The only exception the SEC identified is Exhibit 40, which Mahabub also forwarded to Skluzak. Mahabub Decl. ¶ 8; Ex. 40 at 1. *See also* SOF ¶¶ 209-12 (addressing Skluzak).

183.    The GenAudio Team Emails were not intended to be distributed beyond internal team members. *I.e.*, they were confidential. Mahabub Decl.  ¶¶ 12–15; Ex. 87 (Mahabub Depo. Vol. 1) 65:5–9.

184.    The GenAudio Team knew they were not supposed to forward the GenAudio Team Emails to anyone else. Mahabub Decl. ¶¶ 12–15; Ex. 40 at 1, 2 ("You must delete this

---

[3] Exhibits 8, 9, 10, 40, 42, 44, 46, 47, 49, 51, 57, 60, 61, 64, and 73.

email after you read it" and "DELETE THIS EMAIL AFTER YOU READ IT – DO FOLLOW MY INSTRUCTIONS").

185.     None of the GenAudio Team Emails ask, or suggest, that the recipients forward the emails to people outside the GenAudio team, including potential investors. Exs. 8, 9, 10, 40, 42, 44, 46, 47, 49, 51, 57, 60, 61, 64, 73.

186.     With the possible exception of Exhibit 40,[4] the MSJ does not identify any occasion where any recipient of Mahabub's GenAudio Team Emails forwarded the emails to non-team members or potential investors. SOF ¶¶ 43, 57–60, 63, 67–69, 72, 75.

187.     With the possible exception of Skluzak's purchase of GenAudio stock (SOF ¶ 70), the MSJ does not identify any GenAudio stock purchases that it alleges were based on the GenAudio Team Emails. SOF ¶¶ 43, 57–60, 63, 67–69, 72, 75.; Exs. 8, 9, 10, 40, 42, 44, 46, 47, 49,51, 57, 60, 61, 64, 73.

188.     Mahabub is not aware of any instance where a recipient of the GenAudio Team Emails purchased GenAudio stock based on the emails or their contents. Mahabub Decl. ¶ 19.

189.     Nor did Mahabub intend for anyone to invest based on the contents of the GenAudio Team Emails. Mahabub Decl. ¶¶ 9, 20.

190.     The MSJ does not allege that any of Mahabub's recipients of the GenAudio Team Emails forwarded the emails to anyone who was not a member of the GenAudio Team.[5] SOF ¶¶ 57–60, 63, 67–68, 72, 75 (referring to recipients of these emails as the "GenAudio Team").

191.     With the exception of Exhibits 8, 9, and 10, Mahabub's primary purpose in sending the GenAudio Team Emails was to keep the GenAudio Team motivated during a

---

[4] As noted, on page 1 of Exhibit 40, Skluzak forwarded this email to Tiscareno on October 30, 2013. However, Skluzak's purpose in forwarding the email was not to encourage Tiscareno to invest in GenAudio.

[5] While Skluzak received Exhibit 40 (see MF 68), that email was forwarded by Mahabub himself, not one of the email recipients. And, while Skluzak allegedly forwarded the email to Tiscareno, this occurred much later, in October 2013. Ex. 40 at 1.

difficult, and exhausting, start-up stage and software development process. Mahabub Decl. ¶¶ 9–10; SOF ¶ 44.

192.    During the 2009 to 2012 timeframe, GenAudio, like most tech sector start-ups, was characterized by a high stress work-environment. High turnover and low morale were constant problems. These problems were exacerbated by (as is typical at many start-ups) inconsistent payment of wages. Mahabub Decl. ¶ 10.

193.    It is common in the software development industry to go to great lengths to motivate employees. Mahabub Decl. ¶ 11.

194.    With the exception of Exhibits 8, 9, and 10, the MSJ does not allege that any of the GenAudio Team Emails contain requests to GenAudio employees from Mahabub for help finding investors. SOF ¶¶ 11–12.

195.    When a GenAudio Team member knew someone who might be interested in purchasing GenAudio stock, the company's standard practice was to have the team member tell the potential investor to contact Mahabub or Mattos, who would provide the potential investor with the company's investment materials. Mahabub Decl. ¶¶ 18, 20; Ex. 87 (Mahabub Depo. Vol. 1) 183:1–18 (this was the company's "modis [sic] operandi").

196.    None of the GenAudio Team Emails ask the recipients to forward them to potential investors. Exs. 8, 9, 10, 40, 42, 44, 46, 47, 49, 51, 57, 60, 61, 64, 73.

197.    Mahabub did not intend or anticipate that the recipients of the GenAudio Team Emails to forward them to potential investors. Mahabub Decl. ¶ 13.

198.    With the possible (and disputed) exception of Skluzak's receipt of Exhibit 40,[6] Mahabub was not aware, at the time, of any instance where a member of the GenAudio Team forwarded one of the GenAudio Team Emails to a potential investor. Mahabub Decl. ¶ 15.

_____

[6] While Skluzak may have received Exhibit 40, Defendants dispute that this was related to the sale of securities.

199.      The GenAudio Team Emails were internal corporate communications. Mahabub Decl. ¶ 13.

200.      The GenAudio Team Emails were not distributed to the public or included among materials provided to potential investors in the 2010 Offering or the 2011-2012 Offering. Mahabub Decl. ¶ 16.

201.      Apart from Exs. 8, 9, and 10, the MSJ does not identify any GenAudio Team Email where Mahabub asks for help finding investors from the GenAudio Team. SOF ¶¶ 11, 12, 57–60, 63, 67–68, 72, 75.

202.      None of the GenAudio Team emails ask the recipients to invest in GenAudio. Mahabub Decl. ¶¶ 17–18; Ex. 87 (Mahabub Depo. Vol. 1) 182:14–183:20 (re Ex. 10, requests for help with financing meant, if team members knew any investors who might be interested in GenAudio, Mahabub and/or Mattos would like to talk to them).

203.      Nothing in Exhibits 8, 9, and 10 asked GenAudio Team members to personally invest in GenAudio. Mahabub Decl. ¶ 18; Exs. 8, 9, and 10; Ex. 87 (Mahabub Depo. Vol. 1) 182:14–183:20 (re Ex. 10, requests for help with financing meant, if team members knew any investors who might be interested in GenAudio, Mahabub and/or Mattos would like to talk to them).

204.      Mahabub believed all the optimistic representations in Exhibits 8, 9, and 10 at the time he made them. Those statements, concerning his beliefs regarding the value of an investment in GenAudio, that the SEC highlights in Exhibits 8, 9, and 10 accurately reflected Mahabub's opinions at the time he sent these emails. Mahabub Decl. ¶¶ 21–23; Ex. 8 at 2; Ex. 9 at 1; Ex. 10 at 1..

205.      The alterations that the SEC highlighted in the forwarded email in Ex. 10 (see MF 45) were not included in the original email that Mahabub sent to Tiscareno et al. Nonetheless, they were understood by Mahabub to be factually accurate and reflected other conversations

Mahabub had with Tiscareno and other Apple employees. Mahabub Decl. ¶ 23; Ex. 10 at 1; Ex. 83 at 8.

206.     Nothing in Exhibits 8, 9, and 10 asked GenAudio Team Members to convey information concerning a possible deal between GenAudio and Apple to potential shareholders. Exs. 8, 9, 10.

207.     Exhibits 8 and 9 do not contain any altered correspondence between Mahabub and Apple employees. Mahabub Decl. ¶ 22; Exs. 8, 9.

208.     While Exhibit 10 contains altered correspondence from Mahabub to Apple employees, the alterations appear within Mahabub's correspondence to Apple employees. Exhibit 10 does not contain any correspondence from Apple employees to Mahabub. Mahabub Decl. ¶ 23; Ex. 10.

209.     Skluzak decided to invest in GenAudio in April, 2010, well before he received Ex. 40 on May 6, 2010. Ex. 85 (Skluzak Depo.) 58:3–60:5.

210.     Skluzak testified that he did not rely upon Exhibit 40 when choosing to invest in GenAudio. Ex. 85 (Skluzak Depo.) 61:21–62:10.

211.     Mahabub's intent in sending Ex. 40 to Skluzak was in furtherance of his attempts to get Skluzak to join GenAudio's board of directors, not to induce Skluzak to purchase any GenAudio stock. Mahabub Decl. ¶ 8; Ex. 87 (Mahabub Depo. Vol. 1) 60:17–24, 61:5–17.

212.     Mahabub wanted Skluzak on GenAudio's board because of Skluzak's business experience and track record. Mahabub Decl. ¶ 8.

213.     Mattos communicated with potential investors (friends and family) by phone or by email. Ex. 86 (Mattos Depo.) 29:11–13. If by phone, no notes. Id. at 29:14–19. If by email, he used his GenAudio email, which he produced to the SEC. Id. at 29:25–30:6.

///

///

214.     In its MSJ, the SEC did not produce any evidence that Mattos ever actually forwarded one of the GenAudio Team internal emails to potential investors, or communicated any of the facts within them to potential investors. SOF ¶¶ 5–6, 10–11, 43–44, 57–60, 68, 72, 75.

215.     All of the GenAudio Team Emails were sent while the NDA between Apple and GenAudio was in effect. Mahabub Decl. ¶ 14; Ex. 84 (NDA).

216.     Pursuant to the NDA, "Confidential Information" includes information concerning "the nature of [the parties'] business relationship, including, if applicable, the fact that one party provides or may provide goods or services to the other, and the parties' discussions concerning the "Project." Further, "Project" is defined as GenAudio's "AstoundSoundTM and AstoundStereoTM software processing for integration into Apple products." Ex. 84 at ¶ 1.

217.     Each of the GenAudio Team Emails concerned the business relationship between GenAudio and Apple; the possibility that GenAudio might provide goods or services to Apple, and/or the integration of GenAudio's software into Apple products. Mahabub Decl. ¶ 13; Exs. 8, 9, 10, 40, 42, 44, 46, 47, 49, 51, 57, 60, 61, 64, 73.

218.     Mahabub had personal relationships with many investors, and knew them to be accredited. Mahabub Decl. ¶ 5.


## V.     ARGUMENT

### A.     Mahabub Incorporates the arguments contained in GenAudio's Opposition

Mahabub incorporates all of GenAudio's arguments, as made in their concurrently filed Opposition (Dkt. No. 58), herein. The arguments below represent additional reasons why the Court should deny the SEC's MSJ.

///

///

**B.      The Motion for Summary Judgment should be denied because the SEC fails to meet their burden of producing admissible evidence**

Before even considering Defendants' evidence and other arguments, the Court should deny the MSJ for the simple reason that the SEC failed to comply with the most rudimentary of requirements expected of a party moving for summary judgment. Namely, almost half of the SEC's facts are not supported by admissible evidence. Federal Rule of Civil Procedure 56 requires the moving party to show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). As the Supreme Court explained:

> The burden of production imposed by Rule 56 requires the moving party to make a prima facie showing that it is entitled to summary judgment. [Citation.] The manner in which this showing can be made depends upon which party will bear the burden of persuasion on the challenged claim at trial. If the _moving_ party will bear the burden of persuasion at trial, that party must support its motion with credible evidence – using any of the materials specified in Rule 56(c) – that would entitle it to a directed verdict if not controverted at trial.

_Celotex Corp. v. Catrett_, 477 U.S. 317, 331 (1986) (emphasis added). Here, as required by Rule 56, the SEC was obligated to support its factual assertions through evidence, such as, e.g., "depositions, documents, … [or] declarations…." Rule 56(c)(1)(A).

Additionally, the evidence must be properly authenticated. _E.g., Broadband Mgmt. Solutions, LLC v. Dish Network Serv., L.L.C._, No. 04-cv-01489-EWN-BNB, 2006 U.S.Dist. LEXIS 8695, at *10 (D. Colo. Feb. 16, 2006) (citing _Orr v. Bank of Am., NT & SA_, 285 F.3d 764, 774 (9th Cir. 2002); Fed. R. Evid. 901(b); Fed. R. Civ. P. 30(f)(1), 56(e)) (denying motion for summary judgment when deposition extracts were not properly authenticated by naming "the deponent and the action and includ[ing] the report's certification that the deposition is a true record of the testimony of the deponent."). _See also Republic W. Ins. Co. v. Fireman's Fund Ins. Co._, 241 F.Supp.2d 1090, 1095 (N.D. Cal. 2003) (emphasis added) ("Generally, as provided by Rule 56, Fed. R. Civ. P., only admissible evidence may properly be considered by the trial court

in granting summary judgment. [Citation.] Properly authenticated documents, including discovery materials, although such documents may not be admissible in that form at trial, can be used in a motion for summary judgment <u>if appropriately authenticated by affidavit or declaration</u>.").[7]

Here, and as addressed thoroughly in the concurrently filed Objections, many of the SEC's exhibits, including most of the investigative testimony and deposition transcripts, are inadmissible because they were not properly authenticated. *See, e.g.,* Objections 1–2. In total, more than 50 of the SEC's 107 "facts" are unsupported by admissible evidence.

Nor can the SEC rely upon Defendants' correctly authenticated evidence. As noted by the Supreme Court in *Celotex*, the "initial burden of production" always lays with the moving party. *Celotex*, 477 U.S. at 330. And, this burden must be satisfied before the court considers which party has the most persuasive evidence. *Id.* at 330–31 ("The court need not decide whether the moving party has satisfied its ultimate burden of persuasion unless and until the court finds that the moving party has discharged its initial burden of production."). Therefore, the SEC's MSJ should be summarily denied.

### C.   Mahabub's internal GenAudio Team Emails did not violate § 10(b) of the Exchange Act or Rule 10b-5

The Court should deny the MSJ (in addition to the reasons cited in GenAudio's Opposition) because the SEC fails to satisfy its burden of showing a violation of Exchange Act § 10(b) and Rule 10b-5.[8] In particular, the SEC fails to show that, in the internal GenAudio Team

---

[7] Likewise, Defendants may rebut the SEC's factual allegations simply by "showing … that an adverse party cannot produce admissible evidence to support the fact." Rule 56(c)(1)(B). *See also James v. Wadas*, 724 F.3d 1312, 1319–20 (10th Cir. 2013) (quoting *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005)) ("Mere allegations unsupported by further evidence … are insufficient to survive a motion for summary judgment.").

[8] Codified as 15 USC § 78j(b) and 17 C.F.R. § 240.10b-5(b), respectively.

Emails, Mahabub and GenAudio made misrepresentations or omissions that were: (1) in connection with the purchase or sale of securities; (2) material facts, (3) made with scienter.[9]

> **1.    The GenAudio Team Emails were not in connection with the purchase or sale of securities because they were not communicated to potential investors and they did not cause any securities transactions**
>
> > **a.    The internal GenAudio Team Emails were not communicated to potential investors**

At the outset, the SEC provides the wrong rule for determining whether the internal GenAudio Team emails satisfy the "in connection with" requirement. The SEC claims it must merely show that the purported misrepresentations were made to induce a purchase of securities or, more broadly, "any fraud that 'coincide[s] with a securities transaction.'" MSJ at 33. The SEC relies on *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008).[10] However, that broad rule is limited to cases involving "documents publicly available to investors." *Wolfson*, 539 F.3d at 1262. "<u>In such cases</u>, the SEC need only show that the documents are reasonably calculated to influence investors, and that the misrepresentations are material to an investor's decision to buy or sell the security." *Id.* (emphasis added). The rationale behind the looser standard is clear: when documents are publicly, and widely, available, it seems fair to presume that they influenced investors. Because the SEC fails to establish that the GenAudio Team Emails were publicly available to investors,[11] they cannot avail themselves of this lenient rule.

The rule is different when, as here, the purported false statements appear in internal corporate communications, rather than widely disseminated documents: The SEC must show that the defendant "knew or should have known that his representation would be communicated to

---

[9] For purposes of this issue, and except as noted *infra*, Defendants do not dispute that at least some of the at-issue emails contained misrepresentations or omissions and were made by means of interstate commerce.

[10] The SEC quotes *SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012), which in turn quotes *Wolfson*, 539 F.3d at 1262. (MSJ at 33.)

[11] SOF ¶¶ 186, 190, 200.

investors because 10(b) and Rule 10b-5 focus on fraud made 'in connection with the sale or purchase' of a security." *Anixter v. Home-Stake Prod. Co*, 77 F.3d 1215, 1226 (10th Cir. 1996) (rule applied to an accountant); *SEC v. Nacchio*, 438 F. Supp. 2d 1266, 1281 (D.C.Col. 2006) (rule applied to corporate employee). *See also SEC v. Delphi Corp.*, No. 06-14891, 2008 U.S.Dist. LEXIS 78671, at *22–23 (E.D. Mich. Oct. 8, 2008) (rule applied to a corporate director).[12] Here, this rule applies because the facts show the GenAudio Team Emails were not publicly disseminated. Specifically, the GenAudio Team Emails: were all sent to members of the "GenAudio Team," (*i.e.*, employees, full-time consultants, and board members) (SOF ¶ 181);[13] were intended to be confidential and not shared beyond members of the GenAudio Team (SOF ¶¶ 183–86); and, because the emails concerned the business relationship between GenAudio and Apple and/or the integration of GenAudio's software into Apple products, and forwarding them to non-team members would violate the NDA with Apple, it would be unforeseeable that any member of the GenAudio Team would do so. SOF ¶¶ 215–17. Indeed, with the possible exception of Skluzak, the SEC fails to allege that any non-team member saw one of the GenAudio Team Emails, or any instance where a GenAudio Team member forwarded one of the emails outside the company.[14] Therefore, because the emails were not publicly disseminated, the

---

[12] As with the laxer rule applied to public communications, the rationale behind this standard is clear. If the SEC's preferred "coincides with" standard applied, then any non-closely-held company would be unable to effectively communicate with their employees, lest they risk securities liability by misrepresenting, or omitting, anything—and for any reason—to employees during a time period that "coincide[s] with a securities transaction." *Wolfson*, 539 F.3d at 1262. Publicly-traded companies, in particular, would be subject to almost-constant liability.

[13] The only exception identified by the SEC is Ex. 40, which Mahabub forwarded to Skluzak. Ex. 40 at 1. *See* SOF ¶¶ 209–212. However, as discussed below, the email, as applied to Skluzak, was likewise not related to the purchase or sale of securities.

[14] While some GenAudio Team members may have invested in the company, and therefore might be considered "investors," the SEC has failed to tie any sales of GenAudio shares to the emails, let alone sales to GenAudio Team members. SOF ¶ 187; SOF ¶¶ 209–10 (Skluzak did not rely upon Ex. 40). Nor is Mahabub aware of any such purchases. SOF ¶¶ 188–89.

SEC must establish, as a matter of law, that Defendants knew or should have known that the emails would be communicated to investors. Since they cannot do so, the MSJ should be denied.

The SEC's arguments are unconvincing. First, the SEC posits that emails to GenAudio Team members were "in connection with" a securities transaction because Mahabub encouraged employees to assist GenAudio in raising funds. MSJ at 34 (citing SOF ¶¶ 10–13). This argument fails because it misses the point: The standard is whether Defendants knew or should have known that internal communications would be "communicated to investors," not potential investors. *Anixter*, 77 F.3d at 1226. This is an important distinction; reading "potential" into the rule would nullify the requirement, as anyone with a dollar to their name is a potential investor. Therefore—and particularly in the context of summary judgment—the SEC must show more. The fact that the MSJ does not tie any sale of stock to the emails strongly evinces that they were not communicated to investors and, therefore, Defendants could not have known that they would be. SOF ¶ 187.

Second, the SEC argues that the GenAudio Team Emails were seen by investors because most were sent to (among others) Mattos, a GenAudio employee "whose primary duties included raising money for GenAudio from investors, as well as GenAudio Team members who were also investors." MSJ at 34 (citing SOF ¶¶ 5–6, 10–11, 43–44, 57–60, 68, 72, 75). However, none of the cited facts show that Mattos forwarded any of these emails (which contained confidential information covered by the NDA)[15] to investors.[16] Additionally, none of the facts cited by the SEC shows that Mattos solicited fellow employees—all they have are unreasonable inferences.

---

[15] SOF ¶ 215–17.

[16] The SEC overstates Mattos's involvement in soliciting new investors. Mahabub, not Mattos, was primarily responsible for bringing in new shareholders. Response to SOF ¶ 6. When Mattos did communicate with potential investors, he did so by phone or through his GenAudio email address—which he produced to the SEC. SOF ¶ 213 Given that the SEC failed to cite to any instance where Mattos forwarded one of the GenAudio Team Emails to a potential investor, this is strong evidence rebutting the SEC's assertion. SOF ¶ 214.

And, more to the point, the SEC presents no evidence that Mattos used any of the GenAudio Team Emails to solicit fellow employees.

> **b.     There is no causal connection between the misrepresentation and any purchase or sale of securities**

The SEC also fails to meet its burden because, in the Tenth Circuit, "in connection with" requires "a causal connection between the allegedly deceptive act or omission and the alleged injury." *Arst v. Stifel, Nicolaus & Co.*, 86 F.3d 973, 977 (10th Cir. 1996). *See also Wolfson*, 539 F.3d 1249, 1262 (10th Cir.  2008) (quoting same). This is true of both private lawsuits, like in *Arst*, and public enforcement suits brought by the SEC. *Wolfson*, 539 F.3d at 1262 (quoting *Arst*, 86 F.3d at 977) (SEC must show "a causal connection between the allegedly deceptive act or omission and the alleged injury").

Put simply, this matter is unsuitable for summary judgment because the SEC has provided no evidence that the GenAudio Team Emails caused anyone to purchase shares. With one possible exception, the SEC failed to even attempt to tie any purchase of GenAudio stock to the emails. SOF ¶¶ 187–90, 209–214. Without that, the SEC cannot establish, as a matter of law, that the emails caused any purchases, and hence were in connection with securities transactions.

Further, the sole exception, where the SEC strives to tie the purchase of shares by Skluzak in connection with his receipt of Exhibit 40, does not amount to much. SOF ¶¶ 69–71. Skluzak testified that he did not rely upon that email when choosing to invest in GenAudio. SOF ¶ 210. In response, the best the SEC could do pry from Skluzak is an acknowledgment that his receipt of Exhibit 40 "affirmed" his willingness to purchase GenAudio stock. SOF ¶ 71. This vague, confusing language does not rebut Skluzak's clear, prior testimony. The SEC therefore fails to establish a causal connection.

Additionally, Skluzak's vague testimony that the email "affirmed" his willingness to invest is insufficient because it does not establish that Skluzak purchased his shares before receiving Exhibit 40. SOF ¶ 71. *See also* SOF ¶ 209 (Skluzak decided to invest in April 2010,

while he received Exhibit 40 in May). To be in connection with a securities transaction, the alleged fraud must be conterminous with the transaction. *E.g., Arst*, 86 F.3d at 977.[17] *See also Seattle-First Nat'l Bank v. Carlstedt*, 678 F.Supp. 1543, 1547–48 (W.D. Okla. 1987) (collecting cases) ("Activities that occur after a plaintiff's purchase of a security cannot form the basis for liability under Rule 10b-5"). Here, the best testimony the SEC could adduce from Skluzak was that the email "affirmed" his purchase. SOF ¶ 71. Even ignoring Skluzak's clear testimony that he did not rely on Exhibit 40, the SEC's evidence is insufficient to establish a causal connection. A jury could find that the transaction occurred prior to his receipt of Exhibit 40, and that no other factors existed that suggest that Exhibit 40 played any meaningful role in Skluzak's purchase.[18]

Finally, as to all the GenAudio Team Emails, causation cannot be established as a matter of law, because the evidence shows that Mahabub (and therefore GenAudio) did not intend for the emails to induce any securities transactions. As to team members' receipt of the emails, the SEC apparently does not dispute that Mahabub's intent in sending these emails was not to induce investments, but to keep the GenAudio team motivated. *See* SOF ¶ 44 (characterizing Mahabub's motive as attempts to "entice" or "inform"); *id.* ¶¶ 191–93. And, as to Skluzak, Mahabub testified that his intent behind sending Exhibit 40 was to convince Skluzak, a seasoned investor, to serve on GenAudio's board. SOF ¶¶ 211–12. Based on these facts, a jury should find that there is no causal connection.

---

[17] In *Arst*, the Tenth Circuit affirmed summary judgment in favor of the <u>defendant</u> when the evidence showed that the allegedly deceptive conduct "occurred *after* the sale" of securities. *Id.* at 977. The court reasoned: "Since Defendants' allegedly deceptive conduct could not have had an impact on Arst's decision to sell his shares, Defendants' conduct was not 'in connection with' the purchase or sale of a security [under] § 10(b)." *Id.* at 977.

[18] The SEC failed to establish that Skluzak, e.g., had a right to rescind the purchase, had not yet signed or submitted all relevant documents, or had not yet paid for his shares.

### 2.     The GenAudio Team Emails did not contain any material misrepresentations or omissions

The standard for materiality is "if a reasonable investor would consider it important in determining whether to buy or sell stock." *SEC v. C. Jones & Co.*, 312 F.Supp.2d 1375, 1379 (D. Colo. 2004) (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)). As to the GenAudio Team Emails, the SEC simply states, with scant analysis: "Given that Mahabub felt he had to lie to influence the GenAudio Team; [sic] it's only logical that the embellishments were also of great consequence to GenAudio's much-needed investors." MSJ at 31.[19]

The terseness of the SEC's argument underscores its weakness. It unreasonably presumes that any misrepresentation, for any purpose, is material for securities purposes. One does not necessarily follow the other.

Nor does the SEC's lone cite, to *SEC v. DiMaria*, No. 1:15-CV-7035-GHW, 2016 U.S.Dist. LEXIS 125694, at *20 (S.D.N.Y. Sept. 15, 2016), support this argument. First, that case involved a motion to dismiss, which requires a much looser standard to overcome than the SEC must satisfy for summary judgment. *Id.* at *20–*21 ("At this stage in the litigation, the SEC is entitled to have the Court to draw all reasonable inferences in its favor…."). Second, that case involved misrepresentations the company made in an earnings release and a Form 10-Q, *i.e.*, publicly available documents targeted at investors. *Id.* at *12. While it may be reasonable to assume that anything in "publicly available documents targeted at investors" is material to investors, the same cannot be said for internal, confidential emails targeted at employees. SOF ¶¶ 183–86, 200, 217.

Put another way, the SEC's argument fails because what may be relevant to motivating employees at a startup is not, *ipso facto*, material to investors. Here, Mahabub's emails to

---

[19] The SEC also argues, more generally, that statements regarding Apple were material because they were important to GenAudio's success and "the risk and value of an investment" in the company. MSJ at 31. This argument is addressed fully in GenAudio's Opposition, and is incorporated herein by reference.

GenAudio Team members were intended to keep them motivated during a difficult, and exhausting, start-up stage. SOF ¶¶ 191–93. It is unlikely a reasonable investor would find it material, e.g., that "we have kept our focus on the 'Less Setting'" (Ex. 42 at 3) or that Mahabub sent an email to Phil Schiller. Ex. 10 at 1.[20] However, such facts might very well be relevant to stressed and overworked engineers who are unsure whether their work is being used and appreciated. Accordingly, the SEC fails to establish that the emails contain material misrepresentations.[21]

### a.   The optimistic statements in Exhibits 8, 9, and 10 are nonactionable puffery

The optimistic statements that the SEC relies on in Exs. 8, 9, and 10 are nonactionable puffery. SOF ¶ 11–12. "Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). Such "vague statements of corporate optimism are not materially misleading, as 'reasonable investors do not rely on them in making investment decisions.'" *SEC v. Nacchio*, 438 F.Supp.2d 1266, 1281 (D. Colo. 2006) (quoting *Grossman*, 120 F.3d at 1119).

Statements claiming that, e.g., someone would be "foolish" not to invest in GenAudio, (Ex. 8 at 2) or "[t]his should get things fired up and expedited to us inking a deal" (Ex. 10 at 1) fall into this category. Each is a "sincere statement of pure opinion [that] is not an 'untrue statement of material fact.'" *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S.Ct. 1318, 1327 (2015). Here, Mahabub honestly believed each of the representations when he made them. SOF ¶¶ 204–05, 208. Further, statements like the one in Exhibit 10, referring to "inking a deal" without providing specifics, were sufficiently vague that a reasonable

---

[20] Nor does the SEC establish that a reasonable investor would know, or care, who Schiller is.

[21] Similarly, because any related omissions in the email were not material, Defendants had no duty to speak. *See SEC v. Curshen*, 372 Fed. Appx. 872, 880 (10th Cir. 2010).

investor would not rely on them. *See id.* at 1328 n.8 ("We note, too, that a reasonable investor generally considers the specificity of an opinion statement in making inferences about its basis."). Therefore, they are immaterial and do not support the SEC's allegations.

The statements are also not actionable under the "bespeaks caution" doctrine. Such forward-looking representations are immaterial when the defendant provided "sufficiently specific risk disclosures or other cautionary statements … to nullify any potential misleading effect." *Grossman*, 120 F.3d at 1120. Here, the challenged statements in Exs. 8, 9, and 10 are forward-looking predictions about a possible deal, accompanied by language indicating that Mahabub was clearly casting recent updates in a positive light to motivate his team. And, the representations were couched in terms that made it readily apparent to all recipients that these views reflected Mahabub's own optimism and hopes. In Ex. 8, Mahabub acknowledges that "investing in GenAudio may be considered a 'high risk' or 'speculative deal.'" Ex. 8 at 3. In Ex. 9, Mahabub's statement is the definition of equivocal: "And someone would not want to invest at this stage in the game, or increase there [sic] shareholder position because why? <u>There is no answer to this question</u>…." Ex. 9 at 1 (emphasis added). And, in Ex. 10, Mahabub conditions his statements on his own optimism: "This is a very exciting time for the Company and for me personally, to ACTUALLY see my 20+ year continuous effort <u>hopefully</u> about to start paying off is Surreal [sic]." Ex. 10 at 1 (emphasis in original). No reasonable investor would rely upon these forward-looking statements (nor has the SEC adduced any evidence that any GenAudio Team member did). Thus, under the bespeaks caution doctrine, they cannot create liability.

### 3.    Any misrepresentations in the GenAudio Team Emails were not made with scienter

In the context of § 10(b), "'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud," or recklessness. *Hackbart v. Holmes*, 675 F.2d 1114, 1117 (10th Cir. 1982) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)). Because it concerns a mental state, "[s]ummary judgment is generally inappropriate … unless no reasonable

inference supports the adverse party's claim." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (§ 10(b) case). *See also Romero v. Union P. Railroad*, 615 F.2d 1303, 1309 (10th Cir. 1980) (issues of intent and motive are "particularly inappropriate for summary judgment").

Here, the court should deny the MSJ because a jury should conclude that Defendants lacked any intent to defraud investors. As previously noted, Mahabub's motive for sending the GenAudio Team Emails was to keep his team motivated. SOF ¶¶ 191–93.[22] Likewise, Mahabub forwarded the call transcription to Skluzak hoping to convince him to join GenAudio's board. SOF ¶ 211. The fact that the SEC fails to identify any transaction based upon the representations in the emails further evidences that Defendants did not act with the requisite intent. SOF ¶ 187. Nor is it sufficient, as the SEC attempts here, to accuse Defendants of hoping to bring in money to keep the company going. SOF ¶¶ 8–13. *See Burman v. Phoenix Worldwide Indus.*, 384 F.Supp.2d 316, 332 (D.D.C. 2005) (quoting *In re Interbank Funding Corp. Sec. Litig.*, 329 F.Supp.2d 84, 90 (D.D.C. 2004)) ("It is well-settled that 'motive-and-opportunity allegations of scienter anchored merely in a defendant's profit motive' are simply insufficient to survive a dismissal motion.").

Nor has the SEC established that Defendants were reckless, defined as "conduct that is 'an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Hackbart*, 675 F.2d at 1118 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1039–40 (7th Cir. 1977)) (emphasis added). Mahabub's conduct, meant to encourage stressed, potentially demoralized, employees, was understandable. SOF ¶¶ 191–93. Further, the SEC cannot plausibly establish there was a danger of misleading buyers or

---

[22] Notably, the SEC acknowledges that Mahabub feared that, one of the emails (Ex. 43), "without alterations, would not have kept the GenAudio Team motivated." (MF 44.)

sellers when, as here, they failed to identify any stock purchases that relate to GenAudio Team Emails. SOF ¶ 187.

### D.     The GenAudio Team Emails do not violate § 17(a)(2) of the Securities Act

The SEC's claims that Defendants violated § 17(a)(2) of the Securities Act fail because, as discussed *supra*, the emails were neither in connection with a securities transaction nor were any misrepresentations material.[23] Additionally, and for similar reasons, the SEC cannot establish negligence because they failed to show that the GenAudio Team Emails were the actual or proximate cause of any stock purchase. SOF ¶ 187.

### E.     Defendants did not engage in a fraudulent scheme

The SEC fails to satisfy its burden of establishing that, by sending altered emails to members of the GenAudio Team, Defendants violated the "scheme liability" provisions of Rule 10b-5(a) and (c) and Securities Act § 17(a)(1) and (3). MSJ at 36–37. Scheme liability cannot be established for three independent reasons.

First, this argument fails because, as explained *supra*, the SEC cannot show that the altered emails were (1) in connection with a securities transaction and (2) either made with scienter or negligence. *See SEC v. Sullivan*, 68 F.Supp.3d 1367, 1377 & n.9 (D. Colo. 2014) (citing *SEC v. St. Anselm Exploration Co.*, 936 F.Supp.2d 1281, 1298–99 (D. Colo. 2013)) (elements for scheme liability).

Second, the SEC's argument fails because "the conduct at issue must involve 'sham' or 'inherently deceptive' transactions." *SEC v. Lucent Techs., Inc.*, 610 F.Supp.2d 342, 360 (D.N.J. 2009).[24] Here, because the SEC has failed to tie any of the GenAudio Team Emails (which

---

[23] The "primary difference" between claims under § 10(b) and Rule 10b-5, compared to claims under § 17(a)(2) is that, rather than requiring scienter, § 17(a)(2) requires proof that a defendant acted negligently. *E.g., Smart*, 678 F.3d at 857.

[24] In *Lucent*, the underlying transactions involved a company's sale of telecommunications equipment. *Id.* at 345. The SEC alleged that the company improperly recognized and reported revenue related to the sales, thereby inflating the company's value. *Id.* In rejecting both scheme

include all of the altered emails) to any particular transactions, let alone any sham or deceptive ones, the SEC cannot meet its burden. SOF ¶ 187.

Third, the SEC's argument fails because it constitutes improper "double dipping." *Sullivan*, 68 F.Supp.3d at 1377. A party cannot prove scheme liability when the alleged acts constituting the scheme are "nothing more than a reiteration of the misrepresentations and omissions that underlies plaintiffs [sic] disclosure claim." *Lucent*, 610 F.Supp.2d at 361 (quoting *TCS Capital Mgmt. v. Apax Partners, L.P.*, No. 06-cv-13447, 2008 U.S.Dist. LEXIS 19854, *22 (S.D.N.Y. Mar. 7, 2008)).[25] That is exactly what the SEC does here, by alleging that, if Mahabub's altered emails and call transcript are not misrepresentations and omissions in violation of § 10(b) and Rule 10b-5, then they constitute a deceptive act subjecting Defendants to scheme liability. MSJ at 36–37. This is improper.

Acknowledging their myriad problems, the SEC asks the Court to consider the GenAudio Team Emails as separate deceptive conduct from the purported scheme to defraud. MSJ at 37 n.11. This likewise fails. First, the SEC "cannot breathe new life into defunct primary liability claims" by reframing alleged misrepresentations as deceptive acts. *Lucent*, 610 F.Supp.2d at 361 (denying scheme liability claims that were a rehash of § 10(b) claims). Second, it ignores the fact that, if the GenAudio Team Emails are removed, then all that is left to (potentially) constitute a scheme to defraud are the public documents. If there were the case, then the emails would not be

---

liability and direct liability under § 10(b) of the Exchange Act, the court noted that the sales were "legitimate business transactions" and distinguished it from a case where "the transactions themselves, which depended on a fiction that the invoices had value, were inherently deceptive." *Id.* at 360–61 (citing *In re Parmalat Sec. Litig.*, 376 F.Supp.2d 472, 504 (S.D.N.Y. 2005)).

[25] The SEC's theory of scheme liability is almost universally rejected: "A majority of the circuits and several district courts in the Tenth Circuit have drawn a 'bright line' between the types of conduct that satisfy claims made under the scheme liability framework and claims that a defendant made material omissions or misstatements actionable under § 17(a)(2) or Rule 10b-5(b)." *Sullivan*, 68 F.Supp.3d at 1377. Accordingly, "scheme liability encompasses only actions which include deceptive conduct <u>beyond assistance with</u> a material misstatement or omission." *Id.* (quoting *SEC v. Goldstone*, 952 F.Supp.2d 1060, 1203 (D.N.M. 2013)) (emphasis added).

"in furtherance of the scheme to defraud" (*Sullivan*, 68 F.Supp.3d at 1377) because the emails were directed at an entirely different audience—the GenAudio Team—than the public offerings. SOF ¶¶ 181–82. Because the target of the public offerings—the public—would not have seen the GenAudio Team Emails, the emails could not be in furtherance of, or "inherent to," any scheme to defraud them. *See Sullivan*, 68 F.Supp.3d at 1378 (citing *Lucent*, 610 F.Supp.2d at 360).

*Sullivan*, which involved a Ponzi scheme, is instructive. There, the SEC alleged that the defendant "committed six deceptive acts" in furtherance of the scheme. *Id.* at 1378. In its analysis, the court found that acts targeting the intended victims of the Ponzi scheme supported allegations of scheme liability, while acts that <u>did not</u> target the intended victims could not support liability. *Id.* at 1378–79. Acts that were "'inherently deceptive' conduct sufficient for scheme liability" included generating false reports that were distributed to investors and soliciting "investments in furtherance of the Ponzi scheme by insinuating that 'more money' would allow BPF to 'make more loans,' thus leading to higher investor pay-outs." *Id.* Conversely, acts that, while deceptive, were not aimed at furthering the Ponzi scheme could not support scheme liability. *Id.* at 1378 ("Although circumventing an SEC investigation and personally benefitting from the profits of a fraudulent scheme are dishonest actions, neither act clearly contributed to the operation of the underlying fraud.").

Here, while altering <u>internal, corporate</u> emails to keep employees motivated might be deceptive, it was not in furtherance of the alleged fraud committed in relation to public stock offerings. Therefore, the SEC cannot rely upon the GenAudio Team Emails to support their scheme liability theory.

*SEC v. Goldstone*, 2015 U.S.Dist. LEXIS 116847, at *976 (D.N.M. Aug. 22, 2015) likewise does not help the SEC. There, the court, in denying the <u>defendants'</u> motion for summary judgment, simply noted that "scheme liability does not preclude, outright, claims based upon a scheme to misrepresent or omit material facts." *Id.* at *978. That case does not dispute, or

conflict with, authorities holding that the allegations establishing deceptive conduct must be different from, or in addition to, those establishing liability for misrepresentations or omissions under § 10(b) or Rule 10b-5. Or, if it does, then *Goldstone* conflicts with the weight of authority holding otherwise—including a prior opinion in that same case. *See, e.g., Sullivan*, 68 F.Supp.3d at 1377 (citing *SEC v. Goldstone*, 952 F.Supp.2d 1060, 1203–04 (D.N.M. 2013)) ("[S]cheme liability requires deceptive conduct *in addition to* misrepresentations.").

### F.    Mahabub did not violate § 5

Plaintiff is using summary judgment to test the legal sufficiency of Defendants' affirmative defense on which Defendants bear the burden of proof at trial. Answer at p.35, Third Affirmative Defense.  Thus, in order for Plaintiff to satisfy its Rule 56 burden, Plaintiff must show an absence of evidence to support an essential element of Defendant's affirmative defense. *Fitzpatrick v City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993). In other words, Plaintiff must demonstrate the absence of evidence supporting applicability of the safe harbor provisions of Section 4(2) of the Securities Act of 1933 and Rule 506 of Regulation D for an issuer in a non-public offering of securities. Plaintiff has failed to carry this burden.

Plaintiff's only attempt at satisfying this burden is by way of ambiguous and inadmissible investor questionnaires and an out of context statement that actually bolsters Defendants reasonable reliance on applicability of the Rule 506 Reg. D exemption. See Responses to SOF ¶¶ 31-37. And importantly, it is only the reasonable belief of the issuer and not the actual status of the purchaser the court must consider when determining whether the exemption applies. *Anastasi v. American Petroleum Inc.*, 579 F.Supp. 273, 275 (D.Colo.1984). "Whether a security offer is a private offering is a question of fact which requires [the Court] to consider all surrounding circumstances, including the relationship between the offerees and the issuer, and the nature, scope, size, type, and manner of the offering. *Id*. at 274-75. But access to information is the most important factor. *Id*. Plaintiffs have failed to demonstrate an absence of evidence supporting

34

Defendants' affirmative defense and therefore have failed to carry its Rule 56 burden.

This is also true with regard to Mahabub's sales of his personal GenAudio stock holdings. Mahabub believed the investors were accredited because they were either previous investors in GenAudio and had submitted paperwork previously attesting to their accredited status, or else Mahabub had a personal relationship with the investor and knew them to be wealthy. See Response to SOF ¶ 16; SOF ¶ 218.  The SEC does not contradict either of these facts, and as such, a material issue of fact exists as to whether the investors were accredited, and/or whether an exemption to registration applied.

## VI.      <u>CONCLUSION</u>

Based on Mahabub's good faith and reasonable beliefs, genuine issues of fact exist regarding whether Mahabub (and GenAudio) had the requisite scienter in making statements to investors regarding discussions with Apple. The SEC's attempt to punish non-actionable puffing fails, and Mahabub's internal emails to his GenAudio team are not actionable because they are neither "in connection with" the purchase or sale of a security, nor are they material.

Plaintiff has failed to identify any "manipulative or deceptive act" other than alleged altered emails that also are asserted to be alleged fraudulent misrepresentations; Plaintiff tries to use the same fraudulent misrepresentation claim as a claim for scheme liability. There can be no scheme liability under that scenario. And material facts exist as to whether any § 5 liability attaches.

///

///

///

///

///

For the foregoing reasons, as well as those articulated in the supporting papers filed herewith, as well as the arguments contained in the Opposition papers filed by GenAudio (and incorporated herein), Plaintiff's motion for summary judgment should be denied.


Dated:  April 28, 2017                    By: /s/  Andrew B. Holmes
                                          Andrew B. Holmes
                                          HOLMES, TAYLOR & JONES LLP
                                          The Oviatt Building
                                          617 South Olive Street, Suite 1200
                                          Los Angeles, CA 90014
                                          Telephone:  (213) 985-2200
                                          Facsimile:  (213) 973-6282
                                          Email:  abholmes@htjlaw.com
                                          Attorneys for Defendant Taj Jerry Mahabub