IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No.:  1:15-cv-02118

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

TAJ JERRY MAHABUB, GENAUDIO,
INC., and ASTOUND HOLDINGS, INC.,

      Defendants.

**DECLARATION OF TAJ JERRY MAHABUB**

I, Taj Jerry Mahabub, declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following statements are true and correct, that this declaration is made on my personal knowledge, and that I am competent to testify as to the matters stated herein:

1. I founded GenAudio, Inc. ("GenAudio"), a Colorado corporation on May 21, 2003.

2. I served as GenAudio's CEO during all times relevant to this action.

3. I also developed the patented audio software that was the core of GenAudio's business.

4. Prior to their purchase of GenAudio stock (either from me personally or from GenAudio), I had personal relationships with many of the investors, and knew them to satisfy the criteria of an "accredited investor" based on my long-term interactions with them.

5. For example, prior to any investment in GenAudio, I knew a group of doctors through my uncle, George Bohigian. These doctors were and/or are family friends whom I have known for many years, each of whom I know met the definition of an "accredited investor." Among these family friends who bought GenAudio stock are:

    a. Dr. John Galanis;
    b. Dr. Jan Boon;
    c. Dr. Phillip Gilson;
    d. Dr. Kirk Morey; and
    e. Dr. Ronan Lev.

6. Concerning the "GenAudio Team Emails" (Exs. 8, 9, 10, 40, 42, 44, 46, 47, 49, 51, 57, 60, 61, 64, and 73 to the SEC's MSJ), I did, as the SEC alleges, alter some email correspondence between myself and Apple.

7. With one possible exception, all recipients of the GenAudio Team Emails were employees, board members, and/or full-time consultants of GenAudio (the "GenAudio Team").

8. The only exception to the above I'm aware of, as relevant to the SEC's MSJ, is Ex. 40, which I forwarded to Dell Skluzak, who had already been a GenAudio shareholder for several

1

years. In forwarding this email to Skluzak, it was not my intent to induce Skluzak into purchasing more GenAudio stock—my understanding was that, by the date of this email to him (May 6, 2010), he had already made a decision to purchase or he had already purchased additional shares based on previous conversations. Rather, my intent was to encourage him to join GenAudio's board. Based on his business experience and background he discussed with me, I thought Skluzak would be a valuable addition to the company as a board member.

9. My intent was not to induce the recipients, a.k.a., the GenAudio Team, to purchase GenAudio stock. Rather, except for Exs. 8, 9, and 10 (see below), it was to keep them motivated and maintain company morale.

10. During the 2009 to 2012 timeframe, GenAudio, like most tech sector start-ups, was characterized by a high stress work-environment. High turnover and low morale were constant problems. These problems were exacerbated by (as is typical at many start-ups) inconsistent payment of wages for both consultants and full-time employees.

11. Based on my experience in the software (and tech) industry, and particularly with startups, it is common for management to go to great lengths to keep employees enthusiastic in such a stressful environment.

12. In July 2009, GenAudio and Apple entered into a confidentiality agreement (the "NDA"). Attached hereto as **Exhibit 84** is a true and correct copy of the NDA, previously marked as Investigative Testimony Exhibit 3.

13. The GenAudio Team Emails were internal corporate communications, and I instructed the team, both orally and in writing, that under no circumstance should any of the emails I sent to them be forwarded to anyone, not even their own immediate family members. They were confidential, as they concerned matters covered by the NDA ("NDA") (e.g., the business relationship between GenAudio and Apple, the possibility that GenAudio might provide goods or services to Apple, and/or the integration of GenAudio's software into Apple products), and I

did not intend for recipients to forward them along to others, or otherwise repeat the information they contained.

14. All of the GenAudio Team Emails were sent while the NDA was in effect.

15. Aside from the email I forwarded to Dell Skluzak (Ex. 40, discussed above), it was not my intent, and I was unaware at the time, that any of the GenAudio Team Emails would be forwarded or shared with anyone outside the GenAudio Team. Nor do I believe that any GenAudio Team member should have done so, given that, based on their work and familiarity with GenAudio's dealings with Apple, all recipients knew the emails included information covered by the NDA.

16. The GenAudio Team Emails were not included among materials provided to potential investors in the 2010 Offering or the 2011-2012 Offering (as those terms are used in the MSJ).

17. None of the GenAudio Team Emails ask GenAudio Team members to personally invest in GenAudio.

18. Exs. 8 (previously marked as Deposition Exhibit 202), 9 (previously marked as Deposition Exhibit 28), and 10 (previously marked as Investigative Exhibit 60 and Deposition Exhibits 29 and 211) ask GenAudio Team Members to help the company get in touch with friends and family members who might be interested in purchasing GenAudio stock. While Exhibit 10 doesn't expressly state this, my statement "[l]et's get some fuel for the ship. Any help from all of you with this financing effort would be great," was not intended as a personal appeal to employees to invest in the company. In context, it was a request for them to put potential investors (friends and family) in touch with myself, Paul Powers, and/or Jim Mattos. I believe the recipients understood this, based on my past emails and numerous other communications with the team, where I emphasized that – without exception - any potential investor should be handled in this manner.

19. I am not aware of any instance where a recipient of the GenAudio Team Emails purchased GenAudio stock based on the emails or their contents (including Exs. 8–10).

20. Nor did I intend for anyone to invest based on the contents of the GenAudio Team Emails. Even with Exs. 8–10, I only expected (and hoped) that employees would tell friends and family members that, if they were interested in investing, they should contact Powers, Mattos, or myself. Once they contacted us, I anticipated providing them with the company's investment materials so they could make an informed investment decision with all the risk factors and necessary disclaimers and disclosures included.

21. Regarding Exs. 8, 9, and 10, my optimistic statements (those highlighted by the SEC in their exhibits) to GenAudio Team Members regarding GenAudio's value were my opinions, which I believed to be true at the time they were made.

22. Neither Exhibit 8 nor Exhibit 9 contain any altered emails between Apple employees and myself.

23. I have reviewed the SEC's Ex. 10, and everything contained therein, excepting the additional recipients, was true to the best of my knowledge. Any additions made were intended to benefit the GenAudio Team by adding details from other conversations with Apple employees. While I subjectively believed Schiller was one of those I met with at Apple, I later learned that it wasn't Schiller, but someone else, and I remembered his name incorrectly. Believing it was Schiller, in the additions to the email, I discussed the embedded level integration process during the conference call referenced in the email; my statement that Schiller was hoping for a fall product rollout was based on prior conference calls; my belief that Schiller and Hailey wanted to follow up on some things regarding application integrations was based on prior conference calls and/or in-person meetings; and I added the additional recipients (Phil Schiller, Barry Corlett, and Jim Tenneboe) because my understanding was that they were now, or would soon be, involved in the process of integrating GenAudio software into Apple products.

4

24. I was told by Tiscareno and Hailey that there was a "big meeting" in early May of 2010 that would take place with "Jobs," which I understood to mean Steve Jobs, Apple's then-CEO. Prior to this litigation, I had never heard the name "Jozwiak" and didn't know that there was a high-level employee at Apple with that name, who apparently was known as "Joz" (pronounced "Jaws").

25. After GenAudio and Apple signed a non-disclosure agreement, my contacts at Apple proposed we execute another non-disclosure agreement. Because we had already signed a non-disclosure agreement with Apple, I presumed the new agreement Apple was proposing would be more restrictive than what we had already signed, and indicated Apple was more interested in reaching a deal with GenAudio.

26. Tiscareno never told me he lacked the authority to discuss a business deal between GenAudio and Apple and that I would need to speak with someone else at Apple to negotiate a transaction.

27. In early 2012, GenAudio made presentations to shareholders in Seattle, St. Louis, and Denver. During those presentations Tiscareno spoke to shareholders about why Apple didn't do a deal with GenAudio. A video and/or audio of at least one of Tiscareno's presentations exists. Long before then, it was already clear from the passage of time that GenAudio would not be completing a transaction with Apple. That also was made clear to investors during the presentations.

28. The following exhibits are true and correct copies of emails I sent and received from my contacts at Apple during my discussions with Apple about GenAudio's technology: **Exhibits 151, 154 through 168, 172 through 183, 185 through 187, 189 through 197, 199 through 206, and 208 through 215**.

//

//

I declare under penalty of perjury that the foregoing is true and correct.

Executed this April 28, 2017 in __Northglenn__ ,Colorado.

_____
Taj Jerry Mahabub

# EXHIBIT 84



*Confidentiality Agreement (Mutual)*
*Page 1 of 3*

## APPLE INC.
## CONFIDENTIALITY AGREEMENT (Mutual)

This Confidentiality Agreement (the "Agreement") is entered into and is effective as of July 1, 2009 (the "Effective Date") by and between Apple Inc., 1 Infinite Loop, Cupertino, California 95014 ("Apple") and GenAudio Inc., located at 12999 E. Adam Aircraft Circle, Ste. 200, Englewood, Colorado, 80112 ("Company").

1. **DEFINITION OF CONFIDENTIAL INFORMATION.** For their mutual benefit, the parties plan to discuss certain confidential information regarding Company's AstoundSound™ and AstoundStereo™ software processing for integration into Apple products (the "Project"). The parties agree that the terms and conditions of this Agreement, the nature of their business relationship, including, if applicable, the fact that one party provides or may provide goods or services to the other, and the parties' discussions concerning the Project will be considered confidential information covered by this Agreement ("Confidential Information"). In addition, any other nonpublic information which one party ("Discloser") discloses to the other party ("Recipient") in the course of their communications regarding the Project will be considered Confidential Information, including but not limited to nonpublic product plans, designs, costs, prices, names, finances, marketing plans, business opportunities, forecasts, orders, personnel, customer information, research, development, know-how, third party confidential information or information learned by Recipient from Discloser's employees, agents or through inspection of Discloser's property; provided such information is clearly designated as "Confidential": (i) in writing, if communicated in writing, or (ii) at the time of disclosure, if disclosed orally or visually. Notwithstanding the foregoing, Confidential Information shall not include information that: (a) is now or subsequently becomes generally available to the public through no fault or breach on the part of Recipient; (b) Recipient can demonstrate to have had rightfully in its possession prior to disclosure to Recipient by Discloser; (c) is independently developed by Recipient without the use of any Confidential Information; or (d) Recipient rightfully obtains from a third party who has the right to transfer or disclose it to Recipient without limitation. Nothing in this Agreement will obligate either party to disclose any Confidential Information.

2. **NONDISCLOSURE AND NONUSE OF CONFIDENTIAL INFORMATION.** Recipient agrees to protect Discloser's Confidential Information, using at least the same degree of care that it uses to protect its own confidential and proprietary information of similar importance, but no less than a reasonable degree of care. Recipient agrees to use Discloser's Confidential Information for the sole purpose of evaluation in connection with the Project and discussions with Discloser related to the Project, or as otherwise agreed upon in writing by an authorized representative of Discloser. Recipient will not disclose, publish, or disseminate Confidential Information to anyone other than those of its employees and consultants who have a need to know in order to accomplish such purpose and who are bound by a written agreement that prohibits unauthorized disclosure or use of Confidential Information. Recipient will be responsible for any violation of the terms of this Agreement by its employees and consultants. Recipient agrees not to use Confidential Information for any other purpose or for its own or any third party's benefit without the prior written consent of an authorized representative of Discloser in each instance. Recipient may disclose Confidential

*JM*

**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**      GA003660

*Confidentiality Agreement (Mutual)*
*Page 2 of 3*

Information to the extent required by law, provided Recipient makes reasonable efforts to give Discloser notice of such requirement prior to any such disclosure and takes reasonable steps to obtain protective treatment of the Confidential Information.

3. **NO LICENSE TO CONFIDENTIAL INFORMATION.** Except as expressly set forth herein, no license or other rights to Confidential Information are granted or implied hereby and the Discloser retains all of its rights therein.

4. **FEEDBACK.** Notwithstanding any other provision in this Agreement, if Recipient provides any ideas, suggestions or recommendations to Discloser regarding Discloser's Confidential Information ("Feedback"), Discloser is free to use and incorporate such Feedback in Discloser's products, without payment of royalties or other consideration to Recipient, so long as Discloser does not infringe Recipient's patents, copyrights or trademark rights in the Feedback. Nothing in this Agreement is intended to grant a license or waive any rights in either party's patents, copyrights or trademarks.

5. **INDEPENDENT DEVELOPMENT.** Discloser understands that Recipient may currently or in the future be developing information internally, or receiving information from other parties that may be similar to Discloser's Confidential Information. Nothing in this Agreement will prohibit Recipient from developing products, or having products developed for it, that compete with Discloser's products, provided that in doing so, Recipient does not use or disclose Discloser's Confidential Information.

6. **NO WARRANTY.** Discloser warrants that it has the right to disclose the Confidential Information to Recipient. Otherwise, all information is provided "AS IS" and without any warranty, express, implied or otherwise, regarding its accuracy or performance.

7. **RETURN OF DOCUMENTS.** Within ten (10) business days of receipt of Discloser's written request, and at Discloser's option, Recipient will either return to Discloser all tangible Confidential Information, including but not limited to all electronic files, documentation, notes, plans, drawings, and copies thereof, or will provide Discloser with written certification that all such tangible Confidential Information of Discloser has been destroyed.

8. **TERM AND TERMINATION.** Recipient's duty to protect Discloser's Confidential Information expires five (5) years from the date on which that Confidential Information was disclosed to Recipient. Either party may terminate this Agreement upon ten (10) days written notice; however, any termination of this Agreement shall not relieve Recipient of its confidentiality and use obligations with respect to Confidential Information disclosed prior to the date of termination.

9. **NO EXPORT.** Recipient may not use or otherwise export or reexport any portion of the Confidential Information except as authorized by United States law and the laws of the jurisdiction in which the Confidential Information was obtained. In particular, but without limitation, the Confidential Information may not be exported or re-exported (a) into any U.S. embargoed countries or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce's Denied Persons List or Entity

JM

**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.** GA003661

*Confidentiality Agreement (Mutual)*
*Page 3 of 3*

List. By using the Confidential Information, Recipient represents and warrants that Recipient is not located in any such country or on any such list. Recipient also agrees that Recipient will not use the Confidential Information for any purposes prohibited by United States law, including, without limitation, the development, design, manufacture or production of nuclear, missile, chemical or biological weapons.

10. **NO IMPLIED WAIVER.** Neither party's failure or delay in exercising any of its rights will constitute a waiver of such rights unless expressly waived in writing.

11. **NO ASSIGNMENT.** This Agreement may not be assigned by either party by any means, including without limitation, by operation of law or merger, without the prior, written consent of the other party. Any attempted assignment of this Agreement in violation of this section will be void.

12. **ENTIRE AGREEMENT AND GOVERNING LAW.** This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed pursuant to this Agreement and supersedes all prior or contemporaneous oral or written agreements concerning such Confidential Information. This Agreement may not be amended except by written agreement signed by authorized representatives of both parties. This Agreement will be governed by and construed in accordance with the laws of the State of California, excluding that body of California law concerning conflicts of law. The parties further submit to and waive any objections to the exclusive jurisdiction of and venue in any of the following forums: U.S. District Court for the Northern District of California, California Superior Court for Santa Clara County, or any other forum in Santa Clara County, for any litigation arising out of this Agreement.

Understood and agreed to by the authorized representatives of the parties:

| Apple | Company |
|---|---|
| Apple Inc. | GenAudio Inc. |
| _____ | _____*[signature]*_____ 7/1/09 |
| By (Signature)          Date | By (Signature)          Date |
| _____ | Jerry Mahabub, CEO |
| Printed Name and Title | Printed Name and Title |

COMPANY: RETURN TWO SIGNED ORIGINALS TO APPLE EMPLOYEE

APPLE EMPLOYEE: RETURN ONE SIGNED ORIGINAL TO APPLE LEGAL, M/S 3-I