**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-02118-WJM-CBS

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

        v.

TAJ JERRY MAHABUB, GENAUDIO, INC., and
ASTOUND HOLDINGS, INC.,

             Defendants.

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS TAJ JERRY MAHABUB AND GENAUDIO, INC.**

---

## TABLE OF CONTENTS

I.      SUMMARY ............................................................................................ 1

II.     SEC REPLY TO DEFENDANTS' RESPONSES TO UNDISPUTED FACTS ....... 1

III.    RESPONSE TO DEFENDANTS' ADDITIONAL STATEMENTS OF FACT .......... 5

IV.     ARGUMENT ....................................................................................... 14

        A.    Defendants' Evidentiary Objections Are Meritless ................................... 15

        B.    The Defendants Made Untrue Statements And Omissions...................... 17

        C.    There Was Nothing "Reasonable" About Mahabub's Conduct
              And He Acted With Scienter. ................................................................ 21

        D.    All Of The Untrue Statements And Omissions Were Material .................. 25

              1.    The Untrue Statements Are Not "Mere Puffing" Or
                    Sheltered By The "Bespeaks Caution" Doctrine ............................ 26

              2.    The Untrue Statements And Omissions Regarding Apple
                    Executives Were Material ............................................................ 28

        E.    The Fraudulent GenAudio Team Emails Were "In Connection With"
              The Purchase And Sale Of Millions Of Dollars In Securities .................... 29

        F.    Defendants Conduct Constitutes Untrue Statements, Material
              Omissions, And A Fraudulent Scheme  .................................................. 33

        G.    Defendants Are Liable for Unregistered Sales of Securities .................... 34

              1.    The SEC Established Defendants Violated the
                    Registration Provisions of Section 5 ............................................. 34

              2.    The Defendants Cannot Establish an Exemption From
                    Registration Under Rule 50 .......................................................... 35

              3.    Defendants also do not qualify for a private offering
                    under Section 4(a)(2) ................................................................... 39

V.      CONCLUSION ................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anastasi v. American Petroleum Inc.*, 579 F. Supp. 273 (D. Colo. 1984) ...................... 40

*Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) ............................ 31-32

*Arst v. Stifel, Nicolaus & Co., Inc.*, 86 F.3d 973 (10th Cir. 1996) ................................... 31

*Camara v. Sanchez*, 12-cv-03040, 2013 WL 9721026 (D. Colo. Sept. 23, 2013) ......... 16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................ 35

*Dennis J. Malouf*, 2016 WL 4035575 (July 27, 2016) (Commission Opinion) ..................
.................................................................................................................... 33, 34, 35

*Fitzpatrick v. City of Atlanta*, 2 F.3rd 1112 (11th Cir. 1993) ........................................... 35

*Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997) ................................. 26, 27-28

*Hill York Corp. v. American Int'l Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971) ............ 39

*Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104 (7th Cir. 2004) ................... 38

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996) ..... 27

*Law Co., Inc. v. Mohawk Const. and Supply Co., Inc.*, 577 F.3d 1164 (10th Cir. 2009) 16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015) ................................................................................................................. 24

*Pinnacle Comm. Int'l, Inc. v. American Family Mortgage Corp.*, 417 F. Supp. 2d. 1073 (D. Minn. 2006) ....................................................................................................... 38

*Quinn & Co. v. SEC*, 452 F. 2d 943 (10th Cir. 1971) ..................................................... 35

*Repass v. Rees*, 174 F. Supp. 898 (D. Colo. 1959) ...................................................... 39

*SEC v. Aqua Vie Beverage Corp.*, No. CV 04-414-S-EJL, 2007 WL 2025231 (D. Idaho July 9, 2007) ............................................................................................................ 22

*SEC v. Blavin*, 760 F.2d 706 (6th Cir. 1985) ................................................................. 31

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) ......................... 29-30

*SEC v. Chen*, No. 2:15-cv-07425, 2016 WL 7469683 (C.D. Cal. Dec. 8, 2016) ............ 30

*SEC v. Delphi*, No. 06-14891, 2008 WL 4539519 (Oct. 8, 2008) ................................. 32

*SEC v. Indigenous Global Dev. Corp.*, 2008 U.S. Dist. LEXIS 50434 (N.D. Cal. June 30, 2008) ....................................................................................................................... 35

*SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000) ................................................... 23

*SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355 (D.R.I. 2011) ......................... 22

*SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233 (11th Cir. 2012) ....................... 30-31

*SEC v. Nacchio*, 438 F.Supp.2d 1266 (D. Colo. 2006) .................................................. 32

*SEC v. Parrish*, 11-cv-00558-WJM-MJW, 2012 WL 4378114 (D. Colo. Sept., 25, 2012) ................................................................................................................................... 34

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ......................................................... 35

*SEC v. Small Bus. Capital Corp.*, No. 12-CV-3237, 2013 WL 4455850 (N.D. Cal. Aug. 16, 2013) ...................................................................................................................... 22

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ......................................................... 30

*United States v. Naftalin*, 441 U.S. 768 (1979) ............................................................ 30

**Statutes**

15 U.S.C. § 77d ................................................................................................... 35, 39-40

15 U.S.C. § 77e ........................................................................................... 1, 34, 35, 40

15 U.S.C. § 77q .................................................................................................... 29, 33

15 U.S.C. § 78j .................................................................................................. 29, 33-34

17 C.F.R. § 240.10b-5 ............................................................................................ 33, 34

17 C.F.R. § 230.501 ............................................................................................... 35, 36

17 C.F.R. § 230.502 ............................................................................................... 35, 36

17 C.F.R. § 230.506 ............................................................................................... 35, 36

**Other**

Fed. R. Civ. P. 56(c)(2) ............................................................................................... 16

Fed. R. Evid. 401 ........................................................................................................ 12

Fed. R. Evid. 402 ........................................................................................................ 12

Fed. R. Evid. 403 ........................................................................................................ 12

Fed. R. Evid. 602 .......................................................................................................... 2

Fed. R. Evid. 701 ........................................................................................................ 12

Fed. R. Evid. 901 ................................................................................................... 12, 16

## I.    <u>SUMMARY</u>

In their Oppositions[1] to the SEC's Motion for Summary Judgment (ECF No. 53) ("Motion"), Defendants GenAudio, Inc. ("GenAudio") and Taj "Jerry" Mahabub (collectively, "Defendants") essentially argue that while they may have been engaged in fraud, it was not <u>securities</u> fraud.  While they effectively concede nearly all of the SEC's undisputed statements of material fact, the Defendants erroneously attempt to excuse their fraudulent conduct by claiming that blatant falsehoods, told throughout the course of securities offerings and sales, are not actionable under the anti-fraud provisions of the federal securities laws.  Defendants are wrong.  The antifraud provisions of the federal securities laws apply to a company and its CEO that are engaged in the offer and sale of millions of dollars of securities at the same time that they are distributing untrue statements and material omissions about their relationship and business prospects with one of the largest companies in the country.  Further, the Defendants cannot raise a triable issue of fact relevant to the claim that they violated Section 5 of the Securities Act by selling unregistered securities.  Summary judgment is appropriate on all of the SEC's claims against both Defendants Mahabub and GenAudio.

## II.    <u>SEC REPLY TO DEFENDANTS' RESPONSES TO UNDISPUTED FACTS</u>[2]

6.    Defendants cite testimony that does not stand for the proposition that only Mahabub was responsible for "capital raises."  It stands for the proposition that

---

[1] GenAudio's Opposition Brief (ECF No. 58) is cited herein as "GA Opp'n" and Mahabub's Opposition Brief (ECF No. 60) is cited as "M. Opp'n."

[2] Attached as Exhibit 245 is a chart summarizing all parties' statements of material fact and responses and replies.  Also attached is the SEC's response to Defendant's Evidentiary Objections to the Motion (ECF No. 58-71).

Mahabub was responsible for "fraudulent misrepresentations about certain business development partners over time" and that "the content listed within the [SEC's action against Mahabub] was his responsibility[.]"  Ex. 217, Mattos Dep. 19:7 – 23.

16.     The cited evidence does not dispute the stated fact.  Further, paragraphs 4 and 5 of Mahabub's Declaration do not demonstrate personal knowledge about each of the investor's income in the two years preceding each stock purchase or the amount of investor's assets at the time of each purchase and should therefore not be considered.  *See* Fed.R.Evid. 602.

35.     Mattos testified that "[p]erhaps once or twice" he followed up with investors to "let them know they needed to resubmit the paperwork."  Ex. 6, Mattos Dep. 170:21 – 171:4.

64.     Exhibit 59 was not "sent to one investor only," the end of Mahabub's April 30, 2010 email states "[y]ou should all receive a hard copy of this presentation deck under your door later on this evening …."  Ex. 59 at 4.  Further, Defendants' argument that these statements were not false simply because Mahabub allegedly believed the statements is incorrect and irrelevant; such belief is an issue of scienter, not falsity.  *See* GA Opp'n Resp. SOF ¶ 64.

67.     Mahabub presents no genuine issue as to his belief that Schiller was ever involved in Apple's communications with GenAudio.  In his declaration, Mahabub states, without providing any details:  "While I subjectively believed Schiller was one of those I met with at Apple, I later learned that it wasn't Schiller, but someone else, and I remembered his name incorrectly."  (ECF No. 61 at ¶ 23).  During his investigative testimony, Mahabub claimed that he had confused Schiller and Hailey.  *See* Ex. 234,

Mahabub Inv. Tr. 133:2 – 136:6.  Not surprisingly, this argument has since been abandoned given that Mahabub added Schiller's name to email correspondence that also included Michael Hailey.  *See* Ex. 10.  Further, the SEC's Motion cites numerous, separate communications prior to May 6, 2010 in which Mahabub references Schiller.  *See* Exs. 42; 44; 46; 47; 49; 51; 57; and 60.  Mahabub's self-serving claim of mistake is insufficient to rebut the evidence cited in support of the SEC's Motion.

78.     The fact that "Mahabub testified he spoke with Tiscareno regarding a Christmas product roll-out" does not dispute the fact that "Apple never told Mahabub or GenAudio that it planned to incorporate GenAudio's technology in any of its new product roll-outs."

79.     The cited evidence does not dispute the stated fact.  Also, Mahabub's testimony regarding licensing only confirms the unreasonableness of assuming any type of "deal" was occurring in the near term, explaining that Isaac said:

> "Well, we're not going to pay you a per unit royalty, you know that."
> … So -- and I'm, like, "Well, I understand."  …  I don't exactly know what that meant.  Could that have meant that maybe they're looking to acquire us if they're not going to pay you a per unit royalty?  Because how else do you -- they either license your technology or they buy it out.  Right?  If they're not going to pay a per unit royalty, then that kind of almost implies something else.  Or maybe they are going to pay a lump sum.  I don't know.  All I know is that that comment was made.  And I told him, I said, "That's okay."  And he said, "Well, when we get to that stage, we'll figure it out."  That's exactly what he told me in the conference room.

Ex. 235, Mahabub Dep. at 96:13 – 97:11.

80.     The cited evidence does not dispute the stated fact.  *See* Reply SOF ¶¶ 78 and 79.

86.     Defendants dispute that the March 15, 2010 letter was sent to "prospective investors," alleging "the letter is addressed only to current shareholders to

3

secure bridge capital."  All of GenAudio shareholders were also prospective investors who the Defendants repeatedly solicited, many of whom repeatedly invested additional funds.  *See, e.g.*, Ex. 11; Ex. 72 at 1 (as of August 28, 2010, the 2010 Offering had raised $2.7 million "with the vast majority of investments coming from existing shareholders ….  If any of you are considering the prospect of increasing your stake, you only have a few days left to make that decision."); Ex. 82 at 22 ("If you are one of our accredited investors and would like to discuss a follow-on investment in the company, please feel free to contact me directly").

92.    The evidence cited by Mahabub in Defendants' SOF ¶¶ 110, 156, 157, and 159-161 does not establish substantive meetings between Mahabub and Apple and does not rebut the testimony cited in the Motion's SOF ¶ 92.  *See* Ex. 35, Tiscareno Inv. 68:14-71:7; Ex. 39, Tiscareno Dep.  232:5-9; Ex. 225, Tiscareno Dep. 255:10-21 (regarding Exs. 75 and 81); Ex. 38, Isaac Dep. 146:1-147:2; 158:10-159:18.

95.    The correct exhibit is attached as Exhibit 241.  In testifying regarding Exhibit 241, and in response to the question "Did you meet with Steve Jobs" Mahabub stated "Not that I remember, no. And I'm not sure why -- I think I -- that's -- that's a mistake in what I wrote there.  I don't think I meant to say that.  Why I didn't catch it, I have no idea.  But no, I never met with their CEO." Ex. 1, Mahabub Inv. 507:9 -19.

101.    Mahabub's September 23, 2010 meeting with Andrew Bright and Barry Corlett is insufficient to create a genuine issue of material fact as to the fact that Defendants "did not inform investors that Mahabub's substantive communications with Apple personnel were almost always limited to mid-level engineering and marketing employees."  *See* Defs. SOF ¶ 153; *see also* Mot. SOF ¶ 92.

**III.**     **RESPONSE TO DEFENDANTS' ADDITIONAL STATEMENTS OF FACT**

For purposes of the Motion, the SEC does not dispute Defendants' Additional

Statements of Fact ¶¶ 108, 110, 112 - 117, 122, 127 – 131, 133 – 141, 144 – 147, 152 –

153, 156 - 157, 159 – 160, 163, 166, 182, 185 – 186, 188, 190, 192, 194 - 201, 208 –

210, 212 – 213, and 215 – 216. [3]

109.    Disputed as to the characterization that communications with Apple were

"extensive."  Mahabub ultimately engaged in "fairly extensive" communications with

Tiscareno; however, he only met with Isaac three or four times, met with Hailey two to

four times over the course of approximately a year, and never met with Schiller, Cook,

or Jobs regarding GenAudio.  Ex. 152, Tiscareno Dep. 267:20 – 23; Ex. 37, Isaac Inv.

Tr. 14:16 – 20; Ex. 36, Hailey Inv. Tr. 16:15 – 22; Mot. SOF ¶¶ 50 - 56.

111.    Disputed as to the characterization as "extensive."  Mahabub and

Tiscareno had many phone calls and may have exchanged "hundreds upon hundreds, if

not thousands of emails regarding GenAudio's technology"; however, he only met with

Isaac three or four times, met with Hailey two to four times over the course of

approximately a year, and never met with Schiller, Cook, or Jobs regarding GenAudio.

*See* SEC Resp. SOF ¶ 109.

118.    Disputed.  Tiscareno did not recall discussing additional NDAs with

Mahabub and was confused about the various correspondence on the issue and Isaac

sent Mahabub an email (Ex. 181) referring Mahabub to another Apple employee

regarding "all the necessary evaluation agreements," but did not otherwise

---

[3] The SEC accepts certain facts as undisputed only for purposes of the Motion.
The SEC does not stipulate to any of the Defendants' additional statements of fact for
purposes of trial.

communicate with Mahabub about such agreements.  Ex. 225, Tiscareno Dep. 238:1 –
246:25 (at 243:22 – 24 "I really don't know what this was NDA … who's messed up on
this – it was me, Ron, or Jerry."); Ex. 169, Isaac Dep. 171:23 – 173:24.

119.    Disputed.  There was no foundation for any belief that Apple had
"indicated Apple was interested in a licensing agreement or acquisition of GenAudio's
technology."  Apple never told Mahabub that it was interested in a licensing deal or in
acquiring GenAudio's technology.  Mahabub's conduct supports a finding that he knew
there was no foundation for such belief, and he set out to deceive his team and
investors to hide that fact.  *See* Mot. SOF ¶¶ 78 - 82; *see also* Ex. 224, Isaac Dep. 32:3
– 13 ("A  We never discussed business opportunities with Jerry, never.  Q  But he
mentioned it a number of times, right?  A I do not recall that, and I wouldn't have even
actually entertained it; not to the -- to the least of it."); *Id.* 189:8 – 16; Ex. 226, Hailey
Dep. 157:4 - 9.

120.    Disputed.  Tiscareno did not agree that there was nothing inaccurate
about the statement and he lacks foundation to testify as to the truth or falsity of
GenAudio's offering materials, which is indicated by the cited testimony and the
testimony surrounding the cited testimony including:  "Q.  Is there anything else, looking
at this, that you find inaccurate?  A.  Well, it's I mean, I'd have to sit down and read
everything line by line.  Q.  I'm just talking about the second paragraph.  A.  Oh.  No.  Q.
Ok.  A.  …  I mean, … I can think of opinions that you didn't ask about.  But it's just
opinions that the document – that I've never read before, really."  Ex. 225, Tiscareno
Dep. 199:20 – 200:5; *see generally id.* at 194:5 – 200:10.

121.    Disputed.  Tiscareno's testimony begins with describing this section of the

PPM as "[p]retty generous statements" and concludes with "[y]eah, I guess" as to their fairness and accuracy, demonstrating his lack of foundation and lack of complete agreement with the statements.  Ex. 152, Tiscareno Dep. 205:4 – 206:15 (discussing Ex. 3 at 21).

123.    Disputed.  GenAudio's contacts at Apple did not "encourage" Mahabub to believe that GenAudio's technology could be included quickly into Apple products for sale to consumers; therefore, it was not reasonable for Mahabub to believe that Apple was anywhere near including GenAudio products into Apple products for sale to consumers.  Mahabub's conduct supports a finding that he knew there was no foundation for such belief, and he set out to deceive his team and investors to hide that fact.  *See* Mot. SOF ¶¶ 78 – 82.

124.    Disputed that "GenAudio's contacts at Apple did not tell Mahabub that they disagreed with his view, which further encouraged Mahabub to believe his statements were correct."  Mahabub's conduct supports a finding that he knew there was no foundation for such belief, and he set out to deceive his team and investors to hide that fact.  *See* Mot. SOF ¶¶ 66, 81-82.  *See also* SEC Resp. SOF ¶ 119.

125.    Undisputed for purposes of the Motion with respect to the time period November 2009 to September 24, 2010.

126.    Undisputed that Mahabub provided such testimony, but disputed that this conversation could have led Mahabub to reasonably believe that Apple would enter into a licensing deal with GenAudio.  *See* Reply SOF ¶ 79.

132.    Disputed.  The cited Hailey testimony merely confirms that Hailey wrote "this will take time, definitely more than a couple of months" to correct Mahabub's

incorrect assumption that the time frame would be faster, and the cited Exhibit 164 does not establish that Mahabub communicated that he still believed 3 to 6 months was realistic, he writes "much appreciated you disclosing to me the more realistic timeframe. This will help me to determine the forward direction of GenAudio over the next 3 to 6 months. <u>Of course, if anything changes, and the timeline is compressed/shortened, please inform me ASAP about this</u> as Apple takes priority over everything else we are doing …" therefore, absent indication from Apple that the timeframe was shortened/compressed, Mahabub had no reason to believe that anything would occur within months.  Ex. 164 (emphasis added); Ex. 188, Hailey Dep. 100:24-101:22.

142.    Dispute that Tiscareno referred to the executive as "the big exec."  Exhibit 206 contains that reference, but is an email from Mahabub.

143.    Undisputed for purposes of the Motion that they "may" have told him, though the fact also supports the proposition that they may not have told him.

148.    Undisputed for purposes of the Motion, but Hailey's description of Joswiak's response is hearsay and Joswiak's response does not suggest that Apple moved forward with GenAudio.  Tiscareno testified that, in fact, his work on GenAudio was generally "dead in the water" after this meeting.  *See* Ex. 225, Tiscareno Dep. 219:15 – 220:17 and 228:14 – 230:8.

149.    Disputed.  Tiscareno testified that he did not keep moving forward with GenAudio after May 6, 2010 and "I can't say 100 percent, but I believe at that point we were dead in the water," and "Q:  Did you ever tell that to Jerry Mahabub?  A:  I – oh, he knew."  He also testified that any work done may have related to "Ron [Isacc]."  Ex. 225, Tiscareno Dep. 219:15 – 220:17 and 228:14 – 230:8.

150.    Disputed.  *See* SEC Resp. SOF ¶ 149.

151.    Disputed.  There was no foundation for Mahabub to believe that there was any "critical green light" and, in fact, his conduct supports a finding that he knew there was no such green light and he set out to deceive his team and investors to hide that fact.  The SEC objects to the citation to Tiscareno's deposition on the basis that Tiscareno has no foundation to testify as to Mahabub's state of mind.  *See* Mot. SOF ¶¶ 68-69; Ex. 152, Tiscareno Dep. 262:16 ("I don't know what he was thinking").

154.    Undisputed for purposes of the Motion, though Mahabub's conduct in falsifying correspondence and making untrue statements about Apple executives evidences that he understood that Tiscareno was not senior enough to enter into a licensing or acquisition transaction with GenAudio.  *See generally* Mot. SOF ¶¶ 50 – 76 (describing fraudulent conduct regarding Apple executives).

155.    Disputed.  Isaac testified that he could not recall one way or the other if he told Mahabub that Mahabub's exchange with Bright "was not a very good exchange to be had with a senior Apple engineer."  Isaac further explained that Mahabub's exchange with Bright "was a huge red flag … and it's not something I would have been proud of and would have retreated me quite a bit, quite honestly, to the point even that I wouldn't have wanted [Bright] seeing me exchange or mention [Mahabub]."  Ex. 38, Isaac Dep. 159:8 – 18; Ex. 169, Isaac Dep. 158:20 – 25.

156.    Undisputed for purposes of the Motion, though no work was substantive. *See* Mot. SOF ¶ 92; Reply SOF ¶ 92.

157.    Undisputed for purposes of the Motion, though no work was substantive. *See* Mot. SOF ¶ 92; Reply SOF ¶ 92.

158.    Disputed.  Isaac testified that he does not recall whether or not GenAudio was part of the evaluation by the "Advanced Technology Group" and no further agreements were ever sent by Apple to GenAudio.  Ex. 169, Isaac Dep. 174:1 – 8; Mot. SOF ¶ 99.

161.    Disputed that Mahabub and Isaac scheduled a time to talk by phone.  The cited exhibit consists of Mahabub asking Isaac what his schedule looks like for a phone call, but does not schedule a call.  Ex. 215.

164.    Disputed.  This is a legal conclusion and not a statement of fact.  As discussed herein, GenAudio's documents did not include cautionary language that was "meaningful" or sufficient to nullify Defendants' misstatements and omissions made throughout GenAudio's offering documents, investor communications and GenAudio Team emails during the relevant period, including prior to and during March 2010.

165.    Undisputed that in 2011 GenAudio investors knew that a deal with the LCEC, or Apple, had not been consummated and "[t]hat there would be no deal with Apple" was made clear to some investors during some presentations in early 2012. Disputed that, as a blanket statement, "[i]nvestors' purchases of stock after [2011] were not based on any statements from GenAudio regarding discussions with, or a potential deal with Apple."  In March 2011, Mahabub falsely claimed that GenAudio and Apple would be entering into a new set of agreements that would prohibit them from update investors regarding the LCEC and the Defendants then issued the 2011-2012 Offering Materials, which made material omissions.  *See* Mot. SOF ¶¶ 98; 100-104.

181.    Undisputed for purposes of the Motion that "[w]ith one possible exception, the 'GenAudio Team Emails,' the emails that Mahabub sent out detailing his

communications and interactions with Apple, were sent only to GenAudio Team members." Disputed that "[t]he exceptions were sent to people 'who [Mahabub] was interested in soliciting to join the board of directors.'" Mahabub "sponsored" Skluzak onto the GenAudio Board in 2012 and Skluzak joined the Board in April 2012 – nearly two years after Mahabub forwarded Skluzak the falsified transcription. Ex. 227, Skluzak Dep. 69:4 – 6; 89:17 – 20.

183.    With the exception of Exhibit 40, undisputed for purposes of the Motion.

184.    Disputed. The cited evidence does not reflect the knowledge or understanding of the GenAudio Team. *See also* SEC Resp. SOF ¶¶ 187 and 214.

187.    Disputed and irrelevant. While the SEC is not required to prove reliance and is therefore not required to tie specific untrue statements to specific purchases, the SEC does allege that the GenAudio Team emails were "in connection with" the purchase and sale of securities and "in the offer and sale" of securities, and that the false information spread by Defendants – through the GenAudio Team emails and other untrue statements – influenced investment decisions. Further, Mattos testified that he did convey positive information from "team updates" to investors "[i]n a very basic sense" and that "the vast majority" of investors knew that the LCEC was Apple. *See* Ex. 228, Mattos Inv. 143:9 – 149:23.

189.    Disputed. The record reflects that Mahabub's false statements were made in connection with a scheme that included raising investor funds to continue to permit GenAudio to operate and, therefore, maintain Mahabub's lifestyle. *See* Mot. SOF ¶¶ 10 – 13 and 40; Exs. 8, 9, and 10 (asking the GenAudio Team for assistance with fundraising); Ex. 40 (forwarding the false transcription to Skluzak); Ex. 30, Skluzak

11

Dep. 29:12 – 30:5 (describing oral conversations with Mahabub about Jobs and Apple).

190. With the exception of Exhibit 40, undisputed for purposes of the Motion, but irrelevant.

191. Disputed. The record reflects that Mahabub's false statements were made in connection with a scheme that included raising investor funds to continue to permit GenAudio to operate and, therefore, maintain Mahabub's lifestyle. *See* Mot. SOF ¶¶ 10 – 13.

193. Disputed. Mahabub's allegation is inadmissible as irrelevant (Fed.R.Evid. 401 and 402), confusing and misleading (Fed.R.Evid. 403), lacking foundation (Fed.R.Evid. 901), and providing impermissible opinion testimony (Fed.R.Evid. 701).[4]

197. Undisputed for purposes of the Motion, but irrelevant. Mahabub's conduct, including his communications with the GenAudio Team and with investors, evidences that he did intend for the content of the emails to reach investors. *See* SEC Resp. SOF ¶ 189.

199. With the exception of Exhibit 40, undisputed for purposes of the Motion.

202. Disputed. Nothing in the exhibits limits the solicitation to non-recipients. Exhibit 9 touts GenAudio as a good investment to the recipients and states "[t]ime to go back into fund raising mode, and if any of you feel like helping out with this effort, I would certainly appreciate it. It's not like you are doing your friends and family a bad thing by getting them into GenAudio at this stage in the game." Exhibit 10 states "Any help from all of you with this financing effort would be great." Exs. 9 and 10; *see also*

---

[4] It is neither common nor reasonable in any industry, including the software development industry, for CEO's to falsify documents and make untrue statements to their Board, employees, consultants, or investors in order to provide "motivation."

Reply SOF ¶ 86.

203.    Disputed.  See response to paragraph 202 above.

204.    Disputed.  Mahabub's conduct in falsifying documents and making untrue statements evidences his disbelief and the exaggeration of the value of any investment in GenAudio.  Mahabub encouraged investment in GenAudio to raise money to fund his business, which in turn funded his lifestyle.  *See* Mot. SOF ¶¶ 10 - 13; SEC Resp. SOF ¶ 207 (Mahabub falsified a portion of the email); SEC Resp. SOF ¶ 205.

205.    Disputed.  Mahabub's conduct in falsifying documents and making untrue statements evidences his disbelief.  Mahabub never communicated with Schiller regarding GenAudio, Schiller had no involvement with GenAudio, and Apple never told Defendants that it planned to incorporate GenAudio's technology in any of its new product roll-outs.  *See* Mot. SOF ¶¶ 54; 78.

206.    Disputed.  The Exhibits all encourage the GenAudio team to solicit investors based on GenAudio's current status, about which Mahabub was providing material, untrue information.  *See* Mot. SOF ¶¶ 10 – 11; Ex. 8, 9, and 10.

207.    Disputed.  Mahabub altered the July 6, 2009 email from Barry Corlett to Mahabub.  *Compare* Ex. 242 at 1 ("Hi Jerry, Thanks.  I am out travelling this week.  I will attend to this when I'm back on the 13th.  thanks, - Barry") to Ex. 8 at 13 (including numerous additional sentences, including "Both Victor and I have been very impressed with the way you have handled yourself up to this point, answered our high level questions, and the demo was very compelling.").

208.    Undisputed, but irrelevant.

209.    Undisputed for purposes of the motion, but irrelevant.

210.    Undisputed for purposes of the motion, but irrelevant.

211.    Disputed.  *See* SEC Resp. SOF ¶ 181.

214.    The SEC disputes that Mattos never "communicated any of the facts [within the GenAudio Team emails] to potential investors."  The record reflects that Mattos may have, but he has been unable to recall specific conversations.  *See* SEC Resp. SOF ¶ 187; *see also* Ex. 6, Mattos Dep. 70:20 – 24 (Q.  Okay.  Would you provide those potential shareholders with the information that Mr. Mahabub was providing to you about Apple?  A.  Perhaps, but again, I don't recall any specific conversations."); *id.* at 72:3 – 8 (testifying that he believed the information Mahabub provided in Ex. 47).

217.    Disputed because many material statements within the emails were untrue and/or falsified and therefore did not accurately reflect "the business relationship between GenAudio and Apple; the possibility that GenAudio might provide goods or services to Apple, and/or the integration of GenAudio's software into Apple products." *See* Mot. SOF ¶¶ 57 – 60, 63, 67 – 68, 72, and 75.

218.    Undisputed for purposes of the Motion as to the general statement, but the SEC does dispute that Mahabub had personal relationships with all investors or a basis to reasonably believe that all  investors were accredited, including Marvin.  *See* Second Declaration of George Marvin; Exs. 26 and 220; Ex. 235, Mahabub Dep. 468:1-11.

## IV.    ARGUMENT

The Defendants attempt to divorce Mahabub's conduct with respect to the GenAudio Team from Defendants' communications with all investors.  They then assert that while Mahabub lied to his team, it had nothing to do with Defendants' securities offerings and sales, and that statements made in GenAudio's offering materials and

14

investor letters constitute "mere puffing" and are subject to the "bespeaks caution" doctrine because those communications were less blatantly untrue and were couched in "hopeful" language.  But this fiction does not withstand scrutiny.  Between at least November 2009 and March 2011, Mahabub was making untrue statements about GenAudio's dealings with Apple to <u>everyone</u>.  And he was disseminating those false statements in a variety of ways, including through the GenAudio Team (which included Mattos, whose job was to communicate with investors) that he encouraged to solicit investors, through his direct communications with investors, and through GenAudio's offering documents and investor communications.  Moreover, between November 2009 and April 2012, the Defendants omitted material information that was critical to inform investors of the true state of GenAudio's dealings with Apple and which was particularly material in light of the untrue information Mahabub was circulating.  <u>All</u> of these untrue statements and material omissions violated the antifraud provisions of the federal securities laws.

### A.    Defendants' Evidentiary Objections Are Meritless

Defendants sole "dispute" regarding the majority of the SEC's undisputed statements of material fact are objections to the authenticity of transcripts and documents pursuant to Federal Rule of Evidence 901.  But the SEC has come forward with authentic evidence that the SEC would be able to admit at trial.  Notably, the Defendants do not claim that <u>any</u> of these documents are inauthentic, a claim that would be perilous given that they or their former employee, Mattos, produced to the SEC most of these documents, and their own Oppositions rely heavily on the emails produced to the SEC by Tiscareno.  Instead, Defendants appear to complain that the

SEC has not cluttered the record with additional documents and affidavits.  But it is unnecessary for the SEC to do so on summary judgment.

Federal Rule of Civil Procedure Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact <u>cannot be presented in a form that would be admissible in evidence</u>."  (Emphasis added.)  Defendants do not meet this burden with their general Rule 901 and 1002 objections.  First, "Defendants fail to acknowledge the well-established principle that most documents Defendants themselves produce in discovery are per se authentic and need not be further authenticated to be considered on summary judgment.  …  In sum, like it or not, Defendants must consider the import of these documents; ill-informed objections as to their authenticity are not enough to hide the potential story …." *Camara v. Sanchez*, 12-cv-03040, 2013 WL 9721026, at *2, n.2 (D. Colo. Sept. 23, 2013) (citations omitted).  Further, the Tenth Circuit "do[es] not require an affidavit to authenticate every document submitted for consideration at summary judgment." *Law Co., Inc. v. Mohawk Const. and Supply Co., Inc.*, 577 F.3d 1164, 1170 (10th Cir. 2009).  In fact, at trial the SEC must simply "produce evidence sufficient to support a finding that the item is what the [SEC] claims it is."  Fed.R.Evid. 901(a).  The SEC has met this burden by producing Bates-stamped copies of documents, clearly identified copies of transcripts, and a Declaration (ECF No. 54).[5]  Therefore, to the extent Defendants dispute the SEC's

_____

[5] The SEC is providing Exhibits 224 – 240 which are (or include) copies of the cover page and signature page of each transcript cited by the SEC; Exhibit 221 are the cover letters from counsel for James Mattos (who at the time was also counsel to GenAudio) explaining productions provided to the SEC in response to a subpoena; Exhibit 222 is the cover letter from counsel for Apple, Inc., explaining productions provided to the SEC in response to a subpoena; Exhibit 223 is the cover letter from

16

statements of fact based on admissibility objections, the corresponding facts should be considered undisputed for purposes of summary judgment.

### B.     The Defendants Made Untrue Statements And Omissions

By making untrue and misleading statements and omitting material information, as well as engaging in a fraudulent scheme, the Defendants violated the antifraud provisions of the federal securities laws.  One egregious example is demonstrated by a December 8, 2010 investor letter in which Mahabub claimed, "I met with [the LCEC's] CEO and gave him a demo of our technology, and he stated, 'I really like your technology and look forward to seeing you again in the future.'  Although they are moving very slow, we are still on their radar screen, and remain very optimistic for a deal in the second or third quarter of 2011."  It is undisputed that this statement was knowingly false, material, and made to investors.  *See* Mot. SOF ¶ 94; Ex. 241 at 11. When the specific untrue statements and omissions that are the basis of the SEC's Motion are examined in light of the undisputed facts, it is clear that there is no genuine dispute as to any material fact and summary judgment is appropriate on the SEC's antifraud claims.

It is undisputed that:  (1) Mahabub falsified email correspondence between Mahabub and Apple employees, *see* Mahabub Decl. at ¶ 6 (ECF No. 61); (2) Mahabub forwarded these falsified emails to GenAudio employees, board members, and/or full-time consultants of GenAudio (the "GenAudio Team"), *id.* at ¶ 7; (3) Mahabub never met or communicated with Jobs, Schiller, or Cook regarding GenAudio or its technology, *see*

---

counsel for Tiscareno, explaining productions provided to the SEC in response to a subpoena.

Mot. SOF ¶ 51, 54, and 56;[6] (4) Jobs was not involved in Apple's dealings with GenAudio, and Apple employees did not discuss GenAudio with Jobs, *id.* ¶ 52 (n.6); (5) Apple never told Mahabub or GenAudio that it planned to incorporate GenAudio's technology in any of its new product roll-outs, *id.* at ¶ 78 (n.6); *see also* Reply SOF ¶ 78; (6) Apple never indicated that it was interested in licensing GenAudio's technology or acquiring GenAudio or GenAudio's technology, Mot. SOF at ¶ 79 (n.6);[7] *see also* Reply SOF ¶ 79; (7) Apple and GenAudio had no negotiations about Apple licensing GenAudio's technology or acquiring GenAudio or its technology, Mot. SOF at ¶ 80 (n.6); *see also* Reply SOF ¶ 80; and (8) investors purchased shares from Mahabub and GenAudio based on representations about Apple's alleged dealings with GenAudio, including Mahabub's oral representations.  Mot. SOF ¶107 (n.6); *see also id.* at ¶¶ 105 – 106 (n.6).

Further, the material untrue statements and omissions set forth in the SEC's Motion are specific and repeated:

Defendants asserted that Jobs was involved in Apple's consideration of GenAudio's technology and that Jobs wanted to meet Mahabub.  These claims went well beyond assertions of belief that Jobs would be involved in one internal Apple meeting on May 6, 2010, and, in fact, Mahabub stated that Jobs wanted to meet with

---

[6] Defendants dispute many of the SEC's statements of fact, including Mot. SOF ¶¶ 54 and 56, on the basis of the admissibility of the evidence.  Those objections are addressed in the Section IV.A, *supra*, and in the SEC's Response to Defendants' Evidentiary Objections.  Hereinafter, similar disputes on the basis of admissibility are indicated with a reference to this footnote as "(n.6)".

[7] In response to both SOF ¶¶ 79 and 80, the Defendants state "Mahabub testified he had a conversation with Isaac about licensing." GA Opp'n at 8, ¶¶ 79-80.  The SEC sets forth this conversation in its Reply SOF ¶ 79.

Mahabub, had actually met with Mahabub regarding GenAudio, and had made specific statements regarding GenAudio's technology. *See generally* Mot. SOF ¶¶ 58, 59, 63, 64, 67, 75, and 94 (n.6). For example, in October 2009, Mahabub stated that he would be meeting with Jobs "in two to three weeks (depending on his schedule) for a one on one meeting[.]" Mot. SOF ¶ 58 (n.6); Ex. 46. In April 2010, Mahabub falsified emails to make it appear as if he and Tiscareno were corresponding about the May 6, 2010 meeting being postponed because Jobs was going on vacation with his family. Mot. SOF ¶ 63 (n.6); Exs. 57 and 58. In April 2010, Mahabub sent prospective investors an email indicating that Jobs was not just reviewing a demonstration of GenAudio's technology, but was considering approval of "the integrated product rollout strategy." Mot. SOF ¶ 64 (n.6); Ex. 59 at 4 (emphasis added); *see also* Reply SOF ¶ 64. In August 2010, Mahabub claimed that Jobs had requested a "hand shake" meeting and in December 2010, he claimed that meeting had occurred and that Jobs had stated "I really like your technology and look forward to seeing you again in the future.'" Mot. SOF ¶¶ 76 and 94 (n.6); Exs. 72 and 241.

Defendants also made numerous claims that Mahabub communicated with Schiller and/or Cook, *see* Mot. SOF ¶¶ 57 – 61 (n.6), including Mahabub's false claim that "it has been requested that I carbon copy Tim [Cook] and Phil [Schiller] on some of my emails with Michael, Ron and Vic (depending on the content)." *Id.* ¶ 58 (n.6);Ex. 47 at 1.[8]

---

[8] This statement is contradicted by Mahabub's Declaration, which alleges that he added Schiller, Cook, and others to a later email (Ex. 10, dated March 21, 2010) "because my understanding was that they were now, or would soon be, involved in the process of integrating GenAudio software into Apple products." (ECF No. 61 at ¶ 23.)

As noted above, despite disseminating this false information about Mahabub's contacts with Apple executives, between November 2009 and April 2012, the Defendants did not inform investors that Mahabub's substantive communications with Apple personnel were almost always limited to mid-level engineering and marketing employees, nor did they inform investors that in September 2010, Mahabub conducted a demonstration to Apple personnel that went poorly.  Mot. SOF ¶ 104 (n.6); *see also* Reply SOF ¶ 104.

Finally, Defendants repeatedly claimed that GenAudio would likely be entering into a deal with Apple.  *See generally id.* ¶¶ 83 – 90, 94, 96, and 98 (n.6); *see also* Reply SOF ¶ 86.  For example, in November 2009, Defendants claimed that GenAudio "may be acquired within the next 6 months in light of our extensive discussions with a global industry leader in consumer electronics."  Mot. SOF ¶ 84; Ex. 70 at 2.  Just over four months later,[9] the Defendants sent investors the 2010 Offering Materials, including a cover letter that alleged "[t]his offering is being conducted to provide bridge capital until we can 'ink' a deal with a large consumer electronics company (referred to as the 'LCEC' throughout the PPM)...."  Mot. SOF ¶ 86 (n.6); Ex. 14.  In an April 30, 2010 email to prospective investors, Mahabub stated that the LCEC was "looking to acquire

_____

[9] Defendants claim the November 9, 2009 email was sent "almost six months" before the 2010 Offering and "thus was outdated and irrelevant by the time the offering started."  GA Opp'n at 30.  This is incorrect – November 9, 2009 was four months and one week before March 15, 2010.  The Offering Materials were issued within the "six months" alleged in the email.  Moreover, Mahabub sold hundreds of thousands of dollars in his personal shares between November 9, 2009 and March 15, 2010.  *See* Ex. 11.  Defendants also claim, "[b]y the time the 2010 offering opened, and no deal with Apple had been consummated, no reasonable investor could have relied on the November 9 statement."  GA Opp'n at 31.  This is disingenuous and illogical, particularly given Defendants' lengthy argument that it was entirely reasonable for Mahabub to believe a deal with Apple was imminent through at least March 2011.

GenAudio's tech for integration into their entire lineup of product offerings[.]"  Mot. SOF

¶ 64 (n.6); Ex. 59 at 4; *see also* Reply SOF ¶ 64.  In the August 1, 2010 investor letter

that alleged the CEO of the LCEC wanted a "hand-shake" meeting with Mahabub, the

Defendants also alleged "we are still moving forwarded with confidence and plan on

carrying it through all the way to the end, which could result in a significant revenue

generating license deal or the potential for acquisition of the technology or the

company."  Mot. SOF ¶ 76; Ex. 66.  In the same December 8, 2010 investor letter in

which Defendants claim that Mahabub met with Jobs regarding GenAudio, they stated

"[a]lthough they are moving very slow, we are still on their radar screen, and remain

very optimistic for a deal in the second or third quarter of 2011."  Mot. SOF ¶ 94 (n.6);

Ex. 241.  Further, despite disseminating this false information about GenAudio's

dealings with Apple, the Defendants did not disclose to investors that Apple and

GenAudio had no negotiations to license GenAudio's technology or to acquire

GenAudio or its technology or that Apple never told the Defendants that it planned to

incorporate GenAudio's technology in any of its new product roll-outs.  Mot. SOF ¶¶

102-103 (n.6).

### C.    There Was Nothing "Reasonable" About Mahabub's Conduct And He Acted With Scienter

In making the untrue statements and omissions, Mahabub acted with scienter or,

at the very least, was reckless and/or negligent.  Mahabub knew that he falsified emails.

He knew that he had never met Jobs regarding GenAudio, and that he was never told

that Jobs requested to meet him.  He also knew that there was no reasonable basis to

claim that Apple would be entering into a transaction with GenAudio within any specific

time period, during any particular quarter, or under any specific terms.[10]  These facts were within Mahabub's personal knowledge; it simply is not possible that he lacked scienter.

"Establishing scienter is typically a question of fact; however, courts can and have decided the issue of scienter on summary judgment in cases where defendants have failed to introduce particular facts or pieces of evidence showing that there exists a genuine issue of material fact with regard to the defendant's state of mind."  *SEC v. Small Bus. Capital Corp.*, No. 12-CV-3237, 2013 WL 4455850, at *9 (N.D. Cal. Aug. 16, 2013) (citing cases).  *See also SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355, 365 (D.R.I. 2011) (granting SEC summary judgment when "no reasonable jury could believe [defendant's] incredible account in light of the overwhelming evidence that she manufactured stories and records and in the absence of a single piece of evidence corroborating her account").  Further, "[w]here conclusory statements … are at total odds with the undisputed factual record, they are insufficient to raise a genuine issue of material fact as to *scienter*."  *SEC v. Aqua Vie Beverage Corp.*, No. CV 04-414-S-EJL, 2007 WL 2025231, at *5 (D. Idaho July 9, 2007).

The Defendants' claim that Mahabub lacked scienter because:  (1) "Tiscareno and Hailey <u>may have</u> expressly told Mahabub the May 6 meeting was with 'Joz' and Mahabub testified that they did so, but that he understood they had said the meeting was with 'Jobs,'" GA Opp'n at 25 (emphasis added);[11] and (2) Mahabub "reasonably

---

[10] Except, perhaps, that Apple would "not pay a per-unit royalty."  *See* Reply SOF ¶ 79.

[11] The only evidence corroborating Mahabub's story is Hailey's testimony that he and Tiscareno "may have said that we – that we were going to pitch to Jaws [sic]."

believed a deal with Apple was likely," mostly because Mahabub wanted to enter into such a deal and expressed this desire to Tiscareno, Hailey, and Isaac, *id.* at 26 - 27.[12] Neither of these excuses presents a genuine issue of material fact with respect to scienter.

First, even if the Defendants' allegations are accepted, it remains undisputed that Mahabub <u>knowingly</u>:  (1) made false statements about meeting Jobs or Jobs ever requesting to meet him; (2) created falsified emails that attributed to Jobs specific interactions and statements; and (3) made untrue statements and created falsified emails regarding the involvement of Schiller and Cook in Apple's dealings with GenAudio.  As the person who had contact with Apple employees, and sent and received the falsified communications, Mahabub cannot escape liability for these untrue statements because he acted with scienter (and, therefore, was also negligent).

Second, Mahabub was <u>at least</u> reckless and negligent in claiming that GenAudio was on the cusp of entering into any type of transaction with Apple, even if he was optimistic that such a deal may ultimately occur.  As explained by the Third Circuit:

> Even if we indulge the defendants and assume arguendo that they believed in these guarantees, we nevertheless must examine the foundation such a belief would have rested upon.  A good faith belief is not a "get out of jail free card."  It will not insulate the defendants from liability if it is the result of reckless conduct.

*SEC v. Infinity Grp. Co.*, 212 F.3d 180, 193 (3d Cir. 2000).

---

Defs. SOF ¶ 143.

[12] Mahabub's Opposition also addresses scienter with the "in connection with" requirement of Section 10(b) of the Securities Act.  *See* M. Opp'n at 30 (regarding scienter) and 31 (regarding negligence).  The "in connection with" argument is addressed in Section IV.E.

Here, the Defendants' reckless claims regarding potential transactions with Apple went well beyond Mahabub stating that he was hopeful or optimistic that Apple might eventually start negotiations with GenAudio.  Indeed, the Defendants' claims included statements about timing and terms of such a transaction, including:

- "[T]here is a strong possibility that the Company may be acquired within the next 6 months," (Nov. 9, 2009 email, Mot. SOF ¶ 84; Ex. 70 at 2).

- <u>Four months later</u> an offering materials letter claimed the offering was "being conducted to provide bridge capital until we can 'ink' a deal with [the LCEC]," (March 15, 2010 letter, Mot. SOF ¶ 86; Ex. 14; *see also* Reply SOF ¶ 86).

- The LCEC was "looking to acquire GenAudio's tech for integration into their entire lineup of product offerings," (Apr. 30, 2010 email to investors, Mot. SOF ¶ 64 (n.6); Ex. 59 at 4; *see also* Reply SOF ¶ 64).

- "I can say that our anticipation of a buyout would be the probable case when and if we ink a deal and come to terms with the LCEC," (Aug. 28, 2010 letter, Mot. SOF ¶ 89 (n.6); Ex. 72).

- "[W]e are still on their radar screen, and remain very optimistic for a deal in the second or third quarter of 2011," (Dec. 8, 2010 letter, Mot. SOF ¶ 94 (n.6); Ex. 241).

Given that no one at Apple had ever told the Defendants that Apple planned to incorporate GenAudio's technology into any of its new product roll-outs, or that it was interested in licensing GenAudio's technology or acquiring GenAudio or its technology, and Apple never entered into negotiations with the Defendants regarding any transaction, there was no foundation for these untrue statements and they were made at least recklessly and negligently.  *See* Mot. SOF ¶¶ 78 – 82 (n.6).  *See also* Mot. at 25, 27 - 28 (addressing scienter and discussing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015)).

Finally, Mahabub was also <u>at least</u> reckless and negligent in repeatedly touting Jobs' involvement in the May 6, 2010 meeting, including falsifying an entire transcript

that evening.  This is especially true given that Tiscareno was very clear that the May 6, 2010 meeting <u>was an attempt to get to first base</u>, explaining:

> [Hailey] and I are pitching this as a concept ….  Once we get the go ahead that this is a great idea, then the questions will be, "well, what about the other technologies, have we reviewed them? etc."  <u>Then we sort of start over internally….</u> <u>We have to get to first base…."</u>

Mot. SOF ¶ 66 (n.6); Ex. 56 at 1 (emphasis added).

Further, Mahabub' s sole evidence allegedly supporting his claimed confusion between "Joz" and "Jobs" is one possible (and apparently unclear) conversation with Tiscareno and/or Hailey.  *See* Defs. SOF ¶ 143.  Even if true, this exceptionally weak foundation made it particularly reckless and negligent of him to repeatedly tout Jobs "green light" to Apple's further dealings with GenAudio without confirming that Hailey and/or Tiscareno did, in fact, present to Steve Jobs, the CEO of Apple.  Such confirmation would have required almost no effort – certainly far less effort than what Mahabub undertook to falsify his emails and the alleged "transcription."

### D.    All Of The Untrue Statements And Omissions Were Material

Defendants claim that the reasonable investor would not want to know the truth about GenAudio's interactions and deal prospects with Apple.  *See* GA Opp'n at 29 – 36; M. Opp'n at 27-28.  They also claim that GenAudio's more formal communications with investors, and some GenAudio Team emails, [13]  merely expressed optimism while

---

[13] Mahabub alleges that statements in Exhibits 8, 9, and 10 are "nonactionable puffery" and subject to the "bespeaks caution" doctrine.  M. Opp'n at 28-29.  The SEC does not seek summary judgment based on the falsity of Mahabub's statements in Exhibit 8 or 9.  The SEC does contend that Exhibit 10 contains actionable false statements that are material for the reasons noted in the Motion and *infra*.  *See* Mot. SOF ¶ 45; Exs. 10 and 34.

also providing sufficient cautionary language.  *Id.*  But it is undisputed that GenAudio's offering materials and shareholder updates were important to investors, and that investors purchased GenAudio shares based on representations about Apple's dealings with GenAudio.  SOF ¶¶ 105-107 (n.6).  During the 2010 and 2011-2012 Offering, the most significant aspect of an investment in GenAudio was a potential transaction with Apple.  There is no genuine issue of material fact as to the materiality of Defendants' untrue statements and omissions.

### 1.  The Untrue Statements Are Not "Mere Puffing" Or Sheltered By The "Bespeaks Caution" Doctrine

GenAudio and Mahabub allege that the false statements and omissions related to the potential transaction with Apple contained within GenAudio's 2010 Offering Materials and shareholder letters are not material because they constitute "mere puffing" or they fall within the "bespeaks caution" doctrine.  *See* GA Opp'n at 29 - 34. Neither theory excuses the repeated false statements.

"Whether information is material also depends on other information already available to the market; unless the statement 'significantly altered the 'total mix' of information' available, it will not be considered material."  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).  Forward-looking statements constituting "vague statements of corporate optimism" are not actionable because they constitute "mere puffery."  *See id.*  Relatedly, "[f]orward-looking representations are also considered immaterial when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements <u>concerning the subject matter of the statements at issue to nullify any potentially misleading effect</u>."  *Id.* at 1120 (emphasis added).  However, "[c]autionary language cited to justify application of the

doctrine must precisely address the substance of the specific statement or omission that is challenged.  In addition, cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made." *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

Between November 2009 and April 2012, the information "available to the market" for GenAudio stock consisted of falsehoods about Mahabub's purported interactions with high-level Apple executives (including Steve Jobs), those executives' involvement in the evaluation of GenAudio's technology, and the possibility of a transaction between GenAudio and Apple.  Against that backdrop, the Defendants issued investor solicitations and communications that claimed, among other things, that GenAudio may be acquired within 6 months (Nov. 9, 2009 email, Mot. SOF ¶ 84; Ex. 70 at 2), the 2010 Offering was to provide "bridge capital until we can 'ink' a deal" with Apple (March 15, 2010 letter, Mot. SOF ¶ 86 (n.6); Ex. 14), that GenAudio believed Apple would either enter into either a licensing arrangement or an acquisition of GenAudio's technology (*see* Mot. SOF ¶¶ 87, 89, 94 and 97 (n.6)), that Apple was "looking to acquire GenAudio's tech for integration into their entire lineup of product offerings" (*id.* ¶ 64 (n.6); *see also* Reply SOF ¶ 64), that GenAudio anticipated that "a buyout would be the most probable case when and if we ink a deal and come to terms with the LCEC" (Aug. 28, 2010 letter, SOF ¶ 89; Ex. 72), and that GenAudio remained "very optimistic for a deal in the second or third quarter of 2011" (Dec. 8, 2010 letter, SOF ¶ 94; Ex. 241).  This was Defendants' sales pitch.

Such statements go well beyond those that the Tenth Circuit found to be "soft, puffing statements, incapable of objective verification" in *Grossman*.  120 F.3d at 1121 -

27

1122 (discussing statements that Novell had experienced, "substantial success" in integrating sales forces, and that a merger was moving "faster than we thought" and presented "a compelling set of opportunities").  The untrue statements alleged here include baseless claims that transactions may occur between GenAudio and Apple, sometimes within a specific period of time.  These were not general, "feel good" statements about GenAudio, but specific claims that influenced investor decisions.  *See* Mot. SOF ¶107 (n.6); *see also id*. at ¶¶ 105 – 106 (n.6).

Defendants point to the statements "nothing is assured yet," the 2010 PPM's general cautionary language, "when and if we ink a deal and come to terms," and "[w]hile we cannot make any guarantees" as sufficient cautionary language subject to the bespeaks caution doctrine.  GA Opp'n at 31-34.  This language is insufficient to nullify the Defendants' misstatements.  First, as explained in the Motion and *infra*, Defendants' knew the untrue statements were false when made.  Second, these documents failed to make any specific disclosures informing investors as to the actual status of GenAudio's dealings with Apple, including the complete absence of negotiations with Apple regarding any licensing or acquisition transactions or the fact that Apple had never told GenAudio that it planned to incorporate GenAudio's technology in any of its new product roll-outs.  Mot. SOF ¶¶ 101 – 104 (n.6) (addressing omissions).  Defendants did just fail to "caution" investors, they failed to disclose material information to investors.

### 2.  The Untrue Statements And Omissions Regarding Apple Executives Were Material

Defendants also claim that the false statements and omission regarding Apple executives were not material because a reasonable investor would care only about

28

"Steve Jobs personally [hearing] a demonstration of GenAudio's technology and [giving] a green light to continue with GenAudio[.]"  GA Opp'n at 35.  This unsubstantiated, conclusory allegation is insufficient to raise a genuine issue of material fact.  Further, Steve Jobs never did personally have any involvement in GenAudio (Mot. SOF ¶ 51-52 (n.6)); therefore, there is no dispute with respect to the false statements regarding Jobs.

### E.   The Fraudulent GenAudio Team Emails Were "In Connection With" The Purchase And Sale Of Millions Of Dollars In Securities[14]

Defendants' "in connection with" argument boils down to an assertion that because Mahabub's falsified emails may not have been forwarded directly to additional investors who then purchased shares in reliance on those emails, the SEC does not have jurisdiction over GenAudio's and Mahabub's fraud.  M. Opp'n at 23 - 26.  But in doing so, Defendants glaze over critical facts, as well as legal authority addressing the "in connection with" element of Section 10(b) of the Exchange Act.[15]

The "in connection with" and "in the offer or sale of" requirements of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act are broad and reflect the intent of the statutory scheme of the federal securities laws.  The Supreme Court has explained, "[a] fundamental purpose, common to these statutes [including the

_____

[14] With the exception of a November 2009 shareholder letter and the falsified transcript forwarded to Skluzak (which the SEC address *infra*), the Defendants do not challenge that the untrue statements and omissions made in: (1) GenAudio's private placement memoranda; (2) the shareholder communications; or (3) Mahabub's direct communications to non-GenAudio Team investors were "in connection with" the purchase or sale of a security and "in the offer or sale" of a security.  *See* GA Opp'n at 35 (incorporating Mahabub's arguments) and M. Opp'n at 22 – 26 (addressing GenAudio Team Emails).

[15] Defendants do not address the Securities Act's "in the offer or sale of any security" element.

Securities Act and the Exchange Act], was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963).[16] It is against this backdrop that authority such as *Wolfson* has developed and explained that Supreme Court has "espoused a broad interpretation" of the "in connection with" element. *See SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008). This "broad interpretation" is not limited to "public dissemination of a document." M. Opp'n at 22. *See Wolfson*, 539 F.3d at 1262 (describing the broad and flexible application before addressing the specific issue of public documents). *See also SEC v. Chen*, No. 2:15-cv-07425, 2016 WL 7469683, at *9 (C.D. Cal. Dec. 8, 2016) ("Coincidence between scheme to defraud and sale of securities is enough to satisfy the 'in connection' element of Rule 10b-5").

Defendants argue that a material issue of fact exists because the SEC has not established that "the [GenAudio Team] emails caused any purchases [of GenAudio securities]." M. Opp'n at 25. This is merely an attempt to read "reliance" as an element into an SEC enforcement action. "'Justifiable reliance,' however, is not an element of an SEC enforcement action because Congress designated the SEC as the primary

---

[16] *See also United States v. Naftalin*, 441 U.S. 768, 775 (1979) (quoting the Senate Report for the Securities Act: "The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion; to restore the confidence of the prospective investor in his ability to select sound securities; to bring into productive channels of industry and development capital which has grown timid to the point of hoarding; and to aid in providing employment and restoring buying and consuming power.").

enforcer of the securities laws, and a private plaintiff's 'reliance' does not bear on the determination of whether the securities laws were violated, only whether that private plaintiff may recover damages."  *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012) (collecting cases).  *See also SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985) ("whether or not investors detrimentally relied upon [defendant's] misstatements is not material to the present suit.  …  [T]he Commission is not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money").

Relatedly, Defendants' arguments regarding Skluzak's receipt of the falsified transcript (M. Opp'n at 25 – 26) focus on an argument that Skluzak did not "rely" on the email.  As noted above, such reliance is unnecessary.  Further, Defendants ignore that it is undisputed that many investors, including Skluzak, invested based on the false information being disseminated by Mahabub.  *See, e.g.* SOF ¶ 107 (n.6); Ex. 30 at 29:12 – 30:5 (describing how Skluzak invested in May of 2010 because of two meetings in which Mahabub told Skluzak "that Mr. Jobs stated to Mr. Mahabub that he was very impressed with the technology and that the level of interaction Mr. Mahabub was having at Apple Computer was extensive and high level.").  This case is therefore readily distinguishable from the alleged Rule 10b-10(a)(7)(i) violation in *Arst v. Stifel, Nicolaus & Co., Inc.*, 86 F.3d 973, 977 (10th Cir. 1996) (customer's request for information required to be provided upon written request was not "in connection with" when customer did not make the request until eight months after the sale).

Defendants' reliance on *Anixter v. Home-Stake Prod. Co.* and cases similar to it is misplaced because Mahabub is not an accountant.  In *Anixter*, the Tenth Circuit did

31

not develop a separate "in connection with" test relevant to internal documents; rather, the court explained, "we conclude that <u>in order for accountants</u> to 'use or employ' a 'deception' actionable under the antifraud law, they must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors."[17]  77 F.3d 1215, 1226 (10th Cir. 1996).  The court explained, "this rule, though far from being a bright line, provides more guidance to litigants than a rule allowing liability to attach to an accountant or other outside professional who provided 'significant' or 'substantial' assistance to the representations of others."[18]  *Id.* at 1227.

Further, even if the "knew or should have known" standard is applied, the undisputed evidence establishes that Mahabub did know, or should have known, that the content of his falsified emails would be distributed to investors because:  (1) the recipients <u>included current shareholders</u> (Mot. SOF ¶ 42) – as a result, individuals who had previously purchased shares and who *per se* had investment decisions to make regarding the potential additional purchase of shares, the retention of their shares, and/or the disposition of their shares received these emails; (2) the recipients included Mattos, a significant fund-raiser and investor communicator for GenAudio, and who also assisted Mahabub in selling his personal shares (Mot. SOF ¶¶ 5-6; see also Reply SOF

_____

[17] *Anixter* does address <u>potential</u> investors, not just "investors."  *See* M. Opp'n at 24.  Further, as noted in Reply SOF ¶ 86, GenAudio's shareholders were all "potential investors."  *Anixter* is further distinguishable because it addressed "when conduct constituting aiding and abetting rises to the level of prohibited primary conduct" in a private action.  77 F.3d at 1223 – 1224.

[18] *SEC v. Nacchio* is similarly distinguishable because the court followed *Anixter* in addressing the liability of an accountant whose violations were premised, in relevant part, on "silence."  438 F.Supp.2d 1266, 1281-82 (D. Colo. 2006).  The five moving defendants in *SEC v. Delphi* were also accountants or served in financial functions.  No. 06-14891, 2008 WL 4539519 (Oct. 8, 2008).

¶ 6); (3) Mahabub encouraged all of the recipients to assist with fundraising during the 2010 Offering (Ex. 9 (March 19, 2010); Ex. 10 (March 21, 2010)); and (4) Mahabub personally provided additional investors with information about his alleged contact with Jobs, demonstrating a lack of secrecy (*see* Mot. SOF ¶¶ 40, 69-70, 107 and transcripts cited therein (n.6)).  There is no genuine issue of material fact that the falsified GenAudio Team emails were "in connection with the purchase or sale" and "in the offer or sale" of GenAudio's securities.

### F.   Defendants Conduct Constitutes Untrue Statements, Material Omissions, And A Fraudulent Scheme

Defendants claim that Mahabub's falsified emails to the GenAudio Team cannot constitute scheme conduct actionable under Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) because the altered emails cannot constitute fraudulent misrepresentations and deceptive conduct in furtherance of a scheme.  GA Opp'n at 38-39; M. Opp'n at 31-32.  First, the SEC <u>has</u> set forth that Mahabub engaged in deceptive conduct separate from his untrue statements and omissions because he altered emails and sent them to his team.  *See* Mot. at 36 - 37.  Further, as explained in the 2016 Commission opinion in *Dennis J. Malouf*, 2016 WL 4035575, at *8-12 (July 27, 2016), the all three subsections of Section 17(a) and Rule 10b-5 are violated by Mahabub's conduct, including his repeated misstatements.  *See* Mot. at 37 n.11.

Mahabub also asserts that the SEC cannot tie the emails "to any particular transaction."  M. Opp'n at 31-32.  To the extent this is merely a reiteration of his "in connection with" and reliance arguments, the SEC addressees the issue in Section IV.E.  To the extent he asserts that the SEC's Section 17(a)(3) claim is unfounded, he is incorrect because his falsified emails were <u>repeated</u> and therefore constitute

"transactions" subject to Section 17(a)(3).  *See Malouf*, 2016 WL 4035575, at *12

(quoting 17(a)(3) and noting "[a]lthough this language closely resembles Rule 10b-5(c),

Section 17(a)(3) uses the term "transaction" rather than the broader term "act").  In

*Malouf*, the Commission explained that to fall within the purview of 17(a)(3), there must

either be a single "act" that could be considered a transaction, practice, or course of

business, or "repeated acts, such as repeatedly making or drafting materially misleading

statements over a period of time, may be considered a fraudulent 'practice' or 'course of

business.'"  *Id*. at *12.  Mahabub's repeated falsified emails, spanning months, fall within

Section 17(a)(3)'s requirement of transactions, practices, and courses of business.

### G.   Defendants Are Liable For Unregistered Sales Of Securities

#### 1.   The SEC Established Defendants Violated The Registration Provisions Of Section 5

The SEC is entitled to summary judgment on its claim that GenAudio and

Mahabub violated the securities registration provisions of Section 5(a) and (c) of the

Securities Act, 15 U.S.C. § 77e(a) and (c), and no exemption from registration applies.

To establish a *prima facie* violation of Section 5, the SEC must prove three elements:

(1) the defendant directly or indirectly offered or sold securities, (2) when no registration

statement was in effect as to those securities transactions, (3) by use of interstate

transportation or communication and the mails were used in connection with the sale or

offer of sale.  *See SEC v. Parrish*, 11-cv-00558-WJM-MJW, 2012 WL 4378114, at *3 (D.

Colo. Sept., 25, 2012).

Defendants admit that GenAudio and Mahabub (1) directly and indirectly offered

and sold GenAudio stock (Mot. SOF ¶¶ 15 (n.6), 19-22, 25-26, 28-29 (n.6)) (2) by use of

interstate commerce (Mot. SOF ¶¶ 23-26, 30), (3) when no registration statements were

filed or in effect with the SEC for those offerings (Mot. SOF ¶¶ 14-15, 19-20).  GA Opp'n

at 2; M. Opp'n at 2-3.  Once the SEC establishes a prima facie violation, then the

burden shifts to the defendants to demonstrate that a claimed exemption from

registration is available.  *Quinn & Co. v. SEC*, 452 F. 2d 943, 945-46 (10th Cir. 1971),

citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).

### 2.  The Defendants Cannot Establish an Exemption From Registration Under Rule 506

To prevail on summary judgment, the SEC must show the absence of a genuine

issue of fact with respect to an essential element of the Defendants' defense that their

sales are exempt from registration under the provisions of Section 4(2) and Rule 506.

*SEC v. Indigenous Global Dev. Corp.*, 2008 U.S. Dist. LEXIS 50434, *27-28 (N.D. Cal.

June 30, 2008), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Fitzpatrick v.

City of Atlanta*, 2 F.3rd 1112 (11th Cir. 1993).  Once the movant has made this showing,

the burden then shifts to the party opposing summary judgment to designate "specific

facts showing there is a genuine issue for trial." *Celotex* at 323.  The undisputed facts

establish that Defendants cannot meet their burden of proof, because they sold

securities to unaccredited investors to whom they did not provide audited financial

statements as required by Rules 506 and 502.

GenAudio and Mahabub claim that their sales are exempt from registration under

the safe harbor of Rule 506 of Regulation D and Section 4(a)(2) of the Securities Act.[19]

_____

[19] Section 4(a) (2) provides that the provisions of Section 5 shall not apply to
"transactions by an issuer not involving any public offering."  15 U.S. C. § 77d(a)(2)
(2010).  Rule 506 implements the statutory exemption involving sales of securities that
are not public offerings.  *See* 17 C.F.R. § 230.506 (2010).  To meet the conditions of
Rule 506, an offer or sale must satisfy the terms of Rules 501 and 502, and the issuer
must reasonably believe that there are no more than 35 non-accredited investors who

GenAudio and Mahabub Answers, Third Affirmative Defense (ECF No. 14 & 15 at p. 35 & 28, respectively).  To establish an exemption under Rule 506, GenAudio must comply with a number of requirements including provisions in Rules 501 and 502.  17 C.F.R. § 230.506(b)(1).  If GenAudio sold stock to purchasers who were unaccredited, it must provide certain information to those purchasers, including audited financial statements. 17 C.F.R. § 230.502(b)(1), (2)(B)(2).  Defendants admit they did not provide audited financial statements to any of the purchasers.  Mot. SOF ¶ 31.  If GenAudio and Mahabub made sales to unaccredited investors, then the Rule 506 exemption does not apply.

To determine whether its investors were accredited, GenAudio sent questionnaires that requested the investor mark one of several boxes to indicate if he or she met one of the definitions for being an accredited investor.  Mot. SOF ¶¶ 32-34 (n.6).  GenAudio received questionnaires from several investors who did not mark any box affirmatively representing that they were qualified as accredited investors.  *Id.*  The SEC requested GenAudio produce its investor files and other documents that demonstrated GenAudio had a reasonable basis to believe these seventeen investors were accredited.  Hughes Decl. ¶ 3.  For thirteen of the seventeen investors, GenAudio produced questionnaires dated in 2010 or 2011 that contain no representation that the investor was accredited.  *Id. at ¶ 4.*  For four of the seventeen investors, GenAudio produced no questionnaire.  *Id.*  At least two investors represented in questionnaires

purchased the securities.  17 C.F.R. § 230.506(b)(1), 2(i).  An accredited investor must meet certain net worth or income requirements.  17 C.F.R. § 230.501(a)(5), (a)(6).  If an issuer sells securities under Rule 506 to any purchaser that is not an accredited investor, the issuer must furnish information including audited financial statements in offerings up to $7,500,000.  17 C.F.R. § 230.502(b)(1), (2)(B)(2).

related to investments in 2004 that they were not accredited.  *Id.*  Marvin, who

purchased shares directly from Mahabub in 2009 and from GenAudio in five

transactions between 2010 and 2012, provided blank questionnaires to GenAudio and

was not an accredited investor.  *Id., s*ee also Second Declaration of George Marvin, and

Exhibits 220 and 26.  Under these circumstances, GenAudio cannot meet its burden of

proving it had a reasonable basis to believe all of its investors were accredited.

Mattos testified that he reviewed questionnaires to determine if they were

complete and contacted one or two investors asking them to resubmit forms, but at

times of high activity he missed some forms.  Mot. SOF ¶ 35, Ex. 6, Mattos Dep.

169:23-171:4.[20]  Mattos admitted that he overlooked a small handful of questionnaires

that were not checked off.  *Id.*  Mattos' statement is corroborated by the blank investor

questionnaires that GenAudio produced. Hughes Decl. ¶ 4.

In an attempt to dispute the lack of investor certification that they were

accredited, Mahabub states, "Prior to their purchase of GenAudio stock (either from me

personally or from GenAudio), I had a personal relationships with <u>many</u> of the investors,

and knew them to satisfy the criteria of an "accredited investor" based on my long term

interactions with them."  Mahabub Dec. ¶ 4 (ECF No. 61) (emphasis added).  Mahabub

also states that he knew five doctors who were family friends and that each was an

accredited investors.  *Id.* ¶ 5.  These statements do not create a disputed issue of fact

as to whether GenAudio sold shares to unaccredited investors, because Mahabub does

---

[20] Mattos' review and follow up with some investors does not create a disputed
issue of fact, that GenAudio possessed blank questionnaires from some investors and
so had a reasonable basis to believe these investors were accredited.  *See* Mot. SOF ¶
35.

not assert he had a personal relationship with <u>all</u> the investors.  In fact, Mahabub admitted he did not know Marvin.  Ex. 235, Mahabub Dep. 468:1-11.

Furthermore, the Court should strike Mahabub's statements in paragraphs 4 and 5 of his declaration, because Mahabub demonstrates no personal knowledge about each investor's income in the two years preceding each stock purchase or the amount of investor's assets at the time of each purchase.  *See Pinnacle Comm. Int'l, Inc. v. American Family Mortgage Corp.*, 417 F. Supp. 2d. 1073, 1084-85 (D. Minn. 2006) (striking declaration for lack of personal knowledge).  Mahabub admits he can <u>only speculate</u> as to whether investors had previously filled out an investor questionnaire.  Mahabub Dec. at ¶ 16.  Mahabub's speculation is not a reasonable basis to believe that all the investors were accredited particularly where GenAudio and Mahabub admitted in the 2010 and 2011-2012 PPMs that since 2003, the Company "sold securities to accredited and non-accredited 'friends and family' investors," which may not have qualified for exemption from registration.  Ex. 243, 2010 PPM at 44-5; Ex. 244, 2011 PPM at 53-54.

Defendants present no facts to dispute that Marvin and at least twelve other investors were not accredited investors when they purchased shares from Mahabub personally or GenAudio in the 2010 and 2011-2012 Offerings.[21]  Summary judgment is the "put up or shut up" moment in the lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.  *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004).

---

[21] Notably, Defendants submitted declarations from two of these unaccredited investors, Marvin and Eastwood, but they are silent on the issue of accreditation.  See ECF Nos. 58-75 and 58-74.

### 3. Defendants Also Do Not Qualify For A Private Offering Under Section 4(a)(2)

Defendants do not qualify for an exemption from registration under Section 4(a)(2), which exempts transaction by an issuer not involving a public offering, 15 U.S.C. § 77d(a)(2) (2010). [22] Four factors are relevant in determining if an offering of securities is public or private: (1) the number of offerees and their relationship to the issuer; (2) the number of units offered; (3) the size of the offering, and: (4) the manner of the offering. *Hill York Corp. v. American Int'l Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971). The number of offerees, not the number of purchasers, is the relevant figure in considering the number of persons involved in an offering. *Id.* Public advertising is incompatible with the claim of a private offering. *Id.* Where the issuer produced no evidence as to how many offers were made to other persons or the experience of those persons, the court cannot determine whether the class needed protection of the registration provisions. *Repass v. Rees*, 174 F. Supp. 898 (D. Colo. 1959).

GenAudio admits it produced no evidence on the number of investors solicited in the 2010 and 2011-2012 Offerings, or their investment experience. Mot. SOF ¶ 27. GenAudio and Mahabub engaged in general solicitations using "road shows" at which Mahabub made public presentations. *Id.* ¶ 29; Ex. 17. Mahabub admitted in a June 2010 email to sending over 20 private placement memoranda (PPMs) by email to contacts that he made at the FSX event and handed out an additional 16 PPMs at the event. *See* Mot. SOF ¶ 29 (n.6); Exs. 17 & 18. "Whether a security offering is a private offering is a question of fact which requires [the Court] to consider all surrounding

---

[22] Mahabub may not claim an exemption under Section 4(a)(2) because he is not an issuer. See *15 U.S.C. § 77b(a)(4).*

circumstances, including the relationship between the offerees and the issuer, and the nature, scope, size, type, and manner of the offering.  *Anastasi v. American Petroleum Inc.*, 579 F. Supp. 273, 274-75 (D. Colo. 1984).  Where the Defendants cannot identify the persons to whom they offered the securities, they cannot establish that they are entitled to a private offering exemption under Section 4(2).

The SEC has established with undisputed facts that the Defendants committed violations of the registration provisions of Section 5(a) and (c), and that they are not entitled to an exemption from registration because they sold in public offerings to unaccredited investors without providing audited financial statements; therefore, the SEC is entitled to summary judgment on its Eighth Claim for Relief against Mahabub and GenAudio.

## V.      **CONCLUSION**

Based on the foregoing and its Motion, the SEC respectfully requests that the Court enter an Order granting summary judgment against Defendants Mahabub and GenAudio as to their liability for the First, Second, Third, Fourth, and Eighth Claims against them.  Alternatively, the Commission requests that summary judgment be entered against Mahabub as to his liability for the Fifth, Sixth, and Seventh Claims alleged against him.

DATED:  May 12, 2017

Respectfully Submitted,


*/s Danielle R. Voorhees*

Leslie J. Hughes (Colo. Bar No. 15043)
Danielle R. Voorhees (Colo. Bar No. 35929)
Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO  80294-1961
Telephone: (303) 844-1000
Fax: (303) 297-3529
Email: HughesLJ@sec.gov
        VoorheesD@sec.gov
*Attorneys for Plaintiff Securities and Exchange*
*Commission*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 12, 2017, the document above was e-filed with the Court's ECF system and will be served on those listed below:

Andrew B. Holmes
Holmes, Taylor & Jones, LLP
617 South Olive Street, Suite 1200
Los Angeles, CA 90014
Telephone: 213-985-2265
Email: abholmes@htjlaw.com
*Attorney for Defendant Taj Jerry Mahabub*

Michael P. McCloskey
Wilson Elser Moskowitz Edelman & Dicker LLP
655 West Broadway, Suite 900
San Diego, CA 92101
Telephone: 619-321-6200
Email: Michael.McCloskey@wilsonelser.com
*Attorney for Defendant GenAudio, Inc.*

Jeffrey G. Benz
Benz Law
12021 Wilshire Boulevard, Suite 256
Los Angeles, CA 90025
Telephone: 310-570-2774
Email: JeffreyBenz@gmail.com
*Attorney for Defendant Astound Holdings, Inc.*

*s/ Elinor E. Blomgren*
Elinor E. Blomgren