EXCERPTED

# EXHIBIT 224

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF COLORADO

 3                      ---o0o---

 4

 5   SECURITIES AND EXCHANGE        )

 6   COMMISSION,                    )

 7           Plaintiff,             )

 8     vs.                          )   No. 1:15-CV-2118

 9                                  )       WJM-CBS

10   TAJ JERRY MAHABUB, GENAUDIO,   )

11   INC. and ASTOUND HOLDINGS,     )

12   INC.,                          )

13           Defendants.            )

14   _____)

15

16

17              DEPOSITION OF RONALD ISAAC

18              FRIDAY, JANUARY 13, 2017

19

20

21

22

23

24   PAGES 1 - 214

25
```

Page 1

```
 1
 2
 3
 4
 5
 6
 7
 8
 9      Deposition of RONALD ISAAC, taken on behalf of
10  Defendants, at 2765 Sand Hill Road, Menlo Park,
11  California, commencing at 10:25 a.m., Friday,
12  January 13, 2017, before Kelli Combs, CSR 7705.
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    Page 2
```

```
 1  APPEARANCES OF COUNSEL CONTINUED:
 2      WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
 3      BY:  DAVID AVENI, ESQ.
 4      655 West Broadway, Suite 900
 5      San Diego, California 92101
 6      619.321.6200
 7      david.aveni@wilsonelser.com
 8
 9
10  FOR THE WITNESS:
11      O'MELVENY & MYERS
12      BY:  CLAY MARQUEZ, ESQ.
13      Two Embarcadero Center, 28th Floor
14      San Francisco, California 94111
15      415.984.8700
16      cmarquez@omm.com
17
18
19
20
21
22
23
24
25
                                                    Page 4
```

```
 1  APPEARANCE OF COUNSEL:
 2  FOR PLAINTIFF:
 3      SECURITIES AND EXCHANGE COMMISSION
 4      BY:  LESLIE J. HUGHES, ESQ.
 5      1961 Stout Street, Suite 1700
 6      Denver, Colorado 80294-1961
 7      303.844.1000
 8      hughes.j@sec.gov
 9
10  FOR DEFENDANT ASTOUND HOLDINGS:
11      BENZ LAW
12      BY:  JEFFREY G. BENZ, ESQ.
13      12021 Wilshire Blvd., Suite 256
14      Los Angeles, California 90025
15      310.570.2774
16      jeffreybenz@gmail.com
17
18  FOR DEFENDANT TAJ JERRY MAHABUB:
19      HOLMES TAYLOR & JONES, LLP
20      BY:  ANDREW B. HOLMES, ESQ.
21      617 South Olive Street, Suite 1200
22      Los Angeles, California 90014
23      abholmes@htjlaw.com
24
25
                                                    Page 3
```

```
 1                  I N D E X
 2  January 13, 2017
 3
 4  RONALD ISAAC
 5  EXAMINATION                        PAGE
 6
 7      (BY MR. AVENI)          9, 207
 8      (BY MR. HOLMES)        178, 208
 9      (BY MS. HUGHES)          184
10
11              I N D E X
12          EXHIBITS FOR IDENTIFICATION
13  EXHIBIT NO.                        PAGE
14  Exhibit 157   Email chain Bates stamped      59
                  347APL-00000608 through
15                -621
16  Exhibit 158   Email from Mr. Mahabub to      78
                  Ronald Isaac and Vic
17                Tiscareno dated
                  September 15, 2009, Bates
18                stamped
                  SEC-Tiscaareno-V-E-0000526
19
    Exhibit 159   Email from Jerry Mahabub to    81
20                Victor Tiscareno and others
                  dated October 19, 2009,
21                Bates stamped
                  SEC-TiscarenoV-E-0000635
22                and -636
23  Exhibit 160   E-mail exchange between        82
                  Mr. Tiscareno and Jerry
24                Mahabub dated October 22,
                  2009, Bates stamped
25                SEC-TiscarenoV-E-0000645
                                                    Page 5
```

2 (Pages 2 - 5)

Page 6:

```
 1            I N D E X
 2       EXHIBITS FOR IDENTIFICATION
 3  EXHIBIT NO.                    PAGE
 4  Exhibit 161  Email string Bates stamped   85
        SEC-TiscarenoV-E-0000649
 5      and -650
 6  Exhibit 162  Email chain Bates stamped    88
        347APL-00000537 through
 7      -541
 8  Exhibit 163  Email chain dated       103
        October 30, 2009
 9
    Exhibit 164  Email string Bates stamped   116
10      SEC-TiscarenoV-E-0000750
        and -751
11
    Exhibit 165  Email chain dated       121
12      January 4, 2010, Bates
        stamped
13      SEC-TiscarenoV-E-0000956
14  Exhibit 166  Email from Jerry Mahabub to  137
        Ronald Isaac dated June 8,
15      2010, Bates stamped
        SEC-TiscarenoV-E-0001184
16
    Exhibit 167  Email string Bates stamped   160
17      SEC-TiscarenoV-E-0001421
        and -1422
18
    Exhibit 168  Email string Bates stamped   161
19      SEC-TiscarenoV-E-0001742
        and -1743
20
    Exhibit 169  Email string Bates stamped   169
21      347APL-0000095 through -097
22  Exhibit 170  Email string Bates stamped   173
        347APL-00000066 through
23      -069
24  Exhibit 171  Photocopy of stick-on       185
        badges from Apple
25
                                      Page 6
```

Page 8:

```
 1         PREVIOUSLY MARKED EXHIBITS
 2           EXHIBIT    PAGE
 3            130      152
 4            131      153
 5            132      165
 6            133      168
 7
 8
 9              *   *   *   *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                      Page 8
```

Page 7:

```
 1              I N D E X
 2         EXHIBITS FOR IDENTIFICATION
 3  EXHIBIT NO.                    PAGE
 4  Exhibit 172  Photograph of Steve Jobs    195
 5  Exhibit 173  Photograph of Tim Cook      196
 6  Exhibit 174  Photograph of Phil Schiller 196
 7  Exhibit 175  Photograph of Greg Joswiak  197
 8  Exhibit 176  Photograph of Victor        198
              Tiscareno
 9
10
11
12          PREVIOUSLY MARKED EXHIBITS
13             EXHIBIT   PAGE
14             96       50
15             99       57
16             105      107
17             106      113
18             112      129
19             113      131
20             119      141
21             120      143
22             121      144
23             123      148
24             125      149
25             126      150
                                      Page 7
```

Page 9:

```
 1            RONALD ISAAC,
 2  after having been duly sworn, testified as follows:
 3              ---o0o---
 4
 5            EXAMINATION
 6  BY MR. AVENI:
 7     Q   Good morning, Mr. Isaac.  So my name is David
 8  Aveni, and I represent GenAudio, the company in this
 9  case.
10        Thank you very much for taking time for this
11  deposition today.
12        MR. AVENI:  Do we want to do appearances?
13        THE REPORTER:  (Shakes head.)
14  BY MR. AVENI:
15     Q   I know you testified during the administrative
16  proceeding in this case.
17        Have you -- other than that, have you ever had
18  your deposition taken?
19     A   That was my first.
20     Q   The first time?
21     A   Yeah.
22     Q   And I'm sure your attorney has walked through
23  how depositions work.  Just to make it easy and make
24  sure we're all on the same page, I'll run through kind
25  of the standard instructions that everybody gives in
                                      Page 9
```

3 (Pages 6 - 9)

Veritext Legal Solutions
866 299-5127

1 this, that would probably hand-carry something if --
2 if -- if to garner kind of like I was mentioning before
3 without a process.
4        And -- and so if I were involved in any one of
5 these, I do not recall at any time in my career there,
6 quite honestly, that I brought a vendor in and had to go
7 through a process like that.  So I wouldn't know
8 exactly, because such a breadth of the compass, so huge
9 and so big, that there wasn't even a group that was
10 responsible in saying, Okay, I will bring technology in
11 and this is the path it will go and stuff like that.
12        So let me answer that question from my point
13 of view.  I never witnessed that.
14    Q   Okay.
15        But from a vendor's perspective, software
16 vendor's perspective, I mean, that's the whole purpose
17 in talking to you, right, is to see whether ultimately
18 Apple is interested in licensing or acquiring the
19 technology?
20        MR. MARQUEZ:  Objection to the extent it calls
21 for speculation.
22        If you know, you can answer.
23 BY MR. AVENI:
24    Q   You can answer.
25    A   I mean, there are many -- this would fall in

Page 30

1        So let's talk a little more specific about
2 GenAudio, then.
3        Is it fair to say from all of your
4 communications with Jerry Mahabub at GenAudio that it
5 seemed to be his motive in his discussions with you at
6 Apple that he was hoping it would lead to a license of
7 his technology or an inquiring of his technology?
8    A   We never discussed business opportunities with
9 Jerry, never.
10    Q   But he mentioned it a number of times, right?
11    A   I do not recall that, and I wouldn't have even
12 actually entertained it; not to the -- to the least of
13 it.
14    Q   Okay.
15        So -- so you're saying you're not aware that
16 he had that motive?
17    A   No.
18    Q   Okay.
19        Could you describe for me the evaluation
20 process as a general matter that you would go through to
21 look at a vendor's software.  What are the steps along
22 the way?
23    A   I will describe to you what I engaged GenAudio
24 with and many others specifically.  Even though the role
25 was to explore during that time period that you

Page 32

1 the guessing category again.  Quite honestly.  I mean,
2 from a business point of view, I would -- if I were to
3 speculate, I don't know, right?  I mean, if I was
4 rendering services and stuff like that, I'm not sure if
5 that's the intent.
6        There might be many, many intents in business.
7 Some of them could be acquisition strategy, some of them
8 could be licensing opportunities, some of them could be
9 explore and -- and get an opinion for marketing
10 purposes, right?
11    Q   That certainly seems to be a common motive for
12 them to -- for a vendor to talk to Apple, though, right?
13    A   I'm not sure.  I've seen -- I've seen many,
14 many varieties.  I've seen ones where they come to get
15 an Apple badge of acceptance, for example.  You know,
16 some of them, even though the NDAs clearly claim that
17 you cannot -- you cannot disclose that you were here, we
18 have seen some situations where people come and say, You
19 know, even Apple liked it.
20        So it's -- it's very, very hard to tell what
21 the motives are of these different engagements are, and
22 I wouldn't want to be in that position, quite honestly,
23 because my title and my -- my rank just did not give me
24 any opportunity to explore any of that.
25    Q   Okay.

Page 31

1 mentioned, my manager asked me to prepare -- prepare a
2 software package that would allow vendors to drop in
3 their software into a Macintosh platform so we can hear
4 the benefits and the experience enhancements that it
5 would implement on a Macintosh platform with the
6 hardware built in.
7        There were some issues, of course, because the
8 way the speaker drivers were implemented on the
9 Macintosh had to do with the kernel, which is the team
10 that I was in, and the kernel, I would go in there in a
11 little detail to describe what it is exactly, because it
12 does have an interesting distinction of its difficulty.
13        If this was not in the kernel, then any other
14 vendor could just open up an SDK from Apple without even
15 approaching Apple, implement their algorithms and -- and
16 would be able to come in with a Mac and just demonstrate
17 it.
18        Unfortunately, because these were hardware
19 devices that these algorithms were going to influence,
20 they had to go through sort of an exploration with us to
21 basically allow them to drop their software in there so
22 they can control the speakers.
23        This is a -- this is a huge difference from,
24 for example, a software piece that will change the
25 voices of a human being to something like Star Wars, for

Page 33

9 (Pages 30 - 33)

1    date."
2        Given the attachment and the subject line, it
3  appears he's saying "is the latest and greatest
4  presentation to date." He says, "I think it is."
5    A   Yeah, I'm seeing that.
6    Q   Do you have any understanding of the meeting
7  that Mr. Tiscareno is referencing in this top email?
8    A   No, I do not.
9    Q   Do you know whether anything he was doing
10 there as reflected in this email had anything to do with
11 the Mac division?
12   A   I do not believe so.
13   Q   And if Mr. Tiscareno was doing any work in
14 connection with the Mac side, you'd beware of that,
15 right?
16   A   Not necessarily.
17   Q   Why not?
18   A   Potentially he might have been working it
19 through with my Manager, and my Manager might have
20 decided that this is not something that Ron should be
21 concerned about.
22   Q   Okay.
23       But you were principally the person on the Mac
24 side working with Mr. Mahabub, right?
25   A   I was on the technical side. So once we had

Page 142

1  meeting.
2    Q   I will represent to you that that meeting
3  appears to have taken place in September --
4    A   Okay. Thank you.
5    Q   -- and we'll get to that and you'll see that.
6        So you see at the bottom of page 1 that
7  Mr. Tiscareno refers to a meeting on July 7th.
8        Do you see that?
9    A   Yes, I see that.
10   Q   And then he says:
11       "I added Ron to the meeting
12       but not confirmed he's coming."
13       Do you see that?
14   A   Yes, I do.
15   Q   Okay.
16       I'm going to hand you what's been marked as
17 Exhibit 121, which I believe talks about that meeting.
18       Do you recall Exhibit 121?
19   A   I'm reading it through. Perhaps, but, you
20 know, it's -- it's one of those e-mails that is not
21 asking me for a specific thing, except compatibility
22 with 1064, and it would have been my typical habit to
23 respond to something like that if I had -- if I had --
24 if he's asking me for something, quite honestly. So --
25   Q   So are you saying you probably didn't focus on

Page 144

1  integrated and stuff, then my role sort of fades into
2  the background.
3    Q   Okay. You can put that aside.
4        I'm going to hand you what's been marked as
5  Exhibit 20 [sic].
6        MS. HUGHES:  David, did you say 120?
7        MR. AVENI:  120, yes. It should be
8  Exhibit 120.
9  BY MR. AVENI:
10   Q   This is Exhibit 120.
11       And it does not appear that you were copied on
12 this email chain, but do you recognize it?
13   A   I -- I -- I'm not quite sure what -- I haven't
14 seen this email before, to start, but I am not sure what
15 they're referring to, but it potentially could be the
16 meeting that I recall very vividly, because I'm looking
17 down and I'm seeing Andrew Bright, and that is a meeting
18 I recall quite well.
19   Q   Well, if you turn to page -- so I think
20 this -- we can go through it. I think this email
21 actually talks about -- well, I take that back; it
22 doesn't. But you will see other e-mails that talk about
23 a separate meeting with Andrew Bright and Barry Corlett.
24   A   And that's probably the one that I was in
25 that -- that demo cased the iPad and the Mac in one

Page 143

1  this email?
2    A   Yeah.
3    Q   Either email?
4    A   It's just -- it doesn't ring a bell, right, in
5  my memory. It doesn't ring a bell that there was a
6  compatibility issue, and he was waiting on something.
7  And if I -- if, indeed, I had received something like
8  this, I usually would have responded very -- and I might
9  have responded, but I have no -- my memory is not very
10 good there.
11   Q   If you look at Exhibit 121, Mr. Mahabub
12 writes:
13       "Hi Ron and Vic, Great seeing
14       you both again the other day."
15       Do you recall a meeting with Mr. Mahabub on or
16 around July 11th, 2010?
17   A   Very hard to tell from the dates if I had met
18 with -- with Vic, quite honestly.
19   Q   Any reason to think you didn't meet them
20 around that date?
21   A   My memory is not very good there, quite
22 honestly. I don't know. I mean --
23   Q   You just don't know, one way or the other?
24   A   Yeah. I don't know.
25   Q   Okay.

Page 145

37 (Pages 142 - 145)

1    A    The transition that we are referring to had
2  not happened when these evaluations were carried -- were
3  being carried on.
4    Q    When someone comes to Apple's campus, do they
5  have to obtain a badge or a name tag to be on the
6  property?
7    A    Absolutely.  They would have to go through the
8  front lobby, they would have to sign in and designate
9  who they're visiting, and then the receptionist will
10 have -- would need to basically call on someone and to
11 come and basically escort the -- the vendor or the
12 visiting person and stay in their custody throughout the
13 visit.
14    Q    So a visitor isn't allowed to just wander
15 around Apple on their own?
16    A    Absolutely not.
17       MS. HUGHES:  All right.  I'm going to have the
18 court reporter mark this as Exhibit 171.
19          (Plaintiff's Exhibit 171 marked
20          for identification.)
21 BY MS. HUGHES:
22    Q    Do you recognize what is depicted on
23 Exhibit 171?
24    A    Yes.  These seem to be stick-on badges that
25 the receptionist would hand over to visitors.  I do

Page 186

1  recognize -- I'm not too quite sure what the numbers are
2  on the very top.  I do recognize the building names.  MA
3  is Mariani 01.  I seem to have forgotten what AC is.
4  Let's see.  Yes.  But that's -- that's about -- and
5  obviously the name of the person that's visiting and --
6  and who they are with.
7    Q    And when Mr. Mahabub came, did you ever --
8  were you involved in the process of obtaining these
9  badges for him?
10    A    These badges do not reflect -- I was in
11 building IL 5, which none of these badges here reflect a
12 visit to.
13       MR. HOLMES:  Intergalctic Level 5?
14       THE WITNESS:  Yes.
15       MR. HOLMES:  Okay.
16 BY MS. HUGHES:
17    Q    We spent some time today talking about the
18 process you were involved with with GenAudio attempting
19 to integrate their software with the kernel extension
20 that you had provided.
21    A    Correct.
22    Q    At the end of that process, after going
23 through the different iterations, was GenAudio software
24 at a stage it could have been plugged into all of Mac's
25 products and shipped to customers?

Page 187

1    A    No, it wasn't.  The process for integrating
2  software for evaluation purposes is a completely
3  different process than the form it would have taken had
4  it been part of a shipping product.
5    Q    So there were several more steps or processes
6  GenAudio needed to go through before it could be
7  considered part of Apple's software that's included in
8  its products?
9    A    Most likely, yes.
10       MR. HOLMES:  Objection; assumes facts not in
11 evidence.
12       MR. AVENI:  Join.
13 BY MS. HUGHES:
14    Q    When Mr. Mahabub had demonstrated GenAudio's
15 software on the Mac, did you ever move it up to your
16 first line manager?
17       MR. AVENI:  Objection; vague, lacks
18 foundation.
19       THE WITNESS:  The first demo that we
20 encountered with Mr. Mahabub, which was a general public
21 demo which did not involve the work that we had engaged
22 in, my Manager was present, most likely, in that -- in
23 that room.  In any subsequent work that we had completed
24 with GenAudio, and the answer would have been that, yes,
25 it would have been demo'd to my Manager.

Page 188

1  BY MS. HUGHES:
2    Q    So when we talk about that first meeting, do
3  you believe that occurred on or about August 19th, 2009,
4  based on Exhibit 96 that you saw earlier today?
5    A    That is correct.
6    Q    And I'll take that back because it's my copy.
7  Thank you.
8       In the fall of 2009, did you ever tell
9  Mr. Mahabub that Apple would enter into a deal to
10 license GenAudio's technology within the next six
11 months?
12    A    No, I did not.
13    Q    Did you ever tell Mr. Mahabub in the fall of
14 2009 that Apple would enter into an agreement to acquire
15 GenAudio?
16    A    No, I did not.
17    Q    In 2009, did you ever participate in any
18 meetings with Mr. Mahabub that were attended by
19 Steve Jobs?
20    A    No, I did not.
21    Q    In 2009, did you attend any meetings or
22 participate in any meetings with Mr. Mahabub that were
23 attended by Tim Cook?
24    A    No, I did not.
25    Q    In 2009, did you participate in any meetings

Page 189

48 (Pages 186 - 189)

1        When we sell a Macintosh CPU, the -- the rule
2   of thumb is to never allow it to be consuming more than
3   3 percent from what the customer bought.  So we -- we
4   make sure that 97 percent of the processing power is
5   what the customer is buying.
6        So if we were to integrate a technology and we
7   like the experience and it was consuming 25 percent, we
8   would not make a big deal about it because it's just an
9   evaluation.  But had we -- had we were to decide to move
10  to the next level, we would ask the -- the partner or
11  the vendor to basically optimize their software to make
12  sure that it's not consuming as much power as -- as
13  would be.
14    Q   Okay.
15        Did you have any of that conversation with
16  Mr. Mahabub?
17    A   No, we would not have.  And it's just
18  customary not to have that conversation until -- because
19  it exerts a ton of work on the -- on the vendor, and
20  that was never our intentions for the evaluation.
21        MR. HOLMES:  I don't have any further
22  questions.
23        MS. HUGHES:  I have no more questions.
24        Thank you so much for the time you spent with
25  us today.

Page 210

1        THE WITNESS:  Appreciate it.  Thank you very
2   much.
3        MR. MARQUEZ:  Before we close the deposition,
4   I'll just state for the record, earlier this morning the
5   witness expressed some concerns regarding his
6   confidentiality obligations as a former employee at
7   Apple.
8        During the break we spoke, and I understand
9   that there is not a protective order that has been
10  entered in this case, but the parties have agreed that
11  once the deposition transcript has been prepared, we
12  will have an opportunity to review that and identify any
13  potential confidential information that should not be
14  subject to public disclosure, at which point, if we
15  identify any such information, the parties agree that we
16  will confer to see if something can be done about that
17  in terms of a motion to seal or protective order or some
18  other means of protecting that confidential information.
19        MR. HOLMES:  Sounds right.
20        MR. AVENI:  So while we were off the record,
21  counsel for all parties discussed the manner for
22  handling the transcript, and we stipulated that the
23  court reporter would send the original transcript to the
24  witness' counsel, and from receipt, the witness will
25  have 30 days to review the testimony, the transcript,

Page 211

1   rather, and provide an errata with any changes.
2        Anything else?
3        MR. HOLMES:  If the original is lost or
4   stolen --
5        MR. AVENI:  A copy can be used for all
6   purposes.
7        So stipulated?
8        MR. HOLMES:  So stipulated.
9        MR. MARQUEZ:  So stipulated.
10        MS. HUGHES:  Yes.
11        MR. AVENI:  We're off the record.  Thank you.
12        (Time noted:  4:38 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 212

1
2
3
4
5
6
7   I, RONALD ISAAC, do hereby declare under penalty of
8   perjury that I have read the foregoing transcript; that
9   I have made any corrections as appear noted, in ink,
10  initialed by me; that my testimony as contained herein,
11  as corrected, is true and correct.
12        EXECUTED this_____day of_____, 2017, at
13  _____,_____.
14  (city)          (State)
15
16
17                 _____
                    RONALD ISAAC
18
19
20
21
22
23
24
25

Page 213

54 (Pages 210 - 213)

```
 1        I, the undersigned, a Certified Shorthand
 2  Reporter of the State of California, do hereby certify:
 3        That the foregoing proceedings were taken
 4  before me at the time and place herein set forth; that
 5  any witnesses in the foregoing proceedings, prior to
 6  testifying, were administered an oath; that a record of
 7  the proceedings was made by me using machine shorthand
 8  which was thereafter transcribed under my direction;
 9  that the foregoing transcript is a true record of the
10  testimony given.
11        Further, that the foregoing pertains to the
12  original transcript of a deposition in a Federal Case,
13  before completion of the proceedings, a review of the
14  transcript [X] was [ ] was not requested.
15        I further certify I am neither financially
16  interested in the action nor a relative or employee of
17  any attorney or any party to this action.
18        IN WITNESS WHEREOF, I have this date
19  subscribed my name.
20
21  Dated: 1/19/2017
22
23
24
          KELLI COMBS
25        CSR No. 7705
```

Page 214

55 (Page 214)