EXCERPTED

# EXHIBIT 225

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
 2
    ---------------------------------------------------
 3

    SECURITIES AND EXCHANGE    )
 4  COMMISSION,                )
                               )
 5              Plaintiff,     )
                               )
 6        vs.                  ) No. 1:15-cv-02118-WJM-CBS
                               )
 7  TAJ JERRY MAHABUB, GENAUDIO,)
    INC., and ASTOUND HOLDINGS, )
 8  INC.,                      )
                               )
 9              Defendants.    )
10  ---------------------------------------------------
11          DEPOSITION UPON ORAL EXAMINATION
12                        OF
13                  VICTOR TISCARENO
14  ---------------------------------------------------
15              Martin Davis PLLC
          1200 Westlake Avenue North, Suite 802
16             Seattle, Washington 98109
17
18
19
20
21
22
23  DATE:  December 16, 2016
24     REPORTED BY:  Olivia Pennella
25                   Washington CCR 3337

                                                  Page 1
```

```
 1              A P P E A R A N C E S
 2
        FOR PLAINTIFF:
 3
               LESLIE H. HUGHES
 4             DANIELLE R. VOORHEES
               United States Securities and Exchange
 5                Commission
               1961 Stout Street, Suite 1700
 6             Denver, Colorado 80294
               303-844-1086
 7             303-844-1108
               HughesLJ@sec.gov
 8             voorheesd@sec.gov
 9      FOR DEFENDANT TAJ JERRY MAHABUB:
10             ANDREW B. HOLMES
               Holmes, Taylor & Jones LLP
11             617 South Olive Street, Suite 1200
               Los Angeles, California 90014
12             213-985-2200
               abholmes@htjlaw.com
13
        FOR DEFENDANT GENAUDIO, INC.:
14
               DAVID J. AVENI
15             Wilson Elser Moskowitz Edelman &
                  Dicker, LLP
16             655 West Broadway, Suite 900
               San Diego, California 92101
17             619-321-6200
               david.aveni@wilsonelser.com
18
        FOR WITNESS:
19
               JOHN R. ELTRINGHAM
20             Martin Davis PLLC
               1200 Westlake Avenue North, Suite 802
21             Seattle, Washington 98109
               206-650-6560
22             jeltringham@martindavislaw.com
23
24
25
                                                  Page 2
```

```
 1              E X A M I N A T I O N
 2  WITNESS         MR. AVENI   MR. HOLMES   MS. HUGHES
 3  VICTOR TISCARENO    8         280          307
                      340         329          343
 4
 5
 6              E X H I B I T S
 7  No.    Description                              Page
 8  Exhibit 79     Email Correspondence              46
               (SEC-TiscarenoV-E-0001883-1884)
 9
    Exhibit 80     Email Correspondence
10             (SEC-TiscarenoV-E-0001875-1876)       48
11  Exhibit 81     Email Correspondence              53
               (SEC-TiscarenoV-E-0001842-1843)
12
    Exhibit 82     GenAudio In-Person Meetings       55
13
    Exhibit 83     Email Correspondence              57
14             (SEC-TiscarenoV-E-0001840)
15  Exhibit 84     Email Correspondence              62
               (SEC-TiscarenoV-E-0001812-1815)
16
    Exhibit 85     Email Correspondence              68
17             (SEC-TiscarenoV-E-0000056-57)
18  Exhibit 86     Email Correspondence              71
               (SEC-TiscarenoV-E-0000095-96)
19
    Exhibit 87     Email Correspondence              75
20             (SEC-TiscarenoV-E-0000101)
21  Exhibit 88     Email Correspondence              81
               (SEC-TiscarenoV-E-0000161-164)
22
    Exhibit 89     Email Correspondence              84
23             (SEC-TiscarenoV-E-0000249-250)
24  Exhibit 90     Email Correspondence              88
               (SEC-TiscarenoV-E-0000284)
25
                                                  Page 3
```

```
 1              E X H I B I T S (Continued)
 2  No.    Description                              Page
 3  Exhibit 91     Email Correspondence              92
               (SEC-TiscarenoV-E-000300-301)
 4
    Exhibit 92     Email Correspondence              99
 5             (SEC-TiscarenoV-E-0001611-1612)
 6  Exhibit 93     Demo With MH                      99
               (347APL-00000046)
 7
    Exhibit 94     Email Correspondence             111
 8             (SEC-TiscarenoV-E-0000336-37)
 9  Exhibit 95     AstoundSound Demo                113
               (347APL-00000047)
10
    Exhibit 96     GenAudio Demo (Astound)          114
11             (347APL-00000051)
12  Exhibit 97     Email Correspondence             117
               (SEC-TiscarenoV-E-0000376)
13
    Exhibit 98     Email Correspondence             120
14             (SEC-TiscarenoV-E0001639)
15  Exhibit 99     Email Correspondence             124
               (SEC-TiscarenoV-E-0000400)
16
    Exhibit 100    Email Correspondence             126
17             (SEC-TiscarenoV-E-0000412-414)
18  Exhibit 101    Email Correspondence             136
               (SEC-TiscarenoV-E-0000534)
19
    Exhibit 102    Email Correspondence             138
20             (SEC-TiscarenoV-E-0000556)
21  Exhibit 103    Email Correspondence             138
               (SEC-TiscarenoV-E-0000557)
22
    Exhibit 104    Email Correspondence             140
23             (SEC-TiscarenoV-E-0000581)
24  Exhibit 105    Email Correspondence             141
               (SEC-TiscarenoV-E-0001731)
25
                                                  Page 4
```

E X H I B I T S (Continued)

| No. | Description | Page |
|---|---|---|
| Exhibit 106 | Email Correspondence (347APL-00000526-527) | 148 |
| Exhibit 107 | Email Correspondence (SEC-TiscarenoV-E-0000756-757) | 154 |
| Exhibit 108 | Email Correspondence (SEC-TiscarenoV-E-0000770) | 157 |
| Exhibit 109 | Email Correspondence (SEC-TiscarenoV-E-0000946-954) | 159 |
| Exhibit 110 | Email Correspondence (SEC-TiscarenoV-E-0000984) | 178 |
| Exhibit 111 | Email Correspondence (347APL-00000333-336) | 180 |
| Exhibit 112 | Email Correspondence (SEC-TiscarenoV-E-0001560-1561) | 182 |
| Exhibit 113 | Email Correspondence (SEC-TiscarenoV-E-0001018-1020) | 187 |
| Exhibit 114 | Letter dated March 15, 2010 (GA000140) | 193 |
| Exhibit 2 | GenAudio, Inc., Confidential Private Placement Memorandum (GA000487-540) | 202 |
| Exhibit 115 | Email Correspondence (SEC-TiscarenoV-E-0001052-1053) | 208 |
| Exhibit 116 | Apple Organizational Chart | 212 |
| Exhibit 117 | Email Correspondence (SEC-TiscarenoV-E-0001114) | 214 |
| Exhibit 118 | Email Correspondence (SEC-TiscarenoV-E-0001129-1130) | 217 |
| Exhibit 119 | Email Correspondence (SEC-TiscarenoV-E-0001187-1188) | 223 |

E X H I B I T S (Continued)

| No. | Description | Page |
|---|---|---|
| Exhibit 120 | Email Correspondence (SEC-TiscarenoV-E-0001218-1221) | 228 |
| Exhibit 121 | Email Correspondence (SEC-TiscarenoV-E-0001230) | 233 |
| Exhibit 122 | Email Correspondence (SEC-TiscarenoV-E-0001233) | 236 |
| Exhibit 123 | Email Correspondence (SEC-TiscarenoV-E-0001237) | 237 |
| Exhibit 124 | Email Correspondence (SEC-TiscarenoV-E-0001240-1241) | 242 |
| Exhibit 125 | Email Correspondence (SEC-TiscarenoV-E-0001242-1243) | 242 |
| Exhibit 126 | Email Correspondence (SEC-TiscarenoV-E-0001554-1555) | 244 |
| Exhibit 127 | Email Correspondence (SEC-TiscarenoV-E-0001255) | 245 |
| Exhibit 37 | Letter dated August 1, 2010 (GA005351-5353) | 247 |
| Exhibit 128 | Email Correspondence (SEC-TiscarenoV-E-0001263) | 248 |
| Exhibit 129 | Email Correspondence (SEC-TiscarenoV-E-0001266-1267) | 250 |
| Exhibit 130 | Email Correspondence (SEC-TiscarenoV-E-0001276-1278) | 252 |
| Exhibit 131 | Email Correspondence (SEC-TiscarenoV-E-0001416-1418) | 255 |
| Exhibit 132 | Email Correspondence (SEC-TiscarenoV-E-0001752-1753) | 258 |
| Exhibit 133 | Email Correspondence (SEC-TiscarenoV-E-0001767) | 260 |

E X H I B I T S (Continued)

| No. | Description | Page |
|---|---|---|
| Exhibit 134 | Email Correspondence (SEC-TiscarenoV-E-0001775-1776) | 263 |
| Exhibit 135 | Email Correspondence (SEC-TiscarenoV-E-0001778) | 265 |
| Exhibit 136 | Email Correspondence (2 pages) | 272 |
| Exhibit 137 | Email Correspondence; GenAudio Presents AstoundSound | 275 |
| Exhibit 138 | Email Correspondence (9 pages) | 290 |
| Exhibit 139 | Email Correspondence (4 pages) | 290 |
| Exhibit 16 | Email Correspondence (SEC0000001-5) | 343 |

(Exhibit -2, 16, and 37 were marked previous in prior deposition(s).)

Seattle, Washington, Friday, December 16, 2016
8:59 a.m.

------------------------------------

VICTOR TISCARENO, witness herein, having been duly sworn by the Certified Court Reporter, testified as follows:

E X A M I N A T I O N

BY MR. AVENI:

Q. Good morning, Mr. Tiscareno.

A. Yes.

Q. My name is David Aveni. And I represent, as you know, GenAudio --

A. Yes.

Q. -- the company in this matter. I appreciate you taking time today to meet with us and answer questions. I know that you've given testimony a few times before, during the SEC's investigation in this matter.

Have you ever had your deposition taken in a civil dispute?

A. Never. This is it.

Q. This is it. And you testified twice during the SEC's investigation; is that correct?

A. Correct.

Q. So, those are the only times you've been

**Page 194**

```
 1           MS. VOORHEES:  Yeah, understood.
 2           MR. AVENI:  But, I mean, there's one or two.
 3           MR. HOLMES:  This is 114?
 4           MR. AVENI:  Yes.
 5      Q.   (By Mr. Aveni)  So, Exhibit-114 is a letter
 6  dated March 15, 2010.
 7      A.   Mm-hmm.
 8      Q.   So, we're in the time frame of the documents
 9  we've been looking at.  It's a letter from Jerry Mahabub
10  to GenAudio shareholders.  Have you seen this document
11  before?
12      A.   I have not seen this document.  For -- that I
13  know of.  I mean, it's not sent to me by mail.  If I've
14  seen it, it's because it's in -- it was in the stuff
15  that was -- that we were questioned about in the
16  deposition -- the original.  But is this a new one?
17      Q.   What's that?
18      A.   Has this ever been presented?
19      Q.   I think you did look at it in your earlier
20  testimony.
21      A.   Okay.  That's what I mean.  This didn't
22  come -- I didn't get anything like this.
23      Q.   Okay.  No, no, I realize --
24      A.   Okay.
25      Q.   -- that you didn't get it --
```

**Page 195**

```
 1      A.   Okay.  I just --
 2      Q.   -- in 2010.
 3      A.   Okay.
 4      Q.   Okay.  I want you to take a look at the second
 5  paragraph of this letter.
 6      A.   I'm looking at that.
 7      Q.   Okay.  Just go ahead and take a second to read
 8  that, if you could.  Just that paragraph is all you need
 9  to read.
10      A.   Yeah.  Okay.
11      Q.   Okay.  Given your understanding, your
12  knowledge, of the discussions with Apple -- and if we
13  assume the LCEC referenced here is Apple -- is that
14  paragraph fair?
15           MS. HUGHES:  Object to the form of the
16  question.
17      A.   Well --
18      Q.   (By Mr. Aveni)  Do you understand that
19  paragraph to be accurate?
20      A.   Well, I -- I -- reading it -- so I'd say it's
21  accurate, if I read it.  But this embedding the software
22  into the Mac OS X is working with Ron Isaac.  That's
23  none of my business.  I didn't get that deep into Ron
24  Isaac's business.  We didn't share like that.
25      Q.   Okay.
```

**Page 196**

```
 1      A.   He handed me an iPhone -- or excuse me -- an
 2  i-touch, with the software that he created on his own
 3  app as a third-party app developer.  And working -- it
 4  was his units, with his software, that he put on
 5  there -- that he let me use.  So, I did no coding.
 6           I suggested we put these kind of features on
 7  it -- these buttons -- I need you to adjust this, adjust
 8  that, and -- but this other -- the -- the previous
 9  email -- and then tied with this -- this is all a Mac
10  OS team -- Ron Isaac and his -- he works with.
11      Q.   So, I'm just talking about the second
12  paragraph here.
13      A.   I understand.
14      Q.   But do you see this as focused on Mac?
15      A.   Well, because it says embedded level software.
16  I'm not -- we're not writing software.  We never asked
17  him for any software.  We weren't writing it there.
18  Maybe I'm misreading this.  But, you know, it says --
19  "... we had over 15 meetings with marketing and
20  technical management, and will start the actual embedded
21  level integration process within the next 30 days."
22           We aren't doing any of that.  They were doing
23  that in the Mac OS, if they were even doing it.  Now, as
24  I remember -- and this is some -- you'd have to ask the
25  other witnesses, okay, if -- if you haven't already
```

**Page 197**

```
 1  asked them.
 2      Q.   Okay.
 3      A.   My understanding is that -- is that they have
 4  a special build -- operating system that allows
 5  developers a little bit more access to the code, a
 6  little bit more direct connection to the code.
 7           I'll just keep it -- as I remember -- okay --
 8  so that people like GenAudio can get in there and do
 9  more realistic testing, that wouldn't be available to
10  people outside of the company working as developers --
11  just creating whatever kind of app.
12           Because this is at system level.  Audio is
13  very intertwined with a lot of things that are going on
14  in the system, so they have to give those guys a little
15  bit more ac -- but they're not going -- they're not
16  going to let them get into the main code.
17           So they've got this test harness, this thing
18  that they can go in there and -- and -- a mule -- that
19  they can go in and play with.  So, that's them.  Again,
20  we didn't do any embedded level stuff at all, period.
21      Q.   Okay.
22      A.   Zero, zilch, nada.  That's just -- we got a
23  demo unit from him.
24      Q.   Do you have any reason to think that Jerry --
25           So, Jerry seemed to think -- from his
```

## Page 198

1  emails -- that he was sending you the C library that we
2  just talked about, which allow you to do an embedded
3  level integration. That's what the email says. Do you
4  have any reason to think that Jerry didn't believe that?
5      A.  I don't know what they were talking to Ron
6  about.
7      Q.  Okay.
8      A.  Okay. We were looped in. Probably shouldn't
9  have been looped in. Shouldn't -- we should've -- maybe
10 Michael and I should've said, "Hey, Jerry, kind of --
11 we're not in this. Thanks for keeping us in the loop,
12 but please delete our names from the mail list."
13     Q.  Okay. Is there anything --
14     A.  It's -- yeah.
15     Q.  Is there anything else in this paragraph that
16 you disagree with, that you think isn't accurate?
17     A.  Well, its current offering is valued at $3 --
18 I don't know anything about this stuff.
19     Q.  No, no, fair enough. I mean, I'm not trying
20 to ask you to validate everything --
21     A.  Well --
22     Q.  -- in it. But is there anything that you
23 disagree with?
24     A.  Well, the whole -- I don't -- I don't know
25 what it means. It doesn't have -- without -- this is

## Page 200

1      Q.  Okay.
2      A.  It's -- I mean, I don't think -- I -- I mean,
3  I -- you know, I can think of opinions that you didn't
4  ask about. But it's just opinions that the document --
5  that I've never read before, really.
6          MR. AVENI: Okay. You can put that aside.
7      A.  You know, under -- under -- where it says, "15
8  meetings" --
9      Q.  (By Mr. Aveni) Yes.
10     A.  -- I don't -- I can't verify that.
11     Q.  Okay. Well, let's talk about that. So, I've
12 got a running list here. By my count -- at least, of
13 the ones we can confirm on Exhibit-82 -- we're at 11.
14 And we're just talking about ones that we can confirm
15 with --
16     A.  Right.
17     Q.  -- emails.
18     A.  But he -- this is general. He may have met
19 with Ron Isaac separately and his team.
20     Q.  Right. So, is it possible it's --
21     A.  I'm just referring to what I'm involved with.
22     Q.  Okay. Let's just stick with the ones -- let's
23 just stick, for a second, with meetings he had with you.
24     A.  Well --
25     Q.  Is it reasonably accurate?

## Page 199

1  the first time I've read this -- or I've read it in
2  the -- a previous testimony. So, we didn't know that
3  there was another -- there's an undercurrent -- that
4  there was something going on at GenAudio. There's two
5  stories going on.
6          The one I'm living -- and we're -- it's all
7  business. And then he's got his own business. And he's
8  got -- for whatever reason, he's operating -- he's doing
9  something -- he's saying something -- he's selling his
10 team on whatever is going on -- I don't know what.
11 That's not for me to decide. I can just tell you that
12 we don't do -- I didn't do any code.
13     Q.  Okay.
14     A.  Nobody on our team.
15     Q.  Right. So, let's move past the --
16     A.  Okay.
17     Q.  -- embedded level integration. I think we've
18 talked about that quite a bit.
19     A.  Mm-hmm.
20     Q.  Is there anything else, looking at this, that
21 you find inaccurate?
22     A.  Well, it's -- I mean, I'd have to sit down and
23 read everything line by line.
24     Q.  I'm just talking about the second paragraph.
25     A.  Oh. No.

## Page 219

1  meeting. And I think that we can only do it on the last
2  day. And that was also kind of a parting -- you know,
3  farewell.
4      Q.  For Michael Hailey?
5      A.  For Michael Hailey.
6      Q.  Now, you said, "We've used the phrase 'green
7  light.'" Jerry Mahabub was talking to you about this
8  meeting being a green light to keep moving forward,
9  right?
10     A.  Right.
11     Q.  And so it seemed like the two of you were
12 treating it kind of as a make-or-break meeting; is that
13 fair to say?
14     A.  That's fair to say.
15     Q.  Okay. Now after the meeting took place on
16 May 6th, you guys did keep moving forward on the
17 project, right?
18     A.  No.
19     Q.  You didn't keep moving forward?
20     A.  No.
21     Q.  When you say no, what do you mean by that?
22         I mean, there was work that was still done
23 with Jerry Mahabub for a lengthy period of time after
24 May 6th, right?
25     A.  It may have been with Ron Isaac.

Veritext Legal Solutions
866 299-5127

### Page 220

1  Q. Are you saying there was no work on the iPod
2  and iPhone side after May 6?
3  A. I can't say 100 percent, but I believe at that
4  point we were dead in the water.
5  Q. Did you ever tell that to Jerry Mahabub?
6  A. I -- oh, he knew.
7  Q. How did he know that?
8  A. I think we called him up and said, "Hey,
9  we" -- I think one of -- maybe that's what he -- before
10 Michael left, we were able to have our meeting -- "more
11 soon." Now, what I probably did -- and I'd have to find
12 an email or something like that.
13      But it -- it really -- the end result -- it
14 still ended in the same result, that we were not able to
15 convince his boss at the time that -- that this was a
16 viable option for -- let me give you the rundown, so
17 maybe we'll just get that out of the way.
18  Q. Sure.
19  A. The answer that we got was -- first of all,
20 software. Is there going to be a royalty? There's
21 certainly going to be a licensing arrangement,
22 regardless of whether or not somebody like Apple pays
23 for it or not. Two -- so Greg is thinking on his level,
24 how do I sell this upstream, how -- because nothing
25 happens with one guy.

### Page 229

1  just depends -- but generally try not to discuss
2  internal business with an -- outside vendors.
3  Q. So, as far as you know, you didn't discuss --
4  A. I --
5  Q. -- the meeting?
6  A. -- I don't know.
7  Q. Okay.
8  A. I'm -- I'm just -- all I'm saying is, is
9  that --
10 Q. That's a possibility?
11 A. -- that may have -- that's a possibility, that
12 we -- but if you're asking what I did, which is what
13 I've told you, is that I -- I knew that for us -- that
14 was the end of the road for us.
15 Q. So, in your head, you knew that was the end of
16 the road. You just don't know --
17 A. I don't know if I expressed that --
18 Q. -- what you communicated to Jerry, if
19 anything?
20 A. Right.
21 Q. Okay.
22 A. So, my -- I continued to expose my friends to
23 the product in other departments. And that basically
24 was probably the -- and that may have been what I
25 said -- I mean, again, trying to reconstruct what

### Page 228

1       And we would get a more immersive, more
2  accurate sound field. And so he worked on that very
3  hard. We had this meeting, and I had -- I invited some
4  colleagues, some friends -- people that might be
5  interested in -- in the -- in the product.
6  Q. Okay. But you don't remember what you told
7  Jerry, if anything, about the Greg Joswiak meeting,
8  right?
9  A. I don't remember anything. I don't have
10 anything to back it up with, the --
11      MR. AVENI: Okay. Let's mark that one as
12 Exhibit-120.
13      (Exhibit-120 marked for identification.)
14 A. One of the things I want to mention to you --
15 if I may go back -- is that it's not always Apple policy
16 to talk about an internal discussion, tell them -- you
17 know, the most that we would say is, "Hey, it's been
18 great. Thank you very much."
19      But to say that the executive didn't -- the
20 executive didn't like it or any of their gut feelings
21 -- we just wouldn't probably say that.
22 Q. (By Mr. Aveni) Okay.
23 A. Okay. We'd say, "Hey, it's -- you know,
24 it's -- this is where we're going to have to stop. And
25 thank you very much." And if they ask -- you know, it

### Page 230

1  happened --
2  Q. Okay.
3  A. -- six, seven years ago --
4  Q. All right.
5  A. -- is that I may have gone back and said,
6  "Hey, look, let's do this. This is for Ron. I can
7  invite some people here and see if we get more traction
8  on the product, but this might be it."
9  Q. But you don't know that, right? You're --
10 A. Well, I don't know if I followed on --
11 let's -- let's see what it says. You've got all --
12 you've got the power here.
13 Q. Well, I haven't seen anything.
14 A. Okay.
15 Q. We're not going to go through any emails where
16 you say anything like that, so --
17 A. Okay.
18 Q. -- I don't want you to speculate you may have
19 said that, if you haven't.
20 A. I -- I don't know.
21 Q. Okay.
22 A. I don't know what I've said.
23 Q. All right. Let's look at Exhibit-120.
24 A. Mm-hmm.
25 Q. It's an email chain dated July 20, 2010. It's

**Page 231**

```
 1  another document you produced; is that right?
 2         MR. HOLMES: July 2nd.
 3         MR. AVENI: I said July 2nd, didn't I?
 4  July 2, 2010.
 5      Q.  (By Mr. Aveni) This is another email you
 6  produced, right?
 7      A.  That's what it indicates down here.
 8      Q.  Okay. And then if you look at the bottom of
 9  Page 1, you write to Jerry Mahabub -- you say: "Hi
10  Jerry, I have to meet on Wednesday July 7 ... Is that
11  good time for you?"
12         And then Mr. Mahabub responds, at the top of
13  the page, "Green on my screen! See you at 11 a.m. on
14  Wednesday, July 7th"; is that right?
15      A.  Yeah, correct.
16      Q.  Do you recall that meeting?
17      A.  But let's go back again -- so, you're trying
18  to get me to --
19      Q.  I'm just establishing the date of the meeting.
20  You guys met -- you met with Mr. Mahabub on July 7th.
21      A.  Okay. Got it.
22      Q.  Is that true?
23      A.  Yes. I'll probably --
24      Q.  And is there any reason to think you didn't
25  meet on July 7th?
```

**Page 238**

```
 1      Q.  Okay. Okay. This is dated July 28, 2010.
 2  And Mr. Mahabub writes to you, "I will get the devices
 3  to you before then with the new settings I would
 4  imagine. I need the new NDA to review as well that we
 5  discussed."
 6         Do you recall discussing a new NDA with
 7  Mr. Mahabub around this time period, July of 2010?
 8      A.  I don't know. I'm -- I'm going to say that
 9  he's probably referring to an NDA that would have been
10  signed with Ron Isaac's team. We already had an NDA --
11      Q.  Right.
12      A.  -- so --
13      Q.  Do you know one way or the other?
14      A.  I don't know one way or the other.
15      Q.  So he's saying here that you and he discussed
16  a new NDA, right?
17         He says, "I need the new NDA" -- he's writing
18  to you --
19      A.  Yes, I see that.
20      Q.  -- "I need the new NDA to review as well that
21  we discussed." Do you remember having a discussion --
22      A.  I --
23      Q.  -- with Mr. Mahabub, in this time frame, about
24  a new NDA?
25      A.  No.
```

**Page 239**

```
 1      Q.  Do you know one way or the other?
 2      A.  I don't know one way or the other. But I'm
 3  saying that we had an NDA --
 4      Q.  Right.
 5      A.  -- already.
 6      Q.  Yep.
 7      A.  And I don't -- I don't think we needed another
 8  one. I mean, I can't -- I can't -- I can see -- foresee
 9  the other guys needing one.
10      Q.  Where would the -- when you say, "the other
11  guys," do you mean --
12      A.  Ron Isaac --
13      Q.  -- the Mac side?
14      A.  Yeah, the Mac side.
15      Q.  Why would the Mac side need another NDA?
16      A.  They're working with that team. And, you
17  know, Apple may -- sometimes if -- sometimes even new
18  projects would require an ND -- you have an employee NDA
19  when you sign up. You --
20         When you're working with a firm like GenAudio,
21  you need an NDA. And even on projects, maybe we would
22  sign another NDA just to make sure that everybody
23  understands the seriousness of what we're working on.
24         MR. AVENI: Let's go off the record for a
25  minute.
```

**Page 240**

```
 1         (Recess taken from 3:48 p.m. to 3:51 p.m.)
 2      Q.  (By Mr. Aveni) Okay. So, looking back at
 3  Exhibit-123, I think the question you raised was whether
 4  or not the NDA that's referenced in this exhibit refers
 5  to whether or not an NDA is needed for the work Ron
 6  Isaac was doing on the Mac side?
 7      A.  Yeah.
 8      Q.  Okay. Do you recall an email discussion in
 9  October 2009 that related to that question, whether
10  there is an NDA needed on the Mac side for Ron Isaac?
11  Do you remember that discussion?
12      A.  I remember a discussion. I don't know the
13  exact dates. I'll take your word for it. You're
14  probably going to show me. But I'm saying I thought the
15  question came up about needing an NDA across the street,
16  what I call --
17      Q.  Right.
18      A.  -- across the street, the Mac hardware guys.
19  As far as the exact date --
20      Q.  So, I mean, I will represent to you that there
21  is an email from October 2009 -- for the record, it's
22  APL573 --
23      A.  Mm-hmm.
24      Q.  -- where Ron Isaac says the current NDA is
25  okay, and there's no need for another one.
```

```
 1      A.   Okay.
 2      Q.   So, the question I have is:  Given that, is
 3 there any way Exhibit-123 is about an NDA for Ron
 4 Isaac's work as opposed to something else?
 5      A.   I --
 6      Q.   You just don't know?
 7      A.   I just don't know.
 8      Q.   What information would you need to know what
 9 this NDA was about?
10      A.   Maybe more -- "We need an NDA to cover this
11 project or name or people."  I -- I don't know.  I --
12      Q.   Okay.
13      A.   I mean, what --
14      Q.   Okay.  Fair enough.  Now, if the NDA was for
15 Ron Isaac's work, in any event, why would Mr. Mahabub be
16 talking about that with you as opposed to Ron Isaac?
17      A.   Only -- I -- I -- the only thing I could think
18 of, to answer your question, is that I -- I was looped
19 in -- made the friendly introduction.  And I don't think
20 that -- based on all these conversations we're having
21 here, the fact that I'm looped in on the emails -- that
22 I made it very clear to Mr. Mahabub that we are really
23 two separate -- they were operating two separate
24 divisions.  And that our businesses are separate.
25           MR. AVENI:  Okay.
                                                  Page 241
```

```
 1           (Exhibit-124 marked for identification.)
 2      Q.   (By Mr. Aveni)  Okay.  Exhibit-124 is another
 3 document, the Bates number of which reflects that you
 4 produced it.
 5      A.   Mm-hmm.
 6      Q.   Does that seem right to you?
 7      A.   I'll take -- I'll skim it here.  But if I said
 8 I sent it, I sent it.
 9           MR. AVENI:  Okay.  You can put that aside,
10 actually.  Let's go on with this one.
11           (Exhibit-125 marked for identification.)
12      Q.   (By Mr. Aveni)  Okay.  And you produced this
13 document as well, right?
14      A.   Yep.
15      Q.   Okay.  And you see in the middle of the page
16 Jerry Mahabub is writing to you.  And he says again, on
17 August 2nd:  "What about the NDA?  Can you get that sent
18 to me ASAP so we can review it on our end?  I would like
19 to get that signed and in place before the meeting if
20 possible."
21           Does that refresh your recollection at all
22 about another NDA being discussed with Mr. Mahabub?
23      A.   I mean, is this an NDA proposed from
24 GenAudio's viewpoint because they're bringing in a newer
25 technology?
                                                  Page 242
```

```
 1      Q.   Well, I can't answer that.  I have not seen
 2 anything that reflect that.
 3      A.   Rhetorically speaking.
 4      Q.   Okay.  Rhetorically speaking.  But I don't
 5 want you to speculate.
 6           Do you know what this NDA is about?
 7      A.   I don't.  Not today.
 8      Q.   Okay.  Fair enough.
 9      A.   Okay.  I'm glad we're signing NDAs, though.
10      Q.   But Apple -- according to this email,
11 Mr. Mahabub is saying to you, "Can you send the NDA to
12 me" -- meaning Jerry Mahabub.  So, you were going send
13 it to Jerry Mahabub, right?
14           So, it was something that Apple was going to
15 draft?
16      A.   But I don't know if -- not -- did -- based on
17 what you said earlier, did Ron Isaac already answer that
18 question?  He's asking a different question here.  I'm a
19 little bit mixed up here, because you said in a previous
20 one that you confirmed that Ron Isaac said that the
21 current NDA that's in place with them was okay.
22           So, I don't -- I really don't know what this
23 other NDA -- if he's -- if -- who's messed up on this --
24 it was me, Ron, or Jerry.
25      Q.   Okay.  You just don't know?
                                                  Page 243
```

```
 1      A.   I -- I just don't know.
 2      Q.   You don't remember?
 3      A.   But I just want to clarify that I don't
 4 know -- we didn't number them NDA 1, 2, 3.  I wish we
 5 did -- had done that -- in the conversation.
 6           MR. AVENI:  Okay.
 7           THE WITNESS:  Okay.
 8           (Exhibit-126 marked for identification.)
 9      Q.   (By Mr. Aveni)  Okay.  Exhibit-126 is another
10 document that you produced, right?
11      A.   Yeah, yes.
12      Q.   Okay.  And if you look at your email at the
13 top, the second paragraph, you say the -- you're talking
14 about two meetings.  You say, "The first meeting should
15 be regarding AstoundSound in general.  The second
16 meeting to discuss an idea we have, but this one will
17 require a signed NDA on this alone."
18           Do you see that?
19      A.   Okay.
20      Q.   Do you recall this discussion about an NDA,
21 that's reflected in this email?
22      A.   I still don't know why -- what the project is.
23 But we're getting closer.  I --
24      Q.   You don't remember?
25      A.   I don't remember.
                                                  Page 244
```



```
 1      Q.   Can you tell whether this is even the same NDA
 2   as the previous emails we just looked at?
 3      A.   I don't know.
 4      Q.   You don't know.  Do you have any way of
 5   recalling what the idea that you refer to in this
 6   paragraph is?
 7      A.   No.
 8           MR. AVENI:  Okay.  Okay.  I don't want to beat
 9   a dead horse.  We're going to do one more email talking
10   about NDAs, and we'll move on.
11           THE WITNESS:  Okay.
12           (Exhibit-127 marked for identification.)
13           MS. HUGHES:  So, are you close to wrapping up
14   because we do have cross-examination?  You've almost run
15   through the entire seven hours.
16           MR. AVENI:  I don't think I'm here seven.
17           MR. HOLMES:  Do you know how much time has
18   elapsed?
19           THE COURT REPORTER:  Yes.  We started at 8:59
20   a.m., and it's now 4:01 p.m.
21           MR. AVENI:  Right.
22           MR. HOLMES:  Have you been tracking breaks?
23           THE COURT REPORTER:  Yes, I have.
24           MR. HOLMES:  Okay.  So, do you know what the
25   elapsed time is?
                                                  Page 245
```

```
 1      A.   I don't know one way or the other.
 2      Q.   And you don't know whether there is anything
 3   in this sentence I just read to you -- or these two
 4   sentences -- that's inaccurate as a result, right?
 5      A.   I don't know.
 6           MR. AVENI:  Okay.  You can put that aside.
 7           (Exhibit-128 marked for identification.)
 8      Q.   (By Mr. Aveni)  This is another email that you
 9   produced, right?
10      A.   Yes.
11      Q.   Okay.  Okay.  So, the top -- well, you'll see
12   there's a sentence near the top there that says:  "We
13   should have the port from our Quartz composer patch over
14   to OpenGL by the 14th completed and all parameter
15   settings exposed for Expander on the iPad."
16           Do you see that?
17      A.   Yes.
18      Q.   Is that just relating to the separate Expander
19   app, or does that have anything to do with the work that
20   you were doing in connection with GenAudio?
21           MS. HUGHES:  Object to the form of the
22   question.  I don't understand what you're asking him.
23   Could you rephrase it?
24           MR. AVENI:  Sure, I can rephrase it.
25      Q.   (By Mr. Aveni)  I'm trying to figure out if
                                                  Page 248
```

```
 1           MR. AVENI:  Let's go off the record.
 2           (Discussion held off the record.)
 3           MR. AVENI:  So, let's get back on the record.
 4      Q.   (By Mr. Aveni)  So Exhibit-127 is another
 5   email you produced, right?  Do you have that?
 6      A.   Yes.
 7      Q.   Okay.  It says, "Could you please send me the
 8   NDA that we discussed?"  Again, this is on August 26th.
 9   He says, "Would like to get that signed so we can setup
10   (hopefully) firm meeting times in the next week or two
11   with Andrew and Barry."
12           You understand him to be referring to Andrew
13   Bright and Barry Corlett?
14      A.   Yes.
15      Q.   Okay.  So, does that help refresh your
16   recollection that the NDA that was being discussed was
17   tied to the meeting that you were trying to set up with
18   those two individuals?
19      A.   We can -- I'm not going to say, because I
20   really don't --
21      Q.   You don't recall?
22      A.   I don't recall for sure.
23      Q.   Okay.  I just wanted to see if that would
24   trigger any recollection.
25      A.   No.
                                                  Page 246
```

```
 1   side?
 2      A.   Just the Mac side.  But there's -- there's
 3   people that would be interested in -- other audio groups
 4   or marketing or whatever.  Again, trying to raise
 5   awareness, perhaps gain a little traction with --
 6   somebody -- somebody says, "Wow, I can use that."
 7           Again, trying to sell it internally.  You
 8   know, the fact that the people I tried to go to -- to
 9   see if we could raise awareness on it and get them --
10   you know, was kind of shut down there.  Nowhere to go
11   there.  But maybe in Ron's division, they like it.
12      Q.   Okay.
13      A.   And it was actually a little bit different
14   software, so I could see where he might feel like
15   there's still a chance.
16           MR. AVENI:  Okay.  Let's mark this one.
17           (Exhibit-130 marked for identification.)
18      Q.   (By Mr. Aveni)  Okay.  This is another
19   document that you produced, right?
20      A.   Yeah, see everything is about the LCR.
21      Q.   This is another document that you produced?
22      A.   Yes.
23      Q.   Okay.  And so first -- so if you look at the
24   bottom of the first page, Mr. Mahabub is writing about
25   meeting with you on September 16th.  And then at the top
                                                  Page 252
```

**Page 255**

```
 1  missed this.  You're not sure, one way or the other, as
 2  to what this email -- whether this email relates to what
 3  you just explained, right?
 4       A.  I'm not 100 percent sure, but it sounds like
 5  it.
 6       Q.  Okay.
 7       A.  Because it says, "new app."  And I know we've
 8  asked him about that before.  So, I'm kind of jumping
 9  into it with that one.
10       Q.  Okay.  Now, the bottom of Page 2, you're
11  writing to Jerry Mahabub.  And you say, "I have
12  tentatively set up a meeting for Thursday, September
13  23rd."  Do you see that?
14       A.  Okay.
15       Q.  And that's the meeting with Andrew Bright and
16  Barry Corlett, right?
17       A.  Okay.
18       Q.  Is that right?
19       A.  Probably.
20       Q.  Okay.  And that meeting took place, right?
21       A.  Yes.
22           MR. AVENI:  Okay.  So, I'm going to reflect
23  that on Exhibit-82 as well.  Okay.  You can put that
24  document away.
25           (Exhibit-131 marked for identification.)
```

**Page 344**

```
 1       A.  I saw it on this date, October 30th.
 2       Q.  And --
 3       A.  2013.
 4       Q.  And did you write this email to Mr. Skluzak
 5  after you saw the email string from Mr. Mahabub?
 6       A.  Yes, I did.
 7       Q.  And did you have a conversation with
 8  Mr. Mahabub on or about May 5, 2010, that is the same as
 9  transcribed in this Exhibit?
10       A.  No.
11       Q.  Was this a fabrication?
12           MR. AVENI:  Objection.  Asked and answered.
13           MR. HOLMES:  Join.
14       A.  Yes.
15       Q.  (By Ms. Hughes)  And when you write in this
16  letter, "OMG," what does that stand for?
17       A.  Oh my god.
18       Q.  Did you say that because you were upset?
19       A.  I did.  I was very upset.
20       Q.  Because Mr. Mahabub's lying about this -- your
21  conversation with him?
22       A.  Yes.
23           MR. HOLMES:  Objection --
24       Q.  (By Ms. Hughes)  He was lying about --
25           MR. HOLMES:  Objection.  Calls for speculation
```

**Page 343**

```
 1       A.  I -- I don't know.  I'd have to read -- I
 2  mean, I -- I -- I don't know.  I'm not sure.  I'll just
 3  say I'm not sure.  I --
 4       Q.  (By Mr. Aveni)  Okay.
 5       A.  I -- obviously, having -- with all the
 6  knowledge I have, with all this stuff we have in here in
 7  the conversations, I just feel differently about the
 8  conversation.  I -- with --
 9           Like I said, we're operating up here -- and
10  there's something going on over here -- and trying to
11  make it nice, like it's -- like -- like -- like a --
12  well, it's the same kind of conversation.  It's not -- a
13  lot of implied conversation here about what's going --
14  you know, what's going on.  I -- I just can't sign up
15  for that.  I'm sorry.  I --
16           MS. HUGHES:  I have one more or two.
17           MR. HOLMES:  Yes, of course.
18           F U R T H E R   E X A M I N A T I O N
19  BY MS. HUGHES:
20       Q.  Let me show you what we've previously marked
21  as Exhibit-16.  Mr. Tiscareno, have you --
22       A.  Yes.
23       Q.  -- seen this exhibit before?
24       A.  I have.
25       Q.  When did you first see it?
```

**Page 347**

```
 1                    S I G N A T U R E
 2
 3
 4
 5           I declare under penalty of perjury
 6  under the laws of the State of Washington that I have
 7  read my within deposition and the same is true and
 8  accurate, save and except for changes and/or
 9  corrections, if any, as indicated by me on the CHANGE
10  SHEET page hereof.
11           Signed in _____,
12  Washington, on the _____ day of _____,
13  2016.
14
15
16
17           _____
18                 VICTOR TISCARENO
                  TAKEN:  December 16, 2016
```

Veritext Legal Solutions
866 299-5127

```
1                    C E R T I F I C A T E
2    STATE OF WASHINGTON  )
                          ) ss.
3    COUNTY OF KING       )
4
5            I, the undersigned Washington Certified Court
     Reporter, hereby certify that the foregoing deposition
6    upon oral examination of VICTOR TISCARENO was taken
     stenographically before me on December 16, 2016, and
7    transcribed under my direction;
8            That the witness was duly sworn by me pursuant
     to RCW 5.28.010 to testify truthfully; that the
9    transcript of the deposition is a full, true, and
     correct transcript to the best of my ability; that I am
10   neither attorney for nor a relative or employee of any
     of the parties to the action or any attorney or counsel
11   employed by the parties hereto nor financially
     interested in its outcome.
12
             I further certify that in accordance with
13   Washington Court Rule 30(e), the witness is given the
     opportunity to examine, read, and sign the deposition
14   within thirty days upon its completion and submission
     unless waiver of signature was indicated in the record.
15
             IN WITNESS WHEREOF, I have hereunto set my
16   hand this 27th day of December, 2016.
17
18
19
20
21
22           Olivia Pennella
23           Washington CCR 3337
24
25
                                                   Page 348
```

Veritext Legal Solutions
866 299-5127

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

```
                 Federal Rules of Civil Procedure

                              Rule 30


     (e) Review By the Witness; Changes.

     (1) Review; Statement of Changes. On request by the

     deponent or a party before the deposition is

     completed, the deponent must be allowed 30 days

     after being notified by the officer that the

     transcript or recording is available in which:

     (A) to review the transcript or recording; and

     (B) if there are changes in form or substance, to

     sign a statement listing the changes and the

     reasons for making them.

     (2) Changes Indicated in the Officer's Certificate.

     The officer must note in the certificate prescribed

     by Rule 30(f)(1) whether a review was requested

     and, if so, must attach any changes the deponent

     makes during the 30-day period.



     DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES

     ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

     THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,

     2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES

     OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.
```