EXCERPTED

# EXHIBIT 227

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
        Civil Action No. 1:15-cv-02118-WJM-CBS
 3      _____
 4              DEPOSITION OF:  DELL FRANK SKLUZAK
                         February 7, 2017
 5      _____
 6      SECURITIES AND EXCHANGE COMMISSION,
 7      Plaintiff,
 8      v.
 9      TAJ JERRY MAHABUB; GENAUDIO, INC., et al.,
10      Defendants.
        _____
11
                 PURSUANT TO NOTICE, the deposition of
12      DELL FRANK SKLUZAK was taken on behalf of the
        Defendant Taj Jerry Mahabub at 1225 17th Street,
13      27th Floor, Denver, Colorado 80202, on February 7,
        2017, at 9:02 a.m., before Kimberly Smith, Registered
14      Professional Reporter and Notary Public within
        Colorado.
15
16
17
18
19
20
21
22
23
24
25
```

Page 1

## Page 2

```
 1           A P P E A R A N C E S
 2  For the Plaintiff:
 3      LESLIE HENDRICKSON HUGHES, ESQ.
        DANIELLE R. VOORHEES, ESQ.
 4      U.S. Securities and Exchange Commission
        1961 Stout Street, Suite 1700
 5      Denver, Colorado 80294
 6
    For the Defendant Taj Jerry Mahabub:
 7
        ANDREW B. HOLMES, ESQ.
 8      Holmes, Taylor & Jones, LLP
        617 South Olive Street, Suite 1200
 9      Los Angeles, California 90014
10
    For the Defendant GenAudio, Inc.:
11
        MICHAEL P. McCLOSKEY, ESQ.
12      Wilson Elser Moskowitz Edelman & Dicker, LLP
        655 West Broadway, Suite 900
13      San Diego, California 92101
14
    For the Deponent Dell Frank Skluzak:
15
        H. PAUL COHEN, ESQ.
16      H. Paul Cohen, P.C.
        5440 East 6th Avenue Parkway
17      Denver, Colorado 80220
18
19
20
21
22
23
24
25
```

## Page 3

```
 1            I N D E X
 2  EXAMINATION OF DELL FRANK SKLUZAK:              PAGE
    February 7, 2017
 3
    By Mr. Holmes                   6, 110, 165
 4
    By Mr. McCloskey                83, 168, 184
 5
    By Ms. Hughes                   115, 183
 6
                INITIAL
 7  DEPOSITION EXHIBITS:               REFERENCE
 8  Exhibit 247  Background Questionnaire        11
 9  Exhibit 248  Stock Certificate for 400,000       34
        Shares of Common Stock in GenAudio,
10      5/3/10
11  Exhibit 249  Stock Certificate for 30,000        35
        Shares of Common Stock in GenAudio,
12      4/2/10, with attachments
13  Exhibit 250  TD Ameritrade Statement            39
14  Exhibit 251  Stock Certificate for 40,000        40
        Shares of Common Stock in GenAudio,
15      5/21/10
16  Exhibit 252  Report to the Chairman of the Board   60
        of Directors of GenAudio, 1/30/14
17
    Exhibit 253  Apple Logo                      130
18
    Exhibit 254  The list of Proxy Sales and Gifted    141
19      Shares by Mr. Mahabub starting in
        December 2008 A Total of Approx 7
20      Million Shares Disposed of and
        Receipt of over $5 Million Dollar
21      [sic]
22  Exhibit 255  E-mail to Bobak and others from     144
        Skluzak, Subject: Personal Loan
23      Demand Letter Entire Sequence,
        5/29/14, with attached e-mails,
24      with attachment
25
```

## Page 4

```
 1  Exhibit 256  Letter to GenAudio, Inc.,          146
        Shareholder from The Board of
 2      Directors, 9/19/14
 3  Exhibit 257  E-mail to Skluzak from Mahabub,    151
        Subject: Charges on credit card,
 4      7/6/12, with attached e-mail
 5  Exhibit 258  E-mail to Skluzak from Mahabub,    153
        Subject: Monster Press Release
 6      going live on the 7th for the press
        event in Las Vegas!!!, 1/5/13
 7
    Exhibit 259  Letter to Shareholder from         154
 8      Mahabub, 8/28/10
 9  Exhibit 260  List of Quotes                 158
10  Exhibit 261  Letter to Client from Yorba,       180
        7/28/16, with attached documents
11
    DEPOSITION EXHIBITS:  (Previously marked)
12
    Exhibit 1    E-mail to Ostrom from Skluzak,     140
13      Subject: Shareholder List
        Master.xls, 8/8/14, with
14      attachments
15  Exhibit 7    Shareholder Letter, 8/1/10        112
16  Exhibit 13   Letter to GenAudio Shareholder    147
        from The Board of Directors,
17      11/4/14
18  Exhibit 14   Letter to GenAudio Shareholder    148
        from The Board of Directors,
19      2/25/15, with attachment
20  Exhibit 16   E-mail to Skluzak from Tiscareno,  58
        Subject: Look forward to your
21      review, 10/30/13, with attached
        e-mails
22
    Exhibit 24   E-mail to Mahabub and others      125
23      from Mattos, Subject: GenAudio
        Update & Business Summary,
24      11/9/09, with attachment
25
```

## Page 5

```
 1  Exhibit 69   GenAudio, Inc., Confidential       122
        Private Placement Memorandum,
 2      12/11/08
 3  Exhibit 70   GenAudio, Inc., Confidential       123
        Private Placement Memorandum,
 4      3/25/09
 5  Exhibit 198  GenAudio, Inc., Common Stock       117
        Transfer Ledgers
 6
    Exhibit 201  Shareholder Letter from Mahabub,   124
 7      3/30/09
 8  Exhibit 233  GenAudio Confidential Private      49
        Placement Memorandum, 3/15/10
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

```
 1       WHEREUPON, the following proceedings were
 2  taken pursuant to the Federal Rules of Civil
 3  Procedure.
 4           *   *   *   *   *
 5       DELL FRANK SKLUZAK,
 6  having been first duly sworn to state the whole truth,
 7  testified as follows:
 8       (Deponent's reply to oath:  I do.)
 9              EXAMINATION
10  BY MR. HOLMES:
11     Q.  Good morning, Mr. Skluzak.
12     A.  Good morning.
13     Q.  My name is Andrew Holmes.  I represent
14  Jerry Mahabub in this case.  I think you've already
15  spelled your name for the record -- or no.  Okay.
16  Could you spell -- could you state and spell your name
17  for the record, please.
18     A.  D-e-l-l; middle name, F-r-a-n-k; last name,
19  S-k-l-u-z-a-k.
20     Q.  Thank you.  And, Mr. Skluzak, you have
21  counsel here with you today, right?
22     A.  Yes.
23         MR. HOLMES:  Okay.  And Mr. -- I'm sorry --
24  Cohen?
25         MR. COHEN:  Yes.
                                                    Page 6
```

```
 1         MR. HOLMES:  Would you just identify
 2  yourself.
 3         MR. COHEN:  Sure.  H. Paul Cohen,
 4  Registration No. 6683.
 5         MR. HOLMES:  And we also have counsel for
 6  the SEC?
 7         MS. HUGHES:  Good morning.
 8         MR. HOLMES:  And we also have counsel for
 9  GenAudio:  Mike McCloskey.
10     Q.  (BY MR. HOLMES)  So I want to go through
11  some of the preliminaries, just background on how this
12  works.  Have you had your deposition taken before?
13     A.  Yes.
14     Q.  I know that you had your administrative or
15  investigative testimony taken by the SEC a couple of
16  years ago at this point, right?
17     A.  I'm not sure of the exact number of years
18  involved, but it's been a while, yes.
19     Q.  Okay.  So aside from that, have you had
20  your deposition taken before?
21     A.  Yes.
22     Q.  Okay.  How long ago was the last time?
23     A.  Eighteen months.
24     Q.  Okay.  And was it a civil case?
25     A.  Yes.
                                                    Page 7
```

```
 1     Q.  Okay.  And what was that case about?
 2     A.  It was a case between Newborn Caulk Gun
 3  Company and Albion Caulk Gun Company, which I'm a
 4  manufacturer's rep for Newborn Caulk Gun Company.  And
 5  it had to do with import issues --
 6     Q.  Okay.
 7     A.  -- country of origin marking.
 8     Q.  Okay.  And you were represented by counsel
 9  during that deposition?
10     A.  Yes.
11     Q.  Okay.  So I'm going to go through briefly
12  sort of the background on how this works.  It sounds
13  like you, based on that experience, should know how
14  depositions typically work, but just in case.
15         At the outset, you were placed under oath,
16  under penalty of perjury.  Do you understand that?
17     A.  Yes.
18     Q.  What that means is that you're supposed to
19  give the best answers you can today, because it's
20  under penalty of perjury.
21         Please answer the questions as clearly as
22  possible.  And please also do your best to wait until
23  I'm finished asking my question before you start to
24  respond.
25         If we overlap, the court reporter has a
                                                    Page 8
```

```
 1  difficult time taking down what the question is and
 2  what the response is.  Can you do that for me?
 3     A.  Yes.
 4     Q.  Also, answer audibly.  You're doing great.
 5  The court reporter can't take down head nods and head
 6  shakes, so verbal responses, something other than
 7  uh-huh or uh-uh, which also look very, very similar
 8  and are indecipherable on the written record, so a
 9  verbal response of a yes or no or whatever other
10  verbal appropriate response it might be.  Can you do
11  that for me?
12     A.  Yes.
13     Q.  I'm going to ask the questions today.
14  Other counsel will probably have lots of questions
15  after me.  And your attorney may object periodically
16  as we go through this.
17         The way this works, though, is because we
18  don't have a judge present to rule on whether the
19  objection is valid, overruled or sustained, you are
20  required to answer the question to the best of your
21  ability unless your attorney instructs you not to
22  answer.  Do you understand?
23     A.  Yes.
24     Q.  We're going to take breaks about every
25  hour.  It's not supposed to be an endurance test.  If
                                                    Page 9
```

**Page 66**

1  Mr. Mahabub arranged a meeting with Mr.
2  Coey and I at The Elephant Club (sic) at Belmar, in
3  Lakewood, Colorado, with the intent that Mr. Coey
4  would convince me to drop my objection to what Mr.
5  Mahabub was doing, from a business standpoint.
6      After our meeting, Mr. Coey's parting
7  discussion with me is he said, I want to make you
8  president of GenAudio.
9      Q.  What was your understanding of Mr. Coey's
10 role at that point?
11     A.  My understanding of Mr. Coey at that point
12 was that he was an investor in GenAudio, and he also
13 was serving as a person who was gathering like-minded
14 people within his sphere of influence of family,
15 friends, and business associates to invest in
16 GenAudio.
17     Q.  And we're talking about the end of 2012?
18     A.  Approximately, yes.
19     Q.  So at the end of 2012, he was already an
20 investor or was thinking of --
21     A.  Yes.  I don't know what his date of
22 investment was, but it predated our meeting.
23     Q.  And your understanding was that he was
24 gathering other investors for GenAudio?
25     A.  At that point, I don't know if he was

**Page 67**

1  actively involved in finding other investors.  He was
2  actively involved, though, in doing due diligence to
3  report back to the group of people that he had helped
4  get involved in the corporation.
5      Q.  Okay.  And so what did you think of his
6  statement about saying he wanted to make you
7  president?
8      A.  I thought it was -- my best recollection
9  was, is if it was this easy to convince a major
10 investor in GenAudio that Mr. Mahabub was not running
11 the company correctly, that things were pretty bad in
12 the corporation.
13     Q.  Did you say --
14         MR. HOLMES:  I'm sorry.  Could you read
15 back the answer.
16         (The last answer was read back as follows:
17 "I thought it was -- my best recollection was, is if
18 it was this easy to convince a major investor in
19 GenAudio that Mr. Mahabub was not running the company
20 correctly, that things were pretty bad in the
21 corporation.")
22     Q.  (BY MR. HOLMES)  Okay.  So the major
23 investor here was Mr. Coey?
24     A.  Yes.
25     Q.  So was it something about that

**Page 68**

1  understanding or realization that you had that caused
2  you to get more involved then with GenAudio?
3      A.  I believe, at that time, Mr. Mahabub had
4  appointed me as a director.  I'm not positive, though.
5  But Mr. Coey generated momentum for me to become
6  president of the company.
7      Q.  So if we look back at your -- we've marked
8  it 247.  That was that questionnaire.
9      A.  Uh-huh.  That was the first one we looked
10 at?
11     Q.  Yeah.  That was the first one we looked at
12 today.  So if you look at the response to No. 16, it
13 says -- in response to whatever 16 is asking, it says,
14 among other things, In addition, I served as a board
15 of director member for GenAudio, Inc., from April 2012
16 until February 2014 and president of GenAudio, Inc.,
17 from July 1, 2013, until February 23, 2014.
18         Do you see that?
19     A.  I do not.
20     Q.  Oh, sorry.  That should be in response to
21 No. 16 on page 4 of the questionnaire.
22     A.  The stuff that's struck out?  Okay.  I see.
23 It was struck out on something else I'm reading.
24     Q.  Do you see it now?
25     A.  Yes.

**Page 69**

1      Q.  Okay.  Are those dates -- does that sound
2  right to you?
3      A.  Yes.
4      Q.  Okay.  So according to this, you were a
5  board member starting in April of 2012?
6      A.  Yes.
7      Q.  All right.  And so toward the end of 2012,
8  you had this meeting with Mr. Coey.  And then in --
9  starting in July 2013, you became the president of
10 GenAudio?
11     A.  Yeah.  The meeting with Mr. Coey could have
12 been anywhere from the summer of 2012 until the first
13 quarter of 2013.  I tend to think it was in the fall.
14 My specific remembrance is it must have been hot,
15 because we had drinks, and I had sangria --
16     Q.  Okay.
17     A.  -- which would not be a winter or a spring
18 drink.
19     Q.  I'll have to remember that to help
20 witnesses remember what time of year it was.
21         MR. COHEN:  What were you drinking?
22         MR. HOLMES:  What were you drinking?
23         THE DEPONENT:  Yes.
24     Q.  (BY MR. HOLMES)  So when you became
25 appointed as a director in April of 2012, what were

**Page 86**

1  I don't mean to testify here, but it seems kind of
2  self-evident that he sponsored you onto a board in
3  2012. So I'm just trying to figure out: Did a rift
4  repair between 2005 and 2012, or was there no rift at
5  all?
6     A. I would say there was no animosity after
7  the election was complete between Mr. Mahabub and
8  myself.
9     Q. In 2004 (sic), when you failed to get on
10 the board by way of Mr. Ohman's slate, were you
11 disappointed?
12    A. No. Because the -- Mr. Mahabub had
13 controlling voting rights, so it was . . .
14    Q. Fairly complex?
15    A. Yes.
16    Q. Did you talk to Mr. Mahabub prior to the
17 slate being proposed then with respect to, Hey, I
18 don't think it's going to work anyway?
19    A. No.
20       MS. HUGHES: Objection to your earlier
21 question. You said, "2004," which I think misstates
22 the time frame that we're talking about.
23       MR. McCLOSKEY: Okay. My apologies.
24    Q. (BY MR. McCLOSKEY) If I'm messing up the
25 dates, which I'm really good at doing, the record will

**Page 87**

1  speak for itself. So if I'm wrong, please correct me.
2  I take no insult at that, believe me, Mr. Skluzak.
3        But I'm trying to understand the nature of
4  the relationship, how it evolved over time. So that's
5  why I'm asking these questions.
6        In 2005, as I understand your testimony,
7  then you would from time to time converse with
8  Mr. Mahabub with respect to the ongoing operations of
9  the enterprise; am I right?
10    A. I had infrequent conversations, none that I
11 can recall specifically. But my tracking of the
12 momentum -- or the business side of the company would
13 have primarily been through the shareholder updates
14 that were issued periodically.
15    Q. I'm back in 2005. Is that the case in
16 2005?
17    A. Yes.
18    Q. And that progressed through the next five
19 years, as I understand it, through 2010 --
20    A. Yes.
21    Q. -- am I right? Okay.
22       As those things progressed, and over those
23 five years, did the relationship between you and
24 Mr. Mahabub change?
25    A. Through what time period?

**Page 88**

1     Q. 2005 to 2010.
2     A. No.
3     Q. So by the time 2010 came, you started
4  buying shares or purchasing shares. The relationship
5  between you and Mr. Mahabub remained the same as it
6  started out when you were introduced to Mr. Mahabub
7  through your daughter. Is that a fair statement?
8     A. Well, let me qualify.
9     Q. Sure.
10    A. I'll try to give a timeline. My daughter
11 introduced me to Mr. Mahabub. The relationship was --
12 I made a decision to invest, had really no other type
13 of social or business discussion with him.
14       At some point in time in the 2004-2005 time
15 frame, I was contacted by Mr. Ohman to serve on the
16 slate, of which I made a decision to do so with the
17 primary reason of just being involved in the
18 discussion.
19       After -- so there was a period of time
20 where Mr. Mahabub was -- to put it in layman's
21 terms -- just not happy that I decided to do that and
22 made some unkind comments, that I had no umbrage with,
23 because I probably would have done the same thing had
24 I been in his shoes.
25       After that vote in the meeting of -- any

**Page 89**

1  concern, ill-will towards me I think was erased, and
2  we established our relationship based on the first
3  time that I had met him.
4        That relationship stayed basically stable
5  with very little interaction, either in person or by
6  e-mail, outside of the periodic shareholder updates
7  that I would receive.
8     Q. So in 2005, when the vote failed, as you
9  mentioned, no vendetta from Mr. Mahabub or on your
10 part either; is that true?
11    A. There was none on my part. I cannot speak
12 to what Mr. Mahabub may have done.
13    Q. And as the years elapsed between then and
14 2010, nothing changed in terms of relationship?
15    A. Yeah. Materially between our relationship,
16 it maintained the same level.
17    Q. 2012, Mr. Mahabub, I'll call it,
18 sponsored -- maybe that's an improper word. If it is,
19 correct me -- sponsored you onto the board?
20    A. Yes.
21    Q. Was Mr. Mahabub a member of the board as
22 well?
23    A. Yes.
24    Q. How did you interact with him to discharge
25 GenAudio business?

| | |
|---|---|
| 1  Mr. Cohen.<br>2          THE DEPONENT:  Yes.<br>3          MS. HUGHES:  All right.<br>4          WHEREUPON, the within proceedings were<br>5  concluded at the approximate hour of 2:26 p.m. on the<br>6  7th day of February, 2017.<br>7             *   *   *   *   *<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>Page 186 | 1          REPORTER'S CERTIFICATE<br>2  STATE OF COLORADO       )<br>3                          ) ss.<br>4  CITY AND COUNTY OF DENVER  )<br>5          I, KIMBERLY SMITH, Registered Professional<br>6  Reporter and Notary Public ID 20054024603, State of<br>7  Colorado, do hereby certify that previous to the<br>8  commencement of the examination, the said DELL FRANK<br>   SKLUZAK was duly sworn by me to testify to the truth<br>9  in relation to the matters in controversy between the<br>10  parties hereto; that the said deposition was taken in<br>11  machine shorthand by me at the time and place<br>12  aforesaid and was thereafter reduced to typewritten<br>13  form; that the foregoing is a true transcript of the<br>14  questions asked, testimony given, and proceedings had.<br>15          I further certify that I am not employed by,<br>   related to, nor of counsel for any of the parties<br>16  herein, nor otherwise interested in the outcome of<br>17  this litigation.<br>18          IN WITNESS WHEREOF, I have affixed my<br>19  signature this 17th day of February, 2017.<br>20<br>21<br>22<br>23<br>24      KIMBERLY SMITH<br>25<br>Page 188 |
| 1          I, DELL FRANK SKLUZAK, do hereby certify<br>2  that I have read the above and foregoing deposition<br>3  and that the same is a true and accurate transcription<br>4  of my testimony, except for attached amendments, if<br>5  any.<br>6<br>7<br>8       _____<br>        DELL FRANK SKLUZAK<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>Page 187 | |

REPORTER'S CERTIFICATE

STATE OF COLORADO      )
                       ) ss.
CITY AND COUNTY OF DENVER  )

      I, KIMBERLY SMITH, Registered Professional Reporter and Notary Public ID 20054024603, State of Colorado, do hereby certify that previous to the commencement of the examination, the said DELL FRANK SKLUZAK was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

      I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

      IN WITNESS WHEREOF, I have affixed my signature this 16th day of February, 2017.
      My commission expires June 21, 2017.

\_XX\_\_  Reading and Signing was requested.

\_\_\_\_\_  Reading and Signing was waived.

\_\_\_\_\_  Reading and Signing is not required.



Kimberly Smith
Registered Professional Reporter