EXCERPTED

# EXHIBIT 228

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                           ) File No. D-03450-A
GENAUDIO, INC.             )

WITNESS:   Jim Wei-Kung Mattos
PAGES:     1 through 293
PLACE:     Securities and Exchange Commission
           1961 Stout Street
           Denver, Colorado 80294
DATE:      Monday, February 9, 2015

    The above-entitled matter came on for hearing, pursuant to notice, at 9:05 a.m.



Diversified Reporting Services, Inc.
(202) 467-9200

Page 2

APPEARANCES:

On behalf of the Securities and Exchange Commission:
    JENNIFER OSTROM, ESQ.
    KURT GOTTSCHALL, ESQ.
    Securities and Exchange Commission
    Division of Enforcement
    1961 Stout Street
    Denver, Colorado 80294
    (303) 844-1000

On behalf of the Witness:
    MICHAEL P. McCLOSKEY, ESQ.
    WILSON ELSER MOSKOWITZ
    EDELMAN & DICKER LLP
    655 West Broadway, Suite 900
    San Diego, California 92101
    (619) 321-3200

Page 3

CONTENTS

| WITNESS: | EXAMINATION |
|---|---|
| Jim Wei-Kung Mattos | 6 |

| EXHIBITS | DESCRIPTION | IDENTIFIED: |
|---|---|---|
| 65 | Testimony subpoena | 9 |
| 66 | Document subpoena | 9 |
| 67 | Background Questionnaire | 17 |
| 68 | Document Bates numbered JM 1992 through 1995 (E-mail) | 138 |
| 69 | Document Bates numbered JM 2152 (E-mail) | 154 |
| 70 | Document Bates numbered JM 2191 (E-mail) | 158 |
| 71 | Document Bates numbered JM 4182 and 4183 (E-mail) | 166 |
| 72 | Document Bates numbered JM 3863 through 3866 (E-mail) | 174 |
| 73 | Document Bates numbered SEC 6 through 9 (Letter) | 177 |
| 74 | Document Bates numbered JM 3473 (E-mail) | 179 |
| 75 | Document Bates numbered JM 5081 (E-mail) | 193 |

Page 4

CONTENTS (CONT.)

| EXHIBITS | DESCRIPTION | IDENTIFIED: |
|---|---|---|
| 76 | Document Bates numbered JM 3418 Through 3420 (E-mail) | 195 |
| 77 | Document Bates numbered D-P-230 through 235 (E-mail) | 198 |
| 78 | Document Bates numbered JM 7207 through 7212 (E-mail) | 205 |
| 79 | Document Bates numbered JM 7203 through 7206 (E-mail) | 216 |
| 80 | Document Bates numbered JM 7198 through 7200 (E-mail) | 218 |
| 81 | Document Bates numbered JM 10636 through 10639 (E-mail) | 220 |
| 82 | Excerpt from testimony of Victor Tiscareno, 12/3/14 (E-mail) | 231 |
| 83 | Document Bates numbered JM 7073 through 7075 (E-mail) | 236 |
| 84 | Document Bates numbered JM 11476 through 11481 (E-mail) | 247 |
| 85 | Document Bates numbered JM 11148 through 11151 (E-mail) | 256 |
| 86 | Document Bates numbered JM 11713 through 11724 (E-mail) | 258 |

Page 5

CONTENTS (CONT.)

| EXHIBITS | DESCRIPTION | IDENTIFIED: |
|---|---|---|
| 87 | Document Bates numbered JM 15076 and 15077 (E-mail) | 273 |
| 88 | Document Bates numbered JM 16793 and 16794 (E-mail) | 274 |

Page 6

1          PROCEEDINGS
2          MS. OSTROM: Let's go on the record at
3    9:05 a.m. on February 9th of 2015.
4          Would you please raise your right hand.
5    Whereupon,
6              JIM WEI-KUNG MATTOS,
7    being first duly sworn in the above cause, was
8    examined and testified as follows:
9              EXAMINATION
10   BY MS. OSTROM:
11       Q   Would you please state and spell your full
12   name for the record.
13       A   My name is Jim Wei-Kung Mattos. It is
14   J-i-m W-e-i, hyphen, K-u-n-g, M-a-t-t-o-s.
15       Q   And my name is Jennifer Ostrom. And with
16   me is Kurt Gottschall. And we are both officers of
17   the United States Securities and Exchange Commission
18   for purposes of this proceeding. And this is an
19   investigation by the Commission in the the matter of
20   GenAudio, Inc., to determine whether there have been
21   violations of certain provisions of the federal
22   securities laws. However, the facts developed in
23   this investigation might constitute violations of
24   other federal or state civil or criminal laws.
25          And prior to the opening of the record you

Page 7

1    were provided with a copy of the formal order of
2    investigation in this matter. And it will be
3    available for your examination during the course of
4    this proceeding.
5          Mr. Mattos, have you had an opportunity to
6    review the formal order?
7        A   I have.
8        Q   And also prior to the opening of the
9    record you were provided with a copy of the
10   Commission's Supplemental Information Form, and a
11   copy of that notice has been marked as
12   Exhibit No. 1. And, Mr. Mattos, have you had the
13   opportunity to read Exhibit No. 1?
14       A   I have.
15       Q   Do you have any questions concerning the
16   notice?
17       A   No.
18       Q   And I want to highlight for you
19   Paragraph B2 of the Form 1662. It reads as follows,
20   You may be represented by counsel who also
21   represents other persons involved in the
22   Commission's investigation. This multiple
23   representation, however, presents a potential
24   conflict of interest if one client's interests are
25   or may be adverse to another's. If you are

Page 8

1    represented by counsel who also represents other
2    persons involved in the investigation, the
3    Commission will assume that you and counsel have
4    discussed and resolved all issues concerning
5    possible conflicts of interest. The choice of
6    counsel and the responsibility for that choice is
7    yours.
8          Do you understand this?
9        A   I do.
10       Q   And, Mr. Mattos, are you represented by
11   counsel today?
12       A   Yes.
13          MS. OSTROM: And would counsel please
14   identify himself for the record.
15          MR. McCLOSKEY: Michael McCloskey.
16          MS. OSTROM: Could you please give us your
17   address.
18          MR. McCLOSKEY: 655 West Broadway,
19   9th floor, San Diego, California 92121.
20          MS. OSTROM: Mr. McCloskey, are you
21   appearing today as counsel for Mr. Mattos as well as
22   represent GenAudio?
23          MR. McCLOSKEY: Yes.
24          BY MS. OSTROM:
25       Q   Mr. Mattos, if you want to go off the

Page 9

1    record today, please advise me of your desire to do
2    so and I will decide at that time whether to ask the
3    reporter to go off the record. She won't go off the
4    record at your request or your counsel's request,
5    only our request. So if you need a break or need to
6    speak with your counsel, please tell me. Okay?
7        A   Okay.
8        Q   And I'll ask you a number of questions
9    today. If you don't understand or hear something
10   that I ask you, please tell me. I'll rephrase it or
11   repeat it as necessary. Okay?
12       A   Yes.
13       Q   And please allow me to complete the
14   question before you begin your answer so that we're
15   not both speaking at once. All right?
16       A   Yes.
17       Q   And also, then, the last thing is that if
18   you could please answer audibly. It makes it so
19   that she can make the record rather than a head nod
20   or a shake. Okay?
21       A   Understood.
22          (SEC Exhibits 65 and 66 were marked
23            for identification.)
24          BY MS. OSTROM:
25       Q   Mr. Mattos, in front of you is a copy

Page 142

1  Q  So was there an actual deal in place?
2  A  No. There was just internal discussions
3  about the integration of our technology based on
4  the -- the e-mails that Jerry had circulated to the
5  team.
6  Q  Did Exhibit No. 4 -- after you received
7  that on May 6th, did that have any information in it
8  that you gave to Mr. Dodge at this time?
9  A  Exhibit No. 4?
10  Q  Exhibit No. 4 that was on May 6th?
11  A  I don't recall if that was -- I didn't
12  discuss this per se. But this was -- you know, the
13  nature of this correspondence was what gave me, you
14  know, optimism about the potential for some type of
15  license deal.
16  Q  Okay. You say, if that news were to leak
17  to the press. Now, if all you did was talk to
18  Mr. Dodge in general that there was a possibility of
19  a license deal with someone, why would anyone have
20  cared if that went to the press?
21  A  Well, it was just a frank discussion
22  between the two of us. And I was just simply
23  stating that you need to keep this under your hat,
24  you know, because any -- any leak of whatever might
25  violate an NDA we had in place and could cause

Page 143

1  problems.
2    BY MR. GOTTSCHALL:
3  Q  Why did you believe it was okay to orally
4  talk about some of the specifics of the LCEC with
5  Mr. Dodge, but you didn't want him to put it in
6  writing?
7  A  I don't recall the nature of that
8  statement.
9  Q  After you received the team update that's
10  contained in Exhibit 4, did you make an effort to
11  communicate any of that information to the existing
12  or prospective GenAudio investors?
13  A  Well, it would have definitely had an
14  effect on my positivity in terms of the forward
15  momentum of the company. And I'm sure I had some
16  cursory discussions with -- with that regard. But
17  actual specifics, no.
18  Q  But did you try to affirmatively convey to
19  investors or prospective investors any of the
20  optimism that had been reflected by Mr. Mahabub in
21  Exhibit 4?
22  A  In a very basic sense, yes.
23  Q  How did you do that?
24  A  Well, people might call me, say, How are
25  things going? I'd be like, Things seem to be going

Page 144

1  very well. Our technology integration is going
2  well. There's definitely potential for some type of
3  licensing on the horizon. I absolutely -- under no
4  circumstances did I ever suggest that there was a
5  timeline involved or what precisely that integration
6  would be.
7  Q  But my question is a little bit different.
8  My question is whether you affirmatively reached out
9  to folks to try to convey any of the information
10  contained in Exhibit 4?
11  A  Did I reach out? No. Did they reach out
12  to me and did I have subsequent conversations? Yes.
13  Q  So your recollection is that you only
14  attempted to convey that information if people
15  reached out to you?
16  A  Absolutely.
17  Q  And if -- if people reached out to you,
18  what exactly would you tell them regarding the
19  prospects for a licensing or an acquisition?
20  A  Well, generally would be conveyed very
21  positively.
22  Q  Well, I mean, as you sit here today, I
23  want the best of your recollection as to what you
24  would tell people.
25  A  Well, people would call me. Generally

Page 145

1  speaking, they would ask me, How is the progress? I
2  would say, Great. And then I would just, you know,
3  convey in a fairly upbeat manner that we're doing
4  well, the company is moving the football forward.
5  As far as specifics, I never got into specifics
6  about any of that because of the NDAs in place and
7  also the fact that nothing is written in stone.
8  Q  But, I mean, at least some of these
9  existing investors were aware of dealings between
10  GenAudio and what had been referred to as the LCEC,
11  correct?
12  A  Sure. Because, I mean, prior to -- we --
13  we only developed the term LCEC after the NDA had
14  been -- had been, you know, executed by the company
15  and by Apple.
16  Q  So in this time frame, in May 2010, if
17  investors asked you what was going on with the LCEC,
18  what did you tell them?
19  A  I don't recall the nature of that. But,
20  again, you have to remember that we were -- openly
21  referred to them as Apple prior to the NDA being
22  signed, because we were already starting to
23  integrate our product. We were looking at that as a
24  potential possibility for business development. We
25  were only required by contract by the NDA to use a

Page 146

1  subsequent term in reference to them.  But at that
2  point many people knew that we were already
3  developing product for Apple because we had done so
4  by virtue of developing the AstoundSound expander.
5  That was a commercially purchasable consumer grade
6  electronics product for Apple.  So it's -- there's
7  no -- you know, people that have been involved with
8  the company and the investors for a series of years
9  prior to that knew that we were dealing with them.
10  But then we, again, under NDA had to not disclose
11  who the name was at that point.
12        Q    During this time frame, so May 2010, what
13  percentage of GenAudio investors would you say knew
14  by virtue of your prior dealings before the NDA that
15  when the company referred to the LCEC you were
16  referring to Apple?
17        A    Oh, I can't speak in terms of percentages.
18  I don't know.
19        Q    Give me an estimate.  I mean, was it -- do
20  you think most investors knew that?
21        A    Every investor knew that we had a product
22  for Apple.
23        Q    Okay.  But how many do you think knew that
24  when the company was referring to -- to the LCEC
25  they were really referring to Apple?

Page 147

1        A    I would say the vast majority.
2        Q    Okay.  So, again, getting back to your --
3  your communications with investors in this May 2010
4  time frame, you don't, as you sit here today, recall
5  what specifically you told them with respect to the
6  LCEC?
7        A    No.  Not specifically.  Again, any
8  integration would have been our AstoundSound
9  expander product for -- integrated at the hardware
10  level with Apple computers or Apple portable
11  devices.
12        Q    I mean, do you recall generally or --
13  anything that you would have been comfortable saying
14  in this May 2010 time frame with respect to the
15  LCEC?
16        A    Well, at that point in time we used LCEC
17  exclusively so...
18        Q    Right.
19        A    But, again -- but, again -- but, again,
20  the lion's share of the shareholders already
21  understood that LCEC meant Apple because of our --
22  because of our previous dealings with them.
23        Q    And so my question is, to you, if somebody
24  asked you in this time frame what's going on with
25  the LCEC, what generally did you tell them?

Page 148

1        A    I told them that we are -- we're moving
2  forward with -- with product integration based on my
3  understanding of what had been supplied to me from
4  Jerry Mahabub through e-mail communications to the
5  team.
6        Q    Did you describe for them any prospects of
7  a potential licensing deal?
8        A    Not with any specificity, no.
9        Q    Did you generally describe prospects for
10  any license deal?
11        A    I discussed about the, you know, process
12  on the horizon.  But at that point in time, again,
13  they kept on saying, Okay, well, we need this test
14  product and we need that test product.  That's what
15  I was referring to earlier about jumping through
16  hoops.  They kept on making us jump through hoops.
17  So the prospects seemed to be looming on the
18  horizon, but never a set date.  The goal posts
19  seemed to always be moving, in other words.
20        Q    Okay.  But, again, back to my original
21  question, in May 2010 what did you tell investors
22  about the process of -- of integration or anything
23  else with the LCEC?
24        A    Nothing -- nothing specific.  Again, just
25  that we were moving forward.  Every software hurdle

Page 149

1  that they had tossed our way we were overcoming, and
2  the prospects generally tended to be good.
3        Q    In the May 2010 time frame, did you
4  discuss with GenAudio investors the prospects for
5  the LCEC to acquire GenAudio?
6        A    Not specifically, no.  But, again, the
7  possibility of some type of liquidity event was
8  always a topic of discussion.  People always want to
9  know how they're going to get their money back.
10        Q    So what did you tell them when they asked
11  you in this time frame?
12        A    I said there's the possibility of it, but
13  there's no guarantees.
14        Q    And what, if anything, did you tell folks
15  in this time frame, May 2010, about the status of
16  product integration or rollouts?
17        A    I said it seemed to be likely at that
18  point.
19        Q    It seemed to be likely that what?
20        A    That there was going to be some form of
21  integration or potential licensing.  And, again,
22  this was all based on the team e-mails that Jerry
23  had sent out.
24        Q    Anything else that you recall generally or
25  specifically telling GenAudio investors in this time

Page 246

1  A  Oh, as of today -- I've not had any
2  discussion about really three out of the four of
3  these in the last two years.
4  Q  Okay.  And then the next to last sentence
5  in that paragraph says, Things are moving faster
6  than we can keep up at this point, which is the
7  major push for our last round of investment before
8  we enter self-sustaining revenue in late '12, early
9  '13.  Why did you say that, the self-sustaining
10 revenue?  What was your basis?
11     A  Well, our basis was that some of these,
12 based on our financial projections, that were
13 included in the various PPMs at the time, we were
14 anticipating getting over our threshold and being
15 able to be in self-sustaining revenue.
16     Q  Has GenAudio ever been in self-sustaining
17 revenue?
18     A  No.
19     Q  Who did the financial projections you're
20 referring to?
21     A  Those would have been done by Jerry
22 Mahabub, Jim Devine, our VP of finance, and had
23 approval stamps by the board of directors, and
24 possibly legal counsel at the time, but I'm not
25 certain about that.

Page 247

1       (SEC Exhibit 84 was marked
2        for identification.)
3       BY MS. OSTROM:
4   Q  And, Mr. Mattos, let me hand you
5  Exhibit No. 84.  This is numbered JM 11476 through
6  11481.  And the first part of this chain starts on
7  JM 11480.  It's from Jim Mattos to Dennis Joseph
8  Kane and Lilly Kane, dated April 23rd, 2012,
9  GenAudio DMS Press Release.  And then on April 23rd,
10 2012, Dean and Linda Eldridge wrote this, sent this
11 on to, it appears, Gary Allen.  And then on
12 April 23rd, 2012, Gary Allen is writing within this
13 chain to Jim Mattos.  And then on Page JM 11479,
14 Jim Mattos is writing to Gary on April 23rd, 2012.
15 And then on JM 11478, Gary Allen is writing to Jim
16 Mattos on April 23rd, 2012.  Above that is Jim
17 Mattos writing back to Gary Allen.  On Page JM 11477
18 on April 23rd, 2012, Jim Mattos is writing to Gary
19 Allen.  On May 7th, 2012, Gary Allen is writing back
20 to Mr. Mattos on that same page.  And then on the
21 first page of 11476, Mr. Mattos is writing to Gary
22 Allen on May 7th of 2012.  Gary Allen writes him
23 back.  And then Mr. Mattos responds to Gary on
24 May 7th, 2012.  And then Gary Allen finally responds
25 back to Mr. Mattos.  If you could read that, and

Page 248

1  then I'll ask you some questions.
2     A  Okay.
3     Q  Did you produce this to us?
4     A  I did.
5     Q  Okay.  Did you -- if you could look at
6  JM 11479, did you send this e-mail to Gary Allen?
7     A  I did.
8     Q  Okay.  The very first paragraph says, The
9  license agreement generates $1,500 per theatre
10 server for GenAudio.  DMS is currently used in over
11 35,000 theaters worldwide, maintains 10 times the
12 market size of Dolby and digital cinema.  That
13 equates to over $52 million of revenue for GenAudio.
14 Do you see that?
15    A  Yes.
16    Q  Where did you get that information from?
17    A  That was information that was generated by
18 Jerry and the -- the team.  I believe $1,500 is what
19 we had contractually agreed upon with DMS.  And we
20 were just extrapolating the numbers based on their
21 published figures as far as number of theaters, et
22 cetera.
23    Q  And when did the deal with DMS fall
24 through?
25    A  Well, again, it was -- it didn't fall

Page 249

1  through.  The deal was consummated, but we were
2  still working through integration issues.  And we
3  ran out of funding, didn't have the ability to push
4  it forward, and had -- I believe at that time just
5  kind of switched gears to other prospective
6  business.  And within that next year time frame,
7  they got purchased by Dolby.
8     Q  And when was it that what you just said
9  happened, the integration issues, et cetera?  When
10 was that?
11    A  Well, it would have been sometime after
12 this April 23rd, 2012.  I don't recall exactly.
13    Q  Did you tell anybody when it -- when that
14 happened?
15    A  No.  I'm not involved in engineering, so I
16 don't have a precise timeline on when things went
17 south in that regard.
18    Q  So you're telling people that there's
19 going to be $52 million of revenue for GenAudio.  At
20 any point did you tell anybody that that was no
21 longer the case?
22    A  I believe there may have been an e-mail
23 update further down the road to all shareholders
24 with regard to that.
25    Q  With regard to what?

Page 290

1  **to do with helping GenAudio fulfill its document**
2  **production under the document subpoena?**
3       A   Well, no.  Not under GenAudio or myself.
4  I believe he was subpoenaed to produce his own
5  documents.  He did that independently of myself.
6       **Q   Did you talk with him about it then?**
7       A   No.
8       **Q   Okay.  Because --**
9       A   He knew I was producing documents, but --
10      **Q   Okay.**
11      A   -- as far as -- I was going to give you
12 everything.  That's all that had to be said.
13      **Q   The reason why I ask is just clarifying,**
14 **because you said you had discussed document**
15 **production with Mr. Mahabub, so I wanted to make**
16 **sure if there were any more details behind that.**
17      A   Well, it was very -- it was a daunting
18 process, so there were comments along those lines.
19      **Q   I understand. Okay.  And, Mr. Mattos, we**
20 **have no further questions at this time.  We may,**
21 **however, call you again to testify in this**
22 **investigation.  And should this be necessary, we**
23 **will contact you through your counsel.**
24      A   Okay.
25      **Q   Do you wish to clarify anything or add**

Page 291

1  **anything to the statements you've made today?**
2       A   Not at this time.
3           MS. OSTROM:  Let's go off the record at
4  4:30 p.m., February 9th of 2015.
5           (Whereupon, at 4:30 p.m. the proceedings
6  were adjourned.)
7
8              * * * * *

Page 292

PROOFREADER'S CERTIFICATE

In the Matter of:   GENAUDIO, INC.
Witness:        Jim Wei-Kung
File Number:    D-03450-A
Date:           January 9, 2015
Location:       Denver, CO


     This is to certify that I, Nicholas Wagner,
(the undersigned), do hereby swear and affirm
that the attached proceedings before the U.S.
Securities and Exchange Commission were held
according to the record and that this is the
original, complete, true and accurate transcript
that has been compared to the reporting or recording
accomplished at the hearing.


_____    _____
(Proofreader's Name)     (Date)

74 (Pages 290 to 292)

Page 292

## PROOFREADER'S CERTIFICATE

| | |
|---|---|
| In the Matter of: | GENAUDIO, INC. |
| Witness: | Jim Wei-Kung |
| File Number: | D-03450-A |
| Date: | January 9, 2015 |
| Location: | Denver, CO |

This is to certify that I, Nicholas Wagner, (the undersigned), do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.

_____        _2-13-2017_
(Proofreader's Name)                   (Date)

```
1                REPORTER'S CERTIFICATE

 2

 3  I, Sharon R. Dobson, reporter, hereby certify that the

 4  foregoing transcript of  29   pages is a complete, true

 5  and accurate transcript of the testimony indicated, held

 6  on   2-9-2015  , at   Denver, CO    in the matter of:

 7  _____ Gen Audio, Inc. _____.

 8

 9  I further certify that this proceeding was recorded by

10  me, and that the foregoing transcript has been prepared

11  under my direction.

12

13

14  Date:      2-13-2015

15

16

17  Official Reporter:  Sharon R Dobson

18

19

20         Diversified Reporting Services, Inc.

21

22

23

24

25
```