EXCERPTED

EXHIBIT 234

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                    )
                                     ) File No. D-03450-A
GENAUDIO, INC.                       )

WITNESS: Taj Jerry Mahabub
PAGES:   1 through 358
PLACE:   Securities and Exchange Commission
         Byron G. Rogers Federal Building
         1961 Stout Street, 1st Floor
         Denver, Colorado 80294
DATE:    Thursday, February 5, 2015

     The above-entitled matter came on for hearing,
pursuant to Notice, at 9:00 a.m.



          Diversified Reporting Services, Inc.
                 (202) 467-9200

Page 2

```
1    APPEARANCES:
2
3    On behalf of the Securities and Exchange Commission:
4      JENNIFER OSTROM, Senior Counsel
5      KURT L. GOTTSCHALL, Staff Attorney
6      Securities and Exchange Commission
7      Denver Regional Office
8      Byron G. Rogers Federal Building
9      1961 Stout Street, Suite 1700
10     Denver, Colorado 80294
11     (303) 844-1049
12
13   On behalf of the Witness:
14     ANDREW B. HOLMES, ESQ.
15     Holmes, Taylor & Jones, LLP
16     801 South Figueroa Street, Suite 2170
17     Los Angeles, California 90017
18     (213) 985-2200
19
20     MICHAEL P. MCCLOSKEY, ESQ.
21     Wilson, Elser, Moskowitz,
22     Edelman & Dicker, LLP
23     655 West Broadway, Suite 900
24     San Diego, California 92101
25     (619) 321-3200
```

Page 3

C O N T E N T S

```
WITNESS:                  EXAMINATION
Taj Jerry Mahabub              4

EXHIBITS   DESCRIPTION        IDENTIFIED:
56   Bates SEC-RPI-P1-3, certification   33
57   Bates numbered JM2096-2099, series  119
     Of e-mails
58   Bates numbered JM555-558, e-mails   155
59   Bates numbered JM378-380, e-mail    182
     Chain
60   Bates numbered JM1098-1102, e-mails 214
61   Bates numbered JM727-729, e-mails   267
62   Bates numbered JM2093-2095, e-mail  278
63   Bates numbered JM2022-2023, e-mail  296
     Bates numbered JM2158-2167, e-mail
64   Chain                              341
```

Page 4

```
1              P R O C E E D I N G S
2       MS. OSTROM:  Let's go on the record at
3    9:00 a.m., on February 5, 2015.
4       Would you please raise your right hand.
5       Do you swear to tell the truth, the whole
6    truth and nothing but the truth?
7       THE WITNESS:  Yes.
8    Whereupon,
9              TAJ JERRY MAHABUB,
10   was called as a witness and, having been first duly
11   sworn, was examined and testified as follows:
12              EXAMINATION
13      BY MS. OSTROM:
14      Q   And would you please state and spell your
15   full name for the record.
16      A   Taj, T-A-J, Jerry, J-E-R-R-Y, Mahabub,
17   M-A-H-A, B, as in boy, U, B, as in boy.
18      Q   And my name is Jennifer Ostrom, and this is
19   Kurt Gottschall, and we are both officers of the
20   United States Securities and Exchange Commission
21   for purposes of this proceeding.
22      And this is an investigation by the
23   Commission in the matter of GenAudio Inc., to
24   determine whether there have been violations of
25   certain provisions of the federal securities law.
```

Page 5

```
1       However, the facts developed in this
2    investigation might constitute violations of other
3    federal or state, civil or criminal laws.
4       And prior to the opening of the record, you
5    were provided with a copy the Formal Order of
6    Investigation in this matter, and it will be
7    available for your examination during the course of
8    this proceeding.
9       And, Mr. Mahabub, have you had an opportunity
10   to review the formal order?
11      MR. HOLMES:  It's Number 2.
12      BY MS. OSTROM:
13      Q   The one I just handed you could look
14   at. It's at the bottom here.
15      A   Yes, I have seen this before.
16      Q   Okay.  And prior to the opening of the
17   record you were provided with a copy of the
18   Commission's Supplemental Information Form, and a
19   copy of that notice has been marked Exhibit
20   Number 1, and that's right -- right there.
21      And, Mr. Mahabub, have you had the
22   opportunity to read Exhibit Number 1?
23      A   Yes.
24      Q   And do you have any questions concerning
25   this notice?
```

## Page 118

1 board meeting?

2     A   I can't remember.  You'd have to look at

3 the board resolutions.

4     Q   Was there a discussion as to that it was

5 okay, and it would not violate this confidentiality

6 agreement?

7     A   Yeah.  I believe there was.  In fact, I

8 remember distinctly at one of the board meetings me

9 saying, I don't think we should say anything about

10 -- about this to any of the shareholders.  And Paul

11 seemed to think that calling it the LCEC would have

12 been fine, so -- and he's an attorney.

13     Q   When is the board meeting you were talking

14 about?

15     A   I can't remember.  You'd have to look at

16 the board resolutions.

17     Q   Was it 2009, 2010?

18     A   I think so.

19     Q   You don't remember?

20     A   I don't remember, no.  It's too long ago.

21 I just don't remember.

22     Q   Were there any other nondisclosure

23 agreements between Apple and GenAudio other than

24 Exhibit Number 3?

25     A   What was that?

## Page 119

1     Q   Any other nondisclosure agreements between

2 Apple and GenAudio?

3     A   No.  This one just expired, I think, what,

4 in July of 2014, right, the five-year term if I

5 remember correctly.  Yeah, it's five years.  Five

6 years.  So it literally just expired July of last

7 year.

8     MR. HOLMES:  You're giving a lot more

9 information than she's asking for, so just say yes

10 or no.

11     THE WITNESS:  Okay.

12     BY MS. OSTROM:

13     Q   Put it there if you would.

14     MR. HOLMES:  We'll be here a lot longer if

15 you just focus on the question.

16     THE WITNESS:  Okay.

17     (SEC Exhibit No. 57 was

18     marked for identification.)

19     BY MS. OSTROM:

20     Q   Mr. Mahabub, let me hand you Exhibit

21 Number 57.  This is Bates numbered JM2096 through

22 2099.  And it's an e-mail trail beginning with one

23 from Jerry Mahabub, dated October 2nd of 2009 to a

24 Matthew Venturi, V-E-N-T-U-R-I, and that's on Bates

25 number JM2098.

## Page 120

1     A   Uh-huh.  Venturi, yes.

2     Q   And then there's an e-mail from Mr. Mahabub

3 to several people.  And I'm going to name them now,

4 and then we'll not necessarily have to do this all

5 in the future.

6     A   Okay.

7     Q   It's dated October 2nd of 2009, to Paul

8 Powers, Walt, GenAudio, Greg Morgenstein,

9 M-O-R-G-E-N-S-T-E-I-N, Brent Kaviar, K-A-V-I-A-R,

10 Steve Bagwell, B-A-G-W-E-L-L, Jim Mattos,

11 M-A-T-T-O-S, Gary Smith, Jim DeVine, D-E-V-I-N-E,

12 Elliot, E-L-L-I-O-T, Mazer, M-A-Z-E-R, Ted Cohen,

13 Mark Bobak, B-O-B-A-K, Paul Savio, S-A-V-I-O, Ian

14 Esten, E-S-T-E-N, Bob Coover, C-O-O-V-E-R, and

15 Melissa Gonzales.

16     A   Okay.  Great.  Thank you.

17     MR. HOLMES:  Exhibit 57?

18     THE WITNESS:  Yep.

19     BY MS. OSTROM:

20     Q   Why don't you look at this and then I'm

21 going to ask you some questions.

22     A   I do remember writing this e-mail, exciting

23 times at that time.

24     MR. HOLMES:  Whenever she shows you an

25 exhibit, I want to make sure you have a chance to

## Page 121

1 look through the whole thing before you answer the

2 questions about it, just so you're satisfied you

3 know exactly what's in it.

4     THE WITNESS:  Okay.  Can you give me a

5 second to read it?

6     BY MS. OSTROM:

7     Q   Yes.  That's why I said, please read it and

8 when you're done, tell me, and I'll ask you some

9 questions.  Okay?

10     A   Okay.  We're good.

11     Q   And, Mr. Mahabub, did you send Exhibit

12 Number 57 to these people?

13     A   They're all employees of GenAudio or board

14 members, yes.

15     Q   Okay.  And did you send it to them?

16     A   Yes.

17     Q   Okay.  This e-mail is dated October 2nd of

18 2009, and references some meetings.

19     Between July 1st of 2009, and the date of

20 this e-mail, October of 2009, what had happened

21 between GenAudio and Apple?

22     A   I guess whatever I wrote here.  I don't

23 necessarily recall.  It's so long ago.  So this is

24 a pretty good accounting of it.

25     Q   This -- what -- what I'm trying to get at

Page 130

1    Q   And you met with the Apple people prior to
2  that; is that correct?
3    A   That's correct, yes.
4    Q   Okay.  Do you recall if the meeting did
5  last 2-1/2 hours?
6    A   Yeah.
7    Q   Okay.
8    A   It may have been longer.
9    Q   Okay.  Where was the meeting at?
10   A   At Apple.
11   Q   Where in Apple?
12   A   I think that was at the Marianni building,
13 if I recall.  I'm not sure, but I think that's the
14 Marianni building.
15   Q   Can you spell that for me?
16   A   I think it's M-A-R-I-A-N-N-I, I think.
17   Q   And is that where Mr. Tiscareno's office
18 was at?
19   A   Yeah.
20   Q   Okay.
21   A   It's off the campus.
22   Q   And who was present for GenAudio at this
23 meeting?
24   A   Did I bring Ian to that meeting with me?
25 It was Ian or Walter.  I would have brought one of

Page 131

1  them.  I can't remember.  I think Walter was there.
2    Q   And who was present for Apple?
3    A   Vic was present, and then a bunch of people
4  came in the room to check out the demo.  It was
5  like a room full of many people that -- that were
6  just kind of coming in and out, checking it out,
7  because Vic had people lined up.  So I don't
8  remember exactly who was in there or who was
9  listening.  It was so long ago.
10   Q   And what was the purpose of this meeting?
11   A   To show them that we had succeeded in
12 getting our two in, two out processing of
13 limitation to run on an iOS device.
14   Q   And what did you actually do to show them
15 that?
16   A   Ran the demo on a device.
17   Q   What device was that?
18   A   An iPod.
19   Q   So it was one iPod?
20   A   Well, I actually had two of them.
21   Q   Okay.  So two iPods?
22   A   Yes.
23   Q   Anything else you demoed it on at that
24 time?
25   A   That was it.

Page 132

1    Q   Anything else done except for the
2  demonstration on the iPods?
3    A   That was it.  That's all.
4    Q   Okay.
5    A   Just showing our process running on an iPod
6  was quite the amazing accomplishment.
7    Q   Okay.  And there's a reference in this
8  first paragraph that says Phil Schiller.
9        Who is that?
10   A   Phil Schiller is a guy that, I think now
11 he's a senior manager at Apple, or senior VP at
12 Apple, but he -- I think he did marketing.  In
13 fact, that's the marketing guy that -- or that's
14 one of the marketing guys that Vic brought in.  I
15 can't remember the name of the other guy.
16   Q   Did Mr. Schiller attend this meeting?
17   A   You know, I know he got the demo, and I
18 know that he had requested that we put together
19 additional -- I can't remember if that was Vic
20 relaying that information or if he was there.  It's
21 so long ago.  I can't recall.
22   Q   Okay.  This fifth line down --
23       MR. GOTTSCHALL:  And I'm sorry.
24       MS. OSTROM:  No -- yeah, okay.  Go ahead.
25 You can ask it.

Page 133

1      BY MS. OSTROM:
2    Q   Okay.  The fourth line down the sentence
3  says:  The new demos were well received at Apple
4  and Phil Schiller was very impressed.
5    A   Yeah.  But I don't know if that was Vic
6  told me that or I just don't recall.  There was
7  many people that came in for that, so I do not
8  remember.
9    Q   Okay.  The next sentence says:  Phil has
10 requested that I put together two additional film
11 title releases, as an AB demo --
12   A   Yes.
13   Q   Let me finish, please.
14   A   Okay.
15   Q   An AB demo in addition to the Bridge to
16 Terabithia demo.
17       How was that request made to you by
18 Mr. Schiller?
19   A   Through Vic.
20   Q   So that was not something that Mr. Schiller
21 personally told you --
22   A   No.
23   Q   When did Mr. Tiscareno tell you Mr.
24 Schiller requested that?
25   A   I can't remember.  You know, I may have

Page 134

1  made a mistake.  It might not have been
2  Mr. Schiller.  It may have been other marketing
3  guy.  I think this might have been a mistake when I
4  wrote this.
5      Q   Okay.  Which part -- yeah.
6      MR. HOLMES:  Which part?  There's a Phil
7  Schiller reference and then there's a --
8      THE WITNESS:  Yeah.  I'm not sure if it was
9  Phil Schiller or the other marketing guy.  I think
10  I may have just -- I was writing this pretty quick,
11  and I probably didn't sleep the night before
12  because I was up all night working.  So I can't
13  recall what his name was, but it was either Phil or
14  the other marketing guy.
15      Q   (BY MS. OSTROM)  Next paragraph --
16      A   I don't think it's important.
17      Q   The next paragraph where it says, Vic and I
18  are working.  The last sentence in that paragraph
19  says:  As Phil Schiller stated today, "sparks will
20  be flying."
21      A   Yeah.  Like I said, I don't think that that
22  was Phil.  I think that was the other guy.  I think
23  I made a mistake here.
24      Q   So someone told you sparks will be flying
25  in the demonstration --

Page 135

1      A   That's right.
2      Q   -- but it was not Mr. Schiller?
3      A   I don't think so.  That, remembering back,
4  I think that was the other marketing guy.  The guy
5  that was in charge of marketing for iPod division.
6      MR. HOLMES:  Is that Hailey?
7      THE WITNESS:  That is his name, yes.  How
8  did you know?
9      MR. HOLMES:  Because we do our research,
10  too.
11      THE WITNESS:  That's his name, Mark Hailey.
12  That's the guy.  Yes, sorry.  Awesome.  I totally
13  forgot the guy's name.
14      BY MS. OSTROM:
15      Q   So was it Phil Schiller who requested that
16  the additional film titles be given or was it
17  Mr. Hailey?
18      A   I think it was Mr. Hailey, if I remember
19  correctly, not Phil.
20      Q   So did Phil Schiller have any interest in
21  this meeting at all?
22      A   I don't recall.  Like I said, there were
23  multiple people that came in, so -- but I'm pretty
24  sure it was guy.  It wasn't Phil.  It was Mike
25  Hailey that requested.

Page 136

1      Q   And so you said that --
2      A   Because I remember the meeting.  I remember
3  sitting at the table with Mike.  It was not Phil.
4      Q   You said Mr. Tiscareno told you Phil
5  Schiller was very impressed --
6      A   Mike Hailey is what I meant, not Phil.
7      Q   Okay.  So did Mr. Tiscareno tell you
8  Michael Hailey was very impressed?
9      A   Yes.
10      Q   When was it that he told you that, if Mr.
11  Hailey was actually at the meeting?
12      A   Afterwards, I had talked to Vic when I got
13  back to my hotel and Vic said that he was very
14  impressed.
15      Q   So you talked on the phone?
16      A   Yes.
17      Q   What hotel did you stay in?
18      A   I was at either the W Hotel, or I had -- I
19  think I was there for a conference so I probably
20  had a demo suite set up.  I was at the W.  There
21  was a conference at the Moscone or the St. Regis,
22  one of the two.
23      Q   Okay.  In San Francisco?
24      A   Yes.
25      Q   Okay.

Page 137

1      MR. GOTTSCHALL:  And I just want to make
2  sure I understand your testimony.  At the meeting
3  at Apple, is it your recollection that Mike Hailey
4  attended that meeting?
5      THE WITNESS:  Yes.  He was there.  I
6  remember meeting him.  I just got the name wrong
7  here.  That's all.
8      MR. GOTTSCHALL:  Okay.  Right.  Did Mike
9  Hailey tell you directly that he was very
10  impressed, or is it something that Vic Tiscareno
11  relayed to you after?
12      THE WITNESS:  I think Vic relayed that to
13  me afterwards, if I recall.  Actually, yeah, I was
14  exhausted.  We stayed up all night working on this
15  damn demo, so -- so my brain was a little shut down
16  at the time.
17      BY MS. OSTROM:
18      Q   How many times have you met Mr. Schiller?
19      A   I don't think I met Phil Schiller.  I think
20  I only heard through the grapevine that Phil
21  Schiller was giving demos.  Mike Hailey is the guy
22  I met, not Phil Schiller.  I just got the names
23  wrong.
24      Q   Did you ever meet Phil Schiller at any
25  point in time?

Page 182

```
1       Q    And every time you say LCEC, are you
2    referring to Apple?
3       A    Apple, yes.
4       Q    Is there anybody else you ever called the
5    LCEC?
6       A    No.  So what do I do with these?
7       Q    Put them right here for now.
8            (SEC Exhibit No. 59 was
9            marked for identification.)
10      BY MS. OSTROM:
11      Q    Mr. Mahabub, let me hand you Exhibit
12   Number 59.  This is Bates numbered JM378 through
13   380.  And it begins on page JM379, with an e-mail
14   on February 12, 2010, from Jerry Mahabub to Michael
15   and Vic.  And then on page JM378, Victor Tiscareno
16   is sending an e-mail to Jerry Mahabub on
17   February 12th of 2010.
18           And then above that, we have Jerry Mahabub
19   forwarding on the e-mail chain on February 12th of
20   2010, to GenAudio employees.  And it appears the
21   only other person is Paul Powers, who you did say
22   was COO at the time, correct?
23      A    That's correct.
24      Q    There are no other board members on here.
25      A    Okay.
```

Page 183

```
1       Q    I just want to make that clear.
2       A    Yeah.  That's probably because Paul is
3    going to relay the information to Mark and the
4    other board members anyways.
5       Q    So why don't you go ahead and look at that
6    and I'll ask you some questions when you're ready.
7    Okay?
8       A    So this is from Vic to me?
9       Q    Start at the bottom, the end, that would
10   probably be the easiest.  Start at the last e-mail
11   and work your way up.
12      A    Yeah.  Michael, who is Michael?
13      Q    If you can read it silently and then she
14   won't have to take it down and we'll ask you
15   questions.  Okay?  Go ahead and read it to yourself
16   first.
17      A    It could have been Warner Brothers that I
18   was referring to this.
19           MR. HOLMES:  Whenever you speak out loud,
20   she's writing it down, so don't.
21           THE WITNESS:  Yeah.  All right.  Okay.
22   Yep.
23           BY MS. OSTROM:
24      Q    Mr. Mahabub, if you could look at the
25   second page, start with the very first e-mail,
```

Page 184

```
1    which is on JM379.  The e-mail that you sent to
2    Michael and Vic, on February 12th of 2010.
3            Do you see that one?
4       A    Yes.
5       Q    Okay.  Did you send this e-mail?
6       A    I can't -- I can't verify whether I did or
7    I didn't, but it's part of an e-mail chain that I
8    suppose I must have.  I can't tell you because my
9    e-mails at that time are not accessible.
10      Q    Well, go ahead and read the e-mail again
11   and tell us if you --
12      A    It looks familiar, yes.
13      Q    Okay.  So you sent this to Michael and Vic?
14      A    It looks familiar to me.
15      Q    Okay.  Did you modify the e-mail to Michael
16   and Vic in any way before you forwarded in on to
17   GenAudio employees?
18      A    No.  I don't think so.  Unless I had to
19   modify it for redacting things out for any
20   confidential information.  But I don't think this
21   e-mail had anything confidential in it.
22      Q    And am I correct that you do not have the
23   original e-mail to Michael and Vic?
24      A    I do not, no.
25      Q    And who is Michael that you're referring to
```

Page 185

```
1    here?
2       A    I think this is the marketing guy.  What's
3    his name again?  Michael Hailey, yes.
4       Q    Okay.  And Vic is who?
5       A    Tiscareno.
6       Q    Okay.  And the last information we had, was
7    that meeting in October, October 1st of 2009, and
8    now we're on February 12th of 2010.
9            What had happened between Apple and
10   GenAudio between those times?
11      A    Between -- can you say --
12      Q    Between October 1, 2009, when you -- we
13   know you had a meeting at Apple.  We already talked
14   about that earlier.  And now we're to February 12,
15   2010.
16      A    Okay.
17      Q    What happened between Apple and GenAudio
18   between October 1, 2009 and February 12, 2010?
19      A    That's a pretty vague question.  Can you
20   specify what you're -- exactly what you're looking
21   for?
22      Q    What dealings did you have with them in
23   that time period?
24      A    A lot of back and forth, audio engineering,
25   software engineering, optimization of source code,
```

Page 266

```
1        A   A couple times I would ask them if they
2    knew anyone that was interested to let us know, but
3    that never really amounted --
4        Q   Did you make outside presentations to
5    solicit investors?
6        A   Existing shareholders.
7        Q   What about this FSX presentation?  Were
8    only existing shareholders at that?
9        A   Oh, no, no, no.  That was an investment
10   banker conference.  That's not a -- you talk about
11   your offering, but you do that through -- that's
12   when you're being, what do they call them,
13   broker/dealers.
14           So we had an offering that was being
15   sponsored by a broker/dealer, like Westminster or
16   Hudson or Spencer Edwards or whoever it might be.
17           Oftentimes, they would want me to go to an
18   event and talk about the offering, because they
19   would form a syndicate, I think is what they call
20   it, right?  So that's --
21       Q   But that wasn't the case with this
22   placement, correct?  This one wasn't sponsored by
23   VD, was it?
24       A   No.  This one was a direct offering, and I
25   think I did go to FSX through Phil Rodriguez, who
```

Page 267

```
1    wanted me to go, who was also a former board member
2    and he also got introduced to me through Spencer
3    Edwards.  He also ran a broker/dealer firm called
4    Empire Securities.  And he thought that it would be
5    a good idea if I go in and expose the offering, so
6    I did.
7        Q   Did you make a presentation at FSX to
8    solicit investors for this private placement?
9        A   Well, I think I went, but I don't think I
10   actually presented.  I think I remember I was
11   supposed to present, but I didn't.  I don't think I
12   made it.
13           And Judy told me that, because I didn't
14   make it -- Judy Finsweller is her name.  She's --
15   Finsweller.  She's the person in charge of FSX.
16   She told me at any point in time I could, you know,
17   present somewhere else.  I just never did.
18                   (SEC Exhibit No. 61 was
19              marked for identification.)
20           BY MS. OSTROM:
21       Q   Mr. Mahabub, let me hand you Exhibit
22   Number 61.  This is Bates numbered JM727 through
23   729, and these are two e-mails.
24           The first one was from Jerry Mahabub, dated
25   March 21st of 2010 to Victor Tiscareno, Michael
```

Page 268

```
1    Hailey, Ronald Isaac, Phil Schiller -- I'm sorry.
2    I'll start all over.
3            Victor Tiscareno, Michael Hailey, Ronald
4    Isaac, Phil Schiller, Barry Corlett, Jim Tenneboe,
5    and the subject is embed software SDK.
6            And then that e-mail is forwarded on from
7    Jerry Mahabub, dated March 21, 2010, to employees
8    at GenAudio.  And Mr. Paul Powers is included on
9    here, but no other board of directors.  Please read
10   that, and then when you're ready, I'll ask you some
11   questions.
12       A   Okay.  Great.
13       Q   Are you ready?
14       A   Yes.
15       Q   The initial e-mail from yourself to the
16   people listed at Apple, did you send this e-mail to
17   each of those listed individuals?
18       A   If they're on the key list, that's who they
19   went to.
20       Q   How did you get Mr. Phil Schiller's e-mail
21   address?
22       A   He must have been part of an e-mail
23   exchange prior to this one, and I just replied all.
24   I don't see the e-mail prior to this one, so I
25   can't tell you how, but he must have been on the
```

Page 269

```
1    e-mail chain.  That's probably why I got him
2    confused with Mike Hailey.
3        Q   Is there a reason why you forwarded that
4    e-mail, but not the one that started the
5    conversation to your employees?
6        A   Yeah.  I don't know.  I really don't know
7    the answer to that.  I wish I could tell you, but I
8    just don't have it, so I can't tell you.  Sorry.
9        Q   Did you modify the March 21st e-mail to
10   Victor Tiscareno, Mr. Isaac, Phil
11   Schiller, Barry Corlett and Jim Tenneboe in any way
12   before you forwarded it on to your employees?
13       A   I don't recall, but if I did, it would have
14   been done to redact information that might have
15   been considered confidential I shouldn't have
16   disclosed.  But as far as I could tell, reading
17   through this, there should have been no -- there
18   shouldn't be any modifications, but there could
19   have been.  I just don't know.
20           MR. GOTTSCHALL:  And, again, if you did
21   modify your e-mail to the Apple folks before you
22   forwarded it to your other GenAudio employees, it
23   would only be to delete or redact information, not
24   to add information; is that correct?
25           THE WITNESS:  That's right.
```

Page 278

1    Q   Did you tell any shareholders at this time?
2    A   March 21, 2010, tell them about what?
3    Q   About Apple wanting to do this full-blown
4    embedded level integration?
5    A   Oh, gosh, no.  No.  Maybe LCEC, but not
6    Apple.
7              (SEC Exhibit No. 62 was
8              marked for identification.)
9    BY MS. OSTROM:
10   Q   Mr. Mahabub, let me hand you Exhibit
11   Number 62.  This is Number JM2093 through 2095.
12   And this is an e-mail chain.  Sorry.  It's an
13   e-mail from Jerry Mahabub, dated May 2, 2010, to
14   the employees at GenAudio and includes Paul Powers,
15   but none of the other board of directors.  And the
16   subject is:  Moving forward.  Please read this and
17   then I'll ask you some questions.
18   A   These were all to -- okay.  Yep.
19   Q   Did you send this e-mail on May 2, 2010?
20   A   To the best of my knowledge, yes.
21   Q   Mr. Mattos produced this to us, so he
22   received this from you; is that correct?
23   A   He must have.
24   Q   Do you have any reason to disbelieve that
25   you sent this e-mail?

Page 279

1    A   No.
2    Q   Now, the previous conversations we've just
3    had for dealing with March 2010, and the -- and
4    Apple and the integration, correct?
5    A   Uh-huh.  Yes.
6    Q   Okay.  So what happened with Apple between
7    the -- that March time frame and now, May 2, 2010?
8    A   We had a successful integration test, and
9    they were trying to set a meeting up for me to come
10   in and meet with the CEO.  And, of course, I don't
11   know if you remember, but he had very bad health
12   issues and that whole meeting got canceled, so that
13   never happened.
14        And things kept moving forward with
15   different ways to use different processing
16   implementations for how we could improve and
17   differentiate their products, so we kept working on
18   them.
19   Q   Did you have discussions with someone at
20   Apple about meeting with Steve Jobs on Wednesday,
21   May 5th?
22   A   It wasn't -- the best way to explain it
23   was, it wasn't necessarily just a meeting with
24   Steve Jobs.  It was a meeting with many of the
25   management team members.  And I actually went in

Page 280

1    and did this.
2         We went in and met with a Ph.D. in
3    acoustics.  I think his name was Andrew.  I can't
4    remember his last name, and a few others.  There's
5    like ten people in the room, but Steve never came
6    down.
7    Q   Was it on May 5th?
8    A   No.  I think it was on Friday.  I can't
9    remember.
10   Q   Okay.  Who scheduled this meeting that you
11   thought you were going to be meeting with the
12   CEO --
13   A   Victor Tiscareno.
14   Q   Excuse me.  Let me finish.
15   A   Oh, I'm sorry.  Yeah.
16   Q   You say meeting the CEO of the LCEC is this
17   coming Wednesday, which would have been May 5th of
18   2010.
19        Who had told you that you were going to
20   definitively meet with Steve Jobs that coming
21   Wednesday?
22   A   It wasn't a definitive.  It was a
23   potential.
24   Q   Why didn't you say that?
25   A   I'm addressing my team.  If my team has

Page 281

1    questions, they'll go to the phone and call me and
2    ask me.
3    Q   And who was it that scheduled this
4    potential meeting?
5    A   That would have been Vic.
6    Q   Did the meeting itself happen without
7    Mr. Jobs present?
8    A   It did.
9    Q   Was it at this time frame?
10   A   Yes.
11   Q   So you had a meeting in the week of May 2,
12   2010?
13   A   That's right.
14   Q   Okay.  Who was at that meeting?
15   A   I don't remember all their names.  It was a
16   table with a conference room.  There were several
17   engineers in the room, a Ph.D. in acoustics named
18   Andrew.
19        We got into a bit of an argument.  That was
20   interesting, regarding -- audio technology.  But
21   aside from that, that was it.  I was really hoping
22   the big man would come down and check it out, but
23   he never did.
24   Q   Let me just -- so see if this refreshes
25   your recollection at all.  And our understanding is

Page 338

1    Do not say a word of this to anybody.  He literally
2    said I will scald you if you do.
3        But I wanted to let the team know, because
4    I figured the team would at least keep their mouths
5    shut about it, so I let the team know what was
6    going on.
7        Q   Have you even heard Greg Joswiak, J-O-S --
8        A   I do not know that name, no.
9        Q   Let me spell it for her, sorry.  Greg
10   Joswiak, J-O-S-W-I-A-K.
11       Did you ever hear that name from
12   Mr. Tiscareno?
13       A   No.  The name I heard was Eddie Cue, the
14   senior vice president of Apple iPod -- iTunes
15   division.
16       Q   How do you spell his last name?
17       A   I think it's C-U-E.
18       Q   What time period was that?
19       A   I don't remember.
20       Q   Was it in 2010?
21       A   I don't remember.  Probably within that
22   time frame 2010, 2011 before he left, I would
23   imagine, yeah.
24       Q   And what was the context in which he
25   mentioned Mr. Eddie Cue?

Page 339

1        A   That he was giving him a demo or gave him a
2    demo, and then the head of core audio got a cue.
3    And then there was another guy who was like the
4    fifth employee Apple ever -- like really high up on
5    the ladder that got a demo.
6        I mean, this is -- this is garbage.  I
7    mean, I don't know if Vic's got Alzheimer's
8    disease, but I deny that 100 percent.
9        MR. GOTTSCHALL:  So your belief,
10   Mr. Mahabub, is that Victor Tiscareno is denying
11   the substance of the conversation that you and he
12   had on May 6th, that you recorded and transcribed
13   from your computer because of -- of his concern
14   about having given you confidential information?
15       THE WITNESS:  Oh, yeah.  It's coming from
16   internal -- inside of Apple, yeah.  He'd be
17   crucified.
18       MR. GOTTSCHALL:  Are there any other
19   reasons that you're aware of that you believe would
20   cause Mr. Tiscareno to deny that conversation?
21       THE WITNESS:  We owe him money, and he was
22   pissed off at me about that, but aside from that, I
23   don't know.
24       BY MS. OSTROM:
25       Q   How much money?

Page 340

1        A   I think we owe him like 18,000 right now,
2    maybe less.  I gave him a direct payment of like
3    2,800, 3,000 not too long ago, a couple years ago,
4    maybe a year and a half, two years ago, something
5    like that.  But I don't know.  I don't know what to
6    tell you.  All I know is what I say here is the
7    truth, and that's that.
8        MR. GOTTSCHALL:  Do you believe that
9    Mr. Tiscareno bears you any personal animosity?
10       THE WITNESS:  I do.
11       MR. GOTTSCHALL:  Why?
12       THE WITNESS:  Money, number one.  But I
13   think that he's upset because when I brought him on
14   board, there was a deal with a company called BDA
15   that I signed a license deal with.  And BDA really
16   set some bad expectations for what they thought
17   they would accomplish in a certain amount of time.
18       But since he was the one I introduced to
19   BDA, Vic was looking forward to making his
20   commission off of that, right?  Well, the BDA went
21   south and Vic got no commission.  Spent a lot of
22   time trying to make the deal happen, you know, and
23   it never -- never worked out.
24       So, you know, I don't know.  People get
25   disgruntled for different reasons all the time.  My

Page 341

1    guesstimate, I mean, I haven't talked to Vic in a
2    long time.  And my guesstimate is he's probably
3    riding this because he's just doesn't want to get
4    in any trouble.
5        MR. GOTTSCHALL:  Any other reasons you're
6    aware of that you believe would cause Mr. Tiscareno
7    to disclaim this conversation?
8        THE WITNESS:  Not that I know of, no.
9        MR. GOTTSCHALL:  Okay.
10       (SEC Exhibit No. 64 was
11       previously referenced.)
12       BY MS. OSTROM:
13       Q   Mr. Mahabub, let me hand you Exhibit
14   Number 64.  This is Bates numbered JM2158 through
15   2167.  And the first e-mail in this chain begins on
16   page JM2162.  It's dated May 23, 2010, from Jerry
17   Mahabub to Vic.
18       And then on May 24, 2010, on page JM2161,
19   Victor Tiscareno is writing to Jerry.  And then on
20   page JM2160, Mr. Mazer is writing to Victor
21   Tiscareno on May 24th of 2010.
22       And then there is on JM2159, an e-mail,
23   Jerry, that's not addressed to anyone, but then
24   there's a response from P. Savio, S-A-V-I-O, at
25   GenAudioInc.com to Mr. Mahabub on May 25th of 2010.

Page 342

1   That begins on the first page JM2158.
2        And then a Gary Smith is forwarding the
3   entire e-mail chain to the employees at GenAudio,
4   also to Mr. Mahabub on May 25th of 2010.  And this
5   does go to Paul Powers, but no other directors of
6   the board.
7        A   All right.
8        Q   Go ahead and look at that.  Why don't you
9   read the whole thing and we'll ask you some
10  questions.
11       A   Where does this e-mail start?
12       Q   The first one is on page JM2162, May 23rd,
13  Jerry Mahabub to Mr. -- to Vic, JM2162.
14       A   Okay.  Long e-mail.  None of these were
15  ever --
16       MR. HOLMES:  Just wait.
17       THE WITNESS:  Okay.
18       BY MS. OSTROM:
19       Q   The May 23rd e-mail from Jerry Mahabub to
20  Vic, did you send that to Mr. Tiscareno?
21       A   I did.
22       Q   Okay.  And then did you forward it and the
23  other e-mails to GenAudio employees?
24       A   I did.
25       Q   And who did you forward it to?

Page 343

1        A   The same group.
2        Q   The ones that Mr. Smith sent it to, are
3   those the correct people, on the front page?
4        A   Yes.
5        Q   Okay.  Did you modify the May 23, 2010,
6   e-mail to Mr. Tiscareno from yourself?  Did you
7   modify that in any way before you forwarded it to
8   your employees?
9        A   Not that I recall, but if I did, the same
10  goes as talked about in the past, so --
11       Q   What do you mean?
12       A   If I did modify anything, it was to redact
13  information, not alter.
14       Q   If you could turn to JM2166, please.
15       A   Yeah.  All right.
16       Q   A little bit up from the bottom, there's
17  like a break.  Do you see that about a third of the
18  way up.  It says, perhaps?
19       A   Yes.
20       Q   It says:  Perhaps you should forward this
21  e-mail to -- directly to Steve, and that our
22  thoughts in the Pixar/Dolby gig is simply not the
23  right way to go.
24            Who are you referring to when you say you
25  should forward this?

Page 344

1        A   Steve Jobs.
2        Q   Okay.  A little bit down, it says:  Perhaps
3   a little mixed engineering face-off would be the
4   right way to go, and Steve could easily approve for
5   a segment of a theatrical mixed session to be
6   released.
7            Who are you referring to there?
8        A   Same one.  Steve Jobs started Pixar and
9   sold to Disney.  He was a board member of Disney,
10  so --
11       Q   If you turn to the last page, JM2167.
12       A   (The witness complies.)
13       Q   The top, very top line to the left:  I
14  would be happy to show Pixar/Steve Jobs just what
15  we are capable of doing.
16            Do you see that?
17       A   Uh-huh.
18       Q   Is that a yes?
19       A   Uh --
20       MR. HOLMES:  You said uh-huh, so is it yes
21  or no?
22       THE WITNESS:  Oh, yes.
23       BY MS. OSTROM:
24       Q   And why is it that you were telling
25  Mr. Tiscareno that you had things you wanted to

Page 345

1   show Mr. Jobs, when in the previous conversation
2   that you recounted to your employees, Mr. Jobs had
3   apparently seen the -- heard the demonstration?
4        A   These are different demos.
5        Q   Okay.
6        A   Ones a two and two out stereo -- and stereo
7   out.  This is a six channel in two channel out, so
8   totally different processes.  You get one
9   demonstrating a totally different market
10  application altogether.
11       Q   Okay.  And then if you could look at the --
12  near the bottom of that last page.
13       A   Yep.
14       Q   It says:  Also please send the iPod Touch
15  device, it timed out to me in Venice on Tuesday for
16  Wednesday morning's delivery, and I will have it
17  back to you by Thursday morning with the updated
18  provisioning profile.
19            Do you see that?
20       A   Yep.
21       Q   Okay.  What is the iPod device that had
22  timed out?
23       A   What happened is with Apple, at least back
24  in the day when they first started, you had to get
25  something called a provisioning profile, which

Page 354

1  turkey without some sort of strange withdrawal.
2      A   Yeah.
3      Q   Who was the senior team at Apple you had
4  worked with day and night for the past 11 months?
5      A   Ron Isaac, Vic Tiscareno and Michael
6  Hailey, they're all senior managers.
7      Q   Did you have any conversations with
8  Mr. Tiscareno about Steve Jobs looking at other
9  technology to compare with yours?
10     A   I don't remember having any talks with him
11 about it, but I remember e-mailing him about it
12 now, which was right here.
13     Q   And what was your take on it?
14     A   That they're trying to find a way to
15 devalue us.
16     Q   So were you under the impression at this
17 time that there was either a licensing or
18 acquisition that was going to what Apple?
19     A   I thought so, yeah.  I mean, it looked like
20 it was goin in that direction, because when a
21 company goes in and, you know, starts doing
22 maneuvers like that to try to devalue you like
23 that, like, oh, well, look at these three other
24 audio tech companies out there.  That's usually so
25 they can come and throw a lowball at you.

Page 355

1      Q   But what had happened between May 6th and
2  now to lead you to believe that there was going to
3  be some type of offer?
4      A   So just this e-mail exchange here, about
5  how, you know, when you say Steve had them look
6  into other audio technologies as well, which sort
7  of tells me that they're trying to find something
8  so they can come to me and go, oh, look, we can get
9  this over here for this.  So why would we pay you
10 just that?
11     Q   You started this e-mail exchange?
12     A   Yeah, but nothing to do with lowballing.  I
13 started by offering a new processing implementation
14 to show to Steve.  That then turned into Vic's
15 response to me, which then turned into my response
16 to him.
17     Q   So was there anything in between, before
18 you sent this e-mail, the initial e-mail to
19 Mr. Tiscareno, had there been any contact with
20 anyone at Apple after that May 6, 2010, date and
21 this date when you sent the first e-mail to
22 Mr. Tiscareno?  Had there been any contact with
23 anyone at Apple?
24     A   No.
25     Q   Okay.

Page 356

1      A   No.  No, not to my -- actually, not that I
2  recall.  I can't say definitively, but not to my
3  recollection.
4          MS. OSTROM:  And let's go ahead and let's
5  go off the record, and we will be reconvening
6  tomorrow at 9:00 a.m. on February 6th.
7          (Whereupon, at 5:19 p.m. the proceedings
8  adjourned.)
9                  * * * * *

Page 357

PROOFREADER'S CERTIFICATE

In the Matter of:  GENAUDIO, INC.
Witness:        Taj Jerry Mahabub
File Number:     D-03450-A
Date:           February 5, 2015
Location:       Denver, CO


     This is to certify that I, Nicholas Wagner,
(the undersigned), do hereby swear and affirm
that the attached proceedings before the U.S.
Securities and Exchange Commission were held
according to the record and that this is the
original, complete, true and accurate transcript
that has been compared to the reporting or recording
accomplished at the hearing.


_____   _____
(Proofreader's Name)         (Date)

Page 357

1                    PROOFREADER'S CERTIFICATE

2

3   In the Matter of:    GENAUDIO, INC.

4   Witness:             Taj Jerry Mahabub

5   File Number:         D-03450-A

6   Date:                February 5, 2015

7   Location:            Denver, CO

8

9

10        This is to certify that I, Nicholas Wagner,

11   (the undersigned), do hereby swear and affirm

12   that the attached proceedings before the U.S.

13   Securities and Exchange Commission were held

14   according to the record and that this is the

15   original, complete, true and accurate transcript

16   that has been compared to the reporting or recording

17   accomplished at the hearing.

18

19

20

21   _____        2-16-2025
                                 _____
22   (Proofreader's Name)              (Date)

23

24

25

REPORTER'S CERTIFICATE

I, THERESA MENDEZ, reporter, hereby certify that the foregoing transcript of 356 pages is a complete, true and accurate transcript of the testimony indicated, held on 2-5-2015 , at Denver, CO in the matter of: Genaudio, Inc.

I further certify that this proceeding was recorded by me, and that the foregoing transcript has been prepared under my direction.

Date: 2-11

Official Reporter:

Diversified Reporting Services, Inc.

Page 359

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                    )
                                     ) File No. D-03450-A
GENAUDIO, INC.                       )

WITNESS:   Taj Jerry Mahabub
PAGES:     359 through 686
PLACE:     Securities and Exchange Commission
           Byron G. Rogers Federal Building
           1961 Stout Street, Suite 1700
           Denver, Colorado 80294
DATE:      Thursday, February 12, 2015

     The above-entitled matter came on for hearing,
pursuant to Notice, at 8:35 a.m.

COPY

Diversified Reporting Services, Inc.
(202) 467-9200

Page 360

```
 1   APPEARANCES:
 2
 3   On behalf of the Securities and Exchange Commission:
 4      JENNIFER OSTROM, Senior Counsel
 5      KURT L. GOTTSCHALL, Staff Attorney
 6      Securities and Exchange Commission
 7      Byron G. Rogers Federal Building
 8      1961 Stout Street, Suite 1700
 9      Denver, Colorado 80294
10      (303) 844-1094
11
12   On behalf of the Witness and GenAudio:
13      ANDREW B. HOLMES, ESQ.
14      Holmes, Taylor & Jones, LLP
15      801 South Figueroa Street, Suite 2170
16      Los Angeles, California 90017
17      (213) 985-2200
18
19      MICHAEL P. McCLOSKEY, ESQ.
20      Wilson Elser Moskowitz Edelman &
21      Dicker, LLP
22      655 West Broadway, Suite 900
23      San Diego, California 92101
24      (619) 321-3200
25
```

Page 361

```
             CONTENTS
 2
 3   WITNESS:                  EXAMINATION
 4   Taj Jerry Mahabub              362
 5
 6   EXHIBITS      DESCRIPTION      IDENTIFIED:
 7   89  Transcription of Investor Audio    381
 8   90  Bates numbered JM2515-2518, series   421
 9      Of e-mails
10   91  Bates numbered JM5121-5126, series   469
11      Of e-mails
12   92  Bates numbered JM7122-7125, series   533
13      Of e-mails
14   93  Bates numbered GA3895-3898, e-mail   592
15      To Shareholders
16   94  Letter                 657
17
18
19
20
21
22
23
24
25
```

Page 362

```
           P R O C E E D I N G S
 1
 2      MS. OSTROM:  Then let's go on the record
 3   at 8:35 a.m., on February 12, 2015.
 4      My name is Jennifer Ostrom, and with me is
 5   Kurt Gottschall; we are officers of the Commission
 6   for purposes of this proceeding, and we are today
 7   resuming the examination of Jerry Mahabub which was
 8   adjourned on February 5th of 2015.
 9      Would counsel please identify themselves.
10      MR. HOLMES:  Andrew Holmes on behalf of
11   Jerry Mahabub.
12      MR. McCLOSKEY:  Michael McCloskey on
13   behalf of Mr. Mahabub and GenAudio.
14      MS. OSTROM:  The testimony today is
15   pursuant to a Commission subpoena which has been
16   previously marked as Exhibit No. 54.
17   Whereupon,
18           TAJ JERRY MAHABUB,
19   was recalled as a witness and, having been previously
20   sworn, was examined and testified as follows:
21           EXAMINATION
22      BY MS. OSTROM:
23      Q    And, Mr. Mahabub, do you understand that
24   you remain under oath?
25      A    Yes.
```

Page 363

```
 1      MS. OSTROM:  And let the record reflect
 2   that a copy of the formal order of investigation in
 3   this matter will be available for examination during
 4   the course of this proceeding.
 5      BY MS. OSTROM:
 6      Q    And, Mr. Mahabub, we rescheduled your
 7   testimony -- continuation of it because you were ill.
 8      Are you on any medications today?
 9      A    Not today.
10      Q    Okay.
11      A    I went through all of my antibiotics
12   already.
13      Q    Okay.
14      THE REPORTER:  I'm sorry.  I went
15   through --
16      THE WITNESS:  -- all of my antibiotics
17   already, a Z-pack.
18      THE REPORTER:  Do we need to re-swear --
19      MS. OSTROM:  No.
20      THE REPORTER:  I'm sorry.  I just wanted
21   to be sure.  Thanks.  Okay.
22      BY MR. GOTTSCHALL:
23      Q    And, Mr. Mahabub, because you were not
24   feeling well last Friday, are you feeling okay today?
25      A    Much, much better.
```

2 (Pages 360 to 363)

Page 380

1    THE WITNESS:  Yeah, that's a possibility.
2  That's a good point.
3    A    We went -- we went back through the mixed
4  sessions, and some of our drives got corrupted a
5  while ago at the studio, so these were from recovered
6  drives, right, because it's been so long ago.  And I
7  listened to it.  It sounds about right, but it's
8  probably that the, like he said, final-coat-of-wax
9  version but it's damn close.
10    MR. HOLMES:  But just -- just for
11  clarification, the part -- the part that you and I
12  talked about -- and tell me if I'm getting it wrong,
13  but there's a Freddy Mercury bit of music that on
14  what we've produce has the instrumental but no -- no
15  vocals?
16    THE WITNESS:  Right.
17    MR. HOLMES:  And the vocals are supposed
18  to be there?
19    THE WITNESS:  That's right.
20    MR. HOLMES:  So that's -- that's how we
21  knew it probably wasn't the final version of the
22  audio.
23    BY MR. GOTTSCHALL:
24    Q    What about what you -- your voiceover in
25  the audio, is that portion, as far as you know, the

Page 381

1  final version?
2    A    It's hard to tell, because we -- we could
3  have done some -- what's called "overdubs"
4  afterwards.  But if we did, it would be like
5  correcting an "and" or a "the" or something like
6  that, so....
7    Q    Okay.  But not making -- in other words,
8  not making substantive changes?
9    A    No material changes.
10    Q    Okay.
11    A    Correct, yes.
12    BY MS. OSTROM:
13    Q    And the wave file that was produced to the
14  SEC has a date in the file name, and it was May 14th
15  of 2010, and we had that wave file transcribed.
16    (SEC Exhibit 89 was marked
17          for identification.)
18    BY MS. OSTROM:
19    Q    Mr. Mahabub, I want to hand you Exhibit
20  No. 89.  This is an audio transcription of the
21  May 14th, 2010 wave file that GenAudio produced to
22  the commission as an exhibit -- as the presentation?
23    A    Okay.
24    Q    If you could go ahead and look at that.
25  We're going to ask you specific questions about

Page 382

1  specific pages.
2    If at any point you want to look at
3  something else within it, as we go through, please
4  tell me, and I'll give you time to do so, okay?
5    A    (Witness nods head.)
6    Q    Okay.
7    A    Okay.  Yes.
8    Q    If you could turn to Page 7.
9    Well, actually, why don't we turn to the
10  very first page.  I should apologize for this.  Let's
11  turn to the page -- Page 2.  And just wanted to make
12  sure for the record that we -- we noted this.
13    About halfway through that first page it
14  says, "MR. MAHABUB:  Ah, yes that does sound better.
15  Let's start over.
16    "My name is Jerry Mahabub, President and
17  CEO of GenAudio."
18    Do you see that?
19    A    Yes.
20    Q    And does anyone speak in this presentation
21  other than you?
22    A    Yes.
23    Q    And who else speaks in this presentation?
24    A    Greg Morgenstein.  We -- we did a little
25  skit where an applause comes on in the beginning.

Page 383

1  And then I -- I say, "Oh, don't you think that will
2  be better in Astoundsound," and then he puts it in
3  Astoundsound, right.
4    Q    Okay.  And is that the person who's
5  denoted as the announcer on Page 2, would that be
6  Mr. Morgenstein?
7    A    Yes.
8    Q    Okay.  If you could turn now to Page 7 of
9  the transcription.
10    The second full paragraph says, "In
11  particular, a very large consumer electronics
12  company, which I'll refer to as the LCEC, has already
13  initiated embedded level integration of our
14  technology for their entire lineup of major product
15  offerings."
16    Do you see that?
17    A    Yes.
18    Q    Okay.  And throughout this presentation,
19  when you refer to the "LCEC," are you referring to
20  Apple?
21    A    Yes.
22    Q    And what had Apple done to initiate
23  embedded level integration?
24    A    That was a project that we worked on with
25  Ronald Isaac, where they sent us what's called a

Page 452

1    Q   Okay.
2    A   Because given the timeline here, it would
3    have had to have been, right.
4    Q   Okay.  If you could turn to the second
5    page of Exhibit No. 7, where it says "Consumer
6    Electronics Industry," the heading there; do you see
7    that one?
8    A   Yeah.  Oh, yeah, of course.
9    Q   Okay.  The very first sentence says, "In
10   the very near future it has been requested by the
11   LCEC's CEO to have a 'handshake' meeting with myself
12   alongside meeting with the LCEC's expert in acoustics
13   physics and others."
14       Do you see that?
15   A   Yes.
16   Q   Okay.  Now, is that a reference to a
17   meeting with Mr. Jobs and Mr. Bright?
18   A   That is what I was referring to based on
19   the e-mail, I think, that you provided in the earlier
20   -- or just prior to.
21   Q   The one we just looked at, Exhibit No. 90?
22   A   Yes.
23   Q   Okay.  If you'd turn to the first page of
24   Exhibit No. 7 again; this is dated August 1st of
25   2010.

Page 453

1    A   Okay.
2    Q   So am I correct that no such meeting had
3    yet taken place as of August 1st, 2010?
4    A   No such meeting ever took place.
5    Q   Okay.  You did meet with Mr. Bright,
6    though, at some point?
7    A   Yes.
8    Q   Okay.  And you hadn't yet had the meeting
9    with Mr. Bright, is that correct, at this time?
10   A   I don't know.  I can't recall.
11   Q   Okay.
12   A   I don't think so.
13       Or maybe I did, because this is August.
14   And didn't -- wasn't a meeting set up for July?  See,
15   I don't remember if we postponed that meeting or --
16   we must have postponed it.
17   Q   Okay.
18   A   Yeah.
19   Q   Okay.  And the LCEC's expert in acoustics
20   physics that is referring to Mr. Bright, correct?
21   A   Yes.
22   Q   Okay.  Okay.
23       BY MR. GOTTSCHALL:
24   Q   You also say in that -- later in that same
25   paragraph in Exhibit 7, quote, It has been requested

Page 454

1    that we sign an even more restrictive NDA with the
2    LCEC, period, close quote.
3        What are you referring to there?
4    A   Exactly what we discussed about ten
5    minutes ago.
6    Q   And that was that?
7    A   The heavier NDA that -- that I believe I
8    never received.
9    Q   Okay.
10   A   Because we needed to do that in order to
11   do the merger of our tuning DSP parameters with their
12   tuning DSP kext, so....
13   Q   And the basis for this statement then was
14   the e-mail from Mr. Tiscareno in which he had
15   referenced that Ron Isaac may want you to enter into
16   a more restrictive NDA?
17   A   Yes.  I don't remember that e-mail, I
18   don't remember this, but that's obviously where it
19   came from, right.
20       BY MS. OSTROM:
21   Q   And the next sentence, the -- the second
22   full sentence after the heading Consumer Electronics
23   Industry says, "This meeting will take place within
24   the next couple of weeks."
25   A   Okay.

Page 455

1    Q   Do you recall how soon after this
2    August 1st, 2010 shareholder letter you met with
3    Mr. Bright?
4    A   No.
5    Q   Okay.
6    A   I do not recall.
7    Q   Okay.
8    A   I'm sorry.  It was too long ago.
9        It had to have been within the vicinity
10   though, it had to have been pretty close in.
11   Q   Mr. Mahabub, let me hand you Exhibit
12   No. 73.  And again, if you could go ahead and read
13   that to yourself and then we'll ask you some
14   questions when you're ready.
15   A   (Witness reviews Exhibit 73.)
16       All right.  Okay.
17   Q   Did GenAudio send this to shareholders?
18   A   I don't remember, but I guess I have no
19   reason to believe that it didn't.
20   Q   And did it come -- come from you on that
21   last page, SEC-9, "Best wishes, Jerry Mahabub,
22   Founder, Chairman, President and CEO of GenAudio,
23   Inc.?
24   A   Yes.  I saw it.
25   Q   Okay.  Who drafted Exhibit No. 73?

Page 456

1      A   I believe I was the initial drafter, and
2   -- see, I can't remember if it was Paul Powers or Ben
3   Huber that was reviewing these with him before
4   sending them out.  One of our company counsel was --
5   nothing ever went out without me getting legal
6   counsel's sort of blessing.
7      Q   Okay.  The very first page of Exhibit
8   No. 73, at the top it says, "Dear Shareholder, As of
9   today, we have raised approximately 2.7 million of
10  the 3 million, with the vast majority of investments
11  coming from existing shareholders.  We would like to
12  complete the offering and raise the full 3 million
13  U.S. dollars.  If any of you are considering the
14  prospect of increasing your stake, you only have a
15  few days to make that decision.  The offering must
16  close on August 31st, 2010."
17         Do you see that?
18     A   Yes.
19     Q   Does that refresh your recollection as to
20  when the March 2010 offering was to close initially?
21     A   I believe so, but I can't remember if the
22  board extended it or not --
23     Q   Okay.
24     A   -- through board resolution.  I just -- I
25  don't recall.

Page 457

1      Q   Do you know if you raised the entire
2   $3 million by August 31st of 2010?
3      A   I do not remember.  I don't think we did,
4   we may have though.
5          Actually, we may have oversubscribed, if I
6   recall correctly.  I think we may have actually
7   oversubscribed by a bit.
8      Q   Okay.  If you could turn to the second
9   page, which is SEC-7.
10     A   Which -- which -- yeah.
11     Q   Okay.  And the second full paragraph --
12     A   Yeah.
13     Q   -- says, "We will be inking our marketing
14  and promotion agreement with 20th Century Fox in the
15  near future."
16     A   Mm-hmm.
17     Q   "Because Walden Media gave the full-blown
18  green light to the Narnia 3 audio team to use our
19  professional audio" --
20         THE REPORTER:  I'm sorry.  The green light
21  to?
22         MS. OSTROM:  Yes.
23         BY MS. OSTROM:
24     Q   -- "gave the full-blown green light to the
25  Narnia 3 audio team to use our professional audio

Page 458

1   software, there was no turning back and this actually
2   gives us some leverage when we go to negotiate with
3   20th Century Fox for our marketing and promotion
4   items we are asking for."
5          Do you see that?
6      A   I do.
7      Q   Okay.  How close was GenAudio to inking
8   the marketing and promotional agreement with 20th
9   Century Fox?
10     A   You'd need to ask Brent Kaviar about that
11  one.  I can't answer that.
12     Q   Okay.  So is this information you got from
13  Mr. Kaviar?
14     A   Yeah.  Brent is from the industry.  He's a
15  former senior vice president of post-production for
16  New Line Cinema for seventeen years, and he was the
17  guy that knew Jonas at Walden Media and knew Steve
18  Barnett at 20th Century Fox, that we went through all
19  their tests and passed with green lights, and then
20  Fox and Walden, you know -- we went out to London.
21  We were -- we were working with the audio editorial
22  team.
23     Q   So it says, "in the near future."  Is that
24  information you got from Mr. Kaviar?
25     A   Yes.

Page 459

1      Q   Okay.  And what happened?
2      A   I don't really remember exactly -- what
3   happened as far as why we weren't on the film or
4   what?  Yeah.
5      Q   Yes, with Narnia 3.
6      A   You know, we've asked the editorial team
7   out there, and I reported to the shareholders what
8   they told me in a -- I think a future update past
9   this one, that Dolby had come in and sabotaged us at
10  the dub stage, which is -- which happens all the
11  time.  Dolby is an 800-pound guerilla.
12         And they had two options to do an
13  Astoundsound surround mix with 5.1 using our
14  technology, or at the time Dolby was pushing their
15  garbage 7.1 technology, which they were claiming to
16  be, you know, all this great stuff.
17         So they came out with a game of Toy Story
18  3 and they wanted more content for 7.1.  Well,
19  apparently, at the dub stage, Dolby walked on the
20  stage and pretty much looked at Mike Hodges, who was
21  the audio mix engineer at the time, and also the
22  editorial team -- I was not there when this happened.
23  This is the story I heard.
24     Q   From Mr. Kaviar?
25     A   No.  No.

Page 492

1  to any of them about how the meeting went?
2      A   Vaguely, yeah.  I think we talked a little
3  bit.  Most people had already dispersed, so....
4      Q   Did you tell any of them that you'd had an
5  argument with Mr. Bright?
6      A   I don't think so.
7      Q   Okay.  Did you ever tell Brent Kaviar?
8      A   Actually, no.  I did, I did.
9      Q   Okay.  Who did you tell?
10     A   Walter, probably Brent I would have told,
11 a few other of the team -- you know, the team
12 members that I work with that.
13     Q   Okay.
14     A   Yeah.
15     Q   And what do you recall telling them?
16     A   I just told them I went in there and --
17 and there was an issue with the guy not liking our
18 R&D methodologies, and your typical conventional
19 physicist mentality of -- of, you know, how it's
20 based on the eardrum and how it vibrates.  And, you
21 know, I said, "No, it's based on the brain and how it
22 interprets and processes spatial auditory
23 information."  So this was a, you know, R&D
24 methodology discrepancy between the both of us that
25 we fought over.

Page 493

1      Q   Okay.  And at the conclusion of the
2  meeting that you had at -- which Mr. Bright attended,
3  how was it left at -- the next step between GenAudio
4  -- GenAudio and Apple?
5      A   I don't remember.  I don't recall.  I
6  remember Vic just shaking my hand and me leaving, and
7  I don't really remember what happened after that.
8      Q   Okay.  Did anyone from Apple contact you
9  after the meeting to tell you how they thought it
10 went?
11     A   Yeah; Vic did.
12     Q   Okay.  Anyone else?
13     A   No; just Victor.
14     Q   And what did Mr. Tiscareno say?
15     A   I believe his words exactly were, "Well,
16 that could have gone a little better," right, because
17 of the argument that busted out.
18         But other than that, that's -- you know, I
19 said, "Overall, in general, how'd it go?"
20         And he goes, "Oh, it went fine.  The demos
21 were great but, you know, the argument with Andrew."
22         I was like, "Well, you know, he was
23 attacking my research.  What do you expect me to do,
24 just sit there and let him demolish me in front of
25 all your people?  I'm not going to do that."

Page 494

1      Q   So in 2010, did you attend any other
2  meetings at the Apple offices after the meeting that
3  Mr. Bright was at?
4      A   I believe so.  There was probably maybe
5  one or two meetings I went to, I just don't remember,
6  what dates, times or why, but I do remember going
7  back.
8      Q   And was that prior to Mr. Tiscareno
9  telling you that he was going to be leaving?
10     A   Yes.
11     Q   Okay.  Okay.  And who did you meet with at
12 those couple of meetings?
13     A   I just don't remember.
14     Q   Okay.
15     A   Probably maybe one was with Vic, maybe one
16 with Ron, and --
17     Q   Okay.
18     A   -- the standard people.
19     Q   Okay.  But you didn't, again, have a
20 meeting where you had a roomful of people, or
21 anything like that, like we've talked --
22     A   No.
23     Q   -- talked about?
24     A   No, no.  That was like sort of --
25     Q   Okay.

Page 495

1      A   I was waiting for the big fifty-management
2  presentation meeting and it never happened.
3      Q   Okay.  Were you told any reason why that
4  was?
5      A   No.  No.  Vic just disappeared in 2011,
6  and that was it.  Damn near dropped me to my knees.
7  I was not very happy about that.
8          MS. OSTROM:  And actually, why don't --
9  why don't we go ahead and let's go off the record.
10         (Break from 11:00 a.m. to 11:16 a.m.)
11         (Mr. Gottschall is not present.)
12         EXAMINATION (CONTINUED)
13 BY MS. OSTROM:
14     Q   And while we were off the record,
15 Mr. Mahabub, did we have any substantive discussions
16 regarding this investigation?
17     A   No.
18     Q   Okay.  And I want to just make sure.  So
19 on the break -- you are taking some Advil, correct?
20     A   (Witness nods head.)
21     Q   Nothing else, right?
22     A   No.
23     Q   Okay.  Okay.
24     A   No.  Just Advil.
25     Q   Okay.  Let me hand you Exhibit No. 35.

Page 496

1  And again, please look at the whole thing, and then
2  I'll ask you some questions.
3      A    (Witness reviews Exhibit 35.)
4           Okay.
5      Q    And, Mr. Mahabub, did GenAudio send
6  Exhibit No. 35 to shareholders?
7      A    I do remember this one.  Yes.
8      Q    Okay.  And who drafted it?
9      A    Myself, Ben Huber and Paul Powers, if I
10  recall.  It was me and, I think -- it was either one
11  or both of our company counsel that did the, sort of,
12  final sweep.
13      Q    Okay.  And who reviewed it?
14      A    Paul and/or Ben.  I can't remember exactly
15  who, but it would have been one of those guys.
16      Q    Okay.  And who made any revisions?
17      A    Paul and/or Ben.
18      Q    Okay.  Did you make the initial draft
19  then?
20      A    Yes.
21      Q    Okay.  And you know, I know our sides -- I
22  even had them put tape on that one.  These stickers
23  just suck.  Even the lettering starts coming off.
24      A    Yeah.
25      Q    If you look at the very first page, which

Page 497

1  is GA-4921, under "Executive Summary," it says, "One
2  of our executive officers, Paul Powers, COO and
3  general counsel of our company, has chosen a new
4  career path and is no longer with us on a full-time
5  basis."
6           Is that about the time that Mr. Powers
7  left as COO of the company?
8      A    Yeah.  But it was probably a little before
9  then, if I'm writing about it on December 8th.  I
10  just don't remember exactly what date.
11      Q    Okay.  And then he remained a board of
12  directors member, correct?
13      A    He did, yes.
14      Q    Okay.
15      A    Until 2011.
16      Q    Okay.  And why did he resign in 2011?
17      A    He resigned, Mark Bobak resigned, Ted
18  Cohen and Elliot Mazer, all four resigned.
19      Q    And why did Mr. Powers resign?
20      A    He had taken a new job with SeaWorld, if I
21  remember correctly, and he had to move to Florida and
22  refocus his energy and efforts down there.
23           Mark Bobak resigned.  He just --
24           MR. HOLMES:  She didn't ask about Mark.
25           THE WITNESS:  Oh.  Okay.  Yeah.

Page 498

1           MS. OSTROM:  That was -- that's my next
2  question.
3           BY MS. OSTROM:
4      Q    So why did Mr. Bobak resign?
5      A    He said the same thing.  He had, you know,
6  too much other stuff going on.
7           My gut instincts as to why that is, is
8  because ASE had failed miserably for PC and Mac, and
9  that is why they invested.  They didn't invest their
10  money because of Apple; they invested their money
11  because of ASE, and that's why they got all their
12  other people to invest as well.  And their marketing
13  strategy, that they pretty much will determine at the
14  board level, which I had nothing to do with, flopped
15  miserably.
16           So, as a result of the company, in their
17  eyes, flopping, they all decided to resign from the
18  board; that's why I believe they resigned.
19      Q    And when did you, quote/unquote, pull the
20  ASE from the market?
21      A    Not until afterwards.  I -- I tried to
22  revive it using a different marketing approach
23  through Anschutz Entertainment Group, who I talked
24  about in here, and a couple other different
25  approaches we took.

Page 499

1           Wolfgang's Vault was another approach I
2  took to try and market the ASE product, and it was --
3  it was too hard.  You need to have a lot of money to
4  go business to consumer.  And that's when I started
5  to mould the company more B-to-B instead of B-to-C,
6  right.
7      Q    And why did Mr. Cohen resign?
8      A    They all resigned at about the same time.
9      Q    Right.  But why did Mr. Cohen resign?
10      A    Well, because I had called him up and let
11  him know that Paul and Mark were resigning.
12           And then he had asked me, "Well, what do
13  you want me to do?"
14           And I said, "Well, you know, maybe it's,
15  you know, a good time to reset the board here, get a
16  fresh start, get us some fresh perspectives on the
17  board of directors."
18           And he resigned, and so did Elliot Mazer
19  for the same reasons.  And then shortly thereafter, I
20  believe I collapsed the board from a five-member
21  board to a three-member board, and that was it.
22      Q    And why did you think it was a good time
23  to reset the board?
24      A    Because there had been so much tainted
25  energy at that board, with Paul Powers and Mark Bobak

36 (Pages 496 to 499)

Page 684

1        MS. OSTROM:  And we'll go off the record
2    at 3:50 p.m., on February 12th of 2015.
3            (Whereupon, at 3:50 p.m. the examination
4    adjourned.)
5                * * * * *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 685

1            PROOFREADER'S CERTIFICATE
2
3    In the Matter of:   GENAUDIO, INC.
4    Witness:        Taj Jerry Mahabub
5    File Number:      D-03450-A
6    Date:           February 12, 2015
7    Location:        Denver, CO
8
9
10        This is to certify that I, Nicholas Wagner,
11    (the undersigned), do hereby swear and affirm
12    that the attached proceedings before the U.S.
13    Securities and Exchange Commission were held
14    according to the record and that this is the
15    original, complete, true and accurate transcript
16    that has been compared to the reporting or recording
17    accomplished at the hearing.
18
19
20
21    _____    _____
22    (Proofreader's Name)       (Date)
23
24
25

Page 685

1                    PROOFREADER'S CERTIFICATE

2

3    In the Matter of:   GENAUDIO, INC.

4    Witness:            Taj Jerry Mahabub

5    File Number:        D-03450-A

6    Date:               February 12, 2015

7    Location:           Denver, CO

8

9

10        This is to certify that I, Nicholas Wagner,

11   (the undersigned), do hereby swear and affirm

12   that the attached proceedings before the U.S.

13   Securities and Exchange Commission were held

14   according to the record and that this is the

15   original, complete, true and accurate transcript

16   that has been compared to the reporting or recording

17   accomplished at the hearing.

18

19

20

21   _____        2-19-2015

22   (Proofreader's Name)              (Date)

23

24

25

1      UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3              REPORTER'S CERTIFICATE

4

5      I, Denise Truax, Registered Merit Reporter,

6  hereby certify that the foregoing transcript

7  consisting of 326 pages is a complete, true, and

8  accurate transcript of the testimony indicated, held

9  2-12-2015    in the matter of  GcnAudio, Inc

10          I further certify that this proceeding

11  was recorded by me, and the foregoing transcript has

12  been prepared under my direction.

13

14  DATE:    2-19-2015

15

16

17

18  Official Reporter: _____

19

20              Denise Truax

21

22

23

24

25