**E**XCERPTED

# EXHIBIT 235

# In The Matter Of:

*Securities and Exchange Commission v.*
*Taj Jerry Mahabub, et al.*

---

*Taj Jerry Mahabub*
*Vol. 1*
*January 19, 2017*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94103*
*(415) 597-5600*

Original File 30906Mahabub.txt

**Min-U-Script® with Word Index**

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 1

1            IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF COLORADO
3
4      - - - - - - - - - - - - - -
5   SECURITIES AND EXCHANGE      )
6   COMMISSION,                  )
7            Plaintiff,          )
8                                ) CASE NO.
9   v.                           ) 1:15-cv-02118-CBS-WJM
10                               )
11  TAJ JERRY MAHABUB, GENAUDIO, )
12  INC., and ASTOUND HOLDINGS,  )
13  INC.,                        )
14           Defendants.   )
15    - - - - - - - - - - - - - -
16
17      VIDEOTAPED DEPOSITION OF TAJ JERRY MAHABUB
18          THURSDAY, JANUARY 19, 2017
19           PAGES 1 - 256; VOLUME 1
20
21         BEHMKE REPORTING AND VIDEO SERVICES, INC.
22      BY: PAULA A. PYBURN, CSR NO. 7304, RPR, CLR
23              160 SPEAR STREET, SUITE 300
24           SAN FRANCISCO, CALIFORNIA 94105
25                     (415) 597-5600

Page 2

1
2
3
4
5
6
7
8       Videotaped deposition of TAJ JERRY MAHABUB,
9   VOLUME 1, taken by Plaintiff, at 444 South Flower
10  Street, Suite 900, Los Angeles, California,
11  commencing at 10:17 a.m., on THURSDAY, JANUARY 19,
12  2017, before Paula A. Pyburn, Certified Shorthand
13  Reporter No. 7304, RPR, CLR, pursuant to Notice.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1   APPEARANCES OF COUNSEL:
2   FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION:
3       SECURITIES AND EXCHANGE COMMISSION
4       BY:  DANIELLE R. VOORHEES, TRIAL COUNSEL
5            LESLIE HENDRICKSON HUGHES, TRIAL COUNSEL
6       1961 Stout Street, Suite 1700
7       Denver, Colorado 80294
8       Telephone: (303) 844-1000
9       Email:  voorheesd@sec.gov
10              hugheslj@sec.gov
11
12  FOR DEFENDANT TAJ JERRY MAHABUB:
13      HOLMES, TAYLOR & JONES LLP
14      BY:  ANDREW B. HOLMES, ATTORNEY AT LAW
15      617 South Olive Street, Suite 1200
16      Los Angeles, California 90014
17      Telephone:  (213) 985-2200
18      Email:  abholmes@htjlaw.com
19
20
21
22
23
24
25

Page 4

1   APPEARANCES OF COUNSEL - (CONTINUED):
2   FOR DEFENDANT GENAUDIO, INC.:
3       WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
4       BY:  MICHAEL P. MCCLOSKEY, ATTORNEY AT LAW
5       655 West Broadway, Suite 900
6       San Diego, California 92101
7       Telephone: (619) 881-3326
8       Email:  michael.mccloskey@wilsonelser.com
9
10  FOR DEFENDANT ASTOUND HOLDINGS, INC.
11  - (A.M. SESSION):
12      BENZ LAW GROUP
13      BY:  JEFFREY BENZ, ATTORNEY AT LAW
14      12021 Wilshire Boulevard, Suite 256
15      Los Angeles, California 90025
16      Telephone: (310) 570-2774
17      Email:  jeffreybenz@gmail.com
18
19  ALSO PRESENT:
20      CASEY HOWELL, VIDEOTAPE OPERATOR
21
22
23
24
25

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 5

```
 1                    INDEX
 2  THURSDAY, JANUARY 19, 2017
 3  TAJ JERRY MAHABUB - VOLUME 1            PAGE
 4      Examination by MS. VOORHEES          14
 5  P.M. SESSION                            153
 6      Examination resumed by MS. VOORHEES  153
 7
 8
 9                    -OOO-
10
11
12  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
13                PAGE       LINE
14                    NONE.
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1                EXHIBITS - (CONTINUED)
 2          TAJ JERRY MAHABUB - VOLUME 1
 3  Number           Description              Page
 4  Exhibit 203   EMAIL CHAIN, BATES NOS.
 5                SEC-TISCARENOV-E-0000325
 6                THROUGH SEC-TISCARENOV-
 7                E-0000326 - 2 pages            68
 8
 9  Exhibit 204   8/10/09 EMAIL FROM JERRY
10                MAHABUB TO GARY SMITH, ETC.,
11                BATES NOS. SEC-MAHABUBJ-E-
12                0022806 THROUGH
13                SEC-MAHABUBJ-E-0022882
14                - 78 pages                    69
15
16  Exhibit 205   EMAIL CHAIN, BATES NOS.
17                347APL-00000608 THROUGH
18                347APL-00000621 - 14 pages    81
19
20  Exhibit 206   EMAIL CHAIN, BATES NOS.
21                SEC-MAHABUBJ-E-0023716
22                THROUGH SEC-MAHABUBJ-
23                E-0023729 - 14 pages          81
24
25
```

Page 6

```
 1                    EXHIBITS
 2          TAJ JERRY MAHABUB - VOLUME 1
 3  Number           Description              Page
 4  Exhibit 199   DECEMBER 11, 2008, CONFIDENTIAL
 5                PRIVATE PLACEMENT MEMORANDUM,
 6                GENAUDIO, INC., BATES NOS.
 7                GA006483 THROUGH GA006585
 8                - 103 pages                   35
 9
10  Exhibit 200   March 25, 2009, Confiden
11                CONFIDENTIAL PRIVATE
12                PLACEMENT MEMORANDUM,
13                GENAUDIO, INC., BATES NOS.
14                GA007367 THROUGH GA007453
15                - 87 pages                    40
16
17  Exhibit 201   EMAIL CHAIN, BATES NOS.
18                SEC-ELLIOTT-E-0002589
19                THROUGH SEC-ELLIOTT-E-000292
20                - 4 pages                     40
21
22  Exhibit 202   EMAIL CHAIN, BATES NOS.
23                SEC-MAHABUBJ-E-0007972
24                THROUGH SEC-MAHABUBJ-
25                E-0007979 - 8 pages           49
```

Page 8

```
 1                EXHIBITS - (CONTINUED)
 2          TAJ JERRY MAHABUB - VOLUME 1
 3  Number           Description              Page
 4  Exhibit 207   EMAIL CHAIN, BATES NOS.
 5                GA006846 THROUGH GA006850,
 6                - 5 pages                    111
 7
 8  Exhibit 208   EMAIL CHAIN, BATES NOS.
 9                SEC-TISCARENOV-E-0000946
10                THROUGH SEC-TISCARENOV-
11                E-0000954 - 9 pages          125
12
13  Exhibit 209   EMAIL CHAIN, BATES NOS.
14                SEC-MAHABUBJ-E-0023474
15                THROUGH SEC-MAHABUBJ-
16                E-0023489 - 16 pages         126
17
18  Exhibit 210   EMAIL CHAIN, BATES NOS.
19                JM000378 THROUGH JM000380
20                - 3 pages                    138
21
22  Exhibit 211   EMAIL CHAIN, BATES NOS.
23                JM000727 THROUGH JM000279
24                - 3 pages                    173
25
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 9

```
 1             EXHIBITS - (CONTINUED)
 2         TAJ JERRY MAHABUB - VOLUME 1
 3   Number          Description          Page
 4   Exhibit 212  EMAIL CHAIN, BATES NOS.
 5                SEC-TISCARENOV-E-0001047
 6                THROUGH SEC-TISCARENOV-
 7                E-0001048 - 2 pages       183
 8
 9   Exhibit 213  EMAIL CHAIN, BATES NOS.
10                SEC-MAHABUBJ-E-0019545
11                THROUGH SEC-MAHABUBJ-
12                E-0019549 - 5 pages       183
13
14   Exhibit 214  EMAIL CHAIN, BATES NOS.
15                JM002048 THROUGH JM002052
16                - 5 pages                 197
17
18   Exhibit 215  EMAIL CHAIN, BATES NOS.
19                SEC-TISCARENOV-E-0001119
20                THROUGH SEC-TISCARENOV-
21                E-0001120 - 2 pages       209
22
23   Exhibit 216  EMAIL CHAIN, BATES NOS.
24                JM002045 THROUGH JM002046
25                - 2 pages                 218
```

---

Page 10

```
 1             EXHIBITS - (CONTINUED)
 2         TAJ JERRY MAHABUB - VOLUME 1
 3   Number          Description          Page
 4   Exhibit 217  5/6/10 EMAIL FROM JERRY
 5                MAHABUB TO BOB COOVER, ETC.,
 6                BATES NOS. JM002017 THROUGH
 7                JM002020 - 4 pages        223
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 11

```
 1         PREVIOUSLY MARKED EXHIBITS
 2         TAJ JERRY MAHABUB - VOLUME 1
 3   Number          Description          Page
 4   Exhibit 16   EMAIL CHAIN, BATES NOS.
 5                SEC0000001 THROUGH
 6                SEC0000005 - 5 pages      244
 7
 8   Exhibit 21   EMAIL CHAIN, BATES NOS.
 9                JM002096 THROUGH JM002099
10                - 4 pages                 105
11
12   Exhibit 23   10/19/09 EMAIL FROM JERRY
13                MAHABUB TO VICTOR TISCARENO,
14                ETC., BATES NOS.
15                SEC-TISCARENOV-E-0000635
16                THROUGH SEC-TISCARENOV-
17                E-0000636 - 2 pages       112
18
19   Exhibit 27   EMAIL CHAIN, BATES NOS.
20                SEC-TISCARENOV-E-0000992
21                THROUGH SEC-TISCARENOV-E
22                - 0000993 - 2 pages       138
23
24
25
```

---

Page 12

```
 1   PREVIOUSLY MARKED EXHIBITS - (CONTINUED)
 2         TAJ JERRY MAHABUB - VOLUME 1
 3   Number          Description          Page
 4   Exhibit 28   EMAIL CHAIN, BATES NOS.
 5                JM001041 THROUGH JM001046
 6                - 6 pages                 153
 7
 8   Exhibit 30   3/21/10 EMAIL FROM JERRY
 9                MAHABUB TO VICTOR TISCARENO,
10                ETC., BATES NOS.
11                347APL-00000315 THROUGH
12                347APL-00000316 - 2 pages 173
13
14   Exhibit 71   EMAIL CHAIN WITH ATTACHMENT,
15                BATES NOS.  SEC-
16                TISCARENOV-E-0000114 THROUGH
17                SEC-TISCARENOV-E-0000118
18                - 5 pages                  31
19
20   Exhibit 72   GENAUDIO, INC., BOARD OF
21                DIRECTORS TELEPHONIC MEETING
22                MINUTES FROM SEPTEMBER 25TH,
23                2009, BATES NO. GA006254
24                - 1 page                  100
25
```

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 13

1        THURSDAY, JANUARY 19, 2017; 10:17 A.M.
2
3        (All counsel stipulated to waive the
4    reporter read on and read off pursuant
5    to Federal Rule 30.)
6
7        **THE VIDEOGRAPHER:** Good morning.  We're now on
8    the record.  Here begins DVD No. 1, Volume 1, in
9    the deposition of Taj Jerry Mahabub in the matter
10   of "Securities and Exchange Commission v. Taj Jerry
11   Mahabub, et al.," being heard in the United States
12   District Court for the District of Colorado, Case
13   No. 1:15-cv-02118-CBS-WJM.
14       Today's date, January 19, 2017.  The time
15   is 10:17 a.m.
16       The video operator today is Casey Howell,
17   contracted by Behmke Reporting & Video Services,
18   located at 160 Spear Street, Suite 300,
19   San Francisco, California.
20       This video deposition is taking place at
21   444 South Flower Street, Suite 900, Los Angeles,
22   California, and was noticed by Danielle Voorhees,
23   Esq., of the Securities and Exchange Commission.
24       Would counsel and all present please
25   identify themselves for the record.

Page 14

1        **MS. VOORHEES:** Danielle Voorhees and
2    Leslie Hughes on behalf of the Securities and
3    Exchange Commission.
4        **MR. HOLMES:** Andrew Holmes on behalf of the
5    witness.
6        **MR. MCCLOSKEY:** Michael McCloskey on behalf of
7    GenAudio.
8        **MR. BENZ:** Jeff Benz on behalf of Astound
9    Holdings.
10       **THE VIDEOGRAPHER:** Thank you.
11       Your court reporter is Paula Pyburn,
12   certified shorthand reporter contracted by Behmke
13   Reporting & Video Services.  She will now
14   administer the oath.
15       **THE REPORTER:** Raise your right hand, please.
16                    * * *
17           TAJ JERRY MAHABUB,
18   having been duly sworn, testified as follows:
19                    * * *
20             EXAMINATION
21   BY MS. VOORHEES:
22    Q.  Mr. Mahabub, you can put your hand down.
23   Thank you.
24       I'm Danielle Voorhees on behalf of the
25   Securities and Exchange Commission, and I'm here

Page 15

1    with Leslie Hughes.
2        You've met both of us before; correct?
3        Is that a "yes"?
4    A.  Yes.
5    Q.  All right.  We'll go over some ground
6    rules.
7        As your counsel noted, the court reporter
8    is trying to take down everything that's being said
9    in the room today, and so we need you to answer
10   verbally my questions.  I need you to try to wait
11   till I finish with my question before you answer,
12   which I know is hard, because you will see where
13   I'm going sometimes, but she has to take down
14   everything.
15       If you could pause just briefly after I
16   ask my questions, it'll probably be helpful for
17   counsel, because they may make objections, and then
18   you can go ahead and answer the question.
19       All right?
20   A.  Yes.
21   Q.  If you need me to clarify anything, just
22   ask me to do it.  Otherwise, I'm going to assume
23   that you understand the questions I ask.
24       Okay?
25   A.  Yes.

Page 16

1    Q.  We can take breaks today as you need them.
2    So just let us know.  We won't take a break while a
3    question is pending, but otherwise, you know, we
4    want everybody to be concentrated on what's going
5    on; so let me know if you need to take a break.
6        Okay?
7    A.  Okay.
8    Q.  Do you understand that you're under oath
9    today?
10   A.  I do.
11   Q.  Okay.  Mr. Mahabub, just to make this go a
12   little faster, I want to go over a few key terms.
13       When I use the word "GenAudio," is it fair
14   that I'm referring to GenAudio, Incorporated, the
15   entity that's a defendant in this case?
16   A.  Yes.
17   Q.  Okay.  And if I refer to "Astound," I'm
18   referring to Astound Holdings, Inc., another entity
19   that is a defendant in this case.
20       Does that make sense?
21   A.  Yes.
22   Q.  If I refer to "Apple," I'm referring to
23   Apple, Incorporated.
24       Does that make sense?
25   A.  Yes.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 65

1    Apple based on the communications I had with my
2    points of contact that I was working with there.
3        Q.  Okay.  And that's as of July of 2009, you
4    thought that?
5        A.  Yep, exactly.  But, you know, like I said,
6    this was meant to go to internal team members; this
7    wasn't meant to be distributed to anyone external
8    to the team, or else it would have been.
9        Q.  If you go down to the next paragraph, it
10   says (as read):
11              We need investors and need them
12          now.
13       A.  Yep.
14       Q.  Why were you writing that?
15       A.  Because we were out of money.  And in
16   order to port code and hire on the right team and
17   the right dev staff, and there were a couple other
18   additional software engineering people that I
19   needed to bring on board at the time, and you can't
20   bring those people on unless you have money.
21       Q.  Okay.  If you could go to the next page.
22   So I'm now on the Bates page 7974.
23       A.  Yeah.
24       Q.  And go down to what I think is the first
25   full paragraph.  It says (as read):

Page 66

1              Everyone keep their eye on the
2          prize and, if possible, bring
3          potential investors to the table,
4          please, preferably through the common
5          stock offering.
6          Do you see that?
7        A.  Yes.
8        Q.  All right.  So you were asking your team
9    to help bring potential investors to the table;
10   correct?
11       A.  Through the common stock offering.  What
12   I'm saying is, don't bring them to the table
13   through anything here.  They have to read the
14   common stock offering, the risk factors associated
15   with the offering; that this is -- you know, this
16   is internal team member confidential stuff, but if
17   you know anyone that might be interested in
18   investing, you know, give them the common stock
19   or -- at the time, the logistics were, you know, go
20   to Jim Mattos, and Mattos would then forward them
21   the common stock offering.
22       Q.  Okay.  So when -- so your parenthetical
23   that says "preferably through the common stock
24   offering," you're referring to the process by which
25   the investors would be provided with the offering

Page 67

1    documents?
2        A.  With information to determine whether or
3    not it was an investment that they want to invest
4    in or not, because this obviously isn't surrounded
5    by the appropriate risk factors and disclaimers in
6    the language that are needed.
7        Q.  Okay.  You say "preferably."  Was there
8    another alternative?
9        A.  Yeah, a term share.  So if there's a
10   potential that someone knew someone that wanted to
11   invest something, a little larger amounts, you
12   know, maybe the company would look at what's called
13   a term sheet, if I remember, is what it's referred
14   to as.
15              So if -- if someone wanted to -- you know,
16   one of our employees said, "Hey, Jerry, here is my
17   Uncle Joe.  You know, he wants to invest
18   $10 million."  Right?  Which never happened.  But
19   if it ever happened, you know, we'd -- we'd
20   entertain a term sheet at that time.
21              So it would either be through a common
22   stock offering or through a potential for a term
23   sheet.  Again, you know, we never had any term
24   sheet offers to the table; it was all through the
25   offerings.

Page 68

1        Q.  Okay.  So you never had any term sheets?
2        A.  No.
3        Q.  Okay.  Were there any other alternatives
4    other than term sheet and common stock offering?
5        A.  No.  No.  There was a term sheet with a
6    group called GenAudio Term Sheet Investment Group,
7    which is a B.S. group set up by Mark Bobak and
8    Dell Skluzak in a -- way for them to start their
9    hostile takeover when they were -- but that's the
10   only term sheet group, as far as I remember.
11       Q.  Okay.
12       THE WITNESS:  Slow down?  Okay, yeah, sorry.
13          (Whereupon, Exhibit 203 was marked for
14          identification by the Court Reporter.)
15       THE WITNESS:  Oh, you guys dug these up, huh?
16   This is great.
17   BY MS. VOORHEES:
18       Q.  All right.  Mr. Mahabub, you've been
19   handed what's been marked as Exhibit 203.  It's
20   email correspondence.  The first page is Bates
21   labeled SEC-TiscarenoV-E-000325.
22              Do you recognize Exhibit 203?
23       A.  Yes.
24       Q.  Okay.  And this is email correspondence
25   between you and Victor Tiscareno; correct?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 69

1    A.  I believe so, yes.  If it was pulled from
2    my computer, it must have been.
3    Q.  It was not pulled from your computer.
4    I'll represent to you that this was produced to us
5    by Mr. Tiscareno.
6    A.  Oh, okay.  Well, then -- then, I suppose
7    it must be right, yeah.
8    Q.  Okay.  And so, knowing that, do you have
9    any reason to doubt that you sent and received the
10   emails as indicated?
11   A.  Yeah, no, sure.
12   Q.  Okay.
13   A.  Vic would have supplied you with the right
14   emails, you know.
15   Q.  Okay.
16   A.  At least I hope.
17       (Whereupon, Exhibit 204 was marked for
18       identification by the Court Reporter.)
19   BY MS. VOORHEES:
20   Q.  All right.  Mr. Mahabub, you've been
21   handed what's been marked as Exhibit 204.
22   Exhibit 204 is Bates-labeled on the first page
23   SEC-MahabubJ-E-0022806.
24       Mr. Mahabub, the document is -- is very
25   long, but I'm only going to ask you questions about

---

Page 70

1    the first, like, two or three pages.
2    A.  Okay.
3    Q.  That's just how it printed and it was just
4    how it was produced to us.
5    A.  This must have came from my computer,
6    obviously.
7    Q.  Correct.
8    A.  Yeah.
9    Q.  This document was produced to us by you.
10       All right.  So, Mr. Mahabub, if you look
11   at the first page of Exhibit 204 -- well, let me
12   ask you this:  Do you recognize this document?
13   A.  Not in its format, no.  I -- but I --
14   that -- that's a tough one to answer, because I'm
15   under oath.  If you say to me -- tell me, do I
16   recognize that?  My answer is no.
17   Q.  Okay.  Do you have any reason to doubt
18   that you sent and received the emails as indicated
19   in Exhibit 204?
20   A.  I don't know.  Sorry.  I just can't answer
21   that question.  I'm sorry.
22   Q.  Let's start to go through the content --
23   A.  Yeah.
24   Q.  -- and see what happens there.
25       If you look at the "To" line that's on the

---

Page 71

1    very first page of Exhibit 204, you see it includes
2    Mr. Smith; Paul Powers; Jim Devine; Jim Mattos;
3    Steve Bagwell; Greg Morgenstein --
4    A.  Morgenstein.
5    Q.  -- M-o-r-g-e-n-s-t-e-i-n --
6    A.  Morgenstein, yes.
7    Q.  Yes, sorry.  I'm just spelling it for the
8    court reporter.
9        Stephan with a p-h --
10   A.  Stephan.
11   Q.  -- Stephan -- Bernsee?
12   A.  Bernsee.
13   Q.  -- Bernsee, B-e-r-n-s-e-e.
14       Recy A. Pilloud?
15   A.  Pilloud.
16   Q.  Pilloud, P-i-l-l-o-u-d.
17       Ian Esten?
18   A.  Esten.
19   Q.  Esten, E-s-t-e-n.
20       Bob Coover, C-o-o-v-e-r.
21       A P. Savio, P. S-a-v-i-o.
22   A.  That would have been Paul Savio.
23   Q.  Okay.  And Walt, and it just says
24   "walt@genaudio."
25   A.  It's Walter Horat, H-o-r-a-t.

---

Page 72

1    Q.  Okay.  Mr. Mahabub, is -- is this roughly
2    the team that you referenced that we were
3    discussing in the previous exhibit?
4    A.  Yeah.  I might have had the board members
5    blind carbon copied as well.  Oftentimes when I'd
6    send out things like this, the board would always
7    be bcc'd also.
8    Q.  Okay.
9    A.  Which would have been -- at this time
10   Mark -- let's see, what is the date here? --
11   Mark Bobak, Paul Powers, Ted Cohen, and
12   Elliot Mazer.
13   Q.  Okay.  All right.
14       If you go to the second page of
15   Exhibit 204, you'll see that I've -- I have
16   highlighted, hopefully on all of the copies, some
17   provisions that I want to focus in on just
18   because these are so difficult read.
19       MR. HOLMES:  I have highlighting on the third
20   page.
21       MS. VOORHEES:  Oh, sorry, yeah, you're probably
22   right.  It may start on the --
23       MR. MCCLOSKEY:  Should be --
24       MS. VOORHEES:  Yeah, sorry.  I'll read you the
25   ones I want you to look at.

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 81

1 these lines, that would have been the primary
2 purpose.  Certainly not to raise money.  The
3 purpose would have been to keep my team on board.
4       I don't think it's a violation of the SEC
5 to do that.
6       MR. HOLMES: Danielle, whenever you're ready
7 for a break, I could use one.
8       MS. VOORHEES: Oh, sure, that's fine.  Let's go
9 off the record.
10      THE VIDEOGRAPHER: We're off the record.  The
11 time is 11:22.
12      (A recess was taken from 11:22 a.m.
13      to 11:41 a.m.)
14      THE VIDEOGRAPHER: We're back on the record.
15 The time is 11:41.
16      Please proceed.
17 BY MS. VOORHEES:
18   Q.  All right.  Mr. Mahabub, you understand
19 you're still under oath?
20   A.  Yes.
21      (Whereupon, Exhibit 205 and
22      Exhibit 206 were marked for
23      identification by the Court Reporter.)
24   THE WITNESS: Both of these?
25 ///

Page 82

1 BY MS. VOORHEES:
2   Q.  Correct.  Again, I'm just going to try to
3 make this a little quicker.
4   A.  Okay.
5   Q.  All right.  Mr. Mahabub, you've been
6 handed first what has been marked as Exhibit 205.
7 It's email correspondence from September of 2009.
8 It bears the Bates label 347APL-00000608.
9      And then you've also been handed what's
10 been marked as Exhibit 206.  It is email
11 correspondence, also from September of 2009.  It on
12 the first page is Bates-labeled
13 SEC-MahabubJ-E-0023716.
14      If you could take a look first at
15 Exhibit 205 and just let me know if you recognize
16 this email correspondence.
17   A.  As -- as with all the other things so long
18 ago, my answer to that is I -- I see it.  It's
19 helping me remember.  But I can't tell you for sure
20 whether or not -- I mean, if it comes from my
21 email, then it would have been me that wrote it, of
22 course.  But --
23   Q.  Okay.  And I think you have answered this,
24 but just for -- to have a clear statement, do you
25 have any reason to doubt that you sent and received

Page 83

1 the emails as indicated in the exhibit?
2   A.  I don't believe so.
3   Q.  Okay.  Your email address in September of
4 2009 was jerry@genaudioinc.com; correct?
5   A.  Yes.
6   Q.  Okay.  If you look at the very first email
7 on Exhibit 205 to the first page, you see that it
8 says from you to an risaac@apple.com?
9   A.  Yes.
10   Q.  Is that Ron Isaac?
11   A.  Yes.
12   Q.  And he's one of the people that you've
13 testified you corresponded with at Apple; correct?
14   A.  Correct.
15   Q.  All right.  If you could now take a look
16 at Exhibit 206.
17      And 206 is also a series of -- of emails.
18 I'll represent to you that they were produced to us
19 by you.
20      I know that the formatting is strange, as
21 it has been with a few of these emails, but taking
22 a look through the document, do you have any reason
23 to doubt that you sent and received the emails as
24 indicated?
25   A.  I do not believe I have any reason to

Page 84

1 doubt as of -- I can't tell you if I did or I
2 didn't.
3   Q.  Okay.
4   A.  But if it's -- if it's from me, then it
5 would have been me that wrote it, yes.
6   Q.  If you -- Mr. Mahabub, I'm going to try
7 and direct you to just a couple of things.
8      If you could turn to the fourth page of
9 Exhibit -- well, sorry.  Go to the third page of
10 Exhibit 206.  So that's the page that ends in -718
11 down at the bottom.
12   A.  Yeah, I'm there.
13   Q.  Okay.  So you see about -- a little more
14 than halfway down, there's a forwarded message, and
15 it says (as read):
16      From:  Jerry@genaudioinc.com; To:
17 Risaac@apple.com and Victor Tiscareno?
18   A.  Uh-huh, I do.
19   Q.  Do you see that?
20   A.  Yes.
21   Q.  And then it starts out with (as read):
22      Okay, I believe -- I believe I
23 understand your point of view.
24   Do you see that?
25   A.  Yep.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 93

1   have been talking to him on the phone about, yes.
2      Q.  Okay.  So your testimony is that Ron Isaac
3   told you on the phone that he believed that
4   Phil Schiller and other marketing staff would be
5   meeting with you and Mr. Tiscareno?
6      A.  I -- I'm not testifying to that, because I
7   can't really remember.  But I'm saying, if that --
8   judging based on what I'm reading here, if it were
9   me to be making these changes, that would have been
10  the reason why I would have done it, is to add in
11  information that was given via phone call to the
12  end of it so I have a more clearer picture to
13  present to the team members.
14         Not necessarily, you know, in any way
15  that -- it was just more to kind of fill in the
16  blanks so I didn't have to sit there and explain to
17  everyone what was going on, you know?  It was a lot
18  easier just to do it that way, as far as I was
19  concerned.
20     Q.  It was a lot easier to make it look like
21  Mr. Isaac said it than to add it?
22     A.  Well, because he would have said it to me
23  on the phone.  If that was the case, then I would
24  have added it in like this; that's -- that's
25  correct.

Page 94

1      Q.  Okay.  Well, you keep saying "if that was
2   the case."
3         It is the case; right?  I mean, we're
4   looking at a document.
5      A.  Well, I can't -- I can't -- I don't
6   remember, it's so long ago.  So -- you're saying it
7   is the case, but I can't say that for certain
8   because I don't -- for me to tell you, do I
9   remember all this stuff?  No, I don't.
10         I'm trying to reason through my brain and
11  what I would have thought at the time, if this were
12  the case that this happened, which it looks like it
13  was, that would have been the reason why I would
14  have done it.
15     Q.  The reason you would have done it would be
16  that Mr. Isaac would have said to you on the phone
17  the text that you added to his email?
18     A.  It would have either been on the phone or
19  it could have been in a meeting that I had with him
20  in person -- I don't know, it was so long ago.
21         I mean, I was -- I was flying into
22  Cupertino multiple times, having meetings with him
23  in person, phone calls with Isaac, phone calls with
24  Vic.  I mean, it was nonstop.  I mean, we -- I
25  mean, we were thinking that we were going to be

Page 95

1   doing a licensing deal with him.  So that's --
2   that's what happens.
3      Q.  Did Mr. Isaac ever tell you that he
4   thought you would meet Phil Schiller?
5      A.  Not that I recall.  But if I'm writing it
6   in here, then apparently he did.  I just don't
7   remember when or how that would have happened.  It
8   must have been around the same time frame, though.
9      Q.  Did Mr. Isaac ever talk to you about how
10  to get things going from the licensing side of
11  Apple?
12     A.  He did, yes.
13     Q.  Okay.  Tell me everything you remember
14  about those conversations.
15     A.  We met with Jim Tenneboe in a room, and I
16  had just built a new kernel extension.  He had
17  asked me to build a commuting application for him.
18  And Victor was -- Victor was there just for a split
19  second.
20         So Victor took me into this -- another
21  building, like an R & D kind of building, and --
22  like a conference room somewhere in that building.
23  And I waited in there for, like, about 15 minutes,
24  talking with Vic.
25         And then Ron showed up.  And then a guy

Page 96

1   named Jim Tenneboe showed up, who is a tuning
2   engineer at Apple.  And basically they wanted Jim
3   to determine whether or not this is something he
4   wanted to use to tune the Mac -- the future
5   products of Macintosh computers were on board.
6         So he came in and listened to it and was
7   blown away.  He's, like, "Wow, this is really good
8   stuff."
9         I was like, "Yeah, yeah, it's, you know,
10  been a lot of years of working on this."  And we
11  discussed some different changes that he might have
12  wanted to have to see in there.
13         And then Ron made a comment to me.
14  Because I had asked Ron, I was like, "Well, you
15  know, what -- what do we do?  How do we -- we're
16  going to do this, obviously we need to figure out
17  how we're going to license this to you; right?"
18         And he said, "Well, we're not going to pay
19  you a per unit royalty, you know that."  That's
20  exactly what he said, quote-unquote, to me.
21         So -- and I'm, like, "Well, I understand."
22  You know, to me, I mean, maybe I thought -- I don't
23  exactly know what that meant.  Could that have
24  meant that maybe they're looking to acquire us if
25  they're not going to pay you a per unit royalty?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 97

1 Because how else do you -- they either license your
2 technology or they buy it out.  Right?
3      If they're not going to pay a per unit
4 royalty, then that kind of almost implies something
5 else.  Or maybe they are going to pay a lump sum.
6 I don't know.
7      All I know is that that comment was made.
8 And I told him, I said, "That's okay."
9      And he said, "Well, when we get to that
10 stage, we'll figure it out."  That's exactly what
11 he told me in the conference room.
12      And I was like, "Okay."  Because
13 Jim Tenneboe liked it.
14   Q.  Okay.
15   A.  So I was being led down the pathway to
16 believe that a licensing deal was coming our way.
17   Q.  Other than what you just testified to and
18 explained, did Mr. Isaac otherwise ever tell you
19 how he thought something might be the best way to
20 get going from the licensing side here at Apple?
21   A.  If that's what I wrote there, then he must
22 have.  I just don't remember, honestly.  I don't
23 remember, you know?
24   Q.  Is there anything you could do to refresh
25 your recollection on that?

Page 98

1   A.  No.  It's too long ago.  I mean, what I do
2 remember were some very distinct things Ron told
3 me.
4      The most distinct thing was about the fact
5 that, you know -- when they -- when he said, "We
6 have many vendors that we work with," is exactly
7 what he said.  So automatically he was
8 characterizing us as being a vendor.
9      A vendor typically means that, you know,
10 we're going to be selling something to them; right?
11 By definition.
12      So, from my perspective, being a vendor of
13 the -- of the corpora--- of Apple, or a potential
14 vendor, obviously, you're going to move into a deal
15 and get paid something.
16      So we had some very light discussions
17 about that, and I just don't remember.
18      I also do remember him saying that we
19 needed -- he sent me an email on this, that we
20 needed to go under a new set of NDAs, a heftier set
21 of NDAs.  I can't remember exactly when that was --
22   Q.  And I don't want to cut you off, but I
23 will tell you that I think we're going to get
24 there.  So maybe if you want to wait till you have
25 the document that I think you might be referring to

Page 99

1 in front of you --
2   A.  Oh, okay.
3   Q.  -- that might chronologically help.
4   A.  Yeah.  I was just going through the -- you
5 had asked me what -- what I remembered, and that's
6 what I recall, you know?
7   Q.  Okay.
8   A.  Yeah.  So that's pretty much all about it.
9      MS. HUGHES:  Mr. Mahabub, could I just ask
10 something to clarify the record?
11      You said, "We had some very" -- and then
12 you use a word, either "like" or "light"
13 discussions?
14      THE WITNESS:  Where?
15      MS. HUGHES:  When you were just speaking just
16 now, talking about discussions with Mr. --
17      THE WITNESS:  Light.  Light.  In other words,
18 it wasn't like, you know, sitting at the table, you
19 know, negotiating per unit royalties or how much
20 money we were going to get paid.
21      It was more just a general licensing, you
22 know -- and the words he used to me were, "We're
23 not going to pay a per unit royalty."  That's
24 all I really remember about the thing.
25      And I'm, like, all right, fine.

Page 100

1      MS. HUGHES:  So l-i-g-h-t.
2      THE WITNESS:  L-i-g-h-t, yes.
3      THE REPORTER:  Again, you need to slow down a
4 little bit.
5      THE WITNESS:  Okay, sorry.
6 BY MS. VOORHEES:
7   Q.  Mr. Mahabub, I've just handed you what was
8 previously marked as Exhibit -- Deposition
9 Exhibit 72.
10      (Whereupon, Exhibit 72 was previously
11      marked for identification by the Court
12      Reporter.)
13 BY MS. VOORHEES:
14   Q.  It's Bates-labeled GA006254.  These are
15 GenAudio, Inc., board of directors telephonic
16 meeting minutes from September 25th, 2009.  If you
17 could just go ahead and take a look at them.
18      I'll tell you, I'm going to ask you about
19 paragraph 7, but go ahead and look at as much as
20 you need to.
21   A.  Okay, sure.
22   Q.  All right.  Mr. Mahabub, do you recognize
23 the document?
24   A.  I do.
25   Q.  And do you recall the meeting?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 125

1　know what to tell you.  It's team internal
2　confidential emails.
3　　　**MR. HOLMES:** So, Jerry, when she's reading, she
4　wants to make it read into the record.  So as
5　you're commenting on it or saying "uh-huh" or
6　"yeah," that's getting in the record too.  And so
7　just let her finish reading what it is --
8　　　**THE WITNESS:** Oh, okay.
9　　　**MR. HOLMES:** -- then she will ask a question if
10　she has one about it.
11　　　**THE WITNESS:** Yeah.
12　　　**MR. HOLMES:** So try not to do the active
13　listening that you're doing --
14　　　**THE WITNESS:** Okay.
15　　　**MR. HOLMES:** -- commenting on it as it goes.
16　　　**THE WITNESS:** Yeah.
17　　　I think we went through those.
18　　　**MR. HOLMES:** If you want to ask a question or
19　something, we can take a break.  But, otherwise, if
20　it can wait, we'll --
21　　　**THE WITNESS:** It can wait, yeah.  She's got to
22　get a flight.
23　　　This is Section 2 of 20?
24　　　(Whereupon, Exhibit 208 was marked for
25　　　identification by the Court Reporter.)

Page 126

1　　　**MS. VOORHEES:** Did I hand you a second one?
2　Sorry.  There you go.
3　　　(Whereupon, Exhibit 209 was marked for
4　　　identification by the Court Reporter.)
5　**BY MS. VOORHEES:**
6　　　**Q.  All right.  Mr. Mahabub, you've been**
7　**handed what has been marked as Exhibit 208.**
8　**Exhibit 208 is email correspondence.  The first**
9　**page is Bates-labeled SEC-TiscarenoV-E-000946.**
10　　　**A.  I see it, yes.**
11　　　**Q.  All right.**
12　　　**A.  It's 208; right?**
13　　　**Q.  That's right.**
14　　　**A.  Okay.**
15　　　**Q.  You've also been handed Exhibit 209.**
16　**Exhibit 209 is more email correspondence.  It has**
17　**been Bates-labeled SEC-MahabubJ-E-0023474.**
18　　　**Do you see that?**
19　　　**A.  I do, yes.**
20　　　**Q.  Okay.  Do you recognize Exhibit 208?**
21　　　**And if the answer is the same, you can**
22　**just say "same answer."**
23　　　**A.  Same answer.**
24　　　**Q.  Okay.  Do you recognize Exhibit 209?**
25　　　**A.  Same answer.**

Page 127

1　　　**Q.  Okay.  If you take a look at Exhibit 208,**
2　which is -- so correct that one -- and go to the
3　second page, there's an email that says (as read):
4　　　　On November 28th, 2009, at
5　　　　12:09 p.m., Jerry Mahabub wrote.
6　　　Do you see that?
7　　　And then it starts "Hi Vic and Michael."
8　It's a rather long, thesis-style email.
9　　　A.  I do see that, yes.
10　　　Q.  Okay.  Do you see that?  And will you just
11　read that -- that first paragraph to yourself and
12　let me know if that does anything to refresh your
13　recollection about this correspondence.
14　　　A.  Just the first paragraph here, that's it?
15　　　Q.  Right.  Just does that refresh your
16　recollection at all about this email correspondence
17　with Mr. Isaac -- Mr. Hailey, excuse me?
18　　　A.  Not about the email correspondence per se,
19　but about the bugs that we had with Snow Leopard,
20　yes.
21　　　Q.  Okay.  That is not something that we need
22　to get into.
23　　　A.  Okay.
24　　　Q.  Okay.  If you could go to the email that
25　Mr. Hailey writes in response.  So it's above it on

Page 128

1　the second page.  It says (as read):
2　　　　On 12/16/09, 1:54 p.m.,
3　　　　Michael Hailey wrote.
4　　　Do you see that?
5　　　A.  I do.
6　　　Q.  Okay.  And he writes (as read):
7　　　　Thanks for your dissertation and
8　　　　apologies for the delay in responding.
9　　　　As you know, we are interested in your
10　　　　technology because we are looking for
11　　　　solutions that will provide our
12　　　　customers with the best sounding
13　　　　products across all of our lines of
14　　　　business.  Needless to say, this is a
15　　　　big task and, unfortunately, in a big
16　　　　company takes lots of time and
17　　　　coordinated effort.  We're making
18　　　　progress on building our story, but
19　　　　this is not something we can execute
20　　　　overnight.  The business side of
21　　　　things would come into play after we
22　　　　have exec, e-x-e-c, buy-in on the
23　　　　product side.
24　　　　Do you see that?
25　　　A.  I do.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

**Page 181**

1  you know, Naval Warfare Center.  I worked with a
2  lot of people back then.  The United States Army in
3  Huntsville, Alabama.  Missile Research Development
4  Engineering Center.  You name it, they ended up in
5  licensing deals.
6      **MR. HOLMES:** Slow down a little bit.  The
7  reporter is having a hard time keeping up.
8      **THE WITNESS:** Okay.
9      Well, the point is, is, when you hit this
10 particular stage, which is embedded-level
11 integration, it usually means either a sales
12 contract, a licensing deal, a hardware --
13 something, you know?
14     And, you know, that's where we were,
15 'cause, obviously, a kernel extension, a vendor
16 kernel extension, which is what we were handed by
17 Ron Isaac, is -- is basically an embedded-level
18 integration.  That is a full-blown embedded
19 integration when you get handed a kernel extension
20 into a product.
21 **BY MS. VOORHEES:**
22     **Q.  Did you ever talk to Mr. Isaac about what
23 the term "vendor" meant in Apple parlance?**
24     A.  Did not, no.  I mean, I think "vendor" --
25 everyone knows the word "vendor" means, you

---

**Page 182**

1  know?  I mean, it's -- pretty common term to use in
2  business.
3      **Q.  Did you ever talk to anybody at Apple
4  about what the term meant?**
5      A.  No.  That -- that would kind of be like --
6  I don't know if that would be considered rude or,
7  like, condescending towards someone, you know.  A
8  vendor means vendor.  It's an English word in the
9  English dictionary.  I think everyone knows what it
10 means.
11     **Q.  In your previous employment, had you ever
12 been involved in tech-based licensing with Apple?**
13     A.  No.
14     **Q.  If you go down to the second-to-last
15 paragraph in the email we've been looking at, that
16 first email on Exhibit 211.**
17     A.  This page here?
18     **Q.  Yes.  It says (as read):**
19         Let's get some fuel for the ship.
20     A.  Yeah.
21     **Q.  (As read):**
22         Any help from all of you with this
23 financing effort would be great.
24     A.  Uh-huh.
25     **Q.  What did you mean by that?**

---

**Page 183**

1      A.  That means if you guys know anybody out
2  there that may have an interest or is an investor,
3  please introduce them to me or Jim Mattos, and we
4  will take it from there and make sure that they are
5  provided with the correct investment materials to
6  make a -- an informed investment decision.
7      But, of course, they were -- as I told
8  everyone, you're not -- if you're not Jim Mattos,
9  me, or Paul Powers, do not -- you know, just say,
10 "Hey, look, if you're interested, I can introduce
11 you to this guy or that guy."
12     And then, after the introduction is made,
13 from there we will hand them materials that they
14 can make a decision whether or not to invest.
15     That's -- that's pretty much the modus
16 operandi that -- that we did things on.  That way
17 we tried to avoid being here, sitting here with you
18 and -- apparently it didn't work.
19     We did our best.
20     Is that it for these two?
21     Q.  Yes.
22     A.  Okay.
23         (Whereupon, Exhibit 212 and
24         Exhibit 213 was marked for
25         identification by the Court Reporter.)

---

**Page 184**

1      MR. HOLMES: Oh.
2      THE WITNESS: All right.  Thanks.
3      MS. VOORHEES: Did I give you too many?
4      MR. HOLMES: Yeah.
5      MS. VOORHEES: Sorry.
6      MR. HOLMES: Give me too many things, like, I
7  get confused.
8  BY MS. VOORHEES:
9      Q.  All right.  Mr. Mahabub, you've been
10 handed two new exhibits.  The first is Exhibit 212.
11 It's an email chain Bates-labeled SEC-TiscarenoV-E-
12 0001047.
13         Do you recognize Exhibit 212?
14     A.  I do, yes.
15     Q.  Okay.
16     A.  Same answer, you know, as before.
17     Q.  Okay.  So you don't recall Exhibit 212,
18 but you have no reason to doubt that you sent and
19 received the emails as indicated?
20     A.  That's correct, yes.
21     Q.  Thank you.
22         And Exhibit 213 is email correspondence.
23 It is Bates-labeled SEC-MahabubJ-E-0019545.
24         Do you recognize Exhibit 213?
25     A.  Same answer.

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 185

1    Q.   Okay.  You don't recall the exhibit, but
2    you have no reason to doubt that you sent and
3    received the emails as indicated --
4    A.   Correct.
5    Q.   -- correct?
6         Thank you.  All right.
7    A.   I'm in shock about how much damn email
8    exchanges we had with these people.  It's amazing.
9    Q.   If you could turn to --
10   A.   Lot of work.
11        Turn to where?
12   Q.   I'm going to direct you to the bottom
13   email on the first page of Exhibit 212.
14   A.   Okay.
15   Q.   So this is the email that says (as read):
16        Hi, Jerry.  Okay, I will confirm
17        that I sent them to you today.
18   A.   Yes.
19   Q.   You with me?  Okay.
20        And now, if you could go to the top email
21   on the second page of Exhibit 213.
22   A.   Okay.
23   Q.   Second page.
24   A.   All right.  Yeah.
25   Q.   Sorry.

Page 186

1    A.   Okay.
2    Q.   And you see that there's an email that
3    says (as read):
4         Okay, I will confirm that I sent
5         them to you today.
6    A.   Yeah.
7    Q.   Do you see that?
8    A.   I do.
9    Q.   Okay.  I'm now going to read only from
10   Exhibit 213, where there has been inserted (as
11   read):
12        Phil let us know earlier that this
13        might be postponed until early next
14        week.  Apparently Steve is planning on
15        going out of town with his family for
16        the weekend.
17        Do you see that?
18   A.   I do, yeah.
19   Q.   Okay.  Now, if you look at both 212 and
20   213, they include the next phrase I'm going to
21   read, which was (as read):
22        I was hoping to get an update on
23        the song list, but I've not received a
24        response yet.
25        Exhibit 213 then goes on (as read):

Page 187

1         And this is not mission critical
2         for the demo.  The postponing of the
3         meeting could be in our favor.
4         Did you add that text which has also been
5    highlighted in Exhibit 213 to this email?
6    A.   I don't recall.  But, again, same answer.
7         But what I'm curious to know about is what
8    the date of this is.
9         So these are both from the -- from the
10   10th of -- of April; right?
11   Q.   I think it's the 7th.  I think it's
12   4/7/10.
13   A.   Oh, 4/7 -- April 7th.  Hmm.  I'm just --
14   I'm trying to remember back around that time frame
15   to what was going on.
16        And, yeah.  I mean, you know, I'm trying
17   to figure out, were those my notes that I was
18   sending to the team members, or -- I just don't
19   know.  I can't remember, it was so long ago.
20   Q.   Okay.  Well, if you take a look at the
21   first page of Exhibit 213.
22   A.   Yeah.
23   Q.   So that's the one that has highlighting on
24   it.  If you go to the first page --
25        MR. HOLMES:  Flip that back.

Page 188

1         THE WITNESS:  Oh, okay.  All right.
2    BY MS. VOORHEES:
3    Q.   You see at the very top, it says "To:
4    Paul Powers and Gary Smith"?
5    A.   Yes.
6    Q.   And I don't know if that helps refresh
7    your recollection as to what was being done --
8    A.   And Walter.
9    Q.   Oh, you're right, and Walt.
10        Does that help at all?
11   A.   No.
12   Q.   Okay.
13   A.   Not really.
14   Q.   Okay.  Fine.
15        So let's go back to my original question,
16   which is, did you add the highlighted text in the
17   email that I just read?
18   A.   If anyone would have done it, it would
19   have been me, yes.  But, like I said, I don't -- I
20   don't remember what my reasoning for doing it was,
21   but I'm sure I had good reasoning at the time.
22   Q.   All right.  Did -- did Mr. Tiscareno ever
23   tell you that you would be meeting Steve Jobs?
24   A.   I do recall a few different times where he
25   would refer to "the big man meeting," whatever that

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 197

1    form.
2        I mean, I'm not selling securities in that
3    email.
4        (Whereupon, Exhibit 214 was marked for
5        identification by the Court Reporter.)
6    BY MS. VOORHEES:
7        Q.  All right.  Mr. Mahabub, you've been
8    handed what's been marked as Exhibit 214.  This is
9    a document -- it's email correspondence, Bates-
10   labeled JM002048 on the first page.
11       A.  Okay.
12       Q.  Go ahead and flip through it.  I'll tell
13   you that I'm going to ask you about a couple of
14   these emails, including the one that's on the
15   second-to-last page that you send on April 30th.
16       A.  Okay.
17       Q.  So go ahead and let me know when you have
18   had a chance to look it over.
19       A.  All right.
20       Okay.
21       Q.  Do you recognize Exhibit 214?
22       A.  Same answer.
23       Q.  All right.  So you don't recall this email
24   correspondence, but you don't have any reason to
25   doubt that you sent and received it as indicated in

Page 198

1    the exhibit?
2        A.  Correct.
3        Q.  All right.  Going to the first email in
4    time -- so that's the one that's on the second-to-
5    last page.
6        A.  Okay.
7        Q.  It says "From:  Jerry Mahabub; To:
8    Jerry Mahabub; Re:  FSX presenting company."
9        Do you see that?
10       MR. HOLMES:  Second-to-last page.
11       THE WITNESS:  Hold on a second.
12       Yes.
13   BY MS. VOORHEES:
14       Q.  You with me?
15       A.  I'm with you.
16       Q.  Okay.  What is "FSX"?
17       A.  That was Judy Ensweiler.
18       She was the coordinator of a -- it's kind
19   of like an investment banking conference, like
20   NIBA, National Association of Investment Banking --
21   is that right?  National Investment Banking
22   Association, yeah.
23       So it's a place where investment bankers
24   who are all, you know, certified IBs or
25   broker/dealers all come together with their little

Page 199

1    dog and pony shows and get up on stage and march
2    around and try and raise money.
3        Q.  Okay.  And can you spell -- I'm sorry, who
4    was the woman?
5        A.  Judy -- I can't remember how to spell her
6    last name.  Yeah.
7        Q.  Okay.  That's fine.
8        A.  Ensweiler, something like that.  She was a
9    conference coordinator of FSX, yes.
10       Q.  All right.  And you write (as read):
11           Don't forget to stop by the booth
12           and listen to the demos.  I have not
13           been able to make it to the conference
14           just yet as I have been on the phone
15           all morning with the large consumer
16           electronics company, the LCEC --
17       A.  Yep.
18       Q.  (As read):
19           -- looking to acquire GenAudio's tech
20           for integration into their entire
21           lineup of product offerings.
22           And then it goes on.
23           Who were you sending this email to?
24       A.  Marty -- is it Marty?  Is that his name?
25   I think.  I don't know.  I'm -- I'm looking through

Page 200

1    the email chain.  It looks like a guy by the name
2    of Marty.
3        I think Marty is a broker/dealer.  And I
4    was probably asked to send him an email at that
5    time, because I probably would have met -- if I was
6    at FSX and I was there at the time with an
7    offering, it would have been Spencer Edwards.  Or
8    if it wasn't Spencer Edwards, it might have been
9    Westminster.
10       It was one of the broker/dealers that
11   would have introduced me out there.
12       Q.  Okay.  And just so the record is clear,
13   the email chain goes on to include correspondence
14   with a Martin Cohen, M-a-r-t-i-n, C-o-h-e-n.
15       A.  Yeah.  That's who I'm referring to right
16   here (indicating).
17       Q.  I -- I understand.
18       But if you look at the email I'm focused
19   on, it just says from you to you.
20       Do you see that?
21       A.  Yes, I do.
22       Q.  And I'm wondering if you know who else you
23   sent it to, because we don't appear to have a cc or
24   a bcc line.
25       A.  I do not know.  It's a good question.  It

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 209

1   A.  Well, he emailed to me, and it looks like
2   Paul Powers, Jim Devine, and Jim Mattos are also on
3   an email exchange below that.
4   Q.  Right.
5   A.  And execute email back.
6       Why is he using my Astound -- oh.  He's
7   probably emailing to my phone; that's why.  It's my
8   Verizon phone at the time.
9       I don't even have that email.  I haven't
10  had that for years.
11     MR. HOLMES:  Jerry, you're talking a lot out
12  loud.  She asked if you know whether -- if you knew
13  that he bought stock after this.
14     THE WITNESS:  Yeah.  Well, apparently, I must
15  have, because he wrote to me here.  Right?  But do
16  I remember that?  No.
17     I believe Marty is a certified
18  broker/dealer as well.  He's -- right?  I think --
19  I think so.  I think -- yeah, Marty is -- he's a
20  certified -- he's a broker/dealer or representative
21  of a broker/dealer firm or an investment banker of
22  some kind.  A very, very sophisticated investor.
23     (Whereupon, Exhibit 215 was marked for
24       identification by the Court Reporter.)
25     MS. VOORHEES:  We're at 215.  All right.  Thank

Page 210

1   you.
2       Q.  All right.  Mr. Mahabub, you have been
3   handed what's marked Bates-labeled SEC-TiscarenoV-
4   E-0001119.
5       A.  Okay.
6       Q.  If you could just take a minute to look
7   over Exhibit 215 and then let me know if you
8   recognize the exhibit.
9       MR. HOLMES:  Danielle, when you have a -- when
10  you're at a breaking point, I could use one.
11     MS. VOORHEES:  Okay, great.
12     THE WITNESS:  Yeah, I see it.
13  BY MS. VOORHEES:
14     Q.  Do you recognize it?
15     A.  I -- same answer, I guess, again.  Because
16  I don't recall, you know -- it came to my email;
17  so, yeah, there must be something --
18     Q.  Okay.  Just, again, to make sure that
19  we're all clear, same answer would be that you
20  don't recall the specific email correspondence, but
21  you don't have any reason to doubt that you sent
22  and received the emails as indicated --
23     A.  That's correct.
24     Q.  -- in the exhibit?
25     A.  Yes.

Page 211

1      MS. VOORHEES:  Okay.  Let's go off the -- let's
2   go off the record and take a short break.
3      MR. HOLMES:  Thank you.
4      THE VIDEOGRAPHER:  We're off the record.  The
5   time is 2:43.
6       (A recess was taken from 2:43 p.m. to
7       2:55 p.m.)
8      THE VIDEOGRAPHER:  We're back on the record.
9   The time is 2:55.  Please proceed.
10     MS. VOORHEES:  Thank you.
11     Q.  Mr. Mahabub, you understand you're still
12  under oath?
13     A.  Yes.
14     Q.  All right.  Mr. Mahabub, at the break it
15  was being explained to us that you went to bed at
16  6 Apple
17     A.  That's correct.
18     Q.  All right.
19        Can you testify truthfully and accurately
20  today?
21     A.  I probably got a little more steam left in
22  me, yes.  I will let you know if I -- if I'm, like,
23  hitting a brick wall, like, really hard.
24     Q.  Okay.
25     A.  Right now I -- I'm still good, though.

Page 212

1      Q.  Okay.  Right now you can still testify
2   truthfully and accurately?
3      A.  Yes.
4      Q.  And you have been testifying truthfully
5   and accurately?
6      A.  Yes.
7      Q.  You've been understanding me?
8      A.  Yes.
9      Q.  You'll let me know if that changes?
10     A.  Yes, absolutely.
11     Q.  All right.  You --
12     A.  You will know if you see me start nodding
13  off.
14     Q.  All right.
15     MR. HOLMES:  Well, she will depend on you to
16  let her know if -- if you're -- if you need a
17  break --
18     THE WITNESS:  Oh, okay.
19     MR. HOLMES:  -- or anything like that.
20  BY MS. VOORHEES:
21     Q.  Your counsel is exactly right.  I'm not
22  going to make that call for you; so you need to let
23  me know if we hit a point where you can't testify
24  truthfully and accurately.
25        Okay?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 217

1  big company; he was trying to move this into
2  multiple, multiple divisions.
3      You know.  We even were thinking about
4  doing this stuff with QuickTime and with iChat and
5  stuff like that.
6      So -- my guesstimate is he's referring to
7  a particular division here.  I don't think -- I
8  don't remember who he was referring to or why he
9  was referring to it or who this meeting with Apple
10  is down here, but it must have been one of the
11  divisions that he was talking to, and he wanted to
12  get to first base in that particular division.
13  Q.  Do you recall a time when Mr. Tiscareno
14  said that he and Mr. Hailey would be meeting with a
15  Greg Jos- -- Joswiak?  Joswiak?  Am I saying it
16  wrong?
17  A.  No.  I don't -- I don't know that name.
18  Q.  Ms. Hughes is helping me out.
19      Joswiak?
20  MS. HUGHES: "JAWS-we-ack."
21  THE WITNESS: Joswiak.
22  BY MS. VOORHEES:
23  Q.  Does that name ring a bell?
24  A.  No, not that I can remember.  No, I don't
25  recall that name.  Greg Joswiak.

---

Page 218

1      I don't think you meant Steve Wozniak by
2  that name.  But Joswiak is -- yeah.
3  MR. HOLMES: Are we done with 215?
4  MS. VOORHEES: Yes.
5      (Whereupon, Exhibit 216 was marked for
6      identification by the Court Reporter.)
7  BY MS. VOORHEES:
8  Q.  All right.
9  A.  Are you sure you don't mean Wozniak on
10  that last name?
11  Q.  Do you recall a Wozniak?
12  A.  Well, there's -- there's, you know --
13  there's Wozniak, who is "Woz."  That was
14  Steve Jobs's partner in crime there.
15  Q.  Yes.  Let me ask you a more specific
16  question.
17      Did you ever meet with Steve Wozniak?
18  A.  I haven't met him, no, but we are friends
19  on Facebook through a friend of mine.
20  Q.  And when did your Facebook relationship
21  begin?
22  A.  Years ago.  Many years.  Guy by the name
23  of Tolga Katas, K-a-t-a-s, who owned En2Go.
24  THE REPORTER: Who owned?
25  THE WITNESS: En2Go, E-n-t-g-o -- E-n- --

---

Page 219

1  E-n-2-G-o.  So -- yep.
2      So, I mean, I could meet him anytime I
3  want; I could go and meet him.  I'd just have to
4  set it up through Tolga, but I just haven't had a
5  chance to go meet him yet.
6  BY MS. VOORHEES:
7  Q.  So you haven't met Steve Wozniak yet?
8  A.  No.
9  Q.  All right.  If --
10  A.  I could have, but I just haven't really
11  taken the time to do it.
12  Q.  If you could take a look at what has been
13  handed to you, Exhibit 216.
14  A.  Okay.
15  Q.  This is a document with the first page
16  bearing the Bates No. JM002045.
17      Do you recognize Exhibit 216?
18  A.  Same answer.
19  Q.  Okay.  Which means you do not recall the
20  specific email correspondence, but you do not have
21  any reason to doubt that you sent an email -- sent
22  and received the emails as indicated; correct?
23  A.  Yes.
24  Q.  All right.  I'm going to direct you to --
25  A.  Elliot.

---

Page 220

1  Q.  All right.  The last paragraph on the
2  exhibit, it's the one that starts with "Hope you
3  are all doing well."
4  A.  Okay.
5  Q.  You see that?  It says (as read):
6      Hope you are all doing well, and
7      once I hear back from Apple, I will
8      shoot out an email and let everyone
9      know what happened.  Vic is fully
10      prepared on the tech side, and Phil is
11      fully prepared on the marketing side.
12      As Vic stated, "Failure is not an
13      option."
14  A.  Yeah.  Vic did say that to me quite a few
15  times.
16  Q.  Do you recall what you're referring to in
17  that paragraph?
18  A.  I don't.
19  Q.  Okay.  If you go up to the paragraph above
20  it, why -- go ahead and just read that paragraph to
21  yourself.
22  MR. HOLMES: The one that starts on the
23  previous page?
24  MS. VOORHEES: Yeah, the one that starts with
25  "At least being this nervous."

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub -  Vol. 1
January 19, 2017

---

Page 253

1    deposition of Jerry Mahabub.  The time is 3:51.
2        Please proceed.
3        MS. VOORHEES: All right.
4        Q.  Mr. Mahabub, before -- I think after we
5    actually went off the record last time, you said
6    you thought you maybe had 30 minutes left to give
7    us in the deposition?
8        A.  Around there.
9        Q.  Okay.  So given that, and given that the
10   parties have agreed that we can reconvene this
11   deposition on February 8th, 2017, in Denver, we're
12   going to go ahead and conclude the deposition for
13   today.
14       A.  Okay.  That --
15       Q.  We will issue an amended notice that will
16   have you appear at our office in Denver on
17   February 8th, 2017.
18       A.  Okay.
19       Q.  Okay?
20       A.  That's great, yeah.
21       MS. VOORHEES: All right.  Thank you.
22       Counsel, anything else?
23       MR. MCCLOSKEY: So stipulated.  We'll see you
24   on the 8th.
25       MR. HOLMES: Yeah.

---

Page 255

1        Do you want -- are you getting a certified
2    copy?
3        MR. MCCLOSKEY: You guys get the original.
4        MS. VOORHEES: We noticed it.  We will get the
5    original.
6        MR. MCCLOSKEY: Yes, I want a certified copy.
7        THE REPORTER: Does anyone need a rough draft?
8        MS. VOORHEES: Whatever our order is.  We'll
9    have to get back to you on that.
10       (At 3:54 p.m., the deposition
11       proceedings adjourned to February 8,
12       2017.)
13
14
15
16       _____
17       TAJ JERRY MAHABUB
18
19
20
21
22
23
24
25

---

Page 254

1        MS. VOORHEES: Okay.  Sounds good.  Thank you.
2        THE WITNESS: Oh, wait.  And we just pick up
3    where we left off or --
4        MR. HOLMES: Yeah.  Yeah.
5        MS. HUGHES: We also wanted to stipulate that
6    the court reporter did not need to put on her
7    address, business address and those things at the
8    beginning and end of the deposition.
9        THE REPORTER: For the federal rule read on?
10       MS. HUGHES: Yes.
11       MR. HOLMES: So stipulated.
12       MR. MCCLOSKEY: So stipulated.
13       MS. VOORHEES: Agreed.
14       THE VIDEOGRAPHER: This concludes today's
15   deposition of Jerry Mahabub.  The number of DVDs
16   used was three.  The original media will be
17   retained at Behmke Reporting & Video Services,
18   Incorporated, located at 160 Spear Street,
19   Suite 300, San Francisco, California.
20       We're going off the record.  The time is
21   3:52.
22       (Off video record.)
23       THE REPORTER: Do you guys need certified
24   copies?
25       MR. HOLMES: No, I don't.

---

Page 256

1    STATE OF CALIFORNIA     )
2                           ) ss
3    COUNTY OF RIVERSIDE     )
4        I hereby certify that the witness in the
5    foregoing deposition, TAJ JERRY MAHABUB,, was by me
6    duly sworn to testify to the truth, the whole truth and
7    nothing but the truth, in the within-entitled cause;
8    that said deposition was taken at the time and place
9    herein named; and that the deposition is a true record
10   of the witness's testimony as reported by me, a duly
11   certified shorthand reporter and a disinterested
12   person, and was thereafter transcribed into typewriting
13   by computer.
14       I further certify that I am not interested in
15   the outcome of the said action, nor connected with nor
16   related to any of the parties in said action, nor to
17   their respective counsel.
18       IN WITNESS WHEREOF, I have hereunto set my
19   hand this 27th day of January, 2017.
20   Reading and Signing was:
21   _X_ requested  ___ waived  ___ not requested
22
23       _____
24
25       PAULA A. PYBURN, CSR NO. 7304, RPR, CLR

---

# In The Matter Of:

*Securities and Exchange Commission v.*
*Taj Jerry Mahabub, et al.*

---

*Taj Jerry Mahabub*

*Vol. 2*

*February 8, 2017*

---

*Behmke Reporting and Video Services, Inc.*

*160 Spear Street, Suite 300*

*San Francisco, California  94105*

*(415) 597-5600*

Original File 31006MahabubV2.txt

**Min-U-Script® with Word Index**

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 257

```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF COLORADO
 3
 4      - - - - - - - - - - - - - -
 5    SECURITIES AND EXCHANGE     )
 6    COMMISSION,                 )
 7            Plaintiff,          )
 8                                )  CASE NO.
 9    v.                          )  1:15-cv-02118-CBS-WJM
10                                )
11    TAJ JERRY MAHABUB, GENAUDIO, )
12    INC., and ASTOUND HOLDINGS, )
13    INC.,                       )
14            Defendants.         )
15      - - - - - - - - - - - - - -
16
17        VIDEOTAPED DEPOSITION OF TAJ JERRY MAHABUB
18           WEDNESDAY, FEBRUARY 8, 2017
19           PAGES 257 - 541; VOLUME 2
20
21        BEHMKE REPORTING AND VIDEO SERVICES, INC.
22          BY:  BARBARA J. CASTILLO, RMR, CRR
23              160 SPEAR STREET, SUITE 300
24           SAN FRANCISCO, CALIFORNIA 94105
25                   (415) 597-5600
```

Page 258

```
 1
 2
 3
 4
 5
 6
 7
 8        Videotaped deposition of TAJ JERRY MAHABUB,
 9    VOLUME 2, taken by Plaintiff, at 1691 Stout Street
10    Street, Suite 1700, Denver, Colorado, commencing
11    at 9:23 A.M., on WEDNESDAY, FEBRUARY 8, 2017,
12    before Barbara J. Castillo, Registered Merit Reporter,
13    Certified Realtime Reporter and Notary Public within
14    and for the State of Colorado, pursuant to Notice.
15
16
17
18
19
20
21
22
23
24
25
```

Page 259

```
 1    APPEARANCES OF COUNSEL:
 2    FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION:
 3        SECURITIES AND EXCHANGE COMMISSION
 4        BY:  DANIELLE R. VOORHEES, TRIAL COUNSEL
 5            LESLIE HENDRICKSON HUGHES, TRIAL COUNSEL
 6        1961 Stout Street, Suite 1700
 7        Denver, Colorado 80294
 8        Telephone: (303) 844-1000
 9        Email:  voorheesd@sec.gov
10                hugheslj@sec.gov
11
12    FOR DEFENDANT TAJ JERRY MAHABUB:
13        HOLMES, TAYLOR & JONES LLP
14        BY:  ANDREW B. HOLMES, ATTORNEY AT LAW
15        617 South Olive Street, Suite 1200
16        Los Angeles, California 90014
17        Telephone:  (213) 985-2200
18        Email:  abholmes@htjlaw.com
19
20
21
22
23
24
25
```

Page 260

```
 1    APPEARANCES OF COUNSEL - (CONTINUED):
 2    FOR DEFENDANT GENAUDIO, INC.:
 3        WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
 4        BY:  MICHAEL P. MCCLOSKEY, ATTORNEY AT LAW
 5        655 West Broadway, Suite 900
 6        San Diego, California 92101
 7        Telephone: (619) 881-3326
 8        Email:  michael.mccloskey@wilsonelser.com
 9
10    ALSO PRESENT:
11        WALT MATHERN, VIDEOGRAPHER
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

Page 261

```
 1                    INDEX
 2   WEDNESDAY FEBRUARY 8, 2017
 3   TAJ JERRY MAHABUB - VOLUME 2          PAGE
 4       Examination By MS. VOORHEES        270
 5   P.M. SESSION                           386
 6       Examination resumed by MS. VOORHEES 386
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 263

```
 1              EXHIBITS - (CONTINUED)
 2           TAJ JERRY MAHABUB - VOLUME 2
 3   Number        Description              Page
 4   Exhibit 266   Email string, top message
 5                 from Jerry Mahabub to Paul
 6                 Powers and Mark Bobak,
 7                 9/7/10; Bates No.
 8                 SEC-MahabubJ-E-0005677
 9                 through 0005680 - 4 pages    376
10
11   Exhibit 267   GenAudio Shareholder
12                 Progress Report, February
13                 26, 2011; Bates Nos.
14                 GA005317 through 005339
15                 - 23 pages                   393
16
17   Exhibit 268   Email string, top message
18                 from Jerry Mahabub to Jay
19                 Rifkin and Phil Rodriguez,
20                 9/30/11; Bates No.
21                 SEC-MahabubJ-E-0020185
22                 through 0021086 - 2 pages    413
23
24
25
```

---

Page 262

```
 1                 EXHIBITS
 2           TAJ JERRY MAHABUB - VOLUME 2
 3   Number        Description              Page
 4   Exhibit 262   Email string, top message
 5                 from Jerry Mahabub to
 6                 littlebadass19@yahoo.com,
 7                 5/29/10; Bates Nos.
 8                 SEC-MahabubJ-E-0023379
 9                 through 0023389 - 11 pages   288
10
11   Exhibit 263   Audio Transcription, Pages 1
12                 through 56 - 56 pages        296
13
14   Exhibit 264   Letter from Jerry Mahabub to
15                 Shareholder, 8/28/10; Bates
16                 Nos.  SEC0000006 through
17                 0000009 - 4 pages            339
18
19   Exhibit 265   Email from Jerry Mahabub to
20                 Victor Tiscareno, 9/6/10;
21                 Bates No.
22                 SEC-TiscarenoV-E-0001264
23                 - 1 page                     376
24
25
```

---

Page 264

```
 1              EXHIBITS - (CONTINUED)
 2           TAJ JERRY MAHABUB - VOLUME 2
 3   Number        Description              Page
 4   Exhibit 269   Transcript of audio file
 5                 - 32 pages                   435
 6
 7   Exhibit 270   Printout of slides; Bates
 8                 Nos. SEC-Skluzak-E-0000392
 9                 through 0000425 - 34 pages   446
10
11   Exhibit 271   Affidavit of Jerry Mahabub
12                 in Support of Plaintiff's
13                 Response - 12 pages          458
14
15   Exhibit 272   Defendant Astound Holdings,
16                 Inc.'s Response to Plaintiff
17                 Securities and Exchange
18                 Commission's Second Request
19                 for Production of Documents
20                 and First Interrogatories
21                 Dated November 10, 2016
22                 - 7 pages                    494
23
24
25
```

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 265

```
 1              PREVIOUSLY MARKED EXHIBITS
 2           TAJ JERRY MAHABUB - VOLUME 2
 3    Number          Description              Page
 4    Exhibit 31      Email string, top message
 5                    from Gary Smith to
 6                    psavio@genaudioinc.com;
 7                    5/25/10; Bates No. JM002158
 8                    through 002167 - 10 pages      273
 9
10    Exhibit 32      Email string, top message
11                    from Jerry Mahabub to Victor
12                    Tiscareno, 5/25/10; Bates
13                    Nos.
14                    SEC-TiscarenoV-E-0001158
15                    though 0001162 - 5 pages       273
16
17    Exhibit 34      Email string, top message
18                    from Jim Mattos to Jerry
19                    Mahabub, 10/27/14; Bates
20                    Nos. JM002515 through 002518
21                    - 4 pages                      315
22
23
24
25
```

Page 266

```
 1        PREVIOUSLY MARKED EXHIBITS - (CONTINUED)
 2           TAJ JERRY MAHABUB - VOLUME 2
 3    Number          Description              Page
 4    Exhibit 35      Email string, top message
 5                    from Jerry Mahabub to Victor
 6                    Tiscareno, 7/2/10; Bates
 7                    Numbers
 8                    SEC-TiscarenoV-E-0001218
 9                    through 0001221 - 4 pages      315
10
11    Exhibit 37      Letter from Jerry Mahabub to
12                    GenAudio Shareholders,
13                    8/1/10; Bates No. GA005351
14                    through 005353 - 3 pages       330
15
16    Exhibit 40      Email string, top message
17                    from Dell Skluzak to
18                    Jennifer Ostrom, 11/20/14;
19                    Bates Nos.
20                    SEC-Scluzak-E-0000905
21                    through 0000911 - 7 pages      404
22
23
24
25
```

Page 267

```
 1        PREVIOUSLY MARKED EXHIBITS - (CONTINUED)
 2           TAJ JERRY MAHABUB - VOLUME 2
 3    Number          Description              Page
 4    Exhibit 74      Compilation exhibit of a
 5                    stock certificate and other
 6                    documents; Bates Nos.
 7                    Mahabub001659 through 001671
 8                    - 13 pages                     468
 9
10    Exhibit 138     Email string, top message
11                    from Jerry Mahabub to Victor
12                    Tiscareno, 9/1/10 - 9 pages    350
13
14    Exhibit 139     Email string, top message
15                    from Jerry Mahabub - 4 pages   361
16
17    Exhibit 170     Email string, top message
18                    from Richard DeVaul to Jerry
19                    Mahabub, 4/6/11; Bates Nos.
20                    347APL-00000066 through
21                    00000069 - 4 pages             397
22
23
24
25
```

Page 268

```
 1        PREVIOUSLY MARKED EXHIBITS - (CONTINUED)
 2           TAJ JERRY MAHABUB - VOLUME 2
 3    Number          Description              Page
 4    Exhibit 198     GenAudio Inc. Common Stock
 5                    Transfer Ledger; Bates Nos.
 6                    GA001816 through 001852 - 37
 7                    - 37 pages                     462
 8
 9    Exhibit 242     Email string, top message
10                    from Jerry Mahabub, 7/3/09;
11                    Bates Nos.
12                    SEC-MahabubJ-E_0023817
13                    through 0023827 - 11 pages     436
14
15    Exhibit 257     Email string, top message
16                    from Jerry Mahabub to Dell
17                    Skluzak, 7/6/12; Bates No.
18                    SEC-ELLIOTT-E-0002702
19                    - 1 page                       502
20
21    Exhibit 258     Email from Jerry Mahabub to
22                    Dell Skluzak, 1/5/13; Bates
23                    No. SEC-ELLIOTT-E-0002703
24                    - 1 page                       513
25
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

Page 269

1     WEDNESDAY, FEBRUARY 8, 2017; 9:23 A.M.
2
3          THE VIDEOGRAPHER: Good morning.  Here
4     begins DVD Number 1 of Volume 1 in the deposition of
5     Taj Jerry Mahabub in the matter of the United States
6     Securities and Exchange Commission v. Taj Jerry
7     Mahabub, et al., in the United States District Court
8     for the District of Colorado, Case Number
9     1:15-CV-02118.  Today's date is Wednesday,
10    February 8, 2017.  The time on the video monitor now
11    is 9:23 a.m.  The video -- video operator is Walt
12    Mathern, contracted by Behmke Reporting & Video
13    Services, Inc., 160 Spear Street, Suite 300, San
14    Francisco, California.  This video is taking place at
15    1961 Stout Street, Denver, Colorado and was noticed
16    by Danielle Voorhees.
17          Counsel, please voice identify yourself
18    and state whom you represent.
19          MS. VOORHEES: Danielle Voorhees and
20    Leslie Hughes on behalf of the Securities and
21    Exchange Commission.
22          MR. MCCLOSKEY: Michael McCloskey on
23    behalf of GenAudio, Incorporated.
24          MR. HOLMES: Andrew Holmes on behalf of
25    Jerry Mahabub.

---

Page 270

1          THE VIDEOGRAPHER: The court reporter is
2     Barbara Castillo contracted by Behmke Reporting &
3     Video Services.  Will the reporter please swear in
4     the witness.
5               TAJ JERRY MAHABUB,
6     being first duly sworn in the above cause, was
7     examined and testified as follows:  Good
8               EXAMINATION
9     BY MS. VOORHEES:
10    Q    Good morning, Mr. Mahabub.  Thanks for
11    coming in again today.  Just to repeat a couple of
12    ground rules for the deposition, let's try not to
13    talk over each other.  The court reporter is trying
14    to take everything down.  If you don't understand the
15    question I'm asking, go ahead and stop me and ask me
16    to clarify.  Otherwise I'm going to assume that you
17    understood.  Is that fair?
18    A    Yes.
19    Q    Okay.  Verbal answers are important so
20    that the court reporter can actually note your
21    answer.  Let me know if you need to take a break.  As
22    long as there's not a question pending we can take
23    breaks as you need.  Is there any reason you cannot
24    testify fully and accurately today?
25    A    No.

---

Page 271

1     Q    Did you get enough sleep last night?
2     A    Some.
3     Q    All right.
4     A    Not much, but some.
5     Q    All right.  Did you do anything to prepare
6     for your deposition today?
7     A    Jumping jacks.  Not much, no.
8     Q    Okay.  Did you read any documents?
9     A    I did breeze through for the first time,
10    just kind of skimmed through the transcript from --
11    Q    Okay.
12    A    -- the initial.  Right.
13    Q    Okay.  So do you mean that you looked at
14    the investigative transcripts from the investigation?
15    A    I -- it was the transcript from when I was
16    deposed during that time, yes.
17    Q    Okay.  So the transcript of your testimony
18    from a couple years ago during the SEC investigation?
19    A    Correct.
20    Q    Okay.  Did you --
21          MS. VOORHEES: Sorry.
22          MR. HOLMES: Can we just take a 20 second
23    break?
24          MS. VOORHEES: Sure.
25          MR. HOLMES: Let's go off the record.

---

Page 272

1          THE VIDEOGRAPHER: The time now is 9:25.
2     We're off the record.
3          (Recess from 9:25 to 9:26 a.m.)
4          THE VIDEOGRAPHER: The time now is 9:26.
5     We're back on the record.
6     Q    (BY MS. VOORHEES) Mr. Mahabub, you -- in
7     addition to reviewing your investigative testimony
8     transcript, did you do anything to prepare for
9     today's deposition?  Did you look at anything else?
10    A    No, only that.  Hopefully I don't give as
11    long of answers as I did for that one because that
12    was big.
13    Q    Okay.  Did you review your deposition from
14    just a couple of weeks ago when we were out in Los
15    Angeles?
16    A    No.
17    Q    Did you review anybody else's testimony --
18    A    No.
19    Q    -- transcripts?  Did you look at any
20    documents?
21    A    No, nothing, just -- just that transcript.
22    Q    Just the transcript?
23    A    Yeah.
24    Q    Okay.  All right.  Mr. Mahabub, I'm going
25    to hand you what has previously been marked as

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

Page 293

1　Q　Okay.  So the very last sentence reads,
2　That is a really good sign, especially since Steve
3　Jobs green lighted us to move forward.  What's the
4　basis for that statement?
5　A　I'm not sure.  Vic probably must have
6　given me a call or something like that and stated
7　that the top executive, the big man or whatever the
8　hell he was referring to gave the green light to go
9　forward with something.  So what it was I have no
10　idea.  But I must have gotten some word in from Vic
11　that we got a green light.
12　　　A couple of times he'd call me up on the
13　phone and tell me, congratulations, you know, we got
14　the green light to move forward with this, that or
15　the other.  I was like okay, cool.
16　Q　Okay.  But it sounds like sitting here
17　today you don't recall exactly what Mr. Tiscareno
18　said to you that was the basis for this statement?
19　A　No.  No.  I can't remember exactly at that
20　time what was stated.  You know, it's impossible.
21　You're talking about a long time ago.  But writing
22　that, yeah, I would have probably have interpreted
23　whatever he was saying to mean that the -- the big
24　exec or the top dog or -- or whoever it was he was
25　referring to.  Like I said, again, my interpretation,

Page 294

1　that was Steve Jobs.  For the rest of the team I
2　translate that to say Steve Jobs.  So that was that.
3　Q　Why did you do that?  Why didn't you just
4　pass on to the team exactly what Mr. Tiscareno said
5　to you?
6　A　Well, I think that it's pretty reasonable
7　to assume that the big man at Apple is Steve Jobs.  I
8　think if you asked anyone at that time who's the big
9　man at Apple -- I mean, I think if I asked you that
10　you'd probably say Steve Jobs.  So it's probably a --
11　a rather reasonable thing to assume.  So that's I
12　didn't just put it in there.
13　Q　But it sounds as if Mr. Tiscareno used
14　with you phrases than other just "the big man,"
15　many --
16　A　Yeah.  The only time he would use phrases
17　other than the big man would be by name.
18　Q　Okay.
19　A　Right.
20　Q　So he did not use the top exec.  He didn't
21　use executives.
22　A　Every once in a while he did, yeah.  But
23　that was like a generic meeting that he was lining
24　up, I remember, some kind of like the big meeting
25　with the big man and top executive, blah, blah.  And

Page 295

1　that was -- at first I thought I was going to be
2　going to the meeting, but then, you know, I found out
3　I wasn't going to the meeting.  So yeah, that's
4　pretty much what happened there.
5　Q　Okay.  But -- so if you have written in an
6　email "Steve Jobs" to your team, that is because Mr.
7　Tiscareno said to you the big man?  Like there's a
8　one-to-one correlation there?
9　A　Yeah, that's right, exactly.  It was
10　either that or a phone call I had with him or, you
11　know, something had happened where -- I mean, he's
12　the one that -- that prompted me to email to Jobs
13　directly.
14　Q　And we'll get there.  We'll get there.
15　A　Okay.
16　Q　But I'm just trying to make sure that you
17　changed the words "the big man" to refer to Steve
18　Jobs.
19　A　Whether it was through a phone
20　conversation or through an email, that was used in
21　the translation, if I remember correctly, yes.
22　Q　Okay.  So you weren't just making that up?
23　A　No.  No.  What do I do with --
24　I'm done with that one right now.
25　　　MR. HOLMES:  Make a stack in front of you.

Page 296

1　　　THE DEPONENT:  Yeah.  Don't make anything
2　up.
3　　　(Exhibit Number 263 was marked.)
4　Q　(BY MS. VOORHEES)  All right.  Mr.
5　Mahabub, you have been handed what has been marked as
6　Exhibit 263.  This is the transcription of a WAV file
7　that was produced to us in -- I believe in the
8　investigation.  I am going to play it, not the entire
9　thing, play part of it on my computer.
10　　　MR. HOLMES:  Do you have a page reference
11　of where you're going to play, by any chance?
12　　　MS. VOORHEES:  Do I have what?
13　　　MR. HOLMES:  Page reference of what you
14　were going to play.
15　　　MS. VOORHEES:  I actually was just going
16　to play the beginning and ask Mr. Mahabub to confirm
17　that it's his voice on the recording.
18　　　MR. HOLMES:  Okay.
19　　　MS. VOORHEES:  All right.  I'll try to get
20　this as close to the beginning as I can and as loud
21　as I can make it.
22　　　(Audio recording of Exhibit 263 was
23　played.)
24　Q　(BY MS. VOORHEES)  Do you recognize that
25　voice?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 297

1    A    Yeah, of course.
2    Q    Is that you?
3    A    That's me.
4    Q    Who's the other voice?
5    A    Greg Morgenstein.  He's my chief engineer
6    at the studio in Los Angeles.
7    Q    Okay.  Mr. Mahabub, do you recall putting
8    together this -- this audio presentation?
9    A    Yes.
10    Q    And can you just tell me about it.  Why
11    were you putting it together?  What was it used for?
12    A    I don't remember exactly what it was used
13    for, but I think I had talked to Paul Powers and I
14    had said, Paul, you know what we should do, we should
15    do a video presentation for all the shareholders and,
16    you know, give them an update on, you know, what we
17    think is going on.  So -- and he liked the idea, so I
18    went through with it.
19    Q    And what did you do to put the
20    presentation together?
21    A    Oh, there was a PowerPoint -- I'm sorry,
22    we used something called Keynotes on a Mac, which is
23    basically the same thing as PowerPoint is for a PC.
24    And so it was a PowerPoint coupled with, you know,
25    basically a script that I had written and recorded to

Page 298

1    go along with the slides in the deck, and then we --
2    so we record the voice and then you take the deck and
3    you spit it out to a video file.
4        And then what you can do is time it in
5    video editing software so that when a bullet point
6    hits it's in sync with -- you see what I mean?  So
7    you pause the frames.  And then when you go to the
8    next bullet point you let it go to the next bullet
9    point so everything goes in sync with -- you
10    understand what I'm saying?
11    Q    I think that I -- I think that I
12    understand it, though.
13    A    Yeah.
14    Q    I'm not as interested in the technical
15    aspects.  Who -- who put together the content for the
16    presentation?
17    A    That would have been Paul, myself and
18    other team members as well.  I mean, you know, there
19    was quite a few team members that gave input into
20    that one, if I remember.
21    Q    If you could turn to Page 54 of the
22    transcript.
23    A    Yeah.  Okay.  I'm there.
24    Q    I'm going to start reading in the middle
25    of Line 2 on Page 54.  It says, Perhaps the biggest

Page 299

1    part of the entire presentation is that we have
2    attracted a very large consumer electronics company
3    of which, as of a couple of days ago and after
4    building a two-year relationship with my management
5    team contacts, in almost one year of technology
6    integration, software optimization and marketing
7    strategy planning the CEO of the LCEC finally met
8    with senior marketing and technical management and we
9    have the green light to move forward.  That meeting
10    could have stopped us dead in our tracks.  And -- and
11    then it goes on.
12        Mr. Mahabub, is the reference to the LCEC
13    here to Apple?
14    A    In this particular case, if I recall,
15    yeah.  I'm pretty sure I'm talking about Apple there.
16    Q    Okay.  And -- and what is the basis for
17    the statement that the CEO of Apple finally met with
18    senior marketing and technical management and we have
19    the green light to move forward?
20    A    Probably got a phone call from -- from Vic
21    that said, you know, the big man and met with people
22    and we have the green light to move forward.
23    Q    Do you recall getting that phone call?
24    A    I do.
25    Q    Okay.  And tell me everything you remember

Page 300

1    about getting that phone call.
2    A    Boy, that's a tough one.  I mean, I
3    remember the phone call.  I remember that.  You know,
4    we talked about -- you know, sometimes five times a
5    day, you know, for a long time.  So I mean, it was
6    kind of funny because I always would wonder why some
7    -- some of the things Victor would -- he wouldn't
8    email me back about, he would call me up about.  You
9    know what I mean?  But he wouldn't put it in writing.
10    He would call me.
11        And, you know, I keep fairly decent
12    records and try to remember stuff.  At that time it
13    was a lot easier than trying to remember it now.
14    But, you know, for the most part if he called me and
15    said something along those lines, I would have
16    probably have recorded it, but I couldn't disclose
17    exactly who it was to the shareholders because there
18    were NDAs that we had in place.  So I tried to find a
19    way to, you know, state it in a way that made more
20    sense -- that would make sense to them but at the
21    same time it wouldn't violate the NDA.
22    Q    So it sounds like you don't recall
23    anything else specifically about the phone call where
24    Mr. Tiscareno told you that the CEO of Apple met with
25    -- engaged in this meeting.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 373

1   this would have been sent after -- after I sent it.
2   Q    Okay.
3   A    Yeah.
4   Q    So your recollection is that you actually
5   sent the email to Mr. Jobs and then you forwarded it
6   to Mr. Tiscareno?
7   A    Yeah. No. No. I know that's happened.
8   I just couldn't remember if I sent him a draft or
9   not, but I don't think so. I remember trying to call
10  him to go through it with him and I couldn't get in
11  touch with him.
12  Q    Okay. At this point in time, what -- what
13  was Mr. Tiscareno's position at Apple?
14  A    Senior manager of iPod acoustics or
15  something like that.
16  Q    Okay.
17  A    Senior manager of iPod acoustics, I think
18  is what it was. So senior manager in acoustics,
19  something along -- he was senior manager of some
20  audio title.
21  Q    Sorry. If you could turn back to the last
22  page of Exhibit 139.
23  A    Yeah.
24  Q    I'm still in that objective portion.
25  A    Okay.

Page 374

1   Q    I just want to read you the one phrase of
2   that sentence that I haven't yet. It reads, With the
3   potential to initiate development level integration
4   on the fast track. What did you mean by that?
5   A    Okay. So there's two types of ways you
6   can integrate. One is on the kernel extension side,
7   which we did for Mac, and the other is on the user
8   space side. So you have kernel space and user space
9   integrations.
10  User space integrations means you're
11  integrated into an application that rests on top of
12  the operating system. And our kernel space
13  integration means you've integrated into -- as an
14  imbedded level integration into the device
15  architecture, right.
16  So what I'm saying here is that, you know,
17  we can do a -- a commercial level integration, which
18  means it's fully tested, it's been ported, it's been
19  optimized to its absolute maximum extreme extent, you
20  know, things like this because although we had
21  optimized we didn't optimize it all the way down to
22  where we could have. We got damn close, but --
23  MR. HOLMES: Jerry, I see the reporter
24  struggling. If you can show down a little bit.
25  THE DEPONENT: Sorry about that.

Page 375

1   A    So basically it's -- it's a commercial
2   level integration which requires you a different set
3   of tests and different test vectors that you set up
4   in -- in the software.
5   Q    (BY MS. VOORHEES) And that was not
6   something that had happened at this point in time?
7   A    No. We did what I would refer to as a --
8   as a low level beta integration, right, not a
9   commercial release integration. There's -- you have
10  to be a software engineer to understand what I'm
11  talking about there.
12  Q    But I just want to make it -- I just want
13  to make sure I'm correct that when you write, With
14  the potential to initiate deployment level
15  integration on the fast track, you are referring to
16  something that has not yet happened?
17  A    Commercial release is deployment.
18  Q    Commercial release?
19  A    Yes. That means that this thing is ready
20  to go out to market, has been tested on our devices
21  thoroughly and you're ready to go, push the green
22  button, push the button.
23  Q    Why didn't you use that wordage?
24  A    Because development level integration is
25  sort of the --

Page 376

1   Q    Same thing?
2   A    Yeah.
3   Q    Okay.
4   A    Same thing.
5   MS. HUGHES: Can we go off the record for
6   one moment?
7   MS. VOORHEES: Yes.
8   THE VIDEOGRAPHER: The time now is 11:52.
9   We're off the record.
10  (Recess from 11:52 to 12:02 p.m.,
11  whereupon Exhibit Numbers 265 and 266 were
12  marked.)
13  THE VIDEOGRAPHER: The time now is two
14  minutes after noon. We're back on the record.
15  Q    (BY MS. VOORHEES) All right, Mr. Mahabub,
16  do you understand that you're still under oath?
17  A    I do.
18  Q    Mr. Mahabub, while we were on the break I
19  handed you Exhibits 265, which is the email with the
20  Tiscareno Bates stamp on it.
21  A    Uh-huh.
22  Q    And Exhibit 266, which the email with the
23  Mahabub Bates stamp on it. Do you see those?
24  A    (Deponent nodded head.)
25  Q    Do you recognize Exhibit 265?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 377

1     A    I do.
2     Q    All right.  Do you recall this email?
3     A    This one I do briefly recall.
4     Q    Okay.  And you sent it to Mr. Tiscareno;
5    is that correct?
6     A    Yes.
7     Q    Okay.  If you look at Exhibit 266, do you
8    recognize this document?
9     A    I think so.  This is the one that went
10   forwarded to what looks like Paul and Mark, right?
11    Q    I'm sorry, where are you looking?
12    A    The people who this email went to, Paul
13   Powers and Mark Bobak.
14    Q    Correct.  Do you recognize Exhibit 266
15   then?
16    A    Well, I recognize it much like this one.
17   I recognize it, but I just don't remember exactly
18   what was done there.  Let me kind of take a look at
19   your highlights.
20    Q    Yes.  Again, this is one where I've
21   highlighted Exhibit 266, a paragraph that does not
22   appear to be in Exhibit 265.  So yes, if you could go
23   ahead and take a look at that.
24    A    Uh-huh.
25    Q    Did you add that paragraph to Exhibit 266?

Page 378

1     A    I think so.  I must have.  I don't
2    remember adding it, but yes, obviously it was me that
3    added it because it's from me, so . . .
4     Q    And if you could just read that paragraph
5    to yourself and then let me know if you recall why
6    you added it.
7     A    I think that's -- I'm not sure if I was
8    stating that to them or if that was -- it's confusing
9    to me.  I'm not sure what happened there.
10        MR. HOLMES:  Jerry, when you're responding
11   to a question like she gave, she wants to know if you
12   remember why you added that paragraph.
13        THE DEPONENT:  Yeah.
14        MR. HOLMES:  So that's -- it's not whether
15   -- there's a difference between remembering why you
16   added it and interpreting it sitting here today, and
17   if there is a difference in your mind you should
18   explain that.
19    A    This was a phone call I think I had with
20   Vic and I just slipped that in during this time
21   because I was basically lighting a cattle prod on --
22   on Vic's butt because I was starting to get a little
23   -- a little upset with the timing on things.
24    Q    (BY MS. VOORHEES)  Okay.
25    A    So yeah.  I think this is basically me

Page 379

1    letting them know -- and I wrote this and through
2    vocal -- through voice this was stated as well.
3     Q    Okay.  So Exhibit 265 is the email that
4    you sent to Mr. Tiscareno, and Exhibit 266 is the
5    copy of that email that you forwarded to Mr. Powers
6    and Mr. Bobak, correct?
7     A    With the -- with the additional paragraph
8    of the -- and I think I actually let Mark and Paul
9    know that I -- I'm pretty sure I did.
10    Q    Okay.
11    A    Because they're -- as board members I
12   would have probably disclosed that.
13    Q    And sorry, we just -- I feel like we're
14   not getting complete thoughts here, so let's take
15   this one at a time.  So you added the highlighted
16   paragraph in Exhibit 266.  You put this into what was
17   otherwise an email that you did actually send to Mr.
18   Tiscareno, correct?
19    A    This is one that was sent to Mr. Tiscareno
20   here.
21    Q    Exactly.
22    A    Yeah.
23    Q    But you've added that paragraph in the one
24   that you forwarded to your team, correct?
25    A    Not to the team, no, just to two board

Page 380

1    members.  They would have been just board members on
2    this one.
3     Q    Sorry, correct.
4     A    Just Paul, Mark, right?
5     Q    That -- that looks to be -- again, these
6    emails are a little bit difficult to read, but it
7    does looks like it would be those two.
8     A    I believe this one was to Paul and Mark,
9    yeah.
10    Q    And so if I understand your testimony,
11   what you're explaining is the new paragraph that you
12   imbed so that it looks like it's in your email to Mr.
13   Tiscareno --
14    A    Right.
15    Q    -- was based on a phone call that you had
16   with Mr. Tiscareno?
17    A    That's correct, yes.
18    Q    Why didn't you actually just say it to Mr.
19   Tiscareno in the email you actually sent to him?
20    A    Because the phone call happened after I
21   had sent the email.
22    Q    Okay.
23    A    So we had -- I sent the email and he
24   called me up and I just basically went over
25   everything I say here.  You know, I was just letting

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 413

1    MS. VOORHEES: 268?
2    THE REPORTER: Yes.
3    (Exhibit Number 268 was marked.)
4    Q   (BY MS. VOORHEES) Mr. Mahabub, you've
5    been handed what's been marked as Exhibit 268.
6    Exhibit 268 is email correspondence produced to us by
7    -- by you. The top email is dated September 30th of
8    2011. If you could just take a minute and read that
9    first e-mail.
10   A   Okay.
11   Q   Do you recognize Exhibit 268?
12   A   The same answer as I always give, you
13   know. It's -- vaguely recognize it, yes.
14   Q   Okay. Do you have any reason to doubt
15   that you sent and received the emails as indicated?
16   A   No.
17   Q   So the email that is at the top of the
18   page from you to Jay Rifkin, R-i-f-k-i-n, and
19   phil@dimarak.
20   A   That's Phil Rodriguez.
21   Q   So that's Mr. Rodriguez?
22   A   Yes.
23   Q   Okay. You are sending them an email from
24   Mr. -- sorry, from you to Mr. Tiscareno and Michael
25   Franzi, F-r-a-n-z-i. In the middle of the first

Page 414

1    paragraph of your email you write, Vic and I, and
2    most likely Michael, will be meeting in San Jose with
3    Phil Schiller, SVP marketing for Apple --
4    A   Uh-huh.
5    Q   -- in the next couple of months in an
6    attempt to get the ball rolling again. I have met
7    Steve Jobs, Phil Schiller, Scott Forstall and many
8    other executive team members at Apple, and we just
9    did not have enough market exposure at that time to
10   really drive the business initiative.
11   Why were you sending this email?
12   A   This was an email to the -- to the board
13   members at the time, and I was just letting them know
14   that Vic had been in touch with me, that, you know,
15   he was going to try to get things rolling again at
16   Apple, the TI thing I was talking to you about, Texas
17   Instruments. So he had mentioned something about
18   meeting with -- with Phil at the time. So that's why
19   I put that in there.
20   And then I just gave him a little history
21   and background about things that had happened prior
22   to that, and then -- and that was that. Of course,
23   the -- the -- the whole -- the whole point here was
24   that we might have a chance to reinstigate -- or
25   reinstentate (sic) with Apple because of a deal we

Page 415

1    might be able to do with Texas Instruments. That's
2    all that was.
3    Q   Okay. So let me just break down a couple
4    of things in the few sentences that I just read to
5    you. Did you have a meeting set up with Phil
6    Schiller?
7    A   I don't know if it was necessarily set up,
8    per se, but I know that we had to first go to Texas
9    Instruments, see what happened there, and from there
10   it was going to be presented to Phil, either from TI
11   or -- I don't -- I don't remember which side it was,
12   but it had to go right to the top of marketing. So,
13   you know, that's --
14   Q   Okay. What's the basis for your
15   statement, Vic and I, and most likely Michael, will
16   be meeting in San Jose with Phil Schiller?
17   A   You know, I was reading back at the -- at
18   the email chain here, and I think I wrote Michael; is
19   that right?
20   Q   The first e-mail in time I believe is to
21   Victor Tiscareno and Michael Franzi.
22   A   Right. Right. So I'm introducing Vic to
23   Michael, right. Michael came onboard to start
24   working with us. And I can't -- I don't really
25   recall the specific details. It was a long time ago,

Page 416

1    but, you know, I brought Michael onboard, said, look,
2    Michael, here's Vic, Vic, here's Michael and then
3    forwarded to the board the introduction I made
4    between the two of those guys and said, you know,
5    we're going to try to do this again.
6    Q   Okay.
7    A   We're going to see if we can't get
8    something going.
9    Q   But, Mr. -- Mr. Mahabub, can you tell me
10   what this -- what the basis for this statement is,
11   Vic and I, and most likely Michael, will be meeting
12   in San Jose, in California?
13   A   I can't remember what the basis for it
14   was.
15   Q   Okay.
16   A   I don't recall.
17   Q   Was that true?
18   A   If I put it in there, yeah. I mean, I
19   just don't remember what the basis for it was.
20   Q   Okay. The next sentence says, I have met
21   Steve Jobs. That's not true, right?
22   A   Well, I did have a -- a very brief meeting
23   with him in the hallway, but it wasn't a meeting
24   about AstoundSound at all. All right. It had
25   nothing to do with AstoundSound. This was just a

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

Page 433

1  Schiller.  So you never met Phil Schiller?
2      A   No.
3      Q   Okay.  Who is Scott Forstall?
4      A   He used to be there.  There was a guy that
5  -- that put me in touch with Vic named -- I gave you
6  his name the other day, and I can't -- I can't
7  remember it now.  He was a senior vice president of
8  iPod division.  He's the guy that I initially
9  interacted with at Apple.  He's the guy that put me
10 in touch with Vic.
11     Q   Barry Corlett?
12     A   No. No. No.
13     Q   Okay.  All right.  So that's -- sorry.
14         MS. HUGHES:  Tony Videll (phonetic).
15     Q   (BY MS. VOORHEES)  Tony Videll?
16     A   Tony Videll, yes.  And Tony Videll also
17 put me in touch with this guy, Scott Forstall,
18 initially at the very beginning.  So I met with
19 Scott, and there was another guy who was a VP.  I
20 can't remember what his name was.  Victor brought him
21 into the first -- you know, when I brought speakers
22 up there and stuff like that and actually gave a
23 demo.  Ted Cohen was there.  Toby was there.  Jerry
24 Bentley, one of my sound engineers was there, and I
25 was there.  There was a VP there.  I just can't

---

Page 434

1  remember his name.
2      Q   And Scott Forstall was there?
3      A   Scott Forstall is one of the guys that
4  popped in, yes.
5      Q   Okay.  And then you write, And many other
6  executive team members at Apple.  Who's that in
7  reference to?
8      A   Just people who I had met whenever I had
9  gone up there.  I don't know necessarily if executive
10 team members is the right way to say that.  I think
11 that's probably not correct.  Management team members
12 is probably a better way to say it.
13     Q   Okay.  Were there any other executive team
14 members then?
15     A   No.  No, not that I can recall.  I mean,
16 I've been in rooms with a lot of people, you know,
17 giving demos, so who knows if one of them was an
18 executive.  I don't know.  I don't remember.  I think
19 they were mostly engineers though.
20     Q   All right.  Mr. Mahabub --
21         MS. VOORHEES:  Let's mark this, I guess.
22     A   Scott Forstall is no longer with the
23 company, I don't think, anymore.
24         (Exhibit Number 269 was marked.)
25         MR. HOLMES:  Is this different than --

---

Page 435

1          MS. VOORHEES:  Yes.
2      Q   (BY MS. VOORHEES)  All right.  Mr.
3  Mahabub, you have been handed -- this is the exhibit
4  we're on now.
5      A   Okay.
6      Q   You have been handed what's been marked as
7  Exhibit 269.  This is another transcript that the SEC
8  had made of an audio file.  I think it's actually an
9  audio and video file in this instance --
10     A   Uh-huh.
11     Q   -- that was produced to us.  I believe
12 that the name of the file was GenAudio, underscore,
13 investor, underscore, presentation, underscore,
14 111511.  And, again, I'm just going to play the very
15 beginning of the file and just ask you to tell me if
16 you recognize the voice.
17         (Audio recording of Exhibit 269 was
18         played.)
19     Q   (BY MS. VOORHEES)  Is that your voice, Mr.
20 Mahabub?
21     A   Yes.
22     Q   Okay.  And do you recall putting together
23 this presentation?
24     A   Well, not, you know -- for whatever I can
25 remember of it.  Yeah.  We put together quite a few

---

Page 436

1  presentations.  So if you ask me do I specifically
2  recall this, no, but I have no reason to doubt that
3  we did.
4      Q   Okay.
5          MR. HOLMES:  There was a video that went
6  with that.
7          MS. VOORHEES:  There is a video that comes
8  on my computer with this one.
9      Q   (BY MS. VOORHEES)  Okay.  Well, do you
10 recall whether or not this was a presentation that
11 was given around November of 2011?
12     A   I wouldn't remember the date.  I'm sorry.
13     Q   Okay.  Do you recall the purpose of the
14 presentation?
15     A   No.  I'd have to read through it to see
16 what it was about here.
17     Q   All right.  We'll not do that today.  All
18 right.  Mr. Mahabub, I'm going to hand you a document
19 that was recently marked as Exhibit 242, but I don't
20 have the stamped copy of it yet.
21         MS. VOORHEES:  So if we could just
22 indicate on the transcript that this is Exhibit 242
23 even though it's not stamped.
24     A   Do you have a cleaned up version of this
25 one, by any chance?

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 437

1    Q    (BY MS. VOORHEES)  I do not.
2         MR. HOLMES:  I only had the patience to do
3    that with one of them.
4    Q    (BY MS. VOORHEES)  So, Mr. Mahabub, I know
5    this is an email that -- one of the emails that
6    you -- that you produced to us.  It's kind of hard to
7    read.  The dates on the emails, I believe, are July
8    of 2009 --
9    A    Uh-huh.
10   Q    -- sort of going back in time.  Read
11   whatever you need to and then just let me know if you
12   recognize the document.
13   A    I'm going to say the same answer.  I don't
14   really remember it, per se, but I have no reason to
15   doubt that it would have been me, you know.
16   Q    Okay.  That it would have been you that
17   sent and received the emails as indicated?
18   A    Yes.
19   Q    Okay.  So, Mr. Mahabub, I'm going to
20   paraphrase a bit, but I believe that in this email
21   you are notifying the recipients that there is an NDA
22   that has been provided by Apple, and there's a
23   reference on the second page, sort of in the middle.
24   It says, I am pleased to let everyone know that Apple
25   is moving forward to the next stage of the

Page 438

1    pre-integration process with us, and this started
2    with my signing their nonnegotiable NDA, which is
3    attached to this email.
4    A    Nonnegotiable?  You mean nondisclosure?
5    Q    Well, I'm just reading from a paragraph on
6    the second page of the exhibit.
7    A    Where is that?
8         MR. HOLMES:  The one ending in 818.
9    A    Where is it?  Oh, nonnegotiable.  Yeah.
10   That means that we have no right -- we can't alter
11   the NDA.
12   Q    (BY MS. VOORHEES)  Right.  And, again, I'm
13   just trying to sort of put in context the email.
14   A    Oh, okay.
15        MR. HOLMES:  She's reading this.
16   Q    (BY MS. VOORHEES)  Just -- because, again,
17   we're sort of jumping back in time.  I've generally
18   tried to move chronologically, but this one is a
19   little out of time.  So if you could go to the third
20   page of the exhibit.  So it's the one that ends in
21   819.
22   A    Yeah.
23   Q    And if you go down about five lines --
24   A    Uh-huh.
25   Q    -- there's a sentence that says, This is

Page 439

1    actually very standard stuff.  The last three big
2    technology integration deals I did prior to forming
3    GenAudio, the same kind of language existed.  Do you
4    see that?
5    A    I do.
6    Q    What were the last three big technology
7    integration deals you did prior to forming GenAudio?
8    A    That was working with a company called
9    Innovative Electronic Systems.  The first one --
10   there was actually a lot of them.  Missile research
11   development engineering center in Huntsville,
12   Alabama.  I worked on the sport ice project, which
13   was diagnostic systems for tank center in the field
14   that go down.  And I designed the hardware and the
15   software cards that attach to the relay boxes.  So
16   that was basically a government contract.
17   Q    And you were involved in the -- the
18   drafting of the documents related to the deal?
19   A    I did -- I made the deal for the company.
20   I wrote the software and built the hardware.
21   Q    Okay.
22   A    Yeah.
23   Q    All right.  So that's -- that's one.  What
24   was -- what were the other two?
25   A    There's -- there's a bunch of them, too

Page 440

1    many to even think of.  Another one would have been a
2    sale of another card, which I designed that we're
3    manufacturing in England at a place called Elan
4    Digital Systems, and that was through Innovative
5    Electronics Systems again, and that was for -- I
6    think that was for Boeing, if I remember.  And then
7    there was another one for the US Naval warfare
8    center.
9    Q    Okay.
10   A    I think it was on the Trident 2
11   submarines.  It was all data acquisition stuff.
12   Q    And in connection with those projects, you
13   were privy to the nondisclosure agreements between
14   the entities?
15   A    That's right.
16   Q    Were you -- it sounds like you were, but
17   were you involved in the entire process towards
18   getting the licensing deals?
19   A    All the way, yeah.
20   Q    Okay.  Were those actually licensing
21   deals?
22   A    They're more sales contracts than anything
23   I would say, not necessarily a licensing deal because
24   it's hardware based, not software.
25   Q    Okay.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 465

1  right, but you can't subtract shares from -- it
2  sounds to me like that's like, you know, a total
3  number there.
4      Q    Okay.  Well, let's just keep walking down
5  the chart for a second.
6      A    Okay.
7      Q    So if you look at the next two entries you
8  see one -- the next one has an issue date of
9  3/31/2004 for 300,000 shares.  Do you see that?
10     A    Yes.
11     Q    And then the next one shows an issue date
12  of 1/23/2013, original issue conversion of debt.  Do
13  you see that?
14     A    That's it.  Yeah.
15     Q    Okay.  And that -- and so that's for this
16  over 128,000 shares.  And then if you go over to --
17     A    Where -- where is that?
18     Q    Sorry.  I'm on the third -- well, it's
19  really the fourth row.  It's the one -- it's the last
20  one with your name on it on the first page.
21     A    Yep.  Right there.  Okay.
22     Q    Okay.  And so then if you go over past the
23  column that says, Mahabub stock sales to what sort of
24  looks like a column but without any boxes around it
25  and it shows 35,600, do you see that number?

Page 466

1      A    Oh, here, yeah.
2      Q    Do you see where I'm at?
3      A    I do.
4      Q    Okay.  Do you currently hold 35,600
5  shares?
6      A    I'm -- I'd have to find out and do a full,
7  you know, reconcile against everything.  I think that
8  sounds about right.
9      Q    Sound about right?
10     A    Yeah.
11     Q    Okay.  All right.  Oh, did you receive
12  share certificates for those issuances that you were
13  just describing regarding the conversion of the debt?
14     A    Did I, but I turned them in.
15     Q    Okay.  What do you mean by you turned them
16  in?
17     A    Basically once -- any time you change your
18  number of shares you're supposed to give your stock
19  certificate and then get a new one in exchange,
20  right.
21     Q    Right.
22     A    You retire your stock certificate to the
23  company --
24     Q    Okay.
25     A    -- and then a new one is issued basically.

Page 467

1      Q    Okay.  So you have -- you have a stock
2  certificate now that tells you how many shares you
3  have?
4      A    No, I do not.
5      Q    Okay.
6      A    I haven't been issued one.
7      Q    You haven't been issued one?
8      A    No.
9      Q    Okay.  Why not?
10     A    Jim Devine just never did it.  Yeah.
11         MS. VOORHEES:  All right.  Let's take a
12  quick break because we need to change the video.
13         THE DEPONENT:  Okay.
14         THE VIDEOGRAPHER:  We are going off the
15  record.  The time now is 19 minutes after 3:00.  This
16  is the end of Video Disk Number 2 in the deposition
17  of Taj Jerry Mahabub.
18         (Recess from 3:19 to 3:37 p.m.)
19         THE VIDEOGRAPHER:  Back on the record.
20  Here marks the beginning of DVD Number 3 in the
21  deposition of Taj Jerry Mahabub.  The time now is
22  3:37 p.m.
23     Q    (BY MS. VOORHEES)  Mr. Mahabub, do you
24  understand you're still under oath?
25     A    Yes.

Page 468

1      Q    I'm going to hand you what's been
2  previously marked as Exhibit 74.  Exhibit 74 is a
3  compilation of documents.  There is a GenAudio, Inc.
4  stock certificate.  There's a stock sale and purchase
5  agreement, an irrevocable proxy, and that's it.  Do
6  you recognize these documents?
7      A    Yes.
8      Q    Okay.  These documents relate to an
9  investor named George William Marvin.  Do you know
10  Mr. Marvin?
11     A    I do not.
12     Q    Okay.  So if you go to the third -- I
13  believe it's the third page of the exhibit.  At the
14  bottom it's Bates labeled Mahabub 1661 --
15     A    Yes.
16     Q    -- the stock sale and purchase agreement,
17  and it says, This stock sale and purchase agreement
18  is made as of November 15, 2009, the effective date,
19  by and among Jerry Mahabub, Mahabub, George William
20  Marvin, the purchaser, and GenAudio, Inc., a Colorado
21  corporation, the company.  Do you see that?
22     A    I do.
23     Q    And then it explains that in this
24  agreement Mahabub, the purchaser and the company --
25  I'm sorry -- are sometimes referred to as the

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 537

```
 1        MS. VOORHEES: Yep.
 2        MR. HOLMES: I had it.  81?
 3        MS. VOORHEES: Yep.
 4        MR. HOLMES: So maybe there's a section
 5   there that starts at Paragraph 79, so maybe just kind
 6   of for context.
 7        Q    (BY MS. VOORHEES)  Yeah.  Go ahead and
 8   read that.
 9        A    Okay.  What -- I don't understand what --
10   what am I supposed to read?
11        Q    I think your counsel just wants you to see
12   the paragraphs that precede Paragraph 81 in our
13   complaint.
14        A    Okay.
15        Q    So have you had a chance to read those?
16        A    Yeah.
17        Q    Okay.  So now my question is, how do you
18   square the testimony that you gave today about your
19   encounter with Mr. Jobs with your admission that you
20   did not meet in person with Apple's CEO?
21        A    I didn't go to the -- the meeting that I
22   thought I was going to go to is what I was referring
23   to from before.  This was just a brief encounter that
24   I had, you know.  I mean, it wasn't -- it wasn't a
25   meeting.  It was just -- well, it depends how you
```

Page 538

```
 1   define meeting, right.  When I'm talking about a
 2   meeting I'm talking about the big man meeting or
 3   whatever the hell Vic was talking about.
 4        Q    So let me ask you this, Mr. Mahabub.
 5   Sitting here today do you stand by the statement in
 6   Paragraph 81 of your answer that you admit you did
 7   not meet in person with Apple's CEO?
 8        A    Not for that meeting that was supposed to
 9   be set up, no, of course not.
10        Q    I just want to know if you stand by the
11   statement, Mahabub admits he did not meet in person
12   with Apple's CEO.  Is that a true statement?
13        MR. HOLMES: I think -- I think we're
14   talking at cross purposes.  The way -- because I
15   drafted the answer and got Mr. Mahabub to -- to
16   review it and sign off on it and it was in the
17   context -- 81 was read in context with Paragraph 80.
18        MS. VOORHEES: Okay.
19        MR. HOLMES: So Paragraph 80 talks about a
20   specific meeting, which is, our understanding, was
21   that same, quote/unquote, big meeting.  That's what
22   we thought we were doing.  If my drafting was
23   imprecise, that's my fault.
24        Q    (BY MS. VOORHEES)  Okay.  So let's go --
25   and I think I have this in front of you, Mr. Mahabub.
```

Page 539

```
 1        A    Yeah.
 2        Q    So Paragraph 80 of the complaint says, On
 3   or about December 8, 2010, GenAudio and Mahabub, a
 4   CEO of GenAudio, disseminated a letter to all
 5   shareholders in which Mahabub falsely claimed that, I
 6   met with their CEO -- and then it's in brackets --
 7   the LCEC, and gave him a demo of our technology, and
 8   he stated, I really like your technology and look
 9   forward to seeing you in the future.
10        A    Hum.
11        Q    I think what your counsel is saying that
12   did not happen; is that correct?
13        A    That's correct.
14        Q    Okay.  I think that clears it up.
15        A    Yes.
16        Q    All right.
17        MS. VOORHEES: Mr. Mahabub, I have no
18   further questions for you.
19        THE DEPONENT: Okay.
20        MS. VOORHEES: Off the record.
21        MR. HOLMES: All right.
22        THE VIDEOGRAPHER: This concludes the
23   deposition of Taj Jerry Mahabub.  The number of DVDs
24   used is three.  The original DVDs will be retained at
25   Behmke Reporting & Video Services, Inc., 160 Spear
```

Page 540

```
 1   Street, Suite 300, San Francisco, California.  Going
 2   off the record at three minutes after 5:00 p.m.
 3        (The video portion of the deposition
 4        concluded at 5:03 p.m. on February 8,
 5        2017.)
 6        MR. HOLMES: So we've agreed that the
 7   original of the transcript will be forwarded to my
 8   attention.  Within 30 days of my receipt I will
 9   provide any changes that we make to counsel for the
10   SEC, to all counsel and -- I can't remember if you
11   get the original back or do we retain it.
12        MS. VOORHEES: I think we get it back.
13        MR. HOLMES: Okay.  Then we'll send the
14   original back to counsel for the SEC.  And did I say
15   30 days?  If I didn't I'm saying it now.
16        MS. VOORHEES: Yeah, you did.
17        MR. HOLMES: Agreed?
18        MS. VOORHEES: Agreed.
19        MR. HOLMES: Thanks.
20        (At 5:05 p.m., the deposition proceedings
21        Concluded on February 8, 2017.)
22
23
24        _____
25            TAJ JERRY MAHABUB
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 541

 1    STATE OF COLORADO )
 2                   )  ss.
 3    COUNTY OF DENVER  )
 4          I hereby certify that the witness in the
 5    foregoing deposition, TAJ JERRY MAHABUB, was by me
 6    duly sworn to testify to the truth, the whole truth,
 7    and nothing but the truth, in the within-entitled
 8    cause; that said deposition was taken at the time and
 9    place herein named; that the deposition is a true
10    record of the witness's testimony as reported by me,
11    a duly certified shorthand reporter and a
12    disinterested person, and was thereafter transcribed
13    into typewriting by computer.
14          I further certify that I am not interested
15    in the outcome of the said action, nor connected
16    with, nor related to any of the parties in said
17    action, nor to their respective counsel.
18          IN WITNESS WHEREOF, I have hereunto set my
19    hand this 13th day of February, 2017.
20    Reading and Signing was:
21    Requested
22
23
24
25          BARBARA J. CASTILLO, RMR, CRR