**E**XCERPTED

# EXHIBIT 236

# In The Matter Of:

*Securities and Exchange Commission v.*
*Taj Jerry Mahabub, et al.*

---

*Jim Wei-Kung Mattos*
*July 22, 2016*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California  94105*
*(415) 597-5600*

Original File 29803Mattos.txt

**Min-U-Script® with Word Index**

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

---

Page 1

```
1            IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF COLORADO
3
4     - - - - - - - - - - - - - - -
5     SECURITIES AND EXCHANGE     )
6     COMMISSION,                 )
7              Plaintiff,         ) CASE NO.
8     v.                          ) 1:15-cv-02118-CBS-WJM
9     TAJ JERRY MAHABUB, GENAUDIO, )
10    INC., and ASTOUND HOLDINGS,  )
11    INC.,                        )
12              Defendants.        )
13    - - - - - - - - - - - - - - -
14
15
16        VIDEOTAPED DEPOSITION OF JIM WEI-KUNG MATTOS
17               FRIDAY, JULY 22, 2016
18
19
20
21        BEHMKE REPORTING AND VIDEO SERVICES, INC.
22    BY:  KIMBERLY J. WALDIE, CSR NO. 8696, NVCCR 720
23             160 SPEAR STREET, SUITE 300
24             SAN FRANCISCO, CALIFORNIA 94105
25                        (415) 597-5600
```

Page 2

```
1
2
3
4
5
6
7
8        Videotaped deposition of JIM WEI-KUNG MATTOS,
9    taken on behalf of Plaintiffs, at the Courtyard by
10   Marriott, 6855 South Virginia Street, Reno, Nevada,
11   commencing at 9:07 A.M., FRIDAY, JULY 22, 2016, before
12   Kimberly J. Waldie, Certified Shorthand Reporter No.
13   8696, pursuant to Notice of Deposition.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1     APPEARANCES OF COUNSEL:
2     FOR PLAINTIFF:
3          SECURITIES AND EXCHANGE COMMISSION
4          BY: DANIELLE R. VOORHEES, ATTORNEY AT LAW
5             LESLIE HENDRICKSON HUGHES, ATTORNEY AT LAW
6          1961 Stout Street, Suite 1700
7          Denver, Colorado 80294
8          Telephone: (303)844-1000
9          Email: voorheesd@sec.gov
10
11    FOR DEFENDANT, TAJ JERRY MAHABUB:
12         HOLMES, TAYLOR & JONES, LLP
13         BY: ANDREW B. HOLMES, ATTORNEY AT LAW
14         617 South Olive Street, Suite 1200
15         Los Angeles, California 90014
16         Telephone:  (213) 985-2200
17         Email:  abholmes@htjlaw.com
18
19    FOR DEFENDANT GENAUDIO, INC. AND JAMES T. DEVINE:
20         WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
21         BY: MICHAEL P. McCLOSKEY, ATTORNEY AT LAW
22         655 West Broadway, Suite 900
23         San Diego, California 92101
24         Telephone:  (619) 321-6200
25         Email: Michael.mccloskey@wilsonelser.com
```

Page 4

```
1     APPEARANCES OF COUNSEL - (CONTINUED):
2     FOR DEFENDANT ASTOUND HOLDINGS, INC.
3     - (TELEPHONICALLY):
4          BENZ LAW GROUP
5          BY: JENNIFER YUEN, ATTORNEY AT LAW
6          12021 Wilshire Boulevard, Suite 256
7          Los Angeles, California 90025
8          Telephone: (818) 371-8800
9          Email:  jenniferk.yuen@gmail.com
10
11    ALSO PRESENT:
12         JEFF WALDIE, VIDEOGRAPHER, CCVS
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

**Page 5**

| | | |
|---|---|---|
| 1 | INDEX | |
| 2 | FRIDAY, JULY 22, 2016 | |
| 3 | JIM WEI-KUNG MATTOS | PAGE |
| 4 | Examination by MS. VOORHEES | 12 |
| 5 | Examination by MS. YUEN | 211 |
| 6 | Examination by MR. HOLMES | 215 |
| 7 | Examination by MR. McCLOSKEY | 218 |
| 8 | Further examination by MS. VOORHEES | 219 |
| 9 | | |
| 10 | -oOo- | |
| 11 | | |
| 12 | QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: | |
| 13 | PAGE    LINE | |
| 14 | None. | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**Page 6**

| | | |
|---|---|---|
| 1 | EXHIBITS | |
| 2 | JIM WEI-KUNG MATTOS | |
| 3 | Number      Description | Page |
| 4 | Exhibit 21  E-mail chain, top e-mail dated | |
| 5 | October 2, 2009, Bates JM002096 - | |
| 6 | JM002099 - 4 pages | 64 |
| 7 | Exhibit 22  E-mail chain, top e-mail dated | |
| 8 | October 19, 2009, Bates GA006846 - | |
| 9 | GA006850, - 5 pages | 71 |
| 10 | Exhibit 23  E-mail dated 10/19/2009, Bates | |
| 11 | SEC-TiscarenoV-E-0000635 - | |
| 12 | SEC-TiscarenoV-E-0000636 - 2 pages | 73 |
| 13 | Exhibit 24  Forwarded e-mail originally | |
| 14 | sent November 9, 2009, and | |
| 15 | attachment, Bates GA006774 - | |
| 16 | GA006814, - 41 pages | 76 |
| 17 | Exhibit 25  GenAudio, Inc., Common Stock | |
| 18 | Shareholder List, Bates GA006005 - | |
| 19 | GA006012 - 8 pages | 81 |
| 20 | Exhibit 26  E-mail chain, top e-mail dated | |
| 21 | February 12, 2010, Bates JM000378 - | |
| 22 | JM000380 - 3 pages | 84 |
| 23 | | |
| 24 | | |
| 25 | | |

**Page 7**

| | | |
|---|---|---|
| 1 | EXHIBITS - (CONTINUED) | |
| 2 | JIM WEI-KUNG MATTOS | |
| 3 | Number      Description | Page |
| 4 | Exhibit 27  E-mail dated 2/12/2010, Bates | |
| 5 | SEC-TiscarenoV-E-0000992 - | |
| 6 | SEC-TiscarenoV-E-0000993 - 2 pages | 86 |
| 7 | Exhibit 28  E-mail chain, top e-mail dated | |
| 8 | March 19, 2010, Bates JM001041 - | |
| 9 | JM001046 - 6 pages | 88 |
| 10 | Exhibit 29  E-mail chain, top e-mail dated | |
| 11 | March 21, 2010, Bates JM000727 - | |
| 12 | JM000729 - 3 pages | 97 |
| 13 | Exhibit 30  E-mail dated Sun. 21 Mar 2010, | |
| 14 | Bates 347APL-00000315 - | |
| 15 | 347APL-00000316 - 2 pages | 98 |
| 16 | Exhibit 31  E-mail chain dated May 25, 2010, | |
| 17 | Bates JM002158 - JM002167 - 10 pages | 104 |
| 18 | Exhibit 32  E-mail chain, top e-mail dated | |
| 19 | 5/25/2010, Bates | |
| 20 | SEC-TiscarenoV-E-0001158 - | |
| 21 | SEC-TiscarenoV-E-0001162, | |
| 22 | - 5 pages | 106 |
| 23 | | |
| 24 | | |
| 25 | | |

**Page 8**

| | | |
|---|---|---|
| 1 | EXHIBITS - (CONTINUED) | |
| 2 | JIM WEI-KUNG MATTOS | |
| 3 | Number      Description | Page |
| 4 | Exhibit 33  E-mail dated June 2, 2010, Bates | |
| 5 | GA004959 - GA004961 - 3 pages | 109 |
| 6 | Exhibit 34  E-mail chain, top e-mail dated | |
| 7 | October 27, 2014, Bates JM002515 - | |
| 8 | JM002518 - 4 pages | 114 |
| 9 | Exhibit 35  E-mail chain, top e-mail dated | |
| 10 | 7/2/2010, Bates | |
| 11 | SEC-TiscarenoV-E-0001218 - | |
| 12 | SEC-TiscarenoV-E-0001221 - | |
| 13 | - 4 pages | 117 |
| 14 | Exhibit 36  E-mail chain, top e-mail dated | |
| 15 | Thur 11/20/2014, Bates | |
| 16 | SEC-ELLIOTT-E-0000241 - | |
| 17 | SEC-ELLIOTT-E-0000242 - 2 pages | 122 |
| 18 | Exhibit 37  Letter dated August 1, 2010, Bates | |
| 19 | GA005351 - GA005353, | |
| 20 | - 3 pages | 124 |
| 21 | Exhibit 38  E-mail dated September 6, 2010, | |
| 22 | Bates JM005121 - JM005126 - 6 pages | 126 |
| 23 | Exhibit 39  E-mail dated November 6, 2010, Bates | |
| 24 | JM006157 - JM006158 - 2 pages | 136 |
| 25 | | |

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

---

Page 9

```
 1              EXHIBITS - (CONTINUED)
 2              JIM WEI-KUNG MATTOS
 3    Number        Description              Page
 4    Exhibit 40  E-mail chain, top e-mail dated
 5                Thur 11/20/2014, Bates
 6                SEC-Skluzak-E-0000905 -
 7                SEC-Skluzak-E-0000911,
 8                - 7 pages                    149
 9    Exhibit 41  E-mail chain, top e-mail dated
10                March 12, 2010, Bates JM001098 -
11                JM001102 - 5 pages           153
12    Exhibit 42  Stock Certificate and attachment,
13                Bates Mahabub000018 -
14                Mahabub000029 - 12 pages     160
15    Exhibit 43  Stock Certificate and attachment,
16                Bates GA007852 - GA007867 - 16 pages  166
17    Exhibit 44  E-mail chain, top e-mail dated April
18                27, 2010, Bates JM003267 -
19                JM003273 - 7 pages           173
20    Exhibit 45  E-mail chain, top e-mail dated June
21                28, 2010, Bates JM002199 - 1 page  178
22    Exhibit 46  E-mail chain, top e-mail dated April
23                22, 2011, Bates JM007887 -
24                JM007889 - 3 pages           180
25
```

---

Page 10

```
 1              EXHIBITS - (CONTINUED)
 2              JIM WEI-KUNG MATTOS
 3    Number        Description              Page
 4    Exhibit 47  E-mail chain, top e-mail dated
 5                August 30, 2010, Bates JM004734
 6                - 1 page                     183
 7    Exhibit 48  E-mail chain, top e-mail dated
 8                March 20, 2010, Bates JM000965
 9                - 1 page                     185
10    Exhibit 49  E-mail chain dated March 19, 2010,
11                JM001202 - JM001203 - 2 pages  188
12    Exhibit 50  Letter dated August 6, 2015, Bates
13                AST-0000035 - AST-0000036 - 2 pages  197
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 11

```
 1         FRIDAY, JULY 22, 2016; 9:07 A.M.
 2       THE VIDEOGRAPHER: Here begins DVD No. 1 in the
 3   deposition of Jim Wei-Kung Mattos in the Matter of
 4   Securities and Exchange Commission versus Taj Jerry
 5   Mahabub, et al., in the United States District Court for
 6   the District of Colorado, case No.
 7   1:15-CV-02118-CBS-WJM.
 8       Today's date is July 22, 2016.  The time on the
 9   video monitor is 9:07.
10       The video operator today is Jeff Waldie
11   contracted by Behmke Reporting & Video Services,
12   Incorporated, 160 Spear Street, Suite 300, San
13   Francisco, California.
14       This video deposition is taking place at 6855
15   South Virginia Street, Reno, Nevada, and was noticed by
16   Leslie Hughes, Esq., of the Securities and Exchange
17   Commission.
18       Counsel, please voice identify yourselves and
19   state whom you represent.
20       MS. VOORHEES: Danielle Voorhees and Leslie Hughes
21   on behalf of the Securities and Exchange Commission.
22       MR. McCLOSKEY: Michael McCloskey on behalf of
23   GenAudio.
24       MR. HOLMES: Andrew Holmes on behalf of Jerry
25   Mahabub.
```

---

Page 12

```
 1       MS. YUEN: And Jennifer Yuen on behalf of Astound
 2   Holdings.
 3       THE VIDEOGRAPHER: Would the court reporter please
 4   swear in the witness.
 5             JIM WEI-KUNG MATTOS,
 6     having been first duly sworn by the reporter,
 7       was examined and testified as follows:
 8   THE VIDEOGRAPHER: You may begin.
 9             EXAMINATION
10   BY MS. VOORHEES:
11     Q.  Mr. Mattos, good morning.  Thank you for
12   appearing here today.  Could you please state and spell
13   your full name for the record.
14     A.  My name is Jim Wei-Kung Mattos, J-i-m,
15   W-e-i-K-u-n-g, M-a-t-t-o-s.
16     Q.  Thank you, Mr. Mattos.
17       Are you represented by counsel in this matter?
18     A.  No, I am not.
19     Q.  And you've testified before.  Correct?
20     A.  I have.
21     Q.  And have you testified other than in the SEC
22   investigation that preceded this matter?
23     A.  No.
24     Q.  All right.  The same ground rules apply here.
25   Do you understand that you are under oath?
```

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

---

Page 61

1    Q.  Okay.
2    A.  So that would be the only logical explanation
3  for that.
4    Q.  And when was this communication with
5  Mr. Mahabub?
6    A.  I don't recall.  This happened to him numerous
7  times.  I -- you know, he -- he seemed to have an
8  extraordinary number of failures, and that kind of
9  thing, but, you know, it happens, I guess.
10   Q.  Did you ever think it was intentional?
11   A.  No.
12   Q.  All right.  Mr. Mattos, I want to walk through
13  some documents with you and talk to you about GenAudio's
14  dealings with Apple, Incorporated.  You've read our
15  complaints.  You understand that's a focus --
16   A.  Yes --
17   Q.  -- of ours.  Were you ever at any meetings that
18  Mr. Mahabub had with Apple?
19   A.  No.
20   Q.  Were you ever at any meetings that anyone at
21  GenAudio had with Apple?
22   A.  No.
23   Q.  Were you ever on the phone with Mr. Mahabub and
24  anyone from Apple?
25   A.  No.

---

Page 62

1    Q.  You paused.
2    A.  Well, I was thinking I might have been privy to
3  a conversation with Vic Tiscareno.
4    Q.  Okay.
5    A.  But I don't recall if he was still an Apple
6  employee at that time.  He -- my guess is probably not
7  because he didn't really become a known entity within
8  the company until after he had retired from Apple.
9    Q.  Okay.  Tell me about that conversation with
10  Mr. Tiscareno that you were a part of.
11   A.  I don't recall the contents of it.
12   Q.  Do you recall when it happened?
13   A.  Maybe 2014.
14   Q.  Okay.  All right.
15   A.  At that point he had agreed to become a
16  consultant for GenAudio, so he was -- he had appeared in
17  at least one or two GenAudio functions for our
18  shareholders.  I was there when he spoke to a group of
19  our Denver-based shareholders at a shareholder meeting
20  at that time.
21   Q.  Okay.  Other than that conversation that sounds
22  like Mr. Tiscareno was no longer at Apple, were you ever
23  on the phone with Mr. Mahabub and anyone from Apple?
24   A.  No.
25   Q.  Were you ever on the phone with anyone from

---

Page 63

1  GenAudio and anyone from Apple?
2    A.  No.
3    Q.  Did you ever hear any recordings of
4  communications that Mr. Mahabub had with anyone from
5  Apple?
6    A.  No.
7    Q.  Did Mr. Mahabub ever tell you that he had
8  recorded communications he had with people at Apple?
9    A.  I don't recall.
10   Q.  Did you ever ask Mr. Mahabub for copies of
11  recordings?
12   A.  No.
13   Q.  Did you have any involvement at all with
14  GenAudio's communications with Apple?
15   A.  No.
16   Q.  Are you aware of anyone at GenAudio having
17  involvement in communications with Apple, other than
18  Mr. Mahabub?
19   A.  The only other employee that I believe to be
20  present -- present at one of the meetings on the Apple
21  campus was Walter Horat, one of our software engineers.
22   Q.  Okay.  And did you speak to Mr. Horat about
23  that meeting?
24   A.  I may have, but it would have been something
25  along the lines of "How did it go?"  I'm not a software

---

Page 64

1  engineer nor an audio engineer, so any specifics that
2  would have been discussed in a technical fashion would
3  not have, you know, made much sense to me.
4    Q.  Okay.  Do you recall anything about what
5  Mr. Horat told you about the meeting?
6    A.  Just that it went well, you know.
7    Q.  Did he tell you who they had met with?
8    A.  No.
9    Q.  Do you recall when that communication happened
10  with Mr. Horat?
11   A.  I don't recall.
12      (Exhibit 21 marked for Identification.)
13   Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
14  what has been marked as Deposition Exhibit 21.
15  Exhibit 21 is an e-mail correspondence.  It was
16  previously labeled as Exhibit 57 in the investigation.
17  It's Bates labeled JM002096 through -99.
18      Mr. Mattos, do you recognize Exhibit 21?
19   A.  I do.
20   Q.  And you produced this to the Securities and
21  Exchange Commission.  Correct?
22   A.  I believe so.
23   Q.  You received this e-mail.  Correct?
24   A.  Yes.
25   Q.  Did you read it when you received it?

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

---

Page 65

1    A.   Of course.
2        Q.   All right.  Did you read the e-mails that
3    Mr. Mahabub sent updating the GenAudio team?
4        A.   Always.
5        Q.   And when you reviewed those e-mails, did you
6    believe that Mr. Mahabub was being honest in them?
7        A.   At that time I did.
8        Q.   Okay.  You see that in the first paragraph --
9    and you are welcome to read as much of this as you need
10   to --
11       A.   Sure.
12       Q.   -- but just for the sake of time, I'm going to
13   direct you a couple places.
14           You see in the first paragraph Mr. Mahabub
15   writes:  "Had two great meetings back to back... Shocked
16   I made it through the day with zero sleep last night
17   preparing the final set of demos for Apple (2.5 hour
18   meeting with Apple followed by a 2 hour meeting with
19   Investment Bankers).  The new demos were well received
20   today at Apple and Phil Schiller was very impressed."
21           Who is Phil Schiller?
22       A.   I believe Mr. Schiller is the head of
23   marketing.
24       Q.   At Apple?
25       A.   At Apple.

---

Page 66

1        Q.   All right.
2        A.   At that time, I believe so.
3        Q.   Have you ever met Mr. Phil Schiller?
4        A.   I have not.
5        Q.   Have you ever communicated with him in any way?
6        A.   I have not.
7        Q.   Outside of this e-mail from Mr. Mahabub, did
8    you have any communications with Mr. Mahabub about Phil
9    Schiller?
10       A.   He may have mentioned that he met him.
11   Mr. Mahabub is prone to name dropping, so to speak.
12   That's something that is less important in my world.  So
13   those conversations tended to, you know, kind of go in
14   one ear and out the other, for me personally.
15       Q.   Okay.
16       A.   Yeah.
17       Q.   So you think it's possible Mr. Mahabub may have
18   separately mentioned that he met him?
19       A.   I'm sure he did.
20       Q.   Okay.
21       A.   At this point in time in the company we were,
22   you know, if not talking daily, certainly talking
23   multiple times a week about various, you know,
24   activities and that kind -- that kind of thing.
25       Q.   All right.  Do you recall Mr. Mahabub telling

---

Page 67

1    you anything about his meetings with Mr. Schiller
2    outside of what's in this e-mail?
3        A.   I don't recall.
4        Q.   You see that the second paragraph of the
5    e-mail, the second sentence reads:  "My confidence level
6    is at 80 percent as of now that we will be doing a sweet
7    deal with Apple (pending the big man's approval, and he
8    is the final say as it should be -- he is the CEO and
9    founder of Apple)."
10           What was your understanding as to who
11   Mr. Mahabub was referring to as "the big man"?
12       A.   My understanding would be that that's -- would
13   be Steve Jobs.
14       Q.   Okay.  And the next sentence reads:  "I am
15   supposed to meet with the big man in two to three weeks
16   (depending on his schedule) for a one-on-one meeting --
17   will be interesting to see what happens when the two of
18   us put our heads together -- As Phil Schiller stated
19   today, 'Sparks will be flying.'"
20           Did you ever have any communications outside of
21   this e-mail with Mr. Mahabub about his plans to meet
22   Steve Jobs?
23       A.   Again, he may have mentioned it, but I don't
24   recall when or the contents of that conversation.
25       Q.   All right.  When you received this e-mail from

---

Page 68

1    Mr. Mahabub, did you have any reason to doubt the
2    statements that were made in it?
3        A.   I did not.
4        Q.   Did you ever mention Phil Schiller to GenAudio
5    shareholders?
6        A.   I don't recall.
7        Q.   Is there anything you could do to refresh your
8    recollection on that?
9        A.   Well, all of our communications at that point
10   were by e-mail, so anything that -- any conversation
11   would have already been submitted to the SEC.
12       Q.   All right.  And I understand that the formal
13   company communications went that way, but I'm talking
14   about your personal communications with your friends and
15   family that were shareholders.
16       A.   Well, I mean, official company documents were
17   used for any, you know, discussion.  I didn't generally
18   tend to open up about what was going on outside of
19   official communications.
20       Q.   Okay.  So you don't recall mentioning to
21   GenAudio shareholders that Mr. Mahabub was -- had met
22   with Phil Schiller?
23       A.   It would have been, again, in a -- in a formal
24   company document.
25       Q.   Okay.  But outside of those documents, do you

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

Page 69

1    recall ever mentioning to any GenAudio shareholders that
2    Mr. Mahabub had met with Phil Schiller?
3        A.  I do not.
4        Q.  Did you mention to GenAudio shareholders,
5    again, outside of official documents, that Mr. Mahabub
6    was going to be meeting with Steve Jobs?
7        A.  I don't recall.
8        Q.  If you turn to the next page of Exhibit 21, the
9    second full paragraph down, it begins with "Also,
10   because Craig."
11           Do you see that?
12       A.  Yes.
13       Q.  And I'm not going to read all of this, but it
14   explains that Craig is going to be filing some
15   international patents and that 30K must be paid to
16   Dorsey and Whitney?
17       A.  Right.
18       Q.  Do you see the parens that says "(thanks to Jim
19   Mattos, he has been able to continue to reach out and
20   help me to sell a portion of my personal shares to make
21   this happen)"?
22           Do you see that?
23       A.  Yes.
24       Q.  Is that accurate?  Did you do that?
25       A.  That was an ongoing thing that I was doing at

Page 70

1    that time.
2        Q.  Okay.  You were helping Mr. Mahabub sell his
3    personal shares at that time?
4        A.  Correct.
5        Q.  Okay.  And -- and describe for us the process
6    for doing that.
7        A.  Well, I would have -- I mean, I would have a
8    conversation with somebody, and they may express an
9    interest in further investment in the company, and I
10   would generally say, "Okay.  Well, Jerry has his
11   personal shares that he is selling at a discounted
12   rate."  And that was pretty much the procedure.  If they
13   wanted to move forward, they did.  If they didn't, you
14   know, they didn't.
15       Q.  And what did you tell those investors about --
16   those potential investors about the company?
17       A.  Everything that would have been expressed in
18   the company documents would have been a reiteration of
19   the -- of those conversations.
20       Q.  Okay.  Would you provide those potential
21   shareholders with the information that Mr. Mahabub was
22   providing to you about Apple?
23       A.  Perhaps, but again, I don't recall any specific
24   conversations.
25       Q.  Did you ever see any communications between

Page 71

1    Mr. Mahabub and Phil Schiller?
2        A.  I don't recall.
3           (Exhibit 22 marked for Identification.)
4        Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
5    what's been marked as Exhibit 22.  It was previously
6    marked as Investigative Exhibit 120.  It's Bates labeled
7    GA006846 through GA006850.
8           Do you recognize Exhibit 22?
9        A.  I do.
10       Q.  And did you receive and read this e-mail?
11       A.  At that time I did.
12       Q.  Okay.  And it looks like from your e-mail to
13   Mr. Mahabub on October 19, 2009, you actually listened
14   to the demo that was linked.  Is that correct?
15       A.  I believe so, yes.
16       Q.  All right.  Do you see that Mr. Mahabub writes
17   in his October 19th, 2009, e-mail at 2:13 a.m.:  "Hello
18   team, Below is my latest e-mail to my contacts at Apple.
19   For those who do not know, Tim Cook is the COO of Apple
20   (second in the chain of command at Apple)."
21           And then the second paragraph reads:  "I am
22   happy to let you all know that it has been requested
23   that I carbon copy Tim and Phil on some of my e-mails
24   with Michael, Ron and Vic (depending on the content).  I
25   do hope that the big man likes the demos we have worked

Page 72

1    very hard to create and this will end up in a super
2    sweet licensing deal with us."
3           When you received this e-mail from Mr. Mahabub,
4    did you believe the statements that he made in it?
5        A.  I did.
6        Q.  Did you have any reason to doubt those
7    statements?
8        A.  I did not.
9        Q.  Did you ever meet Tim Cook?
10       A.  I did not.
11       Q.  Have you ever communicated with him in any way?
12       A.  I have not.
13       Q.  Outside of this e-mail, did you ever have
14   communications with Mr. Mahabub about Tim Cook?
15       A.  I don't recall.
16       Q.  Did you do anything to document your
17   communications with Mr. Mahabub?
18       A.  I did not.
19       Q.  If you flip to the third page of the exhibit
20   towards the bottom, do you see where it says "Forwarded
21   Message"?
22       A.  I do.
23       Q.  And there is an e-mail dated Sun 18 Oct, O-c-t,
24   2009, from Mr. Mahabub to Victor Tiscareno,
25   T-i-s-c-a-r-e-n-o, Michael Hailey, H-a-i-l-e-y, Ronald

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

---

Page 73

1    Isaac, I-s-a-a-c, Timothy Cook and Phillip Schiller.  Do
2    you see that?
3        A.  Yes.
4        Q.  And did you read this e-mail when you received
5    it?
6        A.  I'm sure I did at the time.
7        Q.  You see that the second paragraph -- or, excuse
8    me, the third paragraph is addressed to Vic, Phil and
9    Michael?
10       A.  Yes.
11       Q.  And you see the first paragraph is addressed to
12   Tim and says:  "Great to meet you on the phone the other
13   day"?
14       A.  Yes.
15           (Exhibit 23 marked for Identification.)
16       Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
17   what's been marked as Exhibit 23.  This was previously
18   marked as Investigative Exhibit 119, and it's Bates
19   labeled SEC-TiscarenoV-E-0000635 through -36.
20           You are not on this e-mail, Mr. Mattos.  Have
21   you ever seen it?
22       A.  I don't believe so, no.
23       Q.  All right.  You see that it is from Mr. Mahabub
24   to Victor Tiscareno, Michael Hailey and Ronald Isaac?
25       A.  Yes.

---

Page 74

1        Q.  And it's dated 10-19-2009.
2            If you compare Exhibit 23 with that e-mail we
3    were just looking at on Bates page 6848 of Exhibit 22 --
4    do you see that?
5        A.  Yes.
6        Q.  Do you see how the e-mail on Bates page 6848 in
7    Exhibit 22 is addressed to Mr. Tiscareno, Mr. Hailey,
8    Mr. Isaac and Mr. Cook and Mr. Schiller, but in
9    Exhibit 23, Mr. Schiller and Mr. Cook are not included?
10       A.  I do.
11       Q.  Do you know why that is?
12       A.  I do not.
13       Q.  And do you see that the first sentence in
14   Exhibit 22 is addressed to Tim, and that is not the case
15   in Exhibit 23?
16       A.  Yes.
17       Q.  And do you have any explanation for that?
18       A.  I do not.
19       Q.  Did Mr. Mahabub ever tell you he was editing
20   his communications with Apple before he forwarded them
21   on to people at GenAudio?
22       A.  He did not.
23       Q.  Did you know that he was editing his
24   communications at Apple before he forwarded them on to
25   people at GenAudio?

---

Page 75

1        A.  I was not.
2        Q.  If you had known that Mr. Mahabub was editing
3    these communications, would that have concerned you?
4        A.  Very much so.
5        Q.  And why is that?
6        A.  I'm an honest, ethical person.  I believe that
7    communications between two individuals, whether it's on
8    a personal or business -- you know, in a business
9    fashion, being accurate and that is important.
10       Q.  As a person who was working at GenAudio, did
11   you believe that Mr. Mahabub should have been forthright
12   with you about what his communications were with Apple?
13       A.  My understanding is that all communications
14   were correct and accurate.  It was only as a result of
15   the SEC, you know, lawsuit, the litigation, where that
16   became abundantly clear that that was not the case.
17       Q.  And were -- did you rely on Mr. Mahabub being
18   truthful and honest with you in doing your duties for
19   GenAudio?
20       A.  A hundred percent.
21       Q.  And including in your communications with
22   shareholders that were part --
23       A.  Absolutely.
24       Q.  -- of your duties?
25       A.  Absolutely.

---

Page 76

1        Q.  Would you have changed the way that you
2    communicated with shareholders if you had known that
3    Mr. Mahabub was not being honest with you?
4        A.  Without question.
5        Q.  And how would you have changed them?
6        A.  I simply would not have included information
7    that I would have known to be inaccurate.
8            (Exhibit 24 marked for Identification.)
9        Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
10   Exhibit 24.  It is an e-mail with an attachment dated
11   November -- well, the first e-mail is dated
12   November 13th, 2009, and that's the one from you to a
13   Jon Iverson.  The Bates range is GA00674 through -6814.
14           Mr. Mattos, do you recognize Exhibit 24?
15       A.  I do.
16       Q.  And the first page, I'm going to focus on the
17   November 9, 2009, e-mail from you to Mr. Mahabub,
18   Mr. Powers and copying Mr. Devine.
19           Did you draft this e-mail?
20       A.  I did not.
21       Q.  Okay.  Who did?
22       A.  As is represented on GA6775, all communications
23   were initially drafted by Mr. Mahabub.
24       Q.  Okay.  And then you sent out the
25   communications?

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

---

Page 81

1    Q.  And what -- in what format did you keep that?
2    Was that, like, an Excel spreadsheet?
3    A.  Excel spreadsheet.
4    Q.  Do you still have a copy of that share -- of
5    that spreadsheet?
6    A.  I do in my records, yeah.
7    Q.  Like an electronic version?
8    A.  Yeah.  It's the same document that was
9    submitted to the SEC.
10    Q.  Okay.
11        (Exhibit 25 marked for Identification.)
12    Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
13    what's been marked as Exhibit 25.  It's Bates labeled
14    GA006005 through -6012.
15        Do you recognize Exhibit 25?
16    A.  I do.
17    Q.  And what is this?
18    A.  This is the shareholder database --
19    Q.  Okay.
20    A.  -- and financial information -- or the
21    percentages of ownership that I just spoke of.
22    Q.  All right.  Do you know what date this was
23    accurate as of?
24    A.  It would have been accurate as of the date of
25    submission.

---

Page 82

1    Q.  Okay.
2    A.  This was kind of a living, breathing document.
3    Obviously, as -- you know, e-mail addresses or physical
4    addresses were -- they were updated in real time.
5    Q.  Okay.
6    A.  So there might be some slight variation of this
7    that the company is currently using, but, you know,
8    beyond the term -- beyond the end of my employment as of
9    March, I don't -- I don't know, you know, where -- where
10    that document is.
11    Q.  Between 2009 and 2012, who had access to this
12    Exhibit 25?
13    A.  Myself and Jim Devine.
14    Q.  All right.  And who updated it?
15    A.  I -- I updated the contact information.  He
16    would update the percentages of ownership.
17    Q.  And where did you save it or store it?
18    A.  On my computer.
19    Q.  So then when you went to send e-mails, these
20    shareholder updates, what -- what would you do to
21    actually make sure everybody got it?
22    A.  Well, it's a spreadsheet.  So I could separate
23    out all of the e-mail addresses, and then it would just
24    be a copy and paste.
25    Q.  Is that what you would actually do?

---

Page 83

1    A.  Yeah.
2    Q.  And would you do that each time you sent out an
3    update?
4    A.  Correct.
5    Q.  And that way you captured anybody new?
6    A.  Correct.
7    Q.  Did you follow that same process when you sent
8    out offering materials like the private placement
9    memoranda?
10    A.  I believe so.  I mean, that -- that -- the --
11    the PPM would typically be sent out to all shareholders,
12    served as both company update as well as an invitation
13    for additional investment.
14    Q.  Okay.  I -- for the sake of time, I'm just
15    going to represent to you, Mr. Mattos, that we've also
16    seen a version of this spreadsheet that has several
17    sheets to it --
18    A.  Okay.
19    Q.  -- like maybe 20 sheets to it that breaks out
20    investors by state and by type of shares and that sort
21    of thing.  Did you maintain a list like that?
22    A.  No.
23    Q.  Okay.  So you would have just worked with one
24    that had this --
25    A.  Correct --

---

Page 84

1    Q.  -- information?
2    A.  -- yeah.
3    Q.  Okay.
4    A.  I mean, it was always my -- I had requested
5    over a period of a number of years for us to go to some
6    cloud-based services, but we just -- the monies were
7    never allocated for that.
8        (Exhibit 26 marked for Identification.)
9    Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
10    what's been marked as Exhibit 26.  It was previously
11    Investigative Exhibit 59.  It's Bates labeled JM000378
12    through -380.
13        Do you recognize Exhibit 59?
14    MR. McCLOSKEY:  Calling this Exhibit 59.  It's
15    Exhibit 26.
16    MS. VOORHEES:  I'm sorry.  Thank you.
17    Q.  Exhibit 26.
18    A.  I do.
19    Q.  And did you receive and read this e-mail from
20    Mr. Mahabub?
21    A.  I did at that time.
22    Q.  All right.  And did you believe the statements
23    that Mr. Mahabub made in the e-mail?
24    A.  I did.
25    Q.  All right.  You see that the second paragraph

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

Page 85

1    reads:  "The response (to my e-mail) below from Vic is
2    promising.  Great meeting with Phil Schiller yesterday.
3    As I anticipated and already discussed with Walt, Ian,
4    Bob and Paul at my room here in SF yesterday, it looks
5    like Christmas roll-out is the new target for Astound
6    release in Apple products."
7            Outside of this e-mail communication, did you
8    ever talk to Mr. Mahabub about a Christmas roll-out for
9    Astound in Apple products?
10    A.  I'm sure we would have had some type of
11   follow-up conversation.
12    Q.  Do you recall them?
13    A.  The specifics, no.
14    Q.  Did Mr. Mahabub ever tell you that that was not
15   true, that there would not be a Christmas roll-out for
16   Astound products in Apple?
17    A.  No.
18    Q.  Did you tell any GenAudio shareholders that
19   there would be a Christmas roll-out for Astound release
20   in Apple products?
21    A.  I don't recall.
22    Q.  What about potential shareholders?  Did you
23   ever tell any of them that there would be a Christmas
24   roll-out for Astound release in Apple products?
25    A.  I don't recall.

Page 86

1    Q.  If you go down to the bottom of Exhibit 26, do
2    you see an e-mail that says:  "Forwarded Message" from
3    Victor Tiscareno to Jerry Mahabub?
4    A.  Yes.
5    Q.  Would you have read that e-mail when you
6    received this from Mr. Mahabub?
7    A.  I would typically read all e-mails from -- from
8    Mr. Mahabub from beginning to end.
9    Q.  All right.
10        (Exhibit 27 marked for Identification.)
11    Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
12   what's been marked as Exhibit 27.  It was previously
13   marked as Investigative Exhibit 125.  It's Bates labeled
14   SEC-TiscarenoV-E-0000992 through -93.
15        You are not on these e-mails.  Have you ever
16   seen them, Mr. Mattos?
17    A.  No, I do not believe I have.
18    Q.  All right.  Can you compare the e-mail that we
19   were just looking at in Exhibit 26, the one that begins
20   at the very bottom of the first page, to the top e-mail,
21   the one that's dated 2-12-2010, 2:50:58 p.m. in
22   Exhibit 27?
23    A.  Yes.
24    Q.  Do you see that there is additional text in
25   Exhibit 26?  For example, the second sentence that says:

Page 87

1    "I know it is frustrating playing the hurry-up-and-wait
2    game.  Believe me, it frustrates us too."
3    A.  I do.
4    Q.  Then it goes on in Exhibit 26 only to say:
5    "Michael and I want to make sure that we have no
6    hang-ups when we push this to the top, and we are both
7    confident that we can get this okayed by the big man if
8    we play our cards right."
9        Do you see that?
10    A.  I do.
11    Q.  And then do you see that there's also an
12   additional last sentence that says:  I may be able to
13   get you and Sina, S-i-n-a, together tomorrow during
14   MacWorld so that you can update him as well.
15        Do you see that?
16    A.  I do.
17    Q.  Do you have any explanation for the additional
18   text in Exhibit 26 that does not appear in Exhibit 27?
19    A.  I do not.
20    Q.  Did Mr. Mahabub ever tell you that he had
21   edited Exhibit 26 to add text that was not in the e-mail
22   that we see in Exhibit 27?
23    A.  Never.
24    Q.  Did you have any reason to know that
25   Mr. Mahabub had edited Exhibit 26?

Page 88

1    A.  I did not.
2        (Exhibit 28 marked for Identification.)
3    Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
4    what's been marked as Exhibit 28 -- excuse me,
5    Exhibit 28.  It is e-mail correspondence Bates labeled
6    JM001041 through -46, and it is e-mail correspondence
7    and then an attached letter.
8        Do you recognize Exhibit 28?
9    A.  I do.
10    Q.  And did you receive and read the e-mails from
11   Mr. Mahabub?
12    A.  I did.
13    Q.  And you produced this document to the SEC.
14   Correct?
15    A.  I believe so.
16    Q.  All right.  And you see the first sentence in
17   the March 19th, 2010, e-mail says:  "Attached is the
18   cover letter that will go out to all the shareholders
19   with the new PPM via electronic delivery."
20        Were you involved in the drafting of the PPM
21   that was put together in March of 2010?
22    A.  Only insofar as copy edited.
23    Q.  So grammar, spelling.  That sort of thing?
24    A.  Correct.
25    Q.  All right.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

---

Page 97

1  being modified or developed to work specifically with
2  Apple products?
3      A.  Well, being one of the two major platforms,
4  obviously Mac or PC, we were having to do what
5  effectively were, you know, yearly updates to
6  accommodate the latest operating system.
7      Q.  Okay.  For Apple and for PCs?
8      A.  Yes, yes.
9          (Exhibit 29 marked for Identification.)
10     Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
11  what's been marked as Deposition Exhibit 29.  It was
12  previously marked as Investigative Exhibit 61, and it's
13  Bates labeled JM000727 through -729.
14         Mr. Mattos, do you recognize Exhibit 29?
15     A.  I do.
16     Q.  And did you receive and read these e-mails from
17  Mr. Mahabub?
18     A.  I did.
19     Q.  You see in the top e-mail, so the top of the
20  first page of Exhibit 29, Mr. Mahabub writes to several
21  people, including you:  "The latest correspondence from
22  the fruit company (scroll down)."
23         What was your understanding of what "the fruit
24  company" was?
25     A.  Apple.

---

Page 98

1      Q.  And then do you see the second e-mail on this
2  page is a forwarded message from Mr. Mahabub to Victor
3  Tiscareno, Michael Hailey, Ronald Isaac, Phil Schiller,
4  Barry Corlett, C-o-r-l-e-t-t, and Jim Tenneboe, K-e- --
5  sorry -- T-e-n-n-e-b-o-e?
6      A.  I do.
7      Q.  And did you read that part of the e-mail?
8      A.  I'm sure I did at the time.
9          (Exhibit 30 marked for Identification.)
10     Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
11  what's been marked as Deposition Exhibit 30.  It was
12  previously marked as Investigative Exhibit 121.  It's
13  Bates labeled 347APL-00000315 through -316.
14         Mr. Mattos, you are not on this e-mail
15  correspondence.  Have you seen it before?
16     A.  No, I have not.
17     Q.  Do you see that Exhibit 30 -- so the second
18  e-mail you've been handed -- is a March 21st, 2010,
19  e-mail from Mr. Mahabub to Mr. Tiscareno, Mr. Hailey and
20  Mr. Isaac?
21     A.  I do.
22     Q.  And do you see that it does not include
23  Mr. Schiller, Mr. Corlett or Mr. Tenneboe?
24     A.  I do see that.
25     Q.  And do you see that the beginning of

---

Page 99

1  Exhibit 30 -- so the start of that e-mail -- does not
2  include the paragraph that you see at the start of the
3  e-mail on Exhibit 29?  And let me correct that.
4  Actually, it has the same first sentence.  "I will be
5  sending the new demo C library/SDK by tomorrow evening
6  or sometime on Monday."
7          That's in bold.  Correct?
8      A.  Yes.
9      Q.  But if you go on in Exhibit 29 it then says:
10  "This will be right in time for you to start the
11  embedded level integration process as we discussed on
12  our last conference call and will keep everything on
13  schedule with what Phil is hoping for - a fall product
14  roll-out."
15         Do you see that's not in Exhibit 30?
16     A.  Yes.
17     Q.  And then it goes on with some additional
18  information that's also not in Exhibit 30.
19         Do you see that?
20     A.  Yes.
21     Q.  And do you have any explanation for why the
22  e-mail that was forwarded in Exhibit 29 does not match
23  the e-mail that is in Exhibit 30?
24     A.  I do not.
25     Q.  Did you know that Mr. Mahabub had edited the

---

Page 100

1  e-mail that he forwarded on in Exhibit 29?
2      A.  I did not.
3          MR. McCLOSKEY:  That presumes facts not established
4  and calls for speculation.
5      Q.  MS. VOORHEES:  You can answer.
6      A.  No.
7      Q.  Did Mr. Mahabub ever tell you that he edited
8  the e-mail that he sent in Exhibit 29?
9      A.  No.
10     Q.  Outside of the e-mail correspondence in
11  Exhibit 29, did you ever have any communications with
12  Mr. Mahabub about a fall product roll-out connected to
13  Apple?
14     A.  Yes.
15     Q.  And tell us about those.
16     A.  Most of our conversations would have been
17  reiterations of -- of e-mails at that time, you know,
18  relevant to whatever had been -- you know, he had sent
19  out that day or that week.
20     Q.  Okay.  Do you recall any additional information
21  that Mr. Mahabub provided to you that was not in
22  Exhibit 29?
23     A.  No.
24     Q.  Did you talk to GenAudio shareholders about a
25  fall product roll-out of Astound in Apple products?

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

Page 101

1    A.  I am sure I did, but I can't recall specific
2    conversations.
3    Q.  Do you recall specific investors you would have
4    discussed that with?
5    A.  No.
6    Q.  Do you recall anything about those
7    communications?
8    A.  No.  I mean, I -- I -- I feel that questions,
9    you know, concerns, e-mails on a daily basis and in a
10   timely manner, anything -- any communications, you know,
11   obviously written would have been submitted to the SEC
12   already.
13   Q.  In fielding those communications from GenAudio
14   shareholders, did you rely on the information that you
15   were being provided by Mr. Mahabub about what was
16   happening with the company?
17   A.  Entirely.
18   Q.  Did Mr. Mahabub ever tell you that he actually
19   met Steve Jobs?
20   A.  He may have mentioned it.
21   Q.  Do you recall that specifically happening?
22   A.  You know, again, those were things -- those
23   were instances and aspects that were not really of
24   importance to me personally.  Again, he liked to name
25   drop and -- and that sort of thing.  I was, at this

Page 102

1    point, just mainly concerned about outcomes, you know.
2    Are we going to have a contract with them?  Are they
3    going to license our product?  Are they interested in
4    our, you know, company or our technology from a business
5    standpoint?
6    Q.  And between 2009 and 2011, let's say, did you
7    talk to Mr. Mahabub about those things that were
8    important to you, whether or not Apple had an interest
9    in GenAudio, for example?
10   A.  Well, we -- we were continually talking, like I
11   said, almost on a daily basis, if not multiple times a
12   day.  I'm sure I expressed that -- you know, that
13   concern or interest, but in terms of an actual
14   conversation, I don't recall.
15   Q.  What was your understanding between 2009 and
16   2011?  Was Apple interested in GenAudio?
17   A.  That was my understanding, yes.
18   Q.  And was Apple interested in licensing
19   GenAudio's products?
20   A.  Potentially, yes.
21   Q.  And what was the basis of that understanding?
22   A.  Because we were -- well, it was a basis of the
23   communications that were put forth to the team and --
24   and also, you know, to the shareholders more broadly,
25   but also because we had a working software product.  It

Page 103

1    seemed very reasonable that our product would be
2    integrated.
3    Q.  All right.  So between what you knew about
4    GenAudio's product and what you were being told by
5    Mr. Mahabub, you thought that this was reasonable, that
6    Apple would have an interest in GenAudio?
7    A.  Reasonable, yes.
8    Q.  Okay.  And that Apple might want to engage in a
9    licensing agreement with GenAudio?
10   A.  Potentially, yes.
11   Q.  Did Mr. Mahabub ever tell you that Apple might
12   want to buy GenAudio, buy the company?
13   A.  There were discussions along that front.  But
14   there was never anything that I would consider concrete
15   that came out of it.  Never any specific dollar amounts
16   discussed or anything like that.
17   Q.  Okay.  Mr. --
18   A.  I mean --
19   Q.  So Mr. Mahabub never gave you any specific
20   dollar amounts that were being discussed?
21   A.  No, nor dates either.  It was just kind of a
22   general feeling that -- that the prospect was there.
23   Q.  Outside of your communications with Mr. Mahabub
24   and what you knew about GenAudio's product, was there
25   anything else that you relied on related to what you

Page 104

1    thought might happen between GenAudio and Apple?
2    A.  No.
3        (Exhibit 31 marked for Identification.)
4    Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
5    what's been marked as Exhibit 31.  It was previously
6    marked as Testimony Exhibit 64.  It is Bates labeled
7    JM002158 through -2167.
8        Do you recognize Exhibit 64?
9    A.  I do.
10   Q.  And did you read this e-mail correspondence
11   when you received it?
12   A.  I did.
13   Q.  You see that the second e-mail on the first
14   page of Exhibit 31 says:  On May 25, 2010, at 4:11 p.m.,
15   psavio@genaudioinc.com wrote?
16       Do you see that?
17   A.  I do.
18   Q.  Who is associated with that e-mail address?
19   A.  Paul Savio.
20   Q.  Okay.  Did he work for GenAudio?
21   A.  I believe he was a contractor.
22   Q.  All right.  If you look at the second page of
23   Exhibit 31 -- and, sorry, just, again, for the record,
24   you produced this document to the SEC.  Correct?
25   A.  I believe so, yes.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

---

Page 105

1    Q.  Okay.  If you look at the second page under the
2   sentence that says:  "Hope this helps, let me know what
3   you think, Paul."  It looks like there's a new e-mail
4   that starts with:  "Even though there are supposed to be
5   in a no radio period with us."
6         Do you see that?
7    A.  Yes.
8    Q.  Do you know who that e-mail is from?  You can
9   look at the next page if that helps make it more clear.
10   A.  Mr. Mahabub.
11    Q.  Okay.  It says:  "Even though they are supposed
12   to be in a no radio period with us, Vic and I have still
13   been talking and e-mailing each other."
14         Do you know who the "they" is?
15   A.  I believe Apple.
16    Q.  And was there a time when you were under the
17   understanding that Apple had a "no radio" period with
18   GenAudio?
19   A.  I believe I recall that being something in
20   conjunction with the NDA.
21    Q.  Okay.  With the nondisclosure agreement that we
22   already discussed?
23   A.  Yes.
24    Q.  Okay.  Did you have any communications with
25   Mr. Mahabub about that no radio period?

Page 106

1    A.  Again, our conversations were ongoing and
2   daily, so I'm certain we had some discussion about it.
3    Q.  Did Mr. Mahabub ever tell you that there was a
4   point in time where he wasn't supposed to be talking
5   with Apple?
6    A.  I believe so.
7    Q.  And what did he tell you about that?
8    A.  I don't recall the specifics, but, again, it
9   was in -- in relation to the NDA, which, you know, that
10   was commonly understood, you know, that, you know, when
11   we were in NDA with certain companies, that any
12   discussion outside of senior management was not
13   permitted.
14    Q.  All right.  Can you flip to the Bates page
15   2161?
16   A.  Okay.
17    Q.  And I'm looking at the very bottom where it
18   says: On 5-24-10, 11:39 a.m., Victor Tiscareno wrote.
19         Do you see that?
20   A.  I do.
21       (Exhibit 32 marked for Identification.)
22    Q.  MS. VOORHEES:  Mr. Mattos, you have been handed
23   what's been marked as Exhibit 32.  It was previously
24   marked as Exhibit 128.  It's Bates labeled
25   SEC-TiscarenoV-E-0001158 through -62.

Page 107

1    Mr. Mattos, you are not on the e-mails in
2   Exhibit 32.  Have you seen them before?
3    A.  I have not.
4    Q.  Mr. Mattos, I'm going to direct you to the
5   second page of Exhibit 32 where it says:  On 5-24-10,
6   11:39 a.m., Victor Tiscareno wrote.
7         Do you see that?
8    A.  I do.
9    Q.  And if you compare that e-mail to the one we
10   were just looking at at Bates page 2161 in Exhibit 31,
11   do you see that they are somewhat different?
12   A.  I do.
13    Q.  Do you see that they both state:  "Thank you
14   for your thorough e-mail."  But then Exhibit 31 goes on
15   to state:  "We always enjoy reading your periodic long
16   e-mails, so no worries.  And, yes, I agree with
17   everything you said"?
18   A.  I do with the distinction that one says
19   "thorough" and the other says "thoughtful."
20    Q.  Thank you for the correction.
21         And then in Exhibit 31 -- and I'm now at the
22   middle of Bates page 2162 -- do you see there's a
23   sentence that starts:  "Steve has us looking very deep
24   into other audio technology so he can better understand
25   why yours is so much better"?

Page 108

1    A.  Where is that?
2    Q.  It's in the middle of the Bates page 2162.
3    A.  Oh, I see it.
4    Q.  So you see that in --
5    A.  Yes.
6    Q.  -- Exhibit 31?
7         Do you see that that paragraph does not appear
8   in the e-mail in Exhibit 32?
9    A.  Yes.
10    Q.  And then in Exhibit 31, it goes on to state:
11   "We already did all this work with you, so I know it may
12   seem redundant.  We simply do what he tells us to do.  I
13   have forwarded your e-mail on to Steve.  He said he will
14   give it a listen in his home theater.  This just might
15   be what you need to get him to support this from the
16   Pixar angle.  How are your meetings going with Disney?"
17         And do you see what I just read is not in the
18   e-mail we were looking at in Exhibit 32?
19   A.  Yes.
20    Q.  Do you have any explanation for the difference
21   in these e-mails?
22   A.  I do not.
23    Q.  Did you know that Mr. Mahabub edited the e-mail
24   in Exhibit 29 that was forwarded to the GenAudio team?
25   A.  I did not.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

---

Page 109

1   MR. McCLOSKEY: Objection. That assumes facts not
2   established. Calls for speculation.
3   Q. MS. VOORHEES: You can go ahead.
4   A. No.
5   Q. Did you believe the e-mail was accurate that
6   you received in Exhibit 29?
7   A. I did.
8   Q. And what was your understanding of who "Steve"
9   was?
10  A. That would be Steve Jobs.
11  Q. Did you ever tell any GenAudio shareholders
12  that Steve jobs was involved in the negotiations between
13  GenAudio and Apple?
14  A. I don't recall.
15  (Exhibit 33 marked for Identification.)
16  Q. MS. VOORHEES: Mr. Mattos, you've been handed
17  what's marked as Exhibit 33. It was previously
18  Investigative Exhibit 29. It's Bates labeled GA004959
19  through -61, and it's an e-mail from you to, "Home
20  Mattos" on June 2nd, 2010.
21  Do you recognize Exhibit 33?
22  A. I do.
23  Q. And did you draft this e-mail?
24  A. I did not create the contents. That would have
25  been created by Mr. Mahabub. But I would have, of

---

Page 110

1   course, helped copy edit it.
2   Q. Okay. So the same situation as what we've
3   previously discussed?
4   A. Yes.
5   Q. And when it went to "Home Mattos," what does
6   that mean?
7   A. Well, this was typical. When -- within the
8   investor database, I would have obviously 400-something
9   e-mail addresses. So in order to protect identity, I
10  would send the e-mail addressed to myself and then bcc'd
11  with the list of investors, so that that was not a, you
12  know, commonly accessible data file.
13  Q. Okay. So to protect their privacy?
14  A. Right.
15  Q. And when you say "the investor database," do
16  you mean the shareholder list we looked at earlier?
17  A. Correct.
18  Q. And was that your practice throughout 2009
19  through 2012?
20  A. That was my -- yes.
21  Q. Okay. At least inclusive of that time period?
22  A. Oh, yes, yes, and beyond. That was pretty much
23  standard.
24  Q. All right. You see that Exhibit 33, the first
25  sentence says: "Our chairman and CEO, Jerry Mahabub,

---

Page 111

1   decided to create a movie presentation so all of you can
2   experience and listen to our current lineup of product
3   offerings and receive an update regarding the positive
4   forward direction of the company."
5   Were you involved in creating the movie
6   presentation?
7   A. No.
8   Q. Did you listen to it or watch it?
9   A. I believe so, yes.
10  Q. Did you have anything to do with the content?
11  A. No.
12  Q. Did you believe that the statements that were
13  made in that presentation were accurate?
14  A. Yes.
15  Q. Did you have any reason to believe that they
16  were not accurate?
17  A. No.
18  Q. You see the last sentence in that paragraph I
19  was just reading from on the first page of Exhibit 33
20  says: "He also discusses our recently completed
21  valuation analysis report, a brief overview of the
22  current common stock offering and the reason why we are
23  raising money for what we expect will be the last round
24  of financing given our current position with a very
25  large consumer electronics company (referred to as the

---

Page 112

1   LCEC throughout the presentation movie."
2   Do you see that?
3   A. Yes.
4   Q. And is the LCEC still Apple at this time?
5   A. Yes.
6   Q. Was it always Apple?
7   A. Yes.
8   Q. What was GenAudio's current position with Apple
9   as of June 2, 2010, or what was your understanding of
10  what its position was?
11  A. Well, that we were continuing to move forward
12  with either potential technology integration, licensing
13  or, you know, possibly acquisition.
14  Q. Okay. And so when Mr. Mahabub wrote in this
15  e-mail that we sent that "we expect will be the last
16  round of financing," what did that refer to?
17  A. Meaning that it would be the last PPM and, you
18  know, fundraising effort for the company.
19  Q. Because --
20  A. However, that tended to be kind of a standard
21  thing over time.
22  Q. That that statement would be made?
23  A. Well, as a bit of background, when I came
24  onboard with the company, it was actually as an
25  investor. I had some monies that I invested. And this

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

---

Page 113

1    would have been August of 2004.  And I invested with two
2    days left of that current round.  So it was something
3    that was reoccurring over time.
4        Q.   Okay.  So -- and by "reoccurring over time,"
5    meaning that investors were being told "this should be
6    our last round of financing"?
7        A.   We had hoped that, yeah.  That was a reasonable
8    expectation, especially given, you know, the -- the
9    business development efforts at that time and the
10   working software products, you know.  Perhaps a bit of
11   an overstatement in hindsight, but it was something
12   reasonable at that time.
13       Q.   And did you believe that at that time?
14       A.   I did.
15       Q.   And did you think that it would hopefully be
16   the last round of financing because of GenAudio's
17   position with Apple?
18       A.   I was most definitely hopeful about it.  That
19   was probably one of my least favorite things to do for
20   the company.  So --
21       Q.   Okay.  Was to raise money?
22       A.   Well, yeah, yeah.
23       Q.   Okay.  And I guess what I'm trying to get at
24   was by June of 2010, was the company mostly focused on
25   Apple?

---

Page 114

1        A.   I would say, yes, at that time.
2             And just to put that into perspective, the --
3    the AstoundSound Expander had very, very limited
4    traction in terms of sales.  And so our hope was that
5    they would, you know, integrate us into their -- their
6    hardware offerings and create a more universally
7    accepted solution.
8        Q.   And by "they," do you mean Apple?
9        A.   Correct.
10            (Exhibit 34 marked for Identification.)
11       MS. VOORHEES:  Mr. Mattos, you've been handed
12   what's been marked as Exhibit 34.  It was previously
13   Investigative Exhibit 90.  It's Bates labeled JM002515
14   through -18.
15            Do you recognize Exhibit 34?
16       A.   I do.
17       Q.   And did you produce this to the Commission?
18       A.   I did.
19       Q.   And looking at the July 2nd, 2010, 12:34:51
20   p.m. e-mail, do you see that?
21       A.   Yes.
22       Q.   Did you read and receive that e-mail?
23       A.   Yes.
24       Q.   The -- the later e-mail in time -- so the first
25   one at the top of page 34 -- is from you to Mr. Mahabub

---

Page 115

1    on October 27, 2014.
2        Q.   Do you see that?
3        A.   Yes.
4        Q.   And why were you forwarding this e-mail to
5    Mr. Mahabub in October of 2014?
6        A.   I don't recall the specifics.  Mr. Mahabub was
7    prone to receiving what he estimated as hundreds of
8    e-mails a day.  And sometimes he would ask for me to
9    look up certain e-mails and re-forward them to him.
10       Q.   Okay.  And do you recall specific
11   communications with him about him wanting this e-mail
12   re-forwarded?
13       A.   I do not.
14       Q.   You see your signature block in that
15   October 2014 e-mail?  Was -- was that the signature
16   block that you used when you were -- when you considered
17   yourself to be working for Astound Holdings?
18       A.   Yes.
19       Q.   Okay.  What's that mailing address?
20       A.   That was the P.O. box that the company has and
21   I believe still continues to maintain in Centennial.
22       Q.   Okay.  What about the toll free and office
23   numbers?  Where did those ring to?
24       A.   The toll free number was -- went to an
25   answering service.  It was a 24-hour -- AnswerConnect is

---

Page 116

1    the company.  The office at that time were -- and the
2    fax lines were land lines that directed to my home --
3        Q.   Okay.
4        A.   -- which I used as a home office.
5        Q.   And were those the same as what was used for
6    GenAudio?
7        A.   Oh, yes, yeah.  They -- they were maintained
8    and paid for by GenAudio.
9        Q.   Were you involved in setting up any Web sites
10   for Astound Holdings?
11       A.   Web sites, no, aside from the -- the mention of
12   the GoDaddy for Astound Holdings.
13       Q.   Right.
14            All right.  You see in the July 2nd, 2010,
15   e-mail that starts on the first page of Exhibit 34,
16   Mr. Mahabub writes in the second sentence:  "I am,
17   within the next couple of weeks" -- hold on.  Sorry.
18   I'm going to skip forward.  It says:  "Steve wants a
19   quick handshake meeting with me while I'm meeting with
20   his top acoustic scientist."
21            Do you see that?
22       A.   I do.
23       Q.   Outside of this e-mail correspondence, did you
24   have communications with Mr. Mahabub about having a
25   handshake meeting with Steve jobs?

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

---

Page 149

1    Seattle, it invariably would have probably come through
2    the Eldridges or some friend of theirs.
3       Q.  And did you ever have any direct communications
4    with Mr. Allen about GenAudio?
5       A.  I don't recall.
6          (Exhibit 40 marked for Identification.)
7       Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
8    Exhibit 40.  Exhibit 40 is e-mail correspondence that's
9    been Bates labeled SEC-Skluzak-E-0000-905 through -911.
10   Mr. Mattos, you are not on all of these
11   e-mails.  If you flip to page 909, at the very bottom
12   there's an e-mail from you to you on March 29th, 2011;
13   the subject is the LCEC.
14          Do you see that?
15      A.  Yes.
16      Q.  And did you send this e-mail?
17      A.  Yes.
18      Q.  And was this sent in accordance with what you
19   previously testified to with the shareholders being
20   bcc'd?
21      A.  That's correct.
22      Q.  Okay.  Did you draft the e-mail?
23      A.  I did not.
24      Q.  All right.  If you go to, let's see, the Bates
25   page that ends in 910, the second paragraph says:  "I

---

Page 150

1    must ask that you all please refrain from asking the
2    GenAudio team or myself any questions about the LCEC."
3          Do you see that?
4       A.  Yes.
5       Q.  And do you recall this -- this e-mail
6    communication going out instructing people not to ask or
7    communicate about the LCEC?
8       A.  Vaguely, but, yes.
9       Q.  Okay.  Did you have any communications with
10   Mr. Mahabub about that situation outside of this e-mail?
11      A.  Define "situation."
12      Q.  Excuse me.  Did you -- did you talk to him
13   about it, about why this came about?
14      A.  Well, not the specific portion with regard to
15   asking people not to talk about it.
16      Q.  Okay.  What did you talk to him about?
17      A.  Well, again, our conversations were always
18   general in nature about whatever the topic of the day
19   was.
20      Q.  Okay.
21      A.  So, invariably, yes, I would have spoken to him
22   about it.  I would not have questioned that statement.
23      Q.  Okay.  And the -- the very first line in this
24   e-mail says:  "This e-mail is to notify all existing
25   shareholders that what we commonly refer to as the LCEC,

---

Page 151

1    (a large consumer electronics company) and GenAudio are
2    going to be signing a new set of 'evaluation and
3    development' agreements."
4          Do you see that?
5       A.  Yes.
6       Q.  And did you have any communications with
7    Mr. Mahabub about that, about those evaluation and
8    development agreements?
9       A.  No.
10      Q.  Did you believe that was true at the time you
11   sent this out?
12      A.  Yes.  That was kind of a standard next step
13   type of thing for -- for companies that we were
14   considering doing business with.
15      Q.  Okay.  So this had happened before?
16      A.  Yes.
17      Q.  And did you have any reason to doubt that it
18   had happened with Apple?
19      A.  To doubt it, no.
20      Q.  If you look at the next e-mail in time, so it
21   is an e-mail that starts on Bates page 908, and it says:
22   On 3-30-11, 5:55 p.m. Gary Allen wrote.
23          Do you see that?
24      A.  Okay, yes.
25      Q.  Can you just read that, that first paragraph,

---

Page 152

1    and let me know when you are done?
2       A.  "Hi Jerry."
3       Q.  Oh, sorry.
4          You don't have to read it out loud, just to
5    yourself.
6       A.  Okay.  Okay.
7       Q.  Did you tell Mr. Allen at any point that the
8    sale of GenAudio was imminent?
9       A.  I don't recall.
10      Q.  Did you tell Mr. Allen at any point that he was
11   an idiot if he didn't invest in GenAudio?
12      A.  I don't recall.  I don't typically call people
13   idiots, but --
14      Q.  Okay.  Did you tell him that it would be a bad
15   decision to not invest in GenAudio?
16      A.  I don't recall.
17      Q.  Did you tell Mr. Allen that he should be "all
18   in" with GenAudio?
19      A.  I -- I don't recall.
20      Q.  Did you ever become aware of Mr. Allen having a
21   voice mail that left him?
22      A.  No.  I was not aware of that.
23      Q.  Okay.  Have you ever spoken to Mr. Allen about
24   the representations that he says in this e-mail that you
25   made to him?

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

Page 165

1   me.
2   Q.  Okay.  But separate from that, separate from
3   whatever's in the agreement, did you do anything to
4   check the accreditation status?
5   A.  No.
6   Q.  Did you ever ask investors for any additional
7   documentation, any proof of their financial status?
8   A.  No.  That was never required for any offering.
9   Q.  These documents relate to an investor named
10  Jeffrey A. Banks.  Do you see that on the first page of
11  Exhibit 42?
12  A.  Yes.
13  Q.  Do you know Mr. Banks?
14  A.  Not personally, no.
15  Q.  Did you ever have any communications with him
16  about his purchase of Mr. Mahabub's shares?
17  A.  I don't recall.
18  Q.  Were there any other documents that would have
19  been in the investor file for Mr. Banks, assuming these
20  were the only shares that he purchased?
21  A.  That would be it.
22  Q.  Did you keep any other documents regarding
23  Mr. Mahabub's personal share sales?
24  A.  No.  I mean, I was asked to -- originally to
25  digitize them, which I did, put them all in PDF format.

Page 166

1   Aside from that, no.
2   Q.  Okay.  When did you do that?
3   A.  Fall of 2014, I believe.
4   Q.  Okay.  And did you digitize all of the
5   investors' files?
6   A.  No.  These were just -- it was a specific
7   request pertaining to his actual sales.
8   Q.  Okay.  What happened to those PDFs, the
9   electronic version?
10  A.  They were -- they should have been -- I believe
11  they were submitted to the SEC.  I know they were
12  certainly submitted to the legal action against the
13  company back in 2013.  So they are a matter of public
14  record, but --
15  Q.  All right.  Is that why you were digitizing
16  them, was in connection with that litigation?
17  A.  He -- that was just something that he
18  requested.
19  Q.  Mr. Mahabub?
20  A.  Correct.
21  Q.  Okay.  Do you still have a copy?
22  A.  I do.
23      (Exhibit 43 marked for Identification.)
24  Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
25  what's marked as Exhibit 43.  This set of documents is

Page 167

1   Bates labeled GA007852 through -7867.
2       And again, looking at the first page of
3   Exhibit 43, do you recognize the form of that document?
4   A.  I do.
5   Q.  And what is this?
6   A.  It's the GenAudio stock certificate.
7   Q.  And it's made out to Julie A. Eastwood.  Do you
8   know Ms. Eastwood?
9   A.  Not personally, no.
10  Q.  Have you ever spoken to her about anything?
11  A.  I -- I don't recall.
12  Q.  Do you know how she came to invest in GenAudio?
13  A.  I believe she was somehow affiliated with
14  Mr. Mahabub.
15  Q.  Do you know how she was affiliated with him?
16  A.  Speculating, may -- may have been a friend.
17  I'm not really certain.
18  Q.  Okay.  If you turn to the second page of
19  Exhibit 43, you see a document that says:  "Signature
20  page to GenAudio, Inc. Subscription Agreement."
21      Do you see that?
22  A.  Yes.
23  Q.  Do you recognize the form of that document?
24  A.  I do.
25  Q.  And what is this?

Page 168

1   A.  This was the typical signature page for the
2   subscription agreement --
3   Q.  Okay.
4   A.  -- that would have been attached to the --
5   whatever that current PPM would have been.
6   Q.  All right.  And did you collect these
7   subscription agreement signature pages?
8   A.  Yes, that was a part of my job function.
9   Q.  And where did you obtain them from?
10  A.  They would have been usually submitted either
11  via fax or electronically.
12  Q.  By the investor?
13  A.  Correct.
14  Q.  And what would you do with them when you
15  received them?
16  A.  If they were a new investor, I would start up a
17  new file for them.  They would include this document.
18  And then I would hand that off to Jim Devine.  He would
19  verify receipt of -- of funds.  And then we would begin
20  the stock certificate issuance process.
21  Q.  Okay.  After you gave these signature pages to
22  Mr. Devine, did he then sign them and give them back to
23  you?
24  A.  Generally, yes, with -- he would produce the
25  stock certificate, take a photocopy front and -- front

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

Page 169

1  and back, and then would hand me back the file to sign.
2  Q.  Okay.  If you look at the next page, so now on
3  Bates page 7854, do you recognize the form of that
4  document?  And it actually goes over to 855.
5  A.  Yes.
6  Q.  And what is this?
7  A.  This is the subscriber questionnaire.
8  Q.  Okay.
9  A.  That was also part of the PPM.
10  Q.  And did you collect these documents in
11  connection with the PPM?
12  A.  I did.
13  Q.  And what did you do with them?
14  A.  They would go in -- we would receive both these
15  documents essentially at the same time, and I would,
16  again, create an investor file and forward that to Jim
17  Devine for processing.
18  Q.  All right.  You see the middle of Bates page
19  7854, right above the check boxes, it says:  "The
20  undersigned qualifies as an 'accredited investor'" and
21  then there's check boxes.
22  A.  Right.
23  Q.  Did you do anything to check if those were
24  marked off?
25  A.  That was also part of my job function.  I do

Page 170

1  understand in retrospect that there were a few that I
2  overlooked.
3  Q.  Okay.  Did you generally check them?
4  A.  I -- yes.
5  Q.  And what would you do to check them?
6  A.  Well, just to see if they were -- were checked
7  off.
8  Q.  All right.
9  A.  But obviously I slipped.
10  Q.  Okay.  So you've become aware that there are
11  some like the one we're looking at that were not checked
12  off?
13  A.  Yes, there was a small handful; yes, I am aware
14  of that.
15  Q.  Did you ever do anything to follow up with
16  anybody who had not checked off boxes?
17  A.  Well, normally, I would have indicated to the
18  investor that they needed to check one of the boxes, but
19  at times of high activity, I, you know, I -- I -- you
20  know, I missed it.
21  Q.  So -- but there were some instances where you
22  received questionnaires that did not have any boxes
23  checked and you actually did follow up?
24  A.  Perhaps once or twice --
25  Q.  Okay.

Page 171

1  A.  -- yeah.
2  Q.  And when that happened, what did you do?
3  A.  Oh, I would just contact the investor and let
4  them know they needed to resubmit the paperwork.
5  Q.  Did you ever tell them which box to check?
6  A.  No.
7  Q.  Did you ever fill out any of the boxes on
8  behalf of any investors?
9  A.  No.
10  Q.  What about the second page of the subscriber
11  questionnaire?  Did you do anything as far as reviewing
12  the information submitted by the investor?
13  A.  No.  Just to make sure that the -- the
14  signature was intact and legible.
15  Q.  Okay.  So you just made sure they'd signed it?
16  A.  Right.
17  Q.  Did you ever ask any investor in connection
18  with the PPM to submit additional information?
19  A.  No.
20  Q.  Did you ever provide any investors with
21  additional information?
22  A.  I don't understand the question.
23  Q.  Sure.
24      Did you ever send any investors anything
25  outside of the PPM, like additional financial

Page 172

1  statements?
2  A.  No.
3  Q.  Or additional information about the company?
4  A.  No.  That was -- I mean, anything that --
5  everything was -- was contained within the PPM including
6  risk factors, et cetera.  And any -- any financial
7  information that they submitted was taken at face value
8  for, you know, accuracy on behalf of the investor.
9  Q.  Would anyone other than you have been involved
10  in reviewing the subscriber questionnaires?
11  A.  After the fact, no.  I -- it was an assumption
12  that Jim Devine was looking it over, but what -- what I
13  understand now, he was not.
14  Q.  And what's the basis of that understanding?
15  A.  I just assumed we were double-checking each
16  other's work, but, clearly, there were a few that
17  slipped through the cracks.
18  Q.  I guess I'm -- what I'm asking is what's the
19  basis of your understanding that Mr. Devine was actually
20  not double-checking the work?
21  A.  Well, they -- we have a few that were un- --
22  unmarked.  So if he missed it and I missed it, I think
23  it's a fairly easy deduction that we both were not
24  paying attention.
25  Q.  When did you first learn that there were

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

Page 173

1  subscriber questionnaires that -- where there were not
2  boxes checked?
3      A.  Only during the course of submitting
4  documentation to the SEC that it came to the attention
5  of our attorneys.
6      Q.  Was the process which you've just described for
7  collecting the documents and reviewing the documents,
8  was it the same -- same during the 2010 and 2011
9  offerings?
10     A.  Once we -- it never changed.  It was pretty
11  much the same throughout.
12     Q.  And other than receiving and reviewing
13  subscriber questionnaires, did you ever do anything else
14  to check the accreditation status of any investors?
15     A.  No.
16         (Exhibit 44 marked for Identification.)
17     Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
18  Exhibit 44.  It is e-mail correspondence Bates labeled
19  JM003267 through -3273.
20         And, Mr. Mattos, if you'd just take a minute
21  and look at Exhibit 44 and let me know if you recognize
22  it.
23     A.  I do.
24     Q.  And who is Suzanne Gallo, G-a-l-l-o?
25     A.  An investor.

Page 174

1      Q.  And who is Susan Benson, B-e-n-s-o-n.
2      A.  Also an investor and a relative.
3      Q.  Of you?
4      A.  Yes.
5      Q.  Okay.  How are you related to Ms. Benson?
6      A.  Indirectly.  It's my stepfather's ex-wife --
7      Q.  Okay.
8      A.  -- who is the mother of my stepbrothers and
9  -sisters.
10     Q.  All right.  And how did Ms. Gallo come to
11  invest in GenAudio?
12     A.  I -- she is Ms. Benson's best friend, so I
13  believe they probably talked to each other.
14     Q.  Okay.  And then at some point in time, did you
15  talk to Ms. Gallo?
16     A.  I don't specifically recall that conversation.
17  But at that time there were also -- because they were
18  essentially family, there was some family that kind of
19  got involved together, pooled their money, so further
20  down the road we were to -- we did do some stock splits,
21  re-allocations, that kind of thing.
22     Q.  Okay.  If you look at the first page of
23  Exhibit 44, which is the e-mail from you to Ms. Gallo
24  copying Ms. Benson at 10:24 p.m. on April 26th -- do you
25  see that?

Page 175

1      A.  Uh-huh.
2      Q.  It says:  "Thank you in advance for your
3  investment in GenAudio.  The investment money will have
4  to originate from Susan's account.  This is an SEC
5  regulation."
6         What -- what are you talking about there?
7      A.  I don't know specifically, but I would infer
8  that it had to do with -- I believe Ms. Benson was an
9  accredited investor, and again, they were kind of
10  pooling their monies to invest together.  And I think it
11  was a question with regard to how the stock would be
12  split further down the road --
13     Q.  All right.
14     A.  -- which -- which we did do upon request.
15     Q.  Would you do that upon the investors' request?
16     A.  Well, yes.  If a stock owner requested to have
17  shares allocated to their children, we would honor that
18  request.
19     Q.  All right.  So if you flip now to Bates page
20  3270 -- oh, sorry, let's actually start on 3271, go in
21  time.  In the middle of that page, there's an e-mail
22  from March 31st, 2010, at 11:15 a.m.
23     A.  Uh-huh.
24     Q.  Do you see that?
25     A.  Yes.

Page 176

1      Q.  Ms. Gallo writes:  "Jim, what constitutes
2  'accredited investors'?"
3         Do you see that?
4      A.  Yes.
5      Q.  And then if you go over to Bates page 3270, you
6  see your response, and it says:  "Suzanne, Give me a
7  call here at the office (number below) at your earliest
8  convenience.  I would be happy to explain what an
9  accredited investor is."  Then you go on.
10     A.  Right.
11     Q.  What did you tell Ms. Gallo an accredited
12  investor was?
13     A.  I would generally either pull up and recite
14  verbatim or send them a link to the SEC Web site, which,
15  quite, you know, clearly describes what an accredited
16  investor is.
17     Q.  And was Ms. Gallo an accredited investor?
18     A.  I don't recall.
19     Q.  You said you believed Ms. Benson was an
20  accredited investor?
21     A.  I believe she was, yeah.
22     Q.  Did you tell Ms. Gallo to invest through money
23  that she gave to Ms. Benson so it looked like the money
24  was coming from an accredited investor?
25     A.  I don't recall.  That certainly wasn't the

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

---

**Page 177**

1   intention.
2       Q.   Looking back at that first e-mail we talked
3   about on Exhibit 44, the first page, where you wrote:
4   "The investment money will have to originate from
5   Susan's account," I thought you testified that was
6   because Ms. Benson was an accredited investor.
7       A.   I'd have to go back and look at the record.  I
8   believe she is.
9       Q.   So why were you telling Ms. Gallo that she
10  needed to invest through money that came from Ms.
11  Benson's account?
12      A.   It may have been upon explaining what an
13  accredited investor is, that she didn't meet that
14  qualification.  I -- I don't recall the exact nature of
15  the conversation.
16      Q.   Was it your understanding that people could
17  invest in GenAudio even if they weren't accredited as
18  long as they gave the money to an accredited investor?
19      A.   That wasn't the intent of my -- of my
20  conversation with anyone.
21      Q.   Was -- was that your understanding?
22      A.   Restate the question.
23          MS. VOORHEES: Could you read it back.
24      (Record read by the court reporter.)
25          THE WITNESS:  I would say that's accurate.  I mean,

---

**Page 178**

1   if they were doing it through another investor, that was
2   a private transaction between those two parties.
3       Q.   MS. VOORHEES:  And what was the basis of that
4   understanding?
5       A.   Just basic understanding I had from discussions
6   with Jim Devine and others.
7       Q.   So did Jim Devine tell you that that actually
8   was okay?
9       A.   I don't recall that specific conversation.
10      Q.   Did you ever have any conversations with
11  Mr. Mahabub about -- about that issue, about investors
12  who were not accredited investing through people who
13  were accredited?
14      A.   I don't recall.
15      Q.   Okay.
16          (Exhibit 45 marked for Identification.)
17      Q.   MS. VOORHEES:  Mr. Mattos, you've been handed
18  what's been marked as Exhibit 45.  It's e-mail
19  correspondence that's Bates labeled JM002199.
20          Do you recognize Exhibit 45?
21      A.   Yes.
22      Q.   And if you look at this e-mail correspondence,
23  it's between you and a Jason Rosenblatt,
24  R-o-s-e-n-b-l-a-t-t.  Who is Mr. Rosenblatt?
25      A.   I don't recall.

---

**Page 179**

1       Q.   If you look at the first e-mail in time, so at
2   the bottom of the Exhibit 45, there's an e-mail from you
3   to Mr. Rosenblatt on June 20th, 2010, at 11:08 p.m.  And
4   you see that the last sentence of your first paragraph
5   reads:  "Please note that new investors are required to
6   be accredited investors; however, those restrictions do
7   not apply to current investors in GenAudio."
8           Do you see that?
9       A.   Yes.
10      Q.   And did you write that?
11      A.   I did.
12      Q.   And what was the basis of that statement?
13      A.   Just with the understanding that we -- we were
14  going through a reinvestment period that, you know,
15  there were -- there were already investors in GenAudio.
16      Q.   During June of 2010, the March of 2010 offering
17  was ongoing.  Right?
18      A.   That is correct.
19      Q.   All right.  And so was it your understanding
20  that investors who were already invested in GenAudio
21  could invest in that PPM even if they weren't
22  accredited?
23      A.   Well, that was general practice since we
24  didn't -- we didn't stipulate it as such, and we
25  certainly weren't looking to skirt any regulations.  It

---

**Page 180**

1   was just an understanding that if people were invested
2   in previous rounds --
3          (Comments off the record by the reporter and
4           witness.)
5          THE WITNESS: -- "rounds" --
6          (Comments off the record by the reporter.)
7          THE WITNESS: -- that they would be permitted to --
8   to reinvest under the current offering.
9       Q.   MS. VOORHEES:  Even if they were not
10  accredited?
11      A.   I -- maybe that's a bit of an overstatement.
12  Like I said, I wasn't -- I wasn't deliberately trying to
13  skirt regulations.  It was just my understanding at the
14  time.
15      Q.   It was your understanding at the time that
16  current investors did not have to be accredited to
17  invest?
18      A.   No.  Just that they could re-up.
19      Q.   And what do you mean by "re-up"?
20      A.   Re-invest in the company.
21      Q.   Give more money?
22      A.   Correct, yeah.
23      Q.   Under the -- under the 2010 PPM?
24      A.   Correct.
25          (Exhibit 46 marked for Identification.)

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

---

Page 181

1    Q.  MS. VOORHEES:  Mr. Mattos, you've been handed
2  what's been marked as Exhibit 46.  It's e-mail
3  correspondence Bates labeled -7889.
4          Do you recognize Exhibit 46?
5    A.  I do.
6    Q.  And is this e-mail correspondence that you sent
7  and received?
8    A.  I believe so.
9    Q.  And this is e-mail correspondence between you
10  and Elisa DiNallo, E-l-i-s-a, D-i, capital N-a-l-l-o.
11  Am I saying her name correctly?
12    A.  DiNallo.
13    Q.  DiNallo.  All right.
14          Who is Ms. DiNallo?
15    A.  An investor.
16    Q.  And how do you know her?
17    A.  She's a personal friend.
18    Q.  And if you look at the e-mail that she sends on
19  April 22nd, 2011, at 2:56 p.m., that date is on the very
20  bottom of the first page of Exhibit 46.
21    A.  Uh-huh.
22    Q.  Do you see that?
23    A.  Yes.
24    Q.  She writes:  Yes, looks great.  Thank you for
25  all your hard work.  Oops, I think what I meant to say

---

Page 182

1  was accredited.  Is the investment open to everyone or
2  just accredited, and am I accredited?  Sorry for the
3  confusion.
4          Do you see that?
5    A.  Yes.
6    Q.  And then you write back on April 22nd, 2011, at
7  2:12 p.m.:  Oops, establishing the credibility of a
8  "pseudo sophisticated" investor.  If you were thinking
9  about investing, just give me a call.
10          What did you mean by "pseudo sophisticated"
11  investor?
12    A.  I don't recall.
13    Q.  Do you recall this e-mail correspondence at
14  all?
15    A.  I do not.
16    Q.  Was Ms. DiNallo an accredited investor?
17    A.  I don't recall.  She was one of the very early
18  investors, and I know we had -- up until that point, the
19  law stipulated that you could have up to 35 unaccredited
20  investors.  And I know those spots were filled fairly
21  early on in the company's history.  Whether she's an
22  accredited or not, I'd have to look it up.
23    Q.  Did you keep track of that, who was accredited
24  and who was not?
25    A.  I did not, no.

---

Page 183

1    Q.  Did anybody?
2    A.  I believe Jim Devine did.
3    Q.  How would you -- I mean, you said, "I'd have to
4  look it up."  How would you look it up?
5    A.  I would have to look into her file and see what
6  kind of paperwork she had.
7          (Exhibit 47 marked for Identification.)
8          (Comments off the record while exhibit was
9          marked.)
10    Q.  MS. VOORHEES:  Sorry.  Go ahead.
11    A.  I was going to say it's also worth noting that
12  I don't believe that Ms. DiNallo reinvested under
13  that -- under that round.
14    Q.  Okay.  Mr. Mattos, you've been handed what's
15  been marked as Exhibit 47, which is e-mail
16  correspondence Bates labeled JM004734.
17          Do you recognize Exhibit 47?
18    A.  I do.
19    Q.  And did you send and receive these e-mails as
20  indicated?
21    A.  I did.
22    Q.  And who is Wally Fallman?
23    A.  He's an investor and also an uncle.
24    Q.  Okay.  Is he the person that you testified
25  was -- was present during the Astound Holdings vote?

---

Page 184

1    A.  Yes.  They are one and the same.
2    Q.  Okay.  All right.  And he's your uncle?
3    A.  Yes.
4    Q.  And the e-mail that you sent Mr. Fallman on
5  August 2nd, 2010, at 11:18 a.m., you write:  "Hi, Wally.
6  Sounds good.  Please keep in mind any group investments
7  on your family's behalf should be kept track internally.
8  GenAudio cannot officially know anything about it due to
9  SEC laws regulating accredited investors."
10          What did you mean by that?
11    A.  Well, he -- he had invested monies into
12  GenAudio with the understanding that he was going to
13  split them up, which we did at a later date, amongst his
14  children.  He invested, I believe, as an accredited
15  investor, but, you know, there was some additional
16  monies that he wanted -- he was considering reinvesting
17  and splitting it up amongst my cousins.  And it was one
18  of those things where, you know, he wasn't investing as
19  six people.  He was investing as, you know, him and his
20  wife, Wally and Eileen Fallman.
21          (Comments off the record by the reporter.)
22          THE WITNESS:  Eileen, E-i-l-e-e-n.
23          So I was just trying it explain that you have
24  to treat it as a singular investment.  And if you want
25  to split it up, which, again, we were more than happy to

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

Page 221

1  300, San Francisco, California.  Going off the record.
2  The time is 2:58 p.m.
3      (Comments off the record by the reporter.)
4      MR. HOLMES:  Wait.  Before we do that, we should
5  figure out the transcript so he knows what to do with
6  it.
7          Jim, normally this is something your attorney
8  would handle for you or talk about, but you are going to
9  get a chance to review the written booklet of the
10  testimony.  And typically there's a stipulation that
11  says that, you know -- if you don't do a stipulation,
12  then, you know a bunch of things happen that the court
13  reporter has to do.  But if we do a stipulation, then
14  what we do is relieve the court reporter of some of her
15  normal duties, and then we have the deposition
16  transcript sent to you so that you can review it, make
17  any changes that you think need to be made.  Sometimes
18  the response comes out opposite you thought it would be
19  or whatever the change might be.  Then you sign off on
20  changes, and you send it back to counsel for the SEC.
21      THE WITNESS:  Okay.
22      MR. HOLMES:  You have a certain amount of time to do
23  that in.  And I want to just sort of invite you to tell
24  us how much time you need and what process would work
25  for you.

Page 222

1      MR. McCLOSKEY:  Typically it's 30 days.  Are you
2  all right with it being signed under penalty of perjury
3  as opposed to going out, getting the signature
4  notarized?
5      MS. VOORHEES:  Yeah, yes, that's fine.  We can do it
6  under penalty of perjury.  We can provide you a copy of
7  the transcript.  If we give you 30 days, is that
8  sufficient to review?
9      THE WITNESS:  That should be sufficient, yes.
10      (Discussion off the record.)
11      MR. HOLMES:  So, Jim, what that means is you'll get
12  it, and then within 30 days of getting it, you are
13  expected to send back whatever changes you have to the
14  court reporter.
15      THE WITNESS:  Okay.  That's fine.
16      MR. HOLMES:  If you don't do that, then the
17  assumption is you're fine with it as is.
18      THE WITNESS:  Okay.  So no changes, then just don't
19  send it back?
20      MR. HOLMES:  Right.  But it's important to read it
21  because sometimes --
22      THE WITNESS:  No.  I will.
23      MR. McCLOSKEY:  I'd ask you if you have no changes,
24  say you have no changes.  That we way affirm --
25      THE WITNESS:  Okay.  Thank you.

Page 223

1      THE REPORTER:  Counsel, what would you like to
2  order?
3      MS. VOORHEES:  Whatever is in our standard order.
4      THE REPORTER:  Ms. Yuen, would you like a copy?
5      MS. YUEN:  No.
6      THE REPORTER:  Okay.  And, Mr. Holmes?
7      MR. McCLOSKEY:  I'll get you one.
8      MR. HOLMES:  No, not right now.
9      MR. McCLOSKEY:  I'll get a copy.
10      (At 3:01 P.M., the deposition proceedings
11      concluded.)
12
13      ------------------------------
14          JIM WEI-KUNG MATTOS
15
16
17
18
19
20
21
22
23
24
25

Page 224

1  STATE OF CALIFORNIA      )
2                           )  ss.
3  COUNTY OF EL DORADO      )
4      I hereby certify that the witness in the
5  foregoing deposition, JIM WEI-KUNG MATTOS, was by me
6  duly sworn to testify to the truth, the whole truth, and
7  nothing but the truth, in the within-entitled cause;
8  that said deposition was taken at the time and place
9  herein named; that the deposition is a true record of
10  the witness's testimony as reported by me, a duly
11  certified shorthand reporter and a disinterested person,
12  and was thereafter transcribed into typewriting by
13  computer.
14      I further certify that I am not interested in
15  the outcome of the said action, nor connected with, nor
16  related to any of the parties in said action, nor to
17  their respective counsel.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19  this 28th day of July, 2016.
20  Reading and Signing was:
21  _X_ requested  ___ waived  ___ not requested
22
23
24
25          KIMBERLY J. WALDIE, CSR 8696