EXCERPTED

# EXHIBIT 237

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:       )
                        ) File No. D-03450-A
GENAUDIO, INC.          )

WITNESS:    Dell Frank Skluzak
PAGES:      1 through 242
PLACE:      Securities and Exchange Commission
            1961 Stout Street
            Denver, Colorado 80294
DATE:       Monday, December 15, 2014

    The above-entitled matter came on for hearing, pursuant to notice, at 9:00 a.m.



Diversified Reporting Services, Inc.
(202) 467-9200

Page 2

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4      JENNIFER OSTROM, ESQ.
5      KURT GOTTSCHALL, ESQ.
6      Securities and Exchange Commission
7      Division of Enforcement
8      1961 Stout Street
9      Denver, Colorado 80294
10     (303) 844-1000
11
12 On behalf of the Witness:
13     DELL FRANK SKLUZAK, PRO SE

Page 3

1              C O N T E N T S
2
3  WITNESS:                      EXAMINATION
4  Dell Frank Skluzak                 6
5
6  EXHIBITS   DESCRIPTION                IDENTIFIED
7  26      Subpoena                    9
8  27      Background Questionnaire    9
9  28      Document Bates numbered     25
10         No. GA 1816 through 1852
11         (Ledger)
12 29      Document Bates numbered     95
13         GA 4959 through 4961 (E-mail)
14 30      Document Bates numbered     129
15         GA 2139 through 2174
16         (Meeting Minutes)
17 31      Document Bates numbered     135
18         GA 4954 through 4958 (E-mail)
19 32      Document Bates numbered     141
20         GA 4808 through 4900 (Memo)
21 33      Document Bates numbered     147
22         SEC-Skluzak-E-0000126 through 127
23         (Letter)
24 34      Document Bates numbered     162
25         GA 4731 through 4807 (Memo)

Page 4

1              C O N T E N T S (CONT.)
2
3  EXHIBITS   DESCRIPTION                IDENTIFIED
4  35      Document Bates numbered     166
5          GA 4925 through 4938
6          (Shareholder Update)
7  36      Document Bates numbered     171
8          GA 5317 through 5339
9          (Shareholder Update)
10 37      Document Bates numbered     177
11         SEC-Zeis-E-0000506 through 517
12         (Shareholder Letter)
13 38      Document Bates numbered     187
14         GA 4634 through 4638
15         (Letter)
16 39      Document Bates numbered     193
17         GA 2189 through 2227
18         (Meeting Minutes)
19 40      Document Bates numbered     197
20         Mahabub 002784 through 2788
21         (E-mails)
22 41      Document Bates numbered     198
23         GA 2681 and 2682 (Letter)

Page 5

1              C O N T E N T S (CONT.)
2
3  EXHIBITS   DESCRIPTION                IDENTIFIED
4  42      Document Bates numbered     200
5          Mahabub 002807 - 2809 (E-mail)
6  43      Document Bates numbered     205
7          Skluzak D1 and 2 (Letter)
8  44      Document Bates numbered     208
9          GA 5345 through 5350
10         (Shareholder Update)
11 45      Document Bates numbered     226
12         SEC-Skluzak-E-0000434 and 435
13         (Meeting Report)
14 46      Document Bates numbered     227
15         SEC-SkluzakD-P-0000222
16         through 225 (Business Update)
17 47      Document Bates numbered     228
18         SEC-SkluzakD-P-0000217
19         through 220 (Letter)
20 48      Document Bates numbered     228
21         GA 5340 and 5341 (Letter)
22 49      Document Bates numbered     230
23         GA 5302 (Letter)

2 (Pages 2 to 5)

Page 6

1     P R O C E E D I N G S
2         MS. OSTROM: We'll go on the record at
3   9:00 a.m. on December 15 of 2014. Would you please
4   raise your right hand.
5             DELL FRANK SKLUZAK,
6   being first duly sworn in the above cause, was
7   examined and testified as follows:
8              EXAMINATION
9     Q   And would you please state and spell your
10  full name for the record.
11    A   It's Dell Frank Skluzak. First name is
12  Dell, D-e-l-l, middle name Frank, F-r-a-n-k, last
13  name Skluzak, S-k-l-u-z-a-k.
14    Q   And my name is Jennifer Ostrom. And with
15  me is Kurt Gottschall. And we are officers of the
16  United States Securities and Exchange Commission for
17  purposes of this proceeding. And this is an
18  investigation by the Commission in the matter of
19  GenAudio, Inc., to determine whether there have been
20  violations of certain provisions of the federal
21  securities laws. However, the facts developed in
22  this investigation might constitute violations of
23  other federal or state civil or criminal laws.
24        And prior to the opening of the record you
25  were provided with a copy of the formal order of

Page 7

1   investigation in this matter. And it will be
2   available for your examination during the course of
3   this proceeding.
4         Mr. Skluzak, have you had an opportunity
5   to review the formal order?
6     A   I have.
7     Q   And prior to the opening of the record,
8   you were also provided with a copy of the
9   Commission's Supplemental Information Form. And a
10  copy of that notice is what is marked Exhibit No. 1.
11        And, Mr. Skluzak, have you had the
12  opportunity to read Exhibit No. 1?
13    A   I have.
14    Q   And do you have any questions concerning
15  Exhibit No. 1?
16    A   I do not.
17    Q   And, Mr. Skluzak, are you represented by
18  counsel today?
19    A   I am not.
20    Q   You have the right to be accompanied,
21  represented and advised by counsel. This means that
22  you may have an attorney present, and that your
23  attorney can advise you before, during and after
24  your examination here today. Do you understand
25  this?

Page 8

1     A   I do.
2     Q   And since you're not represented by
3   counsel, there are certain matters discussed in
4   Exhibit No. 1 that I want to highlight for you.
5         Do you understand that upon your request,
6   these proceedings will be adjourned so that you may
7   obtain counsel?
8     A   Yes.
9     Q   And do you understand that the statutes
10  set forth in Exhibit No. 1 provide criminal
11  penalties for knowingly providing false testimony or
12  knowingly using false documents in connection with
13  this investigation?
14    A   I understand.
15    Q   And do you understand that you may assert
16  your rights under the Fifth Amendment to the
17  Constitution and refuse to answer any question which
18  may tend to incriminate you?
19    A   I understand.
20    Q   If you want to go off the record, just
21  tell me. She won't go off the record at your
22  request, only at our request. But if you need to
23  take a break or anything like that, just tell me.
24  I'm happy to accommodate you. Okay?
25    A   Okay.

Page 9

1     Q   I'm going to ask you a number of questions
2   today. If you don't understand or don't hear a
3   question, please let me know it and repeat it,
4   rephrase it, whatever it takes for us to be able to
5   understand each other. Also allow me to complete my
6   question before you answer so that we're not both
7   speaking at once so that it's easier for her to take
8   down the notes. And also if you could also answer
9   audibly as we go through today's testimony, I'd
10  appreciate it.
11    A   Okay.
12       (SEC Exhibit 26 marked
13        for identification.)
14        BY MS. OSTROM:
15    Q   Okay. And, Mr. Skluzak, this copy of a
16  subpoena has been marked as Exhibit No. 26. Is this
17  a copy of the subpoena you are appearing pursuant to
18  here today?
19    A   Yes.
20       (SEC Exhibit 27 marked
21        for identification.)
22        BY MS. OSTROM:
23    Q   Mr. Skluzak, I'm handing you what has been
24  marked as Exhibit No. 27. This is your completed
25  Background Questionnaire. Did you complete this

Page 94

1 to appoint two additional board members and to have
2 what was -- is termed the Series C shares, which is
3 what allows him to do that. So with Mr. Mahabub on
4 the board and with his two C series appointments, we
5 had to have four people, so that's what we expanded
6 to.
7     MS. OSTROM: Why don't we go ahead and go
8 off the record and take a break.
9     (Break taken, after which time
10     Mr. Gottschall was no longer present.)
11     BY MS. OSTROM:
12   Q  While we were off the record, Mr. Skluzak,
13 did we have any substantive discussions regarding
14 this investigation?
15   A  We did not.
16   Q  Okay. And after you made your investment
17 in May of 2010, do you recall that there was some
18 type of a video presentation in June of 2010
19 regarding GenAudio?
20   A  I -- I do recall that one was made
21 available. I did not participate in it.
22   Q  Okay. So you didn't watch that?
23   A  I did not.
24   Q  Okay.
25     (SEC Exhibit 29 was marked

Page 95

1     for identification.)
2     BY MS. OSTROM:
3   Q  Mr. Skluzak, let me hand you Exhibit 29.
4 This is numbered GA 4959 through 4961. And did you
5 receive this e-mail?
6   A  I don't specifically recall this one.
7   Q  Okay. This e-mail, if you look at the
8 first paragraph, the last line in the parentheses,
9 it says, Referred to as the LCEC throughout the
10 presentation movie. Do you see that?
11   A  Yes.
12   Q  Do you recall any video where there was
13 references to the LCEC?
14   A  I do not.
15   Q  Okay. This also, then, references
16 presentations in that second paragraph, 10 of them,
17 in various locations. Did you attend any of these
18 presentations?
19   A  I did not.
20   Q  Okay. Did you ever attend any
21 presentations?
22   A  Yes.
23   Q  Okay. And when was the first one that you
24 can recall attending?
25   A  The -- the first one would have been in --

Page 96

1 would have been in 2013. And I'm thinking
2 approximately February or March. It was -- it was
3 done at the Tabor Westin.
4   Q  Okay. Do you recall one that happened in
5 March of 2012?
6   A  Pardon me. It was March 2012. Yes.
7 Yeah.
8   Q  Is that the one you're referring to?
9   A  Yes.
10   Q  So it was here in Denver?
11   A  Yes.
12   Q  And what were the details of what happened
13 at that presentation? What was the purpose? What
14 went on? Just --
15   A  It was a general shareholder update. And
16 at that meeting I remember specifically being very
17 encouraged because Jerry introduced Michael Franzi.
18 And I believe Mr. Tiscareno was there also. I'm not
19 absolutely sure. But I do remember Mr. Franzi being
20 there because I asked -- I got the opportunity to
21 ask him some questions.
22     And I remember Mr. Mahabub giving a
23 PowerPoint presentation showing some demonstrations
24 of pieces of equipment, headphones, a helmet that
25 was provided by the military. And I remember I

Page 97

1 actually wrote a summary report after that that I
2 shared with a number of people who were friends of
3 mine and had invested in the company. I was mostly
4 encouraged by the fact that people like Michael
5 Franzi and Vic Tiscareno, who were industry-
6 experienced people, were being brought onboard. And
7 I felt that was a very good sign.
8   Q  Do you recall who you sent the summary
9 report to?
10   A  I would have sent it to my daughter,
11 Stephanie McGregor. I would have sent it to Brian
12 Foy, Carlos Palma, Tom Kaminski, Albert Lee, Brian
13 Glass, my wife, Carrie Skluzak, her brother, Chris
14 Hartman, Matt Osborne, and probably a variety of
15 other friends who were either interested in GenAudio
16 or had also possibly invested.
17   Q  Did you reference Apple in there at all?
18   A  I don't recall.
19   Q  Okay. How about any executed license
20 deals at that time?
21   A  Yes. We -- I would have mentioned the
22 license deal most likely with BDA headphones.
23   Q  Okay.
24   Q  Okay. What was your understanding as to
25 the license deal that was with BDA at that point in

Page 170

1  with Apple or any contact with Apple?
2      A   Well, when I read this, and it says they
3  met -- he met with the CEO, I thought, you know,
4  that they were just moving in a different direction.
5  But it was still -- my impression was it was still
6  active.
7      Q   Okay.  And what you're referencing is that
8  very first paragraph under the heading the LCEC, the
9  third sentence says, I met with their CEO and gave
10 him a demo of our technology, and he stated, quote,
11 I really like your technology and look forward to
12 seeing you again in the future, close quote.  Did
13 you have any reason to disbelieve that Mr. Mahabub
14 had met with Steve Jobs and had been told this?
15     A   No.  He confirmed it in a telephone
16 conversation that he had met him in the hallway and
17 shook hands with him.
18     Q   Okay.  And this is what we talked about
19 earlier, correct?
20     A   Yes.
21     Q   So seeing this in writing just reinforced
22 that to you?
23     A   Yes.
24     Q   Okay.
25         (SEC Exhibit 36 was marked

Page 171

1         for identification.)
2         BY MS. OSTROM:
3     Q   Mr. Skluzak, let me hand you Exhibit 36,
4  GA 5317 through 5339.  And this is a shareholder
5  progress report dated February 26th of 2011.  Have
6  you seen this before?
7     A   Yes.
8     Q   Okay.
9     A   I remember this one because I thought it
10 looked like an artichoke.
11    Q   And other than the license with Monster
12 that's mentioned in Exhibit No. 36, was there
13 anything else in here that led you to believe there
14 was anything else going on with the company at this
15 time in terms of business progress?
16    A   They had gone to the CES 2011, and they
17 rented a demo suite.  Basically it's a suite in one
18 of the hotels there.  And GenAudio was just -- you
19 know, it continued to be good news.  In fact, one
20 thing I remember is we started bumping up into with
21 maximum number of shareholders, so there was a
22 little caution, stuff like that.  It was in
23 Section 2.  And I remember thinking how in the world
24 could you get so many people to invest in a little
25 company.  I just remember that for some reason.

Page 172

1     Q   If you turn to Page GA 5329, there's a
2  heading for Panasonic right in the middle.  Now,
3  there's these references to Panasonic.  This is
4  to -- not to the automotive, but to the other part
5  of Panasonic, is that correct, at this point in
6  time?
7     A   I -- I think this was the major Panasonic
8  at this point in time.
9     Q   Okay.  Now, the second paragraph says --
10 the first sentence says, Panasonic is interested in
11 licensing our technology for integration into many
12 of their product offerings.  Did you ever talk with
13 Mr. Mahabub about who his contacts were in Panasonic
14 that were interested in licensing the technology?
15    A   No.  Not at this point.
16    Q   Okay.  And then if you could turn to
17 Page 5331, near the bottom there is a heading for a
18 large consumer electronics company, the LCEC.  And
19 the very first sentence says, Our discussions with
20 the confidential LCEC that I have previously advised
21 you about in prior communications are ongoing.  This
22 is now February 26th of 2011.  Do you have any
23 reason to believe that that was accurate at the
24 time?
25    A   No.  I -- I thought what he stated was

Page 173

1  factual, but it concerned me because, you know, the
2  guy who was our champion was leaving and nothing had
3  really happened.  And in electronics, two years is a
4  long time.
5     Q   And am I correct that we're now talking
6  about February of 2011, so you subsequently found
7  out that the -- anything with Apple had actually
8  fallen apart in August of 2010; is that correct?
9     A   Yeah.  Whenever -- it was previous to this
10 update, but whenever that supposed -- or that
11 meeting happened and the supposed phone call.
12    Q   Okay.
13    A   I forget what date that was.  It doesn't
14 matter.
15    Q   No, it does.  I appreciate it if you look
16 at it.  Go ahead and look at it.
17    A   Yeah.  It was -- May 2010 is when it fall
18 apart.
19    Q   Okay.  So it was actually earlier.  And
20 then what we saw was an August 2010 update that was
21 still referring to it, but by that time it had
22 already fallen apart --
23    A   Right.
24    Q   -- to your knowledge subsequent?
25    A   Yes.  Subsequent to that.  And I

Page 174

1  remember -- you might have it in the other stuff
2  you're going to produce, but they talked about going
3  into a super secret NDA, which I remember thinking
4  that sounded funny, too, because an NDA is an NDA,
5  so...
6      Q   Were you ever told who the contact was
7  going to be at Apple after Mr. Tiscareno retired?
8      A   I was not informed of that.
9      Q   Okay.  So am I correct that still -- here
10 in February of 2011 you were still seeing references
11 to the LCEC that comport with what you're being told
12 by Mr. Mahabub and what you believed was actually
13 happening with Apple?
14     A   Yes.
15     Q   So they're -- they're not ready to do a
16 deal, but they're still talking to them?
17     A   Right.
18     Q   Okay.
19     A   Yeah.  The -- the movement of Victor away
20 from the company had slowed the process down.
21     Q   Okay.  Let me hand you Exhibit No. 17.
22 This is a shareholder letter dated April 22nd of
23 2011.  And it accompanied the Private Placement
24 Memorandum of the same date.  Have you seen that
25 before?

Page 175

1      A   Yes.
2      Q   Okay.  Did you -- on Page 3 of
3  Exhibit No. 17, there's a reference to a
4  $3.3 billion valuation by Dr. Khoury of
5  GenAudio's technology.  Do you see that?
6      A   Yes.
7      Q   Did you notice know that at the time?
8      A   Yes.
9      Q   Did you have any questions about that?
10     A   I didn't believe it.  The way I read it
11 was that the company was worth 3.3 billion, and
12 that's what you should value the stock at.  Take
13 that number, divide it by the shares of outstanding,
14 that's what your stock should be worth.
15     Q   Did you ever talk to Dr. Khoury about how
16 he came up with this $3.3 billion?
17     A   I did not.
18     Q   Okay.  Now, there's a reference to the
19 ASE, the AstoundSound expander?
20     A   Um-hum.  Yes.
21     Q   What happened with that?  What was the
22 deal with that?
23     A   I don't know a lot about that, but what --
24 this was a software patch, basically, that would
25 enable or enhance the speakers on your device to

Page 176

1  provide a better sound.  And from -- I never
2  implemented it on my devices.  From what I
3  understood that when they developed it, they had
4  integration problems with -- I don't know whether it
5  was -- was with the Apple software or whether it was
6  the Microsoft software.  But one of them wasn't
7  compatible.  And that's where the largest market
8  share was.  And they couldn't keep up with the
9  progress of the chips and they had download issues.
10 And it just -- it was not a successful business
11 venture.
12     Q   And it was pulled from the market,
13 correct?
14     A   Yes.
15     Q   And do you know if it was ever put back on
16 the market in any way?
17     A   It's been reconstituted here most recently
18 with apps for people who can download the software
19 onto their devices, and it enhances the sound.
20     Q   Okay.
21     A   I've not done it personally.  I've had
22 people who have done it and say for the most part it
23 works and it does improve the sound.
24     Q   Are they selling it, though?
25     A   They are -- they're -- they have two

Page 177

1  revenue models.  One is it's a direct download from
2  the Apple store or Google Play or whatever.  It's a
3  99 cents download and a 50-50 revenue.  And the
4  other is it's free if you download it, and then you
5  get a cut of the advertisements that are run during
6  that particular download.
7      Q   Okay.  Okay.
8      A   Based on what I've been told, the revenue
9  is in the hundreds of dollars.  It's insignificant.
10     Q   Okay.
11         (SEC Exhibit 37 was marked
12          for identification.)
13         BY MS. OSTROM:
14     Q   Mr. Skluzak, let me hand you
15 Exhibit No. 37.  This is Bates numbered
16 SEC-Zeis-E-0000506 through 517.  And this is a
17 shareholder letter dated September 1st of 2011 from
18 Mr. Mahabub.  Have you seen this before?
19     A   I have.
20     Q   Did you receive this about this time,
21 September of 2011?
22     A   Yes.
23     Q   And is this the first time that you
24 believe that Mr. Franzi was engaged, as it shows in
25 that first page at the bottom?

Page 238

1  group.
2    Q  Mr. Suel?
3    A  Mr. Suel.  Because, totally nonrelated,
4  one of the things Sam Khoury had told me is that he
5  had just received a big contract from Panasonic to
6  do a bunch of their IP evaluation.  Had nothing to
7  do with GenAudio, but it was -- and then Larry had
8  talked to Dr. -- or Patrick Suel that Patrick is now
9  only one of two persons left on the venture capital
10 group and how that group is disbanding.  And then
11 that was the tone of the conversation about how
12 that -- Panasonic financially has a lot of problems,
13 so...
14   Q  Okay.  What have you spoken with Mr. Bobak
15 about with regard to this investigation?
16   A  It's basically that I had been called in
17 and been subpoenaed.  Mr. Bobak currently is engaged
18 in a bunch of other stuff that's very time
19 consuming, and I just call him and just tell him and
20 leave a voice mail.  He'll call -- his son is going
21 to school at DU, so he'll call, have a three-second
22 conversation about GenAudio, and then we talk about
23 fly fishing and his son.
24   Q  Did you tell Mr. Bobak what your testimony
25 was going to be today?

Page 239

1    A  No.
2    Q  Okay.
3    A  Just told him I'd been called in.
4    Q  And Dr. Galanis, what have you spoken with
5  him with regard to the investigation?
6    A  Similar conversation with Mr. Bobak.  Just
7  have been called in and -- and would keep him
8  apprised if there was anything going on.
9    Q  Okay.  And other than Dr. Khoury, do you
10 know anyone else who has been -- sorry, Dr. Khoury
11 and Larry Coey, do you know anyone else who has been
12 subpoenaed or testified in this investigation?
13   A  I do not know anybody else.
14   Q  Okay.  Have you spoken with anyone
15 regarding your appearance here today other than the
16 people we've just talked about?
17   A  Yeah.  Well, my wife, my -- the lady who
18 works for me, my brother.
19   Q  Okay.  Anyone else?
20   A  Not that I can think of.
21   Q  Okay.  And is there anything that you wish
22 to clarify or add to the statements you've made
23 today?
24   A  No.
25   Q  Okay. Mr. Skluzak, we've no further

Page 240

1  questions at this time.  We may, however, call you
2  again to testify in this investigation.  And should
3  that be necessary, I will contact you.  And we are
4  off the record at 3:25 p.m. on December 15th, 2014.
5       (Whereupon, at 3:25 p.m. the proceedings
6  were adjourned.)
7
8               * * * * *

Page 241

1            PROOFREADER'S CERTIFICATE
2
3  In the Matter of:   GENAUDIO, INC.
4  Witness:        Dell Skluzak
5  File Number:      D-03450-A
6  Date:           December 15, 2014
7  Location:        Denver, CO
8
9
10    This is to certify that I, Nicholas Wagner,
11 (the undersigned), do hereby swear and affirm
12 that the attached proceedings before the U.S.
13 Securities and Exchange Commission were held
14 according to the record and that this is the
15 original, complete, true and accurate transcript
16 that has been compared to the reporting or recording
17 accomplished at the hearing.
18
19
20
21 _____   _____
22 (Proofreader's Name)      (Date)

```
                                                          Page 241

 1                  PROOFREADER'S CERTIFICATE

 2

 3   In the Matter of:    GENAUDIO, INC.

 4   Witness:             Dell Skluzak

 5   File Number:         D-03450-A

 6   Date:                December 15, 2014

 7   Location:            Denver, CO

 8

 9

10        This is to certify that I, Nicholas Wagner,

11   (the undersigned), do hereby swear and affirm

12   that the attached proceedings before the U.S.

13   Securities and Exchange Commission were held

14   according to the record and that this is the

15   original, complete, true and accurate transcript

16   that has been compared to the reporting or recording

17   accomplished at the hearing.

18

19

20

21   _____      _____12-30-2014_____

22   (Proofreader's Name)              (Date)

23

24

25
```

```
 1                    REPORTER'S CERTIFICATE
 2
 3  I, Sharon R. Dobson, reporter, hereby certify that the
 4  foregoing transcript of  240  pages is a complete, true
 5  and accurate transcript of the testimony indicated, held
 6  on  12-15-14 , at  Denver, CO   in the matter of:
 7         Gen Audio, Inc.                                   .
 8
 9  I further certify that this proceeding was recorded by
10  me, and that the foregoing transcript has been prepared
11  under my direction.
12
13
14  Date:     12-30-14
15
16
17  Official Reporter:  Sharon R Dobson
18
19
20          Diversified Reporting Services, Inc.
21
22
23
24
25
```