**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-02118-WJM-MLC

SECURITIES AND EXCHANGE
COMMISSION,

                  Plaintiff,

        v.

TAJ JERRY MAHABUB and
GENAUDIO, INC.,

              Defendants.

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REVISED MOTION FOR
SUMMARY JUDGMENT AGAINST DEFENDANTS TAJ JERRY MAHABUB AND
GENAUDIO, INC.**

---

# TABLE OF CONTENTS

I.     **PRELIMINARY STATEMENT** ............................................................................... 1

II.    **MOVANT'S STATEMENT OF MATERIAL FACTS** ......................................... 2

   A.    Mahabub And GenAudio Background. ........................................................................ 2

   B.    Prior To November 2009:  Mahabub Conditioned The Market For
GenAudio Stock By Touting GenAudio's Relationship With Apple. ............................. 4

   C.    Beginning In November 2009: Mahabub Offers And Sells His
Personal Shares Of GenAudio Stock While Engaging In Deceptive Conduct. ............ 8

   D.    December 2009 And January 2010:  Apple Tells Mahabub That No "Deal" is
Occurring Anytime Soon. ............................................................................................ 11

   E.    February 2010 And March 2010:  In Connection With GenAudio's 2010 Offering,
Mahabub Provided Investors And The Board With Fraudulent Information
Regarding Progress With Apple. ................................................................................. 11

   F.    April 2010 Through August 2010:  While GenAudio Offered And Sold Stock
Through The 2010 Offering, Mahabub Continued To Create False And
Fraudulent Documents And Lie To Shareholders, Potential Investors,
And The GenAudio Team. ........................................................................................... 16

   G.    September 2010:  GenAudio's Substantive Meetings With Apple Ended. ................. 20

   H.    December 2010 To March 2011:  Defendants' Scheme And Misrepresentations
Continued To Condition The Market For The 2011 Offering. ...................................... 20

   I.    April 2011 To April 2012:  The 2011 Offering. .......................................................... 22

   J.    Representations About GenAudio's Dealings With Apple Were Material
To GenAudio Investor Investment Decisions. ............................................................ 25

III.    **ARGUMENT** ................................................................................................... 25

   A.    The Legal Standard For Summary Judgment. ........................................................... 26

   B.    GenAudio And Mahabub Conducted Unregistered Offerings That Violated
Sections 5(a) And 5(c) Of The Securities Act. .......................................................... 26

   C.    Defendants Violated Section 17(a) Of The Securities Act. ....................................... 31

     i.    The Legal Standard. ............................................................................................... 31

ii. Section 17(a)(2): Defendants Obtained Money Or Property By Means Of Material Misrepresentations And Omissions.......................................... 32

iii. Section 17(a)(1):  Defendants Employed A Device, Scheme, Or Artifice To Defraud ............................................................................ 43

iv. Section 17(a)(3):  Defendants Engaged In A Transaction, Practice Or Course Of Business That Operated As A Fraud Upon Purchasers................... 49

D. Defendants Violated Section 10(b) and Rule 10b-5 of the Exchange Act.................. 51

i. The Legal Standard................................................................................ 51

ii. "In Connection With" And Scienter......................................................... 51

iii. Section 10(b) And Rule 10b5-(b):  Defendants Made Material False And Misleading Statements And Omissions. .......................................... 55

iv. Section 10(b) And Rule 10b-5(a):  Defendants Employed Devices And A Scheme To Defraud. .................................................................... 57

v. Section 10(b) And Rule 10b-5(c):  Defendants Engaged In Act, Practices, Or A Course Of Business Which Operated As A Fraud........................ 59

IV. **CONCLUSION** ............................................................................ 60

## TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980) ........................................................................ 27, 32

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083(10th Cir. 2003) ..................................... 48

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972)........................................ 52

*Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017 (9th Cir. 1999) ............ 53

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).................................................... 26

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ................................................................. 32

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)............................................................... 26

*Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (2014)................................... 43, 54

*Coit v. Zavaras*, No. 16-1146, 2017 WL 104447 (10th Cir. Jan. 11, 2017).................... 26

*Geman v. SEC*, 334 F.3d 1183 (10th Cir. 2003) ........................................................... 40

*Ghiasy v. Kroger Co.*, No. 11-CV-01667-WJM-MJW, 2012 WL 6720650 (D. Colo. Dec.
    27, 2012) ................................................................................................................. 26

*Hackbart v. Holmes*, 675 F.2d 1114 (10th Cir. 1982) ................................................... 47

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944).................................................................... 41

*Hughes v. SEC*, 174 F.2d 969 (D.C. Cir. 1949)............................................................. 41

*In re Dennis J. Malouf*, Securities Act Release No. 10115, 2016 WL 4035575 (July 27,
    2016) ..................................................................................................... 43, 49, 50

*Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011)................. 56

*Lorenzo v. SEC*, 872 F.3d 578 (D.C. Cir. 2017) ........................................................... 43

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006) ...................... 52

*N. Sims Organ & Co. v. SEC*, 293 F.2d 78 (2d Cir. 1961)............................................. 42

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S.Ct. 1318
    (2015) ..................................................................................... 26, 32, 34, 35

*SEC v. Calvo*, 378 F.3d 1211 (11th Cir. 2004) ....................................................... 27, 28

*SEC v. Cavanagh*, 155 F.3d 129, 134 (2d Cir. 1998).................................................... 29

*SEC v. Cavanagh*, 445 F.3d 105 (2nd Cir. 2006).......................................................... 28

*SEC v. Cole*, No. 12-cv-8167 (RJS), 2015 WL 5737275 (S.D.N.Y. Sept. 19, 2015) ..... 42

*SEC v. Cont'l Tobacco Co.,* 463 F.2d 137 (5th Cir. 1972) ............................................ 27

*SEC v. Cooper*, 142 F. Supp. 3d 302 (D.N.J. 2015) ....................................................... 46

*SEC v. Curshen*, 372 F. App'x 872 (10th Cir. 2010) ................................... 32, 36, 37, 42

*SEC v. Daifotis*, 874 F. Supp. 2d 870 (N.D. Cal. 2012) ................................................ 56

*SEC v. E-Smart Techs., Inc.*, 74 F. Supp. 3d 306 (D.D.C. 2014) ................................. 56

*SEC v. Gallagher*, No. 87-3904, 1989 WL 95252 (E.D. Pa. 1989) ............................... 48

*SEC v. Goble*, 682 F.3d 934 (11th Cir. 2012) ............................................................... 52

*SEC v. Goldstone*, 952 F. Supp. 2d 1060 (D.N.M. 2013) ............................................. 56

*SEC v. Gordon*, 522 F. Appx. 448 (10th Cir. 2013) ...................................................... 27

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) ........................................................... 28

*SEC v. Huttoe*, 1998 WL 34078092 (D. D.C. 1998) ..................................................... 42

*SEC v. Kearns*, 691 F. Supp. 2d 601 (D.N.J. 2010) ..................................................... 45

*SEC v. Koracorp Indus. Inc.*, 575 F.2d 692 (9th Cir. 1978) .......................................... 40

*SEC v. Levin*, No. 12-21917, 2013 WL 5588224 (S.D. Fla. Oct. 10, 2013) .................. 56

*SEC v. Luna*, No. 2:10-CV-2166-PMP-CWH, 2014 WL 794202 (D. Nev. Feb. 26, 2014)
.................................................................................................................................... 31

*SEC v. Monterosso*, 557 F. App'x 917 (11th Cir. 2014) ............................................... 46

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) .................................................. 27, 29, 37

*SEC v. North American Research and Development Corp.*, 424 F.2d 63 (March 25,
1970, 2nd Cir.) ............................................................................................................ 58

*SEC v. Parrish*, No. 11-CV-00558-WJM-MJW, 2012 WL 4378114 (D. Colo. Sept. 25,
2012) ................................................................................................................... 43, 47

*SEC v. Pirate Inv'r LLC*, 580 F.3d 233 (4th Cir. 2009) ...................................... 53, 54, 57

*SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072 (9th Cir. 2010)* .......................... 27

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ......................................................... 30

*SEC v. Rana Research, Inc.* 8 F.3d 1358 (9th Cir. 1993) .............................................. 41

*SEC v. Recile*, 10 F.3d 1093 (5th Cir. 1993) ................................................................ 37

*SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1171 (D.C. Cir. 1978) ................................ 53

*SEC v. Smart*, 678 F.3d 850 (10th Cir. 2012)................................................................ 47

*SEC v. Softpoint, Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997)............................................. 27

*SEC v. Sullivan*, 68 F. Supp. 3d 1367 (D. Colo. 2014) .................................................. 49

*SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir. 1968) ..................... 37, 52, 53, 54

*SEC v. Universal Express, Inc.*, No. 04 Civ. 2322(GEL), 2007 WL 2469452 (S.D.N.Y.

    Aug. 31, 2007) ........................................................................................................... 48

*SEC v. USA Real Estate Fund 1, Inc.*, 30 F. Supp. 3d 1026 (E.D. Wash. 2014)........... 31

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ............................ 47, 51, 52, 53, 54, 57

*SEC v. Zandford*, 535 U.S. 813 (2002)........................................................................... 52

*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) ........................................... 53

*Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6 (1971) ......................... 52

*Swenson v. Engelstad*, 626 F.2d 421 (5th Cir. 1980).................................................... 27

*United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.,* 210 F.3d 1207 (10th Cir. 2000) ..... 53

*United States v. Naftalin*, 441 U.S. 768 (1979)........................................................passim

*United States v. O'Hagan*, 521 U.S. 642 (1997)............................................................. 53

*United States v. Wolfson*, 405 F.2d 779, 782 (2d Cir. 1968) ......................................... 29

*World Trade Fin. Corp. v. SEC*, 739 F.3d 1243 (9th Cir. 2014).................................... 29

**Statutes**

15 U.S.C. § 77b(3) ........................................................................................................ 31

15 U.S.C. § 77b(a)(4) .................................................................................................... 29

15 U.S.C. § 77d(a)(2) .............................................................................................. 29, 30

15 U.S.C. § 77e(a) .................................................................................................... 1, 27

15 U.S.C. §§ 77g............................................................................................................ 27

15 U.S.C. § 77q(a) .................................................................................................... 1, 31

15 U.S.C. § 77q(a)(1) .............................................................................................. 43, 46

15 U.S.C. § 77q(a)(2) .............................................................................................. 32, 40

15 U.S.C. §77q(a)(3) ..................................................................................................... 49

15 U.S.C. §§ 77aa......................................................................................................... 27

15 U.S.C. § 78j(b) .................................................................................................... 1, 51

15 U.S.C. § 78t(a) ........................................................................................ 56

17 C.F.R. § 230.144(a)(1) ............................................................................ 29

17 C.F.R. § 230.500(d) ................................................................................. 29

17 C.F.R. §§ 230.501 ................................................................................... 30

17 C.F.R. §§ 230.502(b)(2)(B)(1) ................................................................ 30

17 C.F.R. § 230.502(b)(2)(B)(2) .................................................................. 30

17 C.F.R. § 230.506 .............................................................................. 29, 30

17 C.F.R. §§ 230.506(b)(1) .......................................................................... 30

17 C.F.R. § 240.10b-5 ........................................................................ 1, 51, 53

### Other Authorities

Fed. R. Civ. P. 56(a) .................................................................................... 26

J. William Hicks, *Exempted Transactions under the*

  *Securities Act of 1933* (2012) ............................................................. 29, 30

## I.     PRELIMINARY STATEMENT

As provided in the Court's Order Denying Motion to Strike and Denying Motion for Summary Judgment without Prejudice (ECF No. 80) ("Order"), Plaintiff Securities and Exchange Commission ("SEC") submits this revised motion for summary judgment against Defendants Taj Jerry Mahabub ("Mahabub") and GenAudio Inc. ("GenAudio") (collectively, "Defendants"). The SEC moves on all of its claims. The Defendants violated:  (1) the securities registration provisions of Section 5(a) and (c) of the Securities Act of 1933 ("Securities Act"); (2) the anti-fraud provisions of Section 17(a) of the Securities Act; and (3) the anti-fraud provisions of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 adopted thereunder. 15 U.S.C. §§ 77e(a) and (c), 77q(a), 78j(b) and 17 C.F.R. § 240.10b-5.[1]

The undisputed facts establish that Defendants violated the registration provisions by offering and selling securities of GenAudio when no registration statement was filed or in effect and no exemption from registration applied. In addition, Defendants violated the anti-fraud provisions by repeatedly making false and misleading statements and material omissions regarding GenAudio's prospects with Apple Inc. ("Apple") in communications with investors and potential investors,[2] and by engaging in a scheme and fraudulent course of business whereby they encouraged people to invest in GenAudio by lying about GenAudio's prospects as a legitimate takeover target or licensing partner of Apple.

For the reasons discussed below, the SEC respectfully requests entry of

---

[1] If the Court grants summary judgment, the SEC will submit a separate motion on remedies.

[2] Demonstrative 1 was created by the SEC to summarize false statements made by the Defendants to investors and potential investors during the 2010 Offering.

summary judgment on all of its claims.

## II.   MOVANT'S STATEMENT OF MATERIAL FACTS

### A.   Mahabub And GenAudio Background.

1.      GenAudio is a Colorado corporation with its principal place of business in Centennial, Colorado and it engages in the development and marketing of software that creates three-dimensional audio, which it calls "AstoundSound." *See* Answers ¶ 19.[3]

2.      GenAudio has never registered an offering of securities under the Securities Act. Answers ¶¶ 19, 130, 131; Ex. 1, SEC Attestations (Feb. 29, 2016 and Mar. 16, 2017).[4]

3.      Mahabub is the founder of GenAudio. He served as GenAudio's Chief Executive Officer ("CEO") and Chairman of the Board of Directors ("Board") from 2009 to 2012. Answers ¶ 18. Ex. 2, Mahabub Dep. 459:24 – 460:5 (Jan. 19 and Feb. 8, 2017).[5]

4.      Between November 2009 and April 2012, Mahabub had the right to vote a majority of GenAudio's securities and controlled GenAudio's Board. *See* Ex. 3 at 9 and GA000523; Ex. 4 at 9 and 43.

5.      Between November 2009 and April 2012, some members of GenAudio's Board were also GenAudio shareholders. *See* Ex. 3 at GA000523 (listing Directors who were also shareholders).

---

[3] Facts admitted in the Answers of Mahabub and GenAudio are cited as "Answers ¶ __." GenAudio's Answer is ECF No. 14. Mahabub's Answer is ECF No. 15.
[4] The SEC has renumbered and resubmitted all exhibits to this revised motion for summary judgement.
[5] True and correct copies of transcripts from witnesses who gave sworn testimony during the SEC investigation are cited as "Ex. __, [Witness Last Name] Inv. ___" and during depositions are cited as "Ex. __, [Witness Last Name] Dep. ___". The date(s) of the testimony are cited in the first reference.

6.      Between 2009 and May 2012, Jim Wei-Kung Mattos was the Support Services Manager of GenAudio and his "primary functions [for GenAudio] were to continue to raise money for the company, reaching out through friends and family [and] to manage company records …." Ex. 5, Mattos Inv. 19:8-10 (Feb. 9, 2015); Ex. 6, Mattos Dep. 24:15-22 (July 22, 2016).

7.      Mattos and Mahabub were primarily responsible for bringing in investors to GenAudio, including through the sales of Mahabub's personal stock. Ex. 6, Mattos Dep. 69:18 - 70:3 (addressing Ex. 7), 155:24 – 156:19, and 159:17-25.

8.      Between 2009 and 2012, James T. Devine was GenAudio's Vice President of Finance and his job duties included accounting, issuing stock certificates, and maintaining GenAudio's stock transfer ledger. Ex. 8, Devine Dep. 49:25 – 50:8 (July 19, 2016).

9.      Between 2009 and 2012, GenAudio financed its operations primarily through the sale of debt and equity securities to investors. *See* Answers ¶ 24.

10.     Between 2009 and 2012, GenAudio was consistently insufficiently funded. Ex. 2, Mahabub Dep. at 155:12-15.

11.     GenAudio needed investors' funds to continue to develop technology and to permit Mahabub to travel and attend conferences. *Id.* at 65:15-20 (addressing July 2009 email correspondence) and 153:15 – 155:11 (addressing Ex. 9).

12.     In explaining why he made certain statements encouraging GenAudio's employees, contractors, and Board (collectively, the "GenAudio Team") to assist in fundraising, Mahabub testified:

> *I mean, it takes money to do business. You can't -- certainly can't fly for free and stay in hotel rooms for free with team members, or attend Game*

*Developer Conference or CES for free either. Those all cost money. <u>And in order to have money, you usually have to either raise money or you're independently wealthy, and I burned through all my money already</u>.*

*Id.* at 173:5 – 12; *see also* 171:18-173:12 (addressing <u>Ex. 9</u>) (emphasis added).[6]

**B.    Prior To November 2009:  Mahabub Conditioned The Market For GenAudio Stock By Touting GenAudio's Relationship With Apple.**

13.    Leading up to the offerings at issue in this case, Mahabub conditioned the market by touting GenAudio's compatibility with Apple products and its relationship with Apple. For example, in December 11, 2008 and March 25, 2009 offering documents, GenAudio claimed, "*[o]ver the past several years, [GenAudio] has established excellent relationships with both senior management and software developers at Apple*" and explained that it developed its software and products to be compatible with Apple products. <u>Ex. 10</u> at 18 (GA006507); <u>Ex. 11</u> at 26 (GA007392).

14.    Similarly, in a cover email distributing the March 25, 2009 offering document, Mahabub claimed that a GenAudio product was among the top downloads on Apple's website and "*[t]he selection to be the featured product came from internal Apple staff and has nothing to do with any of our paid marketing programs or advertising.*" <u>Ex. 12</u> at 1.

15.    In May 2009, Mahabub renewed his contact with Apple and reintroduced AstoundSound to Apple. <u>Ex. 13</u> at 1.

16.    From 2009 through 2012, Mahabub was GenAudio's primary point of contact with Apple and controlled the dissemination of the information about dealings

---

[6] The SEC has italicized key statements made by, or attributed to, Mahabub and his contacts at Apple.

with Apple to GenAudio's Board, employees, shareholders, and prospective investors. Answers ¶¶ 38, 124.

17.     Mahabub's primary contact at Apple was Victor Tiscareno, who was a senior audio and acoustic engineer at Apple until February 2011. <u>Ex. 14</u>, Tiscareno Inv. 11:5-9, 11:15-23, and 12:20-25 (Dec. 3, 2014 and Apr. 29, 2015); <u>Ex. 15</u>, Mahabub Inv. 70:2-5 (Feb. 5 and 12, 2015).

18.     Mahabub also met and communicated with Michael Hailey, who was a product market manager with Apple for the iPod, iPhone, and iPad product lines, and Ronald Isaac, who was a signal processing engineer and acoustician technologist with Apple. <u>Ex. 16</u>, 10:24-12:9, 16:7-19, and 17:6-9 (Apr. 21, 2015); <u>Ex. 17</u>, Isaac Inv. 8:17-25 (Apr. 15, 2015); <u>Ex. 15</u>, Mahabub Inv. 69:23-70:5 (regarding Isaac) and 153:23-154:2 (regarding Hailey).

19.     On or about July 1, 2009, Mahabub executed Apple's standard non-disclosure agreement ("NDA") on behalf of GenAudio. *See* Answers ¶ 29.

20.     Beyond the July 2009 NDA, GenAudio never entered into any agreements with Apple. *See* <u>Ex. 15</u>, Mahabub Inv. 102:25-105:15.

21.     Apple never told Mahabub or GenAudio that it planned to incorporate GenAudio's technology into any of its new product roll-outs. <u>Ex. 18</u>, Tiscareno Dep. at 313:4-11, 314:12 – 315:17 (Dec. 16, 2016); <u>Ex. 19</u>, Isaac Dep. 193:24 – 194:11 (Jan. 13, 2017); <u>Ex. 20</u>, Hailey Dep. 97:1 – 98:3, 151:19-22 and 154:11-17 (Jan. 23, 2017).

22.     Apple never indicated that it was interested in licensing GenAudio's technology or acquiring GenAudio or GenAudio's technology. <u>Ex. 14</u>, Tiscareno Inv. 73:9 – 74:5; <u>Ex. 16</u>, Hailey Inv. 29:7 – 30:3; <u>Ex. 17</u>, Isaac Inv. 36:24 – 39:11.

23. Apple and GenAudio did not negotiate about Apple licensing GenAudio's technology or acquiring GenAudio or its technology. Ex. 18, Tiscareno Dep. 166:17-20, 173:3-6, 307:19-308:10, 312:4-313:21, and 317:5-318:8; Ex. 14, Tiscareno Inv. 73:9-74:5; Ex. 19, Isaac Dep. 184:11-21, 189:8-192:23, 195:15-25; Ex. 20, Hailey Dep. 90:8-20, 91:8-18, 93:7-19, 149:1-150:7, and 155:9-156:13.

24. In August and September 2009, Mahabub emailed the GenAudio Team and represented that GenAudio was close to entering into licensing negotiations and a "*big licensing deal*" with Apple, and he altered emails from Apple to make it appear as if Mahabub had been in contact with Philip Schiller ("Schiller") and other high-level Apple employees. *Compare* Ex. 21 at 2-3 to Ex. 22 at 1; *compare* Ex. 23 at 4 to Ex. 24 at 1-2; *see also* Demo. 2 at 1-3.[7]

25. During 2009, 2010, and 2011, Schiller was the Senior Vice President of Worldwide Marketing at Apple. *See* Ex. 18, Tiscareno Dep. 211:21-23.

26. Mahabub never met or communicated with Schiller regarding GenAudio or its technology. Ex. 2, Mahabub Dep. 432:20-433:2 (discussing Sept. 30, 2011 email correspondence); Ex. 18, Tiscareno Dep. 311:1-14; Ex. 16, Hailey Inv. 22:25-24:6; Ex. 17, Isaac Inv. 29:14-17.

27. During a September 25, 2009 Board meeting, "*Mahabub noted that a deal with Apple is highly probable based on the many meetings and Apple's responses to date.*" Ex. 25.

28. On October 2, 2009, Mahabub emailed GenAudio's Board of Directors

---

[7] Demonstrative 2 was created by the SEC to compare emails that Mahabub altered and sent to the GenAudio Team. It is attached as and is cited as "Demo. 2 at [page]."

that "*when the time comes, I will bring on the legal team, that being Paul [Powers], Mark [Bobak], Ben [Huber] and Craig [Hemenway], to assist me with finalizing the deal with Apple*." Ex. 7 at 2.

29.     Mahabub never brought on the "legal team" to finalize a deal with Apple or otherwise negotiate with Apple. *See* Ex. 27, Powers Inv. 25:15-28:7; 32:8-17; 46:1-25; 56:13-25; 70:1-71:13; 74:5-19; 86:8-91, 125:18-129:15 (Feb. 27, 2015); Ex. 28, Bobak Dep. 130:5-9, 137:4-8 (Feb. 2, 2017); Ex. 29, Bobak Inv. 41:22 – 42:15 (Mar. 3, 2015); Ex. 30, Huber Dep. 61:5-63:12; 65:5-13; 66:14-20; 72:20-73:1; 82:21-24; 87:19-25 (Aug. 12, 2016).

30.     In October 2009, Mahabub emailed the GenAudio Board, employees, and contractors false and altered emails that made it appear that he had communicated with Apple executives Schiller and Timothy Cook ("Cook"), that GenAudio had received "*the green light*" on "*the technical … side of the coin*," and that Mahabub would be meeting with Apple CEO, Steve Jobs ("Jobs"). Ex. 7 at 1; c*ompare* Ex. 31 at 3-4 to Ex. 32 at 1; *see also* Demo. 2 at 4. *See also* Ex. 2, Mahabub Dep. 61:10 – 19 and 72:1 – 7 (explaining he always blind carbon copied the Board on updates to the GenAudio Team).

31.     During 2009, 2010 and part of 2011, Cook was the Chief Operating Officer of Apple; he became Apple's CEO in August 2011. *See* Ex. 14, Tiscareno Inv. 189:20-190:2.

32.     Mahabub never met or communicated with Cook regarding GenAudio or its technology. Ex. 2, Mahabub Dep. 31:2-11; Ex. 14, Tiscareno Inv. 190:11-191:8; Ex.

18, Tiscareno Dep. 311:15-20; Ex. 16, Hailey Inv. 22:22-24:6; Ex. 17, Isaac Inv. 29:25-30:2.

33.     During 2009, 2010, and until August 24, 2011, Jobs was the CEO of Apple. *See* Ex. 19, Isaac Dep. 184:7-10 and 196:1-3.

34.     Mahabub never met with Jobs regarding GenAudio or its technology. Ex. 15, Mahabub Inv. 144:8 – 12 ("Q:  Did you ever meet with Steve Jobs?  A:  No. Q: Ever?  A:  No."); Ex. 2, Mahabub Dep. 29:25 – 30:2 ("Q:  Mr. Mahabub, you never met Steve Jobs, the former CEO of Apple; correct?  A:  That's correct.") and 417:6-7 (never met with Jobs regarding AstoundSound). *But see* Ex. 2, Mahabub Dep. at 417:3 – 432:5 (describing a chance encounter with Jobs in the Apple cafeteria, which did not involve any substantive communication).

35.     Jobs was not involved in Apple's dealings with GenAudio, and Apple employees did not discuss GenAudio with Jobs. *See* Ex. 14, Tiscareno Inv. 137:5-7, 139:23 – 140:5, 194:17-19, and 235:17-24; Ex. 18, Tiscareno Dep. 311:21-25 (Dec. 16, 2016); Ex. 16, Hailey Inv. 24:7 – 25:5; Ex. 17, Isaac Inv. 30:3 – 31:4; Ex. 33 at 1.

**C.      Beginning In November 2009: Mahabub Offers And Sells His Personal Shares Of GenAudio Stock While Engaging In Deceptive Conduct.**

36.     At a November 9, 2009 Board meeting, Mahabub "*expressed optimism about the high likelihood of an integration deal with Apple, most likely a technology acquisition, but that a license arrangement remains a possibility.*" Ex. 34 at 1-2.

37.     On November 9, 2009, Mahabub, through Mattos, sent GenAudio's shareholders an email prepared and electronically signed by Mahabub, which stated, in part:

> *Finally, we have made our … product compatible with the new Apple Snow Leopard operating system . . . . It should be kept very confidential*

> _and nothing is assured yet, but as shareholders you should be aware that_
> _there is a strong possibility that the Company may be acquired within the_
> _next 6 months in light of our extensive discussions with a global industry_
> _leader in consumer electronics. In anticipation of this possibility, I have_
> _personally interviewed several independent valuation specialists and_
> _firms. As of November 6, 2009 I selected a firm and engaged this firm to_
> _immediately begin working on this assignment._ Today the Board . . .
> approved this measure.

Ex. 35 at 2; _see also_ Answers at ¶ 52 (emphasis added).

38.     An investor forwarded to Mattos the November 9, 2009 email, thanked

Mattos for "meeting with me and my friends and family the other evening" and

explained, "[w]e are all so very appreciative of your time with us and dedication to Gen

Audio [sic]. Here is the list of investors." Ex. 42 at 1.

39.     Numerous of the investors listed in the email purchased Mahabub's stock

shortly thereafter. _See_ Attach. 1 to Bowen Dec. at rows 11, 20, 22, 23, 24, 25, 26, and

30 (reflecting Nov. 15, 2009 agreements and Jan. 2010 stock certificates) and row 46

(reflecting a Jan. 2010 stock certificate for the investor who sent the email in Ex. 42).

40.     In communications with investors, Mahabub and GenAudio used the term

"LCEC" to refer to Apple. Answers ¶ 57.

41.     Numerous investors knew that "the LCEC" was Apple. _See, e.g._, Ex. 27,

Powers Inv. 110:2 – 111:14; Ex. 36, Skluzak Inv. 52:8 – 53:2 and 55:4 – 56:6 (Dec. 15,

2014); Ex. 37, Skluzak Dep. at 46:15 – 25 (Feb. 7, 2017) (Mahabub would refer to "the

fruit with a piece of – bite out of it" and "[i]t was also a big inference when [Mahabub]

said he met with Steve Jobs"); Ex. 38, Elliott Inv. 24:16-23 (Apr. 8, 2015) ("everybody

just knew it was Apple"); Ex. 5, Mattos Inv. 145:16-147:1 (vast majority of shareholders

knew LCEC was Apple).

42.     In late 2009, Mahabub attended a GenAudio shareholders' meeting in Seattle and told shareholders that "*he was positive that, supposedly I guess it was by the end of the year or something that Apple was going to be buying us out and we'd better get in now* …." Ex. 39, Eldridge Inv. at 17:7 – 10 (Apr. 6, 2015).

43.     As a result of Mahabub's statements at this meeting, shareholders purchased additional shares of GenAudio stock from Mahabub personally and referred new investors. *See* Attach. 1 to Bowen Dec. at rows 13-14 (reflecting a purchase of 88,000 and 80,000 shares with agreements dated of Nov. 15, 2009); Ex. 39, Eldridge Inv. at 17:1 – 19:9 (describing the share purchase process); Ex. 40 at 2 (Nov. 13, 2009 email reflecting an investor referring friends); Ex. 41 at 1 (Nov. 15, 2009 email from Mahabub to investor regarding buying stock before GenAudio is acquired).

44.     After making these false statements to prospective investors, Mahabub, with the assistance of Mattos, sold Mahabub's personal shares of GenAudio to investors. Ex. 42 at 1; Ex. 43 at 2 (Mahabub writing, "Mattos brought in 225k, and I have brought in over 750K USD from previous round investors and some new ones").

45.     Between November 2009 and April 2012, Mahabub offered and sold at least 3,391,300 shares of GenAudio stock to at least 85 investors, raising approximately $2.6 million ("Mahabub Sales"). Bowen Dec. at ¶ 7 and Attach. 1 at row 11.[8]

46.     GenAudio mailed share certificates to Mahabub Sales investors. Ex. 8, Devine Dep. 162:10-18.

---

[8] Material facts related to the Defendants' securities offerings are placed into the chronology based on the approximate start date of the offering.

47.     No registration statement was filed or in effect for Mahabub's offers or sales of GenAudio securities. <u>Ex. 1</u> 2.

**D.     December 2009 And January 2010:  Apple Tells Mahabub That No "Deal" is Occurring Anytime Soon.**

48.     On December 16, 2009, in response to Mahabub's November 28, 2009 email about a potential "deal" between Apple and GenAudio, Apple employee Hailey stated, in part, *"[w]e're making progress and building our story, but this is not something we can execute overnight. The business side of things would come into play after we have exec buy-in on the product side.*" <u>Ex. 44</u> at 2.

49.     On January 5, 2010, Hailey responded to another email from Mahabub and informed him that "*[w]ith respect to timeframe, we are pretty serious about looking at audio quality across the board and this will take time – definitely more than a couple of months.*" <u>Ex. 45</u> at 2.

**E.     February 2010 And March 2010:  In Connection With GenAudio's 2010 Offering, Mahabub Provided Investors And The Board With Fraudulent Information Regarding Progress With Apple.**

50.     On February 12, 2010, before a Board meeting, Mahabub sent the Board false and altered emails that made it appear that he had met with Schiller who discussed a "*project … for Christmas product roll-out*"; that "*Apple is still very interested in licensing Astound for their products*"; and that Apple's employees were working towards getting a deal "*ok'd by the big man.*" *Compare* <u>Ex. 46</u> at 1-2 to <u>Ex. 47</u> at 1; *see also* <u>Demo. 2</u> at 5.

51.     At that February 12, 2010 Board meeting, Mahabub then provided a "*summary of the discussions with Apple*" and a valuation report, after which the Board agreed there was "*[t]he need for a Company stock offering … and Mr. Mahabub and*

*[another Director] were directed to prepare a draft of a private placement memorandum for the Board's review ….*" <u>Ex. 48</u> at 3.

52.    On March 5, 2010, the Board approved the 2010 Offering. <u>Ex. 49</u> at 1, ¶ 3.

53.    On March 10, 2010, Mahabub emailed 15 shareholders the valuation report that was to be included in the upcoming company stock offering, which reported the fair market value of GenAudio was above $1 billion, and offered to sell 250,000 of his personal shares at $0.50 per share while falsely representing, "*we are starting to discuss the business side with the LCEC, and I expect to have a very substantial licensing deal in place for their Christmas Product Rollout. . . .*" <u>Ex. 50</u> at 3.

54.    From approximately March 15, 2010 to August 31, 2010, GenAudio offered and sold at least 1,171,000 common shares of stock to more than 70 investors in various states, raising approximately $3,513,000 (the "2010 Offering"). *See* Answers ¶¶ 35, 78, 130; <u>Ex. 3</u> at 1; <u>Ex. 51</u> at 1-4; <u>Ex. 8</u>, Devine Dep. 136:4-19 (Devine prepared <u>Ex. 51</u>).

55.    No registration statement was filed or in effect for the securities transactions in the 2010 Offering. *See* Answers ¶ 130; <u>Ex. 1</u> at 1.

56.    GenAudio used the means of interstate commerce to offer and sell the 2010 Offering to prospective investors by, among other things, disseminating, via email, a private placement memorandum ("PPM") and letter signed by Mahabub dated March 15, 2010 (collectively, "2010 Offering Materials"). Answers ¶ 36, 135; <u>Ex. 3</u>; <u>Ex. 52</u>.

57.    To complete the sales, Devine mailed the stock certificates to investors. <u>Ex. 8</u>, Devine Dep. 116:4-24, 120:11-121:16.

58.     Mahabub was a necessary participant and substantial factor in the offers and sales made in the 2010 Offering because he assisted with the preparation of the 2010 Offering Materials, reviewed those Offering Materials, and was a member of the Board that approved those Offering Materials. Answers ¶ 37.

59.     During 2010, GenAudio used an investor relations firm to send email blasts to invite prospective investors to attend road shows for GenAudio. GenAudio did not maintain records of email recipients, blasts, or any research reports that were disseminated to prospective investors. Ex. 26, GenAudio Resp. to Request No. 5.

60.     During the 2010 Offering, Mahabub solicited potential investors at public presentations called "road shows." Ex. 54 at 1; Ex. 55 at 1, ¶ 6; Ex. 56 at 1; Ex. 57 at 5.

61.     GenAudio is unable to provide information as to the number or sophistication of investors it solicited to invest in its 2010 Offering. Ex. 53, GenAudio Resp. to Request No. 1 (GenAudio unable to locate and produce emails, metadata, or numbered PPMs evidencing investors solicited during the 2010 and 2011 Offerings); Ex. 8, Devine Dep. 94:10 – 95:1.

62.     GenAudio did not have a set procedure to review whether investors completed the Confidential Subscriber Questionnaire ("Questionnaire") or to verify investor accreditation before it sent out the stock certificates and did not keep a list identifying its non-accredited investors. Ex. 8, Devine Dep. 123:5 -126:9; 127:25-128:19 (regarding 2010 Offering); Ex. 5, Mattos Inv. 42:25-43:13.

63.     Beyond sending and receiving the Questionnaires, GenAudio did nothing to determine whether investors were accredited. *See* Ex. 2, Mahabub Dep. at 488:24 - 489:24 and 490:25 – 491:23; Ex. 6, Mattos Dep. 169:18 – 170:7 (addressing

13

investor file documents) and 171:17-19; Ex. 8, Devine Dep. 127:25 – 128:3 and 178:14-19.

64.     In connection with the 2010 Offering, at least one GenAudio investor wrote "N/A" on the portion of the Questionnaire that addressed accreditation and investment experience. Ex. 58 at 4-5.

65.     In connection with the 2010 Offering, other GenAudio investors failed to complete the portion of the Questionnaire that addressed accreditation. *See* Ex. 59 at 4-5; Ex. 60 at 4-5; Ex. 61 at 4; Ex. 62 at 4; Ex. 63 at 4; Dec. of Marvin at ¶¶ 7-10 (May 5, 2017) (referring to Ex. 220, which is ECF No. 66-1 and contains documents substantially similar to Ex. 63). *See also* Ex. 2, Mahabub Depo at 468:1-11 (Mahabub does not know investor Marvin).

66.     Mattos admitted that he "overlooked" a few Questionnaires that were not completed. Ex. 6, Mattos Dep. 169:18 – 170:20.

67.     GenAudio and Mahabub admitted in the 2010 and 2011 Offering materials that since 2003, the Company has sold securities to accredited and non-accredited 'friends and family' investors," which may not qualified for exemption from registration.  Ex. 3 at 44-45; Ex. 4 at 53-54; Ex. 10 at 46; Ex. 11 at 52.

68.     GenAudio was willing to accept investments from non-accredited investors. *See* Ex. 64 ("new investors are required to be accredited investors; however, those restrictions do not apply to current investors"); Ex. 65 ("any group investments on your family's behalf should be kept track [sic] internally. GenAudio can not [sic] officially know anything about it due to SEC laws regulating unaccredited investors").

69.     GenAudio did not provide an audited balance sheet to any investors in the 2010 Offering. Answers ¶ 137.

70.     The 2010 Offering Materials included a March 15, 2010 cover letter that represented, *"[t]his offering is being conducted to provide bridge capital until we can 'ink' a deal with a large consumer electronics company (referred to as the 'LCEC' throughout the PPM)..."* that was emailed to investors Ex. 52.

71.     The 2010 Offering Materials also included a March 15, 2010 PPM in which GenAudio and Mahabub represented:

> *[T]he Company is optimistic that the LCEC will eventually want access to our AstoundSound Technology for their products. It is unclear what structure such access would take, but the Company believes the LCEC would either (i) integrate a portion of our AstoundSound Technology, namely ASE, into multiple product lines through a licensing arrangement or (ii) acquire all of our AstoundSound Technology or, at least, that portion the LCEC deems necessary for its integration plans.*

Ex. 3 at 21.

72.     In the 2010 Offering, GenAudio and Mahabub failed to inform investors that Apple and GenAudio had no negotiations to license GenAudio's technology or to acquire GenAudio or its technology. *See generally* Ex. 3; *supra* at SOF ¶¶ 20-23, 29, 101.

73.     On March 19, 2010, Mahabub provided the GenAudio Team, including Mattos, with a copy of the March 15, 2010 cover letter that was sent to investors, touted an investment in GenAudio as a good investment, and encouraged them to assist GenAudio in raising money from investors by stating:

> *Time to get some $$$ …. And someone would not want to invest at this stage in the game, or increase there [sic] shareholder position because why?  There is no answer to this question … if any of you feel like helping out with this effort, I would certainly appreciate it. It's not like you are doing your friends and family a bad thing by getting them into GenAudio ….*

Ex. 9 at 1, 3.

74.     Two days later, on March 21, 2010, Mahabub sent the GenAudio Team, including Mattos, a false and altered email that made it appear as if he was communicating with Schiller; Schiller was "*hoping for – a fall product rollout*"; and Apple and Mahabub had discussed an *"embedded level integration process"*. *Compare* Ex. 66 at 1 to Ex. 67 at 1; *see also* Demo. 2 at 6.

75.     Mahabub also stated to the GenAudio Team, "*[l]et's get some fuel for the ship. Any help from all of you with this financing effort would be great.*" Ex. 66 at 1.

**F.     April 2010 Through August 2010:  While GenAudio Offered And Sold Stock Through The 2010 Offering, Mahabub Continued To Create False And Fraudulent Documents And Lie To Shareholders, Potential Investors, And The GenAudio Team.**

76.     In early April 2010, Mahabub became aware of the scheduling of an internal meeting at Apple regarding GenAudio's technology. *See* Ex. 68 at 2 (Mahabub writing, "*[i]n an effort to get 'two thumbs up' from your meeting so we can continue to move forward …*").

77.     In correspondence between Mahabub and Tiscareno, neither indicated that the meeting would involve Jobs, Schiller, or Cook; instead, Mahabub referenced Tiscareno's upcoming meeting with an "*exec.*" *Id.* at 1; Ex. 69; Ex. 70; Ex. 71 at 2.

78.     On April 8, 2010, Mahabub sent a few members of the GenAudio Team false and altered emails that made it appear that Tiscareno stated "*Phil [Schiller] let us know earlier that this might be postponed until early next week. Apparently Steve [Jobs] is planning on going out of town with his family for the weekend*' and that Mahabub stated "*[t]oo bad … although, that might be better given that Steve will be relaxed from

*having a weekend getaway with his family. Perhaps this is why Phil is rescheduling for next week.*" *Compare* Ex. 72 at 1-2 to Ex. 73 at 1; *see also* Demo. 2 at 7-9.

79.     On April 30, 2010, while he was attending a conference for investment bankers and broker-dealers, Mahabub sent prospective investors an email that falsely stated that the LCEC was "*looking to acquire GenAudio's tech for integration into their entire lineup of product offerings*" and "*we are now waiting to when [sic] we will initiate negotiations, pending the CEO of the LCEC to approve the integrated product rollout strategy and the technical implementation strategy that will be presented to the CEO next week!!!*" Ex. 74 at 4.

80.     After receiving the email, an investor purchased 5,000 shares for $15,000. *See id.* at 1-2; Ex. 51 at 2, row 4 (Cohen, shares issued on May 20, 2010).

81.     On May 5, Mahabub sent Tiscareno materials that he suggested Tiscareno use at the meeting with "*the exec*," and he offered to attend the meeting; however, Tiscareno declined the offer, explaining "*this is not that kind of demo. [Hailey] and I are pitching this as a concept ….*" and "*[o]nce we get the go ahead that this is a great idea, then the questions will be, 'well, what about the other technologies, have we reviewed them? etc.' Then we sort of start over internally.… We have to get to first base….*" Ex. 70; Ex. 71 at 1 (emphasis added).

82.     In the morning and early afternoon of May 6, 2010, Mahabub sent emails to the GenAudio Team regarding the upcoming meeting at Apple, which falsely represented that Schiller and Jobs were involved. Ex. 75 at 1-2.

83.     Late in the evening of May 6, 2010, Mahabub sent the GenAudio Team, including Mattos, a purported "transcription" of a phone call between him and Tiscareno.

After repeatedly instructing that the email be deleted, Mahabub set forth his purported conversation with Tiscareno, which included representations that Tiscareno stated that "*Steve thought the technology was so extraordinary …. I believe he wants to explode this technology into the world*" and "*[Steve] instructed all of us to be in a no radio period*" and "*I can say that [Steve] is anxious to meet you in person when we have things figured out on our end.*" Mahabub then concluded the email by stating "*[a]t least we have some time to put our strategy together and get our pawns in order for the asset acquisition or licensing battle.*" Ex. 33 at 2-5.

84.     Mahabub then forwarded the email that contained the false "transcription" to an investor. *Id.* at 1.

85.     On or about May 21, 2010, the investor purchased 40,000 shares of GenAudio stock for $120,000 through the 2010 Offering. Ex. 51 at 2, row 6 (Skluzak IRA).

86.     The investor purchased GenAudio stock in May of 2010 because Mahabub orally represented to the investor that Jobs "*stated to Mr. Mahabub that he was very impressed with [GenAudio's] technology,*" and because "*the level of interaction Mr. Mahabub was having at Apple Computer was extensive and high level.*" Ex. 37, Skluzak Dep. at 29:12 – 30:1.

87.     Further, receipt of the false "transcript" "*affirmed [the investor's] willingness to purchase 40,000 shares of stocks*" in the 2010 Offering, because "*[i]t just confirmed that the decision I had made to purchase the stocks was a good decision.*" *Id.* at 134:9-14 (addressing Ex. 33).

88.     Tiscareno has explained that the "transcription" was false, stating:   "*I never discussed anything about Steve Jobs or any other board member at Apple. I never discussed this with Steve Jobs. Period!*" and "*This letter is pure fabrication.*" <u>Ex. 33</u> at 1.

89.     In May 2010, Mahabub and GenAudio created an investor presentation that was emailed to investors; during the presentation, Mahabub falsely stated that "*the CEO of the LCEC finally met with senior marketing and technical management <u>and we have the green light to move forward</u>*." <u>Ex. 76</u> at 54:8-10 (emphasis added). *See also* <u>Ex. 54</u> (email transmitting presentation). The presentation and email also discussed GenAudio's 2010 Offering and encouraged investors to review the PPM and attached valuation report. *See* <u>Ex. 76</u> at 54-55; <u>Ex. 54</u> at 1.

90.     On July 2, 2010, Mahabub emailed the GenAudio Team false and altered emails that made it appear that Jobs wanted to meet with Mahabub and Jobs was involved in evaluating GenAudio's technology. *Compare* <u>Ex. 77</u> to <u>Ex. 78</u>; *see also* <u>Demo. 2</u> at 10-11.

91.     On or about August 1, 2010, GenAudio sent investors a letter that was electronically signed by Mahabub and stated, in part, that the LCEC's CEO had requested a "*hand-shake*" meeting, and "*I can say that we are still moving forward with confidence and plan on carrying it through all the way to the end, which could result in a significant revenue generating license deal or the potential for acquisition of the technology or the company.*" <u>Ex. 79</u> at 2; Answers ¶ 72 (admitting Mahabub sent a letter to GenAudio shareholders on or about August 1, 2010).

92.     Mahabub also explained in this letter that the 2010 Offering would be closing at the end of August, "*and it has been very successful thus far with the vast majority of investments coming from our existing shareholders.…  Many of you have continued to invest over and over again.…*" Ex. 79 at 3.

93.     The 2010 Offering concluded on or about August 31, 2010 with GenAudio selling a total of 1,171,000 common shares. *See* ¶ 54 (above).

94.     In 2010, using money raised from investors, GenAudio provided Mahabub with compensation and expense reimbursement, including loaning him $48,401 and paying him $50,415 in reimbursement for his home, $60,000 in rent for a sound studio, and $416,154 in salary. *See* Ex. 80; Ex. 8, Devine Dep. at 276:22 – 281:25 (discussing Ex. 80). *See also* Ex. 3 at GA000634 (Balance Sheet as of Dec. 31, 2009, reflecting approximately $28,000 in bank accounts prior to the 2010 Offering).

**G.     September 2010:  GenAudio's Substantive Meetings With Apple Ended.**

95.     On or about September 23, 2010, Mahabub attended a demonstration at Apple with Dr. Andrew Bright, who was an Apple employee with a Ph. D. in Acoustics, Tiscareno, and Isaac. *See* Ex. 81 at 1.

96.     The meeting did not go well due to an argument between Mahabub and Bright, and was Mahabub's last substantive meeting with Apple. *See id.*; Ex. 14, Tiscareno Inv. 68:14-71:7; Ex. 18, Tiscareno Dep. 232:5-9; 255:10-21 (regarding Ex. 81 and Ex. 82); Ex. 19, Isaac Dep. 146:1-147:2; 158:10-159:18.

**H.     December 2010 To March 2011:  Defendants' Scheme And Misrepresentations Continued To Condition The Market For The 2011 Offering.**

97.     On or about December 8, 2010, GenAudio sent shareholders a letter that was drafted and electronically signed by Mahabub and in a section entitled "The LCEC,"

stated, in part, "*I met with their CEO and gave him a demo of our technology, and he stated, 'I really like your technology and look forward to seeing you again in the future.' Although they are moving very slow, we are still on their radar screen, and remain very optimistic for a deal in the second or third quarter of 2011.*" Ex. 83 at 11.

98.     Mahabub did not meet with the CEO and give him a demo of any technology. Ex. 15, Mahabub Inv. 507:9 -19 (addressing Ex. 83). *See also* Ex. 18, Tiscareno Dep. 323:21 – 324:12.

99.     On February 26, 2011, GenAudio and Mahabub sent shareholders a progress report that advised:

> *Although my primary contact has recently retired from the LCEC, . . . he advised me that his replacement would continue to promote and push the technology in an effort to consummate a significant transaction. . . . We have been working with the LCEC for over 2 years now and while progress has been slower than we would like, they have not cut us loose and continue to be very interested in integrating our technology across their entire line-up of product offerings.*

Ex. 84 at 15-16.

100.     On March 29, 2011, GenAudio and Mahabub, through Mattos, sent GenAudio's shareholders an email about "The LCEC" and stated that GenAudio would be signing a new set of "*evaluation and development*" agreements with the LCEC, which would "*completely prohibit*" Mahabub and GenAudio from disclosing any further information about the LCEC, or even using the term "LCEC." Mahabub then explained, "*[a]ll references to the LCEC will be deleted from the business plan section of the new offering" and requested "please refrain from asking the GenAudio team or myself any questions about the LCEC.*" Mahabub told shareholders about a new offering to raise up to $2.1 million at $3.00 per share. He then concluded:  "*Believe me when I tell all of you*

*that I wish I could disclose what is going on, however, the fact of the matter is I cannot.*"

Ex. 85 at 5-6.

101.    GenAudio never signed "evaluation and development" agreements with

the LCEC. Ex. 2, Mahabub Dep. 401:10-15; 402:20-404:6.

**I.      April 2011 To April 2012:  The 2011 Offering.**

102.    From April 2011 to April 2012, GenAudio offered $2,100,000 of common

shares of GenAudio and sold at least 330,000 shares to at least 20 investors in various

states, raising approximately $990,000. Answers ¶¶ 94; 131; Ex. 4 at 1; Ex. 51 at 5-6.

103.    From April 2011 to April 2012 GenAudio offered and sold GenAudio stock

when no registration statement was filed or in effect for the transactions ("2011

Offering"). Answers ¶ 131.

104.    GenAudio used telephones, the Internet, and the mails in connection with

the 2011 Offering. Answers ¶ 135.

105.    GenAudio and Mahabub solicited prospective investors for the 2011

Offering through the March 29, 2011 email to shareholders (see ¶ 98 above), a letter to

investors electronically signed by Mahabub, and a PPM dated April 22, 2011 ("2011

Offering Materials") that was emailed to investors. *See* Answers ¶¶ 95-96; Ex. 86; Ex. 4.

106.    Mahabub was a necessary participant and substantial factor in the 2011

Offering. He assisted with the preparation of the 2011 Offering Materials, reviewed

those Offering Materials, and was a member of the Board that approved those Offering

Materials. Answers ¶ 96.

107.    During the 2011 Offering, Mahabub solicited potential investors at public

presentations he called "road shows." Ex. 87 at 5 (investor writing, "at the SEA

roadshow I was told GenAudio was in great need of Cash or things could get ugly by

May").

108.     GenAudio is unable to provide information about to the number or sophistication of investors it solicited to invest in the 2011 Offering. Ex. 53, Resp. to Request No. 1 (GenAudio unable to locate and produce emails, metadata, or numbered PPMs evidencing investors solicited); Ex. 8, Devine Dep. 94:10 – 95:1.

109.     During the 2011 Offering, GenAudio did not have a set procedure to review whether investors completed the Questionnaire and provided information demonstrating an investor was accredited before it sent out the stock certificates and did not keep a list identifying its non-accredited investors. Ex. 8, Devine Dep. 177:14-178:24 (regarding 2011 Offering); Ex. 5, Mattos Inv. 42:25-43:13.

110.     Beyond sending and receiving the Questionnaires, GenAudio did nothing to determine whether investors were accredited. *See* Ex. 2, Mahabub Dep. at 488:24 - 489:24 and 490:25 – 491:23; Ex. 6, Mattos Dep. 169:18 – 170:7 (addressing investor file documents) and 171:17-19; Ex. 8, Devine Dep. 127:25 – 128:3, 178:14-19.

111.     At least one investor who invested in the 2011 Offering on multiple occasions repeatedly failed to complete the portion of the Questionnaire that addressed accreditation. *See* Ex. 63 at 9, 14, 19, and 24.

112.     Mattos admitted that he "overlooked" a few Questionnaires that were not completed. Ex. 6, Mattos Dep. 169:18 – 170:20.

113.     GenAudio did not provide an audited balance sheet to any investors in the 2011 Offering. Answers ¶ 137.

114.     On April 22, 2011, GenAudio and Mahabub sent investors the 2011 Offering materials. As noted in the March 29, 2011 email, the Offering materials omitted

information about Apple or "the LCEC." *See generally* <u>Ex. 4</u> and <u>Ex. 86</u>.

115.    In the 2011 Offering Materials, Defendants did not inform investors that Mahabub's substantive communications with Apple personnel were almost always limited to mid-level engineering and marketing employees. *See supra*, SOF ¶¶ 17-18, 25-26, 31-35.

116.    In the 2011 Offering Materials, Defendants did not inform investors that Apple and GenAudio had no negotiations to license GenAudio's technology or to acquire GenAudio or its technology. *See supra*, SOF ¶¶ 23, 29.

117.    In the 2011 Offering Materials, Defendants did not inform investors that in September 2010, Mahabub conducted a demonstration to Apple personnel that went poorly. *See supra*, SOF ¶¶ 95-96.

118.    In the 2011 Offering Materials, Defendants did not inform investors that GenAudio had not signed a new set of "evaluation and development" agreements with the LCEC. *See supra*, SOF ¶¶ 100-101.

119.    In 2011, using money raised from investors, GenAudio provided Mahabub with compensation and expense reimbursement, including loaning him $37,535 and paying him $47,940 in reimbursement for his home, $120,000 in rent for a sound studio, and $192,308 in salary. <u>Ex. 80</u>. *See also* <u>Ex. 4</u> at GA004807 (Financial Statement as of March 31, 2011, reflecting approximately $18,000 in bank accounts prior to the 2011 Offering).

**J.     Representations About GenAudio's Dealings With Apple Were Material To GenAudio Investor Investment Decisions.**

120.    Investors received and reviewed GenAudio's Offering Materials. Ex. 88, Elliott Dep. 34:19-35:22 and 65:25-66:5 (Jan. 18, 2017) (discussing 2010 PPM); Ex. 36, Skluzak Inv. 50:21-52:7 (2010 Offering) and 162:9-163:7 (2011 Offering).

121.    GenAudio's and Mahabub's shareholder updates were important to investors. *See* Ex. 39, Eldridge Inv. 37:15 – 38:2 (explaining he purchased additional shares because of shareholder updates regarding Apple); Ex. 38, Elliott Inv. 25:19-27:2 (based on Mahabub's representations, understood Mahabub met Jobs and there were ongoing negotiations with Apple); Ex. 29, Bobak Inv. 31:16-22 and 74:6-24 (after updates came out, shareholders would ask Bobak if they should invest additional money).

122.    Investors purchased shares from Mahabub and GenAudio based on representations about Apple's alleged dealings with GenAudio, including Mahabub's oral representations. *See* Ex. 39, Eldridge Inv. 16:24-19:9 and 30:11-31:18; Ex. 37, Skluzak Dep. at 29:12-30:4. *See also* Ex. 89, Herdt Inv. 23:25-24:17 and 29:14-30:8 (Apr. 10, 2015).

### III.     ARGUMENT

Mahabub and GenAudio violated Sections 5(a) and (c) of the Securities Act because their securities offerings and sales were not registered and were not exempt from registration. They also violated Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act by making and using untrue and misleading statements and omitting material information in statements to investors during their offerings and sales of GenAudio stock, and by engaging in a scheme and fraudulent

course of business whereby they encouraged people to invest in GenAudio by lying about GenAudio's prospects as a legitimate takeover target or licensing partner of Apple.

## A.    The Legal Standard For Summary Judgment.

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it pertains to an element of a claim or defense; a factual dispute is 'genuine' if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party." *Ghiasy v. Kroger Co.*, No. 11-CV-01667-WJM-MJW, 2012 WL 6720650, at *1 (D. Colo. Dec. 27, 2012) (Martinez, J.). The movant must "identify[ ] those portions of the [record], together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations marks omitted). "Once the moving party meets its initial burden … the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial." *Coit v. Zavaras*, No. 16-1146, 2017 WL 104447, at *2 (10th Cir. Jan. 11, 2017). To survive summary judgment, the non-moving party must point to admissible evidence sufficient for a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## B.    GenAudio And Mahabub Conducted Unregistered Offerings That Violated Sections 5(a) And 5(c) Of The Securities Act.

The Securities Act protects investors by ensuring that companies issuing securities "make a full and fair disclosure of information relevant to a public offering." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S.Ct. 1318,

1323 (2015) (internal quotation marks omitted). "The linchpin of the Act is its registration requirement." *Id.* Section 5 of the Securities Act makes it "unlawful for any person, directly or indirectly" to offer or sell securities in interstate commerce unless the securities are registered with the Commission or are exempt from registration. 15 U.S.C. § 77e(a); *SEC v. Gordon*, 522 F. Appx. 448, 450 (10th Cir. 2013) (citing *SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1085 (9th Cir. 2010)*)). A registration statement must contain "material facts bearing upon the investment merit of securities which are publicly offered," *SEC v. Murphy*, 626 F.2d 633, 643 (9th Cir. 1980), including the issuer's financial condition. *See* 15 U.S.C. §§ 77g, 77aa.

To establish a *prima facie* case for a Section 5 violation, the SEC must prove three elements: "(1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale." *SEC v. Cont'l Tobacco Co.,* 463 F.2d 137, 155 (5th Cir. 1972). Scienter is not an element of Section 5. *Aaron v. SEC*, 446 U.S. 680, 714 (1980); *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 859-60 (S.D.N.Y. 1997). Section 5 imposes strict liability on offerors and sellers of unregistered securities. *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004) (citing *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980)).

The facts that establish the SEC's *prima facie* case are not in dispute. In their Answers, GenAudio and Mahabub admit that GenAudio and Mahabub made sales of securities, by means of interstate commerce, and when no registration statement was in effect. Specifically, between November 2009 and April 2012, Mahabub made unregistered offers and sales of his own shares in GenAudio. SOF ¶¶ 2, 6-7, 37-39, 43,

45-47. GenAudio and Mahabub made unregistered offers and sales of shares in the 2010 and 2011 Offerings. SOF ¶¶ 54-60, 102-107. Accordingly, the SEC has established a *prima facie* case against Mahabub and GenAudio.

A person can also violate Section 5 as a "necessary participant" or "substantial factor" in the offer or sale of the unregistered securities by being involved in the organization of the securities offering. *Calvo*, 378 F.3d at 1215*; SEC v. Holschuh*, 694 F.2d 130, 140 (7th Cir. 1982) (defendant's actions in details of plan to issue new securities created primary liability as participant). Mahabub was a necessary participant and substantial factor in GenAudio's sales made in the 2010 Offering and the 2011 Offering. SOF ¶¶ 58, 106. He controlled GenAudio during both offerings, SOF ¶¶ 3, 4; reviewed the PPMs and signed – or electronically signed – the cover letters, *id.* ¶¶ 56, 58, 105-106, and solicited investors and encouraged others to solicit, *id.* ¶¶ 6-7, 59-60, 70-71, 73, 75, 79-80, 83-88, 89, 91-92, 100, 102-107. Mahabub was intimately involved in both of GenAudio's offerings and is therefore liable for violations of Sections 5(a) and (c). *See Holschuh*, 694 F.2d at 140. Accordingly, the SEC has established a *prima facie* case against Mahabub both for his direct sales of his personal shares and his indirect sales through GenAudio.

Once the Commission demonstrates a prima facie Section 5 violation, the defendant has the burden to prove that the offers and sales were exempt from registration. *SEC v. Cavanagh*, 445 F.3d 105, 111, n.13 (2nd Cir. 2006). Exemptions permit "routine trading with respect to securities already issued," but to ensure that investors receive the full benefits of registration, the exemptions do not permit "distributions by issuers or acts of others who engage in steps necessary to such

distributions." *Murphy*, 626 F.2d at 648. "Because registration is so important to the protection of the investing public, exemptions to registration requirements are construed narrowly against the parties claiming their benefits." *World Trade Fin. Corp. v. SEC*, 739 F.3d 1243, 1247 (9th Cir. 2014).

GenAudio and Mahabub assert that their transactions are exempt under the "private offering" exemption in Section 4(a)(2) of the Securities Act, and rely on the safe harbor under Rule 506 of Regulation D, 15 U.S.C. § 77d(a)(2), 17 C.F.R. § 230.506. *See Answers* at p. 28 (Third Affirmative Defenses). Mahabub cannot rely on Section 4(a)(2) or the safe harbor under Regulation D because those provisions apply only to <u>issuers</u> of securities and are not available to any affiliate of the issuer or any other person for resales of the issuer's securities, such as Mahabub. See Section 4(a)(2) (exempting transactions by an <u>issuer</u> not involving a public offering); 17 C.F.R. § 230.500(d) (Regulation D is available only to the <u>issuer</u>); J. William Hicks, *Resales of Restricted Securities*, § 6:2 (2011).[9] An "issuer" is every person who issues a security. 15 U.S.C. § 77b(a)(4). An affiliate of an issuer includes a person who directly or indirectly controls the issuer. 17 C.F.R. § 230.144(a)(1). GenAudio is the issuer of the securities at issue in this case, not Mahabub. SOF ¶ 54, 102. He is an affiliate because he controlled GenAudio through his share ownership, voting rights and control over the operations of GenAudio. SOF ¶ 3, 4, 16, 19, 37, 58, 70-71, 97, 100, 105-106.

---

[9] The exception most often cited for personal sales, Section 4(1) of the Securities Act, is also unavailable to Mahabub a control person, such as an officer, director, or majority shareholder, is "treated as an issuer when there is a distribution of securities" and therefore "ordinarily may not rely upon the Section 4(1) exemption." *SEC v. Cavanagh*, 155 F.3d 129, 134 (2d Cir. 1998) (citing *United States v. Wolfson*, 405 F.2d 779, 782 (2d Cir. 1968)).

Accordingly, Mahabub cannot establish any exemption and summary judgment against him is appropriate on this claim.

GenAudio is not entitled to the private offering exemption under Section 4(a)(2). It cannot produce any evidence establishing it engaged in a private versus public offering, because it cannot identify to whom it offered the stock, its relationship with the offerees, the nature, scope, size, type and manner of the offering. SOF ¶¶ 59-68, 107-112. *See SEC v. Ralston Purina Co.*, 346 U.S. 119,124-25 (1953). An issuer may use the safe harbor in Rule 506 as a means to establish the exemption under Section 4(2), but only if it establishes all of the conditions of Rules 501 and 502, which include proving that the issuer has a reasonable basis to believe that there were no more than 35 purchasers who were <u>not</u> accredited investors, and that it provided audited balance sheets to all non-accredited investors. 17 C.F.R. §§ 230.506(b)(1), 230.501, 230.502(b)(2)(B)(1). *See* J. William Hicks, *Exempted Transactions under the Securities Act of 1933* § 11.82 (2012) (Rule 506 requires the issuer to assess the sophistication of each purchaser).

The undisputed facts are fatal to GenAudio's claimed exemption. During the 2010 and 2011 Offerings, GenAudio offered and sold securities to non-accredited investors without providing an audited balance sheet, as required by Rule 502 of Regulation D. SOF ¶¶ 61-69, 107-113; 17 C.F.R. § 230.502(b)(2)(B)(2). Further, since GenAudio does not have evidence identifying to whom it offered and sold securities, it cannot establish that it made a private offering to offerees who had a relationship with GenAudio, or that the size and manner of the offering would make Section 4(2) of the Securities Act applicable. SOF ¶¶ 61-69, 107-113.

C.     **Defendants Violated Section 17(a) Of The Securities Act.**

i.     **The Legal Standard.**

The Supreme Court has emphasized that the Securities Act was enacted for

broad purposes: "[T]o protect the investing public and honest business; … to prevent

further exploitation of the public by the sale of unsound, fraudulent, and worthless

securities through misrepresentation; to place adequate and true information before the

investor; to protect honest enterprise, seeking capital by honest presentation . . . ."

*United States v. Naftalin*, 441 U.S. 768, 775-776 (1979). Section 17(a) of the Securities

Act, 15 U.S.C. § 77q(a), provides:

> It shall be unlawful for any person in the offer or sale of any securities …
> by the use of … interstate commerce or … the mails, directly or
> indirectly— (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a
> material fact or any omission to state a material fact necessary in order to
> make the statements made, in light of the circumstances under which they
> were made, not misleading; or (3) to engage in any transaction, practice,
> or course of business which operates or would operate as a fraud or
> deceit upon the purchaser. [10]

Section 17(a), "does not require that the fraud occur in any particular phase of

the selling transaction," and is "expansive enough to encompass the entire selling

process[.]" *Naftalin* 441 U.S. at 773. This selling process includes an "offer," which "shall

include every attempt or offer to dispose of … a security or interest in a security, for

value." *Id.* (quoting 15 U.S.C. § 77b(3)) (internal emphasis omitted).

---

[10] Defendants' fraud involved the use of email and the transfer of money between
bank accounts and therefore satisfies the interstate commerce element of Section 17(a)
of the Securities Act and Section 10(b) of the Exchange Act. *See SEC v. USA Real
Estate Fund 1, Inc.*, 30 F. Supp. 3d 1026, 1035 (E.D. Wash. 2014) (addressing email);
*SEC v. Luna*, No. 2:10-CV-2166-PMP-CWH, 2014 WL 794202, at *8 (D. Nev. Feb. 26,
2014) ("the shares were sold in interstate commerce to the public through Defendants'
New Jersey-based broker, and Defendants received the sale proceeds through wire
transfers to their bank accounts"). SOF ¶ 56-57, 70, 104-105.

ii.   **Section 17(a)(2): Defendants Obtained Money Or Property By Means Of Material Misrepresentations And Omissions.**

To prevail on its Section 17(a)(2) claim, the SEC must prove that the Defendants (a) obtained money or property, (b) by means of any untrue statement or omission, (c) of a material fact, (d) in the offer or sale of any security, and (e) using interstate commerce. 15 U.S.C. § 77q(a)(2). Scienter is not an element of a 17(a)(2) claim; the SEC may prevail by establishing negligence. *Aaron*, 446 U.S. at 696.

Statements of opinion may be actionable as fraudulent if the speaker does not actually hold the stated belief, if the statement contains embedded false statements of fact, or if the speaker omits material facts that conflict with what a reasonable investor would take from the statement itself. *Omnicare, Inc.*, 135 S. Ct. at 1326-27, 1329. Omissions are actionable when the speaker has a duty to disclose the omitted information. *SEC v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010). A duty arises when a voluntary statement is made and it omits material information. Statements and omissions are material when there is a substantial likelihood that a reasonable investor would consider the information important in determining whether to buy or sell securities. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

The undisputed facts establish that Defendants repeatedly obtained money by means of false and misleading statements and omissions directly to investors through emails, offering documents, and shareholder updates.

**Defendants made and used false and misleading statements and omissions in numerous documents and oral statements**. Starting in 2009, Mahabub primed his prospective investors by touting GenAudio's relationship with Apple. SOF ¶¶ 13-14. By November 2009, he was explicitly lying about a "deal" on the horizon. SOF ¶¶ 37. By

the spring of 2010 – in the middle of the 2010 Offering – Mahabub was lying about Jobs' involvement in the consideration of GenAudio's technology and Jobs' alleged desire to meet Mahabub. SOF ¶¶ 79, 83-86, 89, 91. Then, by the spring of 2011 and coincident to the 2011 Offering, Mahabub worked to shut down questions and pushback from investors about the lack of progress with Apple by falsely claiming that a new set of "agreements" with Apple prohibited GenAudio from even mentioning "the LCEC," all the while continuing to offer and sell GenAudio securities to his loyal investor base. SOF ¶¶ 100, 114-118. At least with respect to the statements set forth below, Defendants' conduct violated Section 17(a)(2) of the Securities Act.

In the November 9, 2009 email to shareholders (Ex. 35) and oral statements at the shareholder meeting late 2009, Mahabub falsely claimed that GenAudio was about to be acquired by Apple. The email falsely and misleadingly stated, "there is a strong possibility that the Company may be acquired within the next 6 months in light of our extensive discussions with a global industry leader in consumer electronics." Ex. 35 at 3; SOF ¶ 37. An investor forwarded to Mattos the email in connection with her – and numerous others' – purchase of stock from Mahabub. SOF ¶¶ 38-39.

Similarly, at a late 2009 shareholder meeting in Seattle, Mahabub stated that he was "positive" that "by the end of the year or something that Apple was going to be buying us out and [shareholders] better get in now …." SOF ¶ 42. Shareholders at the meeting then purchased additional shares of GenAudio stock from Mahabub personally and referred new investors. SOF ¶ 43. Then, on March 10, 2010, Mahabub emailed certain shareholders the valuation report that was to be included in the 2010 Offering and falsely claimed "we are starting to discuss the business side with the LCEC, and I

expect to have a very substantial licensing deal in place for their Christmas Product Rollout. . . ." SOF ¶ 53. All of these statements lacked any basis. Apple never stated that it was interested in acquiring GenAudio or incorporating GenAudio's technology into its product rollouts, nor did GenAudio and Apple engage in any negotiations to that end. SOF ¶¶ 20-23, 101.[11] Further, in December 2009 and January 2010, Apple employees pushed back on Mahabub's attempts to discuss a business deal. SOF ¶¶ 48-49.

The March 15, 2010 Offering Materials themselves contained additional false and misleading statements regarding GenAudio's prospects with Apple. The cover letter to the 2010 PPM (Ex. 52) stating that: "[t]his offering is being conducted to provide bridge capital until we can 'ink' a deal with [the LCEC] …."[12] SOF ¶ 70. This was false because GenAudio was never close to "inking" a deal with Apple. *See* SOF ¶ 20-23, 101. It was also misleading to suggest that funds raised during the 2010 Offering were "bridge" financing given that no deal with Apple was on the horizon.

Additionally, the 2010 PPM (Ex. 3) contained the misleading statements:

> [T]he Company is optimistic that the LCEC will eventually want access to our AstoundSound Technology for their products. It is unclear what structure such access would take, but the Company believes the LCEC would either (i) integrate a portion of our AstoundSound Technology, namely ASE, into multiple product lines through a licensing arrangement or (ii) acquire all of our AstoundSound Technology or, at least, that portion the LCEC deems necessary for its integration plans.

---

[11] To the extent the statements can be viewed as opinions, they are still actionably false. They are factually incorrect and fail to include important information known to Defendants that would conflict with what a reasonable investor would understand from the statements made. *Omnicare, Inc.*, 135 S. Ct. at 1329. Specifically, Apple and GenAudio never discussed Apple acquiring GenAudio or its technology, and Mahabub's substantive communications with Apple personnel were limited to mid-level engineering and marketing employees, as part of Apple's preliminary evaluation of GenAudio's technology. *See* SOF ¶¶ 17-18, 25-26, 31-32, 33-35.

[12] The LCEC was Apple, SOF ¶ 40, which investors understood, SOF ¶ ¶ 41.

SOF ¶ 71. These statements are fraudulent because they fail to include critical information that conflicts with what a reasonable investor would take from the statements. Specifically, they fail to disclose that Mahabub's substantive communications with Apple personnel were limited to mid-level engineering and marketing employees, and that Apple and GenAudio had no negotiations regarding Apple acquiring or licensing GenAudio's technology or "inking" any deal. SOF ¶¶ 20-23; 72, 101. As the Supreme Court explained in *Omnicare*, the reasonable investor "expects not just that the issuer believes the opinion (however irrationally), <u>but that it fairly aligns with the information in the issuer's possession at the time</u>." *Omnicare, Inc.*, 135 S. Ct. at 1329 (emphasis added).

Defendants' fraudulent statements to entice investors continued during the 2010 Offering. Specifically, the April 30, 2010 email to potential investors (<u>Ex. 74</u>; SOF ¶ 79), the early 2010 oral representations to investor Skluzak and the false transcription forwarded to him (*see* SOF ¶ 83-88), the May 2010 investor presentation (<u>Ex. 76</u>; SOF ¶ 89), and the August 1, 2010 investor letter (<u>Ex. 79</u>; SOF ¶ 91-92) all falsely touted Jobs involvement in Apple's dealings with GenAudio and made false and misleading representations about the status of GenAudio's dealings with Apple. The representations about negotiations with Apple and the involvement of Jobs were false. SOF ¶¶ 20-23, 28-29, 33-35, 101. These statements were also materially misleading because they omitted the truth about GenAudio's dealings with Apple. Without complete and accurate facts, GenAudio's lies about Jobs involvement and express optimism and confidence about the relationship moving forward would leave a reasonable investor with the impression that GenAudio was engaged in negotiations with Apple that involved

Apple executives, and was close to reaching a deal. "[W]here a party without a duty elects to disclose material facts, he must speak fully and truthfully, and provide complete and non-misleading information with respect to the subjects on which he undertakes to speak." *SEC v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010).

Finally, the December 8, 2010 (Ex. 83), February 26, 2011 (Ex. 84), and March 29, 2011 (Ex. 85) investor communications (which were followed by the April 22, 2011 Offering Materials (Ex. 4 and Ex. 86)), falsely claimed that Mahabub had met Jobs, that Apple was interested in integrating GenAudio's technology across its entire line of products, and that GenAudio would be signing a new set of "evaluation and development" agreements with Apple. SOF ¶ 97-100. The March 29, 2011 email even misleadingly teased, "[b]elieve me when I tell all of you that I wish I could disclose what is going on, however, the fact of the matter is I cannot." SOF ¶ 100; Ex. 85 at 7. Mahabub and GenAudio then previewed that references in the PPM to the LCEC would "be deleted from the business plan section of the new offering" and asked shareholders not to mention or ask about the LCEC. *Id.* As promised, the 2011 Offering Materials did not mention the LCEC. *See generally* Exs. 4 and 86.

The 2011 Offering Materials contained material omissions because they failed to inform investors that: (1) Mahabub's substantive communications with Apple personnel were almost always limited to mid-level engineering and marketing employees; (2) Apple and GenAudio had no negotiations to license GenAudio's technology or to acquire GenAudio or its technology; (3) Apple never told Mahabub or GenAudio that it planned to incorporate GenAudio's technology in any of its new product roll-outs; and (4) in September 2010, Mahabub conducted a demonstration to Apple personnel that

went poorly. Given all of the Defendants' prior false and misleading statements, including those in the March 29, 2011 email, which was issued to investors in anticipation of the 2011 Offering, Defendants had a duty to provide investors with this critical information. *Curshen*, 372 F. App'x at 880.

**The statements and omissions were material**. Defendants misled reasonable investors to believe that Apple was interested in either acquiring GenAudio, or acquiring or licensing its technology, facts that are obviously material to the reasonable investor's investment decision. "Material facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir. 1968). *See also SEC v. Recile*, 10 F.3d 1093, 1095, 1097-98 (5th Cir. 1993) (upholding grant of summary judgment when misrepresentations regarding financing and leasing status of a real estate venture "amply satisfy the materiality element"); *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) ("Surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge."). Moreover, the false and misleading statement and omissions were important to GenAudio's investors and influenced their investment decisions. SOF ¶¶ 120-122.

**The statements and omissions were in the offer or sale of securities**. All of these false and misleading statements and omissions were made "in the offer or sale" of securities because they were used to offer and sell securities either directly or by directing investors to offering documents.

Specifically, the Defendants used the November 9, 2009 email, late 2009 oral false statements at the shareholders' meeting, and March 10, 2010 email to offer and sell Mahabub's personal shares of GenAudio stock. For example, an investor forwarded to Mattos the November 9, 2009 email and included a list of investors who wished to purchase stock, many of whom did. SOF ¶¶ 38-39, 44; Bowen Dec. at ¶ 12 (in March 2010, Mahabub sold 195,000 shares of his personal GenAudio stock, raising $100,000). Similarly, because of Mahabub's oral statements at the Seattle shareholder meeting, shareholders purchased additional shares of GenAudio stock from Mahabub personally and referred new investors. SOF ¶ 43.

The 2010 and 2011 Offering Materials were *offering* documents, clearly designed to influence and solicit investors, disseminated to investors and potential investors, and directly used by investors to purchase securities. *See* Ex. 3 at 7, 37-38, and GA000549 - 552; Ex. 4 at 7-9, 44-48, and GA004795 - 4806 (describing the offerings, how to invest, and containing investment documents). GenAudio raised $3,513,000 from investors in the 2010 Offering and $990,000 in the 2011 Offering. SOF ¶ 54, 102.

GenAudio, through Mahabub, used the April 30, 2010 email, early 2010 oral misstatements and false transcript to Skluzak, and May 2010 investor presentation to offer and sell securities. *See* SOF ¶¶ 79-80 (after receiving the April 30, 2010 email, an investor purchased 5,000 shares for $15,000); SOF ¶¶ 84-88 (regarding May 21, 2010 Skluzak purchase); SOF ¶ 89 (regarding May 2010 investor presentation, which discussed the 2010 Offering and encouraged investors to review the PPM and attached valuation report). Finally, Defendants used the August 1, 2010 investor letter to update and solicit investors for the 2010 Offering. *See* SOF ¶ 92.

**The Defendants obtained money from investors**. Mahabub and GenAudio obtained investors' money by means of the false and misleading statements and omissions. Specifically, Mahabub directly obtained money from investors by means of the November 9, 2009 email, his false statements during the Seattle shareholder meeting, and the March 10, 2010 email. *See* SOF ¶¶ 38-39, 43, 45; Bowen Dec. at ¶ 12 (regarding March 2010 sales). GenAudio also directly obtained:  (1) $3,513,000 from investors via the 2010 Offering Materials, SOF ¶ 54, including $120,000 from Skluzak and at least $15,000 from an investor via the April 30, 2010 email, SOF ¶¶ 80, 85; and (2) $990,000 during the 2011 Offering, SOF ¶ 102.

**Defendants acted with intent to deceive and negligently**. As detailed in Section III.C.iii, *infra*, Mahabub, and therefore GenAudio, acted with scienter. Mahabub and GenAudio were also negligent in making the false and misleading statements and omissions. Mahabub was GenAudio's primary contact with Apple and a participant in GenAudio's communications with Apple. SOF ¶ 16. He <u>actually knew</u> that at no point did GenAudio and Apple negotiate regarding the acquisition of GenAudio or its technology, nor did Jobs have any involvement in Apple's dealings with GenAudio. SOF ¶ 20-23, 28-29, 34-35, 101; *see also id.* at 48-49 (in December 2009 and January 2010, Hailey notifying Mahabub that Apple was not at a stage to discuss a "deal") and 81 (in May 2010, Tiscareno telling Mahabub "[we] have to get to first base"). Given these circumstances, it was far below the standard of care of a reasonable person, much less the CEO of a company engaged in securities offerings, to make the misrepresentations and omissions detailed above.

**Reliance and Injury are not Elements of Section 17(a)(2)**. In its Order, this Court stated, "the SEC need not prove reliance, injury, or causation, save for any claims it brings under Securities Act [Section] 17(a)(2), which explicitly requires the defendant to have 'obtain[ed] money or property by means of any untrue statement of a material fact or [a material] omission.'" Order at 17. This Court reasoned that the plain language meant that "there must be injury to some person (*i.e.*, transferring 'money or property' to the defendant) caused by that person's reliance on (*i.e.*, 'by means of') the defendant's material misstatements or omissions." *Id.* at 11. Respectfully, the SEC does not agree that liability under Section 17(a)(2) requires any showing of investor reliance and injury.

As explained by the Tenth Circuit:

> The SEC is not required to prove reliance or injury in enforcement actions. … Aside from the fact that [Defendant's] argument is unsupported by precedents, it fails when considered in light of the overall aims of the securities laws and common sense. In effect, [Defendant] proposes that the Commission should take no action until an investor has suffered actual injury even when, as is the case here, the Commission is aware that a broker-dealer or investment adviser is employing deceptive practices which are virtually certain to lead to investor losses. The courts have rejected this contention for sound policy reasons.

*Geman v. SEC*, 334 F.3d 1183, 1191 (10th Cir. 2003) (citations omitted). While *Geman* did not discuss the claim under Section 17(a)(2) specifically, it certainly understood that the enforcement action involved claims under all three subdivisions of Section 17(a), *see* 334 F.3d, at 1191(quoting Section 17(a)), and its reasoning supports the SEC's longstanding position that investor reliance or harm are not elements of any of the subdivisions of Section 17(a). The reason for dispensing with proof of reliance or harm in Commission actions is that an injunction is not designed to compensate for past harm, but to act prophylactically against future violations. *SEC v. Koracorp Indus. Inc.*,

575 F.2d 692, 697 (9th Cir. 1978) (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

Section 17(a)(2) does not require that money or property be "transferr[ed]" to the defendant or that a transaction be consummated. That liability under Section 17(a)(2) is not predicated on a consummated transaction is confirmed by its application to misrepresentations or omissions "in the offer or sale." As the Supreme Court held in *Naftalin*, Congress intended a broad construction of those terms, 441 U.S. 768 (1970), and the Securities Act thus applies to fraudulent and negligent offers and is not limited to completed transactions or "sales." It would manifestly contravene the purpose of the Securities Act to protect offerees if the SEC were precluded from seeking injunctive relief until after any particular investor has been fraudulently induced into a securities transaction. Furthermore, the plain language of Section 17(a)(2) does not require a showing of any particular investor reliance, injury, or transfer of money or property directly to the violator. Rather, the language requires the violator to have "directly or indirectly" obtained money or property "by means of" a material misrepresentation or omission. *See, e.g., SEC v. Rana Research, Inc.* 8 F.3d 1358, 1363 (9th Cir. 1993).

Courts have long understood that the SEC does not have to prove that investors relied on a defendant's misrepresentations or were harmed thereby in actions to enforce the anti-fraud provisions of the securities laws.[13] *Hughes v. SEC*, 174 F.2d 969, 974 (D.C. Cir. 1949) (affirming SEC's revocation order based on violations of Sections

---

[13] As *Rana Research* explains, reliance and injury are required elements when an injured investor seeks damages in a private action under 10(b), and reliance and damages are nowhere found in the statutory text of Section 10(b) or Rule 10b-5, but have been judicially imposed and "largely directed toward who has standing to enforce the antifraud laws." *Id.* at 1364.

17(a)(1-3) and 10(b), stating that "revocation is proper even if one, or none, of the particular clients here involved has been misled or has suffered injury."); *N. Sims Organ & Co. v. SEC*, 293 F.2d 78 (2d Cir. 1961) (affirming revocation for violations of 17(a)(1-3) and 10(b), finding that reliance is not an element of either provision even where the purchaser cancelled the sale and testified that he did not rely on defendant's statement).

The SEC agrees that the language "obtain money" and "by means of" requires a causal link between the violator's deceptive statements and receipt of money or property. Certainly a violation of Section 17(a)(2) can be shown by "injury to some person … caused by that person's reliance" on the defendant's deception (Order at 11). But, the plain language of Section 17(a)(2) does not require an investor's reliance on the statement or a direct transfer of money between a purchaser and the violator. Indeed, the SEC obtains liability routinely in cases where there is no injury to a specific investor and where the defendant receives money from someone other than a victim.[14]

Regardless, the SEC emphasizes that in this case, Mahabub received money directly from victims of his deceptive statements through his sales of his own shares. And GenAudio received money from investors through the fraudulent offer and sale of

---

[14] *See, e.g., SEC v. Curshen*, 372 F. App'x. 872 (10th Cir. 2010) (affirming order finding defendant liable for violations under 17(a)(1-3) and ordering him to disgorge compensation received from the issuer in exchange for touting stock); *SEC v. Huttoe*, 1998 WL 34078092, at *6 (D. D.C. 1998) (finding defendant liable under Section 17(a)(2) for touting stocks to investors in exchange for undisclosed payments by the issuer); *SEC v. Cole*, No. 12-cv-8167 (RJS), 2015 WL 5737275 at *7 (S.D.N.Y. Sept. 19, 2015 (denying defendant's summary judgment motion, finding it was undisputed that the accountant obtained $28,000 for his work).

securities during the two offerings. That investors relied on and were damaged by defendants' lies, although not required for liability, is clearly established in the record.

### iii.   Section 17(a)(1):  Defendants Employed A Device, Scheme, Or Artifice To Defraud.

To establish a violation of Section 17(a)(1), the SEC must prove that Mahabub and GenAudio, (a) in the offer or sale of any security, (b) directly or indirectly, employed any device, scheme, or artifice to defraud, (c) did so with scienter, and (d) using interstate commerce. 15 U.S.C. § 77q(a)(1); *see SEC v. Parrish*, No. 11-CV-00558-WJM-MJW, 2012 WL 4378114, at * 3 (D. Colo. Sept. 25, 2012) (Martinez, J.) (addressing scienter). Section 17(a)(1) "encompass[es] all fraudulent conduct undertaken with scienter – including conduct undertaken as part of a fraud involving misstatements." *In re Dennis J. Malouf*, Securities Act Release No. 10115, 2016 WL 4035575, at *11 n.76 (July 27, 2016), citing *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1063 (2014) (a misstatement or omission of a material fact is undoubtedly a "device" or "artifice" to defraud.).[15] Sending false statements to potential investors with scienter violates Section 17(a)(1). *See Lorenzo v. SEC*, 872 F.3d 578, 589 (D.C. Cir. 2017) (defendant's "active role in producing and sending the emails constituted employing a deceptive 'device,' 'act,' or 'artifice to defraud' for purposes of liability under Section 10(b), Rule 10b-5(a) and (c), and Section 17(a)(1)") (internal quotation marks omitted) (petition for cert. filed, No. 17-1077 (Jan. 26, 2018); *Malouf*, Securities Act Release No. 10115, at *12 ("one who (with scienter) makes a material misstatement or

---

[15] Some courts have held that Sections 17(a)(1) and (3) and Rule 10b-5(a) and (c) require conduct beyond misstatements and omissions. *See Lorenzo*, 872 F.3d at 594 (citing cases discussing Rules 10b-5(a) and (c)). While the SEC disagrees with such interpretations of these provisions, the issue is irrelevant here where Mahabub engaged in material misstatements and omissions and other deceptive conduct.

omission of a material fact in the offer or sale of a security has violated Section 17(a)(1) because such conduct constitutes 'employ[ing]'" a "'device, scheme, or artifice to defraud.'").

**Defendants employed a device, scheme, or artifice to defraud**. Mahabub and GenAudio engaged in a scheme to defraud whereby Mahabub solicited existing shareholders and potential investors to purchase his personal shares of GenAudio or shares directly from GenAudio, by lying and creating a series of fabricated emails to create the false appearance that that GenAudio was a legitimate takeover target or licensing partner of Apple. The deceptive acts that Defendants engaged in to further the scheme include:

- Between November 2009 and April 2012, in writing and orally, Defendants made false and misleading statements and omissions to defraud investors and potential investors as set forth above. *See* Section III.C.ii, *supra*.

- On September 25, 2009, October 2, 2009, and November 9, 2009, Mahabub, without a reasonable basis, represented to the Board that a deal with Apple was likely. SOF ¶¶ 27, 30, 36.

- On February 12, 2010, Mahabub sent the GenAudio Team a falsified email and, that same day, induced the Board to authorize preparation of the 2010 Offering. SOF ¶¶ 50-51; *see also* SOF ¶ 52 (on March 5, 2010, the Board authorized the 2010 Offering).

- On March 21, 2010, shortly after the 2010 Offering began, Mahabub sent the GenAudio Team a false and altered email and also encouraged the GenAudio Team to help raise money through the 2010 Offering. SOF ¶ 74-75.

- On April 8, 2010, May 6, 2010, and July 2, 2010, during the 2010 Offering, Mahabub sent the GenAudio Team falsified emails. SOF ¶¶ 78, 82, 90.

- On May 6, 2010, during the 2010 Offering, Mahabub sent the GenAudio Team and an investor a falsified "transcript" of a call with Tiscareno. SOF ¶¶ 83-84.

- On December 8, 2010, February 26, 2011, and March 29, 2011, Defendants conditioned the market for the 2011 Offering by falsely claiming that Mahabub had met the CEO of Apple, that Apple continued to be "very interested in integrating our technology across their entire line-up of product offerings" and that GenAudio and Apple were about to enter a new set of agreements that would prohibit GenAudio from discussing "the LCEC." SOF ¶¶ 97-100.

Mahabub's misrepresentations to the GenAudio Board regarding the prospects of a deal with Apple were false and misleading because Mahabub knew that there was no basis for them. *See* SOF ¶¶ 16, 20-23, 25-26, 28-29, 33-35, 101. This course of deception of the Board, which included shareholders and which authorized GenAudio's securities offerings, constitutes a scheme or device to defraud that violates Section 17(a)(1). *See* e.g. *SEC v. Kearns*, 691 F. Supp. 2d 601, 618 (D.N.J. 2010) (misleading auditors was conduct in furtherance of scheme).

Mahabub's falsification and alteration of emails that he sent to the GenAudio Team were additional deceptive devices to further his fraudulent scheme to create the appearance that GenAudio's prospects for a deal with Apple were imminent. *See* SOF ¶¶ 78, 82, 90. One fraudulent device included an email of an entirely fabricated "transcript," which Mahabub used to defraud not only the GenAudio Team, but also an investor. SOF ¶¶ 83-88. Falsifying documents, using falsified documents, and

45

misleading people who were involved in the offer and sale of GenAudio securities violates Section 17(a)(1). *See, e.g.*, *SEC v. Monterosso*, 557 F. App'x 917, 926 (11th Cir. 2014) (upholding summary judgment on liability under Sections 17(a) and 10(b) when defendants "changed the names of customers and vendors and altered the amounts on invoices, and no reasonable person could have believed it was proper to report revenue from fabricated invoices"); *SEC v. Cooper*, 142 F. Supp. 3d 302, 316 (D.N.J. 2015) (granting SEC summary judgment on Sections 17(a) and 10(b) when defendant "created and supplied fake account statements" and "forged an email and a letter from a representative of a brokerage firm").

**The scheme was in the offer or sale of securities**. Defendants' scheme occurred in the selling process of GenAudio securities. *See Naftalin*, 441 U.S. at 773 (Congress intended the statutory terms "offer" and "sale" to be "expansive enough to encompass the entire selling process"). Mahabub and GenAudio needed investor funds to continue to operate GenAudio and for Mahabub to continue to receive his GenAudio salary and expense reimbursements. *See* SOF ¶¶ 9-12, 94, 119. Defendants therefore used the scheme to deceive everyone associated with GenAudio's and Mahabub's securities offerings: the Board members who authorized the offerings, the employees who solicited investors[16] and kept the company operating, and the investors who purchased shares providing GenAudio and Mahabub with millions of dollars.

For example, on the same day that the Board authorized work to begin on the 2010 Offering materials, Mahabub sent them a falsified email that made it appear as if

---

[16] Mattos explained that his "primary functions [for GenAudio] were to continue to raise money for the company, reaching out through friends and family [and] to manage company records[,]" SOF ¶ 6.

Schiller and Jobs were involved in Apple's dealings with GenAudio. SOF ¶¶ 50-51. Similarly, within a week of the 2010 Offering materials being distributed to potential investors, Mahabub asked the GenAudio Team to "get some fuel for the ship" by assisting "with this financing effort" in another email that was falsified and altered to make it appear as if Mahabub was communicating with Schiller and Apple was "hoping for – a fall product rollout." SOF ¶¶ 74-75. Then, throughout the 2010 Offering, Mahabub continued to send the GenAudio Team falsified emails and a falsified transcript to the GenAudio Team. *See* SOF ¶¶ ¶ 78, 82-84, 90. Further, Mahabub also deceived investors by making false and misleading statements and omissions in documents that he and GenAudio used to offer securities. *See* Section III.C.ii, *supra*.

Defendants' scheme was not merely occurring at a company that happened to also be offering securities; instead, there is a clear connection between the fraud and securities transactions because Mahabub designed the scheme ultimately to obtain money from investors through securities offerings. *See SEC v. Wolfson*, 539 F.3d 1249, 1263 (10th Cir. 2008) ("§17(a) requires a connection between the fraud alleged and a securities transaction").

**Defendants acted with scienter**. In the Tenth Circuit, scienter is established by a showing of knowledge or recklessness. *SEC v. Smart*, 678 F.3d 850, 856-57 (10th Cir. 2012). Recklessness is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that it is either known to the defendant or is so obvious that the actor must have been aware of it." *See Parrish*, 2012 WL 4378114, at * 3 (quoting *Hackbart v. Holmes*, 675 F.2d 1114, 1117 (10th Cir. 1982)). As the CEO of GenAudio, Mahabub's scienter is imputed to GenAudio. *Adams*

*v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003), (as amended on denial of reh' g (Aug. 29, 2003)).

Mahabub acted knowingly in falsifying documents and acted knowingly – or at least recklessly – in making misrepresentations to the GenAudio Team and investors. Mahabub knew the truth and actively altered and concealed it. Mahabub personally altered and falsified emails and a fake "transcript" of a phone call; this conduct establishes his scienter. SOF ¶¶ 24, 30, 50, 74, 78, 82-84, 90. *See SEC v. Gallagher*, No. 87-3904, 1989 WL 95252, at *6 (E.D. Pa. 1989) (defendant's knowledge of altered and fake documents provided to auditors established at least gross recklessness). Mahabub knew that his statements to the GenAudio Team and investors about negotiations with Apple were false, misleading, and contained critical omissions. He was GenAudio's primary contact with Apple and the participant in the communications about which he and GenAudio lied; SOF ¶ 16, as a result, Mahabub had actual knowledge of the falsity of the statements about his interactions with Schiller, Cook, Jobs, and Apple's alleged "negotiations" and likelihood of engaging in a deal with GenAudio. SOF ¶¶ 20-23, 17-18, 25-26, 28-29, 31-32, 33-35, 101. He was also the recipient of Apple's emails notifying him that a "deal" was not on the horizon and GenAudio and Apple had to "get to first base." SOF ¶¶ 48-49, 81. Given that he was "unquestionably aware of the true facts, the false statements can only have been intentional." *SEC v. Universal Express, Inc.*, No. 04 Civ. 2322(GEL), 2007 WL 2469452, at *7 (S.D.N.Y. Aug. 31, 2007).

Mahabub's scienter is further established by the extent of his fraud – he engaged in extensive fraudulent conduct over a lengthy period of time, throughout which he and

GenAudio raised millions of dollars from investors and he directly profited from hundreds of thousands of those investor funds. SOF ¶¶ 12, 94, 119. At the very least, this extensive fraudulent conduct establishes recklessness. *See SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1380 (D. Colo. 2014) (deceptive conduct over a period of months "was so obviously misleading to be an 'extreme departure from the standards of ordinary care'").

### iv.   Section 17(a)(3):  Defendants Engaged In A Transaction, Practice Or Course Of Business That Operated As A Fraud Upon Purchasers.

To prevail on a claim for violations of Section 17(a)(3) of the Securities Act, the SEC must establish that the Defendants "[a] engage[d] in any transaction, practice, or course of business [b] which operates or would operate as a fraud or deceit upon the purchaser[,]" [c] in the offer or sale of securities, [d] using means of interstate commerce or the mails, and [e] with negligence. *See* 15 U.S.C. § 77q(a)(3). Between 2009 and 2012, Mahabub, as the CEO, President, and Chairman of the Board of GenAudio, engaged in transactions, practices, and a course of business that operated as a fraud or deceit upon purchasers of GenAudio securities.

**Defendants engaged in transactions, practices, or a course of business that operated as a fraud or deceit**. As detailed above regarding Section 17(a)(1), Defendants engaged in transactions and practices that included: <u>repeatedly</u> making false and misleading statements and omissions to investors, making misrepresentations to the Board, and falsifying emails sent to the GenAudio Team and, in one instance to an investor. All of this conduct constituted a fraudulent practice or course of business that violated Section 17(a)(3). *See Malouf*, Securities Act Release No. 10115, at *12 ("*repeated* acts, such as repeatedly making or drafting materially misleading statements

over a period of time, may be considered a fraudulent 'practice' or 'course of business.'") (emphasis in original).

**The fraudulent conduct was in the offer or sale of securities**. As detailed above regarding Sections 17(a)(1) and 17(a)(2), the conduct that made up Defendants' fraudulent practice or course of business occurred in the selling process of GenAudio securities and in direct offers and sales of GenAudio securities. *See Naftalin*, 441 U.S. at 773.

**The transactions, practices, or course of business operated or would operate as a fraud or deceit upon the purchaser of GenAudio securities**. Each of Mahabub's transactions and practices, including the misleading statements and omissions identified in the Section 17(a)(2) discussion, was a fraudulent course of business that would deceive purchasers of GenAudio's securities. *See Malouf*, Securities Act Release No. 10115, at *12. In addition to his blatantly deceptive statements to investors, Mahabub's additional fraudulent conduct – the falsification of emails and misrepresentations to the Board – were also transactions or practices taken as part of an overall fraudulent course of business to defraud investors into purchasing stock in the company. This includes Mahabub sending the Board a falsified email on the same day that the Board authorized the drafting of the 2010 Offering Materials and, within a week of the 2010 Offering materials being distributed, asking the GenAudio Team to "get some fuel for the ship" by assisting "with this financing effort" in another email that was falsified and altered to make it appear as if Mahabub was communicating with Schiller and Apple was "hoping for – a fall product rollout." SOF ¶¶ 50-51, 74-75.

**Defendants were at least negligent**. As detailed above regarding the violations of Section 17(a)(2), Mahabub's conduct in falsifying documents and making misrepresentations to the GenAudio Team and investors was in fact made with an intent to deceive everyone, including the Board. Mahabub and GenAudio's conduct cannot be characterized as conforming to a reasonable standard of care.

**D.   Defendants Violated Section 10(b) and Rule 10b-5 of the Exchange Act.**

**i.   The Legal Standard.**

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means . . . of interstate commerce or of the mails, . . .— (b) To use or employ, in connection with the purchase or sale of any security  . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5, 17 C.F.R. § 240.10b-5, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means . . . of interstate commerce, or of the mails . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**ii.   "In Connection With" And Scienter.**

This Court asked the parties to address the following:  "are the scienter and 'in connection with' elements satisfied when a defendant makes knowingly false statements *while* securities are for sale, or only when a defendant makes such statements *because* securities are for sale?" Order at 15.

These questions are best answered by using the Tenth Circuit's analysis in *Wolfson*:  "[T]he 'in connection with' requirement is generally met by proof of the *means*

*of dissemination* and the *materiality of the misrepresentation or omission.*" *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008). When a document is designed to reach investors and influence their decisions to transact a purchase of a security, the SEC need only show that the documents are reasonably calculated to influence investors, and that the misrepresentations are material to an investors decision to buy or sell the security. *Id.*

Under Section 10(b) and Rule 10b-5, the phrase "in connection with" must be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (quoting *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972)). Thus, a misrepresentation has been held to be "in connection with the purchase or sale" of a security so long as it "touch[es]," *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12-13 (1971), or "coincide[s]" with, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006), a securities transaction. Indeed, the "in connection with" requirement may be met even in the absence of "an actual purchase or sale of securities." *SEC v. Goble*, 682 F.3d 934, 946 (11th Cir. 2012). *See also Texas Gulf Sulphur Co.*, 401 F.2d, at 859–62  (rejecting the argument that "Congress intended that there be a participation in a securities transaction as a prerequisite of a violation.").

Such a broad interpretation is necessary to effectuate the purposes of Section 10(b). Congress intended the phrase "in connection with" to sweep widely enough to achieve "'a high standard of business ethics in the securities industry'" and to substitute "'a philosophy of full disclosure for the philosophy of caveat emptor.'" *Zandford*, 535 U.S. at 819 (quoting *Affiliated Ute Citizens*, 406 U.S. at 151). A flexible reading of "in

connection with" thus furthers the principal purpose of the securities laws—"to insure honest securities markets and thereby promote investor confidence." *United States v. O'Hagan*, 521 U.S. 642, 658 (1997).

Proof that the defendant specifically intended to influence a securities transaction is sufficient to meet the "in connection" with element, *see United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.,* 210 F.3d 1207, 1221 (10th Cir. 2000), *aff'd*, 532 U.S. 588 (2001), but it is not necessary. *Wolfson*, 539 F.3d at 1262. The "in connection with" requirement does not require a showing of specific intent to influence a securities transaction. Rather, in determining whether the "in connection with" element has been satisfied, courts have for decades "applied an *objective* analysis that considers the alleged misrepresentation in the context in which it was made." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 176 (3d Cir. 2000) (emphasis added) (citing *Texas Gulf Sulphur Co.*, 401 F.2d, at 862); *see also SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1171 (D.C. Cir. 1978) (under *Texas Gulf*, "in connection with" may be satisfied "regardless of the motive … of the violator"); *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017 (9th Cir. 1999) ("in connection with" is a "foundational requirement" that is analyzed separately from *scienter* and the other elements of a Section 10(b) cause of action). Because fraud schemes vary wildly, the link between the fraud and a securities transaction may be shown in various ways, *see generally SEC v. Pirate Inv'r LLC*, 580 F.3d 233, 244 (4th Cir. 2009) (*per curiam*), but courts have not required proof that the defendant had the specific intent to influence a particular securities transaction. Therefore, a showing that the defendant acted with scienter—that is, that he made misstatements knowing they

were false or in reckless disregard of the statements' falsity—is distinct from the "in connection with" inquiry.

Although the "in connection with requirement" is flexibly construed, the Court is correct that this element should not be interpreted so broadly as to convert every common law fraud that "happens to involve securities" into a violation of the federal securities laws. Order at 13. But the Court need not import a specific intent or scienter component into the "in connection with" analysis to achieve that result. The "in connection with" requirement does not "rop[e] in speakers who had no idea that their conduct might implicate Section 10(b)," but courts guard against such overbreadth by using *objective* criteria. *Pirate Inv'r LLC*, 580 F.3d at 250-51 ("[B]y requiring that misstatements be communicated in a medium upon which a *reasonable* investor would rely, the *Texas Gulf* standard protects these *unknowing speakers* from liability and ensures that there is a sufficient nexus between the misrepresentations and the securities sales that they induce to satisfy the Supreme Court's command that the fraud and securities sales 'coincide.'") (emphasis in original). Thus, the Court is correct that "any lie one coworker tells to another" should not be actionable as securities fraud simply because "the employer's securities happen to be for sale" at the time of the lie. Order at 13. But such a suit would fail under a straightforward application of the standard set by the Tenth Circuit in *SEC v. Wolfson* because the lie in that hypothetical—as an objective matter—would not have been calculated to influence, nor be material to, any investment; the liar's motive would be irrelevant to the inquiry. *Cf. Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1066 (2014) (in connection with requirement is met where there are victims who "took, tried to take, who divested

themselves of, who tried to divest themselves of, or who maintained *an ownership interest*" in securities) (emphasis in original).

### iii. Section 10(b) And Rule 10b5-(b):  Defendants Made Material False And Misleading Statements And Omissions.

To establish a violation of Section 10(b) and Rule 10b-5(b), the SEC must establish that the Defendants (a) made false or misleading statements or omissions of material fact (b) in connection with the purchase or sale of any security, (c) with scienter, and (d) using interstate commerce. For a defendant to be primarily liable for a violation of Rule 10b-5(b), the defendant must also be the "maker" of the misstatement or omissions. *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011). "For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.*

**Defendants made material false and misleading statements and omissions**. Defendants made repeated false and misleading statements and omissions to investors and potential investors, and these misstatements were material, as detailed above with respect to the SEC's claims under Section 17(a)(2). *See* Section III.C.ii, *supra*.

GenAudio was the maker of the Offering Materials and shareholder updates, which were issued in its name. *See Janus*, 131 S.Ct. at 2304 (entity issuing prospectus was "maker"). SOF ¶¶ 56, 105. Mahabub was the "maker" of his emails and his oral untrue statements to investors. He was also the "maker" of all of GenAudio's untrue statements and omissions, as he had "ultimate authority" over all statements regarding Apple, *see* SOF ¶ 16, and he controlled GenAudio, *id.* ¶¶ 3-4. He also reviewed and approved GenAudio's Offering Materials, *id.* ¶¶ 58, 106, and investor communications

were electronically signed by Mahabub, and frequently referred to him as the author, *id.* ¶¶ 91, 97-100. "[I]n the wake of *Janus,* an executive who undisputably exercised authority over his own non-casual statements with the intent and reasonable expectation that such statement would be relayed to the investing public, should be deemed to be the person who 'made' the statements …." *SEC v. Daifotis*, 874 F. Supp. 2d 870, 881 (N.D. Cal. 2012); *see also SEC v. Levin*, No. 12-21917, 2013 WL 5588224, at * 14 (S.D. Fla. Oct. 10, 2013) (managing member and owner was maker when he had ultimate control over the content of statements issued to potential investors). Further, Mahabub's "own contemporaneous words and actions show that [he] endorsed the statements" as his altered emails and direct communications with investors also contained untrue and misleading information regarding Apple. *SEC v. E-Smart Techs., Inc.*, 74 F. Supp. 3d 306, 319 (D.D.C. 2014) (holding CEO was a "maker").[17]

**The false and misleading statements and omissions to investors were "in connection with" the purchase and sale of securities**. GenAudio and Mahabub made false and misleading statements and omissions directly to investors in materials used to solicit investments because the materials were disseminated in a manner likely

---

[17] In the alternative, Mahabub is liable for GenAudio's violations of Section 17(a)(2) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5(b) as an aider and abettor or, with respect to the Exchange Act, as a control person. (Compl. at Fifth, Sixth, and Seventh Claims). As set forth above, it is undisputed that GenAudio committed fraud by making numerous untrue and misleading statements and omissions. Mahabub's substantial assistance to GenAudio is demonstrated by his control over the statements and his deceptive conduct and, as explained above, he acted with scienter or, at least, recklessly. Mahabub also controlled GenAudio and is therefore liable as a control person for GenAudio's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b). *See SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1208 (D.N.M. 2013) (setting forth legal standard for aiding and abetting and control person liability); 15 U.S.C. § 78t(a).

to influence investment decisions. *See* Section III.C.ii, <u>The statements and omissions were in the offer or sale of securities</u>, *supra* (discussing the means of disseminating the material false and misleading statements and omissions); *Wolfson*, 539 F.3d at 1262. Lying to investors about the company's prospects is a common form of securities fraud, and thus communications containing such lies are "in connection with" the securities trades in that company. *See, e.g.*, *Pirate Inv'r*, 580 F.3d at 250  (noting that the "in connection with" requirement has been met in cases involving "SEC filings"; "prospectuses"; "sales and marketing materials at brokerage houses"; "investment research reports"; and "detailed drug advertisements published in sophisticated medical journals").

**Defendants acted with scienter**. Mahabub, and therefore GenAudio, acted with scienter, as detailed in Section III.C.iii, *supra*, regarding Section 17(a)(1).

### iv. Section 10(b) And Rule 10b-5(a):  Defendants Employed Devices And A Scheme To Defraud.

To establish a violation of Section 10(b) and Rule 10b-5(a), the SEC must prove that the defendant (a) employed any device, scheme, or artifice to defraud, (b) in connection with the purchase or sale of any security, (c) using interstate commerce, (d) with scienter. 17 C.F.R. § 240.10b-5(a).

**Defendants employed a scheme to defraud**. For the reasons detailed in Sections III.C.iii and III.C.iv, *supra* (addressing violations of Section 17(a)(1) and 17(a)(3)), Defendants engaged in a scheme to defraud.

**The scheme was in connection with the purchase or sale of GenAudio securities**. Defendants' entire scheme was in connection with the purchase and sale of securities. The whole point of Mahabub's deception was to induce investors to purchase

GenAudio securities in offerings authorized by GenAudio's deceived Board. As explained immediately above regarding Rule 10b-5(b), Mahabub used conduct and false and misleading statements. Mahabub falsified emails to the GenAudio Team and made false and misleading statements at Board meetings, *i.e.*, lies that Mahabub argues were not publicly-disseminated, but which demonstrate Mahabub's scienter in making false statements to investors. The false statements to GenAudio's Team or Board are fraudulent devices as part of an overall scheme to defraud investors into purchasing stock in the company. This includes Mahabub sending the Board a falsified email on the same day that the Board authorized the drafting of the 2010 Offering Materials and, within a week of the 2010 Offering materials being distributed, Mahabub asked the GenAudio Team to "get some fuel for the ship" by assisting "with this financing effort" in another email that was falsified and altered to make it appear as if Mahabub was communicating with Schiller and Apple was "hoping for – a fall product rollout." SOF ¶¶ 50-51, 74-75.

Even if this Court were to evaluate whether the falsified emails and misleading statements to the Board were sufficiently "in connection with the purchase or sale of a security," the analysis is the same as discussed above: whether Mahabub lied in a manner that was designed to reach and influence investors. *See* Section III.D.ii, *supra*. The undisputed facts support such a finding. First, all of the falsified information was designed to reach, and did reach, GenAudio shareholders because some Board members were shareholders. SOF ¶ 5. *See SEC v. North American Research and Development Corp.*, 424 F.2d 63 at 79-80 (March 25, 1970, 2nd Cir.)(statements could be calculated to influence shareholders, and even if those on receiving end of

promotional barrage were not directly influenced to buy or sell, "privity of contract is immaterial when the SEC seeks to execute its statutory mandate by bringing an action against reckless insiders."). Second, Mahabub used some falsified emails <u>at the same time</u> he encouraged the Board and other GenAudio Team members to commence the 2010 Offering and to find potential investors. SOF ¶¶ 50-51, 74-75. Finally, it is clear that Mahabub intended for the <u>content</u> of the falsified emails and misstatements at the Board meetings to reach investors because he directly provided investors with other statements (oral and written) that was substantially similar to the content of the falsified emails, including claims that Jobs was involved in Apple's dealings with GenAudio and representations that GenAudio was on the brink of entering into a "deal" with Apple. *See* SOF ¶¶ 37, 42, 84, 86, 91, 97.

**Defendants acted with scienter**. Mahabub, and therefore GenAudio, acted with scienter as detailed in Section III.C.iii, *supra*, regarding Section 17(a)(1).

### v.    Section 10(b) And Rule 10b-5(c):  Defendants Engaged In Act, Practices, Or A Course Of Business Which Operated As A Fraud.

To establish a violation of Section 10(b) and Rule 10b-5(c), the SEC must establish that the Defendants "[a] engage[d] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," [b] in connection with the purchase or sale of any security, [c] with scienter, and [d] using interstate commerce.

**Defendants engaged in acts, practices, or a course of business that operated or would operate as a fraud**. Defendants engaged in transactions, practices, or a course of business that included <u>repeatedly</u> making false and misleading statements and omissions to the defraud investors and potential investors, making

misrepresentations to the Board, and falsifying documents, as detailed in Sections III.C.iii and iv, *supra*, regarding Sections 17(a)(1), (2), and (3). Such conduct violates Rule 10b-5(c). *See Malouf*, 2016 WL 4035575, at *12 ("*repeated* acts, such as repeatedly making or drafting materially misleading statements over a period of time, may be considered a fraudulent 'practice' or 'course of business.'") (Emphasis in original).

**The transaction, practice, or course of business was in connection with the purchase or sale of securities**. As detailed in Sections III.D.iii and iv, *supra*, regarding Sections 10(b) and Rule 10b-5(a) and (b), Defendants' conduct occurred in connection with the purchase or sale of GenAudio securities.

**Defendants acted with scienter**. Mahabub, and therefore GenAudio, acted with scienter, as detailed in Section III.C.iii, *supra*, regarding Section 17(a)(1).

## IV.      CONCLUSION

Based on the foregoing, the SEC respectfully requests that the Court enter an Order granting summary judgment against Defendants Mahabub and GenAudio as to their liability for the First, Second, Third, Fourth, and Eighth Claims against them. Alternatively, the Commission requests that summary judgment be entered against Mahabub as to his liability for the Fifth, Sixth, and Seventh Claims alleged against him.

DATED:  February 16, 2018

Respectfully Submitted,

*/s Danielle R. Voorhees*
Leslie J. Hughes (Colo. Bar No. 15043)
Danielle R. Voorhees (Colo. Bar No. 35929)
Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO  80294-1961
Telephone: (303) 844-1000
Fax: (303) 297-3529
HughesLJ@sec.gov
VoorheesD@sec.gov
*Attorneys for Plaintiff Securities and Exchange Commission*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2018, the document above was e-filed with the Court's ECF system and will be served on those listed below:

Andrew B. Holmes
Holmes, Taylor, Scott & Jones, LLP
617 South Olive Street, Suite 1200
Los Angeles, CA 90014
Telephone: 213-985-2265
Email: abholmes@htsjlaw.com
*Attorney for Defendant Taj Jerry Mahabub*

Michael P. McCloskey
Wilson Elser Moskowitz Edelman & Dicker LLP
655 West Broadway, Suite 900
San Diego, CA 92101
Telephone: 619-321-6200
Email: Michael.McCloskey@wilsonelser.com
*Attorney for Defendant GenAudio, Inc.*

Jeffrey G. Benz
Benz Law
12021 Wilshire Boulevard, Suite 256
Los Angeles, CA 90025
Telephone: 310-570-2774
Email: JeffreyBenz@gmail.com
*Attorney for Defendant Astound Holdings, Inc.*

*s/ Elinor E. Blomgren*
Elinor E. Blomgren