# EXCERPTED

# EXHIBIT 2

# In The Matter Of:

*Securities and Exchange Commission v.*
*Taj Jerry Mahabub, et al.*

---

*Taj Jerry Mahabub*

*Vol. 1*

*January 19, 2017*

---

*Behmke Reporting and Video Services, Inc.*

*160 Spear Street, Suite 300*

*San Francisco, California 94103*

*(415) 597-5600*

Original File 30906Mahabub.txt

**Min-U-Script® with Word Index**

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLORADO
 3
 4    - - - - - - - - - - - - - -
 5    SECURITIES AND EXCHANGE        )
 6    COMMISSION,                    )
 7              Plaintiff,           )
 8                                   ) CASE NO.
 9    v.                             ) 1:15-cv-02118-CBS-WJM
10                                   )
11    TAJ JERRY MAHABUB, GENAUDIO,   )
12    INC., and ASTOUND HOLDINGS,    )
13    INC.,                          )
14              Defendants.          )
15    - - - - - - - - - - - - - -
16
17        VIDEOTAPED DEPOSITION OF TAJ JERRY MAHABUB
18            THURSDAY, JANUARY 19, 2017
19            PAGES 1 - 256; VOLUME 1
20
21        BEHMKE REPORTING AND VIDEO SERVICES, INC.
22      BY: PAULA A. PYBURN, CSR NO. 7304, RPR, CLR
23             160 SPEAR STREET, SUITE 300
24             SAN FRANCISCO, CALIFORNIA 94105
25                       (415) 597-5600
```

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8        Videotaped deposition of TAJ JERRY MAHABUB,
 9    VOLUME 1, taken by Plaintiff, at 444 South Flower
10    Street, Suite 900, Los Angeles, California,
11    commencing at 10:17 a.m., on THURSDAY, JANUARY 19,
12    2017, before Paula A. Pyburn, Certified Shorthand
13    Reporter No. 7304, RPR, CLR, pursuant to Notice.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1    APPEARANCES OF COUNSEL:
 2    FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION:
 3        SECURITIES AND EXCHANGE COMMISSION
 4        BY:  DANIELLE R. VOORHEES, TRIAL COUNSEL
 5             LESLIE HENDRICKSON HUGHES, TRIAL COUNSEL
 6        1961 Stout Street, Suite 1700
 7        Denver, Colorado 80294
 8        Telephone: (303) 844-1000
 9        Email:  voorheesd@sec.gov
10                hugheslj@sec.gov
11
12    FOR DEFENDANT TAJ JERRY MAHABUB:
13        HOLMES, TAYLOR & JONES LLP
14        BY:  ANDREW B. HOLMES, ATTORNEY AT LAW
15        617 South Olive Street, Suite 1200
16        Los Angeles, California 90014
17        Telephone:  (213) 985-2200
18        Email:  abholmes@htjlaw.com
19
20
21
22
23
24
25
```

Page 4

```
 1    APPEARANCES OF COUNSEL - (CONTINUED):
 2    FOR DEFENDANT GENAUDIO, INC.:
 3        WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
 4        BY:  MICHAEL P. MCCLOSKEY, ATTORNEY AT LAW
 5        655 West Broadway, Suite 900
 6        San Diego, California 92101
 7        Telephone: (619) 881-3326
 8        Email:  michael.mccloskey@wilsonelser.com
 9
10    FOR DEFENDANT ASTOUND HOLDINGS, INC.
11    - (A.M. SESSION):
12        BENZ LAW GROUP
13        BY:  JEFFREY BENZ, ATTORNEY AT LAW
14        12021 Wilshire Boulevard, Suite 256
15        Los Angeles, California 90025
16        Telephone: (310) 570-2774
17        Email:  jeffreybenz@gmail.com
18
19    ALSO PRESENT:
20        CASEY HOWELL, VIDEOTAPE OPERATOR
21
22
23
24
25
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 5

```
1                    INDEX
2    THURSDAY, JANUARY 19, 2017
3    TAJ JERRY MAHABUB - VOLUME 1           PAGE
4        Examination by MS. VOORHEES          14
5    P.M. SESSION                            153
6        Examination resumed by MS. VOORHEES 153
7
8
9                    -oOo-
10
11
12   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
13             PAGE        LINE
14                 NONE.
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 7

```
1                EXHIBITS - (CONTINUED)
2          TAJ JERRY MAHABUB - VOLUME 1
3    Number        Description           Page
4    Exhibit 203  EMAIL CHAIN, BATES NOS.
5                 SEC-TISCARENOV-E-0000325
6                 THROUGH SEC-TISCARENOV-
7                 E-0000326 - 2 pages          68
8
9    Exhibit 204  8/10/09 EMAIL FROM JERRY
10                MAHABUB TO GARY SMITH, ETC.,
11                BATES NOS. SEC-MAHABUBJ-E-
12                0022806 THROUGH
13                SEC-MAHABUBJ-E-0022882
14                - 78 pages                   69
15
16   Exhibit 205  EMAIL CHAIN, BATES NOS.
17                347APL-00000608 THROUGH
18                347APL-00000621 - 14 pages   81
19
20   Exhibit 206  EMAIL CHAIN, BATES NOS.
21                SEC-MAHABUBJ-E-0023716
22                THROUGH SEC-MAHABUBJ-
23                E-0023729 - 14 pages         81
24
25
```

---

Page 6

```
1                  EXHIBITS
2          TAJ JERRY MAHABUB - VOLUME 1
3    Number        Description           Page
4    Exhibit 199  DECEMBER 11, 2008, CONFIDENTIAL
5                 PRIVATE PLACEMENT MEMORANDUM,
6                 GENAUDIO, INC., BATES NOS.
7                 GA006483 THROUGH GA006585
8                 - 103 pages                  35
9
10   Exhibit 200  March 25, 2009, Confiden
11                CONFIDENTIAL PRIVATE
12                PLACEMENT MEMORANDUM,
13                GENAUDIO, INC., BATES NOS.
14                GA007367 THROUGH GA007453
15                - 87 pages                   40
16
17   Exhibit 201  EMAIL CHAIN, BATES NOS.
18                SEC-ELLIOTT-E-0002589
19                THROUGH SEC-ELLIOTT-E-000292
20                - 4 pages                    40
21
22   Exhibit 202  EMAIL CHAIN, BATES NOS.
23                SEC-MAHABUBJ-E-0007972
24                THROUGH SEC-MAHABUBJ-
25                E-0007979 - 8 pages          49
```

---

Page 8

```
1              EXHIBITS - (CONTINUED)
2          TAJ JERRY MAHABUB - VOLUME 1
3    Number        Description           Page
4    Exhibit 207  EMAIL CHAIN, BATES NOS.
5                 GA006846 THROUGH GA006850,
6                 - 5 pages                    111
7
8    Exhibit 208  EMAIL CHAIN, BATES NOS.
9                 SEC-TISCARENOV-E-0000946
10                THROUGH SEC-TISCARENOV-
11                E-0000954 - 9 pages          125
12
13   Exhibit 209  EMAIL CHAIN, BATES NOS.
14                SEC-MAHABUBJ-E-0023474
15                THROUGH SEC-MAHABUBJ-
16                E-0023489 - 16 pages         126
17
18   Exhibit 210  EMAIL CHAIN, BATES NOS.
19                JM000378 THROUGH JM000380
20                - 3 pages                    138
21
22   Exhibit 211  EMAIL CHAIN, BATES NOS.
23                JM000727 THROUGH JM000279
24                - 3 pages                    173
25
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 9

```
1              EXHIBITS - (CONTINUED)
2         TAJ JERRY MAHABUB - VOLUME 1
3    Number        Description              Page
4    Exhibit 212   EMAIL CHAIN, BATES NOS.
5                  SEC-TISCARENOV-E-0001047
6                  THROUGH SEC-TISCARENOV-
7                  E-0001048 - 2 pages       183
8
9    Exhibit 213   EMAIL CHAIN, BATES NOS.
10                 SEC-MAHABUBJ-E-0019545
11                 THROUGH SEC-MAHABUBJ-
12                 E-0019549 - 5 pages       183
13
14   Exhibit 214   EMAIL CHAIN, BATES NOS.
15                 JM002048 THROUGH JM002052
16                 - 5 pages                 197
17
18   Exhibit 215   EMAIL CHAIN, BATES NOS.
19                 SEC-TISCARENOV-E-0001119
20                 THROUGH SEC-TISCARENOV-
21                 E-0001120 - 2 pages       209
22
23   Exhibit 216   EMAIL CHAIN, BATES NOS.
24                 JM002045 THROUGH JM002046
25                 - 2 pages                 218
```

Page 11

```
1           PREVIOUSLY MARKED EXHIBITS
2         TAJ JERRY MAHABUB - VOLUME 1
3    Number        Description              Page
4    Exhibit 16    EMAIL CHAIN, BATES NOS.
5                  SEC0000001 THROUGH
6                  SEC0000005 - 5 pages      244
7
8    Exhibit 21    EMAIL CHAIN, BATES NOS.
9                  JM002096 THROUGH JM002099
10                 - 4 pages                 105
11
12   Exhibit 23    10/19/09 EMAIL FROM JERRY
13                 MAHABUB TO VICTOR TISCARENO,
14                 ETC., BATES NOS.
15                 SEC-TISCARENOV-E-0000635
16                 THROUGH SEC-TISCARENOV-
17                 E-0000636 - 2 pages       112
18
19   Exhibit 27    EMAIL CHAIN, BATES NOS.
20                 SEC-TISCARENOV-E-0000992
21                 THROUGH SEC-TISCARENOV-E
22                 - 0000993 - 2 pages       138
23
24
25
```

Page 10

```
1              EXHIBITS - (CONTINUED)
2         TAJ JERRY MAHABUB - VOLUME 1
3    Number        Description              Page
4    Exhibit 217   5/6/10 EMAIL FROM JERRY
5                  MAHABUB TO BOB COOVER, ETC.,
6                  BATES NOS. JM002017 THROUGH
7                  JM002020 - 4 pages        223
```

Page 12

```
1     PREVIOUSLY MARKED EXHIBITS - (CONTINUED)
2         TAJ JERRY MAHABUB - VOLUME 1
3    Number        Description              Page
4    Exhibit 28    EMAIL CHAIN, BATES NOS.
5                  JM001041 THROUGH JM001046
6                  - 6 pages                 153
7
8    Exhibit 30    3/21/10 EMAIL FROM JERRY
9                  MAHABUB TO VICTOR TISCARENO,
10                 ETC., BATES NOS.
11                 347APL-00000315 THROUGH
12                 347APL-00000316 - 2 pages 173
13
14   Exhibit 71    EMAIL CHAIN WITH ATTACHMENT,
15                 BATES NOS.  SEC-
16                 TISCARENOV-E-0000114 THROUGH
17                 SEC-TISCARENOV-E-0000118
18                 - 5 pages                 31
19
20   Exhibit 72    GENAUDIO, INC., BOARD OF
21                 DIRECTORS TELEPHONIC MEETING
22                 MINUTES FROM SEPTEMBER 25TH,
23                 2009, BATES NO. GA006254
24                 - 1 page                  100
25
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 13

1       THURSDAY, JANUARY 19, 2017; 10:17 A.M.
2
3       (All counsel stipulated to waive the
4   reporter read on and read off pursuant
5   to Federal Rule 30.)
6
7       THE VIDEOGRAPHER: Good morning.  We're now on
8   the record.  Here begins DVD No. 1, Volume 1, in
9   the deposition of Taj Jerry Mahabub in the matter
10  of "Securities and Exchange Commission v. Taj Jerry
11  Mahabub, et al.," being heard in the United States
12  District Court for the District of Colorado, Case
13  No. 1:15-cv-02118-CBS-WJM.
14      Today's date, January 19, 2017.  The time
15  is 10:17 a.m.
16      The video operator today is Casey Howell,
17  contracted by Behmke Reporting & Video Services,
18  located at 160 Spear Street, Suite 300,
19  San Francisco, California.
20      This video deposition is taking place at
21  444 South Flower Street, Suite 900, Los Angeles,
22  California, and was noticed by Danielle Voorhees,
23  Esq., of the Securities and Exchange Commission.
24      Would counsel and all present please
25  identify themselves for the record.

Page 14

1       MS. VOORHEES: Danielle Voorhees and
2   Leslie Hughes on behalf of the Securities and
3   Exchange Commission.
4       MR. HOLMES: Andrew Holmes on behalf of the
5   witness.
6       MR. MCCLOSKEY: Michael McCloskey on behalf of
7   GenAudio.
8       MR. BENZ: Jeff Benz on behalf of Astound
9   Holdings.
10      THE VIDEOGRAPHER: Thank you.
11      Your court reporter is Paula Pyburn,
12  certified shorthand reporter contracted by Behmke
13  Reporting & Video Services.  She will now
14  administer the oath.
15      THE REPORTER: Raise your right hand, please.
16              * * *
17          TAJ JERRY MAHABUB,
18  having been duly sworn, testified as follows:
19              * * *
20          EXAMINATION
21  BY MS. VOORHEES:
22    Q.  Mr. Mahabub, you can put your hand down.
23  Thank you.
24      I'm Danielle Voorhees on behalf of the
25  Securities and Exchange Commission, and I'm here

Page 15

1   with Leslie Hughes.
2       You've met both of us before; correct?
3       Is that a "yes"?
4    A.  Yes.
5    Q.  All right.  We'll go over some ground
6   rules.
7       As your counsel noted, the court reporter
8   is trying to take down everything that's being said
9   in the room today, and so we need you to answer
10  verbally my questions.  I need you to try to wait
11  till I finish with my question before you answer,
12  which I know is hard, because you will see where
13  I'm going sometimes, but she has to take down
14  everything.
15      If you could pause just briefly after I
16  ask my questions, it'll probably be helpful for
17  counsel, because they may make objections, and then
18  you can go ahead and answer the question.
19      All right?
20   A.  Yes.
21   Q.  If you need me to clarify anything, just
22  ask me to do it.  Otherwise, I'm going to assume
23  that you understand the questions I ask.
24      Okay?
25   A.  Yes.

Page 16

1    Q.  We can take breaks today as you need them.
2   So just let us know.  We won't take a break while a
3   question is pending, but otherwise, you know, we
4   want everybody to be concentrated on what's going
5   on; so let me know if you need to take a break.
6       Okay?
7    A.  Okay.
8    Q.  Do you understand that you're under oath
9   today?
10   A.  I do.
11   Q.  Okay.  Mr. Mahabub, just to make this go a
12  little faster, I want to go over a few key terms.
13      When I use the word "GenAudio," is it fair
14  that I'm referring to GenAudio, Incorporated, the
15  entity that's a defendant in this case?
16   A.  Yes.
17   Q.  Okay.  And if I refer to "Astound," I'm
18  referring to Astound Holdings, Inc., another entity
19  that is a defendant in this case.
20      Does that make sense?
21   A.  Yes.
22   Q.  If I refer to "Apple," I'm referring to
23  Apple, Incorporated.
24      Does that make sense?
25   A.  Yes.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 29

1     A.  No.
2     Q.  Other than this case that you're being
3  deposed in, are you currently a named party in any
4  other litigation?
5     A.  Not to my recollection, I don't think so.
6     Q.  And other than this case, is GenAudio a
7  named party in any other litigation?
8     A.  I don't believe so.
9     Q.  And other than this case, is Astound a
10  named party in any other litigation?
11     A.  I don't think so.
12     Q.  To the best of your knowledge.
13     A.  No.
14     Q.  Mr. Mahabub, is there any reason that you
15  can't testify truthfully and accurately today?
16     A.  No.
17     Q.  All right.  Mr. Mahabub, we're going to
18  spend much of today talking about GenAudio and its
19  contacts with Apple.  All right?  So I'm going to
20  start diving into that.
21        Between 2009 and February of 2011,
22  Victor Tiscareno was your primary contact at Apple;
23  correct?
24     A.  That's correct.
25     Q.  Mr. Mahabub, you never met Steve Jobs, the

Page 30

1  former CEO of Apple; correct?
2     A.  That's correct.
3     Q.  Mr. Mahabub, you never attended a meeting
4  with Phil Schiller where you discussed GenAudio or
5  Astound Sound; correct?
6     A.  I don't recall.  I'm not sure of the
7  answer to that or not.
8     Q.  Okay.
9     A.  I met many people while I was there; so...
10     Q.  Do you have an actual memory of meeting
11  with Phil Schiller and discussing GenAudio or
12  Astound Sound?
13     A.  I -- I don't know the answer to it.  I
14  can't answer it, unfortunately, because, like I
15  said, I met many people while I was there.  So
16  it's -- it was a long time ago.
17     Q.  I understand that.  I'm just trying to
18  figure out if, sitting here today, you have a
19  memory of meeting Mr. Schiller and discussing
20  GenAudio or Astound?
21     A.  I don't have a distinct memory of it, no.
22     Q.  Mr. Mahabub, did you ever participate in
23  phone calls with Phil Schiller where you discussed
24  GenAudio or Astound Sound?
25     A.  I don't -- I don't remember.  It's a long

Page 31

1  time ago again.
2     Q.  Have you ever met Tim Cook?
3     A.  That's the current CEO; right?  Tim --
4     Q.  I honestly don't know.
5     A.  Yeah, I think Tim is the current C -- I
6  don't believe so.  I could have in a meeting, but I
7  don't believe so.
8     Q.  Have you ever communicated with Mr. Cook
9  regarding GenAudio or Astound Audio?
10     A.  I don't recall.  Again, I just -- this is
11  a long time ago.  I can't remember.
12     Q.  Apple never acquired GenAudio; correct?
13     A.  No.
14     Q.  And Apple never licensed anything from
15  GenAudio; correct?
16     A.  No.
17     Q.  Apple never entered into a license
18  agreement with GenAudio; correct?
19     A.  Correct.
20     Q.  Mr. Mahabub, I'm going to hand you what's
21  been previously marked as Deposition Exhibit 71.
22        (Whereupon, Exhibit 71 was previously
23        marked for identification by the Court
24        Reporter.)
25  ///

Page 32

1  BY MS. VOORHEES:
2     Q.  Deposition Exhibit 71 bears the Bates
3  label SEC-TiscarenoV-E-000114.
4        Mr. Mahabub, go ahead and take a minute to
5  look at the email and attachment and let me know if
6  you recognize it.
7     A.  Yeah.
8     MR. HOLMES:  Sorry.  Can we pause for a second?
9     MS. VOORHEES:  You want to go off the record?
10     MR. HOLMES:  Yeah.
11     MS. VOORHEES:  Yeah, sure.
12        Okay.  Let's go off the record.
13     THE VIDEOGRAPHER:  We're off the record.  The
14  time is 10:35.
15        (A recess was taken from 10:35 a.m. to
16        10:35 a.m.)
17     THE VIDEOGRAPHER:  We're back on the record.
18  The time is 10:35.
19  BY MS. VOORHEES:
20     Q.  All right.  Mr. Mahabub, do you recognize
21  Exhibit 71?
22     A.  I think this is the NDA that we signed
23  with them.  Right?  Yes.
24     Q.  Okay.  So you're referring to the
25  attachment to Exhibit 71?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 61

1 the team is.
2     THE WITNESS: Oh.
3     MR. HOLMES: Make sure you listen to the
4 question.
5     THE WITNESS: I -- I can't even tell you.
6 Melissa Gonzales, Jim Mattos, Paul Powers,
7 Mark Bobak -- it would have been team members and
8 board members.
9 BY MS. VOORHEES:
10     Q.  When you say "team members," you mean
11 people who worked for GenAudio?
12     A.  Or on the board of -- Jerry, yeah.
13     Q.  And that could include people who are
14 actually employed by GenAudio or who were
15 contracting --
16     A.  Or consultants, exactly, full-time
17 consultants.
18     Q.  Okay.
19     A.  Yeah, you bet.
20     Q.  All right.  So if you could go to the next
21 page, then, of Exhibit --
22     A.  But consultants were all under, you know,
23 heavy NDAs with us or had software -- developer
24 agreements executed with us that would have
25 prevented them from -- if I said, "Keep this

---

Page 62

1 internal and confidential," that meant keep it
2 internal and confidential.
3     Q.  All right.  If you could take a look at
4 the second page.  I'm starting in sort of the end
5 of what I think is the first paragraph --
6     A.  Yep.
7     Q.  -- where you see it says (as read):
8         Most likely I will have one or two
9         additional calls with Apple after
10         their review, and if I get the green
11         light, actual integration development
12         and testing will commence.
13     A.  Yeah.
14     Q.  Do you see that?
15     A.  I do.
16     Q.  All right.  "Actual integration
17 development and testing," was that work that was to
18 be done by Apple?
19     A.  No.  By us.
20     Q.  Okay.  If you go down to the next
21 sentence, it says (as read):
22         I believe this could realistically
23         happen within two to four weeks.
24         Do you see that?
25     A.  The integration test, yes.

---

Page 63

1     Q.  Okay.  What was your basis for saying
2 that?
3     A.  We had already ported the code to run
4 across about every platform -- or every operating
5 system that they had at that time.  So getting
6 handed a -- an API or a kext, as Ron Isaac handed
7 to us --
8     THE REPORTER: Or a what?
9     THE WITNESS: A kext, k-e-x-t.  It's called a
10 kernel extension, which is an embedded way to embed
11 into a Macintosh product line.
12     MR. HOLMES: Jerry -- Jerry, when she does
13 that, she just wants you to repeat exactly what you
14 said.  If you add more things, it's more than she
15 needed.
16     THE WITNESS: Okay.  Okay.
17         So I'm not sure exactly what your question
18 is.  I think -- I think my point that I'm making
19 here is that we're pretty much self-ported; so
20 to -- to tighten down the nuts and bolts into a
21 kernel extension or into any type of API that we
22 might receive for OSX or iOS would be a matter of
23 weeks, is the point I was making there.
24 BY MS. VOORHEES:
25     Q.  Okay.  If you could skip down, there's a

---

Page 64

1 series of sentences that say, "Do I believe."
2         If you could go down to the one that says
3 (as read):
4         Do I believe that Apple could be a
5         strong potential buyer of GenAudio in
6         its entirety?  Yes.
7     A.  Absolutely.
8     Q.  Do you see that?
9     A.  Yes.
10     Q.  Okay.  What was your basis for that?
11     A.  Discussions that I had had and, you know,
12 they seemed to be very interested in the
13 technology.  I had written several emails to Victor
14 and Ron and other contacts that I had.  And, you
15 know, they -- they certainly didn't go against
16 anything that I was saying to them; that's for
17 sure.
18     Q.  All right.  The next -- if you skip down
19 two, it says (as read):
20         Do I believe that if someone does
21         not invest at this point in time that
22         they are foolish?  Yes.
23         And what did you mean by that?
24     A.  That means that at the time, I honestly
25 believed that we were going to be doing a deal with

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 65

```
 1   Apple based on the communications I had with my
 2   points of contact that I was working with there.
 3       Q.  Okay.  And that's as of July of 2009, you
 4   thought that?
 5       A.  Yep, exactly.  But, you know, like I said,
 6   this was meant to go to internal team members; this
 7   wasn't meant to be distributed to anyone external
 8   to the team, or else it would have been.
 9       Q.  If you go down to the next paragraph, it
10   says (as read):
11             We need investors and need them
12          now.
13       A.  Yep.
14       Q.  Why were you writing that?
15       A.  Because we were out of money.  And in
16   order to port code and hire on the right team and
17   the right dev staff, and there were a couple other
18   additional software engineering people that I
19   needed to bring on board at the time, and you can't
20   bring those people on unless you have money.
21       Q.  Okay.  If you could go to the next page.
22   So I'm now on the Bates page 7974.
23       A.  Yeah.
24       Q.  And go down to what I think is the first
25   full paragraph.  It says (as read):
```

Page 66

```
 1             Everyone keep their eye on the
 2          prize and, if possible, bring
 3          potential investors to the table,
 4          please, preferably through the common
 5          stock offering.
 6          Do you see that?
 7       A.  Yes.
 8       Q.  All right.  So you were asking your team
 9   to help bring potential investors to the table;
10   correct?
11       A.  Through the common stock offering.  What
12   I'm saying is, don't bring them to the table
13   through anything here.  They have to read the
14   common stock offering, the risk factors associated
15   with the offering; that this is -- you know, this
16   is internal team member confidential stuff, but if
17   you know anyone that might be interested in
18   investing, you know, give them the common stock
19   or -- at the time, the logistics were, you know, go
20   to Jim Mattos, and Mattos would then forward them
21   the common stock offering.
22       Q.  Okay.  So when -- so your parenthetical
23   that says "preferably through the common stock
24   offering," you're referring to the process by which
25   the investors would be provided with the offering
```

Page 67

```
 1   documents?
 2       A.  With information to determine whether or
 3   not it was an investment that they want to invest
 4   in or not, because this obviously isn't surrounded
 5   by the appropriate risk factors and disclaimers in
 6   the language that are needed.
 7       Q.  Okay.  You say "preferably."  Was there
 8   another alternative?
 9       A.  Yeah, a term share.  So if there's a
10   potential that someone knew someone that wanted to
11   invest something, a little larger amounts, you
12   know, maybe the company would look at what's called
13   a term sheet, if I remember, is what it's referred
14   to as.
15          So if -- if someone wanted to -- you know,
16   one of my employees said, "Hey, Jerry, here is my
17   Uncle Joe.  You know, he wants to invest
18   $10 million."  Right?  Which never happened.  But
19   if it ever happened, you know, we'd -- we'd
20   entertain a term sheet at that time.
21          So it would either be through a common
22   stock offering or through a potential for a term
23   sheet.  Again, you know, we never had any term
24   sheet offers to the table; it was all through the
25   offerings.
```

Page 68

```
 1       Q.  Okay.  So you never had any term sheets?
 2       A.  No.
 3       Q.  Okay.  Were there any other alternatives
 4   other than term sheet and common stock offering?
 5       A.  No.  No.  There was a term sheet with a
 6   group called GenAudio Term Sheet Investment Group,
 7   which is a B.S. group set up by Mark Bobak and
 8   Dell Skluzak in a -- way for them to start their
 9   hostile takeover when they were -- but that's the
10   only term sheet group, as far as I remember.
11       Q.  Okay.
12       THE WITNESS:  Slow down?  Okay, yeah, sorry.
13          (Whereupon, Exhibit 203 was marked for
14          identification by the Court Reporter.)
15       THE WITNESS:  Oh, you guys dug these up, huh?
16   This is great.
17   BY MS. VOORHEES:
18       Q.  All right.  Mr. Mahabub, you've been
19   handed what's been marked as Exhibit 203.  It's
20   email correspondence.  The first page is Bates
21   labeled SEC-TiscarenoV-E-000325.
22          Do you recognize Exhibit 203?
23       A.  Yes.
24       Q.  Okay.  And this is email correspondence
25   between you and Victor Tiscareno; correct?
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 69

1     A.  I believe so, yes.  If it was pulled from
2   my computer, it must have been.
3     Q.  It was not pulled from your computer.
4   I'll represent to you that this was produced to us
5   by Mr. Tiscareno.
6     A.  Oh, okay.  Well, then -- then, I suppose
7   it must be right, yeah.
8     Q.  Okay.  And so, knowing that, do you have
9   any reason to doubt that you sent and received the
10  emails as indicated?
11    A.  Yeah, no, sure.
12    Q.  Okay.
13    A.  Vic would have supplied you with the right
14  emails, you know.
15    Q.  Okay.
16    A.  At least I hope.
17        (Whereupon, Exhibit 204 was marked for
18        identification by the Court Reporter.)
19  BY MS. VOORHEES:
20    Q.  All right.  Mr. Mahabub, you've been
21  handed what's been marked as Exhibit 204.
22  Exhibit 204 is Bates-labeled on the first page
23  SEC-MahabubJ-E-0022806.
24        Mr. Mahabub, the document is -- is very
25  long, but I'm only going to ask you questions about

---

Page 70

1   the first, like, two or three pages.
2     A.  Okay.
3     Q.  That's just how it printed and it was just
4   how it was produced to us.
5     A.  This must have came from my computer,
6   obviously.
7     Q.  Correct.
8     A.  Yeah.
9     Q.  This document was produced to us by you.
10        All right.  So, Mr. Mahabub, if you look
11  at the first page of Exhibit 204 -- well, let me
12  ask you this:  Do you recognize this document?
13    A.  Not in its format, no.  I -- but I --
14  that -- that's a tough one to answer, because I'm
15  under oath.  If you say to me -- tell me, do I
16  recognize that?  My answer is no.
17    Q.  Okay.  Do you have any reason to doubt
18  that you sent and received the emails as indicated
19  in Exhibit 204?
20    A.  I don't know.  Sorry.  I just can't answer
21  that question.  I'm sorry.
22    Q.  Let's start to go through the content --
23    A.  Yeah.
24    Q.  -- and see what happens there.
25        If you look at the "To" line that's on the

---

Page 71

1   very first page of Exhibit 204, you see it includes
2   Mr. Smith; Paul Powers; Jim Devine; Jim Mattos;
3   Steve Bagwell; Greg Morgenstein --
4     A.  Morgenstein.
5     Q.  -- M-o-r-g-e-n-s-t-e-i-n --
6     A.  Morgenstein, yes.
7     Q.  Yes, sorry.  I'm just spelling it for the
8   court reporter.
9         Stephan with a p-h --
10    A.  Stephan.
11    Q.  -- Stephan -- Bernsee?
12    A.  Bernsee.
13    Q.  -- Bernsee, B-e-r-n-s-e-e.
14        Recy A. Pilloud?
15    A.  Pilloud.
16    Q.  Pilloud, P-i-l-l-o-u-d.
17        Ian Esten?
18    A.  Esten.
19    Q.  Esten, E-s-t-e-n.
20        Bob Coover, C-o-o-v-e-r.
21        A P. Savio, P. S-a-v-i-o.
22    A.  That would have been Paul Savio.
23    Q.  Okay.  And Walt, and it just says
24  "walt@genaudio."
25    A.  It's Walter Horat, H-o-r-a-t.

---

Page 72

1     Q.  Okay.  Mr. Mahabub, is -- is this roughly
2   the team that you referenced that we were
3   discussing in the previous exhibit?
4     A.  Yeah.  I might have had the board members
5   blind carbon copied as well.  Oftentimes when I'd
6   send out things like this, the board would always
7   be bcc'd also.
8     Q.  Okay.
9     A.  Which would have been -- at this time
10  Mark -- let's see, what is the date here? --
11  Mark Bobak, Paul Powers, Ted Cohen, and
12  Elliot Mazer.
13    Q.  Okay.  All right.
14        If you go to the second page of
15  Exhibit 204, you'll see that I've -- if I have
16  highlighted, hopefully on all of the copies, some
17  provisions that I want us to focus in on just
18  because these are so difficult read.
19    MR. HOLMES:  I have highlighting on the third
20  page.
21    MS. VOORHEES:  Oh, sorry, yeah, you're probably
22  right.  It may start on the --
23    MR. MCCLOSKEY:  Should be --
24    MS. VOORHEES:  Yeah, sorry.  I'll read you the
25  ones I want you to look at.

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 73

1    MR. MCCLOSKEY: These should be highlighted.
2    Okay.
3    MS. VOORHEES: But I have just done that so
4    that we can focus.
5    Q. All right. Mr. Mahabub, I want you to
6    compare Exhibit 203 to the email that starts
7    towards the bottom of the second page of
8    Exhibit 204. That says "Hi, Vic."
9    MR. HOLMES: This one.
10   THE WITNESS: Okay.
11   BY MS. VOORHEES:
12   Q. And, again, in the interest of efficiency,
13   I will tell you that I have highlighted at least
14   some of the changes --
15   A. Yeah.
16   Q. -- that I have seen between the two
17   emails, and that's what I want to go over.
18   A. Okay.
19   Q. But I want you to have a minute to take a
20   look at them.
21       All right?
22   A. Sure, of course.
23       Yeah, yeah. You're just talking about --
24   MR. HOLMES: Jerry -- Jerry, don't -- review it
25   first; wait for a question --

Page 75

1    about that. I'm under oath; so I can't say I
2    remember doing any of that, you know?
3    Q. Okay. I understand. But -- so let's
4    break that down a little bit.
5        If there were alterations, I understand
6    your testimony to be you did them?
7    A. Oh, it was either me, or maybe I had
8    someone else do them for me. It depends. Probably
9    most likely it would have been me, though.
10   Q. It would have been something you knew
11   about; correct?
12   A. I would hope so, yes.
13   Q. Okay. If you take a look at Exhibit 204
14   on the third page -- so Bates ending in -808.
15   A. Okay. Where am I at? Yep.
16   Q. And take a look at the second highlighted
17   paragraph. The one that says, "See you in a couple
18   of days."
19   A. Yes, I see it.
20   Q. Okay. So do you see that corresponding
21   paragraph over on Exhibit 203?
22   A. I do.
23   Q. It starts at the very bottom of the page?
24   A. Uh-huh.
25   Q. All right. So it appears that the email

Page 74

1    THE WITNESS: Okay.
2    MR. HOLMES: -- and then -- then start talking.
3    THE WITNESS: This is really difficult to parse
4    through this.
5        Okay.
6    BY MS. VOORHEES:
7    Q. All right. You've had a chance to take a
8    look at both of them?
9    A. Yes.
10   Q. Okay. You notice that there's some
11   differences?
12   A. I did.
13   Q. Why?
14   A. I am not sure. I don't know how to answer
15   that.
16   Q. Okay. Did you alter the email that is
17   included in Exhibit 204, which is the one that was
18   produced by you and forwarded to your team?
19   A. There were from time to time alterations
20   that I had made, yes. But I can't tell you for
21   sure if I did for the -- I -- I don't know. But
22   apparently so. If there's alterations here, it
23   means I did.
24   Q. Okay.
25   A. I just -- I just can't tell you for sure

Page 76

1    has been altered to add the text (as read):
2        Prior to meeting with the senior VP
3        marketing, Phillip Schiller --
4    A. Yes.
5    Q. (As read):
6        -- and other senior VP staff, please
7        let me know.
8    A. Uh-huh.
9    Q. Why did you add that to this email?
10   A. I'm not sure. I don't -- I don't
11   remember. It might have been to emphasize to the
12   team and keep them motivated that things are moving
13   forward. I -- I don't know.
14   Q. Okay. So you altered Exhibit 204 because
15   you wanted the recipients to believe you were
16   meeting with Phil Schiller; right?
17   A. No, not necessarily. I -- I don't
18   remember if -- I can't -- I can't honestly tell
19   you. I don't recall, it was so long ago. I can't
20   remember making any of these alterations.
21       But if they are done in this way, I would
22   have been doing that with the emphasis to keep the
23   team motivated, basically.
24   Q. All right. You were not --
25   A. The internal team motivated.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 77

1    Q. But -- okay. All right. Fine.
2    A. Which should have nothing to do with any
3  sale of any securities.
4    Q. If you focus on that same clause that I
5  just read, "Prior to meeting with the senior VP
6  marketing, Phillip Schiller" --
7    A. Yeah.
8    Q. -- you were not meeting with Mr. Schiller,
9  were you?
10   A. I -- if I said I did, then there's a good
11 chance that I did. I just don't recall. I don't
12 remember.
13       I met a lot of people. I went to Apple
14 many, many times and had several meetings with many
15 people there; so I just don't remember.
16   Q. Let's talk about everybody you ever met at
17 Apple that you recall. Tell me everybody you
18 recall meeting at Apple.
19   A. I can't remember their names. I just --
20 I -- it was a long time ago. Vic and Ron were my
21 main two points of contact. That's -- those are
22 the main guys I would interact with.
23   Q. Okay.
24   A. And then they would set up meetings.
25 There are times when I would have conferences with

---

Page 78

1  them and they would have, you know, five, six
2  people, sometimes more, around a table to give
3  demos to.
4    Q. And was one of those people ever
5  Phil Schiller?
6    A. I don't -- I don't recall. I mean, if I'm
7  saying it was here, there's a good chance it was,
8  but I just don't remember.
9    Q. But what's curious, Mr. Mahabub, is that
10 you say it in an email forwarded to a team that
11 would not know any better, but you did not say it
12 in the email that you wrote to Mr. Tiscareno;
13 correct?
14   A. Yeah --
15     MR. HOLMES: Objection. Objection.
16 Argumentative.
17     BY MS. VOORHEES:
18   Q. Go ahead. Is that correct?
19   A. I don't know. I don't know. I can't
20 answer -- I'm sorry, I can't answer that under oath
21 because I just don't remember. I don't know the
22 answer to that.
23   Q. Okay. Well, just taking a look at the
24 documents as you sit here today, that clause is not
25 included in Exhibit 203; correct?

---

Page 79

1      MR. HOLMES: Document speaks for itself.
2      MR. MCCLOSKEY: Join.
3      THE WITNESS: I'm not sure I understand the
4  question, what you're asking.
5  BY MS. VOORHEES:
6    Q. The -- the phrase "prior to meeting with
7  the senior VP marketing, Phillip Schiller, and
8  other senior VP staff --
9    A. Uh-huh.
10   Q. -- please let me know," is not included in
11 Exhibit 203?
12     MR. HOLMES: Document speaks for itself.
13     THE WITNESS: Yeah.
14     MR. MCCLOSKEY: Join.
15 BY MS. VOORHEES:
16   Q. And why did you not include that language
17 in the email that you sent to Mr. Tiscareno, but
18 you did include it in the email that you forwarded
19 to your internal team?
20   A. I don't know. I'm not sure what my
21 reasoning was for doing it at the time. But I'm
22 sure I had something in mind, if I -- I just can't
23 answer it because I don't really recall. I'm
24 sorry. It's -- it's a long time ago. I don't
25 remember that.

---

Page 80

1    Q. Do you recall the reason why you made any
2  of the alterations to Exhibit 204?
3    A. Yeah. I think I stated before in my
4  previous testimony that there are some emails that
5  I made modifications to; I can't remember exactly
6  what the modifications were. Most of the time it
7  was redacting information.
8       But if I did anything along these lines,
9  it might have been just to keep the team motivated.
10 Because maybe I was getting some loss of
11 motivation, maybe the team hadn't been paid in
12 several months, and I had to do something to keep
13 them motivated to stay on board.
14   Q. Okay. And you didn't think that
15 forwarding the email that you sent to Mr. Tiscareno
16 without alterations would have kept them motivated?
17   A. No.
18   Q. Why is that?
19   A. Didn't have the strength to it. You -- at
20 the time there was a lot of stuff going on, and we
21 were low on funds and -- and high on energy, with a
22 lot of stuff that we had to get done in terms of
23 porting, development engineering work, and things
24 like that.
25       So if I would have done something along

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 101

```
 1    A.  I do.
 2    Q.  All right.  So I take it you attended the
 3  meeting; correct?
 4    A.  Yes.
 5    Q.  Okay.  If you take a look at paragraph 7,
 6  the last sentence -- well, the first sentence reads
 7  (as read):
 8         Apple.  Mr. Mahabub provided a
 9         summary of the discussions with
10         Apple --
11    A.  Uh-huh.
12    Q.  (As read):
13         -- and noted that the next meeting was
14         this upcoming Thursday.
15         It then goes on, the last sentence reads
16  (as read):
17         Mr. Mahabub noted that a deal with
18         Apple is highly probable based on the
19         many meetings and Apple's responses to
20         date.
21    A.  Uh-huh.
22    Q.  Is that an accurate representation of what
23  you explained to the board on that date?
24    A.  Of course.  That was my opinion at the
25  time, yes.
```

Page 102

```
 1    Q.  Okay.  What -- what was the summary of
 2  discussions with Apple?
 3    A.  Just various meetings that we have had up
 4  to that date, many meetings.  A lot of integration.
 5  A lot of software engineering.  Like I said, there
 6  are -- there are multiple people that we were
 7  interacting with; I don't remember who they all
 8  were.
 9         There are times when I'd go in and have a
10  meeting and there would be multiple people sitting
11  around the table.  I didn't really know who they
12  all were.  All I did was know we were under an NDA
13  with them; so it shouldn't have been a problem at
14  the time.  And I would just give demos that I was
15  asked to produce.
16    Q.  Okay.
17    MR. HOLMES:  I'm doing this to slow you down a
18  little bit.
19    THE WITNESS:  Okay.
20  BY MS. VOORHEES:
21    Q.  All right.  And, Mr. Mahabub, am I correct
22  that the integration that you are discussing was
23  being done by GenAudio?
24    A.  Yes.
25    Q.  Okay.
```

Page 103

```
 1    A.  Yes.
 2    Q.  And the software engineering was also
 3  being done by GenAudio?
 4    A.  That's correct.
 5    Q.  The -- the last sentence (as read):
 6         Mr. Mahabub noted that a deal with
 7         Apple is highly probable.
 8         What did you mean by "a deal"?
 9    A.  That meant that I thought that -- you
10  know, doing a deal.  'Cause we were being listed as
11  a vendor.  We were being given, you know,
12  information, confidential kernel extensions and
13  other things like that as a vendor of Apple.
14         So, I mean, you know, it's -- like I said,
15  what does a vendor do?  A vendor sells stuff to a
16  company.  So seemed like a deal was coming.
17    Q.  And I -- I'm just trying to focus in on
18  that last word, "deal."
19         What did you mean by "deal"?
20    A.  Whatever it meant.  I don't know.  It
21  could have been an acquisition.  It could have
22  meant a license.  It could have meant an up front
23  lump sum -- some kind of a deal, whether it's we're
24  going to promote your product, we're going to not
25  pay you a dime, but we're going to integrate you
```

Page 104

```
 1  and brand the hell out of you.
 2    THE REPORTER:  We're going to --
 3    THE WITNESS:  We're going to promote your
 4  product and integrate your technology in, but we're
 5  not going to pay you a dime.  But we're going to,
 6  you know, promote you.  We're going to put your
 7  name out there.
 8         Because oftentimes, as a new software
 9  company that's just going, you have to kind of give
10  the sweetheart deals away just to get your brand
11  out there.
12  BY MS. VOORHEES:
13    Q.  Did --
14    MR. HOLMES:  I'm just going to caution you to
15  slow down.
16    THE WITNESS:  Okay.
17    MR. HOLMES:  Even what you were doing to try to
18  help the reporter there was very fast.
19    THE WITNESS:  Yeah.
20    MR. HOLMES:  So try to slow down.  I know it's
21  hard.
22    THE WITNESS:  All right.
23  BY MS. VOORHEES:
24    Q.  Mr. Mahabub, thinking back to this board
25  meeting, do you recall discussing the various types
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 145

1    A. I don't remember.
2    Q. Do you recall what their position was?
3    A. No.
4    Q. Do you recall anything about them?
5    A. Not really, no. As I said, my main two
6  point of contacts at Apple were Vic and Ron. Those
7  would be who I primarily dealt with. Vic and Ron
8  would bring people into the loop for me to meet
9  with from time to time.
10   Q. Well, we're seeing a lot of correspondence
11 about somebody named Phil.
12   A. Yeah. I just don't remember who it might
13 have been. You know, I just -- I can't recall.
14 I'm sorry, I don't.
15   Q. What did Phil look like?
16   A. A little heavier set.
17   Q. How old was he?
18   A. Maybe forties or fifties.
19   Q. What was his race?
20   A. White. Caucasian.
21   Q. Where did you meet him?
22   A. At Apple. When I would go in for
23 meetings, he would attend some of the meetings.
24   Q. What time frame?
25   A. I don't remember. I can't remember that.

---

Page 146

1  It was -- it was so intermittent. I don't
2  remember. I honestly don't. If I do, I'd tell
3  you, but I don't.
4    Q. How many times did you meet him?
5    A. I don't remember that neither.
6    Q. How many times did you meet him on the
7  phone -- I mean -- sorry -- did you speak to him on
8  the phone?
9    A. I don't remember. I can't answer that
10 honestly, because I don't remember.
11   Q. Do you have any recollection of his last
12 name?
13   A. No.
14   Q. What building did you meet him in at
15 Apple?
16   A. Many. Many different buildings that we
17 had meetings in. We'd have meetings in the Mariana
18 building --
19   Q. Wait, sorry. I'm -- I'm going to stop you
20 for just a second. Only with Phil. I'm focused on
21 Phil.
22       How many -- what building were you in when
23 you met with Phil?
24   A. I can't recall. We met in so many
25 different buildings, I can't tell you when --

---

Page 147

1    Q. You and Phil met in so many different
2  buildings?
3    A. I -- I don't know. I don't remember.
4  There's so many different people I met with, is
5  what I'm trying to tell you. I don't remember. I
6  don't -- I just -- I don't. I'm sorry. It was a
7  long time ago.
8        This is -- what? -- seven, eight years ago
9  now? Seven years ago? Yeah.
10   Q. If you go to the first page of
11 Exhibit 210, please.
12   A. Yeah.
13   Q. You see that the first line says (as
14 read):
15       Hello, GenAudio Team. Important:
16       Read entire email chain. Walt, that
17       means scroll to the bottom after
18       reading this email.
19   A. Yeah.
20   Q. It says (as read):
21       The response to my email below from
22       Vic is promising. Great meeting with
23       Phil Schiller yesterday.
24       Did you meet with Phil Schiller on
25 February 11th, 2010?

---

Page 148

1    A. I don't recall. But perhaps I might have,
2  if it -- if it's -- if I'm addressing the team
3  members here, it was either done by way to entice
4  them or it was done by way to inform them. I don't
5  recall which way it was.
6        But apparently it was -- I was relaying
7  something to the team about something. And
8  whatever it was, it was what I was saying to the
9  team.
10   Q. Okay. What do you mean by "It was either
11 done to entice them or inform them"?
12       What do you mean by "entice"?
13   A. Entice. To keep them motivated to work.
14   Q. Okay. So does that mean that it was
15 either not true but being done to entice them?
16   A. One of the two, yeah. But if -- I'm
17 pretty sure that these meetings -- I just can't
18 remember. It was so long ago. Like I said, I do
19 not remember.
20       I think I've already admitted to you that
21 there's been -- there were times when I made
22 alterations to keep the team members motivated, but
23 that's all I can say.
24   Q. Okay. And I understand that. I get that.
25       But what I'm trying to figure out is if

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 149

1    the alterations were true or not?
2        A.  I don't know.  I can't remember.
3        Q.  They may not have been?
4        A.  They may not have been, but I can't
5    recall --
6        Q.  Okay.
7        A.  -- yes.
8        Q.  So you can't recall on an alteration-by-
9    alteration basis --
10       A.  I can't, no.
11       Q.  But at least some of them were not true?
12       A.  I don't know.  I would have -- yeah.  I
13   think that there was one where I may have said
14   something that was done to keep them motivated, but
15   it was an untrue statement.  But, again, that was
16   to the team members, not to shareholders.
17       Q.  Which one are you referring to?
18       A.  I don't remember.  It was -- I just said,
19   there might have been one or two that I might have
20   done like that, just remembering back.
21       Q.  Okay.
22       A.  But it's a general -- if you put them all
23   into a pool, a -- you know, a giant pool, maybe so.
24   But that was not my standard M.O.  That was not my
25   standard practice.

Page 150

1        Q.  Okay.  I just want to make sure, though,
2    you're not -- you're not thinking in your head of a
3    specific one that you know was false?
4        A.  No.
5        Q.  Okay.  Did -- did you ever tell
6    Mr. Tiscareno that you were editing his emails
7    before you forwarded them to his team --
8        A.  No.
9        Q.  -- to your team?
10       A.  To my team?  No, no.  It was none of his
11   business.
12       Q.  Okay.  Did he ever give you permission to
13   alter his emails before you forwarded them to your
14   team?
15       A.  No, of course not.
16       Q.  What about Mr. Isaac?  Did you ever tell
17   him that you were altering his emails before
18   sending them to the team?
19       A.  Well, you know, the thing is, is it's a
20   matter of this.  Right?  Oftentimes I'd redact
21   information as well.  So, I mean, it just depended
22   on what was being stated.
23           So, I mean, you know, I think I have -- I
24   think keeping something that's internally team
25   member confidential that is not supposed to ever

Page 151

1    leave their eyes ever, you know, I mean --
2        MR. HOLMES:  Jerry, just make sure you're
3    listening to the question, because I don't think
4    you responded to the question she asked.
5        THE WITNESS:  Oh, okay.
6    BY MS. VOORHEES:
7        Q.  Yeah.  Did Mr. -- did you ever tell
8    Mr. Isaac that you were altering his emails before
9    you forwarded them to your team?
10       A.  No, no.  If I -- if I did any alterations
11   for -- with intent of those emails, no, he was
12   never informed of any of that.
13       Q.  Okay.  Was anyone at Apple informed that
14   you were altering emails before you sent them to
15   your team?
16       A.  Again, if there were any alterations done,
17   they were not informed.
18       Q.  Okay.  Did you ever notify your team that
19   you were altering emails before you sent them to
20   the team?
21       A.  No.  No.  Unless there were redactions or
22   something like that.  But usually not, no.  I would
23   just send it off to them, and that was that.
24           Again, these were meant to be team member
25   confidential emails and stay to the team members'

Page 152

1    eyeballs only.
2        Q.  Did you ever tell the board that you were
3    modifying the emails that were being forwarded to
4    your team?
5        A.  No.
6        MS. VOORHEES:  All right.  I think this would
7    be a good time to break --
8        MR. HOLMES:  Okay.
9        MS. VOORHEES:  -- if that's okay.
10       THE WITNESS:  Yeah.
11       MS. VOORHEES:  So go off the record.
12       THE WITNESS:  Sure thing.
13       MS. VOORHEES:  How long do you want to take for
14   lunch?
15       THE VIDEOGRAPHER:  We're off the record.  The
16   time is 12:49.
17           (At 12:49 p.m., a lunch recess
18           was taken until 1:35 p.m. of the
19           same day.)
20
21   (Nothing omitted nor deleted. See next page.)
22
23
24
25

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 153

```
 1      THURSDAY, JANUARY 19, 2017; P.M. SESSION
 2                      ***
 3          (Mr. Benz is not present.)
 4       THE VIDEOGRAPHER: We're back on the record.
 5    The time is 1:35.
 6          Please proceed.
 7       MS. VOORHEES: All right.  Thank you.
 8                      ***
 9          EXAMINATION (RESUMED)
10    BY MS. VOORHEES:
11       Q.  Mr. Mahabub, do you understand that you
12    are still under oath?
13       A.  I do.
14       Q.  Okay.  All right.
15          I am going to hand you what has previously
16    been marked as Exhibit 28.
17          (Whereupon, Exhibit 28 was previously
18          marked for identification by the Court
19          Reporter.)
20       THE WITNESS: More emails?
21    BY MS. VOORHEES:
22       Q.  More emails.  All right.  Exhibit 28 is
23    email correspondence, and there is an attachment.
24    It is Bates-labeled JM001041.
25          Do you recognize Exhibit 28?
```

---

Page 154

```
 1       A.  Same answer.
 2       Q.  Okay.  So that means that you do not
 3    recall this email and you do not have any reason to
 4    doubt that you sent or received it; correct?
 5       A.  Correct.
 6       Q.  Mr. Mahabub, if you start on the first
 7    page of Exhibit 28, and you see there's an email
 8    from you to several people.  It says -- on March
 9    19th, 2010, excuse me.
10          It says (as read):
11             Hello.  Attached is the cover
12          letter that will go out to all the
13          shareholders with the new PPM via
14          electronic delivery.  Time to get
15          some --
16          And then there's three dollar signs.
17       A.  That's money.
18       Q.  (As read):
19             -- and drive the business side of our
20          company through the roof.  Of course,
21          to do this the right way, we will need
22          to complete our financing requirement
23          or raise enough to get us into a big
24          deal which will generate substantial
25          revenues.
```

---

Page 155

```
 1          What did you mean by "big deal"?
 2       A.  Just any kind of licensing deal with
 3    whoever.  You know, we had a bunch of different
 4    things going on at that time, not just Apple.  So
 5    whatever we could have, you know, rolled into at
 6    the time.
 7          I was trying to keep the team pumped and
 8    get the money that we needed in order to -- that --
 9    half of our achilles heel that we always had was we
10    never had enough money to cross the bridge to where
11    we needed to go to.
12          So that -- that was problematic for this
13    company, you know, pretty much since inception, is
14    we just couldn't seem to raise enough money to --
15    to get where we need to go.
16       Q.  Okay.  If you go down to the next email --
17    so the one that says "On 3/18/10, 11:56 p.m."
18          Do you see where I'm at?
19       A.  Yes.
20       Q.  Okay.  And then it says (as read):
21             Hello, Team.  Please read this
22          email in full as it will affect all of
23          you with whom -- all of you with whom
24          have been paid for the past several
25          months by myself personally.
```

---

Page 156

```
 1          You see that?
 2       A.  Yes.
 3       Q.  Okay.  It says (as read):
 4             Please find attached the corrected
 5          and final version of the PPM.
 6          And it says (as read):
 7             Because the PPM is now live, I can
 8          no longer sell my personal shares at a
 9          discounted rate --
10       A.  Uh-huh.
11       Q.  (As read):
12             -- and this means I will no longer be
13          loaning my personal money from the
14          sale of my personal shares to the
15          company.
16       A.  Yep.
17       Q.  How did you sell your personal shares?
18       A.  Just -- I think it all started with
19    Mark Bobak and another guy named Pedro Soares.
20    Paul Powers and Mark had come up with that I could
21    sell my shares at a discounted rate because they're
22    nonvoting.  There's an irrevocable proxy -- in
23    fact, I ended up fighting them on the same exact
24    proxy agreement that they had me -- that they
25    helped to draft that had me sign, and I had to sue
```

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 169

1    A.  It could have been -- it could have been
2  touching into 2011; I just don't remember.
3    Q.  And when you started to refer to Panasonic
4  as "the LCEC" --
5    A.  Yes.
6    Q.  -- did you stop referring to Apple as "the
7  LCEC"?
8    A.  Yeah.  Because I let the shareholders know
9  that -- that, you know, business with one of the
10  large consumer electronics companies that we're
11  dealing with, you know, had pretty much stopped.
12    Q.  Okay.  So you started referring to
13  Panasonic as "the LCEC" after you had notified the
14  shareholders that the Apple business was stopped?
15    A.  I believe so.  There might be a little
16  overlap there, where at one point in time "the
17  LCEC" could have meant, you know, one or two or
18  maybe even three different companies.  But, you
19  know, that's -- that's really vague in my mind as
20  far as how that all interacted.  It's gray.  It's a
21  gray area of time.
22        Because Apple was kind of coming to an
23  end; these other companies were -- had started
24  while we're still dealing with Apple and they were
25  coming into focus.

---

Page 170

1        So, you know, like I said, Apple was not
2  our only egg in the basket, of course.  You never
3  try and, you know, do that.  Because when you do,
4  you -- it's not good.  You have to -- you have to
5  broaden your horizons when you're trying to do
6  business.
7    Q.  Other than Apple and Panasonic, who else
8  did you ever refer to as "the LCEC"?
9    A.  I can't recall.  There might have been one
10  or two others, but I don't remember who they would
11  have been.  There's a few large companies we were
12  dealing with.
13        Phillips, if I remember correctly, we
14  dealt with them for a little bit.  There was
15  another company --
16    Q.  And again -- sorry, I don't want to
17  interrupt you, but just -- I want to know who you
18  called "the LCEC," not who you interacted with.
19    A.  I don't recall.  I mean, if -- you're
20  asking me things from such a long time ago.  If I
21  could give you specifics, I would, but I can't.
22    Q.  Okay.  Did you refer to any other
23  companies, anybody other than Apple, as "the LCEC"
24  in 2009?
25    A.  No, I don't believe so.

---

Page 171

1    Q.  Did you refer to any other companies as
2  "the LCEC" in 2010?
3    A.  I don't believe so.
4    Q.  Did you --
5    A.  I can't remember, but I don't -- I don't
6  think so.  I mean, it's hard.  It's hard for me to
7  recall back that far.  But I don't believe so.
8        If -- if -- when I testified two years
9  ago, which would have been two years closer to when
10  this happened, my memory would have probably been
11  better at that time.  But, you know, we're talking
12  two years afterwards.  So, yeah, time flies by you,
13  you forget things like that.  Especially when
14  you're dealing with a lot of other things.
15        But I do remember it means Apple in this
16  context.
17    Q.  Okay.  All right.
18    Can you go to the third page of
19  Exhibit 28, please.
20    A.  Sure.
21    Q.  And if you go down to the third full
22  paragraph.  So this is the one that says "Time to
23  go back."
24        Do you see that?
25    A.  Yes.

---

Page 172

1    Q.  Okay.  I'm just going to read that.  (As
2  read):
3        Time to go back into fund-raising
4        mode, and if any of you feel like
5        helping out with this effort, I would
6        certainly appreciate it.
7    A.  Sure.
8    Q.  (As read):
9        It's not like you are doing your
10        friends and family a bad thing by
11        getting them into GenAudio at this
12        stage in the game.
13    A.  Sure.
14    Q.  What did you mean by that?
15    A.  That meant if you had any friends or
16  family that were interested in investing, introduce
17  them to Jim Mattos or me, as they all knew that was
18  the protocol.  Not to try to solicit them other
19  than an introduction to me or Jim Mattos -- or
20  Paul Powers at the time as well -- and that we
21  would handle it from there.  So --
22    Q.  And what's --
23        Oh, go ahead.
24    A.  So, basically, it was more of a, you know,
25  I'm looking forward, I'm seeing we're going to need

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 173

1  additional development staff; I'm seeing we're
2  probably going to need to have money for business
3  travel; for marketing and promoting our product;
4  for continuing to do business.
5      I mean, it takes money to do business.
6  You can't -- certainly can't fly for free and stay
7  in hotel rooms for free with team members, or
8  attend Game Developer Conference or CES for free
9  either. Those all cost money.
10     And in order to have money, you usually
11 have to either raise money or you're independently
12 wealthy, and I burned through all my money already.
13     Q. All right. Mr. Mahabub, I'm going to hand
14 you what's previously been marked as Deposition
15 Exhibit 30 and Investigative --
16     A. Yeah.
17     Q. -- testimony Exhibit 121.
18         (Whereupon, Exhibit 30 was previously
19         marked for identification by the Court
20         Reporter.)
21     MS. VOORHEES: A new exhibit, yeah.
22         (Whereupon, Exhibit 211 was marked for
23         identification by the Court Reporter.)
24     MR. HOLMES: Oh, sorry. These were previously
25 marked as 29 and 30?

Page 174

1      MS. VOORHEES: They were previously marked as
2  29 and 30, but 29 is now also going to be 211.
3      MR. HOLMES: Okay.
4      THE WITNESS: Where are we going?
5  BY MS. VOORHEES:
6      Q. Do you recognize Exhibit -- I'm sorry.
7      Do you recognize Exhibit 30?
8      A. Same answer.
9      Q. Okay. Which means that you do not recall
10 the document, but you do not have any reason to
11 doubt that you sent or received the emails as
12 indicated?
13     A. That's correct.
14     Q. Do you recognize Exhibit -- what has now
15 been marked as Exhibit 211, which was previously
16 Deposition Exhibit 29 and Investigative Exhibit 61?
17     A. Okay.
18     Q. Do you recognize it?
19     A. Same answer.
20     Q. All right. Which means that you do not
21 recall the exhibit, but you do not have any reason
22 to doubt that you sent and received the emails as
23 indicated?
24     A. That's correct.
25     Q. Okay. All right.

Page 175

1      Mr. Mahabub, if you can compare the email
2  that begins on the first page of Exhibit 30 with
3  the second email on the first page of Exhibit 211,
4  it's the one that begins after "Forwarded Message."
5      A. Okay.
6      Q. So you'll see that on Exhibit 30 the email
7  is to Victor Tiscareno, Michael Hailey, and
8  Ronald Isaac.
9      A. Yeah.
10     Q. On Exhibit 211, it includes -- it adds the
11 words "Phil Schiller, Barry Corbet" -- "Corlet"?
12     A. "Corlett."
13     Q. "Corlett." And "Jim Tenneboe"; is that
14 correct?
15     A. Yes.
16     Q. All right. Did you add those names to the
17 email that we're looking at in Exhibit 211?
18     A. You know, I'm wondering if maybe they were
19 blind carbon copied over here on the other one.
20 That -- I was just thinking about that while I was
21 downstair -- I don't know. They could have been.
22 I don't remember. I can't recall. But -- yeah, I
23 just don't know.
24     Q. You would agree that in Exhibit 211, they
25 appear on a "To" line along with Mr. Tiscareno,

Page 176

1  Hailey, and Isaac; correct?
2      A. Yeah. I may have -- I may have just added
3  their names into the fields for the purposes of
4  forwarding to the team. But that would be the only
5  reason.
6      Q. Did you ever blind carbon -- blind carbon
7  copy Mr. Schiller on emails?
8      A. I don't remember.
9      Q. Did you ever blind carbon copy Mr. Corlett
10 on emails?
11     A. I don't remember.
12     Q. Did you ever blind carbon copy
13 Mr. Tenneboe on emails?
14     A. I don't remember that either. I do
15 remember having emails with -- with Barry and Jim
16 both on email chains. I don't remember. I just
17 can't -- I can't tell you. It's so long ago. I --
18 I don't remember.
19     Q. Okay. If you -- continuing to take a look
20 at both exhibits, you see that Exhibit 30 begins
21 with "Hi Michael, Ron, and Vic"?
22     A. Yes.
23     Q. Do you see that?
24         That is not included on Exhibit 211.
25     A. Uh-huh.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

---

Page 253

1  deposition of Jerry Mahabub.  The time is 3:51.
2      Please proceed.
3      MS. VOORHEES: All right.
4      Q.  Mr. Mahabub, before -- I think after we
5  actually went off the record last time, you said
6  you thought you maybe had 30 minutes left to give
7  us in the deposition?
8      A.  Around there.
9      Q.  Okay.  So given that, and given that the
10  parties have agreed that we can reconvene this
11  deposition on February 8th, 2017, in Denver, we're
12  going to go ahead and conclude the deposition for
13  today.
14      A.  Okay.  That --
15      Q.  We will issue an amended notice that will
16  have you appear at our office in Denver on
17  February 8th, 2017.
18      A.  Okay.
19      Q.  Okay?
20      A.  That's great, yeah.
21      MS. VOORHEES: All right.  Thank you.
22      Counsel, anything else?
23      MR. MCCLOSKEY: So stipulated.  We'll see you
24  on the 8th.
25      MR. HOLMES: Yeah.

---

Page 254

1      MS. VOORHEES: Okay.  Sounds good.  Thank you.
2      THE WITNESS: Oh, wait.  And we just pick up
3  where we left off or --
4      MR. HOLMES: Yeah.  Yeah.
5      MS. HUGHES: We also wanted to stipulate that
6  the court reporter did not need to put on her
7  address, business address and those things at the
8  beginning and end of the deposition.
9      THE REPORTER: For the federal rule read on?
10      MS. HUGHES: Yes.
11      MR. HOLMES: So stipulated.
12      MR. MCCLOSKEY: So stipulated.
13      MS. VOORHEES: Agreed.
14      THE VIDEOGRAPHER: This concludes today's
15  deposition of Jerry Mahabub.  The number of DVDs
16  used was three.  The original media will be
17  retained at Behmke Reporting & Video Services,
18  Incorporated, located at 160 Spear Street,
19  Suite 300, San Francisco, California.
20      We're going off the record.  The time is
21  3:52.
22      (Off video record.)
23      THE REPORTER: Do you guys need certified
24  copies?
25      MR. HOLMES: No, I don't.

---

Page 255

1      Do you want -- are you getting a certified
2  copy?
3      MR. MCCLOSKEY: You guys get the original.
4      MS. VOORHEES: We noticed it.  We will get the
5  original.
6      MR. MCCLOSKEY: Yes, I want a certified copy.
7      THE REPORTER: Does anyone need a rough draft?
8      MS. VOORHEES: Whatever our order is.  We'll
9  have to get back to you on that.
10      (At 3:54 p.m., the deposition
11      proceedings adjourned to February 8,
12      2017.)
13
14
15
16  _____
17      TAJ JERRY MAHABUB
18
19
20
21
22
23
24
25

---

Page 256

1  STATE OF CALIFORNIA     )
2                          ) ss
3  COUNTY OF RIVERSIDE     )
4      I hereby certify that the witness in the
5  foregoing deposition, TAJ JERRY MAHABUB,, was by me
6  duly sworn to testify to the truth, the whole truth and
7  nothing but the truth, in the within-entitled cause;
8  that said deposition was taken at the time and place
9  herein named; and that the deposition is a true record
10  of the witness's testimony as reported by me, a duly
11  certified shorthand reporter and a disinterested
12  person, and was thereafter transcribed into typewriting
13  by computer.
14      I further certify that I am not interested in
15  the outcome of the said action, nor connected with nor
16  related to any of the parties in said action, nor to
17  their respective counsel.
18      IN WITNESS WHEREOF, I have hereunto set my
19  hand this 27th day of January, 2017.
20  Reading and Signing was:
21  _X_ requested  ___ waived  ___ not requested
22
23
24
25      PAULA A. PYBURN, CSR NO. 7304, RPR, CLR

---

# In The Matter Of:

*Securities and Exchange Commission v.*
*Taj Jerry Mahabub, et al.*

---

*Taj Jerry Mahabub*
*Vol. 2*
*February 8, 2017*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California  94105*
*(415) 597-5600*

Original File 31006MahabubV2.txt
Min-U-Script® with Word Index

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 257

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLORADO
 3
 4     - - - - - - - - - - - - - -
 5     SECURITIES AND EXCHANGE     )
 6     COMMISSION,                 )
 7              Plaintiff,         )
 8                                 ) CASE NO.
 9     v.                          ) 1:15-cv-02118-CBS-WJM
10                                 )
11     TAJ JERRY MAHABUB, GENAUDIO, )
12     INC., and ASTOUND HOLDINGS, )
13     INC.,                       )
14              Defendants.        )
15     - - - - - - - - - - - - - -
16
17         VIDEOTAPED DEPOSITION OF TAJ JERRY MAHABUB
18            WEDNESDAY, FEBRUARY 8, 2017
19            PAGES 257 - 541; VOLUME 2
20
21         BEHMKE REPORTING AND VIDEO SERVICES, INC.
22         BY:  BARBARA J. CASTILLO, RMR, CRR
23              160 SPEAR STREET, SUITE 300
24         SAN FRANCISCO, CALIFORNIA 94105
25              (415) 597-5600
```

Page 258

```
 1
 2
 3
 4
 5
 6
 7
 8         Videotaped deposition of TAJ JERRY MAHABUB,
 9     VOLUME 2, taken by Plaintiff, at 1691 Stout Street
10     Street, Suite 1700, Denver, Colorado, commencing
11     at 9:23 A.M., on WEDNESDAY, FEBRUARY 8, 2017,
12     before Barbara J. Castillo, Registered Merit Reporter,
13     Certified Realtime Reporter and Notary Public within
14     and for the State of Colorado, pursuant to Notice.
15
16
17
18
19
20
21
22
23
24
25
```

Page 259

```
 1     APPEARANCES OF COUNSEL:
 2     FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION:
 3         SECURITIES AND EXCHANGE COMMISSION
 4         BY:  DANIELLE R. VOORHEES, TRIAL COUNSEL
 5              LESLIE HENDRICKSON HUGHES, TRIAL COUNSEL
 6         1961 Stout Street, Suite 1700
 7         Denver, Colorado 80294
 8         Telephone: (303) 844-1000
 9         Email:  voorheesd@sec.gov
10              hugheslj@sec.gov
11
12     FOR DEFENDANT TAJ JERRY MAHABUB:
13         HOLMES, TAYLOR & JONES LLP
14         BY:  ANDREW B. HOLMES, ATTORNEY AT LAW
15         617 South Olive Street, Suite 1200
16         Los Angeles, California 90014
17         Telephone:  (213) 985-2200
18         Email:  abholmes@htjlaw.com
19
20
21
22
23
24
25
```

Page 260

```
 1     APPEARANCES OF COUNSEL - (CONTINUED):
 2     FOR DEFENDANT GENAUDIO, INC.:
 3         WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
 4         BY:  MICHAEL P. MCCLOSKEY, ATTORNEY AT LAW
 5         655 West Broadway, Suite 900
 6         San Diego, California 92101
 7         Telephone: (619) 881-3326
 8         Email:  michael.mccloskey@wilsonelser.com
 9
10     ALSO PRESENT:
11         WALT MATHERN, VIDEOGRAPHER
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Securities and Exchange Commission v.**
**Taj Jerry Mahabub, et al.**

**Taj Jerry Mahabub - Vol. 2**
**February 8, 2017**

---

Page 261

```
 1                 INDEX
 2   WEDNESDAY FEBRUARY 8, 2017
 3   TAJ JERRY MAHABUB - VOLUME 2        PAGE
 4      Examination By MS. VOORHEES      270
 5   P.M. SESSION                        386
 6      Examination resumed by MS. VOORHEES  386
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 262

```
 1                 EXHIBITS
 2          TAJ JERRY MAHABUB - VOLUME 2
 3   Number       Description            Page
 4   Exhibit 262  Email string, top message
 5                from Jerry Mahabub to
 6                littlebadass19@yahoo.com,
 7                5/29/10; Bates Nos.
 8                SEC-MahabubJ-E-0023379
 9                through 0023389 - 11 pages   288
10
11   Exhibit 263  Audio Transcription, Pages 1
12                through 56 - 56 pages         296
13
14   Exhibit 264  Letter from Jerry Mahabub to
15                Shareholder, 8/28/10; Bates
16                Nos.  SEC0000006 through
17                0000009 - 4 pages             339
18
19   Exhibit 265  Email from Jerry Mahabub to
20                Victor Tiscareno, 9/6/10;
21                Bates No.
22                SEC-TiscarenoV-E-0001264
23                - 1 page                      376
24
25
```

Page 263

```
 1         EXHIBITS - (CONTINUED)
 2          TAJ JERRY MAHABUB - VOLUME 2
 3   Number       Description            Page
 4   Exhibit 266  Email string, top message
 5                from Jerry Mahabub to Paul
 6                Powers and Mark Bobak,
 7                9/7/10; Bates No.
 8                SEC-MahabubJ-E-0005677
 9                through 0005680 - 4 pages     376
10
11   Exhibit 267  GenAudio Shareholder
12                Progress Report, February
13                26, 2011; Bates Nos.
14                GA005317 through 005339
15                - 23 pages                    393
16
17   Exhibit 268  Email string, top message
18                from Jerry Mahabub to Jay
19                Rifkin and Phil Rodriguez,
20                9/30/11; Bates No.
21                SEC-MahabubJ-E-0020185
22                through 0021086 - 2 pages     413
23
24
25
```

Page 264

```
 1         EXHIBITS - (CONTINUED)
 2          TAJ JERRY MAHABUB - VOLUME 2
 3   Number       Description            Page
 4   Exhibit 269  Transcript of audio file
 5                - 32 pages                    435
 6
 7   Exhibit 270  Printout of slides; Bates
 8                Nos. SEC-Skluzak-E-0000392
 9                through 0000425 - 34 pages    446
10
11   Exhibit 271  Affidavit of Jerry Mahabub
12                in Support of Plaintiff's
13                Response - 12 pages           458
14
15   Exhibit 272  Defendant Astound Holdings,
16                Inc.'s Response to Plaintiff
17                Securities and Exchange
18                Commission's Second Request
19                for Production of Documents
20                and First Interrogatories
21                Dated November 10, 2016
22                - 7 pages                     494
23
24
25
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

Page 265

```
 1            PREVIOUSLY MARKED EXHIBITS
 2         TAJ JERRY MAHABUB - VOLUME 2
 3   Number        Description           Page
 4   Exhibit 31   Email string, top message
 5                from Gary Smith to
 6                psavio@genaudioinc.com;
 7                5/25/10; Bates No. JM002158
 8                through 002167 - 10 pages    273
 9
10   Exhibit 32   Email string, top message
11                from Jerry Mahabub to Victor
12                Tiscareno, 5/25/10; Bates
13                Nos.
14                SEC-TiscarenoV-E-0001158
15                though 0001162 - 5 pages     273
16
17   Exhibit 34   Email string, top message
18                from Jim Mattos to Jerry
19                Mahabub, 10/27/14; Bates
20                Nos. JM002515 through 002518
21                - 4 pages                    315
22
23
24
25
```

Page 266

```
 1      PREVIOUSLY MARKED EXHIBITS - (CONTINUED)
 2         TAJ JERRY MAHABUB - VOLUME 2
 3   Number        Description           Page
 4   Exhibit 35   Email string, top message
 5                from Jerry Mahabub to Victor
 6                Tiscareno, 7/2/10; Bates
 7                Numbers
 8                SEC-TiscarenoV-E-0001218
 9                through 0001221 - 4 pages    315
10
11   Exhibit 37   Letter from Jerry Mahabub to
12                GenAudio Shareholders,
13                8/1/10; Bates No. GA005351
14                through 005353 - 3 pages     330
15
16   Exhibit 40   Email string, top message
17                from Dell Skluzak to
18                Jennifer Ostrom, 11/20/14;
19                Bates Nos.
20                SEC-Scluzak-E-0000905
21                through 0000911 - 7 pages    404
22
23
24
25
```

Page 267

```
 1    PREVIOUSLY MARKED EXHIBITS - (CONTINUED)
 2         TAJ JERRY MAHABUB - VOLUME 2
 3   Number        Description           Page
 4   Exhibit 74   Compilation exhibit of a
 5                stock certificate and other
 6                documents; Bates Nos.
 7                Mahabub001659 through 001671
 8                - 13 pages                   468
 9
10   Exhibit 138  Email string, top message
11                from Jerry Mahabub to Victor
12                Tiscareno, 9/1/10 - 9 pages  350
13
14   Exhibit 139  Email string, top message
15                from Jerry Mahabub - 4 pages 361
16
17   Exhibit 170  Email string, top message
18                from Richard DeVaul to Jerry
19                Mahabub, 4/6/11; Bates Nos.
20                347APL-00000066 through
21                00000069 - 4 pages           397
22
23
24
25
```

Page 268

```
 1    PREVIOUSLY MARKED EXHIBITS - (CONTINUED)
 2         TAJ JERRY MAHABUB - VOLUME 2
 3   Number        Description           Page
 4   Exhibit 198  GenAudio Inc. Common Stock
 5                Transfer Ledger; Bates Nos.
 6                GA001816 through 001852 - 37
 7                - 37 pages                   462
 8
 9   Exhibit 242  Email string, top message
10                from Jerry Mahabub, 7/3/09;
11                Bates Nos.
12                SEC-MahabubJ-E_0023817
13                through 0023827 - 11 pages   436
14
15   Exhibit 257  Email string, top message
16                from Jerry Mahabub to Dell
17                Skluzak, 7/6/12; Bates No.
18                SEC-ELLIOTT-E-0002702
19                - 1 page                     502
20
21   Exhibit 258  Email from Jerry Mahabub to
22                Dell Skluzak, 1/5/13; Bates
23                No. SEC-ELLIOTT-E-0002703
24                - 1 page                     513
25
```

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

Page 269

1    WEDNESDAY, FEBRUARY 8, 2017; 9:23 A.M.
2
3        THE VIDEOGRAPHER: Good morning.  Here
4    begins DVD Number 1 of Volume 1 in the deposition of
5    Taj Jerry Mahabub in the matter of the United States
6    Securities and Exchange Commission v. Taj Jerry
7    Mahabub, et al., in the United States District Court
8    for the District of Colorado, Case Number
9    1:15-CV-02118.  Today's date is Wednesday,
10   February 8, 2017.  The time on the video monitor now
11   is 9:23 a.m.  The video -- video operator is Walt
12   Mathern, contracted by Behmke Reporting & Video
13   Services, Inc., 160 Spear Street, Suite 300, San
14   Francisco, California.  This video is taking place at
15   1961 Stout Street, Denver, Colorado and was noticed
16   by Danielle Voorhees.
17       Counsel, please voice identify yourself
18   and state whom you represent.
19       MS. VOORHEES: Danielle Voorhees and
20   Leslie Hughes on behalf of the Securities and
21   Exchange Commission.
22       MR. MCCLOSKEY: Michael McCloskey on
23   behalf of GenAudio, Incorporated.
24       MR. HOLMES: Andrew Holmes on behalf of
25   Jerry Mahabub.

---

Page 270

1        THE VIDEOGRAPHER: The court reporter is
2    Barbara Castillo contracted by Behmke Reporting &
3    Video Services.  Will the reporter please swear in
4    the witness.
5             TAJ JERRY MAHABUB,
6    being first duly sworn in the above cause, was
7    examined and testified as follows:  Good
8             EXAMINATION
9    BY MS. VOORHEES:
10       Q    Good morning, Mr. Mahabub.  Thanks for
11   coming in again today.  Just to repeat a couple of
12   ground rules for the deposition, let's try not to
13   talk over each other.  The court reporter is trying
14   to take everything down.  If you don't understand the
15   question I'm asking, go ahead and stop me and ask me
16   to clarify.  Otherwise I'm going to assume that you
17   understood.  Is that fair?
18       A    Yes.
19       Q    Okay.  Verbal answers are important so
20   that the court reporter can actually note your
21   answer.  Let me know if you need to take a break.  As
22   long as there's not a question pending we can take
23   breaks as you need.  Is there any reason you cannot
24   testify fully and accurately today?
25       A    No.

---

Page 271

1    Q    Did you get enough sleep last night?
2    A    Some.
3    Q    All right.
4    A    Not much, but some.
5    Q    All right.  Did you do anything to prepare
6    for your deposition today?
7    A    Jumping jacks.  Not much, no.
8    Q    Okay.  Did you read any documents?
9    A    I did breeze through for the first time,
10   just kind of skimmed through the transcript from --
11   Q    Okay.
12   A    -- the initial.  Right.
13   Q    Okay.  So do you mean that you looked at
14   the investigative transcripts from the investigation?
15   A    I -- it was the transcript from when I was
16   deposed during that time, yes.
17   Q    Okay.  So the transcript of your testimony
18   from a couple years ago during the SEC investigation?
19   A    Correct.
20   Q    Okay.  Did you --
21       MS. VOORHEES: Sorry.
22       MR. HOLMES: Can we just take a 20 second
23   break?
24       MS. VOORHEES: Sure.
25       MR. HOLMES: Let's go off the record.

---

Page 272

1        THE VIDEOGRAPHER: The time now is 9:25.
2    We're off the record.
3        (Recess from 9:25 to 9:26 a.m.)
4        THE VIDEOGRAPHER: The time now is 9:26.
5    We're back on the record.
6    Q    (BY MS. VOORHEES) Mr. Mahabub, you -- in
7    addition to reviewing your investigative testimony
8    transcript, did you do anything else to prepare for
9    today's deposition?  Did you look at anything else?
10   A    No, only that.  Hopefully I don't give as
11   long of answers as I did for that one because that
12   was big.
13   Q    Okay.  Did you review your deposition from
14   just a couple of weeks ago when we were out in Los
15   Angeles?
16   A    No.
17   Q    Did you review anybody else's testimony --
18   A    No.
19   Q    -- transcripts?  Did you look at any
20   documents?
21   A    No, nothing, just -- just that transcript.
22   Q    Just the transcript?
23   A    Yeah.
24   Q    Okay.  All right.  Mr. Mahabub, I'm going
25   to hand you what has previously been marked as

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 401

```
 1    Q    All right.  So then --
 2    A    At least I don't think I did.  I may have,
 3  but I don't think I did.
 4    Q    You don't --
 5    A    He might have been at one of the meetings.
 6  I don't know.
 7    Q    Okay.  You don't specifically recall
 8  meeting Mr. Pance?
 9    A    No.
10    Q    Okay.  So then if you could go to the
11  first page of Exhibit 170, there is email
12  correspondence that now includes Mr. Pance,
13  Mr. Isaac, you and a Richard DeVaul.  Do you see
14  that?
15    A    Yes.
16    Q    Did you ever meet with Richard DeVaul?
17    A    Can you give me a second to read through
18  this real fast?
19    Q    Sure.
20    A    Let me see what this is.  It looks like
21  Rich wrote me an email here.
22    Q    So the first page is a little bit odd.
23  I'm not -- this is how it was produced to us, and I'm
24  not entirely sure what's happening.  But I think that
25  there is an email that you write and then sort of
```

Page 402

```
 1  imbedded in the middle of it is an email from
 2  Mr. DeVaul, the one that says, Hello Jerry, sorry
 3  about the delay.
 4    A    Let me see what he said here.  I remember
 5  that.  I just -- I don't remember who Richard DeVaul
 6  was.  He must have been introduced to me through --
 7  through either Sasha or -- or Ronald.
 8    Q    Okay.  But reading that email, the one
 9  that says, Hello Jerry, sorry about the delay in
10  replying.  Things have been a bit hectic here, do you
11  recall receiving that email?
12    A    I must have because it's -- it's here,
13  yeah.  So . . .
14    Q    I know.  I -- I understand you're not
15  disputing that.  I'm just wondering if you remember
16  actually receiving that email.  Do you remember
17  reading it?
18    A    I don't remember, no, but I mean, it's in
19  there.  I must have received it, right.
20    Q    Okay.  So Mr. DeVaul writes, I'm not sure
21  what the agreements would be that you were referring
22  to.  We have a standard MNDA that we use when we
23  start certain kinds of discussions with potential
24  vendors.  I'm happy to send that to you if we end up
25  at that level of discussion.
```

Page 403

```
 1         Mr. Mahabub, separate and apart from this
 2  email, which I understand you don't specifically
 3  remember, do you recall receiving that response from
 4  Apple?
 5    A    I believe so.
 6    Q    Okay.
 7    A    I don't remember this exact email, but I
 8  mean, something along those lines was going on, yeah.
 9    Q    Okay.
10    A    And I remember being upset.
11    Q    Okay.  And tell me about that.  That was
12  my next question, was how did you feel about that?
13    A    I was upset because I felt like we were
14  starting at square one and we had just worked there
15  for two, two and a half years, maybe even longer, you
16  know, getting, you know, tech level integrations down
17  and all kinds of stuff, you know, tunings with Vic,
18  and then now it's like we've already signed the MNDA.
19  You know, we were under that mutual nondisclosure
20  agreement.  We're past that.  The reason why I think
21  Ronald wanted me to go under the heavier agreements
22  was so they could evaluate heavier into, you know,
23  potential for commercial licensing.
24    Q    And you did not ever receive even drafts
25  of any heavier agreements, correct?
```

Page 404

```
 1    A    I don't recall receiving, no.  No.  And I
 2  did report to the shareholders that we did not
 3  receive them.  I remember doing that.  At least I
 4  think I remember doing that.  It's something I would
 5  have reported to them.  I reported -- because I
 6  remember reporting to them that --
 7         MR. HOLMES:  Stop -- stop mumbling out
 8  loud unless intending it to be part of your
 9  response --
10         THE DEPONENT:  Yeah.
11         MR. HOLMES:  -- because the reporter --
12         THE DEPONENT:  I'm thinking in my own
13  head.
14         MR. HOLMES:  Yeah, but you're not.  You're
15  speaking out loud.
16    Q    (BY MS. VOORHEES)  Do you have anything
17  else to add, though?  Because I want to make sure
18  you've completed your thought.
19    A    No.  That's -- I don't think so, not --
20  not for right now.  I have to go back and look.
21    Q    Mr. Mahabub, I'm going to hand you what's
22  been previously marked as Deposition Exhibit 40.  All
23  right.  Deposition Exhibit 40 is a series of email
24  correspondence between various people.  I would like
25  to first -- and you're not all of the emails, Mr.
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 405

1    Mahabub.  So I'd like to first direct your attention
2    to an email to and from Jim Mattos on March 29, 2011.
3    It's on the Bates Page 909.  It starts at the very
4    bottom of the Bates Page 909.
5        A    Hold on one second.
6        Q    Sure.
7        A    All the way to the back there kind of or
8    middle?
9        Q    Yeah.  It's the middle.
10       A    Okay.  I've got it.
11       Q    It's the third page from the back.  So you
12   see at the very bottom Mr. Mattos is sending an email
13   to himself with the subject being the LCEC.  And then
14   it says, Dear shareholder.  And if you turn the page
15   it reads, This email is to notify all existing
16   shareholders that what we commonly refer to as the
17   LCEC -- I'm going to skip the parenthetical -- and
18   GenAudio are going to be signing a new set of, quote,
19   evaluation and development agreements.  This will
20   completely prohibit myself or any of GenAudio's team
21   members to disclose any further information about the
22   LCEC, including even the abbreviation LCEC in any
23   future shareholder correspondence.
24            Do you recall that email going out to
25   shareholders?

Page 406

1        A    I don't, but it doesn't mean it didn't.
2        Q    Okay.  And go ahead and read however much
3    you need to read of that email, Mr. Mahabub.  You'll
4    see at the very end it says, Best wishes, Jerry
5    Mahabub, Founder, Chairman and CEO.
6        A    Yeah.
7        Q    I just want to see if any of the portion
8    of the document refreshes your recollection.
9        A    I think so.  I think this might have been
10   -- I just don't remember.  Perhaps this up here is
11   referring to the Ronald Isaac agreements, I believe,
12   the ones that Ron said that were there -- that they
13   were going to be sending to us to sign in his email
14   to me, or having Sasha Pance sending to me to sign.
15   So I think that's -- that's what that's referring to
16   right there.
17       Q    And do you know that?  Do you know that --
18   that what's being referred to in this email is the
19   agreements that Mr. Isaac mentioned to you?
20       A    That's the only possible agreements they
21   could be because those are the only -- that's the
22   only other set of agreements we would have ever
23   received, and we never did.
24       Q    Okay.  So then the next sentence that
25   reads, This will completely prohibit myself or any of

Page 407

1    GenAudio's team members to disclose any further
2    information about the LCEC, including even the
3    abbreviation LCEC in any future shareholder
4    correspondence, what's the basis for that statement?
5        A    When I talked to Ron on the phone he had
6    stated to me about these new agreements, that they're
7    going to be pretty heavy, that pretty much so that
8    you have to keep the button on everything.
9        Q    Did he tell you that you could not use the
10   abbreviation LCEC?
11       A    He basically said that anything even
12   associated with what we're doing cannot -- just
13   absolutely cannot be mentioned.  So I just
14   automatically interpreted that as being, you know,
15   abbreviations of any kind or anything just -- you
16   know, don't say anything until -- you know, maybe we
17   do a deal hopefully, but . . .
18       Q    Why did you send this email or why did you
19   cause this email to be sent to the shareholders
20   before those agreements were entered into?
21       A    Transparency.  As I was saying, we were
22   going to be entering into them because that's what he
23   said in his email, that he's going to be sending me
24   the new agreements to sign.  I mean, it's basically
25   what he said.  So it's more or less monkey see,

Page 408

1    monkey do.  I took what he said and put it into a
2    report and was transparent to the shareholders about
3    it.
4        Q    If you look at the next email in time, it
5    starts sort of towards the top of the Bates Page 908,
6    and it says, On 3/30/11, 5:55 p.m. Gary Allen wrote.
7        A    Okay.
8        Q    Do you know Gary Allen?
9        A    I do not.
10       Q    Okay.  Just read this email.  You don't
11   have to read the whole thing, but just read some of
12   it to yourself and let me know if you recall
13   receiving this email from Mr. Allen.
14       A    I don't remember receiving the email, but
15   that doesn't mean I didn't.
16       Q    Okay.  And then if you could go to the
17   email that starts towards the bottom of Page 906.
18   It's a response from you to Mr. Allen on March 30th,
19   2011.
20       A    Okay.
21       Q    Do you recall writing that response to
22   Mr. Allen?
23       A    I don't recall writing it, but apparently
24   I did, yes.
25       Q    Okay.  You don't have any reason to doubt

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 417

1   passing by in the hallway type event and that was
2   that.
3       Q    Mr. Mahabub, you have testified several
4   times that you have never met Steve Jobs.  Are you
5   telling me that that's incorrect?
6       A    Not -- not in terms of a meeting for
7   AstoundSound I have never met Steve Jobs.
8       Q    Have you ever met Steve Jobs in your life?
9   Have you ever met Steve Jobs?
10      A    In passing in a hallway at Apple one time.
11  It was -- it wasn't even like a -- it wasn't a, hey,
12  how are you doing, I'm Jerry, let's go into a
13  conference room and have a meeting about
14  AstoundSound.  It was just a passing in the hallway
15  meeting, nothing at all, just that's it.
16      Q    So you are testifying that you met Steve
17  Jobs?
18      A    Not in the purpose of AstoundSound is what
19  I'm talking about.
20      MR. HOLMES:  Jerry -- Jerry, yes or no.
21      A    Yes.
22      Q    (BY MS. VOORHEES)  Okay.  You met Steve
23  Jobs?
24      A    Once at Apple in the hallway.
25      Q    When?

Page 418

1       A    I can't remember what date it was.
2       Q    How can you not remember that?
3       A    I just don't remember.  It was a long time
4   ago.  It was -- it was one of the trips that I had
5   over there and we were passing in the hallway and
6   that's it.  That was -- that was all it was.  It was
7   just a simple handshake meeting and -- and that was
8   it.  Nothing -- nothing bigger than that.
9       Q    Tell me everything you remember about that
10  meeting.
11      A    Walking down the hallway and he was
12  walking on the other side and --
13      Q    What hallway?
14      A    I don't remember which building.  Probably
15  the main Apple campus building, I would imagine, or
16  it might have been going toward the food court, if I
17  remember.  That's probably it.  I think it was -- I
18  don't really recall.  Like I said, it was just a
19  passerby meeting.  It wasn't anything, you know,
20  specifically related to Astound or anything like
21  that.
22          So stating that I met Steve Jobs here, it
23  could have been taken out of context, you know what I
24  mean, because it had nothing to do with AstoundSound,
25  per se, but --

Page 419

1       Q    I need you to tell me everything you
2   remember about the meeting with Steve Jobs.
3       A    There was nothing.  It was just a
4   handshake meeting.
5       Q    What -- who else was there?
6       A    I can't remember who else was there.  I
7   was walking to the food court.  Steve Jobs was at --
8   I think it was going to the food court or coming out
9   of the food court and Jobs was there and he was
10  coming out.  And I had a chance to shake the guy's
11  hand.  That's about it.
12      Q    Okay.  You shook his hand?
13      A    Yes.
14      Q    What were you wearing?
15      A    I don't remember.
16      Q    What was he wearing?
17      A    I was probably wearing my blue blazer or
18  something like that, you know.  Any time I go to a
19  meeting at Apple I usually wear a blue blazer or
20  something.
21      Q    What time of day was?
22      A    Lunchtime I'd say.
23      Q    Okay.  You think he would have been eating
24  at the food court?
25      A    Well, yeah.  It was lunchtime because

Page 420

1   that's where we were going.
2       Q    Were you with Mr. Tiscareno?
3       A    No.  I can't remember who I was with at
4   the time.  I don't think it was Vic.  It was one of
5   the other guys I just --
6       Q    Who else could it have been?
7       A    I don't remember.
8       Q    Who did you -- who else escorted you
9   around the Apple cafeteria?
10      A    It may have been Vic's boss when I went in
11  for a meeting with him.  I really don't recall.  I
12  just remember going to the Apple -- I don't remember.
13      Q    Do you remember anything else about this
14  meeting?
15      A    No, because it wasn't a meeting about
16  AstoundSound, per se.  It was just like a -- you
17  know, I was wearing a -- a GenAudio name badge.  I
18  know that.
19      Q    Okay.  Why do you remember that?
20      A    Because any time you check in at the
21  campus they give you like a little name badge that
22  you wear.
23      Q    Do you recall why you were on the Apple
24  campus?
25      A    I don't remember what -- what the purpose

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

Page 421

1  of the meeting was at that time, no, but that's -- my
2  only disclosure to you is it was a passerby like
3  hallway type meeting, you know.  It wasn't anything
4  -- when I say meeting I don't mean a meeting, per se,
5  that was set up for AstoundSound.  Does that make
6  sense?  It had nothing to do with that.  It was just
7  a meet and greet like, you know.
8      Q    Did somebody take you over to Mr. Jobs and
9  introduce you?
10     A    No.  No.  He was -- he was just walking by
11 and I shook his hand and said, I'm Jerry, you know.
12 And he was like, yeah, and kind of walked away.  That
13 was about it.
14     Q    So you just walked up to Mr. Jobs and
15 shook his hand?
16     A    Yeah, which apparently you're not supposed
17 to do at Apple.  Don't look Steve in the eyes kind of
18 a thing, you know.
19     Q    How did you come to learn that?
20     A    Ronald Isaac told that to me and I think a
21 couple of other people as well.
22     Q    And was that before or after you met
23 Mr. Jobs?
24     A    I think it was afterwards, if I remember.
25 I'm not sure.  The timelines are a little off on that

---

Page 422

1  one, but, yeah, it was one of the times I was there,
2  and he was sitting down eating lunch and we were
3  walking -- we were walking in.  I think I actually
4  sat down and ate.
5      Q    Who's we?
6      A    That's what I'm trying to remember who --
7  I can't remember who I was with.
8      Q    You certainly weren't alone?
9      A    No.
10     Q    Okay.
11     A    I just don't remember who I was with.
12     Q    Okay.
13     A    And I had gotten up to go get something
14 and he was walking out and I was walking in the other
15 direction and shook his hand, but that was it.  That
16 was the only time I actually ever had any type of
17 interaction with him.
18     Q    So you're in the cafeteria with someone
19 who you can't recall?
20     A    It was one of the guys that -- I don't
21 think it was Vic, though.
22     Q    Okay.  So it could have been Mr.
23 Tiscareno's boss?
24     A    I think it was after Vic had already
25 retired, yes.

---

Page 423

1      Q    Okay.  So that should limit our potential
2  players, right?
3      A    (Deponent nodded head.)
4      Q    So Mr. Tiscareno has retired.  It could
5  have been his boss, whose name I can't remember.
6      A    Right.
7      Q    You -- so you met with Mr. Tiscareno's
8  boss without Mr. Tiscareno present?
9      A    One time, yes.
10     Q    Okay.
11     A    But it could have been that time, but --
12 and then there were another couple of engineers I was
13 working with, and I can't remember their names
14 either.  I just don't remember.
15     Q    Okay.  But -- so I want to know though the
16 class of people it could have possibly been, because
17 I've got to run this down.
18     A    Yeah.
19     Q    So it could have been Mr. Tiscareno's
20 boss.  It could have been who else?  Who else are
21 possibilities?
22     A    I don't -- I don't remember, honestly.  I
23 -- it's -- I don't.
24     Q    I know you don't remember.  But who else
25 did you interact with at Apple after Mr. Tiscareno

---

Page 424

1  retired?
2      A    Primarily Ronald Isaacs.  Jim Tenneboe was
3  another guy I interacted with, Vic Tiscareno's boss.
4  And then there were two engineers, and I can't
5  remember what their names were, and they were in the
6  Mac division, but I don't remember what their names
7  were.
8      Q    Okay.  They were in the Mac division?
9      A    Yeah.
10     Q    Okay.
11     A    But that was it.
12     Q    Did you ever have lunch with those people?
13     A    I just -- I honestly do not recall.  If I
14 did I would tell you.
15     Q    Okay.  So you are walking out of the Apple
16 cafeteria, Mr. Jobs is walking in, you believe?
17     A    No.  I think he was sitting down eating
18 with someone else, and, you know, it was pretty
19 obvious that he was there.  And then I got up and
20 went to go -- I went to the bathroom, went back to
21 get a drink or something like that and I had -- we
22 were just sort of passing and, you know, I stuck out
23 my hand and said, hi, I'm Jerry, you know, or -- and
24 then he stuck out his hand and shook my hand and that
25 was about it.

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

**Page 425**

```
 1   Q   Did you say anything to him beyond, I am
 2   Jerry?
 3   A   No.
 4   Q   Did he say anything to you?
 5   A   Not really, no.
 6   Q   Did he say anything to you?  You said not
 7   really.  What did he say to you?
 8   A   He just looked at me and said let's --
 9   something like -- it was more like -- what's the
10   easiest way to put it to you, like pushing me away
11   kind of an attitude more than anything, I think.
12   Q   Okay.  Did he shake your hand?
13   A   He did.
14   Q   And -- then what made you feel like he
15   was pushing you away?
16   A   Well, he didn't really say anything.  He
17   just shook my hand, walked away, you know.
18   Q   Okay.  Was he with somebody?
19   A   I don't think -- I mean -- I think he was
20   with someone he was eating lunch, right, like two or
21   three people.  When he was walking by me, no.
22   Q   Okay.  So he was standing up --
23   A   Yeah.
24   Q   -- when you shook his hand?  Was anybody
25   with you?
```

**Page 426**

```
 1   A   No, not -- the guy I was having lunch with
 2   was sitting at the table.  I just don't remember who
 3   it was.
 4   Q   Who did you tell at -- did you tell
 5   somebody at Apple that you had just met Steve Jobs?
 6   A   No.  I remember mentioning something to
 7   Ron about it, and Ron is like, oh, don't ever look
 8   Steve Jobs in the eye, you know, he's kind of like --
 9   gave me something like that.  And I'm like I shook
10   the guy's hand.  I don't know what to tell you, but
11   he --
12   Q   I'm sorry, I want to stop you right there.
13   So you told Mr. Isaac that you shook Steve Jobs's
14   hand?
15   A   I think that's why he made that -- that
16   thing up, like, you know, don't look Steve Jobs in
17   the eye when you're walking down the hallway kind of
18   thing.  That's what he told --
19   Q   I just need a yes or no to this question,
20   though.  Did you tell Ron Isaac, I just shook Steve
21   Jobs's hand?
22   A   No, not just shook.  It might have been
23   like after the fact or something.  I don't exactly
24   recall what the situation or the circumstances were,
25   but . . .
```

**Page 427**

```
 1   Q   But you told Mr. Isaac that you had met
 2   Steve Jobs?
 3   A   I think -- I think I did, yeah, because
 4   that's why he gave me the story, you know, don't look
 5   Steve Jobs in the eye kind of thing, you know, when
 6   you're walking around the hallways is what he said,
 7   something along those lines.
 8   Q   Did you tell Mr. Tiscareno that you had
 9   met Steve Jobs?
10   A   Mr. Tiscareno wasn't there at the time.
11   Q   Well, no, ever.  Did you tell him ever
12   that you met Steve Jobs?
13   A   No.
14   Q   Why not?
15   A   It wasn't -- it had nothing to do with
16   what we were doing really.  I mean, it was
17   unimportant.
18   Q   Well, it ends up in this email that is
19   about Mr. Tiscareno and Mr. Franzi, right?
20   A   Yeah.  Yeah, it ends up in this email,
21   just -- you know, I'm just letting the board know
22   that, you know, if he were to ever remember me and we
23   were to do something, you know, that maybe it would
24   mean something.  It really -- it's -- it can be taken
25   out of context here, but like I said, it's email to
```

**Page 428**

```
 1   the board members.
 2   Q   Did you tell Mr. Jobs your last name?
 3   A   No.
 4   Q   Did you tell him where you worked?
 5   A   No.
 6   Q   Did you mention GenAudio?
 7   A   No.
 8   Q   Did you mention AstoundSound?
 9   A   Nothing.
10   Q   You said nothing other than, hi, I'm
11   Jerry?
12   A   That's about it.
13   Q   Is that it?
14   A   That's it.  Yeah.  I mean, really not much
15   more time to do anything but that.
16   Q   Okay.
17       MS. VOORHEES: Let's go off the record.
18   A   But that's the only time ever, yeah.
19       THE VIDEOGRAPHER: The time now is
20   17 minutes after 2:00.  We're off the record.
21       (Recess from 2:17 to 2:34 p.m.)
22       THE VIDEOGRAPHER: The time now is 2:34
23   and we're back on the record.
24       Q   (BY MS. VOORHEES)  All right.  Mr.
25   Mahabub, do you understand you're still under oath?
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

**Page 429**

```
 1    A    Yes.
 2    Q    Okay.  Other than the encounter with
 3   Mr. Jobs that you have just testified to in the Apple
 4   cafeteria after Mr. Tiscareno had retired, did you
 5   ever otherwise meet Steve Jobs?
 6    A    First of all, I want to clarify, honestly,
 7   it could have been before, it could have been after.
 8   I don't recall.  So I just really don't.  It was an
 9   encounter, very brief and that was that.  So when it
10   happened I can't tell you.  I mean, I wish I could
11   but I can't.  And no, there are no other interactions
12   after that other than the email interaction that I
13   had.  That was about it.
14    Q    All right.  So let's -- let's talk about
15   the timing thing.  Do you think that you Mr. -- met
16   Mr. Jobs before you emailed him?
17    A    I can't -- I do not recall.  I'm sorry.  I
18   don't remember.
19    Q    You seemed fairly certain that Mr.
20   Tiscareno was not at Apple at the time.  Are you now
21   saying you're not sure about that?
22    A    I'm not sure, no.  I just don't -- I'm
23   putting out possibilities when I say that, and I
24   probably shouldn't do that.  I just don't -- don't
25   recall.
```

**Page 430**

```
 1    Q    Do you recall actually meeting him in the
 2   cafeteria?  Is that a thing that really happened?
 3    A    Yeah.  But it was -- it was just like --
 4   like I said, it was a handshake meeting.
 5    Q    I don't need you to re-testify if what
 6   you've previously said is true.
 7    A    Yes.
 8    Q    Okay.  So you know that that happened?
 9   You remember shaking Mr. Jobs' hand?
10    A    And that was it, yeah.
11    Q    Okay.  But you now are not sure whether or
12   not that happened before or after Mr. Tiscareno
13   retired?
14    A    I don't recall when, no.
15    Q    Was Mr. Tiscareno with you?
16    A    I don't think so.  I just don't remember
17   who was with me at the time.  I had so many meetings
18   at Apple.  I mean, many, many times I was on that
19   campus with meetings.  So I just don't know.
20    Q    But only one time did you encounter Steve
21   Jobs, right?
22    A    Yep, that's right.
23    Q    And you still can't remember?
24    A    Well, that's not -- I mean, encountering
25   him, he's all over.  He walks around the campus.  So
```

**Page 431**

```
 1   I mean, you could be somewhere and he'll be, you
 2   know, right over there talking with someone else.
 3   You know, it doesn't mean you go run up and interrupt
 4   the guy or anything like that.  But as far as actual,
 5   you know, handshake with him, that only happened
 6   once, yes.
 7         And I was like -- you know, I was pretty
 8   choked up by the whole thing.  It was even hard for
 9   me to speak.  It's like, you know, I'm not worthy
10   kind of thing, you know.
11    Q    Okay.  So -- so you -- did you ever shake
12   Mr. Jobs' hand other than what you just described?
13    A    No.
14    Q    Did you ever talk to him about GenAudio
15   ever?
16    A    Other than email, no.
17    Q    Okay.  Other than the email that we've
18   marked and looked at, right?
19    A    Yes.
20    Q    So other than that you never spoke to him
21   about GenAudio, correct?
22    A    No.
23    Q    Other than that, did you ever communicate
24   with him about AstoundSound?
25    A    No.
```

**Page 432**

```
 1    Q    Okay.  Other than the encounter in the
 2   cafeteria that you testified to and the email that we
 3   looked at in Exhibit 138 and 139, did you have any
 4   other communications with Mr. Jobs?
 5    A    No.
 6    Q    If you could take a look at Exhibit -- how
 7   many -- let me ask you this.  How many times did you
 8   eat lunch in the Apple cafeteria?
 9    A    God, I can't -- I mean, at least probably
10   maybe ten times, a dozen times, I would say.
11    Q    Okay.  How did you pay?
12    A    Did I pay or did Vic pay or the person I
13   was with, Ron.  Whoever I was with usually paid
14   because whoever you're with, they'll -- the Apple
15   employee, they will cover your lunch for you, you
16   know, so, yeah.
17    Q    Okay.  If you could take a look at
18   Exhibit 268 again.
19    A    Uh-huh.
20    Q    So back on that same sentence that says, I
21   have met Steve Jobs, Phil Schiller -- did you meet
22   Phil Schiller?
23    A    I think that's a mistake.  No.  Scott
24   Forstall --
25    Q    Hold on.  Let's -- let's stick with Phil
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 433

```
1    Schiller.  So you never met Phil Schiller?
2    A    No.
3    Q    Okay.  Who is Scott Forstall?
4    A    He used to be there.  There was a guy that
5    -- that put me in touch with Vic named -- I gave you
6    his name the other day, and I can't -- I can't
7    remember it now.  He was a senior vice president of
8    iPod division.  He's the guy that I initially
9    interacted with at Apple.  He's the guy that put me
10   in touch with Vic.
11   Q    Barry Corlett?
12   A    No. No. No.
13   Q    Okay.  All right.  So that's -- sorry.
14        MS. HUGHES:  Tony Videll (phonetic).
15   Q    (BY MS. VOORHEES)  Tony Videll?
16   A    Tony Videll, yes.  And Tony Videll also
17   put me in touch with this guy, Scott Forstall,
18   initially at the very beginning.  So I met with
19   Scott, and there was another guy who was a VP.  I
20   can't remember what his name was.  Victor brought him
21   into the first -- you know, when I brought speakers
22   up there and stuff like that and actually gave a
23   demo.  Ted Cohen was there.  Toby was there.  Jerry
24   Bentley, one of my sound engineers was there, and I
25   was there.  There was a VP there.  I just can't
```

Page 434

```
1    remember his name.
2    Q    And Scott Forstall was there?
3    A    Scott Forstall is one of the guys that
4    popped in, yes.
5    Q    Okay.  And then you write, And many other
6    executive team members at Apple.  Who's that in
7    reference to?
8    A    Just people who I had met whenever I had
9    gone up there.  I don't know necessarily if executive
10   team members is the right way to say that.  I think
11   that's probably not correct.  Management team members
12   is probably a better way to say it.
13   Q    Okay.  Were there any other executive team
14   members then?
15   A    No.  No, not that I can recall.  I mean,
16   I've been in rooms with a lot of people, you know,
17   giving demos, so who knows if one of them was an
18   executive.  I don't know.  I don't remember.  I think
19   they were mostly engineers though.
20   Q    All right.  Mr. Mahabub --
21        MS. VOORHEES:  Let's mark this, I guess.
22   A    Scott Forstall is no longer with the
23   company, I don't think, anymore.
24        (Exhibit Number 269 was marked.)
25        MR. HOLMES:  Is this different than --
```

Page 435

```
1        MS. VOORHEES:  Yes.
2    Q    (BY MS. VOORHEES)  All right.  Mr.
3    Mahabub, you have been handed -- this is the exhibit
4    we're on now.
5    A    Okay.
6    Q    You have been handed what's been marked as
7    Exhibit 269.  This is another transcript that the SEC
8    had made of an audio file.  I think it's actually an
9    audio and video file in this instance --
10   A    Uh-huh.
11   Q    -- that was produced to us.  I believe
12   that the name of the file was GenAudio, underscore,
13   investor, underscore, presentation, underscore,
14   111511.  And, again, I'm just going to play the very
15   beginning of the file and just ask you to tell me if
16   you recognize the voice.
17        (Audio recording of Exhibit 269 was
18        played.)
19   Q    (BY MS. VOORHEES)  Is that your voice, Mr.
20   Mahabub?
21   A    Yes.
22   Q    Okay.  And do you recall putting together
23   this presentation?
24   A    Well, not, you know -- for whatever I can
25   remember of it.  Yeah.  We put together quite a few
```

Page 436

```
1    presentations.  So if you ask me do I specifically
2    recall this, no, but I have no reason to doubt that
3    we did.
4    Q    Okay.
5        MR. HOLMES:  There was a video that went
6    with that.
7        MS. VOORHEES:  There is a video that comes
8    on my computer with this one.
9    Q    (BY MS. VOORHEES)  Okay.  Well, do you
10   recall whether or not this was a presentation that
11   was given around November of 2011?
12   A    I wouldn't remember the date.  I'm sorry.
13   Q    Okay.  Do you recall the purpose of the
14   presentation?
15   A    No.  I'd have to read through it to see
16   what it was about here.
17   Q    All right.  We'll not do that today.  All
18   right.  Mr. Mahabub, I'm going to hand you a document
19   that was recently marked as Exhibit 242, but I don't
20   have the stamped copy of it yet.
21        MS. VOORHEES:  So if we could just
22   indicate on the transcript that this is Exhibit 242
23   even though it's not stamped.
24   A    Do you have a cleaned up version of this
25   one, by any chance?
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

Page 457

1    A    Yeah.
2    Q    Okay.  Did he ask you orally, in writing?
3    A    It was on the phone, yeah.
4    Q    Okay.  And you're not sure whether or not
5  you've provided that information?
6    A    I can't remember, yeah.  I just -- I don't
7  think we did.
8    Q    Why not?
9    A    Because I was embarrassed by the financial
10  statements and I wanted to see if we couldn't clean
11  them up a little bit before sending them to Apple and
12  we look like a bunch of idiots.
13    Q    All right.  So it sounds like your best
14  recollection is you probably didn't provide that
15  information?
16    A    Right.
17    Q    Did you ever provide Apple with any
18  information about GenAudio's contracts or policies
19  and procedures, employment agreements, you know,
20  copies of any policies?
21    A    No.
22    Q    Shareholder information?
23    A    Maybe.  Maybe like number of shareholders
24  or something like that but never, you know, anything
25  specific.  It was just like very -- very generic

---

Page 458

1  information.
2    Q    Okay.  You said maybe number of
3  shareholders?
4    A    Yeah.
5    Q    Okay.  Do you actually recall providing
6  that to someone?
7    A    In a conversation I think, yes, but not
8  formally like in writing as a detailed document
9  approved by the board to send to them.
10    Q    Did -- did GenAudio and Apple ever
11  exchange any draft term sheets?
12    A    Not that I recall.  No, because we never
13  got that other set of agreements, so no.
14    Q    All right.  Mr. Mahabub, I'm going to
15  switch gears here for a second and ask you a couple
16  of questions about your personal stock sales.
17    A    Yeah.
18       (Exhibit Number 271 was marked.)
19    Q    (BY MS. VOORHEES)  Mr. Mahabub, you've
20  been handed what's been marked as Exhibit 271.  This
21  is an affidavit of Jerry Mahabub in support of
22  plaintiff's response in an action captioned Jim
23  Mattos versus GenAudio, Inc. in District Court,
24  Arapahoe County, Colorado.  The exhibit consists of
25  the affidavit, a verification and acknowledgment, a

---

Page 459

1  California jurat with affiant statement and then
2  Mahabub Exhibit D.  If you could just take a minute
3  and flip through this, let me know if you recognize
4  it.
5       MR. HOLMES:  It's 271?
6       MS. VOORHEES:  Yes, 271.
7    A    I'm not sure.  No, I don't recognize this.
8  I'm trying to figure out what this is in reference
9  to.
10    Q    (BY MS. VOORHEES)  Okay.
11    A    It's an affidavit.
12    Q    Yes.  If you go to the third page of the
13  document, so where your signature -- is that your
14  signature?
15    A    Yes.
16    Q    Okay.  Did you sign this affidavit?
17    A    I believe so, yes.  I think this is --
18  yeah.  Yes.
19    Q    Okay.  I just want to ask you about a
20  couple of statements in the affidavit just to confirm
21  them.  So Paragraph 3 on the first page of
22  Exhibit 271.
23    A    Okay.
24    Q    The first sentence reads, I served as
25  GenAudio's CEO from October 1st, 2008, to

---

Page 460

1  January 30th, 2014, and then it goes on.  Is that
2  accurate?  Were you the CEO from October 1st, 2008,
3  to January 30th 2014.
4    A    That is correct.  Actually, it was before
5  that date but for -- yes, but also before.
6    Q    Okay.  Okay.  But also before.  All right.
7  If you go to Paragraph 7, so that's on the next page.
8    A    All right.
9    Q    So Paragraph 7 says, Further, I have sold
10  num-- numerous shares of my stock over the years
11  with the initial sales of my personal shares
12  occurring in Q4 2008 and Q1 2009 when I sold my
13  shares to Mr. Bobak and Mr. Paul Powers, both
14  attorneys and at the time members of the board.  Is
15  that accurate?
16    A    That's accurate.
17    Q    Okay.  If you go down to Paragraph 8, it
18  says, I made similar sales of my personally indicated
19  stock at steep discount between the end of 2008
20  and 2013, including two transactions with
21  Mr. Skluzak, one of which was for 400,000 shares at
22  an extremely low price per share of 25 cents, in
23  parens, a hundred thousand dollars.  Is that correct?
24    A    That's correct.
25    Q    It goes on to say, And a substantial

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 461

1  portion of the proceeds from these stock sales was
2  invested in a studio facility in Los Angeles that
3  became the backbone of the GenAudio, Inc.'s
4  technology and business development efforts, and a
5  substantial portion went to fund GenAudio's business,
6  marketing, promotions and trade show events, software
7  development and operations. Is all of that true?
8      A   Yes.
9      Q   Okay. Paragraph 9 says, All totaled, I
10 sold seven million five hundred and -- five thousand
11 eight hundred shares to 129 investors between 2008
12 and 2013. Is that accurate?
13     A   I believe so, yes.
14     Q   Okay. And then later on in the paragraph
15 there's a reference to attached as Mahabub Exhibit D
16 is a chart summarizing the sale of my personal stock,
17 which includes any transfers of such stock. Do you
18 see that?
19     A   Exhibit E, you mean, right?
20     Q   No. I'm sorry, that's Exhibit D.
21     A   Oh, on the top one. Yes. Okay.
22     Q   Yeah. So then if you flip to the last
23 couple pages of the document, which are Mahabub
24 Exhibit D.
25     A   Okay.

Page 462

1      Q   Do you recognize this chart?
2      A   I recognize it, yes. I'm not sure if it's
3  accurate, but I recognize the chart, yes.
4      Q   Do you have any reason to doubt that it's
5  accurate if it's attached to your affidavit?
6      A   No.
7      Q   Okay. How did -- how was this chart put
8  together?
9      A   I'm trying to remember. I don't remember.
10 Probably Jim Devine, I would imagine, must have put
11 this together from the stock transfer ledger maybe.
12     Q   Did you review the chart before you
13 submitted this affidavit to the court?
14     A   I did.
15     Q   And at the time that you had it submitted
16 did you believe that it was accurate?
17     A   I believe so, yes.
18     Q   Mr. Mahabub, I'm going to hand you what's
19 been previously marked as Exhibit 198. It's
20 GenAudio, Inc. common stock transfer ledger.
21     MS. VOORHEES: And, Counsel, this is one
22 of the documents that was used yesterday.
23     Q   (BY MS. VOORHEES) Do you recognize
24 Exhibit 198?
25     A   This is more Jim Devine's department than

Page 463

1  mine.
2      Q   Okay.
3      A   So yeah. I mean, I recognize it, but it's
4  not my cup of tea. I had him deal with this kind of
5  stuff.
6      Q   Okay. And did you believe that Mr. Devine
7  was capable of handling -- you know, keeping track of
8  the transfer of GenAudio stock?
9      A   At the time he was doing it, yes.
10     Q   Okay. I want to ask you a few questions
11 about just the first several entries on the very
12 first page of Exhibit 198.
13     A   Okay.
14     Q   So you see that the first three entries
15 all relate to you.
16     A   Yes.
17     Q   So the first one says Mahabub, Jerry with
18 an issue date of May 21st of 2003, and it lists the
19 6.7 million shares. Do you see that?
20     A   I do.
21     Q   And then if you go all the way over to the
22 -- well, it's the -- the column that says, Shares
23 surrendered. Do you see that?
24     A   Yes.
25     Q   And it shows over 7 million shares and

Page 464

1  then it shows basically a deficit of about 392,000
2  shares. Do you see that?
3      A   I do.
4      Q   Okay. Excuse me. Is -- is that accurate?
5      A   No.
6      Q   Okay. What -- what is inaccurate about
7  that?
8      A   I was also -- there were shares that I
9  received in exchange for debt that the company owed
10 me. In 2009 I think Paul Powers and the board all
11 voted for that. Basically I was loaning sums of
12 money to the company from the sales of my stock
13 primarily, but I was putting it back in the company.
14 Then something where they -- we decided to reduce the
15 debt of the company and then give me -- so I sold the
16 shares at a much discounted rate and then exchanged
17 the debt in at a rate that was like two, three times
18 as high, I mean.
19     Q   Okay.
20     A   Does that make sense?
21     Q   Well --
22     A   It's hard to understand, I know. But it's
23 like -- so that number is actually -- if this is done
24 by date in chronological order and that was the
25 formation of the company, that would probably be

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

Page 465

1    right, but you can't subtract shares from -- it
2    sounds to me like that's like, you know, a total
3    number there.
4        Q    Okay.  Well, let's just keep walking down
5    the chart for a second.
6        A    Okay.
7        Q    So if you look at the next two entries you
8    see one -- the next one has an issue date of
9    3/31/2004 for 300,000 shares.  Do you see that?
10       A    Yes.
11       Q    And then the next one shows an issue date
12   of 1/23/2013, original issue conversion of debt.  Do
13   you see that?
14       A    That's it.  Yeah.
15       Q    Okay.  And that -- and so that's for this
16   over 128,000 shares.  And then if you go over to --
17       A    Where -- where is that?
18       Q    Sorry.  I'm on the third -- well, it's
19   really the fourth row.  It's the one -- it's the last
20   one with your name on it on the first page.
21       A    Yep.  Right there.  Okay.
22       Q    Okay.  And so then if you go over past the
23   column that says, Mahabub stock sales to what sort of
24   looks like a column but without any boxes around it
25   and it shows 35,600, do you see that number?

---

Page 466

1        A    Oh, here, yeah.
2        Q    Do you see where I'm at?
3        A    I do.
4        Q    Okay.  Do you currently hold 35,600
5    shares?
6        A    I'm -- I'd have to find out and do a full,
7    you know, reconcile against everything.  I think that
8    sounds about right.
9        Q    Sound about right?
10       A    Yeah.
11       Q    Okay.  All right.  Oh, did you receive
12   share certificates for those issuances that you were
13   just describing regarding the conversion of the debt?
14       A    Did I, but I turned them in.
15       Q    Okay.  What do you mean by you turned them
16   in?
17       A    Basically once -- any time you change your
18   number of shares you're supposed to give your stock
19   certificate and then get a new one in exchange,
20   right.
21       Q    Right.
22       A    You retire your stock certificate to the
23   company --
24       Q    Okay.
25       A    -- and then a new one is issued basically.

---

Page 467

1        Q    Okay.  So you have -- you have a stock
2    certificate now that tells you how many shares you
3    have?
4        A    No, I do not.
5        Q    Okay.
6        A    I haven't been issued one.
7        Q    You haven't been issued one?
8        A    No.
9        Q    Okay.  Why not?
10       A    Jim Devine just never did it.  Yeah.
11           MS. VOORHEES: All right.  Let's take a
12   quick break because we need to change the video.
13           THE DEPONENT: Okay.
14           THE VIDEOGRAPHER: We are going off the
15   record.  The time now is 19 minutes after 3:00.  This
16   is the end of Video Disk Number 2 in the deposition
17   of Taj Jerry Mahabub.
18           (Recess from 3:19 to 3:37 p.m.)
19           THE VIDEOGRAPHER: Back on the record.
20   Here marks the beginning of DVD Number 3 in the
21   deposition of Taj Jerry Mahabub.  The time now is
22   3:37 p.m.
23       Q    (BY MS. VOORHEES)  Mr. Mahabub, do you
24   understand you're still under oath?
25       A    Yes.

---

Page 468

1        Q    I'm going to hand you what's been
2    previously marked as Exhibit 74.  Exhibit 74 is a
3    compilation of documents.  There is a GenAudio, Inc.
4    stock certificate.  There's a stock sale and purchase
5    agreement, an irrevocable proxy, and that's it.  Do
6    you recognize these documents?
7        A    Yes.
8        Q    Okay.  These documents relate to an
9    investor named George William Marvin.  Do you know
10   Mr. Marvin?
11       A    I do not.
12       Q    Okay.  So if you go to the third -- I
13   believe it's the third page of the exhibit.  At the
14   bottom it's Bates labeled Mahabub 1661 --
15       A    Yes.
16       Q    -- the stock sale and purchase agreement,
17   and it says, This stock sale and purchase agreement
18   is made as of November 15, 2009, the effective date,
19   by and among Jerry Mahabub, Mahabub, George William
20   Marvin, the purchaser, and GenAudio, Inc., a Colorado
21   corporation, the company.  Do you see that?
22       A    I do.
23       Q    And then it explains that in this
24   agreement Mahabub, the purchaser and the company --
25   I'm sorry -- are sometimes referred to as the

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 473

1 understand, Mr. Mahabub, that the thought -- the idea
2 that you could sell your personal shares begins
3 sometime in 2009 with sales to Mr. Powers and Mr.
4 Bobak; is that accurate?
5   A   That's correct.
6   Q   And in connection with those sales you end
7 up using some of the money for the company so that
8 you can attend CES; is that correct?
9   A   I think it was all of the money --
10   Q   Okay.
11   A   -- at that time.
12   Q   All of the money.  So basically all of the
13 money was used on behalf of the company; is that
14 correct?
15   A   Yeah.
16   Q   Okay.  So without getting necessarily into
17 the specifics of any particular stock sale on a
18 moving forward basis then, what was the process for
19 you selling your personal shares?
20   A   Yeah.  Basically it was more of a -- like
21 I said, I tried to limit it to friends and family
22 only.
23   Q   Like your friends and family?
24   A   My friends and family, yes.
25   Q   So how did someone like Mr. Marvin end up

Page 474

1 investing?
2   A   He was either a friend, a family of mine
3 or a friend or family member of Jim Mattos's.  I
4 think it's on my side because it's St. Louis.  So it
5 would have been like, you know, one of my family
6 members or friends that introduced him most likely.
7   Q   Oh, I understand.  So by friends and
8 family you mean one of your friends or family would
9 introduce Mr. Marvin to you?
10   A   To me.
11   Q   Okay.  Have you met Mr. Marvin?
12   A   I have, yes.
13   Q   Okay.  When -- when have you met him?
14   A   In St. Louis at a shareholder presentation
15 once.
16   Q   And was that after he was already a
17 shareholder?
18   A   Yes.
19   Q   Okay.  Did you meet him before he
20 purchased shares from you?
21   A   I don't believe so, no.
22   Q   Okay.
23   A   I don't remember, but I don't think so.
24   Q   Do you know how he came to purchase shares
25 from you?

Page 475

1   A   I don't recall.
2   Q   Who drafted the stock sale and purchase
3 agreements that you used in connection with your
4 personal stock sales?
5   A   Paul Powers, Ben Huber and Mark Bobak.
6   Q   Okay.  And were the stock sale and
7 purchase agreements that you used for your personal
8 sales intended to be used for all of your personal
9 sales or just for the ones to Mr. Bobak and Powers?
10   A   I don't know the answer to that question.
11 I know that for the initial ones that we did it was
12 Pedro Sorrez (phonetic), Paul Powers, Mark Bobak, and
13 I think like Steve Bagwell was another guy on that
14 list.  They -- pretty much the board was encouraging
15 me more or less to do it.  So --
16       MR. HOLMES:  Jerry, pay attention to the
17 question.
18   A   Yeah.  No.  There was a board resolution
19 for it and that's -- yeah.
20   Q   (BY MS. VOORHEES)  Okay.  So -- so there's
21 definitely -- there's definitely a drafting of these
22 documents in connection with your sale to those
23 people; is that correct?
24   A   To those people and also for -- you know,
25 like I said, the board had encouraged me that if I

Page 476

1 wanted to do that because the studio that was
2 starting to get built out by the company, pretty much
3 owed all the board members agreed, you know, not to
4 continue to build it because of money, right.  So I
5 knew that the studio would be absolute critical
6 component for the company rolling forward.
7       So what I did was continued to sell my
8 personal shares to, A, continue to loan money to the
9 company to keep it operating and, B, build out the
10 studio.  And that's why I outright own the studio.
11   Q   Okay.  And so in connection with doing
12 that you continued to use the stock sale and purchase
13 agreements that had been drafted for the sale to
14 those four or five people that you named?
15   A   That's right.
16   Q   Okay.  So then how -- who actually would
17 edit the document, like, for example, the one that
18 we're looking at in Exhibit 74 so that it includes
19 Mr. Marvin's name as the purchaser, for example?  How
20 did that happen?
21   A   That was me.
22   Q   You would do that?
23   A   (Deponent nodded head.)
24   Q   Okay.  And did you do that for all of your
25 stock sales?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 477

1    A    Yes.
2    Q    Okay.  What about the irrevocable proxy
3    agreement that's also attached?  Is that the same
4    situation?
5    A    Same situation.
6    Q    Okay.  So that -- that was drafted in
7    connection with the initial -- in connection with the
8    stock sale to several people in 2009 and then you
9    continued to use it on a going forward basis?
10    A    That -- that's correct, yes, to build out
11    the studio and to continue to loan money to GenAudio,
12    and also during large gaps of the company when, you
13    know, I'd pay all the rest of the teach members
14    except myself.  So I mean, there are times when I'd
15    go three or four years without payroll, but everybody
16    else would get paid but me just to make sure that,
17    you know, if I'm loaning money to the company to pay
18    everyone, I'm certainly not going to loan money to
19    the company to pay myself again, you know.  So it
20    was --
21    MR. HOLMES:  Jerry, she asked whether, not
22    why.
23    THE DEPONENT:  Okay.  All right.
24    MR. HOLMES:  You answered it a long time
25    ago.

Page 478

1    Q    (BY MS. VOORHEES)  Mr. Mahabub, why did
2    you maintain the proxy rights?
3    A    I think that the purpose of that was
4    because they were my founder shares that, you know,
5    I'm the inventor of the technology and since I'm
6    doing that, then, you know, one of the main
7    objectives was to reduce the price per share, and the
8    reason for the reduction was because they were
9    non-voting -- one of the reasons of the reduction in
10    price per share is because they were non-voting
11    shares.
12    Q    Other than the documents we're looking at
13    in Exhibit 74, which are an example related to
14    Mr. Marvin, did investors who purchased your personal
15    shares get any other documents?
16    A    Well, of course, yes.  If they ever needed
17    -- if someone would come in, I would usually -- if
18    there was a previous offering that we had, you know,
19    done maybe, per se, I would send that to them just so
20    they'd have, you know, risk factors and things like
21    that they can review, that kind of stuff, and
22    understand, you know, speculative deal, that kind of
23    stuff.
24    Q    So you would provide investors with a copy
25    of the private placement memorada?

Page 479

1    A    A previous one, or if there was one maybe
2    that -- I think at very rarely, very rarely did I do
3    this, but there are like a few times when I sold
4    stock during the time of an official company offering
5    that was open on the table and I would have either
6    done that because, you know, build-out of the studio
7    was happening or because GenAudio needed more money.
8    It's the bottom line.  Because whatever reason the
9    offer wasn't working, so I'd go to my friends and
10    family and they'd say, well, you know, we -- we'd
11    rather invest in the discounted shares because we
12    don't care about the voting rights, you know.
13    MR. HOLMES:  Jerry, she's -- you're
14    answering something she didn't ask.
15    THE DEPONENT:  Oh, okay.  I'm sorry.
16    MR. HOLMES:  Listen to the question and
17    try to stick with it as best you can.
18    THE DEPONENT:  Yeah.  Okay.
19    Q    (BY MS. VOORHEES)  Let me just see if I
20    can summarize.  If the personal stock sales were
21    occurring after another offer -- offering had ended,
22    you would send the previous offering materials to the
23    investor, correct?
24    A    That's right, yes.
25    Q    If an offering was ongoing and you were

Page 480

1    still engaging in personal stock sales, you'd send
2    those current offerings?
3    A    The current offering, yeah.
4    Q    Did you keep any records or any documents
5    of any sort showing what copies of private placement
6    memoranda actually went to each investor?
7    A    I don't think so, no.  I mean, maybe
8    through -- through emails or something there might be
9    attachments.  I don't know.
10    Q    Okay.  But other than maybe it would end up
11    some somebody's email, you do not have like a log or
12    anything like that?
13    A    No.
14    Q    Okay.  When you sold your personal shares,
15    did you evaluate whether or not the investors were
16    accredited?
17    A    Yeah.  That was one of the stipulations,
18    was that we could only take on accredited investors
19    because at that time I think the Jobs act hadn't come
20    into place yet.  So I mean, we had to be a lot more
21    cautious about that.
22    Q    So how did you -- and, again, I want to
23    differentiate between the company's offerings and
24    your offerings because I know in connection with the
25    company's offerings there's subscription agreements

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 481

1  that are completed by the investors.
2      A    Yes.
3      Q    I'm not seeing that in connection with
4  your personal sales.
5      A    No sub-agreements, yeah.
6      Q    Okay.  So there's no subscription
7  agreement with your personal sales; is that correct?
8      A    I think most the people that invested in
9  my --
10     Q    I'm sorry, can you just say yes or no. Is
11  that correct, there was no subscription agreement
12  that went along with your personal sales?
13     A    A purchase agreement, not a subscription
14  agreement, yeah.
15     Q    Okay.  An investor questionnaire where
16  they fill out the information about their
17  accreditation sales?
18     A    No.
19     Q    That doesn't happen in your personal
20  sales?
21     A    To an extent it does, but not directly.
22     Q    Okay.  No actual physical document?
23     A    No.
24     Q    Okay.  All right.  So go ahead.  Now tell
25  me how you did evaluate accreditation.

Page 482

1      A    So most of them that came and invested
2  through my personal stock sale deal had either, A,
3  invested in a company offering and filled out an
4  investor questionnaire so we knew they were
5  accredited, or, B if they didn't and I talked to
6  them, you know, I'd just make sure that it was, you
7  know -- if something went wrong it was money they
8  could lose, this, that or the other, what's their net
9  worth, was it over a million, do him -- him and their
10  spouse or whatever make 300,000 per year or him -- I
11  think it was like 200,000 per year or 300,000 per
12  year if I remember what the accreditation standards
13  were.  So I'd just ask the questions and make sure
14  they were.
15     Q    Did you do that with Mr. Marvin?
16     A    I believe so, yes.
17     Q    Was he accredit---
18     A    I think he was investing in the company
19  first.  I can't remember.
20     Q    Okay.  Was he accredited?
21     A    I think so, yeah, or else -- I believe so.
22     Q    How -- what did you do to keep track of
23  these oral conversations that you were having with
24  investors?
25     A    Not much.  I mean, they were friends and

Page 483

1  family, so it was personal stock sale.  It didn't
2  dilute the other shareholders, so, you know, it
3  pretty much didn't affect the company.  It only
4  affected me.
5      Q    Okay.  And I'm trying to just focus on the
6  accreditation point.  Is there something -- some
7  document or something that we could go look at to see
8  whether or not the investors who purchased your
9  personal shares were accredited?
10     A    I think the document you have to look at
11  there would be in the corporation files if they
12  filled out a subscription agreement.
13     Q    Okay.  If they also invested in the
14  company?
15     A    Yes.
16     Q    But otherwise there would not be a
17  document?
18     A    There would not be a document, that's
19  right.
20     Q    What -- tell me about the transfer of
21  money.  When investors purchased their personal stock
22  what happened with the money?
23     A    They would wire transfer it to my account
24  or send a check.
25     Q    Okay.  To your personal account?

Page 484

1      A    Yes.
2      Q    Which account?
3      A    I've had so many banks.  Back then I would
4  have had -- let's see, U.S. Bank would have been back
5  then and -- and also I think Wells Fargo, I believe.
6  I can't remember who I moved to after U.S. Bank.  I
7  think Wells Fargo.
8      Q    Okay.  So if investors bought your
9  personal shares, the money went into your personal
10  account?
11     A    That's right.
12     Q    Okay.  And then you would transfer it to
13  GenAudio?
14     A    Or Astound Studios.
15     Q    Or Astound Studios?
16     A    Yeah.
17     Q    Did you keep any of the money?
18     A    A little bit, yeah, obviously because I
19  wasn't paying -- getting paid.  So there was a small
20  portion that I kept, but the only reason why was
21  because of my understanding that I wasn't obligated
22  to have to loan money to the company or -- no
23  obligation to the company and the shareholders or the
24  board to have to loan my personal money to the
25  company, but that's what I chose to do with it.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

---

Page 485

1    Q    Did you do anything to -- to keep track of
2  where the money went, you know, whether you kept it
3  or whether it went to GenAudio or Astound Studios?
4    A    I tried, yeah.  I tried my best.  I had an
5  accountant through some point in time that would code
6  things in on this went to GenAudio, this went to
7  Astound Studios.  This went here.
8    Q    Who's that accountant?
9    A    Carl Hebeler.
10   Q    Can you spell his last name.
11   A    H-e-b-e-l-e-r.
12   Q    Okay.  Do you have any of the records that
13  Mr. Hebeler created that -- that showed the flow of
14  money?
15   A    He gave them to me.  They were a storage
16  unit in Marin Del Rey which got --
17   Q    I don't know what that means.
18   A    When you don't pay your storage unit and
19  then they auction the storage unit off.
20   Q    Oh, okay.  So do you no longer have those
21  records?
22   A    I may have some like on my computer and
23  stuff like various transactions but not, you know --
24  not in any really reconcilable way right now.
25   Q    Okay.  Do you know offhand how much money

Page 486

1  you personally kept versus how much went to one of
2  the businesses?
3    A    It wasn't that much, I'll tell you that.
4  It really wasn't because the businesses really sucked
5  me dry pretty hard.  You know, when you're building
6  out the studio plus loaning money to the company,
7  yeah.
8    Q    How much did you raise from your personal
9  stock sales?
10   A    That's a good question.  I don't know.
11  Maybe all in, all in sum total --
12   Q    Right.
13   A    -- maybe like 3 or 4 million, something
14  like that, I'd say.
15   Q    Okay.
16   A    The studio was about 2.5 million to build
17  out, if I remember.
18   Q    Okay.  So -- and did you spend -- did all
19  of the money to build out the studio come from these
20  personal stock sales?
21   A    Yes.
22   Q    Mr. Mahabub, just to try to clarify this,
23  did you ever make payments to GenAudio employees or
24  contractors or other people that GenAudio owed money
25  to from your personal stock sales?

Page 487

1    A    I've given some of them personal loans,
2  yes.
3    Q    Okay.
4    A    But that wasn't to be done in lieu of
5  salary compensation.  Their salaries continued to
6  accrue.  They were just more -- if the company ever
7  hit like a tough spot, right, and, you know, someone
8  needed some extra money, whatever, to pay a bill or,
9  you know, whatever they might need it for, sure, I
10  would -- I would loan the money to them directly so
11  they could pay.
12       Because usually it was like emergency,
13  diehard straight situation where even taking the time
14  to get it to the company and having Jim Devine write
15  a check to them they would have been, you know,
16  evicted out of their house.  So it was pretty --
17   Q    Okay.
18   A    Yeah.
19       MR. HOLMES:  Jerry, yes and no question.
20       THE DEPONENT:  Okay.
21   Q    (BY MS. VOORHEES)  Setting aside those
22  loans I'm just trying to figure out the flow of
23  money.  So I understand the -- the money would come
24  into your personal bank account and then it could go
25  to the studio.  It sounds like a lot of the money

Page 488

1  went to the studio.  And then the money could go to
2  GenAudio into GenAudio's bank account.  I'm trying to
3  figure out if you also would make payments directly
4  to third parties on behalf of GenAudio.
5    A    I may have a couple of times in the
6  interest of just, you know, getting -- I remember one
7  time Paul and I went through this huge like creditor
8  zero out thing and pretty much I zeroed out all the
9  creditors.  It was over a million, $1.2 million in
10  creditors or something.  You know, Paul and I went on
11  the -- you know, calling them up and negotiating with
12  them to settle out with a lower amount and paying
13  them down.  So maybe like on one or two of them I did
14  that.  I just can't -- usually I'd try to give to
15  GenAudio to make the payment, but sometimes I would
16  just make it direct.
17   Q    Okay.
18   A    But it got chopped off as a loan, right,
19  or something.  Jim Devine tried to keep good records
20  on that, I think.
21   Q    All right.  I want to switch now to some
22  questions about the GenAudio offerings.
23   A    Yeah.
24   Q    So in connection with the offering that
25  began in March of 2010, did GenAudio evaluate whether

---

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 2
February 8, 2017

Page 489

1 or not its investors were accredited?
2    A    I think we did on -- on every offering
3 that we did, yes.
4    Q    Okay.
5    A    We had a suitability questionnaire.
6    Q    And what was your involvement in that
7 process?
8    A    I pretty much handed that skillet over to
9 Jim Mattos and Jim Devine.
10    Q    Okay.
11    A    They were sort of the ones taking care of
12 that.
13    Q    Were there any procedures in place over
14 the evaluation of investor questionnaires?
15    A    Well, yeah.  They -- they fill out the --
16 as far as I remember, my understanding was they fill
17 out the questionnaire and if they check they're
18 accredited, then, you know, there's no other further
19 due diligence we had to do on our part.  If they tell
20 us they're accredited, you know, we believe them.
21    Q    And what happened if they did not check
22 the box or indicated they were not accredited?
23    A    That I do not know.  I don't remember
24 encountering that until recently when this came up.
25 I guess there were like a few files that were missing

Page 490

1 the suitability questionnaire, they weren't actually
2 filled out or something like that.  I remember Jim
3 Mattos saying that, you know, they were missing some
4 of the documents there that got overlooked.
5    Q    So back during the 2010 offering did you
6 -- were you personally involved in reviewing these
7 documents --
8    A    No.
9    Q    -- to determine accreditation?  Okay.  How
10 did you confirm that Mr. Mattos and Mr. Devine were
11 reviewing the documents?  Did you do anything to
12 confirm that?
13    A    Well, they had the -- you know, they had
14 the documents.  So when they come in on a fax, their
15 -- their job was to -- to make sure that all the
16 documents were signed and filled out, you know, and
17 the I's were dotted and T's were crossed.  So that's
18 not that hard of a job to do, so . . .
19    Q    Do you have an understanding today as to
20 how some investors who either indicated they weren't
21 accredited or who didn't fill out the form ended up
22 becoming investors?
23    A    I do not know, no, because we -- we
24 limited the offerings to accredited investors only.
25    Q    In connection with the offering that began

Page 491

1 in April 2011, did GenAudio evaluate whether its
2 investors were accredited?
3    A    Same thing with a suitability --
4    Q    Okay.
5    A    -- questionnaire.
6    Q    And what was your involvement in that
7 process?
8    A    Same -- you know, not much.  Like I said,
9 it was primarily Jim Mattos and Jim Devine that were
10 handling that.
11    Q    Okay.  And so you were not involved in the
12 review of the investor accreditation?
13    A    No.
14    Q    Did you do anything to confirm that Mr.
15 Devine and Mr. Mattos were actually checking
16 accreditation?
17    A    I think I called them a couple of times,
18 you know, and just asked him, you know, are you
19 making sure that they're filling out the forms.  Oh,
20 yeah.  Yeah.  So if --
21    Q    Was it part of their job to -- to check
22 investor accreditation?
23    A    Yes.
24    Q    When investors invested through the
25 GenAudio offerings in 2010 and 2011, where did their

Page 492

1 money go?  What bank account?
2    A    That I think was Wells Fargo at the time.
3    Q    Who had authority over that bank account
4 or who had access to it?
5    A    At one point in time the board took my
6 access off of it because I didn't actually want, you
7 know.  So I think it would have been Jim Devine -- at
8 one point I had access to.  I was like -- I think it
9 was like me, Jim, Paul Powers, if I recall maybe.  I
10 think he was on it as well as a signer.  And then it
11 was just Jim Devine and Paul Powers for a bit.
12         And then Paul, Mark, Ted and Elliott all
13 resigned from the board in 2011.  So you need to have
14 two signers on the account, so I became a signer on
15 the account again, and I think that's kind of how
16 that went down.
17    Q    Okay.  So do you recall when you stopped
18 having access to the account for the first time?
19    A    I think it was in 2009, if I remember
20 correctly.
21    Q    Okay.  And then you regained access to the
22 account after Mr. Powers, Mr. Bobak, Mr. Elliott
23 resigned?
24    A    I can't remember if it was before they
25 resigned or after.  It was -- I don't recall.

**Securities and Exchange Commission v.**
**Taj Jerry Mahabub, et al.**

**Taj Jerry Mahabub - Vol. 2**
**February 8, 2017**

Page 541

```
 1    STATE OF COLORADO )
 2               )  ss.
 3    COUNTY OF DENVER  )
 4          I hereby certify that the witness in the
 5    foregoing deposition, TAJ JERRY MAHABUB, was by me
 6    duly sworn to testify to the truth, the whole truth,
 7    and nothing but the truth, in the within-entitled
 8    cause; that said deposition was taken at the time and
 9    place herein named; that the deposition is a true
10    record of the witness's testimony as reported by me,
11    a duly certified shorthand reporter and a
12    disinterested person, and was thereafter transcribed
13    into typewriting by computer.
14          I further certify that I am not interested
15    in the outcome of the said action, nor connected
16    with, nor related to any of the parties in said
17    action, nor to their respective counsel.
18          IN WITNESS WHEREOF, I have hereunto set my
19    hand this 13th day of February, 2017.
20    Reading and Signing was:
21    Requested
22
23
24
25          BARBARA J. CASTILLO, RMR, CRR
```