# EXCERPTED

# REDACTED

# EXHIBIT 4

EXHIBIT ___ 10 ___                         PLTF.
                                           DEFT.
WITNESS _Devine_
CONSISTING OF ___17___ PAGES
DATE _7-19-16_
BEHMKE REPORTING AND VIDEO SERVICES, INC.

Memorandum No. _____          Name: _____

## Confidential Private Placement Memorandum

# GENAUDIO, INC.

### UP TO 700,000 SHARES OF COMMON STOCK
### $3.00 PER SHARE





GOVERNMENT
EXHIBIT
34
D-03450

### AGGREGATE OFFERING AMOUNT: $2,100,000

THESE SECURITIES HAVE NOT BEEN REGISTERED WITH OR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY SUCH STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PRIVATE PLACEMENT MEMORANDUM. THIS PRIVATE PLACEMENT MEMORANDUM DOES NOT CONSTITUTE AN OFFER IN ANY JURISDICTION IN WHICH AN OFFER IS NOT AUTHORIZED.

*The Information Contained Herein is Confidential and Intended Only for the Entity or Person to Which or Whom It is Given to or Transmitted Electronically.*

### April 22, 2011

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                GA004731
DEN 971702041

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## 700,000 Shares of Common Stock

# GENAUDIO, INC.

GENAUDIO, INC. ("we", "us", "the "Company" or "Gen Audio") is offering up to seven hundred thousand (700,000) shares of its common stock at $3.00 per share (the "Shares" or "Common Stock") subject to the Company's over-allotment right to sell up to an additional one hundred fifty thousand (150,000) Shares in its sole discretion depending on demand. The minimum investment is three thousand (3,000) Shares, or $9,000; provided, however, such minimum investment may be waived by the Company on an investor-by-investor basis. *See* "SUMMARY OF THE OFFERING."

The Company shall have the right, in its sole discretion, to accept or reject any subscription and funds received, in whole or in part. Upon return of any rejected subscription (or portion thereof) to a prospective investor, without any deduction therefrom or interest thereon, the Company shall have no further obligation to such prospective investor with respect to the rejected subscription amount.

INVESTMENT IN THE SHARES IS SPECULATIVE. THUS, PROSPECTIVE INVESTORS SHOULD CAREFULLY REVIEW AND CONSIDER THE MATTERS DESCRIBED UNDER "RISK FACTORS" AND "RELATED PARTY TRANSACTIONS" AND SHOULD CONSIDER SUCH RISKS CAREFULLY BEFORE ACQUIRING THE COMPANY'S SECURITIES. INVESTORS MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME AND A TOTAL LOSS OF THEIR INVESTMENT. NONE OF THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR ANY OTHER REGULATORY BODY HAS APPROVED OR DISAPPROVED THESE SECURITIES OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

## SUMMARY OF SUBSCRIPTION PROCEDURES

The prospective investor (the "Investor") who is the direct recipient of this Confidential Private Placement Memorandum ("Memorandum") has received herewith a subscription agreement ("Subscription Agreement") for subscribing to purchase Shares as set forth on Exhibit A hereto. To subscribe for Shares, an Investor must complete, execute and deliver to Company the following items: (i) one copy of the executed pages of the Subscription Agreement, including any exhibits thereto, by means of which the Investor shall subscribe to purchase Shares; (ii) to comply with the "Patriot Act," a copy of each Investor's driver license (front and back) or passport photo page; and (iii) a check or wire transfer payable to the Company for that number of Shares for which the investor wishes to subscribe, which amount will be deposited into a segregated account established for the Offering until the Company has accepted or rejected such subscription, in whole or in part.

Subscriptions for the purchase of Shares may be accepted by the Company as received or in periodic closings. There is no minimum number of Shares for which subscriptions must be received prior to the use of any offering proceeds by the Company and the subscription proceeds may be released to the Company at any time. Any subscriptions not received and accepted by the Company by September 30, 2011 (the "Termination Date"), shall be deemed refused and the Company shall return the full amount of the subject Investor's cash payment, without interest or deduction; however, the Company may elect to extend the Termination Date for up to 3 additional 30 day periods, not to exceed a total of 90 days. The Company shall have the right to reject any subscriptions received, in whole or in part, at its sole discretion, whether or not the Offering is oversubscribed. *See "SUMMARY OF THE OFFERING."*

GENAUDIO INC.
PRIVATE PLACEMENT MEMORANDUM

CONFIDENTIAL
DO NOT COPY

*DEN 97470204*
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004732

# TABLE OF CONTENTS

LEGENDS ........................................................................................................................................ 1

JURISDICTIONAL STATEMENTS ......................................................................................... 2

FORWARD LOOKING STATEMENTS .................................................................................. 5

INVESTOR SUITABILITY STANDARDS .............................................................................. 6

SUMMARY OF THE OFFERING .............................................................................................. 7

BUSINESS OF THE COMPANY .............................................................................................. 10

    OVERVIEW ................................................................................................................................ 10
    THE TECHNOLOGY ................................................................................................................ 11
    CURRENT PRODUCT OFFERINGS ....................................................................................... 15
    INDUSTRY ANALYSIS ............................................................................................................ 27
    MARKETING ............................................................................................................................ 28
    BUSINESS STRATEGY ............................................................................................................ 30
    BUSINESS DEVELOPMENT ................................................................................................... 32
    INTELLECTUAL PROPERTY (IP) VALUATION ANALYSIS ............................................ 36

MANAGEMENT ORGANIZATIONAL CHART ................................................................. 38

MANAGEMENT OF THE COMPANY .................................................................................. 39

MANAGEMENT COMPENSATION ....................................................................................... 41

SECURITIES OWNERSHIP ...................................................................................................... 43

DESCRIPTION OF SECURITIES ............................................................................................ 44

    COMMON STOCK ................................................................................................................... 44
    PREFERRED STOCK ............................................................................................................... 44
    WARRANTS AND OPTIONS ................................................................................................. 46

PLAN OF DISTRIBUTION AND SUBSCRIPTION PROCEDURES ............................. 47

EXIT STRATEGY ......................................................................................................................... 48

RISK FACTORS ............................................................................................................................ 49

    RISKS RELATED TO THE BUSINESS OF THE COMPANY .............................................. 49
    RISKS RELATED TO THE COMPANY .................................................................................. 53
    RISKS RELATED TO THE OFFERING .................................................................................. 54
    OTHER RISK FACTORS ......................................................................................................... 57

RELATED PARTY TRANSACTIONS ..................................................................................... 58

LEGAL PROCEEDINGS ............................................................................................................ 61

ADDITIONAL INFORMATION .............................................................................................. 61

## EXHIBITS

Subscription Agreement ................................................................................. Exhibit A

Financial Statements ....................................................................................... Exhibit B

# LEGENDS

## *SUITABILITY AND OTHER MATTERS*

INVESTORS SHALL BE REQUIRED TO REPRESENT THAT THEY ARE FAMILIAR WITH AND UNDERSTAND THE TERMS, RISKS AND MERITS OF THE OFFERING DESCRIBED IN THIS MEMORANDUM, AND ALL THE ATTACHMENTS HERETO. THE SHARES ARE BEING OFFERED IN A PRIVATE OFFERING TO A LIMITED NUMBER OF INDIVIDUALS OR ENTITIES MEETING CERTAIN SUITABILITY STANDARDS (*SEE* "INVESTOR SUITABILITY STANDARDS"). THIS OFFERING INVOLVES A HIGH DEGREE OF RISK AND PROSPECTIVE INVESTORS SHOULD BE AWARE THAT THEY MAY SUSTAIN A LOSS OF THEIR ENTIRE INVESTMENT (*SEE* "RISK FACTORS").

## *EXCLUSIVE NATURE OF PRIVATE PLACEMENT MEMORANDUM*

NO PERSON OR ENTITY HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM. ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY. THE COMPANY DISCLAIMS ANY AND ALL LIABILITIES FOR REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONTAINED IN, OR OMISSIONS FROM, THIS MEMORANDUM, OR ANY OTHER WRITTEN OR ORAL COMMUNICATION TRANSMITTED OR MADE AVAILABLE TO THE RECIPIENT. THE DELIVERY OF THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER IN ANY JURISDICTION TO ANY PERSON TO WHOM SUCH OFFER WOULD BE UNLAWFUL IN SUCH JURISDICTION. THIS MEMORANDUM DOES NOT PURPORT TO BE ALL-INCLUSIVE OR TO CONTAIN ALL OF THE INFORMATION THAT A PROSPECTIVE INVESTOR MAY DESIRE IN EVALUATING AN INVESTMENT IN THE COMPANY. THIS MEMORANDUM DOES NOT CONTAIN ALL OF THE INFORMATION THAT WOULD NORMALLY APPEAR IN A PROSPECTUS FOR AN OFFERING REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. INVESTORS MUST CONDUCT AND RELY ON THEIR OWN EVALUATIONS OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION WITH RESPECT TO THE SHARES. *SEE* "RISK FACTORS" AND "RELATED PARTY TRANSACTIONS" FOR A DISCUSSION OF CERTAIN FACTORS WHICH SHOULD BE CONSIDERED IN CONNECTION WITH THE PURCHASE OF THE SHARES.

## *NASAA UNIFORM LEGEND*

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FUTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATIONS TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AND THE APPLICABLE STATE SECURITES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

# JURISDICTIONAL STATEMENTS

**FOR RESIDENTS OF ALL STATES:** IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATIONS OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

THIS MEMORANDUM HAS BEEN PREPARED FOR INFORMATIONAL PURPOSES ONLY IN ORDER TO ASSIST PROSPECTIVE INVESTORS IN EVALUATING AN INVESTMENT IN THE COMPANY.  BY ACCEPTING DELIVERY OF THIS MEMORANDUM, OR ANY OTHER MATERIAL IN CONNECTION WITH THIS OFFERING, THE OFFEREE AGREES (a) TO KEEP STRICTLY CONFIDENTIAL THE CONTENTS OF THIS MEMORANDUM AND SUCH OTHER MATERIAL, AND TO NOT DISCLOSE SUCH CONTENTS TO ANY THIRD PARTY OR OTHERWISE USE THE CONTENTS FOR ANY PURPOSE OTHER THAN EVALUATION BY SUCH OFFEREE OF AN INVESTMENT IN THE SHARES, (b) NOT TO COPY ALL OR ANY PORTION OF THIS MEMORANDUM OR ANY SUCH OTHER MATERIAL, AND (c) TO RETURN THIS MEMORANDUM AND ALL SUCH OTHER MATERIAL TO THE COMPANY IF (i) THE OFFEREE DOES NOT SUBSCRIBE TO PURCHASE ANY SHARES, (ii) THE OFFEREE'S SUBSCRIPTION IS NOT ACCEPTED, OR (iii) THIS OFFERING IS TERMINATED OR WITHDRAWN.

THE OFFER AND SALE OF THE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM REGISTRATION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER, AND SIMILAR EXEMPTIONS FROM REGISTRATION PROVIDED BY CERTAIN STATE SECURITIES LAWS.  THE SHARES ARE OFFERED ONLY TO ACCREDITED INVESTORS WHO HAVE THE QUALIFICATIONS NECESSARY TO PERMIT THE SHARES TO BE OFFERED AND SOLD IN RELIANCE UPON SUCH EXEMPTIONS, AND WHO MEET THE SUITABILITY STANDARDS SET FORTH BELOW IN "INVESTOR SUITABILITY STANDARDS."

THE COMPANY RESERVES THE RIGHT AT ITS SOLE DISCRETION AND FOR ANY REASON WHATSOEVER TO MODIFY, AMEND AND/OR WITHDRAW ALL OR A PORTION OF THE OFFERING, AND/OR ACCEPT OR REJECT IN WHOLE OR IN PART ANY PROSPECTIVE INVESTMENT IN THE SHARES, OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE NUMBER OF SHARES SUCH INVESTOR DESIRES TO PURCHASE.  THE COMPANY SHALL HAVE NO LIABILITY WHATSOEVER TO ANY OFFEREE AND/OR INVESTOR IN THE EVENT THAT ANY OF THE FOREGOING SHALL OCCUR, EXCEPT FOR THE RETURN OF THE REJECTED PORTION OF SUCH INVESTOR'S SUBSCRIPTION FUNDS, WITHOUT INTEREST THEREON OR DEDUCTION THEREFROM.

CERTAIN PROVISIONS OF VARIOUS AGREEMENTS ARE SUMMARIZED IN THIS MEMORANDUM, BUT PROSPECTIVE INVESTORS SHOULD NOT ASSUME THAT THE SUMMARIES ARE COMPLETE. SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXT OF THE ORIGINAL DOCUMENTS WHICH SHALL BE MADE AVAILABLE TO PROSPECTIVE INVESTORS BY THE COMPANY UPON REQUEST.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM, OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM OR WITH THE COMPANY, OR ANY PROFESSIONAL ASSOCIATED WITH THE OFFERING, AS LEGAL OR PROFESSIONAL TAX ADVICE. THE OFFEREE AUTHORIZED TO RECEIVE THIS MEMORANDUM SHOULD CONSULT ITS OWN LEGAL COUNSEL, TAX ACCOUNTANT OR BUSINESS ADVISOR REGARDING LEGAL, TAX AND OTHER MATTERS CONCERNING PURCHASING THE SHARES.

NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME NOR ANY SALE OF SHARES HEREUNDER SHALL IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE.   THE COMPANY SHALL MAKE AVAILABLE TO ANY PROSPECTIVE INVESTOR, PRIOR TO THE CLOSING FOR THE SALE OF SHARES TO SUCH INVESTOR, THE OPPORTUNITY TO ASK QUESTIONS OF, AND TO RECEIVE ANSWERS FROM, REPRESENTATIVES OF THE COMPANY CONCERNING THE COMPANY AND THE TERMS AND CONDITIONS OF THE OFFERING, AND TO OBTAIN ANY ADDITIONAL RELEVANT INFORMATION TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN OBTAIN IT WITHOUT

2

UNREASONABLE EFFORT OR EXPENSE.  EXCEPT FOR SUCH INFORMATION THAT IS PROVIDED BY THE COMPANY IN RESPONSE TO REQUESTS FROM PROSPECTIVE INVESTORS OR THEIR ADVISORS, NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THE OFFER OR SALE OF THE SHARES TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON.  PROSPECTIVE INVESTORS SHOULD NOT RELY UPON INFORMATION NOT CONTAINED IN THIS MEMORANDUM UNLESS IT IS PROVIDED BY THE COMPANY IN WRITING AS INDICATED ABOVE.

THIS MEMORANDUM INCLUDES DATA OBTAINED OR DERIVED FROM INDUSTRY PUBLICATIONS AND REPORTS CONCERNING THE INDUSTRIES THE COMPANY SEEKS TO OPERATE IN.  THE COMPANY BELIEVES SUCH SOURCES TO BE RELIABLE, HOWEVER, NEITHER THE ACCURACY NOR COMPLETENESS OF THE DATA IS GUARANTEED. THE COMPANY HAS NEITHER INDEPENDENTLY VERIFIED THIS DATA NOR SOUGHT THE CONSENT OF SUCH SOURCES TO REFER TO THEIR REPORTS IN THIS MEMORANDUM.

THE OFFERING PRICE OF SHARES HAS BEEN DETERMINED ARBITRARILY.  THE PRICE OF THE SHARES DOES NOT NECESSARILY BEAR ANY RELATIONSHIP TO THE ASSETS, EARNINGS OR BOOK VALUE OF THE COMPANY, OR TO POTENTIAL ASSETS, EARNINGS, OR BOOK VALUE OF THE COMPANY.  THERE IS NO ACTIVE TRADING MARKET IN THE COMPANY'S SHARES AND THERE CAN BE NO ASSURANCE THAT AN ACTIVE TRADING MARKET IN ANY OF THE COMPANY'S SECURITIES WILL EVER DEVELOP OR BE MAINTAINED.

NO REPRESENTATIONS, WARRANTIES OR ASSURANCES OF ANY KIND ARE MADE OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN, IF ANY, THAT MAY ACCRUE TO AN INVESTOR OR THE COMPANY.

THE SHARES OFFERED BY THIS MEMORANDUM ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**FOR FLORIDA RESIDENTS ONLY:** THE SHARES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE HOLDER IN A TRANSACTION EXEMPT UNDER § 517.061 OF THE FLORIDA SECURITIES ACT. THE SHARES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA.  IN ADDITION, ALL FLORIDA RESIDENTS SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE COMPANY, AN AGENT OF THE COMPANY, OR AN ESCROW AGENT OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**FOR GEORGIA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED AND SOLD IN RELIANCE ON PARAGRAPH (13) OF CODE SECTION 10-5-9 OF THE GEORGIA SECURITIES ACT OF 1973, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT. EACH GEORGIA RESIDENT WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 9(M) OF THE GEORGIA SECURITIES ACT, DIRECTLY FROM AN ISSUER OR AFFILIATE OF AN ISSUER, IS HEREBY NOTIFIED HE CANNOT SELL OR TRANSFER SUCH SECURITIES EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THIS ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THIS ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THIS ACT.  ANY PERSON WHO PURCHASES THE SECURITIES OFFERED HEREBY SHALL HAVE THE UNQUALIFIED AND UNWAIVABLE RIGHT TO RESCIND SUCH PURCHASE WITHIN 72 HOURS OF THE EXECUTION OF A WRITTEN AGREEMENT TO PURCHASE ANY SECURITIES OFFERED HEREBY.

**FOR MISSOURI RESIDENTS ONLY:**  THE UNDERSIGNED ACKNOWLEDGES THAT THE

3

SHARES HAVE NOT BEEN REGISTERED UNDER THE MISSOURI UNIFORM SECURITIES ACT, AS AMENDED (THE "MISSOURI ACT"), AND ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND SALE OF SECURITIES AS SET FORTH HEREIN. THE UNDERSIGNED HEREBY ACKNOWLEDGES THAT SUCH SHARES MAY BE DISPOSED OF ONLY THROUGH A LICENSED BROKER-DEALER. IT IS A FELONY TO SELL SECURITIES IN VIOLATION OF THE MISSOURI ACT.

**FOR TEXAS RESIDENTS ONLY**: THE UNDERSIGNED HEREBY ACKNOWLEDGES THAT THE SHARES CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE TEXAS SECURITIES ACT, OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. THE UNDERSIGNED FURTHER ACKNOWLEDGES THAT BECAUSE THE SHARES ARE NOT READILY TRANSFERRABLE, THE INVESTOR MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*DEN 97470204*
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**          **GA004737**

# FORWARD LOOKING STATEMENTS

DISCUSSIONS OF CERTAIN MATTERS IN THIS MEMORANDUM AND OTHER RELATED DOCUMENTS MAY CONSTITUTE FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A OF THE SECURITIES ACT OF 1933, AS AMENDED, AND SECTION 21E OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "EXCHANGE ACT"), AND AS SUCH, MAY INVOLVE RISKS AND UNCERTAINTIES. FORWARD-LOOKING STATEMENTS, WHICH ARE BASED ON CERTAIN ASSUMPTIONS AND DESCRIBE FUTURE PLANS, STRATEGIES, AND EXPECTATIONS, ARE GENERALLY IDENTIFIABLE BY THE USE OF WORDS OR PHRASES SUCH AS "BELIEVE", "PLAN", "EXPECT", "INTEND", "ANTICIPATE", "ESTIMATE", "PROJECT", "FORECAST", "MAY INCREASE", "MAY FLUCTUATE", "MAY IMPROVE" AND SIMILAR EXPRESSIONS OF FUTURE OR CONDITIONAL VERBS SUCH AS "SHOULD", "WOULD", AND "COULD." THESE FORWARD-LOOKING STATEMENTS RELATE TO, AMONG OTHER THINGS, EXPECTATIONS OF THE BUSINESS ENVIRONMENT IN WHICH THE COMPANY OPERATES, PROJECTIONS OF FUTURE PERFORMANCE, VALUATIONS, POTENTIAL FUTURE CREDIT EXPERIENCE, PERCEIVED OPPORTUNITIES IN THE MARKET AND STATEMENTS REGARDING THE COMPANY'S MISSION AND VISION. THE COMPANY'S ACTUAL RESULTS, PERFORMANCE AND ACHIEVEMENTS MAY DIFFER MATERIALLY FROM THE RESULTS, PERFORMANCE, AND ACHIEVEMENTS EXPRESSED OR IMPLIED IN SUCH FORWARD-LOOKING STATEMENTS DUE TO A WIDE RANGE OF FACTORS. THESE FACTORS INCLUDE, BUT ARE NOT LIMITED TO, CHANGES IN INTEREST RATES, GENERAL ECONOMIC CONDITIONS, THE LOCAL ECONOMY, THE DEMAND FOR THE COMPANY'S PRODUCTS AND SERVICES, CONSUMER PREFERENCES, ACCOUNTING PRINCIPLES OR GUIDELINES, LEGISLATION AND REGULATIONS, MONETARY AND FISCAL POLICIES OF THE U.S. GOVERNMENT, U.S. TREASURY, AND FEDERAL RESERVE, REAL ESTATE MARKETS AS WELL AS COMPETITION IN THE AUDIO TECHNOLOGY INDUSTRY, DEVELOPMENT OR ADVANCEMENT OF COMPETITIVE AUDIO TECHNOLOGIES, THE ABILITY OF THE COMPANY TO ATTRACT AND RETAIN KEY PERSONNEL, PERFORMANCE OF NEW EMPLOYEES, REGULATORY ACTIONS, CHANGES IN AND UTILIZATION OF NEW TECHNOLOGIES AND OTHER BUSINESS, ECONOMIC AND TECHNOLOGICAL RISKS. THESE FACTORS SHOULD BE CONSIDERED IN EVALUATING THE FORWARD-LOOKING STATEMENTS, AND UNDUE RELIANCE SHOULD NOT BE PLACED ON SUCH STATEMENTS. THE COMPANY DOES NOT UNDERTAKE, AND SPECIFICALLY DISCLAIMS ANY OBLIGATION, TO UPDATE ANY FORWARD-LOOKING STATEMENTS TO REFLECT OCCURRENCES OR UNANTICIPATED EVENTS OR CIRCUMSTANCES AFTER THE DATE OF SUCH STATEMENTS.

We urge you to review carefully the "RISK FACTORS' and "RELATED PARTY TRANSACTION" sections of this Memorandum for a more complete discussion of the risks of purchasing the Shares. All subsequent written and oral forward-looking statements attributable to us, or persons acting on our behalf, are expressly qualified in their entirety by the cautionary statements in such section, this section and elsewhere in this Memorandum.

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004738

# INVESTOR SUITABILITY STANDARDS

Each prospective Investor will be required to represent that he, she or it satisfies the following suitability standards and is:

(a)     a private business development Company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940;

(b)     an organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of Five Million Dollars ($5,000,000);

(c)     a director or executive officer of the Company;

(d)     a natural person whose individual net worth, or joint net worth with that person's spouse, exceeds One Million Dollars ($1,000,000)[1];

(e)     a natural person who has an individual income in excess of Two Hundred Thousand Dollars ($200,000) in each of the two (2) most recent years and has a reasonable expectation of reaching the same income level in the current year;

(f)     a natural person who has a joint income with that person's spouse in excess of Three Hundred Thousand Dollars ($300,000) in each of the two (2) most recent years and has a reasonable expectation of reaching the same income level in the current year;

(g)     a trust, with total assets in excess of Five Million Dollars ($5,000,000), not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as defined by Rule 506(b)(2)(ii) of the Securities Act of 1933, as amended; or

(h)     an entity in which all of the equity owners are accredited investors.

Each prospective Investor in this Offering must also be either an existing shareholder of the Company or a new Investor subscribing for a substantial number of Shares hereunder (as approved by the Board of Directors in its sole and absolute discretion).

An investment in the Shares is suitable only for persons of adequate financial means who have no need for liquidity with respect to this investment. There is not currently any established public market for the Shares and no expectation that any such public market will develop. The minimum initial investment shall be for 3,000 Shares, for which the price has been arbitrarily established at $9,000, or $3.00 per Share; however, the Company may accept subscriptions for less than such amount.

This Memorandum contains essential information about the Company and the Shares being offered. Prospective Investors are advised to read this Memorandum carefully and obtain any documents referred to in this Memorandum prior to making a decision to purchase any Shares. This Memorandum contains all of the representations by the Company concerning this Offering, and no person is authorized to make different or broader statements than those contained herein. Investors are cautioned not to rely upon any information not expressly set forth in this Memorandum.

---

[1] In calculating net worth, an investor must include all of such investor's assets (other than his or her primary residence) whether liquid or illiquid, such as cash, stock, securities, personal property and real estate based on the fair market value of such property MINUS all debts and liabilities (other than a mortgage or other debt secured by his or her primary residence). However, in the event that the amount of any mortgage or other indebtedness secured by an investor's primary residence exceeds the fair market value of the residence, that excess liability should ALSO be deducted from his or her net worth.

6

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.     GA004739

# SUMMARY OF THE OFFERING

*Investors should read this Memorandum carefully before making any investment decisions regarding the Company and should pay particular attention to the information contained under the heading "RISK FACTORS" and "Related Party Transactions." Additionally, Investors should consult their own legal, tax and financial advisors in order to fully comprehend the consequences of investing in the Company. The following summary does not purport to be complete and is qualified in its entirety by more detailed information appearing elsewhere in this Memorandum and the Exhibits hereto.*

| | |
|---|---|
| **The Company** | Formed in May 2003, GenAudio, Inc., a Colorado corporation (the "Company"), is revolutionizing the audio listening experience by offering a sound solution called AstoundSound® that produces uniquely processed sound which immerses the listener in a 360 degree sound field using only 2 channels (2 speakers or headphones).  The sound solution offered by GenAudio does not require multiple speakers or any specialized decoding/encoding or playback hardware or software, allowing users to experience AstoundSound™ on their existing equipment, making the technology both mobile and cost-effective. |
| **Securities Offered** | Up to Seven Hundred Thousand (700,000) shares of the Company's common stock, par value $.0001 ("Shares" or "Securities" ), at a price of $3.00 per Share. The Company also has an overallotment right to sell up to an additional One Hundred Fifty Thousand (150,000) Shares in the event this Offering is over-subscribed. |
| **Price per Share** | $3.00. |
| **Minimum Investment** | The minimum investment amount for a single Investor is Three Thousand (3,000) Shares, or $9,000; provided, however, the Company, at its sole discretion, may accept subscriptions for less than such amount. |
| **Best Efforts Offering** | This is a best efforts offering being conducted by the Company.  There is no aggregate minimum number of Shares that must be sold prior to the initial closing of the Offering, and the Company may commence using proceeds as soon as subscriptions are accepted. *See "RISK FACTORS".* |
| **Offering Period** | The term of this Offering shall commence on the date hereof and terminate on September 30, 2011, unless extended for up to 3 additional 30-day periods, not to exceed a total of 90 days in the sole discretion of the Company. |
| **Investor Suitability** | The Shares are being offered and sold solely to "accredited investors" as defined in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended (the "Securities Act"), pursuant to an exemption from registration under Rule 506 promulgated under Regulation D, who are either (a) existing shareholders of the Company, or (b) new Investors subscribing for a substantial number of Shares hereunder (as approved by the Board of Directors in its sole and absolute discretion).  Subscribers shall be required to submit a completed Subscription Agreement, together with all exhibits thereto, including a confidential subscriber questionnaire, so that the Company can determine whether investor suitability requirements are satisfied. |
| **Risk Factors** | This Offering involves substantial risks to Investors.  An investment in the Shares is speculative and should not be considered by persons who cannot afford the loss of their entire investment.  An Investor must depend on their own investigation of the Company. *See "RISK FACTORS" and "RELATED PARTY TRANSACTIONS".* |
| **Subscription Agreement** | Purchases of the Shares must be made pursuant to the Subscription Agreement |

7

**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**            GA004740

in the form appended to this Memorandum as Exhibit A, which contains, among other provisions, representations and warranties by the Company, investment representations by the subscriber, and restrictions on transferability of the Shares.

**Capital Stock Authorized And Currently Outstanding**

The Company's authorized capitalization consists of 25,000,000 shares of Common Stock, par value $.0001 per share, and 5,000,000 shares of Preferred Stock, par value $.0001 per share, of which 1,000 have been designated as "Series C Preferred Stock" and 1,400,000 have been designated as "Series D 10% Convertible Preferred Stock." *See "DESCRIPTION OF SECURITIES."* 13,382,100 shares of Common Stock are currently issued and outstanding, warrants to purchase 8,034,885 shares of Common Stock have been granted and are outstanding. There are 1,000 shares of Series C Preferred Stock and 434,000 shares of Series D 10% Convertible Preferred Stock issued and outstanding (which can be converted into shares of Common Stock on a one for one basis plus an additional 15,164 shares of Common Stock as a result of the application of such shares' weighted average anti-dilution rights to prior financing rounds and to this Offering assuming all of the Shares being offered hereunder are purchased without exercise of the Company's over allotment option and excluding the 10% annual dividend to which such preferred shares are entitled which may be paid in cash or stock at the Company's election).

**Total Capital Stock And Warrants Outstanding After Completion Of The Offering Assuming It Is Fully Subscribed**

| | | |
|---|---|---|
| Existing Common Shares | 13,382,100 | Common Shares |
| Existing Warrant Shares | 8,034,885 | Common Shares |
| Compensatory Warrant Pool | 20,000 | Common Shares |
| Existing Series C Preferred Shares | 1,000 | Preferred Shares |
| Existing Series D Preferred Shares, as adjusted | 449,164 | Preferred Shares |
| Common Shares in this Offering | 700,000 | Common Shares |
| Fully Diluted (shares and warrants) | 22,567,149 | Total Shares |

*See "SECURITIES OWNERSHIP."*

**Use of Proceeds**

The Company intends to use the net proceeds from this Offering as bridge financing to what it expects to be self-sustaining revenues by the end of the 4th quarter 2011 as a result of various recent business development activities, including the execution of the Company's first revenue generating license to embed our technology in Monster headphones and at least one promotional partnership with AEG Live for enhanced marketing of our AstoundSound® Expander product for Mac and PC, all as described in more detail herein. In particular, we plan to use the funds raised hereunder for the following purposes: (i) salaries and fees of our consultants, (ii) sales and marketing efforts to promote the Company's products online, at trade shows and the like, (iii) additional research and development for commercial exploitation of the Company's AstoundSound core technology for both operating system software integration and hardware integrated circuit chip integration; (iv) legal expenses associated with increased business development and operational activity as well as the protection of the Company's intellectual property, (v) pay approximately $93,000 of current liabilities as of March 31, 2011, and (vi) general working capital purposes, all in accordance with the Company's general business plans and goals. The foregoing uses are illustrative only and management will have broad discretion in the allocation of the net proceeds of this Offering.

**Plan of Distribution**

All of the Shares are being offered to accredited investors only under the terms set forth in this Memorandum and the Subscription Agreement. The Shares are offered by the Company subject to receipt and acceptance by the Company of subscription documentation and funds, with the right to reject any subscription,

8

DEN 97470204
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**          GA004741

in whole or in part. *See "PLAN OF DISTRIBUTION."*

| | |
|---|---|
| **Limited Transferability** | The Shares being sold will not be registered with the Securities and Exchange Commission or qualified under the securities laws of any state, but will be offered and sold pursuant to an exemption therefrom. Therefore, the Shares will be "restricted securities" and may not be resold or otherwise distributed without registration or qualification under the Securities Act and/or any other applicable securities laws or the availability of an exemption therefrom. *See "RISK FACTORS".* |
| **Management** | The Board of Directors of the Company consists of three members. Jerry Mahabub (Chairman), Jay Rifkin, and Phil Rodriguez, . *See "BOARD OF DIRECTORS AND MANAGEMENT"* for additional information regarding the Board of Directors and other key personnel as well as certain of its third party contractors. |
| **Dividends** | The Company has not paid any dividends on its Common Stock and does not anticipate paying any dividends in the foreseeable future. |
| **Voting Rights** | Each share of Common Stock is entitled to one vote in all matters brought to a vote before shareholders.   There are no cumulative voting rights and no decisions require more than a majority vote under the Company's articles of incorporation or bylaws.   Notwithstanding the foregoing, the Series C Preferred Stock held by Mr. Mahabub, the Company's founder, CEO and majority shareholder, is entitled to appoint two (2) of the Company's five (5) directors. In addition, Mr. Mahabub controls a majority of the outstanding voting power of the Company's Common Stock through either ownership or proxy. |
| **Preemptive Rights** | None. |

9

*DEN 97470204*
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**          **GA004742**

# BUSINESS OF THE COMPANY

*"THE BEST WAY TO PREDICT THE FUTURE IS TO INVENT IT"*
-Alan Kay

## OVERVIEW



Formed in May 2003 as a Colorado corporation, GenAudio intends to revolutionize the way audio is heard throughout multiple industries by offering a software-based solution that immerses the listener in the center of a 360-degree spherical soundscape. The Company has coined its unique sound solution "AstoundSound®".

The AstoundSound software technology creates four-dimensional ("4D") audio (3 physical dimensions of space over time) with a high degree of positional accuracy based on an elaborate digital audio filter set created from the combination of physiological, physical and mathematical modeling of how the human brain processes and perceives sound.[2] These digital audio filters are the direct result of many years of unique R&D and can place any sound source very accurately in both elevation and azimuth (i.e. on a sphere around the listener) and with incredible depth perception.

This software based listening experience emulates sound occurring as we hear sounds every day as humans, without the need for the multiple speakers utilized by current hardware driven technologies. It thereby provides a mobile surround sound audio solution, which may be incorporated into consumer devices such as mp3 players, smartphones, and computers, as well as a tool for professional audio engineers in the audio mixing process.



AstoundSound differs significantly from currently offered surround sound systems because it is software based and therefore does not require anything more than 2 speakers or a simple pair of headphones. While other purportedly competitive technologies at best provide 3D surround sound on a linear plane and require the use of 4 or more speakers, the AstoundSound technology provides enhanced depth and elevation auditory cues. This provides a listening experience akin to being in the center of a globe where sound can emanate from both above and below the listener's position, as well as in front and behind the listener with a minimum of two speakers and no special hardware.

Without the requirement of any specialized decoding or playback hardware (like DTS and Dolby), this allows users to experience AstoundSound on their existing equipment. GenAudio believes that its cost-effective software solution, mobility feature, and unique 3D audio processing technology gives it a much wider appeal than current hardware based surround sound systems in the market. Those systems require specialized hardware or multiple speakers to effectuate a "surround sound" listening experience (e.g. Bose 3-2-1 system, Sound Bars, Surround Sound systems, etc.).

---

[2] For the purposes of simplicity and due to industry preference for usage of the term "3D" in connection with video content, the Company no longer refers to its technology as "4D" for any of our marketing or promotion efforts. Although this term is the most accurate, from a marketing perspective it is very difficult to combine 3D picture with 4D audio.

10

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004743

Moreover, the Company believes that its technology is far superior to competing software technologies due to its (a) unique technology core based on how the human brain actually processes audio information and (b) ability to stay "in phase" with no compromise to center channel or low-end audio information and negligible tonal colorization. These are common issues that plague all other attempts to create an accurate 3D spatial audio experience.

AstoundSound creates an audio solution that may be utilized at the consumer, prosumer, and professional levels that truly changes the game.

## AstoundSound - An immersive and innovative 3D audio experience

- AstoundSound produces robust 3D sound, which can distinguish multiple sound sources simultaneously.
- The so-called "sweet spot" is all around–not in a central location. Users can experience AstoundSound, irrespective of listening position, as long as there are two speakers and they are within the speaker boundaries.
- No special equipment or decoding devices are needed to enjoy the AstoundSound experience.
- Music and Films processed with AstoundSound can be played on all consumer electronic equipment and speakers.
- AstoundSound is compatible with all existing multi-channel audio presentation formats such as Dolby Digital, DTS, and SDDS, making it easy to use for theatrical film title releases.
- Three-dimensional sound spatialization is applied during the mixing process. It is an encode only process.

We believe that AstoundSound is an extremely "disruptive" technology that represents the next major milestone in the history of audio.



### THE TECHNOLOGY



AstoundSound is versatile, as it can be integrated into just about anything and everything that has an audio component. It requires no special equipment and it can be played back on any type of media (both digital and analog) using consumers' existing hardware and equipment. The technology can be experienced while driving in your car, relaxing in your home theater, listening to music with your iPod or portable CD player, playing a video game, watching TV, attending live concert events, going to the movie theater, and in many other settings.

The technology is the result of 23 years of research and development commencing with the innovative brain research and development by our Company's founder and CEO, Jerry Mahabub. Mr. Mahabub modeled how the brain processes audio information using a 10 Tesla superconducting magnet by performing fMRI scans for over two years (from 1988 to 1991). The picture to the left was taken in 1989 while Mr. Mahabub was attending RPI in Troy, NY and working at a superconducting lab. Although the caption states Mr. Mahabub was in the class of "'92", he completed his studies at RPI in 1991.

11

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                     GA004744



This raw fMRI imaging data coupled with EEG/MEG data (electrical and magnetic) using advanced numerical analysis and computational physics based modeling enabled the creation of the core of AstoundSound, which is made up of 7,337 discrete digital audio "filters" for placing sound sources in both elevation and azimuth within, along and beyond a defined sphere. Distance perception is accomplished through a separate digital signal process that uses a sophisticated ray tracing algorithm we have developed over the years and is referred to as room simulation in the industry. This "AstoundCore" is at the heart of all of the Company's product offerings as illustrated in the diagram to the left.

After forming the Company in 2003, Mr. Mahabub filed the first utility patent application in 2004. In 2005, Mr. Mahabub hired a team of carefully selected top ranked software engineers with very diverse backgrounds ranging from audio digital signal processing ("DSP") to applied mathematics. **Their primary purpose: to wrap various software applications around the AstoundCore to enable licensing and/or distribution of multiple product offerings in multiple industries, commencing with the entertainment and consumer electronics industry.**

The Company's software development strategy is based on a modularized approach with each product offering custom tailored with respect to its corresponding technology segmentation. This methodology allows the Company to create separate product offerings on three levels: consumers, prosumers, and professional audio engineers -- all based on the AstoundCore, which represents the core technology where new features and the most advanced digital signal processing algorithms are utilized.

The three technology tiers enable the Company to access multiple revenue streams from a wide range of revenue models for both business-to-business (B2B) and business-to-consumer (B2C). GenAudio has developed different products around the AstoundCore to license and distribute via B2B to various targeted vertical markets within the entertainment industry, such as the broadcast, video game, music, film, and consumer electronics markets. The Company has also developed and is currently selling a B2C based product offering called AstoundSound® Expander or ASE.

The Company has elected to focus on the following vertical markets and has prioritized its product offerings and software development tasks accordingly:

| Primary Targets: | Consumer Electronics | Film/Music | Video Games |
|---|---|---|---|
| Secondary Targets: | Broadcast | Live Concerts | Theme Parks |
| Future Targets: | Telecommunication | Medical | Aviation |

Last year, the technology was optimized to work with handheld consumer electronic devices. Due to the extreme optimizations, the AstoundSound technology has a negligible impact on portable electronics processors, and a negligible impact on a device's battery life - the two most important factors for handheld consumer products integration.

12

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004745

We completed development of version 1 of our professional audio plug-ins for the Film/Music market segments. We have also recently completed a new version of our gaming SDK by integrating the highly optimized backend DSP core into this product offering. We are currently building relationships within the game industry. The largest game engine company has requested that we port the code to work for the Xbox 360. This company, among several others, license their game engines directly to game development houses that focus on making games for consoles such as Microsoft's Xbox 360 and Sony's PS3. Our current goal is to license our SDK to as many of these game engine companies as possible and share in their revenues.

We are also working diligently on our first live concert application we call AstoundLive®, a real-time off-board processor. Consequently, we have entered into promotional partnership negotiations with AEG Live to webcast future AEG Live concert events. AEG Live has decided that the upcoming New Orleans Jazz and Heritage Festival "JazzFest" will be the first concert to webcast in AstoundSound®. Anywhere from between 1,000,000 to over 10,000,000 viewers are expected. We will also be promoting our AstoundSound Expander product offering during set breaks via the webcast at a special discounted price of $16.95 if purchased during the event.

AstoundLive® will also serve as the baseline application for what we hope Skywalker Ranch and other large dub stages will eventually license from us. Their workflow calls for an off-board processor for mixing films as they only use ProTools rigs as a "tape machine", whereas other studios use ProTools to actually mix and process audio (mixing in ProTools is referred to as "mixing in the box"). Below is a screen shot of what the live concert application looks like in its current state:



The screen shot above shows the "point source localization" section of the concert processor. This part of the application is used to process discrete mono inputs such as audience microphones and will be mixed in with a stereo expanded version of the two-channel feed we will get from the front of the house mixer. The combined audio experience after being synced with the live-recorded video will then be webcasted worldwide.

This experiential marketing approach coupled with a promotional partnership to sell AstoundSound Expander could potentially bring this product offering back to the spotlight and possibly generate significant revenue.

*Our product offerings have reached a critical stage. For this reason, we have shifted our focus to licensing to industry leaders for integration into consumer electronics, webcasting large live concert events, and mixing and mastering film and music. We believe such business development activities have the strongest potential to generate substantial revenues for GenAudio in the near to mid-term and will drive our brand and identity across multiple market segments simultaneously. We expect this will trigger a domino effect thereby maximizing shareholder value.*

13

*DEN 97470204*
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**                **GA004746**

The Company is not the only party that believes that AstoundSound is the next logical step in the evolution of audio. World-class sound engineers and artists such as Neil Dorfsman, Steve Lillywhite, Robin Thicke, Gus Skinas, and many others; as well as some of the most skeptical (and widely respected) members of the audio press who have extensive experience in this area, share this vision.  The following lists just a few of the many testimonials, industry reviews, and interviews:

> Neil Dorfsman, a four-time Grammy award winner for both Best Producer and Best Engineer (Sting, Dire Straits, Paul McCartney, etc.), stated in his endorsement letter to Mr. Jerry Mahabub, the Company's CEO, *"You have begun an audio revolution, and started what I believe will be a new era in professional audio production—truly coherent, multi-dimensional audio reproduction for Music Recordings, Film, Television, and Video Games." He also stated, "I am sure it will become the industry's gold standard."*

> Steve Lillywhite, a Grammy award winning Producer for U2's "Beautiful Day" and "How to Dismantle an Atomic Bomb", and Producer for Matchbox Twenty, Peter Gabriel, The Rolling Stones and others, stated, *"I was amazed by the first audio demo I heard. AstoundSound significantly extends the sound field beyond the traditional stereo mix. The audio recording was so true-to-life that it actually sounds 'real'."*

> Robin Thicke, an award winning multiplatinum R&B and Pop star not only remixed several tracks on his 2008 album release of "Something Else" with the AstoundSound technology, but also stated, *"As an artist having this technology is a dream come true. My goal is to always have my audience hear my music on a deeper level, so I am thrilled about AstoundSound."*

> Gus Skinas, the President of Super Audio Center LLC, co-developer of the Super Audio CD Sonoma System and engineer for the 30th Anniversary re-master of Pink Floyd's Dark Side of the Moon stated, *"AstoundSound is the most effective, natural sounding four-dimensional audio positioning processor. Its ability to process audio at very high sample rates produces stunning results especially when coupled with the very high quality DSD program here at the Super Audio Center."*

> Applelinks "GenAudio's AstoundStereo Expander Software takes Position as Top Audio Download on Apple Site"
http://www.applelinks.com/index.php/more/genaudios_astoundstereo_expander_software_takes_position_as_top_audio_downl/

> Stage Select's "GenAudio debuts 'Deprived' at E3 2009"
http://www.stageselect.com/N4093-press-release-genaudio-debuts-deprived-at-e3-2009.aspx

> Electronic Musician "Soundfield Simulators Tech" By Scott Wilkinson
http://emusician.com/futuretech/soundfield-simulators-tech-page/

> CES 2011 Interview "Audio can be 3D too" with Scott Wilkinson
http://www.youtube.com/watch?v=NRyB0Y8oAqA&feature=player_embedded

> AES 2010 "GenAudio takes surround to another dimension with AstoundSound" by Jack Kontney
http://broadcastengineering.com/audio/genaudio-takes-surround-to-another-dimension-astoundsound-20101212/

> Examiner.com "GenAudio's new technology gives you Surround Sound on Steroids!" by Patti Fantasia
http://www.examiner.com/film-industry-in-las-vegas/genaudio-surrounds-you-with-sound-3d

> Podcast 58: Interview of GenAudio's CEO with Scott Wilkinson
http://www.ultimateavmag.com/category/home-theater-geeks-podcast

14

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                    GA004747

## CURRENT PRODUCT OFFERINGS

The Company intends to continue its audio engineering services through its partner studio facility, Astound Studios, for new album and film title releases. The following roadmap provides an overview for continued development of AstoundSound products that will allow us to reach further into market segments and generate additional revenue.



**AstoundSound 2011 Product Roadmap**

The Company plans to roll its product development forward as depicted in the diagram above. Our technology is now market ready to be integrated into consumer electronic. As described in more detail below, the first consumer electronic product with our technology integrated, Monster headphones, will be launched in the near future (3rd quarter, 2011 is the current targeted launch date)!

AstoundSound™ Pro – Professional Audio Engineering Software Tools

The Company's AstoundSound Pro software encompasses our most advanced digital signal processing capability and is intended for use solely by the world's top professional audio engineers, producers, and mixers. It enables audio engineers to process any input "mono" audio file and construct any 4D path (3 dimensions of space over time), with a variety of different path drawing and audio processing modes.

15

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004748



AstoundSound Pro enables an audio engineer to create pinpoint sound localization anywhere within a 360-degree sphere and, if desired, move such sound along any defined path over any time interval. The Company has recently completed two RTAS plug-ins for use with DigiDesign's "ProTools." These first revision plug-ins will eventually be licensed for commercial use with selected third-party audio studios.

Recently, Astound Studios, the Company's studio partner which is wholly owned by Mr. Mahabub, was selected by Mix Magazine (http://www.mixonline.com) to be on the front cover of the April 2011 NAB special edition issue. This honor is providing enormous exposure for the studio, the Company and AstoundSound.

In an effort to target the crème of the crop of professional audio engineers, over 50,000 complimentary copies were distributed throughout the recent annual NAB conference in Las Vegas. AstoundStudios was also selected to be on the front cover of another large quarterly professional audio publication from Guitar Center Pro (GC Pro) called Audio Solution.

Coincidentally, we appeared on the cover of that publication on April 1, 2011 – the same time we appeared on the front cover of Mix Magazine. Not just one, but two completely separate professional audio engineering trade magazines published two great articles about both the studio and GenAudio's technology with Astound Studios and AstoundSurround® literally front and center on the covers. The Company believes it is fair to say that we fully intend on "riding this wave" and exploiting the business opportunities that arise from this incredible marketing of GenAudio to the professional audio community.

Both magazines were handed out just recently for visitors that attended hourly presentations at our demo suite at the Hilton – Las Vegas from April 9th to April 14th 2011. The Company believes this exposure has provided significant credibility and is helping convince the broadcast industry that GenAudio and its technology are ready for immediate integration and licensing. Below is a hyperlink to the press release for NAB 2011:

http://finance.yahoo.com/news/GenAudio-Hosting-prnews-2761754023.html?x=0

You can read the full inside article either by purchasing a copy of mix magazine or reading it online by clicking on the following hyperlink: http://mixonline.com/studios/profiles/on_cover_genaudio_astound_studios/. You can read the full inside article of Audio Solutions either by stopping off at a local Guitar Center store (they are a nationwide professional audio equipment store) and picking up the Spring 2011 print issue, or clicking on the following hyperlink (pp. 6 through 8): http://www.nxtbook.com/nxtbooks/newbay/gcpro_audiosolutions_spring2011/#/6.

16

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004749

As a direct result of the new visibility for the Company and its technology within the majority of professional audio circles, the Company's board of director has decided to temporarily hold off on licensing our professional audio tools to third parties and to keep the plug-ins for use at Astound Studios; thereby compelling projects to be mixed and mastered in AstoundSound where we have complete control over how the final audio mix will be experienced on an international scale.

The Company believes this will also create significant anticipation for other studios to become anxious to want to



use our technology, and eventually will need to use it. By keeping the professional audio tools "in-house" for the next 8 to 12 months and "conditioning" the market, we believe this enable us to potentially charge a higher license fee for the use of our technology, thereby setting a more favorable precedent for licensing to other studios down the road. We do not want to be looked upon as just "another plug-in" and by driving content into the world that will make a dramatically enhanced difference to the way audio is presented, we can alleviate this problem.

This is of critical importance when bringing a disruptive technology like AstoundSound to market for theatrical film title releases among various other content. We do not want to permit other studios that do not have the same understanding and deep knowledge of how to mix and apply the technology as we do with our software to produce inferior mixes. This could potentially have a negative impact on our branding and will help prevent a negative reaction from consumers.

For the first few film title releases and various other media content, we intend to maintain complete control over all audio processing. Among other things, this will help set a precedent for future audio mixes that use our technology. Much like James Cameron set the precedent for what can be done with the new polarizing 3D visual technology in *Avatar*, we plan on doing the same for the next generation of audio.

Notwithstanding the foregoing, we expect that we may license to some third party studios that mix content that will not have our logo prominently displayed such as trailers, advertisements, etc. For studios that are focused on mixing trailers and ad spots, we are looking at licensing the use of the plug-ins and will seek to be paid on a per title basis.

The associated revenue model for each market application differs in terms of the fees to be paid on a per title basis. For example, for film trailers and eisodic TV shows, we initially expect to charge relatively low fees per trailer and show, which will most likely increase as demand increases. For theatrical, we anticipate charging a higher fee per film title on the theatrical mix though it will be in line with what we understand Dolby, DTS and SDDS currently charge. However, because our process will hold when folded down to two-channels (stereo) for home theater

17

DVD/Blu-Ray or digital distribution of the film title, we also expect to negotiate slightly higher license fees within a pre-determined range on a per unit royalty basis for physical distribution as well as for digital distribution via downloading of film titles.

These "plug-ins" enable professional engineers two implementations for mixing: stereo expansion and pinpoint sound localization (including elevation +/- 90 degrees through the virtual panning of AstoundSound). Engineers can simply "map" any of the sliders or user interface controls within the plug-in to a mixing console surface and this is fully user definable, making it adaptable to a variety of audio mix engineers' personal preferences.



*AstoundSound Professional RTAS Plug-in: Mono Input, Stereo or multi-channel output*

The screen shot above shows the localization settings tab. For surround sound mix sessions, there is an additional tab that allows engineers to pan a localized sound source within the surround sound field, in real-time, during mixing. The other tabs have DSP parameter settings that enable a professional audio engineer to "dial-in" the processed audio. These additional parameter settings complement the spatial audio processing (localization) and are all included in our US and Foreign patent filings. It has taken years to get to this point, and we are continually improving the software with frequent upgrades and updates that are then thoroughly tested at Astound Studios.

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004751



*AstoundSound Professional RTAS Plug-in: Stereo Input, Stereo or multi-channel output*

The screen shot above is for widening stereo elements within a surround sound or stereo mix session. This, coupled with the mono in plug-in, is a powerful combination. Together, they enable the mix engineer to create soundscapes and audio scenes that envelope the listener such that it is almost impossible to tell the difference between what is real and what is virtual; and will work across a variety of mediums-movie theater, a home theater, or on a portable media player device with headphones. Our technology fills the entire room with sound sources that are perceived by the listener in virtual reality space, regardless of listening position.   In a nutshell, what Real D (http://www.reald.com/) does for picture by pushing visual elements into the audience, we do for audio by pushing sound into the audience.  When we integrate 3D picture with our unique 3D audio technology – it doen't get any better than this!

Since the plug-ins have been thoroughly tested, fully functional, robust and stable, audio engineers can move in all three spatial dimensions simultaneously over time, have seamless workflow integration, and reduce the post-production time and costs to construct complex 4D audio paths via automation within the host application. Recently, we have added several clients that have used our AstoundSound Pro technology.  Please click on the following hyperlink to see a list of Astound Studios clients, many of whom have licensed the right to use the AstoundSound® technology for their projects:

http://www.astoundstudios.net/clients/

The Company launched its first beta version of its AstoundSound Professional audio product in 2007 as a stand-alone software application during AES 2007. Since then, that version has been ported over to our current professional audio products. Recently, we have demonstrated various implementations of our technology, including our latest and greatest software product offerings at AES 2010 (Audio Engineering Society), CES 2011 (Consumer Electronics Show), GDC 2011 (Game Developer Conference) and NAB 2011 (National Association of Broadcasters). Both potential B2B licensees and media/press visited us at our demo suites for every event.

GenAudio Team at our beta event Oct. 2007

19

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004752

<u>Theatrical Implementation of AstoundSound – AstoundSurround®</u>



Screen shot of the 2D representation of our 3D Theatrical Film Trailer

The Company is uniquely positioned to provide the needed sound solution for the recent 3D impact in the film industry. AstoundSound brings forth the 3D audio component that is needed to complement the 3D visuals by seamlessly integrating into the 5.1/Surround Sound mixes during audio post-production.

We have created several theatrical demonstrations using our own 3D content mixed in AstoundSurround which enables us to demonstrate the superiority of AstoundSurround over standard 5.1 Surround Sound mix on the fly in any 3D screening room at any of the major film studios. In addition, we also can easily demonstrate the difference between the two channel (stereo) normal LTRT fold-down, versus the AstoundSound processed LTRT fold-down.

We have been demonstrating the technology to major film studios, and we expect to start mixing and processing our first theatrical 3D film title in AstoundSurround at AstoundStudios. This movie is currently scheduled to be released before the end of 2011. This 3D film, among others, were brought to us by Jay Rifkin who recently joined GenAudio's board of directors. Mr. Rifkin has requested that we not disclose the name of this film until a later date so that we do not adversely affect the film's own marketing and promotional plans for its launch.

We believe that once the world goes to the theater and hears AstoundSurround on a few major theatrical film title releases, our technology could become widely accepted as the next "standard". If this occurs, this will push AstoundSurround to be utilized by audio engineers and incorporated as part of the print masters at the dub stage for film title releases - this is being heavily supported by several top professional audio film mixers, such as world-renowned film music mixer (who recently joined GenAudio's board of directors) Jay Rifkin, Paul Massey, Michael Hedges, Michael Semanick and many others. We have also presented at Skywalker Ranch, and are currently working on a special product offering to seamlessly integrate with their specific workflow in the future.

As stated above, we have decided to not let anyone else use our technology or professional audio tools for now. We don't want consumers to see our brand all over the big screens and barely hear the difference because a mix was out of our control being mixed at another facility. The potential of the technology being lightly used for our first debut appearance on the big screens could cause our brand to be significantly damaged. To resolve this, we expect the first 3 to 5 major theatrical releases will be mixed in AstoundSurround at Astound Studios.

DEN 97470204
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**          **GA004753**

Thanks to the partnership with Astound Studios and our growing relationship with Jay Rifkin, we can now ensure that major 3D film title releases will be properly mixed at Astound Studios and the world will know what this technology is fully capable of doing.

Much like when Dolby introduced "surround sound" or "5.1" in 1991 in direct response to advances in video graphics within the film industry, the new 3D films being produced today require a similar audio sound solution that can provide pinpoint sound placement beyond the linear plane. This is achieved by pushing audio information into the audience, much like when we wear 3D glasses at the theater and feel like we can reach out and touch the images. AstoundSound provides the same experience for audio.

If and when the film industry adopts our technology as the next standard, we will follow industry custom and practice by requiring that producers either bring their film mixing needs to Astound Studios, or that they permit one of our own professional audio staff members on site at their studio for quality control purposes and to train their mix engineers. There will be no exceptions.

It is important to note that AstoundSound is very different from THX, Dolby, DTS, and other formats. THX is a standardization certification format that was created to ensure a room is set up correctly in terms of acoustics and speaker placement. Dolby, DTS, and SDDS are all considered "delivery" formats because these represent the audio formats that are delivered to theaters with a new film title release.

In essence, these delivery formats do nothing but encode audio after mixing during creation of the "print master" at the dub stage for theatrical release. This encoded audio is then decoded on the other side, either for theatrical release in a cinema or for a home theater DVD. Neither THX nor any of the delivery formats have anything to do with **how** the audio was mixed – this has been a big misconception among consumers for a long time. THX, Dolby, DTS, and SDDS are not mixing technologies. They do not make the original audio sound better nor do they provide for a new listening experience like AstoundSound. AstoundSound, on the other hand, is applied **during the mixing process**.

AstoundSound provides a new audio experience with intensive elevation (height information) and depth perception filling the entire room with sound above, below, and beyond the physical placement of the speakers. Since we enhance the sound during the mixing process, rather than at the end user stage through a multiple speaker configuration, we are not a direct competitor of Dolby, DTS, or SDDS. Instead, we significantly enhance the audio experience and our technology is fully compatible with all surround sound encode/decode delivery formats (Dolby, DTS, SDDS). All three surround sound delivery formats are still being used today, and will continue to be used in the future.

The Company has recently mixed (as Astound Studios) its first full length feature film title release entitled "Discover the Gift" by award winning Director Demian Lichtenstein, who is best known for directing "3000 miles to Graceland" with Kevin Kostner and other famous actors. The film is gaining tremendous recognition, starting with its debut at the Sundance 2011 film festival, and just recently, a red carpet premier event in Los Angeles at the Agape Center. Click on the following link to watch a clip of the premier (Note the AstoundSurround® brand on the backdrop where celebrity photos were being taken):

http://www.youtube.com/watch?v=8i_xK193991

21



We mixed this film in AstoundSurround "on the house" so we could let the industry know that our technology is finally here and make an impact on theatrical space. In return, our AstoundSurround trailer runs at the beginning of the film, we received credit "bugs" at the end and our sound engineering staff was given credit. After listening to our AstoundSurround® mix, Director - Demian Lictenstein, decided to offer to share in revenues from both theatrical and DVD sales. We are currently in negotiations.

Perhaps the most incredible aspect of "AstoundSurround" integration into theatrical film title releases is that the technology survives the "fold-down" process to a two channel (stereo) encoded audio mix-commonly referred to in the professional audio realm as the "LTRT", which is an acronym for "Left Total, Right Total".

The LTRT fold-down is a Dolby encoding process for playback in theaters or home theaters that do not have Dolby Digital home receivers, or only have two speakers (e.g. TV speakers). Such two-channel/speaker audio encompasses the vast majority of listening experiences and this is where the AstoundSound software driven sound solution accomplishes something unique – a surround sound listening experience with just two speakers or headphones.

In summary, when incorporated into the LTRT or stereo mix, AstoundSound creates a listening experience akin to a hardware based 6 channel surround sound audio experience with just two speakers or headphones which we refer to as "AstoundStereo". It enables the consumer to enjoy an audio experience that is virtually indistinguishable from the hardware driven 6-speaker surround sound listening experience without the need for such hardware or a decoding device.

Our revenue model for theatrical releases is to recoup our expenses from the movie studio for having a certified AstoundSound Audio Engineer present during mixing; as well as to assist and train the mix engineers working on a specific film title project (similar to Dolby). Clients will then be charged distribution royalties based on the physical distribution (DVD and Blu-Ray) and digital distribution (Internet Download, Hotel Movie Rental, etc.) of the film after its theatrical run.

We believe this is a fair and justifiable approach, since it is these distribution channels where our technology provides a major impact and market differentiation - it essentially enables "surround sound on the go" due to the need for only two speakers or headphones with no special hardware or decoding required. As a result, the Astound technology is a "value add" which will enable the film studios to increase their margins and in turn profit share with the Company.

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004755

AstoundSound™ - Prosumer Application for Independent Studios and Garage Bands

The AstoundSound™ Prosumer application is targeted at independent studios, amateur audio engineers and people who want to create expansive stereo mixes for their final product offerings. The Prosumer version of AstoundSound was created by:

- Removing many of the pro audio mixing and engineering features.
- Using a lower resolution set of digital audio filters that are analogous to the high-resolution filters found in the professional audio product offerings.
- Constructing a user interface specifically for audio expansion that requires a stereo input (rather than a mono input like AstoundSound Pro).

The Company anticipates worldwide release of the Prosumer version of the plug-in via various distribution channels such as Guitar Center and Sweetwater in the future. The Company has elected to delay this release in order to enable its "early adopter" strategic partners and licensees the right to use the software to differentiate their product offerings and to create branding and product awareness of the AstoundSound technology at the highest professional levels before offering it at the prosumer level.

The following is a snapshot of the Company's audio unit plug-in for Apple's Logic Pro and Logic Express audio production software. The Prosumer plug-in also works with other audio software programs that use audio unit plug-ins, such as Garage Band and Final Cut Studio.



AstoundSound Expander - Consumer Application and Consumer Electronic Integration

GenAudio unveiled its AstoundSound Technology in January 2009 at the Consumer Electronics Show ("CES"), MacWorld, and Sundance Film Festival. The consumer version of the Company's technology, AstoundSound Expander and previously named AstoundStereo Expander ("ASE"), delivers an application that any consumer can use with extreme ease by the simple push of a button. All one has to do is turn the processing on and the computer's two channel stereo audio becomes surround sound "on-the-go".

This is our initial consumer product offering and is available at www.astoundsound.net. ASE enables consumers to create their own expanded and enhanced listening experience on their desktop and laptop computers with any stereo audio file. Consumers can download a free trial of the ASE product and then purchase the software through our digital distribution partner Currently, the software is available only by download and it is unlikely the Company will sell this software via physical distribution channels.

23

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004756

The ASE is currently being offered with a MSRP of $39.95 USD and consumers can "try before they buy" with a 30-day free trial period. We are in the process of moving from our current distribution partner, Digital River, to a more aggressive partner, Avangate, who we hope will help drive sales of ASE through better "affiliates".



**Screen shot of our ASE for PC consumer product (Mac version available also)**

In March, 2009, Apple placed ASE on the front page of their "downloads" section as well as under the more specific "audio downloads" section as the "featured download" for being the "top" audio download amongst all audio software downloads world-wide. We maintained the position as "Top Audio Download" and "Featured Product" from March 2009 to the end of May 2009 -- ranked #1 of all audio downloads on Apple's world wide web based portals, and such visibility came at no cost to the Company.

ASE lost its intensive momentum for a while due to incompatibility with the release of Snow Leopard and Windows 7 concurrently for Mac and PC respectively. We resolved these issues, and over the past year, this product has been slow to regain attention for direct B2C sales. We expect that is soon to change given our recent negotiations with AEG Live where there is the potential for millions of downloads of ASE and much higher conversion ratios to buy our software given the target market the product will be offered to – live concert music event fans. Also, with the transition to Avangate, we expect to have a bigger push marketing effort through what we hope will be a better affiliate network that the one associated with Digital River.

<u>Video Game Product Offerings</u>

The gaming industry has always been one of our primary target markets. Due to financial constraints on the Company, however, we have largely had to put this industry and the products we were developing for it on the back burner. Although this disappointed us, tough choices had to be made. We simply could not afford to continue to develop our product offerings for this space given our other priorities and limited resources.

Times have changed. Given the size of the market and its need for better audio solutions, we are eager to get back into this industry. From a revenue potential standpoint, DCF Intelligence and Nielsen data indicates that:

- There are over 260 million PC based video gamers worldwide, and estimated to grow to 350 million by 2012. The number does not include the very large number of console game based users.
- The PC gaming market is the largest single game segment on a revenue basis and it is expected to grow 80% over the next 5 years.
- When segmenting by video game genre, we can see the amount of time, dedication and loyalty to not only the game, but also the gaming accessories, gaming community and gaming experience.
- Gamers are also watching movies and streaming music, treating the PC as their home theater system

24

We have recently re-evaluated our strategy in this industry and reestablished our presence in it by having a demo suite during the Game Developers Conference ("GDC") in San Francisco last month.

### Deprived

Our original foray into this market involved the building of a game demo, which we hoped to follow up with the creation of a full-blown game audio engine that would compete directly against companies such as FMOD and WWISE, two of the largest and most licensed game audio engines. To that end, the Company developed a "first level" video game demonstration game entitled "*Deprived*" which premiered at the E3 (Entertainment Electronics Expo) in Los Angeles in June 2009. The "*Deprived*" game environment demo was designed to demonstrate the real-time pinpoint sound placement of the AstoundSound RTI (real-time interface) technology in a video game environment.



**Screen shot from GenAudio's "Deprived" RTI demonstration game environment**

While the game demo was a success from that perspective, we were unable to follow up with any real product offering due to a lack of funds and limitations in older versions of our technology and, to some extent, a poor understanding of the industry.

Having re-assessed the industry and our involvement in it, we have now decided to focus on three distinct participants in the market - Game Engine Companies, Game Console Manufacturers, and Game Development Houses - and to offer each of them unique and relevant products tailored to their role in it.

### *Game Engine Companies ("GECs")*

Every game on the market today uses what is commonly referred to as a game engine which Game Development Houses (see below) license from companies engaged in the business of making such engines, i.e., GECs. Examples of GECs are "Unreal", "Crytek", and "Unity". Some of these GECs include their own audio engines and related development tools for building the audio environment as part of their game engine, while others do not. For those that do not, there are two primary audio engine companies that license their audio engines, which include a full set of development tools, to them - FMOD and WWISE. And, even when a Game Development House license a game

25

engine that includes an audio engine, they will often disable the audio engine and license one from FMOD or WWISE due to their superior performance.

Our initial strategy for entering the gaming market a few years ago was to build our own audio engine, called the AstoundSoundRTI (Real-Time Interface), which provided access to our AstoundSound technology and a related library within the gaming environment, though did not include a full set of audio development tools such as FMOD and WWISE provide. Although we successfully developed the AstoundSoundRTI, it used too much processor power for practical usage. Because "optimizing" it at that time was going to be too time consuming and expensive, we temporarily abandoned the gaming market. Since then, however, we have had several breakthroughs in our technology and over time have managed to optimize the AstoundSound RTI. We are nearing completion of our development work on an audio engine videogame SDK for integration into 3rd party game engines that are licensed by Game Development Houses.

We are currently in integration level discussions with Epic Games, whose Unreal Game Engine is one of the most popular. The creative director of Epic Games came to our demo suite during GDC last month and, following the meeting, tweeted about our game demo and the audio technology saying "it was so real it was creepy". Since then, our new business development manager for interactive media, Michel Henein, has been moving forward with Epic and others that have expressed a serious interest in the technology. The Company anticipates a per-title use upfront license fee plus a back end distribution royalty for each game title in accordance with industry standards for game audio engine licensing.

New technologies in the game industry can have a significant impact as they "freshen" things up. All it takes is one game title release using a new technology to go "AAA" and the new technology typically spreads rapidly, quickly becoming adopted by the gaming community. The game title "Halo" is one good example of this. It has sold over 34 million copies worldwide. With such a viral industry, the Company believes its technology can be one of the next big viral buzzes for gaming. Consequently, we are targeting this industry as a primary business development effort given our recent software development advancements and otherwise being well positioned to make this happen.

### Game Console Manufacturers



The second implementation for gaming targets the console manufacturers. In the game industry they are referred to as 1st party distributors. 3rd party distributors only make games, not consoles and games. Examples of first party distributors are Microsoft Xbox 360, Sony PS3 and Nintendo Wii.

We have been middleware development partners with Microsoft Xbox 360 division since shortly after the company was formed. Recently, we met with the managers of game development for Xbox 360 at our demo suite during the GDC conference. We wanted to gauge their interest in an embedded level integration solution-such that any game that does not use the full-blown real-time engine SDK can have a much more immersive game experience. The response was tremendous.

This implementation has been thoroughly tested for integration, and we are gearing up to change our status with Microsoft to move beyond our current status as middleware solution partners and become full game development partners. As a direct result, we should be able to acquire the actual Xbox 360 hardware development kit that all game companies use to make Xbox 360 games in the near future. This will not only enable us to demo the embedded level solution for Microsoft, we will also be able to port our code for the AstoundSoundRTI to be fully compatible with Xbox 360, and test processor performance among other things.

### Game Development Houses

The final implementation is a product offering for the companies that actually make the games-game development houses. Essentially, we will offer them the ability to process cut-scenes/interstitials for games at Astound Studios in AstoundSound. This would most likely be the least of the revenue generators. However, it is an integral component for any new game that uses the RTI or embedded level integration processing.

26

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004759

*From the Company's inception, the gaming industry has been one of our primary targets, and the most complicated and time consuming to develop software for since it requires a real-time interface (RTI) where sound sources are spatially processed with all game audio running through our AstoundSound process in response to game player movements (commonly referred to as a machine-machine interface – MMI). The Company believes that with our current game product offerings and the very recent reaction of industry executives at our latest demo during GDC, we could be entering into revenue generating license deals in the near future.*

## INDUSTRY ANALYSIS

*There is an immediate need for definitive sound quality enhancement within the entertainment industry.*

From the latest in first-person shooter video games to Hollywood's current 3D blockbusters, audio plays a critically important role in the entertainment industry. The continuously improving visual component of 3D motion pictures and video games is simply not being sufficiently complemented by a superior audio experience. George Lucas summed it up when he stated, "Sound is 50% of the motion picture experience". We agree.

The Company believes that there is a marked need across the entire entertainment industry spectrum for providing a superlative and immersive 3D sound solution, particularly in light of the new wave of 3D movies. Companies like Dolby, DTS, and Sony have product offerings that are commonly referred to as "surround sound" technologies but they are all hardware driven systems that have the following limitations:

- ➢ Increase cost to the consumer.

- ➢ Most consumers do not know how to properly set up a surround sound system - configuration is key to getting it right which include parameters such as room size, speaker distance, etc.

- ➢ Lack of physical space to maximize sound.

- ➢ Existing surround sound formats do not provide mobility - mobile technology now dictates gadget development.

AstoundSound expects to provide the entertainment industry with the next dimension in the evolution of audio. The accurate 360° degree sound field it creates, extends beyond the linear plane of existing surround sound technologies, and works with any two speakers or headphones. Our experiences and research have led to three conclusions:

- ➢ The listening public is demanding it.

- ➢ Large companies are actively seeking to differentiate their product offerings with new and innovative technologies.

- ➢ Producers and engineers are constantly competing to create the best listening experience possible for their mixes.

The following article from Home Theater Review sums up why we are confident we our technology has the upper hand over everything else being offered:

http://hometheaterreview.com/new-home-theater-trend---21-speaker-surround-sound/

The Company believes that "the new home theater trend" discussed in the article is becoming reality and that there is a growing backlash from consumers who are frustrated by the constant technology and format changes, the expensive upgrading of equipment to meet them and the rapid rate at which their old equipment is becoming obsolete. We always suspected this as well and believe that our technology solution addresses consumer's frustrations in this regard. However, we did not want to step on the toes of the audio industry giants. Accordingly, we have treaded lightly and found a way to solve this problem without isolating the giants by (a) enhancing stereo or

27

DEN 97470204
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**          GA004760

2.1 (stereo system with a subwoofer) sound and (b) seamlessly integrating and enhancing multi-channel or 5.1 (5 speakers with a subwoofer) sound.  We believe this is a large part of the reason that we have been successful so far with our efforts in the film industry where other 3D audio technologies have failed.

Current 3D product offerings from competitors can be classified into 3 separate categories as shown the following diagram:



Of the three categories in the diagram (from left to right), the first category is the trend of the industry (surround sound), the second is the easiest to use for the consumer but offers no significant "WOW" factor, and, while the third has the highest "WOW" factor, this category's products are very expensive and do not allow for seamless production workflow integration due to the highly specialized software and scientific training that is required for their use – such technology is simply not a viable commercial or consumer product offering for widespread use within the entertainment industry.

AstoundSound encompasses the best characteristics of all three categories and none of the bad.  AstoundSound can be integrated into all formats in the first category, it has the ease of use associated with the second category, and it surpasses the "WOW" quality factor of the third category by eliminating phase, noise floor, tonal colorization and audio imaging issues.

*AstoundSound is not just a new audio digital signal processing based delivery format, it is a complete paradigm shift for audio in everything – a game changer that is completely aligned with industry trends*

## MARKETING

The marketing component of the Company's business strategy has been constantly evolving.  With multiple software applications for multiple industries, our technology has enabled the Company to pursue new business opportunities for integration into any consumer electronic device that has a stereo audio output capability.  This encapsulates just about everything on the market, including computers, TVs, DVD and Blu-Ray players, gaming consoles and portable gaming equipment, MP3 players, smart phones, headphones and numerous other consumer electronic devices.

This, in turn, allows the Company to significantly reduce direct marketing costs.  With the ability to license the technology to industry leaders within various vertical markets, the Company expects to be able to license its AstoundSound technology to these larger corporations for their product offerings, thereby minimizing Company funded direct marketing expenditures.

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                    GA004761

Although we will continue to incur direct marketing expenses for certain promotions, trade show events, and press releases, these marketing costs are minimal compared to that of a full-blown product launch. We expect that the larger consumer electronics companies will market their improved products incorporating our AstoundSound technology by touting our technology as a differentiator. This should permit us to achieve a significant competitive advantage while simultaneously providing us with significant brand exposure and corporate recognition.

We commenced this marketing strategy with Universal Pictures and MiCasa Multimedia for use of the AstoundSound technology into the DVD & Blu-Ray movie titles "*The Orphanage*", "*Hellboy II: The Golden Army*," and "*Bangkok Dangerous*". We coordinated the release of our ASE product with the release of the "*Hellboy II*" DVD by entering into a marketing and promotion agreement with Universal Studios to place ASE insert cards in the standard definition (widescreen) DVD cases of "*Hellboy II*", which promotion included a home theater giveaway and other award items sponsored and provided by Philips and Universal Pictures.

We recently mixed a full-length feature film, "Discover the Gift" with our AstoundSurround® trailer that is part of the actual reel, meaning that no matter where it is seen, our technology logo and trailer will be seen and heard. Moreover, our logo will appear on the packaging of both the Blu-Ray and DVD. We also recently signed a license deal with Monster and will be co-branding certain of their headphone products that incorporate our technology.

As noted above, we also appeared on the front cover of two top professional audio industry publications. The inquiries from this exposure alone have caused Astound Studios to invest in a new phone system in anticipation of many studios wanting to learn more about our technology. However, our technology is also gaining significant traction through recent projects we have been working on as well, including Walt Disney's *Tron Legacy* Soundtrack (where we co-branded the re-mix in AstoundSound with Monster), and our first full-length feature film entitled *Discover the Gift*.

Moving forward, the Company's current marketing strategy is focused on the following three initiatives:

> **Internet and Live Events**

Marketing of ASE for Mac and PC through both direct marketing efforts, social media campaigns, and through shared revenue arrangements with promotional partnership deals such as future AEG Live concert events and our digital distribution web based portal partnership "affiliates" that are part of our distribution partners network. All of these marketing efforts are primarily based on revenue sharing arrangements on the "back end", which helps to minimize our upfront marketing costs.

> **Professional Audio**

Marketing of the professional audio mixing plug-ins to movie studios, game development houses, record labels and artists/producers, and other parties engaged in audio post-production work for use in the mixing of compact disks, DVDs, film trailers, television commercials, television programming, and motion pictures.

As noted above, the Company's AstoundSound Technology has already been incorporated into CDs such as Robin Thicke's *Something Else*, DVDs such as *HellBoy II: The Golden Army*, trailers such as RealD's proprietary trailer utilized by RealD before most 3D theatrical 3D movies, and independent theatrical releases such as *Discover the Gift*.

These early successes with these early adopters of the Company's technology utilized the Company's plug-ins and all content is now being mixed and mastered at Astound Studios - our studio partner for promoting the technology and providing professional audio engineering services across the board. The plug-ins are now much further advanced such that licensing the plug-ins to third parties in exchange for a per project royalty is achievable for content other than album releases and theatrical film title releases which we will keep in-house for now.

29

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                    GA004762

> **Consumer Electronics Companies**

Marketing of our optimized ASE product to be embedded into consumer electronics devices has commenced with the signing of an exclusive license deal for embedding our technology into certain Monster headphone product offerings.

Now that our ASE software can be embedded into just about any consumer electronics device via a special software programming "library," we are well positioned to exploit this market segment to its fullest potential.

To assist us in that endeavor, we retained a valuation expert to help us determine the fair market value for all current implementations of the technology, including the price per unit for specific types of consumer electronics devices that we have targeted for embedding our AstoundSound technology.

Now that this report is complete, we have entered into the next stage of our consumer electronics marketing and licensing initiative, i.e. actively seeking consumer electronics companies interested in licensing the technology for inclusion in their product offerings.

We believe companies like Motorola, AMD, Toshiba, Philips, Samsung, Panasonic, Sony, among many others, are all strong potential candidates for licensing our technology for their product offerings. Portable media players, computers, home theater receivers, car stereos and navigational systems, TVs and Blu-Ray players are just some of the devices that can benefit from having our AstoundSound Technology integrated into them.

## BUSINESS STRATEGY

Software based technology development requires a great deal of time and patience. There are constant revisions, updates, new features, optimizations, and tedious debugging among many other factors that are necessary for building actual market ready products. Some companies take shortcuts and release software into the markets that frustrate the end-user by including poor or complicated user interfaces or, worse yet, bugs that cause the software not to work as advertised. We believe it is critical to minimize any negative user experience and to ensure that our product offerings work well and as advertised. This is especially important when creating disruptive software that tackles many "user-types" throughout multiple market segments. In our view, there are three primary components for any successful business development efforts:

> **Building strong relationships** – It is very difficult to complete a deal with a business partner if you do not build strong relationships with people that can make the decision to incorporate a new technology. Depending on the industry, partner and person, developing this type of a relationship can take a long time. Over time, as a new technology starts to generate consumer demand, credibility is gained from successful strategic partnerships and/or licensees of a technology. The result is that the relationship building process, in terms of time, is reduced. For the past few years, the company has been aggressively building relationships with industry professionals within our target markets. Our patience and relationship building efforts are now starting to bear fruit.

> **Building Superior Product offerings** – Any company or individual can develop software and post it up for digital distribution via online stores or physical distribution with pretty packaging. Although we believe our ASE computer product offering is compelling, its sales have been lackluster. While we believe that part of the problem has been a lack of funds to facilitate a substantial marketing campaign, a bigger part of the problem has been an inability to develop the right promotional partnerships to enable awareness and lead to a real viral interest in ASE. We believe that we are finally developing those relationships with Monster, AEG Live and others as discussed elsewhere in this Memorandum. Moreover, if and when our technology is used in a blockbuster film or a popular consumer electronics product (for which we hope our Monster deal serves as the catalyst), we believe our technology will become a household name, hopefully, driving consumers to download ASE on their own initiative.

In fact, all of our product offerings are very compelling and most are market-ready. This has been taken care of throughout the second stage of the Company's growth from 2004 to present. Our core strategy has taken a 180-degree shift from intensive software development to intensive business development, which

30

DEN 97470204
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**                    **GA004763**

began approximately two years ago when we began to focus on relationship building. Although we still do not have substantial revenues from our business development activities, we have signed one deal and are negotiating others that should result in such revenues. Accordingly, we do no longer view ourselves as a development stage company.

➢ **Intensive Competitor Analysis** – One of the largest hurdles for any technology company is to stay on top of the competition by monitoring what technologies are emerging in the market and what your competitors are up to by "reading between the lines" given the plethora of information that can be found online.

Today, technology product rollouts are planned only 3 to 6 months in advance due to the rapid pace at which advances in technology are made. This puts significant pressure on companies to keep abreast of the latest developments and to react quickly, including by accelerating plans, halting them or changing course. This is the unfortunate reality for any technology development team in the current business environment.

The Company is constantly scouring the Internet for new press releases, attending trade shows and networking with insiders to learn about all the new technologies that are developing in the audio space. Armed with this information, we have been making adjustments to our business strategy as necessary to get to what we believe are the right people in the right markets at the right time. This is especially true with all the hype and inferior technology being offered to the world and consumers accepting this technology as "the best" due to a brand identity.

From a strategic perspective, we believe there is a proven recipe that many successful platform based audio technology companies have followed, especially for ones that have introduced disruptive audio technologies with the goal of becoming the industry standard such as Dolby, DTS and Sony. We consider ourselves to be one of those companies. In sum, this strategy is as follows:

➢ The consumer electronics industry generally takes its lead from the film industry. For new audio technology, whether software or hardware, to make it to the theaters, the technology must be accepted by the professional audio and film studio industry or it will not get any traction.

➢ Workflow integration is critical for acceptance by the professional audio and film studio industry. The technology must match current industry needs as well as pass all Quality Control (QC) testing before it will even be considered for use on a theatrical film title release.

➢ For the technology to become a standard within the industry, both consumer and professional audio engineers must want to use and experience the technology again and again.

➢ Once the technology has broad appeal on the big screens (i.e., it is not just a one-off), consumers will want to use it in their home theater setups, portable media players, car systems, and other consumer electronics devices.

➢ The consumer electronics companies rely on this new consumer preference (which they often help to create) to develop new product offerings that incorporating the new technology and meet the demand. This, of course, means rapid licensing of the technology across multiple fields of use within the consumer electronics space to facilitate all of the new product offerings.

A good and recent example of this trend in action is the development of numerous 3D product offerings by consumer electronics companies (as we witnessed at CES 2011) in reaction to the recent theatrical releases of 3D motion.

We have determined and created our product offerings across the board such that almost all of our primary targets now have product offerings that are market ready. This completely enables our potential licensees to rapidly integrate our technology, test it, and bring new consumer electronics devices, film title releases, albums, etc. to market that incorporate our technology.

Two things that will catalyze and accelerate our CE licensing efforts are: 1) we already have a CE license for actual products that will launch with our technology embedded with one of the largest brands in audio, Monster Cable, Inc. and 2) one of our new board members, Jay Rifkin, is bringing us a horror genre 3D theatrical film title releasing around the end of the 4th quarter 2011 (being distributed internationally by Lionsgate). The film will be mixed in

31

AstoundSurround® at Astound Studios.  We believe that our strategy together with our current business development activities described below may be enough to drive some of the larger consumer electronics companies to sign licensing deals with us in large fields of use such as 3D HDTVs, Camcorders, Car Navigational Systems, Receivers, and Blu-Ray players.

*The Company believes that it is on the verge of reaching the "tipping point" with the recent explosion of business development opportunities over the past 6 months, including the signing of its first revenue generating license deal with Monster, a well-known consumer electronics company and several others starting to materialize into real deals.*

## BUSINESS DEVELOPMENT

We have attended various trade group conferences and other industry festivals and events for our target markets, including for AES (Audio Engineering Society), CES (Consumer Electronics Show), Sundance Film Festival, Game Developer Conference (GDC) and National Association of Broadcasters (NAB), over the past two to three years.  At these events, we have been very aggressive about marketing our technology, showing demonstrations and discussing various B2B licensing opportunities.  Our PR firm, Rogers and Cowan, has been very helpful in this regard since we initially retained them about a year ago.

However, we believe that the recent completion of Astound Studios, which is now owned and operated by GenAudio's Founder and CEO, Jerry Mahabub, has been instrumental in the recent success of our business development efforts.  Indeed, the impressive studio with its vintage equipment and customization for mixing using our AstoundSound technology has provided us with a lot of credibility within the audio industry, especially after having been prominently displayed on the cover of two professional audio magazines with complimentary articles inside the publications.  The studio has opened several doors and helped us to foster even stronger relationship with potential partners.  It also allows us to maintain quality control over projects mixed in AstoundSound.  Although owned by Mr. Mahabub (which was the idea of the Company's former independent board of directors, not Mr. Mahabub who wanted the Company to retain the studio), its primary use is for Company projects.

<u>New Business Development Team Members</u>

Because we are quickly becoming overwhelmed with new opportunities, we have brought in additional experts and consultants in their respective fields to assist in our business development efforts in various vertical markets.  The following summaries briefly describe these individuals and there backgrounds.

> ➢ On the professional audio side, we have:

>> **Brent Kaviar** is former SVP Post Production who has recently accepted a new job offer as the SVP Theatrical Distribution for Paramount Pictures and will continue to advocate for us and make introductions.

>> **Jay Rifkin** is one of our new board members has indicated that he can and will bring two 3D film title releases to the Company to be mixed in AstoundSurround.  The first of these films, which is a horror genre movie, is expected to be in theaters everywhere by the end of the 4th Quarter 2011. Mr. Rifkin has also stated that there may be up to seven additional films that he is currently aware of that he may be able to bring to Astound Studios to be processed in AstoundSurround over the next two years.

>> **Chris Fisher** is an executive with National Cinemedia.  Chris's efforts have already resulted in excellent introductions that led us into winning an award with AEG Live for mixing the new "We are the World 25 for Haiti" in AstoundSurround at Astound Studios.

> ➢ On the consumer electronics side, **Sam Khoury** is our independent valuation analysis expert, will make introductions for the Company within this space and assist with licensing negotiations. Mr. Khoury has indicated that he has at least one large car stereo company that he believes would be a good candidate for us to develop a business relationship with though we have not yet been introduced.

> ➢ On the video game side, **Michel Henein** is a leading expert in game audio technology who has connections with numerous decision makers at most of the top video game development houses, will take a leading role.

32

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                    GA004765

The foregoing business development professionals are well respected within their respective industries, believe in our technology and have committed to promote it and make introductions for us. In return, they will receive commissions (unless they are actually employed by the Company and receive a salary).

<u>Current Business Development Opportunities</u>

**M MONSTER®**

We have successfully signed three revenue generating license deals with Monster Cable Products Inc. ("Monster"). The first covers our re-mix of the "Tron Legacy" Soundtrack using AstoundSound professional audio tools at Astound Studios (http://www.monstercable.com/press/viewpress.asp?article=247) and the second covers our re-mix of *Miles Davis: Sketches of Spain*, in "Monster HD Headphone Surround – Powered by AstoundSound®"

Although these are not as significant in terms of projected revenue generation, they have led to a third license deal with Monster that we do project to generate significant revenue following the launch for the Monster headphone product offerings in which our technology will be embedded as well as additional headphone products to be rolled out over time. This agreement is a two-year license, exclusive to the headphone space, with renewal options and minimum payment requirements. The first headphones that we will be embedded in are small, in-line handheld "optimizer" headphones primarily targeted at gamers. We are optimistic that this license will put us into self-sustaining revenues by the end of 2011. This is our first consumer electronics integration license.

We believe that having actual product offerings incorporating our technology, especially products from such a well-known company as Monster under a co-branding arrangement, will begin a chain reaction in the market place and generate increasing interest in our technology among other consumer electronics companies. Although our logo mark, "Powered by AstoundSound®" will not be on the physical device itself, it will be prominently displayed on the packaging, the size and placement of which, we have the right to approve.



We have also discussed the possibility of entering into a fourth license agreement with Monster which would be non-exclusive and cover various Monster speaker docks, potentially including Beats by Dre which are sold at Best Buy among other distributors. This is a companion product to the Monster Beats by Dre headphones that have been one of the top selling headphones in the world since their release. We do not expect this license, if completed, to generate as much revenue as the one covering headphone but believe it will nonetheless generate some revenue as well as additional exposure.

Finally, Monster has expressed an interest in having Astound Studios re-mix other albums to which it has the rights in AstoundSound as well. While these re-mixes primarily provide us with brand exposure at the moment, we believe we are close to structuring and agreeing on a better relationship that will also generate revenue. Even if we do not, however, we believe that co-branding with Monster on their albums will accelerate awareness of our technology on a global scale.

Thus far, we have three license deals with Monster covering two albums and certain headphones and we are hopeful we will be entering into a fourth one with them shortly covering speaker docks. We expect that these will not only result in revenue for us, and hopefully substantial revenue, but will also entice other companies to want to use our technology and logo mark, "Powered by AstoundSound®".

*After 8 years of company operations, which includes building the software, filing patents, business development, and raising money, this may be the most significant milestone we have achieved – we have actually fully embedded our stereo expander technology into the first of several headphone products with Monster. We are code complete and the actual physical product is now ready for manufacturing and distribution. This initial product has two AstoundSound mode settings and by simply pushing either of the two AstoundSound mode buttons on the handheld device, normal audio turns into an ASTOUNDING audio experience!*

33

DEN 97470204
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**          **GA004766**

# Panasonic
## ideas for life

Panasonic Corporation North America ("Panasonic") and GenAudio initiated their relationship via an introduction from one of our shareholders. Since that time, Panasonic and GenAudio have signed an NDA and entered into a software test development agreement. Although Panasonic has expressed a strong interest for licensing our technology for integration into many of their consumer electronic products, they have also told us that they want to see us succeed in the theatrical film space before they move forward with the potential for licensing our technology. In the meantime, they are also working with their parent company, Panasonic Japan, to find a "champion" for the technology at the home office, i.e., someone who will actually do the embedded level integration for one or more of their product offerings.



We initially met with John Rubey, President of AEG Live, through Chris Fisher with National Cinemedia, who brought Mr. Rubey to Astound Studios to listen to some of our demos. Following the demos, Mr. Rubey asked if we would like to do a theatrical mix and process the new "We are the World 25 for Haiti", an 8-minute long 3D music documentary produced by Quincy Jones, in AstoundSurround. Of course, we said yes. You can watch and listen to the 2D version of the documentary at http://www.astoundsurround.com, which uses the two-channel LTRT fold-down version of the documentary's audio, which maintained the spatial integrity of the audio - a unique feature of our software processing capabilities.

GenAudio and AEG Live won an award together at the 3D Film Festival in Hollywood for this documentary. The following is a hyperlink to the press release announcing the award:

http://www.prnewswire.com/news-releases/genaudios-astoundsurround-plays-supporting-role-in-win-for-aeg-network-lives-we-are-the-world-25-for-haiti-3d-short-film-at-the-3-d-film-and-interactive-festival-105352713.html

Since that project, Mr. Rubey and Mr. Mahabub have built a strong professional relationship. As a result, we are on the precipice of signing a promotional partnership agreement with AEG Live to mix the webcasts of various AEG Live concerts in AstoundSound. We call this implementation AstoundLive®. We have completed the initial software development for AstoundLive® and it is currently being tested. We have agreed that the first AstoundLive® webcast will be the upcoming New Orleans Jazz and Heritage Festival or commonly referred to as "Jazz Fest". The Company will be sending it's professional audio engineering team and potentially one or two additional live concert mix engineers to New Orleans given the length of the 7-day event spread across two weekends. Jazz Fest starts on April 29 and goes through until May 8, 2011.

Under the promotional partnership agreement, the AstoundLive® logo will appear periodically in the lower corner of the webcasted video window (as these webcasts carry both video and audio). During set breaks and/or intermissions, we will have an advertisement that directs all viewers to our website to "turn all their media into a live concert venue by clicking here to purchase ASE – Available throughout the live concert event at a special discounted price of . . . ". The initial discounted price is anticipated to be $16.95 if they download during the webcast but may be subject to change over time.

The Company believes this promotional partnership could jumpstart sales of its ASE product offering and put it back on the map given the number of viewers we should be able to reach. For example, AEG Live estimates that anywhere from between 1,000,000 to over 10,000,000 unique viewers will be watching the Jazz Fest webcast at all times. Moreover, the Company further believes that the demographic that will be watching these webcasts is, for the most part, is the same demographic that would love an application like ASE. Finally, the webcast event itself provides each potential consumer with a unique trial experience where they automatically have a free trial simply by listening and watching the webcast. As a result, we expect conversion ratios, i.e., from free trial to purchase, to increase substantially from our current levels for ASE, which are low.

34

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                GA004767

To incentivize AEG Live, the Company has offered them a percentage of our revenues from sales of ASE. AEG Live appears to be excited about this new partnership as we do. Assuming all goes from, AEG Live has also stated that they want their future concert events to be webcasted in AstoundLive. We will be happy to accommodate them.



During CES 2011, the Company met with key decision makers at EMI Music. As we expected, they were impressed with our technology and professional audio software for the potential to mix and master their artists in AstoundSound. Consequently, we have commenced discussions about processing some of their top selling artists, namely in the techno music genre (at least to start with). The Company is awaiting a follow up meeting with them at Astound Studios in the near future.

Based on their level of interest, we hope to enter into negotiations for the use of our technology sometime within the next 2 to 3 months. In particular, we discussed entering into more of a strategic partnership relationship similar to the partnership we have entered into with Monster for processing music in HDHS – Powered by AstoundSound. Having partnerships with both Monster and EMI in the music industry, both of which have an enormous presence, could result in significant revenue, further brand recognition and other opportunities.



We have recently signed an NDA with Starz/Encore Entertainment and met with them at our demo suite during NAB 2011 in Las Vegas, NV. They are interested in a real-time embedded level process to down mix their 6 channel input audio to AstoundSound 2 channel audio before their content is broadcast.

By doing this, their subscribers and other viewers will be able to enjoy a surround sound experience from their existing stereo equipment as part of the actual broadcast. If we can reach such a deal, we believe that other stations would soon follow suit, including HBO, Cinemax, Showtime, Discovery Channel, Arts and Entertainment, as well as other businesses in the television industry such as advertising agencies. Moreover, if this were to happen, we believe it would be of such a magnitude that consumer electronics companies would seek to license our technology regardless of our theatrical presence.

There are several other companies that we are currently working with as well. For example, Doremi and their audio partner DMS recently signed our NDA and we are immediately moving forward with integration of AstoundSound into their theatrical server systems. Doremi currently has over 50% market share and their servers are in over 22,000 theaters worldwide. Doremi believes this could cripple competitor encode/decode technologies for surround sound delivery in theaters, especially with the advent of digital cinema. GenAudio shares in that vision.

At this stage in the company's growth, there is an immediate need to bring on additional staff as we drive our technology into various market segments. We are starting to become overwhelmed and need to be careful not to take on more than we can handle. Accordingly, until we bring on more staff and other resources, we will need to analyze and evaluate each of the business opportunities that comes our way and make sure we focus on the ones that are directly aligned with our core strategies and that have the most chance of a successful (and profitable) outcome. We are truly excited about all of the opportunities before us.

*We have reached a transition in the Company's growth from a development stage company to one with revenues, our product offerings are at a critical stage for multiple market segments simultaneously, and our IP valuation analysis was recently updated and resulted in an increase to over $3 Billion. This increase is, in part, a result of new patent filings that have opened up additional market segments for licensing.*

35

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                    GA004768

# INTELLECTUAL PROPERTY VALUATION ANALYSIS

## STATEMENT REGARDING FORWARD LOOKING PROJECTIONS

THE STATEMENTS, PROJECTIONS AND ESTIMATES OF FUTURE PERFORMANCE OF THE COMPANY OR VARIOUS ELEMENTS OF THE COMPANY'S BUSINESS CONTAINED IN THE FOLLOWING FINANCIAL PROJECTIONS ARE FORWARD-LOOKING STATEMENTS. INVESTORS SHOULD EXPECT THAT ANTICIPATED EVENTS AND CIRCUMSTANCES SHALL NOT OCCUR, THAT UNANTICIPATED EVENTS AND CIRCUMSTANCES SHALL OCCUR, AND THAT ACTUAL RESULTS SHALL LIKELY VARY FROM THE FORWARD-LOOKING CIRCUMSTANCES. INVESTORS SHOULD BE AWARE THAT A NUMBER OF FACTORS COULD CAUSE THE FORWARD-LOOKING STATEMENTS OR PROJECTIONS CONTAINED IN THIS MEMORANDUM OR OTHERWISE MADE BY OR ON BEHALF OF THE COMPANY TO BE INCORRECT OR TO DIFFER MATERIALLY FROM ACTUAL RESULTS. SUCH FACTORS MAY INCLUDE, WITHOUT LIMITATION, (i) THE ABILITY OF THE COMPANY TO PROVIDE SERVICES AND TO COMPLETE THE DEVELOPMENT OF ITS PRODUCTS IN A TIMELY MANNER, (ii) THE DEMAND FOR AND TIMING OF DEMAND FOR SUCH SERVICES AND PRODUCTS, (iii) COMPETITION FROM OTHER PRODUCTS AND COMPANIES, (iv) THE COMPANY'S SALES AND MARKETING CAPABILITIES, (v) THE COMPANY'S ABILITY TO SELL ITS SERVICES AND PRODUCTS PROFITABLY, (vi) AVAILABILITY OF ADEQUATE DEBT AND EQUITY FINANCING, AND (vii) GENERAL BUSINESS AND ECONOMIC CONDITIONS. THESE IMPORTANT FACTORS AND CERTAIN OTHER FACTORS THAT MIGHT AFFECT THE COMPANY'S FINANCIAL AND BUSINESS RESULTS ARE DISCUSSED IN THIS MEMORANDUM UNDER "RISK FACTORS." THERE CAN BE NO ASSURANCE THAT THE COMPANY SHALL BE ABLE TO ANTICIPATE, RESPOND TO OR ADAPT TO CHANGES IN ANY FACTORS AFFECTING THE COMPANY'S BUSINESS AND FINANCIAL RESULTS.

In anticipation of entering into licensing deals and the potential for an asset acquisition, the Company hired and retained Inavisis, Inc. (http://www.inavisis.com/index.html) to complete a valuation analysis of the Company's intellectual property in November of 2009. Dr. Samuel Khoury, President of Inavisis, Inc., has performed valuation analysis services for several technology companies including Honeywell, Samsung, Avaya, among many others.

Dr. Khoury commenced his research for the report in November 2009. This included intensive white board sessions with our CEO for four months to learn about the Company, review of all our US and foreign patent filings, the gathering of market data from credible sources, and the determination of appropriate revenue models for each separate market into which he believed our technology could be licensed. Dr. Khoury completed the valuation analysis report in March 2010.

The report methodically broke down each of our target markets into thinly sliced segments, including primary, secondary, and third targets, and determined the total net present value of the technology across all market applications to be just north of $1 Billion, assuming the accuracy of the various assumptions set forth therein, including the entering of licenses in each of the markets at the assumed royalty rates within the time periods identified.

**The IP valuation analysis and all market segment calculations by Dr. Khoury took into consideration the following:**

- ➢ We had no revenue generating license deals at the time of the report, which meant a very high "risk factor" was used.

- ➢ "Risk factors" for each discrete market application were calculated

- ➢ "Discount rates" were applied for each segment. Discount rate from our perspective is the same as what is commonly referred to as "rate of return" from a licensee or buyer's perspective.

- ➢ Market Size data from reliable and trusted sources such as the Consumer Electronics Association (CEA) among others.

- ➢ Our US and Foreign patent filings currently being in a pending status

36

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.     GA004769

> ➢ Worldwide market (not domestic only) due to our patent filings being both US and Foreign

> ➢ Many other factors that are fully disclosed in the report for each market segment net present value calculation.

The initial findings were based on a per unit royalty revenue model approach of each thinly sliced market segment, which has helped evaluate appropriate fields of use when entering into "carve-out" license agreements. This has also provided us with a baseline for negotiating royalties within each market segment.

From March 2010 into the 4th quarter 2010, further software breakthroughs enabled two additional patents to be filed, and one more patent is expected to be filed in the near future. These two new patents have enabled the Company to license our technology into several other market applications that were not included in the valuation analysis report from March of 2010.

As a result of the new patents and potential market applications, Dr. Khoury was again retained to update his valuation analysis report to take these into account for purposes of benchmarking Company initiatives, evaluating and negotiating licensing transaction and, potentially, an acquisition transaction if one presents itself. In preparing this update, Dr. Khoury found some recent, comparable of license agreements for software-based audio technologies from which he could glean current "market" royalty rates. Based on this information together with the new patent filings and additional market applications, Dr. Khoury, using the same approach as the first version of his valuation report, updated the net present value of the Company's technology to approximately $3.3 Billion. It is also noteworthy that one of the risk factors used in the valuation was the fact that we had not yet signed a license agreement as of the time it was completed. Accordingly, as we enter into licensing transactions, this risk factor should decrease and, in theory, our value will increase above the $3.3 Billion.

Notwithstanding the foregoing, as with the original report, the updated valuation analysis also assumes the accuracy of the various assumptions set forth therein, including the entering of licenses in each of the markets at the assumed royalty rates within the time periods identified. Moreover, there is no guaranty or assurance that any actual transactions will occur or that consummated transactions will result in the revenues projected in the updated report, and the Company and its management make no representations or warranties concerning the same. The report is not intended as a valuation of the Company itself or the Shares and the net present value placed on the Company's technology in the report is not intended to suggest that the Company or its intellectual property is actually worth that much or would sell for that much. See the "STATEMENT REGARDING FORWARD LOOKING PROJECTIONS" at the beginning of this Section and "RISK FACTORS" below. The report, however, does provide us with a roadmap, legitimate valuation arguments and a position of strength for negotiating transactions. In a nutshell, we did our homework.

We have opted not to include the new updated valuation analysis report in this offering due to sensitive and confidential information that appears within it. Notwithstanding, we will consider disclosing it for viewing purposes only (not copying) under a signed NDA in a controlled setting (e.g., our counsel's offices). If this is of interest to you, please email our Company's CEO, Jerry Mahabub, a█████████████████████

37

# MANAGEMENT ORGANIZATIONAL CHART

The following chart depicts the Company's current hierarchy and organizational structure, including consultants who play important and active roles in the Company's business activities and, in some cases, former employees.  All management reports directly to the CEO.



GENAUDIO INC.

PRIVATE PLACEMENT MEMORANDUM                 38

CONFIDENTIAL

DO NOT COPY

DEN 97470204

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                 GA004771

## MANAGEMENT OF THE COMPANY

The Company's Board of Directors and management team are comprised of a team of dedicated professionals with extensive experience in technology, software development, marketing, the entertainment industry, finance, licensing and business development. Management is augmented by an advisory committee, consisting of honorary members extensively involved in the field of acoustics, professionals in the audio industry, marketing experts, and seasoned individuals with experience in the commercialization and sale of digital audio technology. The executive officers, directors, and senior management of the Company and the positions held by each are as follows:

| Name | Age | Position |
|------|-----|----------|
| Jerry Mahabub | 39 | Founder, Chairman, CEO, President (Full-time Employee) |
| Jay Rifkin | 55 | Board Member |
| Phil Rodriguez | 57 | Board Member |
| James Devine | 55 | Secretary, Sr. Vice President – Finance (Full-Time Employee) |
| Greg Morgenstein | 39 | Sr. Vice President - Audio Engineering (Full-Time Employee) |

BIOGRAPHIES

**Jerry Mahabub: Founder, Chairman, Chief Executive Officer, and Chief Technical Officer**

Mr. Mahabub founded GenAudio in 2003 and is the inventor of the core technology, AstoundSound® with over 23 years of continuous R&D as of present. His activities include strategic planning with respect to the overall integrated business and technical direction, patent filing, capital formation, and business development, including the formation of partnerships and strategic alliances as well as license negotiations. Mr. Mahabub also works directly with the software development team when necessary for testing, advancements to the technology, and new software features. Mr. Mahabub also owns Astound Studios which GenAudio uses as it's primary studio facility under a partnership agreement and recently formed Astound Records to bring new artists to market with their content or albums mixed in AstoundSound at Astound Studios.

Prior to founding GenAudio, Mr. Mahabub was the owner and Executive Manager of Rapid Prototype Technologies, LLC from 1998 to 2003, where he designed and developed new and innovative technologies for a large variety of government contracts and mainstream commercial markets. His responsibilities there included design engineering, business development, technology commercialization, and licensing. In addition, Mr. Mahabub was often asked to assess technologies for investment firms and assist with IP based independent valuation analysis. Mr. Mahabub has negotiated many world-wide licensing deals, channel partnerships and strategic alliances with multiple divisions of Hewlett Packard and many other companies in an effort to create marketable, state of the art, disruptive and cost-effective products, and has also consulted for both hardware and software engineering projects. Prior to his position at Rapid Prototype Technologies, Mr. Mahabub was Director of Engineering at Ines Inc./SPYR Technologies Inc. from 1995 to 1998, where he established that company as a GSA/8A provider for government contracts. The work involved research and analysis of market trends for commercialization efforts, competition and market analysis, product marketing strategy, print and digital advertisements, ISO 9001 compliance, and negotiation of several government contracts in accordance with the Federal Acquisition Regulations and Government Procurement Policies for numerous branches of the armed forces. The following is a list of some of the entities which he has assisted in designing, developing and/or transferring technologies, including through licensing: SAIC, Miltope, Hewlett Packard, Intel, Motorola, Siemens, Philips, Boeing, the Jet Propulsion Laboratory, the US Naval Warfare Center, Quantico, the US Army Missile Research and Development Engineering Center (MRDEC), and TMDE.

Mr. Mahabub started attending Rensselaer Polytechnic Institute ("RPI") in Troy, NY doing coursework and lab work from the age of 13 and entering as a full time student at the age of 16. In 1988, at 16, he was hired to work part-time at a Superconducting Research Laboratory while attending RPI full-time and also worked, from the age of 13, in Dr. Charles P. Bean and Ivar Gaiver's lab (Nobel Prize winner for the discovery of Superconducting Tunneling in 1971). He was the youngest to be accepted into the special school for entrepreneurship at RPI where he helped to grow three high-tech incubator companies from the age of 16. He double-majored in Physics (B.S) and Electrical and Computer Systems Engineering – ECSE (B.E.) with a Minor in Philosophy/Symbolic Logic.

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004772

**Jay Rifkin: Board Member**

Jay Rifkin brings more than 25 years of building entertainment, technology and interactive marketing companies that have successfully envisioned and capitalized on media and consumer trends. He was a principal founder and CEO of Media Ventures, a creative entertainment cooperative that has produced more than two hundred major motion picture and television soundtracks. Mr. Rifkin was CEO of the company from its inception in 1989 until 2005 and built Media Ventures into an industry-leading source for original film and television music. His work on Disney's "The Lion King" drove soundtrack sales to more than 18 million copies worldwide and earned him a Grammy Award, two American Music Awards and a Tony nomination. In 1998, Mr. Rifkin co-founded Media Revolution, a cutting edge developer of advanced online marketing solutions. As Chairman, his clients included Sony, Warner Bros., Universal and 20th Century Fox. In 1995, Mr. Rifkin founded Mojo Records, a joint venture with Universal that was sold to Zomba/BMG in 2001. As CEO, he effectively targeted a niche youth demographic, generating multiple Gold and Platinum selling records. Mr. Rifkin is currently the CEO of China Youth Media, Inc., a youth marketing and media company that delivers content and advertising in the People's Republic of China. Mr. Rifkin is also a member of the Board of Directors for The Blacksquare Capital Fund.

**Phil Rodriguez: Board Member**

Phil Rodriguez is the President and Chief Executive Officer of The Dimirak Companies. Mr. Rodriguez started his career in the insurance and investment business in 1980. He founded Dimirak Financial Corporation in 1981, a financial planning and insurance services company. Dimirak Securities Corporation, established 2007, is located in North County San Diego. Dimirak Securities is registered with the U.S. Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), a Self-Regulatory Organization (SRO), and is a Member of the Securities Investor Protection Corporation (SIPC). Dimirak Securities provides Placement Agent and Investment Banking services, consulting, marketing and distribution for their clients in the areas of Oil & Gas, Real Estate, Notes, and Entertainment. Mr. Rodriguez is a licensed General and Municipal Securities Principal, a General Securities Representative, and an Investment Advisor. He is also licensed with the California Department of Insurance for Life, Accident & Health, Variable Contracts, and as a Fire & Casualty Broker-Agent. His expertise is in the area of insurance planning, employee benefits and retirement plans. He has personally recruited and trained hundreds of representatives in the field of insurance and securities. As a placement agent, his team has raised over one billion dollars for their clients.

**James Devine: Corporate Secretary and Sr. VP Finance**

Mr. Devine joined the Company first as a consultant in early 2006 and became Vice President of Finance in late 2006, responsible for accounting, reporting and general Company administration. From 2003 to 2006, he worked for Quinella Corp., a Certified Public Accounting firm, whose practice includes tax, accounting and consulting services to public and private companies in various industries. From 2000 to 2003, he worked for US Escrow & Financial Services, where his duties included credit, due diligence and analysis of finance clients. Mr. Devine received a B.A. degree in Accounting, Business Administration from Concordia College, Morehead, MN. He is a Certified Public Accountant, Minnesota 1982.

Mr. Devine started his career with Automatic Data Processing as a systems analyst in accounting and reporting systems for major accounts. After 3 years he entered the field of public accounting, where he gained exposure to a number of industries. Mr. Devine left public accounting in 1983 and formed a high-tech company for the production of high-end liquid crystal displays. Subsequent to the sale of this business, from 1985 to 1989 he joined an investment-banking firm where he became a securities principal and worked in the underwriting of debt and equity. Mr. Devine subsequently took a position as CFO for a national real estate management firm. He then accepted a political appointment in 1991 from the Governor of North Dakota as Deputy Director of Finance for the state's Department of Economic Development. In addition, he was appointed President of the North Dakota Future Fund, a venture capital fund financed by the state's legislature to provide capital to businesses and high-tech ventures within the state. After serving his term, Mr. Devine worked from 1995 to 1998 for an investment firm where he specialized in locating financing for companies based upon economic incentives from taxing authorities among other criteria. Mr. Devine works directly with the Company's CPA firm, Quinella Corporation, located in Denver, CO.

In 2005, as the result of a failed business transaction over which Mr. Devine had no control, Mr. Devine filed for personal bankruptcy protection under Chapter 7 of the United States Bankruptcy Code.

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004773

**Greg Morgenstein: Sr. VP Audio Engineering**

Greg Morgenstein is a multi-talented engineer, producer, composer, sound designer and editor. He's built an all star client roster by being reliable, innovative and always ready to jump into any audio project thrown his way. Determined not to silo himself, Mr. Morgenstein has worked with hip hop's best and brightest stars such as Ludacris and Missy Elliot, teamed up with pop star greats Jennifer Lopez and Janet Jackson and partnered with several legends along the way, including Guns & Roses and Aretha Franklin. Outside of the music realm, Mr. Morgenstein was the sound designer for four of the DVD re-mastered James Bond films. Additionally, Mr. Morgenstein has composed music for "Moulin Rouge" and "The Break Up" movies.

Mr. Morgenstein is responsible for mixing, and managing all professional audio engineering services for the Company. Mr. Morgenstein's solid track record and extensive entertainment industry contacts provide business opportunities for licensing of the AstoundSound technology, including new film titles for theatrical release, new album projects from multi-platinum artists, and television broadcasts and advertisements. Mr. Morgenstein received his Bachelor of Science in Music from Berkley College of Music in 1997.

# MANAGEMENT COMPENSATION

Salaries

Employee compensation is approximately $61,167 per month and contractor compensation varies from month to month but generally ranges from approximately $30,000 to $40,000 per month. In order to conserve financial resources and due to changes in the Company's business plan, the Company has endeavored to utilize consultants rather than employees for discrete project tasks. Four former employees, Gary Smith, Brent Kaviar, Recy Pilloud, and Steve Bagwell are now engaged as part time consultants rather than full time employees. Paul Powers, former board member and former COO of GenAudio, is no longer providing any consulting services for GenAudio due to his other responsibilities with his new job. The following table sets forth information concerning the compensation of the most-highly compensated members of management.

| | |
|---|---|
| Jerry Mahabub, Founder, Chairman, CEO, President[1] | $250,000 |
| James T. Devine, Corporate Secretary & Sr. VP Finance | $135,000 |
| Greg Morgenstein, Sr. VP Audio Production | $120,000 |

[1]   Mr. Mahabub is also entitled to a gross up bonus sufficient to pay all taxes due on his salary.

Benefits

Employees also are entitled to standard benefits such as vacation and sick leave and to participate in the Company's standard benefit plans, which currently only consist of group medical and dental.

Equity Incentives

The Company awards warrants to purchase shares of the Company's Common Stock to its directors, officers, employees, and key contractors for purposes of incentivizing and retaining them, especially in light of the recent salary deferrals discussed above; however, the Company has no formal equity incentive plan and there are no formal plan documents governing such awards. Instead, the Board of Directors periodically sets aside a certain number of shares of Common Stock to be available for equity incentive and bonus compensation and then, based upon the recommendations of the Company's CEO, the Board of Directors approves grants of warrants out of this "pool" to particular individuals or consulting businesses on such terms as the Board of Directors deems appropriate. Although there is no formal set of plan terms or documents, the warrants are typically issued with an exercise price equal to fair market value (as determined by the Board of Directors) for a 5 year term with a cashless exercise feature pursuant to a standard form of Company warrant agreement. The primary variable that changes is whether any given warrants contain vesting conditions. Currently, no shares of Common Stock remain in the "pool" for issuance under this informal plan but the Board of Directors has the authority to make them available at any time without any stockholder action, although it has no current plans to do so.

41

<u>Cash Bonus Plan</u>

The Company has also adopted a cash bonus plan for its directors, officers, employees, and key contractors upon the consummation of a significant transaction, which creates value for all stockholders.  In particular, in the event the Company sells substantially all of its assets or there is a change of control of the Company (a "Disposition") with a gross transaction price as set forth below, the Company will retain the following sum from the gross transaction price of such disposition transaction for the purpose of awarding cash bonuses to directors, officers, employees, and key contractors after the closing of such Disposition, subject to a maximum bonus pool of $10,000,000:

| Gross Transaction Price | Bonus % | Cash Range |
|---|---|---|
| >150MM - 200MM | 1% | 1.5MM – 2MM |
| >200MM - 250MM | 1.5% | 3MM – 3.75MM |
| >250MM - 300MM | 2.0% | 5MM – 6MM |
| >300MM | 2.5% | 7.5MM -10MM |

The allocation of this cash pool shall be made by recommendation of the CEO, and approved by the Company's Budget Committee except that the CEO's bonus shall be determined by the independent directors of the Board of Directors in the exercise of their sole discretion. The Budget Committee shall determine any bonuses allocable to directors after obtaining the advice of an independent compensation advisor. No bonus pool shall be created unless the gross transaction price in the Disposition is more than One Hundred Fifty Million Dollars ($150,000,000) and the total cash bonus pool shall not exceed Ten Million Dollars ($10,000,000).  For purposes of this bonus program, a Disposition expressly does not include any license arrangement.

<u>Legal Counsel</u>

The Company's primary law firms are Dorsey and Whitney, LLP for patent and trademark legal services and Greenberg and Traurig, LLP. for general representation, particularly corporate and securities legal services.

BALANCE OF PAGE LEFT INTENTIONALLY BLANK

42

DEN 97470204<br>
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004775

## SECURITIES OWNERSHIP

The following table sets forth information regarding the ownership of the Company's securities as of the date of this Memorandum assuming the full amount of Shares offered pursuant to this Memorandum is subscribed for (without exercise of any overallotment right).

| Shareholder Name | Position(s) | Ownership of Common Stock | % of Common Stock | Voting Control Over Common Stock | % of Voting Power | Warrant Shares | Fully Diluted Ownership | Fully Diluted Voting Control |
|---|---|---|---|---|---|---|---|---|
| Jerry Mahabub (1) | Director, Chairman, CEO | 960,900 | 6.61% | 7,001,000 | 48.18% | 2,202,685 | 14.02% | 40.78% |
| Philip Rodriguez (2) | Director | 210,000 | 1.45% | 20,000 | 0.14% | 50,000 | 1.15% | 0.31% |
| Jay Rifkin(3) | Director | 20,000 | 0.14% | 0 | 0.00% | 50,000 | 0.31% | 0.22% |
| All directors as a group | | 1,190,900 | 8.19% | 7,021,000 | 48.31% | 2,302,685 | 15.48% | 41.32% |
| All other officers and employees as a group | | 0 | 0.00% | 0 | 0.00% | 4,422,800 | 19.60% | 19.60% |
| All other common stockholders as a group(4) | | 12,192,200 | 83.90% | 6,312,100 | 43.78% | 1,289,400 | 59.74% | 33.91% |
| All Series D preferred stockholders as a group (5) | | 449,164 | 3.09% | 449,164 | 3.09% | 0 | 1.99% | 1.99% |
| Reserved for Incentive Compensation Pool | | 0 | 0.00% | 0 | 0.00% | 20,000 | 0.09% | 0.09% |
| Maximum number of shares reserved for this Offering | | 700,000 | 4.82% | 700,000 | 4.82% | 0 | 3.10% | 3.10% |
| Totals | | 14,532,264 | 100.00% | 14,532,264 | 100.00% | 8,034,885 | 100.00% | 100.00% |

(1)  1,000 of the shares owned by Mr. Mahabub are Series C Preferred Shares which are identical to common in all respects except that they carry the right to elect two board positions.  In addition, the discrepancy between the number of shares owned by Mr. Mahabub and the number of shares over which he has voting control is the result of personal sales by Mr. Mahabub of approximately 6,040,100 shares that he previously owned but for which he retained all associated voting rights through voting proxies.

(2)  Shares owned by Mr. Rodriguez include 130,000 shares purchased from Mr. Mahabub on January 20, 2010 and 60,000 shares purchased from Mr. Mahabub on April 6, 2011, all of which are subject to a voting proxy in favor of Mr. Mahabub.

(3)  The 20,000 shares were purchased from Mr. Mahabub on April 6, 2011 and are subject to a voting proxy in favor of Mr. Mahabub.

(4) the discrepancy between the number of shares owned by all other common stockholders as a group and the number of shares over which such group has voting control is the result of personal sales by Mr. Mahabub of approximately 5,830,100 shares that he previously owned to such stockholders but for which he retained all associated voting rights through voting proxies.

(5)  Reflects the total number of shares of Common Stock into which the outstanding Series D Preferred Shares can be converted (on a 1-for-1 basis) as a result of the application of such shares' weighted average anti-dilution rights to prior financing rounds and assuming the purchase of all of the Shares offered hereunder but excluding the 10% annual dividend (payable in cash or stock at the Company's election) to which such shares are entitled.

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004776

# DESCRIPTION OF SECURITIES

The Company's authorized capitalization consists of 25,000,000 shares of Common Stock, par value $.0001 per share, and 5,000,000 shares of Preferred Stock, par value $.0001 per share, of which 1,000 have been designated as "Series C Preferred Stock" and 1,400,000 have been designated as "Series D 10% Convertible Preferred Stock." *See "DESCRIPTION OF SECURITIES."* 13,382,000 shares of Common Stock are currently issued and outstanding, warrants and options to purchase 8,034,885 shares of Common Stock have been granted and are outstanding. In addition, there are 1,000 shares of Series C Preferred Stock and 434,000 shares of Series D 10% Convertible Preferred Stock issued and outstanding (convertible into shares of Common Stock on a one for one basis plus an additional 15,164 shares of Common Stock as a result of the application of such shares' weighted average anti-dilution rights to prior financing rounds and to this Offering assuming all of the Shares being offered hereunder are purchased without exercise of the Company's over allotment option but excluding the 10% annual dividend to which such preferred shares are entitled which may be paid in cash or stock at the Company's election).

There are also 1,000 shares of Series C Preferred issued and outstanding, which were issued to Jerry Mahabub, the Company's President and Chief Executive Officer, in August of 2006, together with certain other consideration, in exchange for all of his rights in and to the intellectual property related to the AstoundSound brand and technology. *See "RELATED PARTY TRANSACTIONS."*

The following is a brief summary of certain terms and provisions of the capital stock of the Company. Such summary does not purport to be complete and is qualified in all respects by reference to the actual text of the Company's Articles of Incorporation (the "Articles"), its Bylaws, and to applicable law.

## COMMON STOCK

The holders of shares of Common Stock are entitled to one vote for each share on all matters on which the holders of Common Stock are entitled to vote. There is no cumulative voting for the election of directors. Subject to the rights of any outstanding shares of Preferred Stock, the holders of the Common Stock are entitled to receive ratably such dividends as may be declared by the Board out of funds legally available therefor. Holders of Common Stock are entitled to share ratably in the net assets of the Company upon liquidation or dissolution after payment or provision is made for all liabilities and the preferential liquidation rights of any shares of Preferred Stock then outstanding. The holders of Common Stock have no pre-emptive rights to purchase any shares of any class of stock. Additionally, all outstanding shares of Common Stock are, and the shares of Common Stock to be issued by the Company upon exercise of outstanding warrants shall be upon payment therefore, fully paid and non-assessable.

## PREFERRED STOCK

The Board currently has two series of Preferred Stock authorized - Series C Preferred Stock and Series D Preferred Stock - and may create and issue additional shares of Preferred Stock in one or more series and fix the rights, preferences and privileges thereof, including voting rights, dividends, terms of redemption, redemption prices, liquidation preferences, number of shares constituting any series or the designation of such series without further vote or action by the stockholders. Although the Company presently has no intention to do so, the Board may issue Preferred Stock with voting and conversion rights that could adversely affect the voting power of the holders of Common Stock or the Preferred Stock.

### Series A and B Preferred Stock

The Company previously authorized Series A Preferred Stock and Series B Preferred Stock but each such series has been cancelled.

44

*DEN 97470204*
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**          GA004777

Series C Preferred Stock

The holders of Series C Preferred are entitled to one vote for each share of Series C Preferred held by such holder and have voting rights and powers equal to the voting rights and powers of the holders of Common Stock and any other series of Preferred Stock possessing voting rights as a single group.  In addition, the holders of Series C Preferred, voting as a separate class, are entitled to nominate and elect two directors to the Company's Board of Directors, and possess the right to remove or replace such directors.

Currently, the Series C Preferred are all held by Founder and CEO Jerry Mahabub who received such shares contemporaneously with his transfer of the core technology to the Company. The right to elect a second director was added to the Series C Preferred Stock by an amendment to the Articles of Incorporation due to the expansion of the Board of Directors from three (3) members to five (5) members.  See "RELATED PARTY TRANSACTIONS."

Holders of the Series C Preferred are entitled to participate in any dividends declared by the Board of Directors in equal standing with the holders of the Common Stock.  Upon the liquidation, dissolution or winding up of the Company, after payment or provision for payment of the debts and other liabilities of the Company and subject to any preferential rights that may be subsequently granted to holders of other series of preferred stock, the holders of the Series C Preferred share ratably in the distribution of the assets of the Company legally available for distribution among the holders of the Common Stock and the Series C Preferred.

Series D Preferred Stock

The holders of the Series D Preferred vote on an as-converted basis and, except as otherwise set forth in the Articles, shall be entitled to vote, as a single class with the Common Stock, on all matters upon which shares of the Company's Common Stock are entitled to vote. In addition, the Company may not, without the affirmative vote of the holders of a majority of the Series D Preferred: (i) alter or change adversely the powers, preferences, or rights given to the Series D Preferred, (ii) increase the authorized number of Series D Preferred or (iii) enter into any agreement with respect to any of the foregoing.

Holders of the Series D Preferred accrue cumulative dividends at a rate of ten percent (10%) per annum on a daily basis (360 days per year) which are payable, at the election of the Company, in either cash or additional shares of Common Stock upon conversion or at such earlier dividend payment date(s) as may be declared by the Company. Holders of the Series D Preferred are also entitled to participate in any dividends declared by the Board of Directors in equal standing with the holders of the Common Stock.

Upon the liquidation, dissolution or winding up of the Company, after payment or provision for payment of the debts and other liabilities of the Company and subject to any preferential rights that may be subsequently granted to holders of other series of preferred stock, the holders of the Series D Preferred are entitled to receive, on a pro rata basis among all holders of Series D Preferred, an amount equal to the amount paid for the Series D Preferred plus all accrued and unpaid dividends, in preference to all other classes of capital stock currently existing.  The Series D Preferred are, subject to weighted average anti-dilution rights with standard carve outs therefrom, convertible into shares of the Company's Common Stock.

LIQUIDITY AND OTHER RIGHTS OF CERTAIN COMMON AND PREFERRED SHARES

If a Liquidity Event (as defined below) does not occur with prescribed time frames, holders of certain shares of the Company's Common Stock and Series D Preferred have various rights to demand and receive liquidity for such shares.  For purposes, hereof, a Liquidity Event means (i) a sale of all or substantially all of the Company's assets, (ii) a merger, reorganization or similar business combination in which the shareholders of the Company immediately prior to such merger, reorganization or combination own less than a majority of the voting power of the surviving entity immediately following such merger, reorganization or other business combination, (iii) an underwritten initial public offering ("IPO"), (iv) the date the Company otherwise becomes a publicly reporting company and lists its shares of Common Stock for sale on a national securities exchange, any of the Nasdaq markets, or the OTC Bulletin Board, or (v) any recapitalization, share repurchase program or other reorganization in which the applicable investors holding the liquidity rights described herein are entitled to receive an amount equal to their capital investment plus a 15% annualized return thereon.

Investors who purchased shares of our Common Stock under that certain offering conducted by Westminster

45

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.

Securities pursuant to our Confidential Placement Memorandum dated March 22, 2008, as supplemented (the "Westminster Round"), received a contractual put right to require the Company to repurchase the shares purchased by them in the Westminster Round at cost, being $3 per share, plus a 15% annualized return if a Liquidity Event has not occurred within 4 years of the closing of such offering, being September 18, 2008. Accordingly, if a Liquidity Event has not occurred by September 18, 2012, the investors in the Westminster Round could, in theory, require the Company to repurchase approximately 1,585,000 shares of Company Common Stock for their cost of $4,755,000 plus interest of $2,853,000 (i.e., $4,755,000 x 15% x 4). If an investor in the Westminster Round fails to exercise his, her or its put right within six months of becoming entitled to do so, such right shall expire.

Investors who purchased shares of our Series D Preferred under that certain offering conducted by the Company pursuant to our Confidential Placement Memorandum dated December 11, 2008, as supplemented (the "Series D Round"), received as part of the preferred nature of such Series D Preferred, the option to either (a) increase their dividend rate from 10% to 15%, or (b) require the Company to repurchase the shares purchased by them in the the Series D Round for $7.50 per share plus all accrued and unpaid dividends if a Liquidity Event has not occurred by September 18, 2012. Accordingly, if a Liquidity Event has not occurred by September 18, 2012, the investors in the Series D Round could, in theory, require the Company to repurchase approximately 434,000 shares of Series D Preferred for $3,255,000 plus interest of between approximately $760,000 and $868,000 (depending on when each of the investors in the Series D Round acquired their respective shares of Series D Prefered). Upon a Liquidity Event, the holders of the Series D Preferred are also entitled to receive, on a pro rata basis among all holders of Series D Preferred, an amount equal to the amount paid for the Series D Preferred plus all accrued and unpaid dividends, in preference to all other classes of capital stock currently existing

Investors who purchased shares of our Common Stock under that certain offering conducted by Westminster Securities pursuant to our Confidential Placement Memorandum dated July 8, 2009, as supplemented (the "Second Westminster Round"), received a contractual put right to require the Company to repurchase the shares purchased by them in the Second Westminster Round at cost, being $4 per share, plus a 15% annualized return if a Liquidity Event has not occurred by September 18, 2012. Accordingly, if a Liquidity Event has not occurred by September 18, 2012, the investors in the Second Westminster Round could, in theory, require the Company to repurchase approximately 19,000 shares of Company Common Stock for their cost of $76,000 plus interest of between approximately $34,000 and $37,000 (depending on when each of the investors in the Second Westminster Round acquired their respective shares of Common Stock in such round). If an investor in the Second Westminster Round fails to exercise his, her or its put right within four months of becoming entitled to do so, such right shall expire.

Investors who purchased shares of our Common Stock under that certain offering conducted by the Company pursuant to our Confidential Placement Memorandum dated March 12, 2010, as supplemented (the "March 2010 Round"), received a contractual put right to require the Company to repurchase the shares purchased by them in the the March 2010 Round at cost, being $3 per share, plus a 10% annualized return if a Liquidity Event has not occurred by September 18, 2014. Accordingly, if a Liquidity Event has not occurred by September 18, 2014, the investors in the March 2010 Round could, in theory, require the Company to repurchase approximately 1,171,000 shares of Company Common Stock for their cost of $3,513,000 plus interest of of between approximately $1,581,000 and $1,300,000 (depending on when each of the investors in the March 2010 Round acquired their respective shares of Common Stock in such round). If an investor in the March 2010 Round fails to exercise his, her or its put right within four months of becoming entitled to do so, such right shall expire.

In addition, the investors in the above described offering rounds received various types of contractual registration rights.

## WARRANTS AND OPTIONS

The Company has issued warrants and options at various strike prices over the past several years to purchase up to 8,034,885 shares of Common Stock to investors, directors, officers, employees and consultants  Of these warrants and options, (i) approximately 3,534,085 have been issued to investors and placement agents in connection with prior offerings as well as to other parties in connection with loans and similar transactions and (ii) approximately 4,500,800 have been issued to directors, officers, employees and consultants as compensation for their services (including an additional 20,000 shares currently reserved for issuance under the Company's equity incentive "pool").

The exercise prices of our outstanding warrants and options range from $0.50 for approximately 1,445,000 shares, to

46

$1.00 for approximately 110,000 shares, to $3.00 for approximately 1,857,400 shares, to $4.00 for approximately 717,500 shares, and to $5.00 for approximately 3,904,985 shares.

Generally speaking, three different warrant or option forms have been used to evidence all of these warrants - one for earlier investors with a call provision (all of which have now been called), one for later investors with no call provision and some subsequently negotiated protections for investors, and one for compensatory grants which have various vesting conditions and few protections. None of our warrants or options expire prior to August 1, 2011, when approximately 1,605,000 compensatory options with exercise prices of $0.50 and $1.00 per share shall expire. Included in the number of outstanding Company warrants is the Company's recent issuance of warrants to its CEO, Jerry Mahabub, to purchase up to 2,052,685 shares of the Company Common Stock at $5.00 per share in consideration of his lending funds to the Company for continued operations, forgiveness of interest on certain debt owed to Mr. Mahabub by the Company and his purchase of studio improvements and equipment from the Company at the Company's cost basis without depreciation for age or obsolescence. *See "RELATED PARTY TRANSACTIONS."*

The Company has an informal plan pursuant to which it issues equity awards, primarily options to purchase Company Common Stock, from a "pool" of reserved shares to its directors, officers, employees and key contractors for purpose of incentivizing and retaining them. There are currently 20,000 shares available for issuance as equity compensation in such pool and no current plan to authorize additional shares. *See "MANAGEMENT COMPENSATION."*

## PLAN OF DISTRIBUTION AND SUBSCRIPTION PROCEDURES

All of the Shares are being offered to selected persons qualifying as accredited investors pursuant to exemptions from registration pursuant to Section 4(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder and pursuant to the terms set forth in this Memorandum. The Shares are offered by the Company subject to receipt and acceptance by the Company, and the right to reject, any subscription in whole or in part.

The Offering hereunder will terminate upon the earlier of (i) the Company's sale of 700,000 Shares, subject to the Company's over allotment right to sell an additional 150,000 Shares depending on demand, or (ii) September 30, 2011, unless extended by the Company for up to 3 additional 30 day periods, not to exceed a total of 90 days at the discretion of the Board of Directors (the "Termination Date"). The Company shall not be required to provide any notice of the Company's exercise of its over-allotment right or of its earlier termination of the Offering or extension of a termination date; provided, however the Company shall in no event extend the Offering beyond November 30, 2011.

All expenses incident to the offer and sale of the Shares, including all filing fees, legal, accounting, and printing expenses, will be paid by the Company. The Company does not intend to pay any commissions; however, it reserves the right to pay up to a 10% commission to a licensed broker-dealer or other qualified finder.

The Shares may be purchased by selected offerees, being either existing shareholders of the Company or new investors subscribing for a substantial number of Shares under this Offering (as approved by the Board of Directors in its sole and absolute discretion) who verify that they are bona fide accredited investors. The minimum purchase amount is 3,000 Shares at $3.00 per share, or an aggregate of $9,000. The Company reserves the option to accept a lesser purchase amount at its discretion. The Company reserves the right to withdraw all or any part of the Offering and, as stated above, to reject any subscription in whole or in part. The Company also reserves the right to offer additional incentives or "volume" discounts to any investor who invests more than $1,000,000.

All proceeds from subscriptions for the Shares shall be deposited into a segregated bank account established by the Company for purposes of this Offering in accordance with the instructions set forth in the Subscription Agreement. If the Offering is withdrawn or otherwise terminated or if any subscriptions are rejected, funds paid by subscribers whose funds are not closed upon will be returned without interest or deduction.

Subscriptions for the purchase of the Shares may be accepted by the Company as received or in periodic closings, There is no minimum number of Shares for which subscriptions must be received prior to the use of any Offering proceeds by the Company. Any subscriptions not received and accepted by the Company by the Termination Date shall be deemed refused and the Company shall return the full amount of the subject Investor's cash payment, without interest or deduction.

47

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                    GA004780

At the time of investment, Investors will be required to execute and deliver a (i) Subscription Agreement in the form attached hereto as Exhibit A, including the confidential subscriber questionnaire attached thereto, and (ii) payment for the full purchase price of the Shares desired to be purchased. The Subscription Agreement should be provided to the Company at the following contact information:

If by mail:        GenAudio, Inc.

                   ███████████████████

                   Attn: James T. Devine, VP of Finance

If by fax:         ████████████

If by email:       ███████████████

Payment for the Shares may be made by check payable to the "GenAudio, Inc." and delivered to the Company or via wire transfer directly to the Company's segregated account, all pursuant to the instructions set forth in the Subscription Agreement.

## EXIT STRATEGY

We expect to develop a value proposition for AstoundSound within the next two years. We believe that the most likely event is a sale of the Company of substantially all of its assets to an established consumer products company, or alternatively, a license arrangement with one or more consumer electronics companies for exclusive use of the AstoundSound technology within certain defined markets. If a major acquisition is not consummated, the Company may conduct an IPO or alternative method of entering the public markets once the AstoundSound brand is further established and assuming we have reached a stage of generating substantial revenues and/or profits.

BALANCE OF PAGE LEFT INTENTIONALLY BLANK

48

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004781

# RISK FACTORS

*The purchase of the Shares involves a high degree of risk including, but not limited to, the risks described below. Before subscribing for the Shares, each Investor should consider carefully the general investment risks enumerated elsewhere in this Memorandum and the following risk factors, as well as the other information contained in this Memorandum, including the matters described in "Related Party Transactions".*

## RISKS RELATED TO THE BUSINESS OF THE COMPANY

### *Our products may have technical difficulties or undetected design errors which we may not be able to correct or that may otherwise cause us to incur additional costs*

Because our products have not been fully developed and deployed, they could have substantial defects, technical difficulties or undetected design errors. Our products have just recently been commercially deployed and, in fact, the Company has already encountered certain compatibility problems with certain versions of ASE with the latest versions of Apple and Microsoft operating systems that are being remedied but have delayed full deployment. We cannot assure you that our products will perform the desired functions, offer sufficient performance benefits or meet the technical or other requirements of customers. Further, if errors and defects are discovered, we cannot assure you that we will be able to correct such errors and defects. Also, technical difficulties or design errors could result in unanticipated costs, including costs related to product liability litigation. The discovery of any design defect or any ensuing litigation could damage our reputation and our relationships with our partners could be adversely affected and could materially and adversely affect our results of operations.

### *Our failure to reach an agreement to embed our ASE consumer product into consumer electronic products could have a material adverse affect on our business plan*

We are relying on our efforts to successfully integrate our technology as an embedded sound solution into consumer electronics for purposes of initial revenue generation and, potentially, brand development. If these efforts are not successful, we expect we will continue to struggle financially and that we will have difficulty establishing our brand. Factors that could contribute to our inability to successfully integrate our technology into consumer electronics include product errors, technical difficulties related to the integration process as well as a failure to reach acceptable business terms with the manufacturers of consumer electronics into which our technology may be embedded.

### *We anticipate having an initial long sales cycle for certain of our products*

We believe that potential customers of certain of our products, namely the ones targeted for theatrical releases, initially will need to go through an internal process to decide whether they wish to use our products. We will have to educate and inform prospective customers, namely studios, producers and audio mix engineers in the film industry, regarding the use and benefits of our products. For these and other reasons, our initial sales cycle for these products will be a lengthy process. During this process, we will have to expend substantial time, effort and funds demonstrating our products, preparing contract proposals and negotiating agreements. Our failure to achieve signed contracts after expending such time, effort and funds could have a material adverse affect on our business, operating results and financial condition.

### *We initiated limited marketing efforts and we will be reliant on strategic partners*

We formally launched our initial product, ASE, at the Mac World Expo on January 6th to the 10th, 2009, the Consumer Electronics Association International Show on January 8th to the 11th, 2009, and the Sundance Film Festival on January 15th to the 25th, 2009. Since then we have engaged in various marketing campaigns and promotional endeavors. Most recently, and as discussed elsewhere in this Memorandum, we have mixed the new film "Discovering the Gift" (which includes our AstoundSurround trailer and logo bugs), entered into an agreement with Monster to embed our technology in certain of their headphones and co-brand the resulting products, and reached an understanding to broadcast webcasts of various AEG Live concerts in our technology together with an ASE purchase promotion. These marketing efforts, and others that largely consist of establishing strategic alliances and non-revenue branding opportunities, continue. We have also recently seen a significant uptick in industry

49

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                    GA004782

awareness and brand recognition as a result of the completion of Astound Studios and it being prominently featured in two professional audio publications.

Our success in promoting, marketing and licensing our technology, products and services will depend on further enhancing awareness and may depend in large part on our ability to enter into a number of additional agreements with strategic partners. There is no guarantee that we will be able to enhance such awareness or enter into such agreements on favorable terms and therefore our ability to generate revenue could suffer. Should we fail to do any of these things, our business will likely be materially adversely affected.

Furthermore, there can be no assurances that any strategic partners will actively market our technology, products and services, or that if they do so, their efforts will be successful or generate significant revenues for the Company. Although we intend to develop an in-house marketing and sales infrastructure to focus on direct sales to potential B2B customers, there can be no assurance that the Company will have the necessary resources to do so, or that any such efforts undertaken will be successful.

### We may not successfully develop our brand

Establishing and maintaining our brand name will be a crucial aspect of our effort to attract business. In addition, we believe that the importance of brand recognition will increase in the future due to the growing number of competitors. Promotion and enhancement of our brand name will depend largely on our ability to provide consistent high-quality products and services, which cannot be assured. As noted above, two of our strategies in this regard is to embed certain or our products into consumer electronics manufactured by leading companies in the industry or into processors that are used in consumer electronics and to cause professional audio engineers to adopt certain of our other products as the audio mixing "gold" standard. If we are unsuccessful in these endeavors, we will have difficulty developing our brand. And, if and when we do develop any significant brand recognition, if our customers do not perceive our products to be of a high quality, or if we introduce new products and services or enter into new business ventures that are not favorably received by identified users, the value of our reputation and brand name will be diminished.

### We will be dependent on third-party relationships

We expect to be dependent on a number of third-party relationships. These relationships are intended to include arrangements, including non-exclusive contracts and partnerships with providers of key services, and the resulting generation of revenue, including third party promotional arrangements with such parties as Astound Studios, Equilibrium Entertainment, AEG Live, Monster and others. The failure of us to enter into and thereafter continue such relationships on reasonable terms could have a material adverse affect on our business, results of operations and financial condition.

### Rapid technological changes may have a potential adverse effect on our business

Our future growth and our ability to remain competitive may depend in part upon our ability to develop new and enhanced products or services and to introduce these products or services at competitive prices in a timely and cost-effective manner. The markets for our products and services are characterized by rapid technological change, frequent new introductions, changes in customers' demands and evolving industry standards. In addition, product and service introductions or enhancements by our competitors or the use of other technologies could cause a decline in sales or loss of market acceptance of our existing products and services. Our success in developing, introducing, selling and supporting new and enhanced products or services depends upon a variety of factors, including timely and efficient completion of service and product design and development, and timely and efficient implementation of product and service offerings. Because new product and service commitments may be made well in advance of sales, new product or service decisions must anticipate changes in the industries served. Such a failure on our behalf to react to changing market conditions could create an opportunity for other market participants to capture a critical share of the market within a short period of time.

### We are a technology-based company, which may affect our market value for reasons beyond our control

We are a technology-based company, and as such may be susceptible to wide shifts in our market value due to a variety of factors. These factors include, among others, the rapidly changing and very competitive market for technology-based products and the large expense and lengthy time period involved in researching and developing

50

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.        GA004783

such products. These market attributes require companies to have strong technical support systems, track records and financial stability to maintain and attract new clients. Companies in these markets also experience serious competition in hiring sales, consulting and technical personnel. There can be no assurance that we will be able to overcome these obstacles and compete successfully in our market. Our future success will depend, in large part, on our ability to penetrate our target markets in accordance with our current plans and then maintain a competitive position in such markets.

### We face competition

The markets for products and services similar to ours is competitive and we expect competition to intensify in the future. Numerous well-established and well-financed companies and smaller entrepreneurial companies are focusing significant resources on developing and marketing products and services that may compete with us. There can be no assurance that we will be able to compete successfully or that competitive pressure, including possible downward pressure on the prices we charge for our products and services, will not affect our business, results of operations and financial condition. Several existing companies may, in part or in whole, compete directly with us. Many of our competitors may be significantly larger than us, have established operating histories and procedures, have access to significantly greater capital and other resources, have management personnel with more experience than our management and may have other advantages over us in conducting certain businesses and providing certain services. There can be no assurance that we can compete successfully.

### There may be fluctuations in our operating results

If we are unsuccessful in embedding our technology into consumer electronics or cannot reach acceptable business terms in connection with same, we may have difficulty generating revenues in the near term since we have experienced low levels of downloads of our stand-alone ASE consumer product, expect longer sales cycles with our professional applications and initially expect that we will license our products at the outset primarily for marketing exposure as opposed to revenue.

Once operations are more consistent and revenues are more reliable, significant annual and quarterly fluctuations in our results of operations may be caused by, among other factors, the volume of revenues generated by the Company, the timing of new product or service announcements, releases by the Company and its competitors in the marketplace of new products or services, and general economic conditions.

There can be no assurances that the level of revenues and profits, if any, achieved by us in any particular fiscal period will not be significantly lower than in other comparable fiscal periods. The Company's expense levels are based, in part, on its expectations as to future revenues. As a result, if future revenues are below expectations, net income or loss may be disproportionately affected by a reduction in revenues, as any corresponding reduction in expenses may not be proportionate to the reduction in revenues.

### We may be unable to manage growth effectively

We expect to expand our operations by embedding our technology in consumer electronics, targeting professional audio engineers for the adoption of our technology in the mixing process, mixing audio projects in our technology through an affiliated studio, increasing our sales and marketing efforts, building additional strategic relationships with third parties, expanding our product offerings and research and development activities, and escalating our infrastructural and personnel capabilities. The anticipated growth could place a significant strain on our management, and operational and financial resources. Effective management of the anticipated growth will require expanding our sales, administrative, development and management personnel, implementing appropriate financial controls, and developing additional expertise by existing management personnel. However, there can be no assurances that these or other measures implemented by us will effectively increase the Company's capabilities to manage such anticipated growth or to do so in a timely and cost-effective manner. Moreover, management of growth is especially challenging for a Company with a relatively short operating history and limited financial resources, and the failure to effectively manage growth could have a material adverse affect on our operations.

### We will be required to invest in facilities and equipment on a continuing basis

We have invested, and intend to continue to invest, in facilities and state-of-the-art equipment in order to increase, expand or update our capabilities and facilities. Changes in technology or sales growth beyond currently established

51

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004784

production capabilities will require further investment. However, there can be no assurances that we will generate sufficient funds from operations to finance any required investment or that other sources of funding will be available. Additionally, there can be no guarantees that any future expansion will not negatively affect earnings.

### We may be unable to protect and enforce our proprietary rights

Our ability to compete effectively with other companies will depend, in part, on our ability to maintain the proprietary nature of our intellectual properties, e.g., patents, trademarks, copyrights and trade secrets. Our success will also depend, in part, on our ability to obtain and/or enforce intellectual property protection for these assets in the United States and other countries. The Company, in such circumstances, may file applications for patents, copyrights and trademarks, and enter into confidentiality and non-compete agreements, all as management deems appropriate. However, there can be no assurances as to the degree of protection offered by any intellectual property rights issued to, licensed by or otherwise negotiated for by, the Company.

There can be no assurances that competitors, many of whom have substantial resources and substantial investments in competing technologies, will not seek to apply for and obtain patents and other intellectual property protection that would prevent, limit or interfere with our ability to make and sell our products and or services. In addition, the laws of certain countries do not protect our proprietary rights to the same extent as do the laws of the United States

The defense and prosecution of patent, trademark, copyright and trade secret infringement and misappropriate suits may be both costly and time consuming even if the outcome is favorable to the Company. An adverse outcome could subject us to significant liabilities to third parties, require disputed rights to be licensed from third parties, or require us to cease selling some or all of our products. We will also rely on proprietary technology in the form of trade secrets and know-how and there can be no assurances that others may not independently develop the same or similar technology, or otherwise obtain access to our proprietary technology. There can be no assurances that confidentiality agreements entered into by the Company's employees, consultants, advisors and collaborators will provide meaningful protection for our trade secrets, know-how or other proprietary information in the event of any unauthorized use or disclosure of such trade secrets, know-how or other proprietary information.

### We are dependent upon computer infrastructure

We rely heavily on our computer hardware operations, the computer facilities and related services of our digital distribution partner, and the Internet. Accordingly, a system failure could materially adversely affect the performance of the Company. We presently have limited redundancy systems, no back up facilities and only a limited disaster recovery plan. Despite the implementation of network security measures by us, computer servers are vulnerable to computer viruses, physical or electronic break-ins and similar disruptive problems. Computer viruses, break-ins or other problems caused by third parties could lead to interruptions, delays or stoppages in service to users of our services and products. The occurrence of any of these events could have a material adverse affect on our business, operations and financial condition.

### Loss of key members of our management could adversely affect our business

We are highly dependent on the services of Jerry Mahabub, the Company's President and Chief Executive Officer, and the loss of his services could have an adverse affect on the future operations of the Company. We do not currently maintain a key-man life insurance policy insuring the life of Mr. Mahabub, although the Company may secure such a key man insurance policy on Mr. Mahabub in the future.

### We may not be able to attract and retain professional and qualified personnel

Our ability to realize our objectives will be dependent on our ability to attract and retain additional, qualified personnel. Competition for such personnel can be intense, and there can be no assurance that our results will not be adversely affected by difficulty in attracting and/or retaining qualified personnel. We require all personnel to enter into confidentiality agreements as a condition of employment. However, there can be no assurance that such agreements will fully protect us from competitive injury if any of these individuals leave the Company and disclose proprietary or otherwise sensitive information.

52

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004785

*We might be unable to employ a sufficient number of technical personnel.*

We believe that our success depends upon our ability to employ and retain technical personnel with the ability to design, utilize, enhance service and maintain our technology and products.  In addition, our ability to expand our operations depends in part on our ability to increase our personnel having the expertise to expand the capabilities of our existing products and to develop new products.  The demand for such personnel is high and the supply of qualified technical personnel is limited.  A significant increase in the wages paid by competing employers could result in a reduction of our technical work force and increases in the wage rates that we must pay or both.  If either of these events were to occur, our cost structure could increase and our growth potential could be impaired.

RISKS RELATED TO THE COMPANY

*We have a limited operating history and limited capital and should be considered a start-up company*

The Company was formed in 2003 and it has just recently established revenues, though they are immaterial at this point.  Our current operations consist of developing our proprietary technology to provide audio processing products and services to consumers and the entertainment industry.  As a result, we have limited historical financial and revenue information upon which you can judge our business.  There can be no assurance that we can realize our plans on the timetables projected in this Memorandum in order to reach sustainable or profitable operations.  There is no assurance that we will not seek additional capital or that such capital shall be available at reasonable cost, or that it would not materially dilute your investment in this Offering if it is obtained.

Investment in a start-up company such as the Company is inherently subject to many risks.  The Company only has a limited operating history upon which you may base an evaluation of our performance; therefore, we are still subject to all of the risks incident to the creation and development of a new business including, among other items, competition from other companies, the lack of long-term operating history, and the need for additional working capital.

*Our existing shareholders will have controlling ownership*

Assuming the maximum amount of Shares offered hereunder are sold in this Offering, the directors, executive officers and existing principal shareholders of the Company will still control the right to vote a majority of the Company's voting capital stock.  In fact, Mr. Mahabub, the Company's Chairman and CEO, will hold the right to vote over 48% of the Company's capital stock on his own effectively giving him voting control on all decisions given the large number of Company shareholders and disparate ownership.  The voting rights represented by these share holdings provide our management and existing principal shareholders, namely Mr. Mahabub, with a sufficient number of voting rights for all practical purposes to effectively control the election of our directors, cause us to engage in transactions with affiliated entities, cause or restrict the sale or merger of the Company, and effect such other matters as may be presented for a vote of our shareholders.  Such concentration of ownership and control could have the effect of delaying, deferring or preventing a change in control of the Company even when such a change of control would be in the best interests of the Company's other shareholders  Accordingly, investors in this Offering will have little voice in our management decisions and will exercise very little control over us.  In addition, the Colorado Business Corporation Act provides that certain actions must be approved by a specified percentage of shareholders.  In the event that the requisite approval of shareholders is obtained, dissenting shareholders would be bound by such vote.  Accordingly, no persons should purchase Shares unless they are willing to entrust all aspects of control to our management.  In addition to the foregoing, the Company created a class of Series C Preferred Stock (the "Series C Preferred") which is virtually identical to the Common Stock, but entitles the holders thereof to appoint two members to the Company's Board of Directors.  All of the authorized shares of Series C Preferred were issued to Mr. Mahabub, our founder, Chairman of the Board, and CEO, as partial consideration for the Company's proprietary technology.  As a result, for as long as he owns such shares of Series C Preferred, he will be entitled to appoint at least two members to the Board.  *See* "*BOARD OF DIRECTORS AND MANAGEMENT*," and "*DESCRIPTION OF SECURITIES.*"

*We may be subject to claims from previous offerings*

Although we are not a party to any pending legal actions or proceedings and are not aware that any such actions or proceedings are likely to be initiated in the near future, since we commenced operations in 2003, we conducted three securities offerings in the early years of the Company in which we sold securities to accredited and non-accredited

53

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004786

"friends and family" investors. Although we have not conducted an in-depth investigation of those offerings, we believe that we may not have fully complied with all applicable securities rules to qualify such offerings as exempt from registration. Accordingly, we may have sold unregistered securities in violation of the Securities Act, and any counterpart state securities laws in those states where such securities were sold. Until the various federal and state statutes of limitations have expired with respect to any such violations, some or all of the investors in such offerings may have a right to rescind their respective investments, entitling them to a return of their investment capital with statutory interest. In addition, the Securities and Exchange Commission and any state securities agencies with jurisdiction could potentially seek to enforce the securities laws and penalize us for any such violations. There is also a risk that the current Offering could be integrated with the prior offerings so that our failure to comply with applicable securities laws and regulations would be deemed a failure of this Offering to so comply. Notwithstanding the foregoing, given the likely scope of any potential securities violations, the context in which they may have occurred and the nature of the Company's investors, we do not believe that the risk of a rescission or enforcement action being threatened or brought against us is significant.

### *GenAudio has not paid any dividends and have no current plans to pay any dividends on our Common Stock*

GenAudio has never paid cash dividends on our Common Stock and has no current plans to pay cash dividends with respect to our Common Stock in the foreseeable future. We intend to retain any earnings for use in the operation of our business. Our Board shall determine dividend policy in the future based upon, among other things, our results of operations, financial condition, contractual restrictions and other factors deemed relevant at the time. We intend to retain appropriate levels of our earnings, if any, to support the Company's business activities.

### *The Company has engaged in various related party transactions with its management*

The Company and its founder, Chairman of the Board and CEO, Mr. Mahabub, have engaged in various related party transactions, including loans to one another, undocumented expense reimbursements, and the sale of the Company's former studio facility. See *"RELATED PARTY TRANSACTIONS."*

### RISKS RELATED TO THE OFFERING

### *There is no minimum number of Shares which must be sold in the Offering; this is a best efforts Offering*

There is no minimum number of Shares that must be sold by us in this Offering prior to the initial closing, and we expect to accept subscriptions for Shares as they are received. As a result, there can be no assurance that we will raise sufficient funds in this Offering to carry out our business plan as currently proposed, or that the net proceeds from the initial subscriptions for the Shares will be in an amount sufficient to enable us to continue operations in any meaningful manner. In the event sufficient subscriptions for the Shares are not received and accepted by us, we may be forced to curtail or cease our activities, which would likely result in the loss to Investors of all or a substantial portion of their investment.

The Shares are being offered by the Company on a "best efforts" basis. No individual, firm or corporation has agreed in advance to purchase any of the offered Shares. No assurance can be given that any or all of the Shares will be sold.

### *The Company is in jeopardy of becoming subject to the public reporting requirements of the Securities Exchange Act of 1934, as amended*

The Company currently has approximately 472 common shareholders. This has the potential to create a significant problem for the Company. Under the applicable securities laws and regulations, if the Company ever has total assets exceeding $10,000,000 (which the Company hopes occurs in the near future) and 500 or more common shareholders, then it will become obligated to register its shares of common stock and to comply with applicable reporting requirements of the Security and Exchange Commissions.

Between retaining auditors, instituting internal procedures and policies, and preparing numerous filings with the assistance of accountants and legal counsel on an on-going basis, the cost will be substantial. In addition, the Company's management would be distracted from the core business of the Company and the Company likely would lose all strategic advantages it currently enjoys as a private company with little or none of the benefit of being a public company. That is, just because the Company registers its common stock and becomes subject to various

54

public company reporting rules, does not necessarily mean a market for the Company's Common Stock will develop or that the Company will have access to the public markets for additional capital.

While the Company may not be able to prevent such a situation from arising, if its existing shareholders do not refrain from any additional sales or transfers of their Company Common stock, the Company may seek to enforce existing transfer restrictions and requirements and impose new ones, further limiting the trnasferability of the Shares.

### *The offering price of the Shares is not based on any objective criteria*

The offering price for the Shares was determined arbitrarily by the Company based upon a number of factors. Such price is based primarily on the amount of funds sought from this financing, the number of shares of Common Stock the Board is willing to issue in order to raise such funds, the prices at which the Company has historically sold equity, the recent accomplishment of certain milestones and the Company's other business prospects. Accordingly, there is no direct relationship between the price of the Shares and the assets, earnings, net worth or book value of the Company, the market value of the Common Stock, or any other recognized criteria of value. As such, the price does not necessarily indicate the current value of the Shares and should not be regarded as an indication of any future market price of the Company's capital stock.

### *There is no public market for the Shares*

The Shares offered hereby are being offered in a private offering based upon available exemptions from federal and state securities laws. There is no public market in which the shares of Common Stock may be sold, and it is not anticipated that any such market will develop in the foreseeable future. Therefore, purchasers of the Shares should be prepared to hold their Shares for an indefinite period of time.

### *There are restrictions on transfer of the Shares*

The Shares offered hereby will be restricted securities as such term is defined in Rule 144 under the Securities Act. None of such Shares may be resold unless registered under the Securities Act and applicable state securities laws or unless exemptions from such registration requirements are available. Any such exemption must be established to our satisfaction.

Because of potential restrictions on transferability of the Shares, and the fact that no trading market exists or is expected to develop for the Shares, holders of the Shares are not likely to be able to liquidate their investments or pledge the Shares as security on a loan in the event of an emergency. Thus, the Shares should be considered only as a long-term investment.

### *There will be no merit review of the Offering*

Investors are cautioned that the Shares have not been registered under the Securities Act or any state securities laws. No federal or state authority has reviewed the accuracy or adequacy of the information contained herein nor has any regulatory authority made a merit review of the pricing of this Offering, the percentage of capital stock offered to Investors, or any dilutive factors therefrom. Therefore, investors must recognize that they do not have all the protections afforded by securities laws to register or qualify offerings with the Federal government or in states with merit reviews, and must therefore judge for themselves the adequacies of the disclosures, the pricing, dilution and fairness of the terms of this Offering without benefit of prior merit review by any authorities.

### *We may require additional financing*

Assuming the maximum amount of Shares offered hereunder are sold in this Offering, we believe that the net proceeds from this Offering, together with our projected cash flow from operations, will be sufficient to fund the Company's operations as currently conducted until the first quarter of 2012, by which time we hope to be generating self-sustaining revenues, assuming the Company's business plan and earnings projections and their underlying assumptions are materially accurate. Such belief, however, cannot give rise to an assumption that our cost estimates are accurate or that unforeseen events or changes in our business plan or earnings projections would not occur that would require us to seek additional funding to meet our operational needs. In addition, there can be no assurance

*DEN 97470204*
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**          **GA004788**

that the cash flow generated from operations will be sufficient to implement our business objectives. As a result, we may require substantial additional financing in order to implement our business objectives.

There can be no assurances that we will be able to obtain additional funding when needed, or that such funding, if available, will be available on terms acceptable to us. In the event that our operations do not generate sufficient cash flow, or we cannot acquire additional funds if and when needed, we may be forced to curtail or cease our activities, which would likely result in the loss to Investors of all or a substantial portion of their investment.

### *Dilution effect of the Offering*

After completion of this Offering and assuming the maximum amount of Shares offered hereunder are sold in this Offering, existing shareholders will own approximately 13,782,264 shares of the Company's capital stock representing approximately 95.17% of the Company's issued and outstanding capital stock (including outstanding Series C Preferred and Series D Preferred an as-converted basis), whereas the investors under this Offering will own 700,000 shares of Common Stock, representing approximately 4.83% of the Company's issued and outstanding capital stock , for which they shall have paid $3.00 per share, well in excess of the average price per share paid for the outstanding shares of Common Stock, thus representing an immediate dilution in their investment.  *See* "SECURITIES OWNERSHIP" and "DESCRIPTION OF SECURITIES".

Finally, in the event we require additional equity financing subsequent to the completion of this Offering, purchasers of the Shares in this Offering may experience further dilution to the extent that such new shares may be issued for a value less than the price paid for the Shares offered hereunder.  We may issue or sell additional securities of the Company in the future, upon such terms and at such price as we may determine in our sole discretion.

### *GenAudio has the right to create and issue additional series of Preferred Stock, which may have preferential rights over the holders of Common Stock*

We are authorized to issue up to 5,000,000 shares of Preferred Stock, of which 1,000 shares have been designated as "Series C Preferred Stock" and 1,400,000 shares have been designated as "Series D 10% Convertible Preferred Stock," the rights, preferences and limitations of which are described elsewhere in this Memorandum.  *See* "DESCRIPTION OF SECURITIES." Additional preferred stock may be issued in any series from time to time with such designations, rights, preferences and limitations, including stock with rights senior and in preference to the Common Stock, and may be sold at such price, as the Board may in its sole discretion.

### *We may need to raise additional capital in the form of debt, which would be senior to our capital stock*

From time to time, we may need to raise additional capital to fund the Company's operations and product development, and these funds may be raised in the form of debt.  We can issue any type of debt for any purpose without your consent.  In the event that we incur any indebtedness, our Common Stock and Preferred Stock will be junior and subordinate to such debt.  In the event of a liquidation, the holders of our debt would be entitled to repayment before any distribution of our assets, if any, to holders of Common Stock and Preferred Stock.  Although the Company has no outstanding long-term debt or loan facilities at this time, as of March 31, 2011, it owes various contractors approximately $12,000, Rogers and Cowen (the Company's PR firm) approximately $23,000, the Company intellectual property and corporate counsel an aggregate of approximately $50,000,  related parties approximately $4,000, and an additional $4,000 in miscellaneous trade payables.  *See* "*RELATED PARTY TRANSACTIONS.*"

### *Management will have broad discretion in the allocation of the proceeds from the Offering*

We intend to use the net proceeds of this Offering as set forth in the section entitled "Summary of the Offering." In the event less than all of the Shares are sold in this Offering, or other unforeseen events or circumstances arise, the Board of Directors will have broad discretion in allocating the proceeds of the Offering by reallocating, eliminating and/or reducing funds to be expended on the categories set forth in such Summary.

### *There are risks associated with dependence on our projections*

The plans and projections discussed by the Company in this Memorandum are based upon assumptions that we believe to be reasonable.  Among other things, our plans are based on the premise that existing and future consumer

56

demand for the intellectual property, products, goods and services offered by the Company will continue or materialize. Such assumptions may, however, be incomplete or inaccurate, and unanticipated events and circumstances may occur. For these reasons, actual results achieved during the periods covered may be materially and adversely different than the projections and plans the Company has developed. Moreover, even if the assumptions underlying the Company's plans prove to be correct, there can be no assurances that we will not incur substantial operating losses in attaining our goals.

### *There are risks associated with dependence on the Valuation Report*

The Valuation Report referred to in this Memorandum in the section entitled "Business of the Company" was not prepared by the Company and represents only potential licensing valuations in various markets based on the numerous assumptions set forth in the Valuation Report. Accordingly, the Company is not in a position to determine the accuracy of such projections. Such assumptions may be incomplete or inaccurate, and unanticipated events and circumstances may occur. For these reasons, actual results achieved may be materially and adversely different than the projections set forth in the Valuation Report. Even if the assumptions underlying the Valuation Report prove to be correct, the Valuation Report is not intended as a valuation of the Company or its Shares. Moreover, a substantial portion of Inavasis' remuneration for the report was paid in part with warrants to purchase 270,000 shares of the Company's Common Stock at $5.00 per share so Inavasis has an economic interest in the Company. This is noted in the Valuation Report by Inavasis as follows: "*The fee is not based, in any way, on any values arrived at in the valuation. The fees for this report were established prior to the commencement of any work. Inavisis agreed to accept fixed fee compensation for conducting the valuation with cash and warrants to acquire common stock of GenAudio. Despite this form of compensation the Inavisis report was designed to remain independent to help GenAudio management negotiate arms length and fairly valued licensing deals with potential licensees, or an outright sale of the AstoundSound Technology to one or more buyers.*"

### *Unaudited Financial Information*

All financial information and financial statements provided as part of this Memorandum or otherwise provided to Investors in connection with a potential investment in the Shares, have been prepared internally by the Company based on numerous assumptions. No independent party has in any manner verified, audited or confirmed the reasonableness of the assumptions or the data that form the basis of such financial information and our financial statements were not prepared in accordance with generally accepted accounting principles.

### *Investors are not independently represented*

Prospective investors in the Company are encouraged to engage independent counsel and financial advisors in its organization or in connection with the preparation of Offering materials. Attorneys assisting in the formation of the Company and the preparation of the Offering materials have represented only the Company. Any decision by an Investor to invest in the Offering should be based on an independent review of the merits and risks of any investment in the Company undertaken by the Investor, together with its advisors, if any.

## OTHER RISK FACTORS

The United States is currently in a recession. Business activity across a wide range of industries and regions is greatly reduced and local governments and many businesses are experiencing serious difficulty due to the lack of consumer spending, reductions in the value of real estate and the lack of liquidity in the credit markets. Unemployment has increased significantly. Since mid-2007, and particularly during the second half of 2008 and first quarter of 2009, the securities markets generally were materially and adversely affected by significant declines in the values of nearly all asset classes and by a serious lack of liquidity and a lack of financing for many investors.

Market conditions have also led to the failure or merger of a number of prominent financial institutions. In addition, declining asset values, defaults on mortgages and consumer loans, and the lack of market and investor confidence, as well as other factors, have all combined to cause rating agencies to lower credit ratings, and to otherwise increase the cost and decrease the availability of capital, despite very significant declines in Federal Reserve borrowing rates and other government actions.

Some banks and other lenders have suffered significant losses and have become reluctant to lend, even on a secured basis, due to the increased risk of default and the impact of declining asset values on the value of collateral. The

57

foregoing has significantly weakened the strength and liquidity of some financial institutions. In 2008 and 2009, the U.S. government, the Federal Reserve and other regulators have taken numerous steps to increase liquidity and to restore investor confidence, but asset values have continued to decline and access to capital continues to be very limited.

The Company's performance will be dependent upon the business environment in the markets where the Company operates and consumer confidence, which is relatively low at this time. It is expected that the business environment and consumer confidence globally and in the United States will continue to deteriorate for the foreseeable future. There can be no assurance that these conditions will improve in the near term and such conditions could adversely affect the Company's overall results of operations and financial condition.

In addition to the above risks, businesses are often subject to risks not foreseen or fully appreciated by management.

## RELATED PARTY TRANSACTIONS

### Transfer of Intellectual Property by Mr. Mahabub to the Company

In August of 2006, the Company issued 1,000 shares of Series C Preferred Stock to Mr. Mahabub. The Series C Preferred was issued, among other consideration, in exchange for all rights to the intellectual property for the Company's core technology and its related applications. Such additional consideration included forgiveness of any loans advanced to Mr. Mahabub prior to August, 2006, and inventor royalties payable to Mr. Mahabub once Net Revenues (defined below) from the licensing and/or sale of such intellectual property exceed fifty million dollars ($50,000,000), in accordance with the following schedule:

| NET REVENUES | PERCENT OF NET REVENUES |
|---|---|
| Over $50,000,000 | 3.5% |
| Over $100,000,000 | 2.5% |
| Over $150,000,000 | 1.5% |
| Over $200,000,000 | 0.5% |

"Net Revenues" are deemed to be the aggregate amount of (i) annual revenue received by the Company from the licensing of the Company's intellectual property to other parties or from the sale of products and services incorporating or otherwise relying upon the intellectual property, less discounts and allowances, returns, refunds and promotional sales, the amount of any shipping or insurance billed, sales or use taxes, and support obligations or (ii) the consideration received by the Company from the sale of the Company's intellectual property or any portion thereof, less any transaction costs incurred by the Company.

The Board has recently agreed to amend this agreement to lower the amount of Net Revenues at which Mr. Mahabub will be entitled to royalties to $1,000,000 and to provide two additional compensation levels in connection therewith, as set forth in the table below:

| NET REVENUES | PERCENT OF NET REVENUES |
|---|---|
| Over $1,000,000 | 5.5% |
| Over $25,000,000 | 4.5% |

In addition, the Board also agreed to amend the definition of Net Revenues to include consideration received from any sale of the Company or its assets, not just one related to the Company's intellectual property.

### Financing of Company Operations by Mr. Mahabub

As of March 31, 2011, Mr. Mahabub has sold approximately 5,980,100 of his personal shares of Company Common Stock to investors at varying prices (though Mr. Mahabub has retained all voting rights to these shares pursuant to irrevocable proxies). The purpose of these sales has been, among other things, for Mr. Mahabub to raise funds to repay advances previously made by the Company to him and to loan to the Company for purposes of financing the Company's operations at various times over the past few years when the Company experienced shortages of funds.

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                    GA004791

In lieu of payment of the accrued interest on the monies loaned through 2009 when the Company was experiencing its largest cash shortfalls and in recognition of Mr. Mahabub's sale of his personal shares (at what Mr. Mahabub and the Company believe to have been below their fair market value at the time of sale) to provide loans to the Company for Company operations, Mr. Mahabub received warrants in the beginning of 2010 to purchase 1,536,622 shares of the Company's Common Stock (i.e., one share of Common Stock for each dollar loaned to the Company) for a period of five years at a strike price of $5.00 per share.

In total, Mr. Mahabub has repaid all of the amounts previously advanced to him by the Company, being approximately $943,500, and loaned to the Company additional amounts of approximately $1,320,000 in the aggregate, largely as a result of these sales. The Company currently owes Mr. Mahabub approximately $422,000 as described in more detail below.

### Astound Studios - Sale of Studio Improvements and Equipment to Mr. Mahabub

In mid to late 2008, the Company realized that it needed to lease studio space so that it could mix and produce its own projects for purposes of building brand recognition and eventually generating revenue through both theatrical and DVD distribution channels, with the ultimate goal of driving the consumer electronics industry to the to the Company. Given the nature of the Company's technology and the need to produce the best possible results for branding purposes, the Company also realized that to do these projects properly it needed high quality space in the Los Angeles area. As a result, the Company followed a dual path. At approximately the same time it began leasing space from Chalice Studios, a state-of-the-art facility, on a temporary basis to complete some pressing projects, it also entered into a month-to-month lease for the purpose of building out and operating its own studio facility. Once that was completed, it was expected that the Company would be able to manage its projects more efficiently from both a timing and cost perspective and have even more control over the end product.

Under its lease arrangement for the new studio, the Company was responsible for the build-out of the space, which the Company diligently undertook. In the summer of 2009, however, the landlord demanded that the Company enter into a lease with a minimum three-year term. Given the Company's financial situation at the time, it was not in a position to responsibly make such a commitment. As a result of these circumstances but being convinced that a studio was needed to successfully bid on projects and showcase the power of AstoundSurround®, on July 1, 2009, Mr. Mahabub personally agreed to lease the studio from the landlord instead.

Although the Company continued to pay for the build out, it became increasingly evident that the build out was costing the Company more money than originally anticipated and that the Company did not have the cash to continue funding it. Accordingly, still convinced of the importance of the studio, Mr. Mahabub began to personally pay for the build out. Then, in March 2010, GenAudio's five member Board of Directors unanimously decided to sell and transfer the existing improvements to the studio space as well as all of the audio and related studio equipment the Company had previously acquired to Mr. Mahabub for an amount equal to GenAudio's cost basis in the improvements and studio equipment, being $860,648. This amount was deducted against the approximately $1,320,000 that the Company owed Mr. Mahabub. As part of this transaction:

(i)   Mr. Mahabub assigned the 3-year lease he had personally entered into with the landlord (as well as the studio improvements and equipment) to Astound Studios, a company that Mr. Mahabub formed to own and operate the studio;

(ii)   The Company was given the right to use the studio space on a first priority and rent-free basis;

(iii)   The Company became entitled to no less than the fair market value for any use by Astound Studios of GenAudio's technology and personnel (consistent with transactions between the Company and independent third parties); and

(iv)   The Company granted Astound Studios the perpetual, non-exclusive right to use the name "Astound" as part of its name (since the principal purpose of Astound Studios is to use the studio to mix projects that promote GenAudio and its technology).

After investing a substantial amount of Mr. Mahabub's personal funds (partially obtained through private discounted sales of his stock in the Company) into completing the build out and equipping the new studio facility with state of the art digital audio gear combined with the most sought after (and rare) vintage gear, the studio was finally completed and ready for use in June, 2010.

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA004792

Currently, the vast majority of studio time is used for GenAudio projects and testing our software. This was not the original expectation as both GenAudio's Board of Directors and Mr. Mahabub anticipated that the studio would be leased to outside third parties so that Mr. Mahabub could fund operations and recoup some of his expenses, perhaps even ear a small return on his investment and risk. Due to GenAudio's needs, however, Astound Studios has not been able to book the studio to other clients for any meaningful projects or periods of time - only one to three days per month.

As a result, Astound Studios and the Company recently amended their original agreement to require GenAudio to pay Astound Studios a rental cost of $1,000 per day (capped at an aggregate $10,000 per month maximum studio rental charge) though the Company still has priority access to the studio and can use it for as little or as much time as it wishes in any given month. This is significantly less than the $50,000 per month that GenAudio was charged by Chalice Studios, an inferior studio, to use its facilities from late 2008 to the end of the first quarter 2009.

### Astound Records - Use of Company Technology and Personnel

Astound Studios is currently focused on mixing film audio projects for the Company in AstoundSurround as well as new album releases and the re-mixing of soundtracks for commercialization, including the Tron soundtrack under its most recent agreement with Monster Cable Products, Inc. In addition, Astound Studios is in the process of establishing its own record label - Astound Records - as a subsidiary which will focus on recording musical artists in AstoundSound. It is anticipated that Astound Records would pay a reasonable license fee for the use of the Company's technology and its personnel in connection with any recordings mixed in the Company's technology and that Astound Records would retain all proceeds from sales of such recordings (or split the proceeds with strategic partners within the music industry as it deems appropriate). Mr. Rifkin currently anticipates that Mr. Rifkin, one of the Company's directors who formerly owned Mojo Records and sold it to Sony/BMG, will eventually receive up to a 20% equity interest in Astound Records given his expertise.

### Current Amounts Owed to and by Mr. Mahabub

As a result of the various related party transactions between the Company and Mr. Mahabub as described above, the current indebtedness of Mr. Mahabub as of March 31, 2011 is $456,000, which amount accrues interest at the rate of five percent (5%) per annum. It is evidenced by a Consolidated Promissory Note that provides for payments of $5,000 per month to begin only after the Company has net operating income of at least $100,000 per quarter, which payments shall continue on the first of each month until all principal and interest due hereunder is paid in full provided the Company continues to have a net operating income of at least $100,000 at the time of each such payment date; and provided further that for each $100,000 incremental increase in net quarterly operating income of the Company that exists on a payment date, then Company shall increase its payment amount by Five Thousand Dollars ($5,000.00) until all principal and interest due thereunder is paid in full.

The Company currently lists approximately $121,000 as an asset (described as "advance to shareholder") on its March 31, 2011 balance sheet. That amount reflects advances that the Company has made to Mr. Mahabub in reimbursement of various business expenses incurred by Mr. Mahabub but for which Mr. Mahabub has not yet provided the Company with receipts. Accordingly, it is currently listed as a receivable from Mr. Mahabub; however, it is anticipated that documentation verifying the associated expenses will be provided at which time all documented amounts will be re-categorized as business expense items.

In the first three months of 2011, Mr. Mahabub borrowed an aggregate of approximately $96,900 from the Company, the majority of which Mr. Mahabub advised was used to fund Astound Studios operations for projects specifically related to GenAudio and general studio costs. The loans comprising this amount are evidenced by three separate unsecured notes which bear interest at the rate of 5% per annum and have recently been amended to defer repayment until such time(s) as the Company's Consolidated Promissory Note issued to Mr. Mahabub and described above becomes payable and to otherwise require payment on equivalent terms.

### Engagement of Jay Rifkin

Mr. Rifkin, one of the Company's directors, was recently engaged by the Company to make introductions for the Company to, and otherwise assist in negotiations with, a substantial manufacturer of computer chips. If a licensing transaction is reached with this company or GenAudio or its assets are sold to this company, Mr. Rifkin will be entitled to the following percentages of "net revenues" received from any such transaction:

DEN 97470204
FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.        GA004793

| NET REVENUES | PERCENT OF NET REVENUES |
|---|---|
| Up to $25,000,000 | 2.75% |
| Over $25,000,000 | 2.25% |
| Over $50,000,000 | 1.75% |
| Over $100,000,000 | 1.25% |
| Over $150,000,000 | 0.75% |
| Over $200,000,000 | 0.25% |

"Net Revenues" are deemed to be the aggregate amount of (i) annual revenue received by the Company from the licensing of the Company's intellectual property to the chip manufacturer, less discounts and allowances, returns, refunds and promotional sales, the amount of any shipping or insurance billed, sales or use taxes, and support obligations or (ii) the consideration received by the Company from the sale of the Company to such chip manufacturer, less any transaction costs incurred by the Company.

## LEGAL PROCEEDINGS

To our knowledge, we are not a party to any material legal proceedings or litigation and we are not aware of any contemplated or threatened legal proceedings or litigation as of the date of this Memorandum. However, Investors should review "RISK FACTORS".

## ADDITIONAL INFORMATION

Each Investor, or the Investor's professional advisor, if any, is invited to ask questions of the Company's management concerning the terms and conditions of the Offering and to obtain any additional information that the Company possesses or can acquire without unreasonable effort or expense as may be necessary to verify the accuracy of the information furnished in this Memorandum. For additional information, please contact:

GenAudio, Inc.



Attn: Jerry Mahabub — Founder, Chairman, CEO and President

61

# EXHIBIT A

## SUBSCRIPTION AGREEMENT

THIS SUBSCRIPTION AGREEMENT (this "Agreement") is by and between the undersigned Subscriber identified on the signature page attached hereto (the "Subscriber") and GenAudio, Inc., a Colorado corporation located at 8200 South Quebec Street, Suite A3250, Centennial, CO 80112 (the "Company").

The Company is conducting a private placement (the "Offering") pursuant to a Confidential Private Placement Memorandum dated April 22, 2011, (together with its exhibits and as the same may be supplemented and amended from time to time, the "Memorandum"). The Offering is a "best efforts" offering of up to 700,000 shares of the Company's common stock, par value $0.0001 (the "Common Stock" or "Shares"), at a price of $3.00 per share (the "Purchase Price") for an aggregate maximum offering price of $2,100,000. Upon the Company's receipt of immediately available funds and acceptance of Subscriber' subscription (a "Closing"), the Company shall promptly thereafter deliver to Subscriber the Shares subscribed for by Subscriber. The date of the Closing in which the purchase and sale of Shares pursuant to this Agreement is effected is the "Closing Date". The Shares are sometimes referred to herein as the "Securities".

NOW THEREFORE, in consideration of the foregoing recitals, the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**Section 1.**     **Subscription and Purchase.**

    **Section 1.1.**     Subscription.  Subject to the conditions set forth in Section 2 hereof, the Subscriber hereby subscribes for and agrees to purchase the number of Shares indicated on the signature page hereto on the terms and conditions described herein.

    **Section 1.2.**     Purchase of Shares.  The Subscriber understands and acknowledges that the purchase price to be remitted to the Company in exchange for the Shares shall be $3.00 per Share, for an aggregate purchase price as set forth on the signature page hereof (the "Aggregate Purchase Price").  The Subscriber's delivery of this Agreement shall be accompanied by the completed Confidential Subscriber Questionnaire attached hereto as Exhibit A and by payment for the Shares subscribed for hereunder, payable in United States Dollars, by check or by wire transfer pursuant to the instructions set forth in Exhibit B hereto and delivered contemporaneously with delivery of this Agreement as instructed in the Memorandum. The Subscriber understands and agrees that, subject to Section 2 and applicable laws, by executing this Agreement, it is entering into a binding agreement.

**Section 2.**     **Closing Procedures**

    **Section 2.1.**     Closings.  Closings under the Offering may be held at the discretion of the Company at any time.  Sales of the Securities may continue following the initial Closing and any Closing thereafter until the earlier of the date that subscriptions for all of the Shares being offered in the Offering have been accepted by the Company or the date that the Offering terminates on the date that is 180 days from the date of the Memorandum, unless extended for up to 3 additional 30 day periods, not to exceed a total of 90 days .  Notwithstanding the foregoing, the Company shall have the right to accept or reject any subscription amounts, in whole or in part.  In the event of a rejection, this subscription shall be void with respect to such rejected amount, and all funds paid by the Subscriber with respect to such rejected amount shall be promptly returned without interest or deduction to the Subscriber.

    **Section 2.2.**     Delivery of Certificates.  The Subscriber hereby authorizes and directs the Company to deliver any certificates or other written instruments representing the Shares to be issued to such Subscriber pursuant to this Agreement to the address indicated on the signature page hereof.  Certificates representing the Shares purchased by Subscriber shall be delivered promptly following the Closing Date.

Section 2.3.     Foreign Subscribers.  If the Subscriber is not a United States resident or domiciled individual, corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government entity (or agency or subdivision thereof) or other entity of any kind (each, a "Person"), such Subscriber shall immediately notify the Company, and the Subscriber hereby represents that the Subscriber is satisfied as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Securities, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities.  Such Subscriber further represents and warrants that Subscriber's subscription and payment for, and continued beneficial ownership of, the Securities will not violate any applicable securities or other laws of the Subscriber's jurisdiction.

Section 3.         Representations and Warranties of the Subscriber.

The Subscriber hereby represents and warrants to the Company as follows:

Section 3.1.     Power and Authority.  The Subscriber has full power and authority to enter into this Agreement, the execution and delivery of which has been duly authorized, if applicable, and this Agreement constitutes a valid and legally binding obligation of the Subscriber.  The Subscriber is either an individual or an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with full right, corporate or partnership power and authority to enter into and to consummate the transactions contemplated by this Agreement and otherwise to carry out its obligations hereunder.

Section 3.2.     Exempt Offering.   The Subscriber acknowledges that the Offering and sale of the Securities is intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), by virtue of Section 4(2) of the Securities Act and the provisions of Regulation D promulgated thereunder ("Regulation D").

Section 3.3.     Acquisition for Own Account.  The Subscriber is acquiring the Securities solely for the Subscriber's own beneficial account, for investment purposes, and not with a view towards, or resale in connection with, any distribution of the Securities (this representation and warranty shall in no way limit Subscriber's right to sell the Securities in compliance with applicable federal and state securities laws).

Section 3.4.     Financial Condition.  The Subscriber's financial condition is such that the Subscriber is able to bear the risk of holding the Securities for an indefinite period of time, the Subscriber has adequate means to provide for the Subscriber's current financial needs and contingencies, the Subscriber has no need for liquidity in this investment and the Subscriber is able to risk the loss of the Subscriber's entire investment in the Securities.  The Subscriber's overall commitment to investments that are not readily marketable such as an investment in the Securities is not disproportionate to the Subscriber's net worth and the Subscriber's investment in the Securities will not cause such overall commitments to become excessive.

Section 3.5.     Accredited Investor.   The Subscriber has completed the applicable Confidential Subscriber Questionnaire attached hereto and is an "accredited investor" as that term is defined in Rule 501 of Regulation D of the Securities Act.

Section 3.6.     Sophistication.  The Subscriber and the Subscriber's attorney, accountant, purchaser representative and/or tax advisor, if any (collectively, the "Advisors") has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of a prospective investment in the Securities.  The Subscriber, either alone or together with its Advisors, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the Offering, and has so evaluated the merits and risks of such investment. The Subscriber has not authorized any Person to act as its Purchaser Representative (as that term is defined in Regulation D of the General Rules and Regulations under the Securities Act) in connection with the Offering.

*DEN 97470204*
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**          **GA004796**

Section 3.7.   Review of Information.   The Subscriber acknowledges receipt and careful review of the Memorandum, including all exhibits thereto, and has been furnished by the Company during the course of this transaction with all information regarding the Company, the Offering and the Securities which the Subscriber has requested or desires to know; and the Subscriber and its Advisors, if any, have been afforded the opportunity to ask questions of and receive answers from duly authorized officers or other representatives of the Company concerning the terms and conditions of the Offering, the business, financial condition, results of operation and prospects of the Company, and any additional information which the Subscriber has requested, and all such questions have been answered to the full satisfaction of the Subscriber and its Advisors, if any.

Section 3.8.   Evaluation of Risks.   The Subscriber has carefully considered the potential risks relating to the Company and a purchase of the Securities, including but not limited to a thorough review of the "Risk Factors" section of the Memorandum, and fully understands that the Securities are a speculative investment that involve a high degree of risk of loss of the Subscriber's entire investment.

Section 3.9.   No Oral Representations.   The Subscriber confirms that no oral or written representations or warranties have been made to the Subscriber by the Company or any of its officers, employees, agents, sub-agents, affiliates or advisors, other than any representations of the Company contained herein, and in subscribing for the Securities, the Subscriber is not relying upon any representations other than those contained herein.

Section 3.10.   No Reliance.   The Subscriber is not relying on the Company or any of its employees, agents, sub-agents or advisors with respect to the legal, tax, economic and related considerations involved in this investment. The Subscriber has relied on the advice of, or has consulted with, only its Advisors. Each Advisor, if any, is capable of evaluating the merits and risks of an investment in the Securities.

Section 3.11.   Restrictions on Transfer.   The Subscriber will not sell or otherwise transfer any Securities without registration under the Securities Act or an exemption therefrom, and fully understands and agrees that the Subscriber must bear the economic risk of its purchase because, among other reasons, the Securities have not been registered under the Securities Act or under the securities laws of any state and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless they are subsequently registered under the Securities Act and under the applicable securities laws of such states, or an exemption from such registration is available.  In particular, the Subscriber is aware that the Securities are "restricted securities," as such term is defined in Rule 144 promulgated under the Securities Act (as such rule may be amended or superseded by a similar rule or regulation having substantially the same effect, "Rule 144"), and they may not be sold pursuant to Rule 144 unless all of the conditions of Rule 144 are met. The Subscriber also understands that the Company is under no obligation to register the Securities on behalf of the Subscriber or to assist the Subscriber in complying with any exemption from registration under the Securities Act or applicable state securities laws. The Subscriber understands that any sales or transfers of the Securities are further restricted by state securities laws and the provisions of this Agreement. Upon Company's request, Subscriber shall deliver to Company a legal opinion reasonably acceptable to Company contemporaneously with the request for any transfer of the Securities confirming that such proposed transfer complies with all requirements of the Securities Act, including Rule 144, and applicable state securities laws.

Section 3.12.   Restrictive Legends.   The Subscriber understands and agrees that the certificates for the Shares shall bear substantially the following legend until (i) such Shares shall have been registered under the Securities Act and effectively disposed of in accordance with a registration statement that has been declared effective or (ii) in the opinion of counsel reasonably acceptable to the Company, such Shares may be sold without registration under the Securities Act, as well as any applicable "blue sky" or state securities laws:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAWS, AND NEITHER SUCH SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR OTHERWISE TRANSFERRED UNLESS (1) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR (2) AN EXEMPTION FROM SUCH REGISTRATION EXISTS AND THE COMPANY RECEIVES AN OPINION OF COUNSEL TO THE HOLDER OF SUCH SECURITIES, WHICH COUNSEL AND OPINION ARE REASONABLY SATISFACTORY TO THE COMPANY, THAT SUCH SECURITIES MAY BE OFFERED, SOLD,

PLEDGED, ASSIGNED OR TRANSFERRED IN THE MANNER CONTEMPLATED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR APPLICABLE STATE SECURITIES LAWS.

Section 3.13.    No SEC Review.  The Subscriber understands that neither the Securities and Exchange Commission (the "SEC") nor any state securities commission has approved the Securities or passed upon or endorsed the merits of the Offering. There is no government or other insurance covering any of the Securities.

Section 3.14.    Address.  The Subscriber hereby represents that the address of the Subscriber furnished at the end of this Agreement is the undersigned's principal residence, if the Subscriber is an individual, or its principal business address if it is a corporation or other entity.

Section 3.15.    Prohibited Party to Transaction.  Neither Subscriber nor any Person who owns an interest in Subscriber (a "Purchaser Party") is now, or shall be at any time prior to or at the Closing Date, a Person with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories, or a United States Financial Institution as defined in 31 U.S.C. Section 5312, as amended, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("OFAC").

Section 3.16.    Payment of Purchase Price.  Subscriber has taken, and shall continue to take until the Closing Date, such measures as are required by law to assure that the funds used to pay to the purchase price for the Shares are derived: (i) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

Section 3.17.    Money Laundering.  To the best of Subscriber's knowledge, neither Subscriber nor any Purchaser Party, nor any Person providing funds to Subscriber: (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as defined below); (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws. For purposes of this Section 3(cc), the term "Anti-Money Laundering Laws" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that: (i) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (ii) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (iii) require identification and documentation of the parties with whom a Financial Institution conducts business; or (iv) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq. (the "Bank Secrecy Act"), the Trading with the Enemy Act, 50 U.S.C. Appendix, the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

Section 3.18.    Survival.  Subscriber represents and warrants that the representations and warranties contained in this Section 3 are true and accurate as of the date hereof and shall survive the delivery of the Purchase Price and this completed Agreement.

Section 4.        Representations and Warranties of the Company.

The Company hereby represents and warrants to the Subscriber as follows:

Section 4.1.    Organization and Qualification.  The Company is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                    GA004798

organization (as applicable), with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted.

Section 4.2.  Authorization; Enforcement. The Company has the corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement has been duly authorized, executed and delivered by the Company and is valid, binding and enforceable against the Company in accordance with its terms.

Section 4.3.  Issuance of Securities. The Shares to be issued to the Subscriber pursuant to this Agreement, when issued and delivered in accordance with the terms of this Agreement, will be duly authorized and validly issued and will be fully paid and non-assessable, free and clear of all liens, charges, security interests, encumbrances, rights of first refusal, preemptive rights or other restrictions (collectively, "Liens") imposed by the Company other than restrictions on transfer provided for in this Agreement. The Company has reserved from its duly authorized capital stock the maximum number of shares of common stock issuable pursuant to this Agreement.

Section 4.4.  No Conflicts with Organizational Instruments. The execution and delivery and the performance of this Agreement by the Company does not and will not  conflict with the Company's articles of incorporation or bylaws, as amended to date.

Section 4.5.  Capitalization. After giving effect to the transactions contemplated by this Agreement and the Memorandum, the Company will have the outstanding capital stock as set forth in the Memorandum. All of the outstanding shares of capital stock of the Company are validly issued, fully paid and nonassessable, and no further approval or authorization of any stockholder, the Company's Board of Directors or others is required for the issuance and sale of the Securities.

Section 4.6.  Financial Statements.  The financial statements attached as Exhibit B to the Memorandum (the "Financial Statements") present fairly and accurately the financial condition of the Company and the results of operations of the Company for the periods covered thereby, are correct and complete, and are consistent with the books and records of the Company.

Section 4.7.  Material Changes; Undisclosed Events, Liabilities or Developments. Since the date of the latest Financial Statements, except as disclosed in the Memorandum, (i) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a material adverse impact (i) on the Company's operations, assets, or business condition, taken as a whole (other than an event whose impact would reasonably be expected to aggregate less than $250,000), or (ii) on the enforceability of this Agreement or the Company's ability to perform in any material respect on a timely basis hereunder (any of (i) or (ii) a "Material Adverse Effect"), (ii) the Company has not incurred any liabilities (contingent or otherwise) other than trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice, (iii) the Company has not altered its method of accounting, and (iv) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock.

Section 4.8.  Litigation. There is no action, suit, inquiry, or  proceeding pending or, to the knowledge of the Company, threatened against or affecting the Company, or any of its properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action") which could, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect.

Section 4.9.  Employees.   To the Company's knowledge, no employee, officer or director of the Company, nor any consultant with whom the Company has contracted, is in violation of any proprietary information agreement or non-competition agreement.

Section 4.10.  Patents and Trademarks. The Company has not received any notice (written or otherwise) that any of the Intellectual Property Rights used by the Company violates or infringes upon the rights of

*DEN 97470204*
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**                    **GA004799**

any Person. To the knowledge of the Company, all such Intellectual Property Rights are enforceable and there is no existing infringement by another Person of any of the Intellectual Property Rights.

Section 4.11.   Survival.   The foregoing representations, warranties and agreements shall survive the Closing Date.

Section 5.   Indemnification.

Section 5.1.   Company Indemnification of Subscriber. The Company hereby agrees to indemnify and hold harmless the Subscriber and, where applicable, its directors, officers, and employees ("Subscriber Party"), from and against any and all loss, damage, liability, claim or expense (including, but not limited to, fees, costs and expenses incurred in investigating, preparing or defending such matter, whether commenced or threatened) due to or arising out of a material breach of any representation, warranty or covenant of the Company contained in this Agreement.

Section 5.2.   Subscriber Indemnification of Company.   The Subscriber acknowledges that the Subscriber understands the meaning and legal consequences of the representations and warranties and certifications contained in Section 3, and the Subscriber hereby agrees to indemnify and hold harmless each of the Company, its directors, officers, and employees ("Company Party") from and against any and all loss, damage and liability due to or arising out of a material breach of any representation, warranty or covenant of the Subscriber contained in this Agreement.

Section 5.3   Indemnification Procedures.     If any action shall be brought against any indemnified party in respect of which indemnity may be sought hereunder, such indemnified party shall promptly notify the indemnifying party in writing, and the indemnifying party shall have the right to assume the defense thereof with counsel of its own choosing reasonably acceptable to the indemnified party. Any indemnified party shall have the right to employ separate counsel and participate in the defense thereof, but the fees and expenses of such counsel shall be at such indemnified party's expense except to the extent that (i) the employment thereof has been authorized by the indemnifying party in writing, (ii) the indemnifying party has failed after a reasonable period of time to assume such defense and to employ counsel or (iii) in such action there is, in the reasonable opinion of such separate counsel, a material conflict on any material issue between the position of the indemnifying party and the position of such indemnified party, in which case the indemnifying party shall be responsible for the reasonable fees and expenses of no more than one such separate counsel. The indemnifying party will not be liable to any indemnified party under this Agreement (i) for any settlement by a indemnified party effected without the indemnifying party's prior written consent, which shall not be unreasonably withheld or delayed; or (ii) to the extent, but only to the extent that a loss, claim, damage or liability is attributable to any indemnified party's breach of any of the representations, warranties, or agreements made by such indemnified party in this Agreement.

Section 6.   Legend Removal; Replacement of Securities. To the extent that the restrictive legends on any certificates representing the Shares are no longer required under the Securities Act, Subscriber may submit such certificates to the Company or its designated transfer agent for cancellation and re-issuance of new certificates without such legends, which certificates shall be delivered to Subscriber promptly following of receipt of the original certificates (and any other requisite documentation to effect legend removal, including an opinion of counsel reasonably acceptable to Company). In the event of the loss, theft, destruction or mutilation of a stock certificate representing the Shares, upon the Company's receipt of evidence reasonably satisfactory to it of such event, and in the case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it, or in the case of mutilation upon surrender of such mutilated certificate, the Company shall issue and deliver to Subscriber a replacement certificate of like tenor.

Section 7.   Securities Act Information. If the Company subsequently becomes a publicly traded entity, the Company thereafter covenants to use its best efforts to timely file all reports required to be filed by it after such date pursuant to the Securities Exchange Act of 1934, as amended, or, if not so required, to prepare and furnish to the Subscribers and make publicly available in accordance with Rule 144(c) such information as is required for the Subscribers to sell the Securities under Rule 144.

*DEN 97470204*
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**          **GA004800**

**Section 8.**      **Blue Sky Filings.**  The Company shall take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Securities for, sale to the Subscribers at each Closing under applicable securities or "Blue Sky" laws of the states of the United States.

**Section 9.**      **Listing of Securities.**  If at any time hereafter the Common Stock shall become publicly registered or traded, the Company shall, not later than the initial such date, and continuing at least until all the Shares have been sold, provide a transfer agent and registrar for its Common Stock.  Once traded on an over-the-counter market or listed on a national exchange or marketplace, the Company shall use its reasonable best efforts to comply with the continued trading or listing requirements, as applicable.

**Section 10.**      **Expenses.**  Each of the Subscriber and the Company shall be responsible for their respective fees and expenses incurred in connection with the consummation of the transactions contemplated by this Agreement.

**Section 11.**      **Confidentiality.**  Subscriber shall hold confidential, and will cause the Subscriber's partners, officers, employees, directors, equity owners, agents, and representatives, if any, (collectively, "Representatives") to hold confidential (and not to use except in connection with the investment in the Company), all non-public information concerning the Company, its subsidiaries and its affiliates that is provided to Subscriber or Subscriber's Representatives in connection with its investment.  Except as required by law, regulation or legal process or regulatory authority, without the prior written consent of the Company, Subscriber will not, and will use Subscriber's best efforts to cause Subscriber's Representatives to not, disclose or use any such confidential information for any purpose other than in connection with the investment contemplated hereby.

**Section 12.    Miscellaneous.**

Section 12.1.    Execution.  This Agreement may be executed in one or more counterparts, which together shall constitute one and the same agreement.  Facsimile and electronically imaged signatures shall have the same force and effect as originals.  This Agreement shall be binding upon and inure to the benefit of the heirs, executors, successors and permitted assigns of the parties.  The Company may not assign this Agreement without the written consent of Subscriber (other than by merger).  Subscriber may assign any or all of its rights under this Agreement to an assignee or transferee of its Securities, provided such assignee or transferee agrees in writing to be bound to the provisions of this Agreement that apply to "Subscriber" with respect to such Securities.  This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters.

Section 12.2.    Modifications.  No provision of this Agreement may be amended or waived except in a writing signed by both parties (in the case of an amendment) or signed by the party against whom enforcement of any such waived provision is sought (in the case of a waiver).  If any term, provision or covenant of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of this Agreement shall remain in full force and effect and the parties shall use their commercially reasonable best efforts to find and employ an alternative means to achieve substantially the same result as that contemplated by such term, provision or covenant.

Section 12.3.    Notices.  All notices required or permitted hereunder shall be in writing and shall be deemed effectively given to the other party: (i) upon personal delivery; (ii) when sent by confirmed electronic mail (e-mail) or facsimile if sent during normal business hours of the recipient, if not, then on the next business day; (iii) three (3) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent to the Company at its principal address or to Subscriber at Subscriber's last address in the Company's records or such other address as the Company or Subscriber may designate by ten (10) days advance written notice to the other party.  If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a business day, then such action may be taken or such right may be exercised on the next succeeding business day.

Section 12.4.    Governing Law; Venue.  This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado, without reference to the conflicts of law provisions thereof.  Venue for any proceeding or dispute arising between the parties hereto in any manner pertaining or related to this Agreement shall, to the extent permitted by law, be the City and County of Denver, Colorado.  The parties hereby consent to the exclusive jurisdiction of the state courts of the State of Colorado sitting within the City and County of Denver, Colorado, and waive any contention that any such court is an improper venue for enforcement of this Agreement.

Section 12.5.    **WAIVER OF JURY TRIAL:**  THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY DISPUTE OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

## SIGNATURE PAGE TO GENAUDIO, INC. SUBSCRIPTION AGREEMENT

The undersigned Subscriber hereby certifies that he, she or it (i) has received and relied solely upon the Memorandum, this Subscription Agreement and their respective exhibits and schedules, (ii) agrees to all the terms and makes all the representations set forth in this Subscription Agreement and (iii) meets the suitability standards set forth therein and herein.

Subscription Amount:  $ _____

# of Shares: _____

_____        __        _____
Name of Subscriber (Print)               Name of Joint Subscriber (if any) (Print)

_____                  _____
Signature of Subscriber                  Signature of Joint Subscriber (if any)

_____
Capacity of Signatory (for entities)

_____        __        _____
Social Security or Taxpayer Identification Number    Country of Residence (if a non-U.S. Subscriber)

Subscriber Contact Information:

_____                  _____
Street Address                           Telephone            Fax

_____                  _____
City          State      Zip Code        Email

Instructions for Delivery of Securities:

   Deliver to the address above               Deliver to an alternate address:

 

                                                        _____

                                                        _____

The Subscriber certifies under penalty of perjury that (1) the Social Security Number or Taxpayer ID and address provided above is correct, (2) the Subscriber is not subject to backup withholding (unless otherwise noted above) either because he has not been notified that he is subject to backup withholding or because the Internal Revenue Service has notified him that he is no longer subject to backup withholding and (3) the Subscriber (unless a non-U.S. Subscriber) is not a nonresident alien, foreign partnership, foreign trust or foreign estate.

THE SUBSCRIPTION FOR SECURITIES OF GENAUDIO, INC. BY THE ABOVE NAMED SUBSCRIBER(S) IS ACCEPTED THIS _____ DAY OF _____, 2011.

GENAUDIO, INC.

By: _____
Name:
Title:

*DEN 97470204*
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**          **GA004803**

**EXHIBIT A TO SUBSCRIPTION AGREEMENT - CONFIDENTIAL SUBSCRIBER QUESTIONNAIRE**

This Questionnaire is provided to a prospective Subscriber who has expressed interest in purchasing securities of GenAudio, Inc. (the "Company"). The purpose of this Questionnaire is to determine whether Subscribers meet applicable suitability standards to invest in the offering of securities by the Company ("Offering"), and to comply with certain "know your customer" requirements. This material does not constitute an offer to sell nor is it a solicitation of an offer to buy securities, which offer may be made only pursuant to the terms and conditions of the Subscription Agreement to which this Questionnaire is an exhibit. Completion of this Questionnaire does not guarantee a Subscriber's participation in the Offering.

Answers to this Questionnaire will be kept confidential, provided they may be provided to such parties as required to provide assurance that the Offering will not result or has not resulted in violations of securities laws which are being relied upon by the Company in connection with the offer and sale thereof.

Please type or clearly print answers. If securities are to be purchased by more than one individual or entity, a separate Questionnaire should be completed for each.

Name of Subscriber: _____

1. The undersigned qualifies as an "accredited investor" pursuant to the following definition (please check one or more of the following which apply to Subscriber; if none apply, do not check any items):

☐   **The undersigned is an individual who is a director or executive officer of the Company.** An "executive officer" is the president, a vice president in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the Company.

☐   **The undersigned is an individual that (1) had individual income of more than $200,000 in each of the two most recent fiscal years and reasonably expects to have individual income in excess of $200,000 in the current year, or (2) had joint income together with the undersigned's spouse in excess of $300,000 in each of the two most recent fiscal years and reasonably expects to have joint income in excess of $300,000 in the current year.** "Income" means adjusted gross income, as reported for federal income tax purposes, increased by the following amounts: (i) any tax exempt interest income under Section 103 of the Internal Revenue Code (the "Code") received, (ii) any losses claimed as a limited partner in a limited partnership as reported on Schedule E of Form 1040, (iii) any deduction claimed for depletion under Section 611 of the Code or (iv) any amount by which income has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Code. In determining personal income, however, unrealized capital gains should not be included.

☐   **The undersigned is an individual with individual net worth, or combined net worth together with the undersigned's spouse, in excess of $1,000,000.** "Net Worth" means all of an investor's assets (other than his or her primary residence) whether liquid or illiquid, such as cash, stock, securities, personal property and real estate based on the fair market value of such property MINUS all debts and liabilities (other than a mortgage or other debt secured by his or her primary residence unless such mortgage or other debt exceeds the fair market value of the residence, in which case such excess liability should ALSO be deducted from his or her net worth.

☐   **The undersigned is a Trust with total assets in excess of $5,000,000,** was not formed for the specific purpose of acquiring securities of the Company, and the purchase of the securities is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the risks and merits of the prospective investment in such securities.

☐   **The undersigned is a corporation, partnership, limited liability company or limited liability partnership that has total assets in excess of $5,000,000** and was not formed for the specific purpose of acquiring securities of the Company.

☐   **The undersigned is an entity in which all of its equity owners are "accredited investors".**

*DEN 97470204*
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**          **GA004804**

2.   The Subscriber's principal residence, if different than the address provided on the signature page to the Subscription Agreement, is as follows:

_____

_____

3. The Subscriber's current employment or business activity is as follows:

Company Name: _____

Address: _____

Telephone Number: _____

Principal Business: _____

Position and Title: _____

4. The Subscriber has _____ years of investment experience.

5. The Subscriber invests or trades in marketable securities:

        ☐ More than 20 times per year
        ☐ 6-20 times per year
        ☐ 1-5 times per year
        ☐ Never

6. The Subscriber invests in non-marketable securities such as private placements:

        ☐ More than 10 times per year
        ☐ 6-10 times per year
        ☐ 1-5 times per year
        ☐ Never

7. The Subscriber has provided the following identification information:

        ☐ A copy of Subscriber's driver's license (front and back) or passport or, in the case of an entity, such identification for its principal individual shareholders and signatories, accompanies this Questionnaire.

The Subscriber by signing below represents that the information provided in this Questionnaire is true and complete in all material respects.

_____     _____
Name of Subscriber (Print)                              Name of Joint Subscriber (if any) (Print)

_____     _____
Signature of Subscriber                                     Signature of Joint Subscriber (if any)

_____     _____
Capacity of Signatory (for entities)                   Date

*DEN 97470204*
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**          **GA004805**

## EXHIBIT B TO SUBSCRIPTION AGREEMENT - PAYMENT INSTRUCTIONS

Date: _____

To: _____
     [Your Financial Institution]

Dear _____ :

Please wire $_____ from my account # _____
according to the following instructions:

     Wells Fargo Bank:
     ABA #: 121000248
     Account Name: **GenAudio, Inc. Account**
     Account #: ████ 0952

     Ref: _____
            [Your Name]

Funds are for purposes of investment in a private placement.

Thank you,


_____     _____
Signature                     Joint Signature (if any)


_____     _____
Printed Name                  Printed Name

*For payments by check instead of wire transfer, please make payable to:*
*"GenAudio, Inc." and deliver to*

GenAudio Inc.

████████████

Attn: Jim Devine, SVP of Finance

*DEN 97470204*
**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**     GA004806

# EXHIBIT B

## FINANCIAL STATEMENT AS OF MARCH 31, 2011

**GenAudio, Inc.**
**Profit & Loss**
January - March, 2011

| | | Total |
|---|---|---|
| Income | | |
| 410000 Sales of ASE | | 2,118.65 |
| Total Income | $ | 2,118.65 |
| Cost of Goods Sold | | |
| 610000 Server Bandwith | | 14.65 |
| 521000 Cost Movie Editing | | 9,825.00 |
| 530000 Production Costs | | 87,692.25 |
| Total Cost of Goods Sold | $ | 97,531.91 |
| Gross Profit | $ | (95,413.26) |
| Expenses | | |
| 610000 Auto | | 1,155.90 |
| 615000 Bank Charges | | 246.94 |
| 618000 Colocation Expense | | 2,380.00 |
| 624000 Communication | | 1,508.63 |
| 625000 Conferences & Trade Shows | | 15,000.00 |
| 627500 Development Costs | | 89,424.97 |
| 628000 Marketing & Sales | | 2,925.00 |
| 635000 Equipment & Tools | | 1,143.78 |
| 636000 Insurance | | 15,237.90 |
| 640000 Internet | | 968.85 |
| 643000 Legal & Professional | | 60,877.84 |
| 645000 Meals and Entertainment | | 943.85 |
| 647000 Meetings Expense | | 29.44 |
| 648000 Miscellaneous | | 179.97 |
| 651000 Office Expenses | | 155.32 |
| 653000 Payroll Tax Expense | | 20,202.60 |
| 653600 Payroll Fees | | 646.59 |
| 654000 Printing & Replacing | | 561.31 |
| 654500 Postage & Shipping | | 2,517.48 |
| 656200 Public Relations | | 33,459.56 |
| 658000 Rent or Lease | | 2,998.20 |
| 660000 Salaries & Wages | | 120,732.63 |
| 664000 Software | | 200.00 |
| 670000 Travel | | 36,728.38 |
| Total Expenses | $ | 412,123.24 |
| Net Operating Income | $ | (507,536.50) |
| Other Expenses | | |
| 720000 Interest Expense (Income) | | 15,677.81 |
| Total Other Expenses | $ | 15,677.81 |
| Net Other Income | | (15,677.81) |
| Net Income | $ | (523,214.31) |

**GenAudio, Inc.**
**Balance Sheet**
As of March 31, 2011

| | | Total |
|---|---|---|
| ASSETS | | |
| Current Assets | | |
| Bank Accounts | | |
| 106000 Wells Fargo 0376 | | 17,976.19 |
| Total Bank Accounts | $ | 17,976.19 |
| Other Current Assets | | |
| 122000 Employee Advances | | 97,703.38 |
| 126000 Payroll Voids Receivable | | 207.31 |
| 135000 Retainers | | 20,000.00 |
| 137000 Prepaid Expenses | | 27,752.88 |
| 137100 Prepaid Rent | | 10,000.00 |
| 138000 Travel Advance | | 1,027.12 |
| Total Other Current Assets | $ | 156,690.69 |
| Total Current Assets | $ | 174,666.88 |
| Fixed Assets | | |
| 150000 Computers & Sound Equip.Net | | 22,853.19 |
| 154000 Furniture & Fixtures Office Net | | 710.43 |
| Total Fixed Assets | $ | 23,563.62 |
| Other Assets | | |
| 180000 Advances to Shareholder | | 121,380.32 |
| 185000 Deposits | | 17,500.00 |
| 195000 Offering Costs Net | | 249,535.94 |
| 196000 License & Technology Transfer | | 323,435.05 |
| Total Other Assets | $ | 711,851.31 |
| TOTAL ASSETS | $ | 910,081.81 |
| LIABILITIES AND EQUITY | | |
| Liabilities | | |
| Current Liabilities | | |
| Accounts Payable | | |
| 200000 Accounts Payable | | 88,195.75 |
| Total Accounts Payable | $ | 88,195.75 |
| Other Current Liabilities | | |
| 215000 Payable Stock Subscri | | 100.00 |
| Total Other Current Liabilities | $ | 100.00 |
| Total Current Liabilities | $ | 88,295.75 |
| Long Term Liabilities | | |
| 271000 Preferred Dividend Payable | | 437,000.00 |
| 285000 N/P J Mahabub | | 456,107.66 |
| Total Long Term Liabilities | $ | 893,107.66 |
| Total Liabilities | $ | 981,403.41 |
| Equity | | |
| 301900 Preferred Stock Series C | | 0.10 |
| 302000 Preferred Stock Series D | | 43.40 |
| 305000 Common Stock | | 1,333.21 |
| 310000 Additional Paid-In-Capital | | 15,001,123.39 |
| 312000 Purchased Warrants | | (23,800.00) |
| 315000 Accrued Preferred Dividend | | (437,000.00) |
| 320000 Retained Earnings | | (14,089,807.39) |
| Net Income | | (523,214.31) |
| Total Equity | $ | (71,321.60) |
| TOTAL LIABILITIES AND EQUITY | $ | 910,081.81 |

**FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.**