E**XCERPTED**

# EXHIBIT 5

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:            )
                             ) File No. D-03450-A
GENAUDIO, INC.               )

WITNESS:  Jim Wei-Kung Mattos

PAGES:    1 through 293

PLACE:    Securities and Exchange Commission

          1961 Stout Street

          Denver, Colorado 80294

DATE:     Monday, February 9, 2015

        The above-entitled matter came on for hearing, pursuant to notice, at 9:05 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

Page 2

```
 1    APPEARANCES:
 2
 3    On behalf of the Securities and Exchange Commission:
 4        JENNIFER OSTROM, ESQ.
 5        KURT GOTTSCHALL, ESQ.
 6        Securities and Exchange Commission
 7        Division of Enforcement
 8        1961 Stout Street
 9        Denver, Colorado 80294
10        (303) 844-1000
11
12    On behalf of the Witness:
13        MICHAEL P. McCLOSKEY, ESQ.
14        WILSON ELSER MOSKOWITZ
15        EDELMAN & DICKER LLP
16        655 West Broadway, Suite 900
17        San Diego, California  92101
18        (619) 321-3200
19
20
21
22
23
24
25
```

Page 3

```
 1                   C O N T E N T S
 2
 3    WITNESS:                    EXAMINATION
 4    Jim Wei-Kung Mattos              6
 5
 6    EXHIBITS    DESCRIPTION           IDENTIFIED:
 7      65    Testimony subpoena           9
 8      66    Document subpoena            9
 9      67    Background Questionnaire     17
10      68    Document Bates numbered      138
11            JM 1992 through 1995 (E-mail)
12      69    Document Bates numbered      154
13            JM 2152 (E-mail)
14      70    Document Bates numbered      158
15            JM 2191 (E-mail)
16      71    Document Bates numbered      166
17            JM 4182 and 4183 (E-mail)
18      72    Document Bates numbered      174
19            JM 3863 through 3866 (E-mail)
20      73    Document Bates numbered      177
21            SEC 6 through 9 (Letter)
22      74    Document Bates numbered JM 3473   179
23            (E-mail)
24      75    Document Bates numbered JM 5081   193
25            (E-mail)
```

Page 4

```
 1                 C O N T E N T S (CONT.)
 2
 3    EXHIBITS    DESCRIPTION           IDENTIFIED:
 4      76    Document Bates numbered JM 3418   195
 5            Through 3420 (E-mail)
 6      77    Document Bates numbered      198
 7            D-P-230 through 235 (E-mail)
 8      78    Document Bates numbered      205
 9            JM 7207 through 7212 (E-mail)
10      79    Document Bates numbered      216
11            JM 7203 through 7206 (E-mail)
12      80    Document Bates numbered      218
13            JM 7198 through 7200 (E-mail)
14      81    Document Bates numbered      220
15            JM 10636 through 10639 (E-mail)
16      82    Excerpt from testimony of    231
17            Victor Tiscareno, 12/3/14 (E-mail)
18      83    Document Bates numbered      236
19            JM 7073 through 7075 (E-mail)
20      84    Document Bates numbered      247
21            JM 11476 through 11481 (E-mail)
22      85    Document Bates numbered      256
23            JM 11148 through 11151 (E-mail)
24      86    Document Bates numbered      258
25            JM 11713 through 11724  (E-mail)
```

Page 5

```
 1                 C O N T E N T S (CONT.)
 2
 3    EXHIBITS    DESCRIPTION           IDENTIFIED:
 4      87    Document Bates numbered      273
 5            JM 15076 and 15077 (E-mail)
 6      88    Document Bates numbered      274
 7            JM 16793 and 16794 (E-mail)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

Page 6

1          PROCEEDINGS
2          MS. OSTROM:  Let's go on the record at
3   9:05 a.m. on February 9th of 2015.
4          Would you please raise your right hand.
5   Whereupon,
6             JIM WEI-KUNG MATTOS,
7   being first duly sworn in the above cause, was
8   examined and testified as follows:
9              EXAMINATION
10      BY MS. OSTROM:
11      Q   Would you please state and spell your full
12   name for the record.
13      A   My name is Jim Wei-Kung Mattos.  It is
14   J-i-m W-e-i, hyphen, K-u-n-g, M-a-t-t-o-s.
15      Q   And my name is Jennifer Ostrom.  And with
16   me is Kurt Gottschall.  And we are both officers of
17   the United States Securities and Exchange Commission
18   for purposes of this proceeding.  And this is an
19   investigation by the Commission in the the matter of
20   GenAudio, Inc., to determine whether there have been
21   violations of certain provisions of the federal
22   securities laws.  However, the facts developed in
23   this investigation might constitute violations of
24   other federal or state civil or criminal laws.
25          And prior to the opening of the record you

Page 7

1   were provided with a copy of the formal order of
2   investigation in this matter.  And it will be
3   available for your examination during the course of
4   this proceeding.
5          Mr. Mattos, have you had an opportunity to
6   review the formal order?
7      A   I have.
8      Q   And also prior to the opening of the
9   record you were provided with a copy of the
10   Commission's Supplemental Information Form, and a
11   copy of that notice has been marked as
12   Exhibit No. 1.  And, Mr. Mattos, have you had the
13   opportunity to read Exhibit No. 1?
14      A   I have.
15      Q   Do you have any questions concerning the
16   notice?
17      A   No.
18      Q   And I want to highlight for you
19   Paragraph B2 of the Form 1662.  It reads as follows,
20   You may be represented by counsel who also
21   represents other persons involved in the
22   Commission's investigation.  This multiple
23   representation, however, presents a potential
24   conflict of interest if one client's interests are
25   or may be adverse to another's.  If you are

Page 8

1   represented by counsel who also represents other
2   persons involved in the investigation, the
3   Commission will assume that you and counsel have
4   discussed and resolved all issues concerning
5   possible conflicts of interest.  The choice of
6   counsel and the responsibility for that choice is
7   yours.
8          Do you understand this?
9      A   I do.
10      Q   And, Mr. Mattos, are you represented by
11   counsel today?
12      A   Yes.
13          MS. OSTROM:  And would counsel please
14   identify himself for the record.
15          MR. McCLOSKEY:  Michael McCloskey.
16          MS. OSTROM:  Could you please give us your
17   address.
18          MR. McCLOSKEY:  655 West Broadway,
19   9th floor, San Diego, California 92121.
20          MS. OSTROM:  Mr. McCloskey, are you
21   appearing today as counsel for Mr. Mattos as well as
22   represent GenAudio?
23          MR. McCLOSKEY:  Yes.
24          BY MS. OSTROM:
25      Q   Mr. Mattos, if you want to go off the

Page 9

1   record today, please advise me of your desire to do
2   so and I will decide at that time whether to ask the
3   reporter to go off the record.  She won't go off the
4   record at your request or your counsel's request,
5   only our request.  So if you need a break or need to
6   speak with your counsel, please tell me.  Okay?
7      A   Okay.
8      Q   And I'll ask you a number of questions
9   today.  If you don't understand or hear something
10   that I ask you, please tell me.  I'll rephrase it or
11   repeat it as necessary.  Okay?
12      A   Yes.
13      Q   And please allow me to complete the
14   question before you begin your answer so that we're
15   not both speaking at once.  All right?
16      A   Yes.
17      Q   And also, then, the last thing is that if
18   you could please answer audibly.  It makes it so
19   that she can make the record rather than a head nod
20   or a shake.  Okay?
21      A   Understood.
22          (SEC Exhibits 65 and 66 were marked
23           for identification.)
24          BY MS. OSTROM:
25      Q   Mr. Mattos, in front of you is a copy

|  | Page 18 |
|---|---|
| 1 | GenAudio. Those were mostly correct, but I actually |
| 2 | had forgotten that I had put them onto LinkedIn. So |
| 3 | if you prefer a more accurate representation, I can |
| 4 | read that off for you. |
| 5 | **Q   And which question are you referring to?** |
| 6 | A   This would have been -- |
| 7 | **Q   Go ahead and take your time and look. On** |
| 8 | **Page 10 there's an -- employment activities start.** |
| 9 | A   Correct. So this would have been Page 10, |
| 10 | Question 35. If you -- like I said, if you'd like, |
| 11 | I can read off the actual dates of my various |
| 12 | positions. |
| 13 | **Q   Yeah. I think that would be helpful for** |
| 14 | **us to get it correct. Thank you.** |
| 15 | A   Let me just pull up the LinkedIn. |
| 16 | **Q   Of course.** |
| 17 | A   I don't usually use LinkedIn very often. |
| 18 | I had forgotten that I had captured that information |
| 19 | more accurately there. Okay. Let's see. I will -- |
| 20 | in accordance with the question I'll go ahead and go |
| 21 | from the most current position to the previous |
| 22 | positions. |
| 23 | **Q   Sure. That's fine.** |
| 24 | A   So from -- from October 2014 to present my |
| 25 | position is corporate secretary and senior vice |

|  | Page 19 |
|---|---|
| 1 | president of corporate communications and investor |
| 2 | relations for our new title, which is Astound |
| 3 | Holdings Incorporated. |
| 4 | And then from the period of May 2012 to |
| 5 | October 2014 same title, corporate secretary and |
| 6 | senior vice president of corporate communications, |
| 7 | and investor relations for GenAudio. |
| 8 | ==And then from the period of March 2006 to== |
| 9 | ==June 2012 I was the support services manager of== |
| 10 | ==GenAudio.== |
| 11 | And from the period of August 2004 to |
| 12 | February 2006 my title was director of sales for |
| 13 | GenAudio. |
| 14 | **Q   Okay. So you became secretary and senior** |
| 15 | **vice president at the same time of GenAudio?** |
| 16 | A   No. Corporate secretary, that position |
| 17 | was not given to me until March, I believe, of 2014. |
| 18 | **Q   Okay.** |
| 19 | A   But I had changed my title on LinkedIn to |
| 20 | reflect that. |
| 21 | **Q   I understand.** |
| 22 | A   Yeah. |
| 23 | **Q   Okay. So you were promoted to senior vice** |
| 24 | **president of corporate communications of GenAudio in** |
| 25 | **May of 2012?** |

|  | Page 20 |
|---|---|
| 1 | A   Correct. |
| 2 | **Q   Okay. And what did you do as director of** |
| 3 | **sales?** |
| 4 | A   Well, when I originally came onboard with |
| 5 | the company, one of my priority tasks was helping to |
| 6 | bring investors onboard to help raise funds to get |
| 7 | the company off the ground. At that time because of |
| 8 | my almost 20-year background in sales, it seemed |
| 9 | like an appropriate title. But as we started the |
| 10 | company, we initially did not have an actual product |
| 11 | to sell. So I, in essence, moved to Colorado in |
| 12 | September -- no, excuse me, August -- no, September |
| 13 | of 2005 to, in essence, help Jerry, you know, get |
| 14 | the company off the ground as a startup. And at |
| 15 | that time I was basically just filling in wherever I |
| 16 | could. |
| 17 | **Q   Okay.** |
| 18 | A   So although my title says director of |
| 19 | sales, really support services manager I would say |
| 20 | would be a more accurate representation of my actual |
| 21 | job functions at that time. |
| 22 | **Q   And what kinds of things, just in general,** |
| 23 | **did you do to support Mr. Mahabub in the business?** |
| 24 | A   Primarily, like I said, helping to bring |
| 25 | awareness through new investors, office managerial |

|  | Page 21 |
|---|---|
| 1 | things, record keeping. Basically, in essence, |
| 2 | everything that does not include hardcore |
| 3 | accounting, does not include software engineering |
| 4 | and does not include audio engineering. |
| 5 | **Q   And did you have anything to do with** |
| 6 | **keeping track of the stock sales?** |
| 7 | A   Only insofar as managing records. The |
| 8 | stock sales themselves were primarily recorded by |
| 9 | Jim Devine, who has been our VP of finance for -- |
| 10 | oh, jeez. I want to say maybe he came onboard 2007 |
| 11 | time frame. |
| 12 | **Q   And so --** |
| 13 | A   Maybe 2006. |
| 14 | **Q   What records did you keep?** |
| 15 | A   Well, I'm -- I helped in -- and to this |
| 16 | date I still manage all of the hard records. So as |
| 17 | we would, you know, raise money for the company, I |
| 18 | would make sure that we had, you know, obviously all |
| 19 | the PPMs on file, Private Placement Memorandum, make |
| 20 | sure that we had all of the various investor |
| 21 | documents that were -- would be required by law. |
| 22 | That type of thing. |
| 23 | **Q   So was it Mr. Devine, then, that kept** |
| 24 | **track of the actual sales of stock to people --** |
| 25 | A   That is correct. |

Page 42

1  3.6 million, roughly, in 2010. Initially when I
2  came onboard, like I said, uncompensated, I was
3  raising $10,000 a day back in fall of 2004 on. And
4  then over the course of time we had a series of, you
5  know, licensed broker-dealers that came into play --
6       THE WITNESS: Good catch.
7       MS. OSTROM: Sorry about that.
8    A   -- that, you know, did raise some moneys,
9  but by and large they were ineffective.
10      BY MR. GOTTSCHALL:
11   Q   But, I mean, how are you calculating that
12  $5 million in your mind?
13   A   It's just a rough calculation over time.
14   Q   Okay.
15   A   I don't know if it's ever been recorded
16  within the company. I don't believe so. I don't
17  believe that there was ever a line item thing where
18  it would say X number of dollars came in from this
19  person. But by and large it was Jerry Mahabub and
20  myself that raised the lion's share. The vast
21  majority of the investors are our friends and
22  family. They're people that we've been known since
23  birth in many cases.
24      BY MS. OSTROM:
25   Q   When you initially started soliciting

Page 43

1  people as part of your position with GenAudio, what
2  all did that entail?
3    A   Well, it was primarily a demonstration of
4  the technology, offering for them to review the
5  private placement memorandum that were affiliated
6  with each individual offering. And then, of course,
7  the office managerial aspect of -- of collecting
8  documents, making sure that we had subscription
9  agreements, investor questionnaires, those types of
10  documents on file. And then, of course, consulting
11  with Jim Devine, our VP of finance, to make sure the
12  moneys had been received and then a formal
13  processing of the stock certificates themselves.
14   Q   Is the demoing of the technology something
15  that you did on your own?
16   A   In the -- in the beginning, yes. It was a
17  5-minute demo that we -- that Jerry had created
18  sometime in 2003. And it has even to this day
19  continued to be one of our primary sales tools.
20   Q   Are there any other written materials that
21  you gave investors other than the PPMs?
22   A   No. Just -- just official documents that
23  were board approved and obviously reviewed by
24  counsel, et cetera.
25   Q   Have you ever received any shares from

Page 44

1  GenAudio as compensation?
2    A   No.
3    Q   Okay.
4    A   I have received warrants, which are
5  different -- I mean, they're obviously not paid
6  for -- as a reward for my service. But nothing that
7  was directly related to X number of stock sales or a
8  percentage or any of that type of thing.
9    Q   And have you exercised the warrants in any
10  way?
11   A   No.
12   Q   Okay.
13   A   No.
14      BY MR. GOTTSCHALL:
15   Q   How many GenAudio warrants have you
16  received?
17   A   GenAudio warrants were approximately
18  500,000. I did help a former board member and
19  senior manager of the company sell some of his
20  shares by the name -- gentleman by the name of Paul
21  Powers. At that time he offered to compensate me
22  for my work in doing that. I chose to not receive
23  monetary payment, but receive a portion of his
24  warrants that were then deeded to me in exchange.
25  And those were approximately 300,000. So I would

Page 45

1  say it's probably about 750,000 total warrants that
2  I have currently, somewhere in that -- in that
3  neighborhood.
4    Q   Okay. So 300,000 were transferred to you
5  by Mr. Powers?
6    A   I think it's 250. I'm trying to just do
7  the quick math.
8    Q   Okay.
9    A   And it's about 500,000 from GenAudio
10  directly.
11   Q   Okay. And have you received any warrants
12  in the new entity?
13   A   No. Not -- not currently.
14      BY MS. OSTROM:
15   Q   Do you recall who Mr. Powers sold his
16  shares to?
17   A   That was probably somewhere between
18  approximately 30 individuals. Those are all on
19  record with the company.
20   Q   And did you find all 30 of those
21  individuals?
22   A   Most of them were existing shareholders.
23   Q   But, I mean, did you get the two together?
24   A   Yes.
25   Q   I mean, were you the one --

Page 142

1     Q   So was there an actual deal in place?
2     A   No.  There was just internal discussions
3 about the integration of our technology based on
4 the -- the e-mails that Jerry had circulated to the
5 team.
6     Q   Did Exhibit No. 4 -- after you received
7 that on May 6th, did that have any information in it
8 that you gave to Mr. Dodge at this time?
9     A   Exhibit No. 4?
10     Q   Exhibit No. 4 that was on May 6th?
11     A   I don't recall if that was -- I didn't
12 discuss this per se.  But this was -- you know, the
13 nature of this correspondence was what gave me, you
14 know, optimism about the potential for some type of
15 license deal.
16     Q   Okay.  You say, if that news were to leak
17 to the press.  Now, if all you did was talk to
18 Mr. Dodge in general that there was a possibility of
19 a license deal with someone, why would anyone have
20 cared if that went to the press?
21     A   Well, it was just a frank discussion
22 between the two of us.  And I was just simply
23 stating that you need to keep this under your hat,
24 you know, because any -- any leak of whatever might
25 violate an NDA we had in place and could cause

Page 143

1 problems.
2     BY MR. GOTTSCHALL:
3     Q   Why did you believe it was okay to orally
4 talk about some of the specifics of the LCEC with
5 Mr. Dodge, but you didn't want him to put it in
6 writing?
7     A   I don't recall the nature of that
8 statement.
9     Q   After you received the team update that's
10 contained in Exhibit 4, did you make an effort to
11 communicate any of that information to the existing
12 or prospective GenAudio investors?
13     A   Well, it would have definitely had an
14 effect on my positivity in terms of the forward
15 momentum of the company.  And I'm sure I had some
16 cursory discussions with -- with that regard.  But
17 actual specifics, no.
18     Q   But did you try to affirmatively convey to
19 investors or prospective investors any of the
20 optimism that had been reflected by Mr. Mahabub in
21 Exhibit 4?
22     A   In a very basic sense, yes.
23     Q   How did you do that?
24     A   Well, people might call me, say, How are
25 things going?  I'd be like, Things seem to be going

Page 144

1 very well.  Our technology integration is going
2 well.  There's definitely potential for some type of
3 licensing on the horizon.  I absolutely -- under no
4 circumstances did I ever suggest that there was a
5 timeline involved or what precisely that integration
6 would be.
7     Q   But my question is a little bit different.
8 My question is whether you affirmatively reached out
9 to folks to try to convey any of the information
10 contained in Exhibit 4?
11     A   Did I reach out?  No.  Did they reach out
12 to me and did I have subsequent conversations?  Yes.
13     Q   So your recollection is that you only
14 attempted to convey that information if people
15 reached out to you?
16     A   Absolutely.
17     Q   And if -- if people reached out to you,
18 what exactly would you tell them regarding the
19 prospects for a licensing or an acquisition?
20     A   Well, generally would be conveyed very
21 positively.
22     Q   Well, I mean, as you sit here today, I
23 want the best of your recollection as to what you
24 would tell people.
25     A   Well, people would call me.  Generally

Page 145

1 speaking, they would ask me, How is the progress?  I
2 would say, Great.  And then I would just, you know,
3 convey in a fairly upbeat manner that we're doing
4 well, the company is moving the football forward.
5 As far as specifics, I never got into specifics
6 about any of that because of the NDAs in place and
7 also the fact that nothing is written in stone.
8     Q   But, I mean, at least some of these
9 existing investors were aware of dealings between
10 GenAudio and what had been referred to as the LCEC,
11 correct?
12     A   Sure.  Because, I mean, prior to -- we --
13 we only developed the term LCEC after the NDA had
14 been -- had been, you know, executed by the company
15 and by Apple.
16     Q   So in this time frame, in May 2010, if
17 investors asked you what was going on with the LCEC,
18 what did you tell them?
19     A   I don't recall the nature of that.  But,
20 again, you have to remember that we were -- openly
21 referred to them as Apple prior to the NDA being
22 signed, because we were already starting to
23 integrate our product.  We were looking at that as a
24 potential possibility for business development.  We
25 were only required by contract by the NDA to use a

Page 146

1  subsequent term in reference to them. But at that
2  point many people knew that we were already
3  developing product for Apple because we had done so
4  by virtue of developing the AstoundSound expander.
5  That was a commercially purchasable consumer grade
6  electronics product for Apple. So it's -- there's
7  no -- you know, people that have been involved with
8  the company and the investors for a series of years
9  prior to that knew that we were dealing with them.
10 But then we, again, under NDA had to not disclose
11 who the name was at that point.
12     Q   During this time frame, so May 2010, what
13 percentage of GenAudio investors would you say knew
14 by virtue of your prior dealings before the NDA that
15 when the company referred to the LCEC you were
16 referring to Apple?
17     A   Oh, I can't speak in terms of percentages.
18 I don't know.
19     Q   Give me an estimate. I mean, was it -- do
20 you think most investors knew that?
21     A   Every investor knew that we had a product
22 for Apple.
23     Q   Okay. But how many do you think knew that
24 when the company was referring to -- to the LCEC
25 they were really referring to Apple?

Page 147

1     A   I would say the vast majority.
2     Q   Okay. So, again, getting back to your --
3  your communications with investors in this May 2010
4  time frame, you don't, as you sit here today, recall
5  what specifically you told them with respect to the
6  LCEC?
7     A   No. Not specifically. Again, any
8  integration would have been our AstoundSound
9  expander product for -- integrated at the hardware
10 level with Apple computers or Apple portable
11 devices.
12     Q   I mean, do you recall generally or --
13 anything that you would have been comfortable saying
14 in this May 2010 time frame with respect to the
15 LCEC?
16     A   Well, at that point in time we used LCEC
17 exclusively so...
18     Q   Right.
19     A   But, again -- but, again -- but, again,
20 the lion's share of the shareholders already
21 understood that LCEC meant Apple because of our --
22 because of our previous dealings with them.
23     Q   And so my question is, to you, if somebody
24 asked you in this time frame what's going on with
25 the LCEC, what generally did you tell them?

Page 148

1     A   I told them that we are -- we're moving
2  forward with -- with product integration based on my
3  understanding of what had been supplied to me from
4  Jerry Mahabub through e-mail communications to the
5  team.
6     Q   Did you describe for them any prospects of
7  a potential licensing deal?
8     A   Not with any specificity, no.
9     Q   Did you generally describe prospects for
10 any license deal?
11     A   I discussed about the, you know, process
12 on the horizon. But at that point in time, again,
13 they kept on saying, Okay, well, we need this test
14 product and we need that test product. That's what
15 I was referring to earlier about jumping through
16 hoops. They kept on making us jump through hoops.
17 So the prospects seemed to be looming on the
18 horizon, but never a set date. The goal posts
19 seemed to always be moving, in other words.
20     Q   Okay. But, again, back to my original
21 question, in May 2010 what did you tell investors
22 about the process of -- of integration or anything
23 else with the LCEC?
24     A   Nothing -- nothing specific. Again, just
25 that we were moving forward. Every software hurdle

Page 149

1  that they had tossed our way we were overcoming, and
2  the prospects generally tended to be good.
3     Q   In the May 2010 time frame, did you
4  discuss with GenAudio investors the prospects for
5  the LCEC to acquire GenAudio?
6     A   Not specifically, no. But, again, the
7  possibility of some type of liquidity event was
8  always a topic of discussion. People always want to
9  know how they're going to get their money back.
10    Q   So what did you tell them when they asked
11 you in this time frame?
12    A   I said there's the possibility of it, but
13 there's no guarantees.
14    Q   And what, if anything, did you tell folks
15 in this time frame, May 2010, about the status of
16 product integration or rollouts?
17    A   I said it seemed to be likely at that
18 point.
19    Q   It seemed to be likely that what?
20    A   That there was going to be some form of
21 integration or potential licensing. And, again,
22 this was all based on the team e-mails that Jerry
23 had sent out.
24    Q   Anything else that you recall generally or
25 specifically telling GenAudio investors in this time

Page 290

1  to do with helping GenAudio fulfill its document
2  production under the document subpoena?
3      A  Well, no.  Not under GenAudio or myself.
4  I believe he was subpoenaed to produce his own
5  documents.  He did that independently of myself.
6      Q  Did you talk with him about it then?
7      A  No.
8      Q  Okay.  Because --
9      A  He knew I was producing documents, but --
10     Q  Okay.
11     A  -- as far as -- I was going to give you
12 everything.  That's all that had to be said.
13     Q  The reason why I ask is just clarifying,
14 because you said you had discussed document
15 production with Mr. Mahabub, so I wanted to make
16 sure if there were any more details behind that.
17     A  Well, it was very -- it was a daunting
18 process, so there were comments along those lines.
19     Q  I understand.  Okay.  And, Mr. Mattos, we
20 have no further questions at this time.  We may,
21 however, call you again to testify in this
22 investigation.  And should this be necessary, we
23 will contact you through your counsel.
24     A  Okay.
25     Q  Do you wish to clarify anything or add

Page 291

1  anything to the statements you've made today?
2      A  Not at this time.
3         MS. OSTROM:  Let's go off the record at
4  4:30 p.m., February 9th of 2015.
5         (Whereupon, at 4:30 p.m. the proceedings
6  were adjourned.)
7
8              * * * * *

Page 292

PROOFREADER'S CERTIFICATE

In the Matter of:   GENAUDIO, INC.
Witness:            Jim Wei-Kung
File Number:        D-03450-A
Date:               January 9, 2015
Location:           Denver, CO


    This is to certify that I, Nicholas Wagner,
(the undersigned), do hereby swear and affirm
that the attached proceedings before the U.S.
Securities and Exchange Commission were held
according to the record and that this is the
original, complete, true and accurate transcript
that has been compared to the reporting or recording
accomplished at the hearing.



_____    _____
(Proofreader's Name)      (Date)

74 (Pages 290 to 292)

Page 292

1 PROOFREADER'S CERTIFICATE
2
3 In the Matter of: GENAUDIO, INC.
4 Witness: Jim Wei-Kung
5 File Number: D-03450-A
6 Date: January 9, 2015
7 Location: Denver, CO
8
9
10     This is to certify that I, Nicholas Wagner,
11 (the undersigned), do hereby swear and affirm
12 that the attached proceedings before the U.S.
13 Securities and Exchange Commission were held
14 according to the record and that this is the
15 original, complete, true and accurate transcript
16 that has been compared to the reporting or recording
17 accomplished at the hearing.
18
19
20
21 _____     2-13-2017
22 (Proofreader's Name)     (Date)
23
24
25

```
 1                  REPORTER'S CERTIFICATE
 2
 3  I, Sharon R. Dobson, reporter, hereby certify that the
 4  foregoing transcript of  29   pages is a complete, true
 5  and accurate transcript of the testimony indicated, held
 6  on  2-9-2015 , at  Denver, CO   in the matter of:
 7           Gen Audio, Inc.                              .
 8
 9  I further certify that this proceeding was recorded by
10  me, and that the foregoing transcript has been prepared
11  under my direction.
12
13
14  Date:       2-13-2015
15
16
17  Official Reporter:  Sharon R Dobson
18
19
20         Diversified Reporting Services, Inc.
21
22
23
24
25
```