EXCERPTED

# EXHIBIT 8

# In The Matter Of:

*Securities and Exchange Commission v.*
*Taj Jerry Mahabub, et al.*

*James T. Devine*
*July 19, 2016*

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94105*
*(415) 597-5600*

Original File 29781Devine.txt
**Min-U-Script® with Word Index**

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

James T. Devine
July 19, 2016

### Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF COLORADO
 3
 4  - - - - - - - - - - - - - - - -
 5  SECURITIES AND EXCHANGE         )
 6  COMMISSION,                     )
 7         Plaintiff,               )  CASE NO.
 8  v.                              )  1:15-cv-02118-CBS-WJM
 9  TAJ JERRY MAHABUB, GENAUDIO,    )
10  INC., and ASTOUND HOLDINGS,     )
11  INC.,                           )
12         Defendants.
13  - - - - - - - - - - - - - - - -
14
15
16       VIDEOTAPED DEPOSITION OF JAMES T. DEVINE
17                 TUESDAY, JULY 19, 2016
18
19
20
21                     BEHMKE REPORTING AND VIDEO SERVICES, INC.
22                                       BY:  BARBARA J. CASTILLO
23                                     160 SPEAR STREET, SUITE 300
24                               SAN FRANCISCO, CALIFORNIA 94105
25                                                (415) 597-5600
```

### Page 2

```
 8       Videotaped Deposition of JAMES T. DEVINE,
 9    taken  on behalf of Plaintiff, at 869 Mercury
10    Circle, Lone Tree, Colorado, commencing at 10:04
11    A.M., TUESDAY, JULY 19, 2016, before Barara J.
12    Castillo, Registered Merit Reporter, Certified
13    Realtime Reporter and Notary Public within and
14    for the State of Colorado.
```

### Page 3

```
 1  APPEARANCES OF COUNSEL:
 2  FOR PLAINTIFF:
 3      SECURITIES AND EXCHANGE COMMISSION
 4      BY: DANIELLE R. VOORHEES, ATTORNEY AT LAW
 5          LESLIE HENDRICKSON HUGHES, ATTORNEY AT LAW
 6      1961 Stout Street, Suite 1700
 7      Denver, Colorado 80294
 8      Telephone: (303)844-1000
 9      Email: voorheesd@sec.gov
10
11  FOR DEFENDANT, TAJ JERRY MAHABUB:
12      HOLMES, TAYLOR & JONES, LLP
13      BY: ANDREW B. HOLMES, ATTORNEY AT LAW
14      617 South Olive Street, Suite 1200
15      Los Angeles, California 90014
16      Telephone:  (213) 985-2200
17      Email:  abholmes@htjlaw.com
18
19  FOR DEFENDANT GENAUDIO, INC. AND JAMES T. DEVINE:
20      WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
21      BY: DAVID J. AVENI, ATTORNEY AT LAW
22      655 West Broadway, Suite 900
23      San Diego, California 92101
24      Telephone:  (619) 881-3326
25      Email: david.aveni@wilsonelser.com
```

### Page 4

```
 1  APPEARANCES OF COUNSEL - (CONTINUED):
 2  FOR DEFENDANT ASTOUND HOLDINGS, INC.
 3  - (TELEPHONICALLY):
 4      BENZ LAW GROUP
 5      BY: JENNIFER YUEN, ATTORNEY AT LAW
 6      12021 Wilshire Boulevard, Suite 256
 7      Los Angeles, California 90025
 8      Telephone: (818) 371-8800
 9      Email:  jenniferk.yuen@gmail.com
10
11  ALSO PRESENT:
12      MARYVONNE TOMPKINS, VIDEOGRAPHER
```

Case 1:15-cv-02118-WJM-SKC   Document 84-8   Filed 02/16/18   USDC Colorado   Page 4 of 17

Securities and Exchange Commission v.  
Taj Jerry Mahabub, et al.

James T. Devine  
July 19, 2016

Page 5

```
 1                      INDEX
 2  TUESDAY, JULY 19, 2016
 3  JAMES T. DEVINE                          PAGE
 4      Examination by MS. VOORHEES            12
 5  P.M. SESSION                              153
 6      Examination resumed by MS. VOORHEES   153
 7      Examination by MR. HOLMES             272
 8      Examination by MS. VOORHEES           280
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1                    EXHIBITS
 2                  JAMES T. DEVINE
 3  Number           Description              Page
 4  Exhibit 1   E-mail and attachment from Dell
 5              Skluzak to Jennifer Ostrom,
 6              8/8/14; Bates Nos. SEC-Skluzak-E
 7              0000001 through 0000002
 8              - 61 pages                      81
 9
10  Exhibit 2   Confidential Private Placement
11              Memorandum for GenAudio, Inc.,
12              3/15/10; Bates Nos. GA 000487
13              through 000634 - 148 pages      93
14
15  Exhibit 3   GenAudio stock certificate for
16              Sarah Bushong-Weeks, 7/28/10;
17              Bates Nos. GA 001144 through GA
18              001148 - 5 pages               129
19
20  Exhibit 4   SEC Attestation and Form D for
21              GenAudio, Inc., 8/19/10; Bates
22              Nos. SEC 334 - 7 pages         131
23
24
25
```

Page 7

```
 1              EXHIBITS - (CONTINUED)
 2                  JAMES T. DEVINE
 3  Number           Description              Page
 4  Exhibit 5   SEC Attestation and Form D for
 5              GenAudio, Inc., 11/19/10; Bates
 6              Nos. SEC 334 - 7 pages         135
 7
 8  Exhibit 6   GenAudio, Inc. Schedule of
 9              Financing; Bates Nos., GA 000997
10              through GA 001002 - 6 pages    136
11
12  Exhibit 7   GenAudio, Inc. Common Stock
13              Transfer Ledger; Bates Nos.
14              001816 through GA 001852
15              - 35 pages                     142
16
17  Exhibit 8   GenAudio Board of Directors
18              Minutes July 29, 2010 Meeting;
19              Bates Nos. GA 002940 through GA
20              002946 - 11 pages              163
21
22
23
24
25
```

Page 8

```
 1              EXHIBITS - (CONTINUED)
 2                  JAMES T. DEVINE
 3  Number           Description              Page
 4  Exhibit 9   Unanimous Written Consent of The
 5              Board of Directors of GenAudio,
 6              Inc.; Bates Nos. GA 002932
 7              through GA 001939 - 8 pages    166
 8
 9  Exhibit 10 Confidential Private Placement
10              Memorandum for GenAudio, Inc.,
11              4/22/11; Bates Nos. GA 004731
12              through GA 004807 - 77 pages   172
13
14  Exhibit 11 SEC Attestation and Form D for
15              GenAudio, Inc., 5/16/11; Bates
16              Nos. SEC 334 - 7 pages         180
17
18  Exhibit 12 GenAudio, Inc. Board of
19              Directors Meeting Minutes,
20              5/15/12; Bates Nos. GA 002139
21              through GA 002174 - 36 pages   183
22
23
24
25
```

Securities and Exchange Commission v.  
Taj Jerry Mahabub, et al.

James T. Devine  
July 19, 2016

Page 9

```
 1                EXHIBITS - (CONTINUED)
 2                   JAMES T. DEVINE
 3   Number            Description              Page
 4   Exhibit 13 Letter from the Board of
 5              Directors of Astround Holdings
 6              to GenAudio Shareholder,
 7              11/4/14; Bates Nos. AST 000030
 8              through 000034 - 5 pages         209
 9
10   Exhibit 14 Letter from the Board of
11              Directors of Astound Holdings to
12              GenAudio Shareholder, 2/25/15;
13              Bates Nos. AST 000025 through
14              000027 - 3 pages                 216
15
16   Exhibit 15 E-mail from Jerry Mahabub to
17              multiple people, 5/2/10; Bates
18              Nos. JM 002093 through 002095
19              - 3 pages                        227
20
21   Exhibit 16 E-mail string, top message from
22              Victor Tiscareno to Dell
23              Skluzak, 10/30/13; Bates Nos.
24              SEC 0000001 through 0000005
25              - 5 pages                        227
```

Page 10

```
 1                EXHIBITS - (CONTINUED)
 2                   JAMES T. DEVINE
 3   Number            Description              Page
 4   Exhibit 17 E-mail string, top message from
 5              Mark Bobak to multiple people,
 6              1/29/14; Bates Nos.
 7              SEC-ELLIOTT-E 0000565 through
 8              0000581 - 17 pages               239
 9
10   Exhibit 18 E-mail string, top message from
11              Dell Skluzak to Mike Elliott,
12              1/26/14; Bates Nos.
13              SEC-ELLIOTT-E 0000034 through
14              0000102 - 79 pages               253
15
16   Exhibit 19 Mahabub Exhibit D; Bates Nos.
17              SEC-ELLIOTT-E 0004073 through
18              0004078 - 6 pages                268
19
20   Exhibit 20 Spreadsheet entitled Non-Cash;
21              - 1 page                         276
22
23
24
25
```

Page 11

1    TUESDAY, JULY 19, 2016; 10:04 A.M.
2         **THE VIDEOGRAPHER:** Here begins the Video
3    Number 1 in the deposition of James T. Devine in the
4    matter of Securities and Exchange Commission versus
5    Taj Jerry Mahabub, et al., in the United States
6    District Court for the District of Colorado, Case
7    Number 1:15-CV-02118-CBS-WJM.
8         Today's date is Tuesday, July 19, 2016.
9    The time on the video is 10:04.  The video operator
10   today is Maryvonne Tompkins, contracted by Behmke
11   Reporting & Video Services, Inc., 160 Spear Street,
12   Suite 300 in San Francisco, California.  The video
13   deposition is taking place at 869 Mercury Circle in
14   Lone Tree, Colorado 80124, and was noticed by
15   Danielle Voorhees, Esquire, of the Securities and
16   Exchange Commission.
17        Counsel, please voice-identify yourself
18   and the party you represent, please.
19        **MS. VOORHEES:** Danielle Voorhees and
20   Leslie Hughes on behalf of the Securities and
21   Exchange Commission.
22        **MR. AVENI:** David Aveni on behalf of
23   GenAudio and also representing the deponent.
24        **MR. HOLMES:** Andrew Holmes on behalf of
25   Jerry Mahabub.

Page 12

1         **THE VIDEOGRAPHER:** And on the phone,
2    please.
3         **MS. YUEN:** Jennifer Yuen on behalf of
4    Astound Holdings, Inc.
5         **THE VIDEOGRAPHER:** The court reporter
6    today is Barbara Castillo, certified shorthand
7    reporter, contracted by Behmke Reporting and Video
8    Services, will identify and please swear in the
9    witness.
10             JAMES T. DEVINE,
11   being first duly sworn in the above cause, was
12   examined and testified as follows:
13             EXAMINATION
14   BY MS. VOORHEES:
15       Q    Mr. Devine, can you please state and spell
16   your last name?
17       A    James T. Devine, D-e-v-i-n-e.
18       Q    Thank you, Mr. Devine.  Are you
19   represented by counsel in this matter?
20       A    Yes, I am.
21       Q    And who's your counsel?
22       A    David Aveni.
23       Q    Thank you, Mr. Devine.  Have you testified
24   under oath before?
25       A    Yes.

**Securities and Exchange Commission v.**
**Taj Jerry Mahabub, et al.**

James T. Devine
July 19, 2016

Page 49

1   A   I think one year we had year-end bonuses.
2   It might have been 2000-- it might have been 2008 we
3   did. I don't recall how much they were, though.
4   They weren't extravagant, you know.
5       Q   What's -- approximately how much?
6   A   5,000, 3,000, something like that.
7       Q   All right. Do you recall receiving any
8   other bonuses from GenAudio, Inc.?
9   A   No.
10      Q   What about stock or warrants or options?
11  Did you ever receive any of that type of
12  compensation?
13  A   I had warrants, yes.
14      Q   Okay. And how did you obtain your
15  warrants?
16  A   Board of directors awarded them.
17      Q   And when was that?
18  A   Well, there were various awards. 2006 or
19  2007 I believe I got some and 2000-- I'd have to go
20  back and look. 2008, 2009. They were, you know,
21  incremental.
22      Q   Okay. And those were awarded to you based
23  on a board of directors' decision?
24  A   Yeah.
25      Q   Okay. What were your duties under your

Page 50

1   employment agreement? What job duties were you
2   responsible for at GenAudio?
3   A   Well, my title was vice president of
4   finance. And later on I became secretary. And, you
5   know, I did the accounting and -- and projections,
6   you know, worksheets, projections, issued the stock
7   certificates, kept the stock ledger, transfer ledger,
8   those sorts of things.
9       Q   Did anybody else also perform those duties
10  with you?
11  A   No.
12      Q   Who was your supervisor?
13  A   Jerry Mahabub.
14      Q   Anybody else that you reported to?
15  A   No.
16      Q   And is that true for the entire time you
17  were employed by GenAudio, Inc.?
18  A   Yeah.
19      Q   Did you ever supervise anyone at GenAudio,
20  Inc., anyone under you?
21  A   Well, yeah, I guess it was the office
22  manager and at times, you know, Jim Mattos. And then
23  there was another gal that worked there, Melissa
24  Gonzales. She worked in the office. She did
25  marketing.

Page 51

1       Q   Okay. When did you supervise the office
2   manager? What years?
3   A   Oh, when I was there.
4       Q   Okay.
5   A   Yeah.
6       Q   And what -- who was that person?
7   A   Jim Mattos.
8       Q   Oh, that was Jim Mattos. Okay.
9   A   Yeah. But he reported to Jerry too. It
10  was kind of a -- there wasn't any official lines of
11  communication in terms of, you know, who reported to
12  who.
13      Q   Okay.
14  A   Everybody reported to Jerry basically.
15      Q   All right. Everybody ultimately reported
16  to Jerry Mahabub?
17  A   Yeah.
18      Q   Did you direct Mr. Mattos in any of the
19  job duties he was performing?
20  A   Yeah.
21      Q   Which ones?
22  A   Filing.
23      Q   All right. And what do you mean by
24  "filing"?
25  A   Well, he -- you know, the vendor files,

Page 52

1   the personnel files, the investor files.
2       Q   Okay. So Mr. Mattos, like, physically
3   filed documents?
4   A   Yes.
5       Q   And you would tell him how to do that?
6   A   Yes.
7       Q   Okay. Anything else that you directed Jim
8   Mattos in doing?
9   A   No.
10      Q   In 2009 -- well, let's start in October
11  of 2008. So from October of 2008 through 2009, where
12  did you physically work?
13  A   At the office.
14      Q   Okay. In Englewood?
15  A   Yes.
16      Q   And then what about after September 2009
17  when the lease was up, where did you physically work
18  after that?
19  A   Out of my house.
20      Q   So was that true in 2010, 2011 and 2012?
21  A   (Deponent nodded head.)
22      Q   Is that a yes?
23  A   Yes.
24      Q   Okay. Did anybody else work out of your
25  home with you for GenAudio, Inc.?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

James T. Devine
July 19, 2016

Page 93

1  family members that have invested through GenAudio?
2     A    No.  No.
3          (Exhibit Number 2 was marked.)
4          **MS. VOORHEES:** All right.
5          **THE REPORTER:** Do you want me to cover
6  this?
7          **MS. VOORHEES:** No, but please don't.
8  Thanks.
9     Q    (BY MS. VOORHEES)  Mr. Devine, you've just
10 been handed what's been marked as Depo Exhibit 2.
11         Mr. Devine, Deposition Exhibit 2 is the
12 GenAudio, Inc., private placement memorandum.  It was
13 previously marked as investigative testimony
14 Exhibit 6.  It's Bates-labeled GA 0000487
15 through 634.  Do you recognize Exhibit 2, Mr. Devine?
16    A    Yes.
17    Q    Mr. Devine, did you have any role in
18 distributing this PPM to anyone?
19    A    No.
20    Q    Do you see at the top of the first page of
21 Exhibit 2, there's a memorandum no -- for number --
22    A    Yeah.
23    Q    -- and then a space, and then there's a
24 name and --
25    A    Yeah.

Page 94

1     Q    -- a space?
2     A    Yeah.
3     Q    Were those filled in?
4     A    I don't know.
5          **MR. AVENI:** Objection, vague and calls for
6  speculation.
7     A    Yeah.
8     Q    (BY MS. VOORHEES)  You don't know?
9     A    Yeah.
10    Q    Okay.  Did you maintain a list of any sort
11 of who the private placement memoranda were
12 distributed to?
13    A    I did not.
14    Q    Do you know if anybody at GenAudio did?
15    A    I don't.  I'm not -- I can't answer that
16 as a certainty.  I don't know.
17    Q    Okay.  Whose role would it have been to
18 have kept track of who GenAudio, Inc., was soliciting
19 for investments?
20         **MR. AVENI:** Objection, calls for
21 speculation.
22    A    Whoever handed or e-mailed the memorandum.
23    Q    (BY MS. VOORHEES)  Okay.  Was there any
24 sort of corporate document that kept track of who was
25 being solicited?

Page 95

1     A    Not that I'm aware of.
2     Q    Did you read Exhibit 2, this private
3  placement memoranda?
4     A    In its entirety?
5     Q    Sure.  Let's start with that.
6     A    No.  I mean, I looked at it, you know, and
7  I contributed in terms of, you know, some numbers
8  near the back.
9     Q    Okay.  Why don't you just describe for us
10 what your role in preparation of this document was.
11    A    Let's see.  I believe there were some
12 disclosures on monies that were owed to Jerry.
13    Q    Okay.
14    A    I'm trying to look to see where --
15    Q    I -- if you go to Page 49 of the PPM.
16    A    Where are the -- where's the --
17    Q    The page numbers are at the bottom
18 usually.  Though I'll tell you not always.  You might
19 have to go to the next page and see where you're at.
20 It's Bates Page 538.
21    A    Okay.  That makes it easier.  Yeah.
22    Q    Do you see there's a section called
23 Related-Party Transactions?
24    A    Right.
25    Q    Okay.  Is this what you were looking for?

Page 96

1     A    Well, yeah.
2     Q    Okay.
3     A    So there's some narrative on financing of
4  company operations by Jerry Mahabub, and I believe I
5  gave those numbers to whomever was preparing the --
6  the memorandum.
7     Q    Okay.  And so if you look at that last
8  full paragraph on Page 49 of the PPM under Financing
9  of Company Operations by Mr. Mahabub --
10    A    Uh-huh.
11    Q    -- did you provide the number of shares
12 that Mr. Mahabub had sold?
13    A    I would have provided that, yes.
14    Q    Okay.  And then would you have provided,
15 in the middle of the paragraph where it says, These
16 transactions resulted in the company owing to
17 Mr. Mahabub the aggregate principal amount of
18 approximately -- and then it gives about 1.5 million,
19 would you have provided that number?
20    A    Yes.
21    Q    Okay.  What about the number of warrants
22 that Mr. Mahabub received then?
23    A    Yes.  Yes.
24    Q    You would have provided that information?
25    A    Yes.

Case 1:15-cv-02118-WJM-SKC   Document 84-8   Filed 02/16/18   USDC Colorado   Page 8 of 17

Securities and Exchange Commission v.                                                                                                James T. Devine
Taj Jerry Mahabub, et al.                                                                                                                          July 19, 2016

Page 113

1  A    Well -- let me put it this way.  It was on
2  QuickBooks, and then it was also on a spread --
3  separate spreadsheet that I maintained.
4     Q    Okay.  Where did the -- what's the backup
5  for the loans to shareholders?
6     A    It would just be the checks or debit card
7  transaction.
8     Q    Okay.  And were those for personal
9  expenses of Mr. Mahabub?
10    A    Some of them could have been.
11    Q    Were any of them not?
12    A    In terms of loans to shareholders?
13    Q    Right.
14    A    No.
15    Q    Okay.  And how did you determine what
16  amounts -- what those amounts were?
17    A    By what they were for.
18    Q    Okay.  And were you the person making that
19  determination?
20    A    Yes.
21    Q    Did you talk to Mr. Mahabub about those?
22    A    If I had a question, I'd ask him, Was
23  this, you know, company-related or personal-related?
24    Q    Okay.  What about the long-term note
25  payable to Mr. Mahabub, where does that amount come

Page 114

1  from?
2     A    That would have been deposits made to
3  the -- or monies paid by Jerry to the corporation
4  under his note.
5     Q    Okay.  Did you have anything to do with
6  negotiating that note?
7     A    No.  I mean, it's a combination of
8  payments.  It's not just one.  You know, it was an
9  ongoing thing as he would sell his shares, and then
10  he would loan the company money.
11    Q    Okay.  How did you know when he was
12  loaning the company money versus paying for, for
13  example, his expenses, et cetera?
14    A    Clarify that, if you would.
15    Q    Sure.  So I understand that if Mr. Mahabub
16  makes a payment to GenAudio, Inc. --
17    A    Uh-huh.  Correct.
18    Q    -- then that is going to be part of this
19  note payable to Jerry Mahabub; is that correct?
20    A    Right.  Yes.
21    Q    Did he ever make payments to pay down, for
22  example, the expenses that were his personal
23  expenses?
24    A    At this point, in 2010 -- and it really
25  started in 2009, for the most part he was paying his

Page 115

1  expenses out of his sales of shares.
2     Q    Okay.
3     A    So I didn't -- didn't have a good
4  accounting for that.  He wasn't using the corporate
5  debit card for everything.
6     Q    Other than providing the information that
7  we've discussed regarding Exhibit 2, Mr. Devine, were
8  you charged with reviewing any part of this document
9  before it was finalized?
10    A    No.
11    Q    Okay.  Did you review any part of it
12  before it was finalized?
13    A    No.
14    Q    And as you sit here today, can you recall
15  contributing anything else to it?
16    A    (Deponent shook head.)
17    Q    Is that a no?
18    A    No, not that I'm aware of.
19       MS. VOORHEES: Okay.  Let's go off the
20  record for the DVD.
21       THE VIDEOGRAPHER: This marks the end of
22  DVD Number 1 in the deposition of James T. Devine.
23  We are going off the record at 12:10.
24       (Recess from 12:10 p.m. to 12:18 p.m.)
25       THE VIDEOGRAPHER: We are back on the

Page 116

1  record.  Here marks the beginning of DVD Number 2 in
2  the deposition of James Devine.  The time is 12:18.
3       MS. VOORHEES: All right.  Thank you.
4     Q    (BY MS. VOORHEES)  Mr. Devine, we were
5  talking about Deposition Exhibit 2, which is the
6  March -- sorry, I put it in here.
7     A    March 15th.
8     Q    Thank you.  March 15th, 2010, PPM for
9  GenAudio, Inc.
10    A    Right.
11    Q    I now ask you to flip to Exhibit A, which
12  is on Bates page 541.
13    A    Okay.
14    Q    Mr. Devine, did you have any role in
15  putting together this subscription agreement that is
16  Exhibit A?
17    A    No.
18    Q    Okay.  And if you can flip to Bates
19  Page 550, this is Exhibit A to Exhibit A, which is
20  the confidential subscriber questionnaire.
21    A    Right.
22    Q    Did you have anything to do with putting
23  this document together, with drafting it?
24    A    No.
25    Q    Okay.  And what about Bates Page 552,

Securities and Exchange Commission v.  
Taj Jerry Mahabub, et al.

James T. Devine  
July 19, 2016

**Page 117**

 1  which is the Exhibit B payment instructions, did you
 2  have anything to do with putting together this
 3  document?
 4  A    Yes.
 5  Q    Okay.  And what did you do for this?
 6  A    I provided the account numbers and the
 7  bank.
 8  Q    Okay.
 9  A    The bank information, basically.
10  Q    And was this Wells Fargo Bank the bank
11  that GenAudio, Inc., was using during the 2010
12  offering?
13  A    Well, let me explain.  Normally when we --
14  we did an offering with the brokerage firms, there
15  was an escrow account.  And Jerry wanted to also
16  maintain an escrow account.  It wasn't a true escrow
17  account.
18  Q    Sorry.  I just want to stop you, just to
19  make sure I'm clear.  He wanted to maintain an escrow
20  account for the 2010 offering?
21  A    Correct.
22  Q    Okay.  Go ahead.
23  A    So I believe this account was the escrow
24  account where the majority of the investment money
25  came to, and then it was transferred at our

**Page 118**

 1  discretion to our general account.
 2  Q    All right.  When you say it wasn't a true
 3  escrow account, what do you mean by that?
 4  A    Well, a true escrow account, you have to
 5  meet criteria.  There is criteria established as to
 6  when the monies can be released.  But we had complete
 7  control of the account, so it wasn't truly an escrow
 8  account.
 9  Q    What was your understanding, then, for why
10  this separate account was set up?
11  A    Because Jerry wanted to do it that way.
12  Q    Okay.  Did he offer you any explanation?
13  A    No, just -- no.
14       MR. HOLMES:  Sorry to just interject.  Are
15  you -- are you -- do you know that Jerry -- it was
16  Jerry that wanted to do it that way, or are you
17  speculating?
18       THE DEPONENT:  No.  I'm not speculating on
19  that.  He wanted to do -- see, since we controlled
20  the account, there -- I didn't see any reason why to
21  have a separate account.
22  Q    (BY MS. VOORHEES)  Okay.  But Mr. Mahabub
23  wanted to, so you did?
24  A    Yeah.
25  Q    Okay.  Where was -- well, let me ask you

**Page 119**

 1  this then.  How did it actually work?  When the
 2  majority of the funds goes into this -- this Wells
 3  Fargo account that we're looking at --
 4  A    Uh-huh.  Yes.
 5  Q    -- then the money was transferred to
 6  another account, you said?
 7  A    To our primary, our general account.
 8  Q    Okay.  And what bank was that at?
 9  A    Wells Fargo.
10  Q    Okay.  So just a different account number?
11  A    Yeah.
12  Q    And who determined when funds would be
13  transferred to the general account?
14  A    On an as-needed basis.  And I believe at
15  the end of the offering, we just transferred it all.
16  Q    Now, you said that the majority of the
17  funds went into this Wells Fargo account.  And I'm
18  just going to call it the 952 account because that's
19  the last three digits of the account number.  Did not
20  all of the funds go into the 952 account?
21  A    I believe there were some that went
22  directly into our general account.
23  Q    Okay.  And why is that?
24  A    Because some people had that account
25  number from previous.

**Page 120**

 1  Q    Got it.  Okay.  After the 2010 offering,
 2  did GenAudio, Inc., maintain this 952 account?
 3  A    No.
 4  Q    It was --
 5  A    It was closed --
 6  Q    -- shut down?
 7  A    It was closed, yes.
 8  Q    Do you recall when that happened?
 9  A    I don't know the exact date.  I'd have to
10  go back and look at the records.
11  Q    All right.  Mr. Devine, when investors
12  would fill out the subscription agreement and the
13  confidential subscriber questionnaire that are
14  Exhibit A and Exhibit A to Exhibit A to the PPM, did
15  you receive those documents?
16  A    The documents -- this is kind of nebulous
17  on how this was handled in some respects.  But
18  previous to this, you know, we had brokerage firms
19  that would actually receive the documents, and then,
20  you know, they would then forward them on to us and
21  forward us the money, less their 10 percent or
22  8 percent or whatever their percentage was.  And so I
23  relied upon them.
24       And then we would put a file together as
25  we received the documents.  Jim Mattos would put a

Case 1:15-cv-02118-WJM-SKC Document 84-8 Filed 02/16/18 USDC Colorado Page 10 of 17

Securities and Exchange Commission v.  James T. Devine
Taj Jerry Mahabub, et al.  July 19, 2016

**Page 121**

 1  shareholder file together and put the documents in
 2  the -- in the file.  And then I would receive the --
 3  let's see.  Let's look here.  Well, your Bates
 4  Page 549.
 5     Q   Okay.
 6     A   I would receive that as part of the
 7  subscription agreement, this page that listed the
 8  subscription amount, you know, how they wanted it
 9  styled in terms of name of subscriber, whether it was
10  a trust or an IRA or a 401(k) or whatever.  And
11  then -- well, you can see all the information on
12  there.
13     Q   Yeah.
14     A   And then address.  And then I would sign
15  it and make a copy of it for the file, send them the
16  original and send them a stock certificate.
17     Q   Okay.  So that -- am I correct that what
18  you just described is what happened when
19  GenAudio, Inc., was using a brokerage firm to conduct
20  an offering?
21     A   And when we were doing it ourselves.
22     Q   Oh, okay.
23     A   Yeah.  Both -- in both instances.
24     Q   Okay.  So sorry.  Let me walk back
25  through, then, since -- so we're talking about a

**Page 122**

 1  process that occurred during the 2010 offering.
 2     A   Okay.
 3     Q   Investors would send the subscription
 4  agreement, including the signature page to whom?
 5     A   They would send it to the company.
 6     Q   Okay.
 7     A   And then Jim Mattos, Jimmy, would put
 8  together a file.
 9     Q   Okay.
10     A   And then he would bring me the file.  And
11  then I would take this page and create a stock
12  certificate based on this information.
13     Q   Okay.  So you would rely on the signature
14  page to subscription agreement to create the stock
15  certificates?
16     A   Right.
17     Q   And you would also sign this subscription?
18     A   Correct.
19     Q   All right.  And why were you the one
20  signing it?
21     A   Well, at the time I was secretary --
22  secretary, I believe.
23     Q   Okay.
24     A   Or -- I signed them sometimes as
25  secretary, sometimes as vice president of finance,

**Page 123**

 1  because there wasn't a secretary at the time.  So,
 2  you know, just who else is going to do it?
 3     Q   That was your -- one of your duties?
 4     A   Yeah.
 5     Q   Okay.  If you look at the next page, then,
 6  so it's Bates Page 550 and it's Exhibit A,
 7  Confidential Subscriber Questionnaire.
 8     A   Uh-huh.
 9     Q   Did you receive these documents as well in
10  the investor files that Mr. Mattos would put
11  together?
12     A   I believe they were there, yes.
13     Q   Okay.  And what -- did you do anything
14  with them?
15     A   No.
16     Q   Okay.  Do you know if anybody related to
17  GenAudio did anything with these documents other than
18  put them in a file?
19     A   Not really.  We didn't have a -- we didn't
20  have a punch list, so to speak, a set -- a set
21  procedure.
22     Q   Okay.
23     A   It was -- we got -- I think -- I think in
24  some respects we got kind of lazy because of relying
25  on the brokerage firms to do all that work.

**Page 124**

 1     Q   All right.
 2     A   You know.
 3     Q   So during the 2010 offering, did you check
 4  to see if the boxes on Page 550 were all -- were
 5  checked, if any of those boxes were checked?
 6     A   No.  I kind of relied on Jim Mattos for
 7  that, or whoever sold them the stock.  I mean, it was
 8  primarily Jim Mattos or Jerry.
 9     Q   Okay.  Did Mr. Mattos ever tell you that
10  he was checking those boxes?  Sorry.  That's a bad
11  question.
12         Did he ever tell you that he was looking
13  to see whether those boxes had been checked?
14     A   Yeah, that's better.
15         MR. HOLMES: That's an important
16  distinction.
17         MS. VOORHEES: Yes, it is.
18     A   From my understanding, Jim Mattos was not
19  checking boxes.
20     Q   (BY MS. VOORHEES)  Okay.
21         MR. AVENI: Let's keep -- now, I think
22  we're making a messy record.  You mean Jim Mattos was
23  not physically checking off boxes himself?
24         THE DEPONENT: Yes, exactly.
25         MR. AVENI: Okay.

Case 1:15-cv-02118-WJM-SKC Document 84-8 Filed 02/16/18 USDC Colorado Page 11 of 17

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

James T. Devine
July 19, 2016

**Page 125**

1  A  I don't recall how it went, whether he was
2  checking them or not.
3  Q  (BY MS. VOORHEES) Okay. What about the
4  second page of the subscriber questionnaire, so it's
5  the one with the Bates 551.
6  A  Yeah.
7  Q  Did you review any of this information?
8  A  No.
9  Q  So if you look back to Page 549, at the
10 very bottom where it says, The subscription for
11 securities of GenAudio, Inc., by the above-named
12 subscribers is accepted this, blank, day of, blank,
13 comma, 2010.
14 A  Right.
15 Q  Would you fill that in?
16 A  Yeah.
17 Q  Okay. And then you would sign it?
18 A  Yeah.
19 Q  And did you ever reject any subscriptions?
20 A  No.
21 Q  Okay. And did you ever check anything
22 before you accepted the subscriptions other than the
23 signature page?
24 A  To see if they're -- if they had paid for
25 their shares.

**Page 126**

1  Q  All right.
2  A  Yeah.
3  Q  So you did wait for payment to come in?
4  A  Yeah.
5  Q  Anything else that you did before
6  accepting the subscription?
7  A  No. Not that I recall. You know, we
8  just, you know, got this and, you know, just went off
9  of that.
10 Q  All right. Mr. Devine, I assume if wire
11 transfers came in they went directly to the Wells
12 Fargo account; is that correct?
13 A  Yes.
14 Q  The 952 account? What about checks? Did
15 you ever receive checks for the 2010 offering?
16 A  We may have. I don't recall. For the
17 most part, people wired in. Some people did send
18 checks. And I don't recall if they sent them for
19 this particular offering, but that would be notated
20 in the bank records, whether it was a wire or whether
21 it was a deposit.
22 Q  Do you still have copies of the bank
23 statements for those Wells Fargo accounts that you
24 were using during the 2010 offering?
25 A  Yes.

**Page 127**

1  Q  Where do you have them?
2     MR. AVENI: What -- are you asking -- do
3  you need to go off the record to talk to me? She's
4  asking you -- you said you physically have these
5  records. She's just asking you where you're
6  maintaining them. That's okay; you can answer that
7  question.
8     But if you need to talk to me about an
9  issue, we can go off the record. Do you need to talk
10 about a privilege issue?
11    THE DEPONENT: No, not a privilege issue.
12 They're right over in the corner.
13 Q  (BY MS. VOORHEES) Okay. So you still
14 have them?
15 A  Yeah.
16 Q  You actually still have physical copies of
17 them?
18 A  Yeah.
19 Q  Okay. And, again, I don't want to get
20 into any communications with your counsel --
21 A  No. That's all right. That's fine.
22 Q  -- but have you talked to anybody about
23 not providing those documents to the Commission?
24 A  No. No. Not at all.
25 Q  During the 2010 offering, did you do

**Page 128**

1  anything to check whether investors in GenAudio were
2  accredited investors?
3  A  No.
4  Q  Do you know what that term means?
5  A  Yes.
6  Q  Okay. What does it mean to you?
7  A  Well, you have to meet a certain criteria,
8  and I believe, from my old days, it was like 200,000
9  a year in salary for two years or more; net worth of
10 a million dollars, not including your -- your
11 residential property.
12 Q  And you did not check that during the 2010
13 offering?
14 A  No.
15 Q  Okay. Are you aware of anyone on behalf
16 of GenAudio, Inc., checking that during the 2010
17 offering?
18 A  No. I -- I'm not aware that they did or
19 they did not.
20    MS. VOORHEES: Thank you. Just a second.
21 I want to make sure.
22    MS. HUGHES: Sure.
23    MS. VOORHEES: All right. There we go.
24    THE DEPONENT: Are we done with this?
25    MS. VOORHEES: Yes, for now. Thank you.

Case 1:15-cv-02118-WJM-SKC   Document 84-8   Filed 02/16/18   USDC Colorado   Page 12 of 17

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

James T. Devine
July 19, 2016

Page 133

 1   Q   Did you authorize counsel to E-file it
 2   with your signature?
 3   A   Yes.
 4   Q   And which attorney would that have been?
 5   A   Ben Huber.
 6   Q   Okay.  If you go to the second-to-last
 7   page, which is in Box 14, where it says Investors, do
 8   you see that?
 9   A   Yes.
10   Q   And do you see there's two paragraphs.
11   The first says, Select if securities in the offering
12   have been or may be sold to persons who do not
13   qualify as accredited investors.  Number of such
14   nonaccredited investors who have invested in the
15   offering.
16   A   Yes.
17   Q   And do you see that there's no checkmark,
18   and there's nothing in that first box?
19   A   Correct.
20   Q   Do you know why?
21   A   I'm not aware --
22   Q   Okay.
23   A   -- why it's not there.
24   Q   Okay.  Did you do anything to check the
25   number of investors, that 41?

Page 134

 1   A   Well, I would have had the information.
 2   Q   You would have had those files?
 3   A   Yeah.
 4   Q   Okay.  And did you do anything to make
 5   sure that number was right?
 6   A   In what respect?
 7   Q   Well, here, let me back up.  How was this
 8   form actually prepared?
 9   A   I would get the number of investors that
10   invested in that period, and I believe I also
11   submitted the state that they were from.
12   Q   Okay.
13   A   To -- to the law firm.  Then they would
14   prepare this.
15   Q   Okay.  And then did you see the Form D
16   before it was actually filed?
17   A   Yes.
18   Q   Okay.  And did you do anything to review
19   the Form D before it was filed?
20   A   I'd look at it, you know.  But it was
21   based on information that I gave, and that was 41 --
22   I believe at that point there must have been 41
23   investors that purchased shares.
24   Q   Okay.  So you don't have any reason to
25   doubt that number?

Page 135

 1   A   Yeah.
 2   Q   All right.
 3       (Exhibit Number 5 was marked.)
 4   Q   (BY MS. VOORHEES)  All right.  Mr. Devine,
 5   I'm handing you what's been marked as Exhibit 5.
 6   Deposition Exhibit 5 is a certified copy of another
 7   Form D for GenAudio, Inc.
 8   A   Okay.
 9   Q   And, again, if you'll go to the last page
10   of Exhibit 5, that last line you were looking at, do
11   you see that this one is dated 2010-11-19?
12   A   Yes.
13   Q   And it has your name as the signature and
14   name of signer?
15   A   Yes.
16   Q   And was this prepared in the same manner
17   as what you just described with Exhibit 4?
18   A   Yes.
19   Q   Okay.  And did you authorize counsel to
20   file it with your name?
21   A   Yes.
22   Q   Okay.  Do you know why in Item 14 on the
23   second-to-last page there is no disclosure of
24   nonaccredited investors?
25   A   I see there is none.

Page 136

 1   Q   Okay.  Do you know why there are none?
 2   A   I'm not aware of why.
 3       (Exhibit Number 6 was marked.)
 4   Q   (BY MS. VOORHEES)  All right.  Mr. Devine,
 5   I'm going to hand you what's been marked as
 6   Deposition Exhibit 6.  This is a document
 7   Bates-labeled GA-000997 through 1002.  Mr. Devine, do
 8   you recognize Exhibit 6?
 9   A   Yeah.
10   Q   What is it?
11   A   Schedule of financing.
12   Q   All right.  Did you prepare Exhibit 6?
13   A   I believe I did.
14   Q   All right.  And why?
15   A   Maybe it was at somebody's request.  I
16   don't recall why I prepared this.
17   Q   When did you prepare it?
18   A   There is no date, is there?  Well, I'd say
19   sometime in 2014.
20   Q   Okay.  And that's because it seems to go
21   up to then?
22   A   Yeah.  Exactly.
23   Q   All right.  Let's look at the first page
24   of Exhibit 6.  You see the little chart that says,
25   Year?

Case 1:15-cv-02118-WJM-SKC   Document 84-8   Filed 02/16/18   USDC Colorado   Page 13 of 17

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

James T. Devine
July 19, 2016

Page 161

 1   A    Mahabub Stock Sales, I believe.
 2   Q    And did you provide that separate
 3   spreadsheet to Mr. Mahabub?
 4   A    Not that I'm aware of.  I don't think he
 5   ever asked for it.
 6   Q    Do you still have it?
 7   A    Yeah, electronically.
 8   Q    All right.  So when Mr. Mahabub would sell
 9   some of his personal shares, Mr. Mahabub would
10   provide you with the contract that -- the share
11   purchase agreement contract?
12   A    Yeah.
13   Q    Okay.  Would you receive anything else?
14   A    No.
15   Q    Okay.  Did you receive a subscription
16   agreement?
17   A    No.  There was no subscription agreement.
18   It wasn't an original issue --
19   Q    Okay.
20   A    -- by the company.
21   Q    What about a subscriber questionnaire?
22   A    No.
23   Q    Did you receive any documents related to
24   the proxy rights?
25   A    That was part of the contract.

Page 162

 1   Q    Okay.  So that was in the contract?
 2   A    Yeah.  I believe it was an addendum to the
 3   contract.
 4   Q    Did you do anything to check whether the
 5   investors to whom Mr. Mahabub was selling his
 6   personal shares were accredited investors?
 7   A    No.
 8   Q    Do you know if anybody checked that?
 9   A    Not that I'm aware of.
10   Q    For the investors who purchased shares --
11   Mr. Mahabub's personal shares, did you provide them
12   with any information about GenAudio?
13   A    No.
14   Q    Did you issue share certificates to those
15   certificates?
16   A    Did I issue shares?  Yes.
17   Q    How would you get those to the investors?
18   A    Mail them.
19   Q    Mail?  Did you ever keep a list of
20   unaccredited investors or nonaccredited investors?
21   A    No.
22   Q    Mr. Devine, were you ever a board member?
23   A    No.
24   Q    Were you ever asked to be a board member?
25   A    No.

Page 163

 1   Q    To your knowledge was Jim Mattos ever a
 2   board member?
 3   A    No, not to my knowledge.
 4   Q    Did you attend the GenAudio board members?
 5   A    No.
 6   Q    Ever?
 7   A    I -- when Dale and Mark, they expanded the
 8   board, then I took the minutes.
 9   Q    Okay.
10   A    But before that, no.
11   Q    So in 2010 and 2011 and 2012, you did not
12   attend?
13   A    No.
14   Q    Okay.  And you didn't keep the minutes?
15   A    No.
16        (Exhibit Number 8 was marked.)
17   Q    (BY MS. VOORHEES)  Mr. Devine, I'm going
18   to hand you what's been marked as Deposition
19   Exhibit 8.  Do you recognize Exhibit 8?
20   A    Let's see here.
21        MS. HUGHES: Is there a Bates number on
22   there?
23        MS. VOORHEES: Oh, I'm sorry.  Yes.  Thank
24   you.  This is previously marked as Investigative
25   Exhibit 99, and it is Bates-labeled GA-002940

Page 164

 1   through 2946.  Thank you.
 2   A    I don't really recognize it, but yeah, I
 3   can see it's from the -- from a board meeting.
 4   Q    (BY MS. VOORHEES)  Okay.  And you see in
 5   the paragraph that is numbered one on the first page
 6   of Exhibit 8 --
 7   A    Right.
 8   Q    -- it says that you asked for questions.
 9   Do you recall attending this meeting?
10   A    Well, okay.  When you say "attend,"
11   oftentimes -- or not oftentimes, occasionally, they
12   would ask me to get on the phone, see if anybody had
13   any financial questions, and then I -- you know, I
14   didn't participate in any other business.
15   Q    Okay.
16   A    So, you know, from that perspective, yes.
17   Q    Okay.  Great.  So if you could, then,
18   turn, Mr. Devine, to the third page of Exhibit 8,
19   which is Bates-labeled 2942.  Do you see that that's
20   a scanned copy of an e-mail from Paul Powers?
21   A    Right.
22   Q    Who's Paul Powers?
23   A    He was on our board of directors, and I
24   think at the time -- I'm not sure, but I think he was
25   the chief operating officer also.

Case 1:15-cv-02118-WJM-SKC   Document 84-8   Filed 02/16/18   USDC Colorado   Page 14 of 17

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

James T. Devine
July 19, 2016

Page 177

1  involvement in anyone's use of the AstoundSound
2  studio in California?
3    A    No.
4    Q    If you go to the next page, so Page 61 of
5  the PPM, it's Bates Page 4794.
6    A    Yeah.
7    Q    Do you see that for additional
8  information, it directs people to Mr. Mahabub?
9    A    Yes.
10   Q    Do you know why it wasn't you for this
11 PPM?
12   A    Jerry's call.  He wanted to have them
13 contact him rather than me.
14   Q    Okay.  Did you have any involvement in the
15 drafting of the subscription agreement that's
16 Exhibit A?
17   A    Maybe the bank information.
18   Q    Okay.  So if you go to Exhibit B to the
19 subscription agreement, the payment instructions --
20   A    Yeah.
21   Q    Okay.
22   A    But I don't see -- I don't believe it's
23 changed from the last one.  No, it's the same.
24   Q    Okay.  Was your involvement in the process
25 for gathering the subscriptions the same for the 2011

Page 178

1  offering as it was for the 2010 offering?
2    A    When you say "gathering" --
3    Q    When -- you walked us through the process
4  for gathering the signature page to the subscription
5  agreements --
6    A    Yes.  Yes.
7    Q    -- and then you signed it, correct?
8    A    Yes.
9    Q    And then you would issue the shares,
10 correct?
11   A    That is correct.
12   Q    Okay.  Was that all the same in 2011?
13   A    Yes.
14   Q    Okay.  Did you do anything in 2011 to
15 review the confidential subscriber questionnaires?
16   A    No.
17   Q    Did you do anything to check whether the
18 investors were accredited?
19   A    Not that I recall.
20   Q    Are you aware of anyone at GenAudio doing
21 anything to check to see whether investors were
22 accredited?
23   A    I'm not sure if Jim Mattos looked at them
24 or not, to be honest with you.
25   Q    All right.  Exhibit B to the PPM starts on

Page 179

1  Page 4807.  Actually I guess it's the only page.
2    A    Yes.
3    Q    And that's the financial statement as of
4  March 31st, 2011, correct?
5    A    Correct.
6    Q    Did you prepare this document?
7    A    Yes.
8    Q    And there's profit and loss sheet and then
9  a balance sheet, correct?
10   A    Correct.
11   Q    And did you leave anything off when you
12 created these?
13   A    No.
14   Q    Okay.  Did you create them out of
15 QuickBooks?
16   A    Yes.
17   Q    All right.  Other than what we just
18 covered, Mr. Devine, and what you previously
19 testified to regarding the 2010 offering, did you
20 have any other involvement in this 2011 offering by
21 GenAudio, Inc.?
22   A    Not other than the items that we discussed
23 and if there was any items in -- you know, there
24 could be items in there that I haven't seen.  But if
25 it was accounting items, I would have provided that,

Page 180

1  yes.
2    Q    Okay.  Were the financial statements that
3  are on the last page of Exhibit 10, were they
4  accurate as of March 31st, 2011?
5    A    Well, they would have -- you know,
6  whatever there was there, yes.
7    Q    Okay.
8    A    I mean, you know, I don't remember if I
9  had to go back and make prior year corrections on
10 anything.  But as of that time, yes, they were
11 correct.
12       (Exhibit Number 11 was marked.)
13   Q    (BY MS. VOORHEES)  All right.  Mr. Devine,
14 I'm going to hand you what's been marked as
15 Exhibit 11.  It is a certified copy of a Form D
16 received by the commission on May 16, 2011, for
17 GenAudio, Inc.  And, Mr. Devine, if you flip to the
18 second page of Exhibit 11, do you recognize the form
19 of this document?
20   A    Yes.
21   Q    And if you go to the last page of
22 Exhibit 11, do you see that your name is listed --
23   A    Yes.
24   Q    -- for the signature and the name of
25 signer?

Case 1:15-cv-02118-WJM-SKC Document 84-8 Filed 02/16/18 USDC Colorado Page 15 of 17

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

James T. Devine
July 19, 2016

Page 273

1 office -- when did you move out of that office again?
2  A   I believe it was September of --
3 September, October 2009.
4  Q   Okay.
5  A   I believe.
6  Q   And do you recall -- did you and
7 Mr. Mahabub have any conversation about how much of a
8 meeting or a conversation he had with Mr. Jobs?
9  A   No. No.
10  Q   Were you left with any impression about
11 whether it was a planned meeting, whether it was, you
12 know, a -- what the nature or duration of the
13 conversation was?
14  A   No.
15  Q   All right. But it was before any of the
16 other e-mails that we were looking at that I
17 articulated there was something that said that there
18 was going to be a meeting with -- it was in the first
19 paragraph. There was going to be a meeting with
20 Mr. Jobs.
21  A   I know what you're referring to, yeah.
22  Q   But it was -- it was some -- it was maybe
23 even a year or two before that?
24  A   Yeah. I don't know. He said he met -- if
25 I remember correctly, he said he met Steve Jobs and

Page 274

1 his kids. What his kids were doing at the office, I
2 don't know.
3  Q   Okay. Okay. I just wanted to make sure
4 we had the timing on that understood.
5     All right. And then you gave some
6 testimony earlier, and we just alluded to it, about
7 being on the board. And you looked at a particular
8 exhibit, I believe it was Exhibit Number 9, that
9 showed that you were on the board of directors.
10     Can you pull that in front of you? It's
11 in the stack in front of you there.
12     MR. AVENI: Yeah. What's the number?
13     MR. HOLMES: 9.
14     MR. AVENI: Oh, 9. That's 10. There you
15 go.
16  A   Okay.
17  Q   (BY MR. HOLMES) Okay. So in this
18 particular exhibit, it indicates that you and
19 Mr. Mattos were being apported-- being appointed to
20 the board of directors.
21  A   Yes.
22  Q   And it looks like it's -- it's dated
23 January 18, 2011, right above Mr. Mahabub's signature
24 on the second page.
25  A   I see that.

Page 275

1  Q   Okay. And I apologize for not having a
2 hard copy of it, but do you recall whether you
3 were -- whether you actually resigned from the board
4 effective the same day?
5  A   I didn't know I was on it. I don't
6 remember -- I remember there were some things that
7 happened around that time. But I didn't think -- I
8 don't know if I got a copy of the UWC.
9  Q   EWC?
10  A   Unanimous written consent.
11  Q   UWC?
12  A   Yeah. Didn't I say UWC? UWC. I think I
13 need some water.
14  Q   Okay. Would you be surprised to learn
15 that there's a document that has your signature or
16 what looks like your signature on it?
17  A   No, I wouldn't be surprised.
18  Q   And that that document is the one where
19 you're resigning --
20  A   Yeah.
21  Q   -- as a member of the board?
22     And I just -- I identified this off the
23 record to counsel for the SEC, but this was produced
24 at Bates Number Mahabub-002905 through 2908. Do you
25 recall -- sitting here today, do you recall the

Page 276

1 purpose of that particular -- why you were on the
2 board and off the board in the same day?
3  A   I think he wanted to change the minimum
4 number of required directors.
5  Q   And "he"'s Mr. Mahabub?
6  A   Yeah.
7  Q   Do you have any other recollection about
8 what that was about?
9  A   No.
10  Q   And we were looking at, in various places
11 this morning actually, some of the documentation that
12 the SEC put in front of you in exhibit form showing
13 some of the -- the discussions of loans that
14 Mr. Mahabub had taken from the company and vice
15 versa --
16  A   Right.
17  Q   -- that the company had made to
18 Mr. Mahabub.
19     MR. HOLMES: And then what I wanted to do
20 was have another exhibit marked.
21     (Exhibit Number 20 was marked.)
22     MR. HOLMES: So this is -- is this 20?
23     THE REPORTER: Yes.
24  Q   (BY MR. HOLMES) So it's a one-page
25 spreadsheet. And do you recognize it?

**Page 277**

1  A   Yes.
2  Q   What is it?
3  A   It's a recap of Jerry's loans to the
4  company -- or company loans to Jerry, Jerry loans to
5  company, and then the sale -- the noncash sale to
6  Jerry Mahabub of the studio.
7  Q   Okay.  So -- and that last thing you're
8  talking about is the 860 number that's written in the
9  middle of the page?
10  A   Yes.
11  Q   Okay.  So as we're looking at this,
12  there's a column about -- just to the right of that
13  column, it says, Difference, and next to that,
14  Running difference.
15  A   Right.
16  Q   What are those showing us?
17  A   The net of all three of those columns.
18  Q   Okay.  So then this shows that at the end
19  of 2013, there's -- the running difference is the
20  total net.  It shows $180,966.  And which way does
21  that go?  Did the company owe that to Mr. Mahabub or
22  the other way around?
23  A   I believe it goes to Mr. Mahabub.
24  Q   Okay.  So the netting out of all these
25  loans and the cash and noncash contributions,

**Page 278**

1  including the 860 there that -- I think is Astound
2  Studios?
3  A   (Deponent nodded head.)
4  Q   -- there's a net owed to Mr. Mahabub of
5  180-plus?
6  A   Correct.
7  Q   And to the right of what we're just
8  looking at, there's a separate smaller set of numbers
9  that says, Rent for Astound Studio, reimbursement for
10  home and salary.  Do you see that section?
11  A   Yes.
12  Q   What are those?
13  A   Those are the cash payments made to Jerry
14  Mahabub.
15  Q   Okay.
16  A   For rent for the studio.  Not the accrual,
17  just the actual cash payments.  And the same for the
18  house and same for his salary.
19  Q   Okay.  And why is there reimbursement for
20  his house?
21  A   Because the board approved it.
22  Q   Okay.  Do you have an understanding of why
23  the board approved reimbursement for his house?
24      MS. VOORHEES: Objection, foundation.
25  Q   (BY MR. HOLMES)  Do you have an

**Page 279**

1  understanding?
2  A   Well, yeah.  He had -- had to have a place
3  to live out there, so -- and considered that his home
4  was here, and so he rented a -- rented a house.
5  Q   Okay.  And then the salary column, is that
6  salary that was actually paid, or was that accrued
7  salary?
8  A   That was actually paid.
9  Q   Okay.
10  A   That came off the payroll records.
11  Q   Okay.  So were there actually further
12  amounts that -- that the board had approved but were
13  unpaid for rent for Astound Studio and for the
14  salary?
15  A   Yes.
16  Q   And these numbers at the bottom of that
17  separate little section -- the 220,000, next to it,
18  288,000 and change, and the 750,000 and change -- are
19  those included at all in the table that's to the
20  left?
21  A   No.
22  Q   Okay.  Do they tell us anything about
23  whether there is money owed to or from Mr. Mahabub by
24  GenAudio?
25  A   No.  Well, yes.  The running difference

**Page 280**

1  would have been at the end of 2013 that we owed him
2  180,966, thereabouts.
3  Q   Okay.  And so that should --
4  A   And I'm not -- just let me comment one
5  step further.  I don't know if this includes
6  interest.  I'd have to go back.  I think these are
7  just net figures.
8  Q   And I'm sorry, I don't know if I asked
9  this.  Did you create this spreadsheet?
10  A   I believe I did, yes.
11      MR. HOLMES: I don't think I have anything
12  else.
13      MR. AVENI: Okay.  I have no questions at
14  this time.
15      EXAMINATION
16  BY MS. VOORHEES:
17  Q   I just have a quick redirect.  Mr. Devine,
18  when you were a board member for about a day, did you
19  actually vote to change the minimum number of board
20  of directors?
21  A   I don't recall.
22  Q   Okay.  Mr. Devine, Exhibit 20 --
23      MS. VOORHEES: I guess, counsel, is there
24  a Bates number on this?  Is this something that's
25  been produced to us?

Case 1:15-cv-02118-WJM-SKC Document 84-8  Filed 02/16/18  USDC Colorado  Page 17 of 17

Securities and Exchange Commission v.  
Taj Jerry Mahabub, et al.

James T. Devine  
July 19, 2016

Page 281

 1         **MR. HOLMES:** I believe it was. I'll go
 2  back and look to see where it is. I was looking at
 3  an electronic version of it, but I believe there's a
 4  PDF version that was produced.
 5         **MS. VOORHEES:** Okay. But you don't know
 6  what the number is?
 7         **MR. HOLMES:** Not offhand, I'm sorry. I'll
 8  look for it.
 9         **MS. VOORHEES:** Okay.
10     Q    (BY MS. VOORHEES)  Mr. Devine, when did
11  you create Exhibit 20?
12     A    2013.
13     Q    Okay. You think you created it in 2013?
14     A    You know, I'd have to go back and look at
15  the date stamp on the worksheet.
16     Q    Okay. Do you still have this worksheet?
17     A    I believe I do.
18     Q    Okay. Do -- why were you creating this
19  document?
20     A    I was asked to by somebody.
21     Q    Do you know who?
22     A    No. I don't remember.
23     Q    What's the backup documentation for this
24  document? What did you use to create it?
25     A    The accounts off of QuickBooks.

Page 282

 1     Q    Okay.
 2         **MS. VOORHEES:** We have no further
 3  questions.
 4         **THE VIDEOGRAPHER:** The time is 5:21. We
 5  are going off the record. This will conclude the
 6  deposition for today.
 7         (Discussion off the record.)
 8         **MS. VOORHEES:** Counsel, do you want an
 9  opportunity to review the deposition -- for the
10  witness to review the deposition?
11         **THE VIDEOGRAPHER:** You guys don't need
12  this on video?
13         **MS. VOORHEES:** We don't need it --
14         **MR. AVENI:** We don't need it on video.
15         **MS. VOORHEES:** -- video. Oh, I'm sorry.
16         **THE VIDEOGRAPHER:** If you're not on video,
17  you don't need your microphone. Sorry to interrupt.
18         **MS. VOORHEES:** Counsel, do you and the
19  witness want an opportunity to review the deposition?
20         **MR. AVENI:** Yes, please.
21         **MS. VOORHEES:** Okay. We'll do that within
22  30 days of receipt of the transcript by counsel.
23         **MR. AVENI:** The court reporter will send
24  it to me. I will send it to Mr. Devine. Mr. Devine
25  will make any changes, send it back to me. And do

Page 283

 1  you want me to hold on to the original?
 2         **MS. VOORHEES:** We'll receive the original
 3  transcript, I believe, correct? You'll receive a
 4  copy.
 5         **MR. AVENI:** That's fine.
 6         **MS. VOORHEES:** Yes. So then send me any
 7  addendum or changes.
 8         **MR. AVENI:** Okay.
 9         **MS. VOORHEES:** Thank you.
10         (Deposition concluded at 5:23 p.m. on July
11         19, 2016. )
12
13
14         _____
15         JAMES T. DEVINE

Page 284

 1  STATE OF COLORADO)
 2             ) ss.    REPORTER'S CERTIFICATE
 3  COUNTY OF DENVER )
 4         I hereby certify that the witness in the
 5  foregoing deposition, JAMES DEVINE, was by me duly
 6  sworn to testify to the truth, the whole truth, and
 7  nothing but the truth, in the within-entitled cause;
 8  that said deposition was taken at the time and place
 9  herein named; that the deposition is a true record of
10  the witness's testimony as reported by me, a duly
11  certified shorthand reporter and a disinterested
12  person, and was thereafter transcribed into
13  typewriting by computer.
14         I further certify that I am not interested
15  in the outcome of the said action, nor connected
16  with, nor related to any of the parties in said
17  action, nor to their respective counsel.
18         IN WITNESS WHEREOF, I have hereunto set my
19  hand this 28th day of July, 2016.
20  Reading and Signing was:
21  Requested
22         *Barbara J. Castillo*
23
24         BARBARA J. CASTILLO, RMR, CRR
25         STATE OF COLORADO