# EXCERPTED

# REDACTED

# EXHIBIT 10

Memorandum No. _____     Name: _____

## Confidential Private Placement Memorandum

# GENAUDIO, INC.

PRIVATE PLACEMENT
OF
SERIES D 10% CONVERTIBLE PREFERRED STOCK
$5.00 Per Share



**MINIMUM OFFERING AMOUNT: $1,000,000 (200,000 Shares)**
**MAXIMUM OFFERING AMOUNT: $7,000,000 (1,400,000 Shares)**
**Minimum Investment: $100,000 (20,000 Shares)**

THESE SECURITIES HAVE NOT BEEN REGISTERED WITH OR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY SUCH STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PRIVATE PLACEMENT MEMORANDUM. THIS PRIVATE PLACEMENT MEMORANDUM DOES NOT CONSTITUTE AN OFFER IN ANY JURISDICTION IN WHICH AN OFFER IS NOT AUTHORIZED.

The Information Contained Herein is Confidential and Intended Only for the Entity or Person to Which or Whom It is Given to or Transmitted Electronically.

December 11, 2008

EXHIBIT 199     PLTF. / DEFT.
WITNESS Mahabub
CONSISTING OF 103 PAGES
DATE 1/19/17
BEHMKE REPORTING AND VIDEO SERVICES, INC.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.     GA006483

## SUMMARY OF THE OFFERING

*Investors should read this Memorandum carefully before making any investment decisions regarding the Company and should pay particular attention to the information contained under the heading "RISK FACTORS." Additionally, Investors should consult their own legal, tax and financial advisors in order to fully comprehend the consequences of investing in the Company. The following summary does not purport to be complete and is qualified in its entirety by more detailed information appearing elsewhere in this Memorandum and the Exhibits hereto.*

**The Company**  Formed in May 2003, GenAudio, Inc., a Colorado corporation, intends to revolutionize the entertainment industry by offering a unique listening experience. The Company has developed a sound solution called AstoundSound™ that produces sound uniquely processed to contain significant psycho-acoustic information and immerses the listener in a 360 degree sound field using only 2 channels. The audio solution offered by GenAudio does not require any specialized decoding or playback hardware or software, allowing users to experience AstoundSound™ on their existing equipment. The technology's cost-effectiveness gives it a much wider appeal than other technologies in the market, which require specialized software and multiple speakers to create a surround sound experience.

**Securities**  Series D 10% Cumulative Convertible Preferred Shares, par value $0.001 (the "Preferred Shares"). The Articles of Amendment to be filed with the Colorado Secretary of State and setting forth the terms of the Preferred Shares is attached as Exhibit B.

**Price Per Preferred Share**  $5.00.

**Minimum Investment**  $100,000, or 20,000 Preferred Shares

**Minimum Amount**  $1,000,000, or 200,000 Preferred Shares.

**Maximum Amount**  $7,000,000, or 1,400,000 Preferred Shares.

**Offering Period**  The initial subscription period for the Offering will conclude on the earlier of the sale of not less than 200,000 Preferred Shares or January 31, 2009, subject to one extension of up to 30 days at the discretion of the Board of Directors (the "Initial Closing Date"). Following the Initial Closing Date, the Company will extend the Offering until the earlier of the sale of all of the Preferred Shares offered hereunder or April 1, 2009, subject to one additional extension of up to 30 days at the discretion of the Board of Directors (the "Final Closing Date"). The Offering will be withdrawn if at least 200,000 Preferred Shares have not been subscribed for and accepted on or before the Initial Closing Date. The Company shall not be required to provide any notice of earlier termination or extension of a termination date; provided, however the Company shall not extend the Offering beyond May 1, 2009 in any event. *See* "PLAN OF DISTRIBUTION."

**Escrow Account**  All proceeds from subscriptions for Preferred Shares shall be deposited to an escrow account at First Western Trust Bank in Denver, Colorado (the "Escrow Account"). If the Offering is withdrawn or otherwise terminated or if any subscriptions are rejected, funds paid by subscribers whose funds are not closed upon will be returned without interest or deduction. *See* "PLAN OF DISTRIBUTION."

**Dividends**  The Preferred Shares shall accrue cumulative dividends at a rate of ten percent (10%) per annum, accruing daily and payable, at the election of the Company, in either cash or Common Stock upon conversion or at such earlier dividend payment date(s) as may be declared by the Company and shall participate on a pro rata basis on an as-converted basis in all dividends issued in respect of the Company's Common Stock. *See* "DESCRIPTION OF SECURITIES" and EXHIBIT B.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                GA006492

| | |
|---|---|
| **Liquidation Preference** | In the event of a liquidation of the Company, including a sale of all or substantially all of the Company's assets (an "Asset Transfer") or a merger, reorganization or similar business combination in which the shareholders of the Company (as a group prior to such merger, reorganization or combination) will own less than a majority of the equity interests or voting power of the surviving entity immediately following such merger, reorganization or other business combination (an "Acquisition"), holders of the Preferred Shares shall be entitled to receive, on a pro rata basis among all holders of Preferred Shares, an amount equal to the amount paid for the Preferred Shares in preference to all other classes of capital stock currently existing, plus all accrued and unpaid dividends. *See* "DESCRIPTION OF SECURITIES" and EXHIBIT B. |
| **Conversion Terms** | Conversion Rate - Subject to the anti-dilution rights set forth below, upon conversion, each Preferred Share shall convert into one share of the Company's Common Stock, par value $0.001 per share (each a "Conversion Share" and, collectively, the "Conversion Shares"). |
| | Optional Conversion - The Preferred Shares shall be convertible into Conversion Shares at any time at the option of the holder thereof. Holders of Preferred Shares will receive advance notice of, among other things, any Asset Transfer or Acquisition for purposes of determining whether to convert prior to such event. |
| | Mandatory Conversion - The Preferred Shares shall automatically convert into Conversion Shares upon the earlier to occur of (a) five (5) years from the Final Closing Date, (b) the date that a majority of Preferred Shares have converted to Conversion Shares, (c) the consummation of an underwritten initial public offering of the Company's Common Stock (an "IPO"), (d) the date the Company otherwise becomes a publicly reporting company and lists its Common Stock for sale on a national securities exchange, any of the Nasdaq markets, or the OTC Bulletin Board (a "Going Public Transaction"), (e) any equity recapitalization, share repurchase program or other reorganization in which the holders of Common Stock are entitled to receive an amount equal to their capital investment (a "Recapitalization") or (f) the Company's exercise of its Call Right (as described below) and Holder's failure to elect to receive the Call Price (as defined below) in connection therewith. |
| | *See* "DESCRIPTION OF SECURITIES" and EXHIBIT B. |
| **Anti-Dilution Rights** | The Preferred Shares shall be entitled to weighted-average anti-dilution rights with standard carve outs for certain potentially dilutive issuances, including, but not limited to, issuances upon exercise of outstanding options and warrants, issuances under the Company's equity incentive pool or otherwise as compensatory grants approved by the Board of Directors, and issuances in connection with leasing or financing transactions or to strategic partners. *See* "DESCRIPTION OF SECURITIES" and EXHIBIT B. |
| **Liquidity Obligation** | If an Asset Transfer, Acquisition, IPO, Going Public Transaction or Recapitalization (each a "Liquidity Event") does not occur by September 18, 2012, each holder of Preferred Shares shall have the right to either (i) increase the dividend rate to fifteen percent (15%) per annum until such time as the Liquidity Event occurs, or (ii) demand that the Company redeem such holder's Preferred Shares for cash at a redemption value of one hundred fifty percent (150%) of the purchase price, or $7.50 per share, plus all accrued and unpaid dividends. *See* "DESCRIPTION OF SECURITIES" and EXHIBITS A and B. |
| **Company Call Right** | At any time after the one year anniversary of the Final Closing Date, the Company shall be entitled to call all Preferred Shares (or a portion thereof on a pro rata basis) at a price equal to one hundred twenty percent (120%) of the purchase price, or $6.00 per share, plus all accrued and unpaid dividends (the "Call Price") by delivering notice of exercise of such Call Right to all holders of Preferred Shares (the "Call Notice"). The effective |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                            GA006493

|                          |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                             |
|--------------------------|---|
| **Registration Rights**  | date of the call shall be thirty (30) days after the date of delivery of the Call Notice; provided, however, that all holders of Preferred Shares may convert their Preferred Shares into Conversion Shares at any time prior to the effective date of the Call Right. *See* "DESCRIPTION OF SECURITIES" and EXHIBITS A and B. |

**Registration Rights**  Purchasers of Preferred Shares shall be entitled to standard piggyback registration rights with respect to their Conversion Shares. *See* "DESCRIPTION OF SECURITIES" and EXHIBIT A.

**Board of Directors**  The Board of Directors currently consists of five members, Jerry Mahabub, Elliot Mazer, Ted Cohen, Paul Powers and Mark Bobak. *See* "MANAGEMENT."

**Voting Rights**  The Preferred Shares shall vote on an as-converted basis and, except as otherwise set forth herein, shall be entitled to vote, as a single class with the Common Stock, on all matters upon which shares of the Company's Common Stock are entitled to vote. In addition, the Company may not, without the affirmative vote of the holders of a majority of the Preferred Shares: (i) materially alter or change adversely the powers, preferences, or rights given to the Preferred Shares, (ii) increase the authorized number of Preferred Shares or (iii) enter into any agreement with respect to any of the foregoing. *See* "DESCRIPTION OF SECURITIES" and EXHIBIT B.

**Investor Suitability**  The Preferred Shares are being offered and sold solely to "accredited investors" as defined in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended (the "Securities Act"), pursuant to an exemption from registration under Rule 506 promulgated under Regulation D, who shall acquire the securities offered hereunder for their own account, for investment purposes and without a view toward resale or other distribution. Subscribers shall be required to submit a completed Subscription Agreement, together with any exhibits thereto, so that the Company can determine whether investor suitability requirements are satisfied. Affiliates of the Company or any existing accredited shareholder may acquire Preferred Shares. *See* "INVESTOR SUITABILITY STANDARDS".

**Risk Factors**  This Offering involves substantial risks to Investors. An investment in the Preferred Shares and the Conversion Shares (the "Securities") is speculative and should not be considered by persons who cannot afford the loss of their entire investment. An Investor must depend on their own investigation of the Company. *See* "RISK FACTORS".

**Subscription Agreement**  Purchases of the Preferred Shares must be made pursuant to the Subscription Agreement in the form appended to this Memorandum as Exhibit A, which contains, among other provisions, representations and warranties by the Company, investment representations by the subscriber, and restrictions on transferability of the Securities. *See* EXHIBIT A.

**Capital Stock Authorized And Currently Outstanding**  The Company's authorized capitalization consists of 25,000,000 shares of Common Stock, par value $.0001 per share, and 5,000,000 shares of Preferred Stock, par value $.0001 per share, of which 1,000 have been designated as Series C Preferred Stock. *See* "DESCRIPTION OF SECURITIES." Eleven Million Eight Hundred Fifty Thousand (11,850,000) shares of Common Stock are currently issued and outstanding, warrants to purchase One Million Eight Hundred Nineteen Thousand Six Hundred (1,819,600) shares of Common Stock have been granted to Investors and are outstanding (though some are currently subject to a call right), warrants to purchase Three Million Three Hundred Twenty Three Thousand Three Hundred (3,323,300) shares of Common Stock have been granted to directors, officers, employees and consultants and are outstanding, and an additional Six Hundred Seventy Six Thousand Seven Hundred (676,700) shares of Common Stock are reserved for issuance to employees, consultants, officers and directors pursuant to the Company' equity incentive pool. In addition, there are 1,000 shares of

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.  GA006494

|  |  |  |
|---|---|---|
| **Total Capital Stock and Warrants Outstanding After Completion of the Offering, Assuming The 1,400,000 Preferred Shares Are Sold** | Existing Common Shares ...................................... 11,850,000 | Common Shares |
| | Existing Investor Warrants ..................................... Common Shares | 1,819,600 |
| | Existing Compensatory Warrants ............................ Common Shares | 3,323,300 |
| | Equity Incentive Pool ............................. 676,700 | Common Shares |
| | Existing Preferred Shares | 1,000  Series  C Preferred Shares |
| | Series D Shares in this Offering ............................. 1,400,000 | Preferred Series D Shares |
| | Fully Diluted Total .......................................... 19,070,600 | |

See "CAPITALIZATION".

**Use of Proceeds**  The Company intends to use the net proceeds from this Offering primarily to market and promote its product offerings but may also use such proceeds to pay off certain accounts payable, to cover the costs of salaries, to purchase sound equipment and expand facilities, to make patent filings, to cover ongoing product development costs, for other sales and marketing, and to otherwise maintain as general working capital, all in accordance with the Company's general business plans and goals. Management will have broad discretion in allocation of the proceeds of this Offering. See "USE OF PROCEEDS."

**Plan of Distribution**  All of the Securities are being offered to accredited investors under the terms set forth in this Memorandum. The Securities are offered by the Company subject to receipt and acceptance by the Company, with the right to reject any subscription, in whole or in part. See "PLAN OF DISTRIBUTION".

**Limited Transferability**  The Shares being sold will not be registered with the Securities and Exchange Commission or qualified under the securities laws of any state, but will be offered and sold pursuant to an exemption therefrom. Therefore, the Shares may not be resold or otherwise distributed without registration or qualification under the Securities Act and/or any other applicable securities laws or the availability of an exemption therefrom. Furthermore, there is currently no market for the Shares and no market is expected to develop. See "RISK FACTORS".

**Preemptive Rights**  None.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.   GA006495

## NEW BUSINESS DEVELOPMENT

**Apple**

Over the past several years, the Company has established excellent relationships with both senior management and software developers at Apple. All of the Company's initial software is written for Apple's Mac OS X based hardware devices, and the Company intends to continue developing for Apple products. Recently, Apple released a software development kit ("SDK") for development of third party software for Apple's new iPhone and iPod Touch products. The Company was selected, among a small and exclusive list of approximately 25 other companies, as one of the initial beta testers to develop audio processing software that can be integrated into the iPhone and iPod Touch.

The Company developed a product for the iPhone and iPod Touch that was fully functional on the iPhone SDK simulator. However, at Apple's World Wide Developer Conference held in June 2008, Apple announced that, due to security concerns, Apple would not allow any third-party developers to directly access the requisite portion of the iPhone and iPod Touch operating system (or, "kernel"), thereby forcing all third-party software to operate as a stand-alone application. Since this is not consistent with the product that the Company designed and tested, the Company elected to focus its resources on the initial deployment of its AstoundStereo™ consumer product for computers. The Company anticipates that Apple will modify the security features of its products and lift the restrictions within the next year, as they have done in the past for the Macintosh computer, and the Company will be able to launch its iPhone and iPod Touch applications shortly thereafter. In addition, the Company has commenced discussions with Google to be included in the Google Android phones being developed by various phone manufacturers such as the T-Mobile G1 and various phones Motorola is developing using the Google Android operating system.

**HBO**

The Company utilized its AstoundSound™ technology in connection with a 19-minute HBO documentary film entitled "Viko" that will be premiering at both the January, 2009 Sundance Film Festival and the May, 2009 Cannes Film Festival, two of the world's most prestigious film festivals. The Company mixed the special effects for the "Viko" film in AstoundStereo Pro™ as well as processing the music portion of the audio mix using AstoundStereo™ Pro. The Company will debut a 30-second AstoundSound™ trailer preceding the movie, and also feature the AstoundSurround™ logo in the rolling credits. The Company believes the Viko documentary will help the Company gain significant exposure within the film industry.

**Google / HTC / Motorola**

With the reduction of the AstoundCore to only 3MB, the Company can now easily integrate its technology into a variety of "smart phones" and other handheld mobile devices. The mobile entertainment space has recently become a strong focus for entertainment-based technologies, and is an excellent testing ground for cutting-edge applications such as AstoundSound™. The technology can be applied to anything from enhancing music and videos that the user may be listening to on their phone, to significantly increasing intelligibility for teleconferencing and/or video conferencing. The Company believes that integrating into mobile devices would allow for a per-unit license fee revenue model as well as potential for a percent of distribution as a royalty.

Immediately after the Company gave its presentation at the October 20, 2008 Consumer Electronics Association's iStage competition for "America's Best New Gadget", a Google business development representative expressed his desire to have an AstoundStereo™ application for the Google Android operating system smartphones. Google's new Android operating software is an "open" source operating system and the Company has confirmed the compatibility of AstoundStereo™ and the Android operating system and intends to utilize its existing architectural structure developed for the Apple iPhone to create an application for the Google based phones. The Company has engaged in discussions with Google and intends to prioritize this integration following the completion of its AstoundStereo computer product launch and the Company belives this product lends itself to a lucrative per unit licensing royalty structure. Very recently, Motorola announced that it intends to reduce the number of operating systems it will use for the phones it manufactures with the Google Android operating system will serve as Motorola's primary operating system platform (See *Wall Street Journal* article dated October 29, 2008). Motorola's global market share of the cell phone industry is approximately 14%.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.      GA006507

<mark>Case 1:15-cv-02118-WJM-SKC Document 84-10 Filed 02/16/18 USDC Colorado Page 8 of 17</mark>

## MANAGEMENT

GenAudio's management is comprised of a team of dedicated professionals with extensive experience in technology, software development, marketing, the entertainment industry, finance, licensing and business development. Management is augmented by an advisory committee, consisting of honorary members extensively involved in the field of acoustics, professionals in the audio industry, marketing experts, and seasoned individuals with experience in the commercialization and sale of digital audio technology.

The officers, directors, and senior management of the Company and the positions held by each are as follows:

| Name | Age | Position |
|---|---|---|
| Jerry Mahabub | 37 | Founder, Chairman, President and CEO |
| Ted Cohen | 56 | Board Member |
| Elliot Mazer | 67 | Board Member |
| Paul Powers | 50 | Board Member |
| Mark Bobak | 49 | Board Member |
| James Devine | 51 | Secretary and Vice President - Finance |
| Gary Smith | 41 | Vice President - Software Engineering |

### BIOGRAPHIES

**Jerry Mahabub: Chairman, President, and Chief Executive Officer**

Mr. Mahabub, founder of GenAudio, has been Chairman, CEO and President since 2003, as well as acting CTO. His activities include strategic planning with respect to the overall business and technology, raising money, negotiating licenses, guiding/training the senior management team, and forming strategic partnerships. Prior to founding GenAudio, he was owner and Executive Manager of Rapid Prototype Technologies, LLC from 1998 to 2003, where he designed and developed new and innovative technologies for a large variety of government contracts and mainstream commercial markets. His responsibilities there included design engineering, business development, technology commercialization, and licensing. He negotiated sophisticated licensing deals and partnerships with multiple divisions of Hewlett Packard and other companies in an effort to create marketable and cost-effective products commercially viable for licensing downstream and/or distribution, and acted as a consultant for both hardware and software engineering projects. Mr. Mahabub started attending Rensselaer Polytechnic Institute ("RPI") in Troy, NY doing coursework and lab work from the age of 13 and entering as a full time student at the age of 16. He double-majored in Physics (B.S.) and Electrical and Computer Systems Engineering – ECSE (B.E.) with a Minor in Philosophy of Science from RPI, from 1984 to 1991.

Mr. Mahabub is the inventor of the AstoundSound™ technology. With over 22 years of experience in research and development as well as 15 years in business development and technology license negotiations, he has been responsible for developing and commercializing some of the world's most sophisticated technologies.

Prior to his position at Rapid Prototype Technologies, Mr. Mahabub was Director of Engineering at Ines Inc. / SPYR Technologies Inc. from 1995 to 1998, where he established the Company as a GSA/8A provider for government contracts. The work involved research and analysis of market trends for commercialization efforts, competition and sales forecasts, working directly with marketing consultants on press releases and advertisements for test and measurement journals and magazines, successfully achieved ISO 9001 compliance certification, and working on several projects in accordance with the Federal Acquisition Regulations and Government Procurement Policies. Some of the customers he developed data acquisition technology for and negotiated the contracts, some in excess of 60MM USD, included Boeing, the Jet Propulsion Laboratory, the US Naval Warfare Center and the US Army Missile Research and Development Engineering Center.

**Ted Cohen: Board member**

Ted Cohen joined GenAudio's board in 2007, and brings his widespread digital expertise in music, mobile, IPTV and product & service development. He is also the Managing Partner of TAG Strategic, a digital media and entertainment advisory company.

In his previous role as Senior Vice President of Digital Development & Distribution for EMI Music, Mr. Cohen led next-

<mark>
GENAUDIO INC.  
PRIVATE PLACEMENT MEMORANDUM

31

CONFIDENTIAL  
DO NOT COPY

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.          GA006520
</mark>

# RISK FACTORS

*The purchase of Preferred Shares involves a high degree of risk including, but not limited to, the risks described below. Before subscribing for Preferred Shares, each Investor should consider carefully the general investment risks enumerated elsewhere in this Memorandum and the following risk factors, as well as the other information contained in this Memorandum.*

### RISKS RELATED TO THE BUSINESS OF THE COMPANY

#### *We may not successfully develop our brand*

Establishing and maintaining our brand name will be a crucial aspect of our effort to attract business. In addition, we believe that the importance of brand recognition will increase in the future due to the growing number of competitors. Promotion and enhancement of our brand name will depend largely on our ability to provide consistent high-quality products and services, which cannot be assured. If our customers do not perceive our products to be of a high quality, or if we introduce new products and services or enter into new business ventures that are not favorably received by identified users, the value of our reputation and brand name will be diminished.

#### *We have initiated limited marketing efforts and we will be reliant on strategic partners*

To date, our marketing efforts primarily have been limited to establishing strategic alliances and non-revenue branding opportunities, and only recently commenced marketing and public relations efforts to potential customers through programs with GMR Entertainment, Digital River and Edelman Public Relations Worldwide, including an Amazon promotion for 6 tracks off of Robin Thicke's new album that were mixed in our technology and a sweepstakes promotion with Universal Home Theater in connection with the recent release of the Hellboy II DVD.

Our success in promoting, marketing and licensing our technology, products and services may depend in large part on our ability to enter into a number of additional agreements with strategic partners. There is no guarantee that we will be able to enter into such agreements on favorable terms and therefore our ability to generate revenue could suffer. Should we fail to enter into any such agreements, our business will likely be materially adversely affected.

Futhermore, there can be no assurances that any strategic partners will actively market our technology, products and services, or that if they do so, their efforts will be successful or generate significant revenues for the Company. Although we intend to develop an in-house marketing and sales infrastructure to focus on direct sales to potential customers, there can be no assurance that the Company will have the necessary resources to do so, or that any such efforts undertaken will be successful.

#### *We will be dependent on third-party relationships*

We expect to be dependent on a number of third-party relationships. These relationships are intended to include arrangements, including non-exclusive contracts and partnerships with providers of key services, and the resulting generation of revenue. The failure of us to enter into and thereafter continue such relationships on reasonable terms could have a material adverse affect on our business, results of operations and financial condition.

#### *We anticipate having an initial long sales cycle*

We believe that potential customers of our products and services initially will need to go through an internal process to decide whether our products fit their needs. We will have to educate and inform prospective customers regarding the use and benefits of our products and services. For these and other reasons, our initial sales cycle will be a lengthy process. During this process, we will have to expend substantial time, effort and funds demonstrating our products and services, preparing contract proposals and negotiating contracts. Our failure to achieve signed contracts after expending such time, effort and funds could have a material adverse affect on our business, operating results and financial condition.

*Rapid technological changes may have a potential adverse effect on our business*

Our future growth and our ability to remain competitive may depend in part upon our ability to develop new and enhanced products or services and to introduce these products or services at competitive prices in a timely and cost-effective manner. The markets for our products and services are characterized by rapid technological change, frequent new introductions, changes in customers' demands and evolving industry standards. In addition, product and service introductions or enhancements by our competitors or the use of other technologies could cause a decline in sales or loss of market acceptance of our existing products and services. Our success in developing, introducing, selling and supporting new and enhanced products or services depends upon a variety of factors, including timely and efficient completion of service and product design and development, and timely and efficient implementation of product and service offerings. Because new product and service commitments may be made well in advance of sales, new product or service decisions must anticipate changes in the industries served. Such a failure on our behalf to react to changing market conditions could create an opportunity for other market participants to capture a critical share of the market within a short period of time.

*Our products may have technical difficulties or undetected design errors which we may not be able to correct or that may otherwise cause us to incur additional costs*

Because our products have not been fully developed and deployed, they could have substantial defects, technical difficulties or undetected design errors. ~~Our products have~~ just recently ~~been commercially deployed. We cannot assure you that our products~~ will perform the desired functions, offer sufficient performance benefits or meet the technical or other requirements of customers. Further, if errors and defects are discovered, we cannot assure you that we will be able to correct such errors and defects. Also, technical difficulties or design errors could result in unanticipated costs, including costs related to product liability litigation. The discovery of any design defect or any ensuing litigation could damage our reputation and our relationships with our partners could be adversely affected and could materially and adversely affect our results of operations.

*We are a technology-based company, which may affect our market value for reasons beyond our control*

We are a technology-based company, and as such may be susceptible to wide shifts in our market value due to a variety of factors. These factors include, among others, the rapidly changing and very competitive market for technology-based products and the large expense and lengthy time period involved in researching and developing such products. These market attributes require companies to have strong technical support systems, track records and financial stability to maintain and attract new clients. Companies in these markets also experience serious competition in hiring sales, consulting and technical personnel. There can be no assurance that we will be able to overcome these obstacles and compete successfully in our market. Our future success will depend, in large part, on our ability to penetrate the market in accordance with our current plans and then maintain a competitive position in such market.

*We face competition*

The market for products and services similar to ours is competitive and we expect competition to intensify in the future. Numerous well-established and well-financed companies and smaller entrepreneurial companies are focusing significant resources on developing and marketing products and services that may compete with us. There can be no assurance that we will be able to compete successfully or that competitive pressure, including possible downward pressure on the prices we charge for our products and services, will not affect our business, results of operations and financial condition. Several existing companies may, in part or in whole, compete directly with us. Many of our competitors may be significantly larger than us, have established operating histories and procedures, have access to significantly greater capital and other resources, have management personnel with more experience than our management and may have other advantages over us in conducting certain businesses and providing certain services. There can be no assurance that we can compete successfully.

*There may be fluctuations in our operating results*

Significant annual and quarterly fluctuations in our results of operations may be caused by, among other factors, the volume of revenues generated by the Company, the timing of new product or service announcements, releases by the Company and its competitors in the marketplace of new products or services, and general economic conditions.

There can be no assurances that the level of revenues and profits, if any, achieved by us in any particular fiscal period will not be significantly lower than in other comparable fiscal periods. The Company's expense levels are based, in part, on its expectations as to future revenues. As a result, if future revenues are below expectations, net income or loss may be disproportionately affected by a reduction in revenues, as any corresponding reduction in expenses may not be proportionate to the reduction in revenues.

### *We may be unable to manage growth effectively*

We expect to expand our operations by increasing our sales and marketing efforts, building additional strategic relationships with third parties, expanding our research and development activities, and escalating our infrastructural and personnel capabilities. The anticipated growth could place a significant strain on our management, and operational and financial resources. Effective management of the anticipated growth will require expanding our sales, administrative, development and management personnel, implementing appropriate financial controls, and developing additional expertise by existing management personnel. However, there can be no assurances that these or other measures implemented by us will effectively increase the Company's capabilities to manage such anticipated growth or to do so in a timely and cost-effective manner. Moreover, management of growth is especially challenging for a Company with a short operating history and limited financial resources, and the failure to effectively manage growth could have a material adverse affect on our operations.

### *We will be required to invest in facilities and equipment on a continuing basis*

We have invested, and intend to continue to invest, in facilities and state-of-the-art equipment in order to increase, expand or update our capabilities and facilities. In light of anticipated business opportunities, a significant investment in audio processing equipment and facilities is contemplated. Changes in technology or sales growth beyond currently established production capabilities will require further investment. However, there can be no assurances that we will generate sufficient funds from operations to finance any required investment or that other sources of funding will be available. Additionally, there can be no guarantees that any future expansion will not negatively affect earnings.

### *We may be unable to protect and enforce our proprietary rights*

Our ability to compete effectively with other companies will depend, in part, on our ability to maintain the proprietary nature of our intellectual properties, e.g., patents, trademarks, copyrights. Our success will also depend, in part, on our ability to obtain and/or enforce intellectual property protection for these assets in the United States and other countries. The Company, in such circumstances, may file applications for patents, copyrights and trademarks, as management deems appropriate. However, there can be no assurances as to the degree of protection offered by any intellectual property rights issued to or licensed by the Company.

There can be no assurances that competitors, many of whom have substantial resources and substantial investments in competing technologies, will not seek to apply for and obtain patents that would prevent, limit or interfere with our ability to make and sell our products and or services. In addition, the laws of certain countries do not protect our proprietary rights to the same extent as do the laws of the United States

The defense and prosecution of patent, trademark and copyright infringement suits may be both costly and time consuming even if the outcome is favorable to the Company. An adverse outcome could subject us to significant liabilities to third parties, require disputed rights to be licensed from third parties, or require us to cease selling some or all of our products. We will also rely on proprietary technology and there can be no assurances that others may not independently develop the same or similar technology, or otherwise obtain access to our proprietary technology. There can be no assurances that confidentiality agreements entered into by the Company's employees, consultants, advisors and collaborators will provide meaningful protection for our trade secrets, know-how or other proprietary information in the event of any unauthorized use or disclosure of such trade secrets, know-how or other proprietary information.

### *We are dependent upon computer infrastructure*

We rely heavily on our computer hardware operations, the computer facilities and related services of Digital River, and the Internet. Accordingly, a system failure could materially adversely affect the performance of the Company. We presently have limited redundancy systems, no back up facilities and only a limited disaster recovery plan. Despite the implementation of

| GENAUDIO INC. | 44 | CONFIDENTIAL |
|---|---|---|
| PRIVATE PLACEMENT MEMORANDUM | | DO NOT COPY |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.        GA006533

network security measures by us, computer servers are vulnerable to computer viruses, physical or electronic break-ins and similar disruptive problems. Computer viruses, break-ins or other problems caused by third parties could lead to interruptions, delays or stoppages in service to users of our services and products. The occurrence of any of these events could have a material adverse affect on our business, operations and financial condition.

### *Loss of key members of our management could adversely affect our business*

We are highly dependent on the services of Jerry Mahabub, the Company's President and Chief Executive Officer, and the loss of his services could have an adverse affect on the future operations of the Company. We do not currently maintain a key-man life insurance policy insuring the life of Mr. Mahabub, although it is likely that the Company will secure such a key man insurance policy on Mr. Mahabub in the near future.

### *We may not be able to attract and retain professional and qualified personnel*

Our ability to realize our objectives will be dependent on our ability to attract and retain additional, qualified personnel. Competition for such personnel can be intense, and there can be no assurance that our results will not be adversely affected by difficulty in attracting and/or retaining qualified personnel. We require all personnel to enter into confidentiality agreements as a condition of employment. However, there can be no assurance that such agreements will fully protect us from competitive injury if any of these individuals leave the Company.

### *We might be unable to employ a sufficient number of technical personnel.*

We believe that our success depends upon our ability to employ and retain technical personnel with the ability to design, utilize, enhance, service and maintain our products. In addition, our ability to expand our operations depends in part on our ability to increase our personnel having the expertise to expand the capabilities of our existing products and to develop new products. The demand for such personnel is high and the supply of qualified technical personnel is limited. A significant increase in the wages paid by competing employers could result in a reduction of our technical work force and increases in the wage rates that we must pay or both. If either of these events were to occur, our cost structure could increase and our growth potential could be impaired.

### RISKS RELATED TO THE COMPANY

### *We have a limited operating history and limited capital and should be considered a start-up company*

The Company was formed in 2003 and, although it has raised approximately $8,700,000 to date, it has just recently established revenues. Our current operations consist of developing our proprietary technology to provide audio processing products and services to the entertainment industry. As a result, we do have little historical financial and no revenue information upon which you can judge our business. There can be no assurance that we can realize our plans on the timetables projected in this Memorandum in order to reach sustainable or profitable operations. There is no assurance that we will not seek additional capital or that such capital shall be available at reasonable cost, or that it would not materially dilute your investment in this Offering if it is obtained.

Investment in a start-up company such as the Company is inherently subject to many risks. The Company only has a limited operating history upon which you may base an evaluation of our performance; therefore, we are still subject to all of the risks incident to the creation and development of a new business including, among other items, competition from other companies, the lack of long-term operating history, and the need for additional working capital.

### *Our existing shareholders will have controlling ownership*

Assuming the maximum amount of Preferred Shares offered hereunder are sold in this Offering, the directors, executive officers and principal stockholders of the Company will still own a majority of the Company's voting capital stock. The voting rights represented by these share holdings provide our management with a sufficient number of voting rights to control the election of our directors, cause us to engage in transactions with affiliated entities, cause or restrict the sale or merger of the Company, and effect such other matters as may be presented for a vote of our shareholders. Such concentration of ownership and control could have the effect of delaying, deferring or preventing a change in control of the Company even when such a change of control would be in the best interests of the Company's other stockholders. Accordingly, Investors will have little voice in our

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                    GA006534

management decisions and will exercise very little control over us. In addition, the Colorado Business Corporation Act provides that certain actions must be approved by a specified percentage of shareholders. In the event that the requisite approval of shareholders is obtained, dissenting shareholders would be bound by such vote. Accordingly, no persons should purchase Securities unless they are willing to entrust all aspects of control to our management. In addition to the foregoing, the Company created a class of Series C Preferred Stock (the "Series C Preferred") which is virtually identical to the Common Stock, but entitles the holders thereof to appoint one member to the Company's Board of Directors ("Board"). All of the authorized shares of Series C Preferred were issued to our founder, majority shareholder, Chairman of the Board, President and CEO in exchange for the Company's proprietary technology. As a result, for as long as he owns such shares of Series C Preferred, he will be entitled to appoint at least one member to the Board. (*See* "MANAGEMENT," "CAPITALIZATION" and "DESCRIPTION OF SECURITIES.")

### *We have not paid any dividends and have no current plans to pay any dividends on our Common Stock*

We have never paid cash dividends on our Common Stock and have no current plans to pay cash dividends with respect to our Common Stock in the foreseeable future. We intend to retain any earnings for use in the operation of our business. Our Board shall determine dividend policy in the future based upon, among other things, our results of operations, financial condition, contractual restrictions and other factors deemed relevant at the time. We intend to retain appropriate levels of our earnings, if any, to support the Company's business activities.

### *We may be subject to claims from previous offerings*

Although we are not a party to any pending legal actions or proceedings and are not aware that any such actions or proceedings are likely to be initiated in the near future, since we commenced operations in 2003, we conducted three securities offerings in which we sold securities to accredited and non-accredited "friends and family" investors. Although we have not conducted an in-depth investigation of those offerings, we believe that we may not have fully complied with all applicable securities rules to qualify such offerings as exempt from registration. Accordingly, we may have sold unregistered securities in violation of the Securities Act, and any counterpart state securities laws in those states where such securities were sold. Until the various federal and state statutes of limitations have expired with respect to any such violations, some or all of the investors in such offerings may have a right to rescind their respective investments, entitling them to a return of their investment capital with statutory interest. In addition, the Securities and Exchange Commission and any state securities agencies with jurisdiction could potentially seek to enforce the securities laws and penalize us for any such violations. There is also a risk that the current Offering could be integrated with the prior offerings so that any failure of ours to comply with applicable securities laws and regulations in connection with the prior offerings would be deemed a failure of this Offering to so comply. Notwithstanding the foregoing, given the likely scope of any potential securities violations, the context in which they may have occurred and the nature of the Company's investors, we do not believe that the risk of a rescission or enforcement action being threatened or brought against us is likely or would result in any material adverse effect upon the Company.

### *We have not filed any tax returns since the commencement of our operations*

Since the Company was formed in 2003, we have not filed any tax returns with the Internal Revenue Service or any state tax authority. The Company has, however, recently retained tax counsel to assist it with this matter and is in the process of gathering all necessary information to complete the returns. Because the Company has not generated any revenue until late 2008 and has never had net income, the Company does not believe that this failure will result in any material adverse consequences (though it may result in the imposition of some nominal penalties), and the Company expects some beneficial tax loss carry forwards.

### *We have historically characterized all of our service providers as independent contractors*

Until recently, the Company characterized all of the individuals who provided it with services as independent contractors. The Company, with the assistance of outside tax counsel, is currently evaluating whether any of these individuals were improperly characterized as such and, if so, the best approach for rectifying the situation. The Company believes it is likely that at least a few of these individuals should have been characterized as employees and that the Company will be responsible for any withholdings and related tax payments that it may not have made as a result of the mischaracterization. Once the Company's evaluation is complete, the Company intends to make corrective tax filings and to pay any amounts required thereby to the Internal Revenue Service, the Colorado Department of Revenue and any other applicable state tax authority.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.　　　　　　　　GA006535

*We recently acquired 265,000 shares of Common Stock from our founder and CEO, Mr. Mahabub*

The Company recently acquired 265,000 shares of Mr. Mahabub's common stock at a price of $2.50 per share in exchange for the cancellation of $662,500 of indebtedness owed by him to the Company and the agreement of the Company to remit the Deferred Withholding (as defined below) to the applicable taxing authorities. The cancelled indebtedness represented (i) $483,461 of aggregate principal and interest evidenced by two promissory notes made by Mr. Mahabub in favor of the Company dated July 30, 2007 and November 21, 2008, respectively, for amounts previously paid to Mr. Mahabub by the Company, (ii) $11,371 of additional payments made after the date of the last Note, and (iii) $167,668 of salary paid to Mr. Mahabub that should have been withheld and remitted to the Internal Revenue Service and the Colorado Department of Revenue (the "Deferred Withholding") but was not since, at the time paid, the Company was unaware that Mr. Mahabub would be deemed a statutory employee for which such withholding and remittance was required. While the Company believes this transaction was consummated at a favorable price and will reduce overall dilution for all existing shareholders, the Company has given up its right to demand payment in cash from Mr. Mahabub when the debt would have otherwise become due and is obligated to remit the Deferred Withholding amount to the applicable taxing authorities which will reduce the Company cash reserves when paid. See "CAPITALIZATION."

**RISKS RELATED TO THE OFFERING**

*There is no minimum number of Preferred Shares which must be sold in the Offering; this is a best efforts Offering*

There is no minimum number of Preferred Shares that must be sold by us in this Offering prior to the initial closing, and we expect to accept subscriptions for Preferred Shares as they are received. As a result, there can be no assurance that we will raise sufficient funds in this Offering to carry out our business plan, including the scaling up of our operations, as currently proposed, or that the net proceeds from the initial subscriptions for Preferred Shares will be in an amount sufficient to enable us to continue operations in any meaningful manner. In the event sufficient subscriptions for Preferred Shares are not received and accepted by us, we may be forced to curtail or cease our activities, which would likely result in the loss to Investors of all or a substantial portion of their investment.

The Preferred Shares are being offered by the Company, on a "best efforts" basis. No individual, firm or corporation has agreed in advance to purchase any of the offered Preferred Shares. No assurance can be given that any or all of the Units will be sold.

*The offering price of the Securities is not based on any objective criteria*

The offering price for the Securities was determined arbitrarily by the Company based upon a number of factors. Such price is based primarily on the amount of funds sought from this financing, the number and dividend rate of Preferred Shares the Board is willing to issue in order to raise such funds, the prices at which the Company has historically sold equity, the recent accomplishment of certain milestones and the Company's other business prospects. Accordingly, there is no direct relationship between the price of the Securities (including the securities comprising the Securities) and the assets, earnings, net worth or book value of the Company, the market value of the Common Stock, or any other recognized criteria of value. As such, the price does not necessarily indicate the current value of the Preferred Shares and should not be regarded as an indication of any future market price of the Company's capital stock.

*There is no public market for the Securities*

The Preferred Shares offered hereby are being offered in a private offering based upon available exemptions from federal and state securities laws. There is no public market in which such Preferred Shares or the shares of Common Stock into which they are convertible (the "Conversion Shares") may be sold, and it is not anticipated that any such market will develop in the foreseeable future. Therefore, purchasers of Preferred Shares should be prepared to hold the Securities for an indefinite period of time, subject to the Company's elective Call Right and the Liquidity Event obligation described herein (which the Company may or may not be able to comply with).

*There are restrictions on transfer of the Securities*

The Preferred Shares and the Conversion Shares offered hereby will be restricted securities as such term is defined in Rule 144 under the Securities Act. None of such Securities may be resold unless registered under the Securities Act and applicable state

| GENAUDIO INC. | 47 | CONFIDENTIAL |
|---|---|---|
| PRIVATE PLACEMENT MEMORANDUM | | DO NOT COPY |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.                    GA006536

securities laws or unless exemptions from such registration requirements are available. Any such exemption must be established to our satisfaction.

Because of potential restrictions on transferability of the Securities, and the fact that no trading market exists or is expected to develop for the Securities, holders of the Securities are not likely to be able to liquidate their investments or pledge the Securities as security on a loan in the event of an emergency. Thus, the Securities should be considered only as a long-term investment, subject to the Company's elective Call Right and the Liquidity Event obligation described herein (which the Company may or may not be able to comply with).

### *There will be no merit review of the Offering*

Investors are cautioned that the Securities have not been registered under the Securities Act or any state securities laws. Accordingly, no federal or state authority has reviewed the accuracy or adequacy of the information contained herein nor has any regulatory authority made a merit review of the pricing of this Offering, the percentage of capital stock offered to Investors, or any dilutive factors therefrom. Therefore, Investors must recognize that they do not have all the protections afforded by securities laws to register or qualify offerings with the Federal government or in states with merit reviews, and must therefore judge for themselves the adequacies of the disclosures, the pricing, dilution and fairness of the terms of this Offering without benefit of prior merit review by any authorities.

### *We may require additional financing*

Assuming the maximum amount of Preferred Shares offered hereunder are sold in this Offering, we believe that the net proceeds from this Offering, together with our projected cash flow from operations, will be sufficient to fund the Company's operations as currently conducted until the Liquidity Event date of September 18, 2012, assuming the Company's business plan and earnings projections are materially accurate. Such belief, however, cannot give rise to an assumption that our cost estimates are accurate or that unforeseen events or changes in our business plan or earnings projections would not occur that would require us to seek additional funding to meet our operational needs. In addition, there can be no assurance that the cash flow generated from operations will be sufficient to implement our business objectives. As a result, we may require substantial additional financing in order to implement our business objectives.

There can be no assurances that we will be able to obtain additional funding when needed, or that such funding, if available, will be available on terms acceptable to us. In the event that our operations do not generate sufficient cash flow, or we cannot acquire additional funds if and when needed, we may be forced to curtail or cease our activities, which would likely result in the loss to Investors of all or a substantial portion of their investment.

### *Dilution effect of the Offering*

After completion of this Offering and assuming the maximum amount of Preferred Shares offered hereunder are sold in this Offering, existing shareholders will own 11,850,000 shares of the Company's Common Stock representing approximately 89.64% of the Company's issued and outstanding capital stock, whereas the purchasers of Preferred Shares in this Offering will own 1,400,000 Preferred Shares, representing approximately 10.36% of the Company's issued and outstanding capital stock, for which they shall have paid $5.00 per share, representing an immediate dilution in their investment. *See* "CAPITALIZATION". Additionally, 1,000 shares of Series C Preferred Stock have been issued to our founder, which are substantially the same as our Common Stock except that such shares carry the right to appoint one Board member. We also have warrants issued or authorized to be issued to purchase up to 5,142,900 shares of Common Stock, which warrants have been or will be issued to officers, directors, employees, consultants, earlier round investors and placement agents. The exercise prices range from $0.50 for approximately 1,515,000 shares to $1.00 for approximately 90,000 shares to $3.00 for approximately 1,648,300 shares to $5.00 for approximately 1,889,600 shares. None of such warrants expire prior to August 1, 2011 and only a portion are subject to certain vesting conditions. The above dilution discussion and table does not take into account or otherwise address the exercise of such warrants or any issuances from our pool of 676,700 Shares of Common Stock which we expect to reserve for equity incentive compensation purposes, all of which may have an additional dilutive effect on the interests of the purchasers of Securities. *See* "DESCRIPTION OF SECURITIES".

Finally, in the event we require additional equity financing subsequent to the completion of this Offering, purchasers of the Securities in this Offering may experience further dilution to the extent that such new shares may be issued for a value less than

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.  GA006537

the price paid for the Common Stock included in the Securities offered hereunder. We may issue or sell additional securities of the Company in the future, upon such terms and at such price as we may determine in our sole discretion.

*We have the right to create and issue additional series of Preferred Stock, which may have preferential rights over the holders of Common Stock or the Preferred Shares*

We are authorized to issue up to 5,000,000 shares of Preferred Stock, of which 1,000 shares have been designated as "Series C Preferred Stock." Additional preferred stock may be issued in any series from time to time with such designations, rights, preferences and limitations, including stock with rights senior and in preference to the Preferred Shares or our Common Stock, and may be sold at such price, as the Board may in its sole discretion.

All of the authorized shares of Series C Preferred Stock are outstanding, having been issued to our founder, majority shareholder, Chairman of the Board, President and CEO in exchange for the Company's proprietary intellectual property. The Series C Preferred Stock is virtually identical to the Common Stock but entitles the holder thereof to appoint one member to the Board. *See* "DESCRIPTION OF SECURITIES."

*We may need to raise additional capital in the form of debt, which would be senior to our capital stock*

From time to time, we may need to raise additional capital to fund the Company's operations and product development, and these funds may be raised in the form of debt. We can issue any type of debt for any purpose without your consent. In the event that we incur any indebtedness, our Common Stock and Preferred Shares will be junior and subordinate to such debt. In the event of a liquidation, the holders of our debt would be entitled to repayment before any distribution of our assets, if any, to holders of Common Stock and Preferred Shares. The Company has no issued debt and no loan facilities at this time.

*Management will have broad discretion in the allocation of the proceeds from the Offering*

We intend to use the net proceeds of this Offering to (i) pay off approximately $110,000 in accounts payable, (ii) cover the costs of salaries to its employees and fees to consultants, (iii) purchase sound equipment and expand or create audio production facilities, (iv) conduct additional research and product development, (v) conduct marketing activities for the commercialization of AstoundSound™ technology and (vi) maintain working capital. *See* "USE OF PROCEEDS." However, in the event all of the Securities are not sold in this Offering, or other unforeseen events or circumstances arise, the Board will have broad discretion in allocating the proceeds of the Offering by reallocating, eliminating and/or reducing funds to be expended on the above categories.

*There are risks associated with dependence on our projections*

The plans and projections discussed by the Company in this Memorandum are based upon assumptions that we believe to be reasonable. Among other things, our plans are based on the premise that existing and future consumer demand for the intellectual property, products, goods and services offered by the Company will continue or materialize. Such assumptions may, however, be incomplete or inaccurate, and unanticipated events and circumstances may occur. For these reasons, actual results achieved during the periods covered may be materially and adversely different than the projections and plans we have developed. Moreover, even if the assumptions underlying the Company's plans prove to be correct, there can be no assurances that we will not incur substantial operating losses in attaining our goals.

*Unaudited Financial Information*

All financial information and financial statements provided as part of this Memorandum or otherwise provided to Investors in connection with a potential investment in the Securities, have been prepared internally by the Company based on numerous assumptions. No independent party has in any manner verified, audited or confirmed the reasonableness of the assumptions or the data that form the basis of such financial information and our financial statements were not prepared in accordance with generally accepted accounting principles.

*Investors are not independently represented*

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.   GA006538

Prospective investors in the Company are encouraged to engage independent counsel and financial advisors in its organization or in connection with the preparation of Offering materials. Attorneys assisting in the formation of the Company and the preparation of the Offering materials have represented only the Company. Any decision by an Investor to invest in the Offering should be based on an independent review of the merits and risks of any investment in the Company undertaken by the Investor, together with its advisors, if any.

**OTHER RISK FACTORS**

In addition to the above risks, businesses are often subject to risks not foreseen or fully appreciated by management.

## LEGAL PROCEEDINGS

To our knowledge, we are not a party to any material legal proceedings or litigation and we are not aware of any contemplated or threatened legal proceedings or litigation as of the date of this Memorandum. However, Investors should review "RISK FACTORS".

## ADDITIONAL INFORMATION

Each Investor, or the Investor's professional advisor, if any, is invited to ask questions of the Company's management concerning the terms and conditions of the Offering and to obtain any additional information that the Company possesses or can acquire without unreasonable effort or expense as may be necessary to verify the accuracy of the information furnished in this Memorandum. For additional information, please contact:

GenAudio, Inc.
[redacted]
Attn: Jerry Mahabub, Chairman, President & CEO
Telephone: [redacted]
E-mail: [redacted]

FOIA CONFIDENTIAL TREATMENT REQUESTED BY GENAUDIO, INC.   GA006539