# EXCERPTED

# EXHIBIT 18

```
       IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLORADO
------------------------------------------------------

SECURITIES AND EXCHANGE    )
COMMISSION,                )
                           )
            Plaintiff,     )
                           )
      vs.                  ) No. 1:15-cv-02118-WJM-CBS
                           )
TAJ JERRY MAHABUB, GENAUDIO,)
INC., and ASTOUND HOLDINGS, )
INC.,                      )
                           )
            Defendants.    )
------------------------------------------------------
            DEPOSITION UPON ORAL EXAMINATION
                          OF
                    VICTOR TISCARENO
------------------------------------------------------
                    Martin Davis PLLC
           1200 Westlake Avenue North, Suite 802
                  Seattle, Washington 98109




DATE:  December 16, 2016
   REPORTED BY:  Olivia Pennella
                 Washington CCR 3337
```

Page 1

```
           A P P E A R A N C E S

FOR PLAINTIFF:

       LESLIE H. HUGHES
       DANIELLE R. VOORHEES
       United States Securities and Exchange
         Commission
       1961 Stout Street, Suite 1700
       Denver, Colorado 80294
       303-844-1086
       303-844-1108
       HughesLJ@sec.gov
       voorheesd@sec.gov
FOR DEFENDANT TAJ JERRY MAHABUB:
       ANDREW B. HOLMES
       Holmes, Taylor & Jones LLP
       617 South Olive Street, Suite 1200
       Los Angeles, California 90014
       213-985-2200
       abholmes@htjlaw.com

FOR DEFENDANT GENAUDIO, INC.:

       DAVID J. AVENI
       Wilson Elser Moskowitz Edelman &
         Dicker, LLP
       655 West Broadway, Suite 900
       San Diego, California 92101
       619-321-6200
       david.aveni@wilsonelser.com

FOR WITNESS:

       JOHN R. ELTRINGHAM
       Martin Davis PLLC
       1200 Westlake Avenue North, Suite 802
       Seattle, Washington 98109
       206-650-6560
       jeltringham@martindavislaw.com
```

Page 2

```
              E X A M I N A T I O N
WITNESS          MR. AVENI   MR. HOLMES   MS. HUGHES
VICTOR TISCARENO     8          280         307
                   340          329         343


                   E X H I B I T S
No.     Description                                Page
Exhibit 79     Email Correspondence                 46
               (SEC-TiscarenoV-E-0001883-1884)

Exhibit 80     Email Correspondence
               (SEC-TiscarenoV-E-0001875-1876)      48
Exhibit 81     Email Correspondence                 53
               (SEC-TiscarenoV-E-0001842-1843)

Exhibit 82     GenAudio In-Person Meetings          55

Exhibit 83     Email Correspondence                 57
               (SEC-TiscarenoV-E-0001840)
Exhibit 84     Email Correspondence                 62
               (SEC-TiscarenoV-E-0001812-1815)

Exhibit 85     Email Correspondence                 68
               (SEC-TiscarenoV-E-0000056-57)
Exhibit 86     Email Correspondence                 71
               (SEC-TiscarenoV-E-0000095-96)

Exhibit 87     Email Correspondence                 75
               (SEC-TiscarenoV-E-0000101)
Exhibit 88     Email Correspondence                 81
               (SEC-TiscarenoV-E-0000161-164)

Exhibit 89     Email Correspondence                 84
               (SEC-TiscarenoV-E-0000249-250)
Exhibit 90     Email Correspondence                 88
               (SEC-TiscarenoV-E-0000284)
```

Page 3

```
           E X H I B I T S (Continued)
No.     Description                                Page
Exhibit 91     Email Correspondence                 92
               (SEC-TiscarenoV-E-000300-301)

Exhibit 92     Email Correspondence                 99
               (SEC-TiscarenoV-E-0001611-1612)
Exhibit 93     Demo With MH                         99
               (347APL-00000046)


Exhibit 94     Email Correspondence                111
               (SEC-TiscarenoV-E-0000336-37)
Exhibit 95     AstoundSound Demo                   113
               (347APL-00000047)

Exhibit 96     GenAudio Demo (Astound)             114
               (347APL-00000051)
Exhibit 97     Email Correspondence                117
               (SEC-TiscarenoV-E-0000376)

Exhibit 98     Email Correspondence                120
               (SEC-TiscarenoV-E0001639)
Exhibit 99     Email Correspondence                124
               (SEC-TiscarenoV-E-0000400)

Exhibit 100    Email Correspondence                126
               (SEC-TiscarenoV-E-0000412-414)
Exhibit 101    Email Correspondence                136
               (SEC-TiscarenoV-E-0000534)

Exhibit 102    Email Correspondence                138
               (SEC-TiscarenoV-E-0000556)
Exhibit 103    Email Correspondence                138
               (SEC-TiscarenoV-E-0000557)

Exhibit 104    Email Correspondence                140
               (SEC-TiscarenoV-E-0000581)
Exhibit 105    Email Correspondence                141
               (SEC-TiscarenoV-E-0001731)
```

Page 4

```
           E X H I B I T S (Continued)
No.        Description                              Page
Exhibit 106     Email Correspondence                 148
                (347APL-00000526-527)

Exhibit 107     Email Correspondence                 154
                (SEC-TiscarenoV-E-0000756-757)
Exhibit 108     Email Correspondence                 157
                (SEC-TiscarenoV-E-0000770)

Exhibit 109     Email Correspondence                 159
                (SEC-TiscarenoV-E-0000946-954)
Exhibit 110     Email Correspondence                 178
                (SEC-TiscarenoV-E-0000984)

Exhibit 111     Email Correspondence                 180
                (347APL-00000333-336)
Exhibit 112     Email Correspondence                 182
                (SEC-TiscarenoV-E-0001560-1561)

Exhibit 113     Email Correspondence                 187
                (SEC-TiscarenoV-E-0001018-1020)
Exhibit 114     Letter dated March 15, 2010          193
                (GA000140)

Exhibit 2       GenAudio, Inc., Confidential Private 202
                Placement Memorandum
                (GA000487-540)

Exhibit 115     Email Correspondence                 208
                (SEC-TiscarenoV-E-0001052-1053)
Exhibit 116     Apple Organizational Chart           212
Exhibit 117     Email Correspondence                 214
                (SEC-TiscarenoV-E-0001114)

Exhibit 118     Email Correspondence                 217
                (SEC-TiscarenoV-E-0001129-1130)
Exhibit 119     Email Correspondence                 223
                (SEC-TiscarenoV-E-0001187-1188)

                                                Page 5
```

```
           E X H I B I T S (Continued)
No.        Description                              Page
Exhibit 120     Email Correspondence                 228
                (SEC-TiscarenoV-E-0001218-1221)

Exhibit 121     Email Correspondence                 233
                (SEC-TiscarenoV-E-0001230)
Exhibit 122     Email Correspondence                 236
                (SEC-TiscarenoV-E-0001233)

Exhibit 123     Email Correspondence                 237
                (SEC-TiscarenoV-E-0001237)
Exhibit 124     Email Correspondence                 242
                (SEC-TiscarenoV-E-0001240-1241)

Exhibit 125     Email Correspondence                 242
                (SEC-TiscarenoV-E-0001242-1243)
Exhibit 126     Email Correspondence                 244
                (SEC-TiscarenoV-E-0001554-1555)

Exhibit 127     Email Correspondence                 245
                (SEC-TiscarenoV-E-0001255)
Exhibit 37      Letter dated August 1, 2010          247
                (GA005351-5353)

Exhibit 128     Email Correspondence                 248
                (SEC-TiscarenoV-E-0001263)
Exhibit 129     Email Correspondence                 250
                (SEC-TiscarenoV-E-0001266-1267)

Exhibit 130     Email Correspondence                 252
                (SEC-TiscarenoV-E-0001276-1278)
Exhibit 131     Email Correspondence                 255
                (SEC-TiscarenoV-E-0001416-1418)

Exhibit 132     Email Correspondence                 258
                (SEC-TiscarenoV-E-0001752-1753)
Exhibit 133     Email Correspondence                 260
                (SEC-TiscarenoV-E-0001767)

                                                Page 6
```

```
           E X H I B I T S (Continued)
No.        Description                              Page
Exhibit 134     Email Correspondence                 263
                (SEC-TiscarenoV-E-0001775-1776)

Exhibit 135     Email Correspondence                 265
                (SEC-TiscarenoV-E-0001778)
Exhibit 136     Email Correspondence                 272
                (2 pages)

Exhibit 137     Email Correspondence; GenAudio       275
                Presents AstoundSound
Exhibit 138     Email Correspondence                 290
                (9 pages)

Exhibit 139     Email Correspondence                 290
                (4 pages)
Exhibit 16      Email Correspondence                 343
                (SEC0000001-5)

(Exhibit -2, 16, and 37 were marked previous in prior
deposition(s).)


                                                Page 7
```

```
        Seattle, Washington, Friday, December 16, 2016
                       8:59 a.m.
              -----------------------------------
   VICTOR TISCARENO,    witness herein, having been duly
                       sworn by the Certified Court
                       Reporter, testified as follows:
              E X A M I N A T I O N
   BY MR. AVENI:
       Q.   Good morning, Mr. Tiscareno.
       A.   Yes.
       Q.   My name is David Aveni.  And I represent, as
   you know, GenAudio --
       A.   Yes.
       Q.   -- the company in this matter.  I appreciate
   you taking time today to meet with us and answer
   questions.  I know that you've given testimony a few
   times before, during the SEC's investigation in this
   matter.
            Have you ever had your deposition taken in a
   civil dispute?
       A.   Never.  This is it.
       Q.   This is it.  And you testified twice during
   the SEC's investigation; is that correct?
       A.   Correct.
       Q.   So, those are the only times you've been

                                                Page 8
```

```
 1    A.   No.
 2    Q.   If you look at where -- we're looking now at
 3  the bottom of 951, and then going on to 952.  I mean,
 4  Mr. Mahabub here is talking about the price that Apple
 5  might pay GenAudio when a deal is done for AstoundSound.
 6         And all the way through this email, Jerry is
 7  pitching to you the value of a deal for Apple, right?
 8    A.   I don't think I read the email.
 9    Q.   But is that the way you read it, when you look
10  through it now?
11    A.   I -- I -- I mean, at a glance, it looks like a
12  sales job to me.  I mean, like so many -- we could write
13  a -- I mean, I can go back to previous emails where he's
14  constantly driving towards that end.
15    Q.   Right.
16    A.   And I just turned a blind eye to it.
17    Q.   I think you said part of your frustration with
18  Mr. Mahabub, if I can call it that, was that he was
19  always trying to negotiate with you; right?
20         MS. HUGHES:  Objection.
21    A.   He never --
22         MS. HUGHES:  It misstates the prior testimony.
23  The word "negotiate" has never came out of his mouth.
24         MR. AVENI:  I didn't -- no, I didn't say
25  whether it has one way or the other.  I'm raising -- he

                                                Page 165
```

```
 1    A.   Oh.
 2    Q.   -- because he's always trying to sell you.
 3    A.   Well, that's -- that's --
 4    Q.   And people are taking --
 5    A.   Well, no.  He --
 6    Q.   I mean, that was --
 7    A.   I was frustrated with his -- his lengthy
 8  emails, that went off on bird walks.  You know, he --
 9  he'd go -- I mean, there's an email back here, that we
10  didn't touch upon, that he's -- he over-communicated
11  things that he shouldn't be communicating.  I never
12  called him on it.
13         For example, "I just left Disney Studios.
14  And, by the way, that's a -- something Steve Jobs owns
15  and" -- and, you know, it just kind of -- dropping names
16  and -- and all this other stuff that had nothing to do
17  with it.  And I just kind of ignored it.
18    Q.   Okay.  Fair enough.
19    A.   Okay.
20    Q.   I guess, you did say that you were frustrated
21  because he was always being a salesman, right?  I think
22  that was one of the words that you did use.
23    A.   Well --
24    Q.   And --
25    A.   It's an email -- you know, obviously if we

                                                Page 167
```

```
 1  can -- that's a speaking objection.  Okay.  I'm not
 2  misstating anybody's testimony.  I'm not para -- I'm not
 3  quoting what the witness said, one way or the other.  He
 4  can explain his testimony.  So, you can raise your
 5  objection.
 6         MR. ELTRINGHAM:  I object.  He never said he's
 7  negotiating anything.  And the word "negotiation" has
 8  not come up ever between the two.
 9         MR. AVENI:  Okay.  Well, I used that phrase.
10         MR. ELTRINGHAM:  Okay.
11         MR. AVENI:  And again --
12         MR. ELTRINGHAM:  That's fine.
13         MR. AVENI:  -- these are speaking objections.
14  Again, I mean, I'm not trying to put words in anybody's
15  mouth.  But he said he was frustrated with Jerry
16  constantly doing this.
17    Q.   (By Mr. Aveni)  My question for you is:  Were
18  you frustrated that Mr. Mahabub was constantly trying to
19  negotiate with you?
20    A.   He never negotiated with me.  I never -- this
21  is the first time that I can recall reading this --
22    Q.   Reading this email --
23    A.   -- this email.
24    Q.   But, I mean, you were saying before that you
25  were frustrated --

                                                Page 166
```

```
 1  could turn the clock -- probably bash him over the head
 2  for this, for -- for constantly doing this.  But I
 3  didn't think anything of it at the time.  It was a guy
 4  who over-communicated in his emails, peppering it with
 5  all kinds of what-ifs.  And I was just focused on --
 6  could you bring me a new sample with this stuff on.
 7    Q.   Okay.  And I understand that --
 8    A.   It's as simple --
 9    Q.   -- you're not --
10    A.   -- as that.
11    Q.   I know you're not focused on it.  But you did
12  say, right, that you were frustrated that he was always
13  acting as a salesman?
14         I think that was the word you used,
15  "salesman."
16    A.   I -- I did use the word "salesman."  I don't
17  know if I used the word "frustrated" --
18    Q.   That's my word.
19    A.   -- until just -- until just now.  Okay.
20    Q.   People are complaining about my word choice.
21  I want to be clear.  I think your word was "salesman."
22  Mine was --
23    A.   I --
24    Q.   -- "frustrated."  But you were saying he
25  was --

                                                Page 168
```

```
 1        A.   I said "salesman."
 2        Q.   -- always acting as a --
 3        A.   Yeah, I mean, I -- I mean, it was -- I think
 4   between Michael Hailey and I -- and I don't know if he
 5   would disag -- Michael Hailey would disagree with me on
 6   this.  But it was, you know, Jerry being Jerry.  I --
 7   I -- and what we meant by that was not necessarily --
 8   hmm -- necessarily unkind.
 9             But he -- he was enthusiastic.  That's a word
10   that came up today.  He's very enthusiastic.  He's
11   enthusiastic about his company.  He's enthusiastic about
12   his software.  And that's the way I read the emails.
13   He's enthusiastic.
14             He wants -- he wants to -- "What is it going
15   to take for you guys to really like my software and
16   really shoot this to the moon?"  I don't know if he used
17   those words.  But, you know, I -- there isn't anything
18   to this.
19        Q.   I guess, this email, though -- I want to know
20   if you would agree that this email goes a little bit
21   beyond that, from Jerry's perspective.
22             In terms of the email from Jerry, he's talking
23   now about things like price and, you know, IP rights
24   and, you know, structure.  And not that you're engaging
25   in it with him on those things, but those are the things
```

Page 169

```
 1   wasn't anything to this.  And I -- you know, I just
 2   don't know.
 3        Q.   Sure.  And I understand that you don't recall
 4   ever responding back.  And I understand your testimony
 5   that you may never even have read this email.  I'm
 6   really trying to focus on what -- you know, where was
 7   Mr. Mahabub's head, as best as you could tell, and --
 8             MS. HUGHES:  Objection.  Calls for
 9   speculation.
10             MR. AVENI:  I haven't asked a question yet.
11             MS. HUGHES:  You're not asking questions.
12   You're just making argumentative statements on the
13   record.
14             MR. AVENI:  I haven't even finished my
15   statement, Leslie.  Come on.  I didn't do that during
16   your deposition.  I'm not arguing with the witness.  I
17   am trying to ask questions.  And I think I've been doing
18   that.
19        Q.   (By Mr. Aveni)  Would you take a look at
20   Page 953, the paragraph at the top.  About halfway --
21   about two-thirds of that paragraph -- do you see that he
22   says, "... as both Vic and I have worked very hard to
23   get the technology into a state that is for the most
24   part ready to integrate with minimal code/dev efforts
25   ..."
```

Page 171

```
 1   that he's talking about; right?
 2             He's raising price issues with you, he's
 3   raising IP rights with you; isn't that right?
 4             MS. HUGHES:  Object to the form of the
 5   question.
 6        A.   I haven't even -- I have to read this in
 7   detail, to find out what it says there.  And, obviously,
 8   we haven't had quite the time to digest --
 9        Q.   (By Mr. Aveni) Sure.
10        A.   -- the thesis --
11        Q.   Right.
12        A.   -- that you got here.  I -- it just seems
13   like -- unless you have an email that tracks this
14   back -- that says I answered him on this, then maybe I
15   could refresh how I worded it or whatever.  But I just
16   don't have anything on it.  And it might have been a
17   holiday.  As a matter of fact, it was a holiday --
18   12/22 -- Thanksgiving.  Probably didn't read it.
19             And then Michael Hailey didn't -- and so I
20   would have thought if he had written all this and if he
21   had been concerned about it, he would have written me
22   back or called me and said, "Hey, did you read my email?
23   I sent you a thing with all this kind of stuff."
24             Did I blow him off, did I -- I -- I don't
25   know.  I -- you know, that -- we -- we weren't -- there
```

Page 170

```
 1             Do you see that?
 2        A.   Mm-hmm.  Stating his opinion.
 3        Q.   Okay.  Do you agree that that's an accurate
 4   statement of --
 5        A.   No, I don't agree with any of it.
 6        Q.   You don't agree with that?
 7        A.   No.  I'm sure along the way I told him many,
 8   many times, "Look, this is" -- you know, he's -- I read
 9   this as a sale -- you know, if I read something like
10   this -- because we've read things like this, okay.
11        Q.   Yeah.
12        A.   If I were to have read this -- 'cause I -- I
13   really don't know if I actually read his email, as I
14   said before.  But we've read other things that are like
15   it -- in here.  He's trying to tell me in these
16   comments -- like this, that -- "We're ready to go.  It
17   won't take much for you guys to just push it over the
18   top."
19        Q.   You read this as a sale --
20        A.   I read -- oh, yeah, totally.  And a lengthy
21   one.  I mean -- and it goes into all things that have
22   nothing to do with us.  Reverse.  Go to play.  Stat.  As
23   if we had -- as if we had any control over the guys on
24   the Mac side -- any control over the guy -- over the
25   guys in marketing, any control over the guys in our --
```

Page 172

```
 1   in our iPod division.  Heck, we're just trying to get
 2   this thing into the concept.
 3       Q.   So, he's trying to negotiate with you.  You're
 4   just not negotiating back.
 5       A.   Yeah.
 6       Q.   Is that fair?
 7       A.   That's -- yes, that is a fair statement.
 8       Q.   If you look at the middle of that same page --
 9       A.   What was that?  I had left it -- 950?
10       Q.   953.
11       A.   953.
12       Q.   Almost smack dab in the middle of the page
13   there, it says, "On the iPod/iPhone side ..."  Do you
14   see that?
15       A.   Mm-hmm.
16       Q.   He says -- this is Jerry Mahabub still
17   writing -- "... the stereo expansion implementation of
18   AstoundSound is ready to be completed/integrated,
19   however, the OpenAL/Gaming implementation still needs to
20   be worked on ..."
21            Do you see that?
22       A.   Yeah, I see it.
23       Q.   Did you agree with that statement?
24            MS. HUGHES:  Are you speaking about now, or
25   are you speaking about at the time when Mr. Mahabub
                                                    Page 173
```

```
 1   side (perhaps it's both of you?)"
 2            Do you see that?
 3       A.   I mean -- let me see.  I'm sorry, where are
 4   you looking at?
 5       Q.   Here, you can see it on my page.  I've got it
 6   highlighted.  Is that helpful?
 7       A.   Yes.  So, we would be handling the business
 8   side anyway.
 9       Q.   Right.  Did you ever tell Jerry that, though,
10   in response to this email?
11       A.   No.
12       Q.   Did you ever say, "Jerry, I'm the wrong guy to
13   talk to?"
14       A.   I don't think it ever came up.
15       Q.   Well, he raised it here.
16       A.   But -- okay.  He raised it here, but I don't
17   think I -- I mean -- if you have an email and I
18   responded to it, I responded to it.
19       Q.   Okay.
20       A.   I'll agree to that.
21       Q.   Do you remember any other time telling him,
22   "Jerry, I'm not the right guy to talk to about that?"
23   Anything like that?
24       A.   I -- I don't remember.
25       Q.   Okay.
                                                    Page 175
```

```
 1   wrote this letter?
 2       Q.   (By Mr. Aveni)  Is that an accurate statement?
 3       A.   He thinks that that's the case.  I never
 4   agreed to that.  And -- and we had a demo.  There is no
 5   way -- I want to reiterate, there is no way this stuff
 6   flies through just on his say-so.  It has to go through
 7   an entire process.  Different engineering team works on
 8   it.  The -- the -- they qualify it, run it through
 9   quality control.  You know, this is just his
10   assumptions, so --
11       Q.   Right.
12       A.   That's just assumptions on his part.  He's
13   putting a sales job on.
14       Q.   But you don't recall responding to him on that
15   and said, "Hey, look, Jerry, that's not accurate to
16   where we are" or anything like that?
17       A.   I think there's a good chance I didn't read
18   this.  And I don't think I responded to it.
19       Q.   Okay.
20       A.   And if I read it, I still didn't respond to
21   it.
22       Q.   Okay.  If you look at Page 949, the first full
23   paragraph there -- near the bottom -- it says:  "Just
24   waiting for the green light from the two of you to move
25   to the next level, and who I talk to about the business
                                                    Page 174
```

```
 1       A.   I mean, it was evident that -- hey, look, if
 2   you're bringing in software -- Apple tends to license
 3   things if they like it.  And -- and that -- you know,
 4   that's the only assumption you can make walking in.  I
 5   don't handle the business side of it.  There's a whole
 6   team from legal, business, maybe the software teams,
 7   that come in and listen -- to see how it's going.  But,
 8   I mean -- no, I -- I probably would be out of the loop.
 9       Q.   And Jerry just didn't seem to understand that,
10   though, right?
11       A.   He's just trying to figure out what -- how
12   the -- what the inner workings were and who -- who -- I
13   mean, based on this, he was just trying to figure out --
14   "What do I have to do, and who do I have to talk to" --
15   based on what I read here.
16       Q.   Okay.  If you look at Page 947 --
17       A.   Mm-hmm.
18       Q.   -- Michael Hailey did respond --
19       A.   Yep.
20       Q.   -- to this email.  And he said that -- the
21   last sentence of this main paragraph -- "the business
22   side of things would come into play after we have exec
23   buy-in on the product side."  Do you see that?
24       A.   Yes.
25       Q.   And then the next page -- I'm sorry -- the
                                                    Page 176
```

**Page 209**

1  A.  I -- I -- I -- I don't know.  But it's not an
2  unusual -- I'm -- I -- maybe he didn't know who it was.
3  I don't know.
4  Q.  And I'll represent to you, we'll go through a
5  series of emails talking -- using that term, "the
6  executive" or "the exec" --
7  A.  Yeah, I might have used it.
8  Q.  -- of Apple.  Do you remember using that term
9  with him?
10 A.  No, I don't remember.  I'm just saying, I may
11 have used it to not disclose who I was talking to.
12 Q.  Okay.  Okay.  So, at this time -- April 18,
13 2010 -- you have an upcoming meeting with the person you
14 refer to as the executive about AstoundSound?
15 A.  I'd have to look at a timeline.
16 Q.  I think we're going to see that the meeting
17 with Greg Joswiak was on May 6th.
18 A.  May 6.
19 Q.  During this time period, there seems to be a
20 series of emails where you talked about a big upcoming
21 meeting.
22 A.  That was it.
23 Q.  Okay.
24 A.  90 percent chance, that's probably the one.
25 Q.  So Jerry Mahabub here says, "Trying to line

**Page 210**

1  you up with as much fire power as possible so we get a
2  green light to continue to move forward!"
3       So, you guys talked about that meeting --
4  A.  Right.
5  Q.  -- with an executive, right?
6  A.  Did I disclose who it was?  I may have not.
7  I -- you know, why -- it's -- I don't need to tell him
8  that.  It turns out it's probably a good idea.
9  Q.  And you said the meeting was with Greg
10 Joswiak?
11 A.  Yeah.
12 Q.  And I think you referred to him as Joz?
13 A.  Yeah.
14 Q.  Is that how you called him?
15 A.  Yeah, between friends.
16 Q.  Joz?
17 A.  Yeah.
18 Q.  Was he known that way --
19 A.  Yeah.
20 Q.  -- around the company?
21 A.  There was Woz, and there was Joz.
22     MR. HOLMES:  Different -niaks.
23     THE WITNESS:  Yeah, the ni -- that's correct.
24     MR. ELTRINGHAM:  Easier reference.
25 Q.  (By Mr. Aveni)  So, you referred to here as

**Page 211**

1  the executive -- you're not sure if you told Jerry who
2  the executive was.  Is it possible Jerry thought the
3  executive was Steve Jobs?
4  A.  I --
5     MS. HUGHES:  Objection.
6  A.  That'd be a guess on my part.
7  Q.  (By Mr. Aveni)  Okay.  You don't know one way
8  or the other?
9  A.  No.
10 Q.  So, who is Greg Joswiak -- at the time?
11 A.  At the time he's vice president of iPod/iPhone
12 and -- that was probably it.
13 Q.  In Marketing, right?
14 A.  In Marketing, yeah.
15 Q.  So, he's the VP of iPhone/iPod in Marketing?
16 A.  Yeah.
17 Q.  And he's a senior employee at Apple, right?
18 A.  Right.  But he's not -- he didn't report to
19 Steve Jobs.
20 Q.  Who did he report to?
21 A.  ==He reported to Phil Schiller, Senior VP Global==
22 ==Worldwide Marketing -- or whatever intergalactic==
23 ==marketing guru.==  I don't -- I don't know.  ==He's been==
24 ==there a long time==.
25 Q.  But, I mean, Greg Joswiak was a senior

**Page 212**

1  employee, right?
2  A.  Yeah, he's been there forever.
3  Q.  And he's not a mid-level engineer?
4  A.  No.
5     MR. AVENI:  Okay.
6     (Exhibit-116 marked for identification.)
7     THE WITNESS:  Built out the org chart.  Okay.
8  Where did you get this?
9     MR. AVENI:  So, I got this from a -- I think I
10 got this from Fortune, as reflected on the bottom.
11    THE WITNESS:  Oh, okay.
12 Q.  (By Mr. Aveni)  I assume you've never seen
13 this org chart before?
14 A.  Not in this particular.
15 Q.  Not in this form?
16 A.  No.
17 Q.  But my question to you is:  This purports to
18 be an org chart around this time.  Does it look accurate
19 to you generally?
20 A.  Yeah, people come and gone.  But let me -- let
21 me -- let me --
22 Q.  You can find Greg Joswiak in the lower
23 left-hand quadrant.
24 A.  Yeah.
25    MR. ELTRINGHAM:  There we go.

```
 1  just depends -- but generally try not to discuss
 2  internal business with an -- outside vendors.
 3      Q.  So, as far as you know, you didn't discuss --
 4      A.  I --
 5      Q.  -- the meeting?
 6      A.  -- I don't know.
 7      Q.  Okay.
 8      A.  I'm -- I'm just -- all I'm saying is, is
 9  that --
10      Q.  That's a possibility?
11      A.  -- that may have -- that's a possibility, that
12  we -- but if you're asking what I did, which is what
13  I've told you, is that I -- I knew that for us -- that
14  was the end of the road for us.
15      Q.  So, in your head, you knew that was the end of
16  the road.  You just don't know --
17      A.  I don't know if I expressed that --
18      Q.  -- what you communicated to Jerry, if
19  anything?
20      A.  Right.
21      Q.  Okay.
22      A.  So, my -- I continued to expose my friends to
23  the product in other departments.  And that basically
24  was probably the -- and that may have been what I
25  said -- I mean, again, trying to reconstruct what
```
Page 229

```
 1  happened --
 2      Q.  Okay.
 3      A.  -- six, seven years ago --
 4      Q.  All right.
 5      A.  -- is that I may have gone back and said,
 6  "Hey, look, let's do this.  This is for Ron.  I can
 7  invite some people here and see if we get more traction
 8  on the product, but this might be it."
 9      Q.  But you don't know that, right?  You're --
10      A.  Well, I don't know if I followed on --
11  let's -- let's see what it says.  You've got all --
12  you've got the power here.
13      Q.  Well, I haven't seen anything.
14      A.  Okay.
15      Q.  We're not going to go through any emails where
16  you say anything like that, so --
17      A.  Okay.
18      Q.  -- I don't want you to speculate you may have
19  said that, if you haven't.
20      A.  I -- I don't know.
21      Q.  Okay.
22      A.  I don't know what I've said.
23      Q.  All right.  Let's look at Exhibit-120.
24      A.  Mm-hmm.
25      Q.  It's an email chain dated July 20, 2010.  It's
```
Page 230

```
 1  another document you produced; is that right?
 2          MR. HOLMES:  July 2nd.
 3          MR. AVENI:  I said July 2nd, didn't I?
 4  July 2, 2010.
 5      Q.  (By Mr. Aveni)  This is another email you
 6  produced, right?
 7      A.  That's what it indicates down here.
 8      Q.  Okay.  And then if you look at the bottom of
 9  Page 1, you write to Jerry Mahabub -- you say:  "Hi
10  Jerry, I have to meet on Wednesday July 7 ... Is that a
11  good time for you?"
12          And then Mr. Mahabub responds, at the top of
13  the page, "Green on my screen!  See you at 11 a.m. on
14  Wednesday, July 7th"; is that right?
15      A.  Yeah, correct.
16      Q.  Do you recall that meeting?
17      A.  But let's go back again -- so, you're trying
18  to get me to --
19      Q.  I'm just establishing the date of the meeting.
20  You guys met -- you met with Mr. Mahabub on July 7th.
21      A.  Okay.  Got it.
22      Q.  Is that true?
23      A.  Yes.  I'll probably --
24      Q.  And is there any reason to think you didn't
25  meet on July 7th?
```
Page 231

```
 1      A.  I -- there's no reason for me to --
 2      Q.  Okay.
 3      A.  Yeah, it's -- and this is the meeting.
 4      Q.  It's what meeting?
 5      A.  ==Well, the other person is Andrew Bright.  That==
 6  ==is the meeting, yeah.==
 7      Q.  ==No.  Well --==
 8      A.  ==I mean, that to me is my final meeting.  I==
 9  ==mean, I think.==
10      Q.  Okay.
11      A.  The big meeting.
12      Q.  All right.  Hear me out.  Let me ask
13  questions.
14      A.  Okay.
15      Q.  Okay.  So if you look at the bottom, you say,
16  "I have to meet on Wednesday July 7" --
17      A.  Okay.
18      Q.  -- 11 a.m.  Is that a good time for you?"  And
19  then you say underneath that, "Also, I would like to
20  arrange a meeting with a couple of guys on the team, one
21  you know, Barry Corlett.  The other person is Andrew
22  Bright (phd in acoustics)."
23      A.  Right.
24      Q.  Does it look like to you that's a separate
25  meeting?
```
Page 232

**Page 253**

```
 1   of that page, he says he's coming down to deliver an
 2   iPad with the new app.  Do you see that?
 3       A.   Yes.
 4       Q.   Okay.  Did you meet with him on September
 5   16th?
 6       A.   Uh --
 7       Q.   As far as you know?
 8       A.   As far as I know.
 9            MR. AVENI:  Okay.  I'm going to reflect that
10   on Exhibit-82.  Okay.
11       Q.   (By Mr. Aveni)  Now he's talking about an app
12   on the iPad.  Does that reflect any work that's been
13   done on the iPad side, on this date?
14       A.   I'll take an assumption that that's true.
15       Q.   Okay.  So, you think yes?
16       A.   Yes.
17       Q.   Okay.
18       A.   Now, what I think we discussed on that is that
19   the app was not necessarily for demonstration; but it
20   was a working tool.  Let me explain the difference.
21       Q.   Okay.
22       A.   When we started off our conversation earlier
23   this morning, we talked about an arcane user interface.
24   You had to key in all -- a numerical key to move the
25   volume up or down.  If you wanted to go up in volume,
```

**Page 254**

```
 1   you go from 5 to 10.  And that's the way the original
 2   app was, that GenAudio developed.
 3            I -- I suggested to GenAudio that they create
 4   a -- a tool set, meaning a user interface that got rid
 5   of all that stuff, and use a graphical interface -- one
 6   that literally moved -- whether it's a slide bar
 7   and with a graphical representation.  And -- and they
 8   did.  And that might be what that is.
 9       Q.   Okay.  So why were you doing that work around
10   this time frame, September 2010?
11       A.   It was a suggestion to GenAudio that they
12   would gain huge benefit for all teams -- whether it was
13   at Apple or even outside -- that he should work on this
14   because it makes it easier to sell the product.
15       Q.   Okay.
16       A.   To us, or to anybody else.  Because you
17   could -- you can dynamically and graphically adjust the
18   volume --
19       Q.   I --
20       A.   -- or adjust -- adjust -- so, it was -- it was
21   just a suggestion to him.  He did it.  And that's -- and
22   he maybe wanted to show it to me.
23       Q.   And just --
24       A.   I mean, I -- I'd forgotten exactly all --
25       Q.   Just to be clear, you're -- and I may have
```

**Page 255**

```
 1   missed this.  You're not sure, one way or the other, as
 2   to what this email -- whether this email relates to what
 3   you just explained, right?
 4       A.   I'm not 100 percent sure, but it sounds like
 5   it.
 6       Q.   Okay.
 7       A.   Because it says, "new app."  And I know we've
 8   asked him about that before.  So, I'm kind of jumping
 9   into it with that one.
10       Q.   Okay.  Now, the bottom of Page 2, you're
11   writing to Jerry Mahabub.  And you say, "I have
12   tentatively set up a meeting for Thursday, September
13   23rd."  Do you see that?
14       A.   Okay.
15       Q.   And that's the meeting with Andrew Bright and
16   Barry Corlett, right?
17       A.   Okay.
18       Q.   Is that right?
19       A.   Probably.
20       Q.   Okay.  And that meeting took place, right?
21       A.   Yes.
22            MR. AVENI:  Okay.  So, I'm going to reflect
23   that on Exhibit-82 as well.  Okay.  You can put that
24   document away.
25            (Exhibit-131 marked for identification.)
```

**Page 256**

```
 1       Q.   (By Mr. Aveni)  And this is another document
 2   that you produced, right?
 3       A.   Mm-hmm, yes.
 4       Q.   Okay.  And you wrote this -- I'm sorry --
 5   Mr. Mahabub wrote this email the day after the meeting
 6   with Andrew Bright and Barry Corlett?
 7       A.   Yes.
 8       Q.   Okay.  If you go to the bottom of Page 2,
 9   there's a paragraph that starts, "Lastly ..."  Do you
10   see that?
11       A.   Yes.
12       Q.   Okay.  I'm just going to read a bit of that;
13   not the whole thing.  It says:  "Lastly, we will need to
14   either go under a more serious development agreement for
15   us to give Apple our real deployment level SDK (not the
16   test level SDK you have already received).
17            "Given that Barry stated it would be easier
18   for us to give our SDK to Apple so Apple could then
19   integrate and point to the iTunes Music library, as
20   opposed to Apple giving us an API to do this on our end
21   (which would actually have been the easiest pathway), I
22   will put together an SDK license agreement for Apple to
23   review and sign as the current NDA between our companies
24   is not strong enough to cover both sides of the fence."
25            Do you see that?
```

```
 1        Q.   So, the iPhone and iPod design was below him,
 2   if you recall; is that right?
 3        A.   Run that by me again?
 4        Q.   Mr. Mansfield, it says here he's the Senior
 5   Vice President of Mac Hardware Engineering?
 6        A.   Yes.
 7        Q.   So, I'm just making sure that it's -- to your
 8   recollection, that below him at some level were the
 9   iPhone and iPod Design?
10        A.   Right.  Steve Zadetsky.
11        Q.   Okay.  I just want to make sure that the --
12        A.   I -- I'm going --
13        Q.   -- peripherals like the iPhone and iPod were
14   below Mac Hardware?
15        A.   No, they're kind of -- Mac Hardware would --
16   by itself here.  If you take a look -- VP iPad -- let me
17   see.  Oh, Dave -- VP Hardware Engineer, iPhone/iPad --
18   so, they -- see, a lot of things changed here.
19        Q.   Okay.
20        A.   So, Zadetsky did iPhone/iPad design.  Tupman
21   did iPhone and iPad.  So, those guys shared
22   responsibilities -- I don't -- you know, on the
23   hardware.  And so -- so, it's -- it's not the same as it
24   was when I was there.
25        Q.   So, I guess, what I'm trying to figure out is:
                                                       Page 305
```

```
 1   thought of to go to?
 2        A.   Yeah.
 3        Q.   Okay.
 4        A.   That we had the most direct influence,
 5   friendship -- you know, he's a good guy -- open -- we
 6   can talk openly, knows us, that would be honest and give
 7   us an opinion about what was going on.  He might have
 8   said, "Hey, I'm not the guy.  Let me take it to Phil
 9   Schiller" -- his boss --
10        Q.   Okay.
11        A.   -- "and see what he says."  I mean, then Phil
12   might have said, "Hey, this is great.  I, you know" --
13   and he might have taken it to whoever was CEO at the
14   time.
15             MR. HOLMES:  Got it.  Okay.  I don't think I
16   have any further questions.  Thank you.
17                    E X A M I N A T I O N
18   BY MS. HUGHES:
19        Q.   Mr. Tiscareno, in your work at Apple, in the
20   time frame from 2009 until you left in 2010, did your
21   res --
22        A.   '11.
23        Q.   2011.
24        A.   Yes.
25        Q.   -- did your responsibilities include
                                                       Page 307
```

```
 1   Why is it that Greg Joswiak is the person that you
 2   brought the project to?
 3        A.   That was because Greg would've given --
 4   would've given Michael Hailey permission to -- for him
 5   to expand on it, get his opinion on it, see where we
 6   could take it.  You know, it's -- it's not easy to take
 7   an idea and bring it to the top.
 8        Q.   Okay.
 9        A.   Yeah.  I mean, if Greg would have said -- then
10   he could have evangelized the project.  And he was a
11   great -- "Let's do this.  You guys keep going.  I'll
12   talk to your manager.  Mike, I want to talk to you
13   later.  We'll work on this."  You know, it would have
14   been a nice conversation in a meeting somewhere, in
15   an -- in his office.  You know, it's -- it was just a --
16   you know, in his personal office.
17        Q.   Is there anybody else that the project could
18   have been brought to, or was he really the guy that --
19        A.   He's really --
20        Q.   -- Mr. Joswiak?
21        A.   He's really the guy we could have -- I'm --
22   you know, it's -- I was running out of my area of
23   influence without being, you know, knocked down, I
24   guess.
25        Q.   Got it.  So, he was really the guy that you
                                                       Page 306
```

```
 1   negotiating acquisition of other companies?
 2        A.   Zero, nothing.
 3        Q.   Did your responsibilities include negotiating
 4   contracts to acquire companies?
 5        A.   No.
 6        Q.   Did it include negotiating licensing
 7   contracts --
 8        A.   No.
 9        Q.   -- to acquire software?
10        A.   No.
11        Q.   When you dealt with GenAudio, did you deal
12   with anyone aside from Jerry Mahabub?
13        A.   From GenAudio?
14        Q.   Yes.
15        A.   No.
16             MR. HOLMES:  I'm going to just object to the
17   term, "deal with" as pretty vague.  I think there was
18   testimony about other people he met.
19        Q.   (By Ms. Hughes)  So, you met Walt Horat?
20        A.   I met Walt Horat.
21        Q.   On one occasion?
22        A.   On one occasion.
23        Q.   Okay.
24        A.   He wanted to bring a friend, and I said no.
25        Q.   Did you have any discussions with any of the
                                                       Page 308
```

```
 1   board of directors of GenAudio in that time frame
 2   from 2009 through February of 2011?
 3       A.   No.
 4       Q.   You didn't talk to Mark Bobak?
 5       A.   No.
 6       Q.   You didn't talk to Paul Powers?
 7       A.   No.
 8       Q.   Ted Cohen?
 9       A.   No.
10       Q.   There's another guy.  I'm not going to be able
11   to think of his name.  But none of the board of
12   directors?
13       A.   No.
14       Q.   We've talked today a lot about this idea of
15   integration and was GenAudio's software integrated with
16   Apple's operating system or not integrated.
17            So, my question is:  What did you understand
18   the idea of integration to mean?
19       A.   It's a question of definition.  I would -- my
20   thought is when somebody says integration, that it's
21   going to the core operating system; not -- not
22   integrating it into an application which resides within
23   the system.
24       Q.   So, you're distinguishing between the core
25   operating system and an application that works outside
                                                  Page 309
```

```
 1       Q.   Did you ever participate in any meetings with
 2   Jerry Mahabub and Phil Schiller?
 3       A.   No.
 4       Q.   Not during 2009?
 5       A.   Never.
 6       Q.   Not during 2010?
 7       A.   Never.
 8       Q.   And not in 2011 either, right?
 9       A.   That's correct.
10       Q.   Did you ever recommend GenAudio software to
11   Phil Schiller?
12       A.   No.
13       Q.   Did you ever demonstrate it to Phil Schiller?
14       A.   No.
15       Q.   Did you ever recommend GenAudio software to
16   Tim Cook?
17       A.   No.
18       Q.   Did you ever give Mr. Cook a demonstration of
19   GenAudio software?
20       A.   No.
21       Q.   Did you ever recommend GenAudio software to
22   Steve Jobs?
23       A.   No.
24       Q.   Did you ever give him a demonstration?
25       A.   No.
                                                  Page 311
```

```
 1   of the operating system?
 2       A.   Correct.  They all work within.  It's how it
 3   plugs in, you know.  It's in a safe zone.
 4       Q.   Throughout the emails, there are references to
 5   something called KEXT, K-E-X-T.  What is KEXT?
 6       A.   Kernel Extension.
 7       Q.   And what does that mean?
 8       A.   Kernel Extension is the -- is a -- I'd have to
 9   look it up actually and give you an absolute definition.
10   You can look it up.  It is actually the -- the starting
11   point for the operating system.  It's the keyway to the
12   operating system.
13            So, that's where everything originates in the
14   operating system.  It's -- it's kind of like home base
15   for the operating system.  And to get access to that
16   requires special permission.
17       Q.   So, I would like you to look at Exhibit-96.
18   This was an Apple meeting notice of a GenAudio
19   demonstration on August 19, 2009.  Can you look at
20   Exhibit-96 in that pile?
21            It's going to be -- yeah, towards the bottom.
22       A.   Okay.
23       Q.   Was Phil Schiller included on this meeting on
24   August 19, 2009?
25       A.   Not on this list.
                                                  Page 310
```

```
 1       Q.   Would you characterize yourself as the main
 2   point of contact within Apple for GenAudio?
 3       A.   Yes.
 4       Q.   Now, I'd like you -- in that same pile -- to
 5   look at Exhibit-98.  This was an August 20, 2009, email
 6   from you to Michael Hailey.  And earlier today, in
 7   talking with defense counsel, you talked about -- in
 8   this time frame -- you were enthusiastic about
 9   GenAudio's product.
10            At this point, did you ever offer that Apple
11   would acquire GenAudio?
12       A.   No.
13       Q.   Did you ever offer to acquire its license for
14   its software?
15       A.   Come again with that last one?
16       Q.   Did you ever offer to acquire a license to use
17   GenAudio software?
18       A.   I don't think I ever used those terms.
19       Q.   Did you ever negotiate terms --
20       A.   No.
21       Q.   -- for a license?
22       A.   Let me just say that -- automatically -- a
23   vendor comes in with a software.  The end result is that
24   if it all works out, you might license something.
25   That's -- that's automatic.  So, the answer to the
                                                  Page 312
```

```
 1   question -- I never offered -- I guess, we could
 2   assume -- but I never offered and said, "Hey, this is
 3   what we're going to do" -- in those words.
 4       Q.   In September 2009, was GenAudio's product
 5   ready to be integrated into Apple's operating system?
 6       A.   No.
 7       Q.   In that time frame, September 2009, did you
 8   ever talk with Mr. Mahabub about acquiring GenAudio
 9   software so it could be included in a Christmas product
10   rollout for Apple?
11       A.   No.
12       Q.   At any point during 2009/2010 and into
13   early 2011, did you ever exchange term sheets with
14   Mr. Mahabub?
15       A.   No.
16       Q.   Did you ever exchange any letters of intent?
17       A.   No.
18       Q.   Did you ever exchange any draft contracts --
19       A.   No.
20       Q.   -- between Apple and GenAudio?
21       A.   No.
22       Q.   Based on your experience with Apple, do you
23   have an understanding of what is the amount of lead time
24   it would take to roll out a new feature in an Apple
25   product?
```

Page 313

```
 1       Q.   I'm -- go ahead.
 2       A.   So without looking it up, I can't tell you
 3   when exactly that happened.  But at some point Apple was
 4   not doing MacWorld anymore.  It may have been in that
 5   time frame.
 6       Q.   So at this point in November of 2009, you and
 7   Mr. Hailey had not yet made a presentation to
 8   Mr. Joswiak, correct?
 9       A.   No.  Let's go back and look at the date,
10   but it's --
11       Q.   That happens in May of 2010?
12       A.   That's correct.
13       Q.   So, could GenAudio's application be included
14   and ready for MacWorld without Mr. Joswiak ever even
15   saying, "Yes, go ahead with it"?
16       A.   Yes -- no, it never would have happened
17   without his permission.  We hadn't got there.
18       Q.   Now, if you would look at Exhibit-109.
19       A.   Yes.
20       Q.   This was that very long email that Mr. Mahabub
21   sent to you and Mr. Hailey on December 22, 2009.
22       A.   Right.
23       Q.   And, in particular, I'd like you to look at
24   the second page.  And this is Mr. Hailey writing back to
25   Mr. Mahabub.  He says at the end of the large middle
```

Page 315

```
 1       A.   I -- the theoretical -- I -- I don't have a
 2   timeline, honestly.  But I -- I think it could be -- I
 3   mean, all-out assault to get something done -- but
 4   it's -- when I -- I can give an arbitrary number.
 5   There -- it's -- it's going to have to go to a different
 6   team that -- I don't understand their process to get
 7   things done.  I can only guesstimate.
 8       Q.   Is it something that could happen in three
 9   months?
10       A.   Sure.
11            MR. AVENI:  Objection.  Calls for speculation.
12       Q.   (By Ms. Hughes)  So, if you would look at
13   Exhibit-105.  This is a November 3, 2009, email exchange
14   between you and Mr. Tiscareno (sic).  And in it he was
15   talking about hopefully having this done by MacWorld.
16            Was it conceivable that, between November 2009
17   and roughly January of 2010, GenAudio's product would be
18   ready to be included in Apple by MacWorld?
19       A.   So while you're talking, I processed
20   something.  And I don't know how to answer your
21   question.  I'm going to say no.  Never did it.  But
22   Apple backed out of MacWorld.  They weren't going to do
23   MacWorld anymore, even though the show went on.
24       Q.   So --
25       A.   So I --
```

Page 314

```
 1   paragraph:  "The business side of things would come into
 2   play after we have exec buy-in on the product side."
 3       A.   Right.
 4       Q.   "I am sure we will continue to be in contact
 5   as things progress on our end.  I just don't want you to
 6   get frustrated by the lack of apparent progress (or the
 7   pace thereof)."
 8            Did I read that correctly?
 9       A.   That's correct.
10       Q.   So, at this point you and Mr. Hailey did not
11   have executive buy-in on GenAudio's product?
12       A.   That's correct.
13       Q.   And Mr. Hailey is advising Mr. Mahabub of that
14   fact in December of 2009?
15       A.   That's correct.
16       Q.   I'd like you to look at Exhibit-114.  This is
17   the March 15, 2010, shareholder letter that Mr. Mahabub
18   sent out in connection with GenAudio's Private Placement
19   Memoranda.
20            If you look at that second paragraph, it says:
21   "This offering is being conducted to provide bridge
22   capital until we can 'ink' a deal with a large consumer
23   electronics company (referred to as the 'LCEC'
24   throughout the PPM) with whom we have had over 15
25   meetings with marketing and technical management, and
```

Page 316

```
 1   will start the actual embedded level integration process
 2   within the next 30 days."
 3          Did I read that correctly?
 4       A. That's correct.
 5       Q. As of March 2010, was there any discussion
 6   between you and Mr. Mahabub about inking a deal between
 7   GenAudio and Apple?
 8       A. No.
 9       Q. Were you aware of Mr. Mahabub having
10   discussions with anyone else at Apple about inking a
11   deal with GenAudio?
12       A. I know of no one.
13       Q. In March of 2010, were you involved at all in
14   embedding GenAudio software into Apple software?
15       A. No.
16       Q. Are you aware of anyone else who was involved
17   in embedding GenAudio software into Apple software?
18       A. I'm not aware of any.
19       Q. In March of 2010, were there any discussions
20   about Apple acquiring GenAudio?
21       A. No.
22       Q. Did Mr. Mahabub ever tell you that anyone at
23   GenAudio was telling investors about negotiations with
24   Apple?
25       A. I know -- I know -- didn't know anything about
                                                       Page 317
```

```
 1   with Apple?
 2       A. Correct.
 3       Q. I'd like you to look at Exhibit-2.  This is
 4   the GenAudio Private Placement Memoranda dated March 15,
 5   2010.
 6       A. Okay.
 7       Q. If you would look at Page Number GA510.
 8       A. Yes.
 9       Q. I'm looking at the third paragraph.  And it
10   states: "Working with the LCEC, the Company has now
11   successfully integrated the AstoundSound Technology into
12   several of the LCEC's products to demonstrate the
13   viability and enhanced audio experience for music,
14   movies, and videogames played on several of their
15   consumer electronic devices."
16          Did I read that correctly?
17       A. That's correct.
18       Q. They're using that word "integration" again.
19          At this point in March of 2010, had Apple
20   integrated -- excuse me -- had GenAudio integrated its
21   software into Apple's operating system?
22       A. I'm going to say no, depending on how
23   "integrated" is defined.  And that's -- so, that's for a
24   software engineer who does software engineering
25   management to determine what that term means.  But I'm
                                                       Page 319
```

```
 1   that.
 2       Q. Would it have concerned you if you knew that
 3   GenAudio was raising money from investors based on these
 4   alleged negotiations with Apple?
 5       A. Absolutely, yes.
 6       Q. Did you ever say to Mr. Mahabub that Apple was
 7   going to ink a deal with GenAudio?
 8       A. No.
 9       Q. We have looked at Exhibit-116.  That's the
10   colorful org chart for Apple.  Did you create this
11   document?
12       A. No.
13       Q. Were you aware it existed before today?
14       A. No.
15       Q. Does it accurately reflect the structure of
16   Apple during 2009?
17       A. No, I don't think it does.  I think -- high
18   probability that org chart was different.
19       Q. Do you know all the people who are identified
20   on this chart?
21       A. I don't know everyone.
22       Q. Okay.  So, you're not sure if this is
23   accurate?
24       A. I'm not sure it's accurate.
25       Q. And by August of 2011 you had left employment
                                                       Page 318
```

```
 1   going to say no.
 2       Q. If a person looked at Apple's code --
 3   operating system code -- in March of 2010, was there any
 4   GenAudio code in that string anywhere?
 5       A. No.
 6       Q. So when you looked at these demonstrations
 7   that Jerry Mahabub brought, they were on stand-alone
 8   devices that he purchased and loaded GenAudio's code
 9   onto?
10       A. Correct.
11       Q. That's no different than anyone going to an
12   app store and choosing an application and putting it on
13   their phone or their iPad?
14       A. Correct.
15       Q. In March of 2010, had you told Mr. Mahabub
16   that Apple was going to go acquire a licensing
17   arrangement with GenAudio?
18          So in March, at the time of this PPM --
19       A. Yes.
20       Q. -- did you tell Mr. Mahabub, "Apple is going
21   to make a licensing agreement with you"?
22       A. I did not.
23       Q. Did you tell Mr. Mahabub that Apple was going
24   to acquire GenAudio?
25       A. No.
                                                       Page 320
```

```
 1        Q.   Are you aware of any facts that would make him
 2   believe that was likely to occur?
 3        A.   No.
 4             MR. HOLMES:  Objection.  Calls for
 5   speculation.
 6             MR. ELTRINGHAM:  Not if he's aware of any
 7   facts.  It's not speculation.
 8             Can we take a break -- just a bathroom break?
 9             MS. HUGHES:  Yes, you may.
10             Let's go off the record, please.
11             (Recess taken from 6:03 p.m. to 6:08 p.m.)
12        Q.   (By Ms. Hughes)  I would like you to look at
13   Exhibit-122.  This is a July 18, 2010, email from
14   Mr. Mahabub to you.
15        A.   Hmm.
16        Q.   And in the fourth paragraph, Mr. Mahabub is
17   suggesting it would be a "phenomenal time for Apple to
18   consider putting out an AstoundSound integrated set of
19   product offerings for their Christmas product rollout."
20             In July 2010, did you ever talk with
21   Mr. Mahabub -- verbally talk with him -- about Apple
22   putting out the AstoundSound product for the Christmas
23   rollout?
24        A.   Never.
25        Q.   Can I have you look at the next exhibit,

                                                  Page 321
```

```
 1   Steve Jobs still the CEO of Apple?
 2        A.   Yes.  I'm going to say yes.  I just don't know
 3   where he -- there were many gaps due to his health.  And
 4   I don't know if he was then -- if Tim Cook had taken
 5   over temporarily or not.  There were gaps in his
 6   presence, so I -- I -- without knowing, I'm going to
 7   say, yes, he was.
 8        Q.   Then let me ask this question.  If in
 9   August 2010 Mr. Jobs was the CEO of Apple, did he ever
10   ask -- that you are aware of -- for a handshake meeting
11   with Mr. Mahabub?
12        A.   No.
13        Q.   Did he ever ask to have a meeting with
14   Mr. Mahabub and Apple's expert in acoustic physics?
15             Did Mr. Jobs ask to have a meeting with
16   Mr. Mahabub and Apple's expert in acoustic physics,
17   which I take this to be Andrew Bright?
18        A.   I'm -- I was going to ask you if you wanted to
19   define who that was.  I could guess, but you've said it.
20   And I said no.  I'm -- not that I'm aware of.
21        Q.   Now, as a follow-up, in December of 2010 did
22   you meet with Mr. Mahabub and Steve Jobs --
23        A.   No.
24        Q.   -- to demonstrate GenAudio's technology?
25        A.   No.

                                                  Page 323
```

```
 1   Exhibit-123.  This is one of a series that Counsel
 2   showed you about a new NDA, nondisclosure agreement.
 3        A.   Mm-hmm, yes.
 4        Q.   Did you ever ask Mr. Mahabub to sign a new
 5   nondisclosure agreement?
 6        A.   I don't recall.
 7        Q.   I'd like you to look at Exhibit-37.  So this
 8   is going to be five or six more in the pile, as you're
 9   moving forward.  This is an August 1, 2010, GenAudio
10   shareholder letter.  It looks --
11        A.   Okay.  Oh, here it is.
12             MR. HOLMES:  It should be between 127 and 128.
13             MR. ELTRINGHAM:  Thank you.
14        A.   5351.  Okay.  Got it.
15        Q.   (By Ms. Hughes)  So, I'd like you to look at
16   the second page of Exhibit-37.  Under the heading,
17   "Consumer Electronics Industry" --
18        A.   Right.
19        Q.   -- it states:  "In the very near future, it
20   has been requested by the LCEC's CEO to have a
21   'hand-shake' meeting with myself alongside meeting with
22   the LCEC's expert in acoustic physics and others.  This
23   meeting will take place within the next couple of
24   weeks."
25             At this point in time, in August of 2010, was

                                                  Page 322
```

```
 1        Q.   Were you ever present in a meeting with Steve
 2   Jobs in which he stated, "I really like your technology,
 3   and I look forward to seeing you again"?
 4        A.   No.
 5        Q.   In December of 2010, did you ever tell
 6   Mr. Mahabub that Apple was interested in inking an
 7   actual license deal with GenAudio?
 8        A.   No.
 9        Q.   Are you aware of anyone else telling
10   Mr. Mahabub that Apple was interested in inking an
11   actual license deal with GenAudio?
12        A.   I'm not aware of anyone.
13        Q.   When you left Apple, and you advised
14   Mr. Mahabub that you were leaving, did you tell him that
15   Apple continues to be very interested in integrating
16   GenAudio's technology across Apple's entire line of
17   product offerings?
18        A.   No.
19        Q.   At some point, did you become aware that
20   Mr. Mahabub had forged a transcript of a telephone
21   conversation with you?
22        A.   When was this, please?
23        Q.   In May of 2010.
24        A.   I was not aware.
25        Q.   At a later point in time, did you see a copy

                                                  Page 324
```

Veritext Legal Solutions
866 299-5127

```
 1   about Mr. Mahabub's objective intent.
 2              MR. AVENI:  Join.  It's also not follow-up.
 3        Q.    (By Ms. Hughes)  And Mr. Mahabub was lying
 4   about the status of his discussions with Apple, wasn't
 5   he?
 6              MR. HOLMES:  Same objection.
 7              MR. AVENI:  Same objection.
 8        A.    Yes.
 9              MS. HUGHES:  No further questions.
10              MR. AVENI:  Let's go off the record for a
11   minute.
12              (Recess taken from 6:41 p.m. to 6:45 p.m.)
13              MR. AVENI:  Okay.  So, first of all,
14   Mr. Tiscareno, thank you again for giving us a full day
15   of your time -- which is very much appreciated.
16              And while we were off the record, Counsel
17   stipulated that once I receive a copy of the transcript,
18   I will promptly forward it to Mr. Tiscareno's counsel,
19   who will send it on to his client.  And Mr. Tiscareno
20   will have 30 days to notify us of any changes.  And it
21   would be sent back to me, and I will hold the
22   transcript.
23              MR. ELTRINGHAM:  That is correct.
24              MR. HOLMES:  So stipulated.
25              MR. AVENI:  Leslie?
```

Page 345

Veritext Legal Solutions
866 299-5127

```
 1              MR. HOLMES:  Do you agree?
 2              MS. HUGHES:  I do agree.
 3              MR. AVENI:  Okay.  We're off the record.
 4              (Deposition concluded at 6:46 p.m.)
 5              (Signature reserved.)
 6                       -----
```

Page 346

Veritext Legal Solutions
866 299-5127

```
                         S I G N A T U R E

             I declare under penalty of perjury
under the laws of the State of Washington that I have
read my within deposition and the same is true and
accurate, save and except for changes and/or
corrections, if any, as indicated by me on the CHANGE
SHEET page hereof.
             Signed in _____,
Washington, on the _____ day of _____,
2016.


                              _____
                              VICTOR TISCARENO

                              TAKEN:  December 16, 2016
```

Page 347

Veritext Legal Solutions
866 299-5127

```
                      C E R T I F I C A T E
STATE OF WASHINGTON )
                    ) ss.
COUNTY OF KING      )

        I, the undersigned Washington Certified Court
Reporter, hereby certify that the foregoing deposition
upon oral examination of VICTOR TISCARENO was taken
stenographically before me on December 16, 2016, and
transcribed under my direction;
        That the witness was duly sworn by me pursuant
to RCW 5.28.010 to testify truthfully; that the
transcript of the deposition is a full, true, and
correct transcript to the best of my ability; that I am
neither attorney for nor a relative or employee of any
of the parties to the action or any attorney or counsel
employed by the parties hereto nor financially
interested in its outcome.

        I further certify that in accordance with
Washington Court Rule 30(e), the witness is given the
opportunity to examine, read, and sign the deposition
within thirty days upon its completion and submission
unless waiver of signature was indicated in the record.

        IN WITNESS WHEREOF, I have hereunto set my
hand this 27th day of December, 2016.


                              _____
                              Olivia Pennella
                              Washington CCR 3337
```

Page 348

Veritext Legal Solutions
866 299-5127