# EXCERPTED

# EXHIBIT 27

Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:       )
                        ) File No. D-03450-A
GENAUDIO, INC.          )

WITNESS: Paul B. Powers

PAGES:   1 through 193

PLACE:   U.S. Attorney's Office

        400 West Washington Street, Suite 300

        Orlando, FL  32801

DATE:    Friday, February 27, 2015


    The above entitled matter came on for hearing, pursuant to notice, at 9:10 a.m.






Diversified Reporting Services, Inc.

(202) 467 9200

Page 2

1    APPEARANCES:
2
3    On behalf of the Securities and Exchange Commission:
4        JENNIFER OSTROM, ESQ.
5        Securities and Exchange Commission
6        1801 California Street
7        Suite 4800
8        Denver, Colorado
9
10   On behalf of the Witness:
11       PAUL B. POWERS, PRO SE
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              CONTENTS
2
3    WITNESS:                    EXAMINATION
4    Paul B. Powers                   4
5
6    EXHIBITS:    DESCRIPTION           IDENTIFIED
7      95     Copy of Subpoena              7
8      96     Completed Background
9             Questionnaire             12
10     97     GenAudio Board of Directors
11            February 12th, 2010          100
12     98     E-mails beginning on
13            May 6th, 2010 at 5:32 a.m.   129
14     99     GenAudio Board of Directors
15            Minutes for July 29          158
16    100     String of e-mails            170
17    101     Unanimous Written Consent of
18            the Board of Directors
19            of GenAudio, Inc.            181
20
21
22
23
24
25

Page 4

1                PROCEEDINGS
2          MS. OSTROM:  Let's go on the record at
3    9:10 a.m. on February 27th of 2015.
4          Would you please raise your right hand.
5    Do you swear to tell the truth, the whole truth and
6    nothing but the truth?
7          MR. POWERS:  I do.
8    Whereupon,
9              PAUL B. POWERS
10   was called as a witness and, having been first duly
11   sworn, was examined and testified as follows:
12              EXAMINATION
13       BY MS. OSTROM:
14       Q   Would you please state and spell your
15   full name, for the record?
16       A   Paul B. Powers, P-O-W-E-R-S.
17       Q   And does the B stand for anything?
18       A   Yeah, the B stands for Bannon,
19   B-A-N-N-O-N.
20       Q   Okay.  And my name is Jennifer Ostrom and
21   I'm an officer of the United States Securities and
22   Exchange Commission for purposes of this
23   proceeding.
24          And this is an investigation by the
25   Commission In The Matter of GenAudio, Inc., to

Page 5

1    determine whether there have been violations of
2    certain provisions of the Federal Securities laws;
3    however, the facts developed in this investigation
4    might constitute violations of other federal or
5    state civil or criminal laws.
6          And prior to the opening of the record,
7    you were provided with a copy of the Formal Order
8    of Investigation in this matter, and it will be
9    available for your examination during the course of
10   this proceeding.
11         Mr. Powers, have you had an opportunity
12   to review the Formal Order?  That's this.
13       A   Yes.  I just reviewed it moments ago.
14       Q   Okay.  Do you have any questions
15   concerning the formal order?
16       A   No, I do not.
17       Q   Okay.  And prior to the opening of the
18   record, you were provided with a copy of the
19   Commission Supplemental Information Form.  And a
20   copy of that notice is what is marked Exhibit
21   Number 1.
22       BY MS. OSTROM:
23       Q   And Mr. Powers, have you had the
24   opportunity to read Exhibit Number 1?
25       A   Yes, I have.

Page 22

1 facilitated the sale of those shares.
2 Q Now, was that all of the shares? Was
3 that all through Mr. Mattos?
4 A Yes.
5 Q Okay. So the whole 285,000 shares?
6 A No. Because I still have 500.
7 Q Except for the 500. Sorry.
8 A Yeah.
9 Q But other than that, all the sales that
10 you've referenced were through Mr. Mattos?
11 A Yeah, but they were just private sales to
12 accredited investors who had -- this was right
13 after the company offering.
14    So I waited until after the company had
15 finished their offering, because I didn't -- I was
16 on board, and certainly didn't want to compete with
17 any corporate opportunities.
18    There were shares that I held for
19 investment, not, you know, for resale. And the
20 purchasers represented that they had read all the
21 risk factors and everything in the PPM and that
22 they were holding for investment and not for
23 resale, as well.
24 Q And did you help then -- when Mr. Mattos,
25 approached you about getting some additional shares

Page 23

1 for his family, did you also then set him up to
2 transfer your sister and brother's shares?
3 A My brother didn't sell any shares.
4 Q Okay.
5 A My sister sold a few shares.
6 Q Okay. And was that through you and the
7 same circumstances?
8 A Well, it wasn't through me. But it was
9 in the same -- yeah, the same circumstances.
10 Q Okay. Did she then talk to Mr. Mattos
11 directly?
12 A No.
13 Q Okay. So you were the one who talked to
14 Mr. Mattos?
15 A Yes. Mr. Mattos had found more
16 purchasers and shares and so -- 6,000 shares, I
17 believe, came from her.
18 Q Okay. And at that time, what was Mr.
19 Mattos' position with GenAudio?
20 A I'm not sure. He -- you have to
21 understand, GenAudio -- you know, the actual roles
22 performed were a little different from the names
23 that you were given.
24    What he was supposed to be doing was
25 taking care of the consumer hotline that related to

Page 24

1 the product that we had in the marketplace, which
2 was AstoundSound stereo expander, which was
3 something that you could download onto your
4 computer in order to improve the sound quality of
5 what you were hearing.
6    So I guess his title would have been
7 something like manager of support services,
8 something like that.
9 Q Okay.
10 A Whatever it was, I'm sure, was listed in
11 the private placement memorandum.
12 Q Okay. And how did it come about that he
13 approached you about getting some additional shares
14 for people?
15 A Well, he had sold shares on behalf of Mr.
16 Mahabub. And, you know, I had some shares. I was,
17 you know, intent on leaving the company. I wasn't
18 happy with the way it was being run.
19    And I was leaving shortly thereafter for
20 a position at SeaWorld. And you know, felt that,
21 you know, if the company did well, I would have
22 warrants. So I didn't need to hold onto that many
23 shares. That was a very big investment for me.
24 Q And for the sales of your shares, and
25 your sister's shares, did you have any direct

Page 25

1 contact with any of the purchasers?
2 A I didn't speak to any of the purchasers,
3 with the exception of Gary Allen, who was in the
4 Seattle area. So I had a couple of conversations
5 with him.
6    And then there was one telephone
7 conversation where he brought a couple of his
8 neighbors in. I couldn't provide their names. But
9 I believe there were three people --
10 Q Okay.
11 A -- on the line on their end.
12 Q Were they, at the time, already
13 shareholders of GenAudio?
14 A That's my understanding, yes.
15 Q Okay. And do you recall what you spoke
16 to Mr. Allen and the others about, at that time?
17 A Yeah, I do. They were asking, you know,
18 whether this so-called LCEC transaction was, you
19 know, likely to happen. And my response was, I
20 have no idea.
21    The way the company was run was, Mr.
22 Mahabub, you know, would have all the discussions
23 with all the potential business partners. I was
24 never in any of them, with the exception of this
25 one demonstration at Earhole Studios.

Page 26

1   I had joined the company with the
2   impression that the technology was further along
3   than I realized, after I joined the company.  So it
4   needed some work.
5   And from a technology standpoint, had to
6   be compressed down to be put into smaller devices
7   without draining battery life.  So there was a lot
8   of technological work to do.
9   I thought I was coming on -- I'm a
10  contracts lawyer, so I just thought I was coming
11  onboard to, you know, assist with negotiations and
12  signing contracts and license agreements.  And that
13  proved not to be the case.
14  Q   Okay.  And we'll go into a lot more
15  detail on these.  But can you tell us what you mean
16  by it proved not to be the case?  Because that's
17  probably important to cover that right now.
18  A   Yeah, well, I'm not quite sure how to
19  describe it.  But Mr. Mahabub is a very
20  formidable -- I'm trying to think of the words to
21  use, without sounding disparagingly.
22  He -- it was his way or the highway.  He,
23  you know, often used analogies to, you know, that
24  I'm the captain of the ship and I'm going to make
25  the calls and we're going to do what I say and I

Page 27

1   don't care what anybody else thinks.  This is my
2   company.
3   And he would separate everybody into,
4   what I would call, silos where he would talk to one
5   person about, you know, what they were doing, then
6   another person about what they were doing.  There
7   was no collaboration, which was really frustrating.
8   And whenever he would call on a potential
9   partner, or business licensee, he would be the only
10  one to go.  So I was never able to go on any of
11  these things, although, you know, some things got
12  done.  But he was very strong-willed.  I don't want
13  to use the word bully, but it's probably fairly
14  accurate.
15  Q   Did you ever assist with any
16  negotiations?
17  A   For -- yes, with Earhole Studios.
18  Q   Okay.
19  A   I assisted with signing a license
20  agreement with Earhole Studios.  Unfortunately, we
21  never did any business with them.
22  Q   Any others that you assisted with
23  negotiations?
24  A   None.  I was never invited into the room.
25  I never made -- the only other business, you know,

Page 28

1   deal that I was involved with was going out with
2   Gary Smith to a company called Q&X.  I think it was
3   in Reno, Nevada, and showing them the technology.
4   But Gary was our spokesperson.  And I was
5   there to, essentially, accompany him.  And Jerry
6   was not there.  It was just the two of us.  But
7   that didn't come to fruition, either.
8   Q   Do you remember what Gary Smith's title
9   was?
10  A   He was a technology person.  So he was
11  like manager of technology.  But he ended up
12  leaving the company and working as a consultant to
13  the company.
14  Q   And why don't we finish up looking at
15  Exhibit Number 28, just to make sure we get
16  everything.  If you look at the next page, there's
17  GA1827.  About a quarter of the way from the top,
18  there's an entry for Paul Powers on December 22nd
19  of 2008, 200,000 shares from Jerry Mahabub.
20  A   Yes.  That was my final purchase, and
21  that was the one that I purchased for a dollar.  It
22  was -- Jerry was trying to raise money for the
23  company and so there was a sale to myself and Mark
24  Bobak, and Pedro Suarez and Steve Bagwell?
25  So the four of us all purchased shares

Page 29

1   from Jerry at a discounted price.  But they were --
2   the way I look at it, a different class of share,
3   because they were nonvoting.
4   Q   And what did he say he needed the money
5   for?
6   A   I don't recall.  You know, presumably he
7   was going to loan the money to the company for
8   continuing operations.  The company was chronically
9   underfunded.
10  On several occasions, I suggested that,
11  you know, we try and bring in a venture capital
12  company in.  And Jerry would, essentially, blow up
13  and say -- I'm not putting this on the record,
14  because a lot of it is a lot of vitriol.
15  But he was opposed to that idea.  Didn't
16  want to give up control and didn't think much of
17  venture capitalists.  I was hoping to do it in
18  order to, you know, secure funding because, you
19  know, sometimes you would -- some weeks you would
20  get a paycheck, some weeks you wouldn't.
21  And in order to instill, you know,
22  appropriate controls and, you know, have someone
23  with experience and also with contacts that could
24  expedite, you know, licensing the technology to
25  third parties for sale to the public.

Page 30

1  Q  Okay. And how is it that you became a
2  director of GenAudio?
3  A  Jerry just asked me, along with Mark
4  Bobak. And that is the only corporate document I
5  did keep was the Minutes, where we were elected. I
6  felt that was appropriate, since I was being
7  elected as a director, to hang onto that set of
8  minutes. It's just one page. But it's in the
9  materials I furnished to you.
10  Q  But what were the circumstances then in
11  which he asked -- Mr. Mahabub asked you to become a
12  director?
13  A  He just thought that, you know -- he only
14  had three directors and he thought we needed a more
15  well-rounded board. And he thought I could help
16  with, you know, entering into contracts and, you
17  know, that sort of thing.
18  Q  And what about Mr. Bobak, do you know the
19  circumstances in which he was asked to become a
20  director?
21  A  I suspect it was the same.
22  Q  Is Mr. Bobak an attorney also?
23  A  Yes, he is. He was a former and chief
24  legal officer for Anheuser-Busch Companies.
25  Q  Was he -- and he was an investor, I think

Page 31

1  you said that earlier?
2  A  Yes. He was also an investor. In fact,
3  one of the largest investors.
4  Q  Okay.
5  A  So that could have -- I mean, I don't
6  want to speculate. But that could have played a
7  part in, you know, Mr. Mahabub's decision to ask us
8  to join the Board.
9     And I was very excited about the
10  technology. To me, it was truly revolutionary
11  that, you know, you could get surround sound, which
12  everybody likes to have in their home theaters, but
13  without the hardware.
14     And the fact that it was mobile and could
15  be put into small devices and, in fact, was. You
16  know, Jerry, at one point, demonstrated it in both
17  an iPad and an iPod. And so, you know, to me -- to
18  this day, I think the technology is really
19  tremendous?
20     Unfortunately, I don't think the company
21  was, you know, well run by Jerry, because he
22  wouldn't allow any collaboration.
23     Whenever there was a business
24  opportunity, he would pursue it on his own and then
25  report back. So I never was able to speak to any

Page 32

1  third parties about any potential business
2  collaborations, with the exception of the one,
3  Earhole Studios situation I mentioned earlier,
4  where we did sign a license agreement.
5     But the technology wasn't ready to hand
6  over to their audio engineers. And, frankly, Jerry
7  kind of, you know, just never got back to them.
8  Q  What time period were you a director?
9  A  I became a director on November 6th,
10  2008.
11  Q  Okay. And when did you resign?
12  A  Well, I didn't formally sign a
13  resignation. I didn't think to do it until January
14  13th, 2011. But when I left as an employee, I, you
15  know, wasn't involved in any sort of board meetings
16  or discussion. And that took place in October of
17  2010.
18  Q  Okay.
19  A  It only occurred to me later that I
20  should, you know, send a resignation notice.
21  Q  So the formal letter of resignation
22  wasn't until January of 2011, but you didn't
23  function as a director of GenAudio after the
24  October 15th, 2010 date; is that correct?
25  A  I believe that is correct.

Page 33

1  Q  Okay. And who were the other members of
2  the Board of Directors when you were a director?
3  A  Mark Bobak, myself. And then Jerry
4  had -- and then Jerry, of course, as chairman. And
5  then the other two directors were Elliot Mazer, and
6  I believe M-A-Z-E-R, and Ted Cohen.
7     Elliot Mazer was, apparently, a fairly,
8  well-known recording studio person. And Ted Cohen
9  was just involved in the music business, in a
10  variety of capacities.
11     When I first joined the board, they were
12  receiving $10,000 a month as director fees. And so
13  one of the first things I did was, you know, to
14  explain to them, that this small company can't
15  afford to do that. You know, you need to take --
16  none of us should be taking any money. We need
17  that for cash flow purposes.
18     You know, warrants are more appropriate,
19  that way if the company is successful, you know,
20  your warrants will be meaningful.
21     So that happened during the 2009 consumer
22  electronics show. We had that meeting and Jerry
23  put that upon me, so I didn't get off to the
24  greatest of starts with the other -- with two of
25  the directors, delivering that message.

Page 46

1  Q  Was that your full-time job, at that
2  time?
3  A  Well, yes.
4  Q  Okay. And did it occupy your time?
5  A  I certainly had more capacity to do more
6  things. I just -- you know, I was led to believe
7  the technology was ready to go and Jerry had, you
8  know, potential licensees all lined up. So my
9  expectation was that I would be, you know, engaged
10 in negotiation -- contract negotiations and doing
11 contracts and nondisclosure agreements.
12     And that's pretty much what I've done my
13 entire legal career, is contract work. And when I
14 got there, I found out that, you know, the
15 technology, you know, while it was very impressive
16 for the demonstration purposes, needed to be
17 compressed down in order to be put into smaller
18 devices.
19     And also, you know, we continued to run
20 into problems with the Astound Stereo Expander
21 product that we were selling. And then I was
22 trying to come up, you know, with some marketing
23 ideas where we could potentially go, maybe college
24 campuses, give demonstrations there, you know, that
25 sort of thing.

Page 47

1  Q  And where had you been employed previous
2  to this?
3  A  Anheuser-Busch Companies for 17 years.
4  Q  Okay. And what was your position there,
5  your last position, at that time?
6  A  Associate general counsel was my position
7  my entire time there.
8  Q  Okay. And so then, was there a point in
9  time between the May 1st, '09 and the October 15th,
10 2010 that you did anything else?
11 A  No.
12 Q  Okay. So the whole time, that was your
13 position, was with GenAudio?
14 A  Yeah, I didn't have any other positions.
15 Q  Okay.
16 A  Candidly, once I saw what the situation
17 was, when I got out there, and the fact it was far
18 different than, you know, I had expected, you know,
19 I was also job searching.
20 Q  Okay. And did you give up your job at
21 Anheuser-Busch specifically to go with GenAudio?
22 A  I did. Yeah, I regret that.
23 Q  And what was your reason? I think you've
24 kind of told us, but I just want to make sure we
25 get it all in one statement.

Page 48

1  A  Well, I thought the technology was
2  incredible. I thought this was, you know, like you
3  read in the paper, you know, one of those companies
4  that could really go from nothing to a billion
5  dollar company, because I -- to me, it was
6  groundbreaking that you could create surround sound
7  through software, without any hardware devices.
8     So if you think about the application of
9  that, whether it's an iPod, you know, that
10 someone's just jogging with or, you know, that
11 there's, you know, hundreds of potential
12 applications. Any time sound is involved, it's a
13 way to enhance that sound.
14 Q  After May 1st of '09, how soon after that
15 did you decide that the Denver office needed to be
16 closed?
17 A  Well, I took one look at it and realized
18 this was a lot of space. And so I inquired as to,
19 you know, Jim Divine, you know, when was the lease
20 up and, you know, did we really need this much
21 space. And so when the lease was up, we, you know,
22 got out of it.
23 Q  And it was a month-to-month, at that
24 time?
25 A  I don't recall --

Page 49

1  Q  Okay.
2  A  -- exactly when it went month-to-month.
3  Q  Okay. And what was the office setup
4  then, that you're referring to, at that time? What
5  was the -- just the setup of the office?
6  A  The physical setup?
7  Q  Yeah.
8  A  Well, it was on the second floor of a
9  building in a -- you know, in an area near a small
10 private airport. And you would walk in and there
11 was a fairly large room with a whiteboard on the
12 wall and a storage closet. And then all along --
13 it was like an L-shape. All along the other wall
14 there were offices, Jerry's office and then Jim
15 Divine's office and then Recy Pilloud's office and
16 then Gary Smith's office and then kind of around
17 the corner was Walt Horat's office.
18     And there was a storage room that they
19 could have made an office for me, but I declined
20 and said, look, I just want to be out here in the
21 middle. So I just set up a temporary table, so
22 that was kind of the office setup.
23 Q  So when you first started --
24 A  And also -- I'm sorry.
25 Q  Go ahead.

Page 54

1  Mahabub said that the technology was ready to embed
2  in consumer electronic devices?
3      A   Well, you know -- you know, much of this
4  I read in the materials that he wrote, so -- and
5  the demonstrations that he gave, which were pretty
6  impressive.
7          You know, he -- you can see some screen
8  shots of it in the PPM.  But he had a device with a
9  four dimensional mouse and he could do
10 demonstrations and move sound anywhere in the room.
11 And all there were were two speakers.
12         So it sure looked like it was, you know,
13 ready to go, to me.
14     Q   Okay.
15     A   So I guess rather than saying it was a
16 statement, it's more of a conclusion that I drew,
17 based on what I read and what I saw.
18     Q   During the time you were employed at
19 GenAudio, did you have any role in drafting any of
20 the shareholder communications?
21     A   Jerry would always draft the shareholder
22 communications in the private placement memorandum.
23 I will say that I would read them and, you know,
24 correct grammatical errors.  But, you know, all the
25 stuff, you know, he wrote.

Page 55

1          I would try to tone them down.  I would
2  try to, you know, put words in that, you know -- I
3  would try and make sure whatever was said, you
4  know, could be proven or at least, you know, was
5  expressed as an expectation.
6          And then, you know, I would encourage
7  Jerry to make sure that all of this was run through
8  outside securities counsel.
9      Q   Who was that, at the time?
10     A   His name was Ben Huber, HUBER.
11     Q   Okay.
12     A   And he was with the Law Firm of Traurig,
13 and Traurig is T-R-A-U-I-G.  And so everything --
14 all the PPMs would be blessed by him.
15         Jerry and I would, you know, butt heads
16 on expenses, his expenses.  So, frankly, after, you
17 know, a couple of months, you know, we didn't
18 really -- we would communicate by e-mail, but we
19 wouldn't really -- I was not a confidant of his.
20 Let me put it that way.  And so he then kind of
21 turned to Mr. Mattos to, you know, to assist him in
22 those shareholder communications.
23         So Jerry always wrote them.  He always
24 did the first draft.  He always did the last draft.
25 In between, you know, he would solicit input from,

Page 56

1  you know, initially me, but then Mr. Mattos.
2      Q   Did any of the other board members review
3  communications before they went to shareholders?
4      A   I really can't say.  Certainly that
5  wasn't their primary function.  Gary -- the
6  technological people were focused on working on,
7  you know, working on the technology and things.
8          I know that Jim Divine would be involved,
9  because he would, you know, provide financials or
10 Jeremy would ask him to do some sort of
11 financial -- all financial elements were done by
12 Jim Divine, under the direction of Jerry Mahabub.
13     Q   Okay.  And then, I know you said that you
14 didn't do any legal work, correct?
15     A   Well, that might be a little bit of an
16 overstatement.  You know, there might be like a
17 non-compete -- I'm sorry, a nondisclosure agreement
18 that I would look at from a company, sometimes?
19         Jerry had a tendency to just -- you know,
20 he was so anxious to try to get a deal done, that
21 if they handed him something, he might sign it on
22 the spot, which I believe is what happened with
23 Apple.  In fact, I know that's what happened with
24 Apple.  There was no opportunity to negotiate
25 anything.

Page 57

1          The license agreement with Earhole
2  Studios, I was involved with drafting early on.  I
3  was the primary drafter of that.  But, you know,
4  that would kind of be it, in terms of legal work?
5          I didn't have any securities knowledge or
6  background so, you know, all of that would go to
7  Ben Huber, as outside counsel.
8          The other thing I would get involved with
9  is, you know, eventually, you know, Jerry would get
10 into a dispute with somebody.  So he had a dispute
11 with a gentleman by the name of Holger Thiele,
12 T-H-I-E-L-E, a fellow from Germany, over -- who
13 owned a piece of equipment out of the studio that
14 they were both, you know, working on and finishing
15 up and, you know, there were arguments.
16         Sometimes I think they may have pooled
17 their money to buy a piece of equipment, which was
18 fine when everybody was getting along.  And then
19 when, you know, they weren't getting along, you
20 know, there was a dispute.  So I tried to resolve
21 that.  It never was resolved.
22         So that was one thing I did.  I don't
23 know if you call that legal work or not.  I was
24 just, you know, trying to resolve a dispute and I
25 was able to do.  So I would have done a settlement

Case 1:15-cv-02118-WJM-SKC   Document 84-27   Filed 02/16/18   USDC Colorado   Page 9 of 18

Page 70

1  Q   Now, you mentioned Apple earlier, how did
2  Mr. Mahabub communicate the status of his dealings
3  with Apple to you, personally?
4      A   To me, personally, he would send off
5  e-mails to the group.  I don't know that I received
6  any one-on-one e-mails from Mr. Mahabub.
7      Q   What about just conversations about the
8  status that were outside of the context of e-mails?
9      A   None come to mind.  I know that, you
10 know, I asked Jerry if I could accompany him, you
11 know, to a meeting there.  You know, I wanted to
12 verify that he was, in fact, having discussions
13 there and having the type of discussions that he
14 was describing in his e-mails.  He was very excited
15 about the prospects of, you know, having some sort
16 of, you know, business agreement with them.
17     Q   He made statements during board meetings,
18 I assume, is that correct, about the status with
19 Apple?
20     A   He would give updates about discussions
21 he's had with, you know, whomever he was speaking
22 with.
23     Q   Okay.  Was there anything out of the
24 context, of either the board meetings or e-mails to
25 the group, where you can recall being given

Page 71

1  information from Mr. Mahabub as to Apple, you,
2  personally?
3      A   Me, personally?
4      Q   Yeah.
5      A   To just myself, no.
6      Q   Okay.  Now, what happened when you wanted
7  to go to visit Apple with him?  What happened with
8  that?
9      A   He kind of -- he sent an e-mail.  It was
10 in a larger context.  I mean, I wasn't the only one
11 on it, saying Paul asked to go.  And, you know,
12 look at the response I got.  And the response was,
13 no, we only want you to be there.
14     Q   Response from whom?
15     A   From some -- I don't recall who it was.
16 But, you know, some Apple representative.
17     Q   Do you know if he told that Apple
18 representative what your position was with the
19 company?
20     A   No idea.
21     Q   That was not in the e-mail?
22     A   No.
23     Q   Wasn't included in the e-mail?
24     A   No.  He was just responding to my request
25 to accompany him.  Since, again, I came to the

Page 72

1  company with the impression that that would be the
2  types of things that I would be doing.  I really
3  didn't have much of a role at the company.  I
4  didn't have a lot to do.
5      Q   Okay.  And did Mr. Mahabub imply that he
6  had told the people at Apple who you were and --
7  with the company, as opposed to someone who was
8  outside the company?
9      A   No.  I think he -- I don't know what he
10 implied to them.  It was just his response.  And it
11 was like, you know, laughing that, you know, that I
12 would want to, you know, be there.  That I would
13 have added value.  I don't know.
14     Q   Do you know the name of Victor Tiscareno?
15     A   I've heard of it, and I've seen it in
16 e-mails.  I've never spoke to him or met him.
17     Q   Do you know if Mr. Tiscareno, in the time
18 period that you were COO of GenAudio, if Mr.
19 Tiscareno knew you had a position with GenAudio?
20 Do you know if that was ever made clear to him?
21     A   I have no idea.
22     Q   Okay.
23     A   I suspect not.  I don't think that was
24 Jerry's focus, when he spoke to Mr. Tiscareno.  I
25 think he was focused on, you know, what are the

Page 73

1  next steps for the company to prove itself to, you
2  know, to get into your products for us, to do some
3  sort of, you know, deal.
4      Q   Were you able to verify, to your
5  satisfaction, that Mr. Mahabub was having the
6  dealings with Apple, as he presented them to you
7  and the other board members?
8      A   Well, I reached that conclusion on the
9  basis of seeing, you know, Mr. Tiscareno's name on
10 some e-mails.  And the fact that Mr. Divine, the
11 vice president of finance, you know, was
12 complaining that, you know, about the cost of Jerry
13 making so many visits there.
14         So -- and then, you know, everything that
15 Jerry wrote in the -- either the shareholder
16 updates or the PPM, you know, those three elements
17 taken together, led me to believe that, you know,
18 not only were discussions -- you know, substantive
19 discussions happening, but that, you know, things
20 were very positive.  He also had mentioned other
21 names besides Victor Tiscareno.
22     Q   When you saw e-mails that came --
23 purportedly came from anyone at Apple, did you ever
24 receive those directly or were they simply --
25     A   No.

19 (Pages 70 to 73)

Page 74

1   Q   -- e-mails -- were they simply e-mails
2   forwarded from Mr. Mahabub to you and others?
3   A   They were e-mails forwarded from Mr.
4   Mahabub to me and others.
5   Q   Okay. Did you participate in any
6   meetings with Apple at all?
7   A   None.
8   Q   Did you ever participate in any phone
9   calls with anyone from Apple?
10  A   No.
11  Q   Did you ever participate in any phone
12  calls with Victor Tiscareno, in particular?
13  A   No.
14  Q   Did you e-mail, or otherwise communicate
15  directly, with anybody at Apple?
16  A   No.
17  Q   Did you e-mail, or otherwise communicate
18  directly, with Mr. Tiscareno, in particular?
19  A   No.
20  Q   You earlier mentioned that you did have a
21  conversation with Mr. Gary Allen and a couple other
22  shareholders about the LCEC status; is that
23  correct?
24  A   Yes.
25  Q   Okay. The LCEC is Apple; is that right?

Page 75

1   A   Yes.
2   Q   Do you recall how that came about that
3   the Apple is known as the LCEC?
4   A   That was Jerry's acronym, although, among
5   others, sometimes they were CE and then LCEC. I
6   even heard him once refer to them as the fruit
7   company.
8   Q   Other than Mr. Mahabub, who else at
9   GenAudio did you understand was involved in
10  dealings with Apple, if anyone?
11  A   The only person that I believe
12  accompanied Jerry there was Walt Horat, because he
13  had -- he was the programmer that was, from what I
14  was told by Jerry, working on putting the
15  technology into various Apple products. So I
16  believe Walt Horat was there, at least once.
17  Q   Do you know how many times?
18  A   I can only think of once.
19  Q   Okay. Was that --
20  A   And I don't know that, you know, for a
21  fact. But that was what I was told.
22  Q   Okay. Did you ever talk to Mr. Horat
23  about anything that happened at Apple?
24  A   No. We didn't get along all that well.
25  He was, apparently, you know, a very, very good

Page 76

1   software programmer. But, you know, also a source
2   of irritation with the other programmers in the
3   office, as I mentioned earlier, with respect to his
4   hours and his work ethic.
5   Q   Other than Mr. Mahabub, was there anyone
6   else at GenAudio that kept you apprized of the
7   status with Apple?
8   A   Status, no. Mr. Divine would, you know,
9   mention, you know, expenses that he felt were --
10  you know, could have been, you know -- the visits
11  could have been done less expensively --
12  Q   Mr. Divine --
13  A   -- in Mr. Divine's opinion.
14  Q   Mr. Divine didn't have any participation
15  in actual talks with Apple, though, correct?
16  A   Not that I'm aware of. I think he would
17  have mentioned it, if he had.
18  Q   Okay. When did you first learn of
19  dealings between Apple and GenAudio?
20  A   I don't recall.
21  Q   Was it before you were employed?
22  A   No.
23  Q   Okay. So it was after you were a board
24  member?
25  A   Well, I was a board member before I was

Page 77

1   employed.
2   Q   Right --
3   A   So, no.
4   Q   -- that's why I -- okay. So not until
5   you became COO and acting GC?
6   A   You know, I actually don't remember.
7   Q   Okay. But it wasn't until you were, in
8   some way, affiliated with GenAudio; is that right?
9   A   Yes. I think so.
10  Q   Okay. Prior to you leaving GenAudio, did
11  you have any understanding that Apple was no longer
12  interested in pursuing a transaction with GenAudio?
13  A   Yes.
14  Q   When did you come to that understanding?
15  A   Again, I don't -- I can't give you a date
16  or even a range.
17  Q   But it was before you left?
18  A   Yeah. And even then, I wasn't sure if
19  everything ended up that there was no possibility.
20  You know, somehow, you know, Jerry had directed his
21  energies elsewhere. And, you know, he went on to
22  have several discussions with Panasonic and others
23  about the technology.
24  Q   Okay. And what was your basis for
25  believing that there was -- that Apple was no

Page 86

1  Q   Okay.  And other than what you were
2  communicated to by Mr. Mahabub, is there any other
3  way in which you ever got an understanding as to
4  Apple's status with GenAudio?
5  A   Other than Jerry's communications?
6  Q   Yes.
7  A   No.
8  Q   Okay.  Mr. Powers, let me hand you
9  Exhibit Number 3.  This is the NDA with Apple.
10 Have you ever seen this before, this NDA?
11     A   I don't think so.  I've certainly, you
12 know, heard Jerry reference it.  And I asked to see
13 it.  But I don't believe I ever was able to see it.
14     Q   Okay.
15     A   You know, that was kind of dismissed when
16 I asked to see it, you know.
17     Q   So you were never asked to review this
18 before Mr. Mahabub signed it?
19     A   No.  Certainly not.
20     Q   Can you recall what the discussions were
21 about, this NDA?
22     A   He had just mentioned that he had signed,
23 you know, their standard NDA.  And, therefore, you
24 know, we shouldn't discuss the fact that
25 discussions were going on with Apple.

Page 87

1  Q   Okay.
2  A   Although he made it, you know, pretty
3  clear by the way he acted in some of his
4  references, you know, that -- who he was talking
5  about.
6  Q   And what are you referring to?
7  A   Well, the LCEC, calling somebody the
8  fruit company, a large consumer electronics
9  company, utilizing an iPod and an iPad for
10 demonstration purposes, you know, that sort of
11 thing.
12     Q   Did you believe that GenAudio's
13 nondisclosure agreement with Apple prohibited
14 GenAudio from disclosing to shareholders the
15 existence of the discussions with Apple?
16     A   I never saw the document, to my
17 knowledge.
18     Q   So you weren't able to reach any
19 conclusion about it?
20     A   Right.
21     Q   Okay.  So you didn't actually see the
22 provisions?
23     A   No, I didn't.
24     Q   Okay.
25     A   I was -- again, you know, everything I

Page 88

1  know about Apple came from Jerry, in one fashion or
2  another.
3  Q   Okay.  Let me hand you Exhibit Number 57.
4  And, please, go ahead and take your time to read
5  that to yourself, whatever you want to do to
6  familiarize yourself with it.
7  A   This is certainly Jerry's typical tone.
8  Q   Have you reviewed it, so I can ask you
9  some questions?
10     A   Yeah.
11     Q   Okay.  Did you receive this e-mail from
12 Mr. Mahabub?
13     A   Well, it says I did.  So, although I
14 don't have a specific recollection of it, I presume
15 so, yes.
16     Q   And was that your e-mail address at the
17 time, ppowers@genaudioinc.com?
18     A   Yes.  Yeah, that sounds right.
19     Q   Okay.  Did you forward this e-mail to
20 anyone?
21     A   No.
22     Q   Did you tell anyone about the contents?
23     A   Not -- no.  I mean, not that I recall.
24     Q   Okay.
25     A   That's not something I would have -- I

Page 89

1  doubt very much that I would have done that.
2  Q   Okay.  Do you have an understanding as to
3  what happened between GenAudio and Apple between
4  signing the NDA in July of 2009 and this date,
5  October of 2009?
6  A   What happened?
7  Q   Yeah, between the two companies.  Were
8  you --
9  A   I wasn't involved.  You know, as he says
10 here, when the time comes, I'll bring on the legal
11 team, that being Paul, Mark, Ben and Craig to
12 assisting with finalizing the deal.
13         So I can only presume that between those
14 two time periods that, you know, Jerry had been
15 meeting with them and providing demonstrations and
16 they were asking for additional elements.
17     Q   And I understand that you're -- that's --
18 once you've gotten this e-mail, that's what you're
19 assuming.  Do you have any understanding of what
20 actually transpired between Apple and GenAudio,
21 between the signing of the NDA and this e-mail,
22 Exhibit 57?
23     A   No.
24     Q   Was there any communication with Mr.
25 Mahabub between signing the NDA and your receipt of

23 (Pages 86 to 89)

Page 90

1 Exhibit Number 57 about Apple, that you can recall?
2     A   When was the NDA?
3     Q   July of 2009.
4     A   Between July and October?
5     Q   Yes.
6     A   I don't recall any. But I presume that
7 there were probably several e-mails.
8     Q   Okay.
9     A   He had tendency to send these long,
10 somewhat rambling, e-mails to about what was going
11 on.
12     Q   So if there was communication about the
13 dealings with Apple between July, October, it would
14 have been in an e-mail from Mr. Mahabub?
15     A   I don't know.
16     Q   If there was.
17     A   More likely than any other communication
18 manner.
19     Q   What I want to make sure we cover is, is
20 if you independently recall, when we go through
21 these time periods, any meetings, any discussions
22 with Mr. Mahabub, outside of the receipt of an
23 e-mail, or if we are looking at minutes of a board
24 meeting.
25     A   No. I don't recall any.

Page 91

1     Q   Okay.
2     A   No. I don't recall.
3     Q   Okay. Do you know if Mr. Mahabub had the
4 meeting with Apple that he's referencing in this
5 e-mail?
6     A   Well, he said he had two great meetings,
7 back to back.
8     Q   Right.
9     A   So --
10     Q   And what I'm trying to cover at this
11 point --
12     A   -- it says it was, well, received today
13 at Apple.
14     Q   Right. And I know the e-mail then speaks
15 for itself. But what I'm going to try to ask you
16 is, if you independently know --
17     A   I --
18     Q   -- of contents in the e-mail?
19     A   I have no independent knowledge of any
20 contents in the e-mail, because I was never at
21 Apple. And, frankly, you know, just not in the
22 loop.
23     Q   Outside of what's in the e-mail, were you
24 told any details of this purported meeting at
25 Apple?

Page 92

1     A   No.
2     Q   How do you know who Phil Schiller is?
3     A   Not that I can recall. Because he was in
4 Jerry's e-mails, from time to time.
5     Q   But you said he was the marketing guy.
6     A   Yeah, I didn't -- I was skeptical. And
7 so I Googled Apple and saw that he was, indeed, you
8 know, a real person and that was his title, as I
9 recall. It might have been something else. But I
10 know he was a marketing person.
11         And I recall Jerry, you know -- I
12 recall -- I have a general recollection of him
13 being mentioned in Jerry's e-mails as the
14 marketing --
15     Q   Okay.
16     A   -- person.
17     Q   Do you know if Mr. Mahabub ever met with
18 Phil Schiller?
19     A   I have no independent knowledge that Mr.
20 Mahabub met with Phil Schiller, beyond him
21 purporting to have met with him, in the e-mails.
22     Q   Okay. The second paragraph that starts
23 Vic and I are working, do you see that one?
24     A   Yes.
25     Q   The second line says -- well, I guess

Page 93

1 it's the second sentence there. It says, my
2 confidence level is at 80 percent, as of now. We
3 will be doing a sweet deal with Apple, paren,
4 pending the big man's approval and he is the final
5 say, as it should be, hyphen, he is the CEO and
6 founder of Apple, closed paren.
7         Do you have an understanding of who Mr.
8 Mahabub was referencing when he talked about the
9 big man and the CEO and the founder of Apple?
10     A   Well, it's pretty obvious, Steve Jobs.
11     Q   Did Mr. Mahabub ever say that he met with
12 Steve Jobs, outside of any e-mail or communication
13 that we may see later?
14     A   Yes.
15     Q   So he -- what was the context of that?
16     A   I don't remember the context. He once
17 communicated that he had lunch in Apple's cafeteria
18 and was introduced to Mr. Jobs.
19     Q   Do you recall any more details about
20 that?
21     A   No.
22     Q   Do you have --
23     A   Well, I --
24     Q   Go ahead.
25     A   The only other detail I recall is that,

Page 110

1  A  Only by Mr. Mahabub.
2  Q  Okay. Did you ever tell anyone that the
3  LCEC referenced Apple?
4  A  I may have.
5  Q  Do you recall who?
6  A  Probably friends of mine that got
7  involved with, you know, investing in the original
8  PPM that I invested in back in 2008, I think.
9  Everybody knew who LCEC was. It was kind of
10 ridiculous because, you know, when Jerry would meet
11 with potential investors, you know, he would have
12 separate discussions with them, or he would refer
13 to them as the fruit company, or he had an iPad or
14 an iPod and, you know, it was kind of, you know,
15 misleading.
16 Q  And that was with shareholders, correct?
17 When you're talking about these things. It's not
18 just the e-mails that we saw that referred to the
19 fruit company and things like that. He would say
20 that in front of shareholders?
21 A  Shareholders or, yeah, potential
22 shareholders when he was trying to, you know --
23 when he was, you know, having -- giving out the
24 PPMs and having a presentation.
25    So, you know, I always viewed LCEC as not

Page 111

1  a very well-guarded secret. So it wouldn't
2  surprise me that, you know, if I was speaking to
3  somebody that I knew well, that I would mention the
4  word Apple.
5  Q  When you had that conversation with Gary
6  Allen, and the other shareholders, was it clear
7  that they knew that the LCEC referenced Apple?
8  A  Yes, I believe so.
9  Q  Okay. And do you know where they got
10 that belief?
11 A  Probably -- I don't.
12 Q  Okay.
13 A  But I don't think it would be hard for
14 them to figure out.
15 Q  Okay. And do you know if GenAudio's
16 technology ever got beyond the demonstration stage
17 with Apple?
18 A  My guess is they probably got it from
19 Jerry. He probably had conversations with them.
20 But I don't know for sure.
21 Q  When you had the discussions with them
22 about whether the LCEC transaction would actually
23 happen, did they actually talk about the LCEC or
24 did they talk about Apple, Gary Allen and the
25 others; do you recall?

Page 112

1  A  I don't recall.
2  Q  Okay. So -- sorry, go ahead.
3  A  Or they could have gotten it from Jim
4  Mattos, because he had conversations with them, as
5  well. So I wouldn't be surprised if they
6  referenced it as Apple, but I don't have the
7  specific recollection. I'm sorry.
8  Q  That's okay. Let me ask you one more
9  question about this and then let's -- before we
10 quit, we'll cover the thing about Jim Mattos and
11 Gary Allen.
12 A  Okay.
13 Q  Did GenAudio's technology, to your
14 knowledge, ever get beyond the demonstration with
15 Apple; do you know?
16 A  I do not -- I don't believe Apple ever
17 sold a product that had the technology in it, if
18 that's what you're asking.
19 Q  Yeah, I'm actually asking if --
20 A  I think --
21 Q  Go ahead.
22 A  -- it was just strictly at the
23 demonstration stage, across a variety of Apple
24 products.
25 Q  Okay. And my question is, do you know if

Page 113

1  Apple, themselves, ever embedded the product in any
2  of their products, as opposed to Mr. Mahabub
3  demonstrating it on products?
4  A  Well, I don't know. Because, again, I
5  wasn't there. And I wasn't privy to the
6  discussion. And, frankly, at this point, Jerry and
7  I were hardly talking to each other.
8     But, you know, who embedded it? I was
9  under the impression that we embedded our
10 technology into their products, utilizing some sort
11 of, I think they called it an SDK, which is some
12 type of standard developer kit, I believe, that
13 would allow us to, you know, access their product
14 just to bypass their security.
15    So they would give kind of, you know, a
16 hardware product that didn't have the normal
17 security that would keep somebody from cracking
18 into it and messing around with it.
19 Q  Okay. Now --
20 A  But that's a layman's description of the
21 process, as best I can.
22 Q  After you left GenAudio, and you were
23 working at SeaWorld, did you receive some
24 communication from some shareholders who were
25 complaining about representations that Mr. Mattos

Page 122

1  paragraph; in the first paragraph he uses fruit
2  company. I don't know.
3      He wasn't really trying to hide the fact
4  that it was Apple, that he was purportedly having
5  discussions with very well.
6      Q   Let me hand you Exhibit Number 62, and
7  same thing. Why don't you go ahead and look at
8  that. And when you're ready, I'll ask you some
9  questions. And there are -- I do have questions
10 about things on the first page, so go ahead and
11 look at that.
12     A   I've read this. I do not believe I've
13 ever read this before. My name is listed as a
14 recipient. I could have just ignored it. At this
15 point -- it's dated May 2nd, 2010. I was -- I
16 could have easily ignored this e-mail, because my
17 real focus was trying to find new employment and
18 getting out of GenAudio. This one I have
19 absolutely no recollection or familiarity with.
20     Q   Okay. Now, the very first sentence says
21 number -- under Number 1 it says, meeting the CEO
22 of the LCEC this coming Wednesday. Do you recall
23 ever being discussion about an actual meeting being
24 set between Mr. Steve Jobs and Jerry Mahabub?
25     A   No, I don't. And that's one of the

Page 123

1  reasons why I don't believe I ever -- I don't know
2  if I ignored the e-mail or what, but that's
3  something I would have recalled. Because that
4  would have been monumental for us.
5      Q   And Number 7, it says Greg and I can now
6  get back to wrapping up the new investor
7  presentations, quote, movie, unquote, with all our
8  demos embedded in the movie file, my voice
9  narrating.
10     Do you recall an investor presentation
11 movie that was sent out to shareholders?
12     A   No. I absolutely don't. That's the
13 second reason why I don't believe I ever seen this,
14 nor do I think there was an investor presentation
15 movie, at least not that I was aware of or saw.
16     Jerry did his demonstrations utilizing a
17 PowerPoint format and some headphones. So he had
18 some wireless headphones and he would demonstrate
19 what the sound was like. And then he was able to
20 use his 4D controller and actually draw a sound
21 path. And people wearing the headphones could, you
22 know, follow and see, at the same time, the sound
23 path that was drawn.
24     So I'm -- I know nothing about a movie of
25 any type.

Page 124

1      Q   And this is lengthy. I'm going to hand
2  you Exhibit Number 89, in conjunction with what you
3  already have in front of you, Exhibit 62. This is
4  a transcript of an audio presentation. The movie
5  was not produced to us, but the actual audio of the
6  movie was produced to us.
7      A   Okay.
8      Q   And I don't need you to obviously read
9  every word, but from what you've said, and please
10 feel free to look at it, if you need to, to answer
11 my question, did you have anything to do with
12 writing the script for the presentation which is in
13 Exhibit Number 89?
14     A   Without even looking at any of the 56
15 pages, I can tell you I had absolutely nothing to
16 do with writing the script for this. As I
17 mentioned, I knew nothing about a movie. You know,
18 just to reiterate, at this time, Jerry was spending
19 all of his time in Los Angeles. I was in my
20 basement in St. Louis, basically job hunting. And
21 I know nothing about a movie. So, therefore, I
22 know nothing about a movie transcript.
23     Q   Okay.
24     A   No. Sorry, I've never seen either of
25 these documents before.

Page 125

1      Q   Okay. And am I correct, though, that you
2  may have seen Exhibit 62, but you don't recall
3  having actually read it, if you received the
4  e-mail?
5      A   I don't think I've seen it or read it.
6  But my e-mail address is at the top. So, you know,
7  I can't reconcile my lack of recollection with the
8  fact that it purports to be -- to include me in the
9  address line.
10     Q   Okay. And then let me hand you Exhibit
11 Number 63 and we'll just go through the same thing.
12 If you can go ahead -- and you'll want to read the
13 whole thing.
14     A   Okay.
15     Q   Do that. And then we'll -- you tell me
16 when you're ready and I'll ask you some questions.
17     A   Okay.
18     Q   One thing I want to make sure that you
19 look at, for the next few exhibits, is Exhibit
20 Number 63. Is dated May 5th, 2010 at 7:22 a.m; do
21 you see that?
22     A   I do.
23     Q   Do you recall receiving this e-mail?
24     A   I do not.
25     Q   Okay. But you're addressed on here,

Page 126

1 correct?
2    A  My name is in here in a couple of places.
3    Q  Okay. Do you recall anything around this
4 time about there being at least an important
5 meeting scheduled at Apple, whether or not it was
6 to involve Mr. Mahabub or not?
7    A  I do not.
8    Q  Okay.
9    A  Nor do I recall any sort of proposal from
10 Asia Pacific Capital.
11    Q  And just so we can be clear on that, that
12 is in Paragraph 4, correct?
13    A  Four.
14    Q  There's a reference --
15    A  Asia Pacific Capital, there is a
16 reference about Jerry giving a one-on-one
17 presentation to the CEO of Asia Pacific Capital. I
18 was referring to Paragraph 6, at the end, where it
19 says, you know, Paul and I will be reviewing your
20 proposal to us later on today.
21    Q  And that's what I was going to then ask
22 you. This is -- do you know what that's referring
23 to?
24    A  It purports to -- my reading of it is
25 that it refers to some sort of proposal from Asia

Page 127

1 Pacific Capital, to be utilized as an alternative
2 for negotiating leverage for a meeting with Steve
3 Jobs, that the company would have other
4 alternatives. But I can tell you, I've never seen
5 anything of the like.
6    Q  Okay. And am I correct, in that, even if
7 it wasn't Asia Pacific Capital, there was no deal
8 like this, proposal, from anyone, at that time,
9 that you were involved in?
10    A  That is correct. And again, I was a big
11 proponent of trying to bring in a venture capital
12 fund because I felt like, you know, it would create
13 better corporate governance and more control, where
14 Jerry could just do whatever Jerry wanted, whenever
15 he wanted. And that they would bring both capital
16 expertise and contacts to the table, all of which I
17 thought the company needed?
18      And Jerry would not have anything to do
19 with that, because he didn't want to give up any
20 control, whatsoever. And generally had, you know,
21 extremely negative things to say about, you know,
22 venture capital vultures, I believe, was the word
23 that he liked to use.
24      So to see this, you know, it's completely
25 180 degrees from what I know to be his attitude

Page 128

1 towards venture capital firms.
2    Q  Do you know who he's referring to when he
3 says Sam?
4    A  The only Sam that I'm aware of is Sam
5 Khoury. Where do you see it?
6    Q  Oh, okay. At the very bottom it says
7 Paul, Sam. And most likely the very last line --
8    A  Presumably --
9    Q  Got you?
10    A  -- that would be in reference to Sam
11 Khoury --
12    Q  Got you.
13    A  -- Of Inavisis.
14    Q  Okay. Got you?
15    A  And he may have, you know, thought that
16 he would come and -- and this is the team that he
17 would create, which would be myself and Sam, and I
18 don't know, perhaps others. But it never happened.
19    Q  Okay.
20    A  And again, I requested to attend a
21 meeting, since he purportedly had so many meetings
22 with Apple, because, you know, I wanted to get a
23 firsthand impression of where things stood. And
24 also, you know, hopefully counterbalance, you know,
25 Jerry a bit, in terms of personality.

Page 129

1    Q  And what do you mean by that?
2    A  Have you met Jerry?
3    Q  I can't tell you anything.
4    A  You can't answer. Okay. So Jerry's
5 personality is very dominating and could put people
6 off, in my personal opinion, because he can come
7 across as a bit of a know-it-all. And has very
8 strong opinions about whatever subject you may be
9 discussing. And, you know, is not very flexible.
10      So, you know, having been involved in
11 business negotiations, in my previous employment
12 experience, I know that temperament is not always
13 the best temperament in order to find some middle
14 ground on which to, you know, strike at a mutually
15 acceptable arrangement.
16      (SEC Exhibit No. 98 was marked
17      for identification.)
18    Q  Mr. Powers, let me hand you Exhibit
19 Number 98. This is Number JM2045 and 2046. It's a
20 few e-mails. The first one begins on May 6th 2010
21 at 5:32 a.m. Jerry Mahabub is writing. We don't
22 know who the recipients are. It doesn't say.
23      Then above that on 5/6/10, Elliot Mazer
24 responds to Mr. Mahabub at 7:44 a.m. And then on
25 May 6th at 12:00 p.m. Mr. Mahabub responds to Mr.

Page 190

1  **Q  Have you spoken with anyone else**
2  **regarding the fact that you're appearing here**
3  **today, other than Mr. Divine and the people that**
4  **you e-mailed?**
5      A   My wife.
6  **Q  Okay. And do you know anyone else who's**
7  **been subpoenaed or testified in this investigation?**
8      A   Yes. Mr. Divine told me that Mr. Mattos
9  had been deposed. And that Mr. Mahabub was going
10 to be deposed, and his lawyer got it pushed off or
11 something like that.
12 **Q  Okay.**
13     A   That's all I know.
14 **Q  Okay. And have you heard anything about**
15 **the substance of anyone else's testimony in this**
16 **investigation?**
17     A   No.
18 **Q  Have you spoken to anyone about the**
19 **substance of your testimony in this investigation,**
20 **what it was going to be?**
21     A   No. I didn't know what questions you
22 were going to ask.
23     MS. OSTROM: Okay. And Mr. Powers, we
24 have no further questions, at this time. We may,
25 however, call you again to testify in this

Page 191

1  investigation. And should this be necessary, we
2  will contact you.
3      Is there anything that you wish to
4  clarify or add to the statements you have made
5  today?
6      THE WITNESS: No. I don't think so.
7      MS. OSTROM: And we are off the record at
8  3:30 p.m. on February 27th, 2015.
9      (Whereupon, at 3:30 p.m., the examination
10 was concluded.)
11         * * * * *

Page 192

1  PROOFREADER'S CERTIFICATE
2
3  In the Matter of:   GENAUDIO, INC.
4  Witness:      Paul B. Powers
5  File Number:     D-03450-A
6  Date:         Friday, February 27, 2015
7  Location:       Orlando, FL  32801
8
9      This is to certify that I, Donna S. Raya,
10 (the undersigned), do hereby swear and affirm that
11 the attached proceedings before the U.S. Securities
12 and Exchange Commission were held according to the
13 record and that this is the original, complete,
14 true and accurate transcript that has been compared
15 to the reporting or recording accomplished at the
16 hearing.
17
18 _____      _____
19 (Proofreader's Name)      (Date)

Page 192

1           PROOFREADER'S CERTIFICATE
2
3   In the Matter of:    GENAUDIO, INC.
4   Witness:             Paul B. Powers
5   File Number:         D-03450-A
6   Date:                Friday, February 27, 2015
7   Location:            Orlando, FL  32801
8
9           This is to certify that I, Donna S. Raya,
10  (the undersigned), do hereby swear and affirm that
11  the attached proceedings before the U.S. Securities
12  and Exchange Commission were held according to the
13  record and that this is the original, complete,
14  true and accurate transcript that has been compared
15  to the reporting or recording accomplished at the
16  hearing.
17
18  _____        ___3/12/15_____
19  (Proofreader's Name)                 (Date)
20
21
22
23
24
25

```
1   STATE OF FLORIDA    )
    COUNTY OF PASCO     )
2

3

4         I, Dana L. Stockton, Registered Professional
    Reporter, certify that I was authorized to and did
5   stenographically report the foregoing deposition of
    PAUL B. POWERS; that a review of the transcript is a
6   true and complete record of my stenographic notes.

7

8         I FURTHER CERTIFY that I am not a relative,
    employee, attorney or counsel of any of the parties,
9   nor am I a relative or employee of any of the
    parties' attorney or counsel connected with the
10  action, nor am I financially interested in this
    action.
11

12        Dated this 11th day of March, 2015.

13

14

15        [signature]

16  _____
    Dana L. Stockton, RPR
17

18

19
                                    DANA L STOCKTON
20                                  MY COMMISSION # FF 022427
                                    EXPIRES: July 15, 2017
                                    Bonded Thru Notary Public Underwriters
21

22

23

24

25
```