**EXCERPTED**

# EXHIBIT 29

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of: )
) File No. D-03450-A
GENAUDIO, INC. )

WITNESS: Mark Thomas Bobak
PAGES: 1 through 112
PLACE: Securities and Exchange Commission
1961 Stout Street
Denver, CO 80294
DATE: Tuesday, March 3, 2015

The above entitled matter came on for hearing, pursuant to notice, at 8:00 a.m.

Diversified Reporting Services, Inc.
(202) 467 9200

APPEARANCES:

On behalf of the Securities and Exchange Commission:
JENNIFER OSTROM, ESQ.
Securities and Exchange Commission
1801 California Street
Suite 4800
Denver, Colorado

On behalf of the Witness:
MARK THOMAS BOBAK, PRO SE

C O N T E N T S

| WITNESS: | | EXAMINATION |
|---|---|---|
| Mark Thomas Bobak | | 4 |

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 102 | Subpoena | 4 |
| 103 | Subpoena duces tecum | 4 |
| 104 | Background Questionnaire | 9 |
| 105 | Document | 53 |

P R O C E E D I N G S

(SEC Exhibit Nos. 102 and 103 were marked for identification.)

MS. OSTROM: Let's go on the record at 8:00 a.m. on March 3rd of 2015.

Would you please raise your right hand. Do you swear to tell the truth, the whole truth and nothing but the truth?

MR. BOBAK: I do.

Whereupon,

MARK THOMAS BOBAK

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. OSTROM:

Q Please state and spell your full name for the record.

A Mark, M-a-r-k, Thomas, T-h-o-m-a-s, Bobak, B-o-b-a-k.

Q And my name is Jennifer Ostrom. I'm an officer of the United States Securities and Exchange Commission for purposes of this proceeding. And this is an investigation by the Commission in the matter of GenAudio, Inc., to

Q Yes, please. Go right ahead.
A -- because there was a -- yes, they did. But Mr. Mahabub, as part of my investment in GTSIG, agreed to waive my proxy and allow me to vote those shares. He was unwilling, through multiple discussions, to do that for anyone else --
Q Got you.
A -- which is why we presented it to the court and had the court rule on it.
Q Okay. Okay. And over any period of time how much money have you -- did you put into GenAudio to fund either operations, legal fees, et cetera?
A In addition to the stock purchases --
Q Yes.
A -- which may have been used to fund --
Q Yes.
A -- patents, legal bills, other marketing efforts, there was approximately $260,000 that I put into GenAudio through GTSIG from July of '13 through February of 2014.
Q Okay. Did you ever participate in any meetings with Apple?
A No.
Q Did you ever participate in any phone

calls with Apple?
A No.
Q Did you ever talk to Victor Tiscareno?
A I introduced myself to Vic at a meeting that he attended in St. Louis, and told him we were glad to have him working with GenAudio. But other than pleasantries and social talk, I had no further contact with Vic, that I recall.
Q And when was that?
A I know Jerry came to St. Louis with Vic and hosted a meeting for shareholders in St. Louis at the Westport Plaza, I believe. And he had a persuade speaker in the room. I don't remember when that was.
Q Was it after you had resigned the first time?
A I think so, but I'm not sure as I sit here today.
Q Okay. So do you recall any communication at all with Mr. Tiscareno prior to you resigning from the board of directors at GenAudio in early 2011?
A Between Vic and I?
Q Yes.
A No.

Q Okay.
A Other than the social -- depending on when the social interaction occurred, no.
Q And my understanding is that that meeting was in 2012, just so you know.
A Okay.
Q But other than that, you never spoke to Mr. Tiscareno about any dealings between Apple and GenAudio no matter what?
A No.
Q Okay. Did you e-mail or otherwise communicate directly with anyone at Apple?
A No.
Q And is that the same for Mr. Tiscareno?
A Yes.
Q Okay. How were you kept apprised of the progression of GenAudio's dealings with Apple?
A I was the fortunate beneficiary of Mr. Mahabub's repetitive updates --
Q Okay.
A -- through e-mail and through Mr. Mattos' communications with shareholders.
Q Okay.
A There may have been an occasional phone call, but essentially Jerry's e-mail was my primary

way of staying abreast of what the company was doing.
Q Okay. Were there any face-to-face conversations outside of board meetings?
A Not that I can recall.
Q Okay. In the e-mails that you received from Mr. Mahabub at that time discussing dealings with Apple, were other people copied on those e-mails?
A Yes.
Q Okay. And can you recall how those e-mails went out, I mean, in terms of who they went to?
A I can recall either receiving one or being sent one by someone who was copied on it. And they summarized from Jerry's perspective his dealings with Apple and his view on how well things were going with Apple.
Q And did you receive at least one e-mail that went to the -- you as a board member?
A I may have, yes. Not that I specifically recall.
Q Am I correct, though, that you never received an e-mail that was only to you from Mr. Mahabub and to no one else?

Q So you never discussed with anybody at Apple about any type of acquisition or licensing; is that correct?
A I never had discussion with anyone employed by Apple concerning GenAudio.
Q And what's your understanding as to why a deal was never done with Apple?
A Again, somewhere in the morass of e-mails, the dark time that I talked about, my understanding today is we never were even in the game with Apple. What happened, whether those trips took place, what discussions actually occurred between GenAudio representatives and Apple, I don't know. I do know that I felt as a shareholder that we were close, that it was 60, 70 percent, and then it went to zero. And I never really understood why.
Q Okay. And to your knowledge, did Apple ever conduct any due diligence of GenAudio to explore a potential transaction?
A Not to my knowledge.
Q Okay. And what was your understanding as to what agreements, if any, were reached between Apple and GenAudio?
A In -- I don't believe they even got

further than an NDA, nondisclosure agreement.
Q Okay.
A There were no -- certainly no contracts or other agreements entered into, to best of my knowledge.
Q And do you know -- do you have any knowledge of Apple representatives communicating that they were interested in licensing GenAudio's technology?
A No.
Q And to your knowledge, did you have any understanding that Apple representatives ever communicated that they were interested in acquiring GenAudio?
A No.
Q Now, you referred to an NDA. Was there any other NDAs, a subsequent NDA? Was there only just the one that you know of?
A As it relates to Apple?
Q Yes.
A Not that I'm aware of. And to be honest, I'm not sure there was an NDA ever executed between GenAudio and Apple. I know there was talk about it or it was referred to in Jerry's e-mails because that's why he used the abbreviation capital C

capital E, so as not to disclose the entity he was talking about.
Q And do you have any knowledge as to what the first communications were between GenAudio and Apple?
A Not as I sit here today, no.
Q Okay. Let me hand you Exhibit No. 3. This is the Confidentiality Agreement with Apple. And why don't you look at this and then tell me if you've ever seen this before.
A I'm sorry. Your question was?
Q Have you ever seen this before?
A Not that I recall.
Q Okay. Did the board approve GenAudio entering into an NDA with Apple?
A It may have. If we did, it should be reflected in the minutes. I don't -- I don't remember. I don't know.
Q Okay. And if it's not reflected in the minutes, is it correct that you probably weren't asked to review it?
A That is correct.
Q Okay. Let me hand you Exhibit No. 57. And feel free to look at this. I'm going to ask you some questions about it, first being if you

received it from Mr. Mahabub.
A It does appear that I received it. It shows it was sent to me at the e-mail address that I gave to you in my form that I filled out.
Q Okay. And did you forward it to anyone?
A I don't remember.
Q Okay. Did you tell anyone about the contents?
A I may have, but I don't remember specifically.
Q And do you know what happened between GenAudio and Apple between the July NDA and this October e-mail in terms of dealings between the two?
A No, I don't.
Q Okay. This references a meeting at Apple in the first paragraph. Do you know if Mr. Mahabub had a meeting with Apple as referenced in this e-mail?
A I don't know whether that meeting took place or not.
Q Okay. Outside of what's in this e-mail, were you told any of the details of the meeting?
A Not that I recall.
Q Okay. Do you know who Phil Schiller is?

Page 73

the shareholders, for the most, part believed that the LCEC was Apple?

A Yes.

Q Okay. And why?

A Again, because of the nature of him talking about the LCEC in terms of their portfolio of products, their gaming products, their phone -- you know, telephones, music. I mean, other than -- there's only two LCECs out there that had that broad of a portfolio, Microsoft and Apple. Everybody knows that Jerry was not a Microsoft guy. He's an Apple guy. He's a Mac guy.

So you were -- the universe was pretty limited. And, again, I think -- I think every shareholder, almost to a person, believed that Apple was the white knight. They always invested in this company hoping that Apple, given its broad product base, would buy the company. And I think that was fed.

You know, there was never any discussion with Microsoft, at least up to this point, that I'm aware of, in terms of licensing, technology. The only problem we had with Microsoft was we could never keep up with the software upgrades for our ASE product. We had this ASE product that's

Page 74

referred to. And every time either Apple or Microsoft would come out with a new version of their operating system, our ASE would be incompatible and we would have to spend time and money to make it compatible.

Q Did you talk to any shareholders who said they invested specifically because they thought Apple was going to acquire the company?

A I think a number -- yes. Yes.

Q And can you --

A Not that they thought Apple was going to acquire. They were hopeful that Apple -- someone like Apple would acquire the company.

Q And what were the substance of those conversations?

A I think it -- they usually occurred after these updates came out. People would say -- people would come to to me knowing that I was the largest shareholder and say, Are you investing more? Should I invest more? And at this point -- I mean, you'd have to look at some of the people, but I think I was generally saying, you know, I'm -- if I were you, I'd keep your powder dry. Let's wait and see. You've got enough invested.

MS. OSTROM: Why don't we go ahead and

Page 75

let's take a break.

(A brief recess was taken.)

BY MS. OSTROM:

Q Let's go back on the record. While we were off the record, Mr. Bobak, did we have any substantive discussions regarding this investigation?

A No.

Q Let me hand you Exhibit No. 99. These are board meeting minutes from July 29th of 2010. And in particular what I'm going to ask you about is Paragraph numbered 2.

A Okay.

Q And did you attend this board meeting?

A It appears that I did, yes.

Q And by phone, correct?

A That's correct. Yes.

Q Okay. Paragraph No. 2 says, Jerry Mahabub summarized the current status of discussions with the LCEC, and noted that his next meeting is scheduled for August 5th of 2010. He will be meeting with their Ph.D. in acoustics and a, quote, handshake meeting, unquote, was contemplated to take place with the LCEC CEO.

Mr. Mahabub was informed that a, quote,

Page 76

heavier, unquote, nondisclosure agreement may be presented to him in anticipation of the company having access to confidential data of the LCEC. The board discussed the need to be deferential to their CEO, and to not sign any new NDA until it has legal review and is reviewed carefully for any restrictions in the company's ability to transact business with any other party.

Do you recall what was reported by Mr. Mahabub as to Apple at this time?

A I think this is where he reported to the board that he was doing the homework, getting ready for a personal meeting with Steve Jobs. That he had read the autobiography. That Steve Jobs was his mentor. This was something he looked forward to his entire life and that he was ready for it. And that Steve Jobs had never met a negotiator like Jerry Mahabub.

At which point we said, Jerry, don't let your ego get in the way of company success. You know, be nice to him. Most CEOs aren't going to give you the time of day. But what is -- also I recall here is I was worried about Apple locking us down with a tough NDA and preventing us, a struggling business who had no cash, from talking

SEC is investigating, because he's adamant that, you know, Jerry has not treated his shareholders properly.

Q And that's Z-e-i-s?

A Z-e-i-s, yeah.

Q Okay.

A And you will see a number of forwarded e-mails in the stack of documents that I produced to you that he sent to me just because he keeps his e-mails and I don't.

Q Okay. And have you spoken with anyone regarding the fact that you're appearing here today?

A Dell asked me when I was coming in. He and I were going to have dinner, but he's in Las Vegas. So other than that, no.

Q And do you know anyone else who has been subpoenaed or testified in this investigation?

A Dell mentioned that he had been subpoenaed and testified. He mentioned that Jerry had been subpoenaed and testified. Other than that, I have no knowledge of anybody else.

Q Okay. And how did you learn that Mr. Skluzak and Mr. Mahabub had testified?

A Dell indicated that he had been asked to

contact me or to let me know that the SEC might be calling so -- and that's it. And then we were talking about something else. He said Jerry was in town for two things, one of which was to be deposed by the SEC, and the other was GenAudio related.

MS. OSTROM: Okay. And, Mr. Bobak, we have no further questions at this time. We may, however, call you again to testify in this investigation. Should this be necessary, we will contact you.

Do you wish to clarify anything or add anything to the statements you've made today?

THE WITNESS: No.

MS. OSTROM: Okay. Let's go off the record, then, at 10:25 a.m., on March 3rd of 2015.

(Whereupon, at 10:25 a.m., the examination was concluded.)

* * * * *

PROOFREADER'S CERTIFICATE

In the Matter of: GENAUDIO, INC.
Witness: Mark Thomas Bobak
File Number: D-03450-A
Date: Tuesday, March 3, 2015
Location: Denver, CO 80294

This is to certify that I, Donna S. Raya, (the undersigned), do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.

____________________ ____________________
(Proofreader's Name) (Date)

PROOFREADER'S CERTIFICATE

In the Matter of: GENAUDIO, INC.
Witness: Mark Thomas Bobak
File Number: D-03450-A
Date: Tuesday, March 3, 2015
Location: Denver, CO 80294

This is to certify that I, Donna S. Raya, (the undersigned), do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.

Donna S. Raya  3/16/15

(Proofreader's Name)  (Date)

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

REPORTER'S CERTIFICATE

I, Sharon R. Dobson, reporter, hereby certify that the foregoing transcript of 110 pages is a complete, true, and accurate transcript of the proceedings indicated, held on March 3, 2015, in the Matter of GenAudio, Inc. I further certify that this proceeding was recorded by me and that the foregoing has been prepared under my direction.

DATE: March 10, 2015

Official Reporter: [signature]
Sharon R. Dobson