# EXCERPTED

# EXHIBIT 36

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                           ) File No. D-03450-A
GENAUDIO, INC.             )

WITNESS:   Dell Frank Skluzak

PAGES:     1 through 242

PLACE:     Securities and Exchange Commission

           1961 Stout Street

           Denver, Colorado 80294

DATE:      Monday, December 15, 2014

    The above-entitled matter came on for hearing, pursuant to notice, at 9:00 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

Page 2

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4      JENNIFER OSTROM, ESQ.
5      KURT GOTTSCHALL, ESQ.
6      Securities and Exchange Commission
7      Division of Enforcement
8      1961 Stout Street
9      Denver, Colorado 80294
10     (303) 844-1000
11
12 On behalf of the Witness:
13     DELL FRANK SKLUZAK, PRO SE
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              C O N T E N T S
2
3  WITNESS:                       EXAMINATION
4  Dell Frank Skluzak                6
5
6  EXHIBITS   DESCRIPTION                IDENTIFIED
7  26       Subpoena                   9
8  27       Background Questionnaire   9
9  28       Document Bates numbered    25
10          No. GA 1816 through 1852
11          (Ledger)
12 29       Document Bates numbered    95
13          GA 4959 through 4961 (E-mail)
14 30       Document Bates numbered    129
15          GA 2139 through 2174
16          (Meeting Minutes)
17 31       Document Bates numbered    135
18          GA 4954 through 4958 (E-mail)
19 32       Document Bates numbered    141
20          GA 4808 through 4900 (Memo)
21 33       Document Bates numbered    147
22          SEC-Skluzak-E-0000126 through 127
23          (Letter)
24 34       Document Bates numbered    162
25          GA 4731 through 4807 (Memo)

Page 4

1            C O N T E N T S (CONT.)
2
3  EXHIBITS   DESCRIPTION                IDENTIFIED
4  35       Document Bates numbered    166
5          GA 4925 through 4938
6          (Shareholder Update)
7  36       Document Bates numbered    171
8          GA 5317 through 5339
9          (Shareholder Update)
10 37       Document Bates numbered    177
11          SEC-Zeis-E-0000506 through 517
12          (Shareholder Letter)
13 38       Document Bates numbered    187
14          GA 4634 through 4638
15          (Letter)
16 39       Document Bates numbered    193
17          GA 2189 through 2227
18          (Meeting Minutes)
19 40       Document Bates numbered    197
20          Mahabub 002784 through 2788
21          (E-mails)
22 41       Document Bates numbered    198
23          GA 2681 and 2682 (Letter)
24
25

Page 5

1            C O N T E N T S (CONT.)
2
3  EXHIBITS   DESCRIPTION                IDENTIFIED
4  42       Document Bates numbered    200
5          Mahabub 002807 - 2809 (E-mail)
6  43       Document Bates numbered    205
7          Skluzak D1 and 2 (Letter)
8  44       Document Bates numbered    208
9          GA 5345 through 5350
10          (Shareholder Update)
11 45       Document Bates numbered    226
12          SEC-Skluzak-E-0000434 and 435
13          (Meeting Report)
14 46       Document Bates numbered    227
15          SEC-SkluzakD-P-0000222
16          through 225 (Business Update)
17 47       Document Bates numbered    228
18          SEC-SkluzakD-P-0000217
19          through 220 (Letter)
20 48       Document Bates numbered    228
21          GA 5340 and 5341 (Letter)
22 49       Document Bates numbered    230
23          GA 5302 (Letter)
24
25

2 (Pages 2 to 5)

Page 6

1        P R O C E E D I N G S
2        MS. OSTROM:  We'll go on the record at
3    9:00 a.m. on December 15 of 2014.  Would you please
4    raise your right hand.
5            DELL FRANK SKLUZAK,
6    being first duly sworn in the above cause, was
7    examined and testified as follows:
8                EXAMINATION
9        Q   And would you please state and spell your
10   full name for the record.
11       A   It's Dell Frank Skluzak.  First name is
12   Dell, D-e-l-l, middle name Frank, F-r-a-n-k, last
13   name Skluzak, S-k-l-u-z-a-k.
14       Q   And my name is Jennifer Ostrom.  And with
15   me is Kurt Gottschall.  And we are officers of the
16   United States Securities and Exchange Commission for
17   purposes of this proceeding.  And this is an
18   investigation by the Commission in the matter of
19   GenAudio, Inc., to determine whether there have been
20   violations of certain provisions of the federal
21   securities laws.  However, the facts developed in
22   this investigation might constitute violations of
23   other federal or state civil or criminal laws.
24       And prior to the opening of the record you
25   were provided with a copy of the formal order of

Page 7

1    investigation in this matter.  And it will be
2    available for your examination during the course of
3    this proceeding.
4        Mr. Skluzak, have you had an opportunity
5    to review the formal order?
6        A   I have.
7        Q   And prior to the opening of the record,
8    you were also provided with a copy of the
9    Commission's Supplemental Information Form.  And a
10   copy of that notice is what is marked Exhibit No. 1.
11       And, Mr. Skluzak, have you had the
12   opportunity to read Exhibit No. 1?
13       A   I have.
14       Q   And do you have any questions concerning
15   Exhibit No. 1?
16       A   I do not.
17       Q   And, Mr. Skluzak, are you represented by
18   counsel today?
19       A   I am not.
20       Q   You have the right to be accompanied,
21   represented and advised by counsel.  This means that
22   you may have an attorney present, and that your
23   attorney can advise you before, during and after
24   your examination here today.  Do you understand
25   this?

Page 8

1        A   I do.
2        Q   And since you're not represented by
3    counsel, there are certain matters discussed in
4    Exhibit No. 1 that I want to highlight for you.
5        Do you understand that upon your request,
6    these proceedings will be adjourned so that you may
7    obtain counsel?
8        A   Yes.
9        Q   And do you understand that the statutes
10   set forth in Exhibit No. 1 provide criminal
11   penalties for knowingly providing false testimony or
12   knowingly using false documents in connection with
13   this investigation?
14       A   I understand.
15       Q   And do you understand that you may assert
16   your rights under the Fifth Amendment to the
17   Constitution and refuse to answer any question which
18   may tend to incriminate you?
19       A   I understand.
20       Q   If you want to go off the record, just
21   tell me.  She won't go off the record at your
22   request, only at our request.  But if you need to
23   take a break or anything like that, just tell me.
24   I'm happy to accommodate you.  Okay?
25       A   Okay.

Page 9

1        Q   I'm going to ask you a number of questions
2    today.  If you don't understand or don't hear a
3    question, please let me know it and repeat it,
4    rephrase it, whatever it takes for us to be able to
5    understand each other.  Also allow me to complete my
6    question before you answer so that we're not both
7    speaking at once so that it's easier for her to take
8    down the notes.  And also if you could also answer
9    audibly as we go through today's testimony, I'd
10   appreciate it.
11       A   Okay.
12          (SEC Exhibit 26 marked
13          for identification.)
14          BY MS. OSTROM:
15       Q   Okay.  And, Mr. Skluzak, this copy of a
16   subpoena has been marked as Exhibit No. 26.  Is this
17   a copy of the subpoena you are appearing pursuant to
18   here today?
19       A   Yes.
20          (SEC Exhibit 27 marked
21          for identification.)
22          BY MS. OSTROM:
23       Q   Mr. Skluzak, I'm handing you what has been
24   marked as Exhibit No. 27.  This is your completed
25   Background Questionnaire.  Did you complete this

Page 50

1  shareholder letter, March 15th of 2010, can you
2  recall other references to the LCEC?
3      A    Prior to March 15?
4      Q    No.  In that time period.
5      A    In that time frame?
6      Q    Yeah.  Prior to your investment.
7      A    Yeah, from Mr. Mahabub.  And then, you
8  know, couple of other investors I would -- would --
9  he would talk to were led to the same conclusion.
10     Q    And what else did you hear about the LCEC
11 from Mr. Mahabub?
12     A    Basically other than the IOS platform, the
13 heavy duty technical work, that things were
14 progressing, and in that time frame that he was
15 going to have a meeting with Steve Jobs.
16     Q    Okay.  And but that was after your first
17 investment under this PPM, correct?
18     A    Yeah.  That was in May?
19     Q    Yes.
20     A    Yes.
21     Q    Okay.  Let me hand you Exhibit No. 6.
22 This is the March 15, 2010, Private Placement
23 Memorandum.  Did you receive this prior to your
24 investment?
25     A    Yes.

Page 51

1      Q    Okay.  If you could turn to Page 21 of
2  this Private Placement Memorandum, which is Bates
3  No. GA 510.
4      A    Okay.
5      Q    In the third paragraph, it says -- if you
6  see the -- that paragraph, it says, In furtherance
7  of this strategic objective, the company has had
8  various discussions with several companies that make
9  electronic devices for consumers which eventually
10 resulted in a nondisclosure agreement, paren, quote,
11 NDA, unquote, close paren, with the LCEC.  Working
12 with the LCEC the company has now successfully
13 integrated the AstoundSound technology into several
14 of the LCEC's products to demonstrate the viability
15 and enhanced audio experience for music, movies and
16 video games played on several other consumer
17 electronic devices.  Do you see that?
18     A    Yes.
19     Q    And did you read that at the time?
20     A    Yes.
21     Q    Okay.  And did that have any influence on
22 your investment?
23     A    Yes.
24     Q    And what influence did it have?
25     A    Well, the influence it had is if -- if

Page 52

1  they can make the technology work on the devices, it
2  made sense that, you know, we had overcome a hurdle
3  from a technical standpoint to be able to play --
4  our software to be integrated into their equipment.
5      Q    And are you referencing Apple at this
6  time?
7      A    Yes.
8      Q    And what led you to believe that this
9  reference in the Private Placement Memorandum was to
10 Apple?
11     A    Actually, I remember reading this page
12 because when you look up at the first paragraph,
13 this, they -- they talk about Apple already.  And so
14 I go, well, Apple, ASE, the LCEC, I just said, well,
15 it's got to be Apple.
16     Q    And the reference to Apple at the top of
17 the page is that there was a download.
18     A    Yes.
19     Q    So it's not actually referencing the Apple
20 as the LCEC in that paragraph?
21     A    Correct.
22     Q    Okay.  So was there anything else that led
23 you to believe that this was -- the LCEC was Apple
24 here?
25     A    It just would have been general

Page 53

1  conversations with Jerry about, you know, what was
2  going on, trips to Cupertino.
3      Q    Okay.  Was there anything more than what
4  you've already told us that happened prior to the
5  May 2010 investment that you made?
6      A    Not that I can recall.  But I -- I
7  understood -- when I saw this, I remember talking to
8  Jerry about -- I said, well, if it's that easy to
9  put on these devices, my concern was that the
10 technology and the patents weren't robust enough to
11 be protected from an IP standpoint.  And I said, how
12 easy was it to do this.  And he goes, Well, you
13 actually don't put it on the chip.  You do what's
14 called a test harness.  And that's what took a lot
15 of the technical work, is you would do these test
16 harnesses, which were basically an electronic
17 conduit of -- like, a bypass, if you would.  But it
18 allowed you to play the outcome of using the 3D
19 sound on this equipment, on the headphones, on the
20 ear buds.
21         So with that conversation, you know, a bit
22 more of my own due diligence -- I didn't jump right
23 away to the fact that, well, these things are ready
24 to go, they're going to be in a box and off the
25 shelf.  I understood that it was really more of a

Page 54

1  technical thing, but it wasn't a commercial
2  production type of product yet. And there was a lot
3  of technical work that still needed to be done to
4  get it embedded onto the chip. And that was the
5  conversation I had with Jerry, that said, okay,
6  well, we need to put more money in because if it
7  works and they like it, now we've got to get it onto
8  the chip.
9      Q   And who are the other people that you
10 talked to that also came to the conclusion that the
11 LCEC was referencing Apple?
12     A   It would have been friends. Guy by the
13 name of Brian Foy and Carlos Palma.
14     Q   And what were your conversations with
15 them?
16     A   We all worked together at Alcoa. Another
17 investor by the name of Tom Kaminski who -- I was
18 also Tom's boss at that point. Or not at that
19 point. 10 years prior Tom was my employer --
20 employee. But we kept very close friends. And we
21 would meet and catch up. And I would tell him what
22 I was doing. And the three of them decided to
23 invest kind of in this 2010 time frame.
24     Q   Had you introduced them to GenAudio?
25     A   Yes.

Page 55

1      Q   Okay. And what did you provide to them as
2  potential investors?
3      A   I just -- I -- I told them about what I
4  was doing. And they all lived in Southern
5  California. And Carlos went up to see the studio.
6  And I believe Tom and Brian had conversations with
7  Jerry also and may have gone to the studio, but I'm
8  not for sure.
9      Q   Did they tell you anything about any
10 conversations with Mr. Mahabub?
11     A   They said they were impressed by the
12 technology and thought, you know, it was neat and
13 they would probably invest.
14     Q   And how did the LCEC being Apple come up
15 with them?
16     A   I told them -- I go, Read the LCEC. And I
17 said, You know, I think it's Apple but, you know,
18 because of secret NDA things, you know, they can't
19 state it in this type of thing. And I think I told
20 them -- I think. I told them -- I said, You know,
21 Jerry has told me he's been to Cupertino a lot and,
22 you know, he always says it's the piece of fruit
23 with the bite out of it.
24     Q   And had he said that more than once?
25     A   Yeah. He said it to me multiple times.

Page 56

1      Q   Okay.
2      A   And he would use a lot of facial
3  expressions of wink-winks and, you know, that type
4  of thing.
5      Q   And were you --
6      A   Nonverbal communications.
7      Q   Were these in just the lunches that the
8  two of you had together?
9      A   Yes. Yes.
10     Q   Okay.
11         BY MR. GOTTSCHALL:
12     Q   Do you know whether or not these other
13 gentlemen that you've described in your testimony
14 that you told about GenAudio -- whether they
15 received the Private Placement Memorandum from the
16 company before they invested?
17     A   I would ass -- I don't know for sure. I
18 believe Carlos purchased shares directly from
19 Mr. Mahabub, not through a PPM. But I'm -- I'm not
20 absolutely positive of how those transactions
21 happened.
22         BY MS. OSTROM:
23     Q   How is it that you introduced them to the
24 company in terms of their contact information? Did
25 you give it to them and they contacted GenAudio

Page 57

1  or --
2      A   Yes.
3      Q   Okay. Okay.
4      A   Well, in some cases I would copy both
5  Jerry and them on an e-mail and said, you know,
6  Brian is interested in this. You should talk to
7  him.
8      Q   And then if you look at the last paragraph
9  on that same page, 21, of the PPM, GA 510, it says
10 that, Although the company is prohibited from
11 disclosing any further information about the
12 identity of the LCEC and the status of current
13 negotiations with it, the company's optimistic that
14 the LCEC will eventually want access to our
15 AstoundSound technology for their products. It is
16 unclear what structure such access would take, but
17 the company believes the LCEC would either, one,
18 integrate a portion of our AstoundSound technology,
19 namely ASE, into multiple product lines through a
20 licensing arrangement, or to acquire all of our
21 AstoundSound technology, or at least that portion
22 the LCEC deems necessary for its integration plans.
23         Did you ever have any discussions with
24 Mr. Mahabub about this paragraph prior to your
25 May 2010 investment?

Page 162

1   Q   Do you recall how much you paid for those
2   shares?
3   A   I do not.
4       (SEC Exhibit 34 was marked
5        for identification.)
6   A   I think it was $3 a share, but I'm not
7   positive.
8       BY MS. OSTROM:
9   Q   Okay.  Mr. Skluzak, let me hand you
10  Exhibit No. 34.  And this is numbered GA 4731
11  through 4807.  And this is a GenAudio Private
12  Placement Memorandum for -- dated April 22nd of
13  2011.  And is this the PPM that you invested under?
14  A   Yes.
15  Q   And can you recall if there was anything
16  in particular in this PPM that influenced your
17  investment?
18  A   One of the things I remembered was we were
19  working with a company called CRS Labs.  And I had
20  just done some research on them because they were
21  very close to our type of technology.  I just
22  remember that for whatever particular reason.
23  Q   Okay.
24  A   Other than that, I mean, basically it
25  was -- at this point I had decided at every offering

Page 163

1   I would make some type of small investment just so I
2   could say I was actively participating.
3   Q   Okay.  And am I correct that in this time
4   period you were continuing to get updates from
5   Mr. Mahabub?
6   A   Yes.  Generally they would come through
7   Mr. Mattos' e-mail correspondence.
8   Q   And were you -- did you have anything --
9   any personal meetings or calls or e-mails with
10  Mr. Mahabub during this time?
11  A   I can't remember any specific ones, but as
12  a general case we would, like, touch base once a
13  quarter.
14  Q   And before I forget to ask you this, we
15  already -- we covered when you were asked to be on
16  the board.  Do you know why it was that Mr. Mahabub
17  asked you to be on the board of GenAudio?
18  A   I don't.  I know that I had gone to the
19  quarterly -- or the -- the shareholder update he had
20  had at the Tabor Westin.  And I had asked a few
21  questions at that meeting.  And Jerry had engaged me
22  in conversation after the meeting.  And I think he
23  was just looking for somebody who would serve.
24  Q   Okay.  And that was in 2012 also, right?
25  A   Yes.

Page 164

1   Q   And if you could look again at
2   Exhibit No. 28, Page 1843.  And this time it's near
3   the top.  It says, Dell Skluzak rollover IRA.  Issue
4   date is April 26th of 2012.  40,000 shares were
5   issued.  And it says under the original issue April
6   '11 PPM.  Is that accurate?
7   A   Yes.
8   Q   And do you know how much you paid for
9   these shares?
10  A   $3 a share, I believe.
11  Q   $3 a share?
12  A   Yeah.
13  Q   Okay.  And was there a a reason in April
14  of 2012 that you invested in the April '11 PPM?
15  A   It was directly after the shareholder
16  update at the Tabor Westin where Mr. Franzi was
17  there.  Mr. -- I believe Mr. Tiscareno was there.
18  And it just seemed to be that things were really
19  going the right direction adding those industry
20  experts.  And I had a lot of confidence at that
21  point.  And from the discussions at the meeting
22  everything really seemed to be coming together.
23  Q   Okay.  Mr. Skluzak, let me hand you
24  Exhibit No. 7.  This is a shareholder letter dated
25  August 1st of 2010.  Did you receive this?

Page 165

1   A   I can't specifically recall this one.
2   Q   Okay.  If you look at the second page,
3   GA 5352, right in the middle under consumer
4   electronics industry heading there's a sentence that
5   says, In the very near future it has been requested
6   by the LCEC's CEO to have a, quote, handshake,
7   unquote, meeting with myself alongside meeting with
8   the LCEC's expert in acoustic physics and others.
9   Do you see that?
10  A   Yes.
11  Q   Did you ever see that in writing that you
12  can recall?
13  A   I do recall seeing that.
14  Q   And did that comport, then, with your
15  discussion you'd been having with Mr. Mahabub
16  regarding him meeting Steve Jobs?
17  A   Yes.
18  Q   Okay.  And then it says, This meeting
19  will take place within the next couple of weeks.
20  And this letter is dated August 1st of 2010.  Is
21  that about the time frame that you recall him
22  mentioning -- sorry, Mr. Mahabub mentioning he was
23  going to meet with Steve Jobs?
24  A   Yes.
25  Q   Okay.  At this time, August of 2010, were

Page 238

1  group.
2  **Q   Mr. Suel?**
3  A   Mr. Suel.  Because, totally nonrelated,
4  one of the things Sam Khoury had told me is that he
5  had just received a big contract from Panasonic to
6  do a bunch of their IP evaluation.  Had nothing to
7  do with GenAudio, but it was -- and then Larry had
8  talked to Dr. -- or Patrick Suel that Patrick is now
9  only one of two persons left on the venture capital
10 group and how that group is disbanding.  And then
11 that was the tone of the conversation about how
12 that -- Panasonic financially has a lot of problems,
13 so...
14 **Q   Okay.  What have you spoken with Mr. Bobak**
15 **about with regard to this investigation?**
16 A   It's basically that I had been called in
17 and been subpoenaed.  Mr. Bobak currently is engaged
18 in a bunch of other stuff that's very time
19 consuming, and I just call him and just tell him and
20 leave a voice mail.  He'll call -- his son is going
21 to school at DU, so he'll call, have a three-second
22 conversation about GenAudio, and then we talk about
23 fly fishing and his son.
24 **Q   Did you tell Mr. Bobak what your testimony**
25 **was going to be today?**

Page 239

1  A   No.
2  **Q   Okay.**
3  A   Just told him I'd been called in.
4  **Q   And Dr. Galanis, what have you spoken with**
5  **him with regard to the investigation?**
6  A   Similar conversation with Mr. Bobak.  Just
7  have been called in and -- and would keep him
8  apprised if there was anything going on.
9  **Q   Okay.  And other than Dr. Khoury, do you**
10 **know anyone else who has been -- sorry, Dr. Khoury**
11 **and Larry Coey, do you know anyone else who has been**
12 **subpoenaed or testified in this investigation?**
13 A   I do not know anybody else.
14 **Q   Okay.  Have you spoken with anyone**
15 **regarding your appearance here today other than the**
16 **people we've just talked about?**
17 A   Yeah.  Well, my wife, my -- the lady who
18 works for me, my brother.
19 **Q   Okay.  Anyone else?**
20 A   Not that I can think of.
21 **Q   Okay.  And is there anything that you wish**
22 **to clarify or add to the statements you've made**
23 **today?**
24 A   No.
25 **Q   Okay.  Mr. Skluzak, we've no further**

Page 240

1  **questions at this time.  We may, however, call you**
2  **again to testify in this investigation.  And should**
3  **that be necessary, I will contact you.  And we are**
4  **off the record at 3:25 p.m. on December 15th, 2014.**
5        **(Whereupon, at 3:25 p.m. the proceedings**
6  **were adjourned.)**
7
8             * * * * *

Page 241

1            PROOFREADER'S CERTIFICATE
2
3  In the Matter of:   GENAUDIO, INC.
4  Witness:         Dell Skluzak
5  File Number:     D-03450-A
6  Date:            December 15, 2014
7  Location:        Denver, CO
8
9
10    This is to certify that I, Nicholas Wagner,
11 (the undersigned), do hereby swear and affirm
12 that the attached proceedings before the U.S.
13 Securities and Exchange Commission were held
14 according to the record and that this is the
15 original, complete, true and accurate transcript
16 that has been compared to the reporting or recording
17 accomplished at the hearing.
18
19
20
21 _____   _____
22 (Proofreader's Name)       (Date)
23
24
25

```
                                                          Page 241

    1                    PROOFREADER'S CERTIFICATE

    2

    3    In the Matter of:    GENAUDIO, INC.

    4    Witness:             Dell Skluzak

    5    File Number:         D-03450-A

    6    Date:                December 15, 2014

    7    Location:            Denver, CO

    8

    9

   10         This is to certify that I, Nicholas Wagner,

   11    (the undersigned), do hereby swear and affirm

   12    that the attached proceedings before the U.S.

   13    Securities and Exchange Commission were held

   14    according to the record and that this is the

   15    original, complete, true and accurate transcript

   16    that has been compared to the reporting or recording

   17    accomplished at the hearing.

   18

   19

   20

   21    _____        12-30-2014

   22    (Proofreader's Name)             (Date)

   23

   24

   25
```

```
 1                    REPORTER'S CERTIFICATE
 2
 3  I, Sharon R. Dobson, reporter, hereby certify that the
 4  foregoing transcript of  240  pages is a complete, true
 5  and accurate transcript of the testimony indicated, held
 6  on  12-15-14 , at  Denver, CO   in the matter of:
 7       Gen Audio, Inc.                                    .
 8
 9  I further certify that this proceeding was recorded by
10  me, and that the foregoing transcript has been prepared
11  under my direction.
12
13
14  Date:     12-30-14
15
16
17  Official Reporter:  Sharon R Dobson
18
19
20          Diversified Reporting Services, Inc.
21
22
23
24
25
```