EXCERPTED

# EXHIBIT 37

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
        Civil Action No. 1:15-cv-02118-WJM-CBS
 3      _____
 4              DEPOSITION OF:   DELL FRANK SKLUZAK
                         February 7, 2017
 5      _____
 6      SECURITIES AND EXCHANGE COMMISSION,
 7      Plaintiff,
 8      v.
 9      TAJ JERRY MAHABUB; GENAUDIO, INC., et al.,
10      Defendants.
        _____
11
                PURSUANT TO NOTICE, the deposition of
12      DELL FRANK SKLUZAK was taken on behalf of the
        Defendant Taj Jerry Mahabub at 1225 17th Street,
13      27th Floor, Denver, Colorado 80202, on February 7,
        2017, at 9:02 a.m., before Kimberly Smith, Registered
14      Professional Reporter and Notary Public within
        Colorado.
15
16
17
18
19
20
21
22
23
24
25
```

Page 1

```
 1           A P P E A R A N C E S
 2  For the Plaintiff:
 3      LESLIE HENDRICKSON HUGHES, ESQ.
        DANIELLE R. VOORHEES, ESQ.
 4      U.S. Securities and Exchange Commission
        1961 Stout Street, Suite 1700
 5      Denver, Colorado 80294
 6
    For the Defendant Taj Jerry Mahabub:
 7
        ANDREW B. HOLMES, ESQ.
 8      Holmes, Taylor & Jones, LLP
        617 South Olive Street, Suite 1200
 9      Los Angeles, California 90014
10
    For the Defendant GenAudio, Inc.:
11
        MICHAEL P. McCLOSKEY, ESQ.
12      Wilson Elser Moskowitz Edelman & Dicker, LLP
        655 West Broadway, Suite 900
13      San Diego, California 92101
14
    For the Deponent Dell Frank Skluzak:
15
        H. PAUL COHEN, ESQ.
16      H. Paul Cohen, P.C.
        5440 East 6th Avenue Parkway
17      Denver, Colorado 80220
18
19
20
21
22
23
24
25
                                               Page 2
```

```
 1              I N D E X
 2  EXAMINATION OF DELL FRANK SKLUZAK:       PAGE
    February 7, 2017
 3
    By Mr. Holmes              6, 110, 165
 4
    By Mr. McCloskey           83, 168, 184
 5
    By Ms. Hughes              115, 183
 6
                   INITIAL
 7  DEPOSITION EXHIBITS:         REFERENCE
 8  Exhibit 247  Background Questionnaire    11
 9  Exhibit 248  Stock Certificate for 400,000   34
              Shares of Common Stock in GenAudio,
10            5/3/10
11  Exhibit 249  Stock Certificate for 30,000   35
              Shares of Common Stock in GenAudio,
12            4/2/10, with attachments
13  Exhibit 250  TD Ameritrade Statement     39
14  Exhibit 251  Stock Certificate for 40,000    40
              Shares of Common Stock in GenAudio,
15            5/21/10
16  Exhibit 252  Report to the Chairman of the Board  60
              of Directors of GenAudio, 1/30/14
17
    Exhibit 253  Apple Logo                130
18
    Exhibit 254  The list of Proxy Sales and Gifted   141
19           Shares by Mr. Mahabub starting in
             December 2008 A Total of Approx 7
20           Million Shares Disposed of and
             Receipt of over $5 Million Dollar
21           [sic]
22  Exhibit 255  E-mail to Bobak and others from   144
             Skluzak, Subject: Personal Loan
23           Demand Letter Entire Sequence,
             5/29/14, with attached e-mails,
24           with attachment
25
                                               Page 3
```

```
 1  Exhibit 256  Letter to GenAudio, Inc.,      146
             Shareholder from The Board of
 2           Directors, 9/19/14
 3  Exhibit 257  E-mail to Skluzak from Mahabub,   151
             Subject: Charges on credit card,
 4           7/6/12, with attached e-mail
 5  Exhibit 258  E-mail to Skluzak from Mahabub,   153
             Subject: Monster Press Release
 6           going live on the 7th for the press
             event in Las Vegas!!!, 1/5/13
 7
    Exhibit 259  Letter to Shareholder from    154
 8           Mahabub, 8/28/10
 9  Exhibit 260  List of Quotes               158
10  Exhibit 261  Letter to Client from Yorba,   180
             7/28/16, with attached documents
11
    DEPOSITION EXHIBITS: (Previously marked)
12
    Exhibit 1   E-mail to Ostrom from Skluzak,    140
13           Subject: Shareholder List
             Master.xls, 8/8/14, with
14           attachments
15  Exhibit 7   Shareholder Letter, 8/1/10    112
16  Exhibit 13  Letter to GenAudio Shareholder   147
             from The Board of Directors,
17           11/4/14
18  Exhibit 14  Letter to GenAudio Shareholder   148
             from The Board of Directors,
19           2/25/15, with attachment
20  Exhibit 16  E-mail to Skluzak from Tiscareno,   58
             Subject: Look forward to your
21           review, 10/30/13, with attached
             e-mails
22
    Exhibit 24  E-mail to Mahabub and others     125
23           from Mattos, Subject: GenAudio
             Update & Business Summary,
24           11/9/09, with attachment
25
                                               Page 4
```

```
 1  Exhibit 69   GenAudio, Inc., Confidential     122
             Private Placement Memorandum,
 2           12/11/08
 3  Exhibit 70   GenAudio, Inc., Confidential     123
             Private Placement Memorandum,
 4           3/25/09
 5  Exhibit 198  GenAudio, Inc., Common Stock     117
             Transfer Ledgers
 6
    Exhibit 201  Shareholder Letter from Mahabub,   124
 7           3/30/09
 8  Exhibit 233  GenAudio Confidential Private     49
             Placement Memorandum, 3/15/10
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                               Page 5
```

```
 1      WHEREUPON, the following proceedings were
 2   taken pursuant to the Federal Rules of Civil
 3   Procedure.
 4           *    *    *    *    *
 5           DELL FRANK SKLUZAK,
 6   having been first duly sworn to state the whole truth,
 7   testified as follows:
 8           (Deponent's reply to oath: I do.)
 9              EXAMINATION
10   BY MR. HOLMES:
11      Q.  Good morning, Mr. Skluzak.
12      A.  Good morning.
13      Q.  My name is Andrew Holmes. I represent
14   Jerry Mahabub in this case. I think you've already
15   spelled your name for the record -- or no. Okay.
16   Could you spell -- could you state and spell your name
17   for the record, please.
18      A.  D-e-l-l; middle name, F-r-a-n-k; last name,
19   S-k-l-u-z-a-k.
20      Q.  Thank you. And, Mr. Skluzak, you have
21   counsel here with you today, right?
22      A.  Yes.
23          MR. HOLMES:  Okay. And Mr. -- I'm sorry --
24   Cohen?
25          MR. COHEN:  Yes.
                                                     Page 6
```

```
 1          MR. HOLMES:  Would you just identify
 2   yourself.
 3          MR. COHEN:  Sure. H. Paul Cohen,
 4   Registration No. 6683.
 5          MR. HOLMES:  And we also have counsel for
 6   the SEC?
 7          MS. HUGHES:  Good morning.
 8          MR. HOLMES:  And we also have counsel for
 9   GenAudio: Mike McCloskey.
10      Q.  (BY MR. HOLMES) So I want to go through
11   some of the preliminaries, just background on how this
12   works. Have you had your deposition taken before?
13      A.  Yes.
14      Q.  I know that you had your administrative or
15   investigative testimony taken by the SEC a couple of
16   years ago at this point, right?
17      A.  I'm not sure of the exact number of years
18   involved, but it's been a while, yes.
19      Q.  Okay. So aside from that, have you had
20   your deposition taken before?
21      A.  Yes.
22      Q.  Okay. How long ago was the last time?
23      A.  Eighteen months.
24      Q.  Okay. And was it a civil case?
25      A.  Yes.
                                                     Page 7
```

```
 1      Q.  Okay. And what was that case about?
 2      A.  It was a case between Newborn Caulk Gun
 3   Company and Albion Caulk Gun Company, which I'm a
 4   manufacturer's rep for Newborn Caulk Gun Company. And
 5   it had to do with import issues --
 6      Q.  Okay.
 7      A.  -- country of origin marking.
 8      Q.  Okay. And you were represented by counsel
 9   during that deposition?
10      A.  Yes.
11      Q.  Okay. So I'm going to go through briefly
12   sort of the background on how this works. It sounds
13   like you, based on that experience, should know how
14   depositions typically work, but just in case.
15          At the outset, you were placed under oath,
16   under penalty of perjury. Do you understand that?
17      A.  Yes.
18      Q.  What that means is that you're supposed to
19   give the best answers you can today, because it's
20   under penalty of perjury.
21          Please answer the questions as clearly as
22   possible. And please also do your best to wait until
23   I'm finished asking my question before you start to
24   respond.
25          If we overlap, the court reporter has a
                                                     Page 8
```

```
 1   difficult time taking down what the question is and
 2   what the response is. Can you do that for me?
 3      A.  Yes.
 4      Q.  Also, answer audibly. You're doing great.
 5   The court reporter can't take down head nods and head
 6   shakes, so verbal responses, something other than
 7   uh-huh or uh-uh, which also look very, very similar
 8   and are indecipherable on the written record, so a
 9   verbal response of a yes or no or whatever other
10   verbal appropriate response it might be. Can you do
11   that for me?
12      A.  Yes.
13      Q.  I'm going to ask the questions today.
14   Other counsel will probably have lots of questions
15   after me. And your attorney may object periodically
16   as we go through this.
17          The way this works, though, is because we
18   don't have a judge present to rule on whether the
19   objection is valid, overruled or sustained, you are
20   required to answer the question to the best of your
21   ability unless your attorney instructs you not to
22   answer. Do you understand?
23      A.  Yes.
24      Q.  We're going to take breaks about every
25   hour. It's not supposed to be an endurance test. If
                                                     Page 9
```

3 (Pages 6 - 9)

| | |
|---|---|
| 1  A. Yes.<br>2  Q. About how many in the first quarter of<br>3 2010?<br>4  A. Two to four.<br>5  Q. Was anybody else at those lunches?<br>6  A. Not -- I believe Mr. Mattos was at one of<br>7 them.<br>8  Q. And what did you talk about at these<br>9 lunches?<br>10  A. We talked about the forward business<br>11 momentum of GenAudio. We talked about professional<br>12 big name people, like recording artists, movie stars,<br>13 that were involved with the company by doing demos of<br>14 the product.<br>15  Q. Anything else you recall?<br>16  A. We talked about -- well, he talked a lot<br>17 about the need for money, to fund.<br>18  Q. As investment or in some other form?<br>19  A. As an investment in GenAudio and also as an<br>20 investment in his studio.<br>21  Q. Separate and apart from GenAudio?<br>22  A. Yes. There was a point where the studio<br>23 diverged from the business of GenAudio, when the board<br>24 at that time made the decision to not fund the studio.<br>25  Q. Are we still talking about the first<br>Page 26 | 1  A. No.<br>2  Q. Tell me about the personal meetings: how<br>3 many? Where?<br>4  A. My estimate would be two. There was one<br>5 meeting at The Hornet, which is a restaurant<br>6 approximately 100 Broadway Street. The second meeting<br>7 was a meeting at 240 Union, at 240 Union, in Lakewood,<br>8 Colorado.<br>9  Q. Okay. Do you recall when those were?<br>10  A. Not specifically, but they were sometime in<br>11 the first four months of 2010.<br>12  Q. So would these be included in the -- you<br>13 said you'd had some meetings in the first quarter --<br>14 roughly two to four meetings in the first quarter of<br>15 2010. Would these be two out of those four meetings?<br>16  A. Yes.<br>17  Q. And do you recall who attended these two<br>18 meetings?<br>19  A. Those two meetings were Mr. Mahabub and<br>20 myself. I do not specifically recall if Mr. Mattos<br>21 was in either one.<br>22    The involvement of Mr. Mattos at either one<br>23 of those meetings was a brief coming in, having a<br>24 discussion with Mr. Mahabub, and dropping some<br>25 paperwork off that I was not made privy to. So he<br>Page 28 |
| 1 quarter of 2010?<br>2  A. Roughly that time period.<br>3  Q. So at some point, did you make a further<br>4 investment in GenAudio?<br>5  A. To the best of my recollection, the next<br>6 investment I made was in May of 2010.<br>7  Q. Tell me about that.<br>8  A. I had one or two discussions with Mr.<br>9 Mahabub about the momentum with the LCEC and the need<br>10 to have more money to fund demo work, demonstration<br>11 work, and the interest by the LCEC in an acquisition<br>12 of GenAudio technology.<br>13  Q. And were these -- how did these<br>14 communications occur? Were they telephone? E-mail?<br>15 In person?<br>16  A. E-mails, the handing over of a prospectus<br>17 that was currently in force, personal meetings, and<br>18 telephone calls.<br>19  Q. To the extent that there were e-mails, do<br>20 you believe that you located and produced all of the<br>21 e-mails that would have been relevant to that time<br>22 period?<br>23  A. Yes.<br>24  Q. Is there any reason to believe anything's<br>25 missing?<br>Page 27 | 1 wasn't a part of the meeting, but he was there for a<br>2 short period of time.<br>3  Q. At both of them?<br>4  A. At just one of them, but I don't recall<br>5 specifically which one.<br>6  Q. So he was there briefly, had a discussion<br>7 with Mr. Mahabub, gave him some documents, and then<br>8 left?<br>9  A. Yeah. My recollection was it was<br>10 convenient for him to come meet Mr. Mahabub to hand<br>11 some type of paperwork off.<br>12  Q. Okay. So is there some reason why it was<br>13 these two meetings as opposed to the other two<br>14 meetings -- roughly, you said, between two and four<br>15 meetings -- that stand out as the reason why you had<br>16 invested in May of 2010?<br>17  A. Yes.<br>18  Q. Why is that?<br>19  A. Because of the level of excitement that<br>20 Mr. Mahabub represented, his statements that he had<br>21 had a meeting with Mr. Steve Jobs at Apple, who<br>22 stated -- Mr. Mahabub stated to me that Mr. Jobs<br>23 stated to Mr. Mahabub that he was very impressed with<br>24 the technology and that the level of interaction Mr.<br>25 Mahabub was having at Apple Computer was extensive and<br>Page 29 |

8 (Pages 26 - 29)

**Page 30**

1  high level.
2      Q.  And do you recall if this conversation
3  occurred at one of the two meetings or at both of
4  them?
5      A.  They were at both of the meetings.
6      Q.  And can you -- to the best of your ability,
7  can you recall more specifically when these meetings
8  occurred?
9      A.  I cannot.
10     Q.  Is there anything that would help us figure
11 that out?  An appointment book?  Calendar?
12     A.  I didn't have an appointment book.  I don't
13 recall who paid for the meals.
14     Q.  Okay.  Is there anything else, aside from
15 what you just said, about Jobs and extensive and
16 high-level interactions that was important to you in
17 your decision to invest?
18     A.  Not that I recall.
19     Q.  All right.  So what happened next?
20     A.  I don't understand the question.
21     Q.  At some point, you then invested?
22     A.  Yes.
23     Q.  Okay.  Do you recall how long it took you
24 to decide to invest after those meetings?
25     A.  I guess I need more specificity.  How long

**Page 31**

1  before I actually paid money or mentally made the
2  decision?
3      Q.  Well, let's start with mentally make the
4  decision.  How long did it take you to make that
5  decision?
6      A.  Following the discussion with Mr. Mahabub,
7  it seemed that -- when the CEO of a company had told
8  you he had had a meeting with Mr. Jobs, that he was
9  having high-level discussions with executive VPs and,
10 as Mr. Mahabub liked to call, C-level executives, that
11 my interest was high, that there was good possibility
12 that the company's technology was going to be
13 successful.
14         So I would assume it was a matter of two to
15 three days when mentally I said, I should invest more
16 money.
17     Q.  Okay.  And then what did you do to follow
18 through on that?
19     A.  I went to my investment accounts.  I was,
20 at that point in time, investing through my IRAs.  So
21 I had to open up a discussion with the special
22 divisions inside of my investment account, which is TD
23 Ameritrade now.  I forget what they were called then.
24         But you had to go to a nonstandard asset
25 group within that organization to get special

**Page 32**

1  authorization for them to decide to hold those type of
2  stocks, which I did.
3      Q.  So if we look at the records of when you
4  did that, if we count back a few days, we should be
5  able to figure out when this meeting was?
6      A.  That takes two to four weeks to do all of
7  that, so . . .
8      Q.  Do you have records of reaching out to
9  them, though, to start the process?
10     A.  No.  All I have is the documents from the
11 brokerage account.
12     Q.  Okay.  So was -- what was the response from
13 TD Ameritrade?
14     A.  That they would -- whatever due diligence
15 they did, that I would -- I'm not aware of what they
16 do to decide that.
17         They came back and said, Yes, we will hold
18 the -- we'll hold the stock certificates, told me what
19 the fee is to do that, and then showed me where the
20 documents were on the website, so I could download
21 them, fill them out, send them.
22     Q.  Okay.  So I don't think we need to go
23 through all the mechanics of how you did it beyond
24 what you just described.
25         But to cut to the chase:  You eventually

**Page 33**

1  then were able to buy more GenAudio stock and put it
2  into your Ameritrade account?
3      A.  I was, yes.
4      Q.  And do you recall any of the specifics of
5  that?
6      A.  Well, if I could review that document, I
7  could tell you specifically what I did.
8      Q.  Do you want me to hand you this?
9      A.  Sure.
10     Q.  Take a look.
11         (Mr. McCloskey tendered the document to the
12 deponent.)
13     A.  So I bought a quantity of 40,000 shares at
14 $3 a share.  That was transacted on May 18th, 2010.
15     Q.  (BY MR. HOLMES)  And can I just look at
16 what you are looking at there?
17     A.  Sure.
18     Q.  And we'll make a copy at the break and make
19 sure everybody gets it.
20         (The deponent tendered the document to
21 Mr. Holmes.)
22     Q.  (BY MR. HOLMES)  Okay.  So you came to
23 the -- oh, there it is:  $3 a share.  I thought you
24 did quick math in your head, but I see it actually did
25 it for you.  Okay.  So that's all.

1  about business meetings happening with Panasonic,
2  Japan specifically.
3      Q. You recall that you -- we talked about it.
4  You gave administrative testimony some time ago in
5  this -- with regard to the same subject matter?
6      A. Yes.
7      Q. Do you recall that in that testimony you
8  testified that during these initial meetings with
9  Mr. Mahabub, that he never identified Apple per se,
10 that it was the LCEC, and that you concluded it was
11 Apple? Do you recall that?
12     A. Yes.
13     Q. Is that consistent with your recollection
14 now?
15     A. Yes. My recollection is that he would say,
16 LCEC, and then he would make statements like, Well,
17 you know the fruit with a piece of -- bite out of it.
18 You know, I'm going to be in Cupertino. So that was
19 where my inference came from.
20     Q. Do you ever remember him saying "Apple" in
21 particular to you, the word "Apple"?
22     A. I don't -- I don't remember a specific
23 date. At some point, he dropped the LCEC and just
24 started saying "Apple." It also was a big inference
25 when he said he met with Steve Jobs.

Page 46

1      Q. Sure. Do you recall when he eventually
2  started saying "Apple" again? Was that after this
3  time period where we're looking at these stock
4  certificates of -- March of 2010 was the -- I guess is
5  there an April one? I'm sorry. May of 2010 is the
6  latest of these.
7      A. My recollection is that at some point in
8  the second half of 2010, the LCEC would be dropped for
9  just a straight-out Apple. "Apple is going to buy
10 us." That happened in discussions with Mr. Mattos
11 also.
12     Q. Okay. But up until -- so second half,
13 sometime after July?
14     A. Yes.
15     Q. So that would be after these particular
16 investments represented by the stock certificates
17 we've looked at so far?
18     A. Yes.
19     Q. Did you have a role at GenAudio at this
20 point, aside from being an investor?
21     A. No.
22     Q. At some point, that changed?
23     A. Yes.
24     Q. When did that change?
25     A. I believe it was approximately in the

Page 47

1  fourth quarter of 2012.
2      Q. And what happened then? You became an
3  officer or a director?
4      A. I became more involved in discussions with
5  Mr. Mahabub, which resulted in him introducing me to
6  Mr. Larry Coey and Richard. And Richard's last name
7  is escaping me at this point. But they were two vocal
8  and fairly large investors in GenAudio.
9      Q. And so we'll come back to that. But at
10 some point later on, you took on a more formal
11 position with GenAudio?
12     A. Yes.
13     Q. Okay. So let's -- we'll come back to that.
14 But that wasn't until at least the end of 2012?
15     A. Yes.
16     Q. Fourth quarter?
17     A. Yes.
18     Q. So prior to the decision to invest, you
19 said -- you said you made the decision to invest after
20 this meeting at the 240 Union?
21     A. Yes.
22     Q. Did you receive a PPM or anything like
23 that?
24     A. Yes.
25     Q. That was prior to your decision to invest?

Page 48

1      A. Yes.
2      Q. And did you read it at the time?
3      A. Yes.
4      Q. Do you recall anything standing out to you
5  in the PPM as good, bad, or indifferent?
6      A. I don't recall anything specifically.
7          MR. HOLMES: Let's go off record for a
8  second.
9          (Discussion off the record.)
10     Q. (BY MR. HOLMES) So what you have in front
11 of you should be a document that was previously marked
12 as Exhibit 233. And it's a document that has Bates
13 numbers on the bottom right, GA 004977 through 5124.
14 It's double-sided printed.
15     Do you know what we're looking at here?
16     A. Yes.
17     Q. What is it?
18     A. If would be what I would term as a
19 prospectus for a stock offering in the first quarter
20 of 2010 for GenAudio.
21     Q. Okay. Is this the prospectus -- or I think
22 we're calling it a PPM -- that you just testified you
23 reviewed prior to investing?
24     A. Yes.
25     Q. So if you take a look at it -- I know your

Page 49

13 (Pages 46 - 49)

**Page 134**

1    And I'm trying to understand why, if you're
2 saying this to Mr. Mahabub in January of 2013, today
3 are you saying you didn't rely on Exhibit 16.
4    A.  What I'm -- the conclusion I reached in
5 this document was that based on Mr. Mahabub's -- the
6 various discussions we had, that I had intended to
7 purchase and made the decision to buy these shares of
8 stocks.
9    ==After receiving this e-mail, it affirmed my==
10 ==willingness to purchase those stocks, because I still==
11 ==would have had the opportunity to stop the monetary==
12 ==transaction to purchase those stocks. It just==
13 ==confirmed that the decision I had made to purchase the==
14 ==stocks was a good decision.==
15    Q.  And prior to buying those 40,000 shares,
16 Mr. Mahabub had stated to you that he had met Steve
17 Jobs in the hallway?
18    A.  Yes.
19    Q.  And that information affirmed to you that
20 the LCEC was Apple?
21    A.  Yes.
22    Q.  Now, when you purchased those 40,000 shares
23 in May of 2010, do you recall filling out an
24 accredited investor questionnaire?
25    A.  I don't specifically recall doing it, but

**Page 135**

1 it would have been consistent with how I purchased
2 other shares of stocks with PPMs.
3    Q.  Meaning with PPMs with GenAudio?
4    A.  Yes, with GenAudio.
5    Q.  So early on, you filled out an investor
6 questionnaire?
7    A.  Yes.
8    Q.  In your records, did you have any copies of
9 the investor questionnaires?
10    A.  Not -- I don't recall for this specific
11 transaction. I did have records of other ones that I
12 had filled out.
13    Q.  And do you know of the time frame when you
14 filled them out?
15    A.  One would have been in 2004. The other one
16 that I'm certain of would have been 2012, in January,
17 at least that I have records for and submitted in the
18 various subpoenas that I got.
19    Q.  When you made the transaction in May 2010,
20 did you discuss with Mr. Mahabub whether or not you
21 were an accredited investor?
22    A.  I don't specifically recall if we had that
23 conversation.
24    Q.  Did you discuss with Jim Devine whether or
25 not you were an accredited investor in May of 2010?

**Page 136**

1    A.  I don't recall any specific conversation
2 with Mr. Devine.
3    Q.  Did you discuss with Jim Mattos whether or
4 not you were an accredited investor in May of 2010?
5    A.  I don't recall any specific discussion with
6 Mr. Mattos.
7    Q.  Did you discuss with anyone else from
8 GenAudio in May of 2010 whether or not you were an
9 accredited investor at that point in time?
10    A.  I don't recall any discussion I had with
11 any GenAudio person in that time frame.
12    Q.  Now, absolutely before that, you bought
13 400,000 shares from Jerry Mahabub personally for
14 $100,000, correct?
15    A.  Yes.
16    Q.  And when you made that purchase, did you
17 fill out an accredited investor questionnaire with
18 Mr. Mahabub?
19    A.  I do not recall filling that document out
20 with Mr. Mahabub.
21    Q.  Now, throughout this morning, we talked a
22 lot about your interaction with Bruce Ohman and being
23 put on a slate of investors to be considered for
24 GenAudio -- a slate of directors to be considered for
25 GenAudio, correct?

**Page 137**

1    A.  Yes.
2    Q.  I do not have it with me, but I've seen
3 documents that show that occurred in March of 2006.
4 Is that consistent with your recollection: It could
5 have been March of 2006?
6    A.  It could have been, yes.
7    Q.  Does that change any of our discussions
8 today or any of your testimony today when everyone
9 talked about, Oh, in 2005, this happened, this
10 happened, this happened, if, in fact, it was March of
11 2006? Does that change your testimony?
12    A.  It does not.
13    Q.  When you became on the board of directors
14 in April or May of 2012, was there a time when you
15 asked to take over the company's books and records or
16 take possession of those books and records?
17    A.  Yes.
18    Q.  Can you tell me when that occurred?
19    A.  I think it was approximately in August or
20 September of that year.
21    Q.  Of 2012?
22    A.  Yeah.
23    Q.  And did that -- did that happen: You took
24 the records from Jim Mattos and took possession of
25 them?

35 (Pages 134 - 137)

## Page 138

1  A.  Yes.  It could have been in 2013.  I'm not
2  specific -- let me restate.  I believe it was in the
3  spring of 2013, because when I physically removed them
4  from Mr. Mattos' presence, I know it was snowing and
5  it was cold.
6      Q.  And where did the records go when they left
7  Mr. Mattos' house?
8      A.  I transferred them to the office warehouse
9  that I had been leasing for PipeKnife Company.
10     Q.  And when you stopped being a director with
11 the company in roughly February of 2014, what happened
12 to those records?
13     A.  They were removed by GenAudio, who hired a
14 moving truck to relocate them.
15     Q.  During the time that you possessed
16 GenAudio's records -- we'll say approximately spring
17 of 2013 to February 2014 -- did you destroy any of the
18 records?
19     A.  No.
20     Q.  Did you misplace any of the records?
21     A.  No.
22     Q.  Did you give possession of the records to
23 anyone else?
24     A.  There were -- there was one shareholder who
25 requested a review of the records, as was allowed by

## Page 139

1  the bylaws, properly executed.  So he reviewed the
2  records.
3      Q.  When you were on the board of directors and
4  they decided to suspend Mr. Mahabub, so roughly
5  December of 2013, did you take over control of the
6  company's servers that kept copies of the e-mails?
7      A.  We directed the company that housed the
8  server to forward any e-mail for Mr. Mahabub to the
9  ==accounts that were active under his name, redirected==
10 ==to myself.==
11     ==Q.  Did you ask the company that was acting as==
12 ==the server for all the e-mails to destroy any of Mr.==
13 ==Mahabub's e-mails?==
14     ==A.  No.==
15     Q.  Did you go in and destroy Mr. Mahabub's
16 e-mails?
17     A.  I deleted certain e-mails that were not
18 related to company business.  Mr. Mahabub received
19 hundreds of pornographic e-mails to his GenAudio
20 account, along with spam and stuff for like,
21 Walgreens -- I just remember Walgreens because he got
22 a lot from Walgreens.  So I deleted those, but I did
23 not delete the delete file.
24     Q.  And when you were no longer a director,
25 roughly February of 2014, what happened to control of

## Page 140

1  the e-mail server and those e-mails?
2      A.  I assume it was returned to GenAudio or to
3  Mr. Mahabub, whoever the acting administrative person
4  was to -- to be able to be the administrator of that
5  account.
6      Q.  Now, in the fall of 2013, did you undertake
7  to determine how many personal stock sales Mr. Mahabub
8  had engaged in?
9      A.  Part of the investigation of what we felt
10 were breaches of fiduciary duty by Mr. Mahabub, that
11 was one of the items we investigated.
12     Q.  I'm going to show you what has previously
13 been marked as Exhibit 1.  Have you seen Exhibit 1
14 before?
15     A.  Yes.
16     Q.  And did you send this master shareholder
17 list to Jennifer Ostrom at the SEC on or about
18 August 8, 2014?
19     A.  Yes.
20     Q.  The underlying master shareholder list,
21 where did you get it from?
22     A.  I received this spreadsheet from two
23 sources:  one was from Mr. Mattos, and the other was
24 from Mr. Devine.
25     Q.  And was it your understanding it was a

## Page 141

1  complete shareholder list as of January 31, 2014?
2      A.  Yes.
3      Q.  Did you use this spreadsheet in determining
4  Mr. Mahabub's personal stock sales?
5      A.  Yes.
6          MS. HUGHES:  Let me have the court reporter
7  mark this as Exhibit 254.
8          (Deposition Exhibit 254 was marked.)
9      Q.  (BY MS. HUGHES)  Have you seen Exhibit 254
10 before?
11     A.  I've either seen this exhibit or some very
12 similar type of spreadsheet.
13     Q.  Did you create Exhibit 254?
14     A.  I believe I did, yes.
15     Q.  Okay.  And is it based on what we just
16 looked at:  the master shareholder list, Exhibit 1?
17     A.  Yes.
18     Q.  And there is a column for "Price" and
19 "Sale."  Where did that information come from?
20     A.  It would have come from either the master
21 shareholder list or the shareholder ledger that Mr.
22 Devine would have provided to me.
23     Q.  And at the time that you created this list
24 of Mr. Mahabub's personal share sales or gifts of
25 shares, did you believe it was accurate?

## Page 186

1  Mr. Cohen.
2  THE DEPONENT: Yes.
3  MS. HUGHES: All right.
4  WHEREUPON, the within proceedings were
5  concluded at the approximate hour of 2:26 p.m. on the
6  7th day of February, 2017.
7        *  *  *  *  *

## Page 187

1        I, DELL FRANK SKLUZAK, do hereby certify
2  that I have read the above and foregoing deposition
3  and that the same is a true and accurate transcription
4  of my testimony, except for attached amendments, if
5  any.
6
7
8  _____
         DELL FRANK SKLUZAK

## Page 188

1            REPORTER'S CERTIFICATE
2  STATE OF COLORADO     )
3                        ) ss.
4  CITY AND COUNTY OF DENVER )
5        I, KIMBERLY SMITH, Registered Professional
6  Reporter and Notary Public ID 20054024603, State of
7  Colorado, do hereby certify that previous to the
8  commencement of the examination, the said DELL FRANK
   SKLUZAK was duly sworn by me to testify to the truth
9  in relation to the matters in controversy between the
10 parties hereto; that the said deposition was taken in
11 machine shorthand by me at the time and place
12 aforesaid and was thereafter reduced to typewritten
13 form; that the foregoing is a true transcript of the
14 questions asked, testimony given, and proceedings had.
15       I further certify that I am not employed by,
   related to, nor of counsel for any of the parties
16 herein, nor otherwise interested in the outcome of
17 this litigation.
18       IN WITNESS WHEREOF, I have affixed my
19 signature this 17th day of February, 2017.
20
21
22
23
24       KIMBERLY SMITH
25

48 (Pages 186 - 188)

REPORTER'S CERTIFICATE

STATE OF COLORADO           )
                            ) ss.
CITY AND COUNTY OF DENVER   )

       I, KIMBERLY SMITH, Registered Professional Reporter and Notary Public ID 20054024603, State of Colorado, do hereby certify that previous to the commencement of the examination, the said DELL FRANK SKLUZAK was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

       I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

       IN WITNESS WHEREOF, I have affixed my signature this 16th day of February, 2017.
       My commission expires June 21, 2017.


\_XX\_\_ Reading and Signing was requested.

\_\_\_\_\_ Reading and Signing was waived.

\_\_\_\_\_ Reading and Signing is not required.



Kimberly Smith
Registered Professional Reporter