**EXCERPTED**

# EXHIBIT 88

### Page 1

```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
---------------------------
SECURITIES AND EXCHANGE     )
COMMISSION,                 )
        Plaintiff,          )
   vs.                      ) No. 1:15-cv-02118-
TAJ JERRY MAHABUB, GENAUDIO,)  WJM-CBS
INC., and ASTOUND HOLDINGS, )
INC.,                       )
        Defendants.         )
---------------------------
```

         DEPOSITION OF MICHAEL ELLIOTT
         600 University Street, Suite 320
              Seattle, Washington 98101
            Wednesday, January 18, 2017

REPORTED BY: Olivia Pennella
             Washington CCR 3337
JOB No. 2517595

PAGES 1 - 198

### Page 2

APPEARANCES

FOR PLAINTIFF:
  BY: LESLIE H. HUGHES
  United States Securities and Exchange
   Commission
  1961 Stout Street, Suite 1700
  Denver, Colorado 80294
  303-844-1086
  HughesLJ@sec.gov

FOR DEFENDANT TAJ JERRY MAHABUB:
  BY: ANDREW B. HOLMES
  Holmes, Taylor & Jones LLP
  617 South Olive Street, Suite 1200
  Los Angeles, California 90014
  213-985-2200
  abholmes@htjlaw.com

FOR DEFENDANT GENAUDIO, INC.:
  BY: MICHAEL McCLOSKEY
  Wilson Elser Moskowitz Edelman & Dicker, LLP
  655 West Broadway, Suite 900
  San Diego, California 92101
  619-321-6200
  michael.mccloskey@wilsonelser.com

### Page 3

E X A M I N A T I O N

| WITNESS | MR. HOLMES | MR. McCLOSKEY | MS. HUGHES |
|---|---|---|---|
| MICHAEL ELLIOTT | 5 | 146 | 162 |
|  | 183 | 189 | 194 |

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| Exhibit 177 | Background Questionnaire | 11 |
| Exhibit 178 | Email Correspondence (JM002525) | 29 |
| Exhibit 179 | Email Correspondence (JM002529) | 31 |
| Exhibit 180 | Confidential Private Placement Memorandum (GA004977-005124) | 33 |
| Exhibit 76 | Confidential Shareholder Communication March 15, 2010 (GA000140) | 37 |
| Exhibit 181 | Handwritten Chronology (3 pages) | 41 |
| Exhibit 182 | Email Correspondence (JM002558) | 42 |
| Exhibit 183 | Email Correspondence (JM002564-002565) | 43 |
| Exhibit 184 | Email Correspondence (JM003112-003113) | 46 |
| Exhibit 185 | Email Correspondence (JM005120) | 66 |
| Exhibit 186 | Email Correspondence (5 pages) | 84 |

### Page 4

E X H I B I T S (Continued)

| No. | Description | Page |
|---|---|---|
| Exhibit 187 | Email Correspondence (JM008623-008626) | 98 |
| Exhibit 188 | Email Correspondence (JM017364-017365) | 100 |
| Exhibit 189 | Email Correspondence (JM009238-009239) | 101 |
| Exhibit 190 | Email Correspondence (JM014522-014523) | 107 |
| Exhibit 191 | Email Correspondence (JM015016-01517) | 111 |
| Exhibit 192 | Email Correspondence (Mahabub002789-002794) | 116 |
| Exhibit 16 | Email Correspondence (SEC0000001-0000005) | 130 |
| Exhibit 193 | Letter to Fellow GenAudio Shareholders (2 pages) | 133 |
| Exhibit 194 | Email Correspondence (JM020310-020312) | 137 |
| Exhibit 195 | Email Correspondence (ME000050-000051) | 141 |
| Exhibit 196 | Shareholder Confidential Communication August 1, 2010 (GA005351-005353) | 167 |
| Exhibit 197 | Shareholder Communication August 28, 2010, (SEC0000006-0000009) | 168 |
| Exhibit 198 | GenAudio, Inc. Common Stock Transfer Ledger (GA001816-001852) | 172 |

(Exhibit 76 and Exhibit 16 were marked separately in one or more prior depositions.)

Page 5

1    Seattle, Washington, Wednesday, January 18, 2017
2                 9:05 a.m.
3
4    MICHAEL ELLIOTT,      witness herein, having been duly
5              sworn by the Certified Court
6              Reporter, testified as follows:
7         E X A M I N A T I O N
8    BY MR. HOLMES:
9        Q.  Good morning, Mr. Elliott.  Would you please
10   state and spell your full name for the record.
11       A.  Michael Elliott.  M-I-C-H-A-E-L.  Elliott,
12   E-L-L-I-O-T-T.
13       Q.  Mr. Elliott, thank you for coming in today.
14   As I mentioned to you before we went on the record, I'm
15   counsel for Jerry Mahabub.  We also have counsel for
16   GenAudio present, and we also have counsel for the SEC
17   here.  So, I know that your testimony was taken in the
18   SEC investigation.
19          Aside from that, have you ever had your
20   deposition taken before?
21       A.  Yes.
22       Q.  How long ago was that?
23       A.  The last time was 2003.
24       Q.  Okay.
25       A.  2003.

Page 6

1        Q.  And was that in a civil case?
2        A.  Yes.
3        Q.  Okay.  Did you have an attorney representing
4    you during that?
5        A.  Yes.
6        Q.  And do you not have an attorney present for
7    you today?
8        A.  No.
9        Q.  Okay.  You do have the right to have an
10   attorney present, and I just wanted to make sure that
11   you were aware of that.
12       A.  Yes.
13       Q.  Okay.  Typically what happens in these
14   depositions is that I will ask a series of questions,
15   then the other counsel who are present will be able to
16   ask some follow-up questions when I'm finished.
17          The way this works, as you may recall from the
18   last deposition you did -- the SEC administrative
19   testimony is a little bit different because it's just
20   the SEC and maybe your attorney there with you.  The
21   civil deposition is more like what this is.
22          So, the rules are:  I will ask questions.  And
23   then sometimes if your attorney is present, he can
24   interject objections.  And you don't have an attorney
25   here, but what I want to make sure that you're aware of

Page 7

1    is that you have a couple of things that you don't have
2    to tell me about.
3           You don't have to tell me about any privileged
4    communications you've had with an attorney or with your
5    wife or with a priest or psychologist or doctor --
6    anything like that.  Those are privileged
7    communications.  If you have any questions about whether
8    a response calls for that, then please ask me.
9        A.  Mm-hmm.
10       Q.  And I can't give you legal advice, but what I
11   can do is help you understand whether you're waiving a
12   privilege by responding.  And I don't want you to do
13   that without knowingly waiving a privilege.  Do you
14   understand?
15       A.  Mm-hmm.
16       Q.  The other thing that you always have the right
17   to do is not answer if you think the answer will be
18   incriminating; it's the Fifth Amendment.  So I don't
19   anticipate that that will come up, but I wanted to let
20   you know of that as well.  Do you understand that?
21       A.  Yes.
22       Q.  Okay.  All right.  So, this is not meant to be
23   an endurance test.  So, you did tell me that you're just
24   getting over some kind of a flu.  So if you need to take
25   a break, you need to pause for any reason, please let me

Page 8

1    know; and we'll take a break.
2           I would ask that to the extent that you need
3    to take a break, try to do it after you finish answering
4    a question rather than while one is pending.  And then
5    we'll take as much time as is necessary.
6        A.  Okay.
7        Q.  The court reporter placed you under oath.
8    That oath says that you're going to give your best
9    testimony you can under penalty of perjury.  Do you
10   understand that?
11       A.  Yes.
12       Q.  Okay.  Is there any reason why you wouldn't be
13   able to give your best testimony today?
14          For instance, you're taking medication that
15   might affect your memory or your ability to understand
16   questions -- anything like that?
17       A.  No.  Recall -- been many years since many of
18   these things happened.  But that's it.
19       Q.  Okay.  But is there anything -- I mean, you're
20   saying recall in general.  But that's just because
21   memories fade over time.  Are you --
22       A.  Right.
23       Q.  -- saying anything different --
24       A.  No --
25       Q.  -- than that?

Page 33

1 actually from --
2 MS. HUGHES: So on my list, Exhibit-2 was --
3 has the March 15, 2010, PPM --
4 MR. HOLMES: Great.
5 MS. HUGHES: -- GenAudio 487 --
6 MR. HOLMES: Yes.
7 MS. HUGHES: -- that Bates number.
8 MR. HOLMES: That's --
9 MS. HUGHES: Okay. So, this would be
10 Exhibit-2.
11 MR. HOLMES: Okay. The only difference is
12 that the version that the witness is looking at is a
13 later Bates range, and I happened to use that one
14 because it was in color.
15 MS. HUGHES: So, let's mark it as a new one
16 then.
17 MR. HOLMES: Okay. It's exactly the same --
18 I'll represent that it should be exactly the same
19 exhibit, but --
20 Let me have that back for a second.
21 THE WITNESS: Mm-hmm.
22 MR. HOLMES: We'll go ahead and mark it. So,
23 this is Bates Number -- starting -- GA004977 and going
24 through 5124.
25 (Exhibit 180 marked for identification.)

Page 34

1 MR. HOLMES: And actually, Leslie, I think the
2 reason I used this one is because it's in the package
3 that you asked us to stipulate, and you did us the favor
4 of giving us a color copy.
5 MS. HUGHES: Okay.
6 MR. HOLMES: So I want to present the color
7 version to the witness. I do have copies of this, if
8 you --
9 MS. HUGHES: Yes, please.
10 MR. HOLMES: But that's 487.
11 MS. HUGHES: Okay.
12 MR. McCLOSKEY: Thank you.
13 Q. (By Mr. Holmes) So, in front of you is
14 Exhibit-180. And we just had a discussion about what it
15 was marked as previously in the case.
16 Do you recognize what you're looking at?
17 A. Yes.
18 Q. What are you looking at?
19 A. It's a Private Placement Memorandum dated
20 March 15, 2010. Aggregate offering amount, $3 million.
21 Q. And do you recall if this is substantially
22 similar to or the same as the PPM that you reviewed in
23 or about July of 2010?
24 A. It -- it looks -- it looks to be the same.
25 Q. Okay. When you received it, did you read the

Page 35

1 whole thing?
2 A. I did not read the entire thing. I, however,
3 perused the entire thing.
4 Q. Okay.
5 A. And -- and stopped and spent more time on some
6 sections that seemed more interesting to me than others.
7 Q. Do you recall --
8 A. But I did look at the whole thing.
9 Q. Okay. Do you recall what it was that you
10 spent more time on?
11 A. The technology. I was fascinated with and
12 interested in the technology and how it was developed
13 and the -- and the -- second to that would be the -- the
14 opportunities, the market opportunities. I -- yeah.
15 Q. Okay. So, within the exhibit that you have,
16 there is the PPM itself. Then, there are two exhibits
17 to it: One is a subscription agreement, and the second
18 one is a valuation report prepared by a company called
19 Inavasis.
20 A. Yes.
21 Q. Do you recall looking at that as well?
22 A. Yes.
23 Q. And was that one of the things that caught
24 your attention, that you spent more time on?
25 A. It did. I didn't put a lot of weight on that.

Page 36

1 Q. Why not?
2 A. Just because -- well, I -- I'm skeptical, and
3 I -- and I thought that that may or may not be -- I -- I
4 didn't necessarily put a lot of credibility in -- in the
5 valuation. I didn't know Inavasis, and I didn't know --
6 I mean, it was of some interest; but not large interest.
7 Q. Okay. So most, then, of what you looked at
8 was within the PPM itself?
9 A. Yes.
10 Q. And the description of the market
11 opportunities and the technology therein?
12 A. Yes.
13 Q. And what did you come away with after looking
14 at it?
15 A. I came away with the fact that it was a unique
16 opportunity with lots of potential, if -- if marketed --
17 if developed and marketed properly and -- and that it
18 might be a good investment. Yeah, pretty
19 straightforward.
20 Q. Did you spend any time looking at the risk
21 factors or understanding the risk of the investment?
22 A. I did.
23 Q. Tell me about that.
24 A. I -- I view any company like this as very
25 risky. And -- and my advice to my sister-in-law, who

**Page 65**

1  Q.  So, you don't believe it had anything to do
2  with whether the LCEC was Apple?
3  A.  For her?
4  Q.  Right.
5  A.  No.  It was because I recommended it.
6  Q.  Was there anybody else that you introduced the
7  GenAudio investment to, besides your sister?
8  A.  Not -- not who followed through.  I sent -- I
9  sent some information to a few friends and to my -- my
10  oldest son.  But nobody did anything with it, other than
11  my sister-in-law.
12  Q.  And the neighbors and others who were in the
13  pool party group that invested, do you know, did they
14  invest before or after you did?
15  A.  Some before, some were -- Gary Allen had
16  already invested.  Tim Herdt, I think, had already
17  invested sometime in June.  This is speculation, because
18  they had -- when I became interested, they spoke as if
19  they were -- they were already involved.
20      It was that June through August period where
21  there was a frenzy of activity, because it was
22  represented to us by Jim Mattos that "you need to get in
23  now.  The -- the time is closing.  You got to -- you
24  have to do it now.  Time is running out."
25  Q.  So, is there anything that was in the

**Page 66**

1  communications with Mr. Mattos that made you invest, as
2  opposed to the PPM and things like that?
3  A.  No.  The -- no.  It was my conversations with
4  Dean and reading through the PPM and -- and doing some
5  research on the technology.
6  Q.  So, why did you bring up this urgency in the
7  June to August 2010 time period?
8  A.  Because again in these pool parties, it was
9  represented by Dean that -- that we may not be able to
10  buy any -- any more shares if in fact the LCEC and
11  GenAudio come to an agreement, so best to get involved
12  now if you're thinking about getting involved.  That was
13  it.
14      MR. HOLMES:  Okay.  So on your chronology
15  then, you had a -- looking at the first page of
16  Exhibit-181.
17      Here, let's mark our next exhibit in order.
18      (Exhibit 185 marked for identification.)
19  Q.  (By Mr. Holmes)  All right.  You have a
20  one-page exhibit in front of you.  At the top, it's an
21  email from you to Jim Mattos.  That email is dated
22  September 5th.
23      The email -- about halfway down the page --
24  that you're responding to is from Jim Mattos to
25  michaele@nwlink.com dated August 1, 2010.  Do you see

**Page 67**

1  that?
2  A.  Mm-hmm, yes.
3  Q.  Do you recognize this?
4  A.  Let me just review it.  Yeah, I recognize it.
5  Q.  Okay.  And that email, michaele@nwlink.com,
6  that's you?
7  A.  Yes.
8  Q.  Okay.  So, this August 1st email -- we don't
9  have the attachment right here -- but attached to
10  this was the update that you were referencing when you
11  wrote August 1, 2010, on your chronology?
12  A.  No.  There was something else that I -- that I
13  got this from, that actually referred to a handshake --
14  that Jerry was setting up a meeting with Steve Jobs -- a
15  handshake meeting with the CEO of the LCEC.
16  Q.  Right.  And just -- sorry, just to make sure
17  you understand, this email -- the one that's halfway
18  down the page -- references an attached PDF with a brief
19  summary.  It's not in the exhibit we're looking at right
20  now.
21  A.  Okay.  Well, that's probably the PDF that --
22  that -- that this note came out of then, yeah.
23  Q.  Okay.
24  A.  Yeah.  Okay, I understand what you're saying
25  now.

**Page 68**

1  Q.  Okay.  And then in this email, in the one from
2  Mr. Mattos to you on August 1st, the --
3  A.  Mm-hmm.
4  Q.  -- one, two, three -- fourth line down says:
5  "As a precautionary measure, we ask that you do not
6  discuss this email correspondence with anyone who is not
7  a GenAudio shareholder.  As a result, this
8  correspondence has been classified 'Shareholder
9  Confidential' -- which means for 'Shareholder eyes
10  only.'"  And then it goes on to say, "As the old adage
11  says, 'Loose lips sink ships.'"
12  A.  Mm-hmm.
13  Q.  What did you understand the purpose for saying
14  all that?
15  A.  This is a refrain that was often stated on --
16  on lots of different emails and letters and memoranda
17  that came down from GenAudio.  So, what did I -- what
18  did I think?  They didn't want any of this discussed for
19  fear of infringing on the NDA with the LCEC, is what I
20  assumed.
21  Q.  And do you recall at any point GenAudio
22  actually confirming in a GenAudio piece of
23  correspondence or conversation with Jim Mattos or Jerry
24  Mahabub or anyone like that, that in fact the LCEC was
25  Apple?

Page 193

1 Q. How much have you come out-of-pocket
2 personally to underwrite the effort to go after
3 Mr. Mahabub, GenAudio -- do whatever it is that you
4 wanted to do?
5 A. You mean, independent of the investment?
6 Q. Independent of your 60,000-plus.
7 A. Yeah, it was -- yeah, plus. We co-opted the
8 attorney fees with Erin Jensen early on.
9 Q. Co-opted?
10 A. Well, the eight or nine of us that --
11 Q. Oh, you all put into a pool?
12 A. Yeah, yeah, we pooled -- thank you -- we
13 pooled money to pay his fees. Other than that, postage,
14 a lot of time. But in terms of financial, just that
15 initial few hundred dollars each.
16 Q. How much did you pay Mr. Jensen?
17 A. I can't recall. I can look it up, but it
18 was --
19 Q. Estimate?
20 A. -- it was -- oh, maybe $1500 at the most --
21 20,000 -- 1500.
22 Q. Does Mr. Jensen --
23 A. It was just to help us kind of pave the way to
24 the SEC, and that was it.
25 Q. Does Mr. Jensen continue to have any kind of a

Page 194

1 role in connection with this case?
2 A. No.
3 MR. McCLOSKEY: No further questions. Thank
4 you, sir.
5 FURTHER EXAMINATION
6 BY MS. HUGHES:
7 Q. Now it's my challenge on memory. And I'm just
8 going to throw this out -- a way for you possibly to
9 recall.
10 My recollection is, I asked my paralegal to
11 email to you a copy of your investigative transcript to
12 review. But, sitting here today, I don't have that
13 email with me. And it's possible she did not send it to
14 you.
15 A. Do you mean as a -- as a precursor to that
16 fall meeting --
17 Q. Yes.
18 A. -- we just had?
19 I don't remember getting that.
20 Q. Did you receive it after the fall meeting?
21 A. I think I -- I would remember that, because
22 that was only a few months ago.
23 MS. HUGHES: So, I'm just -- for the sake of a
24 clear record, I think that we may -- I certainly would
25 have asked my paralegal to send you one. That may not

Page 195

1 have occurred.
2 So, gentlemen, I can share that information
3 with you after I'm back in the office.
4 Q. (By Ms. Hughes) But if you don't recall
5 having reviewed it, that's where we're at.
6 A. I don't.
7 MS. HUGHES: Okay. Very good. I have no
8 other questions.
9 MR. HOLMES: So, let's go off the record.
10 (Discussion held off the record.)
11 MR. HOLMES: Okay. So we've agreed, with
12 regard to the transcript, that the original will be sent
13 by the court reporter directly to the witness at an
14 address he'll provide off the record to the reporter.
15 You'll have 30 days from your receipt of the
16 that transcript to identify and make any changes that
17 you'd like to make to it. You will then forward to
18 Mr. McCloskey's office whatever changes you desire to
19 make.
20 If you do not do that within the 30 days, then
21 you agree that no changes need be made; and that a copy
22 of the unsigned transcript can be used as a final and
23 for all purposes.
24 Does everybody agree?
25 THE WITNESS: Agree.

Page 196

1 MS. HUGHES: Yes.
2 MR. McCLOSKEY: So stipulated.
3 MR. HOLMES: Thank you.
4 (Deposition concluded at 3:19 p.m.)
5 (Signature reserved.)
6 -----

197

```
 1                    C E R T I F I C A T E
 2    STATE OF WASHINGTON  )
                           ) ss.
 3    COUNTY OF KING       )
 4
 5            I, the undersigned Washington Certified Court
      Reporter, hereby certify that the foregoing deposition
 6    upon oral examination of MICHAEL ELLIOTT was taken
      stenographically before me on January 18, 2017, and
 7    transcribed under my direction;
 8            That the witness was duly sworn by me pursuant
      to RCW 5.28.010 to testify truthfully; that the
 9    transcript of the deposition is a full, true, and
      correct transcript to the best of my ability; that I am
10    neither attorney for nor a relative or employee of any
      of the parties to the action or any attorney or counsel
11    employed by the parties hereto nor financially
      interested in its outcome.
12
              I further certify that in accordance with
13    Washington Court Rule 30(e), the witness is given the
      opportunity to examine, read, and sign the deposition
14    within thirty days upon its completion and submission
      unless waiver of signature was indicated in the record.
15
              IN WITNESS WHEREOF, I have hereunto set my
16    hand this 23rd day of January, 2017.
17
18       \S\OLIVIA PENNELLA
19
20       _____
         Washington Certified Court Reporter No. 3337
21       License expires June 4, 2017.
22
23
24
25
```