**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No.:  1:15-cv-02118-WJM-CBS

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,


TAJ JERRY MAHABUB, GENAUDIO,
INC., and ASTOUND HOLDINGS, INC.,

      Defendants.

---

**DEFENDANT GENAUDIO INC.'S OPPOSITION TO
PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
REVISED MOTION FOR SUMMARY JUDGMENT**

---

1897609v.2

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

II.   RESPONSE TO MOVANT'S MATERIAL FACTS ............................................. 2

III.  GENAUDIO'S STATEMENT OF ADDITIONAL MATERIAL FACTS ........... 17

IV.   ARGUMENT ................................................................................................ 31

    A.   Alleged Misleading Statements and Omissions ............................................. 31

        1.   Alleged Fraudulent Statements Regarding Discussions
            with Apple ............................................................................................. 32

            a.   Mahabub Reasonably Believed Steve Jobs Gave
               The Green Light ................................................................. 32

            b.   Mahabub Reasonably Believed A Deal With Apple
               Was Likely ......................................................................... 34

               i.   GenAudio's Extensive Discussions with Apple .................... 34
               ii.  Other Reasons To Be Optimistic About A Deal
                   With Apple ................................................................ 35
               iii. Alleged Misrepresentations Regarding Discussions
                   With Apple ................................................................ 37

        2.   Alleged Omissions ............................................................................... 48

            a.   The September 2010 Meeting With Apple "Went Poorly." ........... 49

            b.   Discussions were with mid-level Apple personnel ........................ 50

            c.   Apple Negotiations and Plan To Integrate Technology .................. 51

    B.   Alleged Fraudulent Scheme Liability ............................................................. 52

    C.   Alleged Liability for Unlawful, Unregistered Securities Offerings .............. 54

V.    CONCLUSION ............................................................................................. 55

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases</u>

*Anastasi v. American Petroleum Inc.,*
    579 F.Supp. 273 (D.Colo.1984) ....................................................... 55

*Fitzpatrick v. City of Atlanta*,
    2 F.3d 1112 (11th Cir. 1993) ............................................................ 54

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ............................................. 37, 38, 46

*Romero v. Union Pac. Railroad*,
    615 F.3d 1303 (10th Cir. 1980) ........................................................ 1

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d. Cir. 1996) ............................................................. 37

*SEC v. Nacchio*,
    438 F.Supp.2d 1266 (D. Col. 2006) ................................................ 37

*SEC v. St. Anselm Exploration Co.*,
    936 F.Supp.2d 1281 (D.Colo.2013) ................................................ 52

*SEC v. Sullivan*,
    68 F.Supp.3d 1367 (D. Colo. 2014) ............................................... 52

## <u>Other Authorities</u>

Rule 506 of Regulation D .......................................................................... 54

Section 4(2) of the Securities Act of 1933 ................................................ 54

Section 5 of the Securities Act ................................................................. 55

# INTRODUCTION.

In its revised motion for summary judgment, the Securities and Exchange Commission ("Plaintiff") attempts to repackage as securities fraud altered emails and arguably misleading statements sent principally to the management team of GenAudio, Inc. ("GenAudio"), not to investors.  While GenAudio concedes its CEO, Taj Jerry Mahabub ("Mahabub"), compromised his honesty in certain limited instances in emails to his *employees*, his flirtation with the truth does not give rise to liability under either Section 10(b) or 17(a) of the Securities Exchange Act. Mahabub's conduct may prove objectionable for a variety of reasons, but Plaintiff fails to demonstrate he acted with the requisite state of mind or link his misgivings to the purchase of GenAudio shares by investors so as to give rise to securities fraud.

Nor has Plaintiff presented admissible evidence to demonstrate the absence of genuine issues of material fact.  Even if Plaintiff's evidence was admissible, it is confronted by other evidence offered by GenAudio and Mahabub calling into question its probative value.  For example, this competing evidence demonstrated genuine issues with respect to scienter.  Because it concerns a mental state, scienter needs to be determined by a trier of fact, thus is uniquely ill-suited for disposition by summary judgment.  *See Romero v. Union Pac. Railroad,* 615 F.3d 1303, 1309 (10th Cir. 1980).

The alleged Section 5 violations for unregistered securities fare no better.  First, whether the twin offerings are exempt under Section 4(2) because private is a fact intensive examination and analysis ill-suited for summary disposition.  Moreover, the failure of an investor to check a box on an accredited investor questionnaire could be as much administrative inattention to detail as an affirmative indication the investor is not accredited.  Nor does annotating the questionnaire "NA" demonstrate self-evident investor disqualification.  At best the annotation is ambiguous and, without more, does not evaporate GenAudio's eligibility for exemption from

securities registration.  Given the existence of these genuine issues of material fact, Plaintiff has

failed to sustain its burden that it is entitled to judgment as a matter of law.

## II.   RESPONSE TO MOVANT'S MATERIAL FACTS.

1 – 12: Undisputed.

13.   Leading up to the offerings at issue in this case, Mahabub conditioned the market

by touting GenAudio's compatibility with Apple products and its relationship with Apple.

**Response:**  It is disputed that Mahabub conditioned the market but undisputed that the quoted

statement is true.

14.   Similarly, in a cover email distributing the March 25, 2009 offering document,

Mahabub claimed that a GenAudio product was among the top downloads on Apple's website

and "[t]he selection to be the featured product came from internal Apple staff and has nothing to

do with any of our paid marketing programs or advertising." **Response:** Disputed. *See* Mahabub

Decl. ¶ 29.

15 - 20. Undisputed.

21.   Apple never told Mahabub or GenAudio that it planned to incorporate

GenAudio's technology in any of its new product roll-outs. **Response:**  Disputed.  Mahabub

testified he spoke with Tiscareno regarding a Christmas product roll-out.  Ex. 150, Mahabub

Dep. 143:24-144:1, 310:21-311:11; *see also* SOF ¶¶ 129, 131, 168.

22.   Apple never indicated that it was interested in licensing GenAudio's technology

or acquiring GenAudio or GenAudio's technology. **Response:**  Disputed.  Mahabub testified he

had a conversation with Isaac about licensing.  Ex. 150, Mahabub Dep. 95:9-97:16.  Mahabub

also reasonably believed for <u>*many*</u> reasons that Apple was interested in acquiring its technology.

*See, e.g.,* SOF ¶¶ 133-135, 138, 139, 141, 142, 147-152, 166, 168, 170-172, 174-175, 177.

23.   Apple and GenAudio did not negotiate about Apple licensing GenAudio's

technology or acquiring GenAudio or its technology. **Response:**  Disputed.  Mahabub testified

he had conversations with Tiscareno and Isaac regarding licensing and product rollout.  Ex. 150, Mahabub Dep. 95:9-97:16, 143:24-144:1, 310:21-311:11; *see also* SOF ¶ 168 (Mahabub sending negotiation emails to Apple); Tiscareno and Isaac never told Mahabub they would not be the ones to negotiate any deal with GenAudio.  SOF ¶¶ 139, 140.

24.     In August and September 2009, Mahabub emailed the GenAudio Team and represented that GenAudio was close to entering into licensing negotiations and a "big licensing deal" with Apple, and he altered emails from Apple to make it appear as if Mahabub had been in contact with Philip Schiller ("Schiller") and other high-level Apple employees.  **Response:** Undisputed that the relevant emails in Exs. 21, 22, 23, and 24 identify Jerry Mahabub and Ron Isaac as the sender, and the contents of these emails speak for themselves.

25-29.  Undisputed

30.     In October 2009, Mahabub emailed the GenAudio Board, employees, and contractors false and altered emails that made it appear that he had communicated with Apple executives Schiller and Timothy Cook ("Cook"), that GenAudio had received "the green light" on "the technical…side of the coin," and that Mahabub would be meeting with Apple CEO, Steve Jobs ("Jobs").  **Response:** Undisputed that the relevant emails in Exs. 31 and 32 identify Jerry Mahabub as the sender, and the contents of these emails speak for themselves.

31-32.  Undisputed.

33.     Jobs was not involved in Apple's dealings with GenAudio, and Apple employees did not discuss GenAudio with Jobs.  **Response:** Undisputed. Objection pursuant to Fed. R. Evid. 801 *et seq.*: Ex. 33 is an email from Apple employee, Tiscareno, and is inadmissible hearsay offered to prove that Apple employees did not discuss GenAudio with Jobs.

34-37.  Undisputed.

38.     An investor forwarded to Mattos the November 9, 2009 email, thanked Mattos for "meeting with me and my friends and family the other evening" and explained, "[w]e are all so

very appreciative of your time with us and dedication to Gen Audio [sic]. Here is a list of investors." **Response:** Objection pursuant to Fed. R. Evid. 801 *et seq.*: Ex. 42 is an email from an outside investor, Donaghue, and is inadmissible hearsay; it is undisputed the content of the email is as quoted.

39.     Numerous of the investors listed in the email purchased Mahabub's stock shortly thereafter. **Response:** Objection pursuant to Fed. R. Evid. 801 *et seq.*: Ex. 42, to which this statement relies, is an email from an outside investor, Donaghue, and is inadmissible hearsay; it is undisputed the content of the email is as quoted.

40-41.   Undisputed.

42.     In late 2009, Mahabub attended a GenAudio shareholders' meeting in Seattle and told shareholders that "he was positive that, supposedly I guess it was by the end of the year or something that Apple was going to be buying us out and we'd better get in now...." **Response:** Undisputed that Mahabub attended a GenAudio shareholders' meeting in Seattle and spoke to shareholders. Disputed as to the content of what Mahabub said because the witness's statement is speculative.

43.     As a result of Mahabub's statements at this meeting, shareholders purchased additional shares of GenAudio stock from Mahabub personally and referred new investors. **Response:** Disputed. Objection pursuant to Fed. R. Evid. 801 *et seq.*: Ex. 40 is an email from outside investors Dean & Linda Eldridge and is inadmissible hearsay offered to prove Mahabub sold his personal shares and that outside investors referred new investors.

44.     After making these false statements to prospective investors, Mahabub, with the assistance of Mattos, sold Mahabub's personal shares of GenAudio to investors. **Response:** Disputed. The cited Exhibits do not support the proposition that Mahabub sold his personal shares of GenAudio to investors. Objection pursuant to Fed. R. Evid. 801 *et seq.*: Ex. 42 is an

email from an outside investor, Donaghue, and is inadmissible hearsay offered to prove Mahabub sold his personal shares to investors.

45-47.  Undisputed.

48.     On December 16, 2009, in response to Mahabub's November 28, 2009 email about a potential "deal" between Apple and GenAudio, Apple employee Hailey stated, in part, "[w]e're making progress and building our story, but this is not something we can execute overnight. The business side of things would come into play after we have exec buy-in on the product side." **Response:**  Disputed.  *See* SOF ¶¶ 129, 143, 168; Objection pursuant to Fed. R. Evid. 801 *et seq.*: Ex. 44 is an email from Apple employee Hailey and is inadmissible hearsay offered to prove that no deal would be occurring anytime soon.

49.     On January 5, 2010, Hailey responded to an email from Mahabub and informed him that "[w]ith respect to timeframe, we are pretty serious about looking at audio quality across the board and this will take time – definitely more than a couple of months." **Response:** Disputed. *See* SOF ¶¶ 129, 143, 168; Objection pursuant to Fed. R. Evid. 801 *et seq.*: Ex. 45 is an email from Apple employee Hailey and is inadmissible hearsay offered to prove that no deal would be occurring anytime soon.

50.     On February 12, 2010, before a Board meeting, Mahabub sent the Board false and altered emails that made it appear that he had met with Schiller who discussed a "project…for Christmas product roll-out"; that "Apple is still very interested in licensing Astound for their products"; and that Apple's employees were working towards getting a deal "ok'd by the big man." **Response:** Undisputed that the relevant emails in Exs. 46 and 47 forwarding the Tiscareno email identifies Jerry Mahabub as the sender, and the contents of these emails speak for themselves.

51-52.  Undisputed.

53.     On March 10, 2010, Mahabub emailed 15 shareholders the valuation report that was to be included in the upcoming company stock offering, which reported the fair market value of GenAudio was above $1 billion and offered to sell 250,000 of his personal shares at $0.50 per share while falsely representing, "we are starting to discuss the business side with the LCEC, and I expect to have a very substantial licensing deal in place for their Christmas Product Rollout…." **Response:** Disputed. The valuation report concluded GenAudio *technology* may be worth $1 billion under certain express conditions, which were assumed, and included cautionary language regarding those findings. Ex. 3 at 39.  There was no finding the company, GenAudio, was worth $1 billion and Mahabub's statement makes it clear he is referring to the technology. Ex. 50 at 3. Further Mahabub clarifies that this number does not necessarily reflect the negotiated price for an acquisition or license. *Ibid.*; Additionally, Mahabub's representations were not falsely represented. Ex. 150, Mahabub Dep. 95:9-97:16, 143:24-144:1, 310:21-311:11; SOF ¶¶ 133-135, 138, 139, 141, 142, 147-152, 166, 168, 170-172, 174-175, 177.

54-58.  Undisputed.

59.     During 2010, GenAudio used an investor relations firm to send email blasts to invite prospective investors to attend road shows for GenAudio. GenAudio did not maintain records of email recipients, blasts, or any research reports that were disseminated to prospective investors. **Response:** Disputed. The cited Ex. 26 does not state that GenAudio used an investor relations firm to send email blasts or that GenAudio didn't maintain records that were disseminated to prospective investors.

60-61.  Undisputed.

62.     GenAudio did not have a set procedure to review whether investors completed the Confidential Subscriber Questionnaire ("Questionnaire") or to verify investor accreditation before it sent out the stock certificates and did not keep a list identifying its non-accredited investors. **Response:**  Disputed. Mattos reviewed the Questionnaires to ensure investor qualified

as accredited and if Questionnaire incomplete, normally contact the investor to complete it. Ex. 6, Mattos Dep. 169:23-171:4.

63.     Beyond sending and receiving the Questionnaires, GenAudio did nothing to determine whether investors were accredited. **Response:**  Disputed. Mattos reviewed the Questionnaires to ensure investor qualified as accredited and if Questionnaire incomplete, normally contact the investor to complete it.  Ex. 6, Mattos Dep. 169:23-171:4.

64.     In connection with the 2010 Offering, at least one GenAudio investor wrote "N/A" on the portion of the Questionnaire that addressed accreditation and investment experience.  **Response:**  Undisputed the Questionnaire has "N/A written on a portion of the document. Disputed the document demonstrated the investor was unaccredited.

65.     In connection with the 2010 Offering, other GenAudio investors failed to complete the portion of the Questionnaire that addressed accreditation. **Response:**  Undisputed as to the contents of the document as the document speaks for itself. Disputed the documents demonstrate investors were unaccredited.

66.     Undisputed.

67.     GenAudio and Mahabub admitted in the 2010 and 2011 Offering materials that since 2003, the Company has sold securities to accredited and non-accredited 'friends and family' investors," which may not qualify for exemption from registration. **Response:** Disputed. The 2010 and 2011 Offering materials do not establish the selling of securities since 2003 only that the "company commenced operations in 2003." Ex. 3 at 44-45; Ex. 4 at 53-54; Ex. 10 at 46; Ex. 11 at 52.

68.     GenAudio was willing to accept investments from non-accredited investors. **Response:**  Disputed. The cited evidence demonstrates GenAudio's allegiance to the accredited investor requirement. Ex. 64 (Rosenblatt was a prior investor already known to be accredited,

thus the reference to new investors required to be accredited); Ex. 65 (Mattos acknowledging SEC regulations in reference to aggregate investment by family pooling).

69.    Undisputed.

70.    The 2010 Offering Materials included a March 15, 2010 cover letter, that represented, "[t]his offering is being conducted to provide bridge capital until we can 'ink' a deal with a large consumer electronics company (referred to as the 'LCEC' throughout the PPM)...." that was emailed to investors. **Response:** Disputed that it was sent to prospective investors as the letter is addressed only to current shareholders to secure bridge capital. Ex. 14.

71.    Undisputed.

72.    Between November 2009 and April 2012, GenAudio and Mahabub did not inform investors that Apple and GenAudio had no negotiations to license GenAudio's technology or to acquire GenAudio or its technology. **Response:** Disputed. Mahabub testified he had a conversation with Isaac about licensing. Ex. 150, Mahabub Dep. 95:9-97:16. Mahabub also reasonably believed for *many* reasons that Apple was interested in acquiring its technology. *See, e.g.,* SOF ¶¶ 133, 134, 135, 138, 139, 141, 142, 147-165, 166, 168, 170-172, 174, 175, 177, 184-186.

73.    Undisputed.

74.    Two days later, on March 21, 2010, Mahabub sent the GenAudio Team, including Mattos, a false and altered email that made it appear as if he was communicating with Schiller; Schiller was "hoping for – a fall product rollout"; and Apple and Mahabub had discussed as "embedded level integration process". **Response:** Undisputed that the relevant emails in Exs. 66 and 67 identify Jerry Mahabub as the sender, and the contents of these emails speak for themselves.

75.    Undisputed.

76.     In early April 2010, Mahabub became aware of the scheduling of an internal meeting at Apple regarding GenAudio's technology. **Response:** Disputed. Mahabub was aware of the internal meeting long before April 2010.  Mahabub and Tiscareno worked on demos to be used at that meeting in late 2009.  Ex. 203 (Tiscareno and Mahabub discussing with Mahabub the preparation of demos to be shown to "the man", Ex. 152, Tiscareno Dep. 140:18-141:21 (Tiscareno confirming Ex. 203 relates to preparation of demos to be shown at the internal meeting).

77.     In correspondence between Mahabub and Tiscareno, neither indicated that the meeting would involve Jobs, Schiller, or Cook; instead, Mahabub referenced Tiscareno's upcoming meeting with an "exec." **Response:** Disputed. Mahabub and Tiscareno used several terms in their correspondence to describe the individual who would receive the presentation on May 6, 2010, including "the exec.", "the big exec.", and "the man."  *See* SOF ¶ 155.  Mahabub also testified Tiscareno and Hailey told him the meeting was with "Jobs."  SOF ¶ 157.  Tiscareno and Hailey may have intended to tell him the meeting was with "Joz."  SOF ¶ 156. Prior to this litigation, Mahabub did not know anyone named "Jozwiak" or "Joz" worked at Apple.

78.     On April 8, 2010, Mahabub sent a few members of the GenAudio Team false and altered emails that made it appear that Tiscareno stated "Phil [Schiller] let us know earlier that this might be postponed until early next week. Apparently Steve [Jobs] is planning on going out of town with his family for the weekend" and that Mahabub stated "[t]oo bad … although, that might be better given that Steve will be relaxed from having a weekend getaway with his family. Perhaps this is why Phil is rescheduling for next week." **Response:** Undisputed that the relevant emails in Exs. 72 and 73 identify Jerry Mahabub and Victor Tiscareno as the sender, and the contents of these emails speak for themselves.

79.     On April 30, 2010, while he was attending a conference for investment bankers and broker-dealers, Mahabub sent prospective investors an email that falsely stated that the

LCEC was "looking to acquire GenAudio's tech for integration into their entire lineup of product offerings" and "we are now waiting to when [sic] we will initiate negotiations, pending the CEO of the LCEC to approve the integrated product rollout strategy and the technical implementation strategy that will be presented to the CEO next week!!!" **Response:**  Disputed.  The email was sent to one investor only.  Other than Cohen, Mahabub only speculates as to who else may have received the email.  Ex. 150, Mahabub Dep., 200:12-202:10.  Mahabub's email was not false as he believed the statements were reasonable under the circumstances. *Id*., 205:2-19 (reasonable to believe Apple looking to acquire GenAudio technology for integration); 207:4-20 (reasonable to believe awaiting CEO approval of integrated product rollout strategy and technical implementation strategy). *See* SOF ¶ 142, 147, 149, 150, 151, 153-159.

80.     After receiving the email, an investor purchased 5,000 shares for $15,000.
**Response:**  Disputed. Objection pursuant to Fed. R. Evid. 801 *et seq.*: The email from the investor in Ex. 74 and Ex. 51 are inadmissible hearsay as an out of court statement offered to prove the truth of the matter asserted. The email states, "Thanks, I will mail the subscription agreement" and is being offered to prove a subscription agreement was sent.

81.     On May 5, Mahabub sent Tiscareno materials that he suggested Tiscareno use at the meeting with "the exec," and he offered to attend the meeting; however, Tiscareno declined the offer, explaining "this is not that kind of demo. [Hailey] and I are pitching this as a concept ...." and "[o]nce we get the go ahead that this is a great idea, then the questions will be, 'well, what about the other technologies, have we reviewed them? etc.' Then we sort of start over internally.... We have to get to first base...." **Response:**  Disputed. Mahabub and Tiscareno used several terms in their correspondence to describe the individual who would receive the presentation on May 6, 2010, including "the exec.", "the big exec.", and "the man." *See* SOF ¶ 155.  Mahabub also testified Tiscareno and Hailey told him the meeting was with "Jobs."  SOF ¶ 157.  Tiscareno and Hailey may have intended to tell him the meeting was with

"Joz." SOF ¶ 156. Prior to this litigation, Mahabub did not know anyone named "Jozwiak" or "Joz" worked at Apple. Objection pursuant to Fed. R. Evid. 801 *et seq.*: Ex. 71 is an email from Apple employee Tiscareno and is inadmissible hearsay.

82.     In the morning and early afternoon of May 6, 2010, Mahabub sent emails to the GenAudio Team regarding the upcoming meeting at Apple which falsely represented that Schiller and Jobs were involved. **Response:**  Disputed.  Mahabub honestly and reasonably believed Schiller and Jobs were involved. Mahabub Decl., ¶ 23-24; *See* SOF ¶¶ 142, 147, 149, 150, 151, 153-159.

83.     Late in the evening of May 6, 2010, Mahabub sent the GenAudio Team a purported "transcription" of a phone call between him and Tiscareno. After repeatedly instructing that the email be deleted, Mahabub set forth his purported conversation with Tiscareno, which included representations that Tiscareno stated that "Steve thought the technology was so extraordinary .... I believe he wants to explode this technology into the world" and "[Steve] instructed all of us to be in a no radio period" and "I can say that [Steve] is anxious to meet you in person when we have things figured out on our end." Mahabub then concluded the email by stating "[a]t least we have some time to put our strategy together and get our pawns in order for the asset acquisition or licensing battle." **Response:**  Undisputed that the relevant emails in Ex. 33 identifies Jerry Mahabub as the sender, and the contents of these emails speak for themselves.

84.     Mahabub then forwarded the email that contained the false "transcription" to an investor. **Response:** Undisputed that Mahabub forwarded an email to Skluzak. Objection pursuant to Fed. R. Evid. 801 *et seq.*: The email from Tiscareno in Ex. 33 is inadmissible hearsay as an out of court statement offered to prove the truth of the matter asserted in the email that the transcription was false.

85.     Undisputed.

86.     The investor purchased GenAudio stock in May of 2010 because Mahabub orally represented to the investor that Jobs "stated to Mr. Mahabub that he was very impressed with [GenAudio's] technology," and because "the level of interaction Mr. Mahabub was having at Apple Computer was extensive and high level." **Response:** Disputed. Ex. 218, Skluzak Dep., 59:23-60:5 ("I had already made my determination ... prior to this date, sometime in April, that I was going to invest.") Additionally, Mahabub did not tell the investor (Skluzak) that he had personally spoken with Jobs, or that Jobs personally told him that Jobs was very impressed with GenAudio's technology. Rather, Mahabub told Skluzak that Tiscareno told him that Jobs was shown the technology and that he liked it. Tiscareno might have said "Joz" or "Jaws," in reference to another Apple executive named Jozwiak. But, since Mahabub had never heard of "Jaws" before, and until this litigation didn't know that an executive by that name even existed, his understanding was that Tiscareno was referring to Steve "Jobs." Mahabub Decl. ¶¶ 24, 28.

87.     Further, receipt of the false "transcription" "affirmed [the investor's] willingness to purchase 40,000 shares of stocks" in the 2010 Offering, because "[i]t just confirmed that the decision I had made to purchase the stocks was a good decision." **Response:** Disputed. Skluzak did not rely on the "transcription" to purchase shares as he had purchased prior to receiving the email from Mahabub. Ex. 218, Skluzak Dep., 59:23-60:5 ("I had already made my determination ... prior to this date, sometime in April, that I was going to invest.")

88.     On October 30, 2013, Tiscareno received a copy of the May 6, 2010 "transcription" from a GenAudio investor and responded "OMG!" and went on to explain "I never discussed anything about Steve Jobs or any other board member at Apple. I never discussed this with Steve Jobs. Period!" and "This letter is pure fabrication." **Response:** Disputed.  Objection pursuant to Fed. R. Evid. 801 *et seq.*: The email from Tiscareno in Ex. 33 is inadmissible hearsay as an out of court statement offered to prove the truth of the matter asserted

in the email that Tiscareno never discussed anything with Steve Jobs and that the transcription was false.

89.     In May 2010, Mahabub and GenAudio created an investor presentation that was emailed to investors; during the presentation, Mahabub falsely stated that "the CEO of the LCEC finally met with senior marketing and technical management and we have the green light to move forward."; The presentation and email also discussed GenAudio's 2010 Offering and encouraged investors to review the PPM and attached valuation report. **Response:**  Disputed. Mahabub reasonably believed his statement about the LCEC's CEO was true. *See* SOF ¶¶ 142, 147, 149-151, 153-159.

90.     On July 2, 2010, Mahabub emailed the GenAudio Team false and altered emails that made it appear that Jobs wanted to meet with Mahabub and Jobs was involved in evaluating GenAudio's technology. **Response:** Undisputed that the relevant emails in Ex. 77 and 78 identify Jerry Mahabub and Victor Tiscareno as the sender, and the contents of these emails speak for themselves.

91-94.  Undisputed.

95.     On or about September 23, 2010, Mahabub attended a demonstration at Apple with Dr. Andrew Bright, who was an Apple employee with a Ph. D. in Acoustics, Tiscareno, and Isaac. **Response:** Undisputed that Mahabub attended a demonstration at Apple. Objection pursuant to Fed. R. Evid. 801 *et seq.*: The email from Tiscareno in Ex. 81 is inadmissible hearsay as an out of court statement offered to prove the truth of the matter asserted in the email.

96.     The meeting did not go well due to an argument between Mahabub and Bright, and was Mahabub's last substantive meeting with Apple. **Response:**  Disputed. The meeting was not Mahabub's last substantive meeting with Apple.  Mahabub continued to work substantively with both the iPhone/iPod/iPad division and the Mac division, and had many more substantive discussions with them in-person, by email, and by phone.  SOF ¶¶ 134, 174, 175, 179-181, 184.

97-104.   Undisputed.

105.   GenAudio and Mahabub solicited prospective investors for the 2011 Offering through the March 29, 2011 email to shareholders (see ¶ 98 above), a letter to investors electronically signed by Mahabub, and a PPM dated April 22, 2011 ("2011 Offering Materials") that was emailed to investors. **Response:** Disputed. Ex. 85, which contains the March 29, 2011 email to shareholders, makes it clear "the new offering [PPM of April 22, 2011] will be limited to our existing accredited shareholders, and we plan on raising up to 2.1 MM USD at 3.00 USD per share." Ex. 85, p.6.

106.   Undisputed.

107.   During the 2010 and 2011-2012 Offerings, Mahabub solicited potential investors at public presentations he called "road shows." **Response:**  Disputed. Objection pursuant to Fed. R. Evid. 801 *et seq.*: Ex. 87 is an email from an outside investor and is inadmissible hearsay offered to prove that potential investors were solicited during road shows.

108.   Undisputed.

109.   During the 2011 Offering, GenAudio did not have a set procedure to review whether investors completed the Questionnaire and provided information demonstrating an investor was accredited before it sent out the stock certificated and did not keep a list identifying its non-accredited investors. **Response:**  Disputed. Mattos reviewed the Questionnaires to ensure investor qualified as accredited and if Questionnaire incomplete, normally contact the investor to complete it. Ex. 6, Mattos Dep. 169:23-171:4.

110.   Beyond sending and receiving the Questionnaires, GenAudio did not do anything to determine investor accreditation. **Response:**  Disputed. Mattos reviewed the Questionnaires to ensure investor qualified as accredited and if Questionnaire incomplete, normally contact the investor to complete it. Ex. 6, Mattos Dep. 169:23-171:4.

111.    At least one investor who invested in the 2011-2012 Offering on multiple occasions repeatedly failed to complete the portion of the Questionnaire that addressed accreditation. **Response:**  Undisputed as to the contents of the document as the document speaks for itself. Disputed the documents demonstrate investors were unaccredited.

112-113.  Undisputed.

114.    On April 22, 2011, GenAudio and Mahabub sent investors the 2011 Offering materials. As noted in the March 29, 2011 email, the Offering materials omitted information about Apple or "the LCEC." **Response:**  Disputed. Ex. 4 and Ex. 86 do not support this statement of fact as neither is an email dated March 29, 2011.

115.    In the 2011 Offering Materials, GenAudio and Mahabub did not inform investors that Mahabub's substantive communications with Apple personnel were almost always limited to mid-level engineering and marketing employees. **Response:**  Disputed.  Mahabub met with some senior Apple personnel.  Mahabub also reasonably believed Tiscareno was a senior Apple employee.  SOF ¶¶ 170, 171.

116.    In the 2011 Offering Materials, GenAudio and Mahabub did not inform investors that Apple and GenAudio had no negotiations to license GenAudio's technology or to acquire GenAudio or its technology. **Response:**  Disputed.  *See* response to SOF ¶¶ 23, 29.

117.    In the 2011 Offering Materials, GenAudio and Mahabub did not inform investors that in September 2010, Mahabub conducted a demonstration to Apple personnel that went poorly. **Response:**  Disputed. *See* response to SOF ¶¶ 95-96.

118-119.  Undisputed.

120.    Investors received and reviewed GenAudio's Offering Materials. **Response:** Disputed. The statement is accurate only as to two investors – Elliot and Skluzak. Further, Plaintiff relies on this statement to support its assertion that "Defendants misled reasonable investors to believe that Apple was interested in either acquiring GenAudio, or acquiring or

licensing its technology, facts that are obviously material to the reasonable investment decision. […] Moreover, the false and misleading statement and omissions were important to GenAudio's investors and influenced their investment decisions." (Motion for Summary Judgment at 37.) The cited portions of the transcript, however, never mention Apple or any misrepresentation regarding Apple. The cited portions only affirm that Elliot and Skluzak received and reviewed Offering Materials.

121.    GenAudio's and Mahabub's shareholder updates were important to investors.

**Response:** Undisputed that the testimony is as cited. Disputed that "investors" applies to more than Eldridge, Elliot, and Bobak. Objection pursuant to Fed. R. Evid. 801 *et seq.*: statements by other people to Bobak are inadmissible hearsay.

122.    Investors purchased shares from Mahabub and GenAudio based on representations about Apple's alleged dealings with GenAudio, including Mahabub's oral representations. **Response:**  Disputed because, at least from Mahabub's and GenAudio's perspective, none of the referenced stock purchases were due to a knowing dissemination of information to people who would buy stock.  First, at the time these purchases occurred, GenAudio's non-disclosure agreement ("NDA") with Apple was in effect.  Mahabub Decl. ¶ 12; Ex. 91.  Therefore, any information related to GenAudio's relationship with Apple was confidential and should not have been used as a basis for purchasing GenAudio stock (i.e., it was insider information).  Second, as to Eldridge specifically, he did not hear about Apple from Mahabub. Eldridge first heard about Apple possibly being interested in GenAudio in 2009 from his son, Derek Eldridge, who heard it from Jim Mattos.  Ex. 95, Eldridge Inv. 23:9–24:13. *See also* Ex. 93, Mattos Dep. 129:5–10, 131:4–15 (corroborating Eldridge's testimony and acknowledging that Derek Eldridge "was one of [his] best friends" and they discussed Apple).

### III.   GENAUDIO'S STATEMENT OF ADDITIONAL MATERIAL FACTS

123.   GenAudio's discussions with Apple regarding GenAudio's AstoundSound technology began in late 2006.  Ex. 151; Ex. 152, Tiscareno Dep. 46:21-47:1.[1]

124.   GenAudio had separate discussions with several separate product divisions at Apple: both the iPhone/iPod/iPad division and the Macintosh (or "Mac") division.  Tiscareno served as GenAudio's primary point of contact for the iPhone/iPod/iPad division, and Isaac was the primary person working with GenAudio from the Mac division. Ex. 170, Isaac Inv. 13:17-14:2.

125.   When vendors contact Apple to engage in discussions of the vendors' technology, the ultimate goal of those discussions from the vendor's perspective is to reach an agreement with Apple to buy that technology, either through a licensing agreement, or a partnership/ acquisition, and the purpose from Apple's perspective also is the potential for such an agreement. Ex. 152, Tiscareno Dep. 30:14-23; 50:14-51:3; Ex. 171, Hailey Inv. 32:23-33:4.

126.   Here, from the beginning of the discussions between GenAudio and Apple, Mahabub made clear to Apple that his goal was to reach a licensing agreement or acquisition of GenAudio's technology.  Ex. 172 at 2; Ex. 173, Ex. 152, Tiscareno Dep. 70:23-71-7.

127.   GenAudio and Apple executed a Non-Disclosure Agreement in July 2009. Mahabub Decl. ¶ 12.

128.   By August 2009, Tiscareno and Mahabub were working closely together regarding GenAudio's technology and the two communicated frequently.  Ex. 152, Tiscareno Dep. 118:14-16, 120:5-8; Ex. 185 ("I . . . feel that we have become friends . . . .")

129.   Mahabub repeatedly wrote to his contacts at Apple regarding his view that most of the work needed to implement GenAudio's technology into Apple products was completed

---

[1]      For the convenience of the Court, citations to and testimony from the SEC investigation and to deposition transcripts follow the same format as used by Plaintiff in its brief.

and that GenAudio's technology could be included quickly into Apple products for sale to consumers.  For example, in September 2009, Mahabub told Tiscareno that as of September 2009, the work needed to implement GenAudio's technology into Apple's products was "already for the most part done. . . .  [I]t is in fact a very real and attainable goal for X-Mas product rollout if we work hard and fast[]!")  Tiscareno did not tell Mahabub that he disagreed with that view, which further encouraged Mahabub to believe his statements were correct. Ex. 189; Ex. 152, Tiscareno Dep. 127:10-20, 128:20-24 ("Q: Did you talk to Mr. Mahabub about whether you agreed with that statement? . . . A. No, I never called him on those things."); 130:5-8; 130:25-131:8; 134:10-16 (regarding Mahabub's frequent comments of this nature).

130.    When Mahabub wrote to Tiscareno in September 2009 that "[I]t is in fact a very real and attainable goal for X-Mas product rollout if we work hard and fast[]!", Ex. 189, Tiscareno testified he thought Mahabub really appeared to believe in GenAudio's prospects for reaching a deal with Apple. Ex. 152, Tiscareno Dep. 131:14-132:7.

131.    In September 2009, Mahabub also wrote to Isaac, his primary contact in Apple's Mac division, regarding his optimism that Apple's interest in, and evaluation of, GenAudio's technology was sufficiently advanced that a deal between Apple and GenAudio could be imminent.  Mahabub wrote, "I hope we can get this done on the fast track – potentially for inclusion in Apple's X-Mas product rollout strategy?" Ex. 192 at 13.  Isaac testified he did not read this portion of Mahabub's email and did not respond to it, nor did he tell Mahabub that he disagreed with Mahabub's view. Ex. 169, Isaac Dep. 71:13-72:11.

132.    On November 3, 2009, Mahabub also wrote Tiscareno, his primary contact in Apple's  iPhone/iPod/iPad division, and again expressed optimism and belief that a deal between Apple and GenAudio would be completed in the short term.  Mahabub said, "Hopefully Mac Division signs off on this and we can get moving on to the next step, especially if there is any hope of having this done by MacWorld from the Marketing side, it would only make sense that

we start to figure out the MacWorld deal structure between Apple and GenAudio sooner rather than later." Ex. 193.  MacWorld is a conference that was held each year in January, so Mahabub was suggesting a transaction could be completed sufficiently quickly for GenAudio's technology to be integrated into Apple products and on the market by January, three months later. Ex. 152, Tiscareno Dep. 143:1-12.  Tiscareno did not respond to Mahabub's comment, and he did not tell Mahabub his statement about the short timeline for a possible deal was unrealistic. Ex. 152, Tiscareno Dep. 144:10-16, 145:1-12.

133.    By November 2009, the discussions between GenAudio and Apple regarding GenAudio's technology were extensive. Ex. 152, Tiscareno Dep. 152:2-154:14 (Tiscareno saying there were "a lot" of communications with GenAudio by November 2009).

134.    By November 2009, Mahabub had met *in-person* with Apple personnel at Apple's offices at least 10 times.  Ex. 153 (prepared during testimony of Victor Tiscareno to reflect the dates of at least 15 in-person meetings, based on emails, calendar entries, and deposition testimony, and showing at least 10 in-person meetings by November 2009).[2]

135.    Mahabub and Apple personnel also had extensive other contacts, including many phone calls and emails.  Ex. 152, Tiscareno Dep. 25:25-26:5; 29:17-30:3; Ex. 169, Isaac Dep. 46:1-2, 47:2-5; Ex. 150, Mahabub Dep. 92:11-15.

136.    By November 2009, GenAudio had successfully worked with Apple to accomplish full embedded level integration of GenAudio's technology into the most complicated line of Apple products in the Mac division, such that minimal effort would be needed to integrate the technology onto other Apple computers. Ex. 169, Isaac Dep. 44:1-11, 117:16-118-24 (Isaac acknowledging GenAudio accomplished full embedded level integration by November 2009), 136:3-9, 175:21-176:21 (integration of GenAudio's technology was completed on the most complicated line of Mac computers and minimal effort would be needed to integrate the

---

[2]        Exhibit 153 is referenced throughout the Tiscareno deposition transcript as Deposition Exhibit 82.

technology onto other types of Mac computers); Ex. 174 (deposition exhibit number 164 discussed by Isaac in his testimony, and setting the timeframe for full embedded level integration).

137.    In November 2009, Mahabub hired an intellectual property valuation specialist to value GenAudio's technology under several scenarios in anticipation of negotiations with Apple over a licensing agreement or acquisition for that technology. Ex. 198 at 39.

138.    On November 28, 2009, Mahabub sent his contacts at Apple a lengthy email in which he sought to negotiate the terms of a transaction with Apple for GenAudio's technology, including its architecture, price, patent ownership, and timing of its close. Ex. 190; Ex. 152, Tiscareno Dep. 173:3-7 (discussing Ex. 190: "Q: So [Mahabub's] trying to negotiate with you. You're just not negotiating back. A: Yeah.")

139.    After Tiscareno received Mahabub's November 28, 2009 email, Tiscareno ignored it; he did not tell Mahabub that his attempt to negotiate a deal with Apple was premature or that his understanding of Apple's intent was misplaced. Ex. 152, Tiscareno Dep. 164:13-165:8, 167:17, 25-168:6; 173:3-7. Tiscareno also did not tell Mahabub that Tiscareno would not be responsible for any negotiation on behalf of Apple. Ex. 152, Tiscareno Dep. 174:22-175:24; Mahabub Decl. ¶ 26.

140.    Isaac never told Mahabub that Isaac lacked the authority to make a decision about any business deal with GenAudio on the Mac side. Ex. 169, Isaac Dep. 160:22-161:10 ("[M]aking business decisions was way above my pay grade, and that remains a very accurate statement. Q: Do you recall ever telling that to Mr. Mahabub? A: No, I do not.").

141.    Hailey did respond to Mahabub's November 28, 2009 email. In Hailey's response, he confirmed Apple is "interested in [GenAudio's] technology" and said "[w]e're making progress and building our story, but this is not something we can execute overnight.

The business side of things would come into play after we have exec buy-in on the product side." Ex. 190 at 2.

142.   Following Hailey's response to the November 28, 2009 email, Mahabub was focused on what Hailey had referred to as the "executive buy-in" as a "final milestone" to be reached before a deal with Apple could be reached for GenAudio's technology.  Ex. 201; Ex. 152, Tiscareno Dep. 178:18-179:9 ("final milestone"); Ex. 190 at 1 (Mahabub asking when "exec buy-in might take place" and asking for a "ball park figure" on timing).

143.   After Hailey's response, Mahabub still believed "executive buy-in" at Apple could be obtained within the next few months.  Ex. 188, Hailey Dep. 100:24-101:22 (Q: And you wrote that because it seems Mr. Mahabub thought the time frame would be faster than a couple of months, right? A: Correct."); *see also* Ex. 164 at 2 (Mahabub thanking Hailey for disclosing "the more realistic timeframe" and suggesting he still thought it could occur within 3-6 months).

144.   On March 15, 2010, GenAudio sent a cover letter to potential investors stating that GenAudio's 2010 stock offering "is being conducted to provide bridge capital until we can 'ink' a deal with a large consumer electronics company (referred to as the 'LCEC' throughout the PPM)." Tiscareno testified that there was nothing inaccurate regarding that statement. Ex. 152, Tiscareno Dep. 194:5-6, 195:4-21, 199:20-25 (discussing SEC Ex. 52).

145.   GenAudio's March 15, 2010 Private Placement Memorandum similarly states as follows:

> [GenAudio] is optimistic that the LCEC will eventually want access to our AstoundSound technology for their products.  It is unclear what structure such access would take, but the Company believes the LCEC would either (i) integrate a portion of our AstoundSound Technology, namely ASE, into multiple product lines through a licensing arrangement or (ii) acquire all of our AstoundSound Technology or, at least, that portion the LCEC deems necessary for its integration plans

Again, Tiscareno testified these statements are accurate.  Ex. 152, Tiscareno Dep. 203:11-13, 204:6-7, 205:2-207:22 (discussing SEC Ex. 3 at 21).

146.     GenAudio's March 15, 2010 Private Placement Memorandum, and the March 15, 2010 letter that accompanied it, included meaningful cautionary language regarding the risks facing GenAudio, including that GenAudio had not consummated any deal with Apple, and the specific fact there was no guarantee that such deal would be reached in the future.  Ex. 198 at 5, 21, 39 (discussing the valuation report prepared in anticipation of negotiations for a deal with the LCEC, and stating, "there is no guarantee or assurance that any actual transactions will occur or that consummated transactions will result in the revenues projected in the Valuation Report, and the Company and its management make no representations or warranties concerning the same"), 40-49; SEC Ex. 52 (March 15, 2010 letter accompanying the Private Placement Memorandum).

147.     On May 6, 2010, Tiscareno and Hailey gave a demonstration of GenAudio's technology to a senior executive at Apple named Greg Joswiak. Ex. 152, Tiscareno Dep. 214:10-215:20 (confirming the meeting occurred on May 6, 2010).

148.     Greg Joswiak, who was the Vice President of iPod/iPhone in the Marketing Department, is among the most senior executives at Apple. Ex. 216 (org. chart showing top Apple executives as of 2011, including Joswiak in the same role as in 2010); Ex. 152, Tiscareno Dep. 211:11-21, 212:3-214:2 (Tiscareno acknowledging "it doesn't get any higher than that").

149.     Greg Joswiak is known at Apple by the nickname "Joz," and both Tiscareno and Hailey refer to Joswiak using the "Joz" nickname.   Ex. 152, Tiscareno Dep. 180:4, 208:21, 210:9-21; Ex. 188, Hailey Dep. 15:20-21, 144:25-145:10; Ex. 171, Hailey Inv. 18:5-7.

150.     This May 6, 2010 meeting was when the critical "executive buy-in" at Apple would be determined.  Ex. 152, Tiscareno Dep. 179:3-180:8.

151.     As a result, the May 6, 2010 presentation to Greg Joswiak was a "make-or-break" meeting regarding Apple's interest in GenAudio's technology.  If Joswiak did not give a "green light" to continue with GenAudio, then discussions between GenAudio and Apple's

iPhone/iPod/iPad division regarding potential use of GenAudio's technology in iPhone/iPod/iPad devices would end.  Ex. 152, Tiscareno Dep. 218:13-17, 219:6-14.

152.    Tiscareno also needed the May 6, 2010 meeting to result in a green light for Tiscareno to keep spending time related to GenAudio.  Ex. 152, Tiscareno Dep. 221:1-222:7.

153.    Mahabub's contacts at Apple told him how important this May 6, 2010 meeting was, and Mahabub understood discussions with the iPhone/iPod/iPad division would end if the meeting did not result in a green light for the project. Ex. 202 ("Trying to line you up with as much fire power as possible so we get a green light to continue to move forward!"), Ex. 152, Tiscareno Dep. 179:3-180:8, 219:6-14.

154.    Tiscareno testified if he used a term such as "the big man" Tiscareno probably meant it as a reference to Steve Jobs without expressly using Steve Jobs' name.  Ex. 152, Tiscareno Dep. 156:2-16. ("And, you know, if I – if I used them myself, it was probably – that's wink-wink – that's who it is.")

155.    Mahabub worked with Tiscareno to prepare for the May 6, 2010 presentation. During those discussions, Tiscareno and Mahabub referred to the executive who would receive the presentation as "the man", "the executive", "the exec.", and "the big exec." (as an abbreviation for the "big executive"). Ex. 203 (Tiscareno discussing with Mahabub the preparation of demos of GenAudio's technology for someone at Apple whom Tiscareno refers to as "the man"); Ex. 202 ("the executive"), Ex. 204 ("the exec."), Ex. 205 ("the exec at Apple"), Ex. 206 ("the big exec at Apple"), Ex. 152, Tiscareno Dep. 208:19-209:7; Ex. 150, Mahabub Dep. 188:22-189:1 ("the big man").

156.    Tiscareno and Hailey may also have told Mahabub that the meeting was with "Joz", without using Greg Joswiak's actual name.  Ex. 171, Hailey Inv. 33:11-17 ("We may have said that we – that we were going to pitch to Jaws."

157.    Mahabub testified that when he spoke with Tiscareno and Hailey by phone in advance of the May 6 meeting, he had understood they told him the meeting was with "Jobs", meaning Steve Jobs, and Mahabub believed the May 6 presentation was to Steve Jobs. Ex. 150, Mahabub Dep. 189:1-3, 190:7-21, 221:19-223:7, 227:14-228:2; Ex. 219, Mahabub Dep. 290:12-291:3, 323:2-22.

158.    Mahabub has never heard the name Greg Joswiak, and was not told the May 6, 2010 meeting was with someone with that name.  Ex. 150, Mahabub Dep. 217:13-25, 252:12-15.

159.    Mahabub testified that around February 2010, he also had a conversation with Tiscareno in which Tiscareno said words to the effect that "Michael [Hailey] and I want to make sure we have no hang-ups when we push this to the top, and we both are confident that we can get this okayed by the big man if we play our cards right." Ex. 150, Mahabub Dep. 142:15-143:2.

160.    The only individuals present during the May 6, 2010 meeting were Tiscareno, Hailey, and Greg Joswiak.  Mahabub was not invited to attend and did not participate.  Ex. 152, Tiscareno Dep. 217:22-25.

161.    At the May 6 meeting, Joswiak "agreed that there was value in exploring ways to enhance the listening experience for people using iPods and iPhones" and thought there was value in continuing the exploration  Ex.  188, Hailey Dep. 114:20-115:4, 117:15-19.

162.    After the May 6, 2010 meeting, Tiscareno and Mahabub continued to engage in substantive work in connection with possible use of GenAudio's technology on products for Apple's iPod/iPhone/iPad division. Ex. 152, Tiscareno Dep. 223:23-224:18; Ex. 208; Ex. 166 (Mahabub email to Tiscareno in July 2010 regarding work on a revised demonstration application); Ex. 176; Ex. 209; Ex. 178 (discussing continued work on the app for the iPad; Ex. 195; Ex. 167; Ex. 152, Tiscareno Dep. 253:11-16 (discussing Ex. 167 and admitting it reflects additional work being done in connection with GenAudio's technology in September

2010 related to the iPad); <u>Ex. 168</u>; <u>Ex. 152</u>, Tiscareno Dep. 258:18-259:9 ("Q: Does this reflect that there was still some more work being done on the iPad and iPod side? A: That's what it says here."); <u>Ex. 197</u>; <u>Ex. 152</u>, Tiscareno Dep. 260:1-18; <u>Ex. 210</u>; <u>Ex. 152</u>, Tiscareno Dep. 263:17-265:2 (Tiscareno admitting he was performing work connected to GenAudio technology in January 2011 and that it appears the work related to the iPad); <u>Ex. 211</u>; <u>Ex. 169</u>, Isaac Dep. 147:11-148:8 (Mahabub presentation given to Andrew Bright and Barry Corlett on September 23, 2010 was to demonstrate GenAudio's technology on both the iPad side and the Mac side; Corlett worked on audio architecture in the iPod division; the meeting was held in the iPod building);

163.    Any belief by Tiscareno that all of his post-May 6 work regarding GenAudio technology could have involved work for the Mac division rather than for the iPhone/iPod/iPad division is mistaken.  <u>Ex. 169</u>, Isaac Dep. 141:22-142:12 (Isaac does not believe <u>Ex. 208</u> relates to work done in connection with the Mac division); 148:12-149:2 (The potential NDA discussed in <u>Ex. 176</u> does not relate to work being done on the Mac side); 165:22-166:8; 161:16-162:6 (same for <u>Ex. 211</u>); 150:21-152:4 (same for <u>Ex. 178</u>); 152:6-153:20 (same for <u>Ex. 167</u>). Tiscareno was not substantively involved in the discussions between GenAudio and Apple's Mac division or in the Mac division's evaluation of GenAudio's technology and integration of GenAudio's technology into Mac products.  <u>Ex. 152</u>, Tiscareno Dep. 110:5-14, 22-24, 150:6-8; <u>Ex. 169</u>, Isaac Dep. 49:5-16.

164.    Mahabub believed the May 6, 2010 meeting had resulted in the critical "green light" to continue toward a transaction regarding GenAudio's technology and that discussions with the iPhone/iPod/iPad division were still moving forward.  <u>Ex. 219</u>, Mahabub Dep. 300:22-301:15; <u>Ex. 194</u> (Mahabub writing in July 2010 that "This would be a phenomenal time for Apple to consider putting out an Astound integrated set of product offerings for their Christmas product rollout"); <u>Ex. 209</u>; <u>Ex. 197</u>; <u>Ex. 152</u>, Tiscareno Dep. 262:17-263:7.

165.     Tiscareno does not recall ever telling Mahabub that based on the May 6, 2010 meeting, in Tiscareno's view, the discussions between GenAudio and the iPhone/iPod/iPad division at Apple had come to an end and would not continue.  Ex. 152, Tiscareno Dep. 225:3-226:4, 228:6-229:20.

166.     In fact, on multiple occasions in July and August 2010, Tiscareno discussed with Mahabub the potential need for GenAudio to sign additional non-disclosure agreements with Apple. Ex. 176 ("I need the new NDA to review as well that we discussed"); Ex. 177 at 1; Ex. 178 at 1; Ex. 179;

167.     Mahabub believed because GenAudio had already signed Apple's standard non-disclosure agreement, the fact Apple wanted GenAudio to execute further non-disclosure agreements meant those additional proposed agreements would be even more restrictive, and indicated Apple was interested in a licensing agreement or acquisition of GenAudio's technology.   Ex. 150, Mahabub Dep. 97:17-20, 98:18-21; Mahabub Decl. ¶ 25.

168.     Throughout 2010, including on numerous occasions after the May 6, 2010 meeting, Mahabub continued to write to his contacts at Apple regarding his understanding that Apple's interest in GenAudio's technology, and its evaluation of GenAudio's technology was sufficiently advanced that a license agreement or acquisition would be completed between GenAudio and Apple in the near future, or that he was optimistic such a deal would take place soon.  Again, GenAudio's contacts at Apple did not tell Mahabub that they disagreed with his view, which further encouraged Mahabub to believe his statements were correct. Ex. 191 at 3 (*March 21, 2010:* Mahabub stating the path forward is simple: "1. Ink a licensing deal . . . 2. Hand over the actual AstoundAPI . . . 3. Ready to Ship."); Ex. 194 (*July 18, 2010:* Mahabub stating "This would be a phenomenal time for Apple to consider putting out an Astound integrated set of product offerings for their Christmas product rollout"); Ex. 195 (*September 6, 2010*); Ex. 196 (*September 8, 2010*); Ex. 152, Tiscareno Dep. 250:2-251:15 (Tiscareno agrees

that in September 2010 Mahabub appeared to believe discussions between GenAudio and Apple were moving forward in a manner that was "optimistic" for GenAudio); Ex. 169, Isaac Dep. 134:23-25 (Isaac did not pay attention to many of Mahabub's emails); Ex. 169, Isaac Dep. 207:10-19 (Isaac confirming he never discussed with Mahabub how long it might take to incorporate GenAudio's technology into Apple products); Ex. 152, Tiscareno Dep. 128:16-130:8 (Tiscareno acknowledging he glossed over Mahabub's many optimistic comments in emails about the status of GenAudio's relationship with Apple and did not respond to them), 133:11-134:16 (similar), 165:6-16 (similar), 167:7-168:6 (similar); Ex. 150, Mahabub Dep. 64:4-17, 143:24-144:33 (Mahabub had discussion with Tiscareno regarding a Christmas product rollout); Ex. 219, Mahabub Dep. 310:21-311:11 (same).

169.    Mahabub also testified he also had a conversation with Isaac in which Mahabub said "we need to figure out how we're going to license this to you; right?" and that Isaac responded "Well, we're not going to pay you a per unit royalty, you know that."  This conversation led Mahabub further to believe a licensing deal would be reached with Apple. Ex. 150, Mahabub Dep. 95:9-97:16.

170.    On September 23, 2010, Mahabub made a presentation to a number of Apple employees, including Andrew Bright, who was a very senior Apple employee, and Barry Corlett, who also was a senior Apple employee.  Ex. 169, Isaac Dep. 146:1-3, 147:3-16; Ex. 152, Tiscareno Dep. 255:10-21.

171.    Mahabub understood Tiscareno also was a senior employee at Apple.  Ex. 150, Mahabub Dep. 38:3-7; Ex. 152, Tiscareno Dep. 20:3-15 (Tiscareno's title was "Senior Engineer" for Audio and Acoustic).

172.    After the September 23, 2010 meeting, nobody at Apple ever said to Mahabub that the Mac division had decided to end discussions with GenAudio or end further evaluation of GenAudio's technology.  Ex. 169, Isaac Dep. 158:10-159:24.

173.     Immediately after the September 23, 2010 meeting, Mahabub proposed Apple and GenAudio proceed to execute a "more serious development agreement" that was stronger than the standard Non-Disclosure Agreement the parties had signed in July 2009.  Mahabub said this was necessary so that GenAudio could go ahead and give Apple its real software development kit, or "SDK," as the next step toward a commercial licensing agreement.  Thus Mahabub continued to believe following the September 23, 2010 meeting that the discussions with Apple remained on track toward a deal. Ex. 180 at 2-3.

174.     After the September 2010 meeting with Bright and Corlett, Apple and GenAudio continued to conduct work in connection with GenAudio's technology related to the Mac division.  Ex. 212; Ex. 169, Isaac Dep. 162:17-165:15; Ex. 168; Ex. 169, Isaac Dep. 166:10-21; Ex. 197 ("I can now update the iPad/iPod and Mac side apps with the new processing that solves many issues we had with the current implementations you have . . . .")

175.     After September 2010, work also continued between GenAudio and Tiscareno on the iPhone/iPod/iPad side.  Ex. 168; Ex. 152, Tiscareno Dep. 258:18-259:9; Ex. 169, Isaac Dep. 165:22-166:8; Ex. 197; Ex. 152, Tiscareno Dep. 260:1-18; Ex. 210; Ex. 152, Tiscareno Dep. 263:17-265:2.

176.     In a December 13, 2010 email to his contacts at Apple, Mahabub continued to express his belief that a deal would be reached, and expressed his surprise that reaching a deal had taken this long.  Mahabub's contacts at Apple did not respond to the email to tell Mahabub that Apple had decided not to proceed with GenAudio. Ex. 197 ("I was hoping to have Apple products with our tech inside by now.  [P]erhaps with these updates we will be working on for you, we can finally cross the bridge and ink an actual license deal"); Ex. 152, Tiscareno Dep. 262:17-263:7 (discussing Ex. 197); Ex. 169, Isaac Dep. 169:16-170:19 (Isaac did not respond to Ex. 197);

177.    In early 2011, Apple's Advanced Technology Group conducted a further evaluation of audio technology in connection with Mac computers, including GenAudio's technology, and discussed that evaluation with GenAudio, including the possibility of signing an "evaluation agreement" with GenAudio.  Ex. 181; Ex.  169, Isaac Dep. 170:24-173:24.

178.    Mahabub continued to believe because GenAudio had already signed Apple's standard non-disclosure agreement, the fact Apple wanted GenAudio to execute a further evaluation agreement meant that proposed agreement would be even more restrictive, and indicated Apple remained interested in proceeding toward a deal with GenAudio.  Ex. 150, Mahabub Dep. 97:17-20, 98:18-21; Mahabub Decl. ¶ 25.

179.    When Tiscareno left Apple in February 2011, he informed Mahabub that his supervisor, Jesse Dorogusker, was "fully aware and engaged with the project" relating to GenAudio. Ex. 214.

180.    Mahabub testified he met with Dorogusker on two occasions regarding GenAudio's technology.  Ex. 219, Mahabub Dep. 394:25-396:24.

181.    Mahabub was scheduled to meet again with Isaac on March 14, 2011.  Although Mahabub went to Apple's campus for the meeting as scheduled, Isaac was unable to attend because he was delayed by car trouble.  Instead, Isaac and Mahabub scheduled a meeting to talk by phone.  Ex. 215.

182.    Apple's Mac division ultimately did not reach a deal with GenAudio for its technology because while some within Apple were supportive of that type of technology, others at Apple were not.  As a result, interest in GenAudio's technology slowly fizzled out over time. Ex. 169, Isaac Dep. 176:22-177:23.

183.    The Mac division never explained to Mahabub that interest in GenAudio's technology had fizzled out and that the Mac division would not be continuing to move forward with GenAudio.  Ex. 169, Isaac Dep. 177:20-178:16.

184.     Ultimately, the discussions between GenAudio and Apple regarding GenAudio's technology were extensive. Ex. 151, Tiscareno Dep. 152:2-154:14 (Tiscareno saying there were "a lot" of communications with GenAudio by November 2009), 267:20-23 (the discussions were "fairly extensive"), 269:2-6 (Tiscareno demonstrated GenAudio's technology to a lot of Apple employees); Ex. 150, Mahabub Dep. 206:13-16.

185.     Over the course of GenAudio's relationship with Apple, Mahabub met in-person with Apple personnel at Apple's offices at least 15 times, the last of which was on December 1, 2010.  Ex. 153 (prepared during testimony of Victor Tiscareno to reflect the dates of at least 15 in-person meetings, based on emails, calendar entries, and deposition testimony),[3] Ex. 152, Tiscareno Dep. 56:4-20; *Meeting 15:* Ex. 168, Ex. 152, Tiscareno Dep. 259:13-25.

186.     Mahabub and Apple personnel had extensive other contacts, including many phone calls, and exchanged hundreds upon hundreds, if not thousands of emails regarding GenAudio's technology.  Ex. 152, Tiscareno Dep. 25:25-26:5; 29:17-30:3; Ex. 169, Isaac Dep. 46:1-2, 47:2-5; Ex. 150, Mahabub Dep. 92:11-15.

187.     Mahabub believed GenAudio was going to reach a deal with Apple for GenAudio's technology.  Ex. 150, Mahabub Dep. 64:20-65:5, 94:24-95:1, 109:23-24, 110:2-4, 103:6-16, 181:9-20, 205:2-19.

188.     GenAudio investors knew in 2011 that a deal with the LCEC, or Apple, had not been consummated.  Investors knew this because of the passage of time without an announcement a deal had been reached.  Investors' purchases of stock after that time were not based on any statements from GenAudio regarding discussions with, or a potential deal with Apple. That there would be no deal with Apple also was made clear during presentations to investors in early 2012.  Declaration of George Marvin dated April 27, 2017, ¶ 3; Mahabub Decl., ¶ 27.

---

[3]     Again, Exhibit 153 is referenced throughout the Tiscareno deposition transcript as Deposition Exhibit 82.

189.    Some investors who purchased shares during 2010 to 2012 did not make their purchase decisions based on statements from GenAudio regarding discussions with, or the possibility of a deal with Apple.  Declaration of Julie Eastwood dated April 28, 2017, ¶ 4.

## IV.    ARGUMENT.

### A. Alleged Misleading Statements and Omissions

As with Plaintiff's prior motion for summary judgment, the alleged misrepresentations alleged by Plaintiff essentially fall into two categories:  statements regarding the status of discussions with Apple, and statements regarding the involvement of Steve Jobs.[4]  Plaintiff also alleges Defendants omitted material information about the same two categories.[5]

Because Plaintiff relies on the exact same alleged misrepresentations and omissions for each alleged violation of the securities laws under Section 17(a) of the Securities Act and Section 10(b) if the Exchange Act, Defendants will address each of the alleged misrepresentations and omissions first, and then discuss Plaintiff's failure to satisfy its burden on the various elements of each alleged violation.

---

[4]      Plaintiff also makes allegations regarding Mahabub's internal emails and other communications to GenAudio insiders, including Skluzak.  Mahabub addresses those in his opposition to Plaintiff's revised motion for summary judgment, the arguments which GenAudio adopts and incorporates by reference as if fully set forth below.  Further, the Court has instructed the parties to address several legal issues regarding the elements of Section 17(a) and Section 10(b), including issues related to the "in connection with" requirement, as well as reliance and injury.  Defendants' positions on those legal arguments are included in Mahabub's opposition to Plaintiff's revised motion, and to avoid duplication, those discussions are not repeated here.  GenAudio adopts and incorporates by reference each of the arguments Mahabub makes in his separate opposition to Plaintiff's motion.

[5]      Apparently after having reviewed Defendants' arguments in their opposition to Plaintiffs' previous motion for summary judgment, Plaintiff has made significant revisions regarding the statements and alleged omissions on which it relies.  In several instances, as discussed below, Plaintiff now relies on alleged misrepresentations that it previously failed to disclose in its written discovery responses.  Another significant revision is the fact that Plaintiff no longer relies on the various allegedly falsified emails as misrepresentations (instead, Plaintiff improperly seeks to re-characterize them as deceptive acts, as a hook to establish so-called scheme liability, as discussed below).  As a result, Plaintiff no longer relies on alleged misrepresentations regarding the involvement of other Apple executives, such as Tim Cook and Phil Schiller, to establish liability under Section 17(a)(2) and Rule 10b-5(b).

**1.   Alleged Fraudulent Statements Regarding Discussions with Apple**

Plaintiff's motion is fatally defective because genuine issues of material fact exist regarding the most critical component of this entire case: Mahabub's reasonable belief GenAudio would reach a deal with Apple.  Mahabub reasonably believed his contacts at Apple had presented GenAudio's technology to Steve Jobs, and that Jobs personally signed off on continuing Apple's project with GenAudio toward a deal.  In light of that fact, and the many other facts that reasonably bolstered Mahabub's confidence regarding Apple's interest in GenAudio's technology, Mahabub's statements to investors regarding GenAudio's optimism over a deal with Apple were reasonable such that he did not act negligently or with scienter.

**a.      Mahabub Reasonably Believed Steve Jobs Gave The Green Light**

In December 2009, Hailey told Mahabub that before Apple could reach a business deal with GenAudio, the Apple team needed "executive buy-in" to proceed with GenAudio. SOF ¶ 141.  Following that interaction, Mahabub became very focused on obtaining that executive buy-in, which he understood to be a "final milestone" to be reached before a deal with Apple could be obtained.  SOF ¶ 142.  According to Tiscareno, this critical "executive buy-in" was to be determined at a May 6, 2010 presentation to a very senior Apple executive named Greg Joswiak.  SOF ¶¶ 147, 148, 150.

Mahabub understood how critical the May 6, 2010 internal Apple meeting was, and both Mahabub and Tiscareno treated the meeting as a "make-or-break" moment for the possibility of a deal between GenAudio and Apple.  SOF ¶ 153.  In fact, Tiscareno testified that if he did not receive the green light to continue with GenAudio, then he would not be permitted to spend additional time working on the project, and the iPhone/iPod/iPad division's work with GenAudio would need to end.   SOF ¶ 152.

Mahabub believed the May 6 meeting was with Apple's iconic CEO, Steve Jobs. His understanding stemmed from two facts.  First, in his discussions with Tiscareno about the

critical meeting, he and Tiscareno euphemistically discussed that the meeting would be with someone at Apple simply labeled as "the man," "the executive" or "the big exec." SOF ¶ 155. Given Steve Jobs' fame, his history as one of the founders of Apple, and his iconic status within the technology industry, it is more than reasonable that someone would understand a euphemistic reference to "the man" at Apple to mean Steve Jobs. In fact, the reasonableness of that view is highlighted by Tiscareno's own testimony that if he ever used a term such as "the big man," he likely would intend it as a sort-of "wink-wink, nudge-nudge" reference to Steve Jobs without using Jobs' name. SOF ¶ 154. Thus, when Mahabub spoke with Tiscareno regarding a make-or-break" meeting with a senior Apple executive referred to as "the man" or "the big exec," Mahabub reasonably understood that to mean Steve Jobs.

Second, Mahabub's understanding that the May 6 meeting was with Steve Jobs was strongly reinforced by the fact that the actual executive who attended the May 6 meeting – Greg Joswiak – went by the nickname "Joz." That nickname sounds remarkably similar to the last name "Jobs," particularly over the phone. Tiscareno and Hailey testified they may have expressly told Mahabub the May 6 meeting was with "Joz," and Mahabub testified that they did so, but that he understood they had said the meeting was with "Jobs." Thus, Mahabub understood his Apple contacts were telling him they were going to make a critical internal presentation to a very senior Apple executive Mahabub understood they alternately referred to as "the man" or "Jobs." It is more than reasonable for Mahabub to have believed under those circumstances that the meeting was with Steve Jobs himself. SOF ¶ 157. This is particularly true since Mahabub had never heard of Greg Joswiak, SOF ¶ 158, and Mahabub was not present at the May 6 meeting. SOF ¶ 160. At the very least, a genuine issue of material fact exists as to whether Mahabub reasonably believed the internal meeting was with Jobs.

Not only did Mahabub reasonably believe the meeting was with Jobs, he also reasonably believed Jobs gave the critical green light to continue with GenAudio toward a deal. Besides

understanding the meeting was a "make-or-break" moment, Mahabub understood it was the moment in which the anticipated "executive buy-in" would, or would not, occur.  SOF ¶¶ 141, 142, 150, 151, 152, 153.  Hailey testified that at the May 6 meeting, Joswiak agreed there was value in continuing the work Tiscareno and Hailey had been doing, SOF ¶ 161, and thus the "green light" to continue had been given at the meeting.

Further, after the May 6 meeting, Tiscareno did in fact continue to work with GenAudio on a possible implementation of GenAudio's technology into products from Apple's iPhone/iPod/iPad division.  SOF ¶ 162.  Because Tiscareno testified he would need a green light to continue working on the GenAudio project, and since Tiscareno did keep working, Mahabub reasonably believed Tiscareno must have received the needed "green light" at the May 6 meeting.

As a result, Mahabub reasonably understood the internal May 6, 2010 presentation was to Steve Jobs, and that Jobs personally had given the green light to continue toward a deal with GenAudio.  These facts demonstrate Mahabub's optimism regarding a deal with Apple was reasonable with the result that his alleged misrepresentations and omissions lacked scienter. They further demonstrate many of the other alleged misrepresentations and omissions were immaterial.

### b.  Mahabub Reasonably Believed A Deal With Apple Was Likely

#### i.  GenAudio's Extensive Discussions with Apple

Putting aside Mahabub's critical understanding regarding the May 6 meeting, Mahabub's optimism regarding a transaction with Apple also was reasonable in light of the discussions with Apple and the progress made to integrate GenAudio's technology into Apple products.   Apple engaged in *extensive* discussions with GenAudio.  SOF ¶ 133.  Those discussions spanned a number of years – starting in late 2006 and continuing into 2011 (with a two-year hiatus from 2007 to 2009 as GenAudio further developed its technology).  SOF ¶¶ 123, 128, 157-161. The

work between the two companies involved *at least* fifteen in-person meetings at Apple's campus. SOF ¶ 185.  At least one additional meeting was scheduled but ultimately had to be conducted by phone, SOF ¶ 181, and there was testimony about other meetings with Apple personnel that may not have been reflected in email correspondence. SOF ¶ 180.  GenAudio also had very extensive discussions with Apple personnel by phone and email.  SOF ¶ 186.  These extensive discussions, and the time Apple invested, reasonably caused Mahabub to believe Apple was interested in GenAudio's technology and increased his confidence a deal would be reached.

### ii.    Other Reasons To Be Optimistic About A Deal With Apple

Throughout the discussions with Apple, Mahabub frequently told his contacts at Apple his belief that a deal between Apple and GenAudio would be reached in the short term, and that Apple could roll out products containing GenAudio's technology for sale within months. SOF ¶¶ 129-132, 168, 176.  For example, on November 28, 2009, Mahabub sent Tiscareno and Hailey a very lengthy email in which he discussed, among other things, the value to Apple of reaching a deal with GenAudio; told Apple he had hired an intellectual property valuation specialist in anticipation of negotiating price terms with Apple; discussed various considerations that could impact the price Apple would pay for GenAudio's technology; and expressed his certainty that a deal with Apple would be consummated.  SOF ¶¶ 137, 138.  In short, Mahabub believed in November 2009 that GenAudio and Apple were at the stage where negotiations over a deal were underway. With one limited exception,[6] Tiscareno, Isaac and Hailey never told Mahabub his optimism regarding a deal or his understanding regarding the timeline of a potential

---

[6]    In December 2009, Hailey told Mahabub the vague statement that "this is not something we can execute overnight.  The business side of things would come into play after we have exec buy-in on the product side." SOF ¶ 141.  In follow-up discussions, Hailey also told Mahabub that it would take more than a "couple" of months. SOF ¶ 143.  This discussion led Mahabub to focus on the "executive buy-in" as the "final milestone" to be reached before a deal with Apple could be reached, and was part of the chain of events that caused Mahabub reasonably to believe Steve Jobs had given a green light to proceed with GenAudio on May 6, 2010.  SOF ¶¶ 141-143, 146-158, 160-163. Thus, this one set of discussions in which Hailey did respond to Mahabub's optimistic statements ultimately was part of the chain of events that caused Mahabub's confidence in a deal with Apple to *increase*, not decrease.

deal was misplaced.  Instead, the Apple employees who served as Mahabub's contacts at Apple testified they routinely just ignored Mahabub's optimistic emails and wrote them off as salesmanship.  SOF ¶¶ 129-132, 138-140, 168, 176.

While Plaintiff alleges various optimistic statements Mahabub made to investors about a deal with Apple were misleading, it is significant that Mahabub was making the same kinds of statements directly to his Apple contacts without contradiction.  SOF ¶¶ 129, 131, 132, 138-140, 168, 176.  That Mahabub was saying to shareholders the same kinds of things he was saying to Apple raises a genuine issue of material fact whether Mahabub possessed the scienter required for liability.

Mahabub had many other reasons to be optimistic regarding his discussions with Apple, including the fact GenAudio was successful at conducting full embedded level integration into some Mac division products by as early as November 2009 (SOF ¶136); the execution of a non-disclosure agreement with Apple, and the fact Apple subsequently proposed multiple times throughout 2010 and 2011 that GenAudio sign additional (presumably even more restrictive) non-disclosure agreements (SOF ¶¶ 127, 166, 167, 177, 178); and Mahabub testified he had conversations with his Apple contacts regarding a possible licensing deal or product roll-out (SOF ¶¶ 168, 169.).  Based on this extensive history, Mahabub both actually and reasonably believed a deal with Apple would materialize.

Finally, Plaintiff challenges as misleading Mahabub's continued optimism about a deal with Apple to investors in late 2010 and early 2011.  However, Apple continued to work with GenAudio throughout that time period, SOF ¶ 162, 174, 175, 176, 180, 181, and nobody at Apple ever told GenAudio that the discussions with Apple were coming to an end.  SOF ¶ 165, 172, 182, 183.  On the contrary, when Tiscareno left Apple in February 2011, he told Mahabub that his supervisor was taking over the project, and that this new point of contact was "fully aware and engaged with the project" related to GenAudio.  SOF ¶¶ 179, 180.  Thus, Mahabub

reasonably continued to believe his discussions with Apple remained ongoing, which continued to buoy his optimism.

### iii.        Alleged Misrepresentations Regarding Discussions With Apple

Plaintiff argues external statements GenAudio made to potential investors regarding the status of discussions with Apple were false and misleading. SOF ¶¶ 37, 70, 71, 79, 97, 99, 100. But a genuine issue of material fact exists as to whether each of them was reasonable based on discussions with Apple to date, and whether Mahabub thus also had the requisite scienter.

Further, many of these challenged statements also are not actionable because they constitute nothing more than optimistic statements about a hoped-for transaction with Apple and thus constitute puffery.  "Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). Such "vague statements of corporate optimism are not materially misleading, as 'reasonable investors do not rely on them in making investment decisions.'" *SEC v. Nacchio*, 438 F.Supp.2d 1266, 1281 (D. Col. 2006) (quoting *Grossman*, 120 F.3d at 1119); *see, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d. Cir. 1996) (statement that company was "optimistic" about its earnings in 1993 and that it "should deliver income growth consistent with its historically superior performance" was non-actionable).

Here, many of the challenged representations are mere statements of optimism that a deal will be reached with Apple in the future.  Such statements are nothing more than forward-looking statements of corporate optimism, or puffery, that are not actionable as a matter of law. Mahabub, who believes quite passionately in the technology he invented, is entitled to profess his opinion, and that of the company, that he is "optimistic" Apple will want the technology for its products, and that at some uncertain time in the future, Apple will want to acquire that

technology.  These statements were expressed as opinions rather than guarantees, usually were indefinite as to time, and are sufficiently vague that they are "not capable of objective verification." *Grossman*, 120 F.3d at 1119.

Certain of the statements also are not actionable under the separate "bespeaks caution" doctrine.  Forward-looking statements are considered immaterial when the defendant has provided "sufficiently specific risk disclosures or other cautionary statements . . . to nullify any potential misleading effect."  *Id.* at 1120.  Here, many of the challenged statements to potential investors are forward-looking predictions about a possible deal, accompanied by meaningful cautionary language making it clear the company was not guaranteeing any particular outcome. [7]

*November 9, 2009 Email to Investors*.[8]  Plaintiff alleges that on November 9, 2009, GenAudio sent its investors an email stating, "*nothing is assured yet*, but as shareholders you should be aware that there is a strong possibility that the Company may be acquired *within the next 6 months* in light of our extensive discussions with a global industry leader in consumer electronics[]."  SOF ¶ 37 (emphasis added).  First, the November 9 email commences with the admonition, "nothing is assured yet."  Thus, this statement is simply an opinion expressing the company's optimism of an eventual deal, and with meaningful cautionary language that the deal might never occur. There is no dispute GenAudio was in genuine discussions to demo its product to Apple at that time, Mahabub and the company believed a deal would be done, and that the discussions, based on a product in which they believed, would yield a successful outcome.

---

[7]       As an introduction to its allegations about specific alleged misrepresentations, Plaintiff alleges that throughout 2009, Mahabub "primed his prospective investors by touting GenAudio's relationship with Apple. (Plaintiff's Brief at 32; SOF ¶¶ 13-14.)  But Plaintiff does not allege any of those statements are misrepresentations. For example, Plaintiff alleges Mahabub disclosed that a GenAudio product was among the top downloads on Apple's website.  SOF ¶ 14.  But Plaintiff does not allege that was false – in fact, that fact undisputedly is true. (*See* Ex. 3 at 14; Mahabub Decl. ¶ 29.)  So Plaintiff claims Mahabub "primed" the market by making true statements to investors about GenAudio's product and its relationship to Apple.

[8]       As detailed in Mahabub's separation opposition to Plaintiff's motion, any statements made prior to January 21, 2010 are barred by the statute of limitations (after taking into account the tolling agreements that were executed by the parties).  Thus, to the extent Plaintiff's claims rely on statements made prior to that date, they are time-barred. Mahabub's argument regarding the statute of limitations is adopted and incorporated by reference.

In short, the November 9, 2009 email is puffery and liability cannot attach under the bespeaks caution doctrine.

Second, this email expressly stated the basis of the company's view that a strong possibility existed that it would be acquired – namely, that it was "in light of the extensive discussions" that had occurred. *Id.*  That basis is true – or at the very least, a genuine issue of fact exists as to whether it was true.  By November 2009, extensive discussions had in fact occurred between GenAudio and Apple.  By that date, GenAudio had met in person with Apple at least ten times, in addition to extensive phone and email discussions.  SOF ¶¶ 128, 133-135, 185, 186.  By that date, GenAudio also already had accomplished full embedded level integration of its technology into certain Apple products.  SOF ¶ 136.  Mahabub's belief that a deal with Apple would be reached before long is demonstrated by the fact that in November 2009 he hired an intellectual property valuation specialist to value GenAudio's technology to assist with negotiations.  SOF ¶ 137.  Around the same time period, Mahabub also made similar optimistic statements to his contacts at Apple, and began raising negotiating points with them regarding the terms of a possible transaction, demonstrating Mahabub genuinely believed his statements of optimism to investors and lacked the requisite scienter.[9]  SOF ¶¶ 132, 138, 187.

*Late 2009 Shareholder Meeting*.[10]  Plaintiff next alleges, based on the administrative testimony of a single individual, that Mahabub made statements to a group of shareholders in late 2009.  According to that individual, Mahabub told shareholders "he was positive that, supposedly I guess it was by the end of the year or something that Apple was going to be buying us out and we'd better get in now . . . ."  SOF ¶ 42.

---

[9]      At the time this email was sent to investors, GenAudio also was not offering any of its stock for sale, and no offering began for some time thereafter.  SOF ¶¶ 19.  Thus, the email was not made in connection with the purchase or sale of securities.

[10]      Again, any claim based on this alleged statement made in late 2009 is barred by the statute of limitations, as detailed in Mahabub's separate opposition.

As an initial matter, Plaintiff cannot rely on this alleged misrepresentation because Plaintiff failed to disclose it as an alleged misrepresentation during discovery.  Specifically, during discovery, GenAudio sent Plaintiff an interrogatory asking Plaintiff to identify each alleged misrepresentation.  Plaintiff's response did not include this alleged misrepresentation, nor did Plaintiff ever provide an amended interrogatory response that included this alleged misrepresentation.  (Declaration of Michael P. McCloskey, ¶ 7 and Exhibit 220, Plaintiff's Response to Interrogatory No. 1, starting at pg. 2.)  Because Plaintiff failed to disclose this alleged misrepresentation in response to an interrogatory that was directly on point, Plaintiff cannot rely on that alleged misrepresentation here.[11]

In addition, on the face of this quote it is obvious the shareholder does not recall what Mahabub actually said.  The individual could not be more precise than simply alleging Mahabub "was positive that supposedly *I guess* it was by the end of the year *or something* . . ."  *Id.*  This individual's use of the terms "I guess" and "or something" demonstrates on its face there is substantial doubt as to what the individual thinks Mahabub actually said.  This utter lack of specificity is not surprising given that this individual is trying to recall what someone said once back in 2009.  The individual who offered this testimony could not even recall *when* Mahabub made this statement.  The best that could be said about this testimony is that the individual recalls that at some unknown time, Mahabub made some statement of optimism that a deal between GenAudio and Apple would occur at some unknown time in the future.  Plaintiff's allegation of a misrepresentation based on this testimony is speculative and Plaintiff cannot satisfy its burden based on such speculation.

---

[11]     Plaintiff also did not rely on this alleged misrepresentation in its original motion for summary judgment. Plaintiff apparently did not decide to rely on this alleged misrepresentation until very recently, long after the close of discovery.

Further, as with the November 2009 email discussed above, this statement is simply an opinion expressing Mahabub's optimism regarding an eventual deal. As such, it constitutes non-actionable puffery.

Finally, although Plaintiff cannot establish precisely when this alleged statement was made, Plaintiff speculates it occurred in "late 2009." As discussed above, there is a genuine issue of material fact as to whether Mahabub's optimism about a future deal with Apple was reasonable in that timeframe. By late 2009, GenAudio had engaged in extensive discussions with Apple, and had worked closely with Apple to integrate GenAudio's technology into Apple products. SOF ¶¶ 128, 133-135. By November 2009, GenAudio had successfully accomplished full embedded level integration into certain Apple products. SOF ¶ 136. While Mahabub allegedly was making these optimistic statements to investors, he was making similar statements to his contacts at Apple regarding his belief a deal with Apple would happen in the near future, and was trying to negotiate with his Apple contacts about the terms of a possible transaction. During this time, Mahabub's contacts at Apple did not tell him his effort to negotiate a deal was premature, nor did they tell him his understanding of Apple's intent regarding GenAudio was misplaced. SOF ¶¶ 129–132, 138-140.[12]

*March 10, 2010 Mahabub Email To Certain Shareholders*. Plaintiff alleges Mahabub sent an email to a small group of shareholders in which he claimed "we are starting to discuss the business side with the LCEC, and I expect to have a very substantial licensing deal in place for their Christmas Product Rollout."

First, this is another instance in which Plaintiff is attempting to rely on an alleged misrepresentation that Plaintiff failed to disclose during discovery. As with the alleged misrepresentation regarding the "late 2009 shareholder meeting" discussed above, Plaintiff failed

---

[12]       Hailey did eventually respond to one of Mahabub's emails, but that response was not sent until mid-December 2009, presumably after this alleged misrepresentation occurred. SOF ¶ 141. In any event, as discussed above, Hailey's response led to Mahabub's focus on the executive buy-in that he understood took place on May 6, 2010, and thus ultimately led Mahabub to have further confidence in the likelihood of a deal with Apple.

to include this alleged misrepresentation in its response to GenAudio's interrogatory requesting identification of each alleged misrepresentation.  (Declaration of Michael P. McCloskey, ¶ 7 and Exhibit 220, Plaintiff's Response to Interrogatory No. 1, starting at pg. 2.)  Because Plaintiff failed to disclose this alleged misrepresentation in its interrogatory response as required, Plaintiff cannot rely on that alleged misrepresentation here.[13]

Second, there is a genuine issue of material fact as to whether these statements were made negligently or with scienter.  Under the circumstances, it was reasonable for Mahabub to assert that GenAudio is "starting to discuss the business side with the LCEC" –  again, there is no dispute Mahabub had started raising negotiating points with Apple regarding a potential transaction.  SOF ¶ 138 (discussing Ex. 190, Tiscareno testified: "Q: So [Mahabub's] trying to negotiate with you.  You're just not negotiating back. A: Yeah."); *see* SOF ¶¶ 129-132, 138-140, 143.  While Mahabub began discussing possible terms for a business deal, Mahabub's contacts at Apple did not tell him they lacked the authority to negotiate and that any eventual deal would be negotiated by others at Apple.  SOF ¶¶ 139, 140.  Thus, at the very least, there is a genuine issue of fact regarding the reasonableness of Mahabub's statement.

Mahabub also believed for many reasons that by this time, his relationship with Apple was advanced, that Apple was interested in GenAudio's technology, and that a transaction between the two companies was likely.  SOF ¶¶ 128-140.  By March 10, 2010, Mahabub also was focused on the upcoming meeting in which "executive buy-in" would take place, as a "final milestone" to be reached before a deal with Apple could be consummated.  SOF ¶ 142, 147-159.  Thus, Mahabub believed GenAudio was in the final stages of closing a deal with Apple.

For the same reasons, a genuine issue of fact exists regarding the reasonableness of Mahabub's statement that he "expect[s]" a deal in place for a Christmas product rollout.  This is

---

[13]     Plaintiff also did not rely on this alleged misrepresentation in its original motion for summary judgment. Again, Plaintiff apparently did not decide to rely on this alleged misrepresentation until very recently, long after the close of discovery.

simply a statement of opinion expressing Mahabub's optimism regarding an eventual deal, and thus is not actionable.  In any event, in the same time period, Mahabub was telling his contacts at Apple that he expected a deal to be reached in the next three to six months, and they were not telling him his belief was unreasonable.[14]  SOF ¶ 143.

*March 15, 2010 Offering Materials*.  Plaintiff alleges the 2010 offering materials sent to investors on March 15, 2010 contained misrepresentations that GenAudio is "optimistic" the LCEC  will "eventually" want GenAudio's technology through either a licensing agreement or an acquisition, and that the offering is being conducted to provide bridge capital "until we can 'ink' a deal" with the LCEC.  SOF ¶¶ 70, 71.  But the statement that GenAudio is optimistic of a deal does not even provide a timeframe for that deal to happen.  It simply tells the investor GenAudio is *optimistic* such a deal might happen "*eventually*."  The statement about 'inking' a deal similarly does nothing more than express GenAudio's optimism such a deal might transpire at some unknown time in the future.  These statements are classic examples of the type of vague statements of corporate optimism that are non-actionable.

Moreover, the March 2010 Private Placement Memorandum ("PPM"), and the March 15, 2010 letter accompanying it, contain considerable meaningful cautionary language and thus are non-actionable under the bespeaks caution doctrine.  The PPM contains an extensive discussion of the various risks associated with GenAudio's forward statements, and includes a specific warning that no transaction had been consummated with the LCEC and there was no guarantee any such deal would be consummated in the future.  The portion of the PPM addressing discussions with Apple makes it clear that a transaction with Apple had not yet been completed, and that it was unclear what form any such deal might take if a deal is completed some day in the future.  SOF ¶ 146.

---

[14]      Plaintiff also appears to take the position this March 10, 2010 email only relates to sales of Mahabub's personal stock, not to sales of GenAudio stock.  SOF ¶ 53.

Further, these statements of belief were true.  As reflected in the communications with Apple, GenAudio was optimistic Apple eventually would want to obtain GenAudio's technology for use in its products.  SOF ¶¶  129-132, 138, 168, 187.  In fact, Tiscareno, who was intimately familiar with the status of discussions with GenAudio, testified there was nothing inaccurate about the specific portions of the 2010 Offering materials Plaintiff challenges as misleading.  SOF ¶¶ 144, 145.  Tiscareno's testimony reveals GenAudio's statements were reasonable based on the status of the Apple discussions.  At the very least, his testimony shows there is a genuine issue of material fact as to whether the statements were false.

*April 30, 2010 Email*.  Plaintiff alleges that on April 30, 2010, Mahabub sent an email to investors saying the LCEC is looking to acquire GenAudio's technology and that GenAudio is waiting to initiate negotiations pending approval by the CEO of the LCEC to be obtained in the following week.  SOF ¶ 79.  But as discussed above, Mahabub reasonably believed that, in the following week, the project would be presented to Steve Jobs for his approval as a "final milestone" toward a deal with GenAudio.  SOF ¶ 142, 146, 149, 150, 151, 153-159.  Based on this fact, and the other reasons Mahabub reasonably believed a deal with Apple was likely that are discussed above, the statements in this April 30 email were reasonable, and Mahabub lacked the necessary scienter for this statement to be actionable.

Further, this email did not guarantee a deal would take place, but rather said Apple's interest in GenAudio's technology was subject to the CEO's – Steve Jobs' – approval, which the email expressly said had not yet occurred.  Thus, all the email did was alert investors to a meeting scheduled for the following week for a senior Apple executive to green light the GenAudio project.  This was true, it was just that Mahabub was mistaken as to which Apple executive would be attending that meeting.

*May 2010 Investor Presentation*. Plaintiff alleges in May 2010, GenAudio sent a presentation to investors falsely stating that "the CEO of the LCEC finally met with senior

marketing and technical management and we have the green light to move forward."  SOF ¶ 89.
But as discussed above, Mahabub reasonably believed that is precisely what happened during the
May 6, 2010 meeting.  SOF ¶¶ 141-143, 147-168.  At the very least, a genuine issue of material
fact exists regarding the reasonableness of Mahabub's belief, and thus whether this statement
was made negligently or with scienter.

Further, as Plaintiff expressly admits, SOF ¶ 89, the May 2010 investor presentation
referred back to the March 15, 2010 PPM and encouraged investors to review it.  The PPM,
in turn, contained meaningful cautionary language, including the specific fact there was no
guarantee any transaction with the LCEC would ever be completed in the future.  SOF ¶ 146.
Thus, none of the statements in the May 2010 presentation are actionable.

*August 1, 2010 Investor Letter*.  Plaintiff points to two statements in Mahabub's August 1
letter to shareholders as alleged misrepresentations.  The first statement is: "I can say that we are
still moving forward with confidence and plan on carrying it through all the way to the end,
which could result in a significant revenue generating license deal or the potential for acquisition
of the technology of the company"  This statement appears to be literally true.  It appears that on
August 1, Mahabub continued to move forward with "confidence" in his relationship with Apple
and had every intention of carrying forward with that relationship until it reached its end,
regardless of what that end would be.  Plaintiff has not provided any evidence showing why
Mahabub should have proceeded *without* confidence as of that date.  Tiscareno does not recall
ever telling Mahabub that in Tiscareno's view, the discussions with the iPhone/iPod/iPad
division had come to an end after the May 6, 2010 meeting, SOF ¶ 165, and in fact after the
May 6 meeting, Tiscareno and Mahabub continued to work together substantively on the
possible use of GenAudio's technology for the iPod/iPhone/iPad division. SOF ¶¶ 162, 163, 166.
Because Mahabub understood the May 6 meeting was a "make or break" meeting at which
"executive buy-in" was to be obtained, SOF ¶¶ 150-153, and because work with the

i/Pod/iPhone/iPad division continued, Mahabub reasonably believed executive buy-in had occurred.  Thus, it was reasonable for GenAudio to affirm it was confident and would continue to pursue the Apple relationship to the end.

Further, it is undisputed that GenAudio's discussions with Apple's Mac division continued unabated as of August 1, 2010 – Plaintiff does not allege the relationship with the Mac division soured until the September 23, 2010 meeting with Andrew Bright and Barry Corlett – which Plaintiff alleges "went poorly."  SOF ¶¶ 95-96.  Thus, again, it was reasonable (and true) that GenAudio continued with "confidence" as of August 1, 2010, and that GenAudio planned to continue with the Apple relationship "all the way to the end."

The remainder of this challenged statement is the unremarkable observation that if a deal with Apple is ever consummated, it "could result in a significant revenue generating license deal or the potential for acquisition of the technology of the company."  There is no dispute that such a deal was the ultimate objective, and that if that goal was reached, such a deal could be very lucrative for GenAudio.  Mahabub's statement does not promise such a deal would be reached – on the contrary, the challenged statement makes it clear there is no such guarantee.  It was simply a statement GenAudio is continuing with confidence, and that *if* a deal is reached, it "*could*" result in a significant revenue generating deal for GenAudio.  The use of the word "could" on its face defies any argument from Plaintiff that the statement promises such a result.

In  addition, this entire challenged statement is nothing more than a statement of corporate optimism, thus non-actionable.  GenAudio's statements that it is "moving forward with confidence," that it "plan[s] on carrying it through all the way to the end," and that it "could" result in a significant revenue generating deal, are vague statements of optimism incapable of objective verification, and thus are puffery.  *See Grossman*, 120 F.3d at 1119.

Plaintiff also challenges the August 1, 2010 letter based on its statement that the LCEC's CEO had requested a "hand-shake" meeting.  However, this statement is not material because, as

discussed above, Mahabub reasonably believed Steve Jobs had, in fact, received a demo of the technology and that he liked it and gave a green light to proceed.  A genuine issue of material fact exists whether a reasonable investor would care about whether Mahabub personally interacted with Steve Jobs as all that would matter is that Jobs received the demo and liked it sufficiently to green light the project.

_December 8, 2010 Letter_.  Plaintiff alleges GenAudio sent investors a letter that said Mahabub met with the LCEC's CEO and gave him a demo, that the CEO told Mahabub that he really liked the technology, and that although the LCEC is "moving very slow, we are still on their radar screen, and remain very optimistic for a deal" later in 2011.  SOF ¶ 97.  First, as discussed above in connection with the August 1, 2010 letter, the statements about the CEO of the LCEC are not material because Mahabub reasonably believed Steve Jobs gave a green light to proceed with GenAudio.  A genuine issue of material fact exists whether a reasonable investor would care about whether Mahabub personally interacted with Jobs.  A reasonable investor would only care that Jobs received the demo and provided authority to continue with GenAudio.

In addition, GenAudio's statement that it is "optimistic" for a deal in 2011 is, again, a vague statement of corporate optimism that is non-actionable.  Finally, around the end of 2010, GenAudio continued to work with both the iPhone/iPod/iPad division and the Mac division, and it thus was reasonable for GenAudio to remain optimistic about a deal with Apple.  SOF ¶¶ 170, 172, 174, 175, 185 (Meeting 15).[15]

_February 26, 2011 Letter_.  Plaintiff challenges additional statements in this letter to the effect that GenAudio "hope[s]" efforts with the LCEC will lead to a transaction "in the not so distant future" and that "[w]hile we cannot make any guarantees, we are very confident this will be the last money raised before achieving self-sustaining revenues given our inked revenue

---

[15]     Further, at the time this email was sent, GenAudio did not have an ongoing stock offering in place, and the next offering did not begin until the following April.  SOF ¶¶ 19, 20.  Thus, the email was not made in connection with the purchase or sale of securities.

generating license deals, near-term licensing potential deals, and upcoming massive global branding." None of these statements are actionable, as they are additional examples of vague corporate optimism, linked to a cautionary reminder that a deal with the LCEC has not yet been reached, and there is no "guarantee" a deal will be reached in the future. Further, Plaintiff has not demonstrated the vague statement regarding other licensing deals that already have been signed, near-term licensing potential deals, and upcoming massive global branding have *anything* to do with GenAudio's discussions with Apple (as opposed to the many other licensing deals GenAudio was pursuing), and thus those statements are irrelevant.

*March 29, 2011 Letter*. Plaintiff challenges as misleading Mahabub's statement that GenAudio would be signing a new set of "evaluation and development" agreements with the LCEC. SOF ¶ 100. However, there is no dispute Apple did propose to Mahabub the execution of evaluation agreements in early 2011. SOF ¶ 177. Because GenAudio had already signed Apple's standard non-disclosure agreement, there is a genuine issue of fact regarding whether Mahabub reasonably believed Apple's request for further agreements meant those new agreements would be more restrictive (otherwise they would be unnecessarily duplicative of the existing NDA), and thus indicated Apple's interest in GenAudio's technology was increasing.[16] SOF ¶¶ 127, 178.

### 2. Alleged Omissions

In addition to the alleged misrepresentations, Plaintiff alleges GenAudio omitted to provide material information that Plaintiff alleges was necessary to prevent GenAudio's statements from being misleading. However, in each instance of an alleged omission, a genuine

---

[16]    Plaintiff seeks disgorgement of all investments in GenAudio's 2011-2012 stock offering. However, investors understood at some point in 2011 that there would be no transaction with Apple given the considerable passage of time with no announcement of a transaction. Further, in early 2012, GenAudio gave presentations to investors at which it was made clear the discussions with Apple had ended. SOF ¶ 188. Further, even in 2010 and early 2011, some investors' decision to purchase GenAudio stock was not influenced by GenAudio's statements regarding discussions with, or a potential transaction with, Apple. SOF ¶ 189. Thus, even if Plaintiff prevails on its motion, a genuine issue of material fact exists as to the amount of disgorgement and fines that would result.

issue of material fact exists as to whether such omissions of fact existed, and whether such omissions would be material to a reasonable investor.[17]

> ### a.   The September 2010 Meeting With Apple "Went Poorly."

Plaintiff alleges GenAudio failed to tell investors the September 23, 2010 demonstration to Apple personnel "went poorly."  But that assessment is *not* an objectively verifiable *fact* that is subject to any disclosure requirement.  Section 17(a) and Section 10(b) only require disclosure of material *facts*, not opinions.  The view that the meeting "went poorly" necessarily is an opinion, and thus is its omission cannot generate liability.

Further, Mahabub's conduct demonstrates he believed GenAudio's relationship with Apple remained on track after the meeting.  For example, the day after the meeting, Mahabub sent an email to a number of the Apple employees who attended.  In the email, Mahabub discussed executing a "more serious development agreement" than the standard non-disclosure agreement that previously had been signed, as a next step toward a commercial licensing agreement.  SOF ¶ 173.

Moreover, after the September 23, 2010 meeting, both the Mac division and the iPhone/iPod/iPad division continued to work with GenAudio in connection with its technology.[18]

---

[17]   As to the April 30, 2010 email, the early 2010 representations to Skluzak, the May 2010 investor presentation, and the August 1, 2010 investor letter, Plaintiff asserts in a conclusory manner, and without further elaboration, that each statement was "materially misleading because they omitted the truth about GenAudio's dealings with Apple."  (Plaintiff's brief at 35.)  Plaintiff never provides any other specifics regarding the alleged omissions as to these statements, and thus fails to satisfy its burden as to such omissions.

[18]   For example, around November 2010, Mahabub and Isaac were working to improve integration of GenAudio's technology into Mac products.  During his testimony, Isaac confirmed this work occurred, as did the related substantive discussions with Mahabub reflected in those documents.  SOF ¶¶ 174. Similarly, emails between Mahabub and Tiscareno reveal work continued on the iPhone/iPod/iPad side between GenAudio and Apple after September 2010.  During his testimony, Tiscareno also confirmed this work occurred, as did the substantive discussions between Tiscareno and Mahabub related to that work.  SOF ¶¶ 175.  In addition, there is evidence showing Mahabub met in-person with Apple personnel at Apple's campus after September 2010.  First, Mahabub met with Tiscareno on December 1, 2010.  SOF ¶ 185 (Meeting 15).  Mahabub also testified he met Tiscareno's boss, Jesse Dorogusker, on two occasions after Tiscareno announced his retirement in 2011.  SOF ¶¶ 179, 180. Finally, Mahabub also was scheduled to meet with Ron Isaac on March 14, 2011.  Although Isaac was unexpectedly delayed and thus was unable to meet with Mahabub in person, they instead scheduled a meeting to talk by phone. SOF ¶ 181.

SOF ¶¶ 174, 175.  Thus, both sides continued to behave as if the relationship was on track and that Apple was still interested in GenAudio's technology.  As a result, Mahabub had no reason to believe there was any new material fact that needed to be disclosed to investors.

Perhaps most importantly, nobody at Apple ever told Mahabub after the September 23, 2010 meeting that the Mac division had decided to end discussions with GenAudio.  SOF ¶ 172.  Thus, Mahabub had no way of knowing the relationship with Apple had been materially harmed by the September 2010 meeting.  In fact, after the September meeting, Mahabub continued to express to his Apple contacts his belief that a deal between the two companies would be reached.  SOF ¶ 176.  Neither Tiscareno nor Isaac responded to tell Mahabub that Apple's interest in GenAudio's technology had ended.  SOF ¶ 176 (on the contrary, in February 2011, Tiscareno strongly suggested to the contrary, telling Mahabub that Tiscareno's supervisor was "fully aware and engaged with the project" relating to GenAudio, SOF ¶ 179).  Thus, Mahabub reasonably believed Apple remained interested in its technology, and there was nothing material to disclose about the September 2010 meeting.  Consequently, Plaintiff is not entitled to summary judgment based on this alleged omission.

### b.    Discussions were with mid-level Apple personnel.

Plaintiff argues GenAudio failed to disclose that its "substantive communications with Apple personnel were almost always limited to mid-level engineering and marketing employees."  As an initial matter, there is a genuine issue of fact as to the seniority of the individuals with whom GenAudio was communicating.  For example, Tiscareno, GenAudio's primary point of contact, had the title of "Senior Engineer."  SOF ¶ 171.

Moreover, Mahabub testified he thought Tiscareno was a senior Apple employee.  SOF ¶ 171. Because Mahabub thought Tiscareno was a senior employee, and because that belief was reasonable based on Tiscareno's title and role, Plaintiff cannot establish as a matter of law, that Mahabub had the duty to disclose Tiscareno was only a mid-level employee.

Further, Apple employees testified that both Andrew Bright and Barry Corlett, who met with GenAudio, and who were involved in evaluating GenAudio's technology, were senior apple employees.  SOF ¶ 170.  Thus, again, Plaintiff cannot show as a matter of law that GenAudio had a duty to disclose it was only meeting with mid-level employees, or that it had the requisite level of scienter in failing to disclose that disputed "fact."

Finally, even if Plaintiff could show it was true that GenAudio was almost exclusively meeting with mid-level Apple personnel, that is not a material fact that needed to be disclosed. As discussed above, Mahabub reasonably believed GenAudio's technology was presented to Steve Jobs, and that Jobs gave the green-light to continue.  As a result, it would not matter to a reasonable investor the level of seniority of the individuals at Apple that were carrying out Steve Jobs' orders.  What would matter to a reasonable investor is the fact *Steve Jobs gave the green light to continuing with GenAudio*.  Thus, the level of seniority of GenAudio's points of contact at Apple would not be a material fact that GenAudio had a duty to disclose.

### c. Apple Negotiations and Plan To Integrate Technology

A genuine issue of material fact also exists regarding Plaintiff's allegation that GenAudio failed to disclose it never negotiated with Apple or that Apple never planned to incorporate GenAudio's technology into Apple products.  As an initial matter, Mahabub testified at one point he had a discussion with Tiscareno regarding a Christmas product rollout of Apple products containing GenAudio technology, SOF ¶ 129, and he also had a conversation with Isaac regarding possible terms of a licensing agreement.  SOF ¶ 169.  That testimony by itself is sufficient to create a genuine issue of material fact on this alleged omission.

In addition, for all the reasons discussed above, Mahabub reasonably believed Apple was very interested in GenAudio's technology, and Mahabub reasonably was optimistic a deal would be reached.  Further, from a vendor's perspective, the entire reason to engage in discussions with Apple is to try to sell the vendor's technology to Apple.  Thus, a vendor reasonably could view

the entire discussions with Apple about the vendor's technology as a negotiation that hopefully culminates in a deal.  SOF ¶ 125.  And there is no doubt that from the beginning of discussions with Apple, Mahabub did treat the discussions as a negotiation.  He made it clear from the outset that his goal was to reach a deal with Apple, and he frequently raised negotiating points about the terms of a deal in his communications with Apple.  SOF ¶¶ 126, 137, 138.

Mahabub's principal contacts at Apple, Tiscareno and Hailey, also never told Mahabub they did not have the authority to negotiate with him on Apple's behalf.  SOF ¶¶ 139, 140. In short, Mahabub was negotiating with Tiscareno and Hailey, he just did not understand they were not negotiating back.

### B.      Alleged Fraudulent Scheme Liability

Plaintiff fails to satisfy its burden establishing "scheme liability" pursuant to § 17(a)(1) and (3) of the Securities Act of 1933 and Rule 10(b)-5(a) and (c).  "To succeed on [a scheme liability] theory, the SEC must prove that [Defendants] committed deceptive acts beyond making fraudulent statements to investors." *SEC v. Sullivan,* 68 F.Supp.3d 1367, 1377 (D. Colo. 2014). The conduct of Defendants, however, must be the performance of a manipulative or deceptive act that is inherently deceptive when performed. *Id.* The Tenth Circuit has "drawn a 'bright line' between the types of conduct that satisfy claims made under the scheme liability framework" and adopted holdings from the Second, Eighth, and Ninth Circuits that "scheme liability encompasses only actions which include deceptive conduct *beyond assistance with a material misstatement or omission*." *Id.* (emphasis added, citations omitted) .

Plaintiff attempts to "repackage" alleged fraudulent misrepresentations and/or omissions as a scheme to defraud. *See SEC v. St. Anselm Exploration Co.,* 936 F.Supp.2d 1281, 1298 (D.Colo.2013). Plaintiff lists the "deceptive acts" on which it relies to establish scheme liability on pages 44 and 45 of its brief.  But each item identified on those pages is an alleged misrepresentation, not a separate deceptive act.

In its initial motion for summary judgment, Plaintiff was faced with the obstacle of having no deceptive acts to rely on for scheme liability, other than the various statements it claimed were misrepresentations and omissions. Defendants argued in their opposition that Plaintiff's scheme liability claims failed because each of the alleged deceptive acts also were alleged misrepresentations. To avoid that problem this time around, Plaintiff tries a sneaky tactic. This time, Plaintiff intentionally *excludes* the various alleged falsified emails and statements to GenAudio insiders from its list of alleged misrepresentations, essentially trying to "save its ammunition" so it can use the falsified emails as deceptive acts.

In other words, the last time around, Plaintiff included everything as both an alleged misrepresentation and an alleged deceptive act. For example, in its previous motion for summary judgment, Plaintiff expressly argued the alleged falsified emails and statements to the GenAudio Board of Directors and other insiders were misstatements and omissions. Plaintiff argued that was the case because (1) some of those individuals also were investors, and (2) because the statements and falsified emails were sent to Jim Mattos, who in turn was responsible for communicating with outside investors. (*See* Plaintiff's Memorandum of Points and Authorities in support of its initial Motion for Summary Judgment, at 26, 28.)

This time, Plaintiff tries to divide Defendants' statements into two categories – some it labels as misrepresentations, and others it re-labels this time around as deceptive acts. But this is essentially a sham-pleading problem. Having previously labeled various statements and emails to insiders as alleged misrepresentations, Plaintiff cannot pretend that label was never affixed, and now claim they aren't representations at all, but rather deceptive acts. Plaintiff is estopped from re-characterizing Defendants alleged misrepresentations in that manner.

Each of the items Plaintiff claims are deceptive acts are actually representations, not deceptive conduct. As such, liability for them must be established under Section 17(a)(2) and Rule 10b-5(b) as misrepresentations or omissions. Plaintiff cannot repackage those

representations as deceptive conduct to establish scheme liability.  The alleged fraudulent misrepresentations or omissions do not constitute deceptive conduct beyond the mere making of an alleged fraudulent statement. *See SEC v. Sullivan, 68* F.Supp.3d 1367, 1377 (D. Colo. 2014). Because Plaintiff has failed to identify any "manipulative or deceptive act" beyond the alleged fraudulent misrepresentations or omissions, Plaintiff cannot meet its burden.

<strong>C.    Alleged Liability for Unlawful, Unregistered Securities Offerings</strong>

Plaintiff is using summary judgment to test the legal sufficiency of Defendants affirmative defense on which Defendants bear the burden of proof at trial. *See* Answer at p. 35, Third Affirmative Defense.  For Plaintiff to satisfy its burden, Plaintiff must show an absence of evidence to support an essential element of Defendant's affirmative defense. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993). Plaintiff must demonstrate the absence of evidence supporting applicability of the private offering exemption of Section 4(2) of the Securities Act of 1933 and Rule 506 of Regulation D for an issuer in a non-public offering of securities. Plaintiff has failed to carry this burden.

The applicability of the statutory section 4(2) exemption is a fact-bound analysis.  Instead of explaining why section 4(2) does not exempt registration of either offering of GenAudio securities, Plaintiff only states GenAudio cannot demonstrate it does because GenAudio cannot establish either offering was private instead of public.  *See* Plaintiff's brief at 30.  In that regard, plaintiff argues GenAudio could not identify the offerees, their relationship with GenAudio, or the nature, size, type and manner of the offering.  *See id*.  Plaintiff's argument demonstrates the fact-intensive nature of the analysis, the resolution of which is the province of the trier of fact.  Accordingly, this is a matter reserved for trial, not resolution by way of summary disposition.

Plaintiff also fails to address Defendant's reasonable reliance on the Rule 506 safe harbor provision. *See* Responses to SOF ¶¶ 61-69; 107-113.  It is the reasonable belief of the issuer and

not the actual status of the purchaser, the court must consider when determining whether the exemption of safe harbor applies. *Anastasi v. American Petroleum Inc.,* 579 F.Supp. 273, 274-75 (D.Colo.1984) ("[t]he suitability question turns on defendants' **reasonable belief at the time of the transaction** rather than [the investors'] actual financial condition and business sophistication.") (emphasis added.)  Like scienter, Defendant's reasonable belief is a state of mind question uniquely ill-suited for determination on summary judgment. As a result, Plaintiff has failed to carry its burden because questions of fact material to Defendant's affirmative defenses remain. *See* Responses to SOF ¶¶ 61-69; 107-113.

## V.  CONCLUSION.

Plaintiff's motion for summary judgment should be denied because genuine issues of material fact abound.  Because Mahabub reasonably believed Jobs gave the green light to continue with GenAudio (and because of many other considerations that further boosted Mahabub's optimism), there is a genuine issue of fact regarding whether Mahabub and GenAudio had the requisite scienter in making statements to investors regarding discussions with Apple.  Further, many of the challenged statements are non-actionable as puffery or under the bespeaks caution doctrine, and several are barred by the statute of limitations.

Plaintiff also has failed to establish scheme liability because Plaintiff has failed to identify any "manipulative or deceptive act" other than alleged misrepresentations and altered emails that also are, or previously were, asserted to be alleged fraudulent misrepresentations. Thus, Plaintiff improperly has repackaged its fraudulent misrepresentation claim as a claim for scheme liability.  Finally, Plaintiff has failed to satisfy its burden of proof on its claim under

Section 5 of the Securities Act for unregistered securities offerings.  For these reasons,

GenAudio respectfully requests that Plaintiff's motion be denied.

Dated:  March 30, 2018    Respectfully submitted,

          WILSON ELSER MOSKOWITZ EDELMAN &
          DICKER, LLP

       By:  s/ Michael P. McCloskey _____
         Michael P. McCloskey
         WILSON ELSER MOSKOWITZ
          EDELMAN & DICKER, LLP
         401 West A Street, Suite 1900
         San Diego, CA  92101
         (619) 321-6200 (tel)
         (619) 321-6201 (fax)
         michael.mccloskey@wilsonelser.com
         *Attorneys for Defendant GENAUDIO, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 30, 2018, a true and correct copy of the foregoing was electronically served via CM/ECF to the following:

| |
|---|
| Leslie J. Hughes, Trial Counsel<br>Danielle R. Voorhees, Trial Counsel<br>SECURITIES AND EXCHANGE COMMISSION<br>1961 Stout Street, Suite 1700<br>Denver, CO  80294-1961<br>Tel:  (303) 844-1000<br>E-mail:  HughesLJ@sec.gov<br>E-mail:  VoorheesD@sec.gov<br>*Attorneys for Plaintiff SECURITIES AND EXCHANGE COMMISSION* |
| Andrew B. Holmes<br>HOLMES, TAYLOR & JONES, LLP<br>617 S. Olive Street, Suite 1200<br>Los Angeles, CA  90014<br>Tel:  (213) 985-2265<br>E-mail:  abholmes@htjlaw.com<br>*Attorneys for Defendant TAJ JERRY MAHABUB* |
| Jeffrey G. Benz, Esq.<br>BENZ LAW<br>12021 Wilshire Boulevard, Suite 256<br>Los Angeles, CA  90025<br>Tel:  (310) 570-2774<br>E-mail:  jeffreybenz@gmail.com<br>*Attorney for Defendant ASTOUND HOLDINGS, INC.* |

By:  s/ Michael P. McCloskey
      Michael P. McCloskey, Esq.
      WILSON ELSER MOSKOWITZ
        EDELMAN & DICKER, LLP
      401 West A Street, Suite 1900
      San Diego, CA  92101
      (619) 321-6200 (tel)
      (619) 321-6201 (fax)
      E-mail:  michael.mccloskey@wilsonelser.com
      *Attorneys for Defendant GENAUDIO, INC.*