EXCERPTED

EXHIBIT 150

# In The Matter Of:

*Securities and Exchange Commission v.*
*Taj Jerry Mahabub, et al.*

---

*Taj Jerry Mahabub*
*Vol. 1*
*January 19, 2017*

---

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94103*
*(415) 597-5600*

Original File 30906Mahabub.txt
Min-U-Script® with Word Index

Case 1:15-cv-02118-WJM-SKC   Document 89-5   Filed 03/30/18   USDC Colorado   Page 3 of 23

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub – Vol. 1
January 19, 2017

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLORADO
 3    - - - - - - - - - - - - - - - - -
 4
 5    SECURITIES AND EXCHANGE        )
 6    COMMISSION,                    )
 7                  Plaintiff,       )
 8                                   )  CASE NO.
 9    V.                             )  1:15-cv-02118-CBS-WJM
10                                   )
11    TAJ JERRY MAHABUB, GENAUDIO,   )
12    INC., and ASTOUND HOLDINGS,    )
13    INC.,                          )
14                  Defendants.      )
15    - - - - - - - - - - - - - - -
16
17        VIDEOTAPED DEPOSITION OF TAJ JERRY MAHABUB
18             THURSDAY, JANUARY 19, 2017
19             PAGES 1 - 256; VOLUME 1
20
21           BEHMKE REPORTING AND VIDEO SERVICES, INC.
22        BY: PAULA A. PYBURN, CSR NO. 7304, RPR, CLR
23             160 SPEAR STREET, SUITE 300
24             SAN FRANCISCO, CALIFORNIA 94105
25                  (415) 597-5600
```

**Page 2**

```
 1
 2
 3
 4
 5
 6
 7
 8        Videotaped deposition of TAJ JERRY MAHABUB,
 9    VOLUME 1, taken by Plaintiff, at 444 South Flower
10    Street, Suite 900, Los Angeles, California,
11    commencing at 10:17 a.m., on THURSDAY, JANUARY 19,
12    2017, before Paula A. Pyburn, Certified Shorthand
13    Reporter No. 7304, RPR, CLR, pursuant to Notice.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1    APPEARANCES OF COUNSEL:
 2    FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION:
 3         SECURITIES AND EXCHANGE COMMISSION
 4         BY:  DANIELLE R. VOORHEES, TRIAL COUNSEL
 5              LESLIE HENDRICKSON HUGHES, TRIAL COUNSEL
 6         1961 Stout Street, Suite 1700
 7         Denver, Colorado 80294
 8         Telephone: (303) 844-1000
 9         Email:  voorheesd@sec.gov
10                 hugheslj@sec.gov
11
12    FOR DEFENDANT TAJ JERRY MAHABUB:
13         HOLMES, TAYLOR & JONES LLP
14         BY:  ANDREW B. HOLMES, ATTORNEY AT LAW
15         617 South Olive Street, Suite 1200
16         Los Angeles, California 90014
17         Telephone:  (213) 985-2200
18         Email: abholmes@htjlaw.com
19
20
21
22
23
24
25
```

**Page 4**

```
 1    APPEARANCES OF COUNSEL - (CONTINUED):
 2    FOR DEFENDANT GENAUDIO, INC.:
 3         WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
 4         BY:  MICHAEL P. MCCLOSKEY, ATTORNEY AT LAW
 5         655 West Broadway, Suite 900
 6         San Diego, California 92101
 7         Telephone: (619) 881-3326
 8         Email:  michael.mccloskey@wilsonelser.com
 9
10    FOR DEFENDANT ASTOUND HOLDINGS, INC.
11    - (A.M. SESSION):
12         BENZ LAW GROUP
13         BY:  JEFFREY BENZ, ATTORNEY AT LAW
14         12021 Wilshire Boulevard, Suite 256
15         Los Angeles, California 90025
16         Telephone: (310) 570-2774
17         Email: jeffreybenz@gmail.com
18
19    ALSO PRESENT:
20         CASEY HOWELL, VIDEOTAPE OPERATOR
21
22
23
24
25
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 37

1    I remember.
2        Q.  All right.  And do you recall how much
3    money GenAudio raised through this offering?
4        A.  I don't.
5        Q.  Was the private placement memorandum
6    that's been marked as Exhibit 199 provided to
7    investors and potential investors?
8        A.  This (indicating) as a packet?
9        Q.  Right.
10       A.  Yeah, I would imagine so.  That's how you
11   raise money.  Right?
12       Q.  Okay.  All right.
13           Mr. Mahabub, if you could flip to page 18
14   of the PPM, which has -- it ends in Bates No. 6507.
15       A.  All right.
16       Q.  You see under -- this page is entitled
17   "New Business Development," and there's a section
18   for Apple?
19       A.  I do.
20       Q.  And it says -- the first sentence says (as
21   read):
22           Over the past several years, the
23           company has established excellent
24           relationships with both senior
25           management and software developers at

Page 38

1            Apple.
2        A.  Uh-huh.
3        Q.  Who was the senior management with which
4    the company had excellent relationships at this
5    point in time?
6        A.  Well, Vic was one, Vic was a senior
7    manager of iPod division.
8        Q.  Okay.  So Mr. Tiscareno.
9        A.  Yeah.
10       Q.  Who else?
11       A.  There's a couple other guys there.  I
12   can't remember his name.  One of them was a VP, and
13   I can't remember his name.  He's the first guy that
14   we met.  And then he brought Victor into the
15   room -- oh, no.  Victor brought him in.
16           There was one guy that I talked to
17   initially, his name was Tony Fadell.
18       Q.  Okay.
19       A.  And Tony Fadell is the one who put me in
20   touch with Victor Tiscareno.
21       Q.  All right.  Any other senior management?
22       A.  Well, I think Tony Fadell was -- was the
23   one who put me to -- to Vic, and then from Vic it
24   went from there.  Whatever Vic did is -- was -- you
25   know, that was my main point of contact.  So...

Page 39

1        Q.  Okay.  What about software developers?
2    Who were the software developers at Apple with
3    which GenAudio had excellent relationships?
4        A.  Well, there were a few.  I can't remember
5    who they were, though.  I just don't remember what
6    their names were.
7            I know Barry Corlett was one.  He was a
8    software guy.
9            And I can't remember -- there's many --
10   over the years, we met many people there.
11       Q.  I understand.  I'm just trying to focus in
12   on as of December 11th, 2008.
13       A.  I can't tell you.  We met many people,
14   like I said.  The first meeting that we had there
15   was in 2007, if I recall --
16       Q.  Okay.
17       A.  -- was my very first meeting.  And that's
18   where one of the VPs of iPod division was there.
19   And then he pretty much -- so everything got left
20   in Vic's hands.
21           I can't remember what the guy's name was,
22   though.  iPod accessories.  He was a VP of iPod
23   accessories.  But I don't remember his name.  That
24   was in 2007, when we first started developing the
25   relationship.

Page 40

1            Yeah, that's my recollection.
2        MR. HOLMES:  When you're done answering the
3    questions, just -- whenever you trail off like
4    that, the reporter is still writing down everything
5    you say.
6        THE WITNESS:  Okay.
7        MR. HOLMES:  And it doesn't show the gaps in
8    time.  So it's going to look like you're continuing
9    to answer the question.
10       THE WITNESS:  Yeah.
11       MR. HOLMES:  So when you're done answering the
12   question, just wait for the next one.
13       THE WITNESS:  Okay.
14           (Whereupon, Exhibit 200 and
15           Exhibit 201 were marked for
16           identification by the Court Reporter.)
17       MR. HOLMES:  200.
18       MS. VOORHEES:  Yes.  It's going to be 200 and
19   201.  For the potential sake of efficiency.
20       MR. HOLMES:  Which is which?
21       MS. VOORHEES:  So the -- I'll just read them
22   into the record.
23       Q.  So, Mr. Mahabub, you have been handed two
24   documents.  The first is Exhibit 200, which is a
25   March 25th, 2009, private placement memorandum.

Case 1:15-cv-02118-WJM-SKC   Document 89-5   Filed 03/30/18   USDC Colorado   Page 5 of 23

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 61

1  the team is.
2      THE WITNESS: Oh.
3      MR. HOLMES: Make sure you listen to the
4  question.
5      THE WITNESS: I -- I can't even tell you.
6  Melissa Gonzales, Jim Mattos, Paul Powers,
7  Mark Bohak -- it would have been team members and
8  board members.
9  BY MS. VOORHEES:
10     Q. When you say "team members," you mean
11  people who worked for GenAudio?
12     A. Or on the board of GenAudio, yeah.
13     Q. And that could include people who are
14  actually employed by GenAudio or who were
15  contracting --
16     A. Or consultants, exactly, full-time
17  consultants.
18     Q. Okay.
19     A. Yeah, you bet.
20     Q. All right. So if you could go to the next
21  page, then, of Exhibit --
22     A. But consultants were all under, you know,
23  heavy NDAs with us or had software -- developer
24  agreements executed with us that would have
25  prevented them from -- if I said, "Keep this

Page 62

1  internal and confidential," that meant keep it
2  internal and confidential.
3      Q. All right. If you could take a look at
4  the second page. I'm starting in sort of the end
5  of what I think is the first paragraph --
6      A. Yep.
7      Q. -- where you see it says (as read):
8          Most likely I will have one or two
9          additional calls with Apple after
10         their review, and if I get the green
11         light, actual integration development
12         and testing will commence.
13     A. Yeah.
14     Q. Do you see that?
15     A. I do.
16     Q. All right. "Actual integration
17  development and testing," was that work that was to
18  be done by Apple?
19     A. No. By us.
20     Q. Okay. If you go down to the next
21  sentence, it says (as read):
22         I believe this could realistically
23         happen within two to four weeks.
24         Do you see that?
25     A. The integration test, yes.

Page 63

1      Q. Okay. What was your basis for saying
2  that?
3      A. We had already ported the code to run
4  across about every platform -- or every operating
5  system that they had at that time. So getting
6  handed a -- an API or a kext, as Ron Isaac handed
7  to us --
8      THE REPORTER: Or a what?
9      THE WITNESS: A kext, k-e-x-t. It's called a
10  kernel extension, which is an embedded way to embed
11  into a Macintosh product line.
12     MR. HOLMES: Jerry -- Jerry, when she does
13  that, she just wants you to repeat exactly what you
14  said. If you add more things, it's more than she
15  needed.
16     THE WITNESS: Okay. Okay.
17         So I'm not sure exactly what your question
18  is. I think -- I think my point that I'm making
19  here is that we're pretty much self-ported; so
20  to -- to tighten down the nuts and bolts into a
21  kernel extension or into any type of API that we
22  might receive for OSX or iOS would be a matter of
23  weeks, is the point I was making there.
24  BY MS. VOORHEES:
25     Q. Okay. If you could skip down, there's a

Page 64

1  series of sentences that say, "Do I believe."
2          If you could go down to the one that says
3  (as read):
4          Do I believe that Apple could be a
5          strong potential buyer of GenAudio in
6          its entirety? Yes.
7      A. Absolutely.
8      Q. Do you see that?
9      A. Yes.
10     Q. Okay. What was your basis for that?
11     A. Discussions that I had had and, you know,
12  they seemed to be very interested in the
13  technology. I had written several emails to Victor
14  and Ron and other contacts that I had. And, you
15  know, they -- they certainly didn't go against
16  anything that I was saying to them; that's for
17  sure.
18     Q. All right. The next -- if you skip down
19  two, it says (as read):
20         Do I believe that if someone does
21         not invest at this point in time that
22         they are foolish? Yes.
23         And what did you mean by that?
24     A. That means that at the time, I honestly
25  believed that we were going to be doing a deal with

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 65

```
 1   Apple based on the communications I had with my
 2   points of contact that I was working with there.
 3   Q.  Okay.  And that's as of July of 2009, you
 4   thought that?
 5   A.  Yep, exactly.  But, you know, like I said,
 6   this was meant to go to internal team members; this
 7   wasn't meant to be distributed to anyone external
 8   to the team, or else it would have been.
 9   Q.  If you go down to the next paragraph, it
10   says (as read):
11          We need investors and need them
12          now.
13   A.  Yep.
14   Q.  Why were you writing that?
15   A.  Because we were out of money.  And in
16   order to port code and hire on the right team and
17   the right dev staff, and there were a couple other
18   additional software engineering people that I
19   needed to bring on board at the time, and you can't
20   bring those people on unless you have money.
21   Q.  Okay.  If you could go to the next page.
22   So I'm now on the Bates page 7974.
23   A.  Yeah.
24   Q.  And go down to what I think is the first
25   full paragraph.  It says (as read):
```

Page 66

```
 1          Everyone keep their eye on the
 2          prize and, if possible, bring
 3          potential investors to the table,
 4          please, preferably through the common
 5          stock offering.
 6          Do you see that?
 7   A.  Yes.
 8   Q.  All right.  So you were asking your team
 9   to help bring potential investors to the table;
10   correct?
11   A.  Through the common stock offering.  What
12   I'm saying is, don't bring them to the table
13   through anything here.  They have to read the
14   common stock offering, the risk factors associated
15   with the offering; that this is -- you know, this
16   is internal team member confidential stuff, but if
17   you know anyone that might be interested in
18   investing, you know, give them the common stock
19   or -- at the time, the logistics were, you know, go
20   to Jim Mattos, and Mattos would then forward them
21   the common stock offering.
22   Q.  Okay.  So when -- so your parenthetical
23   that says "preferably through the common stock
24   offering," you're referring to the process by which
25   the investors would be provided with the offering
```

Page 67

```
 1   documents?
 2   A.  With information to determine whether or
 3   not it was an investment that they want to invest
 4   in or not, because this obviously isn't surrounded
 5   by the appropriate risk factors and disclaimers in
 6   the language that are needed.
 7   Q.  Okay.  You say "preferably."  Was there
 8   another alternative?
 9   A.  Yeah, a term sheet.  So if there's a
10   potential that someone knew someone that wanted to
11   invest something, a little larger amounts, you
12   know, maybe the company would look at what's called
13   a term sheet, if I remember, is what it's referred
14   to as.
15          So if -- if someone wanted to -- you know,
16   one of our employees said, "Hey, Jerry, here is my
17   Uncle Joe.  You know, he wants to invest
18   $10 million."  Right?  Which never happened.  But
19   if it ever happened, you know, we'd -- we'd
20   entertain a term sheet at that time.
21          So it would either be through a common
22   stock offering or through a potential for a term
23   sheet.  Again, you know, we never had any term
24   sheet offers to the table; it was all through the
25   offerings.
```

Page 68

```
 1   Q.  Okay.  So you never had any term sheets?
 2   A.  No.
 3   Q.  Okay.  Were there any other alternatives
 4   other than term sheet and common stock offering?
 5   A.  No.  No.  There was a term sheet with a
 6   group called GenAudio Term Sheet Investment Group,
 7   which is a B.S. group set up by Mark Bobak and
 8   Dell Skluzak in a -- a way for them to start their
 9   hostile takeover when they were -- but that's the
10   only term sheet group, as far as I remember.
11   Q.  Okay.
12          THE WITNESS:  Slow down?  Okay, yeah, sorry.
13          (Whereupon, Exhibit 203 was marked for
14          identification by the Court Reporter.)
15          THE WITNESS:  Oh, you guys dug these up, huh?
16   This is great.
17   BY MS. VOORHEES:
18   Q.  All right.  Mr. Mahabub, you've been
19   handed what's been marked as Exhibit 203.  It's
20   email correspondence.  The first page is Bates
21   labeled SEC-TiscarenoV-E-000325.
22          Do you recognize Exhibit 203?
23   A.  Yes.
24   Q.  Okay.  And this is email correspondence
25   between you and Victor Tiscareno; correct?
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 89

1  Q. Okay. So now -- and then the email
2  continues on.
3      Go back to Exhibit --
4  A. Let me just read something. (As read):
5      The workload that customized per
6  vendor.
7  MR. HOLMES: When you're -- remember, when
8  you're reading out loud, she's taking it down.
9  THE WITNESS: "Customized per vendor." I'm
10 just trying to understand something here.
11 MR. HOLMES: Okay, remember again, also,
12 whenever you're speaking out loud, the reporter is
13 writing it down.
14 THE WITNESS: Oh, okay.
15 BY MS. VOORHEES:
16 Q. Go ahead and read as much as you want to,
17 though, just silently would be best.
18 THE WITNESS: What I find interesting, Andrew,
19 is he's referring to us as a vendor here.
20 MR. HOLMES: Yeah. Let's not -- the --
21 everything you're saying is part of the testimony
22 booklet at the end of the day.
23 THE WITNESS: Oh, okay.
24 MR. HOLMES: So you ask questions or make
25 comments to me or anyone else --

Page 90

1  THE WITNESS: Go off the record?
2  MR. HOLMES: -- we should go off the record to
3  do that or talk about it on a break.
4  THE WITNESS: Okay.
5  MR. HOLMES: Otherwise -- otherwise try to only
6  speak when you're -- when you're responding to a
7  question.
8  THE WITNESS: Hmm. Okay. All right.
9      Never mind. Go ahead.
10 BY MS. VOORHEES:
11 Q. Okay. So now if you could go to -- back
12 to Exhibit 206 right there on that page -- you're
13 on the right spot -- you see that above the second
14 part that I've highlighted, where that block of
15 text starts -- I'm going to point it out to you.
16 Right here is where I'm at.
17 A. Uh-huh.
18 Q. Okay. You see that starts with (as read):
19     Here are some responses, but first
20     I would like to present reasoning
21     behind the framework we have and the
22     way we have gone about it.
23     Do you see that?
24 A. I do.
25 Q. Okay. So that matches what I just read

Page 91

1  from Exhibit 205.
2  A. Okay.
3  Q. Great. So now turn the page on
4  Exhibit 205, and I'm now going to jump to the
5  highlighting and read it on Exhibit 206 and then
6  you can compare the two. All right?
7  A. Yeah.
8  Q. Okay. So the highlighting starts with (as
9  read):
10     I will be able to meet with you and
11     Vic (and I believe Phil Schiller and
12     other marketing staff are meeting with
13     you and Vic as well) on the 16th, and
14     I am excited to listen to the OpenAL
15     demo. This sounds like it might be
16     the best way to get this going from
17     the licensing side here at Apple. Vic
18     and I have discussed this already.
19 A. Uh-huh.
20 Q. Do you see that?
21 A. I do.
22 Q. Okay. And you do see in Exhibit 205, that
23 text is not in Mr. Isaac's email?
24 A. Yeah. What -- what I may have done there
25 was had a -- oftentimes, there were phone calls

Page 92

1  that I would have in addition to these emails. So
2  what I might have done is forward to the team
3  something and added something in to also emphasize
4  what was discussed via phone as well to the team,
5  just to have a full picture of what was going on.
6      So that -- that would make sense right
7  there, because, you know, like I said, many times
8  we'd have -- Vic and I were on the phone -- I mean,
9  look at the phone records. You could probably pull
10 my -- my phone records from my -- I mean, there --
11 we talked a lot.
12     So I would send an email; he would call
13 me -- we talked almost every day, sometimes three,
14 four times a day, on the phone, in addition to the
15 emails. So it's sort of just adding something in to forward
16 like, sort of just adding something in to forward
17 to the team there, in addition to what may have
18 been stated to be, like, okay, this was also a
19 phone conversation.
20     But I didn't notate that, you know,
21 just -- it was more for the team than anything.
22 Q. And in the copy that you forwarded to the
23 team, you made it look like Mr. Isaac's email
24 included that highlighted language; right?
25 A. Yeah, because that's what I would probably

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 93

1  have been talking to him on the phone about, yes.
2  Q. Okay. So your testimony is that Ron Isaac
3  told you on the phone that he believed that
4  Phil Schiller and other marketing staff would be
5  meeting with you and Mr. Tiscareno?
6  A. I -- I'm not testifying to that, because I
7  can't really remember. But I'm saying, if that --
8  judging based on what I'm reading here, if it were
9  me to be making these changes, that would have been
10 the reason why I would have done it, is to add in
11 information that was given via phone call to the
12 end of it so I have a more clearer picture to
13 present to the team members.
14        Not necessarily, you know, in any way
15 that -- it was just more to kind of fill in the
16 blanks so I didn't have to sit there and explain to
17 everyone what was going on, you know? It was a lot
18 easier just to do it that way, as far as I was
19 concerned.
20 Q. It was a lot easier to make it look like
21 Mr. Isaac said it than to add it?
22 A. Well, because he would have said it to me
23 on the phone. If that was the case, then I would
24 have added it in like this; that's -- that's
25 correct.

Page 94

1  Q. Okay. Well, you keep saying "if that was
2  the case."
3        It is the case; right? I mean, we're
4  looking at a document.
5  A. Well, I can't -- I can't -- I don't
6  remember, it's so long ago. So -- you're saying it
7  is the case, but I can't say that for certain
8  because I don't -- for me to tell you, do I
9  remember all this stuff? No, I don't.
10       I'm trying to reason through my brain and
11 what I would have thought at the time, if this were
12 the case that this happened, which it looks like it
13 was, that would have been the reason why I would
14 have done it.
15 Q. The reason you would have done it would be
16 that Mr. Isaac would have said to you on the phone
17 the text that you added to his email?
18 A. It would have either been on the phone or
19 it could have been in a meeting that I had with him
20 in person -- I don't know, it was so long ago.
21       I mean, I was -- I was flying into
22 Cupertino multiple times, having meetings with him
23 in person, phone calls with Isaac, phone calls with
24 Vic. I mean, it was nonstop. I mean, we -- I
25 mean, we were thinking that we were going to be

Page 95

1  doing a licensing deal with him. So that's --
2  that's what happens.
3  Q. Did Mr. Isaac ever tell you that he
4  thought you would meet Phil Schiller?
5  A. Not that I recall. But if I'm writing it
6  in here, then apparently he did. I just don't
7  remember how or when that would have happened. It
8  must have been around the same time frame, though.
9  Q. Did Mr. Isaac ever talk to you about how
10 to get things going from the licensing side of
11 Apple?
12 A. He did, yes.
13 Q. Okay. Tell me everything you remember
14 about those conversations.
15 A. We met with Jim Tennebee in a room, and I
16 had just built a new kernel extension. He had
17 asked me to build a commuting application for him.
18 And Victor was -- Victor was there just for a split
19 second.
20       So Victor took me into this -- another
21 building, like an R & D kind of building, and --
22 like a conference room somewhere in that building.
23 And I waited in there for, like, about 15 minutes,
24 talking with Vic.
25       And then Ron showed up. And then a guy

Page 96

1  named Jim Tennebee showed up, who is a tuning
2  engineer at Apple. And basically they wanted Jim
3  to determine whether or not this is something he
4  wanted to use to tune the Mac -- the future
5  products of Macintosh computers were on board.
6       So he came in and listened to it and was
7  blown away. He's, like, "Wow, this is really good
8  stuff."
9       I was like, "Yeah, yeah, it's, you know,
10 been a lot of years of working on this." And we
11 discussed some different changes that he might have
12 wanted to have to see in there.
13       And then Ron made a comment to me.
14 Because I had asked Ron, I was like, "Well, you
15 know, what -- what do we do? How do we -- we're
16 going to do it, obviously we need to figure out
17 how we're going to license this to you; right?"
18       And he said, "Well, we're not going to pay
19 you a per unit royalty, you know that." That's
20 exactly what he said, quote-unquote, to me.
21       So -- and I'm, like, "Well, I understand."
22 You know, to me, I mean, maybe I thought -- I don't
23 exactly know what that meant. Could that have
24 meant that maybe they're looking to acquire us if
25 they're not going to pay you a per unit royalty?

Case 1:15-cv-02118-WJM-SKC   Document 89-5   Filed 03/30/18   USDC Colorado   Page 9 of 23

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 97

1  Because how else do you -- they either license your
2  technology or they buy it out. Right?
3      If they're not going to pay a per unit
4  royalty, then that kind of almost implies something
5  else. Or maybe they are going to pay a lump sum,
6  I don't know.
7      All I know is that that comment was made.
8  And I told him, I said, "That's okay."
9      And he said, "Well, when we get to that
10  stage, we'll figure it out." That's exactly what
11  he told me in the conference room.
12      And I was like, "Okay." Because
13  Jim Tennebee liked it.
14  **Q. Okay.**
15  A. So I was being led down the pathway to
16  believe that a licensing deal was coming our way.
17  **Q. Other than what you just testified to and**
18  **explained, did Mr. Isaac otherwise ever tell you**
19  **how he thought something might be the best way to**
20  **get going from the licensing side here at Apple?**
21  A. If that's what I wrote there, then he must
22  have. I just don't remember, honestly. I don't
23  remember, you know?
24  **Q. Is there anything you could do to refresh**
25  **your recollection on that?**

Page 98

1  A. No. It's too long ago. I mean, what I do
2  remember were some very distinct things Ron told
3  me.
4      The most distinct thing was about the fact
5  that, you know -- when they -- when he said, "We
6  have many vendors that we work with," is exactly
7  what he said. So automatically he was
8  characterizing us as being a vendor.
9      A vendor typically means that, you know,
10  we're going to be selling something to them; right?
11  By definition.
12      So, from my perspective, being a vendor of
13  the -- of the corpora- -- of Apple, or a potential
14  vendor, obviously, you're going to move into a deal
15  and get paid something.
16      So we had some very light discussions
17  about that, and I just don't remember.
18  I also do remember him saying that we
19  needed -- he sent me an email on this, that we
20  needed to go under a new set of NDAs, a heftier set
21  of NDAs. I can't remember exactly when that was --
22  **Q. And I don't want to cut you off, but I**
23  **will tell you that I think we're going to get**
24  **there. So maybe if you want to wait till you have**
25  **the document that I think you might be referring to**

Page 99

1  in front of you --
2  A. Oh, okay.
3  **Q. -- that might chronologically help.**
4  A. Yeah. I was just going through the -- you
5  had asked me what -- what I remembered, and that's
6  what I recall, you know?
7  **Q. Okay.**
8  A. Yeah. So that's pretty much all about it.
9  MS. HUGHES: Mr. Mahabub, could I just ask
10  something to clarify the record?
11      You said, "We had some very" -- and then
12  you use a word, either "like" or "light"
13  discussions?
14  THE WITNESS: Where?
15  MS. HUGHES: When you were just speaking just
16  now, talking about discussions with Mr. --
17  THE WITNESS: Light. Light. In other words,
18  it wasn't like, you know, sitting at the table, you
19  know, negotiating per unit royalties or how much
20  money we were going to get paid.
21      It was more just a general licensing, you
22  know -- and the words he used to me were, "We're
23  not going to pay you a per unit royalty." That's
24  all I really remember about the thing.
25      And I'm, like, all right, fine.

Page 100

1  MS. HUGHES: So l-i-g-h-t.
2  THE WITNESS: L-i-g-h-t, yes.
3  THE REPORTER: Again, you need to slow down a
4  little bit.
5  THE WITNESS: Okay, sorry.
6  BY MS. VOORHEES:
7  **Q. Mr. Mahabub, I've just handed you what was**
8  **previously marked as Exhibit -- Deposition**
9  **Exhibit 72.**
10      (Whereupon, Exhibit 72 was previously
11      marked for identification by the Court
12      Reporter.)
13  BY MS. VOORHEES:
14  **Q. It's Bates-labeled GA006254. These are**
15  **GenAudio, Inc., board of directors telephonic**
16  **meeting minutes from September 25th, 2009. If you**
17  **could just go ahead and take a look at them.**
18      **I'll tell you, I'm going to ask you about**
19  **paragraph 7, but go ahead and look at as much as**
20  **you need to.**
21  A. Okay, sure.
22  **Q. All right. Mr. Mahabub, do you recognize**
23  **the document?**
24  A. I do.
25  **Q. And do you recall the meeting?**

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub – Vol. 1
January 19, 2017

Page 101

1   A.  I do.
2   Q.  All right.  So I take it you attended the
3   meeting; correct?
4   A.  Yes.
5   Q.  Okay.  If you take a look at paragraph 7,
6   the last sentence -- well, the first sentence reads
7   (as read):
8           Apple.  Mr. Mahabub provided a
9       summary of the discussions with
10      Apple --
11  A.  Uh-huh.
12  Q.  (As read):
13      -- and noted that the next meeting was
14      this upcoming Thursday.
15      It then goes on, the last sentence reads
16  (as read):
17          Mr. Mahabub noted that a deal with
18      Apple is highly probable based on the
19      many meetings and Apple's responses to
20      date.
21  A.  Uh-huh.
22  Q.  Is that an accurate representation of what
23  you explained to the board on that date?
24  A.  Of course.  That was my opinion at the
25  time, yes.

Page 102

1   Q.  Okay.  What -- what was the summary of
2   discussions with Apple?
3   A.  Just various meetings that we have had up
4   to that date, many meetings.  A lot of integration.
5   A lot of software engineering.  Like I said, there
6   are -- there are multiple people that we were
7   interacting with; I don't remember who they all
8   were.
9       There are times when I'd go in and have a
10  meeting and there would be multiple people sitting
11  around the table.  I didn't really know who they
12  all were.  All I did was know we were under an NDA
13  with them; so it shouldn't have been a problem at
14  the time.  And I would just give demos that I was
15  asked to produce.
16  Q.  Okay.
17      MR. HOLMES: I'm doing this to slow you down a
18  little bit.
19      THE WITNESS: Okay.
20  BY MS. VOORHEES:
21  Q.  All right.  And, Mr. Mahabub, am I correct
22  that the integration that you are discussing was
23  being done by GenAudio?
24  A.  Yes.
25  Q.  Okay.

Page 103

1   A.  Yes.
2   Q.  And the software engineering was also
3   being done by GenAudio?
4   A.  That's correct.
5   Q.  The -- the last sentence (as read):
6           Mr. Mahabub noted that a deal with
7       Apple is highly probable.
8       What did you mean by "a deal"?
9   A.  That meant that I thought that -- you
10  know, doing a deal.  'Cause we were being listed as
11  a vendor.  We were being given, you know,
12  information, confidential kernel extensions and
13  other things like that as a vendor of Apple.
14      So, I mean, you know, it's -- like I said,
15  what does a vendor do?  A vendor sells stuff to a
16  company.  So seemed like a deal was coming.
17  Q.  And I -- I'm just trying to focus in on
18  that last word, "deal."
19      What did you mean by "deal"?
20  A.  Whatever it meant.  I don't know.  It
21  could have been an acquisition.  It could have
22  meant a license.  It could have meant an up front
23  lump sum -- some kind of a deal, whether it's we're
24  going to promote your product, we're going to not
25  pay you a dime, but we're going to integrate you

Page 104

1   and brand the hell out of you.
2       THE REPORTER: We're going to --
3       THE WITNESS: We're going to promote your
4   product and integrate your technology in, but we're
5   not going to pay you a dime.  But we're going to,
6   you know, promote you.  We're going to put your
7   name out there.
8       Because oftentimes, as a new software
9   company that's just going, you have to kind of give
10  the sweetheart deals away just to get your brand
11  out there.
12  BY MS. VOORHEES:
13  Q.  Did --
14      MR. HOLMES: I'm just going to caution you to
15  slow down.
16      THE WITNESS: Okay.
17      MR. HOLMES: Even what you were doing to try to
18  help the reporter there was very fast.
19      THE WITNESS: Yeah.
20      MR. HOLMES: So try to slow down.  I know it's
21  hard.
22      THE WITNESS: All right.
23  BY MS. VOORHEES:
24  Q.  Mr. Mahabub, thinking back to this board
25  meeting, do you recall discussing the various types

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 109

1  anyways -- but at the same time, the intention
2  behind the email was not to solicit investors.
3  Q. All right. If you go down to the fourth
4  paragraph --
5  A. Yes.
6  Q. -- do you see where it says (as read):
7      Let's see who is smart enough at
8      this stage in the game to cut me a
9      check?
10 A. Yep, you got it.
11 Q. What do you --
12 MR. HOLMES: Sorry. It's "cut the check."
13 MS. VOORHEES: Sorry. "Cut the check."
14 THE WITNESS: Uh-huh.
15 BY MS. VOORHEES:
16 Q. What did you mean by that?
17 A. Let me see. What did I say after that?
18 Oh, yeah. What I'm telling the team is
19 that, based on where we are right now, because we
20 really can't tell them what's going on here at
21 Apple, but, you know, let's see if anyone has got
22 enough brains to realize that we're really rolling
23 forward. At least I thought we were really rolling
24 forward with Apple.
25     So I'm addressing the team, letting them

Page 110

1  know, you know, let's see who is smart enough out
2  there to invest in the company. Because, you know,
3  at the time, like I said, I thought we were doing a
4  deal.
5      So -- but that doesn't mean that that's
6  what was being told to investors. That's what was
7  being told to team members.
8  Q. All right. Mr. Mahabub, let's --
9  A. Does it make sense what I'm saying? I
10 want to make sure --
11 Q. I'm not going to answer your questions.
12 A. Okay.
13 Q. Mr. Mahabub, let's go back to
14 Phil Schiller.
15 A. Yeah, sure thing.
16 Q. So I believe -- and, again, this is just
17 my recollection of reading your investigative
18 testimony --
19 A. Yeah.
20 Q. -- because I was not there -- I believe
21 that you explained that you thought that you were
22 referring to Michael Hailey when you sent this
23 email.
24 A. Someone else, yeah. That's what I said at
25 the beginning when I first started answering these

Page 111

1  questions. I think I was referring to someone
2  else. That's right.
3  Q. Okay. So -- but what I want to know is
4  your best recollection sitting here right now.
5      Who do you think is the Phil Schiller?
6  Who do you think that person was?
7  A. I don't know. It was someone that was in
8  marketing, that's for sure. Who it was, I can't
9  recall. Like I said, there are many people that I
10 met with on many occasions. You can ask me the
11 question in a thousand different ways; my answer
12 isn't going to change.
13 Q. Okay.
14 A. I don't remember.
15 Q. That's fine. But it was not
16 Phil Schiller?
17 A. I don't know. I don't remember. I really
18 don't remember. If I did, I'd tell you -- I would
19 tell you yes, it was Phil, or it wasn't. But I --
20 I don't.
21 MS. VOORHEES: All right. Just for the record,
22 I'm going to have what was previously marked as
23 Deposition Exhibit 22 remarked, because I have
24 added highlighting to it. So it is different.
25     (Whereupon, Exhibit 207 was marked for

Page 112

1      identification by the Court Reporter.)
2  MR. HOLMES: 207?
3  MS. VOORHEES: Correct.
4  Q. All right. Mr. Mahabub, I'm going to hand
5  you what has been previously marked as Deposition
6  Exhibit 23.
7      (Whereupon, Exhibit 23 was previously
8      marked for identification by the Court
9      Reporter.)
10 BY MS. VOORHEES:
11 Q. All right. Take a look at Exhibit 23
12 first, which is the email that at the bottom has
13 the SEC-Tiscareno Bates stamp.
14 A. 119 or 120?
15 MR. HOLMES: This one.
16 BY MS. VOORHEES:
17 Q. Yeah, sorry. It does have both numbers on
18 it.
19 A. Okay.
20 Q. So, for the record, it was previously
21 Investigative Testimony Exhibit 119.
22 A. Okay.
23 MR. HOLMES: Sorry, were you directing him to a
24 particular portion of it?
25 MS. VOORHEES: No. I just want him to take a

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 141

1      frustrating playing the hurry up and
2      wait game. Believe me, it frustrates
3      us too. Michael and I want to make
4      sure we have no hang-ups when we push
5      this to the top and we are both
6      confident that we can get this okayed
7      by the big man if we play our cards
8      right.
9          Now, if you look over at Exhibit 27, do
10     you see that those sentences that I just read are
11     not in that email?
12     A.  Yes. Again, the same explanation I gave
13     before: If I would have done anything of that
14     nature, it would have been putting in phone calls
15     in addition to emails that I was forwarding to the
16     team. So it could just kind of like be, like, this
17     is what we discussed on the phone; this is what we
18     did here, and I might have just, like, added that
19     in just for the team members to have a scope view
20     about what's going on.
21         Did I -- do I remember doing it?  No.  But
22     there's only one person that would have, and that
23     would have been me, and that would have been why it
24     would have been done, because it would have
25     integrated and merged in in-person meetings, phone

Page 142

1      calls, and/or emails together, more or less sending
2      it as a report.
3          I could have done that differently, yes,
4      but that's what -- the intention would have been
5      that.
6      Q.  Okay.  Did Mr. Tiscareno say to you (as
7      read):
8              I know it's frustrating playing the
9          hurry up and wait game.  Believe me,
10         it frustrates us too?
11     A.  I do recall him saying something along
12     those lines in a phone call with him, yes.  He was
13     pretty frustrated by a few different things in
14     terms of the timing that all this stuff was taking.
15         But, yeah.  I mean, it's what happens.
16     Q.  Did Mr. Tiscareno say to you (as read):
17             Michael and I want to make sure we
18         have no hang-ups when we push this to
19         the top, and we are both confident
20         that we can get this okayed by the big
21         man if we play our cards right?
22     A.  I do recall a conversation with him where
23     he said something along those lines, yes.
24     Q.  When did that conversation occur?
25     A.  Must have been right around the time frame

Page 143

1      that I sent this email, 'cause -- so whenever.
2      It's 2010.
3      Q.  Okay.  If you skip down to the
4      highlighting related to "with the OpenAL
5      implementation."
6          Do you see that?
7      A.  I do.
8      Q.  It says (as read):
9              With the OpenAL implementation,
10         including the project Phil discussed
11         for Christmas product rollout with
12         you.
13     A.  Uh-huh.
14     Q.  Did Mr. Tiscareno ever refer to
15     Mr. Schiller in his communications with you?
16     A.  I don't remember.  There's so many people
17     that he referred to in his communications with me,
18     whether it was on the phone or in person or by
19     email -- I just don't recall.
20         Again, it's -- you're asking me the same
21     question over and over again from different
22     documents.  The answer is not going to change.  I
23     don't remember.
24     Q.  Did Mr. Tiscareno ever discuss a Christmas
25     product rollout with you?

Page 144

1      A.  That I do recall, yes.  But that was
2      for -- I can't remember what his objective was.
3      I -- I think it was just iPod at the time, but then
4      that expanded -- OpenAL is an implementation that's
5      utilized across all the various platforms -- or all
6      the different products that Mac has.  And that's
7      why I went the OpenAL route.  It was a simple
8      replacement of the Mac 3D mixer, if I remember.
9          So that's a technical thing, though.  Not
10     important to you guys.
11     Q.  Mr. Mahabub, do you recall communicating
12     with anybody named Phil at Apple?
13     A.  I do, yes.
14     Q.  And what do you recall about that person?
15     A.  Not much.
16     Q.  How did you communicate with him?
17     A.  Primarily by phone.  Also in-person
18     meetings when I went there.  I just don't
19     remember -- I'm pretty sure his name was Phil, yes.
20     I mean, if you asked me -- if you put someone in a
21     lineup in front of me, could I recognize him?  I
22     might be able to.  It was a long time ago, but, you
23     know -- it was a long time ago.
24     Q.  How many times did you communicate with
25     this person named Phil?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 181

1    you know, Naval Warfare Center. I worked with a
2    lot of people back then. The United States Army in
3    Huntsville, Alabama. Missile Research Development
4    Engineering Center. You name it, they ended up in
5    licensing deals.
6        MR. HOLMES: Slow down a little bit. The
7    reporter is having a hard time keeping up.
8        THE WITNESS: Okay.
9        Well, the point is, is, when you hit this
10   particular stage, which is embedded-level
11   integration, it usually means either a sales
12   contract, a licensing deal, a hardware --
13   something, you know?
14       And, you know, that's where we were,
15   'cause, obviously, a kernel extension, a vendor
16   kernel extension, which is what we were handed by
17   Ron Isaac, is -- is basically an embedded-level
18   integration. That is a full-blown embedded
19   integration when you get handed a kernel extension
20   into a product.
21   BY MS. VOORHEES:
22   Q.  Did you ever talk to Mr. Isaac about what
23   the term "vendor" meant in Apple parlance?
24   A.  Did not, no. I mean, I think "vendor" --
25   everyone knows what the word "vendor" means, you

Page 182

1    know? I mean, it's -- pretty common term to use in
2    business.
3    Q.  Did you ever talk to anybody at Apple
4    about what the term meant?
5    A.  No. That -- that would kind of be like --
6    I don't know if that would be considered rude or,
7    like, condescending towards someone, you know. A
8    vendor means vendor. It's an English word in the
9    English dictionary. I think everyone knows what it
10   means.
11   Q.  In your previous employment, had you ever
12   been involved in tech-based licensing with Apple?
13   A.  No.
14   Q.  If you go down to the second-to-last
15   paragraph in the email we've been looking at, that
16   first email on Exhibit 211.
17   A.  This page here?
18   Q.  Yes. It says (as read):
19       Let's get some fuel for the ship.
20   A.  Yeah.
21   Q.  (As read):
22       Any help from all of you with this
23       financing effort would be great.
24   A.  Uh-huh.
25   Q.  What did you mean by that?

Page 183

1    A.  That means if you guys know anybody out
2    there that may have an interest or is an investor,
3    please introduce them to me or Jim Mattos, and we
4    will take it from there and make sure that they are
5    provided with the correct investment materials to
6    make a -- an informed investment decision.
7        But, of course, they were -- as I told
8    everyone, you're not -- if you're not Jim Mattos,
9    me, or Paul Powers, do not -- you know, just say,
10   "Hey, look, if you're interested, I can introduce
11   you to this guy or that guy."
12       And then, after the introduction is made,
13   from there we will hand them materials that they
14   can make a decision whether or not to invest.
15       That's -- that's pretty much the modis
16   operandi that -- that we did things on. That way
17   we tried to avoid being here, sitting here with you
18   and -- apparently it didn't work.
19       We did our best.
20       Is that it for these two?
21   Q.  Yes.
22   A.  Okay.
23       (Whereupon, Exhibit 212 and
24       Exhibit 213 was marked for
25       identification by the Court Reporter.)

Page 184

1        MR. HOLMES: Oh.
2        THE WITNESS: All right. Thanks.
3        MS. VOORHEES: Did I give you too many?
4        MR. HOLMES: Yeah.
5        MS. VOORHEES: Sorry.
6        MR. HOLMES: Give me too many things, like, I
7    get confused.
8    BY MS. VOORHEES:
9    Q.  All right. Mr. Mahabub, you've been
10   handed two new exhibits. The first is Exhibit 212.
11   It's an email chain Bates-labeled SEC-TiscarenoV-E-
12   0001047.
13       Do you recognize Exhibit 212?
14   A.  I do, yes.
15   Q.  Okay.
16   A.  Same answer, you know, as before.
17   Q.  Okay. So you don't recall Exhibit 212,
18   but you have no reason to doubt that you sent and
19   received the emails as indicated?
20   A.  That's correct, yes.
21   Q.  Thank you.
22       And Exhibit 213 is email correspondence.
23   It is Bates-labeled SEC-MahabubJ-E-0019545.
24       Do you recognize Exhibit 213?
25   A.  Same answer.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 185

1    Q. Okay. You don't recall the exhibit, but
2    you have no reason to doubt that you sent and
3    received the emails as indicated --
4    A. Correct.
5    Q. -- correct?
6       Thank you. All right.
7    A. I'm in shock about how much damn email
8    exchanges we had with these people. It's amazing.
9    Q. If you could turn to --
10   A. Lot of work.
11      Turn to where?
12   Q. I'm going to direct you to the bottom
13   email on the first page of Exhibit 212.
14   A. Okay.
15   Q. So this is the email that says (as read):
16      Hi, Jerry. Okay, I will confirm
17      that I sent them to you today.
18   A. Yes.
19   Q. You with me? Okay.
20      And now, if you could go to the top email
21   on the second page of Exhibit 213.
22   A. Okay.
23   Q. Second page.
24   A. All right. Yeah.
25   Q. Sorry.

Page 186

1    A. Okay.
2    Q. And you see that there's an email that
3    says (as read):
4       Okay, I will confirm that I sent
5       them to you today.
6    A. Yeah.
7    Q. Do you see that?
8    A. I do.
9    Q. Okay. I'm now going to read only from
10   Exhibit 213, where there has been inserted (as
11   read):
12      Phil let us know earlier that this
13      might be postponed until early next
14      week. Apparently Steve is planning on
15      going out of town with his family for
16      the weekend.
17      Do you see that?
18   A. I do, yeah.
19   Q. Okay. Now, if you look at both 212 and
20   213, they include the next phrase I'm going to
21   read, which was (as read):
22      I was hoping to get an update on
23      the song list, but I've not received a
24      response yet.
25      Exhibit 213 then goes on (as read):

Page 187

1       And this is not mission critical
2       for the demo. The postponing of the
3       meeting could be in our favor.
4       Did you add that text which has also been
5    highlighted in Exhibit 213 to this email?
6    A. I don't recall. But, again, same answer.
7       But what I'm curious to know about is what
8    the date of this is.
9       So these are both from the -- from the
10   10th of -- of April; right?
11   Q. I think it's the 7th. I think it's
12   4/7/10.
13   A. Oh, 4/7 -- April 7th. Hmm. I'm just --
14   I'm trying to remember back around that time frame
15   to what was going on.
16      And, yeah. I mean, you know, I'm trying
17   to figure out, were those my notes that I was
18   sending to the team members, or -- I just don't
19   know. I can't remember, it was so long ago.
20   Q. Okay. Well, if you take a look at the
21   first page of Exhibit 213.
22   A. Yeah.
23   Q. So that's the one that has highlighting on
24   it. If you go to the first page --
25   MR. HOLMES: Flip that back.

Page 188

1       THE WITNESS: Oh, okay. All right.
2    BY MS. VOORHEES:
3    Q. You see at the very top, it says "To:
4    Paul Powers and Gary Smith"?
5    A. Yes.
6    Q. And I don't know if that helps refresh
7    your recollection as to what was being done --
8    A. And Walter.
9    Q. Oh, you're right, and Walt.
10      Does that help at all?
11   A. No.
12   Q. Okay.
13   A. Not really.
14   Q. Okay. Fine.
15      So let's go back to my original question,
16   which is, did you add the highlighted text in the
17   email that I just read?
18   A. If anyone would have done it, it would
19   have been me, yes. But, like I said, I don't -- I
20   don't remember what my reasoning for doing it was,
21   but I'm sure I had good reasoning at the time.
22   Q. All right. Did -- did Mr. Tiscareno ever
23   tell you that you would be meeting Steve Jobs?
24   A. I do recall a few different times where he
25   would refer to "the big man meeting," whatever that

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 189

1    was, "the big man." And then I do remember hearing
2    him say "Jobs" a few times to me on the phone.
3        So -- at least that's what I thought he had said.
4    I really don't recall. But that -- that was my
5    recollection.
6    Q.   Okay. Let's unpack that a little bit.
7        Did Mr. Tiscareno ever tell you that
8    you -- you personally -- would be meeting with
9    Steve Jobs?
10   A.   He said that -- at one point in time that
11   there would be -- there would be two ways to do
12   this: One, we go through the channels we go
13   through this way; or, second, that you would have
14   to meet directly with Jobs, or something along
15   those lines.
16       And I was like, okay, well, why don't we
17   just try the fast route, then, to get this done?
18       And he -- and that's when he said go ahead
19   and email him, and I emailed him and forwarded Vic
20   the email, and Vic wrote back to me and said, "The
21   truth is always best." That's what I remember.
22   Q.   Did Mr. Tiscareno ever tell you that you
23   would be attending a meeting with Steve Jobs?
24   A.   I don't recall if he did or he didn't. I
25   don't remember.

Page 190

1    Q.   Did Mr. Tiscareno ever tell you that you
2    would be attending a meeting with "the big man"?
3    A.   I don't recall. I don't even remember who
4    "the big man" was. All I remember is taking a stab
5    at it, that it was Steve Jobs. Because that's
6    obviously who the big man is at Apple; right?
7    Q.   Did you ever talk to Mr. Tiscareno about
8    who he was referring to as "the big man"?
9    A.   Yeah. A couple times, yes. And it was --
10   he would say "Jobs." So I was like, okay, cool.
11   Q.   So Mr. Tiscareno told you that "the big
12   man" was Steve Jobs?
13   A.   Not -- not "Steve"; he would just say
14   "Jobs."
15   Q.   Okay.
16   A.   So --
17   Q.   So Mr. Tiscareno told you that when he
18   referred to "the big man," he was referring to,
19   quote, Jobs?
20   A.   That's what I remember hearing on the
21   phone, yes.
22   Q.   Okay.
23   A.   That was my recollection.
24   Q.   Why did you add this text to Exhibit 213?
25   A.   I don't know. I don't necessarily

Page 191

1    remember adding the text. All I said was, if I
2    did, there was a reason for it.
3        It obviously went to team members: Paul,
4    Gary, and Walter. So it was an internal team email
5    again, not intended for investors.
6    Q.   All right. If you go to the first page of
7    Exhibit 213 -- yep. You're there. Right there.
8    A.   Okay.
9    Q.   And I want to focus on that email that has
10   the highlighting on it on the exhibit.
11       And if you look over the email that is in
12   the middle of the page, the first page --
13   A.   Yeah.
14   Q.   -- of 212.
15   MR. HOLMES: There.
16   THE WITNESS: Okay.
17   BY MS. VOORHEES:
18   Q.   So you'll see both of them say "Hi Vic."
19   A.   I do, yes.
20   Q.   And both of them say (as read):
21           Great. I will update the
22           provisioning profiles on --
23       And one of them, in 212, it's "ont."
24   "The" -- and then there's a change. In 213 it says
25   "three iPad touch devices."

Page 192

1        Do you see that?
2    A.   Yep. Yep.
3    MR. HOLMES: It says "three iPod" --
4    MS. VOORHEES: Sorry. "Three iPad touch."
5    THE WITNESS: "IPod."
6    BY MS. VOORHEES:
7    Q.   "IPod." I'm sorry. "IPod Touch."
8        Did you add that text?
9    A.   You know, if I did, I did that to clarify
10   which devices they were. So that would -- that
11   would have definitely been a reason for doing that.
12   Q.   Okay. But you don't remember doing it?
13   A.   No. No. This is a long time ago. But, I
14   mean, I'm sure if it came from me, from my email,
15   then it probably was me.
16   Q.   Okay.
17   A.   I just -- I just can't remember.
18   Q.   I'm going to jump down, then, to the last
19   sentence in the email on Exhibit 212, which is in
20   the middle of the paragraph in the email on
21   Exhibit 213.
22   A.   Yes.
23   Q.   It says (as read):
24           I will stay at home tomorrow until
25           I receive the devices.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 197

1  form.
2  I mean, I'm not selling securities in that
3  email.
4      (Whereupon, Exhibit 214 was marked for
5      identification by the Court Reporter.)
6  BY MS. VOORHEES:
7  Q. All right. Mr. Mahabub, you've been
8  handed what's been marked as Exhibit 214. This is
9  a document -- it's email correspondence, Bates-
10 labeled JM002048 on the first page.
11 A. Okay.
12 Q. Go ahead and flip through it. I'll tell
13 you that I'm going to ask you about a couple of
14 these emails, including the one that's on the
15 second-to-last page that you send on April 30th.
16 A. Okay.
17 Q. So go ahead and let me know when you have
18 had a chance to look it over.
19 A. All right.
20    Okay.
21 Q. Do you recognize Exhibit 214?
22 A. Same answer.
23 Q. All right. So you don't recall this email
24 correspondence, but you don't have any reason to
25 doubt that you sent and received it as indicated in

Page 198

1  the exhibit?
2  A. Correct.
3  Q. All right. Going to the first email in
4  time -- so that's the one that's on the second-to-
5  last page.
6  A. Okay.
7  Q. It says "From: Jerry Mahabub; To:
8  Jerry Mahabub; Re: FSX presenting company."
9     Do you see that?
10 MR. HOLMES: Second-to-last page.
11 THE WITNESS: Hold on a second.
12    Yes.
13 BY MS. VOORHEES:
14 Q. You with me?
15 A. I'm with you.
16 Q. Okay. What is "FSX"?
17 A. That was Judy Ensweiler.
18    She was the coordinator of a -- it's kind
19 of like an investment banking conference, like
20 NIBA, National Association of Invesument Banking --
21 is that right? National Investment Banking
22 Association, yeah.
23    So it's a place where investment bankers
24 who are all, you know, certified IBs or
25 broker/dealers all come together with their little

Page 199

1  dog and pony shows and get up on stage and march
2  around and try and raise money.
3  Q. Okay. And can you spell -- I'm sorry, who
4  was the woman?
5  A. Judy -- I can't remember how to spell her
6  last name. Yeah.
7  Q. Okay. That's fine.
8  A. Ensweiler, something like that. She was a
9  conference coordinator of FSX, yes.
10 Q. All right. And you write (as read):
11    Don't forget to stop by the booth
12    and listen to the demos. I have not
13    been able to make it to the conference
14    just yet as I have been on the phone
15    all morning with the large consumer
16    electronics company, the LCEC --
17 A. Yep.
18 Q. (As read):
19    -- looking to acquire GenAudio's tech
20    for integration into their entire
21    lineup of product offerings.
22    And then it goes on.
23    Who were you sending this email to?
24 A. Marty -- is it Marty? Is that his name?
25 I think. I don't know. I'm -- I'm looking through

Page 200

1  the email chain. It looks like a guy by the name
2  of Marty.
3  I think Marty is a broker/dealer. And I
4  was probably asked to send him an email at that
5  time, because I probably would have met -- if I was
6  at FSX and I was there at the time with an
7  offering, it would have been Spencer Edwards. Or
8  if it wasn't Spencer Edwards, it might have been
9  Westminster.
10 It was one of the broker/dealers that
11 would have introduced me out there.
12 Q. Okay. And just so the record is clear,
13 the email chain goes on to include correspondence
14 with a Martin Cohen, M-a-r-t-i-n, C-o-h-e-n.
15 A. Yeah. That's who I'm referring to right
16 here (indicating).
17 Q. I -- I understand.
18 But if you look at the email I'm focused
19 on, it just says from you to you.
20 Do you see that?
21 A. Yes, I do.
22 Q. And I'm wondering if you know who else you
23 sent it to, because we don't appear to have a cc or
24 a bcc line.
25 A. I do not know. It's a good question. It

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 201

1  must have been maybe -- it could have been people
2  that I was asked to send an email to by a
3  broker/dealer, something that was interested in --
4  in helping the company to raise its funds.
5      So -- it went to anyone, it would have
6  went to certified, registered broker/dealers, I
7  would imagine. Because if this is surrounded
8  around the FSX conference -- like I said, I don't
9  remember.
10     But if this is around FSX, which it looks
11 like I'm giving a presentation there -- and I
12 probably did; I just was late coming in -- so I
13 probably had some IT members there with a booth
14 with demos set up. It was letting people know, go
15 check out the demos.
16     MR. HOLMES: All right. Just -- Jerry, it
17 sounds like you're sort of speculating or
18 estimating --
19     THE WITNESS: Yeah.
20     MR. HOLMES: -- something like that. Make sure
21 that, if that's what you're doing, you say so.
22     THE WITNESS: Okay.
23     MR. HOLMES: Because otherwise it's going to
24 sound like, yeah, this is what it is.
25     THE WITNESS: Yeah. I'm -- I'm trying to give

Page 202

1  her an answer on what it could have been.
2      MR. HOLMES: Okay. But make sure that you
3  include that qualifying language.
4      THE WITNESS: Oh, okay. Yeah.
5      It's speculatory -- speculative of what
6  I'm telling you, because I don't really remember.
7  But that is what -- judging based on reading
8  through this, that's what I would guesstimate was
9  going on, is a conference of broker/dealers and
10 investment bankers.
11 BY MS. VOORHEES:
12     Q. Okay. If you could read the full first
13 paragraph of that email to yourself, please.
14     A. Which one?
15     Q. The one that says, "Don't forget to stop
16 by the booth."
17     A. Yeah, of course.
18     Q. Go ahead and read that and let me know
19 when you're done.
20     A. Okay.
21     Q. Is "the LCEC" Apple?
22     A. In this context, I believe I'm referring
23 to Apple here, yes.
24     Q. Okay. And what is the basis for the
25 statement (as read):

Page 203

1      The LCEC looking to acquire
2  GenAudio's tech?
3      A. That would have been Paul Powers, our COO,
4  thinking that's what was going to happen.
5      Q. When did Mr. Powers tell you he thought
6  that was going to happen?
7      A. Oh, he told the whole board he thought
8  that was going to happen. That was -- that's what
9  got me motivated to go and hire on a valuation
10 analysis expert and, you know, actually get it
11 done, is -- is Paul was pushing towards saying that
12 that's what they were doing.
13     And I was like, "Paul, I don't think we
14 really know what they're doing, and you seem to
15 think that" -- you know.
16     And Paul was a -- you know, he's an
17 experienced business guy. So I just kind of went
18 with his interpretation on what they were doing, is
19 all I could say.
20     Q. Okay. And if you go on in that sentence
21 that I've been focused on, it says (as read):
22         Looking to acquire GenAudio's tech
23         for integration into their entire
24         lineup of product offerings.
25     What's the basis for that statement,

Page 204

1  "their entire lineup of product offerings"?
2      A. Well, because when you reported to one
3  and I think we went through this last time, during
4  the Astound Holdings deposition, if I recall --
5  when you integrate into an operating system, there
6  are two primary operating systems of Apple: One is
7  for their mobile device product lineup, which is,
8  you know, iPod, iPad, iPhone, and the second is for
9  their computer lineup: MacBook Pro, Macs, iMacs,
10 and so on.
11     One is called "OSX," which is the
12 operating system for the Macintosh computer lineup,
13 and the other one is called "iOS."
14     When you intergrade and embed and you're
15 fully functional inside of the operating system,
16 either on top of the OS or beneath it, under a
17 kernel extension, you work with everything. That's
18 the way it works.
19     You -- here is the OS that runs on -- on
20 the device, that runs across multiple platforms of
21 multiple devices. So that's -- I don't know if you
22 understand where I'm coming from.
23     One OS, multiple devices, we're integrated
24 here. One OS, multiple devices, we're integrated
25 here, which means we cover all of them

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 205

1 (indicating).

2 Q. Did anyone at Apple ever tell you that

3 Apple was looking to acquire GenAudio's tech for

4 integration into Apple's entire lineup of product

5 offerings?

6 A. Not that I recall, no. I don't remember

7 anything like that ever actually being stated by

8 anyone at Apple. But I think it was implied, based

9 on what Paul Powers had thought and based on some

10 of the things that actually I was told.

11 You know -- yeah. I think anyone that --

12 in a reasonable business mind thought would have

13 thought that way, based on -- on -- on the

14 conversations that I had -- that had occurred

15 and -- and the business dealings that we had had

16 with them and the software engineering integrations

17 that we had done and whatnot.

18 I think that that was a fairly reasonable

19 assumption to make and an opinion to make.

20 Q. If you can continue to read on in that

21 sentence, it says (as read):

22 Of which embedded-level integration

23 testing for all product offerings of

24 the LCEC have already been tested

25 successfully.

Page 206

1 A. Correct.

2 Q. What did you mean by "tested

3 successfully"?

4 A. Well, in this context here -- as I said, I

5 don't necessarily recall writing this exactly, but,

6 thinking back at that time frame, that would have

7 been -- had to have -- yeah, had to have been,

8 like, right around the April time.

9 Because that means that we had submitted

10 software to Apple and Apple came back to me with

11 green lights. And they said, "No, we tested it,

12 Jerry. You got" --

13 I mean, Vic and I worked night and day for

14 months and months and months testing this, you

15 know, back and forth to get it to where it was spot

16 on.

17 He would do acoustic tests at his lab. He

18 would send me measurements via email. I would make

19 the tweak changes to the parameters, send him back

20 a new version. He would acoustically test them in

21 his lab; send them back to me; I would make the

22 tweak changes; send it back to him.

23 I mean, this -- this is something that

24 happened a lot, until we finally got -- "That's it,

25 testing is done, Jerry. We've got the response

Page 207

1 flat where we need to be."

2 Like, okay, cool.

3 So I think that's what I meant by that.

4 Q. Okay. (As read):

5 And we are now waiting to when we

6 will initiate negotiations pending the

7 CEO of the LCEC --

8 That's Steve Jobs; right?

9 A. Yeah.

10 Q. (As read):

11 -- to approve the integrated product

12 rollout strategy and the technical

13 implementation strategy that will be

14 presented to the CEO next week.

15 A. Uh-huh.

16 Q. What was your basis for saying that it

17 would be presented to the CEO next week?

18 A. A conversation that I had with -- with Vic

19 about meeting with "the big man" and -- and Jobs or

20 whatever. I mean, that's -- that's what I recall.

21 Q. Tell me everything you recall about that

22 conversation.

23 A. Not much. Pretty much I told you

24 everything I recalled right there.

25 Q. Was it an oral conversation?

Page 208

1 A. It would have been oral, yes.

2 Q. Were you in person or on the phone?

3 A. I think it was on the phone, if I recall.

4 Yeah, we met in person too and discussed,

5 but primarily those would have been phone calls.

6 Yeah.

7 I mean, I hate to say it, but looking back

8 now, it almost feels like I was misled by -- by

9 people at Apple, which really sucks.

10 Q. All right. The email chain goes on to

11 include communications with Mr. Cohen. And then,

12 if you look on the very first page of

13 Exhibit 214 -- are you there?

14 A. I'm here.

15 Q. Okay. Do you see there's an email from

16 Mr. Cohen to you that says (as read):

17 Thanks. I will mail the

18 subscription agreement?

19 You see that?

20 A. No, I don't -- oh, yes. Right up here

21 (indicating).

22 Q. You see that?

23 A. Yes, I do.

24 Q. Okay. So were you aware that Mr. Cohen

25 bought shares after this email correspondence?

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 217

1  big company; he was trying to move this into
2  multiple, multiple divisions.
3      You know. We even were thinking about
4  doing this stuff with QuickTime and with iChat and
5  stuff like that.
6      So -- my guesstimate is he's referring to
7  a particular division here. I don't think -- I
8  don't remember who he was referring to or why he
9  was referring to it or who this meeting with Apple
10 is down here, but it must have been one of the
11 divisions that he was talking to, and he wanted to
12 get to first base in that particular division.
13 Q. Do you recall a time when Mr. Tiscareno
14 said that he and Mr. Hailey would be meeting with a
15 Greg Jos- -- Joswiak? Joswiak? Am I saying it
16 wrong?
17 A. No. I don't -- I don't know that name.
18 Q. Ms. Hughes is helping me out.
19    Joswiak?
20    MS. HUGHES: "JAWS-we-ack."
21    THE WITNESS: Joswiak.
22 BY MS. VOORHEES:
23 Q. Does that name ring a bell?
24 A. No, not that I can remember. No, I don't
25 recall that name. Greg Joswiak.

Page 218

1      I don't think you meant Steve Wozniak by
2  that name. But Joswiak is -- yeah.
3      MR. HOLMES: Are we done with 215?
4      MS. VOORHEES: Yes.
5      (Whereupon, Exhibit 216 was marked for
6      identification by the Court Reporter.)
7  BY MS. VOORHEES:
8  Q. All right.
9  A. Are you sure you don't mean Wozniak on
10 that last name?
11 Q. Do you recall a Wozniak?
12 A. Well, there's -- there's, you know --
13 there's Wozniak, who is "Woz." That was
14 Steve Jobs's partner in crime there.
15 Q. Yes. Let me ask you a more specific
16 question.
17      Did you ever meet with Steve Wozniak?
18 A. I haven't met him, no, but we are friends
19 on Facebook through a friend of mine.
20 Q. And when did your Facebook relationship
21 begin?
22 A. Years ago. Many years. Guy by the name
23 of Tolga Katas, K-a-t-a-s, who owned En2Go.
24    THE REPORTER: Who owned?
25    THE WITNESS: En2Go, E-n-t-g-o -- E-n- --

Page 219

1  E-n-2-G-o. So -- yep.
2      So, I mean, I could meet him anytime I
3  want; I could go and meet him. I'd just have to
4  set it up through Tolga, but I just haven't had a
5  chance to go meet him yet.
6  BY MS. VOORHEES:
7  Q. So you haven't met Steve Wozniak yet?
8  A. No.
9  Q. All right. If --
10 A. I could have, but I just haven't really
11 taken the time to do it.
12 Q. If you could take a look at what has been
13 handed to you, Exhibit 216.
14 A. Okay.
15 Q. This is a document with the first page
16 bearing the Bates No. JM002045.
17      Do you recognize Exhibit 216?
18 A. Same answer.
19 Q. Okay. Which means you do not recall the
20 specific email correspondence, but you do not have
21 any reason to doubt that you sent an email -- sent
22 and received the emails as indicated; correct?
23 A. Yes.
24 Q. All right. I'm going to direct you to --
25 A. Elliot.

Page 220

1  Q. All right. The last paragraph on the
2  exhibit, it's the one that starts with "Hope you
3  are all doing well."
4  A. Okay.
5  Q. You see that? It says (as read):
6      Hope you are all doing well, and
7  once I hear back from Apple, I will
8  shoot out an email and let everyone
9  know what happened. Vic is fully
10 prepared on the tech side, and Phil is
11 fully prepared on the marketing side.
12 As Vic stated, "Failure is not an
13 option."
14 A. Yeah. Vic did say that to me quite a few
15 times.
16 Q. Do you recall what you're referring to in
17 that paragraph?
18 A. I don't.
19 Q. Okay. If you go up to the paragraph above
20 it, why -- go ahead and just read that paragraph to
21 yourself.
22    MR. HOLMES: The one that starts on the
23 previous page?
24    MS. VOORHEES: Yeah, the one that starts with
25 "At least being this nervous."

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 221

```
1      THE WITNESS: Okay.
2   BY MS. VOORHEES:
3      Q. Does that do anything to refresh your
4   recollection?
5      A. Not really, no. But I know the time frame
6   that this was done in. I'm just trying to read
7   here.
8      MR. HOLMES: She hasn't asked a question other
9   than whether it helps refresh your recollection.
10     THE WITNESS: Oh, okay.
11     Yeah, no.
12  BY MS. VOORHEES:
13     Q. And it doesn't. Okay.
14     Look at the very first email on the first
15  page, the one where you write (as read):
16        Hi, Elliot. No doubt, my friend."
17     A. Yes.
18     Q. And it says (as read):
19        Just wrapped up the final meeting
20        with management at Apple before their
21        internal meeting with Jobs.
22        Do you see that?
23     A. I do.
24     Q. Okay. Do you recall writing that
25  sentence?
```

Page 222

```
1      A. No, I don't, but I think I know what it's
2   in -- it's in reference to.
3      Q. Okay. Tell me what it's in reference to.
4      A. There was a meeting that I had with Vic
5   and, like, five or six other people that were in a
6   room at one point in time. And I think that Vic
7   had said that the -- that "the big man meeting" was
8   coming up, and I just assumed that that must have
9   meant Jobs, I think is what I was saying there.
10     Because I -- I do remember there was a
11  final meeting I had with Vic and Ron and a few
12  other people that were -- like, maybe six or seven
13  other people in the room, and then it was supposed
14  to go for the big man meeting right shortly after
15  that.
16     Q. Okay.
17     A. That's -- that's all I remember.
18     Q. And -- and you took "the big man" to mean
19  Mr. Jobs?
20     A. Yeah. And, in fact, the name "Jobs" was
21  stated to me on -- on a few -- on a couple
22  occasions, from what I remember. So, yeah, that's
23  probably why I took it to mean that.
24     Q. Did you ever refer to Mr. Jobs as "the big
25  man"?
```

Page 223

```
1      A. I think that was Vic that called him "the
2   big man," not me. Maybe I wrote back to him and
3   said that. I don't remember.
4      Q. Okay.
5      A. But I think -- I know Vic referred to him
6   as "the big man" to me. "A big exec" or something
7   like that. Or "the top exec." I don't -- I don't
8   recall exactly what he was saying. Something along
9   those lines, something like that.
10     (Whereupon, Exhibit 217 was marked for
11        identification by the Court Reporter.)
12     THE WITNESS: Oh, yeah.
13     MR. HOLMES: We've marked this previously.
14     MS. VOORHEES: Oh, sorry.
15     MR. HOLMES: Do you remember what this one was?
16  I know I used it. I didn't bring that pad with me.
17     THE WITNESS: Looks like people didn't delete
18  the email.
19     MR. HOLMES: Yeah. Just remember, everything
20  you say is being written down. So --
21     THE WITNESS: Yeah, I know. I know. It's just
22  funny. Everyone -- no one ever follows my
23  instructions.
24  BY MS. VOORHEES:
25     Q. All right. Mr. Mahabub, you've been
```

Page 224

```
1   handed what's been marked as Exhibit 217, which I'm
2   told is also another deposition exhibit. So if we
3   can find that, we'll put it on the record.
4      It is email correspondence. It is Bates-
5   labeled JM002017 on the first page. It goes
6   through -220.
7      Do you recognize Exhibit 217?
8      A. 217, I have a recollection of -- of this
9   one, but I don't remember exactly the contents of
10  it, but I remember why this -- this one was
11  written, yes.
12     Q. Okay. Go ahead and start with that. Tell
13  me why this email was written.
14     A. It was a conversation that Vic and I had,
15  and Vic pretty much told me if I ever tell -- told
16  anyone this, that he would break my legs.
17     But at the time, I was like, okay, well,
18  you know, I'm not thinking of myself; I'm not going
19  to hold this back from the team.
20     And this is one of those times when, you
21  know, I had pretty much been waiting to determine
22  how the meeting went with "the big man." Right?
23  Or whatever was going on.
24     And this was a phone call that I had with
25  him -- a long phone call that I had with him. And
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 225

1 I remember pretty much trying to transcribe it
2 verbatim for what happens. Because that was a very
3 important phone call that came in, I thought that
4 the team would want to know about.
5 So that's what that is all about.
6 Q. Okay. So if you go under -- you see where
7 it says "success" in big letters?
8 A. Yes.
9 Q. Okay. It says (as read):
10 Vic just told me after I was
11 practically about to burn a path in my
12 hardwood floors --
13 A. Yep.
14 Q. (As read):
15 -- and below is a verbatim
16 reproduction/transcription of what we
17 discussed, taken from a recording I
18 did on my laptop while he was on
19 speaker phone.
20 A. Yep.
21 Q. And you wrote that; right?
22 A. That -- I think I do remember writing this
23 one, yeah. This one was a pretty big day. I had
24 been waiting for a long time, pacing around, for
25 Vic to call me to tell me the outcome of the

Page 226

1 meeting that he had had. So --
2 Q. Okay. So let's -- let's walk a little bit
3 back in time then.
4 So you now recall that around this May
5 2010 time frame, there was a big meeting that was
6 going to occur at Apple; is --
7 A. That's right.
8 Q. -- that correct?
9 A. Yes.
10 Q. Okay. And what was your understanding as
11 to what the purpose of that meeting was?
12 A. That was supposed to be -- I mean, I
13 wasn't sure if I was going into that or not. That
14 was another meeting that -- that had been set up.
15 But this was -- Vic and I had been talking
16 on the phone for about a week straight, and then he
17 called me up and said something about -- during
18 this meeting that we're going to be going into a
19 dark period now, whatever that meant. You know, we
20 won't be talking to each other for the next two,
21 three weeks.
22 And of course I reported that to the
23 board. And Paul seemed to think they were sizing
24 us up for an acquisition.
25 I said, I don't know. I think maybe they

Page 227

1 just want to talk internally about this and
2 determine, you know, what they want to do with --
3 you know, use the technology for, was my
4 guesstimate, and come back to us and let us know.
5 So -- but by the fact that there was
6 success, apparently, at this meeting, whatever
7 "success" meant -- I don't know -- that's what Vic
8 called me up and told me, that that was really good
9 news for us, in terms of --
10 I mean, at this stage of the game, my gut
11 instincts were that we're getting ready to do a
12 deal with Apple. At least that's -- that's what
13 they had led me to believe.
14 Q. Who did you think was going to be at the
15 Apple meeting?
16 A. Well, Jobs, of course, is who I thought
17 would be there. Because it had been mentioned
18 before.
19 Q. By whom?
20 A. By Vic.
21 Q. So Mr. Tiscareno told you that Steve Jobs
22 would be attending the meeting?
23 A. He said "Jobs"; so automatically just
24 assume he meant Steve Jobs, because I don't think
25 there's too many other "Jobs" at Apple. Right?

Page 228

1 Unless he has got some of his nephews and employees
2 that work there as well.
3 Q. Did you ever ask him if he meant
4 Steve Jobs?
5 A. No.
6 Q. Why not?
7 A. That -- that would be like going to a
8 priest and saying, "Did you say 'God'?" I mean,
9 come on. It's Apple. You know, if someone says
10 the word "Jobs," they mean Steve Jobs. You know?
11 Q. Did you record this phone conversation
12 that you had with Mr. Tiscareno?
13 A. I temporarily recorded it and then deleted
14 the recording, as I stated very clearly in this
15 email.
16 Q. What did you record it on?
17 A. QuickTime.
18 MR. HOLMES: By the way, I think we identified
19 that this was previously marked as Exhibit 16, but
20 with the SEC Bates numbers on it.
21 MS. VOORHEES: Okay, great. You know what? I
22 have got that one.
23 MS. HUGHES: And, actually, I think Exhibit 16
24 is where this is forwarded to Mr. Skluzak. I don't
25 think it's exactly the same thing.

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 249

1  looking to bring Dell onto the board, because I
2  knew at that time that Bobak and Powers and Ted and
3  Elliot were going to be going out the door.
4  Q. Okay. I --
5  A. And if they didn't go out the door, I
6  would be kicking them off.
7  Q. I understand all that.
8      I just want to know if you forwarded it to
9  anybody else?
10  A. Not that I recall, no. Because, like I
11  said, my main mission for saying it to Dell was to
12  bring him up to speed, because I wanted him to be
13  one of the board members.
14      I wasn't sure if I was going to keep the
15  board at five or just, you know, reduce it down to
16  three. But when I reduced it down to three, it was
17  just Phil Rodriguez and Jay Rifkin that came on.
18  MR. HOLMES: I just want to remind you that you
19  answered the question in about the first
20  15 seconds, and then everything after that was not
21  answering the question.
22  THE WITNESS: Oh, okay. Got you.
23  MR. HOLMES: So if she wants to ask that kind
24  of follow-up, she will.
25  THE WITNESS: Okay.

Page 250

1  BY MS. VOORHEES:
2  Q. All right. Mr. Mahabub, if you look at
3  the first email on the first page of Exhibit 16,
4  it's the one from Mr. Tiscareno to Dell Skluzak.
5  A. I see it.
6  Q. Do you see that?
7      If you could just go ahead and read that
8  email to yourself, please.
9  A. I already read it.
10  Q. Okay. What's your reaction to that email?
11  A. I don't know how to react to it, except
12  for the fact that he did tell me that, if I ever
13  said anything about this email to anyone, that he
14  would deny it. So at least he's not lying there.
15  That's all I -- that's my reaction to it.
16  Q. You mean at least -- sorry, I didn't
17  follow that.
18  A. Vic told me at the start of the
19  conversation that if ever I was to disclose
20  anything of what he was telling to me that he would
21  deny it.
22      So I said at least he was not lying there
23  to me.
24  Q. Okay.
25  A. Because clearly he's denying it here.

Page 251

1  Q. Okay. Have you ever spoken to
2  Mr. Tiscareno about this -- this series of emails
3  or about you recording the phone call?
4  A. Have not, no.
5  Q. When was the last time you talked to him?
6  A. This would have been before the sort of
7  unlawful, hostile takeover of the B.S. camp, Bobak
8  and Skluzak -- so we called it a B.S. camp for
9  appropriate reasons.
10      Basically, they came in and did that. And
11  since then -- I think the last time I talked to
12  Vic, he came out to my place that I had in Marina
13  del Rey, and he had stayed the night.
14      And then that's when I started seeing
15  the -- the eyeballs afire being looked upon me by
16  Skluzak.
17      And then, I mean, you know, he must have
18  somehow -- Bobak and Skluzak must have snuck in
19  there and been having little back-end conversations
20  with Vic.
21  MR. HOLMES: Jerry, you're giving a lot of
22  background. She's looking for a date.
23  THE WITNESS: I don't know.
24  MR. HOLMES: Then that's what you say.
25  THE WITNESS: Okay.

Page 252

1      I don't know.
2  BY MS. VOORHEES:
3  Q. If you look at the last paragraph in
4  Mr. Tiscareno's email, it says --
5  A. Yeah.
6  Q. (As read):
7      -- the highest-ranking member of
8      Apple org that I showed it to was
9      Greg Joswiak, J-o-s-w-i-a-k.
10      You see that?
11  A. Yeah, I do.
12  Q. Does that do anything to refresh your
13  recollection about Greg Joswiak?
14  A. No. I -- I did not even know that name
15  until -- until today.
16  MR. HOLMES: Take a two-minute break?
17  MS. VOORHEES: Oh, sure. Let's go off the
18  record.
19  THE VIDEOGRAPHER: This marks the end of DVD
20  No. 2 in the deposition of Jerry Mahabub. The time
21  is 3:33. We're off the record.
22      (A recess was taken from 3:33 p.m. to
23      3:51 p.m.)
24  THE VIDEOGRAPHER: We're back on the record.
25  This is the beginning of DVD No. 3 in the

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Taj Jerry Mahabub - Vol. 1
January 19, 2017

Page 253

1  deposition of Jerry Mahabub. The time is 3:51.
2      Please proceed.
3      MS. VOORHEES: All right.
4      Q. Mr. Mahabub, before -- I think after we
5  actually went off the record last time, you said
6  you thought you maybe had 30 minutes left to give
7  us in the deposition?
8      A. Around there.
9      Q. Okay. So given that, and given that the
10 parties have agreed that we can reconvene this
11 deposition on February 8th, 2017, in Denver, we're
12 going to go ahead and conclude the deposition for
13 today.
14     A. Okay. That --
15     Q. We will issue an amended notice that will
16 have you appear at our office in Denver on
17 February 8th, 2017.
18     A. Okay.
19     Q. Okay?
20     A. That's great, yeah.
21     MS. VOORHEES: All right. Thank you.
22     Counsel, anything else?
23     MR. MCCLOSKEY: So stipulated. We'll see you
24 on the 8th.
25     MR. HOLMES: Yeah.

Page 254

1      MS. VOORHEES: Okay. Sounds good. Thank you.
2      THE WITNESS: Oh, wait. And we just pick up
3  where we left off or --
4      MR. HOLMES: Yeah. Yeah.
5      MS. HUGHES: We also wanted to stipulate that
6  the court reporter did not need to put on her
7  address, business address and those things at the
8  beginning and end of the deposition.
9      THE REPORTER: For the federal rule read on?
10     MS. HUGHES: Yes.
11     MR. HOLMES: So stipulated.
12     MR. MCCLOSKEY: So stipulated.
13     MS. VOORHEES: Agreed.
14     THE VIDEOGRAPHER: This concludes today's
15 deposition of Jerry Mahabub. The number of DVDs
16 used was three. The original media will be
17 retained at Behmke Reporting & Video Services,
18 Incorporated, located at 160 Spear Street,
19 Suite 300, San Francisco, California.
20     We're going off the record. The time is
21 3:52.
22     (Off video record.)
23     THE REPORTER: Do you guys need certified
24 copies?
25     MR. HOLMES: No, I don't.

Page 255

1      Do you want -- are you getting a certified
2  copy?
3      MR. MCCLOSKEY: You guys get the original.
4      MS. VOORHEES: We noticed it. We will get the
5  original.
6      MR. MCCLOSKEY: Yes, I want a certified copy.
7      THE REPORTER: Does anyone need a rough draft?
8      MS. VOORHEES: Whatever our order is. We'll
9  have to get back to you on that.
10     (At 3:54 p.m., the deposition
11     proceedings adjourned to February 8,
12     2017.)
13
14
15
16
17          TAJ JERRY MAHABUB
18
19
20
21
22
23
24
25

Page 256

1  STATE OF CALIFORNIA   )
2                        ) ss
3  COUNTY OF RIVERSIDE   )
4      I hereby certify that the witness in the
5  foregoing deposition, TAJ JERRY MAHABUB,, was by me
6  duly sworn to testify to the truth, the whole truth and
7  nothing but the truth, in the within-entitled cause;
8  that said deposition was taken at the time and place
9  herein named; and that the deposition is a true record
10 of the witness's testimony as reported by me, a duly
11 certified shorthand reporter and a disinterested
12 person, and was thereafter transcribed into typewriting
13 by computer.
14     I further certify that I am not interested in
15 the outcome of the said action, nor connected with nor
16 related to any of the parties in said action, nor to
17 their respective counsel.
18     IN WITNESS WHEREOF, I have hereunto set my
19 hand this 27th day of January, 2017.
20 Reading and Signing was:
21 _X_ requested ___ waived ___ not requested
22
23
24
25     PAULA A. PYBURN, CSR NO. 7304, RPR, CLR