EXCERPTED

EXHIBIT 152

1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO

2

        -----------------------------------------------
3

    SECURITIES AND EXCHANGE        )
4   COMMISSION,                    )
                                   )
5                    Plaintiff,    )
                                   )
6            vs.                   )  No. 1:15-cv-02118-WJM-CBS
                                   )
7   TAJ JERRY MAHABUB, GENAUDIO,)
    INC., and ASTOUND HOLDINGS, )
8   INC.,                          )
                                   )
9                    Defendants.   )
10      -----------------------------------------------
11           DEPOSITION UPON ORAL EXAMINATION
12                       OF
13                 VICTOR TISCARENO
14      -----------------------------------------------
15                 Martin Davis PLLC
            1200 Westlake Avenue North, Suite 802
16               Seattle, Washington 98109
17
18
19
20
21
22
23  DATE:   December 16, 2016
24        REPORTED BY:  Olivia Pennella
25                      Washington CCR 3337

                                              Page 1

## Page 2

```
 1     APPEARANCES
 2
       FOR PLAINTIFF:
 3
         LESLIE R. HUGHES
 4       DANIELLE R. VOORHEES
         United States Securities and Exchange
 5        Commission
         1961 Stout Street, Suite 1700
 6       Denver, Colorado 80294
         303-844-1066
 7       303-844-1108
         HughesLJ@sec.gov
 8       voorheesd@sec.gov
 9     FOR DEFENDANT TAJ JERRY MAHABUB:
10       ANDREW B. HOLMES
         Holmes, Taylor & Jones LLP
11       617 South Olive Street, Suite 1200
         Los Angeles, California 90014
12       213-985-2200
         abholmes@htjlaw.com
13
       FOR DEFENDANT GENAUDIO, INC.:
14
         DAVID J. AVENI
15       Wilson Elser Moskowitz Edelman &
          Dicker, LLP
16       655 West Broadway, Suite 900
         San Diego, California 92101
17       619-321-6200
         david.aveni@wilsonelser.com
18
       FOR WITNESS:
19
         JOHN R. ELTRINGHAM
20       Martin Davis PLLC
         1200 Westlake Avenue North, Suite 802
21       Seattle, Washington 98109
         206-650-6560
22       jeltringham@martindavislaw.com
23
24
25
                                        Page 2
```

## Page 3

```
 1         EXAMINATION
 2  WITNESS      MR. AVENI  MR. HOLMES  MS. HUGHES
 3  VICTOR TISCARENO      8      280      307
                 340      329      345
 4
 5
 6          EXHIBITS
 7  No.  Description              Page
 8  Exhibit 79   Email Correspondence      46
               (SEC-TiscarenoV-E-0001883-1884)
 9
    Exhibit 80   Email Correspondence
10             (SEC-TiscarenoV-E-0001875-1876)  48
11  Exhibit 81   Email Correspondence      53
               (SEC-TiscarenoV-E-0001842-1843)
12
    Exhibit 82   GenAudio In-Person Meetings  55
13
    Exhibit 83   Email Correspondence      57
14             (SEC-TiscarenoV-E-0001840)
15  Exhibit 84   Email Correspondence      62
               (SEC-TiscarenoV-E-0001812-1815)
16
    Exhibit 85   Email Correspondence      68
17             (SEC-TiscarenoV-E-0000026-57)
18  Exhibit 86   Email Correspondence      71
               (SEC-TiscarenoV-E-0000095-96)
19
    Exhibit 87   Email Correspondence      75
20             (SEC-TiscarenoV-E-0000101)
21  Exhibit 88   Email Correspondence      81
               (SEC-TiscarenoV-E-0000161-164)
22
    Exhibit 89   Email Correspondence      84
23             (SEC-TiscarenoV-E-0000249-250)
24  Exhibit 90   Email Correspondence      88
               (SEC-TiscarenoV-E-0000284)
25
                                        Page 3
```

## Page 4

```
 1         EXHIBITS (Continued)
 2  No.  Description              Page
 3  Exhibit 91   Email Correspondence      92
               (SEC-TiscarenoV-E-000300-301)
 4
    Exhibit 92   Email Correspondence      99
 5             (SEC-TiscarenoV-E-0001611-1612)
 6  Exhibit 93   Demo With MH             99
               (347APL-00000046)
 7
    Exhibit 94   Email Correspondence      111
 8             (SEC-TiscarenoV-E-0000336-37)
 9  Exhibit 95   AstoundSound Demo         113
               (347APL-00000047)
10
    Exhibit 96   GenAudio Demo (Astound)   114
11             (347APL-00000051)
12  Exhibit 97   Email Correspondence      117
               (SEC-TiscarenoV-E-0000376)
13
    Exhibit 98   Email Correspondence      120
14             (SEC-TiscarenoV-E-0001635)
15  Exhibit 99   Email Correspondence      124
               (SEC-TiscarenoV-E-0000400)
16
    Exhibit 100  Email Correspondence      126
17             (SEC-TiscarenoV-E-0000412-414)
18  Exhibit 101  Email Correspondence      136
               (SEC-TiscarenoV-E-0000534)
19
    Exhibit 102  Email Correspondence      138
20             (SEC-TiscarenoV-E-0000556)
21  Exhibit 103  Email Correspondence      138
               (SEC-TiscarenoV-E-0000557)
22
    Exhibit 104  Email Correspondence      140
23             (SEC-TiscarenoV-E-0000581)
24  Exhibit 105  Email Correspondence      141
               (SEC-TiscarenoV-E-0001731)
25
                                        Page 4
```

## Page 5

```
 1         EXHIBITS (Continued)
 2  No.  Description              Page
 3  Exhibit 106  Email Correspondence      148
               (347APL-00000526-527)
 4
    Exhibit 107  Email Correspondence      154
 5             (SEC-TiscarenoV-E-0000756-757)
 6  Exhibit 108  Email Correspondence      157
               (SEC-TiscarenoV-E-0000770)
 7
    Exhibit 109  Email Correspondence      159
 8             (SEC-TiscarenoV-E-0000946-954)
 9  Exhibit 110  Email Correspondence      178
               (SEC-TiscarenoV-E-0000984)
10
    Exhibit 111  Email Correspondence      180
11             (347APL-00000333-336)
12  Exhibit 112  Email Correspondence      182
               (SEC-TiscarenoV-E-0001560-1561)
13
    Exhibit 113  Email Correspondence      187
14             (SEC-TiscarenoV-E-0001018-1020)
15  Exhibit 114  Letter dated March 15, 2010  193
               (GA000140)
16
    Exhibit 2    GenAudio, Inc., Confidential Private  202
17    Placement Memorandum
               (GA000487-540)
18
    Exhibit 115  Email Correspondence      208
19             (SEC-TiscarenoV-E-0001052-1053)
20  Exhibit 116  Apple Organizational Chart  212
21  Exhibit 117  Email Correspondence      214
               (SEC-TiscarenoV-E-0001114)
22
    Exhibit 118  Email Correspondence      217
23             (SEC-TiscarenoV-E-0001129-1130)
24  Exhibit 119  Email Correspondence      223
               (SEC-TiscarenoV-E-0001187-1188)
25
                                        Page 5
```

1 case goes to trial or during a deposition.
2    A. I -- I mean, it -- it's basically covering
3 what I already was deposed for.
4    Q. Okay. I see.
5    A. I mean, there's conversations -- all about
6 what was discussed.
7    Q. Just running through the chronology of your
8 discussions with GenAudio --
9    A. Yeah, it's -- it's -- it -- there wasn't
10 anything beyond that --
11    Q. Okay.
12    A. -- that I recall. I mean, that's -- I would
13 have written notes.
14    Q. Is that when they gave you the 50 to 100
15 documents, or is that later?
16    A. No, I received those later. Probably -- as a
17 matter of fact, it was that -- I -- I didn't -- I
18 couldn't receive them because of the size. And so we
19 had to go through some logistics on that. But I would
20 say it was probably three weeks ago.
21    Q. Okay. Any other communications you've had
22 with Ms. Hughes or Ms. Voorhees?
23    A. Not directly.
24    Q. Indirectly?
25    Again, I don't want any communications you've

Page 18

1 had with your attorney.
2    A. It was indirectly.
3    Q. Okay. Through whom?
4    A. Through my attorney, Mr. Eltringham.
5    MR. AVENI: Do you mind if we close the
6 shades?
7    THE WITNESS: It was done on purpose.
8    MR. AVENI: Let's go off the record.
9    (Discussion held off the record.)
10    Q. (By Mr. Aveni) Okay. So was there anything
11 else that you did, other than what you've already
12 mentioned, to prepare for your testimony today?
13    A. No. I -- I -- you know, with all respect,
14 I -- I did what I needed to do to prepare today so that
15 I would be consistent with my answers; that I would
16 recall your questions -- answer your questions a bit
17 better. That's all.
18    Q. Have you reviewed the complaint that the SEC
19 has filed in this case?
20    A. Two years ago. No, it's not -- no, I've --
21 no.
22    Q. Okay. And did you review the testimony from
23 any other witnesses in the case?
24    A. No.
25    Q. Have you met with anybody, other than your

Page 19

1 attorney or the attorneys for the SEC, about this case?
2    A. No.
3    Q. Okay. So, from approximately 2006 through
4 2011 --
5    A. Okay.
6    Q. -- you were at Apple?
7    A. Correct.
8    Q. What was your title? Was it --
9    A. At that time?
10    Q. Yes.
11    A. I can't remember what I was doing then.
12    Q. I believe you testified it was Senior
13 Engineer, Audio and Acoustics. Does that sound about
14 right?
15    A. That sounds about right.
16    Q. Okay. And I don't want to rehash everything
17 you've already testified about.
18    A. Mm-hmm.
19    Q. We're not going to do that. But if you can
20 just very quickly -- when did you start working at
21 Apple?
22    A. I started February 9, 2004.
23    Q. I'm impressed that you remember the exact
24 date. Did you have a different title when you first
25 joined Apple --

Page 20

1    A. Yes.
2    Q. -- as compared to 2006?
3    What was your title in 2004 when you started?
4    A. Well, I was -- I was working on a secret
5 project. But I was a senior manager and -- and -- and
6 so was -- my -- my title was cryptic -- special
7 projects.
8    Q. At that time, were your responsibilities
9 focused solely on that secret project?
10    A. Yes.
11    Q. Okay. When did your responsibilities change?
12    A. Responsibilities changed when iPod changed --
13 it created a new division for -- specifically for the
14 iPod.
15    Q. Okay. And so you were transferred to -- were
16 you transferred into that division?
17    A. Yes.
18    Q. What's the name of that division?
19    A. IPod division.
20    Q. IPod division. Direct and to the point.
21    At some point, your responsibilities also
22 related to other similar products -- Apple products --
23 is that right?
24    A. That's correct.
25    Q. iPad, for example. So, at that time did the

Page 21

6 (Pages 18 - 21)

1 name of the division change?
2    A. Hmm. I don't know. There was a -- my manager
3 was the manager for the division. And then there was
4 a -- a departure because he -- the guy I was working
5 for, before the division, was getting ready to retire.
6 My peer who started the iPod -- grandfathered the
7 iPod -- he became senior manager.
8    Q. What was his name?
9    A. Tony Faddell. Anthony Faddell.
10   Q. Okay.
11   A. F-A-D-D-E-L-L, I think.
12   Q. Okay. During the time frame 2007 to 2011,
13 what were the -- at a high level -- what were the Apple
14 products that were being handled by that division?
15   A. Only iPod. Secret projects that had to do
16 with i-devices, including phone.
17   Q. Okay.
18   A. Now known as the iPhone.
19   Q. And does it also include the iPad?
20   A. The iPad -- it did. Now, there's -- it's a
21 large company.
22   Q. Right.
23   A. Some cross-functionality. But the iPad was
24 actually -- came in late -- I think that was 2009, '10.
25 iPod has been around since 2001. So they may have, I
Page 22

1 think, some responsibilities for -- depending on what
2 intel were shared.
3    Q. Okay. So from 2007 to 2011, what were your
4 responsibilities within?
5    A. I'm sorry, what's the beginning date?
6    Q. 2007. Beginning of 2007 through 2011, what
7 were your responsibilities?
8    A. Acoustics and audio, I'll just say it that
9 way -- general, broad. I mean, it's just all kinds of
10 things.
11   Q. Is there any way to characterize the kinds of
12 things you did? Was it literally your manager telling
13 you, "Go do this next"?
14       That's a very general question. I'm trying to
15 figure out -- can you characterize -- can you put into
16 buckets the different kinds of things you did within
17 acoustics and audio?
18   A. Well, we sourced components. I mean, you
19 start off with a concept. Somebody comes in with a
20 concept -- whether the concepts developed in our area
21 and somehow migrates its way up or it comes down our
22 way -- and this is what -- we're taken into a room and
23 guess what we're going to do now.
24       Then you huddle with the team, and you figure
25 out who's best to take care of this. And you go off. I
Page 23

1 mean, you know, sometimes you need audio amplifiers.
2 Sometimes you need acoustic drivers, devices, speakers.
3 So, there's a lot of components to building something.
4 So, it -- it, you know -- and you have -- there's lots
5 of divisions and lots of responsibilities.
6       There's safety, reliability, packaging. And
7 all those people come in at some point in the -- to
8 build this product. The engineering part might be --
9 but to build the product, you have the investigation
10 phase.
11      They may say, "Here's a competitive product.
12 We kind of want to do something like that" -- which
13 is -- I'm pointing to the iPhone -- "but we want to do
14 something like that. And -- but we want to do it this
15 way. Go figure it out and come back and let me know."
16   Q. During the 2009-2010 time frame, what was your
17 reporting chain up to the top of the company?
18   A. At that time, I was working -- well, Tony
19 Faddell left the company. He was a senior vice
20 president of iPod. I worked for Jesse Dorogusker, and
21 he reported directly to Tony Faddell. We had a power
22 vacuum when Tony left.
23   Q. When did he leave?
24   A. I'd have to look it up, but -- 2009, 2010.
25   Q. Okay.
Page 24

1    A. I'm going to say, 2009. Semi-retired. And we
2 had a power vacuum. They hired somebody else and,
3 unfortunately, got into a lawsuit with IBM. Mark
4 Papermaster -- after -- after they settled that --
5 competitive issues -- he finally came to work for -- for
6 the iPod division, to replace Tony -- Tony's leadership.
7       And, unfortunately, Mark Papermaster didn't
8 last very long. So, you know, it was -- it was
9 basically on automatic pilot. Everybody knew what they
10 were doing. It was just -- there was this power vacuum.
11   Q. And for whoever was in that position --
12 whether it was Mark or Tony or somebody else -- who did
13 that person report to?
14   A. Senior VPs report -- reported to the CEO.
15   Q. And at the time it was Steve Jobs?
16   A. At the time it was probably Steve Jobs.
17   Q. Okay. So, let's start talking a little
18 specifically about GenAudio for a minute.
19       During the entire time you were at Apple --
20   A. Mm-hmm, yes.
21   Q. -- how many times approximately would you say
22 you met in person with GenAudio to discuss GenAudio's
23 technology?
24   A. Eight to twelve times.
25   Q. Okay. And how often would you say you spoke
Page 25

7 (Pages 22 - 25)

**Page 26**

1 to Jerry Mahabub by telephone during that time frame?
2 A. I'm going to just average it -- once a week.
3 Q. Now, were there some times when you spoke
4 multiple times by phone a week?
5 A. Yes --
6 Q. Before big milestones, for example, or things
7 like that?
8 A. I mean, I didn't call him out of the --
9 just -- just to chitchat. It was specific to the
10 project. So, that's why I averaged it. I, you know --
11 it might have been five calls in one day, and none for
12 three weeks. I -- I don't remember that -- that kind of
13 detail. But I -- yes, I communicate with him by phone.
14 Q. Fair enough. And I certainly understand.
15 A. Yeah.
16 Q. We're going back ten years as well. As
17 lawyers, that's something that happens all the time to
18 us. But I realize for witnesses that can be
19 frustrating.
20 A. I wish I had a photographic memory.
21 Q. We fully realize this is quite a long time
22 ago, and I don't mean to test your memory. These
23 details can be important, so I apologize for the many
24 details I'm going to ask.
25      So how many times again, approximately, would

**Page 27**

1 you say you emailed with Jerry Mahabub or anybody else
2 at GenAudio during your time at Apple?
3      MS. HUGHES: Objection. Can you break that
4 into two questions -- who else at GenAudio he emailed
5 with. Let's focus first on Mr. Mahabub, and then on
6 anyone else.
7      MR. AVENI: I don't think that's an objection,
8 but I'm happy to do it that way.
9 A. So, your question is --
10 Q. (By Mr. Aveni) So, how many times would you
11 say you emailed with Jerry Mahabub?
12 A. I -- I'm going to just say, 100. I -- I don't
13 know. I don't -- I don't remember.
14 Q. And that's fair enough.
15 A. I mean, I -- I would say I responded to his
16 emails generally.
17 Q. Right. So, I'll represent to you I have a
18 binder over here --
19 A. Okay.
20 Q. -- that's full -- it's almost the entire
21 emails between you and him. That has almost 200 in it.
22 A. Okay.
23 Q. And I'd say --
24 A. Factor of 50.
25 Q. -- this is only a portion of the emails that

**Page 28**

1 you or Apple produced to us.
2 A. Okay.
3 Q. You know, I'm only asking for your best
4 estimate and for what you remember. But if I said it
5 could be -- you know, if you counted every email in an
6 exchange -- it could be 100 or maybe even 1,000, does
7 that sound possible to you?
8 A. It's possible. When I write an email,
9 it's about a paragraph long -- good or bad grammar. But
10 it's bullet points. When I got a letter from him, it
11 was -- it was pages, paragraphs. So I'm not surprised
12 that you filled a binder.
13 Q. Fair enough.
14 A. I -- I -- look, I didn't spend time --
15 Q. Yeah.
16 A. -- going back and forth with him a lot. It
17 was, "Can you make a meeting? This is what we need to
18 do." And I want you to understand that, quite often,
19 there were very leading proposals in the emails that at
20 that time I just glossed over.
21      You know, I ran down to the bottom --
22 what's -- what's -- what are we doing here -- and -- and
23 just moved on, you know. I don't know if the word
24 "superfluous" works in that -- in his emails, but
25 there's a lot of content there.

**Page 29**

1 Q. He was a very enthusiastic individual.
2 A. He was -- he has -- he has a big personality.
3 Q. And is it fair to say that he is very
4 optimistic about his --
5 A. Yes.
6 Q. -- technology, about AstoundSound?
7 A. He was.
8 Q. And he worked hard to share that optimism with
9 you and others at Apple, right?
10 A. Oh, yeah. It's -- look, I -- I really thought
11 that the software itself was something to look at, you
12 know. All the other stuff that we're talking about
13 here -- as far as the emails, I mean, that was just
14 some -- I try to stay to business.
15 Q. And I understand --
16 A. Focused on.
17 Q. And I understand your comment about the length
18 of some of his emails. And I'm really, by the way, just
19 trying to focus on the sheer number of emails, just to
20 get a sense of the extent of the dialog.
21      And so, you know, when I show you a binder,
22 I'm not trying to talk about the length of his emails.
23 I'm just trying to say it seemed -- from where I sit --
24 that there were hundreds upon hundreds, if not over a
25 thousand, exchanges. And I just want to know if you

8 (Pages 26 - 29)

1    think that's fair.
2       A.   That's fair.
3       Q.   And I'm not telling you I've counted every one
4    of them. I haven't. Have you ever had discussions --
5       So, in your role in the iPod division --
6       A.   Uh-huh.
7       Q.   -- you would at times have discussions with
8    other vendors, other than GenAudio, who were trying to
9    sell you something?
10      A.   Come -- I think -- come back with the question
11   again, I'm sorry.
12      Q.   Sure.
13      A.   I was processing.
14      Q.   There are other times when outside vendors,
15   like GenAudio, would come to you and would want to talk
16   to you about their technology?
17      A.   Yes, there were other vendors that were --
18   that not only sold components, but actually competitors
19   to GenAudio.
20      Q.   Okay. And they would meet with you because, I
21   mean, they're hoping to sell Apple on a component or a
22   technology for use in Apple products, right?
23      A.   Sure. Correct.
24      Q.   What was the typical process for evaluation of
25   an outside vendor's product? Could you walk me through

Page 30

1    what that vetting process is like? At a high level,
2    what are the stages?
3       A.   Sure. Well, I think there's two. One is, we
4    have a need. We made the call out. Or they come in and
5    make a cold call, so --
6       Q.   In GenAudio's case, it was a cold call?
7       A.   That's correct.
8       Q.   Okay. So, let's talk about cold calls for a
9    second. Say, somebody comes in. They make a cold call
10   to you. Can you just walk me through the stages of the
11   process from, you know, your initial meeting all the way
12   through an eventual transaction with that company?
13      What are the different stages along the way?
14      A.   Well, if -- we generally would not get a phone
15   call. Phone calls usually are well-filtered. And, you
16   know, you don't get -- unless somebody passes on your
17   number. It came in as an email. And they do the sales
18   through an email -- you know, try to engage -- "Hey, I
19   got something to show you."
20      Maybe it's somebody I already know that's got
21   something new to show me, okay. "Can we set up a
22   meeting?" "Okay, sure. How much time do you need?"
23   Half an hour is usually as much as we can afford. Do
24   you really need an hour?" -- might be the question going
25   back, and --

Page 31

1       And we give them all the respect that, you
2    know -- doesn't matter whether they're a Fortune 500
3    company. We had people walk in with a -- I'm not
4    kidding -- a garage operation, one person working out of
5    their house. Brings it in. And I jokingly say that
6    there's a Chiquita banana sticker on the box. And
7    you -- you see what they have. You never know when
8    somebody really has something.
9       And so we sit and listen to the demo or their
10   spiel. It's -- it's -- it's what you would think -- I
11   know I'm answering the question, but it's what anyone
12   would think would happen when somebody walks in the
13   door. You listen to what they have to sell.
14      Q.   So, what happens from there? What are the
15   different stages of evaluation -- again, at a high
16   level -- that it goes all the way through to a possible
17   deal with them?
18      A.   It depends. If we have a project and we have
19   a need, then we're going to engage at a different level.
20   And if it's an abstract -- I don't know if that's a
21   right word to use here -- but if it's coming in -- you
22   got this -- I mean, what -- what can I hold -- I'm
23   holding a business card here.
24      But what can we build out of this? I'll have
25   to use my imagination. They walk in. I generate a

Page 32

1    concept. Maybe it's origami. I can fold this card into
2    something. I, you know -- in the case of a software
3    company, do we have a need for that, you know, how does
4    it fit into our program. Is it a coincidence that we
5    need something at that very moment --
6       Oh, if you walked in and you're -- you're here
7    at the right time and, look, it's -- it fits into our
8    program, you know. Those things -- I don't know what
9    the chances are, but probably pretty small. So, you
10   know, with a cold call, it's a cold call. It's --
11      Q.   So, let's say there's a software company.
12   They cold-call you. You do an initial meeting with
13   them. You like what you see. Maybe there's a need for
14   it. You go into a demo stage with them, where they're
15   demoing the product for you.
16      Is that fair to say, is that what happens?
17      A.   I -- I'm -- I don't know, because you've asked
18   a couple of different times, different ways.
19      Q.   Right.
20      A.   And maybe I need to -- to go through the steps
21   carefully here, to educate on what we do, so --
22      Q.   Yeah, by all means.
23      A.   You have basically four major groups here.
24   One is the -- three of them are engineering stages. And
25   the -- the one at the front end of this thing is called

Page 33

9 (Pages 30 - 33)

1 brought in a full corporate presentation slide stack.

2    Q. Okay. Well, let's run through the chronology

3 with the documents --

4    A. Okay.

5    Q. -- so we understand the time frame --

6    A. Yeah.

7    Q. -- as you were describing.

8    A. Sure.

9    MR. AVENI: Let's mark this as Exhibit-79,

10 please.

11    (Exhibit-79 marked for identification.)

12    MS. HUGHES: Can we take a short break?

13    MR. AVENI: Absolutely.

14    (Recess taken from 9:52 a.m. to 9:56 a.m.)

15    MR. AVENI: So, does everybody have a copy?

16    THE WITNESS: Of this?

17    MS. HUGHES: Yes.

18    MR. AVENI: I'm sorry. Let's go off the

19 record.

20    (Discussion held off the record.)

21    Q. (By Mr. Aveni) Okay. So, you've been handed

22 Exhibit-79, which is an email chain dated December 27 --

23    A. Mm-hmm.

24    Q. -- 2006. Is this the first email contact that

25 you mentioned from -- with regard to GenAudio?

Page 46

1    A. Yes.

2    Q. Okay.

3    A. Yeah.

4    Q. And I think that this was mentioned to you,

5 when you testified previously in this case, just so

6 we're on the same page. You'll see on the lower

7 right-hand corner, there's what we call a Bates stamp.

8 It says SEC-TiscarenoV-E --

9    A. Mm-hmm.

10    Q. -- and a number. You'll see that throughout

11 the day. That indicates that that's a document that you

12 produced to the SEC --

13    A. Okay.

14    Q. -- in the underlying investigation.

15    A. Sure.

16    Q. At times, you'll see one that says APL rather

17 than Tiscareno. I believe that reflects -- again, those

18 are numbers the SEC puts on there to reflect documents

19 Apple produced to the SEC.

20    A. Right.

21    MR. AVENI: If you have any questions at any

22 time about the source of a document, feel free to ask

23 me. But I want to make that clear. This is one of your

24 documents. Okay.

25    So, let me mark this next one here as

Page 47

1 Exhibit-80, please.

2    (Exhibit-80 marked for identification.)

3    MS. HUGHES: Thanks.

4    MR. AVENI: Sure.

5    Q. (By Mr. Aveni) Do you recognize this

6 document?

7    A. What would you like to know?

8    Q. I'm going to show you a lot of documents.

9 I'll show you generally the things I want to ask you

10 about.

11    A. Mm-hmm.

12    Q. Obviously, you're welcome to look over each

13 document to make sure you recall it and you understand

14 its contents. But I'm going to generally show you the

15 things --

16    A. Yeah.

17    Q. -- the emails that I'm talking about.

18    Do you remember -- do you recall this

19 document?

20    A. Only because it's more recent, but not from --

21 I mean, I'm -- yeah. It's not anything unusual. I --

22    Q. Okay. So this is an email dated January 21,

23 2007, shortly after the previous --

24    A. Right.

25    Q. -- Exhibit-79. So it's an email from Jerry

Page 48

1 Mahabub to you, discussing an upcoming presentation to

2 you on Apple, right?

3    A. Mm-hmm, yes.

4    Q. Do you recall the purpose of that

5 presentation?

6    A. It's -- it -- it's one step removed from a

7 cold call.

8    Q. How often would you say vendors reach out to

9 you with a cold call?

10    A. I'll say, frequently.

11    Q. Okay. And how many of them would you say make

12 it to the point of getting to make a presentation?

13    A. I would say, 90 percent, just -- if I said 100

14 percent, I don't think that'd be accurate.

15    Q. Okay. Fair enough. Okay. That's fine.

16    So this email sets out six different items

17 that Jerry was hoping to present to you, right?

18    A. Yeah.

19    Q. Okay.

20    A. Yes.

21    Q. I want to point you to the last one real

22 fast -- No. 6, Licensing and/or Partnership Agreement.

23    So, Jerry wanted to discuss a possible

24 licensing or partnership agreement with Apple for

25 incorporating GenAudio's technology to Apple products,

Page 49

13 (Pages 46 - 49)

1  right?
2     A.  Mm-hmm.
3     Q.  That's one of the things he wanted to present
4  to you?
5     A.  I -- I didn't -- we weren't -- I -- I assume
6  so.  It was a slide presentation, as I recall.
7     Q.  Yeah.
8     A.  Slide stuck, a set of headphones, some videos,
9  a little bit of audio.  I mean, it was -- it was just
10 another vendor coming through the door.  Thank you very
11 much for coming.
12    Q.  Fair enough.
13    A.  Okay.
14    Q.  Is it fair to say that when vendors come in
15 and make these cold calls and then make presentations --
16 and the ones lucky enough to continue to have
17 discussions with you -- their ultimate goal is to reach
18 a licensing agreement or a partnership agreement with
19 Apple, right?  That's their ultimate goal?
20        MS. HUGHES:  Objection.  Calls for
21 speculation.
22    Q.  (By Mr. Aveni)  As you understand it, that's
23 their goal, right?
24    A.  They're -- they're trying to sell us
25 something.

Page 50

1     Q.  Right.
2     A.  So I would say, yes, that's the object of
3  their cold call.
4     Q.  Okay.  Fair enough.  Do you recall if you
5  responded to Jerry's email?
6     A.  I don't remember.
7     Q.  And again --
8     A.  I don't.
9     Q.  -- I won't keep apologizing for this, but I
10 realize this is a very long time ago.  I appreciate
11 that.
12        Do you know --
13    A.  Well, you could see -- just even here -- this
14 is a significant bit of information.
15    Q.  You mean, in his email?
16    A.  In his email, yeah.  I would just -- what do
17 we do -- I mean, "Okay.  Bring in your demo, and we'll
18 talk about it then."  I mean, you know, he drops some
19 names in here.  "I'm -- I'm not going to bore you, Tony,
20 and/or Steve, question mark, with a keynote or
21 PowerPoint presentation.  You most likely see those 100
22 times a day."
23    I -- I mean, it's just -- I -- I would gloss
24 over stuff like that.  I'd just say, "Okay.  When can we
25 meet?"  Okay.  He will tell me about it then.

Page 51

1     Q.  Okay.  Fair enough.
2     A.  I try to be respectful to vendors.
3     Q.  You testified before, you know, that you met
4  with Jerry maybe eight or twelve times.  You've
5  exchanged hundreds, maybe more, emails with him; you
6  know, at least weekly phone calls.
7        Is there -- can you say what percentage of
8  vendors get to that stage, that level of communication
9  with you?
10    A.  I don't have an answer for that one.
11    Q.  Is it fair to say that it is a small
12 percentage?
13        MS. HUGHES:  Objection.  Relevance.
14        MR. ELTRINGHAM:  Go off the record?
15        MR. AVENI:  Just answer the question, and then
16 we'll go off the record.
17        (Mr. Holmes entered the room.)
18    A.  I'd be guessing.  I really don't know.
19    Q.  (By Mr. Aveni)  Okay.
20    A.  I don't know how to answer your question,
21 honestly.
22    Q.  I guess, I'm just trying to -- I mean, I
23 assume that most vendors that come in the door -- you
24 said a lot of vendors come in the door.  I'm assuming
25 most of them don't get to that point, where they get to

Page 52

1  have that many communications over a period of years?
2     A.  I don't recall any cold-call vendors that --
3  well, yeah, I don't have any cold-call vendors.  He was
4  one of the few --
5     Q.  Okay.
6     A.  -- that took -- that went just a little bit
7  further along.
8        MR. AVENI:  Okay.  Thank you.  Let's go off
9  the record.
10        (Recess taken from 10:04 a.m. to 10:12 a.m.)
11        MR. AVENI:  I was about to mark Exhibit-81.
12        (Exhibit-81 marked for identification.)
13    Q.  (By Mr. Aveni)  You've been handed Exhibit-81,
14 which -- and just so you know, we're going to run today
15 through a variety of documents, a variety of emails, in
16 rough chronological order.  I mean, just to be fair, I'm
17 not showing you every email just because -- obviously,
18 because of the time pressures, I don't have the time to
19 do that.  So, I'm just trying to show you --
20    A.  Mm-hmm.
21    Q.  -- some significant things along the way.  I
22 don't want you to think I'm showing you every email.
23 I'm not even close to doing that.
24    A.  Okay.
25    Q.  So, Exhibit 81 is an email from Jerry

Page 53

14 (Pages 50 - 53)

1  regarding a meeting he had with you that day,
2  February 14, 2007. And you see the first line says, "I
3  just wanted to thank you very much for having lunch and
4  meeting with me earlier today."
5      So, first, do --
6      A. Mm-hmm.
7      Q. -- you recognize this email as one of your
8  emails?
9      A. Since I -- I don't see anything here unusual.
10      Q. So, you see the first line there: "I just
11  wanted to thank you very much for having lunch and
12  meeting with me earlier today."
13      Is that the first meeting you think you had
14  with Jerry Mahahub in person?
15      A. I'm not sure.
16      Q. You're not sure. Okay. Do you recall that
17  meeting, from this email?
18      A. I -- there was a meeting -- and I don't know
19  what date it was -- where we had kind of an introductory
20  meeting -- laptop, headphones. He brought a developer,
21  Walter Horat, who I later -- later got to know. And he
22  brought him and told me everything about the fact that
23  he worked for Apple. And I don't know if that was to
24  impress me or what.
25      But, you know, he said, "Hey, he used to work
                                                    Page 54

1  here. He's one of my developers." I said, "Okay.
2  Cool." So, I don't know if -- if it was this meeting
3  or -- I just recall, you know, we had -- we had two
4  meetings. One was at -- one was in the main hall, with
5  a laptop. And then we had a follow-up meeting.
6      I'm pretty sure it went kind of in that
7  order -- where we went into our building, in a public
8  meeting room, and got a slide presentation. We got a
9  video and some headphones to wear while we were watching
10  his video.
11      Q. Okay. What I'd like to do is just kind of
12  keep track, on this piece of paper (indicating
13  Exhibit-82), whenever the emails showed you guys had an
14  in-person meeting. I just think that would be helpful
15  to do. I understand.
16      A. Yeah.
17      Q. -- given the passage of time, you may not
18  remember the date of each meeting. But if, you know --
19      You don't have any reason to think this
20  meeting didn't occur, as reflected in this email, right?
21      A. Well, yeah, you know, without going and
22  checking anything that I have or Apple has -- you know,
23  I don't see anything objectionable on it. I mean,
24  there's a lot -- there's some name-dropping in here, of
25  course -- Tony Faddell, Eddie Cues. But that's stuff I
                                                    Page 55

1  would gloss over. You know, I'd -- okay.
2      Q. So --
3      A. Yeah.
4      MR. AVENI: And if this is helpful -- let's
5  mark this as an exhibit as well. I just want to kind of
6  run -- we're just going to -- I just think it'd be
7  convenient and easy to keep track of the meetings that
8  you went through with him.
9      (Exhibit-82 marked for identification.)
10      MR. AVENI: Thank you.
11      Q. (By Mr. Aveni) So what I've marked as
12  Exhibit-82, for the record, is just a piece of paper
13  that I marked, "GenAudio In-Person Meetings." And I
14  wrote, number one -- and I'm not trying to represent
15  that these are the only meetings.
16      I'm not trying to represent anything other
17  than, as we run through these, these are the ones
18  that from the emails appear to have taken place. Is
19  that fair?
20      A. Yes.
21      Q. Okay. So, then you see -- if you look at the
22  bottom of this email, it said: "Everything will come
23  into focus at the upcoming presentation on March 1,
24  2007."
25      And throughout this email he talks about
                                                    Page 56

1  meeting with you about what his presentation would be;
2  is that fair?
3      A. Yes. That might be the one I referred to with
4  the slide deck.
5      MR. AVENI: Right. Okay. You can put that
6  one aside. Okay.
7      Let's mark this as Exhibit-83.
8      (Exhibit 83 marked for identification.)
9      Q. (By Mr. Aveni) So, this is another email --
10  the Bates stamp indicates it was produced by you. It's
11  an email from Jerry to you.
12      Is it okay with you if I referred to Jerry
13  Mahabub sometimes as Jerry?
14      A. That's fine.
15      Q. Sometimes, I'll call him Jerry Mahabub;
16  sometimes, I'll call him Mr. Mahabub. But if I say
17  "Jerry," you'll know what I'm talking about, right?
18      A. I prefer JM. If -- it doesn't matter.
19      Q. I want the record to be clear. I'll try to
20  use --
21      A. Okay.
22      Q. -- Jerry Mahabub --
23      A. Okay.
24      Q. -- and may slip into Jerry at times --
25      A. That's okay. I -- I -- okay.
                                                    Page 57

15 (Pages 54 - 57)

**Page 70**

1  integration with minimal non-recurring engineering."
2       Do you see where it says that?
3    A.  Mm-hmm, yes.
4    Q.  Do you think that reflects the state of
5  GenAudio's state of technology at that stage?
6       MS. HUGHES:  Objection.  It calls for
7  speculation.
8    A.  I -- you know, I -- as I said, I read a lot of
9  this stuff and I -- I glossed -- I got down to the
10  bottom, okay.  What is it that you -- okay, you're going
11  to -- "Give me a license to open up the Expander."
12  "Okay.  I'll try it.  I'll bite."  I downloaded this
13  free software, and it haunts me to this day.  It
14  won't -- I can't find the hidden file, and it --
15       Every time I start a computer up, it comes
16  up -- it has no software attached.  I can't find the
17  hidden file.  I found it -- I found -- it's a big, long
18  numerical code.  And at some point I'm going to figure
19  it out.  But it -- whenever I restart the computer, that
20  stupid free -- say it here --
21    Q.  (By Mr. Aveni)  Okay.
22    A.  -- stupid free software.
23    Q.  If you look at the middle paragraph of that
24  page, the last sentence says:  "... I would like to take
25  the next steps with Apple and see if Apple is interested

**Page 71**

1  in having AstoundStereo integrated into iPod and iPhone
2  product offerings via licensing."  So, that's just to
3  say --
4       I mean, you understood Jerry was trying from
5  the outset to sell you AstoundSound through a licensing
6  agreement?
7    A.  Yes.
8       MR. AVENI:  Okay.  Okay.  Let's mark
9  Exhibit-86.
10       (Exhibit-86 marked for identification.)
11    Q.  (By Mr. Aveni)  Okay.  Do you recognize
12  Exhibit-86?
13    A.  Oh, here's -- here's the comment I made -- "It
14  doesn't sound like Matthew is really on your business
15  team.  I'm sorry, these are rules we have to live with
16  around here."
17    Q.  Right.  And you're referring to -- earlier,
18  you said one time he showed up and wanted to bring
19  another --
20    A.  Yeah.
21    Q.  -- non-GenAudio person to Apple?
22    A.  Yeah.
23    Q.  Okay.  So, you recognize this document?
24    A.  I'll take it for its word.
25    Q.  Okay.

**Page 72**

1    A.  Yeah.  If it came from me, it's probably cool.
2    Q.  Okay.  And so if you look at this, the bottom
3  email on Page 1 is dated June 18, 2009.  It's an email
4  from Jerry to you.
5       At the bottom of that page he says, "See you
6  in a couple of hours."  Do you see that on Page 1?
7    A.  Oh, okay.  I'm sorry, I was looking at the
8  top.
9    Q.  Yeah, look at --
10    A.  I see it -- June 18th.
11    Q.  June 18th.  And on the bottom of Page 1, it
12  says, "See you in a couple of hours."  Do you see that?
13       Here, mine's highlighted.  You can see it a
14  little better.
15    A.  Okay.  Yes.
16    Q.  So, does that reflect that Jerry was meeting
17  with you on June 18, 2009?
18    A.  It -- it says that.
19    Q.  It appears to reflect that meeting?
20    A.  I'll -- yeah.
21    Q.  Is there any reason to think that meeting
22  didn't take place?
23    A.  There's no reason for me to believe it didn't.
24    Q.  Okay.  So, I'm marking it on Exhibit-82.
25    A.  Even though this -- (mumbling) -- yeah.

**Page 73**

1    Q.  Do you recall what took place at that meeting?
2    A.  Just let me -- (mumbling) -- okay -- "a fly on
3  the wall" -- yeah, thanks.
4    Q.  Yeah, I know what you're --
5    A.  I'm sorry for the mumble.  I just kind of --
6  trying to read through this.
7       MR. HOLMES:  You know, the only caution I give
8  you is that if it is audible, the court reporter will
9  probably try to take it down.
10       THE WITNESS:  I understand, I understand.  I
11  just -- they couldn't hear, and I was mumbling into my
12  paper here.
13       MR. AVENI:  And I realize that someone in my
14  office attached an extra email to the back of this
15  (indicating Exhibit-86).
16       THE WITNESS:  This one?
17       MR. AVENI:  So, the last page.  Let's take
18  that page off and -- that email on the last page there
19  is not part of this document.
20       THE WITNESS:  Okay.
21       MR. AVENI:  But we'll talk about that one --
22  since it's here, we'll talk about that one as well.
23       THE WITNESS:  Okay.
24       MR. AVENI:  I'll mark that separately.  Okay.
25    Q.  (By Mr. Aveni)  So, at the top of this exhibit

19 (Pages 70 - 73)

1 conversation even with GenAudio ended from my point of
2 view, where I worked at iPod and iPhone.
3     After we had -- I guess, we'll go -- continue
4 with big meeting -- with Michael Hailey's manager, he
5 was still working -- GenAudio was still working with the
6 folks in the -- in the Mac hardware/DSP audio side of
7 the street, I'll call it, that I introduced -- the Ron
8 Isaacs of -- of the conversation.
9     That's a separate thing. They're colleagues
10 of mine, friends. And -- and they had an -- they had a
11 somewhat general interest in it. And it's -- but they
12 had no program driving -- that they use this product.
13     Q. And you weren't involved in those discussions?
14     A. No. I went -- and sometimes I was invited to
15 their meetings -- maybe all of them -- I don't know how
16 many meetings they ever had with GenAudio. It wasn't
17 really -- at Apple, we don't -- everything is
18 confidential. And -- and even though we're all on the
19 same team, unless you're working on the project, you
20 don't know anything, so --
21     Q. Okay.
22     A. So, the guys across the street -- the Ron
23 Isaac of this conversation that we're -- they -- they
24 were on their own thing. And -- and since they're in
25 development and prototype and things -- things that --

Page 110

1 take that back. This is an email from you to Jerry
2 Mahabub. And you say, "Hi Jerry, Nice to see you
3 today!!"  Do you see that?
4     A. Yes.
5     Q. So do you recall having a meeting with
6 Mr. Mahabub on August 11, 2009?
7     A. Yes.
8     Q. Okay. I'm going mark that on Exhibit-82. Do
9 you recall what that meeting was about?
10     A. I'm taking it -- from here -- that he handed
11 me probably an i-touch, with the feature set that I
12 asked him to work on. There was some -- you know,
13 obviously there were some issues -- technical issues --
14 respond to a feedback, based on what I see here, and --
15 and also called him on -- on making sure that the levels
16 were matched.
17     Again, it doesn't take but a little bit to
18 make people think that they're hearing better because
19 it's louder or quieter. So, he -- I want to make sure
20 this was a level playing field. The same thing happened
21 with SRS. I made sure that they -- "Hey, you guys got
22 to make sure that these are matched."
23     Q. So then at the bottom you say, "BTW" -- that
24 means by the way, right?
25     A. Yes.

Page 112

1 there's no finished product there.
2     It's just a lot of concepts. It's a -- little
3 projects going on all over. And they'd invite me at
4 times for projects -- they're looking -- they got a
5 vendor that came in and showing them -- I mean, I --
6     Over that period of time, we had -- I don't
7 know -- 15 different vendors that probably had this kind
8 of software. Some were from -- came all the way from
9 England, Germany. I'm -- it was sporadic. They'd just
10 come in and show us what they have, to generate some
11 interest.
12     "Hey, do you guys think you can do something
13 with this?" And so they'd invite me to their meetings,
14 you know, "A vendor coming in. You want to check it
15 out?" "Sure. I'll set out some time and come over and
16 check it out." So, just to fill you in with -- with
17 everything.
18     MR. AVENI: Let's mark this one here.
19     (Exhibit-94 marked for identification.)
20     Q. (By Mr. Aveni) Okay. You see on the lower
21 right-hand corner -- again, this is a document that you
22 produced. Does this look right?
23     A. Yeah.
24     Q. Okay. If you look at Jerry Mahabub's email to
25 you, the bottom of Page 1, it says -- oh, I'm sorry. I

Page 111

1     Q. "By the way (sic), this is a great demo
2 device, congratulations!!" So, you're pleased with the
3 work that Mr. Mahabub gave --
4     A. Yeah --
5     Q. -- to you at this stage?
6     A. -- an edible way, if you will.
7     Q. Okay.
8     A. Well, I -- I tell you what -- off the record?
9     MR. AVENI: We can go off the record.
10     (Discussion held off the record.)
11     MR. AVENI: Okay. Let's mark the next one
12 Exhibit-95.
13     (Exhibit-95 marked for identification.)
14     Q. (By Mr. Aveni) Okay. This is another one
15 that's marked with an APL Bates label on the --
16     A. Okay.
17     Q. -- lower right-hand corner, reflecting that
18 Apple produced it. But this is a calender entry, it
19 looks like, from you for another internal meeting with
20 Michael Hailey. Do you see that?
21     A. Right, I see it.
22     Q. And it says at the top, "AstoundSound demo"?
23     A. Mm-hmm.
24     Q. This is about a week and a half after the last
25 calendar entry for an internal meeting with Michael

Page 113

29 (Pages 110 - 113)

1    A. Yes.
2    Q. Okay. If you look at the -- so, this is an
3  email from Jerry Mahabub to you. It's dated August 19,
4  2009.
5    A. Mm-hmm.
6    Q. And then at the bottom of that email, he says
7  to you, "Much appreciated your help. Although I am
8  happy that you are my POC at Apple" -- I understand that
9  to mean point of contact at Apple?
10    A. Mm-hmm, yes.
11    Q. -- "and feel that we have become friends, I
12  wish that I had you or someone like you working on my
13  team!!!"
14      Do you feel like by August 19th, by this date,
15  that you and Jerry Mahabub have worked closely together?
16    A. Yeah, I would say that.
17    Q. Did you have the same feelings of friendship
18  back towards Mr. Mahabub at this stage?
19    A. He -- we just had a good vendor/Apple working
20  relationship, I would say, you know.
21    Q. But your collaboration was --
22    A. Our collaboration was good.
23    Q. And it was close at this point, right? You
24  guys were working a lot together. I mean, it seems like
25  it's a very -- it seems like it's an emotional comment

Page 118

1  from Mr. Mahabub, that reflects a lot of communications
2  with you over time on this project; is that fair?
3      MS. HUGHES: Objection to the form of the
4  question.
5    A. I -- I don't know how I felt at that point.
6  I -- you know, I -- I got along with him well. I
7  respected, you know, the big effort that he put into
8  this. It didn't go unnoticed with me, personally. So
9  if you're asking about personal feeling, I -- I really
10  respected the fact that he -- he -- he did all the -- he
11  went through all this work.
12    Q. (By Mr. Aveni) And it was a close
13  collaboration by this stage, right?
14    A. Based on the emails, that's -- that's about as
15  far as we went. We swapped out gear. We made a call.
16  "Hey, can you bump it up?" I sent him graphs, things
17  that would help him understand what the issue was.
18      Again, he on his own -- had he walked in --
19  "Hey, I'm done with my amplification" -- working on the
20  outside with no other help -- and he comes in and
21  shows -- "Hey, it's not ready. It's -- it's -- you got
22  to do some more work."
23    Q. Right. And I'm not trying to --
24    A. So --
25    Q. I'm not asking you, was the project ready?

Page 119

1      I guess, my question is: At this point, did
2  you feel like you had a close collaborative relationship
3  with Mr. Mahabub?
4    A. We had a good vendor/business relationship.
5    Q. You guys talked frequently at this point?
6    A. Based on the emails and the -- and probably
7  phone calls, yeah.
8    Q. Okay.
9    A. I mean, I -- I don't know what to say to that,
10  except -- yeah, it was -- yeah, based on the emails, it
11  looks like we had a decent communication --
12    Q. Okay.
13    A. -- on it.
14      (Exhibit-98 marked for identification.)
15    Q. (By Mr. Aveni) Okay. From the Bates stamp,
16  again this looks like another document you produced; is
17  that right?
18    A. Yes.
19    Q. Do you recall this email?
20    A. No. But, I guess, I'm going to rip on it.
21  I --
22    Q. This is an internal email, right, from you to
23  Michael Hailey?
24    A. Yes.
25    Q. And is it fair to say the email reflects that

Page 120

1  you were enthusiastic about GenAudio's technology,
2  right?
3      MS. HUGHES: Objection to the form of the
4  question.
5    A. Let me read this and see if I can --
6    Q. (By Mr. Aveni) Sure.
7    A. -- gather -- I'm a slow reader, so trying to
8  digest what process -- what I was thinking about.
9      Okay.
10    Q. Okay. So, is it fair to say that the email
11  reflects that at this stage you were enthusiastic about
12  GenAudio's technology?
13      MS. HUGHES: Object to the form. Leading.
14    A. Yes. It doesn't say anything negative.
15    Q. (By Mr. Aveni) It seems pretty positive,
16  right?
17    A. It seems -- it seems positive.
18    Q. You say, at the top of the second paragraph,
19  "It works as advertised." What was working as
20  advertised?
21    A. Well, it's a figure of speech in this case.
22  But, you know, that he was able to take -- do you want
23  me to explain what -- what he means by fold -- I don't
24  know if I used the word "fold down" in here. But movies
25  are created in six channels -- 5.1 -- five normal

Page 121

31 (Pages 118 - 121)

**Page 126**

1    A.  It's a puzzle.  I really don't know.  I -- I
2  mean, I'm just -- based on -- 8/29 -- so I -- you know,
3  what is 8/29?  I'm looking at --
4    Q.  Well, we don't have to go back -- I will say
5  approximately --
6    MS. HUGHES:  August 26, I believe.
7    MR. ELTRINGHAM:  26.
8    MR. AVENI:  Okay.  I'll say approximate --
9    THE WITNESS:  Or maybe it wasn't.
10    MR. HOLMES:  I'll represent that 8/19 and 8/26
11  were Wednesdays.
12    THE WITNESS:  Okay.
13    MR. ELTRINGHAM:  I have a calendar up here.
14    A.  But, I mean, to be specific, I don't know.
15  You got something that ties this together, that I can --
16    MR. AVENI:  Well, that -- I think they -- that
17  ties it as well as we can.  So I've reflected on here,
18  exact date matters.  So I've reflected on here,
19  approximate, 8/26.  Okay.  You can put that aside.
20    (Exhibit-100 marked for identification.)
21    Q.  (By Mr. Aveni)  Okay.  Exhibit-100 is another
22  document, the Bates stamp reflects, that you produced
23  this one.  Does that look right to you?
24    A.  I got to read through --
25    Q.  Sure.

**Page 127**

1    A.  -- try to get into context.
2    Q.  Sure.  Take a minute.
3    A.  Okay.  I mean, if I sent it, it's -- I'm sure
4  it was in my email box.
5    Q.  Okay.  If you look at the second page --
6    A.  Mm-hmm.
7    Q.  -- there's a paragraph that starts, "The
8  solution for Apple ..."  Do you see that?
9    A.  Yes.
10    Q.  Okay.  The last sentence of that paragraph
11  says, "AstoundSound in real-time during game play, and
12  it is already for the most part done."  Do you see that?
13    A.  Yes.
14    Q.  So when you read that, did you understand that
15  Jerry Mahabub was saying he thought most of the work he
16  needed to implement AstoundSound into Apple for gaming
17  was already completed?  Is that what it seems like what
18  he was trying to say there?
19    A.  Yeah, in his judgment.  That's not our
20  judgment.
21    Q.  That was --
22    A.  No, he -- he constant -- I mean, you can go
23  right down -- he -- he -- I mean, I'm going to skip for
24  a second.  I -- I read this.  And I said -- "... however
25  it is in fact a very real and attainable goal for X-mas

**Page 128**

1  product rollout if we work really (sic) hard and fast!"
2  You know, that just -- he just generated this.
3    Q.  So, you disagreed with him about the status?
4    A.  Yeah, absolutely.  I mean, this isn't even my
5  call.
6    MR. AVENI:  Okay.  And we'll get to that.  So,
7  let's talk about this one at a time.
8    MS. HUGHES:  Could we stop for a moment?
9    You just read something about Christmas
10  rollout.  Where is that on Exhibit --
11    THE WITNESS:  The -- the final --
12    MS. HUGHES:  Oh.
13    THE WITNESS:  -- paragraph on this -- this one
14  right here -- of his email.
15    MS. HUGHES:  Thank you so much.
16    Q.  (By Mr. Aveni)  Okay.  So, let's talk about
17  Mr. Mahabub's comment about AstoundSound and realtime
18  during game play and it's already for the most part
19  done.
20    Did you talk to Mr. Mahabub about whether you
21  agreed with that statement?  Did you tell him something
22  like -- that you didn't think it was as far along as he
23  did -- anything like that?
24    A.  No, I never called him on those things.  He --
25  you can look at all these emails, and they all have

**Page 129**

1  conclusion and assumptions and -- and I think he was --
2  he just had a sales hat on -- salesman hat.  So, I --
3  I -- I just glossed over that stuff and --
4    Q.  You wouldn't respond back to him on --
5    A.  Oh god --
6    Q.  -- anything --
7    A.  -- you can go through all these emails.  And I
8  can probably highlight, you know, places I could have
9  said many, many, many, many times, you know.  But I
10  wasn't -- I'm not going to sit there and cor -- all I
11  cared about was, did you adjust the thing the way I
12  asked you to do it or not.
13    Q.  And so it's fair to --
14    A.  And remaining friendly.
15    Q.  So, it's fair to say -- I want to try to clear
16  up the record a little bit, just so that it's clear what
17  we're talking about later.
18    You're saying that Jerry Mahabub would
19  frequently make comments to you about his view, about
20  how far down the road the technology was in terms of
21  being ready to implement, right?
22    A.  Right.  He was --
23    Q.  And --
24    A.  -- trying to be -- he's trying to en -- show
25  me that he's confident, that he -- he -- that he saw the

33 (Pages 126 - 129)

1  end game; that, you know, we can do it right now.
2  That's the way I -- we're ready to roll --
3     Q.  Right.
4     A.  And, you know, that's --
5     Q.  And you don't recall ever telling him
6  something like, "Jerry, that's not the case or that's
7  not the stage" -- or anything like that?
8     A.  I don't know if we ever did.  I think there
9  were a couple of times where he asserted himself, like
10  "I know how to sell this stuff."  I said, "You're not
11  coming to this meeting.  It's not that kind of meeting."
12       It's -- it's -- it's superficial.  It's not
13  digging down into the nitty-gritty or -- or -- or we're
14  going to knock out term sheets here -- anything like --
15  it wasn't anything like that.
16       This was -- I'm presenting a concept.  You're
17  building the demo.  We're trying to fine-tune the demo
18  and putting our best foot forward.  And that's all I
19  cared about.  You know, as far as details, they're
20  high-level.
21       You know, hey, is it -- it's not working, you
22  know.  It's -- the button's in the wrong place, or it's
23  got a scratch on it.  It's making a ticking sound.  It
24  cuts out.  It's drawing too much power.
25     Q.  So, you were focusing on the specific tasks

Page 130

1  that needed to be done --
2     A.  Yeah.
3     Q.  -- rather than responding to each of his
4  comments regarding the status of implementation?
5     A.  Yeah, he -- you know, the -- the -- all these
6  documents --
7     Q.  Okay.
8     A.  -- have that sort of thing in there.
9     Q.  Okay.  So, let's talk about -- and we'll go
10  through a number of them.  Let's talk about this other
11  sentence that you read, which is in the middle of that
12  page --
13     A.  Yes, okay.
14     Q.  -- where he says, "... however it is in fact a
15  very real and attainable goal for X-Mas" -- meaning
16  Christmas, right?
17     A.  Right.
18     Q.  -- "X-Mas product rollout if we work hard and
19  fast."  I mean, Jerry's an optimist with regard to his
20  technology.  Is that fair to say he comes across that
21  way?
22     A.  He was enthusiastic.
23     Q.  He's enthusiastic.
24     A.  And he had a salesman hat on.
25     Q.  Sure.

Page 131

1     A.  Okay.
2     Q.  But, I mean, he really appeared to believe in
3  his prospect; right?
4     A.  Oh, yes.
5     Q.  And he really appeared to believe in the --
6  you know, in a possible transaction with Apple?
7     A.  Yes.
8     Q.  He's --
9     A.  I would assume -- I mean, that's the
10  assumption -- somebody walking in, they're going to
11  hopefully close something.  I mean, he's not doing it
12  for free, so --
13     Q.  And from your interactions with him, do you
14  understand he seems to think that that was likely --
15  that a deal was going to close with Apple?
16       MS. HUGHES:  Objection.  Lack of foundation.
17     Q.  (By Mr. Aveni)  I mean, he's making --
18     A.  I wasn't --
19     Q.  -- these statements --
20     A.  -- thinking that far in advance.
21     Q.  And I understand you weren't.  And we can talk
22  about that.  But, I guess, my question is:  Did it look
23  like Jerry was thinking that far in advance?
24     A.  Um --
25     Q.  You said that he makes these comments all the

Page 132

1  time.  And you said he's an enthusiastic guy.  He really
2  seemed to believe in the value of his technology.
3       Did it seem like he was convinced -- right or
4  wrong -- that he was further down the road with Apple
5  and that a transaction with Apple was likely?
6       MS. HUGHES:  Objection.  Calls for speculation
7  on what Mr. Mahabub thought.
8       MR. AVENI:  I'm asking based on the witness's
9  interactions with him.
10       You can answer.
11     A.  I didn't have specific note.  It -- it seemed
12  like it was just part of who he was.  You know, if it's
13  constantly coming out of him like that, you know, you
14  just accept it.  Oh, there's another one.  It was
15  harmless, I'll say it that way.
16     Q.  (By Mr. Aveni)  Did you have --
17     A.  I took it as being harmless.  I wasn't
18  thinking about this in any way, shape, or form because
19  it really -- it -- you know, if it was -- in romantic
20  parlance, we're -- we're -- "Let's go get some coffee."
21  What does that mean?  We're getting coffee.
22       It just -- it wasn't on my radar.  Look, it's
23  just -- I'm just focused on the technical -- a couple of
24  yuks once in a while.  You know, he -- he -- he --
25  obviously, he's very enthusiastic.  And on a personal

Page 133

34 (Pages 130 - 133)

1   level, he's -- he's got a big personality. I mean,
2   there's no doubt about it, okay.
3           So, you know, beyond that -- and getting back
4   to this -- I mean, this -- the ques -- I have no way of
5   answering it. It's just -- it's -- it's throughout
6   everything we've got here. Which one do you want me to
7   pick from?
8       Q.   Yeah. And we'll talk about -- I realize --
9       A.   I mean, it's like --
10      Q.   -- he made a lot of these kinds of comments --
11      A.   Yes.
12      Q.   -- right?
13      A.   Peppered it throughout the conversation and
14  this. And it was never very specific. It was just
15  something that washed over me. I just did not -- didn't
16  think about it.
17      Q.   And do you have any reason to think
18  Mr. Mahabub did not genuinely believe in these
19  statements when he says here, "It is in fact a very real
20  and attainable goal for X-Mas product rollout" --
21          When he makes statements like that, did you
22  have any reason to believe that he didn't believe that?
23  I mean, he seemed genuinely to believe this --
24      A.   I'll tell you what I took that as, okay.
25  After reading some of these, I -- I just took it that --

Page 134

1   "Hey, it wouldn't take a whole lot to get this thing
2   ready to go. We're ready to go." He was -- that was a
3   constant. We're -- we're this -- you know, isn't -- you
4   tell me -- I think one of the comments --
5           But he says, "You tell me how high to jump,
6   I'll jump. I'll get this done." And -- and that's --
7   as I mentioned earlier, he did a lot of work and --
8   and -- and -- and, you know, I had to bring up the
9   software.
10          And all I cared about was creating a demo that
11  I could present to somebody. And I complimented him on
12  his ability to get it done, so --
13      Q.   So you testified you didn't respond to Jerry
14  on this X-Mas product rollout, and you generally didn't
15  respond when he made these comments.
16          Do you know if anybody else responded to him,
17  when he said, "it is in fact a real and attainable goal
18  for X-Mas product rollout?
19      A.   Well, yeah, I've --
20      Q.   Did anybody else --
21      A.   I -- I've --
22      Q.   -- respond to this and say, "Jerry, that's not
23  what we talked" --
24      A.   This one specifically?
25      Q.   Yes, this one.

Page 135

1       A.   I don't know. If you have an email that
2   shows -- but, you know, I recall -- again, he -- he --
3   it was a constant drive towards, you know, "Let's --
4   let's make the deal," okay. And, you know, I think
5   Michael Hailey at one point said something about that.
6   He said, "We'll -- we got you, you know. It's" -- you
7   know.
8       Q.   Okay.
9       A.   I -- I --
10      Q.   You can put that aside.
11      A.   Let's keep going --
12      Q.   I just thought --
13      A.   I don't know how to answer your question. I
14  mean, it's --
15      Q.   There's a lot of them.
16      A.   There's a lot of them.
17      Q.   There are a lot of those comments. I will
18  skip some of them for your sanity.
19      A.   Yeah.
20          MR. AVENI:  Okay. Let's mark that as
21  Exhibit-101.
22          (Exhibit-101 marked for identification.)
23      Q.   (By Mr. Aveni)  Okay. This exhibit appears to
24  be another document that you produced. Does that seem
25  to be the case?

Page 136

1       A.   Yeah. Yeah, I see that.
2       Q.   Okay.
3       A.   But -- well, go ahead. Go ahead with your
4   question. I'm just -- never mind.
5       Q.   Okay. If you look at the first sentence --
6   so, this is an email from Jerry Mahabub to yourself and
7   to Michael Hailey --
8       A.   Mm-hmm.
9       Q.   -- to you --
10      A.   Yes.
11      Q.   -- dated September 16, 2009. And it says, "It
12  was great to meet with you both today." Do you see
13  that?
14      A.   Yes.
15      Q.   Do you recall a meeting with Jerry Mahabub and
16  Michael Hailey on or about this date?
17      A.   I'll take that this was official.
18      Q.   Okay. So, I will mark on Exhibit-82. By my
19  count, we're up to about, you know, eight --
20      A.   If you have a calendar that event ties with
21  this, I'll agree to it. I --
22      Q.   Do you need a calendar event? I mean --
23      A.   No, I mean, I -- I -- I recall this kind of
24  email.
25      Q.   Okay. And generally when he said to you, "It

Page 137

35 (Pages 134 - 137)

1  was great meeting with you both today," is it fair to
2  say that you guys met that day?
3  A. Yes.
4  Q. Okay. Do you happen to recall the purpose of
5  this particular meeting?
6  A. I have to read this through here. But -- yes,
7  I -- I -- I'm updated with what I'm reading here. But I
8  don't -- I don't see what's important here.
9  MR. AVENI: Okay. That's fine. We can move
10 on.
11 THE WITNESS: Okay.
12 MR. AVENI: Mark that as Exhibit-102, and this
13 one as 103.
14 (Exhibits-102 and 103 marked for
15 identification.)
16 Q. (By Mr. Aveni) Okay. Exhibits-102 and 103
17 also appear to have been produced by you. Does that
18 look to be the case?
19 A. Yes, I -- I'll take that it came from me.
20 Q. Okay. And these two emails appear to reflect
21 another meeting between you and Mr. Mahabub on October
22 1, 2009. Do you see that?
23 A. Yes.
24 Q. Exhibit-103 says, "See you in about
25 2 hours!" at the bottom. Do you recall that meeting

Page 138

1  with Mr. Mahabub?
2  A. Not specifically.
3  Q. Okay.
4  A. Quite often what -- what would happen is -- is
5  that since the application was a developer copy, that he
6  had put in -- there's provisioning, meaning they say
7  that the -- the -- the application time bombs. You
8  know, it's only capable of operating for 30, 60, 90 days
9  or something like that. I'd -- I've forgotten what it
10 was.
11 And sometimes I'd have it bricked. In other
12 words, it just wouldn't operate anymore with that
13 application. He'd had to re-provision them, reset the
14 clock. Now, that's something he did. It was an option
15 that -- for him to do, that he -- you know, or -- or if
16 it was part of the developer package from Apple, that's
17 the way it worked. And he just enabled the function.
18 Q. Are you saying that was the purpose of this
19 meeting?
20 A. It might have been to swap them out. Hey, I
21 got an updated unit. I don't know. But, see, you can
22 see that it -- it -- in here, he had some button
23 settings and -- and he's telling me -- "An exact level
24 match and response matches bypass mode. More. 1db
25 hotter" -- meaning loudness -- "compared to the bypass

Page 139

1  mode. Less Active ... +3db ..."
2  In other words, bass is up by 3 dB or down by
3  3 dB. So -- "I'm anxious to see your ... entire system
4  ..." Okay. So what I would do is I gave him a test
5  file, a special test file, that -- that would -- I know
6  I used the term -- that would actually -- that he could
7  use.
8  He send it -- he'd run it through on a file on
9  his system, send it back to me, and I'd de-convolute it
10 in my system. And -- and it would show me where his
11 adjustments went with reference to a straight line
12 across the screen, on the graph. So, that's what this
13 was about.
14 MR. AVENI: Okay. I'm going to reflect that
15 meeting on Exhibit-82 as Meeting 9. And you can put
16 those two exhibits away. Okay.
17 Let's mark that as 104.
18 (Exhibit-104 marked for identification.)
19 Q. (By Mr. Aveni) It appears to be another email
20 that you produced; is that right?
21 A. That's what it says, yes.
22 Q. Okay. There's this one line here. It says --
23 this is an email from you to Jerry Mahabub October 8,
24 2009. It says, "Awesome! At least for me, this is the
25 best demo. As an aside anymore Dead videos available?

Page 140

1  I believe the man loves the Dead."
2  Do you see that?
3  A. Yeah.
4  Q. Do you know who "the man" is that you're
5  referring to there?
6  A. I don't. I'm trying to think who -- who the
7  man -- "Dead videos ... the man loves the Dead." Oh,
8  yes. It was -- it was -- Michael Hailey's boss liked
9  the Dead -- like the Grateful Dead.
10 Q. What was his name?
11 A. Greg -- Gregory Joz -- Jozwiak -- Jozwiak,
12 J-O-Z-W-I-A-K. Or it's actually an S. Sorry.
13 J-O-S-W --
14 Q. Joswiak?
15 A. Joswiak.
16 Q. Okay. He liked the Grateful Dead?
17 A. I think he liked the Grateful Dead.
18 Q. So, you were preparing demos for him?
19 A. Yeah, we are preparing demos. At some point,
20 we were preparing demos that we could -- Michael and I
21 could go in and say --
22 MR. AVENI: Okay.
23 (Exhibit-105 marked for identification.)
24 Q. (By Mr. Aveni) Okay. This appears to be
25 another document that you produced; is that right?

Page 141

36 (Pages 138 - 141)

Page 142

1  A. Yep.
2  Q. Okay. Okay. So in the bottom paragraph
3  there, in Mr. Mahabub's email, November 3, 2009 --
4  A. Mm-hmm.
5  Q. -- to you --
6  A. Yes.
7  Q. -- it says, "Hopefully Mac division signs off
8  on this and we can get moving on to the next step,
9  especially if there is any hope of having this done by
10 MacWorld from the marketing side, it would only make
11 sense that we start to figure out the deal structure
12 between Apple and GenAudio sooner rather then (sic)
13 later."
14      Do you remember seeing that?
15 A. No. But I'm reading it.
16 Q. And when you saw that, did it seem to you
17 Jerry believed there was a strong possibility the
18 transaction would be completed?
19 A. It could -- yeah. I could have ignored it
20 and -- you know, because it already starts off with the
21 -- "having this done by MacWorld" implies he's
22 already -- his end game is -- there's product to put
23 this into MacWorld's -- you know, a place that -- that
24 Apple launches products sometime, which they ended up
25 backing out of. And --

Page 143

1  Q. What time of year is MacWorld?
2  A. It is around January of -- right after CES or
3  during CES, I think, which is January -- first or second
4  week of January.
5  Q. So, Jerry Mahabub is telling you here that he
6  thinks a deal between GenAudio and Apple could be
7  imminent?
8  A. I -- I think he's suggesting -- the way I take
9  it and the way I -- that's why I say I just kind of
10 gloss over it. The way I take it is, if we can get this
11 thing done, you guys could have it in your product in
12 time for MacWorld.
13 Q. Right.
14 A. It isn't -- it isn't -- I mean, it's just
15 impossible to even -- knowing what I know, that isn't
16 the way it works. This is software. So, this would be
17 this application. GenAudio would be handed off to a
18 whole different team -- software team.
19      And they'd start over on the guy. That --
20 should run it through and make sure because, you can
21 imagine, every time somebody changes the code, it could
22 break the darned thing. It isn't simply just a "plug in
23 this -- "
24      So while we have it working on something like
25 this, in an application, that's totally separate from

Page 144

1  everything else. It's just a little third-party game.
2  This might as well be a game. That's a different
3  thing -- cup of tea -- versus something that's fully
4  integrated. It's got to run through hours of testing,
5  quality control testing.
6  Q. And Jerry Mahabub didn't seem to understand
7  that, right?
8  A. Well, he's -- he has a salesman hat on.
9  That's the way I took this, honestly.
10 Q. Did you respond to this comment?
11 A. I didn't, no. I mean, I totally glossed over
12 it. I mean, if you take a look at this and -- I -- I
13 just said, "Hey, it's" -- what time -- let's see -- 3:30
14 p.m. -- and then I wrote this at 11:56 at night, right
15 before I rolled into bed. I mean, I just -- I ignored
16 it. It's just another passing comment.
17 Q. As far as you know, did anybody else at Apple
18 respond to that comment?
19 A. Uh --
20 Q. I mean, nobody else was in this email chain.
21 But as far as you know --
22 A. Yeah, no. I -- again, it was just -- to me,
23 it was just a salesman hat. "By the way, we can have
24 this thing done." That's the way I -- I took a lot of
25 his comments, just like that. I --

Page 145

1  Q. Did you and he -- so, you -- Strike that.
2      You mentioned that having it done by MacWorld
3  was not realistic because once you got approval, a whole
4  bunch of other things had to --
5  A. Oh, yeah.
6  Q. -- happen, right?
7      Did --
8  A. Hit the reset button.
9  Q. Did you and Jerry ever talk -- Strike that.
10     Did you and Jerry Mahabub ever talk about all
11 those other steps that needed to happen?
12 A. No, I don't think so.
13 Q. As far as you know, did Jerry understand that
14 all those other steps needed to happen?
15 A. If I would've said something, it would've been
16 what I just told you; that, "Hey, look, you know, this
17 is -- this is -- we're just trying to get somebody to
18 sign off on the idea."
19     And then what would happen is that -- then,
20 they would start to go, "Well, is there anything else
21 out there that's competitive, might be better?" You
22 know, we get into these rooms with -- with white boards
23 and, you know, slide presentations. And we show why
24 this one's better.
25     Whether it's -- you know, when we took a group

37 (Pages 142 - 145)

1   Q.  Sure.
2   A.  -- DSP. And they're working over there. But
3   he -- and -- and actually I may have not even -- I
4   shouldn't have been probably necessarily included on the
5   email thread because --
6   Q.  Yeah, I understand -- I understand you weren't
7   involved in the stuff with Ron Isaac.
8   A.  Right, I was not involved. And I was kept in
9   the loop here. And I don't know if I -- there may have
10   been a couple of times, somewhere along the road, they
11   said, "Hey, you know, you probably shouldn't include me
12   on this thread." But the point is -- is I -- I -- I
13   don't know what -- this is out of context right now for
14   me, except it doesn't seem to be any issue.
15   Q.  Okay.
16   A.  Right.
17   Q.  And my question is simply -- I'm just
18   establishing the meeting, so I --
19   A.  I -- I may have --
20   Q.  Any --
21   A.  -- missed the meeting.
22   Q.  Well, but here he says, "Hi Ron/Vic, Great
23   seeing you both again earlier today." So, he's saying
24   he saw you. Do you have any reason to think --
25   A.  I --
Page 150

1   Q.  -- that didn't happen?
2   A.  I have no reason to think -- I -- yeah, I -- I
3   imag -- maybe we met for lunch, totally independent, no
4   meeting. I -- I mean, there's any number of possibility
5   -- let's just say that I met with him.
6   Q.  Okay. And I want to --
7   A.  I just want to clarify that -- make sure that
8   we --
9   Q.  I understand --
10   A.  -- clarify.
11   Q.  -- you don't remember the details of the
12   meeting.
13   A.  No --
14   Q.  Okay.
15   A.  -- I don't.
16   Q.  I'm going to put it on Exhibit-82, it's the
17   tenth time you met with him. Okay.
18       In light of your testimony, I'm not going to
19   ask you the purpose of the meeting.
20   A.  Thank you.
21   Q.  Okay. So, we've gone through -- I mean, so
22   far we've got, you know, at least ten in-person
23   meetings. We've talked about a variety of emails. As I
24   said, there's some we didn't -- certainly didn't talk
25   about all of them. But there's a number of emails you
Page 151

1   guys exchanged. We've talked about the phone calls,
2   I mean, is it fair to say that from this point
3   where we are now in the timeline -- November 2009 --
4   that the ongoing discussions were getting fairly
5   extensive with GenAudio?
6       MS. HUGHES:  Object to the form of the
7   question.
8   A.  I mean, based on these emails and what I know
9   about it, GenAudio was meeting as an outside vendor
10   trying to engage with Apple to demon -- to demonstrate
11   their product at its best. That's --
12   Q.  (By Mr. Aveni) Sure,
13   A.  So, they were doing what was -- would take to
14   make it viable, at least from a demo standpoint.
15   Q.  And from a vendor's perspective -- I mean, you
16   know, vendors come to you -- as we've talked about --
17   they want to sell you something. I mean, it's Apple.
18   It's probably -- for many of these guys, like a company
19   like GenAudio, it's their dream to get to sit down with
20   you guys.
21       From a vendor's perspective, you know,
22   GenAudio's gotten to sit down with you ten times -- at
23   least, you know, that we can confirm in emails. He's,
24   you know, having regular phone calls with you, you know,
25   regular email communications with you. You know, at
Page 152

1   least from his perspective, he feels like he's working
2   closely with you.
3       So, I mean, is it fair to say a vendor in that
4   position is going to feel like the discussions are
5   fairly extensive?
6       MS. HUGHES:  Object to the form of the
7   question. Calls for speculation about what a vendor
8   might think.
9   A.  I -- I don't know how to answer your question,
10   honestly. I -- I -- he, you know -- based on the
11   emails --
12   Q.  (By Mr. Aveni) Yeah.
13   A.  -- he connected with us a lot.
14   Q.  Yeah.
15   A.  And we went back and forth. Here are the
16   things that we need to do. My emails generally are very
17   short. His are long and sometimes hard to read -- you
18   know, hard to read through and -- and -- you know, so
19   the extra communication -- honestly, I think he
20   over-communicated. That's my opinion. If you ask my
21   opinion, he over-communicated in the emails.
22   Q.  He communicated with you a lot?
23   A.  A lot. And in many cases it looks -- appears
24   in emails, I -- I ignored everything in the content.
25   And I got -- I drilled down to what was necessary. And
Page 153

39 (Pages 150 - 153)

Veritext Legal Solutions
866 299-5127

1  I can go back as an example to, you know, some of
2  these -- I mean, this is just --
3      Q.  Yeah.  And I understand what you're saying.
4  You're saying that --
5      A.  Yeah, he over-communicated.
6      Q.  -- he would have --
7      A.  I mean, I think that's what you're asking,
8  He's over-communicated in emails.  That's what I want to
9  say.
10     Q.  Yeah.  And I understand you're also -- you're
11 saying that he also had lengthy communications.  I'm
12 also talking about the number of communications, that
13 there were just a lot of them.
14     A.  There was a lot of them.
15         MR. AVENI:  Okay.  So, you can put that aside.
16         (Exhibit-107 marked for identification.)
17     Q.  (By Mr. Aveni)  Okay.  The Bates stamp on this
18 document reflects that you produced that.  Does that
19 look right to you?
20     A.  I'm -- yeah, I'm reading now that he's got
21 carets where he -- where I spoke -- or there's carets
22 where I spoke, and then he answered apparently in
23 between paragraphs.  So, let me -- let me read through
24 to see what --
25     Q.  Sure.

Page 154

1      A.  -- where he's going.
2      Q.  Just so you know, I'm -- you're welcome,
3  obviously, to read through it.  I'm just going to ask
4  you about the last paragraph.
5      A.  Okay.  I just want to get the context.
6      Q.  That's fine.
7      A.  I'm reading what I said, and everything else
8  is -- I mean, this has obviously become a lengthy --
9  another one.
10     Q.  Yeah, I don't intend to ask you about the
11 entire document.  But you're welcome to read it.
12     A.  Yeah.  Okay.
13     Q.  Okay.  So looking at that last paragraph on
14 Page 2, Jerry writes -- Jerry Mahabub writes, "Let me
15 know if you know anyone directly I can speak with at
16 Apple to help us solve this nasty issue once and for all
17 ... that would be great ... especially before a demo to
18 the big man!"
19        Do you see that?
20     A.  Yeah.
21     Q.  Who do you understand, "demo to the big man"
22 to be?
23     A.  Well, it looks like a puzzle.  I -- I would
24 assume, since our demos were -- I only had one demo,
25 which was to -- to Greg Joswiak, which is Michael

Page 155

1  Hailey's direct manager -- direct report manager.
2      Q.  I'm wondering if, in the way that Jerry
3  Mahabub writes, whether he's referring to Steve Jobs
4  here when he's referring to the "big man"?
5         MS. HUGHES:  Objection.  Speculation.
6      Q.  (By Mr. Aveni)  Do you know --
7         MS. HUGHES:  Lack of foundation.
8      A.  I don't know.
9      Q.  (By Mr. Aveni)  When you read this, when you
10 received it, did you have any understanding of who Jerry
11 was referring to when he said, "... especially before a
12 demo to the big man!"?
13     A.  I -- I don't know what he meant by that.
14 Look, you know, he -- he used to say -- use terms like
15 that.  And, you know, if I -- if I used them myself, it
16 was probably -- that's wink-wink -- that's who it is.
17 But I don't know -- I don't think he's referring to
18 Steve Jobs.
19     Q.  Okay.
20     A.  I don't know who he was referring to.  When
21 I'm talking about the demo, I'm -- I'm thinking this,
22 If he says that, I, you know -- if he's labeled my
23 meeting with somebody that way, I -- I just didn't
24 correct him on it, "Who do you mean?"  I just didn't do
25 that.  Now, when was this?  2009?

Page 156

1      Q.  So, you don't know one way or the other who
2  he's referring to?
3      A.  I have no idea.  I don't know --
4      Q.  Okay.
5      A.  -- in this case.
6      Q.  Do you recall ever talking to Jerry Mahabub
7  about that comment after he made it?
8      A.  No, I -- I don't remember.
9      Q.  Okay.
10     A.  First of all, I don't remember.
11        MR. AVENI:  That's fine.
12        (Exhibit-108 marked for identification.)
13     Q.  (By Mr. Aveni)  Okay.  This is another email
14 with a Bates Label, reflecting that you produced it.  Is
15 there any reason to think that's inaccurate?
16     A.  I -- I was reading.  I'm sorry, what was it?
17     Q.  I'm sorry.  I said that the Bates number on
18 the right-hand corner reflects that this is a document
19 that you produced.  Is there any reason to think that
20 that's incorrect?
21     A.  No.
22     Q.  Okay.  If you look at the last paragraph of
23 this email -- now we're at November 13, 2009 -- Jerry
24 Mahabub writes to you:  "So now you/Apple have three
25 devices, all of which are completely up to date, and

Page 157

40 (Pages 154 - 157)

1  Bates Stamp No. 951, he tells you there that he's hired
2  an IP valuation specialist --
3      A.  Yes.
4      Q.  -- to provide evaluations of the AstoundSound
5  so that GenAudio and Apple can be ready to sign a deal.
6  Do you see that?
7      A.  Yes.
8      Q.  That last one, that's my words; not a quote.
9         When you read this, did you view this as Jerry
10 Mahabub writing as if he believes a deal over
11 AstoundSound with Apple is imminent?
12         I mean, he's talking at getting a valuation
13 company, that he's now hired, at least talking about
14 getting -- you know, looking at IP rights.
15         Did you view that as Jerry's thinking -- he
16 might be off-base in your mind -- but he's thinking that
17 a deal with Apple is something that should start taking
18 shape?
19     A.  I don't know to whose benefit that was. I
20 don't even know if I read this. I used to have -- you
21 know, if I saw this, I -- it was -- to me, I'd look at
22 this and say this is another lengthy thing. What is --
23 it's just -- it's -- it's just --
24     Q.  I mean, it's incredibly lengthy, right, and
25 very detailed; is that fair?

Page 162

1      A.  Oh, yeah.
2      Q.  I mean --
3      A.  So -- so, to me, this is more sales stuff, you
4  know.
5      Q.  I mean, is there any reason that you think he
6  didn't believe this; that he didn't --
7         MS. HUGHES:  Objection --
8      Q.  (By Mr. Aveni)  -- believe a transaction with
9  Apple was --
10     A.  I don't know --
11     Q.  -- going to be inked soon?
12     A.  I -- I didn't even -- it didn't even dawn on
13 me -- if I read this. But even reading it now, it's
14 just -- it's just --
15     Q.  Well, reading it now, do you have that sense?
16     A.  Well, I mean, it just goes on. It goes on
17 every tangent you can imagine. I mean, who's he writing
18 it for?
19     Q.  Well, it's written to you and to Michael
20 Hailey.
21     A.  I -- I understand. But I -- it didn't -- this
22 was like so many of the other emails. I mean, it --
23 it -- you know, I -- I don't even know if I responded to
24 it.
25     Q.  Did you ever --

Page 163

1      A.  I mean, is there an email that backs up what
2  -- that I respond to this?
3      Q.  I have not seen an email response from you.
4      A.  I -- I -- there were probably a few emails
5  that I missed. I mean, we miss -- I mean, my -- my
6  phone right now says I got a hundred messages. Some of
7  them are saved. Some of them --
8      Q.  I will represent that I have not seen a
9  response from you to Jerry --
10     A.  Yeah --
11     Q.  -- Mahabub --
12     A.  -- and the fact that --
13     Q.  Go ahead. Do you recall ever calling him on
14 the phone in response to this and saying, "Jerry, we're
15 not talking about a deal yet" or anything like that?
16     A.  I don't remember.
17     Q.  Okay.
18     A.  I don't recall anything.
19     Q.  So you see on the bottom of Page 951, where he
20 says he's now hired an IP valuation specialist. Were
21 you aware that he'd done that? Do you remember that?
22     A.  No.
23     Q.  Do you recall ever telling Jerry Mahabub,
24 "Don't hire an IP specialist. It's too expensive. It's
25 too early to do that" -- anything like that?

Page 164

1      A.  No.
2      Q.  If you look at where -- we're looking now at
3  the bottom of 951, and then going on to 952. I mean,
4  Mr. Mahabub here is talking about the price that Apple
5  might pay GenAudio when a deal is done for AstoundSound.
6         And all the way through this email, Jerry is
7  pitching to you the value of a deal for Apple, right?
8      A.  I don't think I read the email.
9      Q.  But is that the way you read it, when you look
10 through it now?
11     A.  I -- I -- I mean, at a glance, it looks like a
12 sales job to me. I mean, like so many -- we could write
13 a -- I mean, I can go back to previous emails where he's
14 constantly driving towards that end.
15     Q.  Right.
16     A.  And I just turned a blind eye to it.
17     Q.  I think you said part of your frustration with
18 Mr. Mahabub, if I can call it that, was that he was
19 always trying to negotiate with you; right?
20        MS. HUGHES:  Objection.
21     A.  He never --
22        MS. HUGHES:  It misstates the prior testimony.
23 The word "negotiate" has never came out of his mouth.
24        MR. AVENI:  I didn't -- no, I didn't say
25 whether it has one way or the other. I'm raising -- he

Page 165

42 (Pages 162 - 165)

1  can -- that's a speaking objection. Okay. I'm not
2  misstating anybody's testimony. I'm not para -- I'm not
3  quoting what the witness said, one way or the other. He
4  can explain his testimony. So, you can raise your
5  objection.
6          MR. ELTRINGHAM: I object. He never said he's
7  negotiating anything. And the word "negotiation" has
8  not come up ever between the two.
9          MR. AVENI: Okay. Well, I used that phrase.
10         MR. ELTRINGHAM: Okay.
11         MR. AVENI: And again --
12         MR. ELTRINGHAM: That's fine.
13         MR. AVENI: -- these are speaking objections.
14  Again, I mean, I'm not trying to put words in anybody's
15  mouth. But he said he was frustrated with Jerry
16  constantly doing this.
17     Q.  (By Mr. Aveni) My question for you is: Were
18  you frustrated that Mr. Mahabub was constantly trying to
19  negotiate with you?
20     A.  He never negotiated with me. I never -- this
21  is the first time that I can recall reading this --
22     Q.  Reading this email --
23     A.  -- this email.
24     Q.  But, I mean, you were saying before that you
25  were frustrated --
                                              Page 166

1     A.  Oh,
2     Q.  -- because he's always trying to sell you.
3     A.  Well, that's -- that's --
4     Q.  And people are taking --
5     A.  Well, no. He --
6     Q.  I mean, that was --
7     A.  I was frustrated with his -- his lengthy
8  emails, that went off on bird walks. You know, he --
9  he'd go -- I mean, there's an email back here, that we
10  didn't touch upon, that he's -- he over-communicated
11  things that he shouldn't be communicating. I never
12  called him on it.
13         For example, "I just left Disney Studios.
14  And, by the way, that's a -- something Steve Jobs owns
15  and" -- and, you know, it just kind of -- dropping names
16  and -- and all this other stuff that had nothing to do
17  with it. And I just kind of ignored it.
18     Q.  Okay. Fair enough.
19     A.  Okay.
20     Q.  I guess, you did say that you were frustrated
21  because he was always being a salesman, right? I think
22  that was one of the words that you did use.
23     A.  Well --
24     Q.  And --
25     A.  It's an email -- you know, obviously if we
                                              Page 167

1  could turn the clock -- probably bash him over the head
2  for this, for -- for constantly doing this. But I
3  didn't think anything of it at the time. It was a guy
4  who over-communicated in his emails, peppering it with
5  all kinds of what-ifs. And I was just focused on --
6  could you bring me a new sample with this stuff on.
7     Q.  Okay. And I understand that --
8     A.  It's as simple --
9     Q.  -- you're not --
10    A.  -- as that.
11    Q.  I know you're not focused on it. But you did
12  say, right, that you were frustrated that he was always
13  acting as a salesman?
14         I think that was the word you used,
15  "salesman."
16    A.  I -- I did use the word "salesman." I don't
17  know if I used the word "frustrated" --
18    Q.  That's my word.
19    A.  -- until just -- until just now. Okay.
20    Q.  People are complaining about my word choice.
21  I want to be clear. I think your word was "salesman."
22  Mine was --
23    A.  I --
24    Q.  -- "frustrated." But you were saying he
25  was --
                                              Page 168

1     A.  I said "salesman."
2     Q.  -- always acting as a --
3     A.  Yeah, I mean, I -- I mean, it was -- I think
4  between Michael Hailey and I -- and I don't know if he
5  would disag -- Michael Hailey would disagree with me on
6  this. But it was, you know, Jerry being Jerry. I --
7  I -- and what we meant by that was not necessarily --
8  hmm -- necessarily unkind.
9         But he -- he was enthusiastic. That's a word
10  that came up today. He's very enthusiastic. He's
11  enthusiastic about his company. He's enthusiastic about
12  his software. And that's the way I read the emails.
13  He's enthusiastic.
14    Q.  He wants -- he wants to -- "What is it going
15  to take for you guys to really like my software and
16  really shoot this to the moon?" I don't know if he used
17  those words. But, you know, I -- there isn't anything
18  to this.
19    Q.  I guess, this email, though -- I want to know
20  if you would agree that this email goes a little bit
21  beyond that, from Jerry's perspective.
22         In terms of the email from Jerry, he's talking
23  now about things like price and, you know, IP rights
24  and, you know, structure. And not that you're engaging
25  in it with him on those things, but those are the things
                                              Page 169

43 (Pages 166 - 169)

1 that he's talking about; right?
2     He's raising price issues with you, he's
3 raising IP rights with you; isn't that right?
4     MS. HUGHES: Object to the form of the
5 question.
6     A. I haven't even -- I have to read this in
7 detail, to find out what it says there. And, obviously,
8 we haven't had quite the time to digest --
9     Q. (By Mr. Aveni) Sure.
10     A. -- the thesis --
11     Q. Right.
12     A. -- that you got here. I -- it just seems
13 like -- unless you have an email that tracks this
14 back -- that says I answered him on this, then maybe I
15 could refresh how I worded it or whatever. But I just
16 don't have anything on it. And it might have been a
17 holiday. As a matter of fact, it was a holiday --
18 12/22 -- Thanksgiving. Probably didn't read it.
19     And then Michael Hailey didn't -- and so I
20 would have thought if he had written all this and if he
21 had been concerned about it, he would have written me
22 back or called me and said, "Hey, did you read my email?
23 I sent you a thing with all this kind of stuff."
24     Did I blow him off, did I -- I -- I don't
25 know. I -- you know, that -- we -- we weren't -- there
Page 170

1 wasn't anything to this. And I -- you know, I just
2 don't know.
3     Q. Sure. And I understand that you don't recall
4 ever responding back. And I understand your testimony
5 that you may never even have read this email. I'm
6 really trying to focus on what -- you know, where was
7 Mr. Mahabub's head, as best as you could tell, and --
8     MS. HUGHES: Objection. Calls for
9 speculation.
10     MR. AVENI: I haven't asked a question yet.
11     MS. HUGHES: You're not asking questions.
12 You're just making argumentative statements on the
13 record.
14     MR. AVENI: I haven't even finished my
15 statement, Leslie. Come on. I didn't do that during
16 your deposition. I'm not arguing with the witness. I
17 am trying to ask questions. And I think I've been doing
18 that.
19     Q. (By Mr. Aveni) Would you take a look at
20 Page 953, the paragraph at the top. About halfway --
21 about two-thirds of that paragraph -- do you see that he
22 says, "... as both Vic and I have worked very hard to
23 get the technology into a state that is for the most
24 part ready to integrate with minimal code/dev efforts
25 ..."
Page 171

1     Do you see that?
2     A. Mm-hmm. Stating his opinion.
3     Q. Okay. Do you agree that that's an accurate
4 statement of --
5     A. No, I don't agree with any of it.
6     Q. You don't agree with that?
7     A. No. I'm sure along the way I told him many,
8 many times, "Look, this :s" -- you know, he's -- I read
9 this as a sale -- you know, if I read something like
10 this -- because we've read things like this, okay.
11     Q. Yeah.
12     A. If I were to have read this -- 'cause I -- I
13 really don't know if I actually read his email, as I
14 said before. But we've read other things that are like
15 it -- in here. He's trying to tell me in these
16 comments -- like this, that -- "We're ready to go. It
17 won't take much for you guys to just push it over the
18 top."
19     Q. You read this as a sale --
20     A. I read -- oh, yeah, totally. And a lengthy
21 one, I mean -- and it goes into all things that have
22 nothing to do with us. Reverse. Go to play. Stat. As
23 if we had -- as if we had any control over the guys on
24 the Mac side -- any control over the guy -- over the
25 guys in marketing, any control over the guys in our --
Page 172

1 in our iPod division. Heck, we're just trying to get
2 this thing into the concept.
3     Q. So, he's trying to negotiate with you. You're
4 just not negotiating back.
5     A. Yeah.
6     Q. Is that fair?
7     A. That's -- yes, that is a fair statement.
8     Q. If you look at the middle of that same page --
9     A. What was that? I had left it -- 950?
10     Q. 953.
11     A. 953.
12     Q. Almost smack dab in the middle of the page
13 there, it says, "On the iPod/iPhone side ..." Do you
14 see that?
15     A. Mm-hmm.
16     Q. He says -- this is Jerry Mahabub still
17 writing -- "... the stereo expansion implementation of
18 AstoundSound is ready to be completed/integrated,
19 however, the OpenAL/Gaming implementation still needs to
20 be worked on ..."
21     Do you see that?
22     A. Yeah, I see it.
23     Q. Did you agree with that statement?
24     MS. HUGHES: Are you speaking about now, or
25 are you speaking about at the time when Mr. Mahabub
Page 173

44 (Pages 170 - 173)

1  wrote this letter?

2      Q.  (By Mr. Aveni)  Is that an accurate statement?

3      A.  He thinks that that's the case.  I never

4  agreed to that.  And -- and we had a demo.  There is no

5  way -- I want to reiterate, there is no way this stuff

6  flies through just on his say-so.  It has to go through

7  an entire process.  Different engineering team works on

8  it.  The -- the -- they qualify it, run it through

9  quality control.  You know, this is just his

10  assumptions, so --

11      Q.  Right.

12      A.  That's just assumptions on his part.  He's

13  putting a sales job on.

14      Q.  But you don't recall responding to him on that

15  and said, "Hey, look, Jerry, that's not accurate to

16  where we are" or anything like that?

17      A.  I think there's a good chance I didn't read

18  this.  And I don't think I responded to it.

19      Q.  Okay.

20      A.  And if I read it, I still didn't respond to

21  it.

22      Q.  Okay.  If you look at Page 949, the first full

23  paragraph there -- near the bottom -- it says: "Just

24  waiting for the green light from the two of you to move

25  to the next level, and who I talk to about the business

Page 174

1  side (perhaps it's both of you?)"

2          Do you see that?

3      A.  I mean -- let me see.  I'm sorry, where are

4  you looking at?

5      Q.  Here, you can see it on my page.  I've got it

6  highlighted.  Is that helpful?

7      A.  Yes.  So, we would be handling the business

8  side anyway.

9      Q.  Right.  Did you ever tell Jerry that, though,

10  in response to this email?

11      A.  No.

12      Q.  Did you ever say, "Jerry, I'm the wrong guy to

13  talk to?"

14      A.  I don't think it ever came up.

15      Q.  Well, he raised it here.

16      A.  But -- okay.  He raised it here, but I don't

17  think I -- I mean -- if you have an email and I

18  responded to it, I responded to it.

19      Q.  Okay.

20      A.  I'll agree to that.

21      Q.  Do you remember any other time telling him,

22  "Jerry, I'm not the right guy to talk to about that?"

23  Anything like that?

24      A.  I -- I don't remember.

25      Q.  Okay.

Page 175

1      A.  I mean, it was evident that -- hey, look, if

2  you're bringing in software -- Apple tends to license

3  things if they like it.  And -- and that -- you know,

4  that's the only assumption you can make walking in.  I

5  don't handle the business side of it.  There's a whole

6  team from legal, business, maybe the software teams,

7  that come in and listen -- to see how it's going.  But,

8  I mean -- no, I -- I probably would be out of the loop.

9      Q.  And Jerry just didn't seem to understand that,

10  though, right?

11      A.  He's just trying to figure out what -- how

12  the -- what the inner workings were and who -- who -- I

13  mean, based on this, he was just trying to figure out --

14  "What do I have to do, and who do I have to talk to" --

15  based on what I read here.

16      Q.  Okay.  If you look at Page 947 --

17      A.  Mm-hmm.

18      Q.  -- Michael Hailey did respond --

19      A.  Yep.

20      Q.  -- to this email.  And he said that -- the

21  last sentence of this main paragraph -- "the business

22  side of things would come into play after we have exec

23  buy-in on the product side."  Do you see that?

24      A.  Yes.

25      Q.  And then the next page -- I'm sorry -- the

Page 176

1  first page of this email, about the middle of Page 1 --

2  so it's Bates Label -- Jerry Mahabub writes: "If

3  you have any idea as to when the exec buy-in might take

4  place, that would help me out."  Do you see that?

5          And then he has some discussions of

6  specific --

7      A.  I -- I -- where --

8          MR. ELTRINGHAM:  It's about the middle of the

9  page.

10          MR. AVENI:  Yeah, right here.

11          THE WITNESS:  Okay.

12      Q.  (By Mr. Aveni)  Do you see that?

13      A.  Yeah.

14      Q.  Did you respond to Jerry's question -- Jerry

15  Mahabub's question about that, as to when the exec

16  buy-in might take place?

17      A.  Do you have an email to back it up?  I don't

18  remember.

19      Q.  Okay.  And do you know if Michael Hailey or

20  anybody else at Apple responded to that?

21      A.  I don't know.

22      Q.  And what I'm asking you -- I'm not trying to

23  trick you.  I'm really asking whether you remember --

24      A.  I don't remember, no.  This is 2009.

25          MR. AVENI:  Okay.  You can put that email

Page 177

45 (Pages 174 - 177)

1 aside.

2 (Exhibit-110 marked for identification.)

3 Q. (By Mr. Aveni) Okay. This has another Bates

4 label that reflects that you produced that.

5 A. Uh-huh.

6 Q. Is there any reason that is not the case?

7 A. No.

8 Q. Is there any reason to think that you didn't

9 produce this?

10 A. No.

11 Q. Okay.

12 A. I'm sorry. There is -- it's -- if I send it

13 to you, it's good.

14 Q. Okay. So, this is an email that's dated

15 February 3, 2010. So, a couple of months after the one

16 that we just looked at.

17 A. All right.

18 Q. And if you look in the middle of that email,

19 Jerry Mahabub is asking you: "Any news on what is going

20 on with AstoundSound and exec buy-in?"

21 So if you remember the email we just looked

22 at, he and Michael Hailey were exchanging emails about

23 when an exec buy-in might take place. And now he's

24 asking you, "Any news on what is going on with

25 AstoundSound and exec buy-in?"

Page 178

1 Do you see that?

2 A. Yes, I see that.

3 Q. So after that email we just looked at --

4 Exhibit-109 -- did Jerry seem very focused to you on

5 exec buy-in as a final milestone that needed to be

6 reached?

7 A. I believe that's what he's driving at.

8 He knew that I had to have a demo and that eventually

9 this would -- this would, you know, culminate to that.

10 I mean --

11 Q. And --

12 A. -- all the demos and the songs and preparing

13 the right song list and -- and -- and that would have

14 been with Michael Hailey's manager.

15 Q. Did you have any understanding what Jerry

16 Mahabub believed that exec buy-in timeline might look

17 like, when that might happen?

18 A. I don't know what we told him then. I do know

19 that at some point in the emails is -- pretty -- pretty

20 vivid on this one -- is that we told him we had a

21 demo -- it was the demo with Michael Hailey's manager --

22 that, you know, you're -- he wanted to invite himself to

23 the meeting, that he can -- that he can do the job.

24 He's done a lot of demos. And we said, no, it's not

25 that kind of meeting.

Page 179

1 Q. Are you saying that --

2 A. It's an internal meeting only. It was three

3 of us. It was Michael Hailey, myself, and Michael

4 Hailey's boss Greg -- Joz. And -- and that was it. And

5 it turned out to be Michael Hailey's last day at Apple.

6 Q. And are you saying that meeting was the time

7 when exec buy-in would be determined?

8 A. Yeah. And the buy-in might have been soft.

9 It might have been like, yes, let's race to get this

10 done. We don't know. It's -- we're springing the idea

11 for the first time -- for the first time. This guy

12 doesn't know anything about it. For the first time.

13 Michael Hailey worked hard. He put together a

14 presentation -- you know, slide stack -- story to go

15 with it -- why we want to do it, why we think this kind

16 of product -- it didn't have to be GenAudio. This kind

17 of product or this idea would benefit iPod or iPhone.

18 Q. Okay. Do you recall whether you responded to

19 Jerry's email in Exhibit-110?

20 A. I don't remember whether or not.

21 MR. AVENI: Okay.

22 (Exhibit-111 marked for identification.)

23 Q. (By Mr. Aveni) Okay. This is another APL

24 marked -- Bates-labeled document.

25 A. Okay.

Page 180

1 Q. Is there any reason to think that you didn't

2 get the email?

3 A. I probably got it. I -- you know, I'm reading

4 this stuff and that -- we must have met with him or

5 something at some point. I'm reading here.

6 Q. Yep. So, let's look at the second page -- the

7 middle of the second page. It's an email dated

8 February 12, 2010. And Jerry Mahabub wrote, "Hi Michael

9 and Vic, Great to see you both yesterday again ..." Do

10 you see that?

11 A. Yes, I'm reading it.

12 Q. Okay. So, he wrote that on February 12th. So

13 does that reflect a meeting on February 11, 2010?

14 A. I --

15 Q. Is there any reason to think that's not the

16 case?

17 A. It could be. Your guess is as good as mine.

18 I'll take your word for this at this point.

19 Q. Is there any reason to think that that email

20 is incorrect, that there wasn't a meeting in person on

21 February 11th?

22 A. Right. When did he write it -- so it would

23 have been the 11th, right.

24 Q. Okay.

25 A. Most likely.

Page 181

46 (Pages 178 - 181)

```
 1      MS. VOORHEES:  Yeah, understood.
 2      MR. AVENI:  But, I mean, there's one or two.
 3      MR. HOLMES:  This is 114?
 4      MR. AVENI:  Yes.
 5      Q.  (By Mr. Aveni)  So, Exhibit-114 is a letter
 6   dated March 15, 2010.
 7      A.  Mm-hmm.
 8      Q.  So, we're in the time frame of the documents
 9   we've been looking at.  It's a letter from Jerry Mahabub
10   to GenAudio shareholders.  Have you seen this document
11   before?
12      A.  I have not seen this document.  For -- that I
13   know of.  I mean, it's not sent to me by mail.  If I've
14   seen it, it's because it's in -- it was in the stuff
15   that was -- that we were questioned about in the
16   deposition -- the original.  But is this a new one?
17      Q.  What's that?
18      A.  Has this ever been presented?
19      Q.  I think you did look at it in your earlier
20   testimony.
21      A.  Okay.  That's what I mean.  This didn't
22   come -- I didn't get anything like this.
23      Q.  Okay.  No, no, I realize --
24      A.  Okay.
25      Q.  -- that you didn't get it --
```
Page 194

```
 1      A.  Okay.  I just --
 2      Q.  -- in 2010.
 3      A.  Okay.
 4      Q.  Okay.  I want you to take a look at the second
 5   paragraph of this letter.
 6      A.  I'm looking at that.
 7      Q.  Okay.  Just go ahead and take a second to read
 8   that, if you could.  Just that paragraph is all you need
 9   to read.
10      A.  Yeah.  Okay.
11      Q.  Okay.  Given your understanding, your
12   knowledge, of the discussions with Apple -- and if we
13   assume the LCEC referenced here is Apple -- is that
14   paragraph fair?
15      MS. HUGHES:  Object to the form of the
16   question.
17      A.  Well --
18      Q.  (By Mr. Aveni)  Do you understand that
19   paragraph to be accurate?
20      A.  Well, I -- I -- reading it -- so I'd say it's
21   accurate, if I read it.  But this embedding the software
22   into the Mac OS X is working with Ron Isaac.  That's
23   none of my business.  I didn't get that deep into Ron
24   Isaac's business.  We didn't share like that.
25      Q.  Okay.
```
Page 195

```
 1      A.  He handed me an iPhone -- or excuse me -- an
 2   i-touch, with the software that he created on his own
 3   app as a third-party app developer.  And working -- it
 4   was his units, with his software, that he put on
 5   there -- that he let me use.  So, I did no coding.
 6      I suggested we put these kind of features on
 7   it -- these buttons -- I need you to adjust this, adjust
 8   that, and -- but this other -- the -- the previous
 9   email -- and then tied with this -- this is all a Mac
10   OS team -- Ron Isaac and his -- he works with.
11      Q.  So, I'm just talking about the second
12   paragraph here.
13      A.  I understand.
14      Q.  But do you see this as focused on Mac?
15      A.  Well, because it says embedded level software.
16   I'm not -- we're not writing software.  We never asked
17   him for any software.  We weren't writing it there.
18   Maybe I'm misreading this.  But, you know, it says --
19   "... we had over 15 meetings with marketing and
20   technical management, and will start the actual embedded
21   level integration process within the next 30 days."
22      We aren't doing any of that.  They were doing
23   that in the Mac OS, if they were even doing it.  Now, as
24   I remember -- and this is some -- you'd have to ask the
25   other witnesses, okay, if -- if you haven't already
```
Page 196

```
 1   asked them.
 2      Q.  Okay.
 3      A.  My understanding is that -- is that they have
 4   a special build -- operating system that allows
 5   developers a little bit more access to the code, a
 6   little more direct connection to the code.
 7      I'll just keep it -- as I remember -- okay --
 8   so that people like GenAudio can get in there and do
 9   more realistic testing, that wouldn't be available to
10   people outside of the company working as developers --
11   just creating whatever kind of app.
12      Because this is at system level.  Audio is
13   very intertwined with a lot of things that are going on
14   in the system, so they have to give those guys a little
15   bit more ac -- but they're not going -- they're not
16   going to let them get into the main code.
17      So they've got this test harness, this thing
18   that they can go in there and -- and -- a mule -- that
19   they can go in and play with.  So, that's them.  Again,
20   we didn't do any embedded level stuff at all, period.
21      Q.  Okay.
22      A.  Zero, zilch, nada.  That's just -- we got a
23   demo unit from him.
24      Q.  Do you have any reason to think that Jerry --
25      So, Jerry seemed to think -- from his
```
Page 197

50 (Pages 194 - 197)

1   emails -- that he was sending you the C library that we
2   just talked about, which allow you to do an embedded
3   level integration. That's what the email says. Do you
4   have any reason to think that Jerry didn't believe that?
5       A.  I don't know what they were talking to Ron
6   about.
7       Q.  Okay.
8       A.  Okay. We were looped in. Probably shouldn't
9   have been looped in. Shouldn't -- we should've -- maybe
10  Michael and I should've said, "Hey, Jerry, kind of --
11  we're not in this. Thanks for keeping us in the loop,
12  but please delete our names from the mail list."
13      Q.  Okay. Is there anything --
14      A.  It's -- yeah.
15      Q.  Is there anything else in this paragraph that
16  you disagree with, that you think isn't accurate?
17      A.  Well, its current offering is valued at $3 --
18  I don't know anything about this stuff.
19      Q.  No, no, fair enough. I mean, I'm not trying
20  to ask you to validate everything --
21      A.  Well --
22      Q.  -- in it. But is there anything that you
23  disagree with?
24      A.  Well, the whole -- I don't -- I don't know
25  what it means. It doesn't have -- without -- this is

Page 198

---

1   the first time I've read this -- or I've read it in
2   the -- a previous testimony. So, we didn't know that
3   there was another -- there's an undercurrent -- that
4   there was something going on at GenAudio. There's two
5   stories going on.
6           The one I'm living -- and we're -- it's all
7   business. And then he's got his own business. And he's
8   got -- for whatever reason, he's operating -- he's doing
9   something -- he's saying something -- he's selling his
10  team on whatever is going on -- I don't know what.
11  That's not for me to decide. I can just tell you that
12  we don't do -- I didn't do any code.
13      Q.  Okay.
14      A.  Nobody on our team.
15      Q.  Right. So, let's move past the --
16      A.  Okay.
17      Q.  -- embedded level integration. I think we've
18  talked about that quite a bit.
19      A.  Mm-hmm.
20      Q.  Is there anything else, looking at this, that
21  you find inaccurate?
22      A.  Well, it's -- I mean, I'd have to sit down and
23  read everything line by line.
24      Q.  I'm just talking about the second paragraph.
25      A.  Oh. No.

Page 199

---

1       Q.  Okay.
2       A.  It's -- I mean, I don't think -- I -- I mean,
3   I -- you know, I can think of opinions that you didn't
4   ask about. But it's just opinions that the document --
5   that I've never read before, really.
6           MR. AVENI:  Okay. You can put that aside.
7       A.  You know, under -- under -- where it says, "15
8   meetings" --
9       Q.  (By Mr. Aveni)  Yes.
10      A.  I -- I don't -- I can't verify that.
11      Q.  Okay. Well, let's talk about that. So, I've
12  got a running list here. By my count -- at least, of
13  the ones we can confirm on Exhibit-82 -- we're at 11.
14  And we're just talking about ones that we can confirm
15  with --
16      A.  Right.
17      Q.  -- emails.
18      A.  But he -- this is general. He may have met
19  with Ron Isaac separately and his people.
20      Q.  Right. So, is it possible it's --
21      A.  I'm just referring to what I'm involved with.
22      Q.  Okay. Let's just stick with the ones -- let's
23  just stick, for a second, with meetings he had with you.
24      A.  Well --
25      Q.  Is it reasonably accurate?

Page 200

---

1       A.  -- I gave you a number earlier of eight to
2   twelve. And I don't know that number to be accurate.
3       Q.  Right.
4       A.  So --
5       Q.  And we'll run through the ones we could
6   confirm with emails. And up to this date, we're at 11.
7       A.  Okay.
8       Q.  Do you think this number is reasonably
9   accurate? I mean, there could be more, right? There
10  could be other meetings that you guys had?
11          MS. HUGHES:  Object to the form of the
12  question.
13      A.  I -- you know, I just can't ver -- validate
14  15. It could be 16.
15      Q.  (By Mr. Aveni)  Okay. Fair enough. You just
16  don't know one way or the other?
17      A.  I just don't know.
18      Q.  Okay.
19      A.  But you -- you're asking, you know, is there
20  anything that we can quibble about. And that's -- and
21  then I don't know anything about 30 days. I mean,
22  what's it going to take -- that's meaningless to me.
23          MR. AVENI:  Okay. Thank you.
24          THE WITNESS:  Okay.
25          MR. AVENI:  Okay. So, the next exhibit we're

Page 201

51 (Pages 198 - 201)

1  going to talk about is the Private Placement Memorandum
2  (indicating Exhibit-2). This has been marked as a prior
3  exhibit. I don't have a copy that has the prior stamp.
4        MS. HUGHES: Is this the March 15, 2010?
5        MR. AVENI: Yeah.
6        MS. HUGHES: I think we've marked it as
7  Deposition Exhibit --
8        MR. AVENI: -- 37?
9        MS. HUGHES: -- No. 2.
10       MR. AVENI: Oh, 2. You're right. I'm
11 sorry -- 2.
12       MS. HUGHES: I mean, there may have been an
13 Investigative Exhibit-37. But I believe we marked it
14 as --
15       MR. AVENI: No, no, you're right. I'm sorry,
16 I was mixing things up.
17       MS. HUGHES: -- Exhibit-2.
18       MR. AVENI: It's Exhibit-2. I just don't have
19 a stamped copy.
20       MS. HUGHES: And your Bates Stamp is GA004877?
21       MR. AVENI: Correct.
22       MS. HUGHES: Right. Then, that's already been
23 marked as Exhibit-2.
24       MR. AVENI: Right. So --
25       MS. HUGHES: I think we should refer to it as
Page 202

1  Deposition Exhibit-2.
2        MR. AVENI: 2. I agree. All I'm saying is,
3  maybe we should just swap this copy out at some point
4  down the road with the actual stamped copy. I just
5  wanted to make you aware. I know it's Exhibit-2. I'm
6  going to refer to it as Exhibit-2. I just wanted us to
7  be on the same page.
8        MS. HUGHES: Thank you.
9        MR. AVENI: Okay.
10       MR. HOLMES: Literally.
11       MR. AVENI: Literally on the same page. Okay.
12       Q. (By Mr. Aveni) So, this is -- I'm handing you
13 what's been marked previously as Exhibit-2, now that
14 we've established that. I've just given you the front
15 part. I have the rest of it here, which is all the
16 back --
17       A. Do you have this thing highlighted anywhere?
18 I mean, where do you want --
19       Q. I'm going to point you to one paragraph.
20       A. Okay.
21       Q. And, for convenience, I'm just giving you
22 that. I've got all the back-end attachments, if you
23 want it.
24       MR. ELTRINGHAM: Is the -- sorry. Just for
25 clarity, is the original Exhibit-2 this shortened
Page 203

1  version or is it the --
2        MR. AVENI: The whole thing. I'm happy to
3  hand that --
4        MR. ELTRINGHAM: Okay. No, that's fine. I
5  just wanted to clarify.
6        Q. (By Mr. Aveni) Okay. So if you go to
7  Page 21 --
8        MS. HUGHES: Does it have a different Bates
9  number on it?
10       MR. AVENI: No. It's GA487 -- is the first
11 page.
12       MS. HUGHES: But Page 21, you're --
13       MR. ELTRINGHAM: Yeah, which --
14       MS. HUGHES: -- using the numbers in the
15 center?
16       MR. ELTRINGHAM: -- Bates number?
17       MR. AVENI: Oh, I'm sorry. I'm using the
18 dockets in GA --
19       MR. HOLMES: 510.
20       MR. AVENI: -- 510, yes.
21       Q. (By Mr. Aveni) Okay. If you look at the
22 third and fourth paragraph on that page, that letter we
23 just read is of the same date and, I'll represent to
24 you, was distributed to shareholders with Exhibit-2 that
25 you're looking at.
Page 204

1        A. Mm-hmm.
2        Q. So, if you can just look at the third and
3  fourth paragraphs.
4        A. Pretty generous statements.
5        Q. Okay. So, I mean, if the LCEC is Apple, was
6  there anything in here that --
7        A. Well, it wasn't integrated. This little
8  expander was an app that you could download and you
9  can -- with a trial. And after the trial period, you
10 can buy it. So, it's a third-party application. It
11 wasn't fully integrated.
12       When I think of fully integrated, I'm thinking
13 that -- the way I take it -- I guess it could be --
14 depend on how -- how a large LCE comp -- LCEC -- what
15 were you saying -- LCEC company might call things. You
16 know, there's a -- there might be some common terms
17 they'd like to call third party as -- versus their own.
18       But, to me, that would be -- that Apple has
19 taken it on. And they're actually shipping it as part
20 of their product.
21       Q. Where do you see that?
22       A. They don't. I'm just saying -- well, it says,
23 "fully integrated" -- "... the LCE (sic) ... has now"
24 fully (sic) successfully integrated the AstoundSound
25 Technology into several of the LCE's (sic) product to
Page 205

52 (Pages 202 - 205)

| | |
|---|---|
| 1 demonstrate ..." -- so, he's using the word | 1 It's a -- it's a -- it's a small possibility, I guess. |
| 2 "demonstrate." | 2 MR. AVENI: Okay. You can put that aside. |
| 3 Q. Right. | 3 THE WITNESS: Okay. |
| 4 A. Okay. "Viability." | 4 (Exhibit-115 marked for identification.) |
| 5 Q. Well, that's accurate, right? | 5 Q (By Mr. Aveni) Okay. So, again, the Bates |
| 6 A. That part is accurate, if it's a | 6 stamp on this document reflects that you produced this |
| 7 demonstration. | 7 to the SEC, right? |
| 8 Q. Okay. So -- | 8 A. I -- I'm going to take your word for it. |
| 9 A. But -- | 9 Q. Okay. |
| 10 Q. -- assuming he's talking about a demonstration | 10 A. That's what it says there. It probably did. |
| 11 here -- | 11 Q. Okay. So if you see at the bottom of Jerry |
| 12 A. Yeah, okay. | 12 Mahabub's email to you, he says: "I am sure the |
| 13 Q. -- this is fair, right? These two paragraphs | 13 executive will very much so enjoy hearing the attached |
| 14 are fair and accurate, right? | 14 demo as well!!! Trying to line you up with us much fire |
| 15 A. Yeah, I guess. | 15 power as possible so we get a green light to continue to |
| 16 Q. Okay. You can put that aside. | 16 move forward!" |
| 17 Is there anything else in those paragraphs | 17 Do you see that? |
| 18 that you have a problem with, that's -- | 18 A. Yes. |
| 19 A. I -- | 19 Q. So, we talked about this meeting. First of |
| 20 Q. -- inaccurate? | 20 all, who's the "executive"? |
| 21 A. -- I -- I could pick -- I don't know. Maybe I | 21 A. I would say, Joz -- Greg Joswiak. |
| 22 read it accurately more in detail. But what -- what | 22 Q. Okay. And Mr. Mahabub is using the term, "the |
| 23 should I be looking for? Do you have a specific | 23 executive" here. Is that a term that you told him? |
| 24 question or area that you -- | 24 I mean, do you know where the term, "the |
| 25 Q. Well -- okay. So if you look at the bottom | 25 executive" came from? |
| Page 206 | Page 208 |
| 1 paragraph, he says: "It is unclear what structure such | 1 A. I -- I -- I -- I don't know. But it's not an |
| 2 access would take ..." But he said -- so if there's a | 2 unusual -- I'm -- I -- maybe he didn't know who it was. |
| 3 deal ever done with the LCRC, he says: "It is unclear | 3 I don't know. |
| 4 what structure such access would take ..." But then he | 4 Q. And I'll represent to you, we'll go through a |
| 5 sets out two possibilities -- if you read that, | 5 series of emails talking -- using that term, "the |
| 6 I mean, those are the same two things he's | 6 executive" or "the exec" |
| 7 been saying to you throughout your discussions with him, | 7 A. Yeah, I might have used it. |
| 8 right? | 8 Q. -- of Apple. Do you remember using that term |
| 9 A. It's -- yeah. | 9 with him? |
| 10 Q. Yes? | 10 A. No, I don't remember. I'm just saying, I may |
| 11 A. Well, we never talked about acquisition. | 11 have used it to not disclose who I was talking to. |
| 12 Q. I understand. | 12 Q. Okay. Okay. So, at this time -- April 18, |
| 13 A. So -- so, licensing arrangements -- automatic, | 13 2010 -- you have an upcoming meeting with the person you |
| 14 I mean, right? And that doesn't even mean that somebody | 14 refer to as the executive about AstoundSound? |
| 15 is going to pay for it. | 15 A. I'd have to look at a timeline. |
| 16 Q. Sure. | 16 Q. I think we're going to see that the meeting |
| 17 A. They might have a different business model for | 17 with Greg Joswiak was on May 6th. |
| 18 that, but -- maybe it's advertising or marketing efforts | 18 A. May 6. |
| 19 that they give away the software. | 19 Q. During this time period, there seems to be a |
| 20 Q. But the way it's written here isn't | 20 series of emails where you talked about a big upcoming |
| 21 inaccurate, is it? It's accurate; is that fair? | 21 meeting. |
| 22 A. I'm going to say, yes, it's fine. | 22 A. That was it. |
| 23 Q. Okay. | 23 Q. Okay. |
| 24 A. But I, you know -- to add that there's an | 24 A. 90 percent chance, that's probably the one. |
| 25 acquisition, they -- of course, it's not impossible. | 25 Q. So Jerry Mahabub here says, "Trying to line |
| Page 207 | Page 209 |

53 (Pages 206 - 209)

1 you up with as much fire power as possible so we get a
2 green light to continue to move forward!"
3        So, you guys talked about that meeting —
4     A. Right.
5     Q. -- with an executive, right?
6     A. Did I disclose who it was? I may have not.
7 I -- you know, why -- it's -- I don't need to tell him
8 that. It turns out it's probably a good idea.
9     Q. And you said the meeting was with Greg
10 Joswiak?
11     A. Yeah.
12     Q. And I think you referred to him as Joz?
13     A. Yeah.
14     Q. Is that how you called him?
15     A. Yeah, between friends.
16     Q. Joz?
17     A. Yeah.
18     Q. Was he known that way --
19     A. Yeah.
20     Q. -- around the company?
21     A. There was Woz, and there was Joz.
22        MR. HOLMES: Different -niaks.
23        THE WITNESS: Yeah, the ni -- that's correct.
24        MR. ELTRINGHAM: Easier reference.
25     Q. (By Mr. Aveni) So, you referred to here as

Page 210

1 the executive -- you're not sure if you told Jerry who
2 the executive was. Is it possible Jerry thought the
3 executive was Steve Jobs?
4     A. I --
5        MS. HUGHES: Objection.
6     A. That'd be a guess on my part.
7     Q. (By Mr. Aveni) Okay. You don't know one way
8 or the other?
9     A. No.
10     Q. So, who is Greg Joswiak -- at the time?
11     A. At the time he's vice president of iPod/iPhone
12 and -- that was probably it.
13     Q. In Marketing, right?
14     A. In Marketing, yeah.
15     Q. So, he's the VP of iPhone/iPod in Marketing?
16     A. Yeah.
17     Q. And he's a senior employee at Apple, right?
18     A. Right. But he's not -- he didn't report to
19 Steve Jobs.
20     Q. Who did he report to?
21     A. He reported to Phil Schiller, Senior VP Global
22 Worldwide Marketing -- or whatever intergalactic
23 marketing guru. I don't -- I don't know. He's been
24 there a long time.
25     Q. But, I mean, Greg Joswiak was a senior

Page 211

1 employee, right?
2     A. Yeah, he's been there forever.
3     Q. And he's not a mid-level engineer?
4     A. No.
5        MR. AVENI: Okay.
6        (Exhibit-116 marked for identification.)
7        THE WITNESS: Built out the org chart. Okay.
8        Where did you get this?
9        MR. AVENI: So, I got this from a -- I think I
10 got this from Fortune, as reflected on the bottom.
11        THE WITNESS: Oh, okay.
12     Q. (By Mr. Aveni) I assume you've never seen
13 this org chart before?
14     A. Not in this particular.
15     Q. Not in this form?
16     A. No.
17     Q. But my question to you is: This purports to
18 be an org chart around this time. Does it look accurate
19 to you generally?
20     A. Yeah, people come and gone. But let me -- let
21 me -- let me --
22     Q. You can find Greg Joswiak in the lower
23 left-hand quadrant.
24     A. Yeah.
25        MR. ELTRINGHAM: There we go.

Page 212

1     A. VP, iPhone Marketing. What's the date on it?
2 Okay. 2011. It might have been changed over -- yeah,
3 he might have dropped the iPod part of it.
4     Q. (By Mr. Aveni) Right.
5     A. Yeah, because it went -- the VP of iPad went
6 to somebody else.
7     Q. Is the reporting line that's reflected here
8 for Greg Joswiak, is that accurate?
9     A. Yeah, that's accurate.
10     Q. Okay.
11     A. As of 8 of 2011.
12     Q. Okay. Do you have any idea, around this time
13 frame, how many employees Apple had worldwide? Just a
14 broad estimate's fine.
15        MR. ELTRINGHAM: Which time?
16     A. At this time?
17     Q. (By Mr. Aveni) How about in May 2010?
18     A. I -- I'm going to take a guess -- 50,000.
19     Q. Wow. Okay.
20     A. I -- I -- I'm not sure. When I started at the
21 main -- at the main -- locally, I think we had like
22 7,000 employees.
23     Q. Okay.
24     A. 8,000. Mostly engineers.
25     Q. And the individuals on the org chart are the

Page 213

54 (Pages 210 - 213)

1  senior people?
2      A.  Yeah, it doesn't get any higher than that.
3      MR. AVENI:  Okay.  Fair enough.  Thank you.
4      MR. HOLMES:  Can we take five minutes?
5      MR. AVENI:  Okay.  Let's go off the record.
6      (Recess taken from 2:59 p.m. to 3:11 p.m.)
7      MR. AVENI:  We're back on the record.  And
8  let's mark this one.
9      (Exhibit-117 marked for identification.)
10     Q.  (By Mr. Aveni)  Okay.  So, we've looked at a
11  couple of emails.  I'll represent to you that there were
12  a number of emails -- I'm just skipping some of them,
13  for time's sake, to talk about the executive meeting or
14  the big meeting.  We've talked a bit about that.
15     A.  Mm-hmm.
16     Q.  I'm happy to show you more, if you need to see
17  them.  This email is dated -- Exhibit-117, it's dated
18  May 5, 2010.
19     A.  Mm-hmm, yes.
20     Q.  And you see Mr. Mahabub says, "Hi Vic, If you
21  would prefer, I can hop on a flight tomorrow night or
22  Thursday early morning and attend the presentation."
23  And you can see the subject is, "Re:  Thursday meeting."
24         Do you recall the big meeting, that we've been
25  talking about, with Greg Joswiak occurring on May 6,

Page 214

1  2010?  Does that fit within your recollection?
2      A.  That sounds about right.  Without getting any
3  other information in front of me, I don't --
4      Q.  And if you look at this email, Exhibit-117,
5  you see that Mr. Mahabub wrote it on May 5th.  But he
6  wrote it early in the morning.  So I think when he says
7  Thursday night, he's still in his head -- this is just a
8  guess on my part.
9      A.  Yeah.
10     Q.  I'm not trying to say this is the case.  But
11  I'm thinking maybe it was still May 4th in his mind?
12     A.  You know, out of all the emails you've asked
13  me, there's very few that I remember.  And I remember
14  getting this email and telling him it's not that kind of
15  meeting.
16     Q.  Okay.
17     A.  So, I'm assuming there's a follow-on --
18     Q.  No.  I just wanted to make sure that we were
19  in agreement that the meeting occurred on May 6th.
20     A.  Yes.
21     Q.  Okay.
22     A.  I -- you're going to show me in a minute.
23     Q.  Well, no.  I think I just wanted to know if
24  you agree with that.
25     A.  Yeah, for the time being, yes.  Unless I see

Page 215

1  something different that shows me differently --
2      Q.  Okay.
3      A.  -- I'll take your word for it.
4      Q.  You don't have any other reason to think it
5  was a different day, right?
6      A.  No.
7      MR. AVENI:  Okay.  Oops.
8      MR. HOLMES:  Glad it (indicating coffee cup)
9  was empty.
10     MR. AVENI:  It was empty.  We're good.
11     MS. HUGHES:  Let's take it off the table then,
12  if it's empty.  Thank you.
13     MR. AVENI:  You're welcome.
14     Q.  (By Mr. Aveni)  Okay.  So, what happened at
15  the meeting with Greg Joswiak?
16         Before we get to that, do you recall referring
17  to it with Mr. Mahabub as the big meeting?
18     A.  I do not recall that.
19     Q.  Okay.  But you thought it was a big meeting,
20  right?
21     A.  It was an important meeting.  Would I have
22  called it the big meeting?  Maybe.  I --
23     Q.  Okay.
24     A.  I --
25     Q.  We can go through it.

Page 216

1      A.  Yeah, I mean --
2      MR. AVENI:  I was trying to save us time,
3  but --
4      (Exhibit-118 marked for identification.)
5      Q.  (By Mr. Aveni)  Okay.  Exhibit-118 again has a
6  Bates stamp reflecting that you produced this, right?
7      A.  Mm-hmm.
8      Q.  Okay.
9      A.  Yes.
10     Q.  Is that a yes?  Okay.
11         And then you see the bottom line of your email
12  to Jerry Mahabub on that page, it says:  "We were able
13  to have our big meeting.  More soon."  Do you see that?
14         "Before Michael left, we were able to have our
15  big meeting."
16     A.  Oh, okay.  All right.  So --
17     Q.  Okay.  Does that refresh your recollection
18  that you refer to it as a big meeting with Mr. Mahabub?
19     A.  Okay.  I'll go with that.
20     Q.  Okay.  You can put that aside.  Now, what
21  happened at the big meeting?
22         So, first of all, who was there?  We know you
23  were there.  Greg Joswiak was there.  Michael Hailey was
24  there.  Was there anybody else?
25     A.  That's it.

Page 217

55 (Pages 214 - 217)

**Page 218**

Q. Okay. What happened at the meeting?

A. We gave a slide presentation. When I say "slide presentation," it was probably on his computer -- laptop or desktop. We had the devices, we had some headphones, and we gave a demonstration -- meaning he -- A/B, the songs they liked, all scrolling back and forth and --

Q. Did he respond that he liked the technology?

A. He -- he did respond. And he generally enjoyed the demonstration. But that's not the hat he's wearing.

Q. Okay. So, how did he respond?

The purpose of the meeting was to give a green light to keep going forward; is that fair?

A. Well, yeah, that's what we had -- we had hoped. But the -- you know, we could call it the green light. We're -- we're giving a presentation. We're springing this idea on him. You know, does this person make a quick decision, or does he take his time to make that decision.

So, we're springing a brand new idea. Greg didn't know anything about it. We just had to find some time to set aside with him, find a hole in his -- in his schedule. It's Michael's last day. And so that was --

It ended up that we tried to schedule a

**Page 219**

meeting. And I think that we can only do it on the last day. And that was also kind of a parting -- you know, farewell.

Q. For Michael Hailey?

A. For Michael Hailey.

Q. Now, you said, "We've used the phrase 'green light.'" Jerry Mahabub was talking to you about this meeting being a green light to keep moving forward, right?

A. Right.

Q. And so it seemed like the two of you were treating it kind of as a make-or-break meeting; is that fair to say?

A. That's fair to say.

Q. Okay. Now after the meeting took place on May 6th, you guys did keep moving forward on the project, right?

A. No.

Q. You didn't keep moving forward?

A. No.

Q. When you say no, what do you mean by that?

I mean, there was work that was still done with Jerry Mahabub for a lengthy period of time after May 6th, right?

A. It may have been with Ron Isaac.

**Page 220**

Q. Are you saying there was no work on the iPod and iPhone side after May 6?

A. I can't say 100 percent, but I believe at that point we were dead in the water.

Q. Did you ever tell that to Jerry Mahabub?

A. I -- oh, he knew.

Q. How did he know that?

A. I think we called him up and said, "Hey, we" -- I think one of -- maybe that's what he -- before Michael left, we were able to have our meeting -- "more soon." Now, what I probably did -- and I'd have to find an email or something like that.

But it -- it really -- the end result -- it still ended in the same result, that we were not able to convince his boss at the time that -- that this was a viable option for -- let me give you the rundown, so maybe we'll just get that out of the way.

Q. Sure.

A. The answer that we got was -- first of all, software. Is there going to be a royalty? There's certainly going to be a licensing arrangement, regardless of whether or not somebody like Apple pays for it or not. Two -- so Greg is thinking on his level, how do I sell this upstream, how -- because nothing happens with one guy.

**Page 221**

Usually, it isn't one person making the decision. It's a committee. At some point, it becomes a committee decision. And I don't know how many people are in that committee. I don't know who was involved in a committee. It's beyond my pay grade --

Q. Okay.

A. -- what happens behind closed doors. But they're trying to figure out -- does it expand the market, does a customer -- when does a customer get out of it. And the other issue was -- that was discussed, that's not thought of, is -- when you --

When you have the -- whatever kind of audio file on your car stereo or wherever, you can adjust the tone of the system by using the tone -- bass, treble, whichever -- simple tone controls -- high/low.

What this software was doing is -- was remixing the audio. It's changing the presentation. We would have to go back to the labels and ask them for permission to do that, even with a bypass mode, because you're changing the -- the mix.

Q. Okay.

A. So, you have royalty -- who's paying for it, it's going to expand the market, and any legal issues that might be -- might happen.

Q. So, I think you previously testified in your

56 (Pages 218 - 221)

**Page 222**

1 prior testimony -- not today. I think you hit on it
2 today, but you previously testified that you needed
3 permission after this green light to keep spending
4 time --
5  A. Well --
6  Q. -- on this project?
7  A. Yeah, yes.
8  Q. And you did spend time after May 6th on this
9 project, right?
10  A. I -- I need proof to answer your question that
11 I did.
12  Q. Okay. We'll go through some of it.
13  A. I'm going to say -- I'm going to say that --
14 that I probably had to go back and tell -- and find
15 out -- let my -- let my boss know what happened at the
16 meeting, because I obviously -- I can't keep going,
17 so --
18  Q. Okay.
19  A. I -- I couldn't answer you. You know, as far
20 as I was concerned today, you're asking me a question,
21 that was the drop-dead date --
22  Q. Okay.
23  A. -- to get an --
24  Q. Well, let's go through some stuff. And we can
25 figure out if --

**Page 223**

1  A. But I helped the guys across the street.
2  Q. Okay.
3  A. I had no other place to go with it.
4  Q. Okay.
5  A. That I recall. Maybe you'll remind me.
6  MR. AVENI: I only have one copy of this.
7  MR. ELTRINGHAM: I can make copies real quick,
8 if you need.
9  MR. AVENI: You know, I'm just going to spend
10 a minute on it. If everybody's okay with that, I'll
11 just show it to you.
12  Are you okay with that, or do you want --
13  MS. HUGHES: What is it?
14  MR. AVENI: It's SEC-TiscarenoV-E-0001187.
15  MS. HUGHES: Does it have the date?
16  MR. AVENI: 6/30/2010.
17  MS. HUGHES: Would you mind making a copy?
18  MR. ELTRINGHAM: No.
19  MR. AVENI: Let's go off the record.
20  (Recess taken from 3:24 p.m. to 3:28 p.m.)
21  (Exhibit-119 marked for identification.)
22  MR. AVENI: We're back on the record.
23  Q. (By Mr. Aveni) So, Exhibit-119 -- so, the top
24 is an email from you to Jerry Mahabub dated June 30,
25 2010. And you say, "Hi Jerry, I have a meeting

**Page 224**

1 tomorrow. Is the the" -- I think you meant, "Is this
2 the latest and greatest prezo to date" -- by "prezo,"
3 you mean presentation, right?
4  A. Yeah.
5  Q. Okay. So you're telling him you have a
6 meeting the next day, which would be July 1st, and
7 you're asking if the presentation here is up-to-date?
8  A. Slide stack.
9  Q. Okay. So what was the meeting that you had on
10 July 1st, do you remember?
11  A. It -- it might have been with a colleague.
12 You know, the presentation was a slide stack of -- of
13 a -- graphics and --
14  Q. So, you're --
15  A. -- lots of --
16  Q. -- still spending lots of time on the project
17 after May 6th, right?
18  A. Well, that's what it says here. But, you
19 know, I don't know how much more technical time we spent
20 on it.
21  Q. Okay. But you're spending time on it, is my
22 point.
23  A. Yeah. Let's look further down the road.
24 Maybe that's -- maybe I'm helping out Ron Isaac. I
25 don't know.

**Page 225**

1  Q. You don't know?
2  A. I don't know.
3  Q. Okay. Now, when you -- so after the meeting
4 with Greg --
5  A. Joswiak, yeah.
6  Q. -- Joswiak -- I mean, I will represent to you
7 that we have not seen any email where you talked to him
8 about the result of that meeting.
9  A. Yeah, there wasn't any communication. It was
10 him to Michael, Michael to me, as far as I --
11  Q. I'm sorry, who to Michael?
12  A. Well, I -- I only got the verbal. Michael
13 Hailey.
14  Q. Okay.
15  A. Okay. Sorry.
16  Q. Are you saying that Michael Hailey told Jerry
17 the --
18  A. Yeah.
19  Q. -- results of the meeting?
20  A. No, no. Told me.
21  Q. Yep.
22  A. And I probably told Jerry.
23  Q. Okay. So, you say you probably told Jerry?
24  A. Yeah, probably. I don't know.
25  Q. Do you know?

57 (Pages 222 - 225)

**Page 226**

1  A. I don't know. I don't know.
2  Q. Do you recall ever sending him an email about
3  the results of the meeting?
4  A. I don't recall any of them.
5  Q. So --
6  A. Yeah.
7  MR. AVENI: Okay.
8  MR. ELTRINGHAM: I think he may have said
9  earlier a phone -- it might have been a phone call.
10  MR. AVENI: Yeah. But he's saying he doesn't
11  remember.
12  Q. (By Mr. Aveni) If you don't remember --
13  A. I don't remember. I mean, it could be any
14  number of things. I do know internally myself that
15  what -- what our meeting was all about -- we had a
16  follow-up meeting with -- that had nothing to do with
17  this. And I don't know if this has to do with that --
18  is --
19  There was a meeting, where Jerry was still
20  working with Ron Isaac across the way. And -- and I
21  made the -- made a statement or suggested to him that --
22  and this is for an iMac. So, you know what those look
23  like. They're flat screen -- speakers are on -- coming
24  out -- blasting out the bottom -- stereo -- left
25  channel, right channel -- reflect off the table.

**Page 227**

1  At the time -- adding that -- people were
2  starting to watch movie on their -- on their displays,
3  you know. They were getting a lot better. Some people
4  were using them as their TV. So, it was not out of the
5  question to have that be your -- the -- the stereo
6  system or the sound, you know, instead of having a sound
7  bar that -- this would be -- a better sound could be
8  made on the iMac.
9  So I suggested, "Hey, Jerry, you know, you
10  can -- you know, you got the sound expander. It's hard
11  to control that sound just out of two speakers. You're
12  trying to create a full surround -- 5.1 system with --
13  with just two speakers."
14  He says it's -- and the voices walking all
15  over -- you know, for the center channel -- is walking
16  all over. You've got this phantom center. "It'd be
17  better if you come up with -- can you come up with
18  something that's a left channel, center channel, and
19  right channel?"
20  And so he worked on -- and he got this metal
21  box. He got three little computer-type desktop speakers
22  about the size of this cup -- coffee cup. And he
23  created an LCR -- left, center, right -- channel
24  system that would take the expanded signal and run it
25  through these --

**Page 228**

1  And we would get a more immersive, more
2  accurate sound field. And so he worked on that very
3  hard. We had this meeting, and I had -- I invited some
4  colleagues, some friends -- people that might be
5  interested in -- in the -- in the product.
6  Q. Okay. But you don't remember what you told
7  Jerry, if anything, about the Greg Joswiak meeting,
8  right?
9  A. I don't remember anything. I don't have
10  anything to back it up with, the --
11  MR. AVENI: Okay. Let's mark that one as
12  Exhibit-120.
13  (Exhibit-120 marked for identification.)
14  A. One of the things I want to mention to you --
15  if I may go back -- is that it's not always Apple policy
16  to talk about an internal discussion, tell them -- you
17  know, the most that we would say is, "Hey, it's been
18  great. Thank you very much."
19  But to say that the executive didn't -- the
20  executive didn't like it or any of their gut feelings
21  -- we just wouldn't probably say that.
22  Q. (By Mr. Aveni) Okay.
23  A. Okay. We'd say, "Hey, it's -- you know,
24  it's -- this is where we're going to have to stop. And
25  thank you very much." And if they ask -- you know, it

**Page 229**

1  just depends -- but generally try not to discuss
2  internal business with an -- outside vendors.
3  Q. So, as far as you know, you didn't discuss --
4  A. I --
5  Q. -- the meeting?
6  A. -- I don't know.
7  Q. Okay.
8  A. I'm -- I'm just -- all I'm saying is, is
9  that --
10  Q. That's a possibility?
11  A. -- that may have -- that's a possibility, that
12  we -- but if you're asking what I did, which is what
13  I've told you, is that I -- I knew that for us -- that
14  was the end of the road for us.
15  Q. So, in your head, you knew that was the end of
16  the road. You just don't know --
17  A. I don't know if I expressed that --
18  Q. -- what you communicated to Jerry, if
19  anything?
20  A. Right.
21  Q. Okay.
22  A. So, my -- I continued to expose my friends to
23  the product in other departments. And that basically
24  was probably the -- and that may have been what I
25  said -- I mean, again, trying to reconstruct what

58 (Pages 226 - 229)

1  MR. AVENI: Okay. Okay. Let's mark this one.
2  (Exhibit-129 marked for identification.)
3  Q. (By Mr. Aveni) Okay. This is another email
4  chain from September 2010. And you produced this
5  document as well, right?
6  A. Yes.
7  Q. Okay. If you look at the second page of this
8  email -- it's real short -- Mr. Mahabub writes: "I can
9  really feel that 2011 will be a very transformational
10  year for my company."
11  Did you understand Mr. Mahabub to mean by
12  that, that he thought a deal with Apple would be
13  consummated in 2011 -- would be a successful year for
14  GenAudio -- do you know?
15  MS. HUGHES: Object to the form of the
16  question. It calls for speculation.
17  A. I don't know.
18  Q. (By Mr. Aveni) What did you understand him to
19  mean there?
20  A. Another sales promotional statement.
21  Q. Okay. Did it appear to you that Mr. Mahabub
22  believed that a possible deal with Apple was still very
23  much alive at this point?
24  A. If you're asking for my opinion on it, sure,
25  why not. But I -- we had no definite -- definitive

Page 250

1  statements that were ever made on that.
2  Q. Okay.
3  A. It was just another sales pitch. I mean,
4  there's lots of them.
5  Q. But, I mean, he still seemed to believe that
6  things were still moving forward in a way that was
7  optimistic for him, right?
8  A. Yes.
9  MS. HUGHES: Object to the form of the
10  question.
11  Q. (By Mr. Aveni) He was still optimistic, it
12  seemed from what he was writing to you, that a deal
13  could still be reached?
14  A. Well, we -- to answer your question, yes, I
15  think so.
16  Q. Okay.
17  A. We had run through the one process with the
18  i -- with the i-touch. We had that meeting. I started
19  a relationship, by introduction to Ron Isaac's team.
20  And that's basically the focus of -- of this. I -- I
21  mean, I don't think there's any more -- any more work on
22  what I had originally intended.
23  Q. Was the meeting that you were arranging with
24  Andrew Bright and Barry Corlett, did that relate to the
25  iPod/iPad side of Apple as well or was it just the Mac

Page 251

1  side?
2  A. Just the Mac side. But there's -- there's
3  people that would be interested in -- other audio groups
4  or marketing or whatever. Again, trying to raise
5  awareness, perhaps gain a little traction with --
6  somebody -- somebody says, "Wow, I can use that."
7  Again, trying to sell it internally. You
8  know, the fact that the people I tried to go to -- to
9  see if we could raise awareness on it and get them --
10  you know, was kind of shut down there. Nowhere to go
11  there. But maybe in Ron's division, they like it.
12  Q. Okay.
13  A. And it was actually a little bit different
14  software, so I could see where he might feel like
15  there's still a chance.
16  MR. AVENI: Okay. Let's mark this one.
17  (Exhibit-130 marked for identification.)
18  Q. (By Mr. Aveni) Okay. This is another
19  document that you produced, right?
20  A. Yeah, see everything is about the LCR.
21  Q. This is another document that you produced?
22  A. Yes.
23  Q. Okay. And so first -- so if you look at the
24  bottom of the first page, Mr. Mahabub is writing about
25  meeting with you on September 16th. And then at the top

Page 252

1  of that page, he says he's coming down to deliver an
2  iPad with the new app. Do you see that?
3  A. Yes.
4  Q. Okay. Did you meet with him on September
5  16th?
6  A. Uh --
7  Q. As far as you know?
8  A. As far as I know.
9  MR. AVENI: Okay. I'm going to reflect that
10  on Exhibit-82. Okay.
11  Q. (By Mr. Aveni) Now he's talking about an app
12  on the iPad. Does that reflect any work that's been
13  done on the iPad side, on this date?
14  A. I'll take an assumption that that's true.
15  Q. Okay. So, you think yes?
16  A. Yes.
17  Q. Okay.
18  A. Now, what I think we discussed on that is that
19  the app was not necessarily for demonstration; but it
20  was a working tool. Let me explain the difference.
21  Q. Okay.
22  A. When we started off our conversation earlier
23  this morning, we talked about an arcane user interface.
24  You had to key in all -- a numerical key to move the
25  volume up or down. If you wanted to go up in volume,

Page 253

64 (Pages 250 - 253)

1  you go from 5 to 10. And that's the way the original
2  app was, that GenAudio developed.
3      I -- I suggested to GenAudio that they create
4  a -- a tool set, meaning a user interface that got rid
5  of all that stuff, and use a graphical interface -- one
6  that literally moved -- whether it's a slide bar
7  and with a graphical representation. And -- and they
8  did. And that might be what that is.
9      Q.  Okay. So why were you doing that work around
10  this time frame, September 2010?
11     A.  It was a suggestion to GenAudio that they
12  would gain huge benefit for all teams -- whether it was
13  at Apple or even outside -- that he should work on this
14  because it makes it easier to sell the product.
15     Q.  Okay.
16     A.  To us, or to anybody else. Because you
17  could -- you can dynamically and graphically adjust the
18  volume --
19     Q.  I --
20     A.  -- or adjust -- adjust -- so, it was -- it was
21  just a suggestion to him. He did it. And that's -- and
22  he maybe wanted to show it to me.
23     Q.  And just --
24     A.  I mean, I -- I'd forgotten exactly all --
25     Q.  Just to be clear, you're -- and I may have

Page 254

1  missed this. You're not sure, one way or the other, as
2  to what this email -- whether this email relates to what
3  you just explained, right?
4      A.  I'm not 100 percent sure, but it sounds like
5  it.
6      Q.  Okay.
7      A.  Because it says, "new app." And I know we've
8  asked him about that before. So, I'm kind of jumping
9  into it with that one.
10     Q.  Okay. Now, the bottom of Page 2, you're
11  writing to Jerry Mahabub. And you say, "I have
12  tentatively set up a meeting for Thursday, September
13  23rd." Do you see that?
14     A.  Okay.
15     Q.  And that's the meeting with Andrew Bright and
16  Barry Corlett, right?
17     A.  Okay.
18     Q.  Is that right?
19     A.  Probably.
20     Q.  Okay. And that meeting took place, right?
21     A.  Yes.
22         MR. AVENI:  Okay. So, I'm going to reflect
23  that on Exhibit-82 as well. Okay. You can put that
24  document away.
25         (Exhibit-131 marked for identification.)

Page 255

1      Q.  (By Mr. Aveni)  And this is another document
2  that you produced, right?
3      A.  Mm-hmm, yes.
4      Q.  Okay. And you wrote this -- I'm sorry --
5  Mr. Mahabub wrote this email the day after the meeting
6  with Andrew Bright and Barry Corlett?
7      A.  Yes.
8      Q.  Okay. If you go to the bottom of Page 2,
9  there's a paragraph that starts, "Lastly ..." Do you
10  see that?
11     A.  Yes.
12     Q.  Okay. I'm just going to read a bit of that;
13  not the whole thing. It says: "Lastly, we will need to
14  either go under a more serious development agreement for
15  us to give Apple our real deployment level SDK (not the
16  test level SDK you have already received).
17         "Given that Barry stated it would be easier
18  for us to give our SDK to Apple so Apple could then
19  integrate and point to the iTunes Music library, as
20  opposed to Apple giving us an API to do this on our end
21  (which would actually have been the easiest pathway), I
22  will put together an SDK license agreement for Apple to
23  review and sign as the current NDA between our companies
24  is not strong enough to cover both sides of the fence."
25         Do you see that?

Page 256

1      A.  Yes.
2      Q.  So, do you recall a discussion about a heavier
3  NDA in this time period?
4      A.  No. But I'm reading it.
5      Q.  Okay. Do you recall what the -- if there was
6  any further discussion about another NDA after this
7  email?
8      A.  No, I don't know.
9      Q.  Now, I think you previously testified the
10  meeting with Andrew Bright did not go great because
11  there was a disagreement that occurred during the
12  meeting; is that --
13     A.  That's correct.
14     Q.  -- fair?
15     A.  That's correct.
16     Q.  Okay. Thank you.
17     A.  Sorry.
18     Q.  But after that meeting you still kept working
19  with Jerry on the project, right?
20     A.  I -- I'm not sure. I don't know -- I mean,
21  we're going to -- I don't know the follow-ups --
22  follow-up emails are.
23     Q.  You don't recall one way or the other?
24     A.  No.
25     Q.  Okay.

Page 257

65 (Pages 254 - 257)

1    A.  I think I -- I think I -- I think I responded
2  to this general time -- because of all this.  I mean, he
3  was rather insulting on some of his -- suggesting books
4  that -- and trying to educate Mr. Andrew Bright on
5  something that Andrew Bright know very well --
6  well-versed in it.
7    Q.  But it appeared that Jerry Mahabub still
8  thought that a deal could be reached, right?
9    A.  I -- I -- I don't know what he was thinking.
10    Q.  Okay.  Is there any reason to think that he
11  didn't believe that?
12    A.  I don't know what he's -- I don't know what he
13  was thinking, I mean, you know.
14    Q.  You continued to act enthusiastic about the
15  possibility of the transaction with Apple, right?
16    A.  I -- I don't remember that far back.
17    MR. AVENI:  Okay.  You can put that aside.
18    (Exhibit-132 marked for identification.)
19    Q.  (By Mr. Aveni)  Okay.  This is another
20  document that you produced, right?
21    A.  Yes.
22    Q.  Okay.  So, the bottom part of this email,
23  you're writing to Jerry Mahabub.  And you say:  "Thanks
24  for updating the software.  By the way (sic), I
25  discovered a small bug in the iPod SW."

Page 258

1    Do you see that?
2    A.  Yes.
3    Q.  And then the next page, Jerry is saying to
4  you:  "We just wrapped up with debugging and have fixes
5  for both iPad and iPod apps for 4.2."  Do you see that?
6    A.  Yes.
7    Q.  Does this reflect that there was still some
8  more work being done on the iPad and iPod side?
9    A.  That's what it says here.
10    Q.  Okay.
11    A.  Not sure what I was using it for, other than
12  keeping it handy.
13    Q.  Okay.  Then, at the top, Mr. Mahabub writes to
14  you:  "Hi Vic, I am heading your way in about 30
15  minutes!"  Do you recall meeting with Mr. Mahabub on
16  December 1, 2010?
17    A.  I recall something about him -- one of his
18  guys having an issue that required med -- medical
19  attention, but I don't know if it was 12 -- December
20  1st.  I'll take it --
21    Q.  Okay.
22    A.  -- that that's what happened on that day, at
23  that time, at that hour.
24    MR. AVENI:  All right.  I will reflect the
25  meeting on Exhibit-82.  You can put that aside.

Page 259

1    (Exhibit-133 marked for identification.)
2    Q.  (By Mr. Aveni)  Okay.  This is another
3  document produced by you, right?
4    A.  (No response.)
5    Q.  This is another document that you produced as
6  well, right?
7    A.  Yes, according to this.
8    Q.  Okay.  So, at the top, Jerry Mahabub writes to
9  you that they just finished filing some new patent
10  applications.  And he says:  "... as a direct result, I
11  can now update the iPad/iPod and Mac side apps with the
12  new processing that solves many issues that we had with
13  the current implementations you have."  And then he
14  talked about that a little further.
15    A.  Yes.
16    Q.  Does this reflect that there was additional
17  work being done on the iPod and iPad side?
18    A.  Yes.
19    MS. HUGHES:  Object to the form of the
20  question.
21    When you say, "more work being done," are you
22  referring to work that Mr. Tiscareno is doing and Apple
23  is doing, or are you referring to work that GenAudio is
24  doing?
25    MR. AVENI:  The i -- I'm referring to the

Page 260

1  iPod/iPad side of the project, which is what I think
2  we've generally been talking about.  Whether it's being
3  done --
4    MS. HUGHES:  Do you mean what is Apple doing
5  on that side of the project?
6    MR. AVENI:  Either one.  I think it's a -- I
7  think it was described as a collaboration.  And so are
8  they working together to do additional work on the
9  iPod/iPad side.  That's what I mean by that.
10    MS. HUGHES:  Mr. Tiscareno, have you
11  understood that in these questions?  When he's asked
12  you, is more work being done on the iPad/iPod project,
13  that he's meaning is Apple working on it?
14    A.  If I go back -- to answer your question, if I
15  go back three or four months in these emails, I don't
16  know what I was doing at that time with the iPad.
17  There's a point where things had stopped on what I was
18  trying to do.
19    Now, the fact that they are still being
20  updated, it might be that we kept them there in case
21  somebody came in -- I could show them.  We wanted to
22  keep a fresh unit.  But there was no -- I don't think
23  there was any further demonstration to any specific
24  team.
25    Q.  (By Mr. Aveni)  But you were still interacting

Page 261

66 (Pages 258 - 261)

1  with Mr. Mahabub with regard to the iPod/iPad side of
2  the project?
3     A. Based on the emails, yes, he was updating the
4  the software. What we were doing with them after he was
5  updating them, that I couldn't tell you.
6     Q. But you were still looking at them, right?
7     A. Yeah. Was it putting them on my desk up on a
8  cabinet? I couldn't answer your question. But,
9  obviously, from this -- he's updating the hardware we
10  had kicking around the office.
11    Q. As far as you can tell, he still thought there
12  was work that --
13    A. Well --
14    Q. -- was valuable for him to do on the project,
15  right?
16    A. I don't know what he was thinking.
17    Q. Yeah. So then, in the middle of
18  the page, he says: "I was hoping to have Apple products
19  with our tech inside by now ... perhaps with these
20  updates we will be working on for you, we can finally
21  cross the bridge and ink an actual license deal."
22        Did you understand him to be saying he's
23  hoping for an actual license deal in connection with
24  iPod and iPad, as well as the Mac side?
25    A. He said that almost on every single email, so

Page 262

1  I -- it -- it probably was lost on me -- making that
2  statement.
3     Q. But is it fair to say that he's --
4     A. He's obviously trying.
5     Q. -- he's trying to sell a deal and still thinks
6  there could be a deal on the iPod/iPad side, right?
7     A. It's what it says there, yeah.
8     MR. AVENI: Okay.
9     MS. HUGHES: David, before you move on, just
10  where -- I guess, that's in the middle of the -- middle
11  paragraph, is that where that is?
12    MR. AVENI: Yes, right smack-dab in the middle
13  of the paragraph.
14    MS. HUGHES: Thank you.
15    MR. AVENI: Sure.
16    (Ms. Voorhees exits the room.)
17    (Exhibit-134 marked for identification.)
18    Q. (By Mr. Aveni) Okay. And you produced this
19  document as well, right?
20    A. Hmm. Yeah.
21    Q. Okay. Now, at the top of this document, you
22  write: "The demo has been switched to Monday. What
23  should I do? I'm still tweaking my demo with the unit I
24  have here."
25        This is dated January 26, 2011, right?

Page 263

1     A. Yes.
2     Q. Do you recall, does this reflect that you were
3  making a -- showing a demo to somebody within Apple,
4  around this time frame?
5     A. That's what it says there.
6     Q. Do you know who the demo was to there?
7     A. I don't know who it was to.
8     Q. Do you know whether the demo would have
9  related to the Mac side or the iPod/iPad side?
10    A. I don't -- I don't have any idea.
11    Q. You can't tell?
12    A. I can't tell.
13    Q. But you're still doing something connected to
14  the project in this time frame; is that right?
15    A. I'm going to say, according to this, yes.
16    Q. Okay. And then if you look at the second half
17  of the email, Jerry Mahabub writes to you -- in the
18  paragraph that starts with, "Unfortunately not ..."
19        After that, it says: "Just send me your iPad
20  when the demo is over to the following address ..." Do
21  you see that?
22    A. Sure.
23    Q. So, does that mean that the demo relates to
24  the iPad?
25    A. I don't know.

Page 264

1     Q. It seems that way, though, right?
2     A. It seems that way. Now, I only have another
3  week or so at Apple. So what was I doing at that time,
4  that late? I -- I have -- I've forgotten.
5     MR. AVENI: Okay.
6     (Exhibit-135 marked for identification.)
7     Q. (By Mr. Aveni) Okay. This is another email
8  you produced, right?
9     A. Yes.
10    Q. Okay. Now, this is as you're leaving Apple;
11  is that right?
12    A. Yes.
13    Q. And you left Apple the next day, right --
14  February 2, 2011?
15    A. Yes.
16    Q. Okay. So, you write here: "Hi Jerry. I'd
17  like to introduce you to my manager, Jesse Dorogusker."
18  And then a little further down you say: "Jesse is fully
19  aware and engaged with the project that you and I worked
20  on for so long together using your GenAudio DSP software
21  and team."
22        Do you recall that?
23    A. Yes.
24    Q. Okay. So you told Jerry, Mr. Dorogusker was
25  fully aware and engaged in the project?

Page 265

67 (Pages 262 - 265)

1    A.  Right.  He gave me authorization to work on
2  this.
3    Q.  Okay.
4    A.  He didn't physically work on it.  He didn't --
5  he didn't get involved, but my boss knew I was working
6  on it and expending energy on it.
7    Q.  And you're telling Jerry Mahabub that he's now
8  taking it over, and he's fully aware and engaged in
9  connection with it, right?
10    A.  He knows that -- what the project is about --
11    Q.  Yep.
12    A.  -- what he's been doing, and that I'm leaving
13  the product with -- with my manager, which later on --
14  chase him down, but --
15    Q.  So, looking at this email, is it fair to say
16  that Mr. Mahabub would have believed that Apple remained
17  interested in continued work on this project?
18        MS. HUGHES:  Object to the form of the
19  question.
20    A.  I -- I don't know.  It was -- you know, I -- I
21  left.  And I don't know what they did after I left.
22    Q.  (By Mr. Aveni)  Okay.
23    A.  He's with Ron Isaac, you know.  He's still
24  engaged over there, you know.  He had introductions.  He
25  had lots of email addresses and --

                                    Page 266

1    Q.  Was your intent, in writing this, to say,
2  "Jesse Dorogusker is taking over.  Don't worry.  He's
3  got the ball, and he's going to run with it"?  Is that
4  effectively what you're trying to say?
5    A.  I -- I think -- I mean, the way -- I know when
6  I wrote it, most likely -- "Hey, I left the three units
7  that are owned by GenAudio with my boss."  That's what I
8  was saying.  "And I'm leaving."
9    Q.  Okay.
10    A.  I mean, there wasn't anything -- it may have
11  left a little bit -- a little range in there, but that
12  was -- you know, I was not writing a poison pen.  He
13  may -- I was just saying, "Hey, been nice working with
14  you."
15    Q.  So, we've gone through a lot of emails.
16    A.  Yes.
17    Q.  We've talked about, I think, a decent number
18  of meetings.  You've already testified again about the
19  number of phone calls you have and so forth.
20    ==Is it fair to say that, ultimately, there were==
21  ==fairly extensive discussions with GenAudio in connection==
22  ==with this project?==
23    ==A.  Yes.==
24    Q.  And you invested a considerable amount of time
25  into it, right?

                                    Page 267

1    A.  Well, I probably spent a lot of time writing
2  emails.  It wasn't that much time, honestly.
3    Q.  But, I mean, it was a significant investment,
4  right?
5    A.  My investment was -- was the emails in --
6  discussion on what to do next and -- and -- and
7  generate, you know, work with a slide deck with Michael
8  Hailey -- meet on that -- yeah.  But when I work on a
9  project -- we're talking about intensive, intensive
10  work.  You know -- slide-the-pizza-under-the-door kind
11  of stuff.
12    Q.  Okay.
13    A.  Day and night.
14    Q.  Ultimately, we've --
15    A.  So, this is not that.
16    Q.  Ultimately, we've seen a lot of emails about a
17  lot of different meetings.  Is it fair to say you showed
18  GenAudio to a lot of Apple employees by the end of this
19  time period, when you left Apple, right?
20        MS. HUGHES:  Object to the form of the
21  question.
22    A.  He was introduced --
23    Q.  (By Mr. Aveni)  I was referring --
24    A.  He was introduced to a significant number of
25  Apple employees during the course -- and -- and your

                                    Page 268

1  question is?
2    ==Q.  I just wanted to ask whether it's fair to say==
3  ==that you demonstrated GenAudio's technology to a lot of==
4  ==Apple employees while you were at Apple?==
5    ==A.  Yes.  And the email list kind of proves that==
6  ==out.==
7    Q.  Okay.  Now, in your previous testimony, during
8  the SEC investigation portion of the case, you mentioned
9  that the GenAudio software was loaded onto two different
10  kinds of devices -- an iPad and an iPod touch -- is that
11  right?
12    A.  That's correct.
13    Q.  And you said it was loaded on there while the
14  testing and the development was ongoing.  And you
15  mentioned that those devices belong to GenAudio rather
16  than Apple?
17    A.  That's correct.
18    Q.  Is there some significance, in your mind, as
19  to who owned the devices?  Does it matter who owns it?
20    A.  We didn't supply him with the software.  We --
21  I didn't have permission to cede devices to GenAudio.
22  Sometimes we do that.  We'll -- we'll cede a -- you
23  know, give equipment -- with a little contract that cede
24  the business.
25        And we didn't have that kind of

                                    Page 269

68 (Pages 266 - 269)



```
 1    MR. HOLMES: Do you agree?
 2    MS. HUGHES: I do agree.
 3    MR. AVENI: Okay. We're off the record.
 4    (Deposition concluded at 6:46 p.m.)
 5    (Signature reserved.)
 6         -----
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 346

```
 1         C E R T I F I C A T E
 2    STATE OF WASHINGTON )
                          ) ss.
 3    COUNTY OF KING      )
 4
 5         I, the undersigned Washington Certified Court
      Reporter, hereby certify that the foregoing deposition
 6    upon oral examination of VICTOR TISCARENO was taken
      stenographically before me on December 16, 2016, and
 7    transcribed under my direction;
 8         That the witness was duly sworn by me pursuant
      to RCW 5.28.010 to testify truthfully; that the
 9    transcript of the deposition is a full, true, and
      correct transcript to the best of my ability; that I am
10    neither attorney for nor a relative or employee of any
      of the parties to the action or any attorney or counsel
11    employed by the parties hereto nor financially
      interested in its outcome.
12
           I further certify that in accordance with
13    Washington Court Rule 30(e), the witness is given the
      opportunity to examine, read, and sign the deposition
14    within thirty days upon its completion and submission
      unless waiver of signature was indicated in the record.
15
           IN WITNESS WHEREOF, I have hereunto set my
16    hand this 27th day of December, 2016.
17
18
19
20
           Washington Certified Court Reporter No. 3337
21    License expires June 4, 2017.
22
23
24
25
```

Page 348

```
 1         SIGNATURE
 2
 3
 4
 5         I declare under penalty of perjury
 6    under the laws of the State of Washington that I have
 7    read my within deposition and the same is true and
 8    accurate, save and except for changes and/or
 9    corrections, if any, as indicated by me on the CHANGE
10    SHEET page hereof.
11         Signed in _____,
12    Washington, on the _____ day of _____,
13    2016.
14
15
16
17         _____
18         VICTOR TISCARENO
           TAKEN: December 16, 2016
19
20
21
22
23
24
25
```

Page 347

88 (Pages 346 - 348)