**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No.:  1:15-cv-02118

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

  v.

TAJ JERRY MAHABUB, GENAUDIO,
INC., and ASTOUND HOLDINGS, INC.,

      Defendants.

---

**DEFENDANT TAJ JERRY MAHABUB'S OPPOSITION TO PLAINTIFF'S REVISED**

**MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

**PAGE(S)**

I.  INTRODUCTION ...........................................................................................1

II.  DEFENDANTS' RESPONSES TO SEC'S STATEMENT OF MATERIAL
     FACTS .......................................................................................................2

III.  GENAUDIO'S STATEMENT OF ADDITIONAL DISPUTED FACTS .......................2

IV.  MAHABUB'S STATEMENT OF ADDITIONAL DISPUTED FACTS ..........................2

V.  ARGUMENT ...............................................................................................8

    A.  Mahabub Incorporates the arguments contained in GenAudio's Opposition ..........8

    B.  The Relevant Statute of Limitations Bars Recovery for Any Claim
        Accruing Prior to January 21, 2010 ......................................................8

    C.  Mahabub did not violate § 5 ..................................................................9

    D.  Mahabub's internal GenAudio Team Emails did not violate § 10(b) of the
        Exchange Act or Rule 10b-5 ...............................................................10

        1.  Issues addressed in the Court's prior order .............................................11

            a.  The GenAudio Team Emails were not "in
                connection with" a securities transaction since the
                misrepresentations they contain were not made
                *because* securities were for sale ..................................................11

            b.  Mahabub lacked scienter for any
                misrepresentations contained within the GenAudio
                Team Emails because his intent was to motivate
                his employees, not to move stock ...............................................16

            c.  Whether causation exists is a valid factor to
                consider when addressing the SEC's "in
                connection with" evidence .........................................................17

        2.  The GenAudio Team Emails do not contain material
            misrepresentations or omissions ............................................................21

            a.  The optimistic statements in Exhibits 9 and 66 are
                nonactionable puffery ...............................................................22

         3.  Mahabub's forwarded email to Skluzak was neither in
            connection with nor material to a securities transaction;
            nor did Mahabub act with scienter .........................................................23

i

E.      The GenAudio Team Emails do not violate § 17(a)(2) of the Securities Act........25

F.      Defendants did not engage in a fraudulent scheme ..............................................25

VI.   CONCLUSION....................................................................................................................28

## **TABLE OF AUTHORITIES**

**PAGE(S)**

## **CASES**

*Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017 (9th Cir. 1999) ................... 14, 15

*Anastasi v. American Petroleum Inc.*, 579 F.Supp. 273 (D.Colo.1984) ................................... 9, 10

*Anixter v. Home-Stake Prod. Co*, 77 F.3d 1215 (10th Cir. 1996) ................................................ 12

*Buffo v. Graddick*, 742 F.2d 592 (11th Cir. 1984) ......................................................................... 18

*Burman v. Phoenix Worldwide Indus.*, 384 F.Supp.2d 316 (D.D.C. 2005) ................................. 17

*Burrage v. United States*, 134 S.Ct. 881 (2014) .......................................................................... 19

*Chadbourne & Parke LLP v. Troice*, 134 S.Ct. 1058 (2014) ....................................................... 13

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) ......................................... 19, 20

*Fitzpatrick v City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993) .......................................................... 9

*Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997) ..................................................... 22, 23

*Hackbart v. Holmes*, 675 F.2d 1114 (10th Cir. 1982) ........................................................... 16, 17

*In re Financial Corp. of Am. Shareholder Litig.*, 796 F.2d 1126 (9th Cir. 1986) ....................... 18

*James v. Wadas*, 724 F.3d 1312 (10th Cir. 2013) .......................................................................... 8

*Ketchum v. Green*, 557 F.2d 1022 (3d Cir. 1977) ......................................................................... 18

*Kokesh v. SEC*, 137 S.Ct. 1635 (2017) ............................................................................... 1, 8, 20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S.Ct.
    1318 (2015) ............................................................................................................................ 22

*Republic W. Ins. Co. v. Fireman's Fund Ins. Co.*, 241 F.Supp.2d 1090 (N.D. Cal.
    2003) ......................................................................................................................................... 8

*Romero v. Union P. Railroad*, 615 F.2d 1303 (10th Cir. 1980) .................................................. 16

*SEC v. C. Jones & Co.*, 312 F.Supp.2d 1375 (D.Colo. 2004) ..................................................... 21

*SEC v. Curshen*, 372 Fed.Appx. 872 (10th Cir. 2010) ............................................................... 22

*SEC v. Delphi Corp.*, No. 06-14891, 2008 U.S.Dist. LEXIS 78671, at *22–23
    (E.D.Mich. Oct. 8, 2008) ....................................................................................................... 12

*SEC v. Lucent Techs., Inc.*, 610 F.Supp.2d 342 (D.N.J. 2009) ...................................................... 26

*SEC v. Nacchio*, 438 F. Supp. 2d 1266 (D.C.Col. 2006) ......................................................... 12, 22

*SEC v. Pirate Inv'r LLC*, 580 F.3d 233 (4th Cir. 2009) ............................................................. 14

*SEC v. Recycle Tech, Inc.*, No. 12-21656, 2013 U.S.Dist.LEXIS 195982, at *17 (S.D.Fla. Sept. 26, 2013).................................................................................................. 18

*SEC v. Savoy Indus., Inc.*, 587 F.2d 1149 (D.C.Cir. 1978)......................................................... 14

*SEC v. Sullivan*, 68 F.Supp.3d 1367 (D. Colo. 2014).................................................... 25, 26, 27

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968)................................................ 13, 18

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ............................................................. passim

*SEC v. Zandford*, 535 U.S. 813 (2002) ...................................................................................... 13

*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) ....................................................... 14

*Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6 (1971) .................................. 12, 13

*Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187 (3d Cir. 1976)................................................... 18

*United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207 (10th Cir. 2000) .............. 14

*United States v. O'Hagan*, 521 U.S. 642 (1997) ........................................................................ 13

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434 (9th Cir. 1984).................... 16

## **OTHER AUTHORITIES**

15 U.S.C. Section 77t(d)(2)(A)–(C) ............................................................................................ 19

15 U.S.C. Section 78j(b)........................................................................................................ passim

15 U.S.C. Section 78u(d)(3)(B)(i)–(iii) ....................................................................................... 19

## **RULES**

17 C.F.R. § 240.10b-5........................................................................................................... passim

I.      **INTRODUCTION**

In this case, Taj Jerry Mahabub ("Mahabub"), as the CEO of GenAudio, created a novel 3-D spatial audio technology that Mahabub and GenAudio tried to license and/or sell to various technology companies, including Apple. There is no dispute that the technology is real and that it works. The SEC's case arose because – despite extended efforts by Mahabub to get Apple to go into business with GenAudio – in the end, they did not.

This is really a case about a big hopes and ambitions, and a seemingly tireless attempt by an ever-optimistic Mahabub to close a deal with Apple. Due to the nature of his interactions with Apple personnel, Mahabub subjectively and reasonably believed that he was always on the verge of a deal, but – like Tantalus himself – was never quite able to get there. And not only does the deal with Apple not occur, but Mahabub's indomitable optimism and dogged efforts are rewarded with an SEC investigation and litigation.

And this is now the SEC's second bite at the "Apple". The SEC's original Motion For Summary Judgment ("MSJ", Dkt. # 53) was denied by this Court. (Dkt. # 80). Despite denying the SEC's MSJ, the Court explicitly gave the SEC another chance, instructing them to "fix" their motion and to try it again. (*Id*.). Despite the Court's instructions, the SEC's new MSJ again fails to meet the requisite evidentiary and legal burdens required to prevail on its new MSJ, and the motion should again be denied – and this time without leave for a third attempt.

First, the SEC fails to consider the effect of *Kokesh v. SEC*, 137 S.Ct. 1635 (2017), which was decided after all of the briefing on the previous motion was completed. Based on that case, a number of the SEC's allegations are barred by the applicable statute of limitations. Second, the SEC can't surpass the numerous issues of material fact (especially those regarding Mahabub's state of mind) to establish the requisite scienter for their fraud claims. Third, the SEC can't show that the alleged misstatements and/or omissions were material and/or were "in connection with" the purchase or sale of a security. And Fourth, the SEC's claims for violation of the registration

provisions fail, as they are not backed-up by admissible evidence of investments actually made, and are not dispositive of whether any exemptions to registration apply (or are barred by the statute of limitations).

The SEC's new MSJ must be denied, and this case should proceed to trial.

## II.   DEFENDANTS' RESPONSES TO SEC'S STATEMENT OF MATERIAL FACTS

Mahabub adopts and incorporates GenAudio's Responses to the SEC's Statement of Material Facts as made in their concurrently filed Opposition (Dkt. # 89) by this reference.

## III.   GENAUDIO'S STATEMENT OF ADDITIONAL DISPUTED FACTS

123–189: Mahabub adopts and incorporates GenAudio's additional disputed facts contained in their concurrently filed Opposition (Dkt. # 89) by this reference.

Paragraphs 190 through 200 are intentionally omitted by Defendants.

## IV.   MAHABUB'S STATEMENT OF ADDITIONAL DISPUTED FACTS

201.   With one possible exception, the "GenAudio Team Emails,"[1] the emails that Mahabub sent out detailing his communications and interactions with Apple, were sent only to GenAudio Team members. The exceptions were sent to people "who [Mahabub] was interested in soliciting to join the board of directors." "GenAudio Team" members, as used in this context, means GenAudio employees, full-time consultants, and board members. SOF ¶¶ 57–60, 63, 67–68, 72, 75 (referring to recipients of these emails as the "GenAudio Team Mahabub Decl. ¶¶ 7–8; Ex. 94 (Mahabub Depo. Vol. 1) 60:17–24, 61:5–17.

---

[1] Exhibits 7, 9, 21, 23, 31, 33, 46, 66, 72, 75, and 77.

202.    The only exception the SEC identified is Exhibit 33, which Mahabub also forwarded to Skluzak. Mahabub Decl. ¶ 8; Ex. 33 at 1. *See also* SOF ¶¶ 229-32 (addressing Skluzak).

203.    The GenAudio Team Emails were not intended to be distributed beyond internal team members. *I.e.*, they were confidential. Mahabub Decl.  ¶¶ 12–15; Ex. 94 (Mahabub Depo. Vol. 1) 65:5–9.

204.    The GenAudio Team knew they were not supposed to forward the GenAudio Team Emails to anyone else. Mahabub Decl. ¶¶ 12–15; Ex. 33 at 1, 2 ("You must delete this email after you read it" and "DELETE THIS EMAIL AFTER YOU READ IT – DO FOLLOW MY INSTRUCTIONS").

205.    None of the GenAudio Team Emails ask, or suggest, that the recipients forward the emails to people outside the GenAudio team, including potential investors. Exs. 7, 9, 21, 23, 31, 33, 46, 66, 72, 75, and 77.

206.    With the possible exception of Exhibit 33,[2] the MSJ does not identify any occasion where any recipient of Mahabub's GenAudio Team Emails forwarded the emails to non-team members or potential investors. SOF ¶¶ 43, 57–60, 63, 67–69, 72, 75.

207.    With the possible exception of Skluzak's purchase of GenAudio stock (SOF ¶ 70), the MSJ does not identify any GenAudio stock purchases that it alleges were based on the GenAudio Team Emails. SOF ¶¶ 84–87.; Exs. 7, 9, 21, 23, 31, 33, 46, 66, 72, 75, and 77.

208.    Mahabub is not aware of any instance where a recipient of the GenAudio Team Emails purchased GenAudio stock based on the emails or their contents. Mahabub Decl. ¶ 19.

---

[2] As noted, on page 1 of Exhibit 40, Skluzak forwarded this email to Tiscareno on October 30, 2013. However, Skluzak's purpose in forwarding the email was not to encourage Tiscareno to invest in GenAudio.

209.    Nor did Mahabub intend for anyone to invest based on the contents of the GenAudio Team Emails. Mahabub Decl. ¶¶ 9, 20.

210.    The MSJ does not allege that any of Mahabub's recipients of the GenAudio Team Emails forwarded the emails to anyone who was not a member of the GenAudio Team.[3] SOF ¶¶ 12, 24, 73–75, 78, 82, 83, 90, 100 (referring to recipients of these emails as the "GenAudio Team").

211.    With the exception of Exhibits 9 and 66, Mahabub's primary purpose in sending the GenAudio Team Emails was to keep the GenAudio Team motivated during a difficult, and exhausting, start-up stage and software development process. Mahabub Decl. ¶¶ 9–10.

212.    During the 2009 to 2012 timeframe, GenAudio, like most tech sector start-ups, was characterized by a high stress work-environment. High turnover and low morale were constant problems. These problems were exacerbated by (as is typical at many start-ups) inconsistent payment of wages. Mahabub Decl. ¶ 10.

213.    It is common in the software development industry to go to great lengths to motivate employees. Mahabub Decl. ¶ 11.

214.    With the exception of Exhibits 9 and 66, the MSJ does not allege that any of the GenAudio Team Emails contain requests to GenAudio employees from Mahabub for help finding investors. SOF ¶¶ 12, 73, 75.

215.    When a GenAudio Team member knew someone who might be interested in purchasing GenAudio stock, the company's standard practice was to have the team member tell the potential investor to contact Mahabub, Powers, or Mattos, who would provide the potential investor with the company's investment materials. Mahabub Decl. ¶¶ 18, 20; Ex. 94 (Mahabub Depo. Vol. 1) 183:1–18 (this was the company's "modis [sic] operandi").

_____

[3] While Skluzak received Exhibit 33 (see SOF ¶ 84), that email was forwarded by Mahabub himself, not one of the email recipients. And, while Skluzak allegedly forwarded the email to Tiscareno, this occurred much later, in October 2013. Ex. 33 at 1.

216.    None of the GenAudio Team Emails ask the recipients to forward them to potential investors. Exs. 7, 9, 21, 23, 31, 33, 46, 66, 72, 75, and 77.

217.    Mahabub did not intend or anticipate that the recipients of the GenAudio Team Emails to forward them to potential investors. Mahabub Decl. ¶ 13.

218.    With the possible (and disputed) exception of Skluzak's receipt of Exhibit 33,[4] Mahabub was not aware, at the time, of any instance where a member of the GenAudio Team forwarded one of the GenAudio Team Emails to a potential investor. Mahabub Decl. ¶ 15.

219.    The GenAudio Team Emails were internal corporate communications. Mahabub Decl. ¶ 13.

220.    The GenAudio Team Emails were not distributed to the public or included among materials provided to potential investors in the 2010 Offering or the 2011-2012 Offering. Mahabub Decl. ¶ 16.

221.    The MSJ does not identify any GenAudio Team Email where Mahabub asks for help finding investors from the GenAudio Team, except for Exhibits 9 and 66. SOF ¶¶ 12, 73, 75.

222.    None of the GenAudio Team emails ask the recipients to invest in GenAudio. Mahabub Decl. ¶¶ 17–18; Ex. 94 (Mahabub Depo. Vol. 1) 182:14–183:20 (re Ex. 66, requests for help with financing meant, if team members knew any investors who might be interested in GenAudio, Mahabub and/or Mattos would like to talk to them).

223.    Nothing in Exhibits 9 and 66 asked GenAudio Team members to personally invest in GenAudio. Mahabub Decl. ¶ 18; Exs. 9 and 66; Ex. 94 (Mahabub Depo. Vol. 1) 182:14–183:20 (re Ex. 66, requests for help with financing meant, if team members knew any

---

[4] While Skluzak may have received Exhibit 33, Defendants dispute that this was related to the sale of securities.

investors who might be interested in GenAudio, Mahabub, Powers, and/or Mattos would like to talk to them).

224.     Mahabub believed all the optimistic representations in Exhibits 9 and 66 at the time he made them. Those statements, concerning his beliefs regarding the value of an investment in GenAudio, which the SEC highlights in Exhibits 9 and 66 accurately reflected Mahabub's opinions at the time he sent these emails. Mahabub Decl. ¶¶ 21–23; Ex. 9 at 1; Ex. 66 at 1.

225.     The alterations that the SEC highlighted in the forwarded email in Ex. 66 were not included in the original email that Mahabub sent to Tiscareno et al. Nonetheless, they were understood by Mahabub to be factually accurate and reflected other conversations Mahabub had with Tiscareno and other Apple employees. Mahabub Decl. ¶ 23; Ex. 66 at 1; Demo. 2 at 6.

226.     Nothing in Exhibits 9 and 66 asked GenAudio Team Members to convey information concerning a possible deal between GenAudio and Apple to potential shareholders. Exs. 9, 66.

227.     Exhibit 9 does not contain any altered correspondence between Mahabub and Apple employees. Mahabub Decl. ¶ 22; Ex. 9.

228.     While Exhibit 66 contains altered correspondence from Mahabub to Apple employees, the alterations appear within Mahabub's correspondence to Apple employees. Exhibit 66 does not contain any correspondence from Apple employees to Mahabub. Mahabub Decl. ¶ 23; Ex. 66; Demo. 2 at 6.

229.     Skluzak decided to invest in GenAudio in April, 2010, well before he received Ex. 40 on May 6, 2010. Ex. 92 (Skluzak Depo.) 58:3–60:5.

230.     Skluzak testified that he did not rely upon Exhibit 33 when choosing to invest in GenAudio. Ex. 92 (Skluzak Depo.) 61:21–62:10.

231.     Mahabub's intent in sending Ex. 33 to Skluzak was in furtherance of his attempts to get Skluzak to join GenAudio's board of directors, not to induce Skluzak to purchase any GenAudio stock. Mahabub Decl. ¶ 8; Ex. 94 (Mahabub Depo. Vol. 1) 60:17–24, 61:5–17.

232.     Mahabub wanted Skluzak on GenAudio's board because of Skluzak's business experience and track record. Mahabub Decl. ¶ 8.

233.     Mattos communicated with potential investors (friends and family) by phone or by email. Ex. 93 (Mattos Depo.) 29:11–13. If by phone, there were no notes. Id. at 29:14–19. If by email, he used his GenAudio email, which he produced to the SEC. Id. at 29:25–30:6.

234.     In its MSJ, the SEC did not produce any evidence that Mattos ever actually forwarded one of the GenAudio Team internal emails to potential investors, or communicated any of the facts within them to potential investors. SOF ¶¶ 6, 7, 37, 38, 41, 44, 62, 63, 66, 73, 74, 83, 100, 109, 110, 112 (all facts referring to Mattos).

235.     All of the GenAudio Team Emails were sent while the NDA between Apple and GenAudio was in effect. Mahabub Decl. ¶ 14; Ex. 91 (NDA).

236.     Pursuant to the NDA, "Confidential Information" includes information concerning "the nature of [the parties'] business relationship, including, if applicable, the fact that one party provides or may provide goods or services to the other, and the parties' discussions concerning the "Project." Further, "Project" is defined as GenAudio's "AstoundSoundTM and AstoundStereoTM software processing for integration into Apple products." Ex. 91 at ¶ 1.

237.     Each of the GenAudio Team Emails concerned the business relationship between GenAudio and Apple; the possibility that GenAudio might provide goods or services to Apple, and/or the integration of GenAudio's software into Apple products. Mahabub Decl. ¶ 13; Exs. 7, 9, 21, 23, 31, 33, 46, 66, 72, 75, and 77.

238.    Mahabub had personal relationships with many investors, and knew them to be accredited. Mahabub Decl. ¶ 5.


V.    **ARGUMENT**

A.    **Mahabub Incorporates the arguments contained in GenAudio's Opposition**

Mahabub incorporates all of GenAudio's arguments, as made in their concurrently filed Opposition (Dkt. # 89), herein. The arguments below represent additional reasons why the Court should deny the SEC's MSJ.[5]

B.    **The Relevant Statute of Limitations Bars Recovery for Any Claim Accruing Prior to January 21, 2010**

As a prefatory matter, the previous summary judgment motion was fully briefed and submitted prior to the Supreme Court's decision in *Kokesh v. SEC*, 137 S.Ct. 1635 (2017). That case determined that there is a five-year statute of limitations applicable to both penalties and disgorgement pursuant to 28 U.S.C. § 2462.

As applied here, the period between March 1, 2015 through November 30, 2015 was "tolled" by written agreements between the parties. (*See* Dkt. # 1, SEC Complaint, ¶¶ 16 (Mahabub) and 17 (GenAudio)). Simple math informs us that a total of 247 days was tolled by these agreements. The SEC's Complaint in this action was filed on September 25, 2015. (Dkt. # 1). Subtracting five years and 247 days from the date of the filing of the Complaint, we arrive at

_____

[5] As described in GenAudio's Opposition, several of the SEC's SOFs rely on inadmissible evidence. As such, they lack proper evidentiary support and should not be considered by the Court. *Republic W. Ins. Co. v. Fireman's Fund Ins. Co.*, 241 F.Supp.2d 1090, 1095 (N.D. Cal. 2003) (emphasis added) ("…only admissible evidence may properly be considered by the trial court in granting summary judgment. [Citation.].");  *James v. Wadas*, 724 F.3d 1312, 1319–20 (10th Cir. 2013) (quoting *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005)) ("Mere allegations unsupported by further evidence … are insufficient to survive a motion for summary judgment.").

January 21, 2010. As such, any claim for disgorgement or penalties that accrued prior to that date is barred by 28 U.S.C. § 2462.

Among the barred claims are all of the purchases identified in SOF ¶¶ 39 and 43, and a substantial portion of the purchases identified in SOF ¶ 45. Indeed, at least $1,166,500 worth of GenAudio stock supposedly sold by Mahabub and for which the SEC seeks disgorgement is beyond the statute of limitations. (*See* Dkt. # 84-93, Declaration of Tracy W. Bowen, ¶¶ 7-10 and Attachment 1 thereto at pp. 1-6).

### C.    Mahabub did not violate § 5

Plaintiff is using summary judgment to test the legal sufficiency of Defendants' affirmative defense on which Defendants bear the burden of proof at trial. Defendant Taj Jerry Mahabub's Answer to Plaintiff's Complaint at p.28, Third Affirmative Defense. (Dkt. # 15). Thus, in order for Plaintiff to satisfy its Rule 56 burden, Plaintiff must show an absence of evidence to support an essential element of Defendant's affirmative defense. *Fitzpatrick v City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993). In other words, Plaintiff must demonstrate the absence of evidence supporting applicability of the safe harbor provisions of Section 4(2) of the Securities Act of 1933 and Rule 506 of Regulation D for an issuer in a non-public offering of securities. Plaintiff has failed to carry this burden.

Plaintiff's only attempt at satisfying this burden is by way of ambiguous and inadmissible investor questionnaires and an out of context statement that actually bolsters Defendants reasonable reliance on applicability of the Rule 506 Reg. D exemption. See Responses to SOF ¶¶ 62-68. And importantly, it is only the reasonable belief of the issuer and not the actual status of the purchaser the court must consider when determining whether the exemption applies. *Anastasi v. American Petroleum Inc.*, 579 F.Supp. 273, 275 (D.Colo.1984). "Whether a security offer is a private offering is a question of fact which requires [the Court] to consider all surrounding circumstances, including the relationship between the offerees and the issuer, and the nature,

scope, size, type, and manner of the offering. *Id*. at 274-75. But access to information is the most important factor. *Id*. Plaintiffs have failed to demonstrate an absence of evidence supporting Defendants' affirmative defense and therefore have failed to carry its Rule 56 burden.

This is true with regard to both GenAudio's stock sales and Mahabub's sales of his personal GenAudio stock holdings. Mahabub believed the investors were accredited because they were either previous investors in GenAudio and had submitted paperwork previously attesting to their accredited status, or else Mahabub had a personal relationship with the investor and knew them to be wealthy. See Response to SOF ¶¶ 62–63; SOF ¶ 238.  The SEC does not contradict either of these facts, and as such, a material issue of fact exists as to whether the investors were accredited, and/or whether an exemption to registration applied.

### D. Mahabub's internal GenAudio Team Emails did not violate § 10(b) of the Exchange Act or Rule 10b-5

In addition to the reasons cited in GenAudio's Opposition, the Court should deny the MSJ because the SEC fails to satisfy its burden of showing a violation of Exchange Act § 10(b) and Rule 10b-5.[6] In particular, the SEC fails to show that, in the internal GenAudio Team Emails, Mahabub and GenAudio made misrepresentations or omissions that were: (1) in connection with the purchase or sale of securities; (2) material facts, (3) made with scienter.[7]

Notably, the SEC seems to have abandoned, for the most part, its prior argument that the GenAudio Team Emails support their non-scheme fraud claims. While the Statement of Facts still references most, but not all, of the GenAudio Team Emails the SEC relied upon in its prior motion, the SEC does not reference those emails in support of its arguments related to § 17(a)(2) of the Securities Act, § 10(b) of the Exchange Act, or Rule 10b-5. The only exception is a

---

[6] Codified as 15 USC § 78j(b) and 17 C.F.R. § 240.10b-5(b), respectively.

[7] For purposes of this issue, and except as noted *infra*, Defendants do not dispute that at least some of the at-issue emails contained misrepresentations or omissions and were made by means of interstate commerce.

reference to the portion of Exhibit 33 containing the GenAudio Team Email and conversation transcript that Mahabub forwarded to Skluzak. MSJ at 33 (citing SOF ¶¶ 83–86).

This contradicts the Court's instructions in its prior Order (Dkt. # 80), which required, or at least strongly suggested, that the SEC's revised MSJ identify which "particular statement, collection of statements, action, or series of actions that the SEC believes satisfies the elements" of the anti-fraud claims. Ord. at 8. Moreover, "the Court must be able to understand precisely which actions allegedly violated which portion(s) of the securities laws." *Id*. In light of this clear directive, the SEC's failure to address the GenAudio Team Emails appears to be an acknowledgment that the GenAudio Team Emails do not violate § 10(b) or Rule 10b-5. However, to the extent the SEC may insist otherwise, the Court should likewise deny the MSJ for the reasons set forth below.

### 1.    Issues addressed in the Court's prior order

#### a.    The GenAudio Team Emails were not "in connection with" a securities transaction since the misrepresentations they contain were not made *because* securities were for sale

The Court asked the parties to address the following: "[A]re the scienter and 'in connection with' elements satisfied when a defendant makes knowingly false statements *while* securities are for sale, or only when a defendant makes such statements *because* securities are for sale?" Order at 15. While the SEC waffles on this issue in their MSJ, the correct standard is the latter.[8]

To meet the "in connection with" requirement, the SEC must prove that a defendant "knew or should have known that his representation would be communicated to investors because 10(b) and Rule 10b-5 focus on fraud made 'in connection with the sale or purchase' of a

---

[8] It is not quite clear what position the SEC takes. While they claim that "the 'in connection with' requirement is flexibly construed, they also acknowledge "that this element should not be interpreted so broadly as to convert every common law fraud that 'happens to involve securities' into a violation of the federal securities laws." MSJ at 54.

security." *Anixter v. Home-Stake Prod. Co*, 77 F.3d 1215, 1226 (10th Cir. 1996) (rule applied to an accountant); *SEC v. Nacchio*, 438 F. Supp. 2d 1266, 1281 (D.C.Col. 2006) (rule applied to corporate employee). *See also SEC v. Delphi Corp.*, No. 06-14891, 2008 U.S.Dist. LEXIS 78671, at *22–23 (E.D. Mich. Oct. 8, 2008) (rule applied to a corporate director). The requirement that a defendant "knew or should have known that his representation would be communicated to investors" is synonymous with saying that the element requires that the at-issue misrepresentations be made *because* securities are for sale. Indeed, it is inconsistent with the former "while" approach posited by the Court, because such an approach (i.e., simply that the misrepresentation was made <u>while</u> securities were for sale) would not require the deceiver to know that his misrepresentations would be communicated to an investor.[9]

While the SEC relies on *SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008), that case actually supports the "because" interpretation. *Wolfson* was just an application or, at most, an extension of the rule expressed in *Anixter*, 77 F.3d at 1226. It concerned misrepresentations contained in documents publicly available to investors. *Wolfson*, 539 F.3d at 1262 ("Nevertheless, we have not yet had occasion to address how the 'in connection with' element applies when the allegations of fraud stem from misrepresentations contained within documents publicly available to investors."). The court reasoned that "because such documents are designed to reach investors and to influence their decisions to transact in a publicly-traded security, any misrepresentations contained within the documents are made 'in connection with' the purchase or sale of that security." *Wolfson*, 539 F.3d at 1262. Thus, as with *Anixter*, by focusing on the <u>purpose</u> behind drafting such documents—they "are designed to reach investors and to influence

---

[9] As the Court recognized, a lesser standard would open up the floodgates of potential securities litigation, as "any lie one coworker tells to another is potentially actionable as securities fraud as long as the employer's securities happen to be for sale." Ord. at 13. *See also Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971) ("We agree that Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.").

their decisions"[10]—*Wolfson* is wholly consistent with the idea that the elements are satisfied only when a defendant knowingly makes false statements <u>because</u> securities are for sale.

Further, <u>all</u> the cases the SEC cites as support for their "non-committal" interpretation actually all support the conclusion that the law requires the misleading statements to be made <u>because</u> securities are for sale:

- *Chadbourne & Parke LLP v. Troice*, 134 S.Ct. 1058, 1066 (2014) ("As far as we are aware, every securities case in which this Court has found a fraud to be 'in connection with' a purchase or sale of a security has involved victims who took, who tried to take, who divested themselves of, who tried to divest themselves of, or who maintained *an ownership interest* in financial instruments that fall within the relevant statutory definition.")

- *SEC v. Zandford*, 535 U.S. 813, 815 (2002) (SEC alleged the defendant stockbroker wrongfully sold "his customer's securities and us[ed] the proceeds for his own benefit without the customer's knowledge or consent.")

- *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 7 (1971) (plaintiff "defrauded in the sale of certain securities")

- *United States v. O'Hagan*, 521 U.S. 642, 647 (1997) (emphasis added) ("Two prime questions are presented. The first relates to the misappropriation of material, nonpublic information <u>for securities trading</u>; the second concerns <u>fraudulent practices in the tender offer setting.</u>")

- *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 839 (2d Cir. 1968) (emphasis added) (action brought "to enjoin certain conduct by [the company] and the individual defendants said to violate Section 10(b) of the Act, 15 U.S.C. Section 78j(b), and Rule 10b-5 (17 CFR 240.10b-5) …, and to compel the rescission by

---

[10] *Wolfson*, 539 F.3d at 1262.

the individual defendants <u>of securities transactions assertedly conducted contrary to law</u>")

- *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1221 (10th Cir. 2000) (fraud concerned misrepresentations "made to induce [the plaintiff] to purchase [a securities] option")

- *Semerenko v. Cendant Corp.*, 223 F.3d 165, 169 (3d Cir. 2000) ("The Class alleges that the defendants violated § 10(b) and Rule 10b-5 by making certain misrepresentations about Cendant during a tender offer for shares of American Bankers Insurance Group, Inc. ('ABI') common stock. The Class consists of persons who purchased shares of ABI common stock during the course of the tender offer.")

- *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1171 (D.C.Cir. 1978) (applying the same rule as *Wolfson*: "It has been held that this requirement is satisfied whenever it may reasonably be expected that a publicly disseminated document will cause reasonable investors to buy or sell securities in reliance thereon, regardless of the motive or existence of contemporaneous transactions by or on behalf of the violator.")

- *SEC v. Pirate Inv'r LLC*, 580 F.3d 233, 237 (4th Cir. 2009) (*per curiam*) (defendants charged with violating antifraud provisions "by offering and selling [a] stock tip")

- *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1025 (9th Cir. 1999) (court held that "in connection with" requirement was satisfied because the plaintiff "received … stock in exchange for its investment," which was predicated on misrepresentations").

Notably, in the last case listed above, *Ambassador Hotel*, the court contrasted a prior decision wherein it held the "in connection with" requirement was not satisfied:

> [Defendant] rendered advice on the manner in which the corporation could account for its repurchase agreements after purchasing and selling [securities]. <u>This advice had nothing to do with the intrinsic nature of the [securities], or with risks related to the method of their purchase, or, indeed, to any factor reasonably linked to their purchase and to plaintiffs' ultimate loss.</u>

*Id.* at 1026 (quoting *In re Financial Corp. of Am. Shareholder Litig.*, 796 F.2d 1126, 1130 (9th Cir. 1986)) (emphasis added).

Likewise, here, the SEC's problem is that the false statements they rely upon in the GenAudio Team Emails appear within internal communications that were not publicly disseminated and which were never meant to reach investors. Specifically, the GenAudio Team Emails:

- Were all sent to members of the "GenAudio Team" (*i.e.*, employees, full-time consultants, and board members) (SOF ¶ 201);[11]

- Were intended to be confidential and not shared beyond members of the GenAudio Team (SOF ¶¶ 223–26);[12] and,

- Because the emails concerned the business relationship between GenAudio and Apple and/or the integration of GenAudio's software into Apple products, and forwarding them to non-team members would violate the NDA with Apple, it was not reasonably foreseeable that any member of the GenAudio Team would violate the NDA and explicit instructions by doing so. SOF ¶¶ 235–37.

---

[11] The only exception identified by the SEC is Ex. 33, which Mahabub forwarded to Skluzak. Ex. 33 at 1. *See* SOF ¶¶ 229–32. However, as discussed *infra*, the email, as applied to Skluzak, was likewise not related to the purchase or sale of securities.

[12] The portion of Ex. 33 written by Mahabub, which the SEC purports to be a fake transcript of a conversation between Mahabub and Tiscareno, begins with Mahabub writing "**DELETE THIS EMAIL AFTER YOU READ IT – DO FOLLOW MY INSTRUCTIONS.**" Ex. 33 at 3.

**b.     Mahabub lacked scienter for any misrepresentations contained within the GenAudio Team Emails because his intent was to motivate his employees, not to move stock**

The GenAudio Team Emails were not made with scienter. In the context of § 10(b), "'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud," or recklessness. *Hackbart v. Holmes*, 675 F.2d 1114, 1117 (10th Cir. 1982) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)). Because it concerns a mental state, "[s]ummary judgment is generally inappropriate … unless no reasonable inference supports the adverse party's claim." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (§ 10(b) case). *See also Romero v. Union P. Railroad*, 615 F.2d 1303, 1309 (10th Cir. 1980) (issues of intent and motive are "particularly inappropriate for summary judgment").

Mahabub's purpose was clearly to motivate his team, not move stock. For example:

- The top-most email in Exhibit 21 ends with Mahabub telling the team: "This is the final stretch before I enter into high level license negotiation with Apple – The part where I have a 100% track record for closing over 270 license deals in my past, so we just need to get there, and we are very VERY close to that happening." Ex. 21 at 3;

- The top-most email in Exhibit 7 closes with: "Time to make some money and thanks to all for hanging in there during such a tough time for the company. Of course, I will reward everyone that has stuck by my side 100% in the end game – and that is really what we are all working so hard for in the first place!" Ex. 7 at 3;

- Mahabub's email to the team in Exhibit 77 ends with: "We are very lucky thus far for everything to be lining up in time as they are. This has not been an easy strategy for me to envision and actually make it into a reality. Thanks to all of you, it is!!! ;)" Ex. 77 at 3.

Nor is it sufficient, as the SEC attempts here, to accuse Defendants of hoping to bring in money to keep the company going. SOF ¶¶ 9–12, 73, 75, 89. Since the purpose of virtually all

stock offers is to raise capital, permitting such a motive to suffice would render the element superfluous. *See Burman v. Phoenix Worldwide Indus.*, 384 F.Supp.2d 316, 332 (D.D.C. 2005) (quoting *In re Interbank Funding Corp. Sec. Litig.*, 329 F.Supp.2d 84, 90 (D.D.C. 2004)) ("It is well-settled that 'motive-and-opportunity allegations of scienter anchored merely in a defendant's profit motive' are simply insufficient to survive a dismissal motion.").

The SEC also fails to establish that Defendants were reckless, which is defined as "conduct that is 'an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Hackbart*, 675 F.2d at 1118 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1039–40 (7th Cir. 1977)) (emphasis added). Mahabub's conduct, meant to encourage stressed, potentially demoralized, employees, was understandable. SOF ¶¶ 211–213. Further, the SEC cannot plausibly establish there was a danger of misleading buyers or sellers when, as here, they failed to identify any stock purchases that actually relate to any of these GenAudio Team Emails. SOF ¶ 207.

### c.   Whether causation exists is a valid factor to consider when addressing the SEC's "in connection with" evidence

The Court's prior Order concludes that the SEC is not required to prove causation, reliance, or injury. Order at 17. Specifically, regarding the language in *Wolfson*, 59 F.3d at 1261:

> This Court is therefore confident that the Tenth Circuit, if it could revisit *Wolfson*, would clarify that any discussion of causation and injury was meant as a reference to private enforcement lawsuits, and not as a new limitation on SEC enforcement actions. [¶] Accordingly, it is the Court's view that the SEC need not prove reliance, injury, or causation, save for any claim it brings under Securities Act § 17(a)(2)…

*Id.* The Court may be correct that, at least at the most basic level (an action for injunctive relief seeking only penalties according to a schedule), the SEC is not required to establish causation. However, there are two reasons why the Court should still engage in a causation analysis here.

17

First, the SEC's lack of evidence that the GenAudio Team Emails caused any stock transactions indicates they fail to meet its burden with respect to the "in connection with" requirement—or, at the very least, there is a triable issue of fact. As the Court recognizes, the at-issue quote from *Wolfson* comes in the context of the court's analysis of the "in connection with" requirement. *Wolfson*, 539 F.3d at 1262 (paragraph containing the "causal connection" reference begins "The Supreme Court has consistently embraced an expansive reading of § 10(b)'s 'in connection with' requirement.").

Rather than being dicta, this quote is consistent with the law in other circuits—which state that causation is, at least, a factor to be considered when determining whether the "in connection with" element is satisfied. *E.g., In re Financial Corp. of Am. Shareholder Litig.*, 796 F.2d 1126, 1130 (9th Cir. 1986) ("One factor to be considered in determining whether the 'in connection with' requirement has been met is whether a causal connection between the fraud and the transaction has been shown."); *Buffo v. Graddick*, 742 F.2d 592, 596 (11th Cir. 1984) (identifying "whether there was a causal connection between the fraud and the securities transaction" as one of four factors to be considered in analyzing the "in connection with" requirement); *Ketchum v. Green*, 557 F.2d 1022, 1029 (3d Cir. 1977) ("If we deem 'connection' and 'causation' to be closely intertwined, and we may be obliged to do so in light of the recent statements of this Court in [*Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187 (3d Cir. 1976),] then it would appear that the plaintiffs simply have failed to bring their case within the ambit of § 10(b)."). *See also SEC v. Recycle Tech, Inc.*, No. 12-21656, 2013 U.S.Dist.LEXIS 195982, at *17 (S.D.Fla. Sept. 26, 2013) (quoting *Buffo v. Graddick*, 742 F.2d at 596) ("The phrase requires a certain relationship between the defendant's actions and a securities transaction.").

In other words, while it may not be necessary to show that the alleged misrepresentation actually caused a securities transaction, the alleged misrepresentation must be of a type that at least could cause a securities transaction. *See, e.g., Tex. Gulf*, 401 F.2d at 860 (Congress intended

the "in collection with" element to require that the fraudulent act "be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities"). Therefore, much like Sir Arthur Conan Doyle's "the dog that didn't bark," the fact that the SEC hardly even attempted to tie any of the purported misrepresentations to a stock transaction serves, at the very least, as a "red flag." It is highly indicative that such misrepresentations fail to satisfy the "in connection with" requirement.

Second, causation is an important consideration where, as here, the SEC seeks remedies that require such a causal relationship. The SEC requests penalties and disgorgement against both defendants. Compl. (Dkt. # 1) at Prayer for Relief ¶¶ 3, 4. So long as the SEC seeks tier three monetary penalties, or tier one or two penalties beyond the statutory minimums, they must prove causation.

For each of the three penalty tiers authorized by Congress, the maximum penalty amount is the greater of the tier amount or "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. §§ 77t(d)(2)(A)–(C), 78u(d)(3)(B)(i)–(iii) (emphasis added). Further, third tier penalties require that the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and [¶] such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii) (emphasis added).

The terms "as a result of" and "resulted in" implicate a clear a causation requirement. This has been repeatedly emphasized by the Supreme Court when considering the same or similar language. *See Burrage v. United States*, 134 S.Ct. 881, 889 (2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2525 (2013)) ("In sum, it is one of the traditional background principles 'against which Congress legislate[s],' [citation] that a phrase such as 'results from' imposes a requirement of but-for causation."); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 814–15 (2011) (quoting Restatement of Torts § 548A, cmt. b at

107) (agreeing with the Restatement and treatises that interpret "as a result of" as requiring proof of causation). *See also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 814–15 (2011) (language such as "resulted in" refers to "loss causation").

Disgorgement likewise requires a causal connection between the wrongful act and the amount the SEC recovers. Though, unlike penalties, there is no statute that explains how disgorgement should be calculated, courts have used language that similarly indicates a causal connection is required. As the Supreme Court recently noted:

> Generally, disgorgement is a form of "[r]estitution measured by the defendant's wrongful gain." Restatement (Third) of Restitution and Unjust Enrichment § 51, Comment a, p.204 (2010) …. Disgorgement requires that the defendant give up "those gains … properly attributable to the defendant's interference with the claimant's legally protected rights." *Ibid.* Beginning in the 1970s, courts ordered disgorgement in SEC enforcement proceedings in order to "deprive … defendants of their profits in order to remove any monetary reward for violating" securities laws and to "protect the investing public by providing an effective deterrent to future violations." [*SEC v. Texas Gulf Sulphur Co.*, 312 F.Supp. 77, 92 (S.D.N.Y. 1970).]

*Kokesh v. SEC*, 137 S.Ct. 1635, 1640 (2017) (emphasis added). In other words, both higher tier penalties and disgorgement require factual findings of a causal relationship.

The SEC states that, should the Court grant summary judgment, it "will submit a separate motion on remedies." MSJ at 1 n.1. While that may be permitted, it also means that, in seeking remedies, the SEC should be limited by what they were able to prove (if anything) in their motion for summary judgment. Otherwise, the instant motion serves as an end-run around the rigorous evidentiary standards required to obtain summary judgment.

This is crucial because, while the SEC alleges that Defendants sold millions of dollars in GenAudio Stock—approximately $4.5 million raised through the sale of 1,501,000 shares[13]—the

---

[13] SOF ¶ 54 (alleging that, as part of the 2010 Offering, GenAudio raised approximately $3,513,000 through the sale of at least 1,171,000 shares); ¶ 102 (alleging that, as part of the 2011

SEC only even <u>attempts</u> to tie purchases to four purported representations (which, in many instances, the SEC fails to allege were even false).[14] This is a miniscule fraction of the entire number of shares sold. The SEC is therefore in a position where they hope to establish fraud, or at least negligence, as to a few minimal transactions, and then later demand disgorgement and penalties that are potentially many multiples above what they have even tried to prove on summary judgment. Thus, to the extent the Court might grant summary judgment, if the SEC seeks disgorgement and/or penalties, it should be limited to the transactions for which they were able to establish a causal connection to the alleged wrongdoing. Hence, again, the need for the Court to conduct a causation analysis here.

### 2. The GenAudio Team Emails do not contain material misrepresentations or omissions

The standard for materiality is "if a reasonable investor would consider it important in determining whether to buy or sell stock." *SEC v. C. Jones & Co.*, 312 F.Supp.2d 1375, 1379 (D. Colo. 2004) (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)). The misrepresentations contained in the GenAudio Team Emails are not material because what may be relevant to motivating employees at a startup is not, *ipso facto*, material to investors. Here, Mahabub's emails to GenAudio Team members were intended to keep them motivated during a difficult, and exhausting, start-up stage. SOF ¶¶ 211–213.

It is unlikely a reasonable investor would find it material, e.g., that "we have kept our focus on the 'Less Setting'" (Ex. 21 at 3) or that Mahabub sent an email to Phil Schiller. Ex. 66

---

offering, GenAudio raised approximately $990,000 through the sale of 330,000 shares).

[14] In three instances, the SEC alleges that investors purchased shares after Mahabub expressed optimism that GenAudio would be acquired in the near future. SOF ¶¶ 37–39, 42–44, 79–80. In the fourth instance, the SEC alleges that one of the GenAudio Team Emails "affirmed [the investor's] willingness to purchase 40,000 shares of stock." SOF ¶¶ 83–87. In that last instance, however, that investor clearly stated that he had decided to invest prior to receipt of the email. SOF ¶ 229.

at 1.[15] However, such facts might very well be relevant to stressed and overworked engineers who are unsure whether their work is being used and appreciated. Accordingly, the SEC fails to establish that the emails contain material misrepresentations.[16] At best, the materiality of these statements is reasonably disputed, and as such summary judgment is unavailable.

### a. The optimistic statements in Exhibits 9 and 66 are nonactionable puffery

The optimistic statements that the SEC may be relying on in Exhibits 9 and 66[17] are nonactionable puffery. "Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). Such "vague statements of corporate optimism are not materially misleading, as 'reasonable investors do not rely on them in making investment decisions.'" *SEC v. Nacchio*, 438 F.Supp.2d 1266, 1281 (D. Colo. 2006) (quoting *Grossman*, 120 F.3d at 1119).

Statements claiming that, e.g., "[t]his should get things fired up and expedited to us inking a deal" (Ex. 66 at 1) fall into this category. It is a "sincere statement of pure opinion [that] is not an 'untrue statement of material fact.'" *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S.Ct. 1318, 1327 (2015). Here, Mahabub honestly believed each of the representations when he made them. SOF ¶¶ 224–25, 228. Further, statements like the one in Exhibit 66, referring to "inking a deal" without providing specifics, were sufficiently vague that a reasonable investor would not rely on them. *See id.* at 1328 n.8 ("We note, too, that a reasonable investor generally considers the specificity of an opinion statement in making

---

[15] Nor does the SEC establish that a reasonable investor would know, or care, who Schiller is.

[16] Similarly, because any related omissions in the email were not material, Defendants had no duty to speak. *See SEC v. Curshen*, 372 Fed.Appx. 872, 880 (10th Cir. 2010).

[17] Though again, given that the SEC appears to no longer assert claims under § 10(b) or Rule 10b-5 based on the GenAudio Team Emails, that may not be the case.

inferences about its basis."). Therefore, they are immaterial and do not support the SEC's allegations.

The statements are also not actionable under the "bespeaks caution" doctrine. Such forward-looking representations are immaterial when the defendant provided "sufficiently specific risk disclosures or other cautionary statements … to nullify any potential misleading effect." *Grossman*, 120 F.3d at 1120. Here, the challenged statements in Exhibits 9 and 66 are forward-looking predictions about a possible deal, accompanied by language indicating that Mahabub was clearly casting recent updates in a positive light to motivate his team. And, the representations were couched in terms that made it readily apparent to all recipients that these views reflected Mahabub's own optimism and hopes.

In Ex. 9, Mahabub's statement is the definition of equivocal: "And someone would not want to invest at this stage in the game, or increase there [sic] shareholder position because why? There is no answer to this question…." Ex. 9 at 1 (emphasis added). And, in Exhibit 66, Mahabub conditions his statements on his own optimism: "This is a very exciting time for the Company and for me personally, to ACTUALLY see my 20+ year continuous effort hopefully about to start paying off is Surreal [sic]." Ex. 66 at 1 (emphasis in original). No reasonable investor would rely upon these forward-looking statements (nor has the SEC adduced any evidence that any GenAudio Team member did). Thus, under the bespeaks caution doctrine, they cannot create liability.

> **3. Mahabub's forwarded email to Skluzak was neither in connection with nor material to a securities transaction; nor did Mahabub act with scienter**

The only GenAudio Team email the SEC expressly addresses in its sections dealing with its anti-fraud claims is Exhibit 33, the email that Mahabub forwarded to Skluzak. However, that email fails to serve as grounds for summary judgment, because it is neither material to nor in connection with a securities transaction. The SEC cannot tie the purchase of shares by Skluzak to

his receipt of Exhibit 33. SOF ¶¶ 83–87. Skluzak testified that he did not rely upon that email when choosing to invest in GenAudio. SOF ¶ 230. The best the SEC could coax from Skluzak is an acknowledgment that his receipt of Exhibit 33 "affirmed" his willingness to purchase GenAudio stock. SOF ¶ 87. This vague, confusing language does not rebut Skluzak's clear, prior testimony that he did not rely on the email when making his investment decision. Additionally, Mahabub forwarded that email in hopes that it would convince him to join GenAudio's board— not to push Skluzak into a stock purchase. SOF ¶ 221. Skluzak's receipt of the email was neither material to nor in connection with a securities transaction.[18]

Additionally, the parties dispute what Mahabub told Skluzak that induced Skluzak to purchase the at-issue shares. According to the SEC, Mahabub told Skluzak that Jobs personally told Mahabub "that he was very impressed with [GenAudio's] technology" and, further, that "the level of interaction Mr. Mahabub was having at Apple Computer was extensive and high level." SOF ¶ 86.

Mahabub disputes this account. He did not tell Skluzak that he personally met or spoke with Jobs. See GenAudio's Resp. to SOF ¶ 86 [Mahabub Decl. ¶ 28] (incorporated herein by reference). Rather, he told Skluzak that, based on what was told to him by Tiscareno, Jobs had been shown the technology and liked what he saw. *Id.* Thus, to the extent there is any admissible evidence regarding what induced Skluzak to buy the stock, there is a conflict between the parties as to what was actually said (and whether it was a misrepresentation).[19] Therefore, the Court should not grant summary judgment.

---

[18] Further, as noted in GenAudio's Response to the SEC's Statement of Facts (incorporated herein by reference), Tiscareno's claim that the "letter is pure fabrication" is inadmissible hearsay. See GenAudio's Resp. to SOF ¶ 88 (incorporated herein by reference). The SEC failed to adduce any admissible evidence that Mahabub's representations were false.

[19] And, as stated previously, it was Greg "Jaws" Joswiak who had actually made those comments, and when Tiscareno shared the news with Mahabub, who had never heard of "Jaws", Mahabub reasonably understood Tiscareno to be referring to "Jobs" – Steve Jobs. See

### E.      The GenAudio Team Emails do not violate § 17(a)(2) of the Securities Act

As with the claims under § 10(b) and Rule 10b-5, the SEC appears to have abandoned its argument that the GenAudio Team Emails violate § 17(a)(2) of the Securities Act. To the extent the SEC may assert otherwise, the claim still fails because, as discussed *supra*, the emails were neither in connection with a securities transaction nor were any misrepresentations material.[20] Additionally, and for similar reasons, the SEC cannot establish negligence because they failed to show that the GenAudio Team Emails were the actual or proximate cause of any stock purchase. SOF ¶ 207.

### F.      Defendants did not engage in a fraudulent scheme

The SEC fails to satisfy its burden of establishing that, by sending altered emails to members of the GenAudio Team, Defendants violated the "scheme liability" provisions of Rule 10b-5(a) and (c) and Securities Act § 17(a)(1) and (3). MSJ at 43–51. Scheme liability cannot be established for three independent reasons.

First, this argument fails because, as explained *supra*, the SEC cannot show that the altered emails were (1) in connection with a securities transaction and (2) made with either scienter or negligence. *See SEC v. Sullivan*, 68 F.Supp.3d 1367, 1377 & n.9 (D. Colo. 2014) (citing *SEC v. St. Anselm Exploration Co.*, 936 F.Supp.2d 1281, 1298–99 (D. Colo. 2013)) (elements for scheme liability).

Second, the SEC's argument fails because "the conduct at issue must involve 'sham' or 'inherently deceptive' transactions." *SEC v. Lucent Techs., Inc.*, 610 F.Supp.2d 342, 360 (D.N.J.

---

GenAudio's Resp. to SOF ¶ 86 [Mahabub Decl. ¶¶ 24, 28] (incorporated herein by reference). As such, if there was a mistake about whether it was "Jaws" or "Jobs", it was an honest mistake.

[20] The "primary difference" between claims under § 10(b) and Rule 10b-5, compared to claims under § 17(a)(2) is that, rather than requiring scienter, § 17(a)(2) only requires proof that a defendant acted negligently. *E.g., Smart*, 678 F.3d at 857.

2009).[21] Here, because the SEC has failed to tie any of the GenAudio Team Emails (which include all of the altered emails) to any particular transactions, let alone any sham or deceptive ones, the SEC cannot meet its burden. SOF ¶ 207.

Third, the SEC's argument fails because it constitutes improper "double dipping." *Sullivan*, 68 F.Supp.3d at 1377. A party cannot prove scheme liability when the alleged acts constituting the scheme are "nothing more than a reiteration of the misrepresentations and omissions that underlies plaintiffs [sic] disclosure claim." *Lucent*, 610 F.Supp.2d at 361 (quoting *TCS Capital Mgmt. v. Apax Partners, L.P.*, No. 06-cv-13447, 2008 U.S.Dist. LEXIS 19854, *22 (S.D.N.Y. Mar. 7, 2008)).[22]

To avoid this, the SEC's MSJ appears to ask the Court to consider the GenAudio Team Emails as separate deceptive conduct from the purported scheme to defraud. MSJ at 43 n.15 (claiming, without citation to any portion of the Statement of Facts nor to any evidence, that "Mahabub engaged in material misstatements and omissions and other deceptive conduct"). This likewise fails.

The SEC "cannot breathe new life into defunct primary liability claims" by reframing alleged misrepresentations as deceptive acts. *Lucent*, 610 F.Supp.2d at 361 (denying scheme liability claims that were a rehash of § 10(b) claims). That is exactly what the SEC is attempting

---

[21] In *Lucent*, the underlying transactions involved a company's sale of telecommunications equipment. *Id.* at 345. The SEC alleged that the company improperly recognized and reported revenue related to the sales, thereby inflating the company's value. *Id.* In rejecting both scheme liability and direct liability under § 10(b) of the Exchange Act, the court noted that the sales were "legitimate business transactions" and distinguished it from a case where "the transactions themselves, which depended on a fiction that the invoices had value, were inherently deceptive." *Id.* at 360–61 (citing *In re Parmalat Sec. Litig.*, 376 F.Supp.2d 472, 504 (S.D.N.Y. 2005)).

[22] The SEC's theory of scheme liability is almost universally rejected: "A majority of the circuits and several district courts in the Tenth Circuit have drawn a 'bright line' between the types of conduct that satisfy claims made under the scheme liability framework and claims that a defendant made material omissions or misstatements actionable under § 17(a)(2) or Rule 10b-5(b)." *Sullivan*, 68 F.Supp.3d at 1377. Accordingly, "scheme liability encompasses only actions which include deceptive conduct <u>beyond assistance with</u> a material misstatement or omission." *Id.* (quoting *SEC v. Goldstone*, 952 F.Supp.2d 1060, 1203 (D.N.M. 2013)) (emphasis added).

here. In its original motion, the SEC claimed that the GenAudio Team Emails qualified as deceptive acts. *See, e.g.*, Dkt. # 53 at 29 (Mahabub acted with scienter when sending the emails); *id.* at 30 (including the emails with other misrepresentations and omissions as evidence of Mahabub's recklessness); *id.* at 31 (Mahabub's statements in the emails were material because "he admitted that he altered his emails with Apple because the truth was not good enough"); *see also* Reply (Dkt. # 66 at 29, § IV.E ("The Fraudulent GenAudio Team Emails Were 'In Connection With' The Purchase And Sale Of Millions Of Dollars In Securities").

The SEC's MSJ also ignores the fact that, if the GenAudio Team Emails are removed, then all that is left to (potentially) constitute a scheme to defraud are the statements directed to the public at-large. If that were the case, then the emails would not be "in furtherance of the scheme to defraud" (*Sullivan*, 68 F.Supp.3d at 1377) because the emails were directed at an entirely different audience—the GenAudio Team—and were not part of any public offering. SOF ¶¶ 201–02. Because the target of a public offering—the public—would not have seen the GenAudio Team Emails, the emails could not be in furtherance of, or "inherent to," any scheme to defraud them. *See Sullivan*, 68 F.Supp.3d at 1378 (citing *Lucent*, 610 F.Supp.2d at 360).

*Sullivan*, which involved a Ponzi scheme, is instructive. There, the SEC alleged that the defendant "committed six deceptive acts" in furtherance of the scheme. *Id.* at 1378. In its analysis, the court found that acts targeting the intended victims of the Ponzi scheme supported allegations of scheme liability, while acts that <u>did not</u> target the intended victims could not support liability. *Id.* at 1378–79. Acts that were "'inherently deceptive' conduct sufficient for scheme liability" included generating false reports that were distributed to investors and soliciting "investments in furtherance of the Ponzi scheme by insinuating that 'more money' would allow BPF to 'make more loans,' thus leading to higher investor pay-outs." *Id.* Conversely, acts that, while deceptive, were not aimed at furthering the Ponzi scheme could not support scheme liability. *Id.* at 1378 ("Although circumventing an SEC investigation and

personally benefitting from the profits of a fraudulent scheme are dishonest actions, neither act clearly contributed to the operation of the underlying fraud."). Here, while altering internal, corporate emails to keep employees motivated might be deceptive, it was not in furtherance of the alleged fraud committed in relation to a Rule 506 stock offerings. Therefore, the SEC cannot rely upon the GenAudio Team Emails to support their scheme liability theory.

**VI.   CONCLUSION**

Based on Mahabub's good faith and reasonable beliefs, genuine issues of fact exist regarding whether Mahabub (and GenAudio) had the requisite scienter in making statements to investors regarding discussions with Apple. The SEC's attempt to punish non-actionable puffing fails, and Mahabub's internal emails to his GenAudio team are not actionable because they are neither "in connection with" the purchase or sale of a security, nor are they material.

Plaintiff has failed to identify any "manipulative or deceptive act" other than alleged altered emails that also are asserted to be alleged fraudulent misrepresentations; Plaintiff tries to use the same fraudulent misrepresentation claim as a claim for scheme liability. There can be no scheme liability under that scenario. And material facts exist as to whether § 5 liability attaches.

For the foregoing reasons, as well as those articulated in the supporting papers filed herewith, as well as the arguments contained in the Opposition papers filed by GenAudio (and incorporated herein), Plaintiff's motion for summary judgment should be denied.

Dated:  March 30, 2018                    By:  /s/  Andrew B. Holmes
                                         Andrew B. Holmes
                                         HOLMES, TAYLOR, SCOTT & JONES LLP
                                         The Oviatt Building
                                         617 South Olive Street, Suite 1200
                                         Los Angeles, CA 90014
                                         Telephone:  (213) 985-2200
                                         Facsimile:  (213) 973-6282
                                         Email:  abholmes@htsjlaw.com
                                         Attorneys for Defendant Taj Jerry Mahabub