**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No.:  1:15-cv-02118

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

  v.

TAJ JERRY MAHABUB, GENAUDIO,
INC., and ASTOUND HOLDINGS, INC.,

      Defendants.

**DECLARATION OF TAJ JERRY MAHABUB**

I, Taj Jerry Mahabub, declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following statements are true and correct, that this declaration is made on my personal knowledge, and that I am competent to testify as to the matters stated herein:

1. I founded GenAudio, Inc. ("GenAudio"), a Colorado corporation on May 21, 2003.

2. I served as GenAudio's CEO from at least 2009 through December 21, 2013, then again from mid-February 2014 through the present.

3. I also developed the patented audio software that was the core of GenAudio's business.

4. Prior to their purchase of GenAudio stock (either from me personally or from GenAudio), I had personal relationships with many of the investors, and knew them to satisfy the criteria of an "accredited investor" based on my long-term interactions with them.

5. For example, prior to any investment in GenAudio, I knew a group of doctors through my uncle, George Bohigian. These doctors have been and continue to be family and/or good friends of one of my family members, Dr. George Bohigian, and family/friends whom I have known for many years, each of whom I know meet the definition of an "accredited investor." Among these family friends who bought GenAudio stock are:

    a. Dr. John Galanis;

    b. Dr. Jan Boon;

    c. Dr. Phillip Gilson;

    d. Dr. Kirk Morey;

    e. Dr. Ronan Lev; and

    f. Dr. Howard Short.

6. Concerning the "GenAudio Team Emails" (Exs. 7, 9, 21, 23, 31, 33, 46, 66, 72, 75, and 77 to the SEC's MSJ), I did, as the SEC alleges, alter some email correspondence

between myself and Apple. To the best of my recollection, this was done to capture and incorporate phone conversations or SMS (text) messages into one document, making it easier for the team to connect the dots and to stay motivated to work.

7. With one possible exception, all recipients of the GenAudio Team Emails were employees, board members, and/or full-time consultants of GenAudio (the "GenAudio Team").

8. The only exception to the above I'm aware of, as relevant to the SEC's MSJ, is Ex. 33, which I forwarded to Dell Skluzak, who had already been a GenAudio shareholder for several years. In forwarding this email to Skluzak, it was not my intent to induce Skluzak into purchasing more GenAudio stock—my understanding was that, by the date of this email to him (May 6, 2010), he had already made a decision to purchase or he had already purchased additional shares based on previous conversations. Rather, my intent was to encourage him to join GenAudio's board. Based on his business experience and background he discussed with me, I thought Skluzak would be a valuable addition to the company as a board member.

9. My intent was not to induce the recipients, a.k.a., the GenAudio Team, to purchase GenAudio stock. Rather, except for Exs. 9 and 66 (see below), it was to keep them motivated and maintain company morale.

10. During the 2009 to 2012 timeframe, GenAudio, like most tech sector start-ups, was characterized by a high stress work-environment. High turnover and low morale were constant problems. These problems were exacerbated by (as is typical at many start-ups) inconsistent payment of wages for both consultants and full-time employees.

11. Based on my background and numerous years of experience in the software (and tech) industry, and particularly with startups, it is common for management to go to great lengths to keep employees enthusiastic in such a stressful environment.

12. In July 2009, GenAudio and Apple entered into a confidentiality agreement (the "NDA"). Attached hereto as **Exhibit 91** is a true and correct copy of the NDA, previously marked as Investigative Testimony Exhibit 3.

13. The GenAudio Team Emails were internal corporate communications, and I instructed the team, both orally and in writing, that under no circumstance should any of the emails I sent to them be forwarded to anyone, not even their own immediate family members. They were confidential, as they concerned matters covered by the NDA ("NDA") (e.g., the business relationship between GenAudio and Apple, the possibility that GenAudio might provide goods or services to Apple, and/or the integration of GenAudio's software into Apple products), and I did not intend for recipients to forward them along to others, or otherwise repeat the information they contained.

14. All of the GenAudio Team Emails were sent while the NDA was in effect.

15. Aside from the email I forwarded to Dell Skluzak (Ex. 33, discussed above), it was not my intent, and I was unaware at the time, that any of the GenAudio Team Emails would be forwarded or shared with anyone outside the GenAudio Team – let alone any potential investors. Nor do I believe that any GenAudio Team member should, could, or would have done so, given that, based on their work and familiarity with GenAudio's dealings with Apple, all recipients knew the emails included information covered by the NDA.

16. The GenAudio Team Emails were not included among materials provided to potential investors in the 2010 Offering or the 2011-2012 Offering (as those terms are used in the MSJ).

17. None of the GenAudio Team Emails ask GenAudio Team members to personally invest in GenAudio.

18. Exs. 9 (previously marked as Deposition Exhibit 28) and 66 (previously marked as Investigative Exhibit 60 and Deposition Exhibits 29 and 211) ask GenAudio Team Members

3

to help the company get in touch with friends and family members who might be interested in purchasing GenAudio stock. While Exhibit 10 doesn't expressly state this, my statement "[l]et's get some fuel for the ship. Any help from all of you with this financing effort would be great," was not intended as a personal appeal to employees to invest in the company. In context, it was a request for them to put potential investors (friends and family) in touch with myself, Paul Powers, and/or Jim Mattos. I believe the recipients understood this, based on my past emails and numerous other communications with the team, where I emphasized that – without exception - any potential investor should be handled in this manner.

19. I was not aware of any instance where a recipient of the GenAudio Team Emails purchased GenAudio stock based on the emails or their contents (including Exs. 9 and 66).

20. Nor did I intend for anyone to invest based on the contents of the GenAudio Team Emails. Even with Exs. 9 and 66, I only expected (and hoped) that employees would tell friends and family members that, if they were interested in investing, they should contact Powers, Mattos, or myself. Once any such person contacted one of us, I anticipated providing them with the company's investment materials so they could make an informed investment decision with all the risk factors and necessary discretionary language such as disclaimers and disclosures included.

21. Regarding Exs. 9 and 66, my optimistic statements (those highlighted by the SEC in their exhibits) to GenAudio Team Members regarding GenAudio's value were my opinions, which I believed to be true at the time they were made.

22. Exhibit 9 does not contain any altered emails between Apple employees and myself.

23. I have reviewed the SEC's Ex. 66, and everything contained therein, excepting the additional recipients, was true to the best of my knowledge. Any additions made were intended to benefit the GenAudio Team by adding details from other conversations with Apple

4

employees. While I subjectively believed Schiller was one of those I met with at Apple, I later learned that it wasn't Schiller, but someone else, and I remembered his name incorrectly. Believing it was Schiller, in the additions to the email, I discussed the embedded level integration process during the conference call referenced in the email; my statement that Schiller was hoping for a fall product rollout was based on prior conference calls; my belief that Schiller and Hailey wanted to follow up on some things regarding application integrations was based on prior conference calls and/or in-person meetings; and I added the additional recipients (Phil Schiller, Barry Corlett, and Jim Tenneboe) because my understanding was that they were now, or would soon be, involved in the process of integrating GenAudio software into Apple products.

24. I was told by Tiscareno and Hailey that there was a "big meeting" in early May of 2010 that would take place with "Jobs," which I understood to mean Steve Jobs, Apple's then-CEO. Prior to this litigation, I had never heard the name "Jozwiak" and didn't know that there was a high-level employee at Apple with that name, who apparently was known as "Joz" (pronounced "Jaws").

25. After GenAudio and Apple signed a non-disclosure agreement, my contacts at Apple proposed we execute another non-disclosure agreement. Because we had already signed a non-disclosure agreement with Apple, I presumed the new agreement Apple was proposing would be more restrictive than what we had already signed, and indicated Apple was more interested in reaching a deal with GenAudio.

26. Tiscareno never told me he lacked the authority to discuss a business deal between GenAudio and Apple and that I would need to speak with someone else at Apple to negotiate a transaction.

27. In early 2012, GenAudio made presentations to shareholders in Seattle, St. Louis, and Denver. During those presentations Tiscareno spoke to shareholders about why Apple didn't do a deal with GenAudio. A video and/or audio of at least one of Tiscareno's presentations

exists. Long before then, it was already clear from the passage of time that GenAudio would not be completing a transaction with Apple. That also was made clear to investors during the presentations.

28. Regarding the allegations in paragraph 86 of the SEC's Statement of Facts, I did not tell Mr. Skluzak that I spoke with Jobs, or that Jobs personally told me that he was very impressed with GenAudio's technology. I did tell Mr. Skluzak what I heard from Tiscareno: that Jobs was shown the technology and that he liked it. If Tiscareno said "Joz" rather than "Jobs" to me, I wouldn't have known the difference, as I didn't know of the existence of anyone named "Joz" at that time. My understanding of that conversation was that Tiscareno was referring to Steve "Jobs".

29. In March 2009, GenAudio's AstoundSound Expander product was among the top downloads on Apple's website, which was publicly available information. At that time, Apple chose to list that product as a "featured download" and "top audio download" and the product remained listed as such for several months. That selection as a featured download had nothing to do with any paid marketing program or advertising by GenAudio.

30. The following exhibits are true and correct copies of emails I sent and received from my contacts at Apple during my discussions with Apple about GenAudio's technology: **Exhibits 151, 154 through 168, 172 through 183, 185 through 187, 189 through 197, 199 through 206, and 208 through 215**.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of March 2018 in Westminster, Colorado.

__/s/ *Taj Jerry Mahabub*__
Taj Jerry Mahabub