# In The Matter Of:

*Securities and Exchange Commission v.*
*Taj Jerry Mahabub, et al.*

*Jim Wei-Kung Mattos*
*July 22, 2016*

*Behmke Reporting and Video Services, Inc.*
*160 Spear Street, Suite 300*
*San Francisco, California 94103*
*(415) 597-5600*

Original File 29803Mattos.txt
**Min-U-Script® with Word Index**

Securities and Exchange Commission v.  
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos  
July 22, 2016

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF COLORADO
 3
 4   - - - - - - - - - - - - - - - -
 5   SECURITIES AND EXCHANGE      )
 6   COMMISSION,                  )
 7           Plaintiff,           )   CASE NO.
 8   v.                           )   1:15-cv-02118-CBS-WJM
 9   TAJ JERRY MAHABUB, GENAUDIO, )
10   INC., and ASTOUND HOLDINGS,  )
11   INC.,                        )
12           Defendants.          )
13   - - - - - - - - - - - - - - - -
14
15
16        VIDEOTAPED DEPOSITION OF JIM WEI-KUNG MATTOS
17                   FRIDAY, JULY 22, 2016
18
19
20
21                BEHMKE REPORTING AND VIDEO SERVICES, INC.
22          BY:  KIMBERLY J. WALDIE, CSR NO. 8696, NVCCR 720
23                              160 SPEAR STREET, SUITE 300
24                             SAN FRANCISCO, CALIFORNIA 94105
25                                            (415) 597-5600
```

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8      Videotaped deposition of JIM WEI-KUNG MATTOS,
 9   taken on behalf of Plaintiffs, at the Courtyard by
10   Marriott, 6855 South Virginia Street, Reno, Nevada,
11   commencing at 9:07 A.M., FRIDAY, JULY 22, 2016, before
12   Kimberly J. Waldie, Certified Shorthand Reporter No.
13   8696, pursuant to Notice of Deposition.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFF:
 3       SECURITIES AND EXCHANGE COMMISSION
 4       BY: DANIELLE R. VOORHEES, ATTORNEY AT LAW
 5           LESLIE HENDRICKSON HUGHES, ATTORNEY AT LAW
 6       1961 Stout Street, Suite 1700
 7       Denver, Colorado 80294
 8       Telephone: (303)844-1000
 9       Email: voorheesd@sec.gov
10
11   FOR DEFENDANT, TAJ JERRY MAHABUB:
12       HOLMES, TAYLOR & JONES, LLP
13       BY: ANDREW B. HOLMES, ATTORNEY AT LAW
14       617 South Olive Street, Suite 1200
15       Los Angeles, California 90014
16       Telephone:  (213) 985-2200
17       Email:  abholmes@htjlaw.com
18
19   FOR DEFENDANT GENAUDIO, INC. AND JAMES T. DEVINE:
20       WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
21       BY: MICHAEL P. McCLOSKEY, ATTORNEY AT LAW
22       655 West Broadway, Suite 900
23       San Diego, California 92101
24       Telephone:  (619) 321-6200
25       Email: Michael.mccloskey@wilsonelser.com
```

Page 4

```
 1     APPEARANCES OF COUNSEL - (CONTINUED):
 2     FOR DEFENDANT ASTOUND HOLDINGS, INC.
 3     - (TELEPHONICALLY):
 4         BENZ LAW GROUP
 5         BY: JENNIFER YUEN, ATTORNEY AT LAW
 6         12021 Wilshire Boulevard, Suite 256
 7         Los Angeles, California 90025
 8         Telephone: (818) 371-8800
 9         Email:  jenniferk.yuen@gmail.com
10
11     ALSO PRESENT:
12         JEFF WALDIE, VIDEOGRAPHER, CCVS
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Securities and Exchange Commission v.
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos
July 22, 2016

Page 5

```
 1                       INDEX
 2     FRIDAY, JULY 22, 2016
 3   JIM WEI-KUNG MATTOS                              PAGE
 4       Examination by MS. VOORHEES                    12
 5       Examination by MS. YUEN                       211
 6       Examination by MR. HOLMES                     215
 7       Examination by MR. McCLOSKEY                  218
 8       Further examination by MS. VOORHEES           219
 9
10                         -oOo-
11
12         QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
13                    PAGE      LINE
14                     None.
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1                       EXHIBITS
 2                   JIM WEI-KUNG MATTOS
 3   Number           Description                      Page
 4   Exhibit 21   E-mail chain, top e-mail dated
 5               October 2, 2009, Bates JM002096 -
 6               JM002099 - 4 pages                      64
 7   Exhibit 22   E-mail chain, top e-mail dated
 8               October 19, 2009, Bates GA006846 -
 9               GA006850, - 5 pages                     71
10   Exhibit 23   E-mail dated 10/19/2009, Bates
11               SEC-TiscarenoV-E-0000635 -
12               SEC-TiscarenoV-E-0000636 - 2 pages      73
13   Exhibit 24   Forwarded e-mail originally
14               sent November 9, 2009, and
15               attachment, Bates GA006774 -
16               GA006814, - 41 pages                    76
17   Exhibit 25   GenAudio, Inc., Common Stock
18               Shareholder List, Bates GA006005 -
19               GA006012 - 8 pages                      81
20   Exhibit 26   E-mail chain, top e-mail dated
21               February 12, 2010, Bates JM000378 -
22               JM000380 - 3 pages                      84
23
24
25
```

Page 7

```
 1                  EXHIBITS - (CONTINUED)
 2                   JIM WEI-KUNG MATTOS
 3   Number           Description                      Page
 4   Exhibit 27   E-mail dated 2/12/2010, Bates
 5               SEC-TiscarenoV-E-0000992 -
 6               SEC-TiscarenoV-E-0000993 - 2 pages      86
 7   Exhibit 28   E-mail chain, top e-mail dated
 8               March 19, 2010, Bates JM001041 -
 9               JM001046 - 6 pages                      88
10   Exhibit 29   E-mail chain, top e-mail dated
11               March 21, 2010, Bates JM000727 -
12               JM000729 - 3 pages                      97
13   Exhibit 30   E-mail dated Sun. 21 Mar 2010,
14               Bates 347APL-00000315 -
15               347APL-00000316 - 2 pages               98
16   Exhibit 31   E-mail chain dated May 25, 2010,
17               Bates JM002158 - JM002167 - 10 pages   104
18   Exhibit 32   E-mail chain, top e-mail dated
19               5/25/2010, Bates
20               SEC-TiscarenoV-E-0001158 -
21               SEC-TiscarenoV-E-0001162,
22               - 5 pages                              106
23
24
25
```

Page 8

```
 1                  EXHIBITS - (CONTINUED)
 2                   JIM WEI-KUNG MATTOS
 3   Number           Description                      Page
 4   Exhibit 33   E-mail dated June 2, 2010, Bates
 5               GA004959 - GA004961 - 3 pages          109
 6   Exhibit 34   E-mail chain, top e-mail dated
 7               October 27, 2014, Bates JM002515 -
 8               JM002518 - 4 pages                     114
 9   Exhibit 35   E-mail chain, top e-mail dated
10               7/2/2010, Bates
11               SEC-TiscarenoV-E-0001218 -
12               SEC-TiscarenoV-E-0001221 -
13               - 4 pages                              117
14   Exhibit 36   E-mail chain, top e-mail dated
15               Thur 11/20/2014, Bates
16               SEC-ELLIOTT-E-0000241 -
17               SEC-ELLIOTT-E-0000242 - 2 pages        122
18   Exhibit 37   Letter dated August 1, 2010, Bates
19               GA005351 - GA005353,
20               - 3 pages                              124
21   Exhibit 38   E-mail dated September 6, 2010,
22               Bates JM005121 - JM005126 - 6 pages    126
23   Exhibit 39   E-mail dated November 6, 2010, Bates
24               JM006157 - JM006158 - 2 pages          136
25
```

Case 1:15-cv-02118-WJM-SKC   Document 90-5   Filed 03/30/18   USDC Colorado   Page 4 of 7

Securities and Exchange Commission v.  
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos  
July 22, 2016

Page 9

```
 1                EXHIBITS - (CONTINUED)
 2                 JIM WEI-KUNG MATTOS
 3    Number          Description              Page
 4    Exhibit 40   E-mail chain, top e-mail dated
 5                 Thur 11/20/2014, Bates
 6                 SEC-Skluzak-E-0000905 -
 7                 SEC-Skluzak-E-0000911,
 8                  - 7 pages                    149
 9    Exhibit 41   E-mail chain, top e-mail dated
10                 March 12, 2010, Bates JM001098 -
11                 JM001102 - 5 pages            153
12    Exhibit 42   Stock Certificate and attachment,
13                 Bates Mahabub000018 -
14                 Mahabub000029 - 12 pages      160
15    Exhibit 43   Stock Certificate and attachment,
16                 Bates GA007852 - GA007867 - 16 pages   166
17    Exhibit 44   E-mail chain, top e-mail dated April
18                 27, 2010, Bates JM003267 -
19                 JM003273 - 7 pages            173
20    Exhibit 45   E-mail chain, top e-mail dated June
21                 28, 2010, Bates JM002199 - 1 page   178
22    Exhibit 46   E-mail chain, top e-mail dated April
23                 22, 2011, Bates JM007887 -
24                 JM007889 - 3 pages            180
25
```

Page 10

```
 1                EXHIBITS - (CONTINUED)
 2                 JIM WEI-KUNG MATTOS
 3    Number          Description              Page
 4    Exhibit 47   E-mail chain, top e-mail dated
 5                 August 30, 2010, Bates JM004734
 6                  - 1 page                     183
 7    Exhibit 48   E-mail chain, top e-mail dated
 8                 March 20, 2010, Bates JM000965
 9                  - 1 page                     185
10    Exhibit 49   E-mail chain dated March 19, 2010,
11                 Bates JM001202 - JM001203 - 2 pages   188
12    Exhibit 50   Letter dated August 6, 2015, Bates
13                 AST-0000035 - AST-0000036 - 2 pages   197
```

Page 11

1      FRIDAY, JULY 22, 2016; 9:07 A.M.
2      **THE VIDEOGRAPHER:** Here begins DVD No. 1 in the
3  deposition of Jim Wei-Kung Mattos in the Matter of
4  Securities and Exchange Commission versus Taj Jerry
5  Mahabub, et al., in the United States District Court for
6  the District of Colorado, case No.
7  1:15-CV-02118-CBS-WJM.
8      Today's date is July 22, 2016.  The time on the
9  video monitor is 9:07.
10     The video operator today is Jeff Waldie
11 contracted by Behmke Reporting & Video Services,
12 Incorporated, 160 Spear Street, Suite 300, San
13 Francisco, California.
14     This video deposition is taking place at 6855
15 South Virginia Street, Reno, Nevada, and was noticed by
16 Leslie Hughes, Esq., of the Securities and Exchange
17 Commission.
18     Counsel, please voice identify yourselves and
19 state whom you represent.
20     **MS. VOORHEES:** Danielle Voorhees and Leslie Hughes
21 on behalf of the Securities and Exchange Commission.
22     **MR. McCLOSKEY:** Michael McCloskey on behalf of
23 GenAudio.
24     **MR. HOLMES:** Andrew Holmes on behalf of Jerry
25 Mahabub.

Page 12

1      **MS. YUEN:** And Jennifer Yuen on behalf of Astound
2  Holdings.
3      **THE VIDEOGRAPHER:** Would the court reporter please
4  swear in the witness.
5          JIM WEI-KUNG MATTOS,
6   having been first duly sworn by the reporter,
7       was examined and testified as follows:
8      **THE VIDEOGRAPHER:** You may begin.
9              EXAMINATION
10 BY MS. VOORHEES:
11     Q.  Mr. Mattos, good morning.  Thank you for
12 appearing here today.  Could you please state and spell
13 your full name for the record.
14     A.  My name is Jim Wei-Kung Mattos, J-i-m,
15 W-e-i-K-u-n-g, M-a-t-t-o-s.
16     Q.  Thank you, Mr. Mattos.
17         Are you represented by counsel in this matter?
18     A.  No, I am not.
19     Q.  And you've testified before.  Correct?
20     A.  I have.
21     Q.  And have you testified other than in the SEC
22 investigation that preceded this matter?
23     A.  No.
24     Q.  All right.  The same ground rules apply here.
25 Do you understand that you are under oath?

**Securities and Exchange Commission v.**
**Taj Jerry Mahabub, et al.**

Jim Wei-Kung Mattos
July 22, 2016

### Page 29

```
 1    A.   Correct.
 2    Q.   So were you reaching out to new friends and
 3  family?
 4    A.   At that point it was more of a network.  It
 5  would be friends and family of friends and family, for
 6  instance.
 7    Q.   All right.
 8    A.   Yeah.
 9    Q.   So you were still bringing in new shareholders?
10    A.   There were, yes.
11    Q.   And what was your process for communicating
12  with those people?
13    A.   Either -- either by phone or by e-mail.
14    Q.   If you spoke to people on the phone about
15  GenAudio, did you keep any notes?
16    A.   No.
17    Q.   Any -- any documents at all that would reflect
18  those communications by phone?
19    A.   No.
20    Q.   If you communicated with those people by
21  e-mail, did you use your GenAudio e-mail address?
22    A.   Always.
23    Q.   And what was your GenAudio e-mail address?
24    A.   Jim@GenAudioInc.dotcom.
25    Q.   You produced documents to the Securities and
```

### Page 30

```
 1  Exchange Commission in connection with the
 2  investigation.  Correct?
 3    A.   Correct.
 4    Q.   And did those documents include your e-mails
 5  with these investors?
 6    A.   Yes.  It was very thorough.
 7    Q.   Okay.  Did you withhold any communications with
 8  investors?
 9    A.   No.
10    Q.   Describe for us the investor files that you
11  maintained.  What -- what did they look like, and what
12  was in them?
13    A.   Well, it would be an alphabetical, you know,
14  inclusion of all investors.  It would include a copy of
15  the stock certificate front and back, copy of the -- I'm
16  forgetting the -- the proper terms for -- them.  The
17  investor documents that were included with each PPM --
18    Q.   Okay.
19    A.   -- that they would have had to have filled out
20  and -- and submitted to the company.
21    Q.   All right.  And we'll walk through those.
22    A.   Yeah.
23    Q.   Anything else?
24    A.   Occasionally maybe an e-mail or two if there
25  was, you know, a communication, but that was pretty
```

### Page 31

```
 1  rare.
 2    Q.   All right.  And when would -- when would you
 3  actually print out an e-mail and put it in the file?
 4    A.   It was so random I couldn't say with any
 5  specificity.  Yeah.
 6    Q.   Okay.  Was there anything else that was
 7  maintained in the investor files?
 8    A.   That was -- that was primarily it.  I mean --
 9  and there would also occasionally be requests for, you
10  know, change of ownership sometimes due to, you know,
11  death, marriage, you know, transfer to other family.
12    Q.   All right.
13    A.   That did occasionally happen.
14    Q.   If shares were transferred to other people, did
15  you open new investor files on those new shareholders?
16    A.   Yes.
17    Q.   Okay.
18    A.   And I would typically include a copy of the
19  stock transfer request form both in the original file as
20  well as the new one.
21    Q.   All right.  So it would be in both investors'
22  files?
23    A.   Yeah.
24    Q.   Okay.
25    A.   Yeah.
```

### Page 32

```
 1    Q.   Where are those investor files today?
 2    A.   I believe they are in storage in the Denver,
 3  Colorado, area.
 4    Q.   All right.  Do you know where the storage
 5  facility is?
 6    A.   I do not.
 7    Q.   And why do you believe they're in storage in
 8  Denver?
 9    A.   When I moved out of my -- out of Colorado late
10  last fall, I requested for the company to come pick up
11  all company equipment and asked -- had some files, and
12  it was my understanding that Mr. Mahabub hired a moving
13  company to transfer them to a storage facility somewhere
14  in the Denver area.
15    Q.   All right.  So did somebody actually come take
16  the documents from you?
17    A.   Yes.
18    Q.   Who was that?  Who took them?
19    A.   It was a moving company that Jerry had hired.
20    Q.   Okay.
21    A.   Yeah.
22    Q.   Did you have any involvement in hiring that
23  moving company --
24    A.   No.
25    Q.   -- or paying that moving company?
```

Securities and Exchange Commission v.  
Taj Jerry Mahabub, et al.

Jim Wei-Kung Mattos  
July 22, 2016

Page 129

1  were coming from the Seattle area.
2  Q.  Okay.
3  A.  It was -- the Eldridge family were principals
4  for bringing in quite a number of people onboard.
5  Q.  Did you know the Eldridge family?
6  A.  I did.
7  Q.  And how did you know them?
8  A.  Their son Derek was a good friend of mine.  He
9  was one of the initial investors in GenAudio back in the
10  2004-2005 time frame.
11  Q.  How did you know Derek Eldridge?
12  A.  Personal friend.
13  Q.  And how long had you known him for?
14  A.  I had known him since the late '90s.
15  Q.  And you said he first invested back in 2004?
16  A.  Might have been -- might have been spring of
17  2005.
18  Q.  Okay.
19  A.  Yeah.
20  Q.  But several years prior to 2010?
21  A.  Oh, yeah.  Yeah.
22  Q.  Okay.
23  A.  He had sold -- he had sold a property and had
24  money to invest, and that's what he did.
25  Q.  All right.  And so then what was his connection

Page 130

1  to the -- to the 2010 offering?
2  A.  Well, the connection was that he is the son of
3  Dean and Linda Eldridge.
4  Q.  Okay.
5  A.  And, presumably, they went out and, you know,
6  solicited their friends to invest in the company.
7  Q.  And did that actually happen?
8  A.  Yes.  The -- the people that were investing at
9  that time were new.  They weren't direct contacts of
10  mine.  Again, it was kind of the friends and family
11  introducing their friends and family type of thing, kind
12  of an umbrella, so to speak.
13  Q.  Were you friends with Derek Eldridge in, let's
14  say, the summer and fall of 2010?
15  A.  Yes.
16  Q.  And did you still talk to him at that time?
17  A.  Yes.
18  Q.  And during that time, tell us about your
19  communications with him about GenAudio.
20  A.  Oh, I don't recall the specifics.
21  Q.  Did you tell him that GenAudio was working with
22  Apple?
23  A.  I mean, all the communications at that time
24  were all based on the shareholder communications that
25  were out there.  So I'm sure we did have some

Page 131

1  conversation.  As far as what and when, I don't recall.
2  Q.  Okay.  You don't recall anything about them?
3  A.  Not in specifics, no.
4  Q.  Do you recall talking to Derek Eldridge about
5  Apple, just in general?
6  A.  Well, he was one of my best friends at the
7  time.  So -- and he was also a shareholder, so, yeah,
8  invariably, we did have some conversations.
9  Q.  And at the time that you were having those
10  conversations with Mr. Eldridge, Derek Eldridge, were
11  you optimistic that GenAudio would enter into some sort
12  of transaction with Apple?
13  A.  I was reasonably optimistic, yes, based on the
14  information that was being supplied by Mr. Mahabub in
15  conjunction with company updates and the PPM.
16  Q.  You said that these Seattle investors -- it was
17  your understanding that they came in through Derek
18  Eldridge's parents --
19  A.  Right.
20  Q.  -- is that correct?
21      All right.  Do you know what -- what Dean and
22  Linda Eldridge were telling their friends and family
23  about GenAudio?
24  A.  I do not.
25  Q.  Did you ever ask them?

Page 132

1  A.  No.
2  Q.  Do you know what Derek Eldridge was telling his
3  friends and family about GenAudio in 2010?
4  A.  I do not.
5  Q.  Focusing back on Exhibit 38, the next paragraph
6  down.  So I'm now on the fourth paragraph on 5125.  It
7  starts:  "Lastly, I wanted you all to know that this
8  entire offering was funded by Jim Mattos and my friends
9  and family, with about 150K coming in from the road show
10  tour I did (strangers) which raised approximately three
11  times the amount of money we spent doing the tour."
12      Were you involved in that road tour?
13  A.  I'd have to go back and look.  I only -- I only
14  went with -- I was only in attendance with Jerry two or
15  three times total.  I don't recall if it was during this
16  specific period or not.
17  Q.  Okay.
18  A.  In fact, during this specific period, I don't
19  think so.  I -- I was mainly just working out of my home
20  at that point.
21  Q.  And by "this specific period," what do you
22  mean?
23  A.  Oh, I mean in terms of whether I was in
24  attendance of these particular road shows, I don't
25  recall.

**Page 221**

1    300, San Francisco, California.  Going off the record.
2    The time is 2:58 p.m.
3         (Comments off the record by the reporter.)
4         **MR. HOLMES:** Wait.  Before we do that, we should
5    figure out the transcript so he knows what to do with
6    it.
7         Jim, normally this is something your attorney
8    would handle for you or talk about, but you are going to
9    get a chance to review the written booklet of the
10   testimony.  And typically there's a stipulation that
11   says that, you know -- if you don't do a stipulation,
12   then, you know a bunch of things happen that the court
13   reporter has to do.  But if we do a stipulation, then
14   what we do is relieve the court reporter of some of her
15   normal duties, and then we have the deposition
16   transcript sent to you so that you can review it, make
17   any changes that you think need to be made.  Sometimes
18   the response comes out opposite you thought it would be
19   or whatever the change might be.  Then you sign off on
20   changes, and you send it back to counsel for the SEC.
21        **THE WITNESS:** Okay.
22        **MR. HOLMES:** You have a certain amount of time to do
23   that in.  And I want to just sort of invite you to tell
24   us how much time you need and what process would work
25   for you.

**Page 222**

1         **MR. McCLOSKEY:** Typically it's 30 days.  Are you
2    all right with it being signed under penalty of perjury
3    as opposed to going out, getting the signature
4    notarized?
5         **MS. VOORHEES:** Yeah, yes, that's fine.  We can do it
6    under penalty of perjury.  We can provide you a copy of
7    the transcript.  If we give you 30 days, is that
8    sufficient to review?
9         **THE WITNESS:** That should be sufficient, yes.
10        (Discussion off the record.)
11        **MR. HOLMES:** So, Jim, what that means is you'll get
12   it, and then within 30 days of getting it, you are
13   expected to send back whatever changes you have to the
14   court reporter.
15        **THE WITNESS:** Okay.  That's fine.
16        **MR. HOLMES:** If you don't do that, then the
17   assumption is you're fine with it as is.
18        **THE WITNESS:** Okay.  So no changes, then just don't
19   send it back?
20        **MR. HOLMES:** Right.  But it's important to read it
21   because sometimes --
22        **THE WITNESS:** No.  I will.
23        **MR. McCLOSKEY:** I'd ask you if you have no changes,
24   say you have no changes.  That we way affirm --
25        **THE WITNESS:** Okay.  Thank you.

**Page 223**

1         **THE REPORTER:** Counsel, what would you like to
2    order?
3         **MS. VOORHEES:** Whatever is in our standard order.
4         **THE REPORTER:** Ms. Yuen, would you like a copy?
5         **MS. YUEN:** No.
6         **THE REPORTER:** Okay.  And, Mr. Holmes?
7         **MR. McCLOSKEY:** I'll get you one.
8         **MR. HOLMES:** No, not right now.
9         **MR. McCLOSKEY:** I'll get a copy.
10        (At 3:01 P.M., the deposition proceedings
11        concluded.)
12
13        ------------------------------
14            JIM WEI-KUNG MATTOS

**Page 224**

1    STATE OF CALIFORNIA       )
2                              )  ss.
3    COUNTY OF EL DORADO       )
4         I hereby certify that the witness in the
5    foregoing deposition, JIM WEI-KUNG MATTOS, was by me
6    duly sworn to testify to the truth, the whole truth, and
7    nothing but the truth, in the within-entitled cause;
8    that said deposition was taken at the time and place
9    herein named; that the deposition is a true record of
10   the witness's testimony as reported by me, a duly
11   certified shorthand reporter and a disinterested person,
12   and was thereafter transcribed into typewriting by
13   computer.
14        I further certify that I am not interested in
15   the outcome of the said action, nor connected with, nor
16   related to any of the parties in said action, nor to
17   their respective counsel.
18        IN WITNESS WHEREOF, I have hereunto set my hand
19   this 28th day of July, 2016.
20   Reading and Signing was:
21   _X_  requested    ___  waived    ___  not requested
22
23        *[signature: Kimberly J. Waldie]*
24
25            KIMBERLY J. WALDIE, CSR 8696