**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-02118-WJM-MLC

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

                v.

TAJ JERRY MAHABUB and
GENAUDIO, INC.,

                Defendants.

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY IN SUPPORT
OF ITS REVISED MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS
TAJ JERRY MAHABUB AND GENAUDIO, INC.**

---

## TABLE OF CONTENTS

I.    SUMMARY ...................................................................................... 1

II.   REPLY IN SUPPORT OF MOVANT'S MATERIAL FACTS ................................ 2

III.  RESPONSE TO DEFENDANTS' ADDITIONAL MATERIAL FACTS ............... 10

IV.   ARGUMENT ................................................................................... 19

      A.   The Defendants Violated Sections 5(a) And (c)
           Of The Securities Act ............................................................. 19

      B.   The Defendants Committed Securities Fraud ..................................... 22

           1.   The Reality Of Defendants' Dealings With Apple .................... 22

           2.   Defendants' Did Not Tell The Truth About Apple ..................... 24

      C.   Defendants Violated Section 17(a)(2) Of The Securities Act And
           Section 10(b) and Rule 10b-5(b) Of The Exchange Act By Making
           False Statements And Omissions. ........................................... 28

           -    Mahabub acted with scienter and was also negligent ................29

           -    Defendants' fraudulent statements were not mere
                puffery or subject to the "bespeaks caution" doctrine ...............31

           -    Defendants made material misstatements and omissions ..........32

           -    Mahabub's falsified transcript that he forwarded to an investor
                was "in connection with" the purchase or sale of securities ......34

      D.   Defendants Engaged In A Scheme To Defraud And Violated
           Section 17(a) (1) And (3) Of The Securities Act And Section
           10(b) And Rules 10b-5(a) And (c) Of The Exchange Act .................... 34

V.    CONCLUSION .................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC*, 446 U.S. 680, 696 (1980) ...............................................................29, 37

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ...............................................................33

*Burman v. Phoenix Worldwide Indus.*, 384 F. Supp. 2d 316 (D.D.C. 2005) ................37

*Busch v. Carpenter*, 827 F.2d 653 (10th Cir. 1987).....................................................19

*Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (2014)......................................... 40

*Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997) ...................................... 31, 32

*IBEW Local 90 Bension Fund v. Deutsche Bank AG*,

    No 11 Civ. 4209 (KBF), 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013)................ 35

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,

    930 F. Supp. 68, 72 (S.D.N.Y. 1996)..................................................................... 31

*Lorenzo v. SEC*, 872 F.3d 578 (D.C. Cir. 2017) ........................................................... 40

*Dennis J. Malouf*, Securities Act Release No. 10115,

    2016 WL 4035575 (July 27, 2016)................................................................. 38, 40

*Mas Fukuda v. Nethercott*, 2016 U.S. Dist. Lexis 92462

    (D. Utah July 15, 2016).................................................................................. 19, 22

*Quinn & Co .v. SEC*, 452 F.2d 943 (10th Cir. 1971).....................................................19

*SEC v. Cooper*, 142 F. Supp. 3d 302 (D.N.J. 2015)..................................................... 38

*SEC v. Curshen*, 372 F. App'x 872 (10th Cir. 2010)..............................................33, 34

*SEC v. Guardian Oil & Gas, Inc.*, No. 3:14-cv-1533-BN,

    2014 WL 7330451 (N.D. Tex. Dec. 23, 2014).................................................... 37

*SEC v. Gordon*, 522 Fed. App'x 448 (10th Cir. 2013) .................................................. 19

*SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000) .................................................. 30

*SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355 (D.R.I. 2011)..... ................... . 29

*SEC v. Lucent Techs., Inc.* 610 F. Supp. 2d 342 (D.N.J. 2009) ....................... .37, 38, 39

*SEC v. Monterosso*, 557 F. App'x 917 (11th Cir. 2014)................................................ .38

*SEC v. McDuffie*, 2014 U.S. Dist. Lexis 128664 (D. Colo. Sept. 15, 2014) .................. 19

*SEC v. North American Research and Development Corp*

    424 F.2d 63 (March 25, 1970, 2d Cir.)................................................................. 35

*SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010) ...........................19

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) .......................................................... 19

*SEC v. Recycle Tech, Inc.* 2103 U.S. Dist. LEXIS 195982,

    (S.D. Fla. Sept. 26, 2013) .................................................................................... 36

*SEC v. Small Bus. Capital Corp.*, No. 12-CV-3237, 2013 WL 4455850

    (N.D. Cal. Aug. 16, 2013) .................................................................................... 29

*SEC v. Smart*, 678 F.3d 850 (10th Cir. 2012)................................................................ 29

*SEC v. Sullivan*, 68 F. Supp. 3d 1367 (D. Colo. 2014)................................................. 39

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ........................................................ 36

**Other Authorities**

Section 4(a)(2) of the Securities Act, 15 U.S.C. § 77d(a)(2).............................. 19, 21, 22

Section 5 of the Securities Act, 15 U.S.C. § 77e ...................................................... 19, 22

Section 17(a) of the Securities Act,

      15 U.S.C. § 77q(a)....................................... 2, 3, 22, 28, 29, 34, 35, 37, 39, 38, 40

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) ............... 1, 22, 38, 34, 35, 36, 40

Rule 10b-5, 17 C.F.R. § 240.10b-5 ........................................... 2,3,22, 28, 29, 34, 39, 40

Rule 501(d), 17 C.F.R. § 230.501(d) .............................................................................. 22

Rule 502(b) and (c), 17 C.F.R. § 230.502(b)(2)(B)(1) and (c)(2).................................. 20

Rule 506 of Regulation D, 17 C.F.R. § 230.506 ......................................... .19, 20, 21, 22

Fed. R. Evid. 803(6) ...................................................................................................... 21

Restatement (Second) of Torts §§ 282, 283 (1965) ...................................................... 29

## I.   SUMMARY[1]

Defendants paint Mahabub as a hopeless optimist who engaged in "a seemingly tireless attempt" to close a deal with Apple. Towards that end, Defendants concede that Mahabub "compromised his honesty." Unfortunately for investors in GenAudio, Mahabub's compromised honesty was not harmless. Mahabub claims that he believed Apple was about to enter into a business transaction with GenAudio, primarily relying on long, rambling, technical emails to Apple employees and his claim that those Apple employees did not respond to _each_ statement by pointing out that no "deal" with Apple was imminent. Based on this history, Defendants claim that the Court should find that Mahabub acted reasonably in lying to investors and falsifying documents. But Defendants engaged in a fraudulent scheme that included making misstatements and omissions to investors; lying to the Board; sending falsified emails to the GenAudio Team; and even falsifying a transcript and forwarding it to an investor. Defendants committed securities fraud.

Defendants also violated the securities registration provisions. They made public offers and sales to unaccredited investors without providing required financial and other information necessary for investors to make an informed investment decision. Defendants fail to provide any evidence to establish a defense to the SEC's _prima facie_ case – which the Defendants concede. This claim is straightforward and undisputed; therefore, entry of summary judgment is appropriate.[2]

---

[1] The SEC's Revised Motion for Summary Judgment (ECF No. 84) is cited as "Mot." GenAudio's Response (ECF No. 89) is cited as "GA Resp." and Mahabub's Response (ECF No. 90) is cited as "M. Resp." Undisputed Statements of Fact are cited as "USOF."

[2] Solely for purposes of summary judgment, the SEC is not asserting the following false statements and omissions as violations: Mahabub's oral statement to

## II.   REPLY IN SUPPORT OF MOVANT'S MATERIAL FACTS[3]

21.   **REPLY:** The evidence cited in Response does not contradict or otherwise

dispute the stated fact. Mahabub provided vague, unclear testimony regarding

Tiscareno's possible use of the phrase "Christmas product roll-out," including testifying:

> Q:   So I just want to make sure I understand. Your testimony is that Mr.
>       Tiscareno told you that Apple may want to use your technology for
>       a Christmas product rollout?
> A:   *It wasn't specifically that. It was – it was something along the lines*
>       *of, you know, we – if we do this and we do this right there is – we*
>       *might be able to make it into a Christmas product rollout. It was*
>       *something – something kind of like – again, very vague. ***
> Q:   But you recall Mr. Tiscareno using those words [Christmas product
>       roll out] in a communication with you?
> A:   *Might not have specifically been exact – he might have said a*
>       *rollout during the holidays. I mean, whatever. I mean, who knows*
>       *exactly what – the words he would have said was, but the*
>       *interpretation would be a Christmas product rollout is what I would*
>       *have interpreted that as, you know.*

Ex. 150, Mahabub Dep. at 310:21 – 311:5 and 312:10 – 17; *see also id.* at 310:6 –

313:12. Tiscareno, on the other hand, was clear, testifying: "Q: Okay. And did you ever

have any discussions about a Christmas product rollout under any circumstances with

Mr. Mahabub? A: No." Ex. 222, Tiscareno Inv. Tr. at 206:25 – 207:3.

22.   **REPLY:** The evidence cited in Response does not contradict or otherwise

dispute the stated fact. Mahabub testified that Isaac told him that Apple would not pay a

---

investors at the late 2009 shareholder meeting (SOF ¶ 42), Mahabub's March 10, 2010
email to shareholders (SOF ¶ 53), and the omission "GenAudio and Mahabub did not
inform investors that in September 2010, Mahabub conducted a demonstration to Apple
personnel that went poorly" (SOF ¶ 117). While the SEC disagrees with the Defendants'
contentions regarding these statements and omissions, the Court may disregard them
and rule in favor of the SEC on its claims for violations of Section 17(a)(2) and Rule
10b-5(b); therefore, it is unnecessary for the Court and parties to address them further
at this juncture.
   [3] Defendants do not dispute a number of facts, which are not repeated here.
Attached as Exhibit 230 is a chart that sets forth each SOF, any applicable Response,
and any applicable Reply.

per-unit royalty, not that Apple would engage in any licensing of GenAudio or its

technology. Mahabub testified:

> *Because I had asked Ron, I was like, "Well, you know, what – what do we*
> *do?  How do we – we're going to do this, obviously we need to figure out*
> *how we're going to license this to you; right?"  And he said, "Well, we're*
> *not going to pay you a per unit royalty, you know that."  That's exactly*
> *what he said, quote-unquote, to me. *** And I told him, I said, "That's*
> *okay."  And he said, "Well, when we get to that stage, we'll figure it out."*
> *That's exactly what he told me in the conference room.*

Ex. 221, Mahabub Dep. at 96:14-20 and 97:8 – 11. Isaac testified, "we never discussed

business opportunities with Jerry, never." Ex. 223, Isaac Dep. 32:3-32:13; *see also* Ex.

19, Isaac Dep. at 189:8-12, 191:2-6, 191:20 – 192:23.

23.    **REPLY:** *See* Reply SOF ¶¶ 21-22.

24.    **REPLY:** The Response "the contents of these emails speak for

themselves" fails to comply with the Court's Practice Standards requirement that the

Response "admit[] or deny[] the asserted material fact set forth by the movant" (§ III.E.4);

therefore, the SEC requests that the fact be deemed admitted.

30.    **REPLY:** The fact should be deemed admitted. *See* Reply SOF ¶ 24.

38. & 39.  **REPLY:** Defendants' hearsay objection is not a sufficient basis for denial

for the reasons stated in Reply SOF ¶ 44.

42.    **REPLY:** The testimony of the witness is not speculative. While the witness

could not recall Mahabub's exact quote on the timing of the alleged "buyout," the

witness was clear that Mahabub was "positive" that "Apple was going to be buying us

out and we'd better get in now." Ex. 39, Eldridge Inv. at 17:7-10.[4]

---

[4] While the SEC no longer relies on Mahabub's statements at this meeting as a
separate basis for summary judgment on its Section 17(a)(2) and Rule 10b-5(b) claims,
the statements are relevant for establishing the information about Apple that Defendants
were actively making directly to investors.

43.     **REPLY:** By making an admissibility objection and failing to provide a brief factual explanation of the reasons for their denial, with a specific reference to admissible evidence, Defendants have failed to comply with the Court's Practice Standards § III.E.4.b and c; therefore the SEC requests that this fact be deemed admitted.

44.     **REPLY:** In Exhibit 43 at 2, Mahabub explicitly states that personal shares have been sold. Defendants' hearsay objection is not a sufficient basis for denial because it fails to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible at trial," Fed. R. Civ. P. 56(c)(2), as required by the Court's Practice Standards III.E.4.c.

48.     **REPLY:** Defendants' cited SOFs do not dispute that this is an accurate quote from Hailey's email. Defendants' SOF ¶ 141 includes the same quote. Defendants' hearsay objection is not a sufficient basis for denial for the reasons stated in Reply SOF ¶ 44. Further, the email is also offered as evidence of the notice provided to Mahabub by Apple.

49.     **REPLY:** Defendants' cited SOFs do not dispute that this is an accurate quote from Hailey's email. Defendants' hearsay objection is not a sufficient basis for denial for the reasons stated in Reply SOF ¶ 44. Further, the email is also offered as evidence of the notice provided to Mahabub by Apple.

50.     **REPLY:** The fact should be deemed admitted. *See* Reply SOF ¶ 24.

53.     **REPLY:** Mahabub's representations were false for the reasons stated in SOF ¶¶ 21-23 and Reply SOF ¶¶ 21-23.

59.     **REPLY:** Exhibit 26 is GenAudio's discovery response that establishes that GenAudio did not maintain records related to Alan Stone or identifying investors to

whom public email blasts were sent. Mahabub testified that he used an investment firm, Alan Stone, to locate investors through road shows. Ex. 224, Mahabub Inv. at 364:11-25, 367:11-369:6; 373:2-376:25 (discussing Ex. 54, which lists ten road shows). In his May 18, 2010 email, Mahabub admits to forwarding an email blast that went out to Alan Stone's contacts for the upcoming road show presentations. Ex. 225. In a September 6, 2010 email, Mahabub admits to raising $150,000 from strangers who attended the road show tour. Ex. 57, at JM005125, fourth paragraph.

62.   **REPLY:** GenAudio did not have an *effective* procedure to review Questionnaires and verify all investors were accredited. While Mattos testified that he generally reviewed the Questionnaires, he admitted to overlooking some Questionnaires that were not complete. Defendants did not keep a list identifying non-accredited investors. SOF ¶¶ 64, 65 and USOF ¶ 66.

64.   **REPLY**: Defendants do not dispute N/A was written in response to questions about accreditation, but dispute whether the document demonstrates the investor was unaccredited. This Questionnaire is the only evidence Defendants put forward on this investor's qualification. Without more evidence, GenAudio cannot establish it had a reasonable belief that the investor was accredited.

65.   **REPLY**: Defendants do not dispute that some investors left portions of the Questionnaire blank, but dispute whether the documents demonstrate the investors were unaccredited. Without more evidence, GenAudio cannot establish it had a reasonable belief that the investors were accredited. Marvin testifies he was not accredited when he invested in the 2010 and 2011. ECF No. 84-89 ¶¶ 7-10.

67.   **REPLY:** GenAudio and Mahabub disclose in the PPMs that prior to the

2010 and 2011 Offerings, GenAudio sold securities to investors who were not accredited. The exact time frame of those sales is not relevant or in dispute. Ex. 3 at 44-45; Ex. 4 at 53-54. Defendants did not keep a list of the un-accredited investors. SOF ¶ 62.

68.     **REPLY:** Defendants do not dispute the statements in the email. Rather they argue about the conclusions to be drawn, and so this fact should be deemed admitted. Rosenblatt initially acquired shares in a transfer from another shareholder on 9/12/2005. *See* Ex. 226 at 2 (excerpt from GenAudio Shareholder List). He then acquired additional shares on 7/14/10 in the 2010 Offering. *Id.* at 4. GenAudio produced no accreditation Questionnaires related to Rosenblatt's purchases in either September 2005 or July 2010.

70.     **REPLY:** All GenAudio shareholders were also prospective investors, as GenAudio relied on its shareholder base to make repeated investments, as is evidenced by the 2010 and 2011 Offering Materials being sent to current shareholders. *See* Ex. 79 at 3 (the 2010 Offering "has been very successful thus far with the vast majority of investments coming from our existing shareholders …. Many of you have continued to invest over and over again …."). Defendants also distributed the 2010 PPM to new investors. *See, e.g.*, Ex. 74 at 4 (Mahabub attaching a PPM to an email to a new investor).

72.     **REPLY:** The cited evidence does not dispute the fact that this omission occurred. *See also* Reply SOF ¶ 21-22.

74.     **REPLY:** The fact should be deemed admitted. *See* Reply SOF ¶ 24.

77.     **REPLY:** Please see Argument §§ IV.B and IV.C regarding the

reasonableness of Mahabub's conduct and his scienter.

78.    **REPLY:** Please see Argument §§ IV.B and IV.C regarding the

reasonableness of Mahabub's conduct and his scienter.

79.    **REPLY:** The record does not reflect that the "email was sent to one

investor only." Instead, it reflects that Mahabub cannot recall to whom he sent the email.

Ex. 150, Mahabub Dep. 200:12 – 202:10. Mahabub's email was false, as the CEO of

Apple was not involved in any aspect of Apple's work with GenAudio. *See* USOF ¶ 35.

Please see Argument §§ IV.B and IV.C regarding the reasonableness of Mahabub's

conduct and his scienter.

80.    **REPLY:** Exhibit 51 is a business record of GenAudio that was

authenticated by Devine. *See* USOF ¶ 54. The email is not offered to prove the

subscription agreement was sent, but that the investor was influenced by Mahabub's

false statements and purchased securities. Defendants' hearsay objection is not a

sufficient basis for denial for the reasons stated in Reply SOF ¶ 44.

81.    **REPLY:** None of the cited evidence or argument disputes the stated fact.

Defendants' hearsay objection is not a sufficient basis for denial for the reasons stated

in Reply SOF ¶ 44.

82.    **REPLY:** These statements were false. USOF ¶¶ 26, 35. Please see

Argument §§ IV.B and IV.C regarding the reasonableness of Mahabub's conduct and

his scienter.

83.    **REPLY:** The fact should be deemed admitted. *See* Reply SOF ¶ 24.

84.    **REPLY:** Defendants' hearsay objection is not a sufficient basis for denial

for the reasons stated in Reply SOF ¶ 44.

86.     **REPLY:** Please see Argument §§ IV.B and IV.C regarding the reasonableness of Mahabub's conduct and his scienter.

87.     **REPLY:** The cited evidence does not contradict the stated fact. Skluzak did testify that the transcription confirmed the decision he had made.

88.     **REPLY:** Defendants' hearsay objection is not a sufficient basis for denial for the reasons stated in Reply SOF ¶ 44.

89.     **REPLY:** Please see Argument §§ IV.B and IV.C regarding the reasonableness of Mahabub's conduct and his scienter.

90.     **REPLY:** The fact should be deemed admitted. *See* Reply SOF ¶ 24.

95.     **REPLY:** Defendants' hearsay objection is not a sufficient basis for denial for the reasons stated in Reply SOF ¶ 44.

105.    **REPLY:** All GenAudio shareholders were also prospective investors. *See* Reply SOF ¶ 70.

107.    **REPLY:** Defendants' hearsay objection is not a sufficient basis for denial for the reasons stated in Reply SOF ¶ 44.

109.    **REPLY**: *See* Reply SOF ¶ 62.

110.    **REPLY**: GenAudio presents no evidence that it contemporaneously obtained information about the status of investors' accreditation aside from the Questionnaires, some of which were not properly completed. For the Questionnaires marked "N/A" or that were blank, GenAudio did not follow up. To the contrary, investor Marvin was not accredited when he purchased in the 2010 and 2011 offerings. SOF ¶ 111, Ex. 63 at 9, 14, 19 and 24; Marvin Dec., ECF No. 84-89 ¶ 7-10.

111.    **REPLY**: Investor Marvin left his Questionnaire blank and was not

accredited. SOF ¶ 111, Ex. 63 at 9, 14, 19 and 24; Marvin Dec., ECF No. 84-89 ¶ 7-10.

114.   **REPLY**: These documents show that GenAudio and Mahabub sent investors the 2011 Offering materials on April 22, 2011. Ex. 4 and Ex. 86. As represented in Mahabub's March 29, 2011 email, the 2011 PPM omits information about Apple or the LCEC. *See* USOF ¶ 100 & Ex. 85. Defendants do not present evidence to dispute this fact.

115.   **REPLY:** Defendants do not dispute the omission of this information; rather, they argue about the relevance and actionability of the omission. Please see Argument § IV.C for a discussion of the materiality of the omission.

116.   **REPLY:** Defendants do not dispute the omission of this information; rather, they argue about the relevance and actionability of the omission. Please see Argument § IV.C for a discussion of the materiality of the omission. *See* Reply to SOF ¶¶ 21-22.

120.   **REPLY:** The SEC relies on this statement to support "[m]oreover, the false and misleading statement and omissions were important to GenAudio's investors and influenced their investment decisions." Mot. at 37. The false statements and omissions within the Offering Materials are discussed in SOF ¶¶ 70-72 and 115-118. Defendants provide no evidence to dispute this fact or to support their assertion that "[t]he statement is accurate only as to two investors …." By failing to provide a brief factual explanation of the reasons for their denial of this fact, with a specific reference to admissible evidence, Defendants have failed to comply with the Court's Practice Standards § III.E.4.b; therefore the SEC requests that this fact be deemed admitted.

122.   **REPLY:** Defendants included information about GenAudio's dealings with Apple in Offering Materials, investor updates, and other direct investor communications.

*See, e.g.*, USOF ¶¶ 40-41, 71, 91, 97, 99-100 and SOF ¶ 42, 70, 79, 89. Defendants'

attempt to claim that GenAudio's victim investors engaged in wrong-doing is

disingenuous and should be rejected. It is irrelevant that Mr. Eldridge heard about Apple

through his son's communications with Mattos – the GenAudio employee responsible

for soliciting investors – and not Mahabub. This bolsters the fact that investors

purchased shares based on information regarding GenAudio's dealings with Apple.

## III.   RESPONSE TO DEFENDANTS' ADDITIONAL MATERIAL FACTS

For purposes of the Motion, the SEC does not dispute Defendants' Additional

Statements of Material Fact[5] ¶¶ 123-128, 130-131, 134, 136-141, 147-154, 158-160,

165, 170, 179-180, 182-183, 185, 189, 202, 205-206, 208, 210, 212, 214-216, 218, 220-

221, 228-230, 232-233, 235-236.

129.   **RESPONSE:** Disputed that Tiscareno's failure to respond to any of

Mahabub's communications "encouraged Mahabub to believe his statements were

correct." Please see Argument §§ IV.B and IV.C regarding the reasonableness of

Mahabub's conduct and his scienter.

132.   **RESPONSE:** Disputed. The cited evidence also does not support the

arguments that Mahabub "again expressed optimism and belief that a deal between

Apple and GenAudio would be completed in the short term" or "Mahabub was

suggesting a transaction could be completed sufficiently quickly for GenAudio's

technology to be integrated into Apple products and on the market by January, three

months later." The email refers to having an undefined "this" completed "from the

_____

[5] The SEC does not dispute these facts only for purposes of the Motion. The
SEC does not stipulate to any of the Defendants' Additional Statements of Material Fact
or to the admissibility of the evidence cited in support of such facts for purposes of trial
or any further proceedings in this matter.

Marketing side" by MacWord and reflects Mahabub's belief that "it would make sense *that we start to figure out the deal structure between Apple and GenAudio sooner rather than later.*" Ex. 193 (emphasis added).

133.   **RESPONSE:** Disputed as to the characterization that discussions with Apple were "extensive." Mahabub ultimately engaged in "fairly extensive" communications with Tiscareno; however, he only met with Isaac three or four times, met with Hailey two to four times over the course of approximately a year, and never met with Schiller, Cook, or Jobs regarding GenAudio. Ex. 152, Tiscareno Dep. 267:20 – 23; Ex. 17, Isaac Inv. Tr. 14:16 – 20; Ex. 16, Hailey Inv. Tr. 16:15 – 22; USOF ¶¶ 26, 32, 34.

135.   **RESPONSE:** Disputed as to the characterization as "extensive." *See* SEC Resp. SOF ¶ 126.

142.   **RESPONSE:** Disputed. The phrase "final milestone" was used by counsel for GenAudio, not Tiscareno or Mahabub. Ex. 152, Tiscareno Dep. 175:3-6. Mahabub's conduct establishes that his "focus" was on falsifying documents and lying to the GenAudio Board about his communications with Apple.

143.   **RESPONSE:** Disputed. Mahabub's response to Hailey states that Mahabub understands that Apple and GenAudio have entered a "'*cooling our heels' stage*" and states "[*i*]*f you have any idea as to when the exec buy-in might take place, that would help me out (a ball park figure, such as within 90 days, within 180 days, within the year, etc.). Perhaps you really have no idea as to when this will take place, and no worries if you do not* …." Ex. 190. Similarly, Exhibit 164 does not establish that Mahabub communicated that he still believed 3 to 6 months was realistic, he writes

"much appreciated you disclosing to me the more realistic timeframe. *This will help me to determine the forward direction of GenAudio over the next 3 to 6 months*. Of course, if anything changes, and the timeline is compressed/shortened, please inform me ASAP about this as Apple takes priority over everything else we are doing …." (Emphasis added); *see also* Ex. 188, Hailey Dep. 100:24-101:22.

144.   **RESPONSE:** Disputed. Tiscareno did not agree that there was nothing inaccurate about the statement and he lacks foundation to testify as to the truth or falsity of GenAudio's offering materials, which is indicated by the cited testimony and the testimony surrounding the cited testimony including: "Q. Is there anything else, looking at this, that you find inaccurate? A. Well, it's I mean, I'd have to sit down and read everything line by line. Q. I'm just talking about the second paragraph. A. Oh. No. Q. Ok. A. … I mean, … I can think of opinions that you didn't ask about. But it's just opinions that the document – that I've never read before, really." Ex. 152, Tiscareno Dep. 199:20 – 200:5; *see generally id.* at 194:5 – 200:10.

145.   **RESPONSE:** Disputed. Tiscareno's testimony begins with describing this section of the PPM as "[p]retty generous statements" and concludes with "[y]eah, I guess" as to their fairness and accuracy, demonstrating his lack of foundation and lack of complete agreement with the statements. Ex. 152, Tiscareno Dep. 205:4 – 206:15.

146.   **RESPONSE:** Disputed that the 2010 Offering Materials included "meaningful cautionary language." This is a legal conclusion. As discussed in the Argument section, *infra*, GenAudio's documents did not include cautionary language that was "meaningful" or sufficient to nullify Defendants' misstatements and omissions made during the relevant period, including prior to and during March 2010.

12

155.    **RESPONSE:** Disputed that Tiscareno referred to the executive as "the big exec." Exhibit 206 contains that reference, but is an email written by Mahabub.

156.    **RESPONSE:** Undisputed for purposes of the Motion that they "may" have told him, though the evidence also supports the inference that they may not have told him. *See also* SOF ¶ 158 (Defendants asserting that Mahabub was not told that the May 6, 2010 meeting was with Joswiak).

157.    **RESPONSE:** Disputed as to Mahabub's belief. Please see Argument §§ IV.B and IV.C regarding the reasonableness of Mahabub's conduct and his scienter.

161.    **RESPONSE:** Undisputed for purposes of the Motion, but Hailey's description of Joswiak's response is hearsay and Joswiak's response does not suggest that Apple moved forward with GenAudio.

162.    **RESPONSE:** Disputed. Tiscareno testified that he did not keep moving forward with GenAudio after May 6, 2010 and "I can't say 100 percent, but I believe at that point we were dead in the water," and "Q: Did you ever tell that to Jerry Mahabub? A: I – oh, he knew." He also testified that any work done may have related to "Ron [Isaac]." Ex. 152, Tiscareno Dep. 219:15 – 220:17 and 228:14-230:8.

163.    **RESPONSE:** Disputed. *See* SEC Resp. SOF ¶ 162.

164.    **RESPONSE:** Disputed. Please see Argument §§ IV.B and IV.C regarding the reasonableness of Mahabub's conduct and his scienter. The SEC objects to the citation to Tiscareno's deposition on the basis that Tiscareno has no foundation to testify as to Mahabub's state of mind. *See* Ex. 152, Tiscareno Dep. 262:16 ("I don't know what he was thinking").

166.    **RESPONSE:** Disputed. Tiscareno did not recall discussing additional

NDAs with Mahabub and was confused about the various correspondences on the issue. Isaac sent Mahabub an email (Ex. 181 at 2) referring Mahabub to another Apple employee regarding "all the necessary evaluation agreements," but did not otherwise communicate with Mahabub about such agreements. Ex. 227, Tiscareno Dep. 238:1 – 246:25; Ex. 169, Isaac Dep. 171:23 – 173:24.

167.   **RESPONSE:** Disputed. See Resp. SOF ¶ 129; *see also* Ex. 223, Isaac Dep. 32:3 – 13 ("A: We never discussed business opportunities with Jerry, never. Q: But he mentioned it a number of times, right? A: I do not recall that, and I wouldn't have even actually entertained it; not to the -- to the least of it."); *Id.* 189:8 – 16; Ex. 228, Hailey Dep. 157:4 - 9.

168.   **RESPONSE:** Disputed. Please see Argument §§ IV.B and IV.C regarding the reasonableness of Mahabub's conduct and his scienter. *See also* Resp. SOF ¶ 129; *see also* Reply SOF ¶¶ 21-22.

169.   **RESPONSE:** Disputed. Please see Argument §§ IV.B and IV.C regarding the reasonableness of Mahabub's conduct and his scienter. *See also* Reply SOF ¶ 22.

171.   **RESPONSE:** Undisputed for purposes of the Motion, though Mahabub's conduct in falsifying correspondence and making untrue statements about Apple executives evidences that he understood that Tiscareno was not senior enough to enter into a licensing or acquisition transaction with GenAudio. Please see Argument §§ IV.B and IV.C regarding the reasonableness of Mahabub's conduct and his scienter.

172.   **RESPONSE:** Disputed. Isaac testified that he could not recall one way or the other if he told Mahabub that Mahabub's exchange with Bright "was not a very good exchange to be had with a senior Apple engineer." Isaac further explained that

Mahabub's exchange with Bright "was a huge red flag … and it's not something I would have been proud of and would have retreated me quite a bit, quite honestly, to the point even that I wouldn't have wanted [Bright] seeing me exchange or mention [Mahabub]." Ex. 19, Isaac Dep. 158:20 – 25 and 159:8 – 18.

176.   **RESPONSE:** Disputed that this evidence supports the assertion that Mahabub "expressed his surprise that reaching a deal had taken this long." Mahabub's email merely states "*I was hoping to have Apple products with our tech inside by now.*" Ex. 197.

177.   **RESPONSE:** Disputed. Isaac testified that he does not recall whether or not GenAudio was part of the evaluation by the "Advanced Technology Group" and no further agreements were ever sent by Apple to GenAudio. Ex. 169, Isaac Dep. 174:1 – 8; SOF ¶¶ 100-101.

178.   **RESPONSE:** Disputed. Please see Argument §§ IV.B and IV.C regarding the reasonableness of Mahabub's conduct and his scienter.

179.   **RESPONSE:** Disputed that Mahabub and Isaac scheduled a time to talk by phone. The cited exhibit consists of Mahabub asking Isaac what his schedule looks like for a phone call, but does not schedule a call. Ex. 215.

184.   **RESPONSE:** Disputed. *See* Resp. SOF ¶ 133.

187.   **RESPONSE:** Disputed. Please see Argument §§ IV.B and IV.C regarding the reasonableness of Mahabub's conduct and his scienter.

188.   **RESPONSE:** Disputed that, as a blanket statement, "[i]nvestors' purchases of stock after [2011] were not based on any statements from GenAudio regarding discussions with, or a potential deal with Apple." In March 2011, Mahabub

falsely claimed that GenAudio and Apple would be entering into a new set of agreements that would prohibit them from update investors regarding the LCEC and the Defendants then issued the 2011-2012 Offering Materials, which made material omissions. *See* USOF ¶¶ 100-10, 118 and SOF ¶¶ 114-117.

201.   **RESPONSE**: Disputed that "[t]he exceptions were sent to people 'who [Mahabub] was interested in soliciting to join the board of directors.'" Mahabub "sponsored" Skluzak onto the GenAudio Board in 2012 and Skluzak joined the Board in April 2012 – nearly two years after Mahabub forwarded Skluzak the falsified transcription. Ex. 229, Skluzak Dep. 69:4 – 6; 89:17 – 20. Further, the GenAudio Team was involved in GenAudio's securities offerings, as some GenAudio Team members were shareholders, the Board members authorized GenAudio's 2010 offering, one GenAudio Team member was responsible for soliciting investors in GenAudio, and all GenAudio Team Members were encouraged to solicit investors for GenAudio. *See* USOF ¶¶ 5-7, 12, 73, 75 and SOF ¶ 50, 74.

209.   **RESPONSE:** Disputed. The record reflects that Mahabub's falsified emails were created in connection with the Defendants' scheme, which culminated with raising investor funds. Mahabub sent the GenAudio Board falsified documents the same day the Board authorized work on the 2010 Offering, he also requested that the GenAudio Team assist in fundraising from investors and Mahabub himself distributed key content of the false emails, including telling investors that Jobs was involved in Apple's dealings with GenAudio and that a "deal" with Apple was imminent. *See, e.g.*, USOF ¶¶ 51, 73, 75 and SOF ¶¶ 42, 50, 74, 84, 86.

211.   **RESPONSE:** Disputed. *See* Resp. SOF ¶ 209.

16

213.    **RESPONSE:** Disputed. There is no evidence in the record to support the proposition that it is common or reasonable in any industry, including the software development industry, for CEO's to falsify documents and make untrue statements to their Board, employees, consultants, or investors in order to provide "motivation." The SEC objections to Mahabub's allegation in his Declaration as inadmissible because it is irrelevant (Fed. R. Evid. 401 and 402), confusing and misleading (Fed. R. Evid. 403), lacking foundation (Fed. R. Evid. 901), and providing impermissible opinion testimony (Fed. R. Evid. 701).

219.    **RESPONSE:** Undisputed for purposes of the Motion, with the exception of Exhibit 33, which is the fabricated telephone transcript sent also sent to investor Skluzak.

222.    **RESPONSE:** Disputed. Nothing in the exhibits limits the solicitation to non-recipients. Exhibit 9 touts GenAudio as a good investment to the recipients and states "*[t]ime to go back into fund raising mode, and if any of you feel like helping out with this effort, I would certainly appreciate it. It's not like you are doing your friends and family a bad thing by getting them into GenAudio at this stage in the game.*" Exhibit 66 states "*Any help from all of you with this financing effort would be great.*"

223.    **RESPONSE:** Disputed. See response to SOF ¶ 222 above.

224.    **RESPONSE:** Disputed. Mahabub's conduct in falsifying documents and making untrue statements evidences his disbelief and the exaggeration of the value of any investment in GenAudio. Please see Argument §§ IV.B and IV.C regarding the reasonableness of Mahabub's conduct and his scienter.

225.    **RESPONSE:** Disputed. Mahabub's conduct in falsifying documents and

making untrue statements evidences his disbelief. Mahabub never communicated with Schiller regarding GenAudio, Schiller had no involvement with GenAudio, and Apple never told Defendants that it planned to incorporate GenAudio's technology in any of its new product roll-outs. *See* SOF ¶¶ 21-23. Please see Argument §§ IV.B and IV.C regarding the reasonableness of Mahabub's conduct and his scienter.

226.    **RESPONSE:** Disputed. These Exhibits encourage the GenAudio team to solicit investors based on GenAudio's current status, about which Mahabub was providing material, untrue information. *See* USOF ¶¶71, 73, 75 and SOF ¶¶ 70, 72, 74.

231.    **RESPONSE:** Disputed. *See* Resp. SOF ¶ 201.

234.    **RESPONSE:** Disputed that Mattos never "communicated any of the facts [within the GenAudio Team emails] to potential investors." The record reflects that Mattos may have, but he has been unable to recall specific conversations. *See* SEC Resp. SOF ¶ 207; *see also* Ex. Mattos Dep. 70:20 – 24 (Q: Okay. Would you provide those potential shareholders with the information that Mr. Mahabub was providing to you about Apple? A: Perhaps, but again, I don't recall any specific conversations."); *id.* at 72:3 – 8 (testifying that he believed the information Mahabub provided in Ex. 47).

237.    **RESPONSE:** Disputed. Many material statements within the emails were untrue and/or falsified and therefore did not accurately reflect "the business relationship between GenAudio and Apple; the possibility that GenAudio might provide goods or services to Apple, and/or the integration of GenAudio's software into Apple products." *See* SOF ¶¶ 24, 30, 50, 74-75, 78, 82-83, 90.

238.    **RESPONSE:** Undisputed for purposes of the Motion as to the general statement, but the SEC does dispute that Mahabub had personal relationships with all

investors or a basis to reasonably believe that all investors were accredited, including Marvin. *See* Marvin Dec., ECF No. 84-94*; Ex. 2, Mahabub Dep. 468:1-11.

## IV.   ARGUMENT

### A.  The Defendants Violated Sections 5(a) And (c) Of The Securities Act.

Whether GenAudio and Mahabub violated the registration requirements of Section 5 of the Securities Act is established on this summary judgment record. *See, e.g.*, *SEC v. Gordon*, 522 Fed. App'x. 448, 450-451 (10th Cir. 2013); *Mas Fukuda v. Nethercott*, 2016 U.S. Dist. Lexis 92462, *12 (D. Utah July 15, 2016); *SEC v. McDuffie*, 2014 U.S. Dist. Lexis 128664, *18-21 (D. Colo. Sept. 15, 2014).

The Defendants do not dispute that the facts establish the SEC's *prima facie* case that GenAudio and Mahabub violated Section 5(a) and (c) of the Securities Act. *See* GA Resp. 54-55; M. Resp. at 9-10. "Once [the SEC has established] a *prima facie* case that the securities offered or sold were not registered, the defendant bears the burden of demonstrating its entitlement to an exemption." *Busch v. Carpenter*, 827 F.2d 653, 656 (10th Cir. 1987); *Quinn & Co .v. SEC*, 452 F.2d 943, 945-46 (10th Cir. 1971); *McDuffie,* 2014 US Dist. Lexis 128664, *14, citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).

Instead, Defendants claim that the SEC must show an absence of evidence to support an essential element of their affirmative defense. The SEC has done so. As their affirmative defenses, GenAudio and Mahabub assert, without citation to any facts, that their sales are exempt from registration under Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D. GA Resp. at 54; M. Resp. at 9-10. This is incorrect. Section 4(a)(2) exempts from registration "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(a)(2). Rule 506, 17 C.F.R. § 230.506, "creates a safe

harbor within this exemption by defining certain transactions [by issuers] as non-public offerings." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1091 (9th Cir. 2010). Rule 502(b) and (c) list the general conditions that GenAudio must meet to claim an exemption under Rule 506, which includes refraining from using any general solicitation to offer or sell securities and requiring the issuer to provide an audited balance sheet to any unaccredited purchaser. *See* 17 C.F.R. § 230.502(b)(2)(B)(1) and (c)(2). GenAudio was engaged in a public offering and cannot satisfy these conditions.

The undisputed facts establish GenAudio and Mahabub engaged in *public* offerings of shares to at least 90 investors through general solicitations. USOF ¶ 45, 54, 102. Investor Marvin, who purchased shares in both the 2010 and 2011 Offerings, was not accredited. USOF ¶ 65, 111. GenAudio and Mahabub admit they did not provided audited balance sheets to *any* purchasers, including Marvin. USOF ¶ 69, 113.

GenAudio and Mahabub used general solicitation to identify potential investors at presentations called "road shows," and failed to maintain information about the identity, sophistication or number of investors, whom it solicited. SOF ¶ 59-61,108, 109. Mahabub offered and sold GenAudio stock to strangers who had no prior relationship with the company. SOF ¶ 59, 60; and SOF ¶ 65. GenAudio also solicited its existing shareholders, some of whom were unaccredited, SOF ¶ 67; but did not identify the unaccredited shareholders. Using general solicitation disqualifies GenAudio from the exemption under Rule 506.  Rule 502(c)(2).

GenAudio and Mahabub had no *reasonable basis* to believe that *all* the purchasers were accredited. See Rule 506(b)(2). Although GenAudio sent Questionnaires to ascertain if investors were accredited, Mattos admitted that he

overlooked some Questionnaires that were not completed. SOF ¶ 66, 111, 112. Further, some investors answered "N/A" or left blank the questions about whether they were accredited investors ( "blank Questionnaires").[6]  SOF ¶ 62-66, 111-12. For example, Marvin, who purchased in both the 2010 and 2011 Offerings, left his Questionnaires blank, and testified he was not accredited. SOF ¶ 65. GenAudio and Mahabub argue that blank Questionnaires create a disputed issue of fact as to whether the investors were accredited. Resp. SOF ¶¶ 64-65. They argue that in spite of these blank Questionnaires, they believed investors were accredited. However, they have the burden to prove that they had *a reasonable basis* to believe that *all* of their investors were accredited when they made the offers and sales. Rule 506(b)(ii). The fact that numerous Questionnaires were blank or marked "NA" is not "ambiguous" as GenAudio disingenuously suggests, rather it establishes that the company knew it was supposed to ask the question, and it failed to follow up on blank Questionnaires and "N/A" responses – a necessary step to provide a basis to believe investors were accredited. GenAudio produced no other evidence to demonstrate it obtained additional information to form a reasonable belief that the purchasers who submitted the blank Questionnaires were accredited. USOF ¶ 61. GenAudio also admits it did not provide audited financial statements to the unaccredited investors. USOF ¶ 69, 113. Based on these undisputed facts, GenAudio and Mahabub cannot establish its affirmative defense that the sales in the 2010 and 2011 Offerings complied with Rule 506 of Regulation D and their entitlement to the Section 4(a)(2) exemption.

---

[6] Mahabub's unsupported assertion that the Questionnaires are inadmissible, M. Resp. at 9, is incorrect; the Questionnaires are business records kept by GenAudio and admissible under Fed. R. Evid. 803(6). They also demonstrate the information GenAudio possessed on an investor's accreditation, and so go to state of mind.

Mahabub is also liable for his personal sales. He sold his personal GenAudio shares when no registration statement was in effect, using the means of interstate commerce. USOF ¶ 45. The exemptions in Section 4(a)(2) and Rule 506, which apply to "transactions by an _issuer_ not involving any public offering" (emphasis added), do not apply to Mahabub, who is an affiliate of an issuer. _See Mas Fukuda,_ *8-10; Section 4(2) and Rule 501(d). As a matter of law, Mahabub cannot rely on Section 4(a)(2) and Rule 506 exemption from the registration requirements of Section 5 for his personal sales. _Mas Fukuda,_ *8-10. The SEC is entitled to summary judgment on its claims that GenAudio and Mahabub violation Section 5.

### B.  The Defendants Committed Securities Fraud.

In their Response briefs, Defendants included over 100 additional facts, many related to back-and-forth between Mahabub and his contacts at Apple. Defendants then focus their argument on alleging that Mahabub "reasonably believed" that his false statements were true. _See_ GA Resp. at 32 – 52. But by focusing on the material facts below it is established that Defendants violated Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act both by making material misrepresentations and omissions to investors and by engaging in a scheme to defraud.

### 1.  The Reality Of Defendants' Dealings With Apple.

From 2009 through 2012, Mahabub was GenAudio's primary contact with Apple and controlled the dissemination of the information about dealings with Apple to GenAudio's Board, employees, shareholders, and prospective investors. USOF ¶ 16. The "GenAudio Team" has been defined to include GenAudio's employees, contractors and Board. _See_ USOF ¶ 12. Some members of GenAudio's Board included GenAudio shareholders. USOF ¶ 5. The GenAudio Team also included employee Jim Mattos,

whose "primary functions [for GenAudio] were to continue to raise money for the company, reaching out through friends and family …." USOF ¶ 6.

Between 2009 and 2012, GenAudio financed its operations primarily through the sale of debt and equity securities to investors. USOF ¶ 9. Mahabub asked the GenAudio Team to assist in fundraising during the 2010 Offering. *See* USOF ¶¶ 73, 75 (quoting emails). In communications with investors, the Defendants used the term "LCEC" to refer to Apple, and numerous investors knew the LCEC was Apple. USOF ¶¶ 40-41.

Beyond a July 2009 NDA, GenAudio never entered into any agreements with Apple. USOF ¶ 20. On October 2, 2009, Mahabub emailed GenAudio's Board of Directors that "*when the time comes, I will bring on the legal team … to assist me with finalizing the deal with Apple.*" USOF ¶ 28. Mahabub never brought on GenAudio's "legal team" to finalize a deal with Apple or to otherwise negotiate with Apple. USOF ¶ 29. Mahabub also never met or communicated with Phil Schiller, Timothy Cook, or Steve Jobs regarding GenAudio. USOF ¶¶ 26, 3, 34. Jobs was not involved in Apple's dealings with GenAudio, and Apple employees did not discuss GenAudio with Jobs. USOF ¶ 35.

Apple never told Mahabub or GenAudio that it planned to incorporate GenAudio's technology in any of its new product roll-outs. SOF ¶ 21. Defendants dispute this fact on the basis that "Mahabub testified he spoke with Tiscareno regarding a Christmas product roll-out." Resp. SOF ¶ 21. But even if Mahabub discussed a Christmas roll-out with Tiscareno, the conversation was: "*something kind of like – again, very vague*" "*along the lines of … if we do this and we do this right there is – we might be able to*

*make it into a Christmas product rollout.*" Reply SOF ¶ 21. This does not dispute that Apple never stated that it planned to incorporate GenAudio's technology in any of its new product roll-outs.

Apple also never indicated that it was interested in licensing GenAudio's technology or acquiring GenAudio or GenAudio's technology. SOF ¶ 22. Defendants dispute this fact on the basis that "Mahabub testified he had a conversation with Isaac about licensing." Resp. SOF ¶ 22. But Mahabub's own testimony is that he mentioned licensing to Isaac and Isaac responded that Apple would not pay GenAudio a per unit royalty, and then stated "*[w]ell, when we get to that stage, we'll figure it out.*" *See* Reply SOF ¶ 22. There is no dispute that Apple never indicated that it was interested in licensing GenAudio's technology or acquiring GenAudio or GenAudio's technology.

Apple and GenAudio also did not negotiate about Apple licensing GenAudio's technology or acquiring GenAudio or its technology. SOF ¶ 23. Defendants dispute this fact based on the material cited above, an email in which Mahabub attempted to negotiate with Tiscareno, but Tiscareno failed to negotiate back, and the fact that "Tiscareno and Isaac never told Mahabub they would not be the ones to negotiate any deal with GenAudio." Resp. SOF ¶¶ 23, 168.  Again, even accepting all of the Defendants' assertions as true, it is not disputed that Apple did not negotiate to license GenAudio's technology or acquire the company.

### 2.  Defendants' Did Not Tell The Truth About Apple.

Defendants' statements to investors and Mahabub's statements to the GenAudio Team did not comport with reality. Instead, by at least August 2009, Mahabub had falsified numerous emails about Apple that he sent to the GenAudio Team. *See* SOF ¶¶

24, 30, 50, 74, 78, 83, 90.[7]  His lies included claiming that he was communicating with Schiller, he would be meeting with Jobs and Jobs was involved in the evaluation of GenAudio's technology, and that Apple was affirmatively communicating with Mahabub about product roll-outs and business transactions. *See id.*

Defendants were similarly misleading all of GenAudio investors. The November 9, 2009 email claimed, "*there is a strong possibility that the Company may be acquired within the next 6 months in light of our extensive discussions with a global industry leader in consumer electronics.*" USOF ¶ 37.[8] This statement was not true and it was unreasonable for Mahabub to make it given that no one at Apple had ever indicated that a deal would be occurring at any point, and certainly not within six months. *See generally* SOF ¶¶ 21-23.

By December 2009, Mahabub had been expressly told by Hailey, in response to Mahabub's references to a deal, that Mahabub's suggested time frame was unrealistic, stating: "*[w]e're making progress and building our story, but this is not something we can execute overnight. The business side of things would come into play after we have exec buy-in on the product side.*" SOF ¶ 48. In January 2010, Hailey had again tempered Mahabub's expectations by explaining: "*[w]ith respect to timeframe, we are pretty serious about looking at audio quality across the board and this will take time –*

---

[7] The fact should be deemed admitted. *See* Reply SOF ¶ 24.

[8] Defendants raise various issues relevant to remedies in their Response briefs. *See, e.g.*, M. Resp. at 8-9 and 20-21. If the SEC prevails on summary judgment, it will submit a brief on remedies and will address these issues to the extent necessary, based on the Court's specific ruling. The SEC notes, however, that the Defendants do not assert that conduct prior to January 21, 2010 is irrelevant to the Court's consideration of the merits of the SEC's claims, as the Defendants cite extensive evidence prior to that date. *See generally* SOF ¶¶ 123-143.

*definitely more than a couple of months.*" SOF ¶ 49.[9] Moreover, Apple had never told Defendants that it planned to incorporate GenAudio's technology into any of its new product roll-outs, that it was interested in licensing GenAudio's technology or acquiring GenAudio or its technology, and the Defendants had not negotiated any such licensing or acquisition with Apple. SOF ¶¶ 21-23.

Nonetheless, in the 2010 Offering Materials dated March 15, 2010, the Defendants claimed: "*This [2010 Offering] is being conducted to provide bridge capital until we can 'ink' a deal with a large consumer electronics company (referred to as the 'LCEC' throughout the PPM) ….*" SOF ¶ 70.[10] And then:

> [T]*he Company is optimistic that the LCEC will eventually want access to our AstoundSound Technology for their products. It is unclear what structure such access would take, but the Company believes the LCEC would either (i) integrate a portion of our AstoundSound Technology, namely ASE, into multiple product lines through a licensing arrangement or (ii) acquire all of our AstoundSound Technology or, at least, that portion the LCEC deems necessary for its integration plans.* USOF ¶ 71.

Then, in an April 30, 2010 email Mahabub asserted that the LCEC was "*looking to acquire GenAudio's tech for integration into their entire lineup of product offerings*" and "*we are now waiting to when [sic] we will initiate negotiations, pending the CEO of the LCEC to approve the integrated product rollout strategy and the technical implementation strategy that will be presented to the CEO next week!!!*" SOF ¶ 79.[11] These statements were false, made at least recklessly, and completely unreasonable given that *all* discussion of any potential business deal was stemming from Mahabub

---

[9] Please see Reply SOF ¶¶ 48, 49 regarding the lack of dispute regarding these facts and the inappropriateness of Defendants' hearsay objections.

[10] Defendants do not dispute this quote; they take issue with the assertion that the letter was sent to "prospective investors."  Resp. SOF ¶ 70; Reply SOF ¶ 70.

[11] Defendants dispute that this email went to more than one investor and claim Mahabub believed the statements were reasonable under the circumstances. Resp. SOF ¶ 79.

alone and Hailey had responded to Mahabub twice to make it clear that no deal was happening soon. *See* SOF ¶¶ 48-49.

Tiscareno's and Hailey's demonstration of GenAudio on May 6, 2010 to Apple employee Greg Joswiak does not excuse Mahabub's behavior. On May 5, 2010, in anticipation of the May 6, 2010 "exec" meeting, Tiscareno explained: "*[Hailey] and I are pitching this as a concept ….*" and "*[o]nce we get the go ahead that this is a great idea, then the questions will be, 'well, what about the other technologies, have we reviewed them? etc.' Then we sort of start over internally…. We have to get to first base….*" SOF ¶ 70 (emphasis added).[12]

Even accepting Mahabub's statement about the May 6, 2010 meeting that he may have confused "Jobs" and "Joz" in a possible telephone communication,[13] this exceptionally weak foundation made it *at least* reckless and negligent for him to: (1) falsify an entire transcript of a purported call with Tiscareno and send it to the GenAudio Team (SOF ¶ 83); (2) forward that "transcript" to an investor (SOF ¶ 84); and (3) continue to repeatedly tout Jobs involvement in Apple's further dealings with GenAudio without confirming that Hailey and/or Tiscareno did, in fact, present information about GenAudio to Jobs. Given Mahabub's frequent contact with Tiscareno,

---

[12] Defendants dispute this fact by making a hearsay objection that is unfounded for the same reasons stated in Reply SOF ¶¶ 48-49; they also dispute other communications Mahabub claims to have had with Tiscareno and Hailey. Resp. SOF ¶ 70. Defendants' assertions do not dispute that the email quote is accurate; therefore, even accepting Defendants other cited facts as true, SOF ¶ 70 is not actually disputed.

[13] Mahabub's claim that he confused "Jobs" with "Joz" after a phone call is incredible given his extensive fraudulent representations regarding Jobs. Between 2009 and 2010, Mahabub *repeatedly* claimed that Jobs was involved in GenAudio and that Jobs wanted to meet Mahabub. These falsifications were not limited to representations that "Jobs" might attend the May 6, 2010 meeting and demonstrate the intentionality of his false statements regarding Jobs. *See, e.g.,* SOF ¶¶ 30, 78, 90[13] and USOF ¶ 97.

such confirmation would have required almost no effort – certainly far less effort than what Mahabub undertook to falsify his emails and an alleged "transcription" of a call with Tiscareno.

Nonetheless, Mahabub continued to lie to investors. In a May 2010 investor presentation he claimed: "*the CEO of the LCEC finally met with senior marketing and technical management and we have the green light to move forward.*" SOF ¶ 89.[14] On August 1, 2010, he represented that the LCEC's CEO had requested a "*hand-shake*" meeting, and "*I can say that we are still moving forward with confidence and plan on carrying it through all the way to the end, which could result in a significant revenue generating license deal or the potential for acquisition of the technology or the company.*" USOF ¶ 91. In December 2010 he claimed that he actually met with Steve Jobs, that Jobs said to Mahabub, "*I really like your technology and look forward to seeing you again in the future,*" and "*[a]lthough [Apple is] moving very slow, we are still on their radar screen, and remain very optimistic for a deal in the second or third quarter of 2011.*" USOF ¶ 97.

### C. Defendants Violated Section 17(a)(2) Of The Securities Act And Section 10(b) and Rule 10b-5(b) Of The Exchange Act By Making False Statements And Omissions.

Defendants' assert that the SEC cannot prevail on its Section 17(a)(2) and Rule 10b-5(b) claims because Mahabub acted reasonably and without scienter, the statements made to numerous GenAudio shareholders were "mere puffery" and/or subject to the "bespeaks caution" doctrine, and Defendants did not make material misstatements and omissions. *See generally* GA Resp. at 32 – 52. Each of these

---

[14] Defendants do not dispute the quote, but claim Mahabub reasonably believed his statements. Resp. SOF ¶ 89.

arguments are addressed in turn below.

**Mahabub acted with scienter and was also negligent.** Despite conceding that Mahabub "compromised his honesty," GA Resp. at 1, Defendants claim that Mahabub lacked scienter and was not negligent in sending the November 9, 2009 email, the March 15, 2010 Offering Materials, the April 30, 2010 email to investors, the May 10, 2010 investor presentation, the August 1, 2010 investor letter, the December 8, 2010 letter, and the March 29, 2011 investor letter. GA Resp. 38-39, 43-48. To establish a violation of Rule 10b-5(b), the SEC must establish that Mahabub acted with scienter. *SEC v. Smart*, 678 F.3d 850, 856-57 (10th Cir. 2012). While "[e]stablishing scienter is typically a question of fact" this is an appropriate case for the Court to decide the issue on summary judgment because Defendants "have failed to introduce particular facts or pieces of evidence showing that there exists a genuine issue of material fact with regard to the defendant's state of mind." *SEC v. Small Bus. Capital Corp.*, No. 12-CV-3237, 2013 WL 4455850, at *9 (N.D. Cal. Aug. 16, 2013) (citing cases).  *See also SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355, 365 (D.R.I. 2011) (granting SEC summary judgment when "no reasonable jury could believe [defendant's] incredible account in light of the overwhelming evidence that she manufactured stories and records and in the absence of a single piece of evidence corroborating her account").

To establish a violation of Section 17(a)(2) of the Securities Act, the SEC must prove that Mahabub was negligent.  *Aaron v. SEC*, 446 U.S. 680, 696 (1980). Negligence is "conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm,"  Restatement (Second) of Torts § 282 (1965), and is judged by the objective standard of comparison to the "reasonable

man under like circumstances," *id.* § 283. Mahabub failed to act as a reasonable person.

As detailed above, Defendants' representations to investors did not comport with reality and went well beyond Mahabub stating that Apple was interested in GenAudio's technology and he was hopeful or optimistic that Apple might eventually start negotiations with GenAudio. Indeed, the Defendants' claims included statements about timing and terms of such a transaction, including, "*there is a strong possibility that the Company may be acquired within the next 6 months*," USOF ¶ 37, claiming the 2010 Offering was "*being conducted to provide bridge capital until we can 'ink' a deal with [the LCEC]*," SOF ¶ 70, and asserting that the LCEC was "*looking to acquire GenAudio's tech for integration into their entire lineup of product offerings*," SOF ¶ 79. Given that Mahabub was the contact between GenAudio and Apple, he *actually knew* that these statements were false or, at the very least, was reckless in not recognizing their falsity. Mahabub's repeated falsification of emails that he sent to the GenAudio Team, including Mattos who a source of information for investors, further support a finding of scienter.  With respect to dealings with Apple, Mahabub was intentionally defrauding his investors, Board, employees, and consultants.

Mahabub's conclusory allegations that he really did believe what he was telling investors are insufficient to defeat a finding of scienter.

> Even if we indulge the defendants and assume arguendo that they believed in these guarantees, we nevertheless must examine the foundation such a belief would have rested upon. A good faith belief is not a "get out of jail free card." It will not insulate the defendants from liability if it is the result of reckless conduct.

*SEC v. Infinity Grp. Co.*, 212 F.3d 180, 193 (3d Cir. 2000).  The undisputed facts establish that Mahabub acted with scienter in making misrepresentations and omissions. Further, Mahabub's conduct was objectively unreasonable.

**Defendants' fraudulent statements were not mere puffery or subject to the "bespeaks caution" doctrine**. Defendants argue that the November 9, 2009 email, the March 15, 2010 Offering Materials, the May 10, 2010 investor presentation, the August 1, 2010 investor letter, the December 8, 2010 letter, and the February 26, 2011 investor letter constitute "mere puffery" and/or are subject to the "bespeaks caution" doctrine. GA Resp. 38-39, 43-48. This is incorrect.  Forward-looking statements constituting "vague statements of corporate optimism" are not actionable because they constitute "mere puffery." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). Relatedly, "[f]orward-looking representations are also considered immaterial when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect." *Id.* at 1120. However, "[c]autionary language cited to justify application of the doctrine must precisely address the substance of the specific statement or omission that is challenged. In addition, cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made." *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

Between November 2009 and April 2012, the Defendants issued investor solicitations and communications that claimed, among other things, that GenAudio may be acquired within 6 months, USOF ¶ 37, the 2010 Offering was to provide "*bridge capital until we can 'ink' a deal,*" SOF ¶ 70, that GenAudio believed Apple would either enter into either a licensing arrangement or an acquisition of GenAudio's technology, USOF ¶ 71, that Apple was "*looking to acquire GenAudio's tech for integration into their*

*entire lineup of product offerings,*" SOF ¶ 79, that GenAudio remained "*very optimistic for a deal in the second or third quarter of 2011*," USOF ¶ 97. The untrue statements alleged here include baseless claims that transactions may occur between GenAudio and Apple, sometimes within a specific period of time. These were not mere puffery – they were Defendants' sales pitch and they were false.[15]

Defendants point to the statements "nothing is assured yet," the 2010 PPM's general cautionary language, "when and if we ink a deal and come to terms," and "[w]hile we cannot make any guarantees" as sufficient cautionary language subject to the bespeaks caution doctrine. GA Resp. at 38, 43, 47. This language is insufficient to nullify the Defendants' misstatements. First, as explained in the Motion and *infra*, Defendants' knew the untrue statements were false when made. Second, these documents failed to make any specific disclosures informing investors as to the actual status of GenAudio's dealings with Apple, including the complete absence of negotiations with Apple regarding any licensing or acquisition transactions or the fact that Apple had never told GenAudio that it planned to incorporate GenAudio's technology in any of its new product roll-outs. Defendants did not just fail to adequately "caution" investors, they affirmatively made false statements and failed to disclose material information to investors.

**Defendants made material misstatements and omissions.** With respect to the August 1, 2010 investor letter and December 8, 2010 investor letter, Defendants argue

---

[15] Such statements go well beyond those that the Tenth Circuit found to be "soft, puffing statements, incapable of objective verification" in *Grossman.* 120 F.3d at 1121 - 1122 (statements regarding "substantial success" in integrating sales forces and a merger was moving "faster than we thought" and presented "a compelling set of opportunities").

that false statements regarding Jobs were immaterial. GA Resp. at 46-47. GenAudio's investor updates were important to investors. SOF ¶ 121. During the 2010 and 2011-2012 Offering, the most significant aspect of an investment in GenAudio was a potential transaction with Apple. The fact that the CEO of Apple wanted to meet Mahabub and did meet Mahabub and complement GenAudio's technology would unquestionably be material to the reasonable investor.

Defendants also argue that they did not make material omissions because Mahabub believed the statements he was making to investors and because the omitted information would not be material to investors. *See* GA Resp. 48-52. These arguments fail to assess the material omissions within the appropriate context – *i.e.*, by considering what information Defendants <u>*were*</u> providing to investors and determining whether additional information was required to make the statements made not misleading.[16] When the omissions are considered in the context of the information the Defendants were providing to investors (as set forth above), it is clear that omissions were made and they were material to the reasonable investor.

Having been told that a deal was on the horizon, that Apple was considering placing GenAudio's technology into its products, and that Steve Jobs was involved in the evaluation of GenAudio's technology, the reasonable investor would certainly want to be informed that: (1) Mahabub's substantive communications with Apple personnel were almost always limited to mid-level engineering and marketing employees;

---

[16] Omissions are actionable when the speaker has a duty to disclose the omitted information. *SEC v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010). A duty arises when a voluntary statement is made and it omits material information. Statements and omissions are material when there is a substantial likelihood that a reasonable investor would consider the information important in determining whether to buy or sell securities. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

(2) Apple and GenAudio had no negotiations to license GenAudio's technology or to acquire GenAudio or its technology; and (3) Apple never told Mahabub or GenAudio that it planned to incorporate GenAudio's technology in any of its new product roll-outs. Given Defendants' prior false and misleading statements, Defendants had a duty to provide investors with this critical information. *SEC v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010).

**Mahabub's falsified transcript that he forwarded to an investor was "in connection with" the purchase or sale of securities**. Mahabub argues that the May 2010 email that he sent to Skluzak containing a fabricated and false transcript of a purported conversation he had with Tiscareno was not "in connection with," nor material to Skluzak's decision to purchase securities. M. Brief at 23-24. Skluzak was in the process of investing when Mahabub provided him with the falsified transcript and he testified that receipt of the transcript "affirmed" his willingness to purchase 40,000 shares. SOF ¶¶ 85-87. The falsified transcript was material to Skluzak and would be material to any reasonable investor as it included claims that Steve Jobs was personally involved in – and excited about – GenAudio's technology.

D. **Defendants Engaged In A Scheme To Defraud And Violated Section 17(a)(1) And (3) Of The Securities Act And Section 10(b) And Rules 10b-5(a) And (c) Of The Exchange Act.**

Defendants argue that the SEC has not established its Section 17(a)(1) and (3), and Rule 10b-5(a) and (c) claims because Mahabub's altered emails:[17] (1) were not in

---

[17] Defendants also claim the December 8, 2010 letter was not "in connection with" the purchase or sale of securities. GA Resp. at 47, n.15. This letter was sent between the 2010 and 2011 Offerings, and was followed by the February 26, 2011 and March 29, 2011 false shareholder communications. SOF ¶¶ 97 – 100. All three of these documents provided a set-up the 2011 Offering whereby Defendants returned to their loyal shareholder base – which had been hearing about a potential deal with Apple for

connection with a securities transaction; (2) were not made with scienter or negligently; (3) were not inherently deceptive; and (4) are actually misstatements or omissions and therefore cannot also violate Section 17(a)(1) and (3). None of these arguments is persuasive.

_First_, Defendants' scheme was "in connection with" the purchase and sale of securities.[18] While Defendants dive into the cases cited by the SEC to distinguish the facts, they ignore the evidence put forward that is specific _to this case_. Defendants' sole focus on the GenAudio Team emails is misguided. This case involves misstatements, omissions, and scheme conduct – _all of which_ is actionable under Section 10(b).

> Typically [in Section 10(b) cases], plaintiffs assert a series of alleged misstatements; defendants defend against such allegations … Proceeding in this manner is, however, only one way to litigate a claim for a violation of Section 10(b). Plaintiffs may also allege that a course of conduct amounts to a fraudulent scheme designed to mislead investors. Such a course of conduct may, but need not necessarily, involve separately actionable statements. Some cases allege violations of Section 10(b) that include both a scheme to defraud and a series of misstatements or omissions. This is such a case.

_IBEW Local 90 Bension Fund v. Deutsche Bank AG_, No 11 Civ. 4209 (KBF), 2013 WL 1223844, at *1 (S.D.N.Y. Mar. 27, 2013).

This is also such a case. As explained in the Motion, the false statements to the GenAudio Team were fraudulent devices as part of _an overall scheme_ to induce investors to purchase stock in the company. The scheme itself was thus "in connection with" the purchase or sale of securities. Even worse, Mahabub's lies to the GenAudio

---

years and was now seeing (false) evidence of momentum in the form of Steve Jobs involvement – to solicit additional funds. This nexus satisfies the "in connection with" element.

[18] This element is relevant only to Section 10(b) of the Exchange Act. Section 17(a) requires that the conduct be "in the offer or sale of" securities. As is detailed in the SEC's Motion – and not addressed in Defendants' briefing – the SEC has established this element. _See_ Mot. at 46 – 47.

Team were designed to reach and influence investors. The falsified emails were designed to reach, and did reach, Board members who were also shareholders. USOF ¶ 5. *See SEC v. N.A. Res. & Dev. Corp.*, 424 F.2d 63, 79-80 (2d Cir. 1970) (statements could be calculated to influence shareholders even if those on receiving end of promotional barrage were not directly influenced to buy or sell).

Mahabub also used some falsified emails while he was encouraging the Board and other GenAudio Team members to commence the 2010 Offering and to find potential investors. SOF ¶ 50, 74;[19] USOF ¶ 51, 75. Finally, Mahabub's falsified emails and misstatements at the Board meetings were substantially similar to other statements (oral and written) that Defendants made directly to investors, including claims that Jobs was involved in Apple's dealings with GenAudio and representations that GenAudio was on the brink of entering into a "deal" with Apple, *see* USOF ¶¶ 37, 91, 97; SOF ¶ 84, warranting the conclusion that all of his statements were part of his scheme to induce further investment in the company by means of deception.

Mahabub also renews his argument, which the Court previously rejected, that the SEC is required to prove causation in order to establish the "in connection with" element of a fraud violation under Section 10(b) of the Exchange Act. He rebuffs the Court's previous holding that the "SEC need not prove reliance, injury or causation," Order at 17, citing *SEC v. Wolfson*, 59 F.3d 1249, 1261 (10th Cir. 2008); and cites instead to several private enforcement lawsuits from other circuits, which are not controlling or persuasive. *See* Mot. at 40-42. Similarly, the decision in *SEC v. Recycle Tech, Inc.* 2103 U.S. Dist. LEXIS 195982, *17 (S.D. Fla. Sept. 26, 2013) does not support Defendants' position,

---

[19] The fact should be deemed admitted. *See* Reply SOF ¶ 24.

stating instead that the "in connection with" requirement is the most imprecise and flexible element and requires a certain relationship between the defendant's actions and securities transaction. That "certain relationship" is present here for the reasons detailed above. The Court should reject Mahabub's causation argument.

_Second_, Defendants' claim that Mahabub did not act with scienter and was not negligent[20] with respect to the altered emails is disingenuous. Affirmatively altering emails is the epitome of intentional deception. It cannot seriously be argued that Mahabub's acts in altering emails conformed to a reasonable standard of care for someone in control of a company whose funding stemmed from investors. It is undisputed that Mahabub sent and received emails from Apple employees, took those emails and intentionally and repeatedly altered them to make it appear as there were advanced negotiations with Apple that involved high-level executives, including Apple's CEO, Steve Jobs. _See supra_ § III.B and SOF ¶¶ 24, 30, 50, 74, 78, 83, 90. Regardless of who could fit within the universe of people he was intending to deceive,[21] Mahabub _at least_ intended to defraud the direct recipients of these emails and therefore acted with scienter. It is also both reckless and negligent for the CEO of a company to falsify email correspondence. Defendants' claim that this conduct was "understandable" (M. Resp. at

---

[20] To establish a violation of Section 17(a)(3), the SEC need only establish negligence. _Aaron v. SEC_, 446 U.S. 680, 696 (1980).

[21] Defendants' citation to _Burman v. Phoenix Worldwide Indus._, 384 F. Supp. 2d 316, 332 (D.D.C. 2005) is irrelevant. Under the Private Securities Litigation Reform Act ("PSLRA"), some courts apply a "motive and opportunity to commit fraud" test as one possible method by which plaintiffs may plead scienter. _See Burman_, 384 F. Supp. 2d at 332. The PSLRA applies to _private_ securities actions and not SEC enforcement actions such as this one. _See, e.g._, _SEC v. Guardian Oil & Gas, Inc._, No. 3:14-cv-1533-BN, 2014 WL 7330451, at *7 (N.D. Tex. Dec. 23, 2014). This authority is irrelevant here where, at the summary judgment stage, it is undisputed that Mahabub falsified documents.

17) is outrageous.

*Third*, citing *SEC v. Lucent Techs., Inc.* 610 F. Supp. 2d 342, 360 (D.N.J. 2009),[22] Defendants argue that the SEC has failed to allege "sham" or "inherently deceptive" transactions and appear to argue that there must be a direct tie to a specific securities sale. *See* M. Resp. at 25-26. This is an incorrect analysis of scheme liability. Section 17(a)(3) includes the word "transaction," requiring the SEC to establish that Defendants "engaged in any transaction, practice, or course of business" that operated as a fraud. Falsifying emails, lying to the Board of GenAudio, and making misstatements and omissions to investors, all designed to create the appearance that a deal with Apple was imminent, was the fraudulent scheme in which the Defendants engaged. Defendants' conduct – including lying to investors and Mahabub's falsification of emails – constituted transactions, practices, and courses of business designed to induce investment in the company. *See In re Dennis J. Malouf*, Securities Act Release No. 10115, 2016 WL 4035575, at *12 (July 27, 2016) ("*repeated* acts, such as repeatedly making or drafting materially misleading statements over a period of time, may be considered a fraudulent 'practice' or 'course of business.'") (emphasis in original). *SEC v. Monterosso*, 557 F. App'x 917, 926 (11th Cir. 2014) (upholding summary judgment on liability under Sections 17(a) and 10(b) when defendants "changed the names of customers and vendors and altered the amounts on invoices, and no reasonable person could have believed it was proper to report revenue from

--------

[22] In *Lucent*, which did not analyze Section 17(a), the court found that it was not inherently deceptive to "giv[e] oral assurances of rights of return or pricing concessions in connection with [] sales[.]" *Lucent*, 610 F. Supp. 2d at 360–61. This case involves obviously, inherently deceptive conduct – falsifying documents and lying to the Board and investors.

fabricated invoices"); *SEC v. Cooper*, 142 F. Supp. 3d 302, 316 (D.N.J. 2015) (granting SEC summary judgment on Sections 17(a) and 10(b) when defendant "created and supplied fake account statements" and "forged an email and a letter from a representative of a brokerage firm").

_Fourth_, the Defendants argue that the falsified emails are "nothing more than a reiteration of the misrepresentations and omissions that underlies plaintiffs [sic] disclosure claim." M. Resp. at 26 (quoting *Lucent*).[23] The Defendants ignore the totality of the conduct set forth by the SEC. *See* Mot. at 44-46. The SEC's scheme case is not premised solely on the falsified emails, but instead is based on all of Defendants' conduct during the relevant time, including the misstatements and omissions made to investors, Mahabub's false statements to the GenAudio Board, and the falsified emails. *See generally* Mot. at 44-45 (listing relevant conduct). When this deceptive conduct is viewed in its entirety, it is clear that Defendants perpetrated a scheme to deceive investors by soliciting existing shareholders and potential investors to purchase Mahabub's personal shares of GenAudio or shares directly from GenAudio, by lying and creating a series of fabricated emails to create the false appearance that that GenAudio was a takeover target or licensing partner of Apple.

Defendants incorrectly claim that "_[t]he Tenth Circuit_ has 'drawn a 'bright line'

---

[23] Defendants' real complaint is that the SEC does not seek summary judgment on its Section 17(a)(2) and Rule 10b-5(b) claims based on the falsified GenAudio Team emails. *See* GA Resp. at 53. After careful consideration of the Court's Order (ECF No. 80), the SEC did streamline the evidence on which it moved for summary judgment. There is nothing improper about the SEC deciding to move for summary judgment on a narrower set of evidence than prior briefing, or which may be presented at trial before a fact finder. The SEC does not thereby concede that the GenAudio Team emails are not themselves misrepresentations under Section 17(a)(2) or Rule 10b-5(b). However, on the SEC's Motion, this Court need not decide the issue or address Mahabub's arguments on pages 21 – 23 of his Response.

between the types of conduct that satisfy claims made under the scheme liability framework," GA Resp. at 52 (emphasis added), citing *SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1377 (D. Colo. 2014). Counsel for the SEC is unaware of any relevant Tenth Circuit authority. This argument is also a red herring because the SEC has clearly set forth both misstatements and omissions made by the Defendants and widely distributed to investors, and other deceptive conduct, including lies to the Board and the GenAudio Team. Mot. at 43-50 (Sections 17(a)(1) and (3)) and 57-60 (Rules 10b-5(a) and (c)). Further, Defendants ignore the post-*Sullivan* authority cited by the SEC, which explains that Section 17(a)(1) "encompass[es] all fraudulent conduct undertaken with scienter – including conduct undertaken as part of a fraud involving misstatements." *Malouf*, 2016 WL 4035575, at *11 n.76 (citing *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1063 (2014)). *See also Lorenzo v. SEC*, 872 F.3d 578, 589 (D.C. Cir. 2017) (defendant's "active role in producing and sending the emails constituted employing a deceptive 'device,' 'act,' or 'artifice to defraud' for purposes of liability under Section 10(b), Rule 10b-5(a) and (c), and Section 17(a)(1)") (internal quotation marks omitted) (petition for cert. filed, No. 17-1077 (Jan. 26, 2018)). This Court is free to consider Mahabub's falsified emails as part of that scheme in granting the SEC summary judgment.

## V.   CONCLUSION

Based on the foregoing and its Motion, the SEC respectfully requests that the Court grant summary judgment against Defendants Mahabub and GenAudio as the SEC's First, Second, Third, Fourth, and Eighth Claims. Alternatively, the Commission requests that summary judgment be entered against Mahabub on the SEC's Fifth, Sixth, and Seventh Claims.

DATED:  April 20, 2018

Respectfully Submitted,

*/s Danielle R. Voorhees*
Leslie J. Hughes (Colo. Bar No. 15043)
Danielle R. Voorhees (Colo. Bar No. 35929)
Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO  80294-1961
Telephone: (303) 844-1000
Fax: (303) 297-3529
HughesLJ@sec.gov
VoorheesD@sec.gov
*Attorneys for Plaintiff Securities and Exchange Commission*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 20, 2018, the document above was e-filed with the Court's ECF system and will be served on those listed below:

Andrew B. Holmes
Holmes, Taylor, Scott & Jones, LLP
617 South Olive Street, Suite 1200
Los Angeles, CA 90014
Telephone: 213-985-2200
Email: abholmes@htsjlaw.com
*Attorneys for Defendant Taj Jerry Mahabub*

Michael P. McCloskey
David J. Aveni
Wilson Elser Moskowitz Edelman & Dicker LLP
401 West A Street, Suite 1900
San Diego, CA 92101
Telephone: 619-321-6200
Email: Michael.McCloskey@wilsonelser.com
Email: David.aveni@wilsonelser.com
*Attorneys for Defendant GenAudio, Inc.*

<u>*s/ Elinor E. Blomgren*</u>
Elinor E. Blomgren