**EXCERPTED**

# EXHIBIT 224

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:              )
                               ) File No. D-03450-A
GENAUDIO, INC.                 )

WITNESS: Taj Jerry Mahabub

PAGES:   1 through 358

PLACE:   Securities and Exchange Commission

        Byron G. Rogers Federal Building

        1961 Stout Street, 1st Floor

        Denver, Colorado 80294

DATE:    Thursday, February 5, 2015

    The above-entitled matter came on for hearing, pursuant to Notice, at 9:00 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

Page 2

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4   JENNIFER OSTROM, Senior Counsel
5   KURT L. GOTTSCHALL, Staff Attorney
6   Securities and Exchange Commission
7   Denver Regional Office
8   Byron G. Rogers Federal Building
9   1961 Stout Street, Suite 1700
10  Denver, Colorado 80294
11  (303) 844-1049
12
13 On behalf of the Witness:
14  ANDREW B. HOLMES, ESQ.
15  Holmes, Taylor & Jones, LLP
16  801 South Figueroa Street, Suite 2170
17  Los Angeles, California 90017
18  (213) 985-2200
19
20  MICHAEL P. MCCLOSKEY, ESQ.
21  Wilson, Elser, Moskowitz,
22  Edelman & Dicker, LLP
23  655 West Broadway, Suite 900
24  San Diego, California 92101
25  (619) 321-3200

Page 3

1           CONTENTS
2
3  WITNESS:                    EXAMINATION
4  Taj Jerry Mahabub                4
5
6  EXHIBITS    DESCRIPTION        IDENTIFIED:
7  56  Bates SEC-RPI-P1-3, certification    33
8  57  Bates numbered JM2096-2099, series   119
9      Of e-mails
10 58  Bates numbered JM555-558, e-mails    155
11 59  Bates numbered JM378-380, e-mail     182
12     Chain
13 60  Bates numbered JM1098-1102, e-mails  214
14 61  Bates numbered JM727-729, e-mails    267
15 62  Bates numbered JM2093-2095, e-mail   278
16 63  Bates numbered JM2022-2023, e-mail   296
17     Bates numbered JM2158-2167, e-mail
18 64  Chain                                341
19
20
21
22
23
24
25

Page 4

1           PROCEEDINGS
2       MS. OSTROM: Let's go on the record at
3  9:00 a.m., on February 5, 2015.
4       Would you please raise your right hand.
5       Do you swear to tell the truth, the whole
6  truth and nothing but the truth?
7       THE WITNESS: Yes.
8  Whereupon,
9           TAJ JERRY MAHABUB,
10 was called as a witness and, having been first duly
11 sworn, was examined and testified as follows:
12          EXAMINATION
13 BY MS. OSTROM:
14   Q  And would you please state and spell your
15 full name for the record.
16   A  Taj, T-A-J, Jerry, J-E-R-R-Y, Mahabub,
17 M-A-H-A, B, as in boy, U, B, as in boy.
18   Q  And my name is Jennifer Ostrom, and this is
19 Kurt Gottschall, and we are both officers of the
20 United States Securities and Exchange Commission
21 for purposes of this proceeding.
22      And this is an investigation by the
23 Commission in the matter of GenAudio Inc., to
24 determine whether there have been violations of
25 certain provisions of the federal securities law.

Page 5

1       However, the facts developed in this
2  investigation might constitute violations of other
3  federal or state, civil or criminal laws.
4       And prior to the opening of the record, you
5  were provided with a copy the Formal Order of
6  Investigation in this matter, and it will be
7  available for your examination during the course of
8  this proceeding.
9       And, Mr. Mahabub, have you had an opportunity
10 to review the formal order?
11      MR. HOLMES: It's Number 2.
12      BY MS. OSTROM:
13   Q  The one I just handed you you could look
14 at. It's at the bottom here.
15   A  Yes, I have seen this before.
16   Q  Okay. And prior to the opening of the
17 record you were provided with a copy of the
18 Commission's Supplemental Information Form, and a
19 copy of that notice has been marked Exhibit
20 Number 1, and that's right -- right there.
21      And, Mr. Mahabub, have you had the
22 opportunity to read Exhibit Number 1?
23   A  Yes.
24   Q  And do you have any questions concerning
25 this notice?

2 (Pages 2 to 5)

Page 354

1 turkey without some sort of strange withdrawal.
2  A  Yeah.
3  Q  Who was the senior team at Apple you had
4 worked with day and night for the past 11 months?
5  A  Ron Isaac, Vic Tiscareno and Michael
6 Hailey, they're all senior managers.
7  Q  Did you have any conversations with
8 Mr. Tiscareno about Steve Jobs looking at other
9 technology to compare with yours?
10  A  I don't remember having any talks with him
11 about it, but I remember e-mailing him about it
12 now, which was right here.
13  Q  And what was your take on it?
14  A  That they're trying to find a way to
15 devalue us.
16  Q  So were you under the impression at this
17 time that there was either a licensing or
18 acquisition that was going to what Apple?
19  A  I thought so, yeah.  I mean, it looked like
20 it was going in that direction, because when a
21 company goes in and, you know, starts doing
22 maneuvers like that to try to devalue you like
23 that, like, oh, well, look at these three other
24 audio tech companies out there.  That's usually so
25 they can come and throw a lowball at you.

Page 355

1  Q  But what had happened between May 6th and
2 now to lead you to believe that there was going to
3 be some type of offer?
4  A  So just this e-mail exchange here, about
5 how, you know, when you say Steve had them look
6 into other audio technologies as well, which sort
7 of tells me that they're trying to find something
8 so they can come to me and go, oh, look, we can get
9 this over here for this.  So why would we pay you
10 just that?
11  Q  You started this e-mail exchange?
12  A  Yeah, but nothing to do with lowballing.  I
13 started by offering a new processing implementation
14 to show to Steve.  That then turned into Vic's
15 response to me, which then turned into my response
16 to him.
17  Q  So was there anything in between, before
18 you sent this e-mail, the initial e-mail to
19 Mr. Tiscareno, had there been any contact with
20 anyone at Apple after that May 6, 2010, date and
21 this date when you sent the first e-mail to
22 Mr. Tiscareno?  Had there been any contact with
23 anyone at Apple?
24  A  No.
25  Q  Okay.

Page 356

1  A  No.  No, not to my -- actually, not that I
2 recall.  I can't say definitively, but not to my
3 recollection.
4      MS. OSTROM:  And let's go ahead and let's
5 go off the record, and we will be reconvening
6 tomorrow at 9:00 a.m. on February 6th.
7      (Whereupon, at 5:19 p.m. the proceedings
8 adjourned.)
9           * * * * *

Page 357

1            PROOFREADER'S CERTIFICATE
2
3 In the Matter of:   GENAUDIO, INC.
4 Witness:        Taj Jerry Mahabub
5 File Number:    D-03450-A
6 Date:           February 5, 2015
7 Location:       Denver, CO
8
9
10     This is to certify that I, Nicholas Wagner,
11 (the undersigned), do hereby swear and affirm
12 that the attached proceedings before the U.S.
13 Securities and Exchange Commission were held
14 according to the record and that this is the
15 original, complete, true and accurate transcript
16 that has been compared to the reporting or recording
17 accomplished at the hearing.
18
19
20
21 _____    _____
22 (Proofreader's Name)    (Date)
23
24
25

Page 357

1                PROOFREADER'S CERTIFICATE
2
3    In the Matter of:    GENAUDIO, INC.
4    Witness:             Taj Jerry Mahabub
5    File Number:         D-03450-A
6    Date:                February 5, 2015
7    Location:            Denver, CO
8
9
10        This is to certify that I, Nicholas Wagner,
11   (the undersigned), do hereby swear and affirm
12   that the attached proceedings before the U.S.
13   Securities and Exchange Commission were held
14   according to the record and that this is the
15   original, complete, true and accurate transcript
16   that has been compared to the reporting or recording
17   accomplished at the hearing.
18
19
20
21   _____     _2-16-2025_____
22   (Proofreader's Name)              (Date)
23
24
25

REPORTER'S CERTIFICATE

I, THERESA MENDEZ, reporter, hereby certify that the foregoing transcript of 356 pages is a complete, true and accurate transcript of the testimony indicated, held on 2-5-2015, at Denver, CO in the matter of: Genaudio, Inc.

I further certify that this proceeding was recorded by me, and that the foregoing transcript has been prepared under my direction.

Date: 2-11-2015

Official Reporter: Theresa T. Mendez

Diversified Reporting Services, Inc.

Page 359

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:           )
                            ) File No. D-03450-A
GENAUDIO, INC.              )

WITNESS:   Taj Jerry Mahabub

PAGES:     359 through 686

PLACE:     Securities and Exchange Commission

           Byron G. Rogers Federal Building

           1961 Stout Street, Suite 1700

           Denver, Colorado 80294

DATE:      Thursday, February 12, 2015

    The above-entitled matter came on for hearing, pursuant to Notice, at 8:35 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

Page 360

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4     JENNIFER OSTROM, Senior Counsel
5     KURT L. GOTTSCHALL, Staff Attorney
6     Securities and Exchange Commission
7     Byron G. Rogers Federal Building
8     1961 Stout Street, Suite 1700
9     Denver, Colorado 80294
10    (303) 844-1094
11
12 On behalf of the Witness and GenAudio:
13    ANDREW B. HOLMES, ESQ.
14    Holmes, Taylor & Jones, LLP
15    801 South Figueroa Street, Suite 2170
16    Los Angeles, California 90017
17    (213) 985-2200
18
19    MICHAEL P. McCLOSKEY, ESQ.
20    Wilson Elser Moskowitz Edelman &
21    Dicker, LLP
22    655 West Broadway, Suite 900
23    San Diego, California 92101
24    (619) 321-3200
25

Page 361

1            C O N T E N T S
2
3  WITNESS:                EXAMINATION
4  Taj Jerry Mahabub              362
5
6  EXHIBITS    DESCRIPTION    IDENTIFIED:
7   89  Transcription of Investor Audio    381
8   90  Bates numbered JM2515-2518, series   421
9       Of e-mails
10  91  Bates numbered JM5121-5126, series   469
11      Of e-mails
12  92  Bates numbered JM7122-7125, series   533
13      Of e-mails
14  93  Bates numbered GA3895-3898, e-mail   592
15      To Shareholders
16  94  Letter                 657
17
18
19
20
21
22
23
24
25

Page 362

1            P R O C E E D I N G S
2        MS. OSTROM:  Then let's go on the record
3  at 8:35 a.m., on February 12, 2015.
4        My name is Jennifer Ostrom, and with me is
5  Kurt Gottschall; we are officers of the Commission
6  for purposes of this proceeding, and we are today
7  resuming the examination of Jerry Mahabub which was
8  adjourned on February 5th of 2015.
9        Would counsel please identify themselves.
10       MR. HOLMES:  Andrew Holmes on behalf of
11 Jerry Mahabub.
12       MR. McCLOSKEY:  Michael McCloskey on
13 behalf of Mr. Mahabub and GenAudio.
14       MS. OSTROM:  The testimony today is
15 pursuant to a Commission subpoena which has been
16 previously marked as Exhibit No. 54.
17 Whereupon,
18          TAJ JERRY MAHABUB,
19 was recalled as a witness and, having been previously
20 sworn, was examined and testified as follows:
21            EXAMINATION
22 BY MS. OSTROM:
23    Q    And, Mr. Mahabub, do you understand that
24 you remain under oath?
25    A    Yes.

Page 363

1        MS. OSTROM:  And let the record reflect
2  that a copy of the formal order of investigation in
3  this matter will be available for examination during
4  the course of this proceeding.
5        BY MS. OSTROM:
6     Q    And, Mr. Mahabub, we rescheduled your
7  testimony -- continuation of it because you were ill.
8     Are you on any medications today?
9     A    Not today.
10    Q    Okay.
11    A    I went through all of my antibiotics
12 already.
13    Q    Okay.
14       THE REPORTER:  I'm sorry.  I went
15 through --
16       THE WITNESS:  -- all of my antibiotics
17 already, a Z-pack.
18       THE REPORTER:  Do we need to re-swear --
19       MS. OSTROM:  No.
20       THE REPORTER:  I'm sorry.  I just wanted
21 to be sure.  Thanks.  Okay.
22       BY MR. GOTTSCHALL:
23    Q    And, Mr. Mahabub, because you were not
24 feeling well last Friday, are you feeling okay today?
25    A    Much, much better.

2 (Pages 360 to 363)

Page 364

1  Q   Okay. If at any point during your
2  testimony today you're -- you're feeling under the
3  weather, or whatnot, that you feel like that's going
4  to impair your ability to provide, you know --
5  A   -- accurate.
6  Q   -- true and accurate testimony, please let
7  us know, and we'll -- we'll reschedule for another
8  day, okay?
9  A   Yes.
10     BY MS. OSTROM:
11  Q   Mr. Mahabub, let me hand you Exhibit
12  No. 29. And could you please read that to yourself
13  and then when you're ready, tell me, and I will ask
14  you some questions, okay.
15  A   (Witness reviews Exhibit 29.)
16  Q   Are you ready?
17  A   Yes.
18  Q   Okay. And did GenAudio send Exhibit
19  No. 29 to shareholders?
20  A   I -- I don't remember. But this looks
21  right, based on the e-mail address from Jim. So I
22  have to assume that, yes, this was sent.
23  Q   Did you send a -- create -- excuse me.
24  Did you create a movie presentation for shareholders?
25  A   Yes.

Page 365

1  Q   Okay. And did you have any other input
2  from anyone else into that presentation?
3  A   Could you re-ask that question? I'm --
4  Q   Yes.
5      So the movie presentation, did you have
6  any input from anyone else into the content of the
7  presentation?
8  A   One in 2010 -- yes.
9  Q   From who?
10  A  Paul Powers.
11  Q   Okay. And what did he do?
12  A   There was a legal disclaimer at the very
13  beginning that he helped to draft, along with Ben
14  Huber, and there was also kind of a script that was
15  written, that we both sort of determined and then
16  recorded that at my studio in -- in Los Angeles, and
17  then you marry the video to the audio, right.
18  Q   And who drafted the script?
19  A   I was the initial drafter.
20  Q   Okay. And then who reviewed it?
21  A   That would have been reviewed by the
22  board, by Paul, of course, yeah.
23  Q   Who were the members of the board who
24  reviewed it?
25  A   Mark Bobak, Paul Powers, Ted Cohen, Elliot

Page 366

1  Mazer.
2  Q   Was there anyone else other than the board
3  and Mr. Huber?
4  A   Well, Jim Mattos.
5  Q   What input did Mr. Mattos have?
6  A   Zero. He was just a messenger.
7      And then we've got Greg Morgenstein, and
8  he is our VP of audio engineering.
9  Q   And what input did he have into the
10  presentation?
11  A   More on the recording. When I was
12  recording my voice, he was acting as the recording
13  engineer.
14  Q   Anything else that he did?
15  A   No. No, not in terms of contents, yeah.
16  Q   Anyone else that reviewed it?
17  A   I don't remember if anyone else reviewed
18  it.
19  Q   Okay.
20  A   Yeah.
21  Q   Did anyone make revisions to your draft?
22  A   Yes; Paul Powers did.
23  Q   Okay. And what revisions did he make?
24  A   I don't recall exactly what revisions they
25  were, but I do know that there was some input from

Page 367

1  him being -- because he also was general counsel for
2  the company as well; so COO, general counsel and a
3  board member. He had a lot to do with a lot of this
4  stuff. And he's a lawyer. I figured, you know, he's
5  a lawyer, you should listen to what he says, right.
6  Q   Anyone other than Mr. Powers revise the
7  presentation?
8  A   Not that I remember.
9  Q   Okay.
10  A  I don't recall.
11  Q   If you could look at Exhibit No. 29, the
12  actual letter to shareholders from Mr. Mattos; did
13  you have anything to do with drafting this letter?
14  A   Not that I remember. I don't remember
15  drafting this letter -- being under oath to tell the
16  truth -- but this looks like something I would have
17  written.
18  Q   Why do you say that?
19  A   I just -- it's just been so long ago, I
20  don't -- I don't --
21  Q   No. Why do you say it looks like
22  something you would have written?
23  A   Because of the style I write in.
24  Q   Oh, okay.
25  A   Yeah.

Page 368

1   Q   Okay.
2   A   So this is something that I would have
3   probably -- I just don't recall, but I would have
4   probably wrote and then sent it to Jim, and then
5   said, "Here, take this and forward it to all the
6   shareholders," basically, under my instruction.
7   Q   Okay.  If you could look at the very first
8   paragraph of Exhibit 29, the last complete sentence.
9   It begins five lines up, to the right, with the word
10  "he."
11      The very first paragraph, and then over to
12  the right, this -- the very last sentence begins
13  about five lines up.
14  A   Okay.
15  Q   And it says, "He also discusses our
16  recently completed valuation analysis report, a brief
17  overview of the current common stock offering and the
18  reason why we are raising money for what we expect
19  will be the last round of financing given our current
20  position with a very large consumer electronics
21  company (referred to as the LCEC, throughout the
22  presentation movie)."
23      Did you write that sentence?
24  A   I don't remember, but it looks like
25  something I would have probably wrote --

Page 369

1   Q   Okay.
2   A   -- back then.
3       I can't -- I can't tell you now.  But
4   obviously I did, because the e-mail is going from Jim
5   to the shareholders.  So I had to have written it, I
6   can't deny that.
7   Q   What was the basis for your statement that
8   you expected this to be the last round of financing?
9   A   We had a few different things happening at
10  the time, and I truly believed that we were going to
11  be doing a deal with the LCEC.  So at that time, all
12  -- all -- we were green-lighted all direct --
13  everything was pointing forward to moving into a deal
14  with those guys, so....
15  Q   Are you referring to Apple?
16  A   Yes.
17      I think everyone -- I mean -- I mean, it's
18  -- quite pissed off when it didn't happen; I'll be
19  frank.  But it -- that is -- that's the way it goes.
20  You win some, you lose some, I guess.
21  Q   In June of 2010, what was GenAudio's
22  status with Apple?
23  A   We were working directly with the same
24  members that I talked about last time, Vic Tiscareno,
25  Ronald Isaac, Michael Hailey, some of the other

Page 370

1   people -- Barry Corlett, I think, and some others.
2       So the status was we had completed
3   integration, we had completed making our process run
4   on the device at this time to where it doesn't affect
5   battery life -- because that was the biggest sort of
6   milestone, is if you run a digital signal process in
7   the background as an embedded process, it can -- it
8   can drain the battery really fast; of course, they
9   don't like that.
10      So we got it down to under 5 percent
11  processor expenditure, we were in a -- a very solid
12  state.  Vic was literally telling me, you know, he
13  would be shocked if we don't do a deal at this point
14  in time.  So we decided to put a presentation
15  together with some of the demos, if I remember
16  correctly, that we did for Apple and some of the
17  demos that we did for, you know, some other gaming
18  companies we were working with, like Microsoft and
19  others.
20      And the objective there was just to show
21  the shareholders, okay, here's the technology we've
22  developed, this is what they're interested in --
23  well, what we believe they're interested in
24  licensing, and you can listen to it for yourself and
25  tell us what you think.

Page 371

1       MR. HOLMES:  Jerry, try to -- try to stay
2   on point.  You went a little -- a little -- she asked
3   you what the basis of your belief was and you went
4   into what was in the presentation.
5       THE WITNESS:  Oh, okay.
6       MR. HOLMES:  So try -- try to stick with
7   the question.
8       THE WITNESS:  Stick with the question,
9   yeah.  Sorry about that.
10      BY MS. OSTROM:
11  Q   And when you say "completed integration,"
12  that was something GenAudio had done, correct?
13  A   Yes.
14  Q   Okay.  And was the March 2010 stock
15  offering still open at this point in time?
16  A   I do not remember.
17  Q   Okay.  The sentence that -- that I read to
18  you and to the record says "a brief overview of the
19  current common stock offering;" do you see that?
20      Again, in the first paragraph.
21  A   Oh, right here (indicating).
22      Yes, I do.
23  Q   Okay.  So is -- do you believe that the
24  stock offering was still open at this time, June of
25  2010?

Page 372

1  A   Based on that statement, yes, I would say
2  that -- it says -- it says "current," that there must
3  have been a stock offering open.
4      Whether it was the same one or a different
5  one, I have no idea. Because we would close
6  offerings down sometimes and reopen new ones, right.
7  So I think this would have been the common stock
8  offering. But I think around that same timeframe,
9  although it might have been 2009, we had a preferred
10 series stock offering as well.
11     So I -- I can't tell you exactly which one
12 it was. Like I said, the -- Paul Powers and Mark
13 Bobak pretty much, though, took over running the
14 offerings, and they brought all their people in as
15 investors at that time from Anheuser-Busch, and I was
16 pretty much sort -- sort of cast aside from doing any
17 dealings at that time, other than this kind of stuff.
18     MR. HOLMES: Stick with the question.
19     THE WITNESS: All right.
20     BY MS. OSTROM:
21  Q  And what you're referring to could have
22 been something that happened in 2009; is that
23 correct?
24  A  I -- I believe so, yes. I just don't
25 remember. I -- it's been so long ago, I cannot

Page 373

1  recall.
2  Q  And we received a -- a wave file produced
3  to us by GenAudio of the presentation; however, they
4  were unable to locate the movie portion. Do you know
5  if that's ever been located?
6  A  I have looked everywhere for that thing.
7  I mean, I have searched high and low. And what I do
8  have, I can tell you, is the audio file that we dug
9  up -- because we -- at our studio, we can go back in
10 the console log and look at the date. And so we were
11 able to dig up the audio. And I'm like, okay, well,
12 that's better than nothing. And then I looked on my
13 computer. In Venice I looked on my, out here I
14 looked on my Mac. I called shareholders up and said,
15 "Hey, don't remember that presentation?" No one
16 seems to have it because it's from so long ago.
17  Q  So were you the one who located the --
18 the --
19  A  -- the audio.
20  Q  Let me finish my question.
21  A  Sorry.
22  Q  Were you the one who located the audio
23 file to produce to the SEC?
24  A  Yes.
25  Q  Okay. And then did you give that to your

Page 374

1  counsel to produce to us?
2  A  Well, to be accurate with -- I answer?
3  Q  Go ahead.
4  A  It was myself and Greg Morgenstein --
5  Q  Okay.
6  A  -- my chief engineer at the studio.
7  Q  And then did -- did you provide that to
8  your counsel for production to us?
9  A  I believe -- yes. Yes.
10 Q  Okay. Did you make this presentation in
11 person at any point?
12     MR. HOLMES: Do you mean did he repeat it
13 or did he play it in person?
14     MS. OSTROM: No.
15     BY MS. OSTROM:
16 Q  I mean, did you actually make this
17 presentation -- you said you had a script, so I was
18 wondering if you made the presentation in person at
19 any point?
20 A  Yes, but it was done not exactly the same,
21 right.
22     So, depending on where I was -- like, I
23 remember sort of going on a "road show" as they
24 called it, right. And you go around to different
25 locations and -- I was with an investment banker at

Page 375

1  the time, and that person would try to bring
2  accredited investors to the table, you know that kind
3  of stuff.
4      So I would present in various locations on
5  different dates. The deck was for the most part the
6  same, but sometimes what I would say would be
7  different. It wouldn't be exactly what I said. You
8  know, each time you present it slightly different,
9  right.
10 Q  Okay.
11     MR. HOLMES: The -- the deck is the
12 presentation?
13     THE WITNESS: Yes.
14     BY MS. OSTROM:
15 Q  Okay. So the sentence above where there's
16 the list of the towns -- the -- the cities from
17 number one to number ten, it says, "In a nutshell,
18 this presentation movie download is for the most part
19 exactly the same presentation our" --
20 A  Yes.
21 Q  Let me finish.
22 A  Okay.
23 Q  -- "our CEO is currently giving to live
24 audiences (limited to accredited investors only) in
25 selected locations."

Page 376

1   **Did you write that sentence?**
2   A   I must have. I don't recall. Like I
3   said, I don't recall writing this e-mail, but this
4   looks like my writing, so....
5   Q   Okay. Did you use the same script?
6   A   Similar, yeah. Very analogous.
7   Q   Okay.
8   A   They're very analogous to each other, yes.
9   Q   Okay. And who were these presentations to
10  that are listed in number one through ten, what was
11  the audience?
12  A   I think this was with a guy that I had
13  been hooked up with by the name of Alan Stone, if I
14  remember correctly. And Alan Stone was a -- he puts
15  on small-cap -- sort of micro-cap conferences for his
16  group of investors that he brings, which are
17  certified -- guaranteed accredited basically. So,
18  you know, he's -- sort of collects all these startup
19  companies and puts them on stage and gets them
20  exposure basically.
21  Q   Now, was it to try to get more investors
22  into the stock offering at the time?
23  A   I can't recall exactly what the purpose
24  was. I think part of it was exposure, and the other
25  part was to solicit investors as well, yes.

Page 377

1   Q   Okay. Was there an -- any attempt to like
2   get venture capital in any of these presentations?
3   A   The FSX Investment Banking conference, the
4   one in Marina Del Rey, there's usually like angel
5   investor groups or venture capital groups, things
6   like that, that show up at those. So I couldn't tell
7   you I was targeting a VC, but certainly I'm sure they
8   were in the audience.
9   Q   Okay. Did you ever say in any of these
10  presentations that the LCEC was Apple?
11  A   Not that I remember. Not that I recall.
12  Q   Okay.
13  A   What -- what I do remember, though, is
14  that we were -- we had a product called Astoundsound
15  Expander, which had we had put out there for Mac and
16  PC, which is for Apple, right; so we would refer to
17  that but in a completely different context.
18      Basically it's the same exact product.
19  The -- the -- what we were doing with Apple is the
20  same back-end DSP core --
21      THE REPORTER: I'm sorry. The same --
22      THE WITNESS: -- back-end DSP core,
23  digital signal processing core.
24  A   -- that we would use for Astoundsound
25  Expander for Mac and PC. So, you know, if I'd refer

Page 378

1   to Apple in a presentation, the reference was to ASE.
2   And then what we did is we optimized that source code
3   to run on a smaller mobile device. Does that make
4   sense?
5   Q   Yes. Okay.
6       So you never said that the LCEC was Apple?
7   A   Not that I remember.
8   Q   Okay.
9   A   No. That would -- that would have been a
10  violation of the NDA.
11      BY MR. GOTTSCHALL:
12  Q   And just to be clear, you located a wave
13  file that you produced to the staff, but that wave
14  file was sent to the existing shareholders of
15  GenAudio by Mr. Mattos in his June 2nd, 2010 e-mail;
16  is that right?
17  A   Can you ask that again? I'm sorry.
18  Q   Sure.
19      You located a wave file of a presentation
20  that you had recorded in your studio; is that right?
21  A   Correct.
22  Q   And was it your understanding that that
23  wave file was attached to or hyper linked to
24  Mr. Mattos's e-mail to GenAudio shareholders in
25  June 2nd, 2010?

Page 379

1   A   No, it wouldn't have been a wave file. It
2   would have been a hyperlink, which -- yeah, right
3   here.
4       If you go to the second page --
5   Q   Uh-huh.
6   A   -- there's a hyperlink right here, and it
7   was password protected, so -- this is called
8   YouSendIt, which is now called Hightail. So you
9   click on the hyperlink, and then there would be a
10  ".mov" file, because there's video associated with
11  the audio. If it was a wave file, then it would be
12  audio only.
13  Q   Okay.
14  A   But that's all I could send you guys
15  because that's all I was able to find.
16  Q   Right. But what you sent to the SEC staff
17  was the audio piece of that movie file that was sent
18  to GenAudio investors?
19  A   Yes, sir.
20  Q   Okay.
21      MR. HOLMES: And just for clarification,
22  even that version may not have been the final
23  version, because the sound -- some -- some of the
24  music and sound is not included in that; so I don't
25  think it was even the final version of that.

Page 684

1  MS. OSTROM: And we'll go off the record
2  at 3:50 p.m., on February 12th of 2015.
3  (Whereupon, at 3:50 p.m. the examination
4  adjourned.)
5  * * * * *

Page 685

1  PROOFREADER'S CERTIFICATE
2
3  In the Matter of: GENAUDIO, INC.
4  Witness: Taj Jerry Mahabub
5  File Number: D-03450-A
6  Date: February 12, 2015
7  Location: Denver, CO
8
9
10  This is to certify that I, Nicholas Wagner,
11  (the undersigned), do hereby swear and affirm
12  that the attached proceedings before the U.S.
13  Securities and Exchange Commission were held
14  according to the record and that this is the
15  original, complete, true and accurate transcript
16  that has been compared to the reporting or recording
17  accomplished at the hearing.
18
19
20
21  _____   _____
22  (Proofreader's Name)      (Date)
23
24
25



Page 685

1              PROOFREADER'S CERTIFICATE
2
3     In the Matter of:    GENAUDIO, INC.
4     Witness:             Taj Jerry Mahabub
5     File Number:         D-03450-A
6     Date:                February 12, 2015
7     Location:            Denver, CO
8
9
10         This is to certify that I, Nicholas Wagner,
11    (the undersigned), do hereby swear and affirm
12    that the attached proceedings before the U.S.
13    Securities and Exchange Commission were held
14    according to the record and that this is the
15    original, complete, true and accurate transcript
16    that has been compared to the reporting or recording
17    accomplished at the hearing.
18
19
20
21    _____        ____2-14-2015____
22    (Proofreader's Name)             (Date)
23
24
25

```
 1         UNITED STATES SECURITIES AND EXCHANGE COMMISSION
 2
 3                      REPORTER'S CERTIFICATE
 4
 5         I, Denise Truax, Registered Merit Reporter,
 6    hereby certify that the foregoing transcript
 7    consisting of 326 pages is a complete, true, and
 8    accurate transcript of the testimony indicated, held
 9    2-12-2015        in the matter of   GenAudio, Inc.
10                I further certify that this proceeding
11    was recorded by me, and the foregoing transcript has
12    been prepared under my direction.
13
14    DATE:   2-19-2015
15
16
17
18    Official Reporter:    _____Denise Truax_____
19
                               Denise Truax
20
```