**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 15-cv-2118-WJM-SKC

SECURITIES & EXCHANGE COMMISSION,

     Plaintiff,

v.

TAJ JERRY MAHABUB, and
GENAUDIO, INC.,

     Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
SEC'S REVISED MOTION FOR SUMMARY JUDGMENT**

---

This is a securities fraud case that Plaintiff Securities and Exchange Commission

("SEC") has brought against Taj "Jerry" Mahabub ("Mahabub") and the company he

founded, GenAudio, Inc. ("GenAudio") (together, "Defendants"). The SEC asserts

various theories of liability under the Securities Act of 1933 ("Securities Act"), 15 U.S.C.

§§ 77a *et seq.*, and the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C.

§§ 78a *et seq.*

Currently pending before the Court is the SEC's Revised Motion for Summary

Judgment. (ECF No. 84.) The SEC requests judgment as a matter of law on all of its

causes of action, leaving only remedies for further consideration. (*Id.* at 8 & n.1.)[1]

GenAudio and Mahabub, represented separately, each filed responses (ECF Nos. 89,

---

[1] All ECF page citations are to the page number in the ECF header, which does not
always match the document's internal pagination, particularly in exhibits and in briefs with
separately numbered prefatory material such as a table of contents.

90), and the SEC filed a combined reply (ECF No. 91).

For the reasons explained below, the Court finds that a subset of facts—more limited than the set of facts proffered by the SEC—entitles the SEC to summary judgment on its claims brought under Securities Act § 17(a)(2) and Rule 10b-5(b). The SEC is also entitled to summary judgment on its claim for sale of unregistered securities under Securities Act § 5(a) and (c). Beyond that, judgment as a matter of law is not appropriate on this record. The Court will order the SEC to file a status report regarding whether a trial on liability is needed, or whether the foregoing is enough to support the remedies the SEC intends to seek.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right

to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  FACTS

The following facts are undisputed unless attributed to a party or otherwise noted.

### A.    GenAudio & Mahabub

GenAudio is a Colorado corporation headquartered in Centennial, Colorado. (ECF No. 84 at 9, ¶ 1.)  "[I]t engages in the development and marketing of software that creates three-dimensional audio, which it calls 'AstoundSound.'" (*Id.*)

Mahabub founded GenAudio, served as its CEO and its Chairman of the Board from 2009 to 2012.  (*Id.* ¶ 3.)  "Between November 2009 and April 2012, Mahabub had the right to vote a majority of GenAudio's securities and controlled GenAudio's Board." (*Id.* ¶ 4.)

During the same timeframe (2009 to 2012), GenAudio primarily financed itself through selling debt and equity securities in private offerings, but it was nonetheless "consistently insufficiently funded."  (*Id.* at 10, ¶¶ 9–10.)  GenAudio had an employee, Jim Wei-Kung Mattos, who spent most of his time trying to raise money for the company.  (*Id.* ¶ 6.)

### B.    Communications About Apple from July 2009–March 2010

#### 1.    The Beginnings of the Apple Relationship

This case centers around Mahabub's attempts to secure a deal with Apple, Inc., to integrate AstoundSound into Apple products.  GenAudio began discussing AstoundSound with Apple in late 2006.  (ECF No. 89 at 16, ¶ 108.)  The relationship between GenAudio and Apple over the next two-and-a-half years is unclear.  However, on July 1, 2009, Mahabub executed Apple's standard non-disclosure agreement

("NDA") on behalf of GenAudio.  (ECF No. 84 at 12, ¶ 19.)

Mahabub's primary point of contact at Apple was Victor Tiscareno, a senior audio and acoustic engineer.  (*Id.* ¶ 17.)  Mahabub also met and communicated with Michael Hailey, a product market manager for the iPod, iPhone, and iPad product lines; and Ronald Isaac, a "signal processing engineer and acoustician technologist."  (*Id.* ¶ 18.) Tiscareno was Mahabub's point of contact with the iPhone/iPod/iPad division, and Isaac was Mahabub's point of contact with the Mac division.  (ECF No. 89 at 20, ¶ 124.)

2.    The First Wave of Altered E-Mails

Between August 2009 and February 2010, Mahabub forwarded several of his e-mails to or from his Apple contacts (mostly Tiscareno) to a group the parties refer to as the "GenAudio Team," meaning "GenAudio's employees, contractors, and Board." (ECF No. 84 at 10, ¶ 12.)  Mahabub altered the forwarded versions of these e-mails. (*See generally* ECF No. 84-92.)  These alterations generally conveyed the impression, or claimed outright, that:

- Mahabub had met with Phil Schiller, Apple's senior vice president of worldwide marketing, and Tim Cook, then Apple's chief operating officer;

- Apple's then-CEO Steve Jobs was being apprised of the GenAudio discussions;

- Mahabub was scheduled to meet with Jobs personally;

- progress toward a deal with Apple had generally been swift; and

- Schiller was targeting a late 2010 rollout of GenAudio-enhanced Apple products.

(*Id.*; ECF No. 84 at 13–14, ¶¶ 24–25, 30–31, 33.)  In truth, Mahabub had not met with—

4

and never would meet with—Jobs, Cook, or Schiller, and Apple employees never brought GenAudio to Jobs's attention. (*Id.* ¶¶ 26, 32, 34–35.)

As will be seen below, forwarding altered e-mails to the GenAudio Team continued to be Mahabub's *modus operandi* in coming months and years. Mahabub suggests he made these alterations only to maintain morale among GenAudio's overworked and inconsistently paid employees, not as a means of encouraging investment. (ECF No. 89 at 4; ECF No. 90 at 9, ¶¶ 212–13.)

3. Other Events Coinciding with the Altered E-Mails

Other events potentially material to this case occurred in this same timeframe as the first set of altered e-mails (August 2009 through February 2010). On September 25, 2009, Mahabub told the GenAudio Board that a deal with Apple was "highly probable." (ECF No. 84 at 13, ¶ 27.) On November 9, 2009, Mattos (GenAudio's full-time fundraiser) sent an e-mail, authored and signed by Mahabub, to GenAudio's investors, informing them that "nothing is assured yet, but as shareholders you should be aware that there is a strong possibility that the Company may be acquired within the next 6 months in light of our extensive discussions with a global industry leader in consumer electronics." (ECF No. 84-35 at 3.) He requested that investors "[p]lease continue to tell people about our Company and direct[] them to our website." (*Id.*) A few days later, a recipient of this e-mail named Donaghue replied to Mattos with a "list of investors," and each of the listed investors purchased GenAudio shares soon afterward. (ECF No. 84 at 16, ¶¶ 38–39.)[2]

_____

[2] Defendants object to the Donaghue e-mail as hearsay (*see* ECF No. 89 at 7, ¶¶ 38–39), but Defendants do not explain why they believe that the content of the e-mail "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). In any event, the following non-hearsay facts remain relevant: the transmission of and words written in

Around this same time, Mahabub began selling his personal GenAudio shares to investors. (*Id.* at 17, ¶ 44.)[3] The sales continued through April 2012. (*Id.* ¶ 45.) No registration statement was filed or in effect for these sales. (*Id.* at 18, ¶ 47.)

On November 28, 2009, Mahabub sent Apple employees Tiscareno and Hailey a lengthy e-mail attempting to ingratiate himself to them, extolling the potential for an Apple-GenAudio partnership, suggesting that Apple's IP lawyers begin examining GenAudio's patents, and stating that "we hope Apple becomes happy with us once the deal is inked and the initial products from Apple incorporating AstoundSound . . . are brought to market." (ECF No. 84-44 at 3–10.) Hailey (the iPod/iPhone/iPad product market manager) responded on December 16, 2009, that "[w]e're making progress and building our story, but this is not something we can execute overnight. The business side of things would come into play after we have exec buy-in on the product side." (*Id.* at 3.) This response caused Mahabub to focus intensely on "exec buy-in." (ECF No. 89 at 24, ¶ 142.) In a follow-up e-mail, he asked if Hailey had "any idea as to when the exec buy-in might take place." (ECF No. 84-44 at 2.) It is not clear if Hailey responded to that e-mail. However, on January 5, 2010, Hailey responded to a separate e-mail from Mahabub. (ECF No. 84-45 at 2–3.) Hailey wrote that Apple was "pretty serious about looking at audio quality across the board and this will take time—definitely more than a couple of months." (*Id.* at 3.)

---

Donaghue's e-mail, including the list of names described as "investors"; and the purchase of GenAudio shares soon after by persons with those same names.

[3] Defendants deny this fact without explanation and therefore fail in their duties under Rule 56(c)(1) and WJM Revised Practice Standard III.E.4(b). They also object to one of the supporting e-mails as hearsay (ECF No. 84-42) but do not argue that the content cannot be presented in admissible form.

4.    The 2010 Offering

Mahabub recalls a conversation with Tiscareno in February 2010 or thereabouts, in which Tiscareno said something to the effect that he and Hailey were "confident" that they could get AstoundSound integration "okayed by the big man if [they played their] cards right."  (ECF No. 89 at 27, ¶ 159.)  Whether Tiscareno recalls this conversation is not clear, but Tiscareno testified at his deposition that if he used the term "big man," it was usually a reference to Jobs.  (*Id.* at 26, ¶ 154.)

Tiscareno's alleged "big man" remark became the basis of alterations Mahabub made to a February 12, 2010 e-mail that he forwarded to GenAudio's board that same day.  (*See* ECF No. 84 at 18, ¶ 50.)  The original e-mail was simply about whether Mahabub had considered testing GenAudio's technology in the newest iPad model. (*See* ECF No. 84-47 at 2.)  Mahabub added to that e-mail several sentences, including one in which Tiscareno purports to say that he and Hailey "are both confident that we can get this ok'd by the big man if we play our cards right."  (ECF No. 84-46 at 3.) Mahabub also put into Tiscareno's mouth a mention of "the project Phil [Schiller] discussed for Christmas product rollout with you."  (*Id.*)  Finally, in Mahabub's commentary on Tiscareno's alleged statements, he told the GenAudio board that he had a "[g]reat meeting with Phil Schiller yesterday" who was targeting a "Christmas rollout" and had also "requested to see a copy of the [GenAudio] valuation report ASAP."  (*Id.* at 2.)

Later the same day, February 12, 2010, GenAudio held a board meeting.  (ECF No. 84 at 18, ¶ 51.)  After a "summary of the discussions with Apple," the board agreed that GenAudio should prepare a new stock offering and directed Mahabub to prepare a

draft private placement memorandum for the board's review.  (*Id.*)  The board formally approved the offering on March 5, 2010 ("2010 Offering").  (*Id.* at 19, ¶ 52.)

On March 10, 2010, Mahabub e-mailed fifteen GenAudio shareholders the company valuation report, announcing that GenAudio would include that report in the 2010 Offering materials and that the 2010 Offering would "go live on March 15, 2010." (*Id.* ¶ 53.)  He then gave these investors an opportunity, ahead of the formal offering, to buy up to 250,000 of his own GenAudio shares at fifty cents per share.  (*Id.*)[4]  And he went on to state that GenAudio was "starting to discuss the business side with the LCEC [*i.e.*, Large Consumer Electronics Company], and I expect to have a very substantial license deal in place for their Christmas Product Rollout."  (ECF No. 84-50 at 4.)  GenAudio's investors generally understood that "LCEC" referred to Apple.  (ECF No. 84 at 16, ¶ 41.)

As promised in Mahabub's e-mail, the 2010 Offering commenced on March 15, 2010.  (*Id.* at 19, ¶ 54.)  It lasted through August 31, 2010.  (*Id.*)  GenAudio did not file a registration statement for the 2010 Offering, nor did it provide an audited balance sheet to potential investors.  (*Id.* ¶ 55; *id.* at 22, ¶ 69.)  The solicitation included a private placement memorandum (ECF No. 84-3) with a cover letter dated March 15, 2010 and signed by Mahabub (ECF No. 84-52).  This letter was specifically directed to current GenAudio shareholders "to keep [them] apprised of current developments."  (*Id.* at 2.) Mahabub represented, among other things, that the 2010 Offering was

> being conducted to provide bridge capital until we can "ink" a deal with a large consumer electronics company (referred to as the "LCEC" throughout the [private placement

---

[4] Later in the e-mail, he made explicit that this would be a bargain compared to the $3.00/share intended for the 2010 Offering.  (ECF No. 84-50 at 5.)

memorandum]) with whom we have had over 15 meetings with marketing and technical management, and will start the actual embedded level integration process within the next 30 days.

(*Id.*)

5.      Fundraising Exhortations & More Altered E-Mails

On March 18, 2010, Mahabub e-mailed the GenAudio Team to explain the current state of company finances, and attached the 2010 Offering cover letter.  (*Id.* at 22, ¶ 73; ECF No. 84-9 at 2–4.)  The e-mail included an exhortation that it was "[t]ime to go back into fund raising mode, and if any of you feel like helping out with this effort, I would certainly appreciate it.  It's not like you are doing your friends and family a bad thing by getting them into GenAudio at this stage in the game."  (*Id.* at 4.)  The following day, Mahabub forwarded that e-mail again to the GenAudio Team, adding some additional information, and further stating,

Time to get some $$$ and drive the business side of our company through the roof! * * * And someone would not want to invest at this stage in the game, or increase there [*sic*] shareholder position because why?  There is no answer to this question, however, in order to truly get to where this ship needs to go, we need to stop for a moment and re-fuel.

(*Id.* at 2.)

On March 21, 2010, Mahabub sent an e-mail to Tiscareno, Hailey, and Isaac, stating that he would soon be sending them certain software that would permit Apple engineers to test AstoundSound as an embedded part of certain Apple products.  (ECF No. 84-92 at 7.)  Later that same day, Mahabub forwarded an altered version of that e-mail to the GenAudio Team.  (*Id.*)  Specifically, Mahabub altered the "To:" line to make it appear that the e-mail had been sent to Schiller and other important Apple executives.  (*Id.*)  Mahabub also added a paragraph to make it appear that his e-mail

had not simply announced his intent to send the software, but that it was actually in response to Apple's request for the software in light of specific business plans to incorporate AstoundSound into Apple's products, and that Mahabub had continued to communicate directly with Schiller:

> This [software transmittal] will be right in time for you to start the embedded level integration process as we discussed on our last conference call and will keep everything on schedule with what Phil [Schiller] is hoping for—a fall product rollout. I will be available anytime on Tuesday for a conference call to go over the [software development kit], and I believe Phil and Michael [Hailey] wanted to follow up and go over a few things with us on the marketing side in terms of the actual application integrations for Quick[T]ime, [i]Tunes, DVD Player among others...Just let me know when you are all available.

(*Id.* (ellipses in original).)

## C. Communications About the "Exec Buy-In" Meeting (April–May 2010)

### 1. Learning of the Meeting

According to the SEC, Mahabub learned in early April 2010 of an important upcoming "internal meeting at Apple regarding GenAudio's technology." (ECF No. 84 at 23, ¶ 76.) Mahabub partly disputes this, claiming that he knew "long before" April 2010 that such a meeting had been scheduled, and that he and Tiscareno had worked "in late 2009" on the "demos to be used at that meeting." (ECF No. 89 at 12, ¶ 76.) In any event, this was the meeting where Mahabub's coveted "buy-in" from an Apple "exec" would be decided. (*Id.* at 25, ¶ 150.) If an executive "did not give a 'green light' to continue with GenAudio, then discussions between GenAudio and Apple's iPhone/iPod/iPad division . . . would end." (*Id.* ¶ 151.) Mahabub understood this. (*Id.* at 26, ¶ 140.)

2.    "Jobs" vs. "Joz"

The SEC claims that none of Mahabub's Apple contacts told him the upcoming demonstration meeting would include Steve Jobs.  (ECF No. 84 at 23, ¶ 77.)  Mahabub claims, however, that he reasonably came to believe that Jobs would attend.  Specifically, in the run-up to the meeting, Mahabub and Tiscareno had discussions about preparing the demonstration for "the executive" or "the exec."  (ECF No. 89 at 26, ¶ 155.)  Moreover, Mahabub claims that Tiscareno and Hailey told him over the phone that the meeting would be with "Jobs," when in fact—if they named the executive at all—they probably said that the meeting would be with "Joz."  (*Id.* at 26–27, ¶¶ 156–57.)  "Joz" (pronounced "jaws") is the nickname for Greg Joswiak, who was then "the Vice President of iPod/iPhone in the Marketing Department, [and was] among the most senior executives at Apple."  (*Id.* at 25, ¶¶ 148–49.)  But Mahabub had never heard of Joswiak and was never told that someone by that name would attend the meeting.  (*Id.* at 27, ¶ 158.)  Thus, he asserts, he reasonably understood Hailey and/or Tiscareno to be saying that "Jobs," not "Joz," would attend.  (*Id.* at 27, ¶ 157.)

3.    Altered E-Mails and Other Statements About the Anticipated Meeting

On April 7, 2010—still in the run-up to the "exec buy-in" meeting—Tiscareno e-mailed Mahabub about delivery of certain demonstration hardware, concluding with, "No rush at the moment.  I don't have a meeting date or time yet."  (ECF No. 84-73 at 2.)  Mahabub responded, and then forwarded an altered version of his response and Tiscareno's trailing e-mail to the GenAudio Team.  (ECF No. 84-57.)  Among other things, Mahabub removed from Tiscareno's e-mail the portion about not having a meeting date or time, and inserted the sentence, "Phil [Schiller] let us know earlier that

11

this [meeting] might be postponed until early next week.  Apparently Steve [Jobs] is planning on going out of town with his family for the weekend." (*Id.* at 3.)  To his own response, Mahabub added that the fabricated postponement "might be better given that Steve will be relaxed from having a weekend getaway with his family.  Perhaps this is why Phil is rescheduling for next week.  He did say [that whether Jobs is relaxed] was a very important factor . . . ." (*Id.* at 2.)

On April 30, 2010, while attending a conference for investment bankers and broker-dealers, Mahabub sent at least one investor an e-mail announcing that the LCEC was "looking to acquire GenAudio's tech for integration into their entire lineup of product offerings . . . and we are now waiting [for the time] when we will initiate negotiations, pending the CEO's [approval of] the integrated product rollout strategy and the technical implementation strategy that will be presented to the CEO next week!!!"  (ECF No. 84-74 at 5.)  The e-mail prompted the recipient to purchase 5,000 shares for $15,000.  (ECF No. 84 at 24, ¶ 80.)[5]

At some point, Mahabub learned that the specific date of the "exec buy-in" meeting would be May 6, 2010.  (*See* ECF No. 89 at 26, ¶¶ 153, 155.)  On May 5, Mahabub e-mailed Tiscareno, offering to fly to Apple headquarters and attend the meeting, and also offering to coach Tiscareno on how best to present AstoundSound.  (ECF No. 84-71 at 2–3.)  Later that day, Tiscareno replied,

> Thanks for your offer to help us, but this is not that kind of demo.
>
> Michael [Hailey] and I are pitching this as a concept, and our

---

[5] Defendants object to this e-mail as hearsay (*see* ECF No. 89 at 13, ¶ 80), but again fail to explain why they believe that the content of the e-mail, or the fact which it represents, "cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

proof of concept is what you developed for us.

I think the demo and the product will speak for itself.  Once we get the go ahead that this is a great idea, then the questions will be, "[W]ell, what about the other technologies have we reviewed them? etc[.]"  Then we sort of start over internally to prove that we know what we are talking about, etc.

We have to get to first base...

(*Id.* at 2 (ellipses in original).)[6]

On the morning of May 6, Mahabub sent e-mails to the GenAudio Team about the meeting scheduled for that day, with statements suggesting that Schiller and Jobs would attend.  (ECF No. 84-75 at 2–3.)

    4.   The Meeting Itself & Aftermath

The "exec buy-in" meeting indeed took place later that day, but only Tiscareno, Hailey, and Joswiak attended.  (ECF No. 89 at 27, ¶ 160.)  At his later deposition, Hailey described Joswiak's "response" as follows: "So, I think he agreed that—he agreed that there was a value and exploring ways to enhance the listening experience for people using iPods and iPhones. * * * My recollection was that he saw value in the consumer problem we were trying to solve."  (ECF No. 89-26 at 6.)

The record does not show what Tiscareno or Hailey said, if anything, to Mahabub about the outcome of the May 6 meeting.  However, late in the evening of the same day, Mahabub sent an e-mail to the GenAudio Team with a purported transcript of a phone call he had supposedly just had with Tiscareno.  (ECF No. 84-33.)  The fact of

---

[6] Defendants again object to this e-mail as hearsay (*see* ECF No. 89 at 13–14, ¶ 81), but still fail to explain why they believe that the content of the e-mail, or the fact which it represents, "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). In addition, the e-mail is obviously relevant for its "effect on the listener," *i.e.*, Mahabub.

the phone call and the transcript were both fabrications. According to the transcript, Tiscareno reported that "the meeting could not have gone any better" and that "Steve thought the technology was so extraordinary," but "it will take a lot of time before you and Apple get to the business side" because Jobs believed that the upcoming release of a new operating system version for iPhones and iPads already had many new features and AstoundSound "is too good to be rolled into a giant pool of other features. I believe [Jobs] wants to explode this technology into the world, and he stated he needs some time to figure out the plan and when to launch this." (*Id.* at 3–4.) In the meantime, Jobs had "instructed all of us to be in a no radio period," *i.e.*, to cease discussions with GenAudio as Apple prepared for formal negotiations. (*Id.* at 4.)

Following this fake transcription, Mahabub provided his own commentary, including a prediction that Apple would take "60 to 90 days," "most likely to prepare what I believe will be a buyout offer." (*Id.* at 5.) As for Jobs, Mahabub stated, "I can't wait to meet him for our one on one meeting, which according to [Tiscareno] is still on the radar screen for when we re-open haling [*sic*] frequencies with [Apple]." (*Id.*)

Mahabub's e-mail included a mandate that recipients should delete it after reading it, because "[i]f this ever got out, it could kill our deal." (*Id.* at 3.) However, Mahabub himself forwarded it to a potential investor named Dell Skluzak, albeit with another command to delete after reading. (*Id.* at 2.) Mahabub says he sent the e-mail to Skluzak as part of a campaign to persuade him to join the GenAudio Board, not to invest. (ECF No. 90 at 12, ¶¶ 231–32.) Skluzak had decided to invest in GenAudio before receiving this e-mail and did not rely on the e-mail when, later in May 2010, he participated in the 2010 Offering. (*Id.* at 11, ¶¶ 229–30; ECF No. 84 at 25, ¶ 85.)

Rather, according to Skluzak, he had twice met with Mahabub "sometime in the first four months of 2010." (ECF No. 84-37 at 5.) During those meetings, Mahabub persuaded Skluzak to invest by trumpeting Steve Jobs's supposed enthusiasm. (*Id.*) Skluzak was impressed at Mahabub's "extensive and high level" interactions with Apple. (*Id.* at 5–6.) Skluzak says that the May 6, 2010 fake-transcript e-mail "affirmed my willingness to purchase [GenAudio shares], because I still would have had the opportunity to stop the monetary transaction to purchase those stocks. It just confirmed that the decision I had made to purchase the stocks was a good decision." (*Id.* at 8.)

As for what Mahabub *actually* learned about the May 6, 2010 meeting with "Jobs"/"Joz," the record reveals nothing. Mahabub claims he assumed that the "critical 'green light'" must have been given because no one at Apple told him otherwise, and because "substantive work" with Tiscareno and other Apple engineers continued after that date. (ECF No. 89 at 27–29, ¶¶ 162, 164–65.)

**D.    Communications About Apple from May–December 2010**

1.    <u>Altered E-Mails and other Claims During the "No Radio" Period</u>

Soon after May 6, 2010, GenAudio created an investor video presentation featuring Mahabub saying, among other things, "as of a couple of days ago . . . the CEO of the LCEC finally met with senior marketing and technical management and we have the green light to move forward." (ECF No. 84-76 at 55.) Mahabub also encouraged investors to review the 2010 Offering materials. (*Id.* at 55–56.) On June 2, 2010, Mattos e-mailed to potential investors a link to the video. (ECF No. 84-54.)

2.    <u>Alleged Resumption of Negotiations & False Claims About Steve Jobs</u>

On July 2, 2010, Mahabub and Tiscareno had an e-mail exchange to set up a July 7 meeting between them and two others on Tiscareno's "team," including Andrew

Bright, a Ph.D. in acoustics. (ECF No. 84-78 at 2.) Mahabub then forwarded this e-mail

to the GenAudio Team, announcing that "[t]he quiet period has ended" and that "Steve

[Jobs] and his team are getting serious about the real core of the technology." (ECF

No. 84-77 at 3.) Thus, Jobs had requested that "his big phd [*sic*] in acoustic [*sic*] report

back to him." (*Id.* at 2–3.) To back up these fabrications, Mahabub altered Tiscareno's

e-mail to state that the meeting with Bright was "requested by Steve himself" and that

"Steve would like to have an initial introduction to you during this meeting, just a simple

handshake meeting with him." (*Id.* at 4.)

For unclear reasons, the meeting with Bright did not happen until late September

2010, and is described in Part II.D.3, below.

On August 1, 2010, GenAudio sent to investors a letter signed by Mahabub, and

reporting on various business developments. (ECF No. 84-79.) Among the many

statements in that letter is the following claim regarding GenAudio's relationship with the

LCEC:

> In the very near future, it has been requested by the LCEC's
> CEO to have a "hand-shake" meeting with myself alongside
> meeting with the LCEC's expert in acoustic physics and
> others. This meeting will take place within the next couple of
> weeks. As you all may already know, due to our NDA with
> the LCEC, I am not at liberty to talk about any details. I can
> say that we are still moving forward with confidence and plan
> on carrying it through all the way to the end, which could
> result in a significant revenue generating license deal or the
> potential for acquisition of the technology or the company.

(*Id.* at 3.) Toward the end of this letter, Mahabub made a reference to the ongoing 2010

Offering:

> Our current offering will be closing at the end of August and
> it has been very successful thus far with the vast majority of
> investments coming from our existing shareholders. Thank

> you very much for your continued support.  Many of you
> have continued to invest over and over again since I formed
> the company back in 2003, and I am grateful and honored to
> have you all as shareholders in GenAudio (including all of
> our newer shareholders of course).  It is a real good sign
> when your shareholders continue to invest repeatedly—[i]t
> makes the entire team and myself happy and we will
> continue to work very hard to maximize shareholder value.

(*Id.* at 4.)

The 2010 Offering closed on August 31, 2010, having yielded $3.513 million from sales of 1.171 million common shares.  (ECF No. 84 at 19, ¶ 54.)

 3. <u>The Argument with Bright</u>

Mahabub's meeting with Bright (Apple's resident Ph.D. in acoustics) took place on September 23, 2010.  (*Id.* at 27, ¶ 95.)  Tiscareno also attended (*id.*), as did "a senior Apple employee" named Barry Corlett (ECF No. 89 at 30, ¶ 170).  "The meeting did not go well due to an argument between Mahabub and Bright" that the record does not elaborate upon.  (ECF No. 84 at 27, ¶ 96.)

Despite the argument, Tiscareno and others continued to work with GenAudio in the ensuing months (ECF No. 89 at 31, ¶¶ 174–75), although the SEC claims that none of this work was "substantive" (ECF No. 84 at 27, ¶ 96).

 4. <u>Additional False Claims About Steve Jobs</u>

On December 8, 2010, GenAudio sent to investors a letter signed by Mahabub. (ECF No. 84-83.)  Among many other developments, Mahabub described ongoing communication with the LCEC, and falsely claimed, "I met with their CEO and gave him a demo of our technology, and he stated, 'I really like your technology and look forward to seeing you again in the future.'"  (*Id.* at 12.)  Mahabub continued, "Although they are moving very slow, we are still on their radar screen, and remain very optimistic for a

deal in the second or third quarter of 2011." (*Id.*)

## E.  Communications About Apple as the Relationship "Fizzles"

### 1.  Tiscareno's Departure

Tiscareno left Apple in February 2011.  (ECF No. 89 at 32, ¶ 179.)  At that time, "he informed Mahabub that his supervisor, Jesse Dorogusker, was 'fully aware and engaged with the project' relating to GenAudio."  (*Id.*)  Mahabub had at least two meetings with the Dorogusker, although he could not recall if they were after Tiscareno's departure or if they happened in the lead-up to Tiscareno's anticipated departure.  (*Id.* ¶ 180 and cited evidence.)

### 2.  An Informal Investment Solicitation

On February 26, 2011, GenAudio sent to investors a letter signed by Mahabub describing GenAudio's current state of affairs.  (ECF No. 84-84.)  Regarding the LCEC, Mahabub conceded that "progress has been slower than we would like," but "they have not cut us loose and continue to be very interested in integrating our technology across their entire line-up of product offerings."  (*Id.* at 16–17.)  He further stated,

> While I wish I had more news to share on this front, I am relieved that they continue to take us seriously and evaluate our technology.  If they were not interested, they would have terminated the discussions by now.  We will continue to support the development efforts with the LCEC with the hope that it will lead to a major transaction for GenAudio and its shareholders in the not so distant future.

(*Id.* at 17.)  After discussing many other potential business opportunities, the letter concluded with an invitation to "accredited investors" who might "like to discuss a follow-on investment" to contact Mahabub directly.  (*Id.* at 22.)

### 3.  The "Evaluation Agreements"

In mid-March 2011, Mahabub was corresponding by e-mail with Isaac (his

primary contact in the Mac division) and another Apple employee about obtaining

broken iMacs so he could use their chassis to create a demonstration of AstoundSound

as integrated into an iMac with a custom speaker configuration.  (ECF No. 89-24.)

Isaac replied that Mahabub should work with another Apple employee (copied on the

e-mail) "to sign all the necessary evaluation agreements."  (*Id*. at 3.)

No evidence in the record shows whether Mahabub sought details on what these

evaluation agreements actually encompassed or entailed.  In their current summary

judgment briefing, Defendants allege that Mahabub: (1) perceived these agreements to

be additional NDAs; (2) assumed that they must be even more restrictive than the NDA

already on file between Apple and GenAudio, because otherwise there would be no

need for more; and (3) inferred from the foregoing two premises that Apple's interest in

GenAudio was increasing.  (ECF No. 89 at 32, ¶ 178.)

Defendants say that these assumptions explain a March 29, 2011 e-mail, signed

by Mahabub, informing GenAudio investors of the following:

> This email is to notify all existing shareholders that what we
> commonly refer to as the "LCEC" . . . and GenAudio are
> going to be signing a new set of "evaluation and
> development" agreements.  This will completely prohibit
> myself or any of GenAudio's team members [from]
> disclos[ing] any further information about the LCEC,
> including even the abbreviation LCEC in any future
> shareholder correspondence. . . .  All references to the
> LCEC will be deleted from the business plan section of the
> new offering [*i.e.*, the 2011 Offering, described below].  Said
> offering will be limited to our existing accredited
> shareholders . . . .
>
> . . . I have no idea how much time will elapse before I can
> mention what is happening or has happened with the LCEC.
>
> . . . Believe me when I tell all of you that I wish I could
> disclose what is going on, however, the fact of the matter is I

cannot.

(ECF No. 84-85 at 7.)  GenAudio, however, never signed any evaluation agreements, or any additional NDAs.  (ECF No. 84 at 29, ¶ 101.)

### 4.  The 2011 Offering

Beginning in April 2011 and continuing through April 2012, GenAudio again solicited equity investment ("2011 Offering").  (*Id.* at 29, ¶ 102.)  GenAudio did not file a registration statement for the 2011 Offering, nor did it provide an audited balance sheet to prospective investors.  (*Id.* at 29–30, ¶¶ 103, 113.)

### 5.  "Interest . . . Slowly Fizzled Out"

Ultimately, GenAudio never reached a deal with Apple.  "[W]hile some within Apple were supportive of that type of technology, others at Apple were not.  As a result, interest in GenAudio's technology slowly fizzled out over time."  (ECF No. 89 at 32, ¶ 182.)  However, no one in "[t]he Mac division [ever] explained to Mahabub that interest in GenAudio's technology had fizzled out and that the Mac division would not be continuing to move forward with GenAudio."  (*Id.* ¶ 183.)[7]

## F.  Additional Information Regarding the Various Sales of GenAudio Shares

As previously noted, no registration statement was in effect for Mahabub's sales of his own GenAudio shares, for the 2010 Offering, or for the 2011 Offering.  Further, GenAudio did not include an audited balance sheet in the information given to potential investors about the 2010 and 2011 Offerings.

The SEC claims that GenAudio did nothing to determine investor accreditation besides sending and receiving potential investor questionnaires, and investors often left

---

[7] The record is not clear about why or precisely when the iPod/iPhone/iPad division lost interest.

the accreditation portion of the questionnaires blank. (*Id.* at 20, ¶¶ 62–65; *id.* at 30, ¶¶ 110–11.) Defendants counter that Mattos reviewed the questionnaires to ensure investors qualified as accredited, and if a questionnaire was incomplete, he would normally contact the investor to complete it. (ECF No. 89 at 10, ¶ 63; *id.* at 17, ¶ 110.) Mattos admitted, however, that he overlooked some incomplete questionnaires. (ECF No. 84 at 21, ¶ 66.) The 2010 and 2011 Offering materials also state that GenAudio had "sold securities to accredited and non-accredited 'family and friends' investors." (*Id.* ¶ 67.)

Finally, GenAudio and Mahabub used means of interstate commerce, such as mail and e-mail, to solicit investment in the 2010 and 2011 Offerings, and in Mahabub's personal shares. (*Id.* at 8–9, 18–19, 29 ¶¶ 37–39, 50–51, 56, 104.)

Mahabub's sale of his personal shares between November 2009 and April 2012 yielded about $2.6 million in the aggregate from at least 85 investors. (*Id.* at 17, ¶ 45.) As noted previously, the 2010 Offering yielded approximately $3.5 million. (*Id.* at 19, ¶ 54.) The 2011 Offering yielded $990,000. (*Id.* at 29, ¶ 102.)

### III. ANALYSIS

The SEC alleges eight claims for relief against Defendants. (*See* ECF No. 1 at 34–40.) They are:

- Claim 1—scheme to defraud in the offer or sale of securities, in violation of Securities Act § 17(a)(1), 15 U.S.C. § 77q(a)(1).

- Claim 2—obtaining money or property by false statements in the offer or sale of securities, in violation of Securities Act § 17(a)(2) & (3), 15 U.S.C. § 77q(a)(2) & (3).

- Claim 3—scheme to defraud in the purchase or sale of securities, in violation of Exchange Act § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a) & (c).

- Claim 4—fraudulent statements in the purchase or sale of securities, in violation of Exchange Act § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

- Claim 5—aiding and abetting violations of Claims 3 and 4 (alleged against Mahabub only, in the alternative to primary liability).

- Claim 6—aiding and abetting violations of Claims 1 and 2 (alleged against Mahabub only, in the alternative to primary liability).

- Claim 7—control person liability under 15 U.S.C. § 78t(a) (alleged against Mahabub only, in the alternative to primary liability).

- Claim 8—offer and sale of unregistered securities, in violation of Securities Act § 5(a) and (c), 15 U.S.C. §§ 77e(a) & 77e(c).

The SEC moves for summary judgment in its favor on all of these claims. The Court will analyze these claims in the order presented by the SEC in its summary judgment motion. As will become clear below, each claim requires a nexus to interstate commerce or the mails, but the Court will say nothing more about that matter because it is undisputed.

## A.     Claim 8: <u>Sale of Unregistered Securities</u> [15 U.S.C. §§ 77e(a) & 77e(c)]

### 1.     *Prima Facie* Case

Subject to certain exceptions discussed below, "it shall be unlawful for any person, directly or indirectly," to use means of interstate commerce or the mails to sell a

security not registered with the SEC.  15 U.S.C. § 77e(a).  A prima facie case of violation comprises the following elements: "(1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale."  *SEC v. Cont'l Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972).  Defendants do not dispute that the SEC has stated a *prima facie* case against GenAudio.  Nor do Defendants dispute that the SEC has stated a *prima facie* case against Mahabub personally for being a "substantial factor" in the offer or sale of unregistered securities.  *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004) (internal quotation marks omitted).

> 2.  <u>Defendants' Affirmative Defenses</u>

Defendants' Third Affirmative Defense argues that registration was not required under the "private offering" exemption codified at 15 U.S.C. § 77d(a)(2), and under "Rule 506" of the SEC's "Regulation D," *i.e.*, 17 C.F.R. § 230.506.  (*See* ECF No. 14 at 35; ECF No. 15 at 28.)  The private offering exemption states that the Securities Act's registration provisions "shall not apply to * * * transactions by an issuer not involving any public offering."  15 U.S.C. § 77d(a)(2).  Rule 506 states that if "an issuer . . . satisf[ies] the conditions" set forth in that Rule, the relevant "[o]ffers and sales of securities . . . shall be deemed to be transactions not involving any public offering within the meaning of [15 U.S.C. § 77d(a)(2)]."  17 C.F.R. § 230.506(a).  But Rule 506 is not the only path to that exemption.  A party that fails to meet all of Rule 506's conditions may nonetheless qualify for the private offering exemption directly under 15 U.S.C. § 77d(a)(2).  *See* 7B J. William Hicks, *Exempted Transactions Under the Securities Act*

*of 1933* § 11:3 (Sept. 2018 update) ("[Rule 506] is not exclusive" and so "those factors that an issuer should consider" under the statute itself remain important) ("*Exempted Transactions*").

The SEC's summary judgment motion explicitly argues that Mahabub cannot invoke either the private offering exemption or Rule 506 because the statute and regulation both apply specifically to the "issuer," and GenAudio, not Mahabub, was the issuer of GenAudio's securities. (ECF No. 84 at 36.) The SEC contends that Mahabub is, rather, "[a]n affiliate of an issuer" under SEC regulations. (*Id.* (citing 17 C.F.R. § 230.144(a)(1)).) GenAudio's and Mahabub's respective response briefs ignore this argument. (*See* ECF No. 89 at 57–58; ECF No. 90 at 14–15.) The Court accordingly deems the argument conceded. Mahabub cannot rely on the private offering exemption or Rule 506, so summary judgment is appropriate in favor of the SEC and against Mahabub on the SEC's claim that Mahabub sold unregistered securities.

Turning to GenAudio, the SEC asserts that Defendants lack any evidence from which a reasonable jury could conclude that either exemption applies. (ECF No. 84 at 35–37.) *See also SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953) (issuer of unregistered securities bears the burden of proof to demonstrate an exemption). The Court will discuss the two potential exemptions in turn, but will start with Rule 506 because a party that satisfies Rule 506 is automatically deemed to satisfy the private offering exemption.

       a.    *Rule 506*

Among Rule 506's many requirements is that the issuer "satisfy all the terms and conditions of . . . [17 C.F.R. §] 230.502." 17 C.F.R. § 230.506(b)(1). That cross-

referenced section requires the issuer to, among other things, "furnish" an audited balance sheet to "any purchaser that is not an accredited investor." *Id.* § 230.502(b)(1) & (b)(2)(i)(B)(1).  GenAudio did not provide an audited balance sheet with the 2010 or 2011 Offerings.  (ECF No. 84 at 22, ¶ 69; *id.* at 30, ¶ 113.)  Accordingly, if GenAudio solicited nonaccredited investors, Rule 506 cannot apply.

As relevant here an "accredited investor" means any person who actually had, or whom the issuer "reasonably believe[d]" to have, an "individual net worth, or [a] joint net worth with that person's spouse, exceed[ing] $1,000,000" "at the time of the sale of the securities to that person."  17 C.F.R. § 230.501(a)(5).  It is undisputed that "GenAudio is unable to provide information as to the number or sophistication of investors it solicited to invest" in either the 2010 or 2011 Offerings.  (ECF No. 84 at 20, 30, ¶¶ 61, 108.) GenAudio thus cannot satisfy Rule 506 by proving to the jury that all of the investors in the 2010 and 2011 Offerings were, in fact, accredited.  It must therefore establish a reasonable belief that all of its investors were accredited.

The Court agrees with the SEC that GenAudio does not have the evidence from which a reasonable jury could find that GenAudio had such a belief.  (*See id.* at 37.) GenAudio's system for ensuring investor accreditation involved sending and receiving questionnaires, at least some of which provided no relevant information about the investor's accreditation.  (ECF No. 84 at 20–21, ¶¶ 62–65.)[8]  Mattos would "normally" contact an investor who did not provide the needed information on the questionnaire (ECF No. 89 at 9–10, ¶¶ 62–63), but Mattos admittedly overlooked at least some of

---

[8] Mahabub, although not GenAudio, objects to the questionnaires as generically "inadmissible."  (ECF No. 90 at 14.)  Mahabub does not provide a legal basis for this objection and so forfeits it.

those incomplete questionnaires (ECF No. 84 at 21, ¶ 66).  Given this admission, it must necessarily follow that GenAudio cannot prove that it reasonably believed that *all* of the 2010 and 2011 Offering investors were accredited.  The SEC is accordingly entitled to summary judgment on GenAudio's Rule 506 defense, and the Court must turn to the private offering exemption itself.

    b. *The Private Offering Exemption*

    Again, the private offering exemption states that the Securities Act's registration provisions "shall not apply to * * * transactions by an issuer not involving any public offering."  15 U.S.C. § 77d(a)(2).  "An offering is considered private only if limited to investors who have no need for the protection provided by registration."  *United States v. Arutunoff*, 1 F.3d 1112, 1118 (10th Cir. 1993).  "To determine if an offering is sufficiently limited courts focus on such factors as: (1) the number of offerees; (2) the sophistication of the offerees, including their access to the type of information that would be contained in a registration statement; and (3) the manner of the offering."  *Id.*

    As noted, "GenAudio is unable to provide information as to the number or sophistication of investors it solicited to invest" in either the 2010 or 2011 Offerings.  (ECF No. 84 at 20, 30, ¶¶ 61, 108.)  Given this, the SEC argues that GenAudio cannot produce evidence from which a reasonable jury could find for GenAudio under the relevant factors.  (*Id.* at 37.)  GenAudio recognizes this argument for what it is: "[The SEC] argues GenAudio could not identify the offerees, the relationship with GenAudio, or the nature, size, type and manner of the offering."  (ECF No. 89 at 57.)  GenAudio counters that "[the SEC's] argument demonstrates the fact-intensive nature of the analysis the resolution of which is the province of the trier of fact."  (*Id.*)

GenAudio is correct in the sense that "the determination of what constitutes a public offering [versus a private offering] is essentially a question of *fact*, in which all of the surrounding circumstances are of significance." 7B *Exempted Transactions* § 11:190 (emphasis in original). However, courts may resolve fact questions as a matter of law if the party that bears the burden of proof on a fact question lacks evidence from which a reasonable jury could find in its favor on that question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Here, GenAudio declares the private offering exemption to create a fact question, but it does not describe any evidence it may introduce to persuade a jury that the relevant factors favor application of the exemption in its favor.

The Seventh Circuit often refers to summary judgment as "the 'put up or shut up' moment in a lawsuit." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1077 (7th Cir. 2016). GenAudio fails to "put up" the necessary evidence, and the record is otherwise clear that it cannot. The SEC is entitled to summary judgment that GenAudio's private offering exemption defense fails, and is consequently also entitled to summary judgment that GenAudio is liable for sale of unregistered securities in the 2010 and 2011 Offerings.

**B.     Claim 2 [partial] & Claim 4: <u>Fraud, and Untrue and Misleading Statements and Omissions</u> [Securities Act § 17(a)(2), Exchange Act § 10(b), and Rule 10b-5(b)]**

1.     <u>Elements</u>

The SEC's Claim 2 alleges a violations of Securities Act § 17(a)(2), which declares it

> unlawful for any person in the offer or sale of any securities[,]
> . . . by the use of any means or instruments of transportation

27

> or communication in interstate commerce or by use of the
> mails, directly or indirectly * * * to obtain money or property
> by means of any untrue statement of a material fact or any
> omission to state a material fact necessary in order to make
> the statements made, in light of the circumstances under
> which they were made, not misleading . . . .

15 U.S.C. § 77q(a)(2).[9]

The SEC's Claim 4 alleges violations of 15 U.S.C. § 78j(b), more commonly

known as "Exchange Act § 10(b)." It states:

> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate
> commerce or of the mails, or of any facility of any national
> securities exchange * * * [t]o use or employ, in connection
> with the purchase or sale of any security registered on a
> national securities exchange or any security not so
> registered . . . any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations as
> the Commission may prescribe as necessary or appropriate
> in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Claim 4 specifically alleges violations of one portion of § 10(b)'s implementing

regulation, 17 C.F.R. § 240.10b-5, more commonly known as "Rule 10b-5." The

relevant portion of Rule 10b-5—specifically, subsection (b)—states:

> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate
> commerce, or of the mails or of any facility of any national
> securities exchange * * * [t]o make any untrue statement of a
> material fact or to omit to state a material fact necessary in
> order to make the statements made, in the light of the
> circumstances under which they were made, not misleading
> * * * in connection with the purchase or sale of any security.

---

[9] As pleaded, Claim 2 appears to assert a combined violation of § 17(a)(2) and (3). (*See*
ECF No. 1 at 35.) However, the SEC's summary judgment motion addresses § 17(a)(2) and (3)
in separate arguments. (*See* ECF No. 84 at 39–50, 56–58.) The Court analyzes § 17(a)(3)
below in Part III.C.

17 C.F.R. § 240.10b-5(b).

 "In an SEC enforcement action such as this one," the elements of a Rule 10b-5(b) violation are: (1) a misrepresentation or omission (2) of material fact (3) made with scienter[10] (4) in connection with the purchase or sale of a security (5) using any means of interstate commerce or the mails.  *SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008).  Reliance by some party on the misrepresentations or omissions is *not* required in an SEC enforcement action.  *Id.*

Typically, courts employ the same elements employed to analyze whether a Securities Act § 17(a)(2) violation occurred, except negligence may substitute for scienter.  *Id.* (stating that violations of Securities Act § 17(a) require "substantially similar proof" as that required to establish a Rule 10b-5(b) violation, with "[t]he principal difference" being that § 17(a)(2) and (3) do not require scienter); *SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012) ("negligence is sufficient" for liability under § 17(a)(2) and (3)).

Although scienter versus negligence is usually stated as the only difference between Securities Act § 17(a)(2) and Rule 10b-5(b) violations, there is some question under Securities Act § 17(a)(2) whether the SEC must prove reliance and injury on the part of some person who acted on the misstatements or omissions.  Speaking of § 17(a) generically, the Tenth Circuit endorses the view that the SEC "need not prove reliance in a civil enforcement action."  *Wolfson*, 539 F.3d at 1264 n.17.  In a prior order, however, this Court questioned that view as to § 17(a)(2) specifically:

---

[10] Exchange Act § 10(b) and Rule 10b-5(b) do not explicitly require scienter, but the Supreme Court has held that scienter is nonetheless required for liability.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976) ("*Hochfelder*").

> [I]t would . . . seem beyond question that § 17(a)(2) requires
> a showing of reliance and injury. Its plain language
> addresses alleged violators who "obtain money or property
> by means of any untrue statement of a material fact or
> [a material] omission." 15 U.S.C. § 77q(a)(2).
> Consequently, there must be injury to some person (*i.e.*,
> transferring "money or property" to the defendant) caused by
> that person's reliance on (*i.e.*, "by means of") the defendant's
> material misstatements or omissions.

*SEC v. Mahabub*, 2017 WL 6555039, at *5 (D. Colo. Dec. 22, 2017) (ECF No. 80). The

Court nonetheless invited "a[ny] party [that] disagrees with the Court's statement of the

elements or other analysis in this regard . . . [to] so state in its . . . summary judgment

filings, and explain why the Court's view is incorrect." *Id.* at *4.

The SEC accepted the Court's invitation and now argues that the Court should

not require reliance and injury. (ECF No. 84 at 47–49.) The SEC highlights the Tenth

Circuit's blanket statement in *Geman v. SEC* that "[t]he SEC is not required to prove

reliance or injury in enforcement actions" because those elements would prevent the

SEC from taking action to prevent investor losses before they happen. 334 F.3d 1183,

1191 (10th Cir. 2003). The SEC nonetheless

> agrees that the language "obtain money" and "by means of"
> requires a causal link between the violator's deceptive
> statements and receipt of money or property. . . . But, the
> plain language of Section 17(a)(2) does not require an
> investor's reliance on the statement or a direct transfer of
> money between a purchaser and the violator.

(ECF No. 84 at 49.) The SEC notes that money from investors would satisfy this

causation standard but that is not the *only* sort of money or property that might qualify.

(*Id.* at 49 & n.14 (citing cases where courts have ordered disgorgement of fees paid to

promoters).)

Defendants say nothing about this issue—either in response to the Court's

statement that reliance and injury appear to be elements of § 17(a)(2), or to the SEC's arguments to the contrary.

The SEC's arguments persuade the Court that the statutory language does not demand reliance and injury on the part of any purchaser, but only "a causal link between the violator's deceptive statements and receipt of money or property." (*Id.*) Accordingly, the Court holds that the elements of a § 17(a)(2) claim are as follows: (1) a misrepresentation or omission (2) of material fact (3) made at least negligently (4) in the offer or sale of any securities (5) using any means of interstate commerce or the mails, and (6) a causal link between the violator's deceptive statements and receipt of money or property.

The Court will discuss, in turn, the disputed elements the SEC's Securities Act § 17(a)(2) claim and its Rule 10b-5(b) claim, combining that discussion under a single heading where appropriate.

2.    Misrepresentation or Omission [§ 17(a)(2) & Rule 10b-5(b)]

The SEC compiles a significant catalog of Mahabub's misrepresentations and allegedly material omissions.  (ECF No. 84 at 39–44.)  Among those, the Court will focus on the following statements because, as will become clear, their liability-creating character is beyond reasonable dispute:[11]

- Mahabub's March 10, 2010 e-mail to GenAudio shareholders where he claimed that GenAudio was "starting to discuss the business side with the LCEC," which investors generally understood to be a reference to Apple. (ECF No. 84-50 at 4; ECF No. 84 at 16, ¶ 41.)  Mahabub knew from

---

[11] The statements and omissions the SEC proffers beyond these raise genuine disputes as to at least one element of liability.

Hailey's December 16, 2009 e-mail that "[t]he business side of things would come into play after [Apple engineers obtained] exec buy-in on the product side." (ECF No. 84-44 at 3–10.) Mahabub further knew that "exec buy-in" had not yet happened. Consequently, this claim regarding "business side" discussions with Apple was knowingly false.

- Mahabub's statement in the same March 10, 2010 e-mail that he "expect[ed] to have a very substantial license deal in place for [the LCEC's] Christmas Product Rollout." (ECF No. 84-50 at 4.) This statement is merely an extension of Mahabub's fabrication in a February 12, 2010 forwarded e-mail to the GenAudio board in which Mahabub altered Tiscareno's words to make it appear that Mahabub had recently discussed a "Christmas product rollout" with Phil Schiller. (*See* ECF No. 84-46.) Thus, in his March 10, 2010 e-mail to shareholders, Mahabub had no truthful basis to make a Christmas product rollout prediction. Couching the statement in terms of an expectation, rather than a certainty, does not take it out of the realm of falsity: "[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

- Mahabub's March 15, 2010 cover letter accompanying the 2010 Offering materials, which stated that the offering was "being conducted to provide bridge capital until we can 'ink' a deal with . . . the 'LCEC.'" (ECF No. 84-52 at 2.) Mahabub had no reasonable basis to expect that a deal with

Apple was imminent enough that the 2010 Offering could be "bridge capital."

- Mahabub's April 30, 2010 e-mail to an investor stating that the LCEC was "looking to acquire GenAudio's tech for integration into their entire lineup of product offerings . . . and we are now waiting [for the time] when we will initiate negotiations, pending the CEO's [approval of] the integrated product rollout strategy and the technical implementation strategy that will be presented to the CEO next week!!!"  (ECF No. 84-74 at 5.)  The Court may assume without deciding that the "Jobs"/"Joz" misunderstanding (a) actually happened and (b) created a mistaken but reasonable misimpression in Mahabub's mind about the attendees at the upcoming "exec buy-in" meeting.  Even so, Mahabub had no reasonable basis to claim that the upcoming meeting would encompass an "integrated product rollout strategy and [a] technical implementation strategy."

- Mahabub's August 1, 2010 investor letter claiming that Steve Jobs had requested "a 'hand-shake' meeting" with Mahabub "[i]n the very near future."  (ECF No. 84-79 at 3.)  This was a blatant lie.

The Court will refer to all of the foregoing as the "2010 Misrepresentations."

The Court additionally finds that the false character of Mahabub's March 29, 2011 investor e-mail is also beyond dispute.  For symmetry, the Court will refer to this e-mail as the "2011 Misrepresentations."[12]  Leading up to the 2011 Misrepresentations,

---

[12] As with the SEC's proffer regarding the 2010 Offering, any statements or omissions the SEC proffers regarding the 2011 Offering beyond the March 29, 2011 e-mail raise a genuine dispute as to at least one element of liability.

Mahabub asked Isaac for broken-down iMacs on whose chassis GenAudio could experiment, and Isaac replied that GenAudio would need to sign certain "evaluation agreements" first. (ECF No. 89-24.) With nothing but assumptions regarding these evaluation agreements—which, again, Isaac mentioned in the context of *responding to Mahabub's request for broken-down iMacs*—Mahabub turned around teased shareholders in his March 29, 2011 e-mail that these new agreements would completely prohibit mentioning the LCEC in future correspondence, including the upcoming 2011 Offering. (ECF No. 84-85.) For good measure, he added, "Believe me when I tell all of you that I wish I could disclose what is going on, however, the fact of the matter is I cannot." (*Id.* at 7.)

Mahabub cannot avoid the falsity of the 2011 Misrepresentations through his claim that he believed the evaluation agreements to be significant because GenAudio already had an NDA with Apple. (*See* ECF No. 89 at 32, ¶ 178.) It is not enough that the speaker "believes [his own] opinion (however irrationally)[.] . . . [I]t [must also] fairly align[] with the information in the [speaker's] possession at the time." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015). No reasonable jury could conclude that Mahabub fairly reached the inferences he now claims motivated the 2011 Misrepresentations.

3.   Materiality [§ 17(a)(2) & Rule 10b-5(b)]

The materiality element is satisfied "if a reasonable investor would consider [the misrepresentation or omission] important in determining whether to buy or sell stock," when considered alongside "other information already available to the market." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). However, "vague

statements of corporate optimism" and "mere puffing" are deemed immaterial as a matter of law. *Id.* (internal quotation marks omitted). Similarly immaterial are statements hedged "with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect." *Id.* at 1120.[13] However, "the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions which the plaintiffs challenge." *Id.* (internal quotation marks omitted; alterations incorporated). And again, "cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made." *In re Prudential*, 930 F. Supp. at 72.

In this case, both the 2010 and 2011 Misrepresentations were material because a reasonable investor would undoubtedly consider the (fabricated) news about the rapid and/or rosy progress of discussions with Apple to be important in any decision to buy or sell the subject securities.[14]

4.    Scienter [Rule 10b-5(b)] or Negligence [§ 17(a)(2)]

Scienter in this context is defined as "intent to deceive, manipulate, or defraud." *Hochfelder*, 425 U.S. at 193. Scienter may be satisfied by a showing of recklessness, meaning "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the

---

[13] This is often known as the "bespeaks caution" doctrine. *Id.*

[14] Specifically with respect to the August 1, 2010 investor letter and its claim that Mahabub would soon have a handshake meeting with Steve Jobs, GenAudio argues that "[a] genuine issue of material fact exists whether a reasonable investor would care about whether Mahabub personally interacted with Steve Jobs." (ECF No. 89 at 50.) This contention is frankly laughable, but the Court could exclude the August 1, 2010 investor letter from the 2010 Misrepresentations and the § 17(a)(2) and Rule 10b-5(b) analyses would be the same.

defendant or is so obvious that the actor must have been aware of it." *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (internal quotation marks omitted).

Defendants' argue that the SEC has not established scienter as a matter of law because a jury could reasonably accept that Mahabub reasonably believed what he said when he said it. (ECF No. 89 at 35–51.) More particularly, Defendants claim that Mahabub could reasonably believe a deal with Apple was likely, and soon at hand, because he was constantly proposing deal terms, even if Apple personnel were not: "Mahabub was negotiating with Tiscareno and Hailey, he just did not understand they were not negotiating back." (*Id.* at 55.)

This argument stretches credulity, but in any case it does not evade the charge of scienter in the context of the 2010 and 2011 Misrepresentations. For the reasons already explained in Part III.B.2, Mahabub had no reasonable basis to believe that any of those misrepresentations matched any perception of reality beyond the one he fabricated in his own mind. He could not have reasonably failed to perceive that he was simply making things up as he wrote the relevant documents. As a matter of law, he was *at least* reckless. *Cf. SEC v. Infinity Grp. Co.*, 212 F.3d 180, 193 (3d Cir. 2000) ("Even if we indulge the defendants and assume arguendo that they believed in these guarantees, we nevertheless must examine the foundation such a belief would have rested upon. A good faith belief is not a 'get out of jail free card.' It will not insulate the defendants from liability if it is the result of reckless conduct.").

Considering that Defendants were at least reckless, the Court need not examine whether they were also negligent.

5. "In the Offer or Sale of Any Securities" [§ 17(a)(2) & Rule 10b-5(b)]

The 2010 and 2011 Misrepresentations were closely connected to the 2010 and 2011 Offerings, respectively. Accordingly, the connection to an offer or sale of securities exists as a matter of law.

6. Causal Link Between the Deceptive Statements and Receipt of Money or Property [§ 17(a)(2) only]

The final element of a Securities Act § 17(a)(2) claim is the causal connection between the misrepresentations or omissions in the receipt of money or property, *i.e.*, "obtain[ing] money or property by means of any untrue statement of a material fact or [a material] omission." 15 U.S.C. § 77q(a)(2). The SEC's argument in this regard is thin, mostly relying on statements from 2009 that the Court has not included in the 2010 Misrepresentations, or on an implicit *post hoc ergo propter hoc* contention that stock purchases *following* one of the 2010 Misstatements were *because of* the deceptive statements. (*See* ECF No. 84 at 46.) On this record, however, only one of the 2010 Misrepresentations shows a causal link between the misrepresentation and GenAudio's receipt of money, namely, Mahabub's April 30, 2010 e-mail regarding the scope of the upcoming "exec buy-in" meeting, which prompted the recipient to purchase 5,000 shares for $15,000. (ECF No. 84 at 24, ¶ 80.)

7. Synthesis

The 2010 and 2011 Misrepresentations establish Defendants' liability as a matter of law on Claim 4. One of the 2010 Misrepresentations (the April 30, 2010 e-mail) establishes Defendants' liability as a matter of law on that part of Claim 2 alleging a Securities Act § 17(a)(2) violation. The remaining 2010 and 2011 Misrepresentations do not. However, to the extent this matter may still proceed to trial to prove additional

37

liability under Securities Act § 17(a)(2), all elements apart from causation are "established in the case" as to the remaining 2010 and 2011 Misrepresentations, and therefore those elements will not be dispute.  Fed. R. Civ. P. 56(g).

**C.** **Claim 1, Claim 2 [partial], & Claim 3: <u>Scheme Liability</u> [Securities Act § 17(a)(1) & (3), Exchange Act § 10(b), and Rule 10b-5(a) & (c)]**

The SEC's Claim 1, the remainder of Claim 2, and Claim 3 raise common issues and will be analyzed jointly.

1. <u>Elements</u>

Claims 1 and 2 allege violations of Securities Act § 17(a)(1) and (3), which declares it

> unlawful for any person in the offer or sale of any securities[,] . . .  by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly * * * (1) to employ any device, scheme, or artifice to defraud, or * * * (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

The SEC's Claim 3 alleges violations of Exchange Act § 10(b) as implemented through Rule 10b-5(a) and (c):

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange * * * (a) [t]o employ any device, scheme, or artifice to defraud, [or] * * * (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Violations of Securities Act § 17(a)(1) and (3) and Rule 10b-5(a) and (c) may all be proven by demonstrating that the violator (1) directly or indirectly employed a device,

scheme, or artifice to defraud (2) with scienter (3) in the offer or sale of a security (4) using interstate commerce or the mails. *SEC v. St. Anselm Expl. Co.*, 936 F. Supp. 2d 1281, 1298 (D. Colo. 2013); *see also SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1377 n.8 (D. Colo. 2014) (§ 17(a)(1) elements can satisfy § 17(a)(3) and Rule 10b-5(a) and (c)). If scienter is lacking, the SEC may nonetheless prove a Securities Act § 17(a)(3) violation by demonstrating that the violator (1) engaged in acts, practices, or courses of dealing which did or would operate as a fraud or deceit (2) in the offer or sale of securities, (3) with negligence, and (4) using interstate commerce or the mails. *St. Anselm*, 936 F. Supp. 2d at 1298.

The prevailing view among the district courts of this circuit is that liability under the foregoing provisions—often called "scheme liability"—may not be based simply on the same misstatements or material omissions that support a Securities Act § 17(a)(2) claim or Rule 10b-5(b) claim. *See, e.g.*, *Sullivan*, 68 F. Supp. 3d at 1377; *St. Anselm*, 936 F. Supp. 2d at 1299; *SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1205 (D.N.M. 2013). That said, "scheme liability does not preclude, outright, claims based upon a scheme to misrepresent or omit material facts." *Id.* at 1206. The Court accepts this statement of the law.

### 2. Device, Scheme, or Artifice to Defraud

The SEC describes Defendants' alleged scheme to defraud as a scheme to solicit investment "by lying and creating a series of fabricated emails to create the false appearance that GenAudio was a legitimate takeover target or licensing partner of Apple." (ECF No. 84 at 51.) The SEC contends that the scheme comprised all of the false and misleading statements and omissions included in its argument for § 17(a)(2)

and Rule 10b-5(b) liability (a broader set of documents than the Court accepted as the 2010 and 2011 Misstatements), as well as (1) Mahabub's overstatements to the GenAudio board about progress with Apple, (2) Mahabub's regular alteration of e-mails to the GenAudio Team (including the falsified Tiscareno transcript), and (3) Mahabub's communications with investors between the end of the 2010 Offering and the beginning of the 2011 Offering, including the 2011 Misstatements and also Mahabub's December 8, 2010 investor letter in which he claimed that he met with the LCEC's CEO (*i.e.*, Jobs). (*Id.* at 51–52.) As already stated, the Court finds that there are reasonable disputes as to the character of some of the statements and omissions included in the SEC's argument for § 17(a)(2) and Rule 10b-5(b) liability.[15] In analyzing the current claims, therefore, the Court will limit itself to the 2010 and 2011 Misstatements and the three additional categories the SEC proffers.

Solely as to the question of whether the foregoing amounts to one or more schemes to defraud *of some sort*, or a practice that would operate as a fraud *of some sort*, there is no reasonable dispute. Whether it amounts to a scheme or practice *to defraud securities purchasers* implicates the "in connection with" element, so the Court will discuss that next.

3.    "In the Offer or Sale of Any Securities" [§ 17(a)(1) & (3)] or "In Connection with the Purchase or Sale of Any Security" [Rule 10b-5(a) & (c)]

Before the Court may analyze this element, it must address the relevance of the many alleged misrepresentations not transmitted beyond the GenAudio Team, mostly comprising Mahabub's alterations to e-mails.

In a prior order, the Court required the parties to explain their views on whether

---

[15] *See* nn.11 & 12, above.

the "in connection with" element is "satisfied when a defendant makes knowingly false

statements *while* securities are for sale, or only when a defendant makes such

statements *because* securities are for sale?" *Mahabub*, 2017 WL 6555039, at *7

(emphasis in original). The tension arose, the Court explained, from the following:

> The Supreme Court "has espoused a broad interpretation" of
> "in connection with." *Merrill Lynch, Pierce, Fenner & Smith
> Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("*Dabit*"). Indeed,
> supposedly "it is enough that the fraud alleged 'coincide' with
> a securities transaction." *Id.* . . . But [this] seems to violate
> the Supreme Court's counsel not to construe the securities
> fraud laws "so broadly as to convert every common-law
> fraud that happens to involve securities into a violation."
> *SEC v. Zandford*, 535 U.S. 813, 820 (2002). Indeed, . . . if
> "in connection with" means nothing more than "coinciding
> with," then, for example, any lie one coworker tells to another
> is potentially actionable as securities fraud as long as the
> employer's securities happen to be for sale.

*Id.* at *6.

The Court is most persuaded by Defendants' argument to apply the standard set

forth in *Anixter v. Home-Stake Production Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996).

(*See* ECF No. 90 at 16–17.) In *Anixter*, the Tenth Circuit addressed "in connection with"

liability for an accountant who prepared data for documents that would go to investors,

but who did not communicate that data directly to any investor. *Id.* at 1225. The Tenth

Circuit announced in that circumstance that "there must be a showing that he knew or

should have known that his representation would be communicated to investors

because § 10(b) and Rule 10b-5 focus on fraud made 'in connection with the sale or

purchase' of a security." *Id.* at 1226. The Court finds this situation reasonably

analogous to Mahabub's, and so adopts this articulation of the "in connection with"

requirement.

The Court finds, on this record, that the SEC has not established beyond reasonable dispute that Mahabub knew or should have known that the GenAudio Team e-mails would reach investors. Aside from Mahabub's fabricated Tiscareno transcript and accompanying commentary, which Mahabub forwarded to Skluzak, it is not clear how many (if any) altered or fabricated communications reached investors.

The Court further finds, on this record, that a reasonable dispute of fact exists whether the collection of communications alleged by the SEC, minus the GenAudio Team e-mails (but including the Skluzak e-mail), may fairly be described as connected to the purchase or sale of securities. The Court thus may not enter summary judgment for the SEC on the "in connection with" element.

      4.    <u>Scienter [§ 17(a)(1) and Rule 10b-5(a) & (c)] or Negligence [§ 17(a)(3) only]</u>

In the Court's previous order, it discussed the "in connection with" and scienter elements as if essentially overlapping. *See Mahabub*, 2017 WL 6555039, at *6–7. But having now adopted *Anixter*'s "in connection with" standard, it is clear that there is no necessary overlap. If a party possesses some sort of "intent to deceive, manipulate, or defraud," *Hochfelder*, 425 U.S. at 193, *and* the party "knew or should have known that his representation would be communicated to investors," *Anixter*, 77 F.3d at 1226, there is no risk of "convert[ing] every common-law fraud that happens to involve securities into a violation," *Zandford*, 535 U.S. at 820.

Here, scienter conceivably exists as a matter of law. The GenAudio team e-mails contain undisputed fabrications, and for scienter purposes, it would not matter that Mahabub sincerely intended the GenAudio Team e-mails solely as an in-house motivational tool *if* the SEC can prove that Mahabub "knew or should have known that

his representation would be communicated to investors." *Anixter*, 77 F.3d at 1226. But the Court finds it imprudent to rule on scienter in this summary judgment posture. Because the "in connection with" element is unresolved, the scope of communications for which Mahabub's state of mind must be analyzed is also unresolved. For this same reason, a ruling on negligence as a matter of law, *see St. Anselm*, 936 F. Supp. 2d at 1298, is imprudent at this stage.

     5.   <u>Synthesis</u>

Because the "in connection with" and scienter/negligence elements cannot be established as a matter of law on this record, the Court must deny summary judgment on the SEC's Claim 1, on the portion of Claim 2 alleging a violation of Securities Act § 17(a)(3), and on Claim 3.

**D.    Claims 5, 6, and 7: <u>Alternative Theories Against Mahabub Personally</u>**

The SEC's Claims 5–7 allege various alternative ways in which Mahabub could be personally liable for the conduct underlying Claims 1–4. The SEC's summary judgment motion specifically seeks such liability in the alternative. (ECF No. 84 at 63 n.17, 67.) Neither GenAudio's nor Mahabub's respective response briefs challenge this alternative argument. More importantly, neither Defendant makes any argument that Mahabub's liability should be analyzed separately from GenAudio's.

In this light, the liability the Court has found as a matter of law under Claim 2 and Claim 4 (*see* Part III.B, above) attaches to Mahabub directly, so the SEC's request for an alternative form of personal liability is moot. As to Claim 1, the relevant part of Claim 2, and Claim 3, where liability cannot be judged as a matter of law on this record (*see* Part III.C, above), any analysis of Mahabub's alternative personal liability is premature.

For these reasons, the Court must deny the SEC's alternative request for judgment as a matter of law on Claims 5–7.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    The SEC's Revised Motion for Summary Judgment (ECF No. 84) is GRANTED to the following extent, but otherwise DENIED:

    a.    Summary judgment is granted in the SEC's favor and against both Defendants on the SEC's Claim 8; and

    b.    On the misrepresentations described in this Order as the "2010 Misrepresentations" and "2011 Misrepresentations," summary judgment is granted in the SEC's favor and against both Defendants on the portion of the SEC's Claim 2 alleging a violation of Securities Act § 17(a)(2) and on the SEC's Claim 4;

2.    The SEC's Request for Oral Argument (ECF No. 92) is DENIED AS MOOT;

3.    On or before **October 26, 2018**, the SEC shall file a status report explaining whether it wishes to go to trial to establish Defendants' liability on claims for which the Court has not granted summary judgment and/or on a broader base of facts than the Court accepted when granting summary judgment, or, alternatively, whether it is willing to proceed directly to the remedies phase of this case (abandoning those claims that would otherwise need to go to trial on liability); and

4.    After receiving the SEC's status report, the Court will determine whether it needs a response from Defendants, and will otherwise set appropriate deadlines.

Dated this 4th day of October, 2018.

BY THE COURT:

_____
William J. Martínez
United States District Judge