**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 15-cv-2118-WJM-SKC

SECURITIES & EXCHANGE COMMISSION,

     Plaintiff,

v.

TAJ JERRY MAHABUB, and
GENAUDIO, INC.,

     Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART**
**PLAINTIFF'S REMEDIES MOTION**

---

This is a securities fraud case that Plaintiff Securities and Exchange Commission ("SEC") brought against Taj "Jerry" Mahabub ("Mahabub") and the company he founded, GenAudio, Inc. ("GenAudio") (together, "Defendants"). The SEC asserted various theories of liability under the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77a *et seq.*, and the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78a *et seq.* The SEC moved for summary judgment on all theories of liability, and the Court granted that motion in part ("Summary Judgment Order"). *See SEC v. Mahabub*, 343 F. Supp. 3d 1022 (D. Colo. 2018) (ECF No. 95). The Court then ordered the SEC to state "whether it wishes to go to trial to establish Defendants' liability on claims for which the Court has not granted summary judgment and/or on a broader base of facts than the Court accepted when granting summary judgment," or, on the other hand, "whether it is willing to proceed directly to the remedies phase of this case

(abandoning those claims that would otherwise need to go to trial on liability)." *Id.* at 1050. The SEC chose the latter course. (*See* ECF No. 99.)

Currently before the Court is the SEC's Motion for Final Judgment Seeking Remedies Against Defendants Taj Jerry Mahabub and GenAudio, Inc. and to Establish a Fair Fund. (ECF No. 110.) Defendants, represented separately, each filed a response (ECF Nos. 111, 112), and the SEC then filed separate replies (ECF Nos. 113, 114). For the reasons explained below, the Court grants the remedies the SEC requests except that the Court will limit Mahabub's joint and several liability with GenAudio to the amounts the SEC has shown to be Mahabub's profits from GenAudio's stock sales. The Court will also require the SEC to submit a new prejudgment interest calculation.

## I. BACKGROUND

The Court's findings of fact and conclusions of law in the Summary Judgment Order are extensive and need not be repeated here. The Court incorporates them by reference and offers the following summary, for context.

GenAudio developed and marketed "AstoundSound," a software-based system for processing normal stereo audio to make it sound three-dimensional (*e.g.*, as if the sound is coming from behind listener, from far away, etc.). *Summary Judgment Order*, 343 F. Supp. 3d at 1028. Mahabub is GenAudio's founder and served as its CEO and Chairman of the Board from 2009 to 2012. *Id.*

Beginning in July 2009 or thereabouts, and continuing for roughly the next three years, Mahabub had various levels of discussions with engineers at Apple, Inc., about integrating AstoundSound into Apple's computers and portable devices. *Id.* at 1029–37.

No one higher than mid-level executives at Apple ever became aware of these discussions. *Id.* at 1032–36. However, when communicating with GenAudio employees, investors, and prospective investors, Mahabub routinely exaggerated or fabricated details about Apple's interest. *See id.* Mahabub claimed, for example, that Apple's senior vice president of worldwide marketing, Phil Schiller, was making specific plans to incorporate AstoundSound into particular product rollouts, and that CEO Steve Jobs had taken a personal interest in AstoundSound. *Id.* at 1030–36. Ultimately, Apple and GenAudio never reached any deal. *Id.* at 1037.

In the Summary Judgment Order, the Court found no genuine dispute that Mahabub, acting on GenAudio's behalf, knowingly or recklessly made six materially false or misleading statements in connection with two offerings of GenAudio securities, in violation of Exchange Act § 10(b) (15 U.S.C. § 78j(b)), and Rule 10b-5(b) (17 C.F.R. § 240.10b-5(b)). Because this is an SEC enforcement action, the SEC did not need to prove that anyone relied to his or her detriment on those statements. *See SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008). However, the SEC nonetheless demonstrated a lack of genuine dispute that one of those six misrepresentations prompted a $15,000 investment in GenAudio. *Summary Judgment Order*, 343 F. Supp. 3d at 1046. That representation was therefore also a violation of Securities Act § 17(a)(2) (15 U.S.C. § 77q(a)(2)). *See id.* at 1042–43 (holding that Securities Act § 17(a)(2) contains a causation requirement, even in an SEC enforcement action). The SEC claimed that numerous other statements made by Mahabub were likewise violations of the Exchange Act or the Securities Act, or both, but the Court found that all statements beyond the six just noted raised genuine, material factual disputes. *Id.* at

1043–44 nn.11–12.

Finally, the Court held that GenAudio and Mahabub had both sold unregistered GenAudio securities without qualifying for any registration exemption. *Id.* at 1039–41. Accordingly, they had violated Securities Act § 5(a) and (c) (15 U.S.C. §§ 77e(a) & 77e(c)). These unregistered securities offerings were the same securities offerings that the Court found to be infected by the misleading statements for which Defendants were liable under Exchange Act § 10(b), Rule 10b-5(b), and Securities Act § 17(a)(2). *See Summary Judgment Order*, 343 F. Supp. 3d at 1039–41.

## II. ANALYSIS

### A. Injunction Against Further Violations

The SEC first asks the Court to enjoin Defendants from further violations of federal securities laws. (ECF No. 110 at 9–11.)[1]

#### 1. Legal Standard

Securities Act 20(b) states that, "upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond" against a person whom the SEC proves to have "engaged . . . in any acts or practices which constitute or will constitute a violation of the provisions of [the Securities Act]." 15 U.S.C. § 77t(b). Using materially identical language, Exchange Act § 21(d)(1) similarly authorizes an injunction against violations of the Exchange Act and its implementing regulations. *See* 15 U.S.C. § 77u(d)(1).

The "proper showing" required by these statutes places the burden on the SEC

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in briefs with unnumbered caption pages.

to demonstrate

> a reasonable and substantial likelihood that the defendant, if not enjoined, will violate securities laws in the future. Determination of the likelihood of future violations requires analysis of several factors, such as the seriousness of the violation, the degree of scienter, whether defendant's occupation will present opportunities for future violations and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations. Although no single factor is determinative, [the Tenth Circuit has] previously held that the degree of scienter bears heavily on the decision. A knowing violation of [Exchange Act §] 10(b) or [Securities Act §] 17(a)(1) will justify an injunction more readily than a negligent violation of [Securities Act] § 17(a)(2) or (3). However, if there is a sufficient showing that the violation is likely to recur, an injunction may be justified even for a negligent violation of § 17(a)(2) or (3).

*SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993) (citations and internal quotation marks omitted).

2.  Application to Mahabub

The SEC argues:

- Mahabub's violations were "serious and repeated," given the multiplicity of false statements and the length of time over which he made them;

- the sale of unregistered securities was also serious given that it had been ongoing for many years;

- Mahabub's misrepresentations were "calculated";

- Mahabub continues to serve as GenAudio's CEO, and he is now also the CEO of a new company for which he has solicited investment; and

- Mahabub has never acknowledged his wrongful conduct or given assurances against future violations.

(ECF No. 110 at 10–11.)

Mahabub never directly responds to any of these accusations. The only portion of his response brief that comes close is an argument related to the penalties the SEC seeks (addressed in Part II.C.2, below), where admission of wrongdoing is also a factor. (*See* ECF No. 112 at 4.) In that context, he notes that he "does not oppose" the director-officer bar (another remedy the SEC seeks, addressed in Part II.D, below). (*Id.*) This non-opposition, he says, shows that "he understands and accepts that [the director-officer bar] appropriately follows the Court's order on the SEC's summary [judgment] motion." (*Id.*)

To the extent this was also meant to address (indirectly) the request for an injunction, it is decidedly *not* an acknowledgment of wrongful conduct. It is, rather, a carefully worded attempt to sound contrite without admitting anything other than uncontroversial proposition that a director-officer bar is often an appropriate remedy against those who violate securities laws.

Given Mahabub's failure to address the factors relevant to an injunction, or to contest the SEC's argument in this regard, the Court finds that Mahabub has conceded that the SEC has made a proper showing for an injunction against him. The Court will therefore award the requested injunction against Mahabub.

3.   Application to GenAudio

The SEC argues that its showing as to Mahabub applies equally to GenAudio because Mahabub acted on GenAudio's behalf and can continue to do so, as its CEO. (ECF No. 110 at 10–11.) GenAudio responds that there can be no reasonable likelihood of a future violation because "GenAudio is a defunct corporation that has ceased operations and is no longer engaged in the sale of securities." (ECF No. 111 at 10.) GenAudio supports this assertion with a declaration from Mahabub explaining

that he is the only remaining GenAudio employee, that GenAudio does not have any open bank accounts, and that GenAudio is no longer operating or engaging in the sale of securities. (ECF No. 111-1.) The SEC replies with a declaration from GenAudio shareholder Dell Skluzak that no one from GenAudio has ever notified him that "the company is defunct and no longer has any ongoing operations." (ECF No. 113-1 ¶ 7.) Moreover, Skluzak says that GenAudio still has assets (at least three recently-issued patents) and that a third-party valuation report from 2010 values a non-exclusive AstoundSound licensing regime at slightly more than $1 billion. (*Id.* ¶¶ 3–5.)

Although the 2010 valuation report is of questionable value today, the Court is persuaded that there remains at least a reasonable probability that GenAudio will operate again and will sell securities. Accordingly, the Court will issue the requested injunction against GenAudio.

**B.    Disgorgement & Prejudgment Interest**

The SEC next seeks disgorgement and prejudgment interest on the disgorged amounts. (ECF No. 110 at 11–14.)

1.    Disgorgement, Penalties, and *Kokesh*

Disgorgement is not a remedy provided for in the Securities Act or Exchange Act, but is instead a remedy the SEC routinely seeks through district courts' inherent equity jurisdiction. *See Kokesh v. SEC*, 137 S. Ct. 1635, 1640 (2017). It is usually calculated according to the profits the violator earned through the securities violations. *See SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006); *SEC v. Curshen*, 372 F. App'x 872, 883 (10th Cir. 2010). Defendants argue, however, that the Supreme Court's *Kokesh* decision mandates reducing or eliminating disgorgement.

The question presented in *Kokesh* was whether equitable disgorgement in an

SEC enforcement action is a "penalty" within the meaning of the general federal statute of limitations for "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise." 28 U.S.C. § 2462. The Supreme Court's answer was "yes." 137 S. Ct. at 1639. The Supreme Court reasoned that disgorgement in SEC enforcement cases is usually imposed for punitive purposes, is not treated as compensatory, and sometimes exceeds the violator's ill-gotten gains. *Id.* at 1643–45. Accordingly, "[d]isgorgement, as it is applied in SEC enforcement proceedings, operates as a penalty under § 2462." *Id.* at 1645.

Here, the SEC is seeking both disgorgement and a statutory penalty. (*See* Parts II.B & II.C, below.) In light of *Kokesh*, however, Mahabub argues that "there is no longer a meaningful distinction between a 'disgorgement' and 'penalties.'" (ECF No. 112 at 2.) Thus, he says, the Court should only order one penalty, not "both the 'disgorgement penalty' and the 'penalty penalty.'" (*Id.*; *see also id.* at 7–8.) GenAudio, for its part, argues "it is far from clear [after *Kokesh*] that the SEC may continue to seek disgorgement in civil actions," given that disgorgement was never explicitly authorized in the first place and it is now deemed a "penalty." (ECF No. 111 at 7.) GenAudio thus urges the Court to "refrain from adopting [a] penalty sought by way of disgorgement." (*Id.* at 8.)

The SEC responds that *Kokesh* was only deciding whether 28 U.S.C. § 2462 provided the statute of limitations for disgorgement, not whether disgorgement is a penalty for all purposes. (ECF No. 113 at 10–11.) An interesting *Kokesh* footnote provides direct support for the SEC's position, but also some indirect support for Defendants' position:

> Nothing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context. The sole question presented in this case is whether disgorgement, as applied in SEC enforcement actions, is subject to § 2462's limitations period.

137 S. Ct. at 1642 n.3. In other words, the Supreme Court has left open the possibility that disgorgement is not a proper remedy but has also specified that *Kokesh* itself has nothing to say on that subject. This Court will take the Supreme Court at its word on that matter. Because Defendants' arguments in this regard are entirely based on doubt supposedly cast by *Kokesh*, and because *Kokesh* disclaims all intent to cast doubt, the Court rejects Defendants' argument that disgorgement is no longer a proper remedy. *Cf. SEC v. Camarco*, 2018 WL 6620878, at *2 (D. Colo. Dec. 18, 2018) ("If the Supreme Court leaves open a question of law, I must follow settled precedent. Although the Tenth Circuit has yet to rule on the issue since the Supreme Court decided *Kokesh*, at least 15 federal courts have ruled that *Kokesh* did not overrule the long-standing precedent that courts possess authority to order disgorgement in SEC enforcement proceedings.").

Moreover, Defendants' implicit premise—*i.e.*, that there cannot be two kinds of penalties in the same case—is unsupported and otherwise unfounded. Even if disgorgement is a "penalty" for all purposes, not just for statute-of-limitations purposes, it does not necessarily follow that the Court cannot award both a disgorgement penalty and a statutory penalty. For this additional reason, the Court rejects Defendants' argument that disgorgement is no longer an available remedy.

2. <u>Measure of Disgorgement</u>

Defendants argue, in the alternative, that disgorgement must be limited to

$15,000 (plus prejudgment interest) because that was the only investment that the SEC has proven to be causally connected to Mahabub's misrepresentations.  (ECF No. 111 at 4–5, 8; ECF No. 112 at 3.)  The SEC responds that it is entitled to seek disgorgement of all "ill-gotten gains," meaning whatever the violator earned while the fraud was ongoing, as distinct from amounts the violator never would have earned but for the misrepresentation.  (ECF No. 113 at 3–5.)

The Tenth Circuit has made statements on both sides of this argument.  In an unpublished decision, it said that disgorgement should be assessed through "a reasonable approximation" of the violator's "ill-gotten gains."  *Curshen*, 372 F. App'x at 883.  In an earlier, published decision, it said, "Disgorgement being remedial rather than punitive, some end-date determination is certainly necessary so that the defendant is not required to disgorge profits not causally connected to the violation."  *Maxxon*, 465 F.3d at 1179.

*Maxxon*'s premise—that disgorgement is remedial, not punitive—might not be good law after *Kokesh*.  It is hard to tell because *Kokesh* said that its decision was limited to the statute-of-limitations question before it.  *See* 137 S. Ct. at 1642 n.3. Technically speaking, then, *Maxxon* could still be good law if one accepts that there is such a thing as a penalty for statute-of-limitations purposes (at issue in *Kokesh*) as distinct from penalty more generally (at issue in *Maxxon*).  Yet *Kokesh* resolved the question before it by looking to its prior case law on what distinguishes a penalty from a compensatory remedy.  *Id.* at 1642–45.  In other words, although the Supreme Court insisted it was only interpreting "penalty" in the context of the statute of limitations, the Court did not ask, "What counts as a 'penalty' in the context of a statute of limitations?"

or "What did Congress mean when it said 'penalty' in 28 U.S.C. § 2462?"  It only asked, "What counts as a 'penalty'?"  Viewed from that perspective, *Maxxon*'s punitive/remedial premise appears flawed.  And if the premise is flawed, then perhaps so is the conclusion that the amount of disgorgement must be causally connected to the violation.

Ultimately, the Court need not decide whether *Kokesh* abrogated *Maxxon* on this point because the Court is confident that *Maxxon*'s causal-connection language was not meant as a contrast to the broader idea of ill-gotten gains.  This is so for four reasons.

First, *Maxxon* refers in different ways to the disgorgement amount ordered in that case, including "illegal profits gained by [the defendant] through sales of stock," "ill-gotten profits resulting from the securities violations," and "the entire proceeds of [the defendant's] stock gain."  465 F.3d at 1177, 1178 & n.8.  When it uses the phrase "profits . . . causally connected to the violation," it is actually quoting a treatise.  *Id.* at 1179 (internal quotation marks omitted).  Regardless, it appears the Tenth Circuit was simply trying to offer linguistic variety, without having in mind the trouble that "causally connected" might create if construed strictly.

Second, speaking of such trouble, it is well-settled that the SEC—in contrast to a private securities fraud litigant—need never prove that a securities buyer or seller relied to its detriment on the violator's misleading statements.  *See Wolfson*, 539 F.3d at 1256.[2]  There is no hint in *Maxxon* that it meant to alter this principle—*i.e.*, to hold that the SEC need not prove reliance *unless it intends to seek disgorgement* (as it nearly

---

[2] As the Court stated in the Summary Judgment Order, a Securities Act § 17(a)(2) violation requires proof, even in an SEC action, that the defendant obtained something by means of its unlawful conduct, but it need not be profits obtained at the expense of those relying upon the defendant's misrepresentations.  *See* 343 F. Supp. 3d at 1042–43.

always does).

Third, *Maxxon* generally describes some of the defendant's misrepresentations but never connects them to any particular securities transactions. *See* 465 F.3d at 1176. It instead notes, without hint of disapproval, that the district court had calculated disgorgement based on all profits from stock sales over a particular time period. *Id.* at 1178 n.8.

Fourth, the weight of authority in other circuits is that disgorgement need not be calculated according to those transactions that can be causally linked to a misrepresentation. *See SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) (citing cases for, and agreeing with, the proposition that "[o]nce the Commission has established that a defendant has violated the securities laws, the district court possesses the equitable power to grant disgorgement without inquiring whether, or to what extent, identifiable private parties have been damaged by [the] fraud. Whether or not any investors may be entitled to money damages is immaterial." (internal quotation marks and citation omitted; alterations in original)). To the Court's knowledge, the Tenth Circuit has never stated that it takes a different approach than the various other circuits.

For all these reasons, the Court holds that it may properly focus on "ill-gotten gains," meaning (in this case) the amounts earned in the securities offerings infected by the misleading statements, which (in this case) is the same as the amounts earned from selling unregistered securities. In other words, given the facts established in the Summary Judgment Order, the Court need not distinguish between unregistered securities offerings and securities offerings infected by misrepresentations.

3.    Application to Mahabub's Personal Sales

Mahabub earned $2,593,900 from sales of his personal GenAudio shares but, of

that amount, the SEC only seeks $1,280,900, on account of the statute of limitations and a tolling agreement.  (ECF No. 84-93 ¶ 7; ECF No. 110 at 11 & n.4.)  The SEC asks that Mahabub be ordered to disgorge at least this amount, plus prejudgment interest from April 1, 2012 (the date of Mahabub's last personal sale) calculated according to the rate of interest used by the Internal Revenue Service for underpayment of federal income taxes set forth at 26 U.S.C. § 6621(a)(2).  (*Id.* at 11, 13.)  Aside from his argument that the maximum amount assessed against him should be $15,000, which the Court rejected above, Mahabub does not contest the SEC's disgorgement request as against him personally.  (*See* ECF No. 112 at 3.)  Accordingly, the Court will order Mahabub to disgorge $1,280,900, plus prejudgment interest in an amount to be calculated under 26 U.S.C. § 6621(a)(2).

      4.    <u>Application to GenAudio's Sales</u>

GenAudio's two share offerings during the relevant time period (the "2010 Offering" and "2011 Offering") yielded $3,513,000 and $990,000, respectively.  (ECF No. 110 at 12.)  Like Mahabub, GenAudio argues that the maximum disgorgement amount should be $15,000, but the Court has rejected GenAudio's reasoning.  GenAudio does not otherwise contest the SEC's calculations.  (*See* ECF No. 111 at 3–5.)  Accordingly, the Court will order GenAudio to disgorge $3,513,000 and $990,000, plus prejudgment interest to be separately calculated on each of those amounts under 26 U.S.C. § 6621(a)(2).

      5.    <u>Mahabub's Joint and Several Liability with GenAudio</u>

The SEC further requests that Mahabub be held jointly and severally liable for GenAudio's disgorgement.  (ECF No. 110 at 11–12.)  The Second Circuit holds, and this Court agrees, that

> where a firm has received gains through its unlawful
> conduct, where its owner and chief executive officer has
> collaborated in that conduct and has profited from the
> violations, and where the trial court has, within the proper
> bounds of discretion, determined that an order of
> disgorgement of those gains is appropriate, it is within the
> discretion of the court to determine that the owner-officer too
> should be subject, on a joint and several basis, to the
> disgorgement order.

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996).

Mahabub does not challenge the concept of joint and several liability, but instead cites a case from the United States District Court for the District of the District of Columbia noting that courts have rejected joint and several liability "when particular defendants have differing levels of culpability for securities-law violations or have received different amounts of illicit profits from those violations." *SEC v. E-Smart Techs., Inc.*, 139 F. Supp. 3d 170, 189 (D.D.C. 2015). (*See also* ECF No. 112 at 3.)

Here, Mahabub and GenAudio do not have differing levels of culpability. All of the deceptions in question were perpetrated by Mahabub on GenAudio's behalf as its CEO. As for different amounts of illicit profits, the SEC argues—and Defendants nowhere contest—that "GenAudio paid Mahabub at least" $574,970 from the $3,513,000 earned in the 2010 Offering, and $397,783 from the $990,000 earned in the 2011 Offering. (ECF No. 110 at 13 & n.5.) The Court, in its discretion, finds that Mahabub should be held jointly and severally liable (including a proportional share of the prejudgment interest) only to the extent of the $574,970 and $397,783 Mahabub earned from the two offerings.[3]

---

[3] The Court recognizes that the SEC's claim that Mahabub profited from GenAudio's earnings "at least" to this extent means that Mahabub could have received more than the two sums noted. However, no party has requested an evidentiary on this (or any) matter, so the Court will rely on the uncontested figures.

## C.   Civil Penalties

In addition to disgorgement, the SEC seeks statutory penalties against

Defendants.  (ECF No. 110 at 14–15.)

1.   <u>Legal Standard</u>

Securities Act § 20(d)(1) (15 U.S.C. § 77t(d)(1)) and Exchange Act § 21(d)(3)(A)

(15 U.S.C. § 78u(d)(3)(A)) authorize the SEC to seek a penalty against any person who

has violated those acts.  Both statutes establish three penalty "tiers," which are

described identically save for cross-references and certain formatting choices, so the

Court will quote only the Securities Act version:

> **(A) First tier**
>
> The amount of the penalty shall be determined by the court in light of the facts and circumstances.  For each violation, the amount of the penalty shall not exceed the greater of (i) $5,000 for a natural person or $50,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation.
>
> **(B) Second tier**
>
> Notwithstanding subparagraph (A), the amount of penalty for each such violation shall not exceed the greater of (i) $50,000 for a natural person or $250,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation [at issue] involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.
>
> **(C) Third tier**
>
> Notwithstanding subparagraphs (A) and (B), the amount of penalty for each such violation shall not exceed the greater of (i) $100,000 for a natural person or $500,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation, if—
>
> > (I) the violation [at issue] involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

> (II) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

15 U.S.C. § 77t(d)(2).

In determining the amount of the penalty, "courts typically consider" the following seven factors:

> (1) the egregiousness of the violations at issue; (2) defendants' scienter; (3) the repeated nature of the violations; (4) defendants' failure to admit their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 568 (S.D.N.Y. 2009).

2.  Application

The SEC argues that the Court should "order Mahabub and GenAudio to pay third tier civil penalties of $1,280,900 and $4,503,000, respectively, which is the amount of their gross pecuniary gain." (ECF No. 110 at 14.) The SEC says that such penalties are justified because:

- "Mahabub repeatedly lied about GenAudio's dealings with Apple";

- "Defendants' conduct . . . created substantial losses or the risk of substantial losses to investors," because the amounts raised were quickly "dissipated";

- "Mahabub and GenAudio have failed to admit their wrongdoing";

- "Mahabub failed initially to produce the fabricated e-mails that he sent to the GenAudio team" (referring to a discovery dispute mentioned in ECF

No. 42); and

- "Defendants have not demonstrated their current and future financial condition," but "Mahabub represented in the past eighteen months that he is a millionaire and hiding his assets from the SEC."

(*Id.* at 14–15.)  As to that last accusation, the SEC attaches a declaration from an accountant, Meaghan McDevitt, who says that Mahabub contacted her in July 2017 seeking assistance in completing a form apparently needed to show at least $10 million in assets as a prerequisite to open a particular kind of foreign currency brokerage account.  (ECF No. 110-1 ¶ 2.)  McDevitt relates that, over the course of the next year or so, Mahabub confided in her that:

- he owns a recording studio in California worth over $10 million;

- he owns a yacht in Panama and land in Costa Rica;

- he has made significant profits trading in Bitcoin;

- he has started a new company to create software for automated cryptocurrency trading, and has contracts for work in that field; and

- he is deliberately hiding assets from the SEC.

(*Id.* ¶¶ 2, 5–7, 11, 13.)

Mahabub responds with an affidavit of his own.  (ECF No. 112-1.)  Interestingly, he nowhere denies making the claims that McDevitt reports—indeed, he does not mention McDevitt at all.  He instead directly denies owning a recording studio, a yacht, or real property; denies having profited from foreign currency trading (although he does not mention Bitcoin trading); and denies having real business prospects with his cryptocurrency software.  (*Id.* ¶¶ 5–9.)  Taking these denials as true, for argument's

sake, his failure to deny that *he claimed otherwise* to McDevitt is at least an implicit admission that he continues to lie when it suits his economic purposes.

In any event, Mahabub claims he is "surviving through the generosity of [his] fiancée and friends, who have been supporting [him] as [he] attempt[s] to rebuild [his] devastated finances." (*Id.* ¶ 10.) GenAudio, for its part, claims that it is defunct with no assets or business prospects. (ECF No. 111 at 9–10.)

Taking all of this together, the Court first notes that the distinction between first, second, and third tier penalties is immaterial if the Court orders a defendant to pay a penalty equal to "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 77t(d)(2). Even a first-tier penalty—which requires no findings regarding fraud, deceit, or likelihood of causing losses to others—allows for a penalty up to that amount.

Next, the Court finds that certain factors weigh in favor of assessing a penalty against Mahabub. In particular, Mahabub repeatedly lied about GenAudio's prospects with Apple, yet Mahabub still does not concede that it was wrong for him to do so. As noted above (Part II.A.2), he attempts to sound conciliatory but only ends up admitting that a director-officer bar is a natural consequence of what this Court found in the Summary Judgment Order. (*See* ECF No. 112 at 4.) In this same vein, although Mahabub attempts to explain in his declaration that he did not know there was anything unlawful about selling his personal shares when they were unregistered (ECF No. 112 ¶¶ 11–15), he entirely ignores his dishonesty. Finally, the types of lies Mahabub was telling—about Apple (a very wealthy corporation with a customer base whose devotion at times borders on the religious) and its iconic CEO, Steve Jobs—were significantly

likely to cause investors to invest, and then lose, a substantial amount of money.

The major factor weighing against a penalty, in the Court's view, would be Mahabub's claimed financial straits.  The Court has very little reason to accept Mahabub's representations as truthful, but the SEC has not asked for a hearing and so the Court feels bound to view this matter in the light most favorable to Mahabub.

Regardless, Mahabub's ability to pay is only one factor among many.  In its discretion, the Court agrees with the SEC that the maximum penalty against Mahabub is warranted here, *i.e.*, the gross amount of pecuniary gain, which the SEC calculates at $1,280,900.  (ECF No. 110 at 14.)[4]

Finally, because GenAudio's actions cannot be meaningfully distinguished from Mahabub's actions, the Court likewise finds that the maximum penalty against GenAudio is warranted here, *i.e.*, the gross amount of pecuniary gain from the 2010 and 2011 Offerings, totaling $4,503,000.  (*Id.*)

3. Fair Fund

The SEC requests "that the Court establish a Fair Fund" under 15 U.S.C. § 7246(a).  (ECF No. 110 at 15 n.6.)  That subsection reads as follows:

> If, in any judicial or administrative action brought by the Commission under the securities laws, the Commission obtains a civil penalty against any person for a violation of such laws, or such person agrees, in settlement of any such action, to such civil penalty, the amount of such civil penalty shall, on the motion or at the direction of the Commission, be added to and become part of a disgorgement fund or other fund established for the benefit of the victims of such violation.

---

[4] This is the amount Mahabub earned from his personal sales of GenAudio shares.  (*See* Part II.B.3, above.)  The SEC has not asked for a penalty that includes the amounts Mahabub received from GenAudio's earnings.  (*See* Part II.B.5, above.)

Defendants do not respond to this request from the SEC and it is not clear they would have standing to oppose it anyway—how the SEC distributes what it recovers is likely not Defendants' concern. The Court will therefore grant the requested relief.

## D. Officer/Director Bar

Finally, the SEC asks that the Court permanently prohibit Mahabub from serving as an officer or director of a public company. (ECF No. 110 at 15–16.) Such relief is authorized by Exchange Act § 21(d)(2) (15 U.S.C. § 78u(d)(2)), which states that

> the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated section 78j(b) of this title [*i.e.*, Exchange Act § 10(b)] or the rules or regulations thereunder [*e.g.*, Rule 10b-5] from acting as an officer or director of any [publicly traded company] if the person's conduct demonstrates unfitness to serve as an officer or director of any [publicly traded company].

Mahabub does not contest this sanction and indeed, as previously noted, has conceded the appropriateness of this remedy. (ECF No. 112 at 4.) It will therefore be granted.

## III. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The SEC's Motion for Final Judgment Seeking Remedies Against Defendants Taj Jerry Mahabub and GenAudio, Inc. and to Establish a Fair Fund (ECF No. 110) is GRANTED IN PART and DENIED IN PART to the extent stated above; and

2. On or before **September 13, 2018**, the SEC shall file updated prejudgment interest calculations on the disgorgement amounts awarded above, showing the various amounts of interest that will be due as of **September 16, 2019**, **September 17, 2019**, and **September 18, 2019**. After receiving the SEC's supplemental calculations, the Court will enter final judgment.

Dated this 5th day of September, 2019.

BY THE COURT:

_____
William J. Martínez
United States District Judge