**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**April 26, 2022**

**UNITED STATES COURT OF APPEALS**

**Christopher M. Wolpert**
**Clerk of Court**

**TENTH CIRCUIT**

---

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff - Appellee,

v.                                                                No. 19-1454

GENAUDIO INC.,

       Defendant - Appellant,

and

TAJ JERRY MAHABUB,

       Defendant.

_____

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff - Appellee,

v.                                                                No. 19-1455

TAJ JERRY MAHABUB,

       Defendant - Appellant,

and

GENAUDIO INC.,

       Defendant.

---

**Appeals from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CV-02118-WJM-SKC)**

---

David J. Aveni, Wilson Elser Moskowitz Edelman & Dicker LLP, San Diego, California, for Defendant-Appellant GenAudio, Inc.

Andrew Bryan Holmes, Holmes, Taylor, Cowan & Jones, Los Angeles, California (David J. Aveni, Wilson Elser Moskowitz Edelman & Dicker LLP, San Diego, California, on the briefs), for Defendant-Appellant Taj Jerry Mahabub.

Emily True Parise, Senior Counsel (Robert B. Stebbins, General Counsel and John W. Avery, Deputy Solicitor, with her on the brief), Securities and Exchange Commission, Washington, D.C., for Plaintiff-Appellee.

---

Before **HOLMES**, **KELLY**, and **CARSON**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

Taj Jerry Mahabub, founder and Chief Executive Officer ("CEO") of GenAudio, Inc. ("GenAudio")—whom we collectively refer to as "Appellants"—attempted to secure a software licensing deal with a well-known technology company, Apple, Inc. ("Apple"). It was Mr. Mahabub's goal to integrate GenAudio's three-dimensional audio software—AstoundSound—into Apple's products. While Appellants were pursuing that collaboration, the Securities and Exchange Commission ("SEC") commenced an investigation into Mr. Mahabub's conduct. Mr. Mahabub was suspected of defrauding investors by

fabricating statements about Apple's interest in GenAudio's software and violating registration provisions of the securities laws in connection with sales of GenAudio securities.

Granting summary judgment for the SEC, the district court found that Mr. Mahabub defrauded investors and violated the securities laws. The court determined that Appellants were liable for knowingly or recklessly making six fraudulent misstatements in connection with two offerings of GenAudio's securities in violation of the antifraud provisions of the securities laws—that is, SEC Rule 10b-5 and § 10(b) of the Exchange Act.[1] As to one of those statements, the court also determined that Appellants violated § 17(a)(2) of the Securities Act, which also proscribes the making of certain misstatements. In addition, the district court granted summary judgment in favor of the SEC on its claims that GenAudio and Mr. Mahabub violated §§ 5(a) and 5(c) of the Securities Act, which prohibit the offer or sale of unregistered securities. As a remedy for these violations, the court ordered disgorgement of Appellants' proceeds and imposed civil penalties.

Appellants now appeal from the district court's decision, raising three overarching issues before us. First, Appellants assert that the district court erred in finding them liable for the six fraudulent misstatements under the securities

---

[1]    Rule 10b-5 is coextensive in its substantive coverage with that of § 10(b). *See, e.g.*, *SEC v. Smart*, 678 F.3d 850, 856 n.7 (10th Cir. 2012).

laws.  Generally, Appellants explain that Mr. Mahabub's statements to actual and potential shareholders were informed by a reasonable belief regarding Apple's interest in acquiring GenAudio's proprietary technology.  Second, Appellants contend that the district court erred in concluding GenAudio did not qualify for two exemptions allowing its sale of unregistered securities—specifically, the private-offering exemption under § 4(a)(2) of the Securities Act, and the Rule 506 safe-harbor exemption of the SEC's Regulation D.  Third, Appellants challenge the district court's legal authority to impose a disgorgement order and the court's computation of the disgorgement amounts, as well as the civil penalties that the court imposed on them.  Exercising jurisdiction under 28 U.S.C. § 1291, we reject all of Appellants' arguments and **affirm** the district court's judgment.

## I

## A

Mr. Mahabub founded GenAudio in 2003 and served as its CEO and Chairman of the Board from 2009 to 2012.  GenAudio is a Colorado corporation headquartered in Centennial, Colorado, that develops and markets software.  GenAudio created a "three-dimensional audio" technology, which it calls AstoundSound.  AstoundSound is a software-based system for processing normal stereo audio to give it a "three-dimensional" effect—as if the sound is coming from some other place, such as behind the listener or from far away.

4

GenAudio primarily financed itself through selling debt and equity securities in private offerings, but it consistently had funding issues. To bolster funding, GenAudio asked Jim Wei-Kung Mattos, a GenAudio employee, to raise money, which he did, devoting much of his time to the task.

In late 2006, GenAudio commenced discussions with Apple regarding AstoundSound. GenAudio's goal throughout "was to reach a licensing agreement or [arrange for the] acquisition of GenAudio's technology" so Apple could integrate AstoundSound into its consumer products. Aplts.' App., Vol. VI, at 1493, ¶ 126 (Def. GenAudio's Resp. to SEC's Revised Mot. for Summ. J., filed Mar. 30, 2018). With this end in mind, GenAudio had talks with two separate product divisions within Apple: (1) the handheld-devices division which encompassed iPhones, iPods, and iPads, and (2) the Macintosh or "Mac" division.

On July 1, 2009, Mr. Mahabub signed Apple's standard non-disclosure agreement ("NDA") on behalf of GenAudio. Mr. Mahabub's primary point of contact in Apple's handheld-devices division was Victor Tiscareno, a senior audio and acoustics engineer. Mr. Mahabub also met and communicated with Michael Hailey, a product-market manager for the iPod, iPhone, and iPad product lines, as well as Ronald Issac, a signal-processing engineer and acoustician technologist. Mr. Issac was Mr. Mahabub's point of contact in the Mac division.

As talks between GenAudio and Apple continued between August 2009 and February 2010, Mr. Mahabub periodically would forward to the GenAudio

5

Team—that is, the Board, employees, and contractors—email communications between himself and his Apple contacts.  However, Mr. Mahabub would alter the original versions of these emails, so as to falsely indicate, for instance, that (1) he was meeting with upper-level Apple personnel—such as Phil Schiller, Apple's senior vice president of worldwide marketing, and Tim Cook, Apple's chief operating officer ("COO"); (2) Apple's then-CEO Steve Jobs was being appraised of GenAudio's  discussions with Apple; (3) Mr. Mahabub was scheduled to meet with Mr. Jobs personally; (4) progress towards a deal with Apple had generally been swift; and (5) Mr. Schiller was targeting a late 2010 rollout of GenAudio-enhanced Apple products.  In short, these altered emails did not reflect the reality of GenAudio's dealings with Apple: in particular, Mr. Mahabub had not met with—and would never meet with—Mr. Jobs, Mr. Cook, or Mr. Schiller, and Apple employees never brought GenAudio to Mr. Jobs's attention.

On September 25, 2009, around the same time that Mr. Mahabub had forwarded the first set of altered emails, he told the GenAudio Board that a deal with Apple was highly probable.  Mr. Mahabub also hired an intellectual-property ("IP") valuation specialist to value GenAudio's technology under several different scenarios in anticipation of negotiations with Apple over a licensing agreement or the acquisition of GenAudio's technology.

Furthermore, Mr. Mattos, GenAudio's fundraiser, sent an email to GenAudio's investors that Mr. Mahabub authored and signed.  That email—sent

on November 9, 2009—informed them that "nothing is assured yet, but as shareholders you should be aware that there is a strong possibility that the Company may be acquired within the next 6 months in light of our extensive discussions with a global industry leader in consumer electronics." *Id.*, Vol. IV, at 951 (Mattos Email, dated Nov. 9, 2009). A few days later one of the recipients of this email replied to Mr. Mattos with a list of investors, and each of the listed investors purchased GenAudio's shares soon afterward.

However, Mr. Mahabub's excitement about the potential partnership was not shared during roughly the same time period by his counterparts in Apple. On September 1, 2009, for instance, Mr. Mahabub emailed Mr. Isaac, his primary contact in Apple's Mac division, writing "I hope we can get this done on the fast track—potentially for inclusion in Apple's X-Mas product rollout strategy?" *Id.*, Vol. VII, at 1745 (Mahabub Email, dated Sept. 1, 2009). Apparently, Mr. Isaac neither read this portion of Mr. Mahabub's email, nor did he respond to it. And, on November 28, 2009—around a couple of weeks after Mr. Mattos sent out his November 9 email at Mr. Mahabub's behest—Mr. Mahabub sent Mr. Tiscareno and Mr. Hailey a lengthy email extolling the potential for an Apple-GenAudio partnership, suggesting that Apple's IP lawyers begin examining GenAudio's patents, and stating that "we hope that Apple becomes happy with us once the deal is inked and the initial products from Apple incorporating AstoundSound . . .

are brought to market." *Id.*, Vol. IV, at 1061 (Mahabub Email, dated Nov. 28, 2009).

Yet, significantly, Mr. Hailey responded on December 16, 2009, clarifying the deal was "not something we can execute overnight." *Id.* at 1058 (Hailey Email, dated Dec. 16, 2009). Critically, Mr. Hailey explained that "[t]he business side of things would come into play *after* we have exec buy-in on the product side." *Id.* (emphasis added). And in a subsequent email sent on January 5, 2010, Mr. Hailey further noted that although Apple was "pretty serious about looking at audio quality across the board," the partnership "will take time—definitely *more than a couple of months*." *Id.* at 1067–68 (Hailey Email, dated Jan. 5, 2010) (emphasis added).

These Apple communications, however, did not temper Mr. Mahabub's actions. On February 12, 2010, Mr. Mahabub forwarded an email to the GenAudio Board that contained actual communications between Mr. Tiscareno and Mr. Mahabub regarding the testing of GenAudio's technology in the newest iPad model. But Mr. Mahabub added several fabricated sentences to the original email, including a line in which Mr. Tiscareno purports to say that he and Mr. Hailey "are both confident that we can get this ok'd by the big man if we play our cards right." *Id.* at 1071–72 (Mahabub Email Forwarding Altered Tiscareno Email, dated Feb. 12, 2010). In the same fabricated email, Mr. Mahabub altered Mr. Tiscareno's communications to describe AstoundSound as "the project [Mr.

8

Schiller] discussed for Christmas product rollout with you." *Id.* at 1072. Mr. Mahabub also falsely told the GenAudio Board he had a "[g]reat meeting with [Mr.] Schiller yesterday" who was targeting a "Christmas rollout" and had also "requested to see a copy of the [GenAudio] valuation report ASAP." *Id.* at 1071.

Later that same day, GenAudio held a board meeting. After Mr. Mahabub summarized the purported discussions with Apple, the Board agreed that GenAudio should prepare a new stock offering and directed Mr. Mahabub to prepare a draft private-placement memorandum ("PPM") for the GenAudio Board's review.

The Board formally approved the offering on March 5, 2010 (the "2010 Offering"). Five days later, on March 10, 2010, Mr. Mahabub emailed fifteen of GenAudio's shareholders the company's valuation report, announcing that GenAudio would include that report in the 2010 Offering materials and the 2010 Offering would "go live on March 15, 2010." *Id.*, Vol. V, at 1108 (Mahabub Email to Shareholders, dated Mar. 10, 2010). Mr. Mahabub gave these investors an opportunity—ahead of the formal offering—to buy up to 250,000 of Mr. Mahabub's own GenAudio shares at fifty cents per share. In that same email, he explained the purchase would be a bargain compared to the $3.00-per-share price intended for the 2010 Offering. Mr. Mahabub also then stated that GenAudio was "starting to discuss the business side with [Apple], and I expect to have a very substantial license deal in place for their Christmas Product Rollout." *Id.* at 1109.

9

The 2010 Offering included a PPM with a cover letter, dated March 15, 2010, that Mr. Mahabub had signed.  The cover letter was aimed specifically at current GenAudio shareholders "to keep [them] apprised of current developments."  *Id.* at 1120 (PPM Cover Letter, signed Mar. 15, 2010).  In that letter, Mr. Mahabub represented, among other things, that the 2010 Offering was being conducted to provide "bridge capital" until GenAudio could "ink" a deal with the "LCEC."[2]  *Id.*  That letter also represented that GenAudio, up to that point, had met with Apple marketing and technical management more than fifteen times, and would "start the actual embedded level integration process within the next 30 days"—i.e., presumably speaking of the integration of GenAudio's technology into Apple's products.  *Id.*

The 2010 Offering lasted through August 31, 2010.  GenAudio did not file a registration statement for the 2010 Offering, nor did it provide an audited balance sheet to any potential investors.  Regardless, the 2010 Offering yielded $3.513 million from sales of 1.171 million common shares.

Around a month after the start of the 2010 Offering, in April 2010, Mr. Mahabub learned of an important "upcoming" internal meeting at Apple regarding GenAudio's technology.  This was the meeting where the "buy-in" from an Apple "exec" conceivably could be secured.  Mr. Mahabub understood that if an

---

[2]     The email refers to Apple as the "LCEC"—or Large Consumer Electronics Company—and neither party disputes that GenAudio's investors generally understood that the term "LCEC" referred to Apple.

executive "did not give a 'green light' to continue with GenAudio, then discussions between GenAudio and Apple's [handheld-devices] division . . . would end." *Id.*, Vol. VI, at 1498–99, ¶ 151.

In the run-up to this crucial meeting, Mr. Tiscareno emailed Mr. Mahabub about the delivery of certain demonstration hardware—concluding with the following statement, "[n]o rush at the moment" because they "[do not] have a meeting date or time yet." *Id.*, Vol. V, at 1233 (Tiscareno Email, dated Apr. 7, 2010). Mr. Mahabub responded, and also forwarded an altered version of the correspondence to the GenAudio Team. Among other things, Mr. Mahabub deleted from Mr. Tiscareno's email the portion about not having a meeting date or time, and inserted the fabricated sentence, "Phil [Schiller] let us know earlier that this [meeting] might be postponed until early next week. Apparently Steve [Jobs] is planning on going out of town with his family for the weekend." *Id.* at 1225–26 (Mahabub Email Forwarding Altered Tiscareno Email, dated Apr. 8, 2010). To his own forwarded response, Mr. Mahabub included a line indicating that the fictitious postponement "might be better given that Steve will be relaxed from having a weekend getaway with his family." *Id.*

At some point in April 2010, Mr. Mahabub learned that the specific date of the "exec buy-in" meeting would be sometime the following month. On April 30, 2010, while attending a conference for investment bankers and broker-dealers, Mr. Mahabub sent at least one investor an email announcing that the LCEC was

11

"looking to acquire GenAudio's tech for integration into their entire lineup of product offerings . . . and we are now waiting [for the time] when we will initiate negotiations, pending the CEO['s] [approval of] the integrated product rollout strategy and the technical implementation strategy that will be presented to the CEO next week!!!" *Id.* at 1239 (Mahabub Email, dated Apr. 30, 2010).[3]  The email prompted the investor to purchase 5,000 shares for a total of $15,000.

Again, however, Mr. Mahabub's enthusiasm did not mirror the reality of GenAudio's dealing with Apple.  On May 5, 2010, Mr. Mahabub emailed Mr. Tiscareno, offering to fly to Apple headquarters to attend the "exec buy-in" meeting and to coach Mr. Tiscareno on how best to present AstoundSound.  Mr. Tiscareno replied:

> Thanks for your offer to help us, but this is not that kind of demo.  Michael [Hailey] and I are pitching this *as a concept*, and our proof of concept is what you developed for us.  I think the demo and the product will speak for itself.  Once we get the go ahead that this is a *great idea*, then the questions will be, "[W]ell, what about the *other technologies*, have we reviewed

---

[3]      Mr. Mahabub subsequently contended that his reference to Apple's CEO—Steve Jobs—in connection with this meeting was the product of a reasonable misunderstanding: Mr. Tiscareno communicated with him about a high-ranking Apple official attending the meeting, Greg Joswiak, who went by the nickname, "Joz" (pronounced "Jaws"), and because he "didn't know" that person and "had never heard" his name, he "understood" Mr. Tiscareno's reference to "mean Steve Jobs."  Aplts.' App., Vol. IX, at 2050, ¶ 24 (Decl. of Taj Jerry Mahabub); *see id.* at 2040 n.19 (Def. Mahabub's Opp'n to Pl.'s Rev. Mot. for Summ. J., filed Mar. 30, 2018) ("[Mr.] Mahabub reasonably understood [Mr.] Tiscareno to be referring to 'Jobs'—Steve Jobs.  As such, if there was a mistake about whether it was 'Jaws' or 'Jobs', it was an honest mistake." (citation omitted)).

them? etc[.]"  Then we sort of *start over* internally to prove that
we know what we are talking about, etc.  We have *to get to first
base*[.]

*Id.* at 1222 (Tiscareno Email, dated May 5, 2010) (emphases added).

That same day, May 5, 2010, the "exec buy-in" meeting took place, with

Mr. Tiscareno, Mr. Hailey, and Greg Joswiak, an Apple executive, in attendance.

Mr. Joswiak "agreed that there was value in exploring ways to enhance the

listening experience for people using iPods and iPhones."  *Id.*, Vol. VII, at 1711

(Michael Hailey Dep. Tr., dated Jan. 23, 2017).

A day after the "exec buy-in" meeting, on May 6, 2010, Mr. Mahabub sent

an email to the GenAudio Team and others with a purported transcript of a phone

call he had supposedly just had with Mr. Tiscareno.  Both the phone call itself

and the transcript were fabrications.  According to the fake transcript, Mr.

Tiscareno reported to Mr. Mahabub that "the meeting could not have gone any

better."  *Id.*, Vol. IV, at 935 (Mahabub Email, dated May 6, 2010).  Moreover,

"Steve thought the technology was so extraordinary," but "it will take a lot of

time before you and Apple get to the business side."  *Id.* at 935–36.  This was

supposedly because Mr. Jobs believed the upcoming release of a new operating

system version for iPhones and iPads already had many new features and

AstoundSound "is too good to be rolled in to a giant pool of other features."  *Id.*

at 936.  The fake transcript further noted that Mr. Tiscareno "believe[d] [Mr.

Jobs] wants to explode this technology into the world, and he stated he needs

13

some time to figure out the plan and when to launch this." *Id.*  And in the

meantime, Mr. Jobs had "instructed all of us to be in a no radio period."[4]  *Id.*

A couple of months later, on August 1, 2010, GenAudio sent investors a

letter, signed by Mr. Mahabub, that purported to report on various business

developments.  The letter claimed, in relevant part, that:

> In the very near future, it has been requested by the LCEC's CEO
> to have a "hand-shake" meeting with myself alongside meeting
> with the LCEC's expert in acoustic physics and others.  This
> meeting will take place within the next couple of weeks.  As you
> all may already know, due to our NDA with the LCEC, I am not
> at liberty to talk about any details.  I can say that we are still
> moving forward with confidence and plan on carrying it through
> all the way to the end, which could result in a significant revenue
> generating license deal or the potential for acquisition of the
> technology or the company.

*Id.*, Vol. V, at 1313 (Mahabub Letter to Shareholders, dated Aug. 1, 2010).

On September 23, 2010, Mr. Mahabub met with Andrew Bright, an Apple

employee with a Ph.D. in acoustics—along with Mr. Tiscareno and another Apple

employee.  That meeting had been previously set up by Mr. Tiscareno to happen

on July 7, 2010, but it was delayed until September.  Mr. Mahabub had altered

Mr. Tiscareno's email scheduling the ultimately postponed July meeting to state

that the meeting with Mr. Bright was "requested by Steve himself" and that

---

[4]      When Dell Skluzak, one of GenAudio's prospective investors around
that time, reached out to Mr. Tiscareno on October 30, 2013, to gather any
comments he might have on the purported transcript, Mr. Tiscareno wrote that
Mr. Mahabub's transcript "is pure fabrication."  Aplts.' App., Vol. IV, at 934
(Tiscareno Email, dated Oct. 30, 2013).

"Steve would like to have an initial introduction to you during this meeting, just a simple handshake meeting with him." *Id.* at 1304 (Mahabub Email Forwarding Altered Tiscareno Email, dated Jul. 2, 2010). However, the September meeting did not go well due to an argument between Mr. Mahabub and Mr. Bright. The record does not reveal the nature of the argument, however. Nevertheless, Apple's employees continued to interact with GenAudio in the ensuing months—although the SEC claims that none of the work of the two companies together during this period was "substantive." *See id.*, Vol. II, at 368, ¶ 96 (Pl.'s Rev. Mot. for Summ. J., filed Feb. 16, 2018).

On December 8, 2010, GenAudio sent investors another letter signed by Mr. Mahabub. Among other developments, Mr. Mahabub described ongoing communications with Apple, and falsely claimed he "met with their CEO and gave him a demo of our technology, and he [i.e., the CEO] stated, 'I really like your technology and look forward to seeing you again in the future.'" *Id.*, Vol. V, at 1336 (Mahabub Letter to Shareholders, dated Dec. 8, 2010). Mr. Mahabub told them further: "Although they are moving very slow, we are still on [Apple's] radar screen, and remain very optimistic for a deal in the second or third quarter of 2011." *Id.*

But the new year did not usher in further significant developments in GenAudio's quest for some sort of business venture with Apple. In mid-March 2011, Mr. Mahabub sent an email to Mr. Isaac to request broken

iMacs—specifically, an iMac "with a bad screen or some form of prototype that has bad parts in it"—to create a demonstration of AstoundSound.  Aplts.' App., Vol. VII, at 1702 (Mahabub Email, dated Mar. 23, 2011).  Mr. Isaac replied that Mr. Mahabub should work with another Apple employee copied on the email "to sign all the necessary evaluation agreements."  *Id.* (Isaac Email, dated Mar. 23, 2011).  The record does not show whether Mr. Mahabub sought details on the nature or requirements of such evaluation agreements.  Nevertheless, on March 29, 2011, Mr. Mattos sent an email to GenAudio's investors from Mr. Mahabub claiming that:

> [Apple and GenAudio are] going to be signing a new set of "evaluation and development" agreements. This will completely prohibit myself or any of GenAudio's team members [from] disclos[ing] any further information about the LCEC, including even the abbreviation LCEC in any future shareholder correspondence. . . . After I sign the new development and evaluation agreements, this email would be considered a breach of the new agreement(s). *This could damage our ability to move forward with the LCEC* for obvious reasons.  Believe me when I tell all of you that I wish I could disclose what is going on, however, the fact of the matter is I cannot.

*Id.*, Vol. VI, at 1387 (Mattos Email to Shareholders, dated Mar. 29, 2011) (emphasis added).  GenAudio never signed any evaluation agreements or any additional NDAs.  And GenAudio never commenced its desired business venture with Apple.  On Apple's side, "interest in GenAudio's technology slowly fizzled out over time."  *Id.* at 1505, ¶ 182.  However, no one "explained to [Mr.] Mahabub that interest in GenAudio's technology had fizzled out and that" Apple,

specifically its Mac Division, "would not be continuing to move forward with
GenAudio." *Id.* at ¶ 183.

Despite the absence of significant progress in its dealings with Apple,
GenAudio solicited equity investment (the "2011 Offering") beginning April 2011
and continuing through April 2012.  Similar to the 2010 Offering, GenAudio did
not file a registration statement for the 2011 Offering.  GenAudio also did not
provide an audited balance sheet to any prospective investors.  Nevertheless, the
2011 Offering still yielded $990,000.

In addition to GenAudio's two offerings, Mr. Mahabub also sold his
personal GenAudio shares to investors.  No registration statement was filed or
otherwise in effect as to these sales.  Mr. Mahabub's sale of his personal shares
between November 2009 and April 2012 yielded a total of approximately $2.6
million from at least 85 investors.

**B**

In September 2015, the SEC filed its complaint, alleging that GenAudio
and Mr. Mahabub violated antifraud provisions of the federal securities laws,
specifically § 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), Rule 10b-5 (17
C.F.R. § 240.10b-5), and § 17(a) of the Securities Act (15 U.S.C. § 77q(a)).  The
SEC also alleged that GenAudio sold unregistered securities in violation of
§§ 5(a) and (c) of the Securities Act (15 U.S.C. §§ 77e(a), 77e(c)).  After
discovery, the SEC moved for summary judgment on all of its claims.

17

The district court denied the SEC's original summary judgment motion, and the SEC submitted a revised motion for summary judgment. The district court ultimately granted summary judgment as to this motion on a subset of the SEC's claims, and denied summary judgment on the rest. The district court identified six statements as to which "their liability-creating character is beyond reasonable dispute" and granted summary judgment against GenAudio and Mr. Mahabub for violating § 10(b) and Rule 10b-5. *SEC v. Mahabub*, 343 F. Supp. 3d 1022, 1043–44 (D. Colo. 2018). The district court first summarized five of these statements from 2010, and why it deemed them to create liability under § 10(b) and Rule 10b-5:

- [Mr.] Mahabub's March 10, 2010 e-mail to GenAudio shareholders where he claimed that GenAudio was "starting to discuss the business side with the LCEC," which investors generally understood to be a reference to Apple.[5] [Mr.] Mahabub knew from [Mr.] Hailey's December 16, 2009 e-mail that "[t]he business side of things would come into play after [Apple's engineers obtained] exec buy-in on the product side."[6] [Mr.] Mahabub further knew that "exec-buy-in" had not yet happened. Consequently, this claim regarding "business side" discussions with Apple was knowingly false.

- [Mr.] Mahabub's statement in the same March 10, 2010 e-mail that he "expect[ed] to have a very substantial license deal in place for [the LCEC's] Christmas Product

---

5    *See* Aplts.' App., Vol. V, at 1109; *id.*, Vol. II, at 357, ¶ 41.

6    *See* Aplts.' App., Vol. IV, at 1058.

Rollout."[7]  This statement is merely an extension of [Mr.] Mahabub's fabrication in a February 12, 2010 forwarded e-mail to the GenAudio board in which [Mr.] Mahabub altered [Mr.] Tiscareno's words to make it appear that [Mr.] Mahabub had recently discussed a "Christmas product rollout" with Phil Schiller.[8]  Thus, in his March 10, 2010 e-mail to shareholders, [Mr.] Mahabub had no truthful basis to make a Christmas product rollout prediction.   Couching the statement in terms of an expectation, rather than a certainty, does not take it out of the realm of falsity: "[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made."[9]

- [Mr.] Mahabub's March 15, 2010 cover letter accompanying the 2010 Offering materials, which stated that the offering was "being conducted to provide bridge capital until we can 'ink' a deal with . . . the 'LCEC.'"[10]  [Mr.] Mahabub had no reasonable basis to expect that a deal with Apple was imminent enough that the 2010 Offering could be "bridge capital."

- [Mr.] Mahabub's April 30, 2010 e-mail to an investor stating that the LCEC was "looking to acquire GenAudio's tech for integration into their entire lineup of product offerings . . . and we are now waiting [for the time] when we will initiate negotiations, pending the CEO['s] [approval of] the integrated product rollout strategy and the technical implementation strategy that will be

---

7      *See* Aplts.' App., Vol. V, at 1109.

8      *See* Aplts.' App., Vol. IV, at 1070–73.

9      *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

10      *See* Aplts.' App., Vol. V, at 1120.

presented to the CEO next week!!!"[11]  The Court may assume without deciding that the "Jobs"/"Joz" misunderstanding (a) actually happened and (b) created a mistaken but reasonable misimpression in [Mr.] Mahabub's mind about the attendees at the upcoming "exec buy-in" meeting.[12]  Even so, [Mr.] Mahabub had no reasonable basis to claim that the upcoming meeting would encompass an "integrated product rollout strategy and [a] technical implementation strategy."

•   [Mr.] Mahabub's August 1, 2010 investor letter claiming that Steve Jobs had requested "a 'hand-shake' meeting" with [Mr.] Mahabub "[i]n the very near future."[13]  This was a blatant lie.

*Id.* (alterations, with the exception of those involving honorifics, in original) (footnotes added) (citations omitted).

Aside from those five 2010 statements, the district court also found that Mr. Mahabub's March 29, 2011, email to shareholders stating that he would sign "evaluation agreements" with Apple "teased shareholders," indicating "that these new agreements would completely prohibit mentioning the LCEC in future correspondence, including the upcoming 2011 Offering." *Id.* at 1044–45.  "For good measure," the district court narrated, Mr. Mahabub told the shareholders, "[b]elieve me when I tell all of you that I wish I could disclose what is going on,

---

[11]   *See* Aplts.' App., Vol. V, at 1239.

[12]   The SEC claims that no one told Mr. Mahabub that the "exec buy-in meeting" would include Apple's CEO, Mr. Jobs.  Mr. Mahabub counters that his reference to Mr. Jobs was the product of an "honest mistake."  Aplts.' App., Vol. IX, at 2041 n.19; *see supra* note 3.

[13]   *See* Aplts.' App., Vol. V, at 1313.

however, the fact of the matter is I cannot." *Id.* at 1045 (quoting Aplts.' App.,

Vol. VI, at 1387).  The district court found this communication to be an

actionable misrepresentation under § 10(b) and Rule 10b-5 because the evaluation

agreements were "mentioned in the context of responding to [Mr.] Mahabub's

request for broken-down iMacs." *Id.* (emphasis omitted).

The district court further determined that one of these statements—Mr.

Mahabub's April 30, 2010, email prompting the recipient-investor to purchase

5,000 GenAudio shares for $15,000—*also* violated §17(a)(2) of the Securities

Act.  In addition, the district court also granted summary judgment in favor of the

SEC on its claims that GenAudio and Mr. Mahabub violated §§ 5(a) and 5(c) of

the Securities Act, which prohibit the offer or sale of unregistered securities.

After obtaining partial summary judgment on some of its claims, the SEC

voluntarily withdrew the remainder and alerted the court that it was prepared to

proceed to the remedy phase as to the claims regarding which the court had

entered judgment in its favor.  Thereafter, the district court ordered remedies for

GenAudio and Mr. Mahabub's violations.  Specifically, the court ordered

Appellants to disgorge the amount of their ill-gotten gains from their violations of

the securities laws.  Regarding GenAudio, its 2010 Offering and 2011 Offering

yielded $3,513,000 and $990,000, respectively, which the district court ordered

GenAudio to disgorge plus prejudgment interest.  As for Mr. Mahabub's personal

sales of his GenAudio shares, the district court ordered Mr. Mahabub to disgorge

$1,280,900.  While he made $2,593,900 from such sales, the district court limited disgorgement because of the statute of limitations and a tolling agreement.

Additionally, the district court ordered GenAudio and Mr. Mahabub to pay civil penalties in the amounts of $4,503,000 and $1,280,900, respectively; these amounts represented their gross pecuniary gain.  The district court also established a Fair Fund pursuant to 15 U.S.C. § 7246(a).  Further, the district court enjoined Appellants from further violations of the securities laws, and permanently barred Mr. Mahabub from serving as an officer or director of a public company.

The district court entered a final and, then, a slightly amended judgment in favor of the SEC.  And Appellants timely appealed from that amended judgment.

## II

We address each of Appellants' three challenges to the district court's judgment in turn, outlining the standards of review and substantive caselaw relevant to each issue and considering and resolving Appellants' contentions.  Specifically, Appellants contend that: (1) the district court erred in determining that no genuine disputes of material fact exist regarding the six statements that it identified—such that a finding of antifraud liability under § 10(b), Rule 10b-5, and (in one instance) § 17(a)(2) was appropriate; (2) the district court erred when it concluded that GenAudio was liable for the unregistered offer or sale of securities—a conclusion that was predicated on the court's supposedly erroneous

determination that GenAudio did not qualify for two statutory exemptions; and
(3) the district court erred in applying the disgorgement remedy to Appellants and
requiring them to pay civil penalties.  We reject each of Appellants' challenges,
concluding that they lack merit.

## A

This Court "review[s] a district court's grant of summary judgment de
novo, using the same standard applied by the district court pursuant to Fed. R.
Civ. P. 56(a)."  *Cillo v. City of Greenwood Village*, 739 F.3d 451, 461 (10th Cir.
2013).   When applying this standard, "[w]e must 'view facts in the light most
favorable to' the non-moving parties . . ., resolving all factual disputes and
reasonable inferences in their favor."  *Id.* (quoting *Tabor v. Hilti, Inc.,* 703 F.3d
1206, 1215 (10th Cir. 2013)).

"Although our review of the record is de novo, 'we conduct that review
from the perspective of the district court at the time it made its ruling, ordinarily
limiting our review to the materials adequately brought to the attention of the
district court by the parties.'"  *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223
(10th Cir. 2008) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th
Cir. 1998)).   "Summary judgment must be granted if 'there is no genuine dispute
as to any material fact' and the moving party is 'entitled to judgment as a matter
of law.'"  *Cillo*, 739 F.3d at 461 (quoting Fed. R. Civ. P. 56(a)); *see also Copelin-
Brown v. N.M. State Pers. Off.*, 399 F.3d 1248, 1253 (10th Cir. 2005) ("Summary

judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.").

"[O]nce the movant has made a showing that there is no genuine dispute of material fact, the non-moving party must 'make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *SEC v. Thompson*, 732 F.3d 1151, 1157 (10th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "For dispositive issues on which the [nonmovant] will bear the burden of proof at trial, [the nonmovant] must 'go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment.'" *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (third alteration in original) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) (quoting *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005)). "[T]he relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Bingaman v. Kan. City Power & Light Co.*, 1 F.3d 976, 980 (10th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

251–52 (1986)).  "To defeat a motion for summary judgment, [the nonmovant's] evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."  *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings."  *Id.* (quoting *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)); *accord Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004).

**B**

Appellants claim that the district court erred in granting summary judgment in the SEC's favor as to its statutory and regulatory claims—under § 10(b)(5), Rule 10b-5, and § 17(a)(2)—because there are genuine disputes of material fact regarding the six statements that the court found actionable.

**1**

To establish a violation under § 10(b) of the Exchange Act and Rule 10b-5, the SEC must establish that Appellants "made: (1) 'a misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, and (5) by [means of interstate commerce].'"  *SEC v. Smart*, 678 F.3d 850, 856–57 (10th Cir. 2012) (alteration in original) (quoting *SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008)).  "A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock."  *Grossman v. Novell, Inc.*, 120 F.3d

1112, 1119 (10th Cir. 1997); *accord In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667

F.3d 1331, 1339 (10th Cir. 2012).  Scienter is an "intent to deceive, manipulate,

or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  Section

17(a)(2) of the Securities Act "requires substantially similar proof with respect to

the offer or sale of securities." *Smart*, 678 F.3d at 857 (citing *Wolfson*, 539 F.3d

at 1256).  "The primary 'difference between § 17(a) and § 10(b) lies in the

element of scienter.'"[14] *Id.* (quoting *Wolfson*, 539 F.3d at 1256).  Section 10(b)

(as well as Rule 10b-5) requires that the SEC establish at least recklessness,

---

[14]  By its terms, § 17(a)(2) declares it unlawful "to obtain money or
property by means of any untrue statement of a material fact or any omission to
state a material fact necessary in order to make the statements made, in light of
the circumstances under which they were made, not misleading."  15 U.S.C.
§ 77q(a)(2).  The district court noted that this language about the receipt of
money or property presented "some question under Securities Act § 17(a)(2)
whether the SEC must prove reliance and injury on the part of some person who
acted on the misstatements or omissions." *Mahabub*, 343 F. Supp. 3d at 1042.  It
invited the parties to comment on this question.  And, though it noted that
Appellants said "nothing about this issue," the SEC did respond. *Id.* at 1043.
Concerning that response, the court said: "The SEC's arguments persuade the
Court that the statutory language does not demand reliance and injury on the part
of any purchaser, but only 'a causal link between the violator's deceptive
statements and receipt of money or property.'" *Id.* (quoting Aplts.' App., Vol. II,
at 390).  This purported causation element was the principal reason the court
singled out only one of the six statements for liability under § 17(a)(2). *See id.* at
1046.  We need not definitively opine, however, on whether the court was correct
in divining the existence of a causation element in a claim under § 17(a)(2).  As
we discuss *infra*, insofar as Appellants do make a § 17(a)(2) argument, it does not
implicate the ostensible causation element that the district court found to exist.
Accordingly, any such argument by Appellants is waived, and we need not
consider it further. *See, e.g.*, *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir.
2007) ("[W]e routinely have declined to consider arguments that are not raised, or
are inadequately presented, in an appellant's opening brief.").

whereas it need only demonstrate negligence to establish a violation of § 17(a)(2).

*See id.* "Fundamentally, both § 17(a) and § 10(b) are designed to protect

'investors from fraudulent practices.'" *Id.* (quoting *Wolfson*, 539 F.3d at 1257).

**2**

Appellants contend the six misstatements "were rendered immaterial by

surrounding circumstances, are not actionable under the bespeaks[-]caution

doctrine, are non-actionable statements of opinion, or were not

misrepresentation[s]" at all. Aplts.' Opening Br. at 16–17. In essence,

Appellants claim that Mr. Mahabub "reasonably believed GenAudio would reach

a deal with Apple." *Id.* at 17. And "[t]his belief was reasonable given the

extensive discussions and integration work [Mr.] Mahabub conducted with Apple

personnel." *Id.* "Thus," Appellants write, "many of the alleged

misrepresentations, which express optimism to actual and potential investors that

a deal with Apple would be completed, were not made with scienter or

negligence." *Id.* Appellants frame the six statements as, "in fact, representations

relaying [Mr.] Mahabub's objectively and subjectively reasonable beliefs, which

[are] neither fraudulent nor negligent." *Id.*

The SEC counters, claiming "there was no genuine dispute that

[Appellants] made material misrepresentations regarding GenAudio's relationship

with Apple, and made them with scienter." Aplee.'s Resp. Br. at 32–33.

According to the SEC, Appellants' "arguments to the contrary rely on [Mr.]

Mahabub's purported subjective belief that a deal with Apple would be accomplished at some point, which is insufficient to raise a genuine issue of fact as to the specific misrepresentations [Appellants] made to investors." *Id.* at 33.

We discuss the six statements at issue—in the context of Appellants' arguments—and consider whether there are any material factual disputes regarding those statements.  We conclude that there are no such disputes and that the district court properly entered judgment as a matter of law in favor of the SEC.

**3**

We first address the two statements in the March 10, 2010, email that the district court determined were fraudulent and, more specifically, made in violation of § 10(b)(5) and Rule 10b-5.

**a**

First, Appellants argue that the March 10 email to shareholders stating that GenAudio was "starting to discuss the business side with the LCEC," *see* Aplts.' App., Vol. V, at 1109, did not violate the securities laws because "a genuine dispute of material fact exists regarding whether this statement was made with scienter or negligence," Aplts.' Opening Br. at 21.  This is because, they say, "[u]nder the circumstances, it was reasonable for [Mr.] Mahabub to assert GenAudio was 'starting to discuss the business side with the LCEC.'" *Id.* at 22. In this connection, Appellants challenge the district court's finding of falsity

28

because Mr. Mahabub "had raised negotiating points with Apple regarding a potential transaction" by March 2010. *Id.* Appellants contend the district court ignored the fact that Mr. Mahabub indicated in his correspondence with Apple employees that "he still understood a deal would be reached in the next 3–6 months, and the vital fact [that] [Mr.] Mahabub's Apple contacts never told [Mr.] Mahabub his belief was unrealistic." *Id.* at 23 (emphasis omitted).

The SEC, on the other hand, asserts that the statement was "misleadingly false" because Mr. Mahabub "[told] shareholders that GenAudio was discussing the business side of things with Apple, when [Mr.] Mahabub knew that a predicate condition to that happening"—that is, the "exec buy-in" meeting—"had not yet occurred." Aplee.'s Resp. Br. at 40. And regarding scienter, the SEC states that, regardless of Mr. Mahabub's genuine belief that a deal with Apple would be reached in the next 3–6 months, "his subjective belief . . . cannot negate that he was at least reckless when he told investors that Apple was *already* discussing the business side of things with GenAudio, when in fact they were not and Apple had told [Mr.] Mahabub that that would not happen until there was buy-in on the product side." *Id.*

We conclude that Appellants' arguments lack merit. Regarding scienter, Appellants' attempt to frame the record facts in a manner that paints a rosy picture of Mr. Mahabub's personal understanding and unilateral discussions with Apple's employees fails to create a genuine dispute of material fact. We have

29

defined "recklessness" as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (quoting *Anixter v. Home–Stake Prod. Co.*, 77 F.3d 1215, 1232 (10th Cir. 1996)).  Like the district court, we conclude that Mr. Mahabub—given Mr. Hailey's December 16, 2009, e-mail—knew or exhibited recklessness regarding the fact that "[t]he business side of things would come into play *after* [Apple engineers obtained] exec buy-in on the product side."  Aplts.' App., Vol. IV, at 1058 (emphasis added).  At the very least, as the SEC argues, it must have been obvious to Mr. Mahabub that the "business side of things" had not commenced when he sent the March 10 email to GenAudio's shareholders indicating that the company was discussing business matters with Apple.

Crucially, there is nothing in the record suggesting that Mr. Mahabub had a factual basis for believing that the "exec buy-in on the product side" had occurred at the time he sent the March 10 email.  Indeed, approximately a mere *three months before* the March 10 email was sent, Mr. Mahabub had asked Mr. Hailey in an email if he had "any idea as to when the exec buy-in might take place."  *Id.*, Vol. IV, at 1057 (Mahabub Email, dated Dec. 22, 2009).  The record is unclear whether Mr. Hailey responded to that email.  However, at the very least, Mr. Mahabub's general and open-ended inquiry of Mr. Hailey bolsters the inference

that, around the time of the March 10 email, Mr. Mahabub had no knowledge that an "exec buy-in" meeting would occur in the near future—much less that it already had occurred.

Furthermore, as detailed *supra*, on January 5, 2010, in response to a separate email from Mr. Mahabub, Mr. Hailey wrote that Apple was "pretty serious about looking at audio quality *across the board* and this will take time—*definitely more than a couple of months*." *Id.* at 1068 (emphases added). Thus, in early January 2010, Mr. Hailey had communicated to Mr. Mahabub that Apple was conducting a comprehensive inquiry of a dimension of the product side—i.e., audio quality—that would certainly take more than two months. Absent contrary signals—and the record reveals none—this communication should have negated any reasonable belief Mr. Mahabub harbored, by the time he sent the March 10 email (a few months after the Hailey email) that the product-side work had been completed and "exec buy-in" had been achieved, such that GenAudio's dealings with Apple had progressed to the business side. Consequently, the district court rightly concluded that Mr. Mahabub acted with scienter; at the very least, he acted recklessly in making the March 10 representation at issue here.

The fact that Mr. Mahabub subjectively believed that the deal with Apple would happen in a few months because no one from Apple corrected him does not alter the calculus. The securities laws impose a personal obligation on corporate

31

executives, like Mr. Mahabub, to sufficiently ground their communications in facts. *See, e.g.*, *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188–89 (2015) ("[A reasonable investor] expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time."); *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018) ("[S]tatements of opinion or belief must rest on '*a factual basis that justifies them as accurate*, the absence of which renders them misleading.'" (alteration in original) (emphasis added) (quoting *Grossman*, 120 F.3d at 1123)).

Thus, no matter how heartfelt their subjective beliefs, corporate executives, like Mr. Mahabub, cannot make material representations to shareholders in disregard or contravention of obvious facts, nor can they find absolution in the failures of others to disabuse them of their magical thinking regarding obvious facts. *See Omnicare*, 575 U.S. at 188 ("Consider an unadorned statement of opinion about legal compliance: 'We believe our conduct is lawful.' If the issuer makes that statement without having consulted a lawyer, it could be misleadingly incomplete. In the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful legal inquiry—*rather than, say, on mere intuition, however sincere*." (emphasis added)); *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1094 (1991) (discussing potential liability stemming

32

from director's statement to minority shareholders that the $42 tender price of a stock was "high" and "fair" that "depended on whether provable facts about the Bank's assets, and about actual and potential levels of operation, substantiated a value that was above, below, or more or less at the $42 figure"); *see also Nakkhumpun v. Taylor*, 782 F.3d 1142, 1159 (10th Cir. 2015) ("An opinion is considered false if the speaker does not actually or *reasonably hold that opinion*." (emphasis added)), *cert. dismissed*, 577 U.S. 981 (2015).

Stated otherwise, no matter how Panglossian their view of the world, corporate executives, like Mr. Mahabub, cannot make material representations to their shareholders in blatant disregard of obvious facts and be excused by the failures of others to correct their false notions. And there can be no doubt that the district court correctly found that the March 10 statement at issue was false. Irrespective of the business overtures that Mr. Mahabub made to Apple's executives, they had made it crystal clear that no business negotiations would take place between GenAudio and Apple until *after* there was "exec buy-in," and the record provides no basis for a reasonable belief that such buy-in had occurred when Mr. Mahabub sent the email on March 10.

Accordingly, for the foregoing reasons, we reject Appellants' first challenge.

**b**

Second, Appellants contend that Mr. Mahabub's statement—found in the same March 10, 2010, email—that he "expect[ed] to have a very substantial license deal in place for [the LCEC's] Christmas Product Rollout," *see* Aplts.' App, Vol. V, at 1109, was a non-actionable statement of opinion.  The SEC counters that "even assuming this statement could be so characterized, as [Appellants] recognize, statements of opinion can be actionable if, among other things, they omit facts that show that [Appellants] 'lacked the basis for making those statements that a reasonable investor would expect.'"  Aplee.'s Resp. Br. at 41 (quoting *Omnicare*, 575 U.S. at 196).  And, here, the SEC states that Mr. Mahabub "omitted that he had no factual basis to make this statement regarding the specific timing of any license deal."  *Id.*

The SEC has the better of this dispute.  Statements of opinion are indeed actionable if the speaker omits material facts that make the statements misleading to would-be reasonable investors.  *See Omnicare*, 575 U.S. at 189–91.  In this instance, the SEC is correct: even if Mr. Mahabub's "Christmas product rollout" statement can be characterized as an opinion, Mr. Mahabub omitted certain information that resulted in the statement being misleading to a reasonable investor.  In particular, Mr. Mahabub omitted the key fact that he had fabricated the "Christmas product rollout" plan out of whole cloth and that the meeting with

34

Mr. Schiller where this supposed plan was discussed was a figment of his imagination.

Indeed, the undisputed facts show that GenAudio's discussions with Apple had not reached the point—by the time Mr. Mahabub sent the March 10 email, containing the "Christmas product rollout" statement—where Mr. Mahabub could have harbored any reasonable belief that any licensing deal was even on the table for discussion with Apple.  Indeed, Mr. Mahabub cites no portions of the record in his briefing (outside of his own statements) that even mention a "Christmas product rollout"—let alone reflect his discussions with Apple executives regarding one.  To be sure, Appellants make much of GenAudio's purported "fifteen in-person meetings" and "extensive discussions, including many phone calls, and hundreds upon hundreds, if not thousands of emails regarding GenAudio's technology."  Aplts.' Opening Br. at 25.  But this line of argument actually works against Appellants: given this purported heavy volume of communications—much of it allegedly documented—between GenAudio and Apple, if Apple were even remotely considering a Christmas product rollout and related license agreement with GenAudio, logic strongly suggests that there would be some reference, however slight, to these matters in the record.  Yet Appellants cannot direct us to any such reference.

Given all of this, we cannot help but conclude that any fanciful belief that may have led Mr. Mahabub to send the email regarding the purported Christmas

product rollout did not "fairly align[] with the information" in his "possession at the time," and his words—whether expressing an opinion or not—provide the foundation for liability under the securities laws. *Omnicare*, 575 U.S. at 189.

Appellants' related challenge to the district court's falsity and scienter findings regarding the "Christmas product rollout" statement perforce suffers a like fate. Appellants once again rely on Mr. Mahabub's own "subjective belief" that a deal would be reached in time for a Christmas rollout. Aplts.' Opening Br. at 26. They argue that, because Apple employees never told Mr. Mahabub that this optimism was misguided or unreasonable, he is not accountable for his mistaken belief. However, as we have indicated *supra*, this sort of argument is not countenanced by the securities laws. Neither the failure of Mr. Mahabub to remove his rose-colored glasses when confronted with obvious facts painting a bleaker picture of the state of GenAudio's interactions with Apple, nor any failure by Apple to disabuse him of his fanciful subjective notions can absolve Mr. Mahabub and GenAudio of liability. The "Christmas product rollout" statement at issue here was false—indeed, fabricated. And, at a minimum, Mr. Mahabub—the acknowledged fabricator of the statement—acted with recklessness in communicating it.[15]

---

[15]     Appellants fall back on the assertion that the two statements from the March 10 email—read "as a whole"—show Mr. Mahabub "reasonably believed a deal with Apple was close at hand." Aplts.' Opening Br. at 26–27. However, like the SEC, we reject this assertion out of hand. Such that it was, Mr. Mahabub's

(continued...)

36

* * *

In sum, as to the two statements that the district court identified in the March 10 email, we reject Appellants' contentions of district-court error.

**4**

Appellants next challenge the district court's findings of liability under § 10(b)(5) and Rule 10b-5 as to Mr. Mahabub's March 15, 2010, cover letter accompanying the 2010 Offering materials. The cover letter stated that the 2010 Offering was "being conducted to provide bridge capital until we can 'ink' a deal with . . . [LCEC, i.e., Apple]." *See* Aplts.' App., Vol. V, at 1120. Appellants attack the district court's ruling in three principal ways. Specifically, they argue that the statement in the cover letter was: (1) actually accurate in light of Mr. Tiscareno's testimony; (2) non-actionable under the bespeaks-caution doctrine; and (3) a non-actionable statement of corporate optimism.

The SEC retorts that, rather than deeming the cover letter's statement accurate, Mr. Tiscareno's testimony actually shows that the cover letter's statement contained opinions that were not grounded in any facts that were within Mr. Tiscareno's knowledge. As for Appellants' invocation of the bespeaks-caution and corporate-optimism theories, the SEC succinctly explains that

_____

[15](...continued)
belief in this regard was hardly reasonable; it was entirely one-sided and lacking in any factual foundation. Therefore, at the very least, Mr. Mahabub acted recklessly in fabricating and then communicating information regarding the purported imminent deal with Apple to GenAudio's investors.

37

"[n]either concept applies to this statement."  Aplee.'s Resp. Br. at 43.  The agency further reasons as follows: "Rather than being a forward-looking statement or a vague statement of loose optimism, there is no genuine dispute that this statement specifically conveys to the investor the (false) fact that a deal with Apple was *at that present time* sufficiently close that any money raised would be a short-term 'bridge' until such a deal can be 'ink[ed].'"  *Id.* (alteration in original) (quoting Aplts.' App., Vol. V, at 1120).

Once again, we conclude that Appellants' arguments are unavailing.  As we further detail *infra*, we agree with the district court's and the SEC's conclusion that the March 15 statement was intended to (falsely) communicate that a deal between GenAudio and Apple was imminent and that the 2010 Offering was needed to provide GenAudio with capital during the reasonably short period necessary to close the deal with Apple.  As a consequence, Mr. Tiscareno's testimony actually undercuts Appellants' contention that the cover letter's statement was not false—rather than helping them.  When shown that statement for the first time, Mr. Tiscareno was asked the following question: "Is there anything else, looking at this, that you find inaccurate?"  Aplts.' App., Vol. VI, at 1599 (Victor Tiscareno Dep. Tr., dated Dec. 16, 2016).  Mr. Tiscareno responded, "Oh.  No. . . . I mean, . . . I can think of opinions that you didn't ask about.  But it's *just opinions* that the document—that I've never read before, really."  *Id.*

38

(emphasis added). However, Appellants' analysis of this statement effectively stops at the word "No" and fails to read Mr. Tiscareno's testimony in context.

As Appellants reason, Mr. "Tiscareno agreed under oath there was *nothing inaccurate* about this statement in the March 15, 2010 cover letter." Aplts.' Opening Br. at 30. However, this interpretation of Mr. Tiscareno's testimony—when viewed in context—is untenable. The most natural reading of Mr. Tiscareno's testimony is that he never before encountered the substance of the cover letter's statement and considered the statement as simply expressing Mr. Mahabub's opinion. This reading of his testimony supports the district court's finding that the statement was false. In particular, that is so because, by Appellants' own account, "[Mr.] Tiscareno was GenAudio's primary contact at Apple . . . and thus was very knowledgeable regarding GenAudio's relationship with Apple." *Id.* It stands to reason, therefore, that if anyone would have been in a position to know of the existence of an imminent deal between GenAudio and Apple and to communicate that information to Mr. Mahabub, it would have been Mr. Tiscareno. Yet it is patent from his testimony that Mr. Tiscareno knew of no such deal and necessarily, therefore, made no such communication to Mr. Mahabub. In short, far from the inference Appellants hope to draw from it, Mr. Tiscareno's testimony strongly indicates that there would have been no factual foundation to Mr. Mahabub's message that a deal between GenAudio and Apple

was imminent.  Accordingly, the district court properly found that this cover letter statement was false.

In attempting to reimagine the statement's import, Appellants rely on the corporate-optimism doctrine.  But this reliance is misplaced.  "Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification."  *Grossman*, 120 F.3d at 1119.  Thus, "[v]ague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions."  *Id.* (collecting cases); *see also SEC v. Nacchio*, 438 F. Supp. 2d 1266, 1281 (D. Colo. 2006) ("It is true that vague statements of corporate optimism are not materially misleading, as 'reasonable investors do not rely on them in making investment decisions.'" (quoting *Grossman*, 120 F.3d at 1119)).

In particular, Appellants contend that "[t]he statement about 'inking' a deal does nothing more than express GenAudio's optimism such a deal might transpire at some unknown time in the future.  The statement does not even provide a timeframe for that deal to happen."  Aplts.' Opening Br. at 33.  Thus, Appellants attempt to persuade us that the statement "is a classic example of the type of vague statement of corporate optimism that is non-actionable."  *Id.* (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996)).

40

We disagree.  The statement's use of the term "bridge capital" is
significant.  As Appellants themselves define it, the term "bridge capital" "is a
commonly used corporate term that describes temporary funding a company needs
to cover its operating expenses *until* some permanent source of funding can be
secured in the future."  *Id.* (emphasis added).  Because, even under this definition,
the term conveys that funding is being sought only to serve a temporary stopgap
purpose, this seems to necessarily connote that there is a realistic expectation that
permanent funding will be secured in the reasonably near future—not, as
Appellants suggest, at some hoped-for, nebulous "unknown time in the future."
*Id.*; *cf., e.g.*, *Bridge Loan*, AMERICAN HERITAGE DICTIONARY (3d ed. 1992) ("A
short-term loan intended to prove or extend financing until a more permanent
arrangement is made."); *Loan*, BLACK'S LAW DICTIONARY (11th ed. 2019)
(defining "bridge loan" as "[a] short-term loan that is used to cover costs until
more permanent financing is arranged or to cover a portion of costs that are
expected to be covered by an imminent sale," which is also "[a]lso termed *bridge
financing*").  We think that a reasonable investor would draw this meaning from
the use of the term.

Moreover, the term would very likely indicate to a reasonable investor that
the business owner had more than a hope and a prayer that, during this short
temporal window, a source of permanent funding would materialize.  Stated
otherwise, it seems implausible that a reasonable investor would interpret the

cover letter's statement, including the term "bridge capital," to mean, as Appellants contend, that the company's CEO merely harbored the subjective hope that "a deal" to provide a permanent source of funding "might transpire." Aplts.' Opening Br. at 33; *see, e.g.*, *Omnicare*, 575 U.S. at 188–89. That would make little commercial sense.

Thus, even accepting Appellants' definition of the term "bridge capital," its use in the cover letter's statement is not, in our view, compatible with Appellants' suggestion that the statement effectively amounts to little more than Mr. Mahabub's optimistic daydreaming about a business venture between GenAudio and Apple that might take place at some unknown future time. The term conveys something more definite both in terms of the occurrence of the contemplated permanent funding—here, supposedly through a signed deal with Apple—and the timeline for its occurrence, i.e., a short one. The cover letter's statement did not need to spell out a certain end date for a reasonable investor to understand that a definite deal was at least contemplated and that there was a reasonable expectation (even though not a guarantee) that the deal would come to fruition in the short term.

We conclude that Mr. Mahabub either knew that a reasonable investor would attach such a definite meaning to the cover letter's statement or was reckless regarding the risk that a reasonable investor would do so. And because no such deal between GenAudio and Apple was imminent, nor a factual basis for

42

any expectation that it was imminent, we are hard pressed to find fault with the SEC's conclusion that "this [cover letter] statement specifically conveys to the investor the *(false) fact* that a deal with Apple was *at that present time* sufficiently close that any money raised would be a short-term 'bridge' until such a deal can be 'ink[ed].'"  Aplee.'s Resp. Br. at 43 (second alteration in original) (first emphasis added) (quoting Aplts.' App., Vol. V, at 1120).

Likewise, we conclude that Appellants' reliance on the bespeaks-caution doctrine is unfounded.  Forward-looking statements are considered immaterial when the defendant has provided "sufficiently specific risk disclosures or other cautionary statements . . . to nullify any potentially misleading effect." *Grossman*, 120 F.3d at 1120.  In assessing whether a statement is not actionable under this doctrine, we look for evidence of "general, forward looking projections dealing with subjects that *were dealt with in much greater detail in the cautionary sections* of the registration statement and amendments thereto." *Id.* at 1122 (emphasis added).  The "relevant inquiry concerns the total mix of information available to the market at the time of the allegedly fraudulent statements." *Id.* (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 246 (1988)).

Overall, "the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." *Id.* at 1120 (omission in original) (quoting *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 371 (3d Cir. 1993)); *see In re*

*Prudential Sec. Inc. Ltd. P'ships Litig. ("In re Prudential")*, 930 F. Supp. 68, 72

(S.D.N.Y. 1996) ("Cautionary language cited to justify application of the doctrine

must precisely address the substance of the specific statement or omission that is

challenged.").  Furthermore, as Appellants themselves acknowledge, "cautionary

language does not protect material misrepresentations or omissions when

defendants knew they were false when made."  *In re Prudential*, 930 F. Supp. at

72; *accord* Aplts.' Opening Br. at 31.

Here, Appellants contend that the cover letter's "statement was

forward-looking in that [Mr.] Mahabub was conveying the need for additional

capital until GenAudio hopefully inked a deal with Apple at some undetermined

time in the future."  Aplts.' Opening Br. at 31 (emphasis omitted).  And they

further contend that this statement was "accompanied by the PPM, which

contained an extensive discussion of the various risks associated with GenAudio's

forward-looking statements" and that this discussion "included a specific warning

that *no transaction had been consummated* with the LCEC and there was *no*

*guarantee* any such deal would be consummated in the future."  *Id.* at 31–32

(citing Aplts.' App., Vol. VIII, at 1766, 1782, 1800 (PPM, dated Mar. 15, 2010)).

However, we are not persuaded by Appellants' line of argument.  For

starters, for the reasons outlined *supra*, we reject out of hand Appellants'

characterization of the cover letter's statement as communicating "the need for

additional capital until GenAudio *hopefully* inked a deal with Apple at *some*

*undetermined time in the future*." *Id.* at 31 (emphases added).  Briefly stated, the cover letter's statement was more definite than Appellants suggest, both in terms of the occurrence of the contemplated permanent funding—here, supposedly through a signed deal with Apple—and the timeline for its occurrence, i.e., a short one.  Borrowing from the language of a case that Appellants themselves rely on, *Phillip Morris*, GenAudio's cover letter's statement had the potential to "misle[a]d a reasonable investor to believe" that GenAudio was reasonably close to "inking" a deal with Apple and needed some money to fund its operations during the reasonably short interim period.  75 F.3d at 811.[16]

Moreover, even accepting Appellants' characterization of the statement as forward-looking and putting aside the significant likelihood that the cover letter's statement was knowingly false—and thus outside the protection of the bespeaks-caution doctrine, *see In re Prudential*, 930 F. Supp. at 72—there is nothing in the three pages of the record that Appellants point to that could arguably be viewed as negating—through detailed and specific disclosures—the misleading effect of the cover letter's statement.

---

[16]   Far from helping Appellants, *Phillip Morris* works against them and bolsters our reasoning.  In *Philip Morris*, the Second Circuit held that "general announcements by Philip Morris that it was 'optimistic' about its earnings and 'expected' Marlboro to perform well," were mere "puffery" that "cannot have misled a reasonable investor to believe that the company had irrevocably committed itself to one particular strategy, and cannot constitute actionable statements under the securities laws."  75 F.3d at 811.  These statements stand in stark contrast to those at issue here.

One of three pages, titled "Forward Looking Statements," applied generically to all of the PPM's statements and related documents, *see* Aplts.' App., Vol. VIII, 1766 (capitalization omitted), and, thus, it did not serve to negate in a detailed and *specific* manner the misleading effect of the cover letter's statement.  Furthermore, supposedly because of its purported confidentiality obligations under the NDA with the LCEC (i.e., Apple), GenAudio did not offer in the remaining two pages anything more than very limited references to its interactions with Apple; it certainly did not provide a specific and detailed update on the status of its communications with Apple that might work to counteract the misleading effect of the cover letter's statement.  *See, e.g.*, *id.*, Vol. X, at 2150 (SEC Reply Br. in Support of Rev. Mot. of Summ. J., filed Apr. 20, 2018) (noting that GenAudio's "documents failed to make any specific disclosures informing investors as to the actual status of GenAudio's dealings with Apple, including the complete absence of negotiations with Apple regarding any licensing or acquisition transactions").

True, Appellants do highlight a few stray sentences on these pages pointing to the fact that no deal with Apple was guaranteed.  *See id.*, Vol. VIII, at 1800 (stating that "there is no guaranty or assurance that any actual transactions will occur").  However, this hardly would negate—as a logical and commercially practical matter—the misleading import of the cover letter's statement that a deal

with Apple was *imminent*.  Thus, we conclude that Appellants' reliance on the bespeaks-caution doctrine is misguided.

In sum, we reject Appellants' challenge related to the March 15 cover letter statement.

**5**

Appellants straightforwardly challenge the district court's determination that they violated § 10(b) and Rule 10b-5 in sending the April 30, 2010, email. Discerning no merit in this challenge, we reject it.  Appellants also make an oblique and indirect attack on the court's determination of § 17(a) liability as to the April 30 email; we discuss and summarily reject it.

**a**

Appellants contend that the district court got it wrong when it found that they committed violations of § 10(b) and Rule 10b-5 by sending Mr. Mahabub's April 30, 2010, email to an investor stating that Apple was "looking to acquire GenAudio's tech for integration into their entire lineup of product offerings . . . and we are now waiting [for the time] when we will initiate negotiations, pending the CEO['s] [approval of] the integrated product rollout strategy and the technical implementation strategy that will be presented to the CEO next week!!!"  Aplts.' App., Vol. V, at 1239.  The district court found that Mr. "Mahabub had no reasonable basis to claim that the upcoming meeting would encompass an

47

'integrated product rollout strategy and [a] technical implementation strategy.'"

*Mahabub*, 343 F. Supp. 3d at 1044.

Appellants now claim that the statement was not made with scienter or even negligence because Mr. Mahabub "believed the exec buy-in meeting involved such [technical] implementation issues" and he "never guaranteed to the recipient of this April 30 email that a deal with Apple would take place." Aplts.' Opening Br. at 34. In response, the SEC notes that "[a]ll [Appellants] point to in support of this contention is [Mr.] Mahabub's own subjective belief that the meeting at issue would discuss 'such implementation issues,' a subjective belief that simply did not comport with reality." Aplee.'s Resp. Br. at 44 (citation omitted). The SEC is correct.

Specifically, before April 30, 2010, Mr. Mahabub had no reasonable basis in fact to believe that any of the representations at issue—that he made in the April 30 email—squared with reality. Stated differently, Mr. Mahabub's April 30 representations to the investor were so lacking in real-world substance that, as the district court wrote, "[h]e could not have reasonably failed to perceive that he was simply making things up as he wrote the relevant documents." *Mahabub*, 343 F. Supp. 3d at 1046. The fact that Mr. Mahabub may have truly believed that the "exec buy-in" meeting—which took place on May 5, 2010—would be the start of real, business negotiations, or that such a meeting would include talk about business strategies is beside the point. As we have stated *supra*, irrespective of

48

how Panglossian or rosy Mr. Mahabub's subjective view was of the state of
negotiations with Apple, he did not have license under the securities laws to make
material representations to investors that had no foothold in reality.

At the time of his April 30 email, Mr. Mahabub had received absolutely no
confirmation from his Apple contacts that his beliefs were true: that is, no
confirmation that in the near future (much less the following week) there would
be a presentation to Apple's CEO of an integrated product-rollout strategy
regarding GenAudio's technology and also regarding a related technical-
implementation strategy.  Indeed, Mr. Hailey—less than five months before, on
December 16, 2009—had explained to Mr. Mahabub that "[t]he business side of
things would come into play *after* we have exec buy-in on the product side."
Aplts.' App., Vol. IV, at 1058 (emphasis added).  And it is clear from our
consideration of the record that Mr. Mahabub had no factual basis for believing
that the "exec buy-in on the product side" had occurred at the time that he sent
the April 30 email discussing the "business side of things."  *Id.*

In other words, the "exec buy-in" condition precedent for discussing
business matters with Apple—such as the integrated product-rollout strategy that
Mr. Mahabub mentioned in his April 30 email—had not been satisfied, and Mr.
Mahabub had no factual basis for believing that it had been.  Furthermore, as we
have previously suggested, even if Apple failed to disabuse Mr. Mahabub of his
fanciful beliefs regarding the status of GenAudio's negotiations with Apple, that

49

would not relieve him of his personal duty under the securities laws not to falsely or recklessly make material representations devoid of any factual basis to investors.

Mr. Mahabub's correspondence with Apple on May 5, 2010—the day of the "exec buy-in" meeting—further undercuts Appellants' challenge by attesting to the still-incipient stage of GenAudio's business interactions with Apple around the time (indeed after) he sent the April 30 email to the prospective investor. As outlined earlier, in the May 5 email, Mr. Mahabub offered to travel to Apple's headquarters to assist his Apple contacts, like Mr. Tiscareno, in explaining GenAudio's technology during the meeting. Mr. Tiscareno's response is telling in shedding light on the early stage of GenAudio's dealings with Apple. Specifically, Mr. Tiscareno stated that he and Mr. Hailey were "pitching [GenAudio's technology] as a *concept*" to Apple executives and, if those executives agreed that the "concept" was a "*great idea*" then there would be further questions from Apple. *Id.*, Vol. V, at 1222 (emphases added).

In other words, far from discussing business details related to a product-rollout or technical-implementation strategy for GenAudio's technology—as Mr. Mahabub indicated in his April 30 email to the investor—Apple's "exec buy-in" meeting was intended by Mr. Tiscareno to address first principles, such as whether the "idea" or "concept" that GenAudio's technology illustrated was a "great" one. *Id.* And there is no indication in the record that Mr. Tiscareno or

GenAudio's other contacts at Apple had ever previously told Mr. Mahabub anything to the contrary.  Thus, Mr. Tiscareno's response paints a picture of the incipient nature of GenAudio's business dealings with Apple around the time (indeed after) Mr. Mahabub sent his April 30 email—a picture that is at odds with the one the April 30 email reflected, with its talk of business matters like a product rollout strategy.

Thus, in light of the foregoing, we have little difficulty concurring with the district court's assessment: Mr. Mahabub "could not have reasonably failed to perceive that he was simply making things up as he wrote" the April 30 email. *Mahabub*, 343 F. Supp. 3d at 1046.  Notwithstanding any contrary subjective beliefs that Mr. Mahabub may have harbored, we conclude that he acted at least recklessly (if not knowingly) in violation of the proscriptions of § 10(b) and Rule 10b-5 when he made the at-issue representations in the April 30 email.

**b**

As noted, the district court determined in only one instance—as to the April 30 email—that Appellants also violated § 17(a)(2) of the Securities Act. Appellants specifically mention § 17(a)(2) in the Table of Contents and Statement of the Issues portions of their Opening Brief (though they are silent about this statutory violation in their Reply Brief).  *See* Aplts.' Opening Br. at i (Table of Contents) ("District Court's determination Defendants were liable under Section 17(a) and 10b-5 was defective because genuine issues of material fact exist."); *id.*

at 1 (Statement of the Issues) ("Whether the district court erred by concluding Appellants were liable for . . . one misrepresentation pursuant to 15 U.S.C. § 77q(a)(2) . . . ."). However, we cannot discern from Appellants' briefing any argument concerning the court's liability determination under § 17(a)(2) as to the April 30 email that is distinct from their arguments attacking the court's finding of liability under § 10(b) and Rule 10b-5 as to the same email. *See supra* note 14. Appellants thus challenge the mental-state element of the court's § 17(a)(2) liability finding—as they did regarding the court's liability finding as to § 10(b) and Rule 10b-5. As such, we summarily reject Appellants' argument.

Recall that, unlike violations of § 10(b) and Rule 10b-5, which require the SEC to establish scienter or recklessness, a violation of § 17(a)(2) merely requires a showing of negligence. *See, e.g.*, *Smart*, 678 F.3d at 856–57. Thus, because we already have determined that Mr. Mahabub was at least reckless in sending the April 30 email, his mental state necessarily was sufficient for the imposition of § 17(a)(2) liability (where only negligence must be shown) for the same email. *Cf.* Aplee.'s Resp. Br. at 39 n.9 ("Because there is no dispute that defendants acted with scienter, they necessarily acted with at least negligence as required for the violation of Section 17(a)(2) the district court found as a matter of law with respect to the April 30, 2010 statement."). Accordingly, Appellants'§ 17(a)(2) argument fails.

**6**

Appellants next challenge the district court's § 10(b) and Rule 10b-5 liability determination concerning Mr. Mahabub's August 1, 2010, investor letter claiming that Mr. Jobs had requested "a 'hand-shake' meeting" with Mr. Mahabub "[i]n the very near future," Aplts.' App., Vol. V, at 1313—a representation that the district court described as a "blatant lie," *Mahabub*, 343 F. Supp. 3d at 1044. Appellants contend that this statement was not material because "a reasonable investor would not care about [Mr.] Mahabub's in-person interactions with Steve Jobs." Aplts.' Opening Br. at 40. They reason that "all a reasonable investor would care about was" the following: that Apple's CEO "Jobs himself had green-lighted the project" in the May 6 exec buy-in meeting; and that this was the "'final milestone' to be reached before a deal with Apple to acquire GenAudio's technology." *Id.* (quoting Aplts.' App., Vol. VI, at 1597). And Mr. Mahabub "reasonably believed" all of this was true. *Id.* at 39–40.

For its part, the SEC declares that "[i]t is beyond dispute that a reasonable investor would have wanted to know that no such meeting (in 'the very near future' or otherwise) had ever been requested and that [Mr.] Mahabub was simply making up the nature of his contacts with Apple's senior management." Aplee.'s Resp. Br. at 45 (citing *SEC v. Texas Gulf Sulphur Co. ("Texas Gulf")*, 401 F.2d 833, 849 (2d Cir. 1968)). Indeed, the district court summarily rebuffed a like

argument by Appellants regarding the August 1 statement, labeling their argument
"frankly laughable." *Mahabub*, 343 F. Supp. 3d at 1045 n.14.

The SEC has the better of this dispute. We are hard pressed to understand
why it would not have been material to a reasonable investor that the CEO of the
company that GenAudio was negotiating with regarding the use of its technology
affirmatively requested a hand-shake meeting in "the very near future" with
GenAudio's CEO, Mr. Mahabub. That is so because, if Steve Jobs (then-CEO of
Apple) actually had made this request, this fact almost certainly would have had a
significant effect on a reasonable investor's assessment of the likelihood that
GenAudio would strike a deal with Apple and perhaps also regarding the timing
of any such deal, given that Mr. Jobs supposedly wanted the hand-shake meeting
to take place in "the very near future."

And that effect on a reasonable investor's assessment—it seems hard to
dispute—would have been favorable to GenAudio and, more specifically,
enhanced the appeal of its stock. *See Texas Gulf*, 401 F.2d at 849 ("Material facts
include not only information disclosing the earnings and distributions of a
company but also those facts which affect the probable future of the company and
those which may affect the desire of investors to buy, sell, or hold the company's
securities."); *see also Grossman*, 120 F.3d at 1119 ("A statement or omission is
only material if a reasonable investor would consider it important in determining
whether to buy or sell stock."); *Texas Gulf*, 401 F.2d at 849 (noting that the

concept of materiality "encompasses" those facts that might affect a stock's value, when reasonably and objectively considered by an investor (quoting *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir. 1965)). Appellants have cited no authority that would lead us to question this reasoning.

Moreover, Appellants' more specific contentions also are unpersuasive. The fact that a reasonable investor would have deemed it material that Apple's then-CEO, Mr. Jobs, (ostensibly) "gave the green light to proceed with GenAudio, and that this green light was the 'final milestone' to be reached before a deal with Apple to acquire GenAudio's technology," Aplts.' Opening Br. at 40 (quoting Aplts.' App., Vol. VI, at 1597), would not necessarily render all other facts concerning a prospective deal between GenAudio and Apple immaterial. Logic and common sense validate this. In particular, news of Mr. Jobs's (ostensible) request for a hand-shake meeting with Mr. Mahabub still could have been important to a reasonable investor because the request reasonably could have been interpreted as an indicator of Mr. Jobs's level of purported enthusiasm about GenAudio's technology and his respect for GenAudio's CEO, Mr. Mahabub.

But the reality is that this is hardly a circumstance—such as Appellants conceive—where a reasonable investor would have had the opportunity to consider accurate information concerning the green-light scenario—involving Mr. Jobs's checking the final box in the May 6 meeting—side-by-side with information concerning the hand-shake request and to weigh the relative

importance of the two matters.  The green-light scenario was chimerical—the
product of Mr. Mahabub's imagination and nothing more.  There was no basis in
fact for Mr. Mahabub to reasonably believe in the truth of that scenario.  *See*
Aplts.' App., Vol. V, at 1222 (Tiscareno email to Mr. Mahabub) ("Michael
[Hailey] and I are pitching [in the May 6 meeting] this *as a concept*, and our
proof of concept is what you developed for us. . . .  Once we get the go ahead that
this is a great *idea*. . . .  Then we sort of start over internally. . . .  We have to get
to *first base*[.]" (emphases added)); *see also id.*, Vol. VI, at 1597 (Tiscareno
describing the plan for the May 6 meeting in his deposition, noting that Mr.
Hailey "worked hard[] [to] put together a presentation" regarding "why we think
this kind of product—*it didn't have to be GenAudio* . . . this *idea* would benefit
iPod or iPhone" (emphasis added)).

Lastly, whether Mr. Mahabub reasonably believed that Mr. Jobs would be
present at that meeting is of no consequence.  Even if we "assume," as the district
court did, that Mr. Mahabub had a reasonable misunderstanding concerning
whether Mr. Jobs would be present at the meeting, *Mahabub*, 343 F. Supp. 3d at
1044; *see supra* note 3, that misunderstanding would not alter the truth that the
green-light scenario was fanciful at best.  We cannot seriously quarrel with the
district court's view that the August 1 statement was tantamount to a "blatant lie,"
*id.*; at the very least, Mr. Mahabub made the statement in reckless disregard of the
relevant facts.

In sum, for the foregoing reasons, we reject Appellants' challenge to the district court's finding of liability as to the August 1 statement.

7

Finally, Appellants challenge the district court's liability finding under § 10(b) and Rule 10b-5 regarding Mr. Mahabub's March 29, 2011, email to shareholders that certain new agreements would completely prohibit him from mentioning the LCEC in future correspondence, including in the upcoming 2011 Offering.[17]  Staying true to their pattern of arguments, Appellants again rely on Mr. Mahabub's supposedly reasonable belief that Apple's request for further agreements meant those new agreements would be more restrictive.  According to Appellants, Mr. Mahabub's belief was reasonable because Appellants "had already signed Apple's standard non-disclosure agreement," and "GenAudio had discussed signing additional (presumably more restrictive) NDAs with Apple on *several other prior occasions*."  Aplts.' Opening Br. at 41.  Accordingly, Appellants conclude, "Apple's request" that Mr. Mahabub sign a "new set" of agreements "created the reasonable implication" that "interest" in AstoundSound "was increasing to such a degree new agreements needed to be entered into."  *Id.*

---

[17]     As explained earlier, this March 29, 2011, email was sent after Mr. Mahabub asked for broken-down iMacs from Apple, with Apple requiring him to first sign certain evaluation agreements before he could receive them.  No evidence in the record indicates that Mr. Mahabub sought details on the nature of the evaluation agreements.

The SEC responds that, "even assuming (with no basis in fact to do so) that it was reasonable to assume the agreements would be more restrictive, that still provides no basis for [Mr.] Mahabub's statement that they would be so restrictive as to prohibit even the mention in correspondence of Apple's name."  Aplee.'s Resp. Br. at 46.  The SEC avers that Appellants' "[f]anciful speculation" is not enough to overcome summary judgment.  *Id.*

As with our consideration of Appellants' other challenges, we conclude that the substance of the SEC's line of argument here is more persuasive.  As we have now repeatedly said, in so many words, it is not enough that Mr. Mahabub "believes [his own] opinion (however irrationally)."  *Omnicare,* 575 U.S. at 189.  Mr. Mahabub's statements also must "fairly align[] with the information in [his] possession at the time."  *Id.*  And, at the time of the March 29, 2011, email, Mr. Mahabub knew that the evaluation agreements he needed to sign pertained to the broken-down iMacs he himself requested from Apple.  He thus knew—or was reckless in disregarding the fact—that without his own request for the broken-down iMacs, those evaluation agreements would never have been on the table. He further knew—or was reckless in disregarding the fact—that there were no signs in the prior interactions between GenAudio and Apple that would have permitted one to reasonably conclude that Apple's condition that the agreements be executed implied that Apple's interest in GenAudio's technology was increasing and, more specifically, that the negotiations between the two

companies had progressed so far that even the name LCEC (i.e., Apple) could not be uttered.

Even if Mr. Mahabub genuinely held a subjective belief that there was such a nexus between Apple's request for the signed evaluation agreements and Apple's ostensibly increasing interest in GenAudio's technology, the securities laws would not countenance his sending the March 2011 email.  The district court correctly suggested the likely state of affairs: as Mr. Mahabub well knew (or at least recklessly disregarded), the natural effect of the email was to "tease[] shareholders" about forward progress in GenAudio's business negotiations with Apple, *Mahabub*, 343 F. Supp. 3d at 1044—which a reasonable investor would have deemed to be material information.

\* \* \*

In sum, based on the foregoing, we conclude that Appellants' substantive challenges to the district court's determination that the six statements at issue violated the securities laws are without merit.

## 8

Before closing the book on our consideration of these six statements, however, we are obliged to acknowledge Appellants' view that, for procedural reasons, the district court was wrong to consider certain statements in assessing their liability for securities-law violations.  Specifically, Appellants point to the March 10 email, and the two statements therein, and claim that "the SEC should

not have been permitted to rely on this alleged misrepresentation because it was
not disclosed during discovery." Aplts.' Opening Br. at 21; Aplts.' Reply Br. at
3–6. Citing Federal Rule of Civil Procedure 26(e),[18] Appellants argue that a party
"who has responded to an interrogatory . . . must supplement or correct its
disclosure or response in a timely manner if the party learns that in some material
respect the disclosure or response is incomplete or incorrect." Aplts.' Opening
Br. at 21 (omission in original) (quoting FED. R. CIV. P. 26(e)). And upon failure
to provide the requisite information, "the party is not allowed to use that

---

[18]    Rule 26(e) provides:

(1) ***In General***. A party who has made a disclosure under Rule
26(a)—or who has responded to an interrogatory, request for
production, or request for admission—must supplement or correct
its disclosure or response:

(A) in a timely manner if the party learns that in some
material respect the disclosure or response is incomplete or
incorrect, and if the additional or corrective information has not
otherwise been made known to the other parties during the
discovery process or in writing; or

(B) as ordered by the court.

(2) ***Expert Witness***. For an expert whose report must be
disclosed under Rule 26(a)(2)(B), the party's duty to supplement
extends both to information included in the report and to
information given during the expert's deposition. Any additions
or changes to this information must be disclosed by the time the
party's pretrial disclosures under Rule 26(a)(3) are due.

FED. R. CIV. P. 26(e) (indentations altered).

information 'to supply evidence on a motion.'" *Id.* (quoting FED. R. CIV. P. 37(c)(1)).[19]

Appellants claim that these procedural rules apply here and should have barred the SEC's reliance on the representations of the March 10 email because "[t]he first time the SEC relied on this alleged misrepresentation was in its revised motion for summary judgment, *long after the close of discovery*." Aplts.' Opening Br. at 21. Responding, the SEC writes that "[s]ince [Appellants] were able to address this misstatement fully at summary judgment, they fail to articulate any prejudice." Aplee.'s Resp. Br. at 39 n.11.

The parties do not explicitly propose a standard of review suitable for Appellants' discovery-related argument. Without adversarial testing, we are reluctant to definitively opine on the matter. Thus, we assume without deciding that the appropriate standard of review is abuse of discretion. In this regard, "[i]t is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment." *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998) (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995)). And "[a] trial court's

---

[19]     Rule 37(c)(1) states, in relevant part, that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

evidentiary rulings" are reviewed for abuse of discretion. *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1047 (10th Cir. 1993); *see Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005) (noting that "[w]e review a district court's ruling on the admissibility of evidence for an abuse of discretion"); *accord Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 578 (7th Cir. 2015) ("We review only for abuse of discretion a district court's ruling on the admissibility of evidence on summary judgment."); *cf. L. Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009) (noting that we "review a district court's *refusal to consider* evidence at the summary judgment stage for abuse of discretion" (emphasis added)); *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 894 (10th Cir. 1997) ("Like other evidentiary rulings, we review a district court's decision to exclude evidence at the summary judgment stage for abuse of discretion.").

A court abuses its discretion when the ruling is "arbitrary, capricious, whimsical, or manifestly unreasonable." *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 777 (10th Cir. 1999) (quoting *FDIC v. Oldenburg*, 34 F.3d 1529, 1555 (10th Cir. 1994)). Further, "[a]n abuse of discretion occurs where a decision is premised on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018) (quoting *N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1245 (10th Cir. 2017)), *cert. denied*, 139 S. Ct. (2018).

However, our review would not end with a determination that the court
abused its discretion.  Under Rule 61 of the Federal Rules of Civil Procedure,
"the court must disregard all errors and defects that do not affect any party's
substantial rights."  FED. R. CIV. P. 61; *see Bridges v. Wilson*, 996 F.3d 1094,
1099 (10th Cir. 2021) ("[E]ven if the trial court is mistaken, it will not be
reversed unless its ruling results in substantial prejudice, or had a substantial
effect on the outcome of the case." (alteration in original) (quoting 12 Moore's
Fed. Prac. – Civ. § 61.02 at 61-4 (2021))).  "Harmless-error doctrine is not
technical."  *Bridges*, 996 F.3d at 1099.  "The appellate court exercises common
sense, trying to make a 'realistic assessment' of the 'practical likelihood' that the
result in the district court would have been different had the error not occurred."
*Id.* (quoting *Wills v. Brown Univ.*, 184 F.3d 20, 30 (1st Cir. 1999)); *see also Hill
v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 659 (10th Cir. 2016) ("An error affecting
a substantial right of a party is an error which had a substantial influence or
which leaves one in grave doubt as to whether it had such an effect on the
outcome." (quoting *McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1142 (10th
Cir. 2006))).

In assessing Appellants' procedural challenge, we believe that the SEC's
prejudice argument—though not fulsome—leads to the correct conclusion.  In
effect, the SEC intimates that, irrespective of whether the district court erred by
admitting and considering the representations of the March 10 email, the error

was harmless—reasoning that Appellants were not substantially prejudiced by any such error nor is there any reasonable basis now for concluding that the result of the proceeding would have been different.  Even without much help from the SEC's briefing, this conclusion is patent to us from the record.

First, as the SEC specifically notes, Appellants were able to fully address the March 10, 2010, email at the summary judgment stage through their response to the SEC's revised motion for summary judgment.  To be sure, GenAudio explicitly complained that the SEC "failed to include this alleged misrepresentation in its response to GenAudio's interrogatory requesting identification of each alleged misrepresentation" and thus reasoned that, as a consequence, the SEC "cannot rely on that alleged misrepresentation here." Aplts.' App., Vol. VI, at 1517–18.  But GenAudio did not stop there.  GenAudio then proceeded to fully discuss the merits of the statements found in the March 10 email—alleging that Mr. Mahabub did not make those statements with scienter or negligence, and that the statements were not false because of his reasonable belief.  *See id.* at 1518–19.  Furthermore, for his part, Mr. Mahabub incorporated GenAudio's arguments in full.  *See id.*, Vol. IX, at 2024 (Def. Mahabub's Opp'n to Pl.'s Rev. Mot. for Summ. J., filed Mar. 30, 2018).

Thus, it is clear to us, as the SEC suggests, that any error regarding the district court's admission of the March 10 email was harmless because Appellants had a full and fair opportunity to respond to the SEC's arguments—first, to argue

against the admission of the March 10 email, and then to address on the merits the

substance of the SEC's contentions.  *Cf. Jacobsen v. Deseret Book Co.*, 287 F.3d

936, 953 (10th Cir. 2002) (explaining the purposes of Rule 26 disclosures,

particularly regarding expert testimony, and noting "to avoid prejudice, [a party]

*need[s] to know the substance* of the experts' testimony" (emphasis added)), *cert.

denied*, 537 U.S. 1066 (2002); *O'Donnell v. Ga. Osteopathic Hosp., Inc.*, 748

F.2d 1543, 1549 (11th Cir. 1984) (explaining that the disclosure requirements of

Rule 26(e)(2) prevent parties from becoming "prejudicially surprised" by

evidence and testimony and from going through a "trial by ambush" (first quoting

*Shelak v. White Motor Co.*, 581 F.2d 1155, 1159 (5th Cir. 1978), then quoting

*Dilmore v. Stubbs*, 636 F.2d 966, 969 n.2 (5th Cir. 1981))), *abrogated on other

grounds by Lindsey v. Am. Cast Iron Pipe Co.*, 810 F.2d 1094, 1102 (11th Cir.

1987); *Dilmore*, 636 F.2d at 969 n.2 ("The rules of discovery are designed to

narrow and clarify the issues and give the parties mutual knowledge of all

relevant facts, thereby preventing surprise.  Although defendants did not receive

the name of [plaintiff's] expert until three weeks prior to trial, they were well

aware of the issues in the case, and [plaintiff's] proffer of [the expert's] testimony

presented no new issues for defendants to meet."); *cf. also Woodworker's Supply,

Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999)

(explaining that, in the context of determining whether a district court's

imposition of sanctions under Rule 37(c)(1) is warranted, the following factors

are weighed to determine if a Rule 26 violation is harmless such that no sanction should be imposed: "(1) *the prejudice or surprise* to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness" (emphasis added)).

In any event, and perhaps more importantly, there is not a reasonable basis for concluding that, even if the district court had excluded the March 2010 email, the result of the proceeding would have been different.  As evident from our detailed discussion *supra*, the remaining four statements provided ample support for the district court's judgment in favor of the SEC—more specifically, its determination that Appellants violated § 10(b) and Rule 10b-5.

Those four statements contained fabrications, fanciful facts, and lies—blatant and implicit—regarding material matters related to GenAudio's negotiations with Apple.  Standing alone, they would have provided a sturdy and sufficient foundation for the district court's conclusion that Appellants acted in contravention of § 10(b) and Rule 10b-5.  In other words, even if the district erred in admitting and considering the statements contained in the March 2010 email, we are convinced that the result of the proceeding would not have been different.[20]  *See Hill*, 815 F.3d at 659; *see also* 36 C.J.S. *Federal Courts* § 658,

_____

[20]    Appellants in their Reply Brief also claim that the district court improperly considered the March 10 email because the SEC withdrew that email

(continued...)

Westlaw (database updated Feb. 2022) ("The court of appeals should not reverse
any judgment unless it believes that such error as was committed materially
affected the merits of the action.  Thus, for example, where the court of appeals
concludes that the result would necessarily have been the same, the error is
harmless." (footnotes omitted)); FEDERAL TRIAL HANDBOOK: CIVIL § 9:45,
Westlaw (database updated Oct. 2021) ("In deciding this question, the court must
determine whether the result would have been different had the error not
occurred.").

---

[20](...continued)
from summary-judgment consideration—an argument which prompted the SEC to
file a motion to file a sur-reply in the event that we decide that Appellants'
withdrawal argument has merit.  *See* Aplts.' Reply Br. at 4–5; Aplee.'s Mot. for
Leave to File Sur-Reply.  However, Appellants' argument gives us no pause.
Under more than one theory, Appellants have waived this late-blooming
argument.  First, although Appellants did argue before the district court and in
their Opening Brief that the district court erred in considering the March 10
email, they *did not* argue—either before the district court or here in their Opening
Brief—that the court erred because the SEC *withdrew* the email from
consideration.  Accordingly, Appellants forfeited their withdrawal argument
before the district court and, because they do not seek plain-error review before
us, they have effectively waived it.  *See, e.g.*, *Havens v. Colo. Dep't of Corr.*, 897
F.3d 1250, 1259 (10th Cir. 2018) ("We conclude that [the plaintiff] has forfeited
the argument that Title II validly abrogates sovereign immunity as to his claim by
failing to raise this argument before the district court, and he has effectively
waived the argument on appeal by not arguing under the rubric of plain error.").
Furthermore, Appellants have waived their withdrawal argument by presenting it
for the first time in their Reply Brief.  *See, e.g.*, *United States v. Bass*, 661 F.3d
1299, 1301 n.1 (10th Cir. 2011) (noting that "[w]e decline to consider arguments
raised for the first time in a reply brief" (quoting *United States v. Murray*, 82
F.3d 361, 363 n.3 (10th Cir. 1996))), *cert. denied*, 566 U.S. 914 (2012).  Thus, we
decline to consider this argument.  And, as a consequence, we **deny** the SEC's
motion to file a sur-reply as moot.

**C**

We now turn to Appellants' second issue. That is, whether the district court erred when it held them liable for the unregistered offer or sale of securities.

"Sections 5(a) and (c) of the [1933] Securities Act, 15 U.S.C. § 77e(a), (c), make it unlawful to offer or sell a security in interstate commerce if a registration statement has not been filed as to that security, unless the transaction qualifies for an exemption from registration." *SEC v. Gordon*, 522 F. App'x 448, 450 (10th Cir. 2013) (unpublished) (alteration in original) (quoting *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1085 (9th Cir. 2010)).[21] To make a prima facie case under §§ 5(a) and (c), the following elements must be shown: "(1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale." *SEC v. Levin*, 849 F.3d 995, 1001 (11th Cir. 2017) (quoting *SEC v. Cont'l Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972)); *see also SEC v. Calvo*, 378 F.3d 1211, 1214–15 (11th Cir. 2004).

---

[21]     We recognize that the unpublished cases cited herein are not binding on us. We nevertheless find them to be persuasive and helpful to our analysis; on this basis, we rely on them. *See, e.g.*, *United States v. Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015).

There are exemptions to the rule, however, including: (1) the private-offering exemption, *see* 15 U.S.C. § 77d(a)(2); and (2) the Rule 506 safe-harbor exemption, *see* 17 C.F.R. §§ 230.502(b), 230.506.  These can be asserted as affirmative defenses.  At trial, the "burden of proof is clearly upon" those litigants "claiming [the exemption's] benefit, as public policy strongly supports registration."  *See Quinn & Co. v. SEC*, 452 F.2d 943, 945–46 (10th Cir. 1971) (footnote omitted), *cert. denied*, 406 U.S. 957 (1972).

Appellants allege the two foregoing exemptions are applicable here. Before turning to the merits of their arguments, we clarify at the outset the scope of their challenge: specifically, we conclude that their arguments only implicate GenAudio's § 5 liability, not Mr. Mahabub's § 5 liability.  In this regard, the district court noted the SEC's threshold contention that Mr. Mahabub could not invoke the exemptions: "The SEC's summary judgment motion explicitly argues that [Mr.] Mahabub cannot invoke either the private offering exemption or Rule 506 because the statute and regulation both apply specifically to the 'issuer,' and GenAudio, not [Mr.] Mahabub, was the issuer of GenAudio's securities." *Mahabub*, 343 F. Supp. 3d at 1039.

The district court further observed that Appellants did not challenge this assertion and, therefore, it deemed any such challenge waived: "The Court accordingly deems the argument conceded.  [Mr.] Mahabub cannot rely on the private offering exemption or Rule 506, so summary judgment is appropriate in

favor of the SEC and against [Mr.] Mahabub on the SEC's claim that [Mr.] Mahabub sold unregistered securities." *Id.* Before us, Appellants do not attempt to attack the district court's waiver ruling. *Compare* Aplts.' Opening Br. at 42–45 (making no attempt to challenge the district court's waiver ruling prohibiting Mr. Mahabub from invoking the exemptions), *with* Aplee.'s Resp. Br. at 26 n.4 (noting that, in the district court, Mr. "Mahabub had conceded that these exceptions only apply to the issuer of a security, and that [Mr.] Mahabub was not the issuer," and turning to a discussion of GenAudio's liability).

Consequently, we deem such an appellate challenge waived. *See, e.g.*, *Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1268 (10th Cir. 2016). More specifically, we do not concern ourselves with Mr. Mahabub's § 5 liability; that is not an open question here. Instead, we turn to the merits of Appellants' challenges to the district court's two exemption rulings, as they relate to GenAudio's § 5 liability. We conclude that Appellants' challenges lack merit.

## 1

We first review Appellants' contention that the private-offering exemption saves GenAudio from liability. Section 4(a)(2) of the Securities Act provides an exemption from that Act's registration provisions for private offerings. *See* 15 U.S.C. § 77d(a)(2) (providing that the registration provisions "shall not apply to . . . transactions by an issuer not involving any public offering"). "An offering is considered private only if limited to investors who have no need for the

70

protection provided by registration." *United States v. Arutunoff*, 1 F.3d 1112, 1118 (10th Cir. 1993); *see Lively v. Hirschfeld*, 440 F.2d 631, 632 (10th Cir. 1971)).  In assessing whether an offering is "sufficiently limited[,] courts focus on such factors as: (1) the number of offerees; (2) the sophistication of the offerees, including their access to the type of information that would be contained in a registration statement; and (3) the manner of the offering." *Id.*; *see also Mark v. FSC Sec. Corp.*, 870 F.2d 331, 333 (6th Cir. 1989) (noting "several factors [that] are significant" in "determining whether a securities offering is exempt from registration under the general language of § 4[(a)](2)," including "the number of offerees" and "the manner of the offering").

"The so-called private offering exemption is an affirmative defense which must be raised and proved by the defendant." *Swenson v. Engelstad*, 626 F.2d 421, 425 (5th Cir. 1980); *see SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953) ("Keeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable."); *Lively*, 440 F.2d at 632 ("[I]t was, and is, recognized by the parties that a defendant seeking to come within the nonpublic offering exemption has the burden to so prove his position.").

Here, Appellants argue that "[t]he SEC failed to meet its burden by explaining why Section 4[(a)](2) did not exempt registration of either

offering of GenAudio securities."  Aplts.' Opening Br. at 43.  They then refer to the general principle that "for issues on which the non-movant would bear the burden of proof at trial, the moving party must show that there is an absence of evidence to support the non-movant's case."  *Id*.  The SEC succinctly counters by stating "it was [Appellants'] burden to provide evidence from which a jury could find that the exemption applied; having failed to do so, summary judgment on the [SEC's] Section 5 claims was appropriate."  Aplee.'s Resp. Br. at 50–51.

We believe that the SEC prevails in this dispute.  Appellants do not argue that the SEC failed to satisfy its burden on summary judgment of establishing its prima facie case.  Consequently, as noted, the burden of proof rested with Appellants to show that the private-offering exemption applied on these facts.  And, referencing the record and the relevant law in its summary-judgment briefing, the SEC pointed out what it perceived to be the deficiencies in Appellants' evidentiary showing regarding the private-offering exemption.  In this regard, it argued the following:

> GenAudio is not entitled to the private offering exemption under Section 4(a)(2).  It cannot produce any evidence establishing it engaged in a private versus public offering, because it cannot identify to whom it offered the stock, its relationship with the offerees, the nature, scope, size, type and manner of the offering. . . . The undisputed facts are fatal to GenAudio's claimed exemption.

Aplts.' App., Vol. II, at 378.

The upshot is that, as movant, the SEC had done all that it was required to do to secure summary judgment—*absent* Appellants demonstrating a genuine dispute of material fact.  In other words, the SEC's motion effectively placed the onus on Appellants to demonstrate the existence of such a genuine dispute.  *See, e.g.*, *Harper v. Del. Valley Broads., Inc.*, 743 F. Supp. 1076, 1090 (D. Del. 1990) ("A party resisting summary judgment cannot expect to rely on the bare assertions or mere cataloguing of affirmative defenses.  The requirement of pointing to specific facts to defeat a summary judgment motion is especially strong when the nonmoving party would bear the burden of proof at trial, as these defendants would on the affirmative defenses they plead." (citations omitted)), *aff'd*, 932 F.2d 959 (3d Cir. 1991); *see also Celotex*, 477 U.S. at 323–24 (noting that "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact" but under Rule 56 "the nonmoving party [who] will bear the burden of proof at trial on a dispositive issue" must "go beyond the pleadings and by her own" record showing demonstrate a genuine dispute for trial); *cf.* 10B Mary Kay Jane, FEDERAL PRACTICE & PROCEDURE § 2734 (4th ed), Westlaw (database updated Apr. 2021) (noting that "a claimant's motion for summary judgment should be denied when *any defense presents significant fact issues that should be tried*" (emphasis added) (footnote omitted)).  From our consideration of

the arguments before us and the record, it is clear that Appellants made no such evidentiary showing that would have precluded summary judgment.

The district court agreed with the SEC's view that GenAudio was "'unable to provide information as to the number or sophistication of investors it solicited to invest' in either the 2010 or 2011 Offerings." *Mahabub*, 343 F. Supp. 3d at 1040 (quoting Aplts.' App., Vol. II, at 361, 368, ¶¶ 61, 108). Given Appellants' failure to provide such evidence, the district court determined that Appellants' private offering exemption theory failed as a matter of law because Appellants "do[] not describe any evidence [they] may introduce to persuade a jury that the relevant factors favor application of the exemption in [their] favor." *Id.* at 1041.

As our sister circuit noted, summary judgment is the "'put up or shut up' moment in a lawsuit." *Citizens for Appropriate Rural Rds. v. Foxx*, 815 F.3d 1068, 1077 (7th Cir. 2016) (quoting *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010)). We agree with the district court that Appellants failed to put up any evidence in support of their private-offering theory, after the SEC had demonstrated that—borrowing Appellants' own words— "there is an absence of evidence to support the non-movant's case"; the SEC revealed Appellants' own "inability to provide information" regarding the 2010 and 2011 Offerings. Aplts.' Opening Br. at 43. Thus, we reject Appellants' challenge to the district court's ruling as to their private-offering exemption theory.

74

**2**

Appellants next claim that the safe-harbor provision under Rule 506 applies here.  Rule 506's safe-harbor exemption permits the sale of unregistered securities to an unlimited number of *accredited* investors.  *See* 17 C.F.R. §§ 230.502(b), 230.506.  To qualify for a Rule 506 exemption, the issuer of the security must—among other things—have a reasonable basis for believing that no more than thirty-five purchasers were not accredited investors, and it must provide an audited balance sheet to "any purchaser that is not an accredited investor." *Id.* §§ 230.502(b)(1), (b)(2)(i)(B)(1); *see id.* § 230.506(b)(1).

Because it was undisputed during summary-judgment proceedings that GenAudio did not provide audited balance sheets to *any* purchasers, GenAudio could avail itself of Rule 506's safe harbor only if it could establish that it had a reasonable belief that *all* of the solicited purchasers were *accredited*.  *See Mahabub*, 343 F. Supp. 3d at 1040 ("GenAudio did not provide an audited balance sheet with the 2010 or 2011 Offerings.  Accordingly, if GenAudio solicited nonaccredited investors, Rule 506 cannot apply." (citation omitted)).  An "accredited investor" means any person who actually had, or whom the issuer "reasonably believe[d]" to have, an "individual net worth, or [a] joint net worth with that person's spouse or spousal equivalent, exceed[ing] $1,000,000" "at the time of the sale of the securities to that person."  17 C.F.R. § 230.501(a)(5).

Appellants argue that they reasonably believed that those purchasing securities "had been vetted and identified as accredited."  Aplts.' Opening Br. at 45.  "Thus, the SEC failed to meet its burden to show there was an absence of evidence to support [the] Appellants' reasonable belief its investors were accredited . . . ."  *Id.*  The SEC pushes back, claiming that Appellants failed to provide any evidence from which a reasonable jury could find that the safe-harbor provision applied.  Noting that GenAudio "did not furnish an audited balance sheet to any investor in connection with the 2010 or 2011 Offerings," the SEC reasons that Appellants "failed to meet their burden of providing evidence from which a jury could find that *all* of the investors solicited for the 2010 and 2011 Offerings were accredited, *i.e.*, that *all* of the investors solicited actually had, or defendants 'reasonably believe[d]' them to have, the requisite net worth at the time of the sales."  Aplee.'s Resp. Br. at 48–49 (alteration in original) (emphases added).

And, underscoring its view that they failed to carry that burden, the SEC points out that the record indicates that Mr. Mattos—GenAudio's main fundraiser—"admittedly overlooked at least some" incomplete questionnaires that GenAudio had provided to its investors to solicit information relevant to the accreditation question.  *Id.* at 49; *see also* Aplts.' App., Vol. III, at 639 (Jim Wei-Kung Mattos Dep. Tr., dated Jul. 22, 2016) (testifying that "I do understand in retrospect that there were a few [incomplete questionnaires] that I overlooked. . . .

a small handful"). Specifically, Mr. Mattos overlooked at least six incomplete investor questionnaires. Thus, based on the state of the record, the SEC urges us to affirm the district court's ruling denying the exemption because it contends that Appellants have failed to provide any sort of evidence to support their purported reasonable belief that GenAudio's investors were accredited.

We conclude that the SEC should prevail in this dispute. For starters, we again reject Appellants' tacit attempt to shift the burden of proof to the SEC as to GenAudio's affirmative defense. Ultimately, Appellants must prove that GenAudio qualified for the safe-harbor exemption; the SEC does not bear the burden of proving the contrary is true. *See, e.g.*, *Ralston Purina Co.*, 346 U.S. at 126; *Harper*, 743 F. Supp. at 1090. Moreover, we should recall, as the district court found, that Appellants utterly failed "'to provide information as to the number or sophistication of investors it solicited to invest' in either the 2010 or 2011 Offerings." *Mahabub*, 343 F. Supp. 3d at 1040 (quoting Aplts.' App., Vol. II, at 361, 368, ¶¶ 61, 108). This finding—which accurately reflects the state of the record—undercuts the plausibility of Appellants' claim that they reasonably believed GenAudio's investors were all accredited. Stated otherwise, without such information, no rational jury could have found that Appellants reasonably believed that GenAudio's investors were all accredited because Appellants failed to show that they had the information that would have allowed them to form such a reasonable belief.

Appellants argue not illogically that Mr. Mattos's admission of missing some questionnaires cannot be treated as dispositive because "[i]t only refutes *the fact* that 100% of GenAudio's investors actually identified themselves as accredited investors," and there is still the question of whether GenAudio possessed "the reasonable belief" that all of the investors were accredited. Aplts.' Opening Br. at 45 (emphasis added). However, as we have discussed, we resolve that reasonable-belief question against Appellants because they failed to provide information regarding the number or sophistication of their investors for the 2010 and 2011 offerings; therefore, they have not demonstrated that GenAudio could have developed a reasonable belief that all of the solicited investors were accredited. In sum, we conclude that Appellants' attempt to find safe harbor under Rule 506 is unavailing.

### D

We turn to Appellants' third and final challenge: they argue that the district court erred in ordering them to pay disgorgement and civil penalties. Specifically, they contend that the court's disgorgement order was not legally authorized and, in any event, the amount of the disgorgement order and the civil penalties was not calculated properly. We conclude, however, that Appellants' arguments lack merit.

Generally, a district court's imposition of remedies is reviewed for an abuse of discretion. *See, e.g.*, *SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th

Cir. 2006) ("The district court has broad discretion not only in determining

whether or not to order disgorgement but also in calculating the amount to be

disgorged." (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474–75 (2d

Cir. 1996))), *cert. denied*, 550 U.S. 905 (2007); *see also SEC v. Pentagon Cap.*

*Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013) ("We review the district court's

imposition of the civil penalty for abuse of discretion."), *cert. denied*, 573 U.S.

946 (2014); *id.* at 288 ("The district court's disgorgement award is also reviewed

for abuse of discretion.").

"An abuse of discretion occurs where a decision is premised on an

erroneous conclusion of law or where there is no rational basis in the evidence for

the ruling." *Andersen*, 882 F.3d at 1223. Similarly, in the context of

disgorgement, we specifically explained that "[w]e review for clear error the

computation of the disgorgement amount and we review de novo the method for

determining that amount." *United States v. RaPower-3*, *LLC*, 960 F.3d 1240,

1251 (10th Cir. 2020); *see also Klein-Becker USA, LLC v. Englert*, 711 F.3d

1153, 1162 (10th Cir. 2013) ("Although we review the district court's decision to

award disgorgement of profits from trademark infringement for abuse of

discretion, we review the amount awarded for clear error and the district court's

method for determining that amount de novo.").

We first consider Appellants' challenge to the legal propriety of the district

court's disgorgement order, and, having rejected that challenge, we proceed to

consider their challenge to the court's computation of the disgorgement amount, which we also conclude is without merit. Lastly, we consider whether the civil penalties that the district court ordered were legally excessive, and we conclude that they were not and that consequently the court did not abuse its discretion in ordering the penalties.

<strong>1</strong>

<strong>a</strong>

"Generally, disgorgement is a form of '[r]estitution measured by the defendant's wrongful gain.'" *See Kokesh v. SEC*, --- U.S. ----, 137 S. Ct. 1635, 1640 (2017) (alteration in original) (quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 51, cmt. a at 204 (AM. L. INST. 2010)); *see Liu v. SEC*, --- U.S. ----, 140 S. Ct. 1936, 1940–41 (2020) ("[C]ourts determined that the SEC had authority to obtain what it called 'restitution' and what in substance amounted to 'profits' that 'merely depriv[e]' a defendant of 'the gains of . . . wrongful conduct.' Over the years, the SEC has continued to request this remedy, later referred to as 'disgorgement,' and courts have continued to award it." (second alteration and omission in original) (footnote and citation omitted) (quoting *Texas Gulf*, 446 F.2d at 1307–08)). In this regard, we have held that disgorgement is "remedial rather than punitive." *Maxxon*, 465 F.3d

80

at 1179;[22] *see also SEC v. Cavanagh*, 445 F.3d 105, 117 & n.25 (2d Cir. 2006)

(noting that "[b]ecause the remedy is remedial rather than punitive, the court may

not order disgorgement above" "the amount of money acquired through

wrongdoing").

Though our court and others generally have characterized disgorgement as

remedial and not punitive, in 2017, the Supreme Court in *Kokesh* determined that

at least the disgorgement remedy at issue there operated in a punitive manner and

thus was subject to a five-year statute of limitations that "applies to any 'action,

suit or proceeding for the enforcement of any civil fine, *penalty*, or forfeiture,

pecuniary or otherwise.'"  137 S. Ct. at 1639 (emphasis added) (quoting 28

U.S.C. § 2462); *see id.* at 1644 ("SEC disgorgement thus bears all the hallmarks

of a penalty: It is imposed as a consequence of violating a public law and it is

intended to deter, not to compensate.").  Among the attributes of the

---

[22]     Before the Supreme Court's *Liu* decision—which we discuss further
*infra*—we explained that a defendant "is not required to disgorge profits not
'causally connected to the violation.'"  *Maxxon*, 465 F.3d at 1179 (quoting Arnold
S. Jacobs, DISCLOSURES & REMEDIES UNDER THE SECURITIES LAWS § 20:109).
Moreover, courts have noted that "[d]isgorgement need only be a reasonable
approximation of profits causally connected to the violation."  *SEC v. Patel*, 61
F.3d 137, 139 (2d Cir. 1995) (alteration in original) (quoting *SEC v. First City
Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989)).  Once a reasonable
approximation is shown, "the burden shifts back to the defendant[s] to
'demonstrate that the disgorgement figure [is] not a reasonable approximation.'"
*SEC v. Teo*, 746 F.3d 90, 105 (3d Cir. 2014) (second alteration in original)
(quoting *First City*, 890 F.2d at 1232); *see also Calvo*, 378 F.3d at 1217 ("The
SEC is entitled to disgorgement upon producing a reasonable approximation of a
defendant's ill-gotten gains.").

disgorgement remedy in that case that signaled to the *Kokesh* Court that it was penal in nature was its imposition on defendants "without consideration of a defendant's expenses that reduced the amount of illegal profit." *Id.* at 1644. Furthermore, notably, the *Kokesh* Court stressed in a footnote that the "sole question" before it related to the application of the statute of limitations, and, in that regard, the Court expressly declined to offer "an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts ha[d] properly applied disgorgement principles" in the setting of that case. *Id.* at 1642 n.3.

A mere three years later—and *after* the parties filed their briefs in this appeal—*Kokesh*'s author (Justice Sotomayor) penned for the Court another important disgorgement decision, *Liu v. SEC*, which returned to some of the matters that *Kokesh* left unresolved. According to *Liu*, in deciding the issue before it, *Kokesh*

> held that a disgorgement order in a [SEC] enforcement action imposes a "penalty" for the purposes of 28 U.S.C. § 2462, the applicable statute of limitations. In so deciding, the Court reserved an antecedent question: whether, and to what extent, the SEC may seek "disgorgement" in the first instance through its power to award "equitable relief" under 15 U.S.C. § 78u(d)(5), a power that historically excludes punitive sanctions.

140 S. Ct. at 1940. Generally speaking, the *Liu* Court answered this antecedent question in the affirmative: "The Court holds today that a disgorgement award

that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." *Id.*

Notably, for our purposes here, the *Liu* defendants had "objected that the disgorgement award failed to account for their business expenses," and the Court "granted certiorari to determine whether § 78u(d)(5) authorizes the SEC to seek disgorgement beyond a defendant's net profits from wrongdoing." *Id.* at 1942. Consistent with the disgorgement remedy's historical roots in equity, the *Liu* Court ruled that, insofar as the disgorgement award exceeded net profits, it was not statutorily permissible. *See id.* 1943–46. It explained how "equity courts" in considering "profits remedies," like disgorgement, historically, have "circumscribe[d] the award . . . to avoid transforming it into a penalty outside their equitable powers." *Id.* at 1944. And the *Liu* Court specified that one way such courts have done so is to "limit[] awards to the net profits from wrongdoing, that is, 'the gain made upon any business or investment, when both the receipts and payments are taken into the account.'" *Id.* at 1944–45 (quoting *Rubber Co. v. Goodyear*, 76 U.S. (1 Wall.) 788, 804 (1870)).

In this regard, the *Liu* Court observed that, "[s]etting aside" one salient exception, "courts consistently restricted awards to net profits from wrongdoing *after* deducting legitimate expenses." *Id.* at 1946 (emphasis added). The Court recognized—but left for resolution on remand—the defendants' case-specific contention that "their disgorgement award is unlawful because it crosses the

83

bounds of traditional equity practice in [that] . . . it declines to deduct business expenses from the award." *Id.* at 1947.  However, in providing guidance for remand, the Court underscored that "courts *must* deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)." *Id.* at 1950 (emphasis added).

## b

For the first time on appeal, without invoking the plain-error doctrine, Appellants contend in their briefing that the district court was not legally authorized to order disgorgement.[23]  Specifically, they argue thusly: "Since there is no statutory basis for disgorgement, and—pursuant to *Kokesh*—it is not an equitable remedy (since equity does not authorize punishment), then the SEC may not seek disgorgement."  Aplts.' Opening Br. at 46; *see also* Aplts.' Reply Br. at 21 ("We urge this court to conclude the SEC has no authority to obtain disgorgement, and strike all disgorgement from this matter.").[24]

For its part, the SEC does not attack Appellants' legal-authority argument on preservation grounds: that is to say, they do not assert that Appellants have

---

[23]    In their district-court briefing, Appellants did not challenge the court's legal authority for ordering disgorgement; rather, they solely focused on "the amount of disgorgement."  Aplts.' App., Vol. VI, at 1524 n.16; *id.*, Vol. IX, 2024 (adopting "GenAudio's arguments").

[24]    To put this argument in context, we should recall that *Liu* was issued after all of the parties' briefs were filed.  In particular, at the time that Appellants filed their Opening Brief, *Liu* was pending before the Supreme Court.  Appellants acknowledged that the Supreme Court in *Liu* would likely offer in the future further guidance on "the SEC's ability to seek disgorgement at all."  Aplts.' Opening Br. at 46.

effectively waived this argument by failing to present it to the district court and by not arguing for relief under the plain-error standard. *See, e.g.*, *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1259 (10th Cir. 2018) ("We conclude that [the plaintiff] has forfeited the argument that Title II validly abrogates sovereign immunity as to his claim by failing to raise this argument before the district court, and he has effectively waived the argument on appeal by not arguing under the rubric of plain error."). Instead, in a short but sufficient argument,[25] the SEC points out that *Kokesh* expressly declined to offer "an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings," 137 S. Ct. at 1642 n.3, and that on remand in *Kokesh*, we actually applied our "longstanding precedents regarding disgorgement" and granted disgorgement, Aplee.'s Resp. Br. at 52.

Because the SEC unreservedly engages with the merits of Appellants' legal-authority argument—despite an apparent preservation problem with it—we exercise our discretion to do the same. *See, e.g.*, *Johnson v. Spencer*, 950 F.3d 680, 707 (10th Cir. 2020) ("exercis[ing] our discretion to review [plaintiff's] forfeited arguments," where defendants "forfeited the issue of [plaintiff's] own forfeiture by failing to argue his lack of preservation in their appellate briefing");

---

[25]     Though the SEC's argument is admittedly brief, we disagree with Appellants' contention that the "SEC has not chosen to respond substantively or defend against" their legal-authority argument concerning disgorgement. Aplts.' Reply Br. at 20.

*see also United States v. McGehee*, 672 F.3d 860, 873 n.5 (10th Cir. 2012) (considering whether "the government forfeited the right to object to" the defendant's failure "to preserve" an argument for reversal). And, if we limit our review to the legal-authority argument that Appellants advance in their appellate briefing, there is no doubt that their argument cannot prevail.

As the SEC rightly points out, *Kokesh* expressly declined to opine on whether courts have the legal authority to order—at least in some instances—the remedy of disgorgement. *See Liu*, 140 S. Ct. at 1946 (straightforwardly rejecting the defendants' argument, akin to Appellants' contention here, that "this Court effectively decided in *Kokesh* that disgorgement is *necessarily* a penalty, and thus not the kind of relief available at equity," and stating that "*Kokesh* expressly declined to pass on the question" and it "has no bearing on the SEC's ability to conform future requests for a defendant's profits to the limits outlined in common-law cases awarding a wrongdoer's net gains" (emphasis added)).

Furthermore, after the parties' briefing was filed, *Liu* rejected the contention that disgorgement is categorically not an equitable remedy and concluded that, insofar as the specifications of a disgorgement order conform to "longstanding equitable principles," the order may find its statutory footing in 15 U.S.C. § 78u(d)(5). *Id.*; *see also id.* at 1940 ("The Court holds today that a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)."). Thus, if

our review is limited to the legal-authority argument of Appellants' briefing, their argument wholly lacks merit and fails.

### c

However, Appellants effectively contend—through the vehicle of a Federal Rule of Appellate Procedure 28(j) supplemental-authority letter, invoking the Supreme Court's decision in *Liu*—that our review is *not* restricted to the legal-authority argument of their appellate briefing.  In their view, even though *Liu* was decided after the parties filed their appellate briefs, we should consider, "in addition to the arguments asserted in Appellants' briefs," a new basis for challenging the legal propriety of the district court's disgorgement order that *Liu* purportedly presents.  Aplts.' Resp. to Aplee.'s Suppl. Authority Letter at 1 (filed July 6, 2020).  They contend that, in *Liu*, "the Court held for the first time that the SEC is prohibited from seeking an equitable remedy in excess of a defendant's *net profits* for any wrongdoing," and, more specifically, that a disgorgement order—in order to conform to the equitable principles embodied in 15 U.S.C. § 78u(d)(5)—must reflect a deduction of legitimate business expenses.  *Id.* According to Appellants, "[i]t is beyond dispute that here, the district court did not take legitimate expenses into account in ordering disgorgement."  *Id.*  Thus, they reason that we should "at the very least, [] remand . . . so the district court can take into account Appellants' legitimate expenditures in determining the proper disgorgement amount."  *Id.*

87

Yet we reject Appellants' request that we consider and grant relief with respect to this late-blooming argument based on *Liu*.  In doing so, we are cognizant of "[t]he general rule . . . that an appellate court must apply the law in effect at the time it renders its decision"—which would include *Liu*'s holding regarding the deduction of legitimate business expenses.  *Thorpe v. Hous. Auth. of City of Durham*, 393 U.S. 268, 281 (1969); *see also Liu*, 140 S. Ct. at 1950. (instructing that "courts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)").  However, even assuming that Appellants are correct that the district court did not correctly deduct any legitimate business expenses in crafting its disgorgement order, we conclude that Appellants have failed to preserve any challenge to this purported error.

To begin, for the first time ever, Appellants presented this claim of error relating to the district court's purported failure to deduct business expenses (i.e., their "business-expenses argument") in their supplemental-authority letter; that is, they failed to present the argument at any time before submitting their supplemental-authority letter.  Consequently, Appellants have—at the very least—forfeited this argument in the district court and thus are entitled to no more than review under our rigorous plain-error standard.  *See, e.g.*, *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127 (10th Cir. 2011) ("Where, as here, a plaintiff pursues a new legal theory for the first time on appeal, that new theory suffers the distinct disadvantage of starting at least a few paces back from the block. . . . [I]f

the theory simply wasn't raised before the district court, we usually hold it forfeited."); *see also McGehee*, 672 F.3d at 876 ("Even if we were to conclude that [the defendant] only forfeited the acceptance-of-responsibility issue—rather than waived it—he could not prevail unless he could successfully run the gauntlet created by our rigorous plain-error standard of review.").

This is so even though the Supreme Court decided *Liu* after the district court entered judgment in this case. *See, e.g.*, *United States v. Gonzalez-Huerta*, 403 F.3d 727, 730–31 (10th Cir. 2005) (en banc) (applying plain-error review to forfeited error, where the defendant asserted for the "first time" on appeal a sentencing error predicated on Supreme Court caselaw issued after the district court's judgment and while his case was "pending on appeal"), *cert. denied*, 546 U.S. 967 (2005), *and reh'g denied*, 546 U.S. 702 (2005); *accord United States v. Buonocore*, 416 F.3d 1124, 1134 (10th Cir. 2005); *see United States v. Maldonado-Ramires*, 384 F.3d 1228, 1230 n.1 (10th Cir. 2004) (concluding, where the defendant invoked for the first time in a Rule 28(j) letter an argument for relief based on a Supreme Court case decided "four weeks after oral argument was held" that, because the defendant did not make the argument before the district court, "this court reviews only for plain error").

Yet, because Appellants have not even endeavored to seek relief as to their business-expenses argument under the plain-error rubric, Appellants have effectively waived any and all review of this argument. *See, e.g.*, *Havens*, 897

F.3d at 1259 (noting that the plaintiff "has effectively waived the argument on appeal by not arguing under the rubric of plain error"); *Fish v. Kobach*, 840 F.3d 710, 729–30 (10th Cir. 2016) (noting that the litigant failed to "make an argument for plain error review on appeal" and consequently, the "argument has come to the end of the road and is effectively waived").[26]

To be sure, Appellants contend that they "did not waive" their business-expenses argument because *Liu* "was announced by the Supreme Court . . . *after* Appellants[] submitted their opening and reply briefs."  Aplts.' Resp. to Aplee.'s Suppl. Authority Letter at 1 (emphasis added).  As support for this contention, they rely on the Supreme Court's decision in *Hormel v. Helvering*, 312 U.S. 552 (1941), which, Appellants explain, "stat[ed] an argument is not waived when 'there have been judicial interpretations of existing law after [the] decision below

---

[26]    Indeed, one could argue—quite reasonably—that Appellants also waived any business-expenses argument by not advancing it in their Opening Brief; making matters worse, they did not even include such an argument in their Reply Brief.  In this regard, "we routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief"—that is, we have treated such arguments as waived.  *Bronson*, 500 F.3d at 1104; *see, e.g.*, *United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) ("Ordinarily, a party's failure to address an issue in its opening brief results in that issue being deemed waived.").  Significantly, in an unpublished order denying a petition for rehearing that invoked *Liu* in support of a business-expenses argument, a panel of our court reached precisely this conclusion.  *See* Order, *United States v. RaPower-3, LLC* (*RaPower-3, LLC II*), No. 18-4150, at *2 (10th Cir., filed July 17, 2020) ("Petitioners waived this issue by not presenting it in their briefs on appeal.").  However, given that we already have determined that Appellants effectively waived this argument, we need not (and thus do not) definitively opine on whether this separate ground of briefing waiver is appropriately applied in these circumstances.

and pending appeal—interpretations which if applied might have materially altered the result.'" *Id.* (quoting *Hormel*, 312 U.S. at 558–59).

However, we are not persuaded.  We recognize at the outset that ordinarily "the decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary." *Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013); *accord Frasier v. Evans*, 992 F.3d 1003, 1029 (10th Cir. 2021); *Mid Atl. Cap. Corp. v. Bien*, 956 F.1182, 1195 n.6 (10th Cir. 2020).  Appellants fail to offer us a cogent reason to exercise that discretion in their favor.  To begin with, even though *Liu* itself was not available to Appellants when they filed their appellate briefs, a business-expenses argument—in *Liu*'s spirit or pointing in the same direction—that is, an argument by defendants to secure a deduction of business expenses from a disgorgement amount, *was* available.  Nothing precluded Appellants from contending in their district-court briefing or briefing before us that a deduction of business expenses from any disgorgement amount was legally proper and appropriate.

Indeed, such a business-expenses argument was hardly novel even in 2015, when the SEC filed its complaint.  Before 2015, a number of litigants in federal litigation had argued—albeit mostly unsuccessfully—that business expenses should be offset from any disgorgement amount.  *See SEC v. Aerokinetic Energy Corp.*, 444 F. App'x 382, 385 (11th Cir. 2011) (unpublished); *SEC v. United Energy Partners, Inc.*, 88 F. App'x 744, 746–747 (5th Cir. 2004) (unpublished);

*SEC v. Hughes Cap. Corp.*, 917 F. Supp. 1080, 1086–87 (D.N.J.1996), *aff'd* 124 F.3d 449 (3d Cir. 1997).  As the Fifth Circuit panel in *United Energy* observed, "the overwhelming weight of authority hold[s] that securities laws violators may not offset their disgorgement liability with business expenses."  88 F. App'x at 746 (alteration in original) (quoting *SEC v. Kenton Cap., Ltd.*, 69 F. Supp. 2d 1, 16 (D.D.C. 1998)).

*Liu* itself underscores the point that, prior to 2015, some litigants had sought, albeit unsuccessfully, business-expenses offsets from disgorgement awards.  To that point, *Liu* expressly abrogated controlling precedent in which the Ninth Circuit, in 2006, and the Eighth Circuit, in 2011, had rejected arguments seeking deductions of certain business expenses from disgorgement awards.  *See Liu*, 140 S. Ct. at 1942, 1950 (citing and abrogating *SEC v. JT Wallenbrock & Assocs*, 440 F.3d 1109, 1113, 1114 (9th Cir. 2006), and *SEC v. Brown*, 658 F.3d 858, 861 (8th Cir. 2011)).  Furthermore, in litigation in this circuit that commenced and proceeded roughly contemporaneously with the instant case, we rejected—admittedly, without extensive analysis—the defendants' argument that "the district court should have subtracted operating expenses from the gross receipts to determine the amount that should be disgorged," where the defendants conceded that they were not entitled to such an offset if their business was started and run to defraud investors, yet failed to establish that this was not so. *RaPower-3, LLC*, 960 F.3d at 1252.

Thus, though proponents of such business-expenses arguments historically had not met with much success, nothing barred Appellants here from making such an argument. And, indeed, prior to Appellants' submission of briefing here and before the district court, some courts had ruled in favor of such business-expenses arguments. *See SEC v. Thomas James Assocs., Inc.*, 738 F. Supp. 88, 92 (W.D.N.Y. 1990) ("I find that it is appropriate to offset these gross profits from the four IPOs with certain business expenses attributable thereto by [the defendant]. These expenses include, for example, commissions, telephone charges, underwriting expenses and a proportionate share of overhead."); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1077 (S.D.N.Y.1990) ("To require disgorgement of all fees and commissions without permitting a reduction for associate expenses and costs constitutes a penalty assessment and goes beyond the restitutionary purpose of the disgorgement doctrine.").

Accordingly, the upshot is that, even prior to the SEC's filing of its complaint in this action and certainly before *Liu*'s issuance, a business-expenses argument—along the lines of *Liu*—*was* available to Appellants, if they wished to secure an offset of business expenses from any disgorgement order. Appellants simply declined to avail themselves of such an argument. This fact counts against Appellants in our decisional calculus regarding consideration of their unpreserved business-expenses argument.

Nor do we read *Hormel* as standing for a contrary proposition.  The Court

in *Hormel* did not purport to establish a mandatory rule that would require

appellate courts to ignore a litigant's lack of preservation—through waiver or

otherwise—in every instance where "judicial interpretations of existing law

[change] after [the] decision below and pending appeal" and the "appli[cation] [of

that interpretation] might have materially altered the result."  312 U.S. at 558–59.

Instead, this quoted language from *Hormel* should be read in the context of the

Court's overall effort to provide case-specific illustrations of its primary point:

that is, "[t]here may always be *exceptional* cases or *particular* circumstances

which will prompt a reviewing or appellate court, *where injustice might otherwise

result*, to consider questions of law which were neither pressed nor passed upon

by the court . . . below."  *Id.* at 557 (emphases added).

In other words, as relevant here, the principal thrust of the Court's analysis

in *Hormel* was that courts of appeals should not rigidly decline to consider

arguments simply because they were not raised below; instead, they should be

inclined to exercise their discretion to consider such arguments in exceptional or

unique circumstances where manifest injustice would follow from not doing so.

*See id.* at 557 ("Rules of practice and procedure are devised to promote the ends

of justice, not to defeat them.  A rigid and undeviating judicially declared practice

under which courts of review would invariably and under all circumstances

decline to consider all questions which had not previously been specifically urged

would be out of harmony with this policy.  Orderly rules of procedure do not require sacrifice of the rules of fundamental justice.").  Yet under the circumstances here—where Appellants passed up repeated opportunities to advance a business-expenses argument before the district court and on appeal—we are hard pressed to discern any manifest injustice in concluding that we should not review such an argument because Appellants failed to preserve it.

Thus, we do not read *Hormel* as standing in the way of this result.  Indeed, there is reason to believe that the *Hormel* Court would endorse it.  That is because in offering case-specific illustrations where the Supreme Court properly had adhered to "the general principle" of *not* considering arguments that had not been raised below, the *Hormel* Court cited a case, roughly analogous to this one, in which the government had repeatedly failed in its pleadings before administrative tribunals and the court of appeals to raise the "newly presented question" it later requested the Court to consider—a request that the Court elected to deny.  *Id.* at 560 (citing *Helvering v. Tex-Penn Oil Co.*, 300 U.S. 481, 498 (1937)).  In any event, in light of the foregoing, we conclude that Appellants' reliance on *Hormel* is unavailing.

In closing, we highlight one additional factor—which though not determinative by any means—underscores the appropriateness of our decision to decline to consider Appellants' tardy business-expenses argument.  Specifically, unlike the legal-authority argument that Appellants advanced in their appellate

briefing, in arguing against the application of *Liu*'s business-expenses holding

here, the SEC has not been silent regarding Appellants' failure to make a

business-expenses argument prior to their supplemental-authority letter. *See*

Aplee.'s Suppl. Authority Letter at 2 (filed June 24, 2020) ("[Appellants] have

made no claim that the disgorgement award should have included a deduction for

any business expenses."); *cf.* Aplee.'s Resp. Br. at 51 n.14 (" In challenging the

amount of disgorgement, appellants dispute the district court's calculation of

proceeds; they are not arguing that they were entitled to any deductions.").

In sum, based on the reasons outlined *supra*, we decline to consider

Appellants' late-blooming business-expenses argument based on the Supreme

Court's decision in *Liu*: that is to say, we refrain from reviewing on the merits

Appellants' contention that, in light of *Liu*, we should remand the case to the

district court to consider deductions from the disgorgement amount based on their

legitimate business expenses.[27] *Cf. CFPB v. Consumer First Legal Grp., LLC*, 6

_____

[27]      Appellants cannot persuasively argue at this juncture of the litigation
that this determination unfairly prejudices them because at no time have they
attempted to describe—let alone itemize—any legitimate business expenditures
that the district court supposedly should have, consistent with *Liu*, deducted from
its disgorgement award.  Nor have Appellants sought supplemental briefing to do
so.  *See SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) (declining "to vacate the
District Court's disgorgement award and remand to allow it to recalculate the
amount of disgorgement in light of *Liu*," where the defendant "failed then [at the
district court] and fails now to identify any other legitimate business expenses
that the District Court should have deducted in light of *Liu*," other than certain
business expenses the district court already deducted when it was calculating
disgorgement), *cert. denied*, --- U.S. ----, 142 S. Ct. 590 (2021); *cf. RaPower-3,*
(continued...)

F.4th 694, 710 (7th Cir. 2021) (holding, where defendant argued in the district

court that an award of equitable remedies had to be limited to its "net profits"

that, even though *Liu* was issued after the court's restitution award, based on

defendant's invocation of the case on appeal, "*Liu* compels [the court] to vacate

the restitution award here and remand for re-calculation based on net profits").

**d**

We turn to Appellants' challenges to the amount contained in the

disgorgement order.  Appellants first contend that the district court should have

capped disgorgement "tied to fraud claims" at $15,000.  Aplts.' Opening Br. at

49.  Relying on our decision in *Maxxon*, where we determined that disgorgement

of profits should be "causally connected" to the violation, Appellants aver that

only one of the six misrepresentations at issue—namely, the April 30, 2010,

email—"shows a causal link between the misrepresentation and GenAudio's

receipt of money."  *Id.* (quoting *Mahabub*, 343 F. Supp. 3d at 1046).  Because the

investor who received the April 30 email responded by providing $15,000 to

Appellants, they argue that any disgorgement must be limited to that amount.  In

effect, Appellants contend that the district court erred in crafting the

---

[27](...continued)
*LLC II*, No. 18-1450, at *1–2 (noting in denying petition for rehearing that "the
petition for rehearing fails to identify any expenses that were not part and parcel
of Petitioners' scheme and should be deducted from the disgorgement order under
the standard stated in *Liu*").

disgorgement order because disgorgement orders must be limited to loss amounts that can be traced to an investor's reliance on specific representations.

The SEC, however, contends that Appellants "misunderstand the relevant statutory schemes." Aplee.'s Resp. Br. at 54. It says that Appellants' argument "mistakes the requirement that disgorgement—which is measured by the defendant's wrongful gain—be 'causally connected' to *the violation*, with the requirement in a *private* securities suit for the injured investors seeking damages as redress to prove reliance and injury." *Id.* (emphases added) (citation omitted) (quoting *Maxxon*, 465 F.3d at 1179). The SEC claims that "[i]n a government enforcement action," as here, those "extra-textual elements"—namely, "reliance and injury"—"are not required because these elements do 'not bear on the determination of whether securities laws were violated' and bear 'only on whether that private plaintiff may recover damages.'" *Id.* at 54–55 n.16 (quoting *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012)). Thus, in the SEC's view, the district court "acted within its discretion in concluding that the profits from the two offerings infected by [Appellants'] fraud were subject to disgorgement; it was under no requirement to link specific investor payments to specific misrepresentations in order to arrive at its calculation." *Id.* at 55.

We agree with the SEC. As the district court noted, it is a well-established principle that the SEC, as a government agency, need not prove that a securities buyer or seller relied on, and was injured by, a violator's misleading statements.

"Unlike private litigants proceeding under § 10(b), '[t]he SEC is not required to prove reliance or injury in enforcement actions.'" *Wolfson*, 539 F.3d at 1256 (alteration in original) (quoting *Geman v. SEC*, 334 F.3d 1183, 1191 (10th Cir. 2003)). We are not alone in following this principle. *See SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) (discussing federal circuit-court cases standing for the proposition that "[o]nce the [SEC] has established that a defendant has violated the securities laws, the district court possesses the equitable power to grant disgorgement without inquiring whether, or to what extent, identifiable private parties have been damaged by [the] fraud. Whether or not any investors may be entitled to money damages is immaterial." (first and third alterations in original) (quoting *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1987)).

*Maxxon*'s "causally connected" language does not purport to abrogate—nor have the effect of abrogating—this well-settled principle. In this regard, as the district court noted, "*Maxxon* generally describes some of the defendant's misrepresentations but never connects them to any particular securities transactions," and upheld the district court's disgorgement order in that case "without [a] hint of disapproval," even though the court "had calculated disgorgement based on all profits from stock sales over a particular time period." *SEC v. Mahabub*, 411 F. Supp. 3d 1163, 1171 (D. Colo. 2019). In short, nothing in *Maxxon* gives us pause in rejecting Appellants' argument that the district court erred in crafting the disgorgement order because disgorgement orders must be

limited to loss amounts that can be traced to an investor's reliance on specific representations.  The district court did not abuse its discretion when it did not limit the disgorgement order to $15,000.

Appellants next argue that the disgorgement amount related to their § 5 violations—Appellants' unregistered sale of securities—"should be limited to $237,900," which is the approximate amount Appellants "raised from those six investors in the offerings"—that is to say, the approximate amount that GenAudio raised from those investors who submitted incomplete questionnaires, which did not permit Appellants to "demonstrate those investors were accredited, as required."  Aplts.' Opening Br. at 50.  In response, the SEC contends that Appellants' argument "turns the Section 5 statutory scheme on its head." Aplee.'s Resp. Br. at 55.  Because it is Appellants' burden to demonstrate that an exemption applies, and having failed to establish that one does apply to the offerings, the SEC says that "the *entire offerings* themselves were illegal, and the experience of the individual investors is simply not relevant to the disgorgement calculation."  *Id.* (emphasis added).

The SEC has the better of this dispute; Appellants' argument is legally untenable.  Appellants do not cite nor could we uncover any caselaw stating that, in an offering of unregistered securities, only the funds raised from unaccredited investors (or investors not verified to be accredited) may be disgorged.  The exemption provisions require the *whole* offering—and not only *some* or even *most*

100

of the offering—to satisfy statutory conditions for an exemption.  *See* 17 C.F.R. § 230.506(a) ("Offers and sales of securities by an issuer that satisfy the conditions in paragraph (b) or (c) of this section shall be deemed to be transactions not involving any public offering within the meaning of section 4(a)(2) of the Act."); *id.* § 230.506(b)(1) ("To qualify for an exemption under this section, offers and sales must satisfy all the terms and conditions of [certain rules].").  We cannot discern any plausible legal basis for Appellants' argument to the contrary.

**2**

We finally turn to Appellants' last issue: their claim that the penalties the district court imposed were unlawful or, at least, should have been capped at $252,900.

Section 20(d)(1) of the Securities Act and Section 21(d)(3)(A) of the Exchange Act authorize the SEC to seek a penalty against violators of the securities laws.  Courts—including the district court here—typically consider the following factors when imposing penalties:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

101

*SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003), *aff'd sub nom. SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005).

Appellants challenge the penalty imposed, arguing that the district court "erred by failing to give adequate weight to [Mr.] Mahabub's financial insolvency when determining the amount of disgorgement and other, statutory, penalties to assess." Aplts.' Opening Br. at 51. Appellants state that Mr. Mahabub has only $4.94 in his sole bank account as of March 7, 2019, does not control other bank or brokerage accounts, has no real property, and is financially dependent on friends and family. On the other hand, the SEC responds that the district court "not only expressly considered" Mr. Mahabub's financial insolvency, "it [even] found that it was '[t]he major factor weighing against a penalty.'" Aplee.'s Resp. Br. at 56 (second alteration in original) (quoting *Mahabub*, 411 F. Supp. 3d at 1175). However, it was in light of the other relevant factors and the severity of Appellants' violations, says the SEC, that the district court found it appropriate to impose penalties.

In substance, the SEC's argument is cogent and wins the day. The district court expressly referenced and considered the seven factors that courts typically evaluate in determining whether to impose fines. And, importantly, the court explicitly noted that "[t]he major factor weighing against a penalty . . . would be [Mr.] Mahabub's claimed financial straits," and, despite its skepticism about the

102

accuracy of Mr. Mahabub's representations on this subject, it acknowledged it

"fe[lt] bound to view this matter in the light most favorable to [Mr.] Mahabub."

*Mahabub*, 411 F. Supp. 3d at 1175.  However, the court underscored that Mr.

"Mahabub's ability to pay is only one factor among many," and it found that

multiple factors tilted the penalty balance against Mr. Mahabub.  *Id.*  In this

regard, the court noted that Mr. Mahabub repeatedly lied about GenAudio's

negotiations, "yet [Mr.] Mahabub still does not concede that it was wrong for him

to do so."  *Id.*  Further, the court explained that Mr. Mahabub "entirely ignores

his dishonesty" when he "attempts to explain in his declaration that he did not

know there was anything unlawful" about selling unregistered shares.  *Id.*  And

finally, the district court stated that "the types of lies [Mr.] Mahabub was

telling—about Apple (a very wealthy corporation with a customer base whose

devotion at times borders on the religious) and its iconic CEO, Steve Jobs—were

significantly likely to cause investors to invest, and then lose, a substantial

amount of money."  *Id.*

It is patent to us that the district court thoughtfully and cogently considered

the relevant factors, and Appellants' contentions to the contrary are meritless.

Even if we were to assume that Appellants' contention is correct that "[i]nability

to pay is 'one of the most important factors' to be considered in the context of

assessing a penalty," Aplts.' Opening Br. at 52 (emphasis omitted) (quoting *SEC

v. Gunn*, No. 08-CV-1013-G, 2010 WL 3359465, at *10 & n.25 (N.D. Tex. Aug.

25, 2010) (unpublished)), there is no dispute that this factor should not be deemed categorically and uniformly the determinative one in the analysis, *see SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008) ("[N]othing in the securities laws expressly prohibits a court from imposing penalties . . . in excess of a violator's ability to pay. . . . [Defendant] cites no decisional law stating that the securities laws impliedly prohibit a district court from imposing penalties . . . in excess of a violator's ability to pay, and we have located none. At most, ability to pay is one factor to be considered in imposing a penalty." (citations and footnote omitted)).

Thus, even if we operated under the assumption that a defendant's ability to pay is one of the most important factors, this would not necessarily mean that the district court abused its discretion in imposing a penalty under the particular circumstances of this case. Indeed, the judicial decision that Appellants rely on itself determined that "a penalty of some kind [was] warranted" on the defendant, and it considered other factors beyond the defendant's impecuniousness in determining whether to impose a penalty and, if so, how much of one. *Gunn*, 2010 WL 3359465, at *11. Here, the district court determined—after thoughtful consideration of the relevant factors—that Mr. Mahabub's purported inability to pay should not tilt the decisional balance against the imposition of a penalty. We discern no abuse of discretion in the court's decision.

Appellants also argue that GenAudio's penalties should have been capped at $252,900. That is because "the most reasonable approximation of GenAudio's

gain from the Section 5 violation is $237,900," and GenAudio only "received $15,000 in stock sales from the 2010 and 2011 misrepresentations."  Aplts.' Opening Br. at 54–55.  Accordingly, Appellants contend that civil penalties should be capped at $252,900.  However, we conclude that this argument is meritless.  These two figures ($237,900 and $15,000) that Appellants identify as justifying a limitation on civil penalties—while not wholly irrelevant, insofar as they relate to the actual losses Appellants inflicted on others through their fraudulent conduct, *see, e.g.*, *Lybrand*, 281 F. Supp. 2d at 730—do not move the needle on the question of whether the district court abused its discretion.

The court was well within its discretion—after thoughtfully considering the relevant factors identified in the caselaw—in weighing heavily the repeated acts of mendacity of Mr. Mahabub and the *significant risk* that his lies would "cause investors to invest, and then lose, a substantial amount of money."  *Mahabub*, 411 F. Supp. 3d at 1175; *see also id.* at 1174 (enumerating for consideration whether, *inter alia*, "defendants' conduct created . . . the risk of substantial losses to other persons," involved "repeated . . . violations," and evinced "defendants' failure to admit to their wrongdoing").  Appellants point to no authority that would cause us to question this reasoning.  Accordingly, we reject Appellants' last argument regarding the court's imposition of civil penalties.

**III**

105

For the foregoing reasons, we reject all of Appellants' challenges and

**AFFIRM** the district court's judgment.